IN THE

# United States Court of Appeals
# for the Eighth Circuit

CLAUDIA RUSS ANDERSON,

*Petitioner-Appellant,*

v.

OFFICE OF THE COMPTROLLER OF THE CURRENCY,

*Respondent-Appellee.*

ON PETITION FOR REVIEW OF THE FINAL ORDER
OF THE COMPTROLLER OF THE CURRENCY
NO. AA-EC-2019-81

## REDACTED ADDENDUM OF
## PETITIONER CLAUDIA RUSS ANDERSON

KELLEY, WOLTER & SCOTT, P.A.
  Douglas A. Kelley
  Steven E. Wolter
  Brett D. Kelley
  Perry F. Sekus
  Garrett S. Stadler
11100 Wayzata Boulevard, Suite 510
Minnetonka, MN 55305
Tel: (612) 371-9090
Fax: (612) 371-0574

Ilan Wurman
UNIVERSITY OF MINNESOTA
LAW SCHOOL*

229 S. 19th Ave
Minneapolis, MN 55455
Tel: (612) 624-8816

*Affiliation included
for identification purposes only

*Attorneys for Petitioner*

# REDACTED ADDENDUM OF PETITIONER

Order Regarding Enforcement Counsel's Motions for Summary
Disposition, filed July 20, 2021 (A.R. 348)...............................................Add. 1-753

[Redacted] Report and Recommendation – Claudia Russ Anderson,
filed December 23, 2022 (A.R. 542) ................................................Add. 754-1,196

[Redacted] Final Decision of the Comptroller of the Currency in
the Matter of Claudia Russ Anderson and Accompanying Order,
filed January 14, 2025 (A.R 583) ..................................................Add. 1,197-1,351

12 USC § 1818 ........................................................................Add. 1,352-1,375

1

**UNITED STATES OF AMERICA**
**DEPARTMENT OF THE TREASURY**
**OFFICE OF THE COMPTROLLER OF THE CURRENCY**

In the Matter of

**Carrie Tolstedt, Former Head of the
Community Bank**

OCC AA-EC-2019-82

**Claudia Russ Anderson, Former
Community Bank Group Risk Officer**

OCC AA-EC-2019-81

**James Strother, Former General
Counsel**

OCC AA-EC-2019-70

**David Julian, Former Chief Auditor**

**Paul McLinko, Former Executive
Audit Director**

OCC AA-EC-2019-71

OCC AA-EC-2019-72

Wells Fargo Bank, N.A.
Sioux Falls, South Dakota

ALJ McNeil

## ORDER REGARDING ENFORCEMENT COUNSEL'S MOTIONS FOR SUMMARY DISPOSITION[1]

### Nature of the Case

On February 20, 2020, Wells Fargo Bank, N.A. ("WFB") and Wells Fargo & Company

("WFC") (collectively referred to hereinafter as "Wells Fargo" or "the Company") admitted as

---

[1] Although the parties have submitted documents that they aver should be maintained under seal and thus not available for public review, nothing in this Order constitutes non-public information or information that must remain under seal.

true a series of facts relating to its business practices as they existed between 2002 and September 2016.[2] The relevant period for purposes of this Order is January 1, 2010 through December 31, 2017.[3]

At all relevant times, WFC owned various subsidiaries through which it operated various lines of businesses, including the wholly owned subsidiary WFB.[4] WFB was a national bank and financial institution under 31 U.S.C. § 5312, and its customers' deposits were insured by the Federal Deposit Insurance Corporation.[5]

WFC provided retail, commercial, and corporate banking services through three operating segments for management reporting purposes: the Community Bank, Wholesale Banking, and Wealth and Investment Management.[6] WFC offered, through WFB and its other subsidiaries, a diverse array of financial services and products to both individuals and businesses.[7]

Wells Fargo's largest business unit was the Community Bank, which contributed more than half (and in some years more than two-thirds) of the Company's revenue from 2007 through 2016.[8] The Community Bank was responsible for managing many of the everyday banking products targeted to individuals and small businesses, including checking and savings accounts, certificates of deposit, debit cards, bill pay, and global remittance products.[9] The Community

---

[2] Enforcement Counsel's Motion for Summary Disposition (EC MSD) Ex. 1 (Deferred Prosecution Agreement) at Exhibit A (Statement of Facts),

[3] Approved Joint ESI Discovery Plan approved by the parties on March 12, 2020 and adopted by the Tribunal on March 15, 2020.

[4] EC MSD Ex. 1, Ex. A at ¶1.

[5] EC MSD Ex. 1, Ex. A at ¶2.

[6] EC MSD Ex. 1, Ex. A at ¶3.

[7] EC MSD Ex. 1, Ex. A at ¶3.

[8] EC MSD Ex. 1, Ex. A at ¶4.

[9] EC MSD Ex. 1, Ex. A at ¶4.

Bank also made referrals to other units in WFC regarding mortgages, lines of credit, credit cards, investment products (including brokerage products), insurance products, safe-deposit boxes and a variety of other banking products.[10] All of the accounts, products, and services referred to in this paragraph are hereinafter referred to collectively as "accounts and financial products."[11]

Product groups within the Community Bank designed and managed some of these accounts and financial products, and others were designed and managed by other parts of the Community Bank.[12] Accounts and financial products throughout Wells Fargo were offered to consumers within a large network of branches, referred to within Wells Fargo as "stores," as well as other channels. Employees and officers of the Community Bank referred to accounts and financial products as "solutions" to be "sold" to customers.[13]

The Community Bank managed the U.S. branches. The branches employed various types of employees, including tellers, who processed basic transactions and made referrals to bankers for account openings or complex transactions, and bankers, who were generally responsible for offering accounts and financial products to customers.[14] Branch managers reported to other managers, and all ultimately reported up to senior regional executives, called Regional Bank Executives ("RBEs").[15] The RBEs generally reported directly to the head of the Community Bank.[16]

---

[10] EC MSD Ex. 1, Ex. A at ¶4.

[11] EC MSD Ex. 1, Ex. A at ¶4.

[12] EC MSD Ex. 1, Ex. A at ¶4.

[13] EC MSD Ex. 1, Ex. A at ¶5.

[14] EC MSD Ex. 1, Ex. A at ¶5

[15] EC MSD Ex. 1, Ex. A at ¶5.

[16] EC MSD Ex. 1, Ex. A at ¶5.

Appellate Case: 25-1079     Page: 5     Date Filed: 05/16/2025 Entry ID: 5517644

### The Cross-Sell Model

Beginning in 1998, Wells Fargo increased its focus on sales volume and reliance on year-over-year sales growth. A core part of this sales model was the "cross-sell strategy."[17] As described externally, the cross-sell strategy called for Wells Fargo to meet all of its customers' financial needs by focusing on selling to its existing customers additional financial products that those customers wanted, needed, and would use.[18] Wells Fargo represented to investors that its ability to execute successfully on its cross-selling strategy provided the Company with competitive advantage, caused an increase in revenue, and allowed it to better serve its customers.[19]

Wells Fargo characterized its cross-selling strategy to investors as a key component of its financial success and routinely discussed its efforts to achieve cross-sell growth. Wells Fargo described cross-selling as its "primary strategy" to achieve its "vision . . . to increase the number of our products our customers utilize and to offer them all of the financial products that fulfill their needs."[20] Wells Fargo stated that cross-selling was the "cornerstone of [its] business model and key to [its] ability to grow revenue and earnings."[21] It was "the foundation of our business model."[22]

Wells Fargo publicly stated on numerous occasions that its sales strategy was "needs-based."[23] In other words, Wells Fargo claimed that its strategy was to sell customers the accounts

---

[17] EC MSD Ex. 1, Ex. A at ¶7.

[18] EC MSD Ex. 1, Ex. A at ¶7.

[19] EC MSD Ex. 1, Ex. A at ¶7.

[20] EC MSD Ex. 1, Ex. A at ¶8

[21] EC MSD Ex. 1, Ex. A at ¶8

[22] EC MSD Ex. 1, Ex. A at ¶8

[23] EC MSD Ex. 1, Ex. A at ¶9.

Appellate Case: 25-1079     Page: 6     Date Filed: 05/16/2025 Entry ID: 5517644

that they needed.[24] In its 2012 Vision and Values statement Wells Fargo stated: "We do not view any product in isolation, but as part of a full and long-lasting relationship with a customer and with that customer's total financial needs. We start with what the customer needs—not with what we want to sell them."[25] Its subsequent Vision and Values statement, published in 2015, contained similar language. In its 2015 Annual Report, Wells Fargo stated that "[o]ur approach to cross-sell is needs-based as some customers will benefit from more products, and some may need fewer."[26] The Company's 2012 through 2016 Annual Reports explicitly referred to these Vision & Values statements.[27]

## The Cross-Sell Metric

From at least 2000 until the third quarter of 2016, Wells Fargo published a Community Bank "cross-sell metric" in its Annual Reports and SEC Forms 10-Q, 10-K, and 8-K that purported to be the ratio of the number of accounts and products per retail bank household.[28] During investor presentations and analyst conferences, Well Fargo referred to the Community Bank's cross-sell metric, which continued to increase over time until it flattened in Q2 2014 and then decreased in Q3 2014, as proof of its success at executing on this core business strategy.[29] Wells Fargo touted to investors the consistent growth of the cross-sell metric over time as demonstrative of its success at executing on its cross-selling strategy.[30]

---

[24] EC MSD Ex. 1, Ex. A at ⁋9.

[25] EC MSD Ex. 1, Ex. A at ⁋9.

[26] EC MSD Ex. 1, Ex. A at ⁋9.

[27] EC MSD Ex. 1, Ex. A at ⁋9.

[28] EC MSD Ex. 1, Ex. A at ⁋11.

[29] EC MSD Ex. 1, Ex. A at ⁋11.

[30] EC MSD Ex. 1, Ex. A at ⁋12.

Appellate Case: 25-1079    Page: 7    Date Filed: 05/16/2025 Entry ID: 5517644

Because of the centrality of the cross-sell metric to Wells Fargo's investor narrative, Company executives were focused on maintaining cross-sell growth from at least 2007 through 2016.[31] The compensation of certain Company executives was impacted by cross-sell growth.[32]

## Contents

Nature of the Case ........................................................................................................ 1

The Cross-Sell Model ................................................................................................... 4

The Cross-Sell Metric .................................................................................................. 5

Implementation of Cross-Sell at the Community Bank ............................................. 10

Unlawful and Unethical Misconduct by the Community Bank to Generate Sales ..................... 11

Community Bank Senior Leadership Knew the Unlawful and Unethical Misconduct was Widespread and that Sales Goals and Pressure Were the Root Cause ............................... 14

Community Bank Senior Leadership Exacerbated the Sales Practices Problem and Concealed Material Facts ........................................................................................... 16

Scope of the Unlawful and Unethical Misconduct ................................................... 17

Impact of Sales Practices Misconduct on Cross-Sell Disclosures ............................ 18

Bank Examiner Analyses .......................................................................................... 21

Incentive Compensation Program in the Community Bank Failed to Balance Risk and Reward ........................................................................................................... 33

Respondents Russ Anderson and Julian failed to Perform their Responsibilities Under the ICRM ..................................................................................................... 45

The Community Bank's Controls were Inadequate ................................................... 49

The Evolution of Controls ......................................................................................... 52

Pause on Proactive Monitoring ................................................................................. 55

Controls Following the Pause .................................................................................... 56

The Bank's Controls to Prevent and Detect Sales Practices Misconduct were Inadequate ........ 61

The Bank's Controls Were Intentionally Inadequate ................................................ 70

Magnitude of Sales Practices Misconduct ................................................................ 72

---

[31] EC MSD Ex. 1, Ex. A at ¶12.

[32] EC MSD Ex. 1, Ex. A at ¶12.

Appellate Case: 25-1079     Page: 8     Date Filed: 05/16/2025 Entry ID: 5517644

Respondent Russ Anderson Failed to Perform her Responsibilities as the Group Risk Officer 76

Background on Bank Supervision Generally..................................................... 76

Respondent Russ Anderson's Responsibilities as the Group Risk Officer................................. 78

Respondent Russ Anderson's Conduct with Respect to the Sales Practices Misconduct
    Problem .................................................................... 80

Respondents Julian and McLinko Failed to Perform their Auditing Responsibilities with
    Respect to the Sales Practices Misconduct Problem............................................ 97

Respondents Julian and McLinko Were Aware of the Sales Practices Problem ..................... 100

February 9, 2015 Meeting with Respondents Russ Anderson and Audit and Audit's Lack of
    Independence ................................................................. 113

Respondents Julian and McLinko Awarded the Community Bank the Highest Possible Audit
    Ratings ..................................................................... 118

Each Respondent Received Personal Gain or Other Benefit from Their Misconduct............. 126

Respondents' Misconduct Caused Enormous Financial Losses and Immense Reputational
    Damage to the Bank as Well as Significant Harm to its Customers and Employees ...... 128

The Importance of the Community Bank to WFC......................................... 130

Assessment of Civil Money Penalties.................................................... 135

Enforcement Counsel's Motions for Summary Disposition ................................ 139

Respondent Russ Anderson's Brief in Opposition ....................................... 143

Respondent Julian's Brief in Opposition ................................................ 147

Respondent Paul McLinko's Brief in Opposition......................................... 151

Respondents' Claims Regarding the OCC's Jurisdiction ................................... 154

Respondent Julian's Objection Based on Reliability....................................... 155

Respondent Julian's Objection Based on Material Relevance ............................... 157

Respondent Julian's Objections Based on the Application of *Daubert*...................... 158

Respondent Julian's Objections Based on Exhibits that Pre-Date 2010...................... 159

Each Respondents' Burden in Opposition ............................................... 159

Implications of the Establishment of Uncontroverted Facts................................ 160

Terminology.......................................................................... 165

Respondent Russ Anderson's Responsibilities as the Group Risk Officer.................... 177

The Community Bank had a systemic sales practices misconduct problem from at least 2002
    until October 2016 ........................................................... 188

Appellate Case: 25-1079     Page: 9     Date Filed: 05/16/2025 Entry ID: 5517644

Respondents Julian and McLinko have acknowledged that the Community Bank had a systemic sales practices misconduct problem and that its root cause was undue pressure to meet unreasonable sales goals ................................................................... 198

Authoritative sources within the Bank testified that the Community Bank had a systemic sales practices misconduct problem rooted in its business model ........................................... 207

All independent reviews and assessments of the Bank's sales practices misconduct problem and the Bank itself concluded that the problem was rooted in the Community Bank's strategy and culture ................................................................... 220

The Community Bank's sales goals were unreasonable ........................................................... 225

The Community Bank imposed unreasonable sales goals on its employees until October 2016, including when Respondent Julian served as Chief Auditor of the Bank and Respondent McLinko served as Executive Audit Director of the Community Bank ......................... 225

The Community Bank's sales goals remained unreasonable during Respondent Russ Anderson's tenure as the Group Risk Officer ................................................................... 227

Respondent Russ Anderson approved incentive compensation plans based on unreasonable sales goals ................................................................... 247

Throughout Respondent Russ Anderson's tenure as the Group Risk Officer, the Community Bank imposed significant pressure on its employees to meet its unreasonable goals ..... 254

The significant pressure to meet unreasonable sales goals led Bank employees to engage in sales practices misconduct ................................................................... 276

Respondent Russ Anderson was responsible for ensuring controls to prevent and detect sales practices misconduct were effective ................................................................... 294

Respondent Russ Anderson failed to institute adequate controls to prevent sales practices misconduct ................................................................... 296

The Bank's Controls to detect sales practices misconduct were inadequate ........................... 310

Respondent Russ Anderson failed to institute adequate controls to detect sales practices misconduct ................................................................... 310

EthicsLine ................................................................... 314

Customer Complaints ................................................................... 320

Proactive Monitoring ................................................................... 326

The Community Bank's sales practices misconduct problem was pervasive and widespread . 356

Respondents Julian and McLinko had responsibilities to assess and assure the Bank had effective controls and risk management over sales practices while the systemic sales practices misconduct problem persisted within the Community Bank ........................... 387

Responsibilities of the Audit Department and executives generally ........................................ 387

Respondent Julian had responsibilities as the Chief Auditor for the Bank from 2012 to 2016, while the systemic sales practices misconduct problem persisted in the Community Bank ........................................................................................................ 394

Respondent McLinko had responsibilities as the Executive Audit Director for the Community Bank from 2011 to 2016, while the systemic sales practices misconduct problem persisted in the Community Bank ......................................................... 401

Respondents Julian and McLinko received extensive information regarding sales practices misconduct at the Community Bank ......................................................... 407

Respondent Julian and Respondent McLinko failed to identify and escalate the systemic sales practices misconduct problem and the significant sales practices risk management and internal controls weaknesses; and Respondent Julian's and Audit's reporting to the Board on sales practices was misleading ........................................................ 501

Respondents Julian and McLinko received financial gain or other benefit from their misconduct ................................................................................................................. 578

Respondent Julian's and Respondent McLinko's conduct with respect to sales practices misconduct resulted in loss to the Bank ................................................................ 582

Sales practices misconduct constituted unethical and illegal activity that violated Bank policy ........................................................................................................................ 585

Throughout her Group Risk Officer tenure, Respondent Russ Anderson received extensive information about ongoing sales practices misconduct in the Community Bank ............ 603

For years, customers complained about being victimized from sales practices misconduct .... 626

Employees repeatedly informed senior leadership about significant pressure to meet unreasonable sales goals and its impact on gaming and sales practices misconduct ....... 629

Respondent Russ Anderson downplayed the sales practices misconduct problem and failed to escalate and accurately report the root cause, scope, and duration of the problem to senior management and the Enterprise Risk Management Committee ......................... 633

Respondent Russ Anderson provided false, misleading, and incomplete reporting on sales practices misconduct to the Risk Committee of the Board and the OCC ........................ 651

Respondent Russ Anderson lied repeatedly to OCC Examiners, provided false, misleading, and incomplete information during OCC examinations, failed to supply information to the OCC known to her, and obstructed OCC Examinations ........................................... 679

Respondent Russ Anderson continued to obscure the sales practices misconduct problem following supervisory criticism ....................................................................... 701

The sales practices misconduct problem was resolved only after intense Congressional and public scrutiny ......................................................................................................... 707

Respondent Russ Anderson's conduct with respect to systemic sales practices misconduct

Appellate Case: 25-1079    Page: 11    Date Filed: 05/16/2025 Entry ID: 5517644

resulted in loss to the Bank ................................................................................ 715

Sales practices misconduct, which persisted at the Bank due to Respondent Russ Anderson's misconduct, harmed customers and breached their trust .................................. 718

The Bank has paid billions of dollars in civil and criminal fines and incurred significant other losses as a result of the sales practices misconduct problem ........................... 727

The Bank's reputation has suffered immense damage as a result of the sales practices misconduct problem and Respondent Russ Anderson's conduct and the Bank has spent hundreds of millions of dollars trying to repair it ............................................... 735

Sales Practices Misconduct, which persisted at the Bank due To respondentJulian's and Respondent McLinko's conduct, harmed its customers and breached their trust ........... 740

Respondent Russ Anderson received financial gain or other benefit from her misconduct ..... 742

Statements Offering Additional Material Facts ................................................... 747

Order on Enforcement Counsel's Motions ......................................................... 749

Pursuant to 12 C.F.R. § 19.30, upon determining that Enforcement Counsel is entitled to summary disposition as to certain of the claims presented in their two motions seeking summary disposition, this Order denies Enforcement Counsel's Motions for Summary Disposition, enters the above determinations, and sets for hearing all of those claims not determined through these Motions ........................................................ 749

Supplemental Pre-Hearing Order ................................................................. 749

CERTIFICATE OF SERVICE ...................................................................... 750

## Implementation of Cross-Sell at the Community Bank

From at least as early as 2002 to approximately 2013, Community Bank leadership directly or indirectly encouraged, caused, and approved sales plans that called for aggressive annual growth in a number of basic banking products, such as checking and savings accounts, debit cards, credit cards, and bill pay accounts.[33]

By approximately 2010, in light of existing product penetration, shifting demand, macroeconomic conditions, and regulatory developments that made certain products—such as

---

[33] EC MSD Ex. 1, Ex. A at ¶13.

Add. 10

Appellate Case: 25-1079     Page: 12     Date Filed: 05/16/2025 Entry ID: 5517644

checking accounts—less profitable, the sales plans were regarded in various parts of the Community Bank as far too high to be met by selling products that customers actually wanted, needed, or would use.[34] Nevertheless, the number of products sold continued to be a significant criterion by which the performance of employees, ranging from tellers and bankers to RBEs, was evaluated.[35]

Throughout the Community Bank, managers responded to the increasing difficulty of growing sales by exerting extreme pressure on subordinates to achieve sales goals, including explicitly directing and/or implicitly encouraging employees to engage in various forms of unlawful and unethical conduct to meet increasing sales goals.[36] Many employees believed that a failure to meet their sales goal would result in poor job evaluations, disciplinary action, or termination.[37] Though there had been evidence of employees struggling to ethically meet sales goals as early as 2002, the problem became significantly more acute beginning in 2010 as the sales plans diverged further from market opportunity and managers responded by increasing pressure on employees to sell products that customers did not want or need and would not use.[38]

**Unlawful and Unethical Misconduct by the Community Bank to Generate Sales**

The Community Bank's onerous sales goals and accompanying management pressure led thousands of its employees to engage in: (1) unlawful conduct to attain sales through fraud, identity theft, and the falsification of bank records, and (2) unethical practices to sell products of

---

[34] EC MSD Ex. 1, Ex. A at ¶14.

[35] EC MSD Ex. 1, Ex. A at ¶14.

[36] EC MSD Ex. 1, Ex. A at ¶14.

[37] EC MSD Ex. 1, Ex. A at ¶14.

[38] EC MSD Ex. 1, Ex. A at ¶14.

no or low value to the customer, while believing that the customer did not actually need the account and was not going to use the account.[39]

Collectively, many of these practices were referred to within Wells Fargo as "gaming."[40] "Gaming" was a term generally known at the Company and referred to employees' manipulation and/or misrepresentation of sales to meet sales goals, receive incentive compensation or avoid negative consequences, such as reprimands or termination.[41] Gaming strategies varied widely, and included using existing customers' identities—without the customers' consent—to open checking and savings, debit card, credit card, bill pay, and global remittance accounts.[42] Many widespread forms of gaming constituted violations of federal criminal law.[43] The following are examples of gaming practices engaged in by Wells Fargo employees during the period from 2002 to 2016:

a. Employees created false records and forged customers' signatures on account opening documents to open accounts that were not authorized by customers.[44]

b. After opening debit cards using customers' personal information without consent, employees falsely created a personal identification number ("PIN") to activate the unauthorized debit card. Employees often did so because the Community Bank rewarded them for opening online banking profiles, which required a debit card PIN to be activated.[45]

---

[39] EC MSD Ex. 1, Ex. A at ¶15.

[40] EC MSD Ex. 1, Ex. A at ¶16.

[41] EC MSD Ex. 1, Ex. A at ¶16.

[42] EC MSD Ex. 1, Ex. A at ¶16.

[43] EC MSD Ex. 1, Ex. A at ¶16.

[44] EC MSD Ex. 1, Ex. A at ¶16.

[45] EC MSD Ex. 1, Ex. A at ¶16.

Appellate Case: 25-1079      Page: 14      Date Filed: 05/16/2025 Entry ID: 5517644

c. In a practice known as "simulated funding," employees created false records by opening unauthorized checking and savings accounts to hit sales goals. They then transferred funds to the unauthorized account to meet the funding criteria required to receive credit for "selling" the new account.[46] To achieve this "simulated funding," employees often moved funds from existing accounts of the customers without their consent.[47] Millions of accounts reflected transfers of funds between two accounts that were equal in amount to the product-specific minimum amount for opening the later account and that thereafter had no further activity on the later account; many of these accounts were subject to simulated funding.[48] In many other instances, employees used their own funds or other methods to simulate actual funding of accounts that they had opened without customer consent.[49]

d. Employees opened unauthorized consumer and business credit card accounts without customer authorization by submitting applications for credit cards in customers' names using customers' personal information.[50]

e. Employees opened bill pay products without customer authorization; employees also encouraged customers to make test or "token" payments from their billpay accounts to obtain employee sales credit (which was only awarded for bill pay accounts that had made a payment).[51]

---

[46] EC MSD Ex. 1, Ex. A at ¶16.

[47] EC MSD Ex. 1, Ex. A at ¶16.

[48] EC MSD Ex. 1, Ex. A at ¶16.

[49] EC MSD Ex. 1, Ex. A at ¶16.

[50] EC MSD Ex. 1, Ex. A at ¶16.

[51] EC MSD Ex. 1, Ex. A at ¶16.

Add. 13

Appellate Case: 25-1079     Page: 15     Date Filed: 05/16/2025 Entry ID: 5517644

f. Employees at times altered the customer phone numbers, email addresses, or physical addresses on account opening documents.[52] In some instances, employees did so to prevent the customers from finding out about unauthorized accounts, including to prevent customers from being contacted by the Company in customer satisfaction surveys.[53] Millions of non-Wells Fargo-employee customer accounts reflected a Wells Fargo email address as the customer's email address, contained a generic and incorrect customer phone number, or were linked to a Wells Fargo branch or Wells Fargo employee's home address.[54]

Employees also intentionally persuaded customers to open accounts and financial products that the customers authorized but which the employees knew the customers did not actually want, need, or intend to use.[55] There were many ways in which employees convinced customers to open these unnecessary accounts, including by opening accounts for friends and family members who did not want them and by encouraging customers to open unnecessary, duplicate checking or savings accounts or credit or debit cards.[56] Millions of secondary accounts and products were opened from 2002 to 2016, and many of these were never used by customers.[57] Gaming conduct and the practice of pushing unnecessary accounts on customers began in at least 2002 and became widespread over time, lasting through 2016, when the Community Bank eliminated product sales goals for its employees. [58]

**Community Bank Senior Leadership Knew the Unlawful and Unethical Misconduct was Widespread and that Sales Goals and Pressure Were the Root Cause**

---

[52] EC MSD Ex. 1, Ex. A at ₱16.

[53] EC MSD Ex. 1, Ex. A at ₱16.

[54] EC MSD Ex. 1, Ex. A at ₱16.

[55] EC MSD Ex. 1, Ex. A at ₱17.

[56] EC MSD Ex. 1, Ex. A at ₱17.

[57] EC MSD Ex. 1, Ex. A at ₱17.

[58] EC MSD Ex. 1, Ex. A at ₱18.

Beginning as early as 2002, when a group of employees was fired from a branch in Fort Collins, Colorado, for sales gaming, Community Bank senior leadership became aware that employees were engaged in unlawful and unethical sales practices, that gaming conduct was increasing over time, and that these practices were the result of onerous sales goals and management pressure to meet those sales goals.[59]

That information was reported to Community Bank senior leadership by multiple channels.[60] Those channels included Wells Fargo's internal investigations unit, the Community Bank's own internal sales quality oversight unit, and managers leading the Community Bank's geographic regions, as well as regular complaints by lower-level employees and Wells Fargo customers reporting serious sales practices violations.[61]

For example, in 2005 a corporate investigations manager described the problem as "spiraling out of control."[62] This reporting continued through 2016, and generally emphasized increases in various forms of sales practices misconduct.[63] By 2012, certain of the RBEs and their direct reports, Regional Presidents, were regularly raising objections about the sales plans.[64] These objections included objections regarding the levels at which the plans were set, the types and categories of products for which they incented sales, the accompanying pressure, the resulting no- or low-value accounts, and unlawful and unethical sales practices at the Community Bank.[65] These complaints specifically articulated that the sales goals were too high and incented Community Bank employees to sell a significant number of low-quality or valueless duplicate

---

[59] EC MSD Ex. 1, Ex. A at ¶19.

[60] EC MSD Ex. 1, Ex. A at ¶20.

[61] EC MSD Ex. 1, Ex. A at ¶20.

[62] EC MSD Ex. 1, Ex. A at ¶20.

[63] EC MSD Ex. 1, Ex. A at ¶20.

[64] EC MSD Ex. 1, Ex. A at ¶21.

[65] EC MSD Ex. 1, Ex. A at ¶21.

products, sometimes through misconduct.[66] Similar complaints continued to be made until 2016.[67]

In November 2013, a member of the senior staff wrote, "I really question the value of adding growth to secondary checking in regions that have very high rates to begin with. Based on what we know about the quality of those accounts it seems like we would want to keep their secondary DDA flat or down . . . ."[68] A year earlier, another senior staff member suggested eliminating any incentive payments tied to accounts that never funded, debit cards that were never used, and more than one demand deposit account per customer per day.[69]

**Community Bank Senior Leadership Exacerbated the Sales Practices Problem and Concealed Material Facts**

Even though Community Bank employees often did not meet the sales goals—or met them by selling products and accounts customers neither wanted nor needed—Community Bank senior leadership increased the sales plans nearly every year through 2013.[70] Pressure to meet those ever-increasing plans also increased during this time period.[71] Even after 2012, when Wells Fargo began regularly retroactively lowering goals during the sales year in recognition that the goals were unachievable, employees still largely missed the lowered goals, an indication that they continued to be too high.[72] Despite knowledge of the widespread sales practices problems, including the pervasive illegal and unethical conduct tied to the sales goals, Community Bank

---

[66] EC MSD Ex. 1, Ex. A at ₱21.

[67] EC MSD Ex. 1, Ex. A at ₱21.

[68] EC MSD Ex. 1, Ex. A at ₱22.

[69] EC MSD Ex. 1, Ex. A at ₱22.

[70] EC MSD Ex. 1, Ex. A at ₱24.

[71] EC MSD Ex. 1, Ex. A at ₱24.

[72] EC MSD Ex. 1, Ex. A at ₱24.

Appellate Case: 25-1079     Page: 18     Date Filed: 05/16/2025 Entry ID: 5517644

senior leadership failed to take sufficient action to prevent and reduce the incidence of unlawful and unethical sales practices.[73]

Certain Community Bank leaders also impeded scrutiny of sales practices by Wells Fargo's primary regulator, the Office of the Comptroller of Currency ("OCC").[74] During OCC examinations in February and May 2015, the OCC was given information that minimized the amount of sales pressure within the Community Bank and the size and scope of Wells Fargo's sales practices problem.[75]

On numerous occasions, Community Bank senior leadership also made statements and gave assurances to the Company's management and Board of Directors that minimized the scope of the sales practices problem and led key gatekeepers to believe the root cause of the issue was individual misconduct rather than the sales model itself.[76] Until approximately 2015, Community Bank senior leadership viewed negative sales quality and integrity as a necessary byproduct of the increased sales and as merely the cost of doing business.[77] They nonetheless failed to advise key gatekeepers of the significant risks that the nonneeds-based selling posed to the Company.[78]

**Scope of the Unlawful and Unethical Misconduct**

Between 2011 and 2016, tens of thousands of employees were the subject of allegations of unethical sales practices.[79] During this period, the Company referred more than 23,000 employees for sales practices investigation and terminated over 5,300 employees for customer-

---

[73] EC MSD Ex. 1, Ex. A at ⁋25.

[74] EC MSD Ex. 1, Ex. A at ⁋27.

[75] EC MSD Ex. 1, Ex. A at ⁋27.

[76] EC MSD Ex. 1, Ex. A at ⁋28.

[77] EC MSD Ex. 1, Ex. A at ⁋28.

[78] EC MSD Ex. 1, Ex. A at ⁋28.

[79] EC MSD Ex. 1, Ex. A at ⁋30.

Appellate Case: 25-1079    Page: 19    Date Filed: 05/16/2025 Entry ID: 5517644

facing sales ethics violations, including, in many cases, for falsifying bank records.[80] Thousands of additional employees received disciplinary action short of termination or resigned prior to the conclusion of the Company's investigations into their sales practices.[81]

Almost all of the terminations and resignations were of Community Bank employees at the branch level, rather than managers outside of the branches or senior leadership within the Community Bank.[82] From 2002 to 2016, Wells Fargo opened millions of accounts or financial products that were unauthorized or fraudulent.[83] During that same time period, Wells Fargo employees also opened significant numbers of additional unneeded, unwanted, or otherwise low value products that were not consistent with Wells Fargo's purported needs-based selling model.[84]

Wells Fargo collected millions of dollars in fees and interest to which the Company was not entitled, harmed the credit ratings of certain customers, and unlawfully misused customers' sensitive personal information (including customers' means of identification).[85] In general, the unauthorized, fraudulent, unneeded, and unwanted accounts were created as a result of the Community Bank's systemic sales pressure and excessive sales goals.[86]

**Impact of Sales Practices Misconduct on Cross-Sell Disclosures**

Accounts and financial products opened without customer consent or pursuant to gaming practices were included by the Company in the Community Bank cross-sell metric until such

---

[80] EC MSD Ex. 1, Ex. A at ¶30.

[81] EC MSD Ex. 1, Ex. A at ¶30.

[82] EC MSD Ex. 1, Ex. A at ¶31.

[83] EC MSD Ex. 1, Ex. A at ¶32.

[84] EC MSD Ex. 1, Ex. A at ¶32.

[85] EC MSD Ex. 1, Ex. A at ¶32.

[86] EC MSD Ex. 1, Ex. A at ¶32.

accounts were eventually closed for lack of use.[87] When Community Bank senior leadership set employee sales goals at a level to achieve year-over-year sales growth, it rarely took into consideration that the base level of sales included accounts or financial products resulting from unlawful misconduct or gaming.[88] This had the effect of imposing additional pressure on employees to continue gaming practices.[89]

Like the accounts and financial products lacking customer consent, accounts and financial products that were never or seldom used by customers were also included by the Company in the Community Bank cross-sell metric until such accounts were eventually closed for lack of use, at which time those accounts were removed from the cross-sell metric.[90] In some cases (like checking or savings accounts), the unused accounts were closed relatively quickly (usually within 90 days if unfunded), but in other cases (like debit cards, the largest product category included in the cross-sell metric, or bill pay, another large contributor to cross-sell), the unused accounts remained open without activity for up to four years.[91]

From 2012 to 2016, Wells Fargo failed to disclose to investors that the Community Bank's sales model had caused widespread unlawful and unethical sales practices misconduct that was at odds with its investor disclosures regarding needs-based selling and that the publicly reported cross-sell metric included significant numbers of unused or unauthorized accounts.[92] Certain Community Bank senior executives who reviewed or approved the disclosures knew, or were reckless in not knowing, that these disclosures were misleading or incomplete.[93] At the end

---

[87] EC MSD Ex. 1, Ex. A at ¶33.

[88] EC MSD Ex. 1, Ex. A at ¶33.

[89] EC MSD Ex. 1, Ex. A at ¶33.

[90] EC MSD Ex. 1, Ex. A at ¶34.

[91] EC MSD Ex. 1, Ex. A at ¶34.

[92] EC MSD Ex. 1, Ex. A at ¶35.

[93] EC MSD Ex. 1, Ex. A at ¶35.

of 2012, the Community Bank decided to add existing global remittance accounts to the calculation of the cross-sell metric over the course of 2013.[94] It did so by excluding inactive global remittance accounts, in a manner inconsistent with prior practice.[95] It was never disclosed to investors that the product was added to the metric.[96]

By the end of 2013, the cross-sell metric had grown by .11 since the prior year.[97] However, .04 of that growth resulted from the addition of global remittance, and the remaining growth was attributable to an increase in accounts and financial products that had been inactive for at least 365 days.[98] Nonetheless, WFC's FY 2013 Form 10-K, filed February 2014, touted that the Community Bank had achieved record cross-sell over the prior year.[99]

Nonetheless, despite the addition of a new product, by late 2013 and early 2014, quarter-over-quarter growth in the cross-sell metric had flattened, significantly because of a slowdown in sales growth as a result of, among other things, the Community Bank's belated efforts to impose increased controls to curb misconduct resulting from aggressive sales goals.[100]

Community Bank executives knew that the metric included many products that were not used by customers. Wells Fargo's inclusion of the word "used" to describe the accounts was therefore misleading.[101] Several months after changing its disclosure that described how the cross-sell metric was calculated to characterize the metric as "products used," Community Bank

---

[94] EC MSD Ex. 1, Ex. A at ⁋36.

[95] EC MSD Ex. 1, Ex. A at ⁋36.

[96] EC MSD Ex. 1, Ex. A at ⁋36.

[97] EC MSD Ex. 1, Ex. A at ⁋36.

[98] EC MSD Ex. 1, Ex. A at ⁋36.

[99] EC MSD Ex. 1, Ex. A at ⁋36.

[100] EC MSD Ex. 1, Ex. A at ⁋37.

[101] EC MSD Ex. 1, Ex. A at ⁋40.

Appellate Case: 25-1079    Page: 22    Date Filed: 05/16/2025 Entry ID: 5517644

senior leadership began to develop an alternative metric to capture products that had been used.[102] The Community Bank referred to this metric internally as "active cross-sell."[103] In developing the active cross-sell metric, Community Bank senior leadership recognized that as many as ten percent of accounts included in the cross-sell metric had not been used within the previous 12 months.[104] The Community Bank considered releasing this alternative metric to investors, but never did so, in part because of concerns raised that its release would cause investors to ask questions about Wells Fargo's historical sales practices.[105]

Following the Company's announcement of the September 2016 settlements with the OCC, the Consumer Financial Protection Bureau, and the City of Los Angeles that confirmed publicly for the first time the scale of the sales practices misconduct within the Community Bank, as well as the widespread media and political criticism of the Company that resulted, Wells Fargo's stock experienced three significant stock drops that translated into an approximately $7.8 billion decrease in market capitalization.[106]

**Bank Examiner Analyses**

Pursuant to the OCC's Uniform Rules of Practice and Procedure, if the contents of a report of examination or reports of supervisory activity or visitation contain relevant, material, and reliable evidence that is not unduly repetitive, the evidence is admissible to the fullest extent authorized by the Administrative Procedure Act and other applicable law.[107]

---

[102] EC MSD Ex. 1, Ex. A at ¶41.

[103] EC MSD Ex. 1, Ex. A at ¶41.

[104] EC MSD Ex. 1, Ex. A at ¶41.

[105] EC MSD Ex. 1, Ex. A at ¶41

[106] EC MSD Ex. 1, Ex. A at ¶42.

[107] 12 C.F.R. § 19.36.

National Bank Examiner for the OCC Elizabeth Candy became the Corporate Risk Team Lead on the OCC's Wells Fargo supervision team in March 2018 and continues to serve in this role.[108] As the Corporate Risk Team Lead, she was and is responsible for planning, coordinating, and monitoring supervisory activities, and leading examinations and reviews of the Bank.[109] She drafts and reviews reports of examinations, Supervisory Letters, and Conclusion Memos and oversees the preparation of such documents by other team members.[110] She also drafts and reviews progress reports for Enforcement Actions and Matters Requiring Attention (MRAs).[111]

Her job involves assessing the adequacy of those Bank functions and establishing the OCC's supervision strategy for those areas.[112] She is also responsible for evaluating the adequacy of and safety and soundness of risk management and corporate governance functions, including the role of the Bank's Board of Directors ("Board"), management committee structure, and policies and procedures.[113] She also identifies and evaluates systemic risks and trends, analyze data and reporting, and participates in discussions with bank management throughout the OCC's supervisory activities.[114]

She assumed responsibility as the Acting Enterprise Risk Management Team Lead on August 16, 2020. In this role, she assesses the adequacy of Bank management and the Board.[115] Her responsibilities include evaluating the following areas of the Bank: enterprise risk

---

[108] EC MSD Ex. 269 (Report of NBE Candy) at ¶10.

[109] EC MSD Ex. 269 (Report of NBE Candy) at ¶10.

[110] EC MSD Ex. 269 (Report of NBE Candy) at ¶11.

[111] EC MSD Ex. 269 (Report of NBE Candy) at ¶10.

[112] EC MSD Ex. 269 (Report of NBE Candy) at ¶10.

[113] EC MSD Ex. 269 (Report of NBE Candy) at ¶10.

[114] EC MSD Ex. 269 (Report of NBE Candy) at ¶10.

[115] EC MSD Ex. 269 (Report of NBE Candy) at ¶11.

Appellate Case: 25-1079   Page: 24   Date Filed: 05/16/2025 Entry ID: 5517644

management, audit, internal controls, incentive compensation, legal, and human resources.[116] She oversees an examination team in Large Bank Supervision focused on various risk areas and serves as an advisor to the Examiner-in-Charge and other OCC officials.[117] She provides analysis and advice on the planning and conduct of examinations and reviews, preparation of reports of examination and Supervisory Letters, and presentations of findings and recommendations to senior management at the Bank and the OCC.[118] She meets with and communicates regularly with senior Bank management, OCC staff, and other Bank regulators to discuss supervisory conclusions, share information, and resolve concerns.[119]

Examiner Candy has twelve years of professional examiner experience at the OCC, including extensive experience in the supervision of community, midsize, and large banks, problem banks, application of safety and soundness principles to bank operations, corporate governance, risk management, and controls.[120] She joined the OCC in 2008, was an examiner in Midsize and Community Bank Supervision with the OCC for six years, from June 2008 through April 2014, before transferring to the OCC's Large Bank Supervision.[121] During her tenure there, she participated in over 100 midsize and community bank examinations, as well as examinations of large banks, including Wells Fargo. In her positions with Midsize and Community Bank Supervision at the OCC, she served as both Acting Examiner-in-Charge and Examiner-in-Charge for multiple problem banks with significant control, compliance, Bank and Secrecy Act ("BSA"), asset quality, and management deficiencies. These were banks with a composite rating

---

[116] EC MSD Ex. 269 (Report of NBE Candy) at ¶11.

[117] EC MSD Ex. 269 (Report of NBE Candy) at ¶11.

[118] EC MSD Ex. 269 (Report of NBE Candy) at ¶11.

[119] EC MSD Ex. 269 (Report of NBE Candy) at ¶11.

[120] EC MSD Ex. 269 (Report of NBE Candy) at ¶3.

[121] EC MSD Ex. 269 (Report of NBE Candy) at ¶3.

Add. 23

Appellate Case: 25-1079     Page: 25     Date Filed: 05/16/2025 Entry ID: 5517644

of "3" or worse under the Uniform Financial Institutions Rating System of the Federal Financial Institutions Examination Council.[122]

Examiner Candy reported that she holds the following opinions as a National Bank Examiner.[123]

From no later than 2002 until October 2016, the Community Bank pursued a business model premised on unreasonable sales goals coupled with extreme pressure on its employees to meet these goals.[124] Leadership focused on increasing the cross-sell ratio year over year at all cost, instead of ensuring that Wells Fargo customers received only the products they wanted, needed, and requested.[125] The pressure included the threat of disciplinary action and termination as well as actual termination for failure to meet the unreasonable goals and contributed to hostile working conditions with managers sometimes embarrassing employees or forcing them to work overtime.[126] In addition, the Community Bank's controls were severely deficient and intentionally so.[127] This business model was recklessly unsafe or unsound and resulted in a severe and systemic sales practices misconduct problem.[128] (The term "sales practices misconduct," as used in her report, refers to the practices of Bank employees issuing a product or service to a customer without the customer's consent, transferring customer funds without the

---

[122] EC MSD Ex. 269 (Report of NBE Candy) at ¶3.

[123] EC MSD Ex. 269 (Report of NBE Candy) at page 6.

[124] EC MSD Ex. 269 (Report of NBE Candy) at ¶16.

[125] EC MSD Ex. 269 (Report of NBE Candy) at ¶16.

[126] EC MSD Ex. 269 (Report of NBE Candy) at ¶16.

[127] EC MSD Ex. 269 (Report of NBE Candy) at ¶16.

[128] EC MSD Ex. 269 (Report of NBE Candy) at ¶16.

Appellate Case: 25-1079    Page: 26    Date Filed: 05/16/2025 Entry ID: 5517644

customer's consent, or obtaining a customer's consent by making false or misleading representations.)[129]

Sales practices misconduct, or issuing products to customers without their consent or obtaining the customer's consent by making false or misleading representations, is an unsafe or unsound banking practice and violates laws and regulations. Those laws and regulations include: 18 U.S.C. §§ 656 (theft/misapplication by bank employee), 1005 (false entries), 1028(a)(7) (identity theft), and 1344(2) (bank fraud); 15 U.S.C. § 45(a) (unfair or deceptive acts and practices); 12 C.F.R. § 1030.4(a) (Regulation DD/Truth in Savings); and 12 C.F.R. § 1026.12(a) (Regulation Z/Truth in Lending).[130]

The incentive compensation program and plans in the Community Bank were deficient in both design and implementation, as well as testing, oversight, and challenge, and resulted in employees engaging in sales practices misconduct over the course of fourteen years. This was recklessly unsafe or unsound and exposed the Bank to increased operational, compliance, regulatory, legal, reputational and financial risks.[131]

The Bank's controls to prevent and detect sales practices misconduct were inadequate and the Bank's risk management of its sales practices and the sales practices themselves, were recklessly unsafe or unsound.[132]

Sales practices misconduct was pervasive in the Community Bank and involved tens of thousands, if not hundreds of thousands, of Bank employees issuing millions of products to customers without their consent.[133]

---

[129] EC MSD Ex. 269 (Report of NBE Candy) at ¶16(a).

[130] EC MSD Ex. 269 (Report of NBE Candy) at ¶17.

[131] EC MSD Ex. 269 (Report of NBE Candy) at ¶18.

[132] EC MSD Ex. 269 (Report of NBE Candy) at ¶19.

[133] EC MSD Ex. 269 (Report of NBE Candy) at ¶20.

Add. 25

Appellate Case: 25-1079    Page: 27    Date Filed: 05/16/2025 Entry ID: 5517644

It took a massive and prolonged failure by Respondents for the sales practices misconduct problem to become as severe and pervasive as it was and last as long as it did.[134] The Respondents knew, or should have known, that sales practices misconduct in the Community Bank was widespread, systemic, and the high-pressure environment and aggressive sales goals contributed to the root cause.[135]

In 2014, National Bank Examiner Jennifer Crosthwaite participated in a number of examinations related to Incentive Compensation, Compliance, and Operational Risk and issued Supervisory Letters highlighting issues in each area.[136] In February 2015, she and the Operations and Compliance Team Leads examined the Community Bank's governance processes with a focus on sales practices.[137] The result of the February 2015 examination was an April 2015 Supervisory Letter including an MRA on sales practices governance.[138]

During the February 2015 exam, Examiner Crosthwaite was told that only 20 or 30 people had been terminated in connection with an investigation that was limited geographically

---

[134] EC MSD Ex. 269 (Report of NBE Candy) at ¶21.

[135] EC MSD Ex. 269 (Report of NBE Candy) at ¶21.

[136] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶9. Examiner Crosthwaite has been the Enterprise Risk Management Team Lead for Wells Fargo since May 2013. In that role, she directs a team of between eight and ten OCC examiners and oversee supervisory efforts at Wells Fargo in the areas of Corporate Risk, Audit, Legal, Human Resources, Reputation Risk, Strategic Risk, Model Risk, Counterparty Credit Risk, and International Risk. Among other things, she regularly meets with Bank senior management to cover key current topics, emerging risks, and issues identified through the OCC's ongoing examination work, and provides clear and detailed feedback to the Bank in the form of Supervisory Letters. She also assists the Examiner-In-Charge in providing input into the Quarterly Management Report, the annual Report of Exam ("ROE"), the Quarterly Risk Assessments, and the supervisory strategies of the Bank. She serves as an expert advisor for the field examining staff of Large Bank Supervision ("LBS") and as an advisor to the Examiner-in-Charge ("EIC"), the Deputy Comptroller for LBS, and other OCC officials. She participated in the OCC's examinations and investigations of the Bank's sales practices. Id. at ¶2.

[137] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶9.

[138] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶9.

Appellate Case: 25-1079    Page: 28    Date Filed: 05/16/2025 Entry ID: 5517644

to Los Angeles/Orange County.[139] After the City of Los Angeles filed its lawsuit against the Bank for sales practices related misconduct in May 2015, she led a targeted examination of the Community Bank specifically related to the allegations in the lawsuit.[140]

In conjunction with the examiners from the Operations and Compliance group, the ERM examiners examined the Community Bank, sampled a number of EthicsLine and customer complaints, and reviewed termination files and notes.[141] It was during this period that she learned, for the first time, that over 230 individuals had been terminated across the Bank (not just in Los Angeles/Orange County) for engaging in simulated funding and changing customer phone numbers.[142] This 230 number was drastically higher than what the Bank had previously reported to the OCC during the February 2015 exam.[143] She then realized that the sales practices problem was more severe and pervasive than what management, including Respondents, had communicated to the OCC.[144] She learned that sales practices was much more than just simulated funding and phone number changes.[145]

Some examples of other types of sales practices misconduct that the OCC's examiners discovered were: opening unauthorized deposit accounts (and in some instances 40 or 50 accounts for one individual), issuing multiple credit and debit cards without consent, and targeting the deceptive practices on protected classes.[146] Community Bank Management also had a practice of pushing two checking and two savings accounts on customers (known as the "2 for

---

[139] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ▯10.

[140] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ▯10.

[141] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ▯10.

[142] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ▯10.

[143] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ▯10.

[144] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ▯10.

[145] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ▯10.

[146] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ▯10.

Appellate Case: 25-1079    Page: 29    Date Filed: 05/16/2025 Entry ID: 5517644

2" campaign).[147] Examiners reviewed over 300 EthicsLine complaints and a sizeable number of customer complaints, which provided detailed accounts of pervasive unsafe or unsound and fraudulent sales practices misconduct.[148] The Bank's EthicsLine is a 24-hour hotline and website program that serves as the primary method for employees to anonymously voice complaints, including reporting possible violations of the Bank's Code of Ethics, violations of law, and suspicious conduct involving other employees.[149]

The examination resulted in a Supervisory Letter with five MRAs that addressed the three lines of defense (the Community Bank, Corporate Risk, and Internal Audit), incentive compensation, and complaint systems.[150] The Supervisory Letter highlighted the aggressive sales culture and lack of effective Bank oversight, controls, and supervision.[151] It also highlighted that there was a lack of transparency in the front-line Community Bank leadership team.[152] This Supervisory Letter required the Bank to assess root cause and hire an independent consultant to assess customer harm. The Bank retained Accenture and PricewaterhouseCoopers ("PwC") for this work, respectively.[153]

Throughout the targeted examination in May 2015, the EIC and Examiner Crosthwaite informed the Bank's Chief Corporate Risk Officer that the OCC did not want Respondent Russ Anderson taking the lead on providing information to the OCC.[154] The EIC and Examiner Crosthwaite requested that the independent Corporate Risk function of the Bank take the lead on

---

[147] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶10.

[148] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶10.

[149] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶10.

[150] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶10.

[151] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶10.

[152] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶10.

[153] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶10.

[154] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶11.

Add. 28

Appellate Case: 25-1079    Page: 30    Date Filed: 05/16/2025 Entry ID: 5517644

coordinating responses to OCC information requests, on scheduling meetings, and on ensuring that the OCC received all such requested information.[155] They made this request because the information that the Community Bank had provided to the OCC previously was not consistent with the information in the City of Los Angeles lawsuit.[156] At this time, based upon Examiner Crosthwaite's interactions throughout early 2015, she was very concerned that Community Bank leadership, and specifically Respondent Russ Anderson, was not fully transparent in meetings with OCC examiners.[157]

In July 2015, the OCC commented on sales practices in its annual Report of Examination ("ROE") that "[t]he Bank needs to proactively control reputational risks through more effective compliance and operational risk programs. This included a reference to our continued assessment of the LA lawsuit, which alleges branch misconduct resulting in customer harm, our early findings suggest management should have responded more proactively to independently investigate the initial allegations. Management needs to ensure that matters such as these are fully and transparently investigated, harmed customers are remediated, bank employees are properly trained, incentive programs do not encourage the alleged behavior, and controls are in place to identify and resolve potential or emerging issues."[158]

In February 2016, the OCC received the results of the PwC report which confirmed that sales practices misconduct was occurring on systemic scale and affected more than 1.5 million customer accounts.[159] The PwC report, combined with the Accenture findings, confirmed the systemic nature of sales practices misconduct. [160] The OCC issued a Supervisory Letter in July

---

[155] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶11.

[156] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶11.

[157] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶11.

[158] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶12.

[159] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶13.

[160] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶13.

Appellate Case: 25-1079     Page: 31     Date Filed: 05/16/2025 Entry ID: 5517644

2016, finding that the sales practices misconduct problem at Wells Fargo was unsafe or unsound.[161]The July 2016 Supervisory Letter ultimately supported the Sales Practices Consent Order issued against the Bank in September 2016.[162] By August 2017, the number of accounts that had been opened between January 2009 and September 2016 in a manner consistent with simulated funding had ballooned to 3.5 million customer accounts.[163]

Examiner Candy opined that through their actions and inactions, each Respondent engaged in recklessly unsafe or unsound practices that enabled the sales practices misconduct problem to exist and continue. Each Respondent also breached his/her fiduciary duties.[164] As the Group Risk Officer for the Community Bank, Respondent Russ Anderson had a primary responsibility to properly identify, quantify and control all risks in the Community Bank's operations.[165] Audit—that is, Respondents Julian and McLinko—had a responsibility to ensure incentive compensation plans were designed and operated in accordance with Bank policy, evaluate risk and controls and ensure it was adequately managed and escalated, advise whether the Community Bank was operating in conformance with laws and regulations, or identify and detail significant or systemic problems in audit reports.[166] None of the Respondents who held leadership roles in those departments adequately performed their responsibilities with respect to the sales practices misconduct problem.[167] Examiner Candy opined that all Respondents failed in their responsibilities.[168]

---

[161]  EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶13.

[162] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶13.

[163] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶¶13, 52.

[164] EC MSD Ex. 269 (Report of NBE Candy) at ¶22.

[165] EC MSD Ex. 269 (Report of NBE Candy) at ¶23.

[166] EC MSD Ex. 269 (Report of NBE Candy) at ¶23.

[167] EC MSD Ex. 269 (Report of NBE Candy) at ¶23.

[168] EC MSD Ex. 269 (Report of NBE Candy) at ¶23.

Appellate Case: 25-1079     Page: 32     Date Filed: 05/16/2025 Entry ID: 5517644

Examiner Candy opined that Respondent Russ Anderson failed to execute her risk management, control, and escalation responsibilities as the Group Risk Officer, the Chairperson of the Community Bank Risk Management Committee, and under the Bank's own policies;[169] and that her conduct was recklessly unsafe or unsound and was done in disregard of or evidenced a conscious indifference to a known or obvious risk of substantial harm.[170] Examiner Candy opined that Respondent Russ Anderson's conduct constituted a breach of her fiduciary duty.[171]

Examiner Candy opined that Respondent Russ Anderson's failure to escalate the sales practices misconduct problem was recklessly unsafe or unsound and constituted a breach of her fiduciary duty,[172] and that her false, misleading, and incomplete reporting to the Enterprise Risk Management Committee, the Board, and the OCC was recklessly unsafe or unsound and constituted a breach of her fiduciary duty.[173]

Examiner Candy opined that Respondent Russ Anderson violated laws and regulations, including by causing, participating in, counseling, or aiding and abetting the following violations: 18 U.S.C. §§ 656 (theft/misapplication by bank employee), 1001(a) (false statements), 1005 (false entries), 1028(a)(7) (identity theft), 1344(2) (bank fraud), and 1517 (obstruction of bank exam); 15 U.S.C. § 45(a) (unfair or deceptive practices); 12 C.F.R. § 1030.4(a) (Regulation DD/Truth in Savings); and 12 C.F.R. § 1026.12(a) (Regulation Z/Truth in Lending).[174]

---

[169] EC MSD Ex. 269 (Report of NBE Candy) at ¶24.

[170] EC MSD Ex. 269 (Report of NBE Candy) at ¶24.

[171] EC MSD Ex. 269 (Report of NBE Candy) at ¶24.

[172] EC MSD Ex. 269 (Report of NBE Candy) at ¶25.

[173] EC MSD Ex. 269 (Report of NBE Candy) at ¶26.

[174] EC MSD Ex. 269 (Report of NBE Candy) at ¶27.

Appellate Case: 25-1079     Page: 33     Date Filed: 05/16/2025 Entry ID: 5517644

Examiner Candy opined that Respondent Russ Anderson's violations of laws and regulations, unsafe or unsound practices, and breaches of fiduciary duties involved personal dishonesty and demonstrated a willful or continuing disregard for the safety or soundness of the Bank.[175]

**Respondents Julian and McLinko**

Examiner Candy opined that Respondent Julian and Respondent McLinko each recklessly engaged in an unsafe or unsound practice by failing to plan and manage audit activity within the Community Bank that would detect and document the ongoing sales practices misconduct problem and identify corrective action to remediate and resolve it.[176] She noted that audits performed under their leadership gave "effective" ratings to areas touching on sales practices, failed to include appropriate scope or sufficient testing, and this continued to be the case until the elimination of sales goals in the Community Bank.[177] In Examiner Candy's opinion, this conduct constituted breaches of their fiduciary duties.[178]

Examiner Candy opined that Respondent Julian recklessly engaged in an unsafe or unsound practice by failing to accurately assess and appropriately incorporate risk events in incentive compensation recommendations for material risk takers and executives at the Bank from 2014 through 2016.[179]

Examiner Candy opined that each of the Respondents' unsafe or unsound practices were part of a pattern of misconduct, resulted in pecuniary gain or other benefit to each of the

---

[175] EC MSD Ex. 269 (Report of NBE Candy) at ¶28.

[176] EC MSD Ex. 269 (Report of NBE Candy) at ¶32.

[177] EC MSD Ex. 269 (Report of NBE Candy) at ¶32.

[178] EC MSD Ex. 269 (Report of NBE Candy) at ¶32.

[179] EC MSD Ex. 269 (Report of NBE Candy) at ¶33.

Add. 32

Appellate Case: 25-1079    Page: 34    Date Filed: 05/16/2025 Entry ID: 5517644

Respondents, and caused significant loss to the Bank.[180] In her opinion, civil money penalties ("CMP") in the amount assessed against each Respondent are appropriate. In her opinion, higher CMPs against each Respondent are consistent with and supported by the evidence.[181]

**Incentive Compensation Program in the Community Bank Failed to Balance Risk and Reward**

Examiner Candy participated in the OCC's May 2015 ongoing supervisory activity of the Bank's sales practices that resulted in Supervisory Letter (SL) 2015-36.[182] The review was prompted by the City of Los Angeles lawsuit filed against Wells Fargo on May 4, 2015. SL 2015-36 specifies that our review focused on the events in 2013 that led to the initial employee terminations for sales practices, the investigation of employee misconduct that followed, and overall changes in governance intended to improve the Bank's practices.[183] The Operating Committee consisted of the Chief Executive Officer and his direct reports.[184] SL 2015-36 concluded that the Bank's management and oversight of Enterprise Sales Practices risk was weak and needed to improve.[185]

SL 2015-36 also concluded that "[t]here also exists only limited monitoring and oversight by the second (Corporate Risk, Human Resources, Compliance, and Legal) and third lines of defense [Audit.]"[186] SL 2015-36 specifically noted that "Cross-selling, if not properly governed, can lead to excessive sales pressure on employees to meet sales goals and achieve financial incentives. Incentive compensation is a key factor in motivating employee behavior and should

---

[180] EC MSD Ex. 269 (Report of NBE Candy) at P34.

[181] EC MSD Ex. 269 (Report of NBE Candy) at P35.

[182] EC MSD Ex. 269 (Report of NBE Candy) at P37.

[183] EC MSD Ex. 269 (Report of NBE Candy) at P37.

[184] EC MSD Ex. 269 (Report of NBE Candy) at P37.

[185] EC MSD Ex. 269 (Report of NBE Candy) at P37.

[186] EC MSD Ex. 269 (Report of NBE Candy) at P37.

Add. 33

Appellate Case: 25-1079     Page: 35     Date Filed: 05/16/2025 Entry ID: 5517644

be reevaluated across all sales activities enterprise- wide given these events."[187] SL 2015-36 required the Bank to review compensation programs to protect against incenting inappropriate behavior.[188]

The OCC uses Matters Requiring Attention (MRAs) to communicate concern about a bank's deficient practices to a bank's board of directors and management.[189] An MRA is a significant supervisory action and must be taken seriously and addressed by bank management.[190]

All incentive compensation plans at the Bank, including the Community Bank, were required to comply with the Bank's Incentive Compensation Risk Management Policy ("ICRM Policy") dated July 13, 2011,[191] and amended on November 27, 2012.[192] The ICRM Policy is the primary policy that governs the Bank's incentive compensation arrangements.[193]

The Bank's ICRM Policy "applies to any Wells Fargo business that pays teams members under an incentive compensation arrangement. It covers both domestic and international team members in all jurisdictions where Wells Fargo does business."[194] The ICRM Policy states:

"[t]he purpose of the Incentive Compensation Risk Management Policy is to help ensure that Wells Fargo's incentive compensation arrangements are

---

[187] EC MSD Ex. 269 (Report of NBE Candy) at ¶37.

[188] EC MSD Ex. 269 (Report of NBE Candy) at ¶37.

[189] EC MSD Ex. 269 (Report of NBE Candy) at ¶38.

[190] EC MSD Ex. 269 (Report of NBE Candy) at ¶41.

[191] EC MSD Ex. 269 (Report of NBE Candy) at ¶41, citing Wells Fargo & Co., Incentive Compensation Risk Management Policy (July 13, 2011) (OCC-WF-SP-05434513).

[192] EC MSD Ex. 269 (Report of NBE Candy) at ¶41, citing Fargo & Co., Incentive Compensation Risk Management Policy (July 13, 2011) (OCC-WF-SP-05434513).

[193] EC MSD Ex. 269 (Report of NBE Candy) at ¶42.

[194] EC MSD Ex. 269 (Report of NBE Candy) at ¶43.

aligned with appropriate risk taking – which is to balance short-term performance goals with the long-term strength and stability of the company."[195]

The amended ICRM Policy issued on November 28, 2012 states:

"Incentive-based compensation arrangements should balance risk and financial rewards in a manner that does not provide our team members with an incentive to take inappropriate risks that could lead to material financial, operational, or reputational risk for the company."[196]

Generally accepted standards of prudent operation and the Bank's own ICRM Policy required incentive compensation arrangements to balance risk and reward in a manner that does not encourage team members to expose Wells Fargo to imprudent risks.[197]

The Wells Fargo Risk Management Framework also emphasizes the importance of a sound incentive compensation program.[198] It states:

"Wells Fargo's incentive-based compensation practices balance risk and financial reward in a manner that incents team members to take appropriate risks they understand and avoid taking risks they do not understand or that exceed risk appetite. To this end, the Incentive Compensation Risk Management (ICRM) program was developed to manage risk in incentive-based compensation arrangements throughout Wells Fargo. The ICRM principles and requirements are fundamental and strictly adhered to, guiding

---

[195] EC MSD Ex. 269 (Report of NBE Candy) at ¶43.

[196] EC MSD Ex. 269 (Report of NBE Candy) at ¶43.

[197] EC MSD Ex. 269 (Report of NBE Candy) at ¶44.

[198] EC MSD Ex. 269 (Report of NBE Candy) at ¶45.

Appellate Case: 25-1079     Page: 37     Date Filed: 05/16/2025 Entry ID: 5517644

both general and tailored compensation practices. The balance of risk and reward is, and always will be, a top priority."[199]

The Human Resources Committee of the Board received a presentation on the ICRM Policy in February 2012. The presentation stated: "[t]he ICRM Program has been broadened to be the single risk management program for all incentive compensation related matters across the enterprise."[200]

After determining Community Bank's incentive compensation practice did not conform to the Bank's own ICRM Policy and Fraud Risk Management Framework, Examiner Candy conducted additional review of sales goals.[201] During this review, she discovered that from 2002 through 2016, the sales goals in the Community Bank were unreasonable.[202] They were unreasonable in part because they could not be met by reasonable and diligent efforts and incentivized employees to engage in sales practices misconduct—improper, unethical, and illegal activity—to meet them.[203]

The Community Bank's sales model was predicated on double-digit annual sales growth over the prior year's sales performance, a concept known as "run rate."[204] The current year's sales plan served as the baseline for each successive year's sales goals, and sales goals were increased each year.[205] So, for example: the Community Bank's 2012 sales plan derived from the

---

[199] EC MSD Ex. 269 (Report of NBE Candy) at ₱45, citing Wells Fargo Bank, N.A., Wells Fargo Risk Management Framework, at 10-11 (July 2014) (OCC-WF-SP-04791987).

[200] EC MSD Ex. 269 (Report of NBE Candy) at ₱46, citing Wells Fargo Bank, N.A., *Incentive Compensation Risk Management Program 2011 Program Update*, Human Resources Committee, at 2 (Feb. 28, 2012) (OCC-WF-SP-07644598).

[201] EC MSD Ex. 269 (Report of NBE Candy) at ₱48.

[202] EC MSD Ex. 269 (Report of NBE Candy) at ₱48.

[203] EC MSD Ex. 269 (Report of NBE Candy) at ₱48.

[204] EC MSD Ex. 269 (Report of NBE Candy) at ₱48.

[205] EC MSD Ex. 269 (Report of NBE Candy) at ₱48.

Add. 36

Appellate Case: 25-1079     Page: 38     Date Filed: 05/16/2025 Entry ID: 5517644

2011 sales performance, and required team members to sell a greater number of products and services than they had sold in 2011; by extension, the Bank's 2013 sales plan was derived from the Bank's 2012 sales performance, which required team members to sell a greater number of products and services than they had sold in 2012.[206] However, sales practices misconduct artificially inflated the run rate, making sales goals increasingly unattainable every year.[207] The Community Bank's sales run rate was tainted by sales practices misconduct; each year's sales performance numbers reflected products and services that were opened for and issued to customers without their knowledge and consent or obtained through false statements and misrepresentations. This made it even harder to achieve the sales goals through legal and ethical means in every subsequent year.[208]

The Independent Directors of the Board of Wells Fargo & Company, the Bank's holding company, conducted an investigation to understand the root cause of improper sales practices in the Community Bank ("Board Report").[209] The Board Report explained the run rate as such: "[t]he problem built on itself: attaining growth when the prior year's sales included a large number of low quality accounts meant that even more low quality accounts had to be opened to hit the increased target."[210]

The Board Report found that the Community Bank's sales goals were "untenable," "unrealistic," and "unattainable."[211] The Board Report found that, even after the Community

---

[206] EC MSD Ex. 269 (Report of NBE Candy) at ¶48.

[207] EC MSD Ex. 269 (Report of NBE Candy) at ¶48.

[208] EC MSD Ex. 269 (Report of NBE Candy) at ¶48.

[209] EC MSD Ex. 269 (Report of NBE Candy) at ¶48, citing Independent Directors of the Board of Wells Fargo & Company, Sales Practices Investigation Report (Apr. 10, 2017), available at https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/presentations/2017/board-report.pdf [hereinafter Board Report].

[210] EC MSD Ex. 269 (Report of NBE Candy) at ¶48, citing *Board Report* at 41.

[211] EC MSD Ex. 269 (Report of NBE Candy) at ¶49, citing *Board Report* at 5, 19, 39.

Appellate Case: 25-1079     Page: 39     Date Filed: 05/16/2025 Entry ID: 5517644

Bank made mid-year downward adjustments to sales goals in 2013 and 2014, "they were still set at an unachievable level."[212] These findings are consistent with Examiner Candy's own conclusions based on her supervisory work and evidence she reviewed during the investigation and litigation.[213]

In October 2015, Accenture, a firm hired by the Bank in response to MRAs issued by the OCC in June 2015, issued a report.[214] The report explained that "despite recent reductions in store sales goals," employees "continue to feel pressure to meet sales targets that many team members perceive to be unreasonable, and this may occur at the potential expense of sales quality." Accenture also observed based on its review that even in 2015, "sales goals have not been met since 2013 (even after accounting for adjustment made throughout the year to improve achievement rates)."[215] However, even though sales goals were lowered in 2013, sales practices misconduct in the Community Bank continued to be significant (as discussed in this report), employees still could not meet sales goals, further showcasing that they were unreasonable.[216]

**The Board of Directors' Sales Practices Investigation Report**

On April 10, 2017, the Independent Directors of the Board of Wells Fargo issued its Sales Practices Investigation Report ("Board Report").[217] Examiner Tanya Smith was the Bank's Acting Examiner-in-Charge at the time.[218] The Board Report found that the "root cause of sales

---

[212] EC MSD Ex. 269 (Report of NBE Candy) at ¶49, citing *Board Report* at 45.

[213] EC MSD Ex. 269 (Report of NBE Candy) at ¶49.

[214] EC MSD Ex. 269 (Report of NBE Candy) at ¶50.

[215] EC MSD Ex. 269 (Report of NBE Candy) at ¶50, citing Accenture, *Wells Fargo Sales Practices Assessment – Community Banking Sales Practices Report: Observations and Recommendations* (Oct. 2015) (OCC-SP1140359).

[216] EC MSD Ex. 269 (Report of NBE Candy) at ¶50.

[217] EC MSD Ex. 280 (Independent Directors of the Board of Wells Fargo & Company, Sales Practices Investigation Report, dated April 17, 2017.

[218] Examiner Smith is the current Examiner-in-Charge of Wells Fargo Bank, N.A., Sioux Falls, South Dakota in Large Bank Supervision at the Office of the Comptroller of the Currency. She became Wells Fargo's Acting

Add. 38

Appellate Case: 25-1079     Page: 40     Date Filed: 05/16/2025 Entry ID: 5517644

practice failures was the distortion of the Community Bank's sales culture and performance management system, which, when combined with aggressive sales management, created pressure on employees to sell unwanted or unneeded products to customers and, in some cases, to open unauthorized accounts."[219] It continued: "the only way definitively to address the broken sales model and the root cause of sales practice abuses was to emphasize other metrics for performance and to abandon exerting pressure through sales goals and sales-driven incentive programs."[220]

The Board Report identified deficiencies in the Law Department, Audit, and Community Bank Risk. The Board Report found:

> Respondent "Russ Anderson's performance fell far short of what was expected and required of the senior risk officer in the Community Bank. Russ Anderson failed to adequately assess and advocate for changes in the business

---

Examiner-in-Charge in March 2017 and has served as its permanent Examiner-in-Charge since July 2017. As Wells Fargo's Examiner-in- Charge, she manages a team of approximately 80 OCC examiners and other employees covering all aspects of the Bank's daily supervision. Her supervisory responsibilities include establishing regulatory and supervisory expectations on major programs through discussions with the Chief Executive Officer and other senior executives, providing clear feedback on progress against Enforcement Actions and Matters Requiring Attention, evaluating the Bank's systems and controls to determine the Risk Assessment and CAMELS ratings, preparing the Report of Examination and the annual comprehensive risk assessment ("CORE"), and regularly communicating with the Board about supervisory findings and priorities. Among other things, she is responsible for developing and supporting the supervisory strategy for this large, complex, multinational institution with multiple risk, regulatory, and control deficiencies, including those related to legal, audit, compliance, risk, governance, and sales practices. From March 2017 onwards, she participated in the OCC's examinations and investigation of the Bank's sales practices. She has over 27-years of professional experience at the OCC, the Federal Deposit Insurance Corporation ("FDIC"), and the International Monetary Fund ("IMF"), including extensive experience in the supervision of large, complex, multinational banks. EC MSD Ex. 267 (Report of Examiner Smith) at ¶¶1-3.

[219] EC MSD Ex. 267 (Report of NBE Smith) at ¶51, quoting Independent Directors of the Board of Wells Fargo & Company, Sales Practices Investigation Report, at 8 (Apr. 10, 2017) ("Board Report"), available at https://www08.wellsfargomedia.com/assets/pdf/about/investorrelations/ presentations/2017/board-report.pdf.

[220] EC MSD Ex. 267 (Report of NBE Smith) at ¶51, quoting Independent Directors of the Board of Wells Fargo & Company, Sales Practices Investigation Report, at 8 (Apr. 10, 2017) ("Board Report"), available at https://www08.wellsfargomedia.com/assets/pdf/about/investorrelations/ presentations/2017/board-report.pdf.

Add. 39

Appellate Case: 25-1079    Page: 41    Date Filed: 05/16/2025 Entry ID: 5517644

practices that resulted in sales integrity violations. She also did not adequately address customer harm arising from improper sales practices." [221]

"Between 2011 and 2016, Wells Fargo Audit Services ("Audit") conducted periodic audits that touched on sales practice issues within the Community Bank. These audits generally found that processes and controls designed to detect, investigate and remediate sales practice violations were effective at mitigating sales practice-related risks. In addition to auditing these detective functions, Audit also reviewed the Community Bank's compensation plans and found that their design did not promote unethical behavior." [222]

"Notwithstanding the growing awareness of the reputational risk associated with mass terminations, and the fact that many of these incidents involved unauthorized products or accounts, the perception persisted in the Law Department that sales integrity issues involved 'gaming' the Community Bank's incentive programs and not conduct affecting customers. That led them to underestimate the need to escalate and more directly manage sales integrity issues." [223]

Respondent Julian was a member of the Operating Committee at the time the Board Report was issued and had the opportunity to review and correct any factual errors in the report

---

[221] Independent Directors of the Board of Wells Fargo & Company, Sales Practices Investigation Report, at 8 (Apr. 10, 2017) ("Board Report"), available at https://www08.wellsfargomedia.com/assets/pdf/about/investorrelations/presentations/2017/board-report.pdf at 49.

[222] Independent Directors of the Board of Wells Fargo & Company, Sales Practices Investigation Report, at 8 (Apr. 10, 2017) ("Board Report"), available at https://www08.wellsfargomedia.com/assets/pdf/about/investorrelations/presentations/2017/board-report.pdf at 91.

[223] EC MSD Ex. 267 (Report of NBE Smith) at ¶52, quoting Independent Directors of the Board of Wells Fargo & Company, Sales Practices Investigation Report, at 8 (Apr. 10, 2017) ("Board Report"), available at https://www08.wellsfargomedia.com/assets/pdf/about/investorrelations/ presentations/2017/board-report.pdf at 75.

prior to its issuance.[224] Examiner Smith interacted with Respondent Julian at the time of the Board Report's issuance, asked him for his feedback on the Board Report, and does not recall him expressing any concerns about the accuracy of the report or any disagreement with any of its findings or conclusions.[225]

Examiner Smith opined that Respondents' current assertion that the Bank fabricated or exaggerated its sales practices problem in the Board Report is implausible on its face.[226] In her 27 years of professional experience as a bank examiner, Examiner Smith has never observed or even heard of any board exaggerating a significant problem to the extreme detriment to the institution.[227]

In addition, in this instance the Board engaged outside counsel to independently look at the facts and circumstances which form the basis of the final report.[228] Examiner Smith's team reviewed a number of documents and interview notes that the outside counsel gathered as part of the Board investigation and found the work and the conclusions to be credible, comprehensive, and not exaggerated.[229] Examiner Smith reported that the OCC's examination work and the subsequent investigation revealed that the sales practices misconduct problem was even worse than what was detailed in the Board Report.[230]

On February 21, 2020, the Bank agreed to pay $3 billion to resolve criminal and civil investigations with the Department of Justice and the Securities and Exchange Commission into

---

[224] EC MSD Ex. 267 (Report of NBE Smith) at ¶53.

[225] EC MSD Ex. 267 (Report of NBE Smith) at ¶53.

[226] EC MSD Ex. 267 (Report of NBE Smith) at ¶54.

[227] EC MSD Ex. 267 (Report of NBE Smith) at ¶54.

[228] EC MSD Ex. 267 (Report of NBE Smith) at ¶54.

[229] EC MSD Ex. 267 (Report of NBE Smith) at ¶54.

[230] EC MSD Ex. 267 (Report of NBE Smith) at ¶54.

sales practices "involving the opening of millions of accounts without customer authorization."[231] Wells Fargo agreed that the factual statements contained within the Statement of Facts to the Deferred Prosecution Agreement ("DOJ Statement of Facts") are true and accurate. The DOJ Statement of Facts described the sales goals as "onerous" and "aggressive."[232]

In her report, Examiner Candy noted the following:

> "Corporate culture refers to the norms and values that drive behaviors within an organization. An appropriate corporate culture for a bank is one that does not condone or encourage imprudent risk taking, unethical behavior, or the circumvention of laws, regulations, or safe and sound policies and procedures in pursuit of profits or business objectives." Office of the Comptroller of the Currency, Comptroller's Handbook, Safety and Soundness, Corporative and Risk Governance at 13 (July 2016).[233]

Based on her work in the supervision of the Bank and evidence she reviewed during the investigation and litigation, Examiner Candy concluded that employees engaged in sales practices misconduct because they feared disciplinary action up to and including termination if they did not meet the unreasonable sales goals and that this environment and aggressive sales

---

[231] EC MSD Ex. 269 (Report of NBE Candy) at ⁋51, quoting Press Release 20-035, U.S. Dep't of Justice, Central District of California, Wells Fargo Agrees to Pay $3 Billion to Resolve Criminal and Civil Investigations into Sales Practices Involving the Opening of Millions of Accounts Without Customer Authorization (Feb. 21, 2020), https://www.justice.gov/usao- cdca/pr/wells-fargo-agrees-pay-3-billion-resolvecriminal-and-civil-investigations-sales.

[232] EC MSD Ex. 269 (Report of NBE Candy) at ⁋50, citing Press Release, U.S. Attorney's Office for the Central District of California, Wells Fargo Agrees to Pay $3 Billion to Resolve Criminal and Civil Investigations into Sales Practices (Feb. 21, 2020); Wells Fargo Deferred Prosecution Agreement and Exhibit A, Statement of Facts (Feb. 20, 2020).

[233] EC MSD Ex. 269 (Report of NBE Candy) at ⁋52.

Appellate Case: 25-1079     Page: 44     Date Filed: 05/16/2025 Entry ID: 5517644

culture existed in the Community Bank from 2002 through 2016.[234] Employees also engaged in sales practices misconduct to earn incentive compensation.

Based on her training, experience, and commission as a National Bank Examiner, Examiner Candy reported that incentive compensation arrangements require effective oversight, governance, controls, and risk management and she concluded that the incentive compensation plans in the Community Bank overemphasized unreasonable sales goals and did not appropriately balance financial risk and reward.[235] The incentive compensation arrangements in the Community Bank incentivized employees to engage in sales practices misconduct.[236] The incentive compensation arrangements also incentivized store or branch managers to encourage, or turn a blind eye to, sales practices misconduct.[237]

At the Bank, incentive compensation and performance management went hand in hand. The sales and incentive plans were commonly referred to as 50/50 plans because there was an expectation that only half the regions would be able to meet them. Although in theory incentive compensation arrangements should reward superior performance and employees should not suffer employment consequences for failing to achieve incentive compensation goals, in practice this is not what happened in the Community Bank.[238]

For employees, failure to meet sales goals under the incentive compensation plans carried with it both the risk of not obtaining incentive compensation and poor performance reviews, including the risk of disciplinary action and termination.[239] As the Board Report concluded,

---

[234] EC MSD Ex. 269 (Report of NBE Candy) at ₱53

[235] EC MSD Ex. 269 (Report of NBE Candy) at ₱54.

[236] EC MSD Ex. 269 (Report of NBE Candy) at ₱54.

[237] EC MSD Ex. 269 (Report of NBE Candy) at ₱54.

[238] EC MSD Ex. 269 (Report of NBE Candy) at ₱54.

[239] EC MSD Ex. 269 (Report of NBE Candy) at ₱55.

"performance management and incentive plans added significant additional risk to the sales model."[240] Moreover, promotions and advancement within the Community Bank were based primarily on employees' ability to generate sales and meet the unreasonable sales goals.[241] This contributed to the high-pressure culture within the Community Bank and gave the impression that the Bank and senior management valued sales at all cost – including above ethics and the customer's best interest.[242]

The incentive compensation plans rewarded employees for sales of secondary products (e.g., a second checking or savings account or additional debit cards).[243] An outsized portion of conduct risk was associated with sales of secondary products. As the Bank acknowledged in the DOJ Statement of Facts, "[m]illions of secondary accounts and products were opened from 2002 to 2016, and many of these were never used by customers."[244] The Board Report explained that Community Bank

> "[r]egional leadership was unsuccessful in having their concerns about secondary checking accounts addressed even as late as 2015. In that year, one regional leader wrote an email continuing to advocate the removal of secondary accounts from incentive compensation plans, saying he and other leaders should 'fight the good fight every year – especially since I think one day we will be asked why it was part of the goal process to begin with.'"[245]

---

[240] EC MSD Ex. 269 (Report of NBE Candy) at ⁋54, citing Board Report at 27.

[241] EC MSD Ex. 269 (Report of NBE Candy) at ⁋55.

[242] EC MSD Ex. 269 (Report of NBE Candy) at ⁋55.

[243] EC MSD Ex. 269 (Report of NBE Candy) at ⁋56.

[244] EC MSD Ex. 269 (Report of NBE Candy) at ⁋56, citing Press Release, U.S. Attorney's Office for the Central District of California, Wells Fargo Agrees to Pay $3 Billion to Resolve Criminal and Civil Investigations into Sales Practices (Feb. 21, 2020); Wells Fargo Deferred Prosecution Agreement and Exhibit A, Statement of Facts (Feb. 20, 2020).

[245] EC MSD Ex. 269 (Report of NBE Candy) at ⁋57, citing *Board Report* at 41 n.17.

The Board Report found that incentive compensation "contributed to problematic behavior by over-weighting sales as against customer service or other factors."[246] Based on an extensive investigation, the Board Report determined that "the only way definitively to address the broken sales model and the root cause of sales practice abuses was to emphasize other metrics for performance and to abandon exerting pressure through sales goals and sales-driven incentive programs."[247] The Board Report described the incentive compensation program as "misaligned" and in January 2017, the Bank put in place a new incentive program that focused on customer service rather than selling products.[248] Examiner Candy's conclusions match those found in the Board Report.[249]

It is Examiner Candy's opinion as a National Bank Examiner that the incentive compensation program and plans in the Community Bank were deficient in both design and implementation and resulted in employees engaging in sales practices misconduct.[250] This was recklessly unsafe or unsound and exposed the Bank to increased operational, compliance, regulatory, legal, reputational and financial risks.[251]

**Respondents Russ Anderson and Julian failed to Perform their Responsibilities Under the ICRM**

The ICRM imposed responsibilities on various functions, including the Group Risk Officer and Audit.[252] Respondent Russ Anderson had responsibility under the Bank's ICRM

---

[246] EC MSD Ex. 269 (Report of NBE Candy) at ¶58, citing *Board Report* at 7

[247] EC MSD Ex. 269 (Report of NBE Candy) at ¶58, citing *Board Report* at 8.

[248] EC MSD Ex. 269 (Report of NBE Candy) at ¶58, citing *Board Report* at 8.

[249] EC MSD Ex. 269 (Report of NBE Candy) at ¶58.

[250] EC MSD Ex. 269 (Report of NBE Candy) at ¶59.

[251] EC MSD Ex. 269 (Report of NBE Candy) at ¶59.

[252] EC MSD Ex. 269 (Report of NBE Candy) at ¶60, citing Incentive Compensation Risk Management Policy (July 13, 2011) (OCC-WF-SP-05434513); Incentive Compensation Risk Management Policy (Nov. 27, 2012) (OCC-WF-SP-07258277).

Appellate Case: 25-1079    Page: 47    Date Filed: 05/16/2025 Entry ID: 5517644

Policy to provide "independent reviews of incentive compensation arrangements and balancing features used" to ensure that incentive compensation plans across the Community Bank achieved appropriate balance between risk and reward. Under the ICRM, Respondent Russ Anderson was "accountable to Wells Fargo's Chief Risk Officer to ensure appropriate balance is achieved."[253]

Respondent Russ Anderson did not provide the Chief Risk Officer, to whom she had a dotted-line reporting relationship, with an independent assessment of the Community Bank's incentive compensation arrangements and did not advise whether they contained the requisite balancing features as required under the ICRM Policy.[254]

Respondent Russ Anderson participated in discussions regarding sales goals and incentive compensation plans with senior leaders in the Community Bank.[255] She knew that regional leaders often complained about the unreasonable sales goals, and that they advocated for changes to the incentive compensation plans. She also was privy to reporting about increasing levels of misconduct tied to sales goals.[256]

Respondent Russ Anderson reviewed and approved incentive compensation plans that consisted of unreasonable sales goals.[257] Based on the evidence she reviewed, Examiner Candy concluded that Respondent Russ Anderson knew that incentive compensation plans consisted of unreasonable and unattainable sales goals.[258] For example, in an October 2012 email exchange with Kenneth Zimmerman, the Community Bank's Head of the Deposit Products Group—the

---

[253] EC MSD Ex. 269 (Report of NBE Candy) at ¶61, citing Incentive Compensation Risk Management Policy (July 13, 2011) (OCC-WF-SP-05434513); Incentive Compensation Risk Management Policy (Nov. 27, 2012) (OCC-WF-SP-07258277).

[254] EC MSD Ex. 269 (Report of NBE Candy) at ¶61.

[255] EC MSD Ex. 269 (Report of NBE Candy) at ¶62.

[256] EC MSD Ex. 269 (Report of NBE Candy) at ¶62.

[257] EC MSD Ex. 269 (Report of NBE Candy) at ¶63.

[258] EC MSD Ex. 269 (Report of NBE Candy) at ¶63.

Add. 46

Appellate Case: 25-1079     Page: 48     Date Filed: 05/16/2025 Entry ID: 5517644

group responsible for the most significant products supervised by the Community Bank, including checking accounts, savings accounts, and debit cards—Respondent Russ Anderson asked why Carrie Tolstedt, the Head of the Community Bank, was "putting together a plan that we know isn't attainable."[259] Mr. Zimmerman responded that Ms. Tolstedt was "backed up against the wall due to the cross-sell metric."[260] This unattainable sales plan was the one actually implemented in the Community Bank.[261]

It is Examiner Candy's opinion as a National Bank Examiner that Respondent Russ Anderson failed to perform her job responsibilities under the ICRM Policy and that this conduct was recklessly unsafe or unsound and a breach of her fiduciary duty.[262] Bank executives are required to execute their responsibilities consistent with Bank policies.[263] Respondent Russ Anderson had ongoing review and approval responsibility for incentive compensation plans that consisted of unreasonable sales goals, and she failed to adequately oversee the implementation or outcomes of the incentive compensations plans.[264] She was on the ICRM Steering Committee.[265] Her actions were contrary to generally accepted standards of prudent operation for a Group Risk Officer, the possible consequences of which, if continued, would be abnormal risk or loss or damage to the Bank, its shareholders, or the Federal Deposit Insurance Corporation.[266]

---

[259] EC MSD Ex. 269 (Report of NBE Candy) at ¶63.

[260] EC MSD Ex. 269 (Report of NBE Candy) at ¶63, citing Email from Ken Zimmerman to Claudia Russ Anderson (Oct. 25, 2012) (OCC-WF-SP-06178357).

[261] EC MSD Ex. 269 (Report of NBE Candy) at ¶63.

[262] EC MSD Ex. 269 (Report of NBE Candy) at ¶64.

[263] EC MSD Ex. 269 (Report of NBE Candy) at ¶64.

[264] EC MSD Ex. 269 (Report of NBE Candy) at ¶64.

[265] EC MSD Ex. 269 (Report of NBE Candy) at ¶64.

[266] EC MSD Ex. 269 (Report of NBE Candy) at ¶64.

Appellate Case: 25-1079     Page: 49     Date Filed: 05/16/2025 Entry ID: 5517644

The Incentive Compensation Steering Committee, later renamed the Incentive Compensation Committee ("ICC"), was responsible for overseeing the ICRM policy, processes, and outcomes and for reporting to the Human Resources Committee of the Board regarding ICRM practices and outcomes.[267] The ICC was responsible for providing "oversight around the design and outcomes of the Business Line incentive plans, and lead[ing] Wells Fargo's enterprise efforts to enhance incentive compensation practices throughout the Company."[268] Respondent Julian was a member of the ICC from 2012 through October 2016.[269]

Examiner Candy opined that Respondent Julian recklessly engaged in unsafe or unsound practices through his failings with respect to incentive compensation risk management, governance, and oversight as members of the ICC.[270] The ICRM Policy states that incentive-based compensation arrangements should "balance risk and financial rewards in a manner that does not provide team members with an incentive to take inappropriate risks that could lead to material financial, operational, or reputational risk for the company."[271] The incentive compensation plans in the Community Bank encouraged employees to take inappropriate risks, risk that Respondent Julian and others were responsible for understanding, managing, overseeing, and escalating as members of the ICC.[272] Respondent Julian's failures with respect to incentive compensation risk management exposed the Bank to abnormal risk of loss and resulted in actual loss.[273]

---

[267] EC MSD Ex. 269 (Report of NBE Candy) at ¶65.

[268] EC MSD Ex. 269 (Report of NBE Candy) at ¶65.

[269] EC MSD Ex. 269 (Report of NBE Candy) at ¶65.

[270] EC MSD Ex. 269 (Report of NBE Candy) at ¶66.

[271] EC MSD Ex. 269 (Report of NBE Candy) at ¶66, citing Incentive Compensation Risk Management Policy (July 13, 2011) (OCC-WF-SP-05434513); Incentive Compensation Risk Management Policy (Nov. 27, 2012) (OCC-WF-SP-07258277).

[272] EC MSD Ex. 269 (Report of NBE Candy) at ¶66.

[273] EC MSD Ex. 269 (Report of NBE Candy) at ¶66.

Appellate Case: 25-1079      Page: 50      Date Filed: 05/16/2025   Entry ID: 5517644

**The Community Bank's Controls were Inadequate**

Examiner Candy participated in the May 2015 ongoing supervisory activity that resulted in SL 2015-36.[274] During that review, she performed work to better understand the Bank's controls related to sales practices.[275] She reviewed customer and employee complaints and identified themes from those complaints.[276] Based on her work on the May 2015 review, she concluded that the Community Bank had a problem with sales practices misconduct and identified weakness in the Bank's controls.[277] However, she did not have clear visibility into the extent, severity, and duration of the sales practices misconduct problem until further supervisory work and Examiner Candy's participation in the investigation.[278]

SL 2015-36 notes that "[o]f the 2,856 sales integrity cases [in 2014], 43% involved lack of customer consent for a product."[279] In her work sampling customer complaints, "in many cases there was no method to prove customer consent in the form of a signature for either the deposit or credit card product."[280] Based on her review of employee complaints made through the Bank's EthicsLine, Examiner Candy identified the following themes: sales pressure; taking advantage of a protected classes (e.g., age/elderly); and the selling of unwanted deposit or credit

---

[274] EC MSD Ex. 269 (Report of NBE Candy) at ¶67.

[275] EC MSD Ex. 269 (Report of NBE Candy) at ¶67.

[276] EC MSD Ex. 269 (Report of NBE Candy) at ¶67.

[277] EC MSD Ex. 269 (Report of NBE Candy) at ¶67.

[278] EC MSD Ex. 269 (Report of NBE Candy) at ¶67.

[279] EC MSD Ex. 269 (Report of NBE Candy) at ¶67, citing OCC Supervisory Letter WFC 2015-36 (June 25, 2015) (OCC-WF-SP-07084578).

[280] EC MSD Ex. 269 (Report of NBE Candy) at ¶67, citing OCC Supervisory Letter WFC 2015-36 (June 25, 2015) (OCC-WF-SP-07084578) at 3.

Appellate Case: 25-1079     Page: 51     Date Filed: 05/16/2025 Entry ID: 5517644

products.[281] Review of customer complaints revealed similar themes.[282] She found the complaints to be credible, and found that the Community Bank did not have adequate controls to proactively identify these types of misconduct, nor did they complete adequate follow-up or investigation of the allegations.[283]

The May 2015 review resulted in the issuance of 5 MRAs.[284] One of the MRAs identified deficiencies in the Bank's controls over complaints.[285] The review determined that the Bank did not have an effective customer complaint process and required management to reassess the customer complaint process "since it is critical to promoting compliance with laws and regulations and reducing reputation risk."[286] One of the MRAs also identified deficiencies in Audit's coverage of sales practices, finding that "no significant issues were identified or escalated as a result of [Audit's] work, and the group has not completed a comprehensive review of sales practices across the enterprise."[287]

After the OCC issued the five MRAs in June 2015, the OCC continued its review of sales practices risk, ultimately issuing SL 2016-36 on July 18, 2016.[288] Examiner Candy participated

---

[281] EC MSD Ex. 269 (Report of NBE Candy) at ¶68, citing OCC Supervisory Letter WFC 2015-36 (June 25, 2015) (OCC-WF-SP-07084578), at 3.

[282] EC MSD Ex. 269 (Report of NBE Candy) at ¶68.

[283] EC MSD Ex. 269 (Report of NBE Candy) at ¶68.

[284] EC MSD Ex. 269 (Report of NBE Candy) at ¶69.

[285] EC MSD Ex. 269 (Report of NBE Candy) at ¶69.

[286] EC MSD Ex. 269 (Report of NBE Candy) at ¶69, citing OCC Supervisory Letter WFC 2015-36 (June 25, 2015) (OCC-WF-SP-07084578) at 4.

[287] EC MSD Ex. 269 (Report of NBE Candy) at ¶69, citing OCC Supervisory Letter WFC 2015-36 (June 25, 2015) (OCC-WF-SP-07084578) at 2.

[288] EC MSD Ex. 269 (Report of NBE Candy) at ¶70, citing OCC Supervisory Letter WFC 2016-36 (July 18, 2016) (OCC-WF-SP-07169362).

Add. 50

Appellate Case: 25-1079    Page: 52    Date Filed: 05/16/2025 Entry ID: 5517644

in the ongoing review that culminated in the issuance of SL 2016-36.[289] SL 2016-36 documents the following conclusions, with which she agrees:

> "The practice of opening deposit accounts without authorization, the practice of moving funds without customer consent (simulated funding) and the failure to timely refund or remediate fees charged are considered unsafe or unsound banking practices."[290]

> "The widespread and unauthorized opening of credit card accounts without consent . . . is considered an unsafe or unsound banking practices. The root causes include excessive sales pressure and the absence of a control process that required documentation of explicit customer consent."[291]

> "Aggressive sales pressure, coupled with lack of adequate risk management oversight, fostered inappropriate and possibly fraudulent behavior by employees. This behavior included the opening of unwanted deposit and credit card accounts and the practice of moving funds without customer consent (simulated funding), which resulted in customer harm, hundreds of terminated employees . . ."[292]

> "In addition, the risks from these sales practices were not adequately managed."[293]

> "Our own review of incentive compensation programs and sales goals confirmed the aggressive sales pressure. For example, Gold, Silver, and

---

[289] EC MSD Ex. 269 (Report of NBE Candy) at ⁋70.

[290] EC MSD Ex. 269 (Report of NBE Candy) at ⁋70.

[291] EC MSD Ex. 269 (Report of NBE Candy) at ⁋70.

[292] EC MSD Ex. 269 (Report of NBE Candy) at ⁋70.

[293] EC MSD Ex. 269 (Report of NBE Candy) at ⁋70.

Add. 51

Appellate Case: 25-1079    Page: 53    Date Filed: 05/16/2025 Entry ID: 5517644

Bronze programs were in place to encourage employees to meet sales goals, with Gold requiring 13 daily 'solutions' or products sold per day."[294]

Weaknesses in internal controls and management information systems including a lack of robust first, second and third lines of defense risk management programs.[295]

Set forth below is Examiner Candy's further explanation of the Bank's controls, how they evolved, and her opinions and assessments related to the controls for preventing and detecting sales practices misconduct.[296]

**The Evolution of Controls**

In general, the Bank relied on three mechanisms to identify employees who engaged in sales practices misconduct: (1) employee reported allegations through the EthicsLine, to Human Resources, or to management, when the report was deemed sufficiently credible to warrant further review; (2) customer complaints, only if subsequent "polling" of other customers of the same employee revealed other similar incidents of misconduct; and (3) "proactive monitoring," which involved the use of data analytics to identify patterns of "red flag" sales activity.[297] The first two detection methods were reactive and relied on another employee or a customer becoming aware of improper activity and reporting it.[298] The third detection method was, in Examiner Candy's opinion, inadequate as it only identified patterns of activity for certain types of misconduct.[299]

---

[294] EC MSD Ex. 269 (Report of NBE Candy) at ¶70.

[295] EC MSD Ex. 269 (Report of NBE Candy) at ¶70.

[296] EC MSD Ex. 269 (Report of NBE Candy) at ¶71.

[297] EC MSD Ex. 269 (Report of NBE Candy) at ¶72.

[298] EC MSD Ex. 269 (Report of NBE Candy) at ¶72.

[299] EC MSD Ex. 269 (Report of NBE Candy) at ¶72.

Appellate Case: 25-1079     Page: 54     Date Filed: 05/16/2025 Entry ID: 5517644

In an email dated August 3, 2012, the former Head of Sales Quality, Cindy Walker, acknowledged that the controls relied on employees and customers reporting misconduct rather than active monitoring to detect misconduct:

> "The Sales Quality (SQ) business model has always been predicated upon being "reactive" by design. That is, researching and vetting incoming EthicsLine allegations, Phone Bank allegations and the like. Monitoring and/or additional reporting activities would not necessarily be effective or in scope considering the business intent."[300]

During her supervisory review, Examiner Candy found that SSCOT's research process was not robust nor effective, and ultimately many allegations were not properly investigated as a result.[301] Bank documents show that between 2012 and 2013, the Sales and Service Conduct Oversight Team (SSCOT– SSCOT was formerly known as Sales Quality), a group within the Community Bank that reported to Respondent Russ Anderson, began "proactively monitoring" some types of sales practices misconduct, including changes to customer phone numbers in the Bank's system and a practice the Bank referred to as "simulated funding."[302] The activity that the Bank described as "simulated funding" involves a banker making fraudulent or unauthorized transfers of money from one account to another without the customer's consent to make it appear as if the customer had funded the account.[303]

Bank documents show that in the summer and fall of 2013, SSCOT conducted an analysis to detect simulated funding and phone number changes in the Los Angeles/Orange County and then across the Regional Bank footprint, using criteria to identify "extreme outlier"

---

[300] EC MSD Ex. 269 (Report of NBE Candy) at ¶73, citing email from Marty Weber to Michael Bacon et. al. (Aug. 8, 2012) (OCC-WF-SP-06076695).

[301] EC MSD Ex. 269 (Report of NBE Candy) at ¶74.

[302] EC MSD Ex. 269 (Report of NBE Candy) at ¶75.

[303] EC MSD Ex. 269 (Report of NBE Candy) at ¶75.

activity.[304] Bank documents show that for conduct likely exhibiting simulated funding, SSCOT used criteria of 50 or more accounts in five months or more than 10 percent of total accounts opened in four months, where the account was funded with a single transfer of funds from an existing accounts to a new account, and then transferred back to the originating accounts within 1 day, with no further activity in the new account.[305] The practical effect of using this methodology was that if activity exhibiting simulated funded was done to 49 accounts in five months, it was not detected through proactive monitoring.[306]

This proactive monitoring was used to identify only egregious patterns of red flag activity for simulated funding and led to an initial round of investigation and termination of approximately 30 employees in fall 2013, some of whom complained to the Los Angeles Times.[307] In October 2013, the Los Angeles Times reported that "the pressure to meet sales goals was intense at Wells Fargo. At times, managers required workers to stay in the branch after the close of business, calling their friends and family members, if they failed to open enough accounts during the day."[308] In December 2013, the Los Angeles Times published a second article identifying that the sales practices misconduct was not limited to Los Angeles:

> "To meet quotas, employees have opened unneeded accounts for customers, ordered credit cards without customers' permission and forged client signatures on paperwork. . . . These conclusions emerge from a review of internal bank documents and court records, and from interviews with 28

---

[304] EC MSD Ex. 269 (Report of NBE Candy) at ¶76.

[305] EC MSD Ex. 269 (Report of NBE Candy) at ¶76.

[306] EC MSD Ex. 269 (Report of NBE Candy) at ¶76, citing email from David Otsuka to Debra Patterson et. al. (Nov. 18, 2013) (OCC-WF-SP-06925140); Email from Glen Najvar to Michael Moore et. al. (Sept. 13, 2013) (OCC-WF-SP-08387599).

[307] EC MSD Ex. 269 (Report of NBE Candy) at ¶77.

[308] EC MSD Ex. 269 (Report of NBE Candy) at ¶77.

Add. 54

Appellate Case: 25-1079    Page: 56    Date Filed: 05/16/2025 Entry ID: 5517644

former and seven current Wells Fargo employees who worked at bank branches in nine states, including California."[309]

**Pause on Proactive Monitoring**

Following the Los Angeles Times articles, SSCOT "paused" proactive monitoring until July 2014, purportedly to allow the Community Bank to identify and address the root cause of the misconduct.[310] It was evident that the misconduct was widespread and continued monitoring could inundate the Community Bank with investigations and terminations.[311] However, by 2013 the root cause of sales practices misconduct was well known by the Community Bank, the Law Department, and Audit.[312]

The Community Bank paused proactive monitoring for approximately seven months, from December 2013 through July 2014.[313] Based on her review of the evidence, Examiner Candy opined that at the time the Community Bank instituted the pause on proactive monitoring, the root cause had been well known within the Bank.[314] Many Bank witnesses testified that no one ever suggested any cause for employees to engage in sales practices misconduct other than the pressure on employees to meet sales goals in order to keep their jobs, and to a lesser extent to earn incentive compensation.[315]

---

[309] EC MSD Ex. 269 (Report of NBE Candy) at ¶77.

[310] EC MSD Ex. 269 (Report of NBE Candy) at ¶78.

[311] EC MSD Ex. 269 (Report of NBE Candy) at ¶78, citing Email from Christine Meuers to Hope Hardison et. al. (Dec. 2, 2013) (OCC-WF-SP-07373388).

[312] EC MSD Ex. 269 (Report of NBE Candy) at ¶78.

[313] EC MSD Ex. 269 (Report of NBE Candy) at ¶80, citing Email from Paula Herzberg to Rebecca Rawson et. al. (Sept. 13, 2016) (OCC-WF-SP-07687489).

[314] EC MSD Ex. 269 (Report of NBE Candy) at ¶81.

[315] EC MSD Ex. 269 (Report of NBE Candy) at ¶81.

From her review of Bank documents during the investigation and litigation, Examiner Candy opined that the pause on proactive monitoring was intended to limit the number of terminations for sales practices misconduct to avoid reputational harm to the Bank from negative publicity.[316] In her opinion as a National Bank Examiner, this was not a prudent nor acceptable reason to pause proactive monitoring.[317]

**Controls Following the Pause**

In July 2014, SSCOT resumed proactive monitoring for simulated funding, applying a new criteria of identifying employees in the 99.99th percent (top 0.01 percent) of Bank team members who met "red flag" activity for simulated funding in one month.[318] Based on Bank documents, approximately 30,000 employees exhibited characteristics of "red flag" activity for simulated funding in one month.[319] However, due to the 99.99th percent threshold SSCOT used to identify potential simulated funding, SSCOT identified only 3 employees per month (i.e., 0.01 percent of 30,000 Community Bank team members) for investigation.[320] The Community Bank referred to these employees as "outliers."[321] Examiner Candy opined that this simply was grossly insufficient – only reviewing 0.01 percent of the "red flag" activity in any given month is nowhere near a sufficient control for identifying potential simulated funding.[322]

---

[316] EC MSD Ex. 269 (Report of NBE Candy) at ¶82.

[317] EC MSD Ex. 269 (Report of NBE Candy) at ¶82.

[318] EC MSD Ex. 269 (Report of NBE Candy) at ¶83, citing Email from Deanna Lindquist to Crystal Silva et. al. (Oct. 22, 2015) (OCC-WF-SP-07916406); Email from Glen Najvar to David Otsuka (July 7, 2014) (OCC-WF-SP-08205606).

[319] EC MSD Ex. 269 (Report of NBE Candy) at ¶84.

[320] EC MSD Ex. 269 (Report of NBE Candy) at ¶84.

[321] EC MSD Ex. 269 (Report of NBE Candy) at ¶84.

[322] EC MSD Ex. 269 (Report of NBE Candy) at ¶84.

Appellate Case: 25-1079     Page: 58     Date Filed: 05/16/2025 Entry ID: 5517644

Beyond simulated funding, SSCOT used 99.99th percent as its threshold for proactive monitoring for the vast majority of sales activity monitored.[323] In April 2015, the Community Bank's threshold was lowered slightly to detect employees in the 99.95th percentile of activity that was a red flag for simulated funding.[324] The 99.95th percent threshold involved an employee engaging in approximately10.3 monthly occurrences of red flag activity for simulated funding.[325] Lowering the threshold monitoring criteria slightly to the 99.95th percentile resulted in the identification of approximately 15 to 18 employees engaging in simulated funding per month.[326] However, the Bank's data shows that 45 percent of employees had at least one instance of red flag activity for simulated funding per month.[327]

OCC National Bank Examiner Gregory Coleman reported that during the May 2015 Risk Committee meeting, Board members expressed concerns about the adequacy of the high threshold that had been used in the 2013 investigation, namely the requirement that employees had made 50 or more telephone number changes to trigger review.[328] Examiner Coleman

---

[323] EC MSD Ex. 269 (Report of NBE Candy) at ¶85.

[324] EC MSD Ex. 269 (Report of NBE Candy) at ¶86, citing Email from Deanna Lindquist to Crystal Silva et. al. (Oct. 22, 2015) (OCC-WF-SP-07916406); Email from Paula Herzberg to Rebecca Rawson et. al. (Sept. 13, 2016) (OCC-WF-SP-07687489).

[325] EC MSD Ex. 269 (Report of NBE Candy) at ¶86, citing Email from David Otsuka to Rebecca Rawson et. al. (Sept. 21, 2015) (OCC-SP0613052).

[326] EC MSD Ex. 269 (Report of NBE Candy) at ¶86, citing Email from Deanna Lindquist to Crystal Silva et. al. (Oct. 22, 2015) (OCC-WF-SP-07916406).

[327] EC MSD Ex. 269 (Report of NBE Candy) at ¶86, citing Email from David Otsuka to Rebecca Rawson et. al. (Sept. 21, 2015) (OCC-SP0613052).

[328] EC MSD Ex. 257 (Report of NBE Coleman) at ¶90 citing Strother Tr. 28:7-24 (December 18, 2018), OCC-SP00047742. Gregory J. Coleman is a Deputy Comptroller of Large Bank Supervision for the OCC. He became a commissioned National Bank Examiner in 1994 and Federal Thrift Regulator in 2013. As Deputy Comptroller of Large Bank Supervision, he is responsible for effectively supervising a portfolio of 8 financial institutions totaling $2.8 trillion in assets, as well as leading, mentoring, and managing a staff of 170 examiners and support personnel. Among other things, his responsibilities include setting examination strategy and overseeing the OCC's supervision and personnel management for the institutions in his portfolio. He also reviews and confirms the OCC's findings and conclusions on safety and soundness, legal and regulatory violations, and fiduciary duty expectations, and deliver such findings to the directors and senior management of the institutions he oversees. From approximately

Appellate Case: 25-1079    Page: 59    Date Filed: 05/16/2025 Entry ID: 5517644

reported that despite these concerns about Community Bank thresholds, Respondent Russ Anderson, who presented at the meeting, failed to advise the Risk Committee of the 99.99 and 99.95 percent thresholds then being used to identify other types of misconduct.[329]

In April 2015, an SSCOT manager who reported directly to Respondent Russ Anderson shared with Respondent Russ Anderson Facebook posts from a former Bank branch manager.[330] The posts stated: "[Wells Fargo management] have created a toxic atmosphere of sales goals that forces employees to sell products [customers] don't want. They literally say 'every customer needs a credit card.' . . . If there is ever a company as disgusting and unethical as this one, I dare you to find it."[331]

Examiner Smith reported that she is aware of several meetings where Respondent Russ Anderson was not transparent with the OCC's examination team.[332] For example, Examiner Smith reported that notwithstanding her obvious knowledge about sales pressure, including terminations for not meeting sales goals, Respondent Russ Anderson told the OCC at a February 10, 2015 meeting that "no one loses their job because they did not meet sales goals."[333] And she told examiners during a May 14, 2015 meeting with the OCC that interviews with employees

---

September 2015 to September 2019, he was the Deputy Comptroller of Large Bank Supervision responsible for overseeing the supervision of Wells Fargo Bank, N.A. Sioux Falls, South Dakota ("Wells Fargo" or "Bank"). Even after the management of the Bank moved out of his portfolio, he continued to participate in the OCC's investigation of the Bank's sales practices and receive periodic updates on the investigation status, consistent with the role of a senior manager. He has thirty-one years of professional experience at the OCC and Promontory Financial Group, including extensive experience in the government and private sector in the supervision and risk management of large, complex financial institutions. EC MSD Ex. 257 (Report of NBE Coleman) at ¶¶1-4, 6.

[329] EC MSD Ex. 257 (Report of NBE Coleman) at ¶90, citing Minutes of the Meeting of the Risk Committee of the Board of Directors of Wells Fargo & Company held on May 19, 2015, OCC-WF-SP-08676318.

[330] EC MSD Ex. 267 (Report of NBE Smith) at ¶111.

[331] EC MSD Ex. 267 (Report of NBE Smith) at ¶111, quoting E-mail from Rawson to Russ Anderson, FYI ONLY | FW: SNJ FACEBOOK POSTS (RP & AP NAMED) (OCCWF-SP-04792164).

[332] EC MSD Ex. 267 (Report of NBE Smith) at ¶112.

[333] EC MSD Ex. 267 (Report of NBE Smith) at ¶112, citing Conclusion Memorandum, Community Bank Operational Risk Exam: Cross Sell/Sales Practices (Feb. 19, 2015) (OCC-SP0125161).

Appellate Case: 25-1079     Page: 60     Date Filed: 05/16/2025 Entry ID: 5517644

"did not lead to a conclusion about sales pressure," that she does not "hear" about pressure from personal bankers "at all," and that "people are positive and pleased."[334]

Examiner Smith reported that as early as November 2008, Respondent Russ Anderson was informed the "vast majority of customer consent sales integrity cases are directly related" to the fact that no customer signature is required for opening accounts.[335] Yet, according to Examiner Smith, the Community Bank continued to permit employees to issue products without a signature requirement.[336]

Examiner Smith reported that although Respondent Russ Anderson was aware of the risks posed to the Bank by sales practices misconduct, the SSCOT, under her supervision, employed a proactive monitoring threshold for simulated funding designed to capture only "extreme outliers" or the worst of the worst offenders.[337] She reported that Respondent Russ Anderson had previously assented to a months-long pause in 2013 and 2014 of the only proactive monitoring the Bank was doing to identify simulated funding.[338] She reported that the Bank lacked the means to proactively identify many other types of sales practices misconduct, including the issuance of unauthorized debit cards.[339]

---

[334] EC MSD Ex. 267 (Report of NBE Smith) at ¶112, quoting Meeting Notes, Discussion with CB GRO Claudia Russ Anderson surrounding Sales Practices (May 14, 2015) (OCC-SP0067064).

[335] EC MSD Ex. 267 (Report of NBE Smith) at ¶113, quoting E-mail from Pyles to Russ Anderson, RE: SS&D Parking Lot File Pickup Notification (OCC-WF-SP-05012541).

[336] EC MSD Ex. 267 (Report of NBE Smith) at ¶114.

[337] EC MSD Ex. 267 (Report of NBE Smith) at ¶115, quoting E-mail from Rawson to Russ Anderson, FOR REVIEW | FW: SIM FUNDING & Phone Change outliers for OTHER AREAS—PROPOSED E-MAIL PART 3 (Oct. 25, 2013) (OCC-WF-SP-07037285).

[338] EC MSD Ex. 267 (Report of NBE Smith) at ¶115, citing E-mail from Russ Anderson to Callahan et al. Sales Quality work (Jan. 30, 2014) (OCC-SP00009142).

[339] EC MSD Ex. 267 (Report of NBE Smith) at ¶115.

Examiner Smith reported that notwithstanding her knowledge about the inadequacy of the Bank's sales practices controls, for which she was directly responsible, Respondent Russ Anderson was involved in the preparation and presentation of the May 2015 memorandum to the Risk Committee of the Board of Directors that stated the Bank's sales practices controls were "robust."[340] The memo stated that the root cause of sales practices misconduct was "intentional team member misconduct," and that the there was "a dramatic reduction in inappropriate practices in the past year," without disclosing the high thresholds SSCOT used to identify wrongdoers.[341] The memorandum was also provided to the OCC.[342]

Examiner Smith opined that Respondent Russ Anderson engaged in violations of law, unsafe or unsound practices, and breaches of her fiduciary duty by failing to ensure that the Bank adequately managed sales practices risk, which allowed the Bank's sales practices misconduct problem to continue unabated for many years, and failed in performing the most basic elements of her job.[343]

Examiner Smith further opined that Respondent Russ Anderson engaged in violations of law, unsafe or unsound practices, and breaches of her fiduciary duty by misleading and providing false information to the Board of Directors and the OCC and obstructing the OCC's examination process; that Respondent Russ Anderson recklessly engaged in the aforementioned unsafe or unsound practices, and that Respondent Russ Anderson's violations, practices, and breaches

---

[340] EC MSD Ex. 267 (Report of NBE Smith) at ¶116, quoting Memorandum from Strother to Risk Committee WFC Board of Directors, Board Risk Committee Agenda Item (May 19, 2015) (OCC-WF-SP-07083821).

[341] EC MSD Ex. 267 (Report of NBE Smith) at ¶117, quoting Memorandum from Strother to Risk Committee WFC Board of Directors, Board Risk Committee Agenda Item (May 19, 2015) (OCC-WF-SP-07083821) at 3, 5.

[342] EC MSD Ex. 267 (Report of NBE Smith) at ¶118.

[343] EC MSD Ex. 267 (Report of NBE Smith) at ¶118

constituted a pattern of misconduct, involved personal dishonesty, and demonstrated a willful and continuing disregard for the Bank's safety and soundness.[344]

In late 2016, in response to an OCC MRA and the work of consultant PriceWaterhouse Coopers regarding the volume of accounts that had likely been affected by simulated funding, the Bank's Financial Crimes Risk Management department conducted its own analysis of potential simulated funding.[345] This analysis concluded that from May 2011 through July 2015, "387,000 accounts were opened by 41,000 Team Members that were more likely than not simulated funding."[346]

Examiner Candy reported that the Bank's SSCOT continued to use the 99.95th percentile threshold until sales goals were eliminated in October 2016.[347] She opined that using the 99.95th percentile, although slightly better than the 99.99th percentile, is also grossly insufficient given the amount of "red flag" activity.[348]

**The Bank's Controls to Prevent and Detect Sales Practices Misconduct were Inadequate**

Examiner Candy reported that effective internal controls provide bankers and examiners reasonable assurance that bank operations are efficient and effective, risk management systems are effective, and the bank complies with banking laws and regulations, internal policies, and internal procedures.[349] She added that senior management is supposed to oversee and provide

---

[344] EC MSD Ex. 267 (Report of NBE Smith) at ¶¶119-20.

[345] EC MSD Ex. 257 (Report of NBE Coleman) at ¶66

[346] EC MSD Ex. 257 (Report of NBE Coleman) at ¶66, quoting FCRM Report at 1, OCC-WF-SP-08515940.

[347] EC MSD Ex. 269 (Report of NBE Candy) at ¶87.

[348] EC MSD Ex. 269 (Report of NBE Candy) at ¶87.

[349] EC MSD Ex. 269 (Report of NBE Candy) at ¶88, citing Office of the Comptroller of the Currency, Comptroller's Handbook, Internal Control at 2 (Jan. 2001).

leadership and direction for the communication and monitoring of control policies, practices, and processes.[350]

It is Examiner Candy's opinion that the Bank's controls to prevent and detect sales practices misconduct were inadequate and the Bank's risk management of its sales practices and the sales practices themselves were recklessly unsafe or unsound.[351] She reported that designing and implementing controls reasonably designed to prevent and detect misconduct or illegal activity is a critical part of effective risk management and internal controls,[352] adding that generally accepted standards of prudent operation require banks to manage risks and implement and maintain controls reasonably designed to prevent and detect misconduct.[353] She reported that ineffective sales practices risk management increases the potential of financial loss, litigation, regulatory risk, reputational damage, conduct risk, and operational and compliance risks.[354]

As explained in the OCC's Corporate and Risk Governance, Comptroller's Handbook:

> A responsible corporate culture and a sound risk culture are the foundation of an effective corporate and risk governance framework and help form a positive perception of the bank. A bank that fails to implement effective corporate and risk governance principles and practices may hinder the bank's competitiveness and adversely affect the bank's ability to establish new relationships and services or to continue servicing existing relationships. Departures from effective corporate and risk governance principles and practices cast doubt on the integrity of the bank's board and management.

---

[350] EC MSD Ex. 269 (Report of NBE Candy) at ¶88, citing Office of the Comptroller of the Currency, Comptroller's Handbook, Internal Control at 2, 16 (Jan. 2001).

[351] EC MSD Ex. 269 (Report of NBE Candy) at ¶89.

[352] EC MSD Ex. 269 (Report of NBE Candy) at ¶89.

[353] EC MSD Ex. 269 (Report of NBE Candy) at ¶89.

[354] EC MSD Ex. 269 (Report of NBE Candy) at ¶89.

Add. 62

Appellate Case: 25-1079    Page: 64    Date Filed: 05/16/2025 Entry ID: 5517644

History shows that such departures can affect the entire financial services sector and the broader economy.[355]

It is Examiner Candy's conclusion that in addition to its inadequate detective controls, the Bank's controls to prevent sales practices misconduct were insufficient.[356] For example, the Bank did not require a customer signature—*i.e.*, evidence of customer consent—to open a debit card.[357] The Bank began requiring a customer signature to open a credit card only in 2015.[358] On November 3, 2008, the former Head of Sales Quality wrote the following email to Respondent Russ Anderson:

> Many of our product groups in the early 90's lobbied to remove the signature requirements because they slowed down the account opening process and carried a back room cost of filing and storing the paper application. The vast majority of customer consent sales integrity cases are directly related to this issue. This is why we have been pressing so hard for PIN or E-Signature Consent on ALL product sales. If we had a requirement that all product or services had one or the other, then most of our consent issues would become moot.[359]

The Head of SSCOT, who reported to Respondent Russ Anderson, testified that the Bank's systems enabled employees to engage in sales practices misconduct.[360] Rebecca Rawson

---

[355] EC MSD Ex. 269 (Report of NBE Candy) at ₱88, quoting Office of the Comptroller of the Currency, Comptroller's Handbook, Safety and Soundness, Corporative and Risk Governance at 3 (July 2016).

[356] EC MSD Ex. 269 (Report of NBE Candy) at ₱90.

[357] EC MSD Ex. 269 (Report of NBE Candy) at ₱90.

[358] EC MSD Ex. 269 (Report of NBE Candy) at ₱90.

[359] EC MSD Ex. 269 (Report of NBE Candy) at ₱90, quoting Email from Tyson Pyles to Claudia Russ Anderson (Nov. 3, 2008) (OCC-WF-SP-05012541).

[360] EC MSD Ex. 269 (Report of NBE Candy) at ₱90.

Add. 63

Appellate Case: 25-1079   Page: 65   Date Filed: 05/16/2025 Entry ID: 5517644

explained in sworn testimony that the Bank's systems allowed employees to issue debit and credit cards to customers without their signatures or consent, which she determined was a control failure:

> Q Okay. So I take it the bank had a policy that you should not issue credit cards or debit cards without the customer's consent?
>
> A Correct.
>
> Q All right. But the system allowed team members to actually issue credit cards and debit cards without the customer's consent or the customer's signature?
>
> A I think that is right.
>
> Q Okay. And you view that as a failure in controls?
>
> A I think that is fair.[361]

Based on the evidence that she reviewed, Examiner Candy concluded that the Bank's controls to detect sales practices misconduct were also insufficient.[362] She reported that a bank should investigate transactions that it considers a "red flag" for misconduct,[363] adding that is particularly true where, as here, the suspected misconduct constitutes illegal and even criminal activity.[364]

Examiner Candy reported that the Bank's use of the term "simulated funding" to refer to the activity described in this report does not change the fact that the activity constitutes fraud and falsification of bank records as well as a violation of 15 U.S.C. § 45(a) (Unfair and Deceptive

---

[361] EC MSD Ex. 269 (Report of NBE Candy) at ⁋91, quoting Rawson Tr. 50:11-19 (July 26, 2018).

[362] EC MSD Ex. 269 (Report of NBE Candy) at ⁋92.

[363] EC MSD Ex. 269 (Report of NBE Candy) at ⁋92.

[364] EC MSD Ex. 269 (Report of NBE Candy) at ⁋92.

Add. 64

Appellate Case: 25-1079    Page: 66    Date Filed: 05/16/2025 Entry ID: 5517644

Acts and Practices or UDAP).[365] She reported that other types of sales practices misconduct similarly constitute illegal and criminal activity, for example opening a savings account without customer authorization involves falsifying bank records and UDAP.[366]

Examiner Candy reported that the evidence shows that SSCOT determined that every month approximately 30,000 employees, or 45 percent of its employees, engaged in an activity that the Bank itself considered to be a "red flag" for illegal behavior.[367] Yet Examiner Candy reported the Bank investigated only 3 employees per month during the period it was using the 99.99 percent threshold, and only approximately 15-18 employees per month when the Bank used the 99.95 percent threshold.[368] Examiner Candy opined that this is far too few.[369]

Examiner Candy was the lead OCC examiner who reviewed the Bank's earnings for three years and was responsible for understanding the drivers of enterprise and major business line income and expense streams.[370] She understood that at least one of the justifications for the chosen thresholds is that the Bank believed it lacked resources to investigate additional misconduct and expanding the thresholds would yield many false positives.[371] Examiner Candy opined that neither rationale is appropriate and both demonstrate that the Bank did not have adequate risk management over sales practices.[372]

---

[365] EC MSD Ex. 269 (Report of NBE Candy) at ¶92.

[366] EC MSD Ex. 269 (Report of NBE Candy) at ¶92.

[367] EC MSD Ex. 269 (Report of NBE Candy) at ¶93.

[368] EC MSD Ex. 269 (Report of NBE Candy) at ¶93.

[369] EC MSD Ex. 269 (Report of NBE Candy) at ¶93.

[370] EC MSD Ex. 269 (Report of NBE Candy) at ¶94.

[371] EC MSD Ex. 269 (Report of NBE Candy) at ¶94.

[372] EC MSD Ex. 269 (Report of NBE Candy) at ¶94.

Add. 65

Appellate Case: 25-1079     Page: 67     Date Filed: 05/16/2025 Entry ID: 5517644

Examiner Candy opined that the lack of resources to conduct necessary investigations is simply not an excuse for any bank, let alone a bank with the size and resources of Wells Fargo.[373] She noted that Wells Fargo was posting record earnings quarter after quarter during that period.[374] Moreover, she reported, a simple phone call to the customer asking whether he or she opened an account, moved a certain amount of money into it, and then moved back the same amount within one day and conducted no further activity on the new account, could suffice to investigate the issue.[375] She determined that the chosen thresholds were intentionally restrictive so as to allow the Bank to manage the *outcome* (that is, manage the number of employees identified), not the *risk*.[376] She reported that the restrictive thresholds limited the number of investigations and terminations for sales practices misconduct, rather than managing the risk.[377] And she opined that that is not consistent with prudent and effective risk management.[378]

Examiner Candy opined that the fact that the Bank was identifying more "red flag" activity than it had the capacity to investigative is a strong indicator that there was a serious and systemic sales practices misconduct problem in the Community Bank.[379] She reported that this is particularly so given the narrow criteria used to identify "red flag" activity (involving back-and-forth movement of funds between accounts within 24 hours, which in Examiner Candy's view is not indicative of customer authorized activity).[380] Moreover, she opined that the evidence indicates that the Community Bank lacked the ability to identify the following types of sales

---

[373] EC MSD Ex. 269 (Report of NBE Candy) at ¶94.

[374] EC MSD Ex. 269 (Report of NBE Candy) at ¶94.

[375] EC MSD Ex. 269 (Report of NBE Candy) at ¶94.

[376] EC MSD Ex. 269 (Report of NBE Candy) at ¶94.

[377] EC MSD Ex. 269 (Report of NBE Candy) at ¶94.

[378] EC MSD Ex. 269 (Report of NBE Candy) at ¶95.

[379] EC MSD Ex. 269 (Report of NBE Candy) at ¶95.

[380] EC MSD Ex. 269 (Report of NBE Candy) at ¶95.

Appellate Case: 25-1079     Page: 68     Date Filed: 05/16/2025 Entry ID: 5517644

practices misconduct using data analytics (and thus relied on reactive channels only to detect such misconduct): bundling; pinning; sandbagging; and the opening of unauthorized debit cards and credit cards.[381]

Examiner Candy reported that the detected "red flag" activity, the majority of which the Bank chose not to investigate, did not even come to close to reflecting the full universe of sales practices misconduct at the Bank.[382] She noted that the Bank determined each month 30,000 of its employees engaged in an activity that was a red flag for just one of the various types of sales practice misconduct, and she opined that this should have alerted Bank leadership, including the Group Risk Officer and Audit, that there was a serious and systemic problem with sales practices misconduct in the Community Bank's model.[383] She opined that this should have alerted them that the problem was not attributable to rogue employees but to the Community Bank's business model and operations.[384] She reported that rather than changing the profitable model, the Bank investigated three employees per month, and later fifteen to eighteen employees, out of the 30,000 employees identified per month who engaged in the "red flag" activity.[385]

Examiner Candy reported that authoritative sources within the Bank knowledgeable on the red flag activity and the detection methodologies gave testimony that shows the Bank's detection approach was inappropriate.[386] For example, the Head of SSCOT, testified as follows:

> Q I take it you would agree that the Bank's analysis shows that about 45 percent of the employees engaged in red flag activity, is that correct?

---

[381] EC MSD Ex. 269 (Report of NBE Candy) at ₽95.

[382] EC MSD Ex. 269 (Report of NBE Candy) at ₽95.

[383] EC MSD Ex. 269 (Report of NBE Candy) at ₽95.

[384] EC MSD Ex. 269 (Report of NBE Candy) at ₽95.

[385] EC MSD Ex. 269 (Report of NBE Candy) at ₽95.

[386] EC MSD Ex. 269 (Report of NBE Candy) at ₽96.

A Correct.

Q All right. And you also agree that the Bank was only investigating 18 of those? A Correct.

Q All right. And you thought that was problematic?

A Correct.

Q And Ms. Sperle, the head of corporate investigation, also thought it was problematic?

A I believe she did.[387]

The Head of SSCOT admitted that the proactive monitoring demonstrated that the Bank's other two reactive methods for detecting sales practices misconduct (methods that relied on employees and customers reporting misconduct) were ineffective.[388] That is because the reactive methods generally failed to identify even the "worst of the worst" actors who then triggered the 99.99% and 99.95% thresholds.[389] Accordingly, it follows that the reactive controls were also ineffective in detecting employees who engaged in the red flag activity with less frequency given that they did not detect even the most egregious offenders.[390] Specifically, the Head of SSCOT testified as follows:

Q And for the most part, the number of people that met that threshold had not been caught by the Bank's other methods for identifying misconduct?

A Correct.

---

[387] EC MSD Ex. 269 (Report of NBE Candy) at ⁋96, quoting Rawson Tr. 188:3-16 (July 26, 2018).

[388] EC MSD Ex. 269 (Report of NBE Candy) at ⁋97.

[389] EC MSD Ex. 269 (Report of NBE Candy) at ⁋97.

[390] EC MSD Ex. 269 (Report of NBE Candy) at ⁋97.

Q All right. So, if these other methods were not effective in identifying people who are at the top fraction of the top one percent of people engaged in the misconduct, it would fall into a mathematical certainty that they really would not be effective if people engaged in this misconduct who are in the 50th percentile or 60th percentile, correct?

A Correct.[391]

Examiner Candy reported that the Bank had better systems and tools to detect employees who did not meet sales goals than it did employees who engaged in sales practices misconduct.[392] She reported that the risk of termination for employees who did not meet sales goals far exceeded that of being investigated and terminated for sales practices misconduct.[393] She found that the Community Bank management had the ability to track sales at a very granular level and would call the branches multiple times a day with an update on sales activity.[394] She reported that this contrasted sharply with the insufficient and infrequent sales quality and proactive monitoring reporting.[395] She reported that the high pressure and aggressive sales goal business model contributed to an environment with high inherent risk for compliance.[396] And she reported that despite this, Respondent Russ Anderson failed to implement sufficient preventative and detective controls, which ultimately pushed the residual risk to unacceptable levels.[397]

As an example, Examiner Candy noted that Loretta Kay Sperle, the former Head of Corporate Investigations, testified before the OCC that there was a significant likelihood that an

---

[391] EC MSD Ex. 269 (Report of NBE Candy) at ¶97, quoting Rawson Tr. 211:7-20 (July 26, 2018).

[392] EC MSD Ex. 269 (Report of NBE Candy) at ¶98.

[393] EC MSD Ex. 269 (Report of NBE Candy) at ¶98.

[394] EC MSD Ex. 269 (Report of NBE Candy) at ¶98.

[395] EC MSD Ex. 269 (Report of NBE Candy) at ¶98.

[396] EC MSD Ex. 269 (Report of NBE Candy) at ¶98.

[397] EC MSD Ex. 269 (Report of NBE Candy) at ¶98.

employee's manager would know if the employee failed to meet her sales goals because the Community Bank tracked that; by contrast, the chances that an employee would be caught for issuing an unauthorized product or service were very small.[398]

She testified:

> Q Okay. So if [employees] were doing it when nobody is watching, and they don't do it enough to trigger the outlier thresholds that you've had, the chances of them getting caught is very small?
>
> A Yes. I would agree.[399]

**The Bank's Controls Were Intentionally Inadequate**

Based on Bank documents and sworn testimony that Examiner Candy reviewed, she concluded that the Bank's senior leaders did not want to identify and terminate additional employees for sales practices misconduct, beyond those identified through the reactive methods and the restrictive proactive monitoring methodology described above, in part because of the negative publicity that terminations were expected to generate.[400]

Examiner Candy reported that ongoing mass terminations would have undermined the Bank's arguments that were presented to the Board and OCC examiners: (1) the misconduct was caused by "bad apple" employees engaging in intentional misconduct, as opposed to a defect in the business model, and (2) corrective measures implemented by the Community Bank were effectively resolving the problem.[401] She opined that Respondent Russ Anderson's failure to implement effective controls, and the failure to identify employees engaged in sales practice

---

[398] EC MSD Ex. 269 (Report of NBE Candy) at ₱98.

[399] EC MSD Ex. 269 (Report of NBE Candy) at ₱98, quoting Loretta Kay Sperle Tr. 158:15-20 (February 13, 2018) (EC MSD Ex. 299).

[400] EC MSD Ex. 269 (Report of NBE Candy) at ₱99.

[401] EC MSD Ex. 269 (Report of NBE Candy) at ₱99.

misconduct to reduce terminations or to manage reputation risk, was unsafe or unsound and was inconsistent with the role of a Group Risk Officer.[402]

Examiner Candy reported that the Bank's former Director of Investigations and Chief Security Officer Michael Bacon saw common schemes indicative of misconduct that could have easily been detected if the Bank had looked for them.[403] She reported that in 2012 or 2013, he advocated for proactively monitoring other types of sales practices activities, such as: employees or customers with excessive accounts ("hundreds") registered to the same address; college credit cards issued to non-college students; and employees with inappropriate business accounts.[404] She reported that the former Chief Security Officer testified that he offered suggestions for proactive monitoring primarily to Respondent Russ Anderson, but also to Operating Committee members.

Examiner Candy reported that in his testimony Mr. Bacon stated that there was resistance to more investigations due to fear of finding more misconduct that would lead to additional terminations.[405] She reported that the former Chief Security Officer testified that the "lack of being proactive" was a "reoccurring theme" and he informed Respondent Russ Anderson that the employees identified and terminated for sales practices misconduct were the "tip of the iceberg."[406] She reported that he emphasized to her and others that a decline in terminations did not necessarily indicate less misconduct because the Bank was not proactive.[407]

---

[402] EC MSD Ex. 269 (Report of NBE Candy) at ¶99.

[403] EC MSD Ex. 269 (Report of NBE Candy) at ¶100, citing Michael Bacon Tr. 120:7-127:19 (May 4, 2018) (EC MSD Ex. 295).

[404] EC MSD Ex. 269 (Report of NBE Candy) at ¶100.

[405] EC MSD Ex. 269 (Report of NBE Candy) at ¶100, citing Bacon Tr. 120:7-127:19 (May 4, 2018).

[406] EC MSD Ex. 269 (Report of NBE Candy) at ¶100 quoting Bacon Tr. 105:25-106:19; 121:23-122:15 (May 4, 2018).

[407] EC MSD Ex. 269 (Report of NBE Candy) at ¶100, citing Bacon Tr. 105:25-106:19; 121:23-122:15 (May 4, 2018).

Add. 71

Appellate Case: 25-1079      Page: 73      Date Filed: 05/16/2025 Entry ID: 5517644

The former Chief Security Officer testified before the OCC that Community Bank senior leadership, including Respondent Russ Anderson, "absolutely" wanted to minimize terminations even if there was strong evidence that the employee engaged in sales practices misconduct.[408]

James Richards, the Head of the Bank's Financial Crimes Risk Management ("FCRM") department, testified before the OCC that "using a percentage threshold does not necessarily address the actual risk. So if you're pulling down a two percent or .01 percent or .05 percent that's managing the output more than it is managing the risk."[409] He testified that he explained this to Respondent Russ Anderson and offered members of his analytics team to assist SSCOT's monitoring, but she refused. He testified that Respondent Russ Anderson responded that if "SSCOT changed or dramatically changed their monitoring thresholds that they would have, and I can't recall her phrase, but many, many more identified team members than they could reasonably handle."[410]

**Magnitude of Sales Practices Misconduct**

Examiner Candy reported that the OCC's investigation revealed that the scope of misconduct dramatically exceeded what has been publicly reported even during the September 2016 Congressional inquiries, what was reported to the Board in real time, and what was disclosed to the OCC during its examinations.[411] Examiner Candy opined that given the business model in the Community Bank, the duration of the sales practices misconduct problem, and the quality of the preventative and detective controls for sales practices misconduct, a significant

---

[408] EC MSD Ex. 269 (Report of NBE Candy) at ¶100, quoting Bacon Tr. 61:16-63:13 (May 4, 2018).

[409] EC MSD Ex. 269 (Report of NBE Candy) at ¶100, quoting James Richards Tr. 139:3-140:17 (May 4, 2018) (EC MSD Ex. 298).

[410] EC MSD Ex. 269 (Report of NBE Candy) at ¶100, quoting Richards Tr. 146:5-149:24 (May 1, 2018).

[411] EC MSD Ex. 269 (Report of NBE Candy) at ¶101.

Appellate Case: 25-1079    Page: 74    Date Filed: 05/16/2025 Entry ID: 5517644

number of Community Bank customer-interfacing employees engaged in sales practices misconduct.[412]

Examiner Candy reported that in August 2017, Bank consultant PricewaterhouseCoopers ("PwC") determined that Bank employees opened approximately 3.5 million potentially unauthorized accounts between January 2009 and September 2016.[413] She reported that Bank documents show that as of January 2016, the Community Bank allowed employees to have approximately 30 percent of the new accounts they opened to remain unfunded; they would still be eligible to receive sales credit for the unfunded accounts.[414] She reported that it is likely that some employees would only engage in simulated funding if they had exhausted other types of misconduct (which the Bank did not have the capabilities to proactively detect) but were still unable to meet their goals.[415] Thus, only employees who had exhausted other opportunities to invent sales but were still short on sales goals were most likely to resort to "simulated funding."[416]

Examiner Candy noted that in the DOJ Statement of Facts, the Bank itself admitted to the volume of sales practices misconduct:

> "The Community Bank's onerous sales goals and accompanying management pressure led thousands of its employees to engage in: (1) unlawful conduct to attain sales through fraud, identity theft, falsification of bank records, and (2) unethical practices to sell products of no or low value

---

[412] EC MSD Ex. 269 (Report of NBE Candy) at ¶101.

[413] EC MSD Ex. 269 (Report of NBE Candy) at ¶102.

[414] EC MSD Ex. 269 (Report of NBE Candy) at ¶107.

[415] EC MSD Ex. 269 (Report of NBE Candy) at ¶107.

[416] EC MSD Ex. 269 (Report of NBE Candy) at ¶107.

Add. 73

Appellate Case: 25-1079    Page: 75    Date Filed: 05/16/2025 Entry ID: 5517644

to the customer, while believing that the customer did not actually need the account and was not going to use the account."[417]

"Millions of secondary accounts and products were opened from 2002 to 2016, and many of these were never used by customers."[418]

"Between 2011 and 2016, tens of thousands of employees were the subject of allegations of unethical sales practices. During this period, the Company referred more than 23,000 employees for sales practices investigation and terminated over 5,300 employees for customer-facing sales ethics violations, including, in many cases, for falsifying bank records. Thousands of additional employees received disciplinary action short of termination or resigned prior to the conclusion of the Company's investigations into their sales practices."[419]

"From 2002 to 2016, Wells Fargo opened millions of accounts or financial products that were unauthorized or fraudulent."[420]

---

[417] EC MSD Ex. 269 (Report of NBE Candy) at ¶110, quoting Press Release, U.S. Attorney's Office for the Central District of California, Wells Fargo Agrees to Pay $3 Billion to Resolve Criminal and Civil Investigations into Sales Practices (Feb. 21, 2020); Wells Fargo Deferred Prosecution Agreement and Exhibit A, Statement of Facts (Feb. 20, 2020), at A-1 through A-16, ¶ 15 (Feb. 21, 2020) (Bank admitting to criminal violations resulting from sales practices misconduct, the root cause, scope, and duration of the problem, and the knowledge of Community Bank senior leadership).

[418] EC MSD Ex. 269 (Report of NBE Candy) at ¶110, quoting Press Release, U.S. Attorney's Office for the Central District of California, Wells Fargo Agrees to Pay $3 Billion to Resolve Criminal and Civil Investigations into Sales Practices (Feb. 21, 2020); Wells Fargo Deferred Prosecution Agreement and Exhibit A, Statement of Facts (Feb. 20, 2020) ¶ 17.

[419] EC MSD Ex. 269 (Report of NBE Candy) at ¶110, quoting Press Release, U.S. Attorney's Office for the Central District of California, Wells Fargo Agrees to Pay $3 Billion to Resolve Criminal and Civil Investigations into Sales Practices (Feb. 21, 2020); Wells Fargo Deferred Prosecution Agreement and Exhibit A, Statement of Facts (Feb. 20, 2020) ¶ 30.

[420] EC MSD Ex. 269 (Report of NBE Candy) at ¶110, quoting Press Release, U.S. Attorney's Office for the Central District of California, Wells Fargo Agrees to Pay $3 Billion to Resolve Criminal and Civil Investigations into Sales

Add. 74

Appellate Case: 25-1079    Page: 76    Date Filed: 05/16/2025 Entry ID: 5517644

"Millions of non-Wells Fargo-employee customer accounts reflected a Wells Fargo email address as the customer's email address, contained a generic and incorrect customer phone number, or were linked to a Wells Fargo branch or Wells Fargo employee's home address."[421]

Examiner Candy reported that "millions" of non-Wells Fargo-employee customer account documents were not delivered to the customer but were sent to the employee or Bank premises indicates both the immense magnitude of the misconduct and the inadequate controls.[422] She reported that this demonstrates the systematic nature of the misconduct and the detrimental impact of the high sales goals and high-pressure business model.[423] She added that in an October 2013 email, a senior Community Bank executive stated: "Basically we are closing about 90% of the accounts we open within 12 months. Not something to broadcast but 'something' is going on."[424]

Examiner Candy reported that anecdotal evidence also illustrates the pervasiveness of sales practices misconduct.[425] She found that every customer-interfacing employee had a powerful motive and opportunity to engage in sales practices misconduct.[426] She found the motive arose from fear of disciplinary action up to and including termination if they did not meet

---

Practices (Feb. 21, 2020); Wells Fargo Deferred Prosecution Agreement and Exhibit A, Statement of Facts (Feb. 20, 2020) ¶ 32.

[421] EC MSD Ex. 269 (Report of NBE Candy) at ⁋110, quoting Press Release, U.S. Attorney's Office for the Central District of California, Wells Fargo Agrees to Pay $3 Billion to Resolve Criminal and Civil Investigations into Sales Practices (Feb. 21, 2020); Wells Fargo Deferred Prosecution Agreement and Exhibit A, Statement of Facts (Feb. 20, 2020) ¶ 16.

[422] EC MSD Ex. 269 (Report of NBE Candy) at ⁋111.

[423] EC MSD Ex. 269 (Report of NBE Candy) at ⁋111.

[424] EC MSD Ex. 269 (Report of NBE Candy) at ⁋112, quoting Email from Laura Schulte to Shelly Freemen (Oct. 18, 2013) (OCC-WF-SP-05365262).

[425] EC MSD Ex. 269 (Report of NBE Candy) at ⁋113.

[426] EC MSD Ex. 269 (Report of NBE Candy) at ⁋114.

Add. 75

Appellate Case: 25-1079     Page: 77     Date Filed: 05/16/2025 Entry ID: 5517644

the unreasonable sales goals, or the desire to earn incentive compensation.[427] She also found that the opportunity arose from the inadequate controls as detailed in this report.[428] Given this motive and opportunity, the Bank's own data and analysis, the duration of sales practices misconduct, and her experience, training, and commission as a National Bank Examiner, it is Examiner Candy's opinion and conclusion that sales practices misconduct was pervasive in the Community Bank and involved tens of thousands, if not hundreds of thousands, of Bank employees issuing millions of products to customers without their consent.[429]

**Respondent Russ Anderson Failed to Perform her Responsibilities as the Group Risk Officer**

**Background on Bank Supervision Generally**

Examiner Coleman reported that the OCC supervises the largest banks and thrifts subject to its supervision within the Large Bank Supervision division ("LBS").[430] Within the OCC, an institution supervised by LBS is referred to as a "large bank."[431] The OCC has "resident" teams of LBS examiners stationed on-site at each large bank. Those examiners, led by an examiner-in-charge, supervise the institution and regularly assess different areas of a bank, including various components of its safety and soundness, risk management, and compliance with laws and regulations.[432]

---

[427] EC MSD Ex. 269 (Report of NBE Candy) at ¶114.

[428] EC MSD Ex. 269 (Report of NBE Candy) at ¶114.

[429] EC MSD Ex. 269 (Report of NBE Candy) at ¶114.

[430] EC MSD Ex. 257 (Report of NBE Coleman) at ¶13.

[431] EC MSD Ex. 257 (Report of NBE Coleman) at ¶13.

[432] EC MSD Ex. 257 (Report of NBE Coleman) at ¶13.

Appellate Case: 25-1079    Page: 78    Date Filed: 05/16/2025 Entry ID: 5517644

Examiner Coleman reported that the OCC uses a risk-based approach to determine its supervision strategy, prioritizing higher-risk activities and functions of the banks to assess the banks' safety and soundness and operation in compliance with applicable laws and regulations. Supervisory strategies are set in advance for each fiscal year.[433] The OCC supervisory process relies on transparency and open communication for its effectiveness. OCC examiners request information from bank management at the inception of each supervisory activity in order to assess the area under examination, and the OCC expects bank management to provide accurate and complete information in response to such requests.[434] Further, the effectiveness of the supervisory process requires that bank management be transparent about examination-related risks, issues, and problems for areas being examined by the OCC.[435]

Examiner Coleman reported that although the OCC has a dedicated staff of examiners assigned to each large bank, the number of OCC examiners is dwarfed by the number of control function staff at each large bank, including the bank's risk management, compliance, legal, and audit personnel, among others.[436] The number of OCC examiners assigned to Wells Fargo between 2010 and 2016 generally ranged from 60 to 85 dedicated examiners. By way of comparison, Wells Fargo had more than 1,400 people in its audit department, more than 1,000 in its law department, and several thousand staff across its risk management function.[437] Each of those control function units or departments has an important role in ensuring the safe and sound operation of the Bank and its compliance with laws and regulations.[438]

---

[433] EC MSD Ex. 257 (Report of NBE Coleman) at ¶14.

[434] EC MSD Ex. 257 (Report of NBE Coleman) at ¶15.

[435] EC MSD Ex. 257 (Report of NBE Coleman) at ¶15

[436] EC MSD Ex. 257 (Report of NBE Coleman) at ¶16.

[437] EC MSD Ex. 257 (Report of NBE Coleman) at ¶16.

[438] EC MSD Ex. 257 (Report of NBE Coleman) at ¶16.

Add. 77

Appellate Case: 25-1079     Page: 79     Date Filed: 05/16/2025 Entry ID: 5517644

Examiner Coleman reported that one of the ways the OCC and financial institutions refer to effective risk management within an institution is by reference to a framework known as the three lines of defense.[439] He reported that this framework is well laid out in OCC guidance:

> The three lines of defense model explains governance and roles among the bank's business units, support functions, and the internal audit function from a risk management perspective. First line of defense risk management activities take place at the frontline units where risks are created. The second line of defense risk management activities occur in an area or function separate from the frontline unit, sometimes referred to as independent risk management. It oversees and assesses frontline units' risk management activities.
>
> The internal audit function is often referred to as the third line of defense in this model. In its primary responsibility of providing independent assurance and challenge, the internal audit function assesses the effectiveness of the policies, processes, personnel, and control systems created in the first and second lines of defense.[440]

Examiner Coleman reported that it is the responsibility of all three lines of defense to keep the Board of Directors informed of the Bank's risk management practices to allow the Board to provide credible challenge to management's recommendations and decisions.[441]

**Respondent Russ Anderson's Responsibilities as the Group Risk Officer**

---

[439] EC MSD Ex. 257 (Report of NBE Coleman) at ¶17.

[440] EC MSD Ex. 257 (Report of NBE Coleman) at ¶17, quoting Comptroller's Handbook, Internal and External Audits at 2 (December 2016), OCC-SP1107962.

[441] EC MSD Ex. 257 (Report of NBE Coleman) at ¶17, citing Wells Fargo Risk Management Framework, Published July 2014, OCC-WF-SP-04791987.

Add. 78

Examiner Candy reported that Respondent Russ Anderson served as the Community Bank's Compliance and Operational Risk Manager or Group Risk Officer from 2004 until August 2016.[442] She noted that as the Group Risk Officer, Respondent Russ Anderson led the first line of defense at the Bank, responsible for identifying, measuring, assessing, controlling, mitigating, monitoring, and reporting current and emerging risks associated with the Community Bank's activities and operations.[443] Examiner Candy reported that Respondent Russ Anderson was accountable for ensuring that the Community Bank effectively managed risk and that the Community Bank conducted its operations consistent with applicable laws and regulations and safety and soundness principles.[444]

Examiner Candy reported that Respondent Russ Anderson also was responsible for providing credible challenge to Community Bank leaders, implementing proactive and sound risk management practices, reinforcing the risk culture throughout the Community Bank, and exhibiting transparency when interacting with Bank management, the Bank's Enterprise Risk Management Committee ("ERMC"), the Bank's Board, and the OCC.[445] She was responsible for understanding the risks associated with sales processes and incentive structures in the Community Bank, assessing whether such risks were adequately managed, credibly challenging Community Bank leadership, and escalating risks and significant trends to senior Bank management, the ERMC, and the Board.[446]

The Bank's Fraud Risk Management Policy details the responsibilities of various functions. "The purpose of this policy is to promote accountability, measurability, partnership, and transparency of fraud risk management at Wells Fargo by setting the structure and

---

[442] EC MSD Ex. 269 (Report of NBE Candy) at ¶115.

[443] EC MSD Ex. 269 (Report of NBE Candy) at ¶116.

[444] EC MSD Ex. 269 (Report of NBE Candy) at ¶117.

[445] EC MSD Ex. 269 (Report of NBE Candy) at ¶118.

[446] EC MSD Ex. 269 (Report of NBE Candy) at ¶119.

Add. 79

expectations for business fraud risk management programs."[447] Under the Bank's Fraud Risk Management Policy, Respondent Russ Anderson was accountable for managing internal fraud risk related specifically to business practices and processes and developing appropriate controls to help mitigate identified fraud risks.[448]

**Respondent Russ Anderson's Conduct with Respect to the Sales Practices Misconduct Problem**

> "The hallmark of a positive control environment is a commitment by the board of directors and senior management to strong controls. A bank's board of directors and management are responsible for establishing and maintaining effective internal control that meets the statutory and regulatory requirements and responds to changes in the bank's environment and conditions. They must ensure that the system operates as intended and is modified appropriately when circumstances dictate."[449]

It is Examiner Candy's opinion that Respondent Russ Anderson failed to execute her risk management, control, and escalation responsibilities as the Group Risk Officer, the Chairperson of the Community Bank Risk Management Committee, and under the Bank's own policies.[450] It is also her opinion that this conduct was recklessly unsafe or unsound and exposed the Bank to a risk of substantial harm. Her conduct, in Examiner Candy's opinion, constituted a breach of her fiduciary duty.[451]

---

[447] EC MSD Ex. 269 (Report of NBE Candy) at ¶120, quoting Fraud Risk Management Policy (Aug. 1, 2013) (OCC-WF-SP-08175861).

[448] EC MSD Ex. 269 (Report of NBE Candy) at ¶120.

[449] EC MSD Ex. 269 (Report of NBE Candy) at ¶121, quoting Office of the Comptroller of the Currency, Comptroller's Handbook, Internal Control at 15 (Jan. 2001).

[450] EC MSD Ex. 269 (Report of NBE Candy) at ¶122.

[451] EC MSD Ex. 269 (Report of NBE Candy) at ¶122.

Appellate Case: 25-1079     Page: 82     Date Filed: 05/16/2025 Entry ID: 5517644

Examiner Candy reported that generally accepted standards of prudent operation require banks to have controls reasonably designed to detect and prevent misconduct.[452] Any control needs to be designed so as to effectively manage risk.[453] The onus is on Bank management to understand activities conducted by lines of business and the risks generated by those activities.[454] The Community Bank was the largest line of business at Wells Fargo and selling additional products to existing customers ("cross-sell") was a cornerstone of the business model.[455] According to OCC economist Mark Pocock,[456] the Bank's business model was known as "cross-sell" and sought to maximize the number of Bank products sold to a household.[457] He reported that Bank senior management theorized that the more Bank products sold to a household, the less likely those customers were to exit their relationship with the Bank, and the deepening of the

---

[452] EC MSD Ex. 269 (Report of NBE Candy) at ¶123.

[453] EC MSD Ex. 269 (Report of NBE Candy) at ¶123.

[454] EC MSD Ex. 269 (Report of NBE Candy) at ¶123.

[455] EC MSD Ex. 269 (Report of NBE Candy) at ¶123.

[456] Mark Pocock currently is employed as the Lead Expert for Capital Adequacy and Planning within the Office of the Comptroller of the Currency ("OCC"), a bureau of the United States Department of the Treasury. He has held this position since July 2019. He received a Bachelor's Degree in Economics with university honors from Brigham Young University, Provo, Utah, in 2001, a Master of Arts in Economics from the University of Texas, Austin, Texas, in May 2003, and a Doctor of Philosophy (PhD) in Economics from the University of Texas, Austin, Texas, in 2006. From January 2012 through June 2017, he held several positions within Large Bank Supervision and the Economics Department at the OCC. In January 2012, he re-joined the OCC as a Senior Financial Economist. In this role he provided analysis and advice on stress testing and other enterprise risk related supervisory and regulatory issues to OCC policy makers and assisted examiners in conducting examinations of statistical models used for stress testing, allowance for loan and lease loss reserves, and operational risk measurement. In January 2015, he was promoted to the position of Dodd-Frank Act Stress Testing Program ("DFAST") Manager for Large Bank Supervision where he was responsible for developing and executing the OCC's DFAST Program. In February 2016, he was promoted to the position of Lead Expert for Capital Adequacy and Planning for Large Bank Supervision. In this position He served as the OCC's subject matter expert on regulatory capital (Basel Accord), the DFAST Program, and related capital adequacy and planning supervisory initiatives. EC MSD Ex. 658 (Report of Mark Pocock, PhD) at ¶¶1-7.

[457] EC MSD Ex. 658 (Report of Mark Pocock, PhD) at ¶33.

Add. 81

Appellate Case: 25-1079     Page: 83     Date Filed: 05/16/2025 Entry ID: 5517644

customer relationship increases the potential revenue earned from the relationship.[458] The financial industry considered the Bank to be "the king of cross-sell."[459]

Dr. Pocock reported that the Bank maintained and WFC publicly reported a metric known as the "cross-sell ratio."[460] The cross-sell ratio is a measure of Bank products sold per household and was touted by the Bank and WFC as an indicator and driver of future revenue.[461] He reported that the Bank's cross-sell business model had many financial benefits, some of which are obvious, but others are subtle.[462] The obvious benefit is that it allowed the Bank to acquire more customers and to sell more products and services to each customer.[463] Dr. Pocock reported that such sales would increase revenue and enhance WFC's stock price.[464]

Dr. Pocock reported that a more subtle, but likely greater benefit of the cross-sell business model, is the prospect of future growth.[465] The Bank and WFC publicly highlighted the potential growth attributable to the cross-sell strategy.[466] While the current income from these products supported the stock price, the larger factor for the stock price is revenue and earnings growth due to additional products sold to households in the future.[467] In general, the likelihood of a customer acquiring his or her next financial product from the Bank increases as the number

---

[458] EC MSD Ex. 658 (Report of Mark Pocock, PhD) at ¶33.

[459] EC MSD Ex. 658 (Report of Mark Pocock, PhD) at ¶33, quoting Wells Fargo & Co., 2010 Annual Report at 5 (2011), available at https://qjubs3y9ggo1neukf3sc81r19vv-wpengine.netdna-ssl.com/assets/pdf/annual-reports/2010-annual-report.pdf.

[460] EC MSD Ex. 658 (Report of Mark Pocock, PhD) at ¶34.

[461] EC MSD Ex. 658 (Report of Mark Pocock, PhD) at ¶34.

[462] EC MSD Ex. 658 (Report of Mark Pocock, PhD) at ¶35.

[463] EC MSD Ex. 658 (Report of Mark Pocock, PhD) at ¶35.

[464] EC MSD Ex. 658 (Report of Mark Pocock, PhD) at ¶35

[465] EC MSD Ex. 658 (Report of Mark Pocock, PhD) at ¶36.

[466] EC MSD Ex. 658 (Report of Mark Pocock, PhD) at ¶36.

[467] EC MSD Ex. 658 (Report of Mark Pocock, PhD) at ¶36.

Appellate Case: 25-1079    Page: 84    Date Filed: 05/16/2025 Entry ID: 5517644

of products the customer has with the Bank increases.[468] For example, if a customer has his saving and checking accounts as well as his debit and credit cards with the Bank, he or she is more likely to look to the Bank for their next financial product, such as a mortgage or automobile loan.[469] Consequently, WFC not only reported the Bank's cross-sell ratio, but also boasted about the Bank's track record of consistent quarterly and annual cross-sell ratio growth.[470]

Dr. Pocock reported that preserving the Bank's cross-sell ratio growth was a primary focus of senior management.[471] He noted that in a May 24, 2012 e-mail, the Bank's Group Financial Officer explained that "[Respondent Tolstedt] had to be talked off the ledge" when informed of the possibility that the cross-sell ratio might drop by a mere .01%.[472] Dr. Pocock reported that the Community Bank's Group Financial Officer explained that "John [the CEO] told the world on Tuesday to expect cross-sell to grow '.15 to .30 a year' which translates 0.01 to .03 a month. So .01 is a significant and material increment when we look at months or quarters."[473]

Examiner Candy reported that Bank management needed to understand the risks generated by this activity and design and implement controls that effectively manage the risk.[474] As the Group Risk Officer, Respondent Russ Anderson's primary responsibility was to ensure that the Community Bank properly managed all risks inherent in its operations.[475] She was also

---

[468] EC MSD Ex. 658 (Report of Mark Pocock, PhD) at ₱36.

[469] EC MSD Ex. 658 (Report of Mark Pocock, PhD) at ₱36.

[470] EC MSD Ex. 658 (Report of Mark Pocock, PhD) at ₱37.

[471] EC MSD Ex. 658 (Report of Mark Pocock, PhD) at ₱38.

[472] EC MSD Ex. 658 (Report of Mark Pocock, PhD) at ₱38.

[473] EC MSD Ex. 658 (Report of Mark Pocock, PhD) at ₱38, quoting E-mail from Bredensteiner to Raphaelson (May 25, 2012) (OCC-SP00001510).

[474] EC MSD Ex. 269 (Report of NBE Candy) at ₱123.

[475] EC MSD Ex. 269 (Report of NBE Candy) at ₱124.

responsible for ensuring that the Community Bank implemented adequate controls commensurate with the risk inherent in those operations.[476] Examiner Candy reported that Respondent Russ Anderson served as Chairperson of the Community Banking Risk Management Committee from at least 2011 until August 2016, and was responsible for understanding the Community Bank's "operational risk profile and [] work[ing] with management across Community Banking to ensure risks are managed effectively."[477] Examiner Candy reported that sales practices risk was not managed effectively. It is Examiner Candy's opinion that Respondent Russ Anderson failed to fulfill her responsibilities with respect to the sales practices misconduct problem and that this was recklessly unsafe or unsound and a breach of her fiduciary duty.[478]

Examiner Candy reported that the Community Bank's sales practices misconduct problem existed during the entire time that Respondent Russ Anderson served as the Group Risk Officer.[479] Examiner Candy opined that the Community Bank did not adequately address the sales practices misconduct problem during her tenure and she did not advocate for fundamental changes to the business model. She found that the Board Report accurately concluded that: "Russ Anderson's performance fell far short of what was expected and required of the senior risk officer in the Community Bank. Russ Anderson failed to adequately assess and advocate for changes in the business practices that resulted in sales integrity violations."[480]

Examiner Candy opined that Respondent Russ Anderson also is responsible for significant deficiencies in the Bank's risk management and controls, which enabled ongoing

---

[476] EC MSD Ex. 269 (Report of NBE Candy) at ¶124.

[477] EC MSD Ex. 269 (Report of NBE Candy) at ¶124, quoting Charter: Community Banking Risk Management Committee (Jan. 2013) (OCC-WF-SP-06917996); Community Banking Risk Management Committee Charter (Mar. 24, 2015) (OCC-WF-SP-08656459).

[478] EC MSD Ex. 269 (Report of NBE Candy) at ¶124.

[479] EC MSD Ex. 269 (Report of NBE Candy) at ¶124

[480] EC MSD Ex. 269 (Report of NBE Candy) at ¶124, quoting Board Report at 49.

legal violations by Bank employees.[481] She reported that Respondent Russ Anderson did not ensure that incentive compensation plans adequately balanced risk and reward as required by the ICRM Policy.[482] The threat of employee termination and disciplinary action and actual terminations for failing to meet sales goals continued until October 2016.[483] Examiner Candy reported that it is her understanding that to this day, Respondent Russ Anderson maintains that employees were not terminated for failing to meet sales goals and that the controls were adequate.[484]

Examiner Candy opined that Respondent Russ Anderson failed to escalate the sales practices misconduct problem and that this was recklessly unsafe or unsound and constituted a breach of her fiduciary duty.[485] Examiner Candy reported that generally accepted standards of prudent operation require risk officers to identify risk in the line of business and ensure appropriate action is taken to mitigate and address the risk.[486] She opined that Respondent Russ Anderson acted contrary to generally accepted standards of prudent operation by protecting the Community Bank's business model instead of challenging or correcting it.[487] She reported that Respondent Russ Anderson never escalated and accurately reported on sales practices misconduct and its root cause, duration, and scope, and the adequacy of controls to the Chief Risk Officer, Enterprise Risk Management Committee, the Board, and the OCC.[488] Examiner Candy reported that instead, Respondent Russ Anderson attempted to protect the Community

---

[481] EC MSD Ex. 269 (Report of NBE Candy) at ⁋124.

[482] EC MSD Ex. 269 (Report of NBE Candy) at ⁋124.

[483] EC MSD Ex. 269 (Report of NBE Candy) at ⁋124.

[484] EC MSD Ex. 269 (Report of NBE Candy) at ⁋124.

[485] EC MSD Ex. 269 (Report of NBE Candy) at ⁋125.

[486] EC MSD Ex. 269 (Report of NBE Candy) at ⁋125.

[487] EC MSD Ex. 269 (Report of NBE Candy) at ⁋125.

[488] EC MSD Ex. 269 (Report of NBE Candy) at ⁋125.

Bank from external scrutiny, rather than properly identifying, controlling, reporting, and escalating risks.[489]

It is Examiner Candy's opinion that Respondent Russ Anderson's false, misleading, and incomplete reporting to the ERMC, the Board, and the OCC was recklessly unsafe or unsound and constituted a breach of her fiduciary duty.[490] "Information should give directors a complete and accurate overview of the bank's condition, activities, and issues. Management is responsible for being transparent and providing information in a meaningful format."[491] Examiner Candy opined that Respondent Russ Anderson's reporting lacked this requisite transparency, candor, and completeness of information.[492]

Examiner Candy reported that despite having knowledge to the contrary, Respondent Russ Anderson in an April 2014 presentation to the Bank's ERMC told the Committee that the Community Bank's business model did not incent inappropriate behavior.[493] Examiner Candy opined that this is a false statement and demonstrates Respondent Russ Anderson's personal dishonesty.[494] Examiner Candy reported that Respondent Russ Anderson reviewed and edited the May 19, 2015 Memo that Mr. Strother submitted to the Risk Committee of the Board and the

---

[489] EC MSD Ex. 269 (Report of NBE Candy) at ⁋125.

[490] EC MSD Ex. 269 (Report of NBE Candy) at ⁋125.

[491] EC MSD Ex. 269 (Report of NBE Candy) at ⁋126, quoting Office of the Comptroller of the Currency, Comptroller's Handbook, Safety and Soundness, Corporative and Risk Governance at 33 (July 2016).

[492] EC MSD Ex. 269 (Report of NBE Candy) at ⁋126.

[493] EC MSD Ex. 269 (Report of NBE Candy) at ⁋126, citing Minutes, Enterprise Risk Management Committee (April 9, 2014) (OCC-WF-SP-06400169).

[494] EC MSD Ex. 269 (Report of NBE Candy) at ⁋126.

Add. 86

OCB.[495] Examiner Crosthwaite reported that as detailed below, the May 19, 2015 Memo was false, misleading, and incomplete.[496]

**Respondent Russ Anderson Obstructed and Provided False Statements to OCC Examiners**

Based on her 24 years of experience as a national bank examiner, Examiner Crosthwaite opined that the Community Bank's Group Risk Officer, Respondent Russ Anderson, failed to fulfill her fiduciary duty and responsibilities as the first line of defense responsible for risk management and controls.[497] Banks are required to have sound risk management policies, procedures, and controls related to all aspects of the bank, including those areas of the bank that may pose, or have posed, heightened risks such as in the case of Wells Fargo Community Bank's sales practices.[498] The Bank had various policies and procedures in place that touched on various aspects of sales practices misconduct.[499] Respondent Russ Anderson had responsibility for ensuring the adequacy and appropriateness of the Community Bank's risk management and controls.[500]

Under the Bank's Incentive Compensation Risk Management Policy, Respondent Russ Anderson was required to ensure that incentive compensation plans appropriately balanced risk and reward, as well as provide independent reviews of incentive compensation arrangements.[501]

---

[495] EC MSD Ex. 269 (Report of NBE Candy) at ¶126.

[496] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶108.

[497] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶108.

[498] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶108.

[499] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶108.

[500] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶109.

[501] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶110.

Respondent Russ Anderson admits that "she had some, but not the sole, authority to address or investigate sales practices misconduct . . ."[502]

Notwithstanding that both the problem and its root cause were identified and well known by at least 2004, the Community Bank and Respondent Russ Anderson took no meaningful action.[503] The Board Report stated: "Despite the recognition by 2004 of both the increasing scope of sales practice issues and their association with sales incentives, the problem continued to grow."[504]

National bank examiners rely on information provided to them and communications with bank personnel and bank management during the course of supervisory activities and examinations.[505] Any bank employee is expected to be forthcoming, transparent, and candid in all communications with management, management committees, the board of directors, and its regulators, including the OCC both verbally and in writing.[506]

Management is required to be transparent and provide comprehensive and accurate information to senior management, the board, and the OCC. Transparency and truthful communication between the banker and regulator is of utmost importance for banks of all sizes.[507] It is imperative to the examination process that exams are conducted honestly and impartially, free from deceit, craft, dishonesty, trickery, unlawful impairment, impediment, and obstruction.[508] The level of transparency by bank management with senior management, the

---

[502] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶110.

[503] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶111.

[504] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶111.

[505] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶112.

[506] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶112.

[507] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶113.

[508] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶114.

Add. 88

Appellate Case: 25-1079     Page: 90     Date Filed: 05/16/2025 Entry ID: 5517644

board, and the regulator influence and can hinder the bank's reputation with shareholders, regulators, customers, other stakeholders, and the community at large.[509]

Respondent Russ Anderson was the OCC's primary point of contact during the February 2015 Exam, given that the examination focused on her risk organization in the Community Bank.[510] She was responsible for ensuring that accurate, complete, and transparent information related to sales practices was being provided to the OCC.[511]

Examiner Crosthwaite opined, and stated the documents she reviewed reflect, that Respondent Russ Anderson intentionally and consistently misled the OCC and the Board on the scope, root cause, the adequacy of the controls and the longstanding nature of the sales practices misconduct problem,[512] asserting that she made several false and misleading statements during the February 2015 and May 2015 examinations and regularly sought to limit the extent of information the Bank provided to Examiner Crosthwaite and others at the OCC.[513] In support of these opinions, Examiner Crosthwaite noted the following:

> a.  On April 4, 2014, Corporate Risk provided feedback on Respondent Russ Anderson's written presentation to the Enterprise Risk Management Committee, requesting more content on the "current state" of sales practices. Respondent Russ Anderson responded that she was "worried about putting something like that into a deck. I'd rather we did that verbally because this deck is subject to the regulators [*sic*] review."

---

[509] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶114.

[510] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶115.

[511] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶116.

[512] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶117.

[513] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶117.

b.   In June of 2013, as a result of an increasing number of whistleblower emails regarding sales practices to the CEO, the Bank launched an investigation into allegations of simulated funding in Los Angeles and Orange County. In October and December 2013, the Los Angeles Times published two articles outlining the Bank's "pressure cooker" sales environment. As a result of that investigation, the Bank terminated approximately 230 team members. None of this information was escalated to the OCC or the Board during 2013 or 2014 by Respondent Russ Anderson. The OCC learned about the 230 team members from Legal in their response to the OCC's request letter for the May 2015 investigation. In February 2015, the OCC conducted a Community Bank examination with a focus on Sales Practices governance. OCC examiners conducted multiple interviews with Respondent Tolstedt, Respondent Russ Anderson, and a number of Tolstedt's direct reports. Respondent Russ Anderson did not mention the 2013 Los Angeles and Orange County investigation into simulated funding or the larger body of terminations.

c.   Respondent Russ Anderson participated in a February 10, 2015 conference call with the OCC ("February 2015 OCC Call"). On the February 2015 OCC Call, an OCC examiner asked whether pressure to meet baseline sales goals was significant and contributed to employee turnover. Respondent Russ Anderson told the OCC that "no one loses their job because they did not meet sales goals." This was demonstrably false. Through Examiner Crosthwaite's work on the February 2017 email review, her team found evidence that the Bank had terminated over 8,520 people between 2011-2016 for not meeting sales goals.

d.   Respondent Russ Anderson told examiners during the May 2015 OCC Meeting that interviews with employees "did not lead to conclusions about

sales pressure," that she does not "hear" about pressure from personal bankers "at all," and that "people are positive and pleased." However, during the OCC's 2017 email review, examiners learned that the problem existed as early as 2002, and that for over 14 years, there was significant pressure, and double-digit increase in sales goals.[514]

Examiner Hudson participated in a February 10, 2015 teleconference between OCC examination staff and Respondent Russ Anderson.[515] Before the meeting, the OCC provided a list of topics and questions to be covered at the meeting, including:

- "April 9, 2014 Claudia Russ-Anderson/Jason MacDuff presentation (with deck) to ERMC [Enterprise Risk Management Committee]: Discuss presentation and proposed changes."

- "Controls and monitoring processes for identifying inappropriate behavior."

- "Testing to ensure that the incentive program encourages appropriate behavior."[516]

On the February 10, 2015 OCC Call, incentive compensation was discussed.[517] Examiner Hudson reported that Respondent Russ Anderson did not identify any concerns with incentive compensation at this meeting, risk created by the incentive compensation plans, or whether such risks were adequately managed.[518] Examiner Hudson reported that as a National Bank Examiner

---

[514] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶118.

[515] EC MSD Ex. 270 (Report of NBE Hudson) at ¶33.

[516] EC MSD Ex. 270 (Report of NBE Hudson) at ¶33, citing Email from Jill Charron to Kevin Swanson and attached notes (February 13, 2015) (OCC-SP0711664).

[517] EC MSD Ex. 270 (Report of NBE Hudson) at ¶33.

[518] EC MSD Ex. 270 (Report of NBE Hudson) at ¶34.

Add. 91

Appellate Case: 25-1079    Page: 93    Date Filed: 05/16/2025 Entry ID: 5517644

she expected that a senior Risk Officer understand whether a bank's incentive compensation program appropriately balances risk and reward because to do so is part of understanding, identifying, escalating, and addressing risks tied to incentive compensation.[519]

On the February 10, 2015 Call, OCC examiners asked whether pressure to meet baseline sales goals was significant and contributed to employee turnover. Respondent Russ Anderson interjected and stated that "no one loses their job because they did not meet sales goals."[520] Examiner Hudson reported that she later learned this statement was demonstrably false.[521]

On the February 10, 2015 Call, OCC examiners asked how the Bank ensures that the customer understands what they purchased.[522] The answer Respondent Russ Anderson provided was that the Bank uses disclosures and surveys, and then they use indicators that tell them how well they delivered the product and to what extent the customer is using the product.[523] Examiners were told that Rebecca Rawson's team manages that process.[524]

No one on the February 10, 2015 Call, including Respondent Russ Anderson, or in any other meeting during the OCC's February 2015 Exam, told the OCC about Bank products the team members opened for customers that customers did not consent to or that customers did not need or want.[525] During the February 2015 Exam, the OCC asked how the Bank determines that customers only received products that they want.[526] Respondent Russ Anderson and her staff

---

[519] EC MSD Ex. 270 (Report of NBE Hudson) at ¶34.

[520] Citing Conclusion Memorandum from Kevin Swanson to Karin Hudson (Feb. 19, 2015) (OCC-SP0125161).

[521] EC MSD Ex. 270 (Report of NBE Hudson) at ¶35.

[522] EC MSD Ex. 270 (Report of NBE Hudson) at ¶36

[523] EC MSD Ex. 270 (Report of NBE Hudson) at ¶36

[524] EC MSD Ex. 270 (Report of NBE Hudson) at ¶36. Rebecca Rawson reported to Respondent Russ Anderson and managed the Sales and Service Conduct Oversight Team ("SSCOT") in the Community Bank. *Id.*

[525] EC MSD Ex. 270 (Report of NBE Hudson) at ¶36

[526] EC MSD Ex. 270 (Report of NBE Hudson) at ¶36

Add. 92

responded that the Bank does a customer needs assessment to make sure customers receive products they want and also use Gallup surveys to gauge customer satisfactions.[527]

On the February 10, 2015 Call, Bank employees told OCC examiners that if a banker opens up a product (like a credit card) and the customer did not request it, then the banker is terminated immediately, and that if a teller puts in a referral that they did not earn, and the store manager knew (or should have known), then the store manager is fired.[528] The messaging from Respondent Russ Anderson and her team on the February 10, 2015 Call was that the Bank was effective in detecting inappropriate sales conduct and took swift disciplinary action.[529]

On the February 10, 2015 Call, OCC examiners also asked whether there was a first line of defense process, including monitoring and MIS (management information system), to assess overall sales quality and sales behavior.[530] Respondent Russ Anderson responded that there was no overall process.[531] Respondent Russ Anderson also stated on the February 10, 2015 Call that customers are not cross-sold any products without first going through a formal needs assessment discussion with a banker, a process that takes about one hour.[532] This remark from Respondent Russ Anderson suggested that customers were only provided products that they needed and consented to.[533]

---

[527] EC MSD Ex. 270 (Report of NBE Hudson) at ₱36, citing Email from Jill Charron to Kevin Swanson and attached notes (February 13, 2015) (OCC-SP0711664).

[528] EC MSD Ex. 270 (Report of NBE Hudson) at ₱37.

[529] EC MSD Ex. 270 (Report of NBE Hudson) at ₱37, citing Email from Jill Charron to Kevin Swanson and attached notes (February 13, 2015) (OCC-SP0711664).

[530] EC MSD Ex. 270 (Report of NBE Hudson) at ₱38.

[531] EC MSD Ex. 270 (Report of NBE Hudson) at ₱38, citing Email from Jill Charron to Kevin Swanson and attached notes (February 13, 2015) (OCC-SP0711664).

[532] EC MSD Ex. 270 (Report of NBE Hudson) at ₱38.

[533] EC MSD Ex. 270 (Report of NBE Hudson) at ₱38.

Appellate Case: 25-1079    Page: 95    Date Filed: 05/16/2025 Entry ID: 5517644

At no point during the February 10, 2015 Call or at any point during the February 2015 Exam did Respondent Russ Anderson inform the OCC about any proactive monitoring threshold used by Sales and Service Conduct Oversight Team ("SSCOT"), a group within the Community Bank that reported to Respondent Russ Anderson.[534] Specifically, at no point did Respondent Russ Anderson inform the OCC of the 99.99% threshold used by SSCOT in its proactive monitoring to detect sales practices misconduct and address the most egregious offenders.[535]

The threshold was not communicated to the OCC even though OCC examiners asked about controls and monitoring during the February 2015 Exam. SSCOT reported to Respondent Russ Anderson. If the Community Bank was using thresholds to detect sales practices misconduct, it was Examiner Candy's expectation as a National Bank Examiner is that Respondent Russ Anderson should have informed the OCC and answered the OCC's questions honestly, transparently, and fulsomely.[536] At this meeting, SSCOT's work was a topic of discussion, yet the proactive monitoring criteria used by SSCOT was not disclosed to the OCC. Examiner Candy reported that Russ Anderson's failure to disclose the manner in which the Bank monitored for sales practice misconduct at a meeting where the OCC had probed this area impeded the OCC's examination into the adequacy of the Bank's existing controls to identify sales practices misconduct.[537]

Respondent Russ Anderson never escalated the problem to the Board or the OCC.[538] When asked to present information on the scope and scale of sales practices misconduct to the

---

[534] EC MSD Ex. 270 (Report of NBE Hudson) at ¶39.

[535] EC MSD Ex. 270 (Report of NBE Hudson) at ¶39.

[536] EC MSD Ex. 270 (Report of NBE Hudson) at ¶39.

[537] EC MSD Ex. 270 (Report of NBE Hudson) at ¶39, citing Email from Jill Charron to Kevin Swanson and attached notes (February 13, 2015) (OCC-SP0711664).

[538] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶119.

Appellate Case: 25-1079    Page: 96    Date Filed: 05/16/2025 Entry ID: 5517644

Board, Respondent Russ Anderson provided high level and misleading reports that failed to address the size and scope of the problem.[539]

On February 21, 2017, while the examiners' review was underway, Respondent Russ Anderson was terminated for cause based on findings from the Board's independent investigation.[540] Contributing factors included: (i) failure to manage risk, failure to escalate, behavior in opposition to culture; (ii) failure to take action to remediate customer harm from sales practices issues; (iii) failure to adequately change business practices once becoming aware of aggressive sales pressure; (iv) failure to take appropriate action to ensure complaints were handled in an appropriate manner; (v) obstructing the examination process; and (vi) continued failure to perform duties appropriate for a Senior Risk Officer of the company.[541] Examiner Crosthwaite opined that Respondent Russ Anderson's false statements to examiners and other acts of obstruction of our examination, constituted a recklessly unsafe or unsound practice and a breach of her fiduciary duty.[542]

Examiner Candy interacted with Respondent Russ Anderson during the OCC's May 2015 review.[543] It is her opinion that Respondent Russ Anderson intentionally and consistently misled the OCC and the Board on the scope, duration, and root cause of the sales practices misconduct, and the adequacy of controls to prevent and detect such misconduct.[544] During conversations, she attempted to mislead examiners that the extent of the problem was primarily limited to the LA/OC market, and the bank had implemented sufficient controls.[545] Respondent Russ Anderson

---

[539] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ⁋119.

[540] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ⁋120.

[541] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ⁋120.

[542] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ⁋121.

[543] EC MSD Ex. 269 (Report of NBE Candy) at ⁋127.

[544] EC MSD Ex. 269 (Report of NBE Candy) at ⁋127.

[545] EC MSD Ex. 269 (Report of NBE Candy) at ⁋127.

Add. 95

also attempted to prevent her employees from giving Examiner Candy information she explicitly asked for regarding controls.[546]

In her opinion as a National Bank Examiner, Respondent Russ Anderson's failure to perform her responsibilities as the Group Risk Officer and false, misleading, and incomplete reporting on the sales practices misconduct problem was in disregard of, and evidenced a conscious indifference to, a known or obvious risk of substantial harm to the Bank.[547] In her role as the Group Risk Officer, Respondent Russ Anderson received extensive information about all aspects of the sales practices misconduct problem: the sales goals, the pressure, and the controls.[548]

Indeed, in a February 2013 email, months before the Los Angeles Times articles, Respondent Russ Anderson acknowledged that she could not identify any mid-level to senior leader in the Community Bank who had both "good sales production" and either good or significantly improved sales quality.[549] This is significant – Respondent Russ Anderson clearly understood that having good sales production was synonymous with having bad sales quality.[550] She never reported this information to the Enterprise Risk Management Committee, the Board, or the OCC.[551]

The false, misleading, and incomplete reporting on the sales practices misconduct problem that Respondent Russ Anderson actively participated in hindered the Board's

---

[546] EC MSD Ex. 269 (Report of NBE Candy) at ¶127.

[547] EC MSD Ex. 269 (Report of NBE Candy) at ¶128.

[548] EC MSD Ex. 269 (Report of NBE Candy) at ¶128.

[549] EC MSD Ex. 269 (Report of NBE Candy) at ¶128.

[550] EC MSD Ex. 269 (Report of NBE Candy) at ¶128.

[551] EC MSD Ex. 269 (Report of NBE Candy) at ¶128.

understanding of the root cause and scope of the problem and the adequacy of controls.[552] It also hindered the Bank's ability to fundamentally address sales practices misconduct and remediate customers.[553]

**Respondents Julian and McLinko Failed to Perform their Auditing Responsibilities with Respect to the Sales Practices Misconduct Problem**

According to the Office of the Comptroller of the Currency, Comptroller's Handbook, Internal and External Audits, an internal audit function is responsible for auditing activities to determine the Bank's compliance with laws, regulations, and established bank policies and procedures.[554] "Internal audit provides an objective, independent review of bank activities, internal controls, and management information systems to help the board and management monitor and evaluate internal control adequacy and effectiveness."[555] "Effective internal and external audit programs are also a critical defense against fraud and provide vital information to the board of directors about the effectiveness of the internal control system."[556] Effective audit programs should "[h]elp maintain or improve the effectiveness of bank risk management processes, controls, and corporate governance."[557] "Internal audit programs are a bank's primary mechanism for assessing controls and operations and performing whatever work is necessary to

---

[552] EC MSD Ex. 269 (Report of NBE Candy) at ¶128.

[553] EC MSD Ex. 269 (Report of NBE Candy) at ¶128.

[554] EC MSD Ex. 269 (Report of NBE Candy) at ¶129, citing Office of the Comptroller of the Currency, Comptroller's Handbook, Internal and External Audits, at 7 (Apr. 2003).

[555] EC MSD Ex. 269 (Report of NBE Candy) at ¶130, quoting Office of the Comptroller of the Currency, Comptroller's Handbook, Internal Control at 1 (Jan. 2001).

[556] EC MSD Ex. 269 (Report of NBE Candy) at ¶130, quoting Comptroller's Handbook, Internal and External Audits at 1 (Apr. 2003).

[557] EC MSD Ex. 269 (Report of NBE Candy) at ¶130.

Add. 97

Appellate Case: 25-1079     Page: 99     Date Filed: 05/16/2025 Entry ID: 5517644

allow the board and management to accurately attest to the adequacy of the bank's internal control system."[558]

Respondent Julian was the Chief Auditor.[559] The chief auditor is responsible for internal audit's control risk assessments, audit plans, audit programs, and audit reports.[560]

Respondent McLinko was responsible for audits of the Community Bank. This included audits covering incentive compensation, risk management, and controls.[561]

Examiner Candy opined that Respondent Julian and Respondent McLinko each recklessly engaged in an unsafe or unsound practice by failing to plan and manage audit activity within the Community Bank that would detect and document the ongoing sales practices misconduct problem and identify corrective action to remediate and resolve it.[562] The same conduct constituted breaches of their fiduciary duties.[563]

Generally accepted standards of prudent operation require internal auditors to exhibit independence from the business line both in terms of operation and judgment[564] and "understand a bank's strategic direction, objectives, products, services, and processes to conduct [its auditing] activities."[565]  Although Examiner Candy reported that she did not have anywhere near complete visibility into the sales practices misconduct issues in the Community Bank during the

---

[558] EC MSD Ex. 269 (Report of NBE Candy) at ℙ130, quoting Office of the Comptroller of the Currency, Comptroller's Handbook, Internal and External Audits at 7-8 (April 2003)

[559] EC MSD Ex. 269 (Report of NBE Candy) at ℙ131.

[560] EC MSD Ex. 269 (Report of NBE Candy) at ℙ131.

[561] EC MSD Ex. 269 (Report of NBE Candy) at ℙ132.

[562] EC MSD Ex. 269 (Report of NBE Candy) at ℙ133.

[563] EC MSD Ex. 269 (Report of NBE Candy) at ℙ133.

[564] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ℙ74.

[565] EC MSD Ex. 269 (Report of NBE Candy) at ℙ134, quoting Office of the Comptroller of the Currency, Comptroller's Handbook, Internal and External Audits, at 12 (Apr. 2003).

May 2015 examination, which was only a few weeks long, based on the information she reviewed she determined that there were weaknesses in risk management and controls.[566]

Respondents Julian and McLinko had unrestricted access to all functions, records, property, and personnel in the Bank, and WFAS's practice was to discuss problem areas and trends with Corporate Investigations, the unit that investigated sales integrity issues at the Bank.[567] Respondents Julian and McLinko also had considerably more information about the sales practices misconduct problem than OCC examiners, and had full authority to perform audits and issue corrective actions (known as issues and remediations for Wells Fargo Audit).[568] They also had significantly more personnel at their disposal, yet did not identify sales practices concerns in any meaningful way in any audit.[569] Instead, all of the audits touching on sales practices indicated that the processes and controls were effective.[570]

Respondent Julian and Respondent McLinko each were responsible for understanding the Community Bank's business model, the risks the model posed to the Bank, and the effectiveness of controls to detect and prevent the materialization of such risks.[571] As set forth above, the risk management framework at the Bank had significant deficiencies and the controls were inadequate to prevent and detect sales practices misconduct.[572]

---

[566] EC MSD Ex. 269 (Report of NBE Candy) at ¶134.

[567] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶75.

[568] EC MSD Ex. 269 (Report of NBE Candy) at ¶134.

[569] EC MSD Ex. 269 (Report of NBE Candy) at ¶134.

[570] EC MSD Ex. 269 (Report of NBE Candy) at ¶134.

[571] EC MSD Ex. 269 (Report of NBE Candy) at ¶134.

[572] EC MSD Ex. 269 (Report of NBE Candy) at ¶134.

Respondent Julian had a significant number of personnel at his disposal and the authority to examine any line of business at the Bank, including the Community Bank.[573] It is Examiner Crosthwaite's opinion that both Respondent Julian and Respondent McLinko should have employed his resources and authority to identify and escalate the sales practices misconduct problem much earlier in a manner that could have lessened the severity and duration of the sales practices problem.[574]

There was a significant control breakdown in the Community Bank, one that Respondent Julian previously acknowledged in his sworn statement.[575] None of the deficiencies were identified in any audit while the sales practices misconduct problem existed at the Bank from the beginning of each Respondent's respective tenures as Chief Auditor and Executive Audit Director, respectively.[576]

Examiner Crosthwaite expected Respondents Julian and McLinko to provide the OCC and herself clear and direct information about issues that present serious risks to the Bank.[577] Respondents Julian and McLinko never provided such information to the OCC related to the Bank's systemic sales practices misconduct problem.[578]

**Respondents Julian and McLinko Were Aware of the Sales Practices Problem**

Respondents Julian and McLinko received regular reporting about the extent of the systemic problem from multiple informational channels, including the committees they were

---

[573] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ⁋76

[574] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ⁋76.

[575] EC MSD Ex. 269 (Report of NBE Candy) at ⁋134.

[576] EC MSD Ex. 269 (Report of NBE Candy) at ⁋134.

[577] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ⁋79.

[578] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ⁋79.

members of.[579]  Examiner Crosthwaite recalled the Chief Security Officer testifying that he was confident that all members of the TMMEC, including Respondents Julian and Strother, were fully aware of the seriousness, extent and root cause of the sales practices misconduct issue because he told them about all aspects of the problem in detail.[580] He testified as follows:

> I am confident because we dedicated an hour and went through a very formal -- albeit an informal setting -- presentation and general discussion whereby all -- all participants acknowledged the existence of the -- of the pressure and the goals, and shared individual stories about such.[581]

The contemporaneous documents Examiner Crosthwaite reviewed during the February 2017 email review support the Chief Security Officer's testimony.[582] In August 2013, he provided information to the members of the TMMEC that sales integrity was the second largest investigation case type and that the number of investigations into sales integrity violations had increased from 2011 to 2012.[583]  The Committee consisted "of senior executives who share responsibility for the appropriate management of team member misconduct and internal fraud matters" and "was formed to look at issues more broadly across the company rather than individual situations." [584] Its purpose was to "provide a forum for Wells Fargo executive management to provide leadership, oversight and direction related to team member misconduct and internal fraud risk management."[585]

---

[579] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶80.

[580] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶80.

[581] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶80.

[582] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶81.

[583] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶81.

[584] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶81.

[585] Quoting Team Member Misconduct Executive Committee Charter, at 1 (May 2012) (OCC-WF-SP-07038231).

Add. 101

Appellate Case: 25-1079     Page: 103     Date Filed: 05/16/2025 Entry ID: 5517644

In March 2013, Respondent Julian wrote to Respondent McLinko that the Chief Security Officer and Head of Corporate Investigations "is presenting some data and Community Banking has a lot of issues [related to team member fraud] each year[.]"[586]

In August 2013, the Chief Security Officer again sent the members of the TMMEC information showing that, in 2012, about half of the 7,000+ EthicsLine complaints investigated by Corporate Investigations related to sales integrity violations and that the number of sales integrity cases had increased from 2012 to 2013.[587] The Chief Security Officer specifically highlighted the following misconduct considerations for the TMMEC, stating:

- Does practice or process create a need or an opportunity for misconduct?

- Are controls allowing too much opportunity?

- Is the LOB [Line of Business] creating an environment whereby the TM [Team Member] must commit misconduct?

- Too much opportunity or too much personal or business pressure can sway most anyone.[588]

Respondent Julian himself admitted in his sworn statement before the OCC that he was informed of the sales practices misconduct problem by various sources, including Corporate Investigations, the TMMEC, the Ethics Committee, and news articles, beginning in 2012.[589]

The Chief Security Officer and Head of Corporate Investigations reported to the Ethics Committee, including Respondent Julian, in August 2013 that "Sales Integrity issues are most prevalent – there needs to be continued focus in this area" and that most EthicsLine reports are

---

[586] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶82.

[587] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶83.

[588] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶83.

[589] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶84.

Appellate Case: 25-1079    Page: 104    Date Filed: 05/16/2025 Entry ID: 5517644

"associated with Sales Integrity Issues."[590] Respondents Julian and McLinko read the 2013 Los Angeles Times articles and were therefore aware that the allegations of sales practices misconduct were widespread across multiple states.[591]

In an April 9, 2014 Enterprise Risk Management Committee meeting, Community Bank leadership informed the committee, including Respondent Julian, that one to two percent of Community Bank employees (1,000 to 2,000) were terminated each year for sales practices-related wrongdoing.[592]

The Enterprise Risk Management Committee oversees the management of all types of risk across Wells Fargo.[593] Enterprise Risk Management Committee members, including Respondent Julian, were responsible for understanding and evaluating risk, addressing escalated issues, and providing active oversight of risk mitigation.[594] The Enterprise Risk Management Committee could escalate any issue to the Operating Committee or the CEO and reported quarterly to the Operating Committee and Risk Committee of the Board of Directors.[595]

The Enterprise Risk Management Committee identified for the Board sales practices as a significant enterprise risk beginning in January 2014, however the description of the risk was lacking in that it provided no information about the root cause, scope, or duration of the sales

---

[590] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶84.

[591] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶84.

[592] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶84.

[593] EC MSD Ex. 267 (Report of NBE Smith) at ¶94.

[594] EC MSD Ex. 267 (Report of NBE Smith) at ¶94.

[595] Citing Wells Fargo, Risk Management Framework, 2nd Edition (July 2014) (OCC-WF-SP-04791987).

practices misconduct problem.[596] It did not describe the problem as systemic.[597] It merely stated that management is discussing the risk and that addressing the risk is key.[598]

Examiner Smith reported that information provided to the Board should give directors a complete and accurate overview of the bank's condition, activities, and issues.[599] Management is responsible for being transparent and providing sufficient information to allow the directors to ask questions and challenge management.[600] Examiner Smith opined that the Enterprise Risk Management Committee's identification of sales practices as a significant risk in January 2014 did not constitute adequate escalation, was not sufficiently transparent, and Respondent Julian did not adequately address the risk of sales practices misconduct on the Bank.[601]

The Ethics Committee was responsible for the content of the Code of Ethics, which contained a section on sales incentive programs, and overseeing the policy and interpretation of the Code.[602] The Code stated: "Steering a customer to an inappropriate or unnecessary product to receive sales credit harms the customer; it is an unacceptable practice . . . Any form of 'gaming' to receive compensation, to meet sales goals, or for any other reason is in direct violation of company policy and this Code."[603]

_____

[596] EC MSD Ex. 267 (Report of NBE Smith) at ¶95.

[597] EC MSD Ex. 267 (Report of NBE Smith) at ¶95.

[598] EC MSD Ex. 267 (Report of NBE Smith) at ¶95, citing Memo from the Enterprise Risk Management Committee, Significant Enterprise Risks (Jan. 22, 2014) (OCC-WFSP-08672449).

[599] EC MSD Ex. 267 (Report of NBE Smith) at ¶95.

[600] EC MSD Ex. 267 (Report of NBE Smith) at ¶95, citing The Director's Book: Role of Directors for National Banks and Federal Savings Associations, at 40 (July 2016).

[601] EC MSD Ex. 267 (Report of NBE Smith) at ¶95.

[602] EC MSD Ex. 267 (Report of NBE Smith) at ¶100.

[603] EC MSD Ex. 267 (Report of NBE Smith) at ¶100, quoting Wells Fargo Team Member Code of Ethics and Business Conduct (OCC-WF-SP-04455174).

The members of the Ethics Committee, including Respondent Julian, regularly received information about the sales practices misconduct problem.[604] For example, the minutes of the August 22, 2013 meeting state the Community Bank has the most EthicsLine complaints at the Bank with "most associated with Sales Integrity Issues." The minutes further state: "Sales Integrity issues are most prevalent – there needs to be continued focus in this area."[605]

Examiner Smith opined that Respondent Julian took no meaningful actions in response to receiving information that thousands of employees each year submitted EthicsLine complaints (i.e. were blowing the whistle) about sales practices misconduct at the Bank, despite the facts that: (1) sales practices misconduct was a violation of the Code of Ethics and they were responsible for it; and (2) they were supposed to provide leadership, oversight, and direction related to sales practices misconduct as members of the Team Member Misconduct Executive Committee.[606]

Examiner Smith opined that Respondent Julian failed to fulfill his responsibilities as members of the Enterprise Risk Management Committee, Ethics Committee, and Team Member Misconduct Executive Committee.[607] It is her opinion that Respondent Julian's failures perpetuated the existence of the Bank's sales practices misconduct problem and constituted unsafe or unsound practices and breaches of their fiduciary duties,[608] and recklessly engaged in the aforementioned unsafe or unsound practices.[609]

---

[604] EC MSD Ex. 267 (Report of NBE Smith) at ¶101.

[605] EC MSD Ex. 267 (Report of NBE Smith) at ¶101, quoting Ethics Committee Meeting Minutes (Aug. 22, 2013) (OCC-WF-SP-06727216).

[606] EC MSD Ex. 267 (Report of NBE Smith) at ¶102.

[607] EC MSD Ex. 267 (Report of NBE Smith) at ¶103.

[608] EC MSD Ex. 267 (Report of NBE Smith) at ¶103.

[609] EC MSD Ex. 267 (Report of NBE Smith) at ¶104.

Respondents Julian and McLinko also received information that the Community Bank and the Group Risk Officer were unable or unwilling to adequately address the sales practices issues.[610] In July 2012, the Chief Security Officer informed Respondents Julian and McLinko that the Community Bank's data "continues to highlight a concerning trend in the area of sales integrity" and that Community Bank Group Risk Officer Claudia Russ Anderson was "minimizing the negative information being submitted to executive management."[611] The Chief Security Officer detailed the concerning data "from the increase in EthicsLine reports, to the increase in executive complaint letters/OCC referrals, and increases in confirmed fraud, thus, we need to continue to escalate this issue with senior leadership."[612] The Chief Security Officer emphasized that the "data continues to point to a very negative trend" and that Respondent Russ Anderson "often challenges the Audit and [Corporate Security] A&E reporting verbiage."[613]

Respondent McLinko testified before the OCC that, based on all the information he reviewed, including the data, analysis, and modeling, it was evident that thousands of Bank employees issued millions of products and services without customer consent:

> Q: Okay. And based on what you have seen and all the information you gathered, those thousands of Wells Fargo employees have issued millions of products and services without customers' consent?
>
> MR. CRUDO: [Objection as to] Foundation.
>
> THE WITNESS: Based upon the data that was produced, on the filing of the data analysis that's done, and the modeling, yes.[614]

---

[610] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶87.

[611] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶87.

[612] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶87.

[613] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶87.

[614] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶88.

Respondent McLinko served on the Community Banking Risk Management Committee from at least 2014 until August 2016, which was responsible for understanding the Community Bank's "operational risk profile and [] work[ing] with management across Community Banking to ensure risks are managed effectively."[615] Respondent McLinko explained in an email he drafted for Respondent Julian that "audit['s] methodology includes contacting Corporate Investigations at the beginning of each audit to determine if there are any cases/trends related to the area under review."[616]

In January 2011, the Chief Security Officer and Head of Corporate Investigations informed Respondent McLinko: "Community Bank sales integrity issue has resulted in two arrests.[617] This is highly unusual but reinforces the fact that this type of activity is unlawful and certainly poses a significant reputation risk to our company."[618] In February 2011, Corporate Investigations met with Audit and informed auditors on case volumes and trends related to sales practices, including the number of terminations and cases and that "customer consent" was the number one issue.[619] Corporate Investigations also informed Audit that some of the Community Bank's controls with respect to sales practices amounted to "the fox guarding the hen house."[620]

In July 2011, the Chief Security Officer and Head of Corporate Investigations again informed Respondent McLinko that "[s]ales Integrity cases continue to surge."[621] In July 2012, the Chief Security Officer and Head of Corporate Investigations again informed Respondent McLinko that the Bank's data "continues to highlight a concerning trend in the area of [s]ales

---

[615] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶89.

[616] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶90.

[617] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶91.

[618] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶91.

[619] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶92.

[620] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶92.

[621] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶93.

Add. 107

Appellate Case: 25-1079      Page: 109      Date Filed: 05/16/2025 Entry ID: 5517644

[i]ntegrity – from the increase in EthicsLine reports, to the increase in executive complaint letters/OCC referrals, and increases in confirmed fraud" and that Respondent Russ Anderson "minimiz[ed] the negative information being submitted to executive management."[622] The Chief Security Officer and Head of Corporate Investigations concluded: "we need to continue to escalate this issue with senior leadership" and stated the data "continues to point to a very negative trend."[623]

In January 2013, an auditor who reported to Respondent McLinko told him that sales integrity "is still [the Chief Security Officer's] #1 concern."[624] In that same email, the auditor wrote: "I questioned [the Chief Security Officer] as to whether they had discussed root cause for some of the items listed above and was it related to sales pressure. He said he felt a lot of it was related to the sales goals and pressure. He feels there's an issue that [Regional Bank] is trying to work through but not a lot of people want to address it with [Respondent Tolstedt]."[625]

Respondent McLinko also was aware of the Los Angeles Times articles at the end of 2013. The Chief Security Officer and Head of Corporate Investigations emailed him the first article and explained it was a "big deal[.]"[626]

Respondent Julian himself asked his staff in a September 2016 email about sales practices misconduct: "Where was audit while this activity was taking place? To be honest, I'm not sure how to answer this but am sure the A[udit and] E[xamination] Committee will and should be asking."[627] Respondent Julian testified that he never received a "good answer about

---

[622] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ⁋94.

[623] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ⁋94.

[624] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ⁋95.

[625] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ⁋95.

[626] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ⁋96.

[627] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ⁋97.

where was audit."[628] Respondent Julian could offer no reasonable explanation for Audit's failure to detect and escalate the sales practices misconduct problem.[629] This is consistent with Bank documents that show Respondent Julian did not receive an acceptable answer when he asked his staff, including Respondent McLinko, in September 2016: "where was audit while this activity was taking place?"[630] No one, including Respondent McLinko, responded with any of the arguments that Respondents Julian and McLinko now advance in the litigation.[631]

Examiner Candy opined that Respondent Julian's and Respondent McLinko's conduct subjected the Bank to abnormal risk or loss or damage to the Bank.[632] Their failures to detect sales practices issues in a timely and fulsome manner and review sales practices created undue legal, compliance, and reputational risks, and risk of customer and team member harm – the very risks that Audit was supposed to be auditing, and which materialized at the Bank.[633] The failure to identify the problem in any audit also perpetuated the problem and caused actual loss to the Bank.[634]

**Respondent Julian's and Respondent McLinko's Failures to Fulfill Their Job Responsibilities are Recklessly Unsafe or Unsound**

The Bank has three lines of defense which are responsible for identifying, measuring, monitoring, and controlling risk. [635]The first line of defense is composed of the Bank's risk-

---

[628] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶97.

[629] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶97.

[630] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶97.

[631] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶97.

[632] EC MSD Ex. 269 (Report of NBE Candy) at ¶135.

[633] EC MSD Ex. 269 (Report of NBE Candy) at ¶135.

[634] EC MSD Ex. 269 (Report of NBE Candy) at ¶135.

[635] EC MSD Ex. 257 (Report of NBE Coleman) at ¶18.

generating business units like the Community Bank.[636] The second line of defense is composed of the Bank's independent risk management functions such as Corporate Risk.[637] Wells Fargo Audit Services ("WFAS" or "Audit") is the third line of defense.[638]

As the third line of defense, the internal audit function assesses the effectiveness of the policies, processes, personnel, and control systems created in the first and second lines of defense. [cite 2003 and 2016 Internal and External Audits Handbook] Evaluation of controls was within the purview of Audit's responsibilities:

> "The effectiveness of internal controls is assessed through the bank's risk reviews (often second line of defense) and audit program (third line of defense) . . . Audit programs are the independent control function that verifies the effectiveness of the bank's risk management system. Unlike risk reviews, audit managers and the board should make decisions regarding the audit program to maintain appropriate independence."[639]

Beginning in March 2014 and through October 2016, Karin Hudson worked as a National Bank Examiner in Large Bank Supervision with the OCC's Wells Fargo examination team based in Charlotte, North Carolina.[640] During this period, she examined various areas in this complex institution, including retail credit and operational risk.[641] Examiner Hudson reported that she

---

[636] EC MSD Ex. 257 (Report of NBE Coleman) at ¶18

[637] EC MSD Ex. 257 (Report of NBE Coleman) at ¶18

[638] EC MSD Ex. 257 (Report of NBE Coleman) at ¶18.

[639] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶98.

[640] Examiner Hudson has twenty years of professional experience at the OCC, including extensive experience in the supervision of community, midsize, large, and problem banks. During her tenure, she has participated in at least 175 examinations. Her experience has included application of safety and soundness principles to bank operations, corporate governance, risk management, internal and external audit, and controls. She also review compliance with required laws, regulations, and OCC guidance. EC MSD Ex. 270 (Report of NBE Hudson) at ¶3.

[641] EC MSD Ex. 270 (Report of NBE Hudson) at ¶6.

Add. 110

Appellate Case: 25-1079     Page: 112     Date Filed: 05/16/2025 Entry ID: 5517644

performed ongoing supervisory activities and conducted examinations of Wells Fargo's Community Bank and Consumer Lending Group lines of business. She documented target review findings, including any applicable Matters Requiring Attention ("MRAs") in Conclusion Memos, Supervisory Letters, and other pertinent supervisory correspondence.[642] Additionally, she was responsible for presenting examination findings to Bank management and had frequent discussions with Wells Fargo management regarding Bank operations and was responsible for monitoring and updating relevant MRAs quarterly to gauge the Bank's progress towards effective completion within established timeframes.[643] She also completed quarterly Bank risk assessments covering areas such as governance, complaints, fraud, litigation, new products or services, and technology breaches causing impact to operational risk.[644]

The OCC commenced a target examination of operational risk management and cross-sell activities of Wells Fargo's Community Bank on approximately February 2, 2015 ("February 2015 Exam").[645] Target examinations may focus on one particular product (e.g., credit cards), function (e.g., audit), or risk (e.g., operational risk) or may cover specialty areas (e.g., municipal securities dealers).[646] Conclusions from target examinations are generally communicated to a bank in supervisory letters.[647]

Examiner Hudson led the February 2015 Exam, which was staffed by ten examiners (including Examiner Hudson) and lasted approximately three weeks: from February 2, 2015 until February 19, 2015.[648] The objective of the examination was to perform a broad assessment of

---

[642] EC MSD Ex. 270 (Report of NBE Hudson) at ¶6.

[643] EC MSD Ex. 270 (Report of NBE Hudson) at ¶6.

[644] EC MSD Ex. 270 (Report of NBE Hudson) at ¶6.

[645] EC MSD Ex. 270 (Report of NBE Hudson) at ¶17.

[646] EC MSD Ex. 270 (Report of NBE Hudson) at ¶17.

[647] EC MSD Ex. 270 (Report of NBE Hudson) at ¶17.

[648] EC MSD Ex. 270 (Report of NBE Hudson) at ¶18.

Group Risk Officer Claudia Russ Anderson's risk function (including the functions that reported to her), and to understand the cross-sell strategy, governance of complaints, and how complaints affect cross-sell activities, among other areas.[649]

Examiner Hudson's interactions with Respondent Russ Anderson began in approximately June 2014 leading up to the February 2015 Exam.[650] Examiner Hudson reported that she wanted to understand the work performed by the risk organization overseen by Respondent Russ Anderson, the cross-sell ratio, and the strategy and risks around cross-sell where cross-sell is reported to be a metric the Bank used to measure the number of Bank products per household.[651]

The examination team held a kickoff meeting with Respondent Russ Anderson on or around February 2, 2015.[652] Around the time of this kickoff meeting, Respondent Russ Anderson indicated to Examiner Hudson that she loved being examined by the regulator and that although regulators review her department and areas under her responsibility, she welcomed the scrutiny and feedback to ensure that she was conducting operations appropriately.[653]

Approximately three days later, on or around February 5, 2015, Respondent Russ Anderson contacted Examiner Hudson's primary supervisor, Christine Moses, and expressed concern about the documents Examiner Hudson's team had requested as part of the February 2015 Exam. Examiner Hudson reports that Respondent Russ Anderson stated that the requests reflected "scope creep" and that the OCC was not sticking to the scope of the original request

---

[649] EC MSD Ex. 270 (Report of NBE Hudson) at ⁋18, citing Scope Memorandum from Karin Hudson (Jan. 8, 2015) (OCC-SP0087452).

[650] EC MSD Ex. 270 (Report of NBE Hudson) at ⁋19.

[651] EC MSD Ex. 270 (Report of NBE Hudson) at ⁋19.

[652] EC MSD Ex. 270 (Report of NBE Hudson) at ⁋20, citing Request Letter from Christine Moses to Carrie Tolstedt (Jan. 7, 2015) (OCC-WF-SP-06521319).

[653] EC MSD Ex. 270 (Report of NBE Hudson) at ⁋20.

Add. 112

Appellate Case: 25-1079     Page: 114     Date Filed: 05/16/2025 Entry ID: 5517644

letter.[654] Christine Moses then contacted Examiner Hudson via phone to relay Respondent Russ Anderson's concern.[655]

During the course of the February 2015 Exam, Examiner Hudson met with Respondent Russ Anderson numerous times.[656] During examinations, OCC staff regularly meet with bank personnel and management.[657] The purpose of such meetings is to obtain information relevant to the OCC's examination, to enable the OCC to make informed and accurate conclusions, and to better understand risks facing the bank and the bank's management from its businesses and operations.[658] The purpose of Examiner Hudson's meetings with Respondent Russ Anderson was to gain an understanding of cross-sell, operational risks in Community Bank oversight, and monitoring and controls over cross-sell and sales activities.[659]

**February 9, 2015 Meeting with Respondents Russ Anderson and Audit and Audit's Lack of Independence**

On February 9, 2015, Examiner Hudson participated in a teleconference that was intended to be between OCC examination staff and Respondent Paul McLinko and his audit staff only ("February 9, 2015 Call").[660] At the time, Respondent McLinko was an Executive Audit Director responsible for auditing the Community Bank.[661] The purpose of the call was for the OCC to learn about Audit's coverage of Community Bank sales practices.[662]

---

[654] EC MSD Ex. 270 (Report of NBE Hudson) at P20.

[655] EC MSD Ex. 270 (Report of NBE Hudson) at P20.

[656] EC MSD Ex. 270 (Report of NBE Hudson) at P21.

[657] EC MSD Ex. 270 (Report of NBE Hudson) at P22.

[658] EC MSD Ex. 270 (Report of NBE Hudson) at P22.

[659] EC MSD Ex. 270 (Report of NBE Hudson) at P22.

[660] EC MSD Ex. 270 (Report of NBE Hudson) at P23.

[661] EC MSD Ex. 270 (Report of NBE Hudson) at P23.

[662] EC MSD Ex. 270 (Report of NBE Hudson) at P23.

Examiner Hudson reported that she was surprised to hear that Respondent Russ Anderson (and three other members of Community Bank) announced themselves on the call.[663] Respondent Russ Anderson actively participated in the discussion that was intended to be between the OCC and Respondent McLinko and his Audit staff only.[664] Although Examiner Hudson did not send the meeting invitation to Respondent Russ Anderson (because the purpose of the discussion was to learn from Audit about their work and coverage of sales practices), Respondent Russ Anderson and her staff nonetheless participated in the meeting.[665]

Examiner Hudson reported she had concerns about Respondent Russ Anderson's and her staff's attendance on the February 9, 2015 Call as it could impede the independence of the audit function.[666] During an examination, it is important according to Examiner Hudson for OCC examiners to meet with the audit function separately to determine its review and assessment of various lines of business at the bank.[667] Examiner Hudson reported that such meetings provide a mechanism for audit to be candid and transparent with the OCC about risk areas at the bank and for examiners to have independent discussions with audit.[668] This type of discussion is not effective if the line of business subject to the audit is present, according to Examiner Hudson.[669] Examiner Hudson reported that in her experience, it is unusual for internal audit to include or allow the line of business that is the subject of the audit discussion to attend such a meeting.[670]

---

[663] EC MSD Ex. 270 (Report of NBE Hudson) at ¶23.

[664] EC MSD Ex. 270 (Report of NBE Hudson) at ¶23.

[665] EC MSD Ex. 270 (Report of NBE Hudson) at ¶23, citing Meeting Notes from Kevin Swanson to Karin Hudson (Feb. 9, 2015) (OCC-SP0333218).

[666] EC MSD Ex. 270 (Report of NBE Hudson) at ¶24.

[667] EC MSD Ex. 270 (Report of NBE Hudson) at ¶24.

[668] EC MSD Ex. 270 (Report of NBE Hudson) at ¶24.

[669] EC MSD Ex. 270 (Report of NBE Hudson) at ¶24.

[670] EC MSD Ex. 270 (Report of NBE Hudson) at ¶24.

Add. 114

Appellate Case: 25-1079     Page: 116     Date Filed: 05/16/2025 Entry ID: 5517644

On the February 9, 2015 Call, Examiner Hudson and her staff asked about Audit's review of sales practices.[671] Respondent McLinko was unable to respond to many questions around sales practices.[672] After the February 9, 2015 Call, Examiner Hudson reported that her impression was that Audit had not done an end-to-end holistic review of sales practices in the Community Bank.[673] Examiner Hudson concluded that Audit reviewed certain areas touching on sales practices but did not review sales practices as a framework.[674] None of the audits touching on sales practices raised any significant issues in the audit reports.[675]

During the February 9, 2015 Call, Bart Deese, an auditor who reported to Respondent McLinko, stated that audits of the Bank's Wholesale Banking group and Wealth, Brokerage, and Retirement group focused on cross-sell as a separate activity, assessing governance, internal controls, oversight, and revenue derived from cross-sell.[676] Mr. Deese indicated that Audit had not conducted a similar review of the Community Bank.[677]

At this point, Respondent Russ Anderson (and another Community Bank employee) interjected and reiterated that in the Community Bank, cross-sell is not a separate activity that can be broken out and governed as a stand-alone activity.[678] Examiner Hudson reported that Respondent Russ Anderson consistently told the OCC's examiners during this examination that the Community Bank did not have a strategy around cross-sell, that it was just something the

---

[671] EC MSD Ex. 270 (Report of NBE Hudson) at ¶25.

[672] EC MSD Ex. 270 (Report of NBE Hudson) at ¶25.

[673] EC MSD Ex. 270 (Report of NBE Hudson) at ¶25.

[674] EC MSD Ex. 270 (Report of NBE Hudson) at ¶25.

[675] EC MSD Ex. 270 (Report of NBE Hudson) at ¶25, citing Conclusion Memorandum from Kevin Swanson to Karin Hudson (Feb. 19, 2015) (OCC-SP0125161).

[676] EC MSD Ex. 270 (Report of NBE Hudson) at ¶26.

[677] EC MSD Ex. 270 (Report of NBE Hudson) at ¶26.

[678] EC MSD Ex. 270 (Report of NBE Hudson) at ¶26.

Add. 115

Appellate Case: 25-1079   Page: 117   Date Filed: 05/16/2025 Entry ID: 5517644

company did, and that the reason they wanted each customer to have eight products is because eight rhymed with great.[679] Respondent McLinko did not disagree with Respondent Russ Anderson or provide any additional information during the February 9, 2015 Call.[680]

Examiner Hudson reported that on the February 9, 2015 Call, she wanted to understand how sales goals impact incentive compensation and employee terminations.[681] During this call, Respondent Russ Anderson stated that "incentive compensation plans are capped to balance the incentives for sales vis-à-vis customer service."[682] According to Examiner Hudson, Respondent Russ Anderson also added that "the impact of sales goals expectations on employee turnover is monitored through exit interviews and that it is not significant."[683] On this call and in other meetings, Russ Anderson consistently stated to Examiner Hudson that sales goals do not drive employee compensation or employee terminations.[684]

Examiner Hudson reported that the primary responsibility of the internal audit function is to provide independent assurance and challenge.[685] As the third line of defense, the internal audit function assesses the effectiveness of the policies, processes, personnel, and control systems created in the first and second lines of defense.[686] Examiner Hudson reported that the fact that under Respondent McLinko's leadership Audit had not conducted a comprehensive review of

---

[679] EC MSD Ex. 270 (Report of NBE Hudson) at ¶26

[680] EC MSD Ex. 270 (Report of NBE Hudson) at ¶26.

[681] EC MSD Ex. 270 (Report of NBE Hudson) at ¶27.

[682] EC MSD Ex. 270 (Report of NBE Hudson) at ¶27, quoting Meeting Notes from Kevin Swanson to Karin Hudson (Feb. 9, 2015) (OCC-SP0333218).

[683] EC MSD Ex. 270 (Report of NBE Hudson) at ¶27, quoting Meeting Notes from Kevin Swanson to Karin Hudson (Feb. 9, 2015) (OCC-SP0333218).

[684] EC MSD Ex. 270 (Report of NBE Hudson) at ¶27.

[685] EC MSD Ex. 270 (Report of NBE Hudson) at ¶28,

[686] EC MSD Ex. 270 (Report of NBE Hudson) at ¶28, citing Comptroller's Handbook, Internal and External Audits (Apr. 2003) (OCC-SP0103885).

sales practices and control systems concerned her because it raised questions about Audit's ability to detect risk, which is an important aspect of Audit's role.[687]

During the February 9, 2015 Call, Respondent Russ Anderson reported to the OCC that the Community Bank group risk function had a "good partnership with Audit."[688] This statement also raised concerns for Examiner Hudson regarding Respondent McLinko's independence in his role as the Executive Audit Director.[689] This statement and the prior interjection of Russ Anderson on the audit call raised concerns for Examiner Hudson regarding the independence of the Audit function generally.[690] Internal audit, according to Examiner Hudson, is required to maintain independence both in appearance and in fact and not be influenced by the lines of business that internal audit is supposed to be auditing.[691] A lack of independence by an audit function is concerning as it could result in strategic decisions that increase business line risks through ineffective policies, procedures, and controls contrary to the bank's risk appetite.[692]

Based on her experience, training, and commission as a National Bank Examiner, and her participation and interaction with Audit in the February 2015 Exam, Examiner Hudson concluded that Audit lacked independence.[693] Examiner Hudson opined that Audit's failure to be fully independent posed an elevated risk to the Bank because it affected Audit's ability to detect

---

[687] EC MSD Ex. 270 (Report of NBE Hudson) at ¶29.

[688] EC MSD Ex. 270 (Report of NBE Hudson) at ¶30.

[689] EC MSD Ex. 270 (Report of NBE Hudson) at ¶30.

[690] EC MSD Ex. 270 (Report of NBE Hudson) at ¶30.

[691] EC MSD Ex. 270 (Report of NBE Hudson) at ¶30, citing Office of the Comptroller of the Currency, Comptroller's Handbook, Internal and External Audits, at 23 (April 2003).

[692] EC MSD Ex. 270 (Report of NBE Hudson) at ¶30.

[693] EC MSD Ex. 270 (Report of NBE Hudson) at ¶31.

and document risks and required corrective actions, and therefore hindered the Bank's ability to fully address risk.[694]

From her participation and interaction with Audit in the February 2015 Exam, Examiner Hudson opined that she did not believe that Audit, under Respondents McLinko's and Julian's leadership, acted with appropriate professional skepticism toward the Community Bank and its managers.[695]

**Respondents Julian and McLinko Awarded the Community Bank the Highest Possible Audit Ratings**

Examiner Smith reported that well-planned, properly structured auditing programs are essential to effective risk management and internal control systems.[696] Effective internal and external audit programs are also a critical defense against fraud and provide vital information to the board of directors about the effectiveness of internal control systems.[697]

This is underscored by the fact that the head of Audit reports directly to the Board through the Audit & Examination Committee.[698]55 The scope of Audit's work "is to determine if the Company's risk management, systems of controls, and governance processes are adequate and functioning as intended."[699] Respondent Julian and his staff, including Respondent McLinko, were responsible for escalating significant weakness and deficiencies in internal controls, risk management, and governance to the Audit & Examination Committee of the Board of Directors weaknesses.[700] Audit's work is critical "to improve the effectiveness of [the Bank's]

---

[694] EC MSD Ex. 270 (Report of NBE Hudson) at ¶31.

[695] EC MSD Ex. 270 (Report of NBE Hudson) at ¶32.

[696] EC MSD Ex. 267 (Report of NBE Smith) at ¶121.

[697] EC MSD Ex. 267 (Report of NBE Smith) at ¶121.

[698] EC MSD Ex. 267 (Report of NBE Smith) at ¶121.

[699] EC MSD Ex. 267 (Report of NBE Smith) at ¶122.

[700] EC MSD Ex. 267 (Report of NBE Smith) at ¶122.

risk management, control and governance processes, their adherence to relevant regulatory guidelines, and appropriateness for Wells Fargo's size, business mix, and risk profile."[701]

In July 2012, the Chief Security Officer and Head of Corporate Investigations informed Respondents Julian and McLinko: "[O]ur data continues to highlight a concerning trend in the area of Sales Integrity – from the increase in EthicsLine reports, to the increase in executive complaint letters / OCC referral, and increases in confirmed fraud, thus, we need to continue to escalate this issue with senior leadership. Our data continues to point to a very negative trend."[702]

The Chief Security Officer and Head of Corporate Investigations also informed Respondent Julian in the email that Respondent Russ Anderson, the Community Bank's Group Risk Officer, was "minimizing" the seriousness of the problem to executive management.[703] In January 2013, the Chief Security Officer and Head of Corporate Investigations informed Audit, including Respondent McLinko, that sales integrity was still his #1 concern.[704] During the February 9, 2015 Call, Audit told the OCC that "no significant coverage gaps were identified"

---

[701] EC MSD Ex. 267 (Report of NBE Smith) at ¶122, quoting Wells Fargo, Risk Management Framework, 2nd Edition (July 2014) (OCC-WF-SP-04791987); Wells Fargo Audit Services, Second Quarter 2014 Summary, at 8 (Aug. 4, 2014) (OCC-SP0811518).

[702] EC MSD Ex. 267 (Report of NBE Smith) at ¶123, quoting E-mail from Bacon to McLinko, Julian et al., HIGHLY CONFIDENTIAL - review & discard - FW: Follow-up - Regional Banking Cash Negotiables Investigations Key Activity Report thru 2Q (OCC-WF-SP-06076643).

[703] EC MSD Ex. 267 (Report of NBE Smith) at ¶123, quoting E-mail from Bacon to McLinko, Julian et al., HIGHLY CONFIDENTIAL - review & discard - FW: Follow-up - Regional Banking Cash Negotiables Investigations Key Activity Report thru 2Q (OCC-WF-SP-06076643).

[704] EC MSD Ex. 267 (Report of NBE Smith) at ¶124, citing Email from Deese to McLinko, Recap of Meeting with Bacon (Jan. 3, 2013) (OCC-WF-SP-08880999).

concerning Audit's coverage of the Community Bank.[705] That was Audit's conclusion that was communicated to the OCC.[706]

Respondent Julian informed the OCC in May 2015, "Our audit methodology includes contacting Corporate Investigations at the beginning of each audit to determine if there are any cases/trends related to the area under review."[707] Respondent Julian admitted in his sworn testimony that any competent auditor would have followed up on the information that he and his Audit group in fact received in real time.[708] Respondent Julian also admitted that if an auditor received such information and failed to investigate further, then such an auditor would not be doing his job.[709] Examiner Smith agreed with Respondent Julian's assessment on this point.

Examiner Smith reported that notwithstanding all the information Respondents Julian and McLinko received about sales practices misconduct in the Community Bank, Audit did not follow up on the information, and as a result, continued to award the Community Bank the highest possible ratings year after year.[710] Examiner Smith opined that Respondent Julian's and Respondent McLinko's failure to identify and escalate the systemic sales practices misconduct problem, including their failure to document the significant sales practices risk management and internal controls weaknesses in any audit report, perpetuated the existence of the Bank's sales

---

[705] EC MSD Ex. 270 (Report of NBE Hudson) at ¶32, citing Meeting Notes from Kevin Swanson to Karin Hudson (Feb. 9, 2015) (OCC-SP0333218).

[706] EC MSD Ex. 270 (Report of NBE Hudson) at ¶32.

[707] EC MSD Ex. 267 (Report of NBE Smith) at ¶125, quoting E-mail from Julian to Grover et al., Audit Coverage of Sales Practices (OCC-WF-SP-06969110).

[708] EC MSD Ex. 267 (Report of NBE Smith) at ¶126, quoting Sworn Statement of Respondent Julian at 167:18-171:4; 263:6-22 (May 31, 2018) (OCC-SP00046063).

[709] EC MSD Ex. 267 (Report of NBE Smith) at ¶126, citing Sworn Statement of Respondent Julian at 167:18-171:4; 263:6-22 (May 31, 2018) (OCC-SP00046063).

[710] EC MSD Ex. 267 (Report of NBE Smith) at ¶127.

practices misconduct problem for many years and was an unsafe or unsound practice and breach of their fiduciary duty.[711]

She further opined that that Respondent Julian failed to adequately supervise the Audit Department and failed to escalate issues to his direct supervisor, the Chair of the Audit and Examination Committee, thereby ensuring that the Board was not made aware of the issues by the independent third line of defense.[712] Examiner Smith opined that these failures perpetuated the existence of the sales practices misconduct problem and constituted unsafe or unsound practices and breaches of his fiduciary duty.[713]

She further opined that Respondents Julian and McLinko recklessly engaged in the aforementioned unsafe or unsound practices.[714]

As part of scoping OCC examinations, examiners review previous audit reports.[715] As with other examinations, the OCC reviewed previous audit reports during the February 2015 Exam with respect to Audit's coverage of cross sell and sales practices in the Community Bank.[716] Based on Examiner Hudson's training and experience as a National Bank Examiner reviewing internal audit programs, audit should conduct a risk assessment and devise an audit scope and testing that would accurately identify and document risk in audit reports.[717] Audit testing should incorporate areas that pose risk to the bank and accurately and completely assess

---

[711] EC MSD Ex. 267 (Report of NBE Smith) at ¶128.

[712] EC MSD Ex. 267 (Report of NBE Smith) at ¶129.

[713] EC MSD Ex. 267 (Report of NBE Smith) at ¶129.

[714] EC MSD Ex. 267 (Report of NBE Smith) at ¶130.

[715] EC MSD Ex. 270 (Report of NBE Hudson) at ¶32.

[716] EC MSD Ex. 270 (Report of NBE Hudson) at ¶32.

[717] EC MSD Ex. 270 (Report of NBE Hudson) at ¶32.

such risks and recommend corrective action.[718] From her participation in the February 2015 Exam and review of audit reports, Examiner Hudson concluded that none of Audit's reports covered sales practices in the manner one would have expected given the significant risks, nor did the reports identify any concerns with the sales model and its impact on employee misconduct and employee terminations.[719]

In July 2015, the OCC communicated to the Bank that it had failed to satisfy the safety and soundness standards contained in the OCC's Guidelines Establishing Heightened Standards for Certain Large Insured National Banks.[720] The OCC highlighted deficiencies with Audit and required Respondent Julian to, among other things, "develop audit programs that test the first line of defense compliance with high risk laws and regulations and report internal audit identified deficiencies to the Bank's Audit and Examination Committee along with the severity of the deficiency and the corrective actions."[721]

Examiner Crosthwaite opined that it was recklessly unsafe or unsound for the Respondents to continue awarding the Community Bank the highest possible rating, even after the sales practices misconduct problem was the subject of two Los Angeles Times articles in the Fall of 2013; after the City of Los Angeles filed a lawsuit against the Bank in May of 2015; and even after the OCC issued five Matters Requiring Attention with respect to sales practices on June 2015.[722] In support of this opinion, Examiner Crosthwaite specifically noted the following:

---

[718] EC MSD Ex. 270 (Report of NBE Hudson) at ¶32.

[719] EC MSD Ex. 270 (Report of NBE Hudson) at ¶32.

[720] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶99

[721] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶99

[722] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶100.

Appellate Case: 25-1079    Page: 124    Date Filed: 05/16/2025 Entry ID: 5517644

a.   During all the years that Respondents Julian and McLinko served in their respective positions, Audit consistently rated the Community Bank as effective— the highest possible grade.

b.   WFAS and Respondents Julian and McLinko issued these "effective" ratings even when they received information indicating that the sales practices problem had grown to an unmanageable level.

c.   WFAS rated the Regional Banking and Business Banking Compliance Program as "effective" in December 2013, when the Los Angeles Times published its second article on the Bank's sales practices.

d.   In June 2015, the OCC issued five MRAs related to sales practices. One MRA required Audit to "reassess their coverage of sales practices and provide an enterprise view." In response to the MRA, Audit indicated that it was committed to maintaining independence and developing a comprehensive audit approach with respect to sales practices. The response to the MRA designated Respondent McLinko as the "accountable executive." The commitments for which Respondent McLinko was the "accountable executive" included being "engaged with the various LOBs (lines of business) as they develop and implement corrective actions to the Enterprise Sales Practices MRA's. … Issue monitoring and validation, reviewing governance processes and enhanced policy, monitoring of projects/initiatives to enhance Enterprise Sales Practices compliance, and obtaining an understanding of key activities and functions performed to ensure compliance with enterprise sales practices along with their sustainability." Notwithstanding all of the commitments which Audit made, and for which Respondent McLinko was the "accountable executive," the Community Bank audit team under Respondent McLinko's leadership continued to award high ratings to the Community Bank.

e. WFAS Audit rated the Community Bank's internal controls for customer account opening as "effective" as late as March 2016, after the Los Angeles City Attorney's lawsuit and the OCC's issuance of five MRAs from the OCC." During my time as ERM Lead, WFAS never rated the Community Bank as anything less than "effective" until 2017, following public backlash over the Bank's sales practices.[723]

Examiner Crosthwaite opined that the Chief Auditor should know whether Community Bank's internal controls were adequate, whether any business operations in Community Bank were causing violations of laws, regulations, or Bank policies, and whether management was taking appropriate steps to address control deficiencies.[724] Although the extent of the sales practices misconduct problem, as is illustrated by PwC's estimation of 3.5 million potentially unauthorized accounts, was alarming, it should not have been a surprise to senior executives such as Respondents Julian and McLinko who had regular and immediate access to sales integrity data.[725]

Respondent Julian was responsible for ensuring that WFAS performed its duties objectively and independent of the lines of business.[726] Respondent Julian failed to meet the expectations the OCC set and communicated for all internal auditors.[727] Despite knowledge about Respondent Russ Anderson's lack of transparency and the Community Bank's failure to address the sales practices problem, Respondents Julian and McLinko did not challenge the Community Bank in any capacity.[728]

---

[723] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶100.

[724] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶101.

[725] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶101.

[726] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶102.

[727] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶102.

[728] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶102.

In his role as Chief Auditor, Respondent Julian was required to assess executive compensation and recommend reduction or negative impacts to compensation if there were deficiencies in risk management or other executive misconduct.[729] Respondent Julian admits that "Audit provided information in connection with annual incentive compensation risk memoranda and that memoranda were provided to the Human Resources Committee of the Board."[730] Respondent Julian was asked to consult and determine whether there needed to be any impacts to executive compensation due to sales practices misconduct. Respondent Julian assessed a rating of "satisfactory" for sales practices in 2014, 2015, and 2016.[731]

"Satisfactory" was the highest possible assessment. Respondent Julian did not recommend any impacts to Respondent Tolstedt's compensation due to sales practices contrary to real-time information he had received about the sales practices misconduct problem.[732] These ratings inaccurately signaled to the CEO and the Board that the Community Bank's management over sales practices risk was appropriate and should have no negative impact on senior management's incentive compensation.[733] Examiner Crosthwaite opined that it was recklessly unsafe or unsound for Respondent Julian to maintain the level of compensation for senior executives he knew or should have known contributed to the problem.[734]

Examiner Crosthwaite opined that Respondent Julian breached his fiduciary duty and engaged in an unsafe or unsound practice by failing to accurately assess and appropriately incorporate risk events in incentive compensation recommendations for material risk takers and

---

[729] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ⁋103.

[730] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ⁋103.

[731] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ⁋104.

[732] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ⁋104.

[733] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ⁋104.

[734] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ⁋105.

executives at the Bank from 2014 through 2016.[735] Examiner Crosthwaite also expressed the concern that although the Community Bank's problems have been common knowledge for many years, Respondents Julian and McLinko deny the existence of any serious or systemic problem with sales practices misconduct in the Community Bank even now.[736]

Examiner Candy concluded that Respondents Julian and McLinko disregarded known and obvious risk of substantial harm to the Bank caused by sales practices misconduct.[737] Each Respondent did not act appropriately to address or mitigate risk of substantial harm to the Bank, irrespective of the information and data supplied to them about the extent and root cause of the problem over the course of their tenures.[738]

It is Examiner Candy's opinion as a National Bank Examiner that Respondent Julian recklessly engaged in an unsafe or unsound practice by failing to accurately assess and appropriately incorporate risk events in incentive compensation recommendations for material risk takers and executives at the Bank from 2014 through 2016.[739] Annual memoranda from 2014 through 2016 rates the Community Bank's risk management in connection with sales practices as "satisfactory," the highest possible assessment.[740] It also is her opinion that Respondent Julian's and Respondent McLinko's practices and breaches constituted a pattern of misconduct.[741]

**Each Respondent Received Personal Gain or Other Benefit from Their Misconduct**

---

[735] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶106.

[736] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶107.

[737] EC MSD Ex. 269 (Report of NBE Candy) at ¶136.

[738] EC MSD Ex. 269 (Report of NBE Candy) at ¶136.

[739] EC MSD Ex. 269 (Report of NBE Candy) at ¶137.

[740] EC MSD Ex. 269 (Report of NBE Candy) at ¶137.

[741] EC MSD Ex. 269 (Report of NBE Candy) at ¶138.

Examiner Candy opined that each Respondent's misconduct conferred personal gain or other benefit to them.[742] As explained above, the sales practices misconduct problem persisted because its root cause, the unreasonable goals and extreme pressure, were also the very basis for the financial success of the business model.[743] The Community Bank was the largest line of business at the Bank.[744] It was the driver of growth for the Bank and the key to its touted cross-sell success.[745]

Examiner Candy opined that as senior executives at the Bank, Respondents reaped the benefits of that success in the form of compensation, substantial bonuses, and long-term equity awards.[746] She reported that as WFC's share price increased during their tenures, so did their effective compensation.[747] Further, she reported that cash bonuses were also substantial and linked to both the Respondents' individual performance as well as the performance of the bank.[748]

Examiner Smith reported that Respondents' improper actions and inactions allowed the Bank's impermissible, but profitable, sales model to continue for many years.[749] As senior executives of the company they benefitted financially from the unsafe and unsound business model that their misconduct preserved and perpetuated because their compensation was based in

---

[742] EC MSD Ex. 269 (Report of NBE Candy) at ¶211.

[743] EC MSD Ex. 269 (Report of NBE Candy) at ¶212.

[744] EC MSD Ex. 269 (Report of NBE Candy) at ¶212.

[745] EC MSD Ex. 269 (Report of NBE Candy) at ¶212.

[746] EC MSD Ex. 269 (Report of NBE Candy) at ¶213.

[747] EC MSD Ex. 269 (Report of NBE Candy) at ¶213.

[748] EC MSD Ex. 269 (Report of NBE Candy) at ¶213.

[749] EC MSD Ex. 267 (Report of NBE Smith) at ¶146.

part on the Bank's financial performance.[750] Upon these findings, Examiner Smith opined that the Respondents received financial gain or other benefits by reason of their misconduct.[751]

**Respondents' Misconduct Caused Enormous Financial Losses and Immense Reputational Damage to the Bank as Well as Significant Harm to its Customers and Employees**

Examiner Candy reported that when the sales practices scandal was publicized, the Bank suffered and continues to suffer massive financial loss and reputational damage.[752] Examiner Smith reported that the sales practices misconduct problem caused enormous and ongoing financial losses and other damage to Wells Fargo.[753] She reported that a former CEO of Wells Fargo estimated the total financial impact of sales practices misconduct on the Bank to be in the "tens of billions of dollars."[754]

The Bank has to date paid roughly $3.83 billion in fines and penalties to the OCC, CFPB, City Attorney of Los Angeles, the U.S. Department of Justice, the Securities and Exchange Commission, and state Attorneys General to settle sales practices-related matters.[755] The Bank has paid roughly $622 million in civil settlements related to sales practices and expended at least $160 million in payments to law firms and consultants in connection with sales practices.[756]

---

[750] EC MSD Ex. 267 (Report of NBE Smith) at ¶146.

[751] EC MSD Ex. 267 (Report of NBE Smith) at ¶147.

[752] EC MSD Ex. 269 (Report of NBE Candy) at ¶214.

[753] EC MSD Ex. 267 (Report of NBE Smith) at ¶148.

[754] EC MSD Ex. 267 (Report of NBE Smith) at ¶148, quoting Sworn Statement of Timothy Sloan at 260:8-261:3 (July 11, 2019) (OCC-SP00048394).

[755] EC MSD Ex. 267 (Report of NBE Smith) at ¶148, citing Wells Fargo & Company, Form 10-Q, at 124-25 (Aug. 4, 2020), available at https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/sec-filings/2020/second-quarter-10q.pdf; Wells Fargo & Company, Form 10-Q, at 124-25 (Nov. 3, 2016), available at https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/sec-filings/2016/third-quarter-10q.pdf.

[756] EC MSD Ex. 267 (Report of NBE Smith) at ¶148, citing Wells Fargo & Company, Form 10-Q, at 124-25 (Aug. 4, 2020), available at https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/sec-

The Bank also incurred significant expenses to rehabilitate its image and rebuild trust with its customers.[757] In 2018, the Bank launched a marketing and outreach campaign, "Re-Established," that cost the Bank hundreds of millions of dollars.[758] Further, the Board of Governors of the Federal Reserve imposed an "asset cap" on Wells Fargo, which has had a significant financial impact on the Bank by limiting the Bank's ability to increase in asset size.[759]

On February 2, 2018, the Federal Reserve Board of Governors imposed an asset cap on WFC.[760] In its public announcement of the action, the Federal Reserve noted that the asset cap was being imposed in response "to recent and widespread consumer abuses and other compliance breakdowns by Wells Fargo"[761] and that it would remain in effect until WFC sufficiently improves its governance and risk management.[762] As of the date of November 20, 2020, the asset cap remained in place.[763] The asset cap imposed on WFC is one of, if not the, costliest penalties ever.[764] The asset cap significantly affected WFC's stock performance.[765]

From February 2, 2018 through December 31, 2019:

---

ilings/2020/second-quarter-10q.pdf; and Declaration of Scott W. Champion (Apr. 24, 2018) (OCC-WF-SP-06584570).

[757] EC MSD Ex. 267 (Report of NBE Smith) at ¶148.

[758] EC MSD Ex. 267 (Report of NBE Smith) at ¶148, citing Sworn Statement of Hope Hardison at 36:14-38:18 (Aug. 16, 2018).

[759] EC MSD Ex. 267 (Report of NBE Smith) at ¶148, citing Order to Cease and Desist Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended, In re Wells Fargo & Co., Docket No. 18-007-B-HC (Feb. 2, 2018) (FRB).

[760] EC MSD Ex. 658 (Report of Dr. Pocock) at ¶58.

[761] EC MSD Ex. 658 (Report of Dr. Pocock) at ¶58 citing Federal Reserve Board of Governors, Press Release (Feb. 2, 2020), *available at* https://www.federalreserve.gov/newsevents/pressreleases/enforcement20180202a.htm.
[762] EC MSD Ex. 658 (Report of Dr. Pocock) at ¶58.

[763] EC MSD Ex. 658 (Report of Dr. Pocock) at ¶58.

[764] EC MSD Ex. 658 (Report of Dr. Pocock) at ¶58, citing American Banker, Wells Fargo asset cap is now one of the costliest bank penalties, (Aug. 24, 2020), *available at* https://www.americanbanker.com/articles/wells-fargo-asset-cap-is-now-one-of-the-costliest-bank-penalties.
[765] EC MSD Ex. 258 (Report of Dr. Pocock) at ¶58.

a. WFC's stock price declined by 16.0 percent;

b. JPMorgan's stock price increased by 22.0 percent;

c. Bank of America's stock price increased by 10.2 percent;

d. Citigroup's stock price increased by 3.7 percent; and

e. The S&P 500 Financials sector index increased by 5.0 percent.[766]

Dr. Pocock reported that his stock analysis demonstrates that WFC far outperformed its peers for many years prior to September 8, 2016, and significantly underperformed its peers ever since that day.[767] He opined that it would not be reasonable nor plausible to attribute this to a coincidence.[768]

Examiner Smith reported that the Company's stock price has significantly lagged its peers since September 8, 2016, the date of the sales practices settlements with the OCC, CFPB, and City Attorney of Los Angeles.[769] Examiner Smith opined that the Bank subsequently suffered immense reputational damage as a result of the sales practices misconduct problem.[770]

**The Importance of the Community Bank to WFC**

WFC is a financial holding company and a bank holding company registered under the Bank Holding Company Act of 1956.[771] WFC's principal business is to act as a holding company for its subsidiaries.[772] As of December 31, 2019, Wells Fargo Bank, N.A. was WFC's

---

[766] EC MSD Ex. 267 (Report of NBE Smith) at ¶58.

[767] EC MSD Ex. 267 (Report of NBE Smith) at ¶65.

[768] EC MSD Ex. 267 (Report of NBE Smith) at ¶65.

[769] EC MSD Ex. 267 (Report of NBE Smith) at ¶148.

[770] EC MSD Ex. 267 (Report of NBE Smith) at ¶149.

[771] EC MSD Ex. 658 (Report of Dr. Pocock) at ¶44, citing Wells Fargo & Co., Annual Report (Form 10-K) at 1 (Feb. 27, 2020).

[772] EC MSD Ex. 658 (Report of Dr. Pocock) at ¶44, citing Wells Fargo & Co., Annual Report (Form 10-K) at 1 (Feb. 27, 2020).

principal subsidiary with assets of $1.7 trillion, or 89 percent of WFC's assets.[773] WFC admitted that the Community Bank "contributed more than half (and in some years more than two-thirds) of the Company's revenue from 2007 through 2016."[774]

Not only did the Bank generate more than half of WFC's revenue, it also provided important synergies to all parts of the corporation.[775] "The Community Bank also made referrals to other units in WFC regarding mortgages, lines of credit, credit cards, investment products (including brokerage products), insurance products, safe deposit boxes and a variety of other banking products."[776] The Bank and the OCC's Wells Fargo examination team concluded that while the cross-sell business model was the root cause of unacceptable levels of misconduct, it was also financially beneficial and increased WFC's stock price.[777]

The scope of the scandal was publicized with the September 8, 2016 Announcement of the OCC's and CFPB's enforcement actions against the Bank.[778] However, the Bank and OCC examiners, concluded that the Bank suffered, and continues to suffer, reputational and financial harm that adversely affected WFC's stock price.[779]

In testimony before the OCC, the Bank's former CEO, Timothy Sloan, testified about the financial impact of the sales practices misconduct scandal on the Bank as follows:

---

[773] EC MSD Ex. 658 (Report of Dr. Pocock) at ⁋44, citing Wells Fargo & Co., Annual Report (Form 10-K) at 1 (Feb. 27, 2020).

[774] EC MSD Ex. 658 (Report of Dr. Pocock) at ⁋45, citing Deferred Prosecution Agreement at A-1.

[775] EC MSD Ex. 658 (Report of Dr. Pocock) at ⁋46.

[776] EC MSD Ex. 658 (Report of Dr. Pocock) at ⁋46, citing Deferred Prosecution Agreement at A-2/

[777] EC MSD Ex. 658 (Report of Dr. Pocock) at ⁋47.

[778] EC MSD Ex. 658 (Report of Dr. Pocock) at ⁋48.

[779] EC MSD Ex. 658 (Report of Dr. Pocock) at ⁋48.

Appellate Case: 25-1079    Page: 133    Date Filed: 05/16/2025 Entry ID: 5517644

Q Overall, what's the best estimate that you have on the total financial impact of the sales practices scandal on the company or the bank?

A Oh it would be in the tens of billions of dollars, when you add -- the most significant impact was one that we were referring to earlier, and that was the impact of the stock price. We really missed out on recovery.[780]

The stock price analysis Dr. Pocock performed provides significant evidence that the Bank and OCC examiners are correct with respect to both propositions.[781] Dr. Pocock found that the Bank and its senior managers benefitted greatly from the impermissible but profitable cross-sell business model during the many years that the model was in effect.[782] He also found, however, that the Bank suffered, and continues to suffer, staggering reputational and financial harm following the public disclosure of the Bank's sales practices misconduct on September 8, 2016 and the scandal that ensued.[783]

From his analysis, Dr. Pocock opined that there is significant evidence that the Bank and its senior managers benefitted greatly from preserving and implementing the profitable but impermissible cross-sell business model for over fourteen years, and that the Bank suffered, and is still suffering, great reputational and financial harm from the scandal, that the impermissible cross-sell business model caused.[784]

Examiner Smith reported that the sales practices misconduct problem has also led to volatility in the membership of the Board of Directors and of individuals in senior executive

---

[780] EC MSD Ex. 658 (Report of Dr. Pocock) at ¶49, quoting Sworn Statement of Timothy Sloan at 260:8-16 (July 11, 2019) (OCC-SP00048394).

[781] EC MSD Ex. 658 (Report of Dr. Pocock) at ¶50.

[782] EC MSD Ex. 658 (Report of Dr. Pocock) at ¶50.

[783] EC MSD Ex. 658 (Report of Dr. Pocock) at ¶50.

[784] EC MSD Ex. 658 (Report of Dr. Pocock) at ¶66.

management positions.[785] In 2017, the Bank fell to last place in a bank reputation survey conducted by American Banker/Reputation Institute.[786] According to the American Banker, the Bank's reputation score "went into free fall . . . [and was] by far the lowest of any bank."[787] The Bank's own research showed that its favorability ratings significantly trailed its peers and that it remained "near the bottom" in terms of trust.[788]

Examiner Smith reported that the sales practices misconduct problem also had negative business impacts on the Bank. As Ms. Mack testified, the scandal hampered the ability of the Community Bank to attract customers.[789]

Examiner Smith reported that the sale practices misconduct problem are ongoing[790] and have led to significant customer harm and breaches of customer trust.[791] In August 2017, Bank consultant PricewaterhouseCoopers ("PwC") determined that Bank employees opened approximately 3.5 million potentially unauthorized accounts between January 2009 and September 2016.[792] The Bank admitted that "[f]rom 2002 to 2016, Wells Fargo opened millions of accounts or financial products that were unauthorized or fraudulent" and that the Bank's "sales goals and accompanying management pressure led thousands of its employees to engage in: (1) unlawful conduct to attain sales through fraud, identity theft, and the falsification of bank

---

[785] EC MSD Ex. 267 (Report of NBE Smith) at ¶150.

[786] EC MSD Ex. 267 (Report of NBE Smith) at ¶151.

[787] EC MSD Ex. 267 (Report of NBE Smith) at ¶151.

[788] EC MSD Ex. 267 (Report of NBE Smith) at ¶151, quoting 2017 reputation survey: Banks avoid the Wells Fargo drag, American Banker, Sean Sposito, (Jun. 27, 2017) available at https://www.americanbanker.com/news/2017-bank-reputation-survey.

[789] EC MSD Ex. 267 (Report of NBE Smith) at ¶152, quoting Mack Tr. at 241:16-242:1.

[790] EC MSD Ex. 267 (Report of NBE Smith) at ¶153.

[791] EC MSD Ex. 267 (Report of NBE Smith) at ¶154.

[792] EC MSD Ex. 267 (Report of NBE Smith) at ¶154, citing PwC, Wells Fargo Sales Practices Project, Analytical Results Update (Jan. 26, 2016) (OCC-WF-SP-08668768).

Add. 133

Appellate Case: 25-1079      Page: 135      Date Filed: 05/16/2025 Entry ID: 5517644

records."[793] Examiner Smith reported that because the problem was systemic since no later than 2002, it is difficult to estimate just how many millions of customers were victimized by fraud, identity theft, and falsification of bank records.[794]

Examiner Smith also reported that the sales model also had a significant impact on Bank employees.[795] She reported that the intentionally unreasonable sales goals and extreme pressure to meet those goals led employees to engage in violations of laws (including criminal laws pertaining to fraud, identity theft, and the falsification of bank records), regulations, and Bank policy, and the Bank fired more than 5,300 employees for engaging in sales practices misconduct between 2011 and 2015.[796] During that same period, over 8,100 employees were terminated from not meeting sales goals.[797] All of the Community Bank's employees over a 14-year period were victimized by intentionally unreasonable goals and extreme pressure to meet those goals.[798]

From these findings, Examiner Smith opined that Respondents' misconduct caused the Bank to suffer material financial loss and reputational damage.[799] It is also her opinion that the Bank has yet to recover from the reputational damage caused by sales practices.[800] It is also her

---

[793] EC MSD Ex. 267 (Report of NBE Smith) at ¶154, quoting Deferred Prosecution Agreement, Statement of Facts.

[794] EC MSD Ex. 267 (Report of NBE Smith) at ¶154.

[795] EC MSD Ex. 267 (Report of NBE Smith) at ¶155.

[796] EC MSD Ex. 267 (Report of NBE Smith) at ¶155, citing Consent Order, In re Wells Fargo Bank, N.A., No. 2016-CFPB-0015 (Sept. 8, 2016) (CFPB), available at https://files.consumerfinance.gov/f/documents/092016_cfpb_ WFBconsentorder.pdf; Statement of John G. Stumpf, Chairman and Chief Executive Officer, Wells Fargo & Co., Hearing before the Committee on Banking, Housing, and Urban Affairs, U.S. Senate, 114th Congress (Sept. 20, 2016) (OCC-SP0111168).

[797] EC MSD Ex. 267 (Report of NBE Smith) at ¶155, citing E-mail from Matthews to Huss, USE THIS VERSION: Updated with totals: Data Request: terms due to sales performance (Sept. 27, 2016) (OCC-SP00034166).

[798] EC MSD Ex. 267 (Report of NBE Smith) at ¶155.

[799] EC MSD Ex. 267 (Report of NBE Smith) at ¶156.

[800] EC MSD Ex. 267 (Report of NBE Smith) at ¶156.

opinion that the reputational harm as well as the improper sales practices resulted in actual or prospective prejudice to the Bank's depositors.[801]

## Assessment of Civil Money Penalties

Respondents Russ Anderson, Julian, and McLinko were among the most senior officers of Wells Fargo, one of the largest financial institutions in the world.[802] Each Respondent had a unique and important responsibility with respect to the Bank's longstanding, widespread, and systemic sales practices misconduct problem.[803] Each Respondent knew about the problem and its root cause.[804] Examiner Smith opined that nonetheless each of the Respondents failed in their responsibilities:[805] they failed to identify, escalate, and address the sales practices misconduct problem continuously and repeatedly for years.[806] And Respondent Russ Anderson provided false and misleading information about the problem to the Board and the OCC.[807] In Examiner Smith's opinion, these failures resulted in millions of unauthorized accounts, and billions of dollars of financial losses and massive reputational damage to the Bank.[808] Additionally, each of the Respondent's received financial benefit as a result of the Bank's improper sales model.[809]

Examiner Candy opined that each Respondent had visibility into the sales practices misconduct problem, responsibilities that required them to take action to minimize and address

---

[801] EC MSD Ex. 267 (Report of NBE Smith) at ¶157.

[802] EC MSD Ex. 267 (Report of NBE Smith) at ¶159.

[803] EC MSD Ex. 267 (Report of NBE Smith) at ¶159.

[804] EC MSD Ex. 267 (Report of NBE Smith) at ¶159.

[805] EC MSD Ex. 267 (Report of NBE Smith) at ¶159.

[806] EC MSD Ex. 267 (Report of NBE Smith) at ¶159.

[807] EC MSD Ex. 267 (Report of NBE Smith) at ¶159.

[808] EC MSD Ex. 267 (Report of NBE Smith) at ¶159.

[809] EC MSD Ex. 267 (Report of NBE Smith) at ¶159.

risk, and authority and stature to effectuate change.[810] She opined that none of the Respondents fulfilled their important responsibilities and their conduct and failures perpetuated the sales practices misconduct problem and enabled ongoing illegal activity at the Bank.[811]

The OCC considers a number of statutory and interagency factors in determining the amount of a civil money penalty ("CMP") to assess to an individual.[812] These include: (1) the size of the financial resources and good faith of the person; (2) the gravity of the violation; (3) the history of previous violations; (4) such other matters as justice may require; (5) evidence that the violations were intentional or committed with disregard of the law or consequences to the institution; (6) the duration and frequency of the misconduct; (7) the continuation of the misconduct after the respondent was notified or, alternatively, its immediate cessation and correction; (8) the failure to cooperate with the agency in effecting early resolution of the problem; (9) concealment of the misconduct; (10) any threat of loss, actual loss, or other harm to the institution, including harm to the public confidence in the institution, and the degree of such harm; (11) the respondent's financial gain or other benefit from the misconduct; (12) any restitution paid by the respondent for the losses; (13) any history of previous misconduct, particularly where similar to the actions under consideration; (14) previous criticism of the institution or individual for similar actions; (15) presence or absence of a compliance program and its effectiveness; (16) tendency to engage in violations of law, unsafe or unsound practices or

---

[810] EC MSD Ex. 269 (Report of NBE Candy) at ¶217

[811] EC MSD Ex. 269 (Report of NBE Candy) at ¶217.

[812] EC MSD Ex. 269 (Report of NBE Candy) at ¶215, citing 1818(i)(2)(G); and Federal Financial Institutions Examination Council's (FFIEC) "Interagency Policy Regarding the Assessment of Civil Money Penalties by the Federal Financial Institutions Regulatory Agencies" transmitted in OCC Bulletin 1998-32, "Civil Money Penalties: Interagency Statement" (July 24, 1998).

breaches; and (17) the existence of agreements, commitments, orders or conditions imposed in writing intended to prevent violations.[813]

In his review of these factors, Examiner Coleman noted that Title 12 U.S.C 1818(i) permits the assessment of a CMP on a per-violation and per-day basis.[814] Title 12 U.S.C. 1818(i)(2)(B) authorizes the OCC to assess a CMP of "of not more than $25,000 for each day during which such violation, practice, or breach continues."[815] Examiner Coleman opined that each Respondent engaged in a repeated pattern of reckless unsafe and unsound practices and breaches of their fiduciary duties over a period of many years, and calculated that even if the OCC were to assess Respondents based on a single violation over a single year, the maximum CMP would exceed $18 million.[816]

The OCC considers a number of statutory and interagency factors in determining the amount of a civil money penalty ("CMP") to assess to an individual.[817] One such factor is the Respondent's ability to pay the CMP. There is no evidence that any of these Respondents lack the financial resources to pay the assessed CMP or a greater amount.[818] Each Respondent had ample opportunity to submit a personal financial statement or other evidence showing that their financial resources should mitigate the CMP but each chose not to.[819] Therefore, the OCC

---

[813] EC MSD Ex. 257 (Report of NBE Coleman) at ¶119, citing 12 U.S.C. § 1818(i)(2)(G) and Interagency Policy Regarding the Assessment of Civil Money Penalties by the Federal Financial Institutions Regulatory Agencies, 63 Fed. Reg. 30227, (June 3, 1998).

[814] EC MSD Ex. 257 (Report of NBE Coleman) at ¶127.

[815] EC MSD Ex. 257 (Report of NBE Coleman) at ¶127, noting that 12 C.F.R. § 19.240 provides for annual adjustments to this amount for inflation. "The current Tier 2 CMP maximum is $51,222 per violation per day. The per-day maximum for violations that occurred between December 6, 2012 and November 2, 2015 is $37,500." *Id.*

[816] EC MSD Ex. 257 (Report of NBE Coleman) at ¶127.

[817] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶131, citing 12 U.S.C. § 1818(i)(2)(G) and interagency policy.

[818] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶131.

[819] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶131.

assumes the Respondents have the ability to pay CMPs in the assessed amounts.[820] In any case, from her review of the Respondents' compensation information received from the Bank, Examiner Crosthwaite opined that each of the Respondents has the ability to pay the CMPs in the assessed amounts.[821]

Examiner Coleman noted the assessed CMPs or even higher CMPs are appropriate to serve the purpose of deterrence.[822] She reported that an important purpose of a CMP is to function as a deterrent.[823] Examiner Coleman reported that each Respondent was a senior executive within the Bank, accepted significant responsibility, and was well compensated.[824] Given the duration and scope of sales practices misconduct problem, Examiner Coleman opined that significant penalties are necessary to deter these Respondents or others in the industry from similar misconduct.[825] Examiner Coleman asserted that if CMPs are insufficient, bank officers may reasonably conclude that ignoring the harm caused by a profitable business model is the prudent and profitable course of action.[826] He asserted that CMPs must be high enough to change that calculation; to encourage other bank executives to identify significant problems and escalate and address them, even if doing so may be unwelcome to their colleagues or senior management.[827]

---

[820] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶131.

[821] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶131.

[822] EC MSD Ex. 257 (Report of NBE Coleman) at ¶130.

[823] EC MSD Ex. 257 (Report of NBE Coleman) at ¶130, citing OCC PPM 5000-7, Civil Money Penalties (November 13, 2018) at 3 ("A CMP may serve as a deterrent to future violations, unsafe or unsound practices, and breaches of fiduciary duty, by the IAP or institution against which the CMP is assessed and by other IAPs and institutions.")

[824] EC MSD Ex. 257 (Report of NBE Coleman) at ¶130.

[825] EC MSD Ex. 257 (Report of NBE Coleman) at ¶130.

[826] EC MSD Ex. 257 (Report of NBE Coleman) at ¶130.

[827]

Upon consideration of all of the statutory and interagency factors, Examiner Candy opined that the CMPs in the assessed amounts are appropriate.[828] Specifically, a CMP of at least $5,000,000 against Respondent Russ Anderson is warranted, a CMP of at least $2,000,000 against Respondent Julian is warranted, and a CMP of at least $500,000 against Respondent McLinko is warranted.[829] Further, she opined that *higher* CMPs against each Respondent are consistent with and supported by the evidence.[830]

**Enforcement Counsel's Motions for Summary Disposition**

On March 26, 2021, Enforcement Counsel filed motions seeking summary disposition in their favor against Respondents Russ Anderson, Julian, and McLinko.[831] In their Motion regarding Respondent Russ Anderson, Enforcement Counsel aver there are no genuine issues of material fact to be determined regarding the charges alleged and relief sought against Respondent Russ Anderson, which are described in the Notice of Charges for Orders of Prohibition and Orders to Cease and Desist and Notice of Assessments of Civil Money Penalty filed on January 23, 2020.[832] Enforcement Counsel aver they are entitled to a decision as a matter of law, and request that this Tribunal issue an order granting the Motion along with a recommendation that the Comptroller issue an order of prohibition along with an order that Respondent Russ Anderson pay a civil money penalty in the amount of $10,000,000.[833]

In their Motion regarding Respondents Julian and McLinko, Enforcement Counsel again aver here are no genuine issues of material fact to be determined regarding the charges alleged

---

[828] EC MSD Ex. 269 (Report of NBE Candy) at ⁋216.

[829] EC MSD Ex. 269 (Report of NBE Candy) at ⁋216.

[830] EC MSD Ex. 269 (Report of NBE Candy) at ⁋216.

[831] Enforcement Counsel's Motion for Summary Disposition against Respondent Claudia Russ Anderson, and Enforcement Counsel's Motion for Summary Disposition against Respondents David Julian and Paul McLinko, both dated March 26, 2021.

[832] Enforcement Counsel's Motion for Summary Disposition against Respondent Claudia Russ Anderson at 1.

[833] Enforcement Counsel's Motion for Summary Disposition against Respondent Claudia Russ Anderson at 1-2.

Add. 139

Appellate Case: 25-1079     Page: 141     Date Filed: 05/16/2025 Entry ID: 5517644

and relief sought against Respondents Julian and McLinko, which are described in the Notice of Charges for Orders of Prohibition and Orders to Cease and Desist and Notice of Assessments of Civil Money Penalty filed on January 23, 2020.[834] Enforcement Counsel aver they are entitled to a decision as a matter of law, and request that this Tribunal issue an order granting the Motion along with a recommendation that the Comptroller issue an order against Respondent Julian to cease and desist and be ordered to pay a civil money penalty in the amount of $7,000,000; and an order against Respondent McLinko to cease and desist and be ordered to pay a civil money penalty in the amount of $1,500,000.[835]

Enforcement Counsel have supported their motions with briefs in support, accompanied by statements of what Enforcement Counsel aver are material facts that are not disputed.[836]

With respect to Respondent Russ Anderson, Enforcement Counsel aver that she engaged in violations of law and regulation, unsafe or unsound practices, and breaches of her fiduciary duties by (a) failing to execute her risk management, control, escalation, and credible challenge responsibilities, (b) providing false, misleading, and incomplete information to senior management, the Enterprise Risk Management Committee, and the Board of Directors, and (c) obstructing the OCC's examinations.[837] They aver that by reason of her violations, practices, and breaches, the Bank suffered loss, the interests of the Bank's depositors were or could have been prejudiced, and Respondent Russ Anderson received financial and pecuniary gain and other

---

[834] Enforcement Counsel's Motion for Summary Disposition against Respondents David Julian and Paul McLinko at 1.

[835] Enforcement Counsel's Motion for Summary Disposition against Respondents David Julian and Paul McLinko at 1-2.

[836] Brief in Support of Enforcement Counsel's Motion for Summary Disposition against Respondent Claudia Russ Anderson, Enforcement Counsel's Statement of Material Facts as to Respondent Claudia Russ Anderson, Brief in Support of Enforcement Counsel's Motion for Summary Disposition against Respondents David Julian and Paul McLinko, and Enforcement Counsel's Statement of Material Facts as to Respondents David Julian and Paul McLinko, all dated March 26, 2021.

[837] Brief in Support of Enforcement Counsel's Motion for Summary Disposition against Respondent Claudia Russ Anderson at 11.

benefit.[838] They aver that her actions demonstrated personal dishonesty and a willful or continuing disregard for the safety and soundness of the Bank. They aver her violations, practices, and breaches were part of a pattern of misconduct.[839] And they aver that there is no genuine dispute about the objective proof that establishes these facts, asserting that the record shows Respondent Russ Anderson's egregious misconduct more than justifies the prompt and summary imposition of a prohibition order and assessment of a CMP greater than the amount initially assessed in the Notice.[840]

With respect to Respondents Julian and McLinko, Enforcement Counsel aver that both Respondents recklessly engaged in unsafe or unsound practices and breached their fiduciary duties to the Bank.[841] They aver that both Respondents failed to do his job while the systemic sales practices misconduct problem persisted unabated.[842] They aver that each failed to identify and escalate the systemic sales practices misconduct problem, and failed to document the significant sales practices risk management and internal controls weaknesses in any audit report or Enterprise Risk Management Assessment.[843] They aver that Respondent Julian failed to adequately supervise Audit and failed to escalate the systemic problem, its root cause, and the

---

[838] Brief in Support of Enforcement Counsel's Motion for Summary Disposition against Respondent Claudia Russ Anderson at 11.

[839] Brief in Support of Enforcement Counsel's Motion for Summary Disposition against Respondent Claudia Russ Anderson at 12.

[840] Brief in Support of Enforcement Counsel's Motion for Summary Disposition against Respondent Claudia Russ Anderson at 12.

[841] Brief in Support of Enforcement Counsel's Motion for Summary Disposition against Respondents Julian and McLinko at 21.

[842] Brief in Support of Enforcement Counsel's Motion for Summary Disposition against Respondents Julian and McLinko at Brief in Support of Enforcement Counsel's Motion for Summary Disposition against Respondents Julian and McLinko at 21. 21.

[843] Brief in Support of Enforcement Counsel's Motion for Summary Disposition against Respondents Julian and McLinko at 21.

control breakdowns to the Audit and Examination Committee.[844] They aver Respondent Julian's conduct ensured the Board remained uninformed of the systemic problem and its root cause and scope by the independent third line of defense.[845] They aver that Respondents Julian's and McLinko's unsafe or unsound practices and breaches of their fiduciary duties, which they aver lasted for years, were part of a pattern of misconduct, caused or were likely to cause more than a minimal loss to the Bank, and resulted in pecuniary gain or other benefit to each.[846] They aver that there is no genuine dispute about the objective proof that establishes these facts and no genuine issues of material fact that preclude summary disposition.[847] And they aver that the record showing Respondents Julian's and McLinko's actions—and each executive's repeated failure to act—more than justifies summary imposition of a personal cease and desist order and a civil money penalty greater than the amount initially assessed in the Notice.[848]

Each of the three Respondents have filed briefs in opposition, and each have filed responses to Enforcement Counsel's Statements of Material Facts.[849] To reduce duplication in

---

[844] Brief in Support of Enforcement Counsel's Motion for Summary Disposition against Respondents Julian and McLinko at 21.

[845] Brief in Support of Enforcement Counsel's Motion for Summary Disposition against Respondents Julian and McLinko at 21.

[846] Brief in Support of Enforcement Counsel's Motion for Summary Disposition against Respondents Julian and McLinko at 22.

[847] Brief in Support of Enforcement Counsel's Motion for Summary Disposition against Respondents Julian and McLinko at 22.

[848] Brief in Support of Enforcement Counsel's Motion for Summary Disposition against Respondents Julian and McLinko at 22.

[849] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition with Exhibits in support, Respondent Claudia Russ Anderson's Response to Enforcement Counsel's Statement of Material Facts as to Respondent Claudia Russ Anderson with Additional Material Facts, Respondent David Julian's Brief in Opposition to Motion for Summary Disposition with Exhibits in support, Response of Respondent David Julian to Enforcement Counsel's Statement of Material Facts as to Respondent David Julian with Additional Material Facts, Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition against Respondents David Julian and Paul McLinko, Respondent Paul McLinko's Response to Enforcement Counsel's Statement of Material Facts as to Respondents David Julian and Paul McLinko with Additional Material Facts, all dated May 21, 2021, and Respondent Julian's Objections to Enforcement Counsel's

the presentation facts, law, and argument, Respondents Russ Anderson and Julian incorporated by reference certain portions of Respondent Julian's responses to Enforcement Counsel's Statement of Material Facts.

**Respondent Russ Anderson's Brief in Opposition**

In her opposition brief, Respondent Russ Anderson avers that there are material factual disputes that preclude summary disposition against her.[850] She averred that "[t]he world would not know about the so-called 'fake account scandal' at Wells Fargo but for the actions of Claudia Russ Anderson" after she inherited the Sales Quality Team in 2012.[851] She averred that she recognized the need for more to be done to detect sales quality issues, and "set out to transform the system."[852] She described her efforts to develop procedures to terminate the employment of employees found to have engage in misconduct, "creating a proactive monitoring pilot program" designed to select areas of misconduct that could be measured statistically based on data in the Bank's possession.[853] After the program found evidence of such misconduct, and after the termination of approximately 30 branch team members, Respondent Russ Anderson averred that the terminations "caused problems for upper management" such that her corporate superiors in

---

Exhibits Submitted in Support of Motion for Summary Disposition and Declaration of Respondent David Julian, dated April 30, 2021.

[850] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 18.

[851] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 13.

[852] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 13.

[853] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 14.

December 2013 ordered a pause in the pilot program.[854] When she resumed the program (without asking for permission to do so), she expanded the program "to cover the Bank's entire footprint," resulting in an additional 230 employee terminations.[855] She averred that this expanded program led to "footprint-wide firings" of about 1,000 to 2,000 employees per year.[856]

According to Respondent Russ Anderson, the OCC's investigation "was based on a foundation of three faulty premises."[857] She averred that the first faulty premise is that "there were millions of fraudulent accounts," noting that the claim was based on the Bank's admission in its deferred prosecution agreement with the Department of Justice.[858] The faulty premise alleged by Respondent Russ Anderson was that "[i]f there were millions of fraudulent accounts, as many witnesses were asked to assume by Enforcement Counsel, then the only possible conclusion is that the controls, the oversight, and the people who conducted them were negligent or committing crimes."[859]

The second faulty premise alleged by Respondent Russ Anderson was that as late as May 2015 the OCC's supervisory team at Wells Fargo was aware of only 20 to 30 terminations in the LA/OC area – and that when the supervisory team learned in May 2015 that there had been 230

---

[854] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 14.

[855] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 14.

[856] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 15.

[857] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 15.

[858] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 15.

[859] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 15-16.

Appellate Case: 25-1079    Page: 146    Date Filed: 05/16/2025   Entry ID: 5517644

terminations "footprint wide" the team reached the (faulty) conclusion that "Wells Fargo had engaged in a cover-up and lied to them time after time."[860]

The third faulty premise alleged by Respondent Russ Anderson was that "since there were millions of fraudulent accounts, the problem had to be 'systemic'" such that anyone who failed to inform the Bank's regulators of the problem "was lying by omission and anyone who failed to escalate the issue had abrogated their fiduciary duties."[861]

Respondent Russ Anderson averred these were faulty premises because "none of the three predicates has withstood the test of time."[862] She averred the Bank's motive in admitting to the creation of millions of fraudulent accounts was to "put its past actions behind it and avoid criminal prosecution."[863] She averred that errors in the investigation by PricewaterhouseCoopers led to the analysis being "overly inclusive in identifying potential customers and accounts that could be entitled to remediation."[864] She averred that after recognizing these errors in the investigation, the Bank determined the actual number was "perhaps less than 1% of PwC's number," and "it is clear it is far less than two million."[865]

---

[860] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 16.

[861] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 16.

[862] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 16.

[863] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 16.

[864] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 16.

[865] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 16.

Respondent Russ Anderson averred that the premise that the OCC was unaware of the magnitude of the sales practices misconduct is "unfounded."[866] Noting in particular the reporting by OCC Examiner Crosthwaite, Respondent Russ Anderson averred that by April 2014 Examiner Crosthwaite was aware of the April 2014 Risk Committee report "that stated there were 1,000 to 2,000 terminations per year for sales practices misconduct."[867] She averred the misconduct was not treated as "an emergency issue" until the City of Los Angeles filed its lawsuit against the Bank in 2015, and that "[t]o divert attention from its failure, [the OCC] looked for a scapegoat and settled on Ms. Russ Anderson," even though the OCC had known about the terminations for years and even though they never asked Ms. Russ Anderson directly about the total number of terminations during the February 2015 examination.[868]

Respondent Russ Anderson avers that the third premise – that "Wells Fargo had a systemic sales practices misconduct problem and everyone knew it" does not "pass muster."[869] Noting that during her own deposition she stated she did not believe there was a systemic problem, Respondent avers that her testimony then is borne out now, that the statistics now in evidence "prove her testimony to be true."[870] She avers that the PwC study "shows that sales practices misconduct was not a systemic problem" by showing – with respect to the type of misconduct involving "simulated funding" – that "46% of the identified accounts were concentrated in California and 10% were from Arizona," and that "almost half of the identified

---

[866] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 17.

[867] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 17.

[868] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 17-18.

[869] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 18.

[870] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 18.

accounts were originated by 6.8% of bankers."[871] Based on these findings, Respondent Russ Anderson avers that she "did not lie by omission by failing to tell the OCC Wells Fargo supervisory team that there was a systemic problem."[872] Further, she averred that the PwC study found that the number of identified accounts dropped from 2.3% in 2013 to 0.7% by September 30, 2016, averring that this drop established that her "monitoring program was effective."[873] Upon asserting that the question of whether sales practices misconduct was "systemic" is a disputed fact, Respondent Russ Anderson argues that she deserves an in-person hearing on the issue and that summary disposition against her is not available.[874]

Further, Respondent Russ Anderson argues against any modification of the civil money penalty being sought, averring the increase from $5 million to $10 million "presents a thinly disguised retribution against Ms. Russ Anderson for having the audacity to contest their charges and demand a hearing."[875]

(Respondent Russ Anderson has also incorporated the analysis advanced by Respondent Julian at pages 9 through 11 in Respondent Julian's Brief in Opposition.[876])

**Respondent Julian's Brief in Opposition**

---

[871] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 18.

[872] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 18.

[873] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 18.

[874] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 18.

[875] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 19.

[876] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 18-19.

Respondent Julian presented his opposition through a Brief with supporting Exhibits, a Response in Opposition to Enforcement Counsel's Statement of Material Facts, a memorandum setting forth objections to exhibits being offered by Enforcement Counsel, and a Declaration by Mr. Julian.[877]

Respondent Julian avers that as the Bank's Chief Auditor, he had "an exemplary professional record and a uniform history of comporting himself with the utmost integrity."[878] He posits that no one "claims that Mr. Julian ever had anything other than the best interests of Wells Fargo at heart," nor that he ever "intentionally did anything wrong, or even acted unprofessionally during a personal interaction with him."[879] He avers he "built Wells Fargo Audit Services . . . from the modest, 'check-the-box' organization that he inherited into a large, robust and effective organization that received repeated acclaim from the OCC," and that he "sought to address sales practices misconduct issues in real time as those issues and his knowledge of them evolved – repeatedly escalating concerns and providing credible challenge in accordance with professional standards."[880]

Respondent Julian avers he is a "scapegoat" who was identified as such only after the OCC's examination team came under "intense scrutiny" by the media, the Senate Banking Committee, and others.[881] He avers this administrative enforcement proceeding exists because "Mr. Julian, unlike others who caved to pressure and settled, refuses to roll over – he demands his on-the-record hearing and looks forward to clearing his good name while exposing

---

[877] Respondent David Julian's Brief in Opposition to Motion for Summary Disposition.

[878] Respondent David Julian's Brief in Opposition to Motion for Summary Disposition at 1.

[879] Respondent David Julian's Brief in Opposition to Motion for Summary Disposition at 1.

[880] Respondent David Julian's Brief in Opposition to Motion for Summary Disposition at 1-2.

[881] Respondent David Julian's Brief in Opposition to Motion for Summary Disposition at 2.

Appellate Case: 25-1079     Page: 150     Date Filed: 05/16/2025 Entry ID: 5517644

Enforcement Counsel's case as nothing more than vague generalities, oversimplifications, distortions, and above all, governmental enforcement overreach."[882]

Respondent Julian avers Enforcement Counsel has by their own brief recognized the existence of a fact issue that would preclude summary disposition, where in their Motion Enforcement Counsel assert the "mutually exclusive possibilities that Mr. Julian both 'knew' and 'should have known' about sales practices misconduct."[883] He avers Enforcement Counsel have "cherry-picked" a subset of evidence that "they refer to as 'objective' (whatever that means), as viewed through their distorted lens" to support their case.[884] Respondent Julian asserts that through the summary disposition process established by the OCC, this Tribunal "does not weigh evidence, does not assess which witness to believe, does not discount or credit experts, and does not resolve any of the many genuine factual disputes that are presented."[885]

Respondent Julian avers that the Administrative Procedure Act does not permit summary disposition "because the Act guarantees a respondent the right to a hearing on the record."[886] He avers Enforcement Counsel's Motion "improperly relies on declarations from witnesses who were not deposed and, in some instances, do not even appear on Enforcement Counsel's witness list," which Respondent Julian calls "the very definition of sandbagging."[887] He avers the Motion

---

[882] Respondent David Julian's Brief in Opposition to Motion for Summary Disposition at 2.

[883] Respondent David Julian's Brief in Opposition to Motion for Summary Disposition at 3, quoting Enforcement Counsel's Brief in Support of Summary Disposition at 223-24.

[884] Respondent David Julian's Brief in Opposition to Motion for Summary Disposition at 3.

[885] Respondent David Julian's Brief in Opposition to Motion for Summary Disposition at 3.

[886] Respondent David Julian's Brief in Opposition to Motion for Summary Disposition at 10, 211-14.

[887] Respondent David Julian's Brief in Opposition to Motion for Summary Disposition at 10, 214-16.

Add. 149

Appellate Case: 25-1079      Page: 151      Date Filed: 05/16/2025 Entry ID: 5517644

is "based on inadmissible and unreliable evidence," and identifies his objections in an appendix to his Response.[888]

He avers this Tribunal has issued rulings that violated his constitutional rights and that Enforcement Counsel have relied on opinions of ALJs and Comptrollers "even though the full body of OCC opinions is not published."[889] He avers Enforcement Counsel's submissions "fail to offer evidence to establish the standard of care applicable to a Chief Auditor" and that "[b]lack-letter law requires this because, otherwise, the Tribunal has no valid measuring stick to determine whether Mr. Julian met his professional obligations."[890] He avers there are many disputed issues of fact concerning whether and when Respondent Julian served as the Bank's Chief Auditor, as well as the "culpability element" and as such summary disposition is not available.[891]

He avers that there are disputed issues concerning what was "knowable" about the misconduct and what he knew "at particular points in time," the scope of the sales practices misconduct, whether the misconduct was "systemic," the root cause of the misconduct, timing and magnitude of such misconduct, his actions in escalating sales practices misconduct issues, and whether any failure to escalate can actually form the basis for liability under Section 1818.[892] He avers there are disputed facts material to whether his actions threatened the financial integrity

---

[888] Respondent David Julian's Brief in Opposition to Motion for Summary Disposition at 10, 216-37, 361-372, citing Appendix of Evidentiary Objections.

[889] Respondent David Julian's Brief in Opposition to Motion for Summary Disposition at 10-11, 237-42.

[890] Respondent David Julian's Brief in Opposition to Motion for Summary Disposition at 11, 242-52.

[891] Respondent David Julian's Brief in Opposition to Motion for Summary Disposition at 252-54.

[892] Respondent David Julian's Brief in Opposition to Motion for Summary Disposition at 254-358.

of the Bank.[893] He avers that the standard of deference to which examiner reports are due as proposed by Enforcement Counsel is "irrelevant at the summary disposition stage."[894]

He avers there are disputed issues regarding the effects of violations, practices, or breaches attributable to Respondent Julian.[895] He avers there are genuine disputes of material fact concerning whether claims based on pre-2015 conduct are time barred.[896] And he avers that there are issues regarding whether any penalty is warranted, and avers that Enforcement Counsel has tried to "penalize Mr. Julian for asserting his right to a hearing," citing the Motion's position that the proper civil money penalty is $7 million, in contrast with the $2 million penalty proposed in the Notice of Charges.[897]

**Respondent Paul McLinko's Brief in Opposition**

To reduce duplication in the presentation of facts, law, and argument, Respondent McLinko incorporated by reference the entirety of Mr. Julian's Brief in Opposition, as well as the documents filed by Mr. Julian, including Respondent Julian's Response to Enforcement Counsel's Statement of Material Facts as to Respondent David Julian, David Julian's Statement of Additional Material Facts, and all accompanying exhibits.[898]

Respondent McLinko avers that the Administrative Procedure Act does not permit summary disposition and that he is "entitled to an on-the-record hearing pursuant to the

---

[893] Respondent David Julian's Brief in Opposition to Motion for Summary Disposition at 358-71.

[894] Respondent David Julian's Brief in Opposition to Motion for Summary Disposition at 372-87.

[895] Respondent David Julian's Brief in Opposition to Motion for Summary Disposition at 387-93.

[896] Respondent David Julian's Brief in Opposition to Motion for Summary Disposition at 393-413.

[897] Respondent David Julian's Brief in Opposition to Motion for Summary Disposition at 11.

[898] Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition against Respondents David Julian and Paul McLinko, at 1.

Appellate Case: 25-1079    Page: 153    Date Filed: 05/16/2025 Entry ID: 5517644

procedures and protections set forth in APA §§ 554, 556 and 557."[899] He avers he should have had the opportunity to depose declarants not identified on Enforcement Counsel's witness list.[900] He avers the Motion is "based on inadmissible and unreliable evidence, avers that his Statement of Disputed Material Facts catalogs additional reasons why much of Enforcement Counsel's evidence is not relevant, material, or reliable," and adopts Respondent Julian's objections as presented in the appendix to Respondent Julian's Response.[901] He avers that evidence predating 2010 is inadmissible and avers "the unfairness in permitting the admissibility of pre-2010 evidence is compounded by the fact that Mr. McLinko was not Executive Audit Director in the pre-2010 period (indeed, he was not even an employee of the Bank for most of that time), and thus he lacks personal knowledge from which to develop a defense to the pre-2010 allegations."[902]

He avers this Tribunal has issued rulings that violated his constitutional rights and that Enforcement Counsel have relied on opinions of ALJs and Comptrollers that are not equally available to Respondents.[903] He avers Enforcement Counsel's Motion does not establish a standard of care applicable to internal auditors and "therefore cannot establish any violation."[904]

---

[899] Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition against Respondents David Julian and Paul McLinko, at 149-50.

[900] Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition against Respondents David Julian and Paul McLinko, at 150.

[901] Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition against Respondents David Julian and Paul McLinko, at 10, 216-37, 361-372, citing Appendix of Evidentiary Objections.

[902] Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition against Respondents David Julian and Paul McLinko at 151.

[903] Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition against Respondents David Julian and Paul McLinko, at 154.

[904] Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition against Respondents David Julian and Paul McLinko, at 155.

He avers there are many disputed issues of fact concerning the "culpability element" and as such summary disposition is not available.[905]

He avers that there are disputed issues concerning his roles and responsibilities at the Bank, what was knowable about the misconduct and what he knew at particular points in time, the scope of the sales practices misconduct, whether the misconduct was systemic, the root cause of the misconduct, the timing and magnitude of such misconduct, and his actions in escalating sales practices misconduct issues.[906] He avers there are disputed facts material to whether his actions threatened the financial integrity of the Bank.[907] He averred disputed issues exist regarding whether he – as an internal auditor – "directed the affairs of a Bank."[908]

He avers there are disputed issues regarding the effects of violations, practices, or breaches attributable to him.[909] He avers there are genuine disputes of material fact concerning whether claims base on pre-2015 conduct are time barred.[910] And he avers that there are issues regarding whether any penalty is warranted, and avers that the increased penalty constitutes

---

[905] Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition against Respondents David Julian and Paul McLinko, at 157-237.

[906] Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition against Respondents David Julian and Paul McLinko, at 226-230.

[907] Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition against Respondents David Julian and Paul McLinko, at 235.

[908] Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition against Respondents David Julian and Paul McLinko, at 234.

[909] Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition against Respondents David Julian and Paul McLinko, at 237-43.

[910] Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition against Respondents David Julian and Paul McLinko, at 243-45.

"improper retaliation," averring that the $500,000 CMP assessed against him in the OCC's Notice of Charges "provides the *maximum* penalty that the OCC may impose."[911]


### Respondents' Claims Regarding the OCC's Jurisdiction

**Enforcement Counsel's Statement of Material Fact No. 1 (Respondents Russ Anderson, Julian and McLinko)**:

At all relevant times Wells Fargo Bank, N.A., Sioux Falls, South Dakota ("Bank") is a national banking association within the meaning of 12 U.S.C. § 1813(q)(1)(A) and an "insured depository institution" as defined in 12 U.S.C. § 1813(c)(2).[912]

**Respondents' Responses**

In each Response where more than one basis is presented disputing the claim presented in the Statement, each basis has been considered. Not all bases will be discussed in this Order, but only the most salient dispute(s) will be presented. This includes disputes that are based on the admissibility of evidence, such that if not specifically addressed in this Order the objection will have first been fully considered and then overruled unless the contrary is stated in the Order.

**Respondent Russ Anderson** did not dispute this jurisdictional fact.[913] Accordingly, the Recommended Decision will include a factual finding and legal conclusion that as to Respondent Russ Anderson that Wells Fargo Bank, N.A., Sioux Falls, South Dakota is a national banking association within the meaning of 12 U.S.C. § 1813(q)(1)(A) and an "insured depository institution" as defined in 12 U.S.C. § 1813(c)(2).

**Respondent McLinko** incorporated by reference "the entirety of Mr. Julian's Response to the Statement of Facts."[914] In the same submission, however, Respondent McLinko responded inconsistently with Respondent Julian's responses to Enforcement Counsel's Statements of Material Facts, in some instances contradicting Respondent Julian's responses. For example, Respondent McLinko raised no objection to Enforcement Counsel's Statement of Material Facts No. 1; and responded that the factual claims in that Statement were "undisputed." As

---

[911] Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition against Respondents David Julian and Paul McLinko, at 249 [emphasis *sic*].

[912] Respondent Claudia Russ Anderson's Amended Answer ("Russ Anderson Amended Answer") at ¶ 1) and Response to Enforcement Counsel's Statement of Material Facts (ECSMF) at No. 1; ( MSD-1 and MSD-343 at 19 (the Bank's Board stipulating the Bank is a "national banking association" and an "insured depository institution"))

[913] Russ Anderson's ECSFM at No. 1.

[914] McLinko's ECSFM at 1.

noted immediately below, Respondent Julian disputed Enforcement Counsel's claims that the Bank was a national banking association, and asserted Enforcement Counsel's proffered evidence will not support a finding that Wells Fargo is subject to the OCC's regulatory authority.[915]

A party cannot in one breath indicate no objection, while incorporating by reference the objection of another party. In such cases, I find Respondent McLinko's more specific response – in this case his "no objection" and "undisputed" response to Material Fact No. 1 – prevails over the generally incorporated response that borrows from Respondent Julian.

Accordingly, the Recommended Decision will include a factual finding and legal conclusion that as to Respondent McLinko that Wells Fargo Bank, N.A., Sioux Falls, South Dakota is a national banking association within the meaning of 12 U.S.C. § 1813(q)(1)(A) and an "insured depository institution" as defined in 12 U.S.C. § 1813(c)(2).

**Respondent Julian** disputed the claims that the Bank was a national banking association or an insured depository institution as defined by the cited statutes.[916] He asserted that Enforcement Counsel's cited evidence – the admissibility of which he challenges – does not support the factual propositions, noting that the evidence purports to be a press release of the United States Attorney's Office.[917]

In Exhibit A accompanying the press release, the Bank admitted to the fact that it was a national bank and financial institution and that its customers' deposits were insured by the FDIC.[918] Respondent Julian asserts that "the document does not mention 12 U.S.C. §§ 1813(q)(1)(A) or 3(c)(2) and therefore does not establish that the Bank was a 'national banking association' or an 'insured depository institution' within the meaning of those sections."[919] He also asserts that the allegation "vaguely refers to 'relevant times' without defining that term."[920] I find the objections unpersuasive and overrule them.

**Respondent Julian's Objection Based on Reliability**

Respondent Julian also objected to the use of the Department of Justice Deferred

---

[915] Julian's ECSFM at No. 1.

[916] Julian's ECSFM at No. 1.

[917] Julian's ECSFM at No. 1.

[918] Julian's ECSFM at No. 1.

[919] Julian's ECSFM at No. 1.

[920] Julian's ECSFM at No. 1.

Prosecution Agreement and its Statement of Facts.[921] He asserted the Exhibit is unreliable and thus inadmissible under 12 C.F.R. § 19.36(a), which he asserts "includes concepts from the Federal Rules of Evidence that are designed to ensure reliability, including hearsay and authenticity rules, citing 12 C.F.R. § 19.36(a)(3) and the Federal Rules of Evidence exclude evidence to the extent such evidence would be irrelevant, immaterial, unreliable, repetitive.[922]

I find the objections unpersuasive and overrule them. As the objections presented in Respondent Julian's Objections to Enforcement Counsel's Exhibits were presented at a time when Enforcement Counsel were precluded from responding (because the OCC's Uniform Rules do not permit a party to reply to a response in opposition to a motion for summary disposition), the objections constitute preliminary questions about the admissibility of Enforcement Counsel's proffered exhibits. This Tribunal must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, this Tribunal is not bound by evidence rules, except those on privilege.[923]

The objection regarding the reliability of the contents of Attachment A to the DOJ press release is supported by no citation to authority other than the OCC's Uniform Rule regarding the admissibility of evidence. That rule authorizes the exclusion of evidence if it is established to be unreliable. In this context, where expert testimony is presented describing the nature of the sources of the expert's information, showing the expert's training on which sources to use and how to use those sources, and showing that the sources she used are widely recognized as acceptable, there is a sufficient showing of reliability to answer preliminary questions about the admissibility of such evidence against a challenge as to the reliability of that evidence.[924] Upon review of the proffered evidence I overrule the objection, finding the proffered evidence to be sufficiently reliable to answer the preliminary question raised by the objection.

---

[921] Respondent Julian's Objections to Enforcement Counsel's Exhibits Submitted in Support of Motion for Summary Disposition at Attachment A: Respondent Julian's Objections to Enforcement Counsel's Exhibits, citing MSD-001.

Submitted in Support of Summary Disposition.

[922] Respondent Julian's Objections to Enforcement Counsel's Exhibits Submitted in Support of Motion for Summary Disposition at Attachment A: Respondent Julian's Objections to Enforcement Counsel's Exhibits.

Submitted in Support of Summary Disposition.

[923] See Fed. R. Evid. 104: "(a) In General. The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege." While the Federal Rules of Evidence are not binding on this Tribunal, they may assist the trier of fact in the course of making decisions regarding issues raised during the adjudicative process.

[924] See Offield v. Colvin, No. 14-1060-CV-W-REL-SSA, 2016 WL 223716, at *14 (W.D. Mo. Jan. 19, 2016).

Respondent Russ Anderson incorporated Respondent Julian's Objections by reference in her Brief in Opposition.[925]

## Respondent Julian's Objection Based on Material Relevance

Respondent Julian asserts the DOJ press release is not materially relevant, rendering it inadmissible under 12 C.F.R. § 19.36(a).[926] (In his Objections to Enforcement Counsel's proffered exhibits, Respondent Julian has identified those Exhibits to which this objection is raised by using the abbreviation "I".)[927] Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action.[928] When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist.[929]

In proceedings such as these, the Administrative Procedure Act provides that the agency as a matter of policy shall provide for the exclusion of irrelevant, immaterial, or unduly repetitious evidence. The OCC does so in its Uniform Rules.[930] Proffered evidence may not be excluded "except on consideration of the whole record or those parts thereof cited by a party and supported by and in accordance with the reliable, probative, and substantial evidence."[931] Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[932] However, the substantial evidence standard presupposes a zone of choice within which the decision-maker can go either way, without

---

[925] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 35.

[926] Respondent Julian's Objections to Enforcement Counsel's Exhibits Submitted in Support of Motion for Summary Disposition at Attachment A: Respondent Julian's Objections to Enforcement Counsel's Exhibits.

Submitted in Support of Summary Disposition.

[927] Respondent Julian's Objections to Enforcement Counsel's Exhibits Submitted in Support of Motion for Summary Disposition at Attachment A: Respondent Julian's Objections to Enforcement Counsel's Exhibits.

Submitted in Support of Summary Disposition.

[928] Fed. R. Evid. 401.

[929] See Fed. R. Evid. 104(b).

[930] 12 C.F.R. § 19.36.

[931] 5 U.S.C. § 556(d).

[932] Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).

interference by the courts.[933]

Nothing in Respondent Julian's objection calls into question whether the facts presented in Attachment A are true. As jurisdictional predicates constitute material facts, there is no basis to exclude the proffered facts on relevance grounds, so Respondent Julian's objection is overruled.

**Respondent Julian's Objections Based on the Application of *Daubert***

Further, Respondent Julian asserts the Exhibit contains improper opinion, meaning that the evidence: "(i) includes an opinion outside of what was disclosed in expert reports filed accordance with the scheduling order; and/or (ii) constitutes an expert opinion that is inadmissible under governing standards, including *Daubert* standards that ensure expert opinion reliability."[934] Respondent Julian has, however, offered no authority in support of the underlying legal premise supporting this averment – that *Daubert* standards apply in administrative proceedings conducted under the Administrative Procedure Act.[935] Given the absence of legal authority supporting this objection, I find no legal basis to make preliminary determinations regarding the admissibility of Enforcement Counsel's proffered exhibits based on the *Daubert* standards, and upon this finding overrule each of those objections (*i.e.*, all of those objections identified by "O" in Respondent Julian's Objections to Enforcement Counsel's Exhibits).

**Respondent Julian's Objections Based on "Late" Exhibits**

Respondent Julian asserts the Exhibit is inadmissible because it was "late," averring that the Exhibit was not produced by Enforcement Counsel within the period for document discovery as specified in the scheduling order, averring that "[i]n the case of declarations, this includes instances where a witness was not deposed, or was not listed on Enforcement Counsel's witness list."[936] Respondent Julian offers, however, no authority that supports the

---

[933] Offield v. Colvin, No. 14-1060-CV-W-REL-SSA, 2016 WL 223716, at *1 (W.D. Mo. Jan. 19, 2016).

[934] Respondent Julian's Objections to Enforcement Counsel's Exhibits Submitted in Support of Motion for Summary Disposition at Attachment A: Respondent Julian's Objections to Enforcement Counsel's Exhibits.

Submitted in Support of Summary Disposition.

[935] See, e.g., Jordan v. Astrue, 2009 WL 3380979 (D. Neb., October 21, 2009) (citing Bayliss v. Barnhart, 427 F.3d 1211 (9th Cir. 2005), and Gangelhoff v. Apfel, 2003 WL 22353047 (N. D. Iowa, July 13, 2003)), holding that the test for reliability as outlined in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993),10 and Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999),11 does not apply in Social Security administrative hearings.

[936] Respondent Julian's Objections to Enforcement Counsel's Exhibits Submitted in Support of Motion for Summary Disposition at Attachment A: Respondent Julian's Objections to Enforcement Counsel's Exhibits.

Submitted in Support of Summary Disposition.

Appellate Case: 25-1079    Page: 160    Date Filed: 05/16/2025 Entry ID: 5517644

legal premise that motions for summary disposition under the OCC's Uniform Rules must be based only on evidence from witnesses listed by an opposing party. Accordingly, this objection will not constitute a basis for excluding evidence presented in Enforcement Counsel's Motion for Summary Disposition. Upon this finding I overrule each of those objections that are based on whether the exhibit was presented within the discovery period (i.e., those identified by "L" in Respondent Julian's Objections).

**Respondent Julian's Objections Based on Exhibits that Pre-Date 2010**

Respondent Julian asserts that the Exhibit is inadmissible because it "predates 2010, which is objectionable because, as was averred in Respondent Julian's Opposition Brief, Enforcement Counsel refused to provide discovery concerning that time period."[937] In his Objection, Respondent Julian does not cite to any part of his Opposition Brief in support of the Objection, prompting a review of the entire Brief (which weighs in at 437 pages). Without claiming that this review was exhaustive, I found in that Brief no legal support for the proposition that the contents of exhibits presented by Enforcement Counsel are inadmissible based on the fact that the contents predate 2010. The preliminary admissibility review called for at this stage of the proceedings anticipates exclusion of evidence only if the proffered evidence is demonstrably irrelevant, immaterial, unreliable, or repetitive. Finding that the objection does not demonstrate a basis for exclusion at this stage, I overrule each of the objections that are based on whether the contents predate 2010 (i.e., those identified by "2010" in Respondent Julian's Objections).

With respect to Respondent Julian's objection that the allegation "vaguely refers to 'relevant times,'"[938] I overrule the objection as being insufficiently specific to permit a determination of whether the proffered Exhibit or its contents are irrelevant, immaterial, unreliable, or repetitive.

**Each Respondents' Burden in Opposition**

The OCC's Uniform Rules provide Respondents with the means by which to respond to claims like those found in Enforcement Counsel's Statement of Material Facts. The specific Rule provides, in pertinent part:

> Any party opposing a motion for summary disposition must file a statement setting forth those material facts as to which he or she contends a genuine

---

[937] Respondent Julian's Objections to Enforcement Counsel's Exhibits Submitted in Support of Motion for Summary Disposition at Attachment A: Respondent Julian's Objections to Enforcement Counsel's Exhibits.

Submitted in Support of Summary Disposition.

[938] Julian's ECSFM at No. 1.

dispute exists. Such opposition must be supported by evidence of the same type as that submitted with the motion for summary disposition[.][939]

Evidence of the same type as that required for summary disposition motions is described as taking "the form of admissions in pleadings, stipulations, depositions, investigatory depositions, transcripts, affidavits and any other evidentiary materials that the moving party contends support his or her position."[940]

Applying this Rule, the response presented by Respondent Julian to the factual claims presented in Enforcement Counsel's Statement of Fact No. 1 does not provide a basis for rejecting Enforcement Counsel's proffer of these facts, as the response is not supported by the same type of evidence that was submitted in support of Enforcement Counsel's Motion. The press release issued by the United States Attorney's Office constitutes "other evidentiary materials" that support Enforcement Counsel's factual claims here. Respondent Julian's response offers nothing that controverts the proffered evidence. Accordingly, as to Respondent Julian the Recommended Decision will include a factual finding and legal conclusion that Wells Fargo Bank, N.A., Sioux Falls, South Dakota is a "national banking association" within the meaning of 12 U.S.C. § 1813(q)(1)(A) and an "insured depository institution" as defined in 12 U.S.C. § 1813(c)(2).

**Respondent McLinko** presented no objection to the contents of Statement of Fact No. 1, and indicated the contents were undisputed. Accordingly, as to Respondent McLinko the Recommended Decision will include a factual finding and a legal conclusion that Wells Fargo Bank, N.A., Sioux Falls, South Dakota is a "national banking association" within the meaning of 12 U.S.C. § 1813(q)(1)(A) and an "insured depository institution" as defined in 12 U.S.C. § 1813(c)(2).

**Implications of the Establishment of Uncontroverted Facts**

As noted above, I find uncontroverted Enforcement Counsel's Statement of Material Fact No. 1 (regarding Respondents Russ Anderson, Julian, and McLinko). Pursuant to the OCC's Uniform Rules of Practice and Procedure, if an Administrative Law Judge determines that a party is entitled to summary disposition as to certain claims only, the ALJ must "defer submitting a recommended decision as to those claims."[941] As will be addressed below, some of the material factual claims presented by Enforcement Counsel in support of their summary disposition motion are controverted, precluding summary disposition on all of the claims. Under the OCC's Rules, a hearing on the controverted claims must be ordered; such a hearing is scheduled to begin on September 13, 2021. Pursuant to the OCC's Rules, those claims for which the ALJ has

---

[939] 12 C.F.R. § 19.29(b)(2).

[940] *Id.*

[941] 12 C.F.R. § 19.30.

Add. 160

determined summary disposition is warranted will be identified in this Order and will appear again in the recommended decision filed at the conclusion of the hearing. No further evidence regarding those claims will be permitted during the hearing.

Enforcement Counsel is entitled to summary disposition in their favor regarding both the factual and legal claims presented in Statement No. 1 in both of their summary disposition motions. Accordingly, the factual and legal claims presented in Enforcement Counsel's Statement No. 1 will be included as final findings and conclusions in that recommended decision, and further evidence regarding the factual claims in Statement No. 1 will not be permitted during the hearing.

Note that the facts presented through the settlement with the Bank are not established as facts for the purposes of determining the merits of Enforcement Counsel's summary disposition motions. None of the Respondents participated in the settlement, and the facts set forth in the settlement are not binding on any Respondent. For the purposes of this Order, the only findings that are binding on Respondents are those that have taken into account first, what Enforcement Counsel aver are undisputed or uncontroverted material facts, and second, what each Respondent has supplied in response – and those responses are binding only on the Respondent who made the response.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 2 and (Julian and McLinko) Nos. 2 and 4**

Respondent Russ Anderson was an "institution-affiliated party" of the Bank as that term is defined in 12 U.S.C. § 1813(u), having served in such capacity within six years from the date of the Notice (*see* 12 U.S.C. § 1813(i)(3)).[942]

Respondent Julian was employed by the Bank within six years of the filing of the Notice of Charges. Pursuant to 12 U.S.C. § 1813(u), Respondent Julian is an "institution-affiliated party" of the Bank.[943]

Respondent McLinko was employed by the Bank within six years of the filing of the Notice of Charges. Pursuant to 12 U.S.C. § 1813(u), Respondent McLinko is an "institution- affiliated party" of the Bank.[944]

---

[942] Russ Anderson Amended Answer ¶ 245 and Response to ECSMF at No. 2.

[943] See 12 U.S.C. § 1813(i)(3); MSD-474 (Bank Board minutes from multiple years showing Respondent Julian's appointment as an officer of the Bank and its Chief Auditor, including in June 2014); MSD-279 (Julian Dep. Tr.) at 29:15- 32:1 (testifying that the Bank's Board minutes show he was an officer of the Bank and the Bank's Chief Auditor); (Julian Amended Answer ¶ 380 (admitting that Respondent Julian was Chief Auditor from around March 2012 to October 2018)).

[944] See 12 U.S.C. § 1813(i)(3)); Respondent Paul McLinko's Amended Answer ("McLinko Amended Answer") ¶ 439, 442 ("Respondent Paul McLinko admits that he held the title of Executive Audit Director at the Bank from approximately late 2008 to at least 2018 and that, with the exception of an approximately six-month period during

Add. 161

Appellate Case: 25-1079    Page: 163    Date Filed: 05/16/2025 Entry ID: 5517644

**Responses:**

**Russ Anderson** did not dispute this jurisdictional fact.[945] Accordingly, the Recommended Decision will include a factual finding and legal conclusion as to Respondent Russ Anderson that she was an "institution-affiliated party" of the Bank as that term is defined in 12 U.S.C. § 1813(u), having served in such capacity within six years from the date of the Notice (*see* 12 U.S.C. § 1813(i)(3).

**Julian** disputed the claim, averring that he did not in his Amended Answer admit that he was Chief Auditor of the Bank from March 2012 to October 2018; rather Mr. Julian admitted that he was Chief Auditor of Wells Fargo & Company, the parent company of the Bank.[946]

It is a material fact in issue whether Respondent Julian, as alleged by Enforcement Counsel in this Statement, was employed by the Bank or its parent within six years of the filing of the Notice of Charges.

Because of the existence of this material controverted fact, summary disposition is not available with respect to Respondent Julian regarding this claim. Pursuant to the OCC's Uniform Rules, the merits of the disputed claims raised in (Julian and McLinko) Statement No. 2 will be addressed during the hearing set to begin on September 13, 2021.

**McLinko** incorporated Respondent Julian's Response,[947] but offered no evidence addressing his own status as an institution-affiliated party. While Respondent McLinko did not dispute his own status as an institution-affiliated party, he did dispute the merits of the claim raised by Respondent Julian in (Julian and McLinko) Statement No. 2 (regarding Mr. Julian's status). That issue will be addressed during the hearing set to begin on September 13, 2021. Because he offered no evidence in his response to the claim in the Statement of Material Facts concerning his own status, the Recommended Decision will include a factual finding and legal conclusion that Respondent McLinko was employed by the Bank within six years of the filing of the Notice of Charges. Pursuant to 12 U.S.C. § 1813(u), Respondent McLinko therefore is an "institution-affiliated party" of the Bank.

---

2012, he was an Executive Audit Director for the Community Bank from approximately 2011 to 2017."); Julian and McLinko MSD- 474 (Bank Board minutes from multiple years showing Respondent McLinko's appointment as a Bank officer, including in June 2014).

[945] Russ Anderson's ECSFM at No. 2.

[946] Julian's ECSFM at No. 2, citing Julian Amended Answer ¶ 386 (admitting that Mr. Julian was Chief Auditor of Wells Fargo & Company but denying that he was an institution-affiliated party of the Bank because he "lack[ed] sufficient knowledge or information to form a belief about the allegation"); MSD-279 at 22:22-23:12 (testifying that he became Chief Auditor of Wells Fargo & Company in or around March 2012 but the he did not know whether he was also Chief Auditor of Wells Fargo Bank, N.A.).

[947] Julian's ECSFM at No. 418.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 3**

The OCC is the "appropriate Federal banking agency" as that term is defined in 12 U.S.C. § 1813(q) and is authorized to initiate and maintain cease and desist and civil money penalty actions against Respondent Julian pursuant to 12 U.S.C. § 1818(b) and (i). (12 U.S.C. § 1813(q).[948]

**Response:**

**Julian** disputed the claim, averring that he was not an officer of Wells Fargo Bank, N.A. during all of the relevant years, and that as such the OCC is not the appropriate federal banking agency with regard to allegations made during the time that Mr. Julian was not an officer of the Bank.[949] He further averred that although the Banks' Board stipulated that "[t]he OCC is the 'appropriate Federal banking agency' as that term is defined in 12 U.S.C. § 1813(q) and is therefore authorized to initiate and maintain this cease and desist action against the Bank pursuant to 12 U.S.C. § 1818(b),"[950] he avers that the Bank's Board did not concede that the OCC was the appropriate Federal banking agency to maintain actions against individuals who were not officers at the Bank, adding that MSD-343 does not mention Mr. Julian's name, civil money penalty actions, or § 1818(i).[951]


It is a material fact in issue whether the OCC is the 'appropriate Federal banking agency' as that term is defined in 12 U.S.C. § 1813(q). Because of the existence of this material controverted fact, summary disposition is not available with respect to Respondents Julian and McLinko concerning the claims raised in this Statement. Pursuant to the OCC's Uniform Rules, the merits of the disputed claims raised in (Julian and McLinko) Statement No. 3 will be addressed during the hearing set to begin on September 13, 2021.

**McLinko** incorporated Respondent Julian's Response.[952]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 4**

---

[948] MSD-343 at 19 (the Bank's Board stipulating the Bank is the "appropriate federal banking agency").

[949] Julian's ECSFM at No. 3.

[950] Julian's ECSFM at No. 3, citing MSD-343 at 19.

[951] Julian's ECSFM at No. 3.

[952] Julian's ECSFM at No. 418.

Add. 163

Appellate Case: 25-1079     Page: 165     Date Filed: 05/16/2025 Entry ID: 5517644

Respondent McLinko was employed by the Bank within six years of the filing of the Notice of Charges. Pursuant to 12 U.S.C. § 1813(u), Respondent McLinko is an "institution-affiliated party" of the Bank (see 12 U.S.C. § 1813(i)(3)).[953]

**Responses:**

**Julian** incorporated Mr. McLinko's response to this Statement.[954]

**McLinko** disputed the claim, averring that the cited evidence does not establish the alleged fact,[955] citing to evidence establishing that he was appointed an Executive Vice President of the Bank in 2009.[956] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent McLinko that he was employed by the Bank within six years of the filing of the Notice of Charges, and the legal conclusion that pursuant to 12 U.S.C. § 1813(u), Respondent McLinko is an "institution-affiliated party" of the Bank (see 12 U.S.C. § 1813(i)(3)).


### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 3 and (Julian and McLinko) No. 5

The OCC is the "appropriate Federal banking agency" as that term is defined in 12 U.S.C. § 1813(q) and is therefore authorized to initiate and maintain prohibition and civil money penalty actions against Respondent Russ Anderson pursuant to 12 U.S.C. § 1818(e) and (i)[957] and is

---

[953] Respondent Paul McLinko's Amended Answer ("McLinko Amended Answer") ¶ 439, 442 ("Respondent Paul McLinko admits that he held the title of Executive Audit Director at the Bank from approximately late 2008 to at least 2018 and that, with the exception of an approximately six-month period during 2012, he was an Executive Audit Director for the Community Bank from approximately 2011 to 2017."); MSD-474 (Bank Board minutes from multiple years showing Respondent McLinko's appointment as a Bank officer, including in June 2014. See id. at 103-104, 111).

[954] Julian's ECSFM at No. 4.

[955] McLinko's ECSFM at No. 4.

[956] McLinko's ECSFM at No. 4, citing MSD-474 (Regular Meeting of the Bank's Board of Directors, Minutes of November 9, 2009). There is no basis shown for concealing from the public the reference being made to this document.

[957] 12 U.S.C. § 1813(q); Respondent Russ Anderson's Response to ECSMF at No. 3 and MSD-343 at 19 (the Bank's Board stipulating the Bank is the "appropriate federal banking agency")).

Add. 164

Appellate Case: 25-1079     Page: 166     Date Filed: 05/16/2025 Entry ID: 5517644

authorized to initiate and maintain cease and desist and civil money penalty actions against Respondents Julian and McLinko pursuant to 12 U.S.C. § 1818(b) and (i).[958]

**Responses:**

**Russ Anderson** did not dispute this jurisdictional fact.[959] Accordingly, the Recommended Decision will include a factual finding and legal conclusion as to Respondent Russ Anderson that the OCC is the "appropriate Federal banking agency" as that term is defined in 12 U.S.C. § 1813(q) and is therefore authorized to initiate and maintain prohibition and civil money penalty actions against Respondent Russ Anderson pursuant to 12 U.S.C. § 1818(e) and (i).


**Julian** disputed the claim, disputing that the OCC is the "appropriate Federal banking agency" as that term is defined in 12 U.S.C. § 1813(q), referring to his response to (Julian and McLinko) Statement No. 2 that he was not an officer of Wells Fargo Bank, N.A. during all of the relevant years, and averring that the Bank's Board did not concede that the OCC was the appropriate Federal banking agency to maintain actions against individuals who were not officers at the Bank.[960]

It is a material fact in issue whether Respondent Julian, as alleged by Enforcement Counsel in this Statement, was employed by the Bank or its parent within six years of the filing of the Notice of Charges.

Because of the existence of this material controverted fact, summary disposition on this issue is not available with respect to Respondent Julian. Pursuant to the OCC's Uniform Rules, the merits of the disputed claims raised in (Julian and McLinko) Statement No. 5 as pertains to Respondent Julian will be addressed during the hearing set to begin on September 13, 2021.

**McLinko** did not dispute this claim.[961] Accordingly, the Recommended Decision will include a factual finding as to Respondent McLinko that the OCC is the "appropriate Federal banking agency" as that term is defined in 12 U.S.C. § 1813(q) and is therefore authorized to initiate and maintain cease and desist and civil money penalty actions against Respondents Julian and McLinko pursuant to 12 U.S.C. § 1818(b) and (i).


**Terminology**

---

[958] See 12 U.S.C. § 1813(q); see MSD-343 at 19 (the Bank's Board stipulating the Bank is the "appropriate federal banking agency")).

[959] Russ Anderson's ECSFM at No. 3.

[960] Julian's ECSFM at No. 5.

[961] McLinko's ECSFM at No. 5.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 4 and (Julian and McLinko) No. 6**

For purposes of the Notice of Charges, the term "sales practices misconduct" was defined as the practices of Bank employees issuing a product or service to a customer without the customer's consent, transferring customer funds without the customer's consent, or obtaining a customer's consent by making false or misleading representations.[962]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[963]

**Julian** did not dispute the term "sales practices misconduct" was used in the Notice of Charges to mean "the practices of Bank employees issuing a product or service to a customer without the customer's consent, transferring customer funds without the customer's consent, or obtaining a customer's consent by making false or misleading representations."[964] He disputed the extent Paragraph 6 suggests the Bank ever used the term "sales practices misconduct"[965] and offered evidence that one Bank employee, Mr. Bacon, never used the term in any of his work.[966]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson and Julian that the term "sales practices misconduct" was defined as the practices of Bank employees issuing a product or service to a customer without the customer's consent, transferring customer funds without the customer's consent, or obtaining a customer's consent by making false or misleading representations

**McLinko** did not dispute this claim.[967] Accordingly, the Recommended Decision will include a factual finding as to Respondent McLinko that for the purposes of the Notice of Charges, the term "sales practices misconduct" was defined as the practices of Bank employees issuing a product or service to a customer without the customer's consent, transferring customer funds without the customer's consent, or obtaining a customer's consent by making false or misleading representations.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 5 and (Julian**

---

[962] Russ Anderson Amended Answer ¶ 4, Julian Amended Answer ¶ 4; McLinko Amended Answer ¶ 4.

[963] Russ Anderson's ECSFM at No. 4.

[964] Julian's ECSFM at No. 6.

[965] Julian's ECSFM at No. 6.

[966] Julian's ECSFM at No. 6.

[967] McLinko's ECSFM at No. 6.

Add. 166

Appellate Case: 25-1079     Page: 168     Date Filed: 05/16/2025 Entry ID: 5517644

The Bank utilized different terminology over the years to describe employee misconduct that encompassed sales practices misconduct and other ethical violations, such as "sales integrity violations," "sales incentive program violations," and "gaming."

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[968]

**Julian** disputed that the term "sales practices misconduct" was historically used by the Bank, citing evidence that the term had not been "official defined by within the Bank until 2016."[969]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson and Julian that the Bank utilized different terminology over the years to describe employee misconduct that encompassed sales practices misconduct and other ethical violations, such as "sales integrity violations," "sales incentive program violations," and "gaming."

**McLinko** disputed the claim because there is no evidence cited in support and because the stated terms are not synonymous with sales practices misconduct as Enforcement Counsel define it.[970]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent McLinko that the Bank utilized different terminology over the years to describe employee misconduct that encompassed sales practices misconduct and other ethical violations, such as "sales integrity violations," "sales incentive program violations," and "gaming."

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 6 and (Julian and McLinko) No. 8**

The Bank's Sales Quality Manual from August 2008 defined "Sales Quality" as follows. "'Sales Quality' is a broader term that captures all sales and referral related issues that impact customer satisfaction as well as profitability of the sale/referral for Wells Fargo. Examples could range from general product design considerations and trends to Bankers failing to

---

[968] Russ Anderson's ECSFM at No. 5.

[969] Julian's ECSFM at No. 6.

[970] McLinko's ECSFM at No. 6, citing MMF ¶ 565 (sales integrity is not necessarily sales practices misconduct).

Appellate Case: 25-1079    Page: 169    Date Filed: 05/16/2025 Entry ID: 5517644

disclose fees while selling a solution[971] to the most serious ethical violations."[972]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[973]

**Julian** did not dispute that the Bank's Sales Quality Manual from August 2008 contains the quoted text, but did not "concede" the contents of the Manual are admissible.[974] Finding the Manual to be admissible in the face of such an unsupported challenge to its admissibility, the Recommended Decision will include a factual finding as to Respondents Russ Anderson and Julian that the Bank's Sales Quality Manual from August 2008 defined "Sales Quality" as follows: 'Sales Quality' is a broader term that captures all sales and referral related issues that impact customer satisfaction as well as profitability of the sale/referral for Wells Fargo. Examples could range from general product design considerations and trends to Bankers failing to disclose fees while selling a solution, to the most serious ethical violations.

**McLinko** did not dispute the claim.[975] Accordingly, the Recommended Decision will include a factual finding as to Respondent McLinko that the Bank's Sales Quality Manual from August 2008 defined "Sales Quality" as follows. "'Sales Quality' is a broader term that captures all sales and referral related issues that impact customer satisfaction as well as profitability of the sale/referral for Wells Fargo. Examples could range from general product design considerations and trends to Bankers failing to disclose fees while selling a solution[976] to the most serious ethical violations."

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 7 and (Julian and McLinko) No. 9

The Bank's Sales Quality Manual from August 2008 defined "Sales Integrity" as follows: "'Sales Integrity' is a narrower term used to specifically describe the subset of Sales Quality concerns that are related to unethical and/or illegal behavior on the part of individuals while

---

[971] Within the Community Bank, the term "solution" referred to Bank products and services that could be opened, issued, or provided by Bank employees, including, but not limited to deposit accounts, debit and credit cards, online bill pay and other Bank services.

[972] MSD-10 at 5.

[973] Russ Anderson's ECSFM at No. 6.

[974] Julian's ECSFM at No. 8.

[975] McLinko's ECSFM at No. 8.

[976] Within the Community Bank, the term "solution" referred to Bank products and services that could be opened, issued, or provided by Bank employees, including, but not limited to deposit accounts, debit and credit cards, online bill pay and other Bank services.

Appellate Case: 25-1079   Page: 170   Date Filed: 05/16/2025 Entry ID: 5517644

selling to our customers. Sales integrity issues involve the manipulation and/or misrepresentation of sales or referrals and reporting of sales and referrals in an attempt to receive compensation or to meet sales goals. Unethical sales behavior has far reaching impacts. It impacts customer relationships, damages relationships between Team Members, and leads to loss of revenue and reputation for the company."[977]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[978]

**Julian** did not dispute that the cited Manual contains the quoted text.[979] **McLinko** did not dispute the claim.[980] Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that the Bank's Sales Quality Manual from August 2008 defined "Sales Integrity" as follows: "'Sales Integrity' is a narrower term used to specifically describe the subset of Sales Quality concerns that are related to unethical and/or illegal behavior on the part of individuals while selling to our customers. Sales integrity issues involve the manipulation and/or misrepresentation of sales or referrals and reporting of sales and referrals in an attempt to receive compensation or to meet sales goals. Unethical sales behavior has far reaching impacts. It impacts customer relationships, damages relationships between Team Members, and leads to loss of revenue and reputation for the company."


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 8 and (Julian and McLinko) No. 10**

The June 2010 Corporate Security Policy Manual categorized its "sales integrity violations" case type into the following subtypes: Customer Consent, False Entries/CIP Violations, Fictitious Customer, Online Banking, Product Manipulation, Funding Manipulation, Reassignment of Sales Credit, Referrals, and Other. All sales integrity violations subtypes were listed as "656 - Defalcation/Embezzlement, and/or 18 USC 1001 & 1005, False entries/records, USA Patriot Act (CIP issues)."[981]

**Responses:**

---

[977] MSD-10 at 5.

[978] Russ Anderson's ECSFM at No. 7.

[979] Julian's ECSFM at No. 9.

[980] McLinko's ECSFM at No. 8.

[981] MSD-423 at 7-9.

**Russ Anderson** incorporated Respondent Julian's response.[982]

**Julian** did not dispute that the June 2010 Corporate Security Policy Manual categorized its "sales integrity violations" case type into subtypes.[983] **McLinko** did not dispute the claim.[984] Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that the June 2010 Corporate Security Policy Manual categorized its "sales integrity violations" case type into the following subtypes: Customer Consent, False Entries/CIP Violations, Fictitious Customer, Online Banking, Product Manipulation, Funding Manipulation, Reassignment of Sales Credit, Referrals, and Other. All sales integrity violations subtypes were listed as "656 - Defalcation/Embezzlement, and/or 18 USC 1001 & 1005, False entries/records, USA Patriot Act (CIP issues)".

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 9 and (Julian and McLinko) No. 11

The Bank's Sales Quality Manual from July 2014 defined sales integrity violations as "manipulations and/or misrepresentations of sales, service or referrals and reporting of sales, service or referrals in an attempt to receive compensation or to meet sales and service goals."[985]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[986]

**Julian** did not dispute that the July 2014 Sales Quality Manual contains the quoted text.[987] **McLinko** did not dispute the claim.[988] Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that the Bank's Sales Quality Manual from July 2014 defined sales integrity violations as "manipulations and/or misrepresentations of sales, service or referrals and reporting of sales, service or referrals in an attempt to receive compensation or to meet sales and service goals."

---

[982] Russ Anderson's ECSFM at No. 8.

[983] Julian's ECSFM at No. 10.

[984] McLinko's ECSFM at No. 10.

[985] Russ Anderson Amended Answer ¶ 33; McLinko Amended Answer ¶ 33; MSD-9 at 5.

[986] Russ Anderson's ECSFM at No. 9.

[987] Julian's ECSFM at No. 11.

[988] McLinko's ECSFM at No. 11.

Appellate Case: 25-1079     Page: 172     Date Filed: 05/16/2025 Entry ID: 5517644

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 12**

In a November 2012 email, Bart Deese explained the distinction between sales quality and sales integrity to Respondent McLinko as follows: "I have heard Sales Quality and Sales Integrity used interchangeably across [Community Bank]. When I think SQ/SI, I think of them together in regards to a banker trying to manipulate incentive compensation plans by recording inappropriate sales (e.g. adding debit cards to customers without consent, creating bogus accounts, etc.)."[989]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[990]

**McLinko** incorporated Respondent Julian's Response.[991]

As neither Respondent proffered evidence controverting the claims presented in the Statement, I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that in a November 2012 email, Bart Deese explained the distinction between sales quality and sales integrity to Respondent McLinko as follows: "I have heard Sales Quality and Sales Integrity used interchangeably across [Community Bank]. When I think SQ/SI, I think of them together in regards to a banker trying to manipulate incentive compensation plans by recording inappropriate sales (e.g. adding debit cards to customers without consent, creating bogus accounts, etc.)."


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 10 and (Julian and McLinko) No. 13**

The term "gaming" within the Bank mirrored the definition of sales integrity violations. "Sales gaming may be classified as the manipulation and/or misrepresentation of sales or sales reporting to receive or attempt to receive compensation, or to meet or attempt to meet sales goals."[992] Specified types of gaming, included the following:

    (a) "Selling products to existing customers without their knowledge (i.e. debit cards) or booking more expensive DDA products above what an actual customer requested and without their knowledge.

    (b) Listing bogus sales referrals by use of current customer SSN's when

---

[989] MSD-479.

[990] Julian's ECSFM at No. 12.

[991] Julian's ECSFM at No. 418.

[992] MSD-2 at 1, 3.

Appellate Case: 25-1079    Page: 173    Date Filed: 05/16/2025    Entry ID: 5517644

they were never present.

(c) Misrepresenting products by not disclosing additional fee income items like overdraft protection.

(d) Signing customers up for on-line banking and bill pay without their knowledge.

(e) Management supplying tellers and bankers with SSN's from the Hogan system to be used as bogus referrals.

(f) Opening unfunded DDA's without customer knowledge and waiving fees (zero balance account auto-closes within 90 days but the sales goal is registered).

(g) Altering or falsifying documents translating to increased sales (i.e.; phony referrals).[993]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[994]

**Julian** did not dispute that the "Incentive Based Gaming" Report contains the quoted text.[995] Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson and Julian that the term "gaming" within the Bank mirrored the definition of sales integrity violations. "Sales gaming may be classified as the manipulation and/or misrepresentation of sales or sales reporting to receive or attempt to receive compensation, or to meet or attempt to meet sales goals." Specified types of gaming, included the types shown above.

**McLinko** disputed the claim, incorporating Julian's response and averring that Corporate Investigations created the reporting term "Sales Integrity" in 2010 at least in part because "gaming" did not adequately capture the conduct CIS was tracking.[996] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent McLinko that the term "gaming" within the Bank mirrored the definition of sales integrity violations. "Sales gaming may be classified as the manipulation and/or

---

[993] MSD-557.

[994] Russ Anderson's ECSFM at No. 10.

[995] Julian's ECSFM at No. 13.

[996] McLinko's ECSFM at No. 13, citing MMF ¶ 565 (sales integrity is not necessarily sales practices misconduct).

Add. 172

Appellate Case: 25-1079   Page: 174   Date Filed: 05/16/2025 Entry ID: 5517644

misrepresentation of sales or sales reporting to receive or attempt to receive compensation, or to meet or attempt to meet sales goals." Specified types of gaming, included the types shown above.

## Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 11 and (Julian and McLinko) No. 14

A "sales incentive program violation" is defined as the "manipulation and/or misrepresentation of sales or sales reporting in an attempt to receive compensation or meet sales goals. Includes inappropriate sales."[997]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[998]

**Julian** did not dispute that the Corporate Security EthicsLine Policy contains the quoted text.[999] Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that a "sales incentive program violation" is defined as the "manipulation and/or misrepresentation of sales or sales reporting in an attempt to receive compensation or meet sales goals. Includes inappropriate sales."

**McLinko** incorporated Respondent Julian's Response.[1000]

## Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 12 and (Julian and McLinko) No. 15

A "case" or an "investigation" as used by the Bank's Corporate Investigations group "is defined as an allegation of team member misconduct involving a possible violation of law or a code of ethics policy violation or information security policy violation, which has resulted in a financial loss and/or exposure or represents a significant compliance or reputational risk."[1001]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1002]

_____

[997] MSD-381 at 6.

[998] Russ Anderson's ECSFM at No. 11.

[999] Julian's ECSFM at No. 14

[1000] McLinko's ECSFM at No. 14.

1001 MSD-526 at 47; MSD-523 at 51.

[1002] Russ Anderson's ECSFM at No. 12.

**Julian** did not dispute that the "WFAS A&E Committee Presentation: 4th Quarter 2012" and "WFAS A&E Committee Presentation: 4th Quarter 2012" contain the quoted text.[1003] **McLinko** did not dispute the claim.[1004] Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that a "case" or an "investigation" as used by the Bank's Corporate Investigations group "is defined as an allegation of team member misconduct involving a possible violation of law or a code of ethics policy violation or information security policy violation, which has resulted in a financial loss and/or exposure or represents a significant compliance or reputational risk."

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 13 and (Julian and McLinko) No. 16**

A "systemic" problem, as used herein, refers to a problem that is inherent in the business model, operations, or culture of a bank as opposed to a problem that can be solved by terminating employees engaged in wrongdoing.

**Responses:**

**Russ Anderson** did not dispute this claim.[1005] **Julian** did not dispute the claim.[1006] Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson and Julian that a "systemic" problem refers to a problem that is inherent in the business model, operations, or culture of a bank as opposed to a problem that can be solved by terminating employees engaged in wrongdoing.

**McLinko** disputed the claim, offering no evidence but averring the word, "systemic" retains its ordinary, customary, or plain meaning.[1007] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent McLinko that a "systemic" problem, as used herein, refers to a problem that is inherent in the business model, operations, or culture of a bank as opposed to a problem that can be solved by terminating employees engaged in wrongdoing.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 14 and (Julian**

---

[1003] Julian's ECSFM at No. 15.

[1004] McLinko's ECSFM at No. 15.

[1005] Russ Anderson's ECSFM at No. 13.

[1006] Julian's ECSFM at No. 16.

[1007] McLinko's ECSFM at No. 16.

**and McLinko) No. 17**

The Community Bank was and is the Bank's largest line of business and houses the Bank's retail branch network.[1008]

**Responses:**

**Russ Anderson,** did not dispute this claim.[1009] **Julian** did not dispute this claim.[1010] **McLinko** did not dispute this claim.[1011] Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that the Community Bank was and is the Bank's largest line of business and houses the Bank's retail branch network.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 15 and (Julian and McLinko) No. 18**

The Community Bank referred to its products and services as "solutions."[1012]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1013]

**Julian** disputed the claim, citing in support Wells Fargo Sales and Service Quality Manual,[1014] averring that the Manual at page 5 "referred to its services as separate and distinct from its 'solutions.'"[1015] There is, however, no reference to services being separate and distinct from solutions on the page cited by Respondent Julian. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that the Community Bank referred to its products and services as "solutions."

---

[1008] Russ Anderson Amended Answer ¶ 2; MSD-1 at 20-21 ¶ 4; Julian Amended Answer ¶ 2; McLinko Amended Answer ¶ 2; MSD-1 at 20 ¶ 4.

[1009] Russ Anderson's ECSFM at No. 14.

[1010] Julian's ECSFM at No. 17.

[1011] McLinko's ECSFM at No. 17.

[1012] MSD- 653 (Pyles Tr.) at 96:5-96:9; MSD-350 (Ramage Tr.) at 37:24-38:2; MSD-579 (Schulte Tr.) at 71:14-72:13.

[1013] Russ Anderson's ECSFM at No. 15.

[1014] Julian's ECSFM at No. 18, citing MSD-009.

[1015] Julian's ECSFM at No. 18.

Appellate Case: 25-1079    Page: 177    Date Filed: 05/16/2025 Entry ID: 5517644

**McLinko** incorporated Respondent Julian's Response.[1016]


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 16 and (Julian and McLinko) No. 19**

The Community Bank referred to its employees as "team members."[1017]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1018]

**Julian** did not dispute the claim.[1019] **McLinko** did not dispute this claim.[1020] Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that the Community Bank referred to its employees as "team members."


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 17 and (Julian and McLinko) No. 20**

The Community Bank referred to its branches as "stores."[1021]

**Responses:**

**Russ Anderson** did not dispute this claim.[1022] **Julian** did not dispute this claim.[1023] **McLinko** did not dispute this claim.[1024] Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that the Community Bank referred to its branches as "stores."

---

[1016] McLinko's ECSFM at No. 18.

[1017] MSD-266 (Russ Anderson Dep. Tr.) at 165:1-3.

[1018] Russ Anderson's ECSFM at No. 16.

[1019] Julian's ECSFM at No. 19.

[1020] McLinko's ECSFM at No. 19.

[1021] MSD-1 at 21 ¶ 5.

[1022] Russ Anderson's ECSFM at No. 14.

[1023] Julian's ECSFM at No. 20.

[1024] McLinko's ECSFM at No. 20.

Appellate Case: 25-1079    Page: 178    Date Filed: 05/16/2025 Entry ID: 5517644

**Respondent Russ Anderson's Responsibilities as the Group Risk Officer**

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 18**

Respondent Russ Anderson served as the Community Bank's Group Risk Officer from 2004 until August 2016.[1025]

**Responses:**

**Russ Anderson** did not dispute that she was Community Bank's Group Officer beginning in 2004, but disputed that she took a personal leave of absence beginning in September 2016.[1026]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she served as the Community Bank's Group Risk Officer from 2004 until August 2016

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 19**

Respondent Russ Anderson reported to Carrie Tolstedt, the Head of the Community Bank, from 2006 through 2016.[1027]

**Responses:**

**Russ Anderson** did not dispute this fact.[1028] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she reported to Carrie Tolstedt, the Head of the Community Bank, from 2006 through 2016.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 20**

Respondent Russ Anderson also had dotted-line reporting to the Bank's Chief Risk Officer Michael Loughlin.[1029]

**Responses:**

---

[1025] Russ Anderson Amended Answer ¶ 242.

[1026] Russ Anderson's ECSFM at No. 18.

[1027] Russ Anderson Amended Answer ¶ 242.

[1028] Russ Anderson's ECSFM at No. 19.

[1029] MSD-266 (Russ Anderson Dep. Tr.) at 194:25-195:2; MSD- 264 (Farrell Expert Report) at 6; MSD-290A (Loughlin Tr.) at 26:18-27:10.

Add. 177

Appellate Case: 25-1079    Page: 179    Date Filed: 05/16/2025 Entry ID: 5517644

**Russ Anderson** disputed the claim "as to time referenced" in the Statement of Facts, noting that she began reporting on a dotted-line basis to Mr. Loughlin in the fall of 2013.[1030]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she had dotted-line reporting to the Bank's Chief Risk Officer Michael Loughlin.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 21

The Bank had three lines of defense tasked with controlling and managing risk. For the risks it generated, the Community Bank was the first line of defense. Corporate Risk was the second line of defense. Audit was the third line of defense.[1031]

### Responses:

**Russ Anderson** disputed the Statement "to the extent that SOF 21 is a generalized statement as to the lines of defense."[1032] She also disputed Enforcement Counsel's "misrepresentation of MSD-224" – the WFC Corporate Risk Sales Practices Risk Governance Document, first on the basis of the Document's admissibility and then regarding the Document's use of "three lines of defense."[1033]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the Bank had three lines of defense tasked with controlling and managing risk. For the risks it generated, the Community Bank was the first line of defense. Corporate Risk was the second line of defense. Audit was the third line of defense.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 22

As the Community Bank's Group Risk Officer from 2004 through 2016, Respondent Russ Anderson led the first line of defense in the Community Bank with responsibility for risk management and controls, including with respect to sales practices.[1034]

---

[1030] Russ Anderson's ECSFM at No. 20.

[1031] Russ Anderson Amended Answer ¶ 10; MSD-224 at 40; Julian Amended Answer ¶ 388; McLinko Amended Answer ¶ 388.

[1032] Russ Anderson's ECSFM at No. 21.

[1033] Russ Anderson's ECSFM at No. 21.

[1034] Russ Anderson Amended Answer ¶ 247; MSD-43 at 5; MSD-203; MSD-204; MSD-206; MSD-207; MSD-210; MSD-224 at 5, 9, 27; MSD-238.

Appellate Case: 25-1079     Page: 180     Date Filed: 05/16/2025 Entry ID: 5517644

**Responses:**

**Russ Anderson** disputed the claim "to the extent Ms. Russ Anderson was the only person responsible for leading the first line of defense," that her MBO's included "any specific reference to responsibility" for sales practices, and for failing to note that she "transformed the Sales and Services Conduct Oversight Team" from reactive to proactive monitoring.[1035]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that as the Community Bank's Group Risk Officer from 2004 through 2016, Respondent Russ Anderson led the first line of defense in the Community Bank with responsibility for risk management and controls, including with respect to sales practices.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 23**

Respondent Russ Anderson "had the responsibility to appropriately assess and effectively manage the risks associated with the activities of the Community Bank. This responsibility included identifying, measuring, monitoring and controlling such risks."[1036]

**Responses:**

**Russ Anderson** disputed the claim that Paragraph 142 of the Notice of Charges and her amended answer thereto supported this Statement of Material Fact.[1037]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that Respondent Russ Anderson had the responsibility to appropriately assess and effectively manage the risks associated with the activities of the Community Bank. This responsibility included identifying, measuring, monitoring and controlling such risks.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 24**

Respondent Russ Anderson provided sworn testimony to Enforcement Counsel in this

---

[1035] Russ Anderson's ECSFM at No. 22.

[1036] MSD- 264 (Farrell Expert Report) at 8; see also Respondent Russ Anderson Amended Answer ¶ 142 (admitting that she had authority to address or investigate sales practices misconduct).

[1037] Russ Anderson's ECSFM at No. 23.

Add. 179

Appellate Case: 25-1079    Page: 181    Date Filed: 05/16/2025 Entry ID: 5517644

proceeding on January 13, 2021.[1038] Respondent Russ Anderson testified she had responsibility for the sales practices misconduct problem in the Community Bank.[1039]

**Responses:**

**Russ Anderson** did not dispute that she, among others at Wells Fargo, had responsibility for the sales practices misconduct problem in the Community Bank, but disputed to the extent Enforcement Counsel misrepresents the cited testimony.[1040]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that during sworn testimony given on January 13, 2021, Respondent acknowledged that she had responsibility for the sales practices misconduct problem in the Community Bank.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 25

According to the Bank's July 2005 Safety & Soundness Plan submitted to the OCC, Respondent Russ Anderson as the Group Risk Officer had "overall responsibility for identifying, assessing, monitoring, and managing credit, regulatory, legal, operational, and reputation risk for Community Banking's lines of business."[1041]

**Responses:**

**Russ Anderson** did not dispute this fact.[1042] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson, according to the Bank's July 2005 Safety & Soundness Plan submitted to the OCC, Respondent Russ Anderson as the Group Risk Officer had "overall responsibility for identifying, assessing, monitoring, and managing credit, regulatory, legal, operational, and reputation risk for Community Banking's lines of business.

---

[1038] As Noted in the Notice, prior to the OCC filing the Notice, Ms. Russ Anderson refused to answer all substantive questions about sales practices misconduct when subpoenaed by the OCC and instead asserted her Fifth Amendment right against self-incrimination. See Russ Anderson Amended Answer ¶ 244.

[1039] MSD-266 (Russ Anderson Dep. Tr.) at 146:12-147:24; see also MSD-8C (Stumpf Tr.) at 551:12-25 (agreeing Respondent Russ Anderson bears significant responsibility for the existence and continuation of the systemic sales practices misconduct problem).

[1040] Russ Anderson's ECSFM at No. 24.

[1041] MSD-205 at 44.

[1042] Russ Anderson's ECSFM at No. 25.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 26**

Respondent Russ Anderson's specific responsibilities as the Community Bank's Group Risk Officer, as set forth in her performance objectives, was to "ensure that an effective compliance and operational risk management program is functioning for Community Banking."[1043] She had a role in working with the business management teams to: 1) "create effective control processes for compliance and operational risks"; and 2) "ensure that monitoring and testing programs effectively and timely detect potential operational risk and compliance issues and collaborating with management to ensure prompt corrective actions to address identified issues."[1044] Respondent Russ Anderson was also supposed to "[a]ct as the 'central repository' for significant issues and risks" and "[d]iscern 'best practices' and help implement where prudent and warranted." She was also supposed to meet with the OCC monthly to discuss all issues relating to Community Banking.[1045]

**Responses:**

**Russ Anderson** disputed the claim to the extent SOF ¶ 26 indicates Ms. Russ Anderson was solely responsible for ensuring an effective compliance and operation risk management program.[1046]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that her specific responsibilities as the Community Bank's Group Risk Officer, as set forth in her performance objectives, was to "ensure that an effective compliance and operational risk management program is functioning for Community Banking."[1047] She had a role in working with the business management teams to: 1) "create effective control processes for compliance and operational risks"; and 2) "ensure that monitoring and testing programs effectively and timely detect potential operational risk and compliance issues and collaborating with management to ensure prompt corrective actions to address identified issues."[1048] Respondent Russ Anderson was also supposed to "[a]ct as the 'central repository' for significant issues and risks" and "[d]iscern 'best practices' and help

---

[1043] MSD-207 at 1.

[1044] MSD-207 at 1.

[1045] MSD-203 at 2; MSD-210 at 2; MSD-207 at 4; MSD- 206.

[1046] Russ Anderson's ECSFM at No. 26.

[1047] MSD-207 at 1.

[1048] MSD-207 at 1.

Appellate Case: 25-1079    Page: 183    Date Filed: 05/16/2025 Entry ID: 5517644

implement where prudent and warranted." She was also supposed to meet with the OCC monthly to discuss all issues relating to Community Banking.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 27

In her role, Respondent Russ Anderson was responsible for understanding the sales processes and incentive structures in the Community Bank and the risks they present.[1049]

**Responses:**

**Russ Anderson** did not dispute this fact.[1050] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she was responsible for understanding the sales processes and incentive structures in the Community Bank and the risks they present.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 28

Respondent Russ Anderson served on important management committees with responsibilities for identifying, managing, and escalating sales practices misconduct.[1051]

**Responses:**

**Russ Anderson** disputed this claim "to the extent SOF 28 suggests she was the sole person on those committees with the outlined responsibilities."[1052]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she served on important management committees with responsibilities for identifying, managing, and escalating sales practices misconduct.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 29

Beginning no later than 2004, Respondent Russ Anderson served as the Chair of the

---

[1049] MSD-203 at 1-2; MSD-204; MSD-206; MSD-207; MSD-210; MSD-211; MSD-212.

[1050] Russ Anderson's ECSFM at No. 27.

[1051] Russ Anderson Amended Answer ¶ 151.

[1052] Russ Anderson's ECSFM at No. 28.

Community Banking Risk Management Committee.[1053]

    a. Ms. Tolstedt and other Community Bank leaders were members of the Community Banking Risk Management Committee.[1054]

    b. According to its charter, the purpose of the Community Banking Risk Management Committee was "to oversee the management of operational and compliance risks inherent in the Community Banking lines of business. This includes the development of appropriate risk identification, measurement and mitigation strategies and reporting, consistent with Wells Fargo's policies, processes and procedures."[1055]

**Responses:**

**Russ Anderson** did not dispute this fact.[1056] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that beginning no later than 2004, Respondent Russ Anderson served as the Chair of the Community Banking Risk Management Committee, that Ms. Tolstedt and other Community Bank leaders were members of the Community Banking Risk Management Committee, and that according to its charter, the purpose of the Community Banking Risk Management Committee was to oversee the management of operational and compliance risks inherent in the Community Banking lines of business. This includes the development of appropriate risk identification, measurement and mitigation strategies and reporting, consistent with Wells Fargo's policies, processes and procedures.


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 30**

The primary responsibility of the Community Banking Risk Management Committee was "to understand Community Banking's operational risk profile and to work with management across Community Banking to ensure risks are managed effectively." [1057]

**Responses:**

---

[1053] OCC-WF-SP-00680477 (2004 MBOs); OCC-WF-SP-10796374 (2005 MBOs).

[1054] MSD-208.

[1055] MSD-208 at 1.

[1056] Russ Anderson's ECSFM at No. 29.

[1057] Russ Anderson Amended Answer ¶ 255; MSD-208.

Add. 183

Appellate Case: 25-1079   Page: 185   Date Filed: 05/16/2025 Entry ID: 5517644

**Russ Anderson** disputed the claim "to the extent Enforcement Counsel mischaracterizes Ms. Russ Anderson's Amended Answer.[1058]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the primary responsibility of the Community Banking Risk Management Committee was to understand Community Banking's operational risk profile and to work with management across Community Banking to ensure risks are managed effectively.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 31**

Under the Bank's Fraud Risk Management Policy, the Community Bank was "responsible for understanding its internal and external fraud risks and must maintain a fraud risk management program ('fraud program') to address these risks." As the Community Bank's Group Risk Officer, Respondent Russ Anderson was responsible for "opining on the adequacy of internal and external fraud risk management and providing credible challenge" to Community Bank business leaders. [1059]

**Responses:**

**Russ Anderson** disputed the claims "as to time."[1060]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that under the Bank's Fraud Risk Management Policy, the Community Bank was responsible for understanding its internal and external fraud risks and must maintain a fraud risk management program to address these risks, and that as the Community Bank's Group Risk Officer, Respondent Russ Anderson was responsible for opining on the adequacy of internal and external fraud risk management and providing credible challenge to Community Bank business leaders.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 32**

The Bank's Product and Service Risk Management Policy also conferred significant responsibilities on Respondent Russ Anderson. The Policy stated, in part: "Wells Fargo expects all its businesses that develop, sell, or service products to employ effective risk management." Under the Policy, the Group Risk Officer "establishes the product risk management practices for the business group, in collaboration with the business group head, business managers, and other senior credit and market risk managers in the group." The Group

---

[1058] Russ Anderson's ECSFM at No. 30.

[1059] MSD-209; MSD-238.

[1060] Russ Anderson's ECSFM at No. 31.

Appellate Case: 25-1079    Page: 186    Date Filed: 05/16/2025 Entry ID: 5517644

Risk Officer's responsibilities included: "Providing credible challenge and sufficient oversight to ensure the objectives of this policy and the business's product risk management process are met" and "escalating matters requiring attention." The policy authorized the Group Risk Officer to "at his or her sole discretion, require that a product's development, modification, or sales of the product be suspended pending further review."[1061]

**Responses:**

**Russ Anderson** disputed the claim "to the extent that Ms. Russ Anderson as Group Risk Officer could require the products at issue in this matter – Demand Deposit Accounts, credit cards, debit cards – to be suspended."[1062] She averred the Statement cites "no documents that would indicate this policy would authorize the suspension of sales of these core products." And she noted that Bank policy describes the roles and responsibilities of other individuals who may have a role in this regard.[1063]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the Bank's Product and Service Risk Management Policy conferred significant responsibilities on Respondent Russ Anderson. The Policy stated, in part: "Wells Fargo expects all its businesses that develop, sell, or service products to employ effective risk management." Under the Policy, the Group Risk Officer "establishes the product risk management practices for the business group, in collaboration with the business group head, business managers, and other senior credit and market risk managers in the group." The Group Risk Officer's responsibilities included: "Providing credible challenge and sufficient oversight to ensure the objectives of this policy and the business's product risk management process are met" and "escalating matters requiring attention." The policy authorized the Group Risk Officer to "at his or her sole discretion, require that a product's development, modification, or sales of the product be suspended pending further review."

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 33**

From 2004 until 2016, Respondent Russ Anderson was the Group Risk Officer in the Community Bank responsible for identifying, measuring, monitoring, and managing risks in the Community Bank, including sales practices risks. In January 2012, the Sales and Service Conduct Oversight Team ("SSCOT") began reporting directly to Respondent Russ Anderson. SSCOT conducted proactive monitoring of sales practices misconduct. This group previously

---

[1061] MSD-43.

[1062] Russ Anderson's ECSFM at No. 32.

[1063] Russ Anderson's ECSFM at No. 32.

Add. 185

Appellate Case: 25-1079      Page: 187      Date Filed: 05/16/2025 Entry ID: 5517644

was known as Sales Quality.[1064]

**Responses:**

**Russ Anderson** did not dispute the claim "to the extent Ms. Russ Anderson admitted to the second sentence of SOF ¶ 33 in her Amended Answer; but disputed "as to time frame referenced and the scope of" her duties.[1065] She further averred that under her leadership, SSCOT "began proactively monitoring for the first time in the history of the Bank in 2013".[1066]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that from 2004 until 2016, she was the Group Risk Officer in the Community Bank responsible for identifying, measuring, monitoring, and managing risks in the Community Bank, including sales practices risks. In January 2012, the Sales and Service Conduct Oversight Team ("SSCOT") began reporting directly to her. SSCOT conducted proactive monitoring of sales practices misconduct. This group previously was known as Sales Quality.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 34

Respondent Russ Anderson served on the Bank's Internal Fraud Committee beginning from January 2013 until 2016, responsible for ensuring "that all stakeholders who share responsibility for internal fraud risk management receive appropriate reporting and have a forum to address broad team member misconduct matters."[1067]

**Responses:**

**Russ Anderson** did not dispute that she served on the Bank's Internal Fraud Committee, but disputed that the cited documents were admissible or that they establish a factual basis for the claims in this Statement.[1068]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she served on the Bank's Internal Fraud Committee beginning from January 2013 until 2016 and was responsible for ensuring that all

---

[1064] Russ Anderson Amended Answer ¶ 260.

[1065] Russ Anderson's ECSFM at No. 33.

[1066] Russ Anderson's ECSFM at No. 33.

[1067] MSD-209 at 5; MSD-219.

[1068] Russ Anderson's ECSFM at No. 34.

stakeholders who share responsibility for internal fraud risk management receive appropriate reporting and have a forum to address broad team member misconduct matters.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 35**

In or around September 2016, Respondent Russ Anderson took a leave of absence from the Bank.[1069]

**Responses:**

**Russ Anderson** did not dispute this claim.[1070] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that in or around September 2016, Respondent Russ Anderson took a leave of absence from the Bank.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 36**

In or around February 2017, the Bank terminated Respondent Russ Anderson for cause in connection with her role in the sales practices misconduct problem in the Community Bank.[1071]

**Responses:**

**Russ Anderson** did not dispute that her employment at the Bank was terminated, but disputed that good cause existed for that termination.[1072]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that in or around February 2017, the Bank terminated Respondent Russ Anderson's employment for cause in connection with her role in the sales practices misconduct problem in the Community Bank.

---

[1069] MSD-266 (Russ Anderson Dep. Tr.) at 40:9-13.

[1070] Russ Anderson's ECSFM at No. 35.

[1071] Russ Anderson Amended Answer ¶ 243; MSD-280 (Board Report) at 8; id. at 52 ("Russ Anderson minimized and obscured issues in reporting on the Community Bank, including sales practices."); id. at 49 ("Russ Anderson's performance fell far short of what was expected and required of the senor risk officer in the Community Bank."); MSD-268 (NBE Crosthwaite Expert Report) at ¶ 120; MSD-586 (Hernandez Tr.) at 190:14-193:4.

[1072] Russ Anderson's ECSFM at No. 36.

**The Community Bank had a systemic sales practices misconduct problem from at least 2002 until October 2016**[1073]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 37 and (Julian and McLinko) No. 21**

Beginning no later than 2002 until October 2016, the Community Bank had a systemic sales practices misconduct problem.[1074]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1075]

**Julian** disputed the claim averring "there is considerable evidence showing that sales practices misconduct issues did not occur on a large scale, varied in severity by time and geography, were not systemic or widespread, and were not caused by unreasonable sales goals or pressure."[1076]

In support, he refers in part to a cover letter attached to a 2004 Gaming Memo states that "incentive based gaming is certainly not rampant [within] the company," and notes that, at most, it is only "somewhat problematic."[1077]

Having reviewed the proffered evidence, I find it insufficiently relates to the issues raised in the Notice of Charges, as it refers to conditions present in the Bank that are too remote in time to constitute evidence material to the issues presented in the Notice of Charges. Accordingly, the claims presented in (Russ Anderson) No. 37 and (Julian and McLinko) No. 21 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[1078]

---

[1073] McLinko disputed the claim presented in this subheading. Subheadings do not contain Statements of Material Fact, and as such contain no disputable facts. To the extent any party submitted responses to claims presented through subheadings such as this, the submission will be maintained in the record as a proffer only.

[1074] See Russ Anderson SOF ¶¶48-86, 124-146; Julian and McLinko SOF ¶¶ 31-213.

[1075] Russ Anderson's ECSFM at No. 37.

[1076] Julian's ECSFM at No.21.

[1077] Julian's ECSFM at No.21, quoting MSD-002 at 1.

[1078] McLinko's ECSFM at No. 21.

Add. 188

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 38**

Respondent Russ Anderson testified that "there has been sales practice misconduct in the bank since I started in 1980, yes."[1079]

**Responses:**

**Russ Anderson** did not dispute the accuracy of the testimony cited, but disputed "any suggestion" that she "admitted sales practices misconduct was systemic or widespread."[1080]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she testified that "there has been sales practice misconduct in the bank since I started in 1980, yes."


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 39 and (Julian and McLinko) No. 22**

Sales practices misconduct violated laws and regulations and harmed the Bank's customers.[1081]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1082]

**Julian** disputed the claim, not by establishing that the misconduct violated laws and regulations, but by averring Enforcement Counsel have not shown direct evidence of sales practices misconduct that violated laws and regulations.[1083] Averring that the claim relies in part on conclusions by the OCC examiners that sales practices misconduct violates multiple consumer and criminal laws, Respondent Julian does not offer countervailing evidence, but instead disputes the conclusions reached by the examiners.[1084]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that sales practices misconduct violated laws and regulations and harmed the Bank's customers.

---

[1079] MSD-266 (Russ Anderson Dep. Tr.) at 31:17-21; 208:12-18.

[1080] Russ Anderson's ECSFM at No. 38.

[1081] See Russ Anderson SOF ¶¶ 257-275; 459-489; Julian and McLinko SOF ¶¶ 214-231.

[1082] Russ Anderson's ECSFM at No. 39.

[1083] Julian's ECSFM at No. 22.

[1084] Julian's ECSFM at No. 22.

**McLinko** incorporated Respondent Julian's Response.[1085]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 40 and (Julian and McLinko) No. 23**

Sales practices misconduct was pervasive and widespread within the Community Bank.[1086]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1087]

**Julian** disputed the claim, averring "the problem was not widespread or systemic" and that it was caused by "unsanctioned sales pressure imposed by rogue regional managers."[1088] He cited in support evidence that "simulated funding" misconduct was deemed "more likely than not" to be the result of 5,604 team members, or only 2.5% of all active Bank team members at any one point in time.[1089] Evidence of such widespread misconduct does not support the factual claim Respondent Julian relies upon – it confirms that the cited misconduct was pervasive and widespread within the Community Bank.

 I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that sales practices misconduct was pervasive and widespread within the Community Bank.

**McLinko** incorporated Respondent Julian's Response.[1090]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 41 and (Julian and McLinko) No. 24**

The root cause of sales practices misconduct was the Community Bank's business model, which imposed undue pressure on employees to meet unreasonable sales goals.[1091]

_____

[1085] McLinko's ECSFM at No. 22.

[1086] See Russ Anderson SOF ¶¶ 214-256; Julian and McLinko SOF ¶¶ 169-213.

[1087] Russ Anderson's ECSFM at No. 40.

[1088] Julian's ECSFM at No. 23.

[1089] Julian's ECSFM at No. 23, quoting (MSD-226 at 7, 481).

[1090] McLinko's ECSFM at No. 23.

[1091] See Russ Anderson SOF ¶¶ 48-68, 124-146; Julian and McLinko SOF ¶¶ 31-116.

Add. 190

Appellate Case: 25-1079      Page: 192      Date Filed: 05/16/2025 Entry ID: 5517644

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1092]

**Julian** disputed the claim, averring that evidence supports the view that sales practices misconduct was limited to a small group of team members.[1093] Included is evidence in the form of testimony from former Community Bank leader Tyson Pyles.[1094] Mr. Pyles was asked whether he believed during any time between 2003 and 2011 that the retail bank incentive compensation plan contributed directly or indirectly to sales practices misconduct. He answered "I don't believe it was the primary root cause. Might it have been an underlying root cause, I'm an open-minded person and would say that it could have been."[1095]

Having examined the evidence proffered in support of Respondent Julian's dispute, I find the evidence is insufficiently related to the issues raised in the Notice of Charges, as it presents conditions present in the Bank too remote in time to constitute material to the issues presented in the Notice of Charges. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that during the time period relevant to the issues presented in the Notice of Charges the root cause of sales practices misconduct was the Community Bank's business model, which imposed undue pressure on employees to meet unreasonable sales goals

**McLinko** incorporated Respondent Julian's Response.[1096]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 42 and (Julian and McLinko) No. 25**

The Bank's controls to both prevent and detect sales practices misconduct were inadequate.[1097]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1098]

---

[1092] Russ Anderson's ECSFM at No. 41.

[1093] Julian's ECSFM at No. 24.

[1094] Julian's ECSFM at No. 24, citing MSD-653C (Tr. T. Pyles) at 648:25-651:16.

[1095] MSD-653C at 648-49.

[1096] McLinko's ECSFM at No. 24.

[1097] See Russ Anderson SOF ¶¶ 150-213; Julian and McLinko SOF ¶¶ 117-168.

[1098] Russ Anderson's ECSFM at No. 42.

Add. 191

Appellate Case: 25-1079     Page: 193     Date Filed: 05/16/2025 Entry ID: 5517644

**Julian** disputed the claim, averring that the Bank's controls to both prevent and detect sales practices misconduct followed the three lines of defense model, and were constantly evolving to improve their capabilities.[1099] Having presented evidence of evolution, Respondent Julian has not presented evidence contradicting the claim that during the relevant period, existing controls were inadequate. In support of his averment, Respondent Julian asserts that "it is not WFAS's role 'to manage the company's internal controls, rather internal audit is responsible for evaluating those controls designed and implemented by the first and second lines of defense.'"[1100] Such a proffer does not contradict the factual claim presented, but offers an opinion regarding what Respondent's expert witness opined was the scope of the role of Wels Fargo Audit Services.

Having examined the evidence proffered in support of Respondent Julian's dispute, I find the evidence is insufficiently related to the claims presented in this Statement, and I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that the Bank's controls to both prevent and detect sales practices misconduct were inadequate.

**McLinko** incorporated Respondent Julian's Response.[1101]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 43 and (Julian and McLinko) No. 26**

None of Respondents' expert witnesses concludes or opines on whether the Community Bank had a systemic sales practices misconduct problem, the root cause thereof, how long that lasted, the magnitude of the problem, or how widespread it was.[1102]

**Responses:**

---

[1099] Julian's ECSFM at No. 25.

[1100] Julian's ECSFM at No. 25, quoting MSD-271 (Respondent Julian's Expert Report of Tali M. Ploetz) at 5.

[1101] McLinko's ECSFM at No. 25.

[1102] See MSD-264 (Farrell Expert Report) at 5; MSD-262 (Abshier Expert Report) at 5; MSD-281 (Wilcox Expert Report) at 11; MSD-265A (Farrell Dep. Tr.) at 52:18-22; MSD-263A (Abshier Dep. Tr.) at 44:18-25, 50:15-51:12; MSD-282A (Wilcox Dep. Tr.) at 40:11-41:11); MSD-271 (Ploetz Expert Report) at 4; MSD- 283A (Julian Deal Expert Report) at 8; MSD-283B (McLinko Deal Expert Report) at 8; MSD- 285 (Jarrett Expert Report) at 6; see also MSD-282A (Wilcox Dep. Tr.) at 40:11-41:16; MSD- 272A (Ploetz Dep. Tr.) at 16:16-22:4; MSD-286B (Jarrett Dep. Tr.) at 580:3-584:3; MSD-284A (Deal Dep. Tr.) at 116:3-119:9.

Add. 192

**Russ Anderson** averred that "no expert in this case . . . has access to necessary data that would be necessary to conclude on such matters, evidence offered by Ms. Russ Anderson's experts bears on the questions."[1103]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson, none of Respondents' expert witnesses concludes or opines on whether the Community Bank had a systemic sales practices misconduct problem, the root cause thereof, how long that lasted, the magnitude of the problem, or how widespread it was.

**Julian** disputed the claim, averring (along with Respondent Russ Anderson) that none of the experts had access to records that would be necessary to conclude on the claims raised here.[1104] Having examined the proffered evidence, I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Julian, none of Respondents' expert witnesses concludes that the Community Bank had a systemic sales practices misconduct problem, the root cause thereof, how long that lasted, the magnitude of the problem, or how widespread it was.

**McLinko** incorporated Respondent Julian's Response and disputed that the cited exhibits supporting the Statement established the alleged fact that Community Bank had systemic sales practices misconduct from at least 2002 until October 2016, or that it established the root cause of the misconduct problem.[1105] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent McLinko that none of Respondents' expert witnesses concludes that the Community Bank had a systemic sales practices misconduct problem, the root cause thereof, how long that lasted, the magnitude of the problem, or how widespread it was.


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 44**

None of Respondent Russ Anderson's expert witnesses concludes or opines that the sales goals in the Community Bank were reasonable.[1106]

---

[1103] Russ Anderson's ECSFM at No. 43.

[1104] Julian's ECSFM at No. 26.

[1105] McLinko's ECSFM at No. 26.

[1106] MSD-265A (Farrell Dep. Tr.) at 53:9-12; MSD-263A (Abshier Dep. Tr.) at 40:23-41:1; MSD-282A (Wilcox Dep. Tr.) at 40:20-23.

Add. 193

Appellate Case: 25-1079    Page: 195    Date Filed: 05/16/2025 Entry ID: 5517644

**Responses:**

Russ Anderson disputed the claim "to the extent that evaluation of 'reasonableness' can be subjective and subject to interpretation by parties based on the nature and extent of information that is made available to them."[1107]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson, that none of her expert witnesses concludes or opines that the sales goals in the Community Bank were reasonable.

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 27

None of Respondent Julian's expert witnesses, and none of Respondent McLinko's expert witnesses conclude or opine that the sales goals in the Community Bank were reasonable.[1108]

**Responses:**

**Julian** did not dispute that no expert proffered by any party in this case has the expertise to conclude as to the reasonableness of sales goals.[1109] Accordingly, the Recommended Decision will include a factual finding as to Respondent Julian that none of his expert witnesses, and none of Respondent McLinko's expert witnesses, conclude or opine that the sales goals in the Community Bank were reasonable.

**McLinko** incorporated Respondent Julian's Response and disputed that the cited exhibits supporting the Statement established the alleged fact that Community Bank had systemic sales practices misconduct from at least 2002 until October 2016, or that it established the root cause of the misconduct problem.[1110]  I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent McLinko that none of Respondent Julian's expert witnesses, and none of Respondent McLinko's expert witnesses conclude or opine that the sales goals in the Community Bank were reasonable.

---

[1107] Russ Anderson's ECSFM at No. 44.

[1108] See MSD-271 (Ploetz Expert Report) at 4; MSD-283A (Julian Deal Expert Report) at 8; MSD-283B (McLinko Deal Expert Report) at 8; MSD-285 (Jarrett Expert Report) at 6; see also MSD-282A (Wilcox Dep. Tr.) at 40:20-23; MSD-286B (Jarrett Dep. Tr.) at 581:10-25; MSD-284A (Deal Dep. Tr.) at 118:10-17; MSD-272A (Ploetz Dep. Tr.) at 19:13-10.

[1109] Julian's ECSFM at No. 27.

[1110] McLinko's ECSFM at No. 27.

Appellate Case: 25-1079      Page: 196      Date Filed: 05/16/2025 Entry ID: 5517644

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 45**

None of Respondents' expert witnesses concludes or opines that the pressure was reasonable.[1111]

**Responses:**

**Russ Anderson** disputed the claim "insofar as 'pressure' is vague."[1112]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that none of her expert witnesses concludes or opines that the pressure was reasonable.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 28**

None of Respondent Julian's expert witnesses, and none of Respondent McLinko's expert witnesses conclude or opine that the pressure was reasonable.[1113]

**Responses:**

**Julian** did not dispute that no expert proffered by any party in this case has the expertise to conclude as to whether the "pressure was reasonable."[1114] Accordingly, the Recommended Decision will include a factual finding as to Respondent Julian that none of his expert witnesses, and none of Respondent McLinko's expert witnesses, conclude or opine that the pressure was reasonable.

**McLinko** incorporated Respondent Julian's Response and disputed that the cited exhibits supporting the Statement established the alleged fact that Community Bank had systemic sales practices misconduct from at least 2002 until October 2016, or that it established the root cause of the misconduct problem.[1115] I find an insufficient factual basis has been presented to establish

---

[1111] MSD-265A (Farrell Dep. Tr.) at 53:13-17; MSD-263A (Abshier Dep. Tr.) at 43:5-10; MSD-282A (Wilcox Dep. Tr.) at 40:24-41:3); MSD-271 (Ploetz Expert Report) at 4; MSD-283A (Julian Deal Expert Report) at 8; MSD-283B (McLinko Deal Expert Report) at 8; MSD-285 (Jarrett Expert Report) at 6; see also MSD-282A (Wilcox Dep. Tr.) at 40:24-41:3; MSD-286B (Jarrett Dep. Tr.) at 582:3-18; MSD-284A (Deal Dep. Tr.) at 118:18-119:9; MSD-272A (Ploetz Dep. Tr.) at 21:9-21.

[1112] Russ Anderson's ECSFM at No. 45.

[1113] See MSD-271 (Ploetz Expert Report) at 4; MSD-283A (Julian Deal Expert Report) at 8; MSD-283B (McLinko Deal Expert Report) at 8; MSD-285 (Jarrett Expert Report) at 6; see also MSD-282A (Wilcox Dep. Tr.) at 40:24-41:3; MSD-286B (Jarrett Dep. Tr.) at 582:3-18; MSD-284A (Deal Dep. Tr.) at 118:18-119:9; MSD-272A (Ploetz Dep. Tr.) at 21:9-21.

[1114] Julian's ECSFM at No. 28.

[1115] McLinko's ECSFM at No. 28.

a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent McLinko that none of Respondent Julian's expert witnesses, and none of Respondent McLinko's expert witnesses conclude or opine that the pressure was reasonable.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 46

None of Respondents' expert witnesses conclude or opine that controls to prevent sales practices misconduct were adequate.[1116]

**Responses:**

**Russ Anderson** disputed the claim on the basis that "neither the OCC nor any of its experts have identified a single preventative control the Community Bank should have had in place which would have prevented the types of potential, illegal sales practice misconduct at issue in this case."[1117]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that none of Respondents' expert witnesses conclude or opine that controls to prevent sales practices misconduct were adequate.

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 29

None of Respondent Julian's expert witnesses, and none of Respondent McLinko's expert witnesses conclude or opine that controls to prevent sales practices misconduct were adequate.[1118]

**Responses:**

**Julian** did not dispute the claim that that no expert proffered by any party in this case has the expertise and concluded expressly that controls to prevent sales practices misconduct were

---

[1116] MSD-265A (Farrell Dep. Tr.) at 56:2-6; MSD-263A (Abshier Dep. Tr.) at 53:13-54:9; MSD-282A (Wilcox Dep. Tr.) at 41:4-7). See MSD-271 (Ploetz Expert Report) at 4; MSD-283A (Julian Deal Expert Report) at 8; MSD-283B (McLinko Deal Expert Report) at 8; MSD-285 (Jarrett Expert Report) at 6; see also MSD-282A (Wilcox Dep. Tr.) at 41:4-7; MSD-286B (Jarrett Dep. Tr.) at 583:15-584:6; MSD-284A (Deal Dep. Tr.) at 122:9-19; MSD-272A (Ploetz Dep. Tr.) at 21:22- 22:4.

[1117] Russ Anderson's ECSFM at No. 46.

[1118] See MSD-271 (Ploetz Expert Report) at 4; MSD-283A (Julian Deal Expert Report) at 8; MSD-283B (McLinko Deal Expert Report) at 8; MSD-285 (Jarrett Expert Report) at 6; see also MSD-282A (Wilcox Dep. Tr.) at 41:4-7; MSD-286B (Jarrett Dep. Tr.) at 583:15-584:6; MSD-284A (Deal Dep. Tr.) at 122:9-19; MSD-272A (Ploetz Dep. Tr.) at 21:22-22:4

reasonable. [1119] Accordingly, the Recommended Decision will include a factual finding as to Respondent Julian that none of his expert witnesses, and none of Respondent McLinko's expert witnesses conclude or opine that controls to prevent sales practices misconduct were adequate.

**McLinko** incorporated Respondent Julian's Response and disputed that the cited exhibits supporting the Statement established the alleged fact that Community Bank had systemic sales practices misconduct from at least 2002 until October 2016, or that it established the root cause of the misconduct problem.[1120] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent McLinko that none of Respondent McLinko's expert witnesses conclude or opine that controls to prevent sales practices misconduct were adequate.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 47

None of Respondent Russ Anderson's expert witnesses conclude or opine that controls to detect sales practices misconduct were adequate.[1121]

**Responses:**

**Russ Anderson** disputed the claim first based on issues she presented in her response to Statement No. 46, and second by incorporating Respondent Julian's response found in Julian and McLinko Statement No. 30.[1122]

**Julian's** response acknowledged that none of the Respondents' expert witnesses "has the expertise and concluded expressly that controls to detect sales practices misconduct were reasonable," but asserted the record elsewhere includes evidence that "certain controls relating to sales practices issues were appropriately conducted."[1123]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a

---

[1119] Julian's ECSFM at No. 29.

[1120] McLinko's ECSFM at No. 29.

[1121] MSD-265A (Farrell Dep. Tr.) at 56:2-6; MSD-263A (Abshier Dep. Tr.) at 53:13-54:9; MSD-282A (Wilcox Dep. Tr.) at 41:4-7); MSD-271 (Ploetz Expert Report) at 4; MSD-283A (Julian Deal Expert Report) at 8; MSD-283B (McLinko Deal Expert Report) at 8; MSD-285 (Jarrett Expert Report) at 6; see also MSD-282A (Wilcox Dep. Tr.) at 41:4-7; MSD-286B (Jarrett Dep. Tr.) at 582:20- 583:13; MSD-284A (Deal Dep. Tr.) at 122:9-19; MSD-272A (Ploetz Dep. Tr.) at 21:22-22:4.

[1122] Russ Anderson's ECSFM at No. 47.

[1123] Julian's ECSFM at No. 30.

factual finding as to Respondent Russ Anderson that none of Respondents' expert witnesses conclude or opine that controls to detect sales practices misconduct were adequate.

## Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 30

None of Respondent Julian's expert witnesses, and none of Respondent McLinko's expert witnesses conclude or opine that controls to detect sales practices misconduct were adequate.[1124]

**Responses:**

**Julian** did not dispute the claim that no expert proffered by any party in this case has the expertise and concluded expressly that controls to detect sales practices misconduct were reasonable.[1125] Accordingly, the Recommended Decision will include a factual finding as to Respondent Julian that none of his expert witnesses, and none of Respondent McLinko's expert witnesses conclude or opine that controls to detect sales practices misconduct were adequate.

**McLinko** incorporated Respondent Julian's Response and disputed that the cited exhibits supporting the Statement established the alleged fact that Community Bank had systemic sales practices misconduct from at least 2002 until October 2016, or that it established the root cause of the misconduct problem.[1126] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent McLinko that none of his expert witnesses, and none of Respondent McLinko's expert witnesses conclude or opine that controls to detect sales practices misconduct were adequate.

**Respondents Julian and McLinko have acknowledged that the Community Bank had a systemic sales practices misconduct problem and that its root cause was undue pressure to meet unreasonable sales goals**

## Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 31

---

[1124] See MSD-271 (Ploetz Expert Report) at 4; MSD-283A (Julian Deal Expert Report) at 8; MSD-283B (McLinko Deal Expert Report) at 8; MSD-285 (Jarrett Expert Report) at 6; see also MSD-282A (Wilcox Dep. Tr.) at 41:4-7; MSD-286B (Jarrett Dep. Tr.) at 582:20-583:13; MSD-284A (Deal Dep. Tr.) at 122:9-19; MSD-272A (Ploetz Dep. Tr.) at 21:22-22:4.

[1125] Julian's ECSFM at No. 30.

[1126] McLinko's ECSFM at No. 30.

In sworn testimony before the OCC during its investigation, Respondent Julian agreed there was a systemic problem with sales practices misconduct at the Bank, and the root cause of the problem was unattainable sales goals and severe pressure on employees to meet them.[1127]

**Responses:**

**Julian** did not dispute that he previously agreed in testimony that the Community Bank had a "systemic" problem, as that term was defined in testimony, with sales practices misconduct and a cause of the problem was, in OCC counsel's words, "at least in large part—that the goals were unattainable or unreasonable, and the pressure to meet those unattainable goals was severe."[1128]

Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that in sworn testimony before the OCC during its investigation, Respondent Julian agreed there was a systemic problem with sales practices misconduct at the Bank, and the root cause of the problem was unattainable sales goals and severe pressure on employees to meet them.

**McLinko** incorporated Respondent Julian's Response.[1129]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 32**

Respondent Julian acknowledged in testimony before the OCC that systemic sales practices misconduct was the inevitable result of the Community Bank's unreasonable sales goals and pressure to meet them.[1130]

**Responses:**

**Julian** agreed he testified that he "now [knew] that the bank gave its employees unreasonable sales goals."[1131] He also agreed with the OCC's assertion that, based on what was now know, it would be "obvious that there [would] be systemic sales practices misconduct.[1132]

Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that in sworn testimony before the OCC he testified that he "now [knew] that the bank gave its employees unreasonable sales goals." (MSD-278 at 121:4-7). He also agreed with

---

[1127] Julian Amended Answer ¶ 12; MSD-278 (Julian Tr.) at 25:1-27:3; 35:5-36:2, 40:23-41:9.

[1128] Julian's ECSFM at No. 31, quoting MSD-278 at 25:1-27:3.

[1129] McLinko's ECSFM at No. 31.

[1130] MSD-278 (Julian Tr.) at 121:4-7; 122:15-25.

[1131] MSD-278 at 121:4-7.

[1132] Julian's ECSFM at No. 32, quoting MSD-278 at 121:20-122:5, 122:15-25.

the OCC's assertion that, based on what was now know, it would be "obvious that there [would] be systemic sales practices misconduct.

**McLinko** incorporated Respondent Julian's Response.[1133]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 33

Specifically, Respondent Julian testified as follows:

> Q: And as you know and as I've said earlier, our investigation is focused on the sales practice issues. And so, let me ask you: Hindsight is 20/20. Let me ask you based on what you know now today. Here we are on May 31st, 2018. Do you now believe that there was a systemic problem with sales practice misconduct at Wells Fargo? And let me define what I mean by 'systemic.' By 'systemic' I mean a problem that is inherent in the system, the business model, the culture of the bank as opposed to a problem that could be solved by terminating some individuals who are doing things they shouldn't do. With that definition do you now believe that there was a significant systemic problem at Wells Fargo with sales practice misconduct?

> A: I do.

> …

> Q. Is it fair to say that sitting here today based on the work that Wells Fargo's Audit Group has done, you can confidently say that Wells Fargo had systemic problem with sales practice misconduct that existed at least since 2011 where the data from Pricewaterhouse was looked at?

> A. Yes. I'm just trying to differentiate the question between that – the – just the prior one. So the answer I think would be very –

> Q. Yes.

> A.       – the same as – expanding on the same as I just said.

> Q: Okay. And based on the work that Wells Fargo Audit Group did, the root cause of the sales practice misconduct was -- at least in large part --- that the goals were unattainable or unreasonable, and the pressure to meet those unattainable goals was severe. Is that fair to say?

> A: Yes, I -- I -- I think that's how I would characterize it.[1134]

---

[1133] McLinko's ECSFM at No. 32.

[1134] Julian Amended ¶ 12, 18; MSD-278 (Julian Tr.) at 24:23-25:16; 35:5-36:2.

Add. 200

Appellate Case: 25-1079     Page: 202     Date Filed: 05/16/2025 Entry ID: 5517644

**Responses:**

**Julian** did not dispute that the testimony shown here was given.[1135] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that in sworn testimony before the OCC he testified as shown in the above Statement.

**McLinko** incorporated Respondent Julian's Response.[1136]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 34

Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 34 relies on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[1137] Upon my review of the confidential documents supporting this Statement of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in this Statement of Material Fact.

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 35

Respondent Julian agreed under oath that the Community Bank's sales practices problem was longstanding, existing from at least 2004 and throughout his tenure, until sales goals were eliminated in October 2016.[1138]

**Responses:**

Julian agreed that the paragraph Enforcement Counsel read described "the problem that existed in the Bank up until 2016 when the Bank eliminated the sales goals."[1139] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that he responded to Enforcement Counsel's question by testifying that "the problem that existed in the Bank up until 2016 when the Bank eliminated the sales goals."

---

[1135] Julian's ECSFM at No. 33.

[1136] McLinko's ECSFM at No. 33.

[1137] See 12 C.F.R. § 19.33(b).

[1138] MSD-278 at 200:15-19 (May 31, 2018).

[1139] Julian's ECSFM at No. 35, citing MSD-278 at 198:2 - 200:19.

**McLinko** incorporated Respondent Julian's Response.[1140]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 36

Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 36 relies on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[1141] Upon my review of the confidential documents supporting this Statement of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in this Statement of Material Fact.

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 37

Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 37 relies on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[1142] Upon my review of the confidential documents supporting this Statement of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in this Statement of Material Fact.

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 38

Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 38 relies on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to

---

[1140] McLinko's ECSFM at No. 35.

[1141] See 12 C.F.R. § 19.33(b).

[1142] See 12 C.F.R. § 19.33(b).

take all appropriate steps to preserve the confidentiality of such documents.[1143] Upon my review of the confidential documents supporting this Statement of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in this Statement of Material Fact.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 39**

In sworn testimony before the OCC during its investigation, Respondent McLinko testified the Community Bank had a systemic problem with sales practices misconduct, the root cause of which was pressure on employees to meet unreasonable sales goals.[1144]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[1145]

**McLinko** disputed the claim, averring that the Statement misstates Mr. McLinko's testimony in that he "explicitly stated that his responses to Enforcement Counsel's questions were not based on his personal knowledge, but rather based on the conclusions that he read in reports written by others".[1146] He presented the following excerpt from his testimony before the OCC:

> I would say when I first believed it was when I read in the details that were provided in the independent board report, that—with that conclusions [*sic*] and what they had to say in there, that put a lot of new information for me that gave me additional insights…[1147]

> Q: Okay. And from what we know now, the goals were unreasonable, and if you didn't meet them, you were terminated. Is that fair to say?

> Mr. Crudo: Foundation.

> A. Based on examples I've seen, yes.[1148]

The Statement is supported by references first to Respondent McLinko's Amended

---

[1143] See 12 C.F.R. § 19.33(b).

[1144] McLinko Amended Answer ¶ 3; MSD-276 (McLinko Tr.) at 54:7-55:2, 95:19-24.

[1145] Julian's ECSFM at No. 39.

[1146] McLinko's ECSFM at No. 39.

[1147] McLinko's ECSFM at No. 39, quoting MSD-276 (McLinko Sworn Stmt.) at 55:11-20;

[1148] McLinko's ECSFM at No. 39, quoting MSD-276 (McLinko Sworn Stmt.) at 95:19-24

Answer, in which the OCC in Paragraph 3 of the Notice of Charges alleged "The Community Bank had a systemic and well-known problem with sales practices misconduct that persisted for at least 14 years, beginning no later than 2002."[1149] McLinko's Response to Paragraph 3 in the Notice of Charges included the following: Respondent Paul McLinko admits that the transcript of his testimony before the OCC states, in part:

> Q: Let's leave it within the community bank. Do you believe that the community bank had a systemic problem with sales practice misconduct?

> A: From everything that I've read, in the regional bank part of the community bank, yes.[1150]

The Statement is further supported by Mr. McLinko's testimony before the OCC, where he was asked: "Do you believe that the community bank h ad a systemic problem with sales practices misconduct?" and answered "From everything that I've read, in the regional bank part of the Community Bank, yes," and then clarifying that by "regional bank" he meant all the branches in all the regions of the country.[1151]

From this proffer of evidence, I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that in sworn testimony before the OCC during its investigation, Respondent McLinko testified the Community Bank had a systemic problem with sales practices misconduct, the root cause of which was pressure on employees to meet unreasonable sales goals.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 40**

Respondent McLinko testified as follows:

> Q Let's leave it within the community bank. Do you believe that the community bank had a systemic problem with sales practice misconduct?

> A From everything that I've read, in the regional bank part of the community bank, yes.

> Q All right. And when you say the regional bank, what does that include?

> A That's the branch environment.

---

[1149] McLinko Amended Answer ¶ 3.

[1150] McLinko Amended Answer ¶ 3.

[1151] MSD-276 (McLinko Tr.) at 54.

Q All right. So it's all the branches in all the regions of the country?

A That's right. Yes, correct.

Q Okay. And do you have a belief on what is the cause of this problem at the bank?

MR. CRUDO: Foundation.

THE WITNESS: Based upon everything that I've read, as of now, the different reports that were issued, I would say that the sales goals and incentive processes were certainly two areas that contributed significantly to the issue, the pressure for the sales goals.[1152]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[1153]

**McLinko** did not dispute that Enforcement Counsel accurately quoted the cited section of Mr. McLinko's testimony, but objected to the use of his own testimony on the ground that it was "unreliable".[1154] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that Respondent McLinko gave the testimony shown in this Statement.


**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 41**

Respondent McLinko testified that his conclusions about the systemic nature of the sales practice misconduct problem were based on the voluminous data and comprehensive analyses reflected in the reports of the Bank's third party consultants engaged to review the sales practices problem, as well as information detailed in the April 2017 Sales Practices Investigation Report published by the Independent Directors of the Board of Wells Fargo & Company, the Bank's holding company ("Company") ("Board Report").[1155]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[1156]

**McLinko** disputed that he described the reports as being based on "voluminous data and

---

[1152] MSD-276 (McLinko Tr.) at 54:7-55:2.

[1153] Julian's ECSFM at No. 40.

[1154] McLinko's ECSFM at No. 40.

[1155] MSD-276 (McLinko Tr.) at 56:8- 57:2; 57:16-21.

[1156] Julian's ECSFM at No. 41.

comprehensive analyses" but otherwise did not dispute the claims made in this Statement.[1157] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that Respondent McLinko testified that his conclusions about the systemic nature of the sales practice misconduct problem were based the reports of the Bank's third party consultants engaged to review the sales practices problem, as well as information detailed in the April 2017 Sales Practices Investigation Report published by the Independent Directors of the Board of Wells Fargo & Company, the Bank's holding company ("Company") ("Board Report").

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 42**

Respondent McLinko testified before the OCC that sales goals and incentivescontributed significantly to the Community Bank's systemic problem with sales practices misconduct.[1158]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[1159]

**McLinko** did not dispute that the testimony shown in the Statement accurately reflects testimony he gave.[1160] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that Respondent McLinko testified before the OCC that sales goals and incentives contributed significantly to the Community Bank's systemic problem with sales practices misconduct.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 43**

Further, Respondent McLinko agreed in sworn testimony that the Community Bank's sales practices misconduct problem existed from at least 2004 until October 2016.[1161]

**Responses:**

---

[1157] McLinko's ECSFM at No. 41.

[1158] McLinko Amended Answer ¶ 19; 70; MSD-276 (McLinko Tr.) at 54:7-55:2.

[1159] Julian's ECSFM at No. 42.

[1160] McLinko's ECSFM at No. 42.

[1161] MSD-276 at 58:24-59:7, 93:17-22 (Mar. 2, 2018).

Appellate Case: 25-1079     Page: 208     Date Filed: 05/16/2025 Entry ID: 5517644

**Julian** incorporated Respondent McLinko's Response.[1162]

**McLinko** did not dispute the claim regarding testimony he gave, objecting only to the use of the testimony as "unreliable". [1163] Overruling that objection, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that Respondent McLinko agreed in sworn testimony that the Community Bank's sales practices misconduct problem existed from at least 2004 until October 2016.

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 44

Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 44 relies on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[1164] Upon my review of the confidential documents supporting this Statement of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in this Statement of Material Fact.

### Authoritative sources within the Bank testified that the Community Bank had a systemic sales practices misconduct problem rooted in its business model[1165]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 48 and (Julian and McLinko) No. 45

Employees engaged in numerous types of sales practices misconduct, including:

    (a) opening and issuing unauthorized checking and savings accounts, debit cards, and credit cards;

    (b) transferring customer funds between accounts without customer consent, a

---

[1162] Julian's ECSFM at No. 43.

[1163] McLinko's ECSFM at No. 43.

[1164] See 12 C.F.R. § 19.33(b).

[1165] Respondent Russ Anderson included a claim of dispute regarding the subheading shown here. As there is no Statement of Material Fact expressed in the subheading, no response is warranted and no ruling is required.

practice the Bank refers to as "simulated funding";

(c) misrepresenting to customers that certain products were available only in packages with other products, known as "bundling";

(d) enrolling customers in online banking and online bill-pay without consent, known as "pinning";

(e) delaying the opening of requested accounts and other products to the next sales reporting period, known as "sandbagging"; and

(f) accessing and falsifying personal customer account information without authorization such as customer phone numbers, home addresses, and email addresses.[1166]

**Responses:**

**Russ Anderson** responded by stating she did not understand the paragraph to contain any other assertion about the events; and by incorporating Respondent Julian's response to Julian and McLinko Statement No. 45.[1167]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that Bank employees engaged in numerous types of sales practices misconduct, including:

(a) opening and issuing unauthorized checking and savings accounts, debit cards, and credit cards;

(b) transferring customer funds between accounts without customer consent, a practice the Bank refers to as "simulated funding";

(c) misrepresenting to customers that certain products were available only in packages with other products, known as "bundling";

(d) enrolling customers in online banking and online bill-pay without consent, known as "pinning";

(e) delaying the opening of requested accounts and other products to the next

---

[1166] McLinko Amended Answer ¶ 8; Russ Anderson Amended Answer ¶ 8; MSD-22; MSD-23; MSD-108; MSD-225; MSD-1; MSD-2; MSD-297 (Richards Tr.) at 87:7-90:3; MSD-295 (Bacon Tr.) at 188:19-189:10; MSD-544 (Weber Tr.) at 82:24-84:12; MSD-585 (Herzberg Tr.) at 119:13-15) (McLinko Amended Answer ¶ 8; see also Russ Anderson Amended Answer ¶ 8; MSD-22; MSD-23; MSD-108; MSD-225; MSD-1; MSD-2; MSD-297 (Richards Tr.) at 87:7-90:3; MSD-295 (Bacon Tr.) at 188:19-189:10; MSD-544 (Weber Tr.) at 82:24-84:12); MSD-585 (Herzberg Tr.) at 119:13-15.

[1167] Russ Anderson's ECSFM at No. 48.

Appellate Case: 25-1079    Page: 210    Date Filed: 05/16/2025  Entry ID: 5517644

sales reporting period, known as "sandbagging"; and

   (f)  accessing and falsifying personal customer account information without authorization such as customer phone numbers, home addresses, and email addresses.

**Julian** responding by stating it was "[u]ndisputed that at least one instance, without regard to timeframe, of each of the events described in (a)-(f) occurred."[1168] He disputed the events were contemporaneously characterized as "sales practices misconduct" but were instead called "sales integrity violations". Citing the PricewaterhouseCoopers analysis of simulated funding, he averred that "evidence shows that the underlying misconduct evolved and varied over time".[1169]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that Bank employees engaged in numerous types of sales practices misconduct, including:

   (a)  opening and issuing unauthorized checking and savings accounts, debit cards, and credit cards;

   (b)  transferring customer funds between accounts without customer consent, a practice the Bank refers to as "simulated funding";

   (c)  misrepresenting to customers that certain products were available only in packages with other products, known as "bundling";

   (d)  enrolling customers in online banking and online bill-pay without consent, known as "pinning";

   (e)  delaying the opening of requested accounts and other products to the next sales reporting period, known as "sandbagging"; and

   (f)  accessing and falsifying personal customer account information without authorization such as customer phone numbers, home addresses, and email addresses.

**McLinko** incorporated Respondent Julian's Response.[1170]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 49 and (Julian and McLinko) No. 46**

---

[1168] Julian's ECSFM at No. 45.

[1169] Julian's ECSFM at No. 45.

[1170] McLinko's ECSFM at No. 45.

In sworn testimony before the OCC, the Bank's former CEO John Stumpf admitted, based on the information presented to him during his testimony, that the Community Bank had a systemic sales practices misconduct problem from the early 2000s until sales goals were eliminated in October 2016.[1171]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1172]

**Julian** averred that in sworn testimony before the OCC, Mr. Stumpf testified that "learning the things I've learned here the last few days, I would agree, it was a systemic problem. . . ."[1173] Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that in sworn testimony before the OCC, Mr. Stumpf testified that "learning the things I've learned here the last few days, I would agree, it was a systemic problem. . . ."

To the extent the claim relates to Mr. McLinko's Amended Answer, Respondent Julian incorporated that portion of Mr. McLinko's Response.[1174]

**McLinko** incorporated Respondent Julian's Response.[1175]


### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 50 and (Julian and McLinko) No. 47

In sworn testimony before the OCC, the Bank's former Chief Risk Officer Michael Loughlin testified that the Community Bank had a systemic problem with sales practices misconduct.[1176]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1177]

**Julian** responded that Mr. Loughlin testified that he was "trying to translate [Enforcement Counsel's definition of systemic] into a simple phrase like widespread" and did not believe the

---

[1171] MSD-8C (Stumpf Tr.) at 550:5-551:25; McLinko Amended Answer ¶¶ 14-15.

[1172] Russ Anderson's ECSFM at No. 49.

[1173] Julian's ECSFM at No. 46, quoting MSD-008C at 550:551:25.

[1174] Julian's ECSFM at No. 46.

[1175] McLinko's ECSFM at No. 46.

[1176] MSD-290A (Loughlin Tr.) at 49:6-52:23; MSD-290B (Loughlin Tr.) at 317:3-9, 318:19-24.

[1177] Russ Anderson's ECSFM at No. 50.

bank had a widespread issue until at least 2015, after reviewing a report "generated by corporate investigations."[1178]

Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that in sworn testimony before the OCC Mr. Loughlin testified that he was "trying to translate [Enforcement Counsel's definition of systemic] into a simple phrase like widespread" and did not believe the bank had a widespread issue until at least 2015, after reviewing a report "generated by corporate investigations."

**McLinko** incorporated Respondent Julian's Response.[1179]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 51 and (Julian and McLinko) No. 48

In sworn testimony before the OCC, the Bank's former Chief Administrative Officer and Director of Human Resources Hope Hardison admitted that the Community Bank had a systemic sales practices misconduct problem rooted in unreasonable sales goals, and that the Bank's response "to this problem was slow and incremental, and ultimately not effective until 2016[.]"[1180]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1181]

**Julian** did not dispute that Ms. Hardison testified that the Bank's response "to this problem was slow and incremental, and ultimately not effective until 2016[.]"[1182] He averred that Ms. Hardison testified that "sometime in 2013" she became "worried that there was a root cause that . . . they weren't acknowledging," and that as late as 2014, the Enterprise Risk Management Committee "didn't believe there was a root cause issue to be solved."[1183] Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that in sworn testimony before the OCC Ms. Hardison testified that "sometime in 2013" she became "worried that there was a root cause that . . . they weren't acknowledging," and that as late as 2014, the Enterprise Risk Management Committee "didn't believe there was a

---

[1178] Julian's ECSFM at No. 47, quoting MSD- 290A (Loughlin Inv. Tr.) at 49:6-52:23.

[1179] McLinko's ECSFM at No. 47.

[1180] MSD-293A (Hardison Tr.) at 33:9-25, 48:1-51:11, 70:18-24; MSD-293B (Hardison Tr.) at 271:11-272:1, 319:2-8; McLinko Amended Answer ¶ 20.

[1181] Russ Anderson's ECSFM at No. 51.

[1182] Julian's ECSFM at No.48.

[1183] Julian's ECSFM at No.48 quoting MSD-293A at 33:9-25, 48:1- 51:11 (Hardison Inv. Tr.).

root cause issue to be solved" and that the Bank's response "to this problem was slow and incremental, and ultimately not effective until 2016."

**McLinko** incorporated Respondent Julian's Response.[1184]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 52 and (Julian and McLinko) No. 49

In sworn testimony before the OCC, Patricia Callahan, the Bank's former Chief Administrative Officer in charge of the Corporate Human Resources function, testified that the Community Bank had a systemic problem with sales practices misconduct, and that the incentive plans were "too aggressive," "basic performance plans were also probably too aggressive in terms of how many of whatever people needed to click off to get satisfactory performance and keep their jobs" and "there was a perception that there was just too much pressure in the branches."[1185]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1186]

**Julian** did not dispute that Ms. Callahan testified that the incentive plans were "too aggressive," "basic performance plans were also probably too aggressive in terms of how many of whatever people needed to click off to get satisfactory performance and keep their jobs" and "there was a perception that there was just too much pressure in the branches", but averred that at the time "when the LA Times articles came out" that she "thought that the root cause was probably a few different things."[1187]

Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that in sworn testimony before the OCC Ms. Callahan testified that the incentive plans were "too aggressive," "basic performance plans were also probably too aggressive in terms of how many of whatever people needed to click off to get satisfactory performance and keep their jobs" and "there was a perception that there was just too much pressure in the branches", but averred that at the time "when the LA Times articles came out" that she "thought that the root cause was probably a few different things."

---

[1184] McLinko's ECSFM at No. 48.

[1185] MSD-291 (Callahan Tr.) at 87:19-88:12, 110:2-111:13, 177:15-23, 190:5-19, 192:1-23). Ms. Callahan also testified that people were terminated for not meeting sales goals and that this was common knowledge within the Bank. (Id. at 24:4-25:9.

[1186] Russ Anderson's ECSFM at No. 52.

[1187] Julian's ECSFM at No. 49, quoting MSD-291 at 87:18-88:17 (Callahan Inv. Tr.).

**McLinko** incorporated Respondent Julian's Response.[1188]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 53 and (Julian and McLinko) No. 50

The Bank's former Head of Corporate Enterprise Risk Karl ("Keb") Byers testified before the OCC that sales goals in the Community Bank "were too high and there was pressure in the system. And there was an overemphasis on solutions versus quality of sale."[1189] Mr. Byers also concluded that the Community Bank had a systemic problem with sales practices misconduct and at the time he gave his sworn statement he could not identify a single person who worked at the Bank who disagreed with that conclusion.[1190]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1191]

**Julian** did not dispute that Mr. Byers testified before the OCC that sales goals in the Community Bank "were too high and there was pressure in the system. And there was an overemphasis on solutions versus quality of sale."[1192] He averred, however, that Mr. Byers testified, when asked whether he believed the Community Bank had a systemic problem with "sales practices misconduct," without his memory being refreshed, and without access to the evidence—"Sure" and "I think that sounds very reasonable."[1193] Mr. Byers also testified that, by the time he appreciated the scope of sales practices misconduct, "it was pretty late. . . to be perfectly honest it just wasn't prior to the September 8th, 2016 [Consent Order] announcement" and that both he and "the second line" thought "the first line [] was making progress and making improvement."[1194]

Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that in sworn testimony before the OCC the Bank's former Head of Corporate Enterprise Risk Karl Byers testified before the OCC that sales goals in the Community Bank "were too high and there was pressure in the system. And there was an overemphasis on solutions versus quality of sale" and, when asked whether he believed the

---

[1188] McLinko's ECSFM at No. 49.

[1189] MSD-382 (Byers Tr.) at 128:14-129:19.

[1190] MSD-382 (Byers Tr.) at 132:2-135:5, 231:20-232:6.

[1191] Russ Anderson's ECSFM at No. 53.

[1192] Julian's ECSFM at No. 50.

[1193] Julian's ECSFM at No. 50, quoting MSD- 382 at 132:2-132:16.

[1194] Julian's ECSFM at No. 50, quoting MSD-382 at 132:17- 133:4.

Appellate Case: 25-1079    Page: 215    Date Filed: 05/16/2025 Entry ID: 5517644

Community Bank had a systemic problem with "sales practices misconduct," without his memory being refreshed, and without access to the evidence, he responded "Sure" and "I think that sounds very reasonable."[1195] Mr. Byers also testified that, by the time he appreciated the scope of sales practices misconduct, "it was pretty late. . . to be perfectly honest it just wasn't prior to the September 8th, 2016 [Consent Order] announcement" and that both he and "the second line" thought "the first line [] was making progress and making improvement."

**McLinko** incorporated Respondent Julian's Response.[1196]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 54 and (Julian and McLinko) No. 51

The Bank's former Chief Security Officer Bill Wipprecht, who was in charge of Corporate Investigations until 2009, testified before the OCC that at least as of 2002 he developed a view that the sales integrity issues within the Community Bank were systemic and that he continued to see an upward trend in sales integrity cases from 2004 to 2009.[1197] Mr. Wipprecht explained that "this was systemic I mean to the bank. It was caused by a policy that – that forced employees to do things against their own will. And to me, that's systemic. And then not to change the policy, follow up, or to put the time and effort that it takes to do it at the highest level of management I thought was a major fault."[1198] He explained that senior leaders in the Community Bank enforced the policy which was "[m]eet your quota or you're – or be terminated."[1199]. Mr. Wipprecht testified that the sales goals were unreasonable.[1200] He further explained that "we, meaning security management -- corporate security -- felt that the teller was being put in a non-compromised position where they -- where, if they couldn't meet their sales goal, they were going to commit a gaming -- a gaming action or some type of activity to meet their sales goal because the pressure was so great."[1201]

**Responses:**

---

[1195] Julian's ECSFM at No. 50, quoting MSD- 382 at 132:2-132:16.

[1196] McLinko's ECSFM at No. 50.

[1197] MSD-294 (Wipprecht Tr.) at 81:1-5, 127:11-128:24.

[1198] MSD-294 (Wipprecht Tr.) at 129:1-14.

[1199] MSD-294 (Wipprecht Tr.) at 130:5- 20.

[1200] MSD-294 (Wipprecht Tr.) at 53:1-54:5.

[1201] MSD-294 (Wipprecht Tr.) at 37:2-38:3, 94:1-21, 111:19- 112:19.

Add. 214

Appellate Case: 25-1079    Page: 216    Date Filed: 05/16/2025 Entry ID: 5517644

**Russ Anderson** incorporated Respondent Julian's response.[1202]

**Julian** objected to the use of the testimony of Mr. Wipprecht (Exhibit MSD-294) on the grounds that the testimony is irrelevant, immaterial, unreliable, or repetitive, noting that Mr. Wipprecht worked at the Bank from 2005 to 2009.[1203] The objection is sustained. Given the passage of time between the time of the witness's employment at the Bank and the filing of the Notice of Charges, given the remote and tangential relationship between the proffered evidence and the material claims presented in the Notice of Charges, given the potential for confusion that admitting the testimony presents, given the redundant nature of the material facts presented in the witness's testimony when compared with Exhibits that are more closely related in time, and given the marginal relevance of the testimony presented in the Statement, the Exhibit will not be admitted in support of Enforcement Counsel's Motion. Accordingly, the claims presented in (Russ Anderson) No. 54 and (Julian and McLinko) No. 51 will not support Enforcement Counsel's Motion as to Respondents Russ Anderson, Julian, or McLinko. The exclusion of Exhibit MSD-294 does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[1204]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 55 and (Julian and McLinko) No. 52

Michael Bacon, Mr. Wipprecht's successor as the Chief Security Officer and Head of Corporate Investigations until September 2014 testified before the OCC that he realized in 2004 that the Bank had a systemic problem with sales practices misconduct, and the problem persisted until he left the Bank in 2014. He testified that "it was my view and continues to be my view that senior leaders in the roles that should have addressed it simply didn't do their job[,]" including Respondent Russ Anderson.[1205]

**Responses:**

---

[1202] Russ Anderson's ECSFM at No. 54.

[1203] Julian's ECSFM at No. 51; see Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[1204] McLinko's ECSFM at No. 51.

[1205] MSD-295 (Bacon Tr.) at 25:12-26:23; see also id. at 17:21-20:19; MSD-296A (Bacon Dep. Tr.) at 222:6-24; 224:2-225:9; 226:1-15; MSD-296B (Bacon Dep. Tr.) at 433:13-434:14.

**Russ Anderson** incorporated Respondent Julian's response.[1206]

**Julian** did not dispute that Mr. Bacon testified as shown in the Statement, but objected to the testimony as "self-serving."[1207] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that Michael Bacon, Mr. Wipprecht's successor as the Chief Security Officer and Head of Corporate Investigations until September 2014 testified before the OCC that he realized in 2004 that the Bank had a systemic problem with sales practices misconduct, and the problem persisted until he left the Bank in 2014. He testified that "it was my view and continues to be my view that senior leaders in the roles that should have addressed it simply didn't do their job[,]" including Respondent Russ Anderson.

**McLinko** incorporated Respondent Julian's Response.[1208]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 56 and (Julian and McLinko) No. 53**

The Bank's former Head of Financial Crimes Risk Management James Richards, who succeeded Mr. Bacon in taking over the Corporate Investigations function, testified before the OCC that the Community Bank had a systemic problem with sales practices misconduct and what he "observed was that there were team members that felt pressure from senior management, sales goals related pressure and that those team members committed sales practices related misconduct as a result."[1209] Mr. Richards further testified that the Community Bank tracked whether employees were meeting sales goals on a daily basis and if employees failed to meet sales goals they would suffer adverse employment consequences up to and including termination.[1210]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1211]

---

[1206] Russ Anderson's ECSFM at No. 55.

[1207] Julian's ECSFM at No. 52.

[1208] McLinko's ECSFM at No. 52.

[1209] MSD-297 (Richards Tr.) at 126:1-129:7, 193:9-13; MSD-298 (Richards Dep. Tr.) at 40:14-20.

[1210] (MSD-297 (Richards Tr.) at 234:5-19).

[1211] Russ Anderson's ECSFM at No. 56.

**Julian** did not dispute that Mr. Richards testified as shown in the Statement, but objected to the testimony as being taken "out of context."[1212] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that the Bank's former Head of Financial Crimes Risk Management James Richards, who succeeded Mr. Bacon in taking over the Corporate Investigations function, testified before the OCC that the Community Bank had a systemic problem with sales practices misconduct and what he "observed was that there were team members that felt pressure from senior management, sales goals related pressure and that those team members committed sales practices related misconduct as a result." Mr. Richards further testified that the Community Bank tracked whether employees were meeting sales goals on a daily basis and if employees failed to meet sales goals they would suffer adverse employment consequences up to and including termination.

**McLinko** incorporated Respondent Julian's Response.[1213]


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 57 and (Julian and McLinko) No. 54**

The Bank's former Deputy General Counsel Christine Meuers testified before the OCC that in the 2000s, she became concerned that the business model drove employees to issue products and services to customers without their consent.[1214]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1215]

**Julian** objected to the use of the witness's testimony on the grounds that the evidence is irrelevant, immaterial, unreliable, or repetitive.[1216] The objection is sustained. Given the passage of time between the period testified to by the witness and the filing of the Notice of Charges, given the remote and tangential relationship between the testimony and the material claims presented in the Notice of Charges, given the potential for confusion that admitting the testimony

---

[1212] Julian's ECSFM at No. 53.

[1213] McLinko's ECSFM at No. 53.

[1214] MSD-599 (Meuers Tr.) at 28:2-29:20, 34:21-37:14, 98:2-101:8 (testifying that "[c]learly there was something in the business model that was driving the behavior," that the "facts were well known" to the people who had the power to change the sales model, including Respondent Russ Anderson).

[1215] Russ Anderson's ECSFM at No. 57.

[1216] Julian's ECSFM at No. 54; Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

Appellate Case: 25-1079     Page: 219     Date Filed: 05/16/2025  Entry ID: 5517644

presents, given the redundant nature of the material facts presented in the testimony when compared with Exhibits that are more closely related in time, and given the marginal relevance of the claim presented in this Statement, the testimony will not be admitted in support of Enforcement Counsel's Motion as to Respondent Russ Anderson, Respondent Julian, or Respondent McLinko. Accordingly, the claims presented in (Russ Anderson) No. 57 and (Julian and McLinko) No. 54 will not support Enforcement Counsel's Motion. The exclusion of the testimony does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[1217]


### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 58 and (Julian and McLinko) No. 55

In sworn testimony before the OCC during its investigation, former General Counsel James Strother testified the Community Bank's sales goals were a major contributing factor to the Bank's sales practices misconduct problem:

> [I]n hindsight knowing what I know today, it's clear that those goals were either the major contributing factor to the problems that we had, and certainly a major contributing factor to it, and that the bank, as a whole, and the Community Bank, in particular, should have recognized earlier that the amount of bad behavior that was resulting, either because of, or partly because of those goals, or mainly because of those goals, was unacceptable and it should have been changed.[1218]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1219]

**Julian** did not dispute that General Counsel James Strother's investigatory testimony contains the quoted text.[1220] Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that Mr. Strother gave the testimony shown in the Statement.

---

[1217] McLinko's ECSFM at No. 54.

[1218] MSD-288A (Strother Tr.) at 110:6-16.

[1219] Russ Anderson's ECSFM at No. 58.

[1220] Julian's ECSFM at No. 55.

Appellate Case: 25-1079    Page: 220    Date Filed: 05/16/2025 Entry ID: 5517644

**McLinko** incorporated Respondent Julian's Response.[1221]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 59 and (Julian and McLinko) No. 56**

In her declaration, former Regional President for Los Angeles and Lead Regional President for Florida Shelley Freeman stated "sales practices misconduct was a systemic problem in that it resulted from the Community Bank's incentive plans and high sales goals, coupled with a lack of oversight and controls. [S]ales practices misconduct had occurred throughout the Bank's geographic footprint, with higher concentrations in certain parts of the country."[1222]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1223]

**Julian** did not dispute that Ms. Freeman's statement contains the quoted text.[1224] Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that former Regional President for Los Angeles and Lead Regional President for Florida Shelley Freeman stated "sales practices misconduct was a systemic problem in that it resulted from the Community Bank's incentive plans and high sales goals, coupled with a lack of oversight and controls. [S]ales practices misconduct had occurred throughout the Bank's geographic footprint, with higher concentrations in certain parts of the country."

**McLinko** incorporated Respondent Julian's Response.[1225]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 60 and (Julian and McLinko) No. 57**

Lisa Stevens and Laura Schulte, Regional Bank Executives reporting to Carrie Tolstedt, testified that the Community Bank had a systemic problem with sales practices misconduct.[1226]

---

[1221] McLinko's ECSFM at No. 55.

[1222] MSD- 199 (Freeman Decl.) at ¶¶ 6-7.

[1223] Russ Anderson's ECSFM at No. 59.

[1224] Julian's ECSFM at No. 56.

[1225] McLinko's ECSFM at No. 56.

[1226] MSD-546 (Stevens Tr.) at 201:1-10; 207:5-17; MSD-579 (Schulte Tr.) at 95:3-14; 99:1-7.

Appellate Case: 25-1079     Page: 221     Date Filed: 05/16/2025 Entry ID: 5517644

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1227]

**Julian** averred that Ms. Stevens and Ms. Schulte testified that they "held the belief" that the Community Bank had a "systemic" sales practices misconduct problem.[1228] Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that Lisa Stevens and Laura Schulte, Regional Bank Executives reporting to Carrie Tolstedt, "held the belief" that the Community Bank had a "systemic" sales practices misconduct problem.

**McLinko** incorporated Respondent Julian's Response.[1229]

**All independent reviews and assessments of the Bank's sales practices misconduct problem and the Bank itself concluded that the problem was rooted in the Community Bank's strategy and culture[1230]**

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 61 and (Julian and McLinko) No. 58**

Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 61 and (Julian and McLinko) No. 58 rely on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[1231] Upon my review of the confidential documents supporting these Statements of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant

---

[1227] Russ Anderson's ECSFM at No. 60.

[1228] Russ Anderson's ECSFM at No. 57, quoting MSD-546 at 207:5-17; MSD-579 at 99:1-7.

[1229] McLinko's ECSFM at No. 57.

[1230] Respondent Russ Anderson included a claim of dispute regarding the subheading shown here. As there is no Statement of Material Fact expressed in this or any other subheading, no response is warranted and no ruling is required.

[1231] See 12 C.F.R. § 19.33(b).

exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in these Statements of Material Fact.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 62 and (Julian and McLinko) No. 59

**Responses:**

Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 62 and (Julian and McLinko) No. 59 rely on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[1232] Upon my review of the confidential documents supporting these Statements of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in these Statements of Material Fact.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 63 and (Julian and McLinko) No. 60

In April 2017, the Independent Directors of the Board of Wells Fargo & Company, the Bank's holding company ("Company"), issued a Sales Practices Investigation Report ("Board Report").[1233] The Bank accepted the findings of the Board Report "as a critical part of [its] journey to rebuild trust."[1234]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1235]

---

[1232] See 12 C.F.R. § 19.33(b).

[1233] Russ Anderson Amended Answer ¶ 21; MSD-280). (Julian Amended Answer ¶ 21; McLinko Amended Answer ¶ 21; MSD-280.

[1234] MSD-326 at 5.

[1235] Russ Anderson's ECSFM at No. 63.

Appellate Case: 25-1079    Page: 223    Date Filed: 05/16/2025 Entry ID: 5517644

**Julian** did not dispute that the cited Exhibits contain the quoted text.[1236] Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that in April 2017, the Independent Directors of the Board of Wells Fargo & Company, the Bank's holding company ("Company"), issued a Sales Practices Investigation Report ("Board Report").[1237] The Bank accepted the findings of the Board Report "as a critical part of [its] journey to rebuild trust."

**McLinko** incorporated Respondent Julian's Response.[1238]


### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 64 and (Julian and McLinko) No. 61

Based on 100 interviews of Bank employees and review across 35 million documents, the Board Report concluded that "[t]he root cause of sales practice failures was the distortion of the Community Bank's sales culture and performance management system, which, when combined with aggressive sales management, created pressure on employees to sell unwanted or unneeded products to customers and, in some cases, to open unauthorized accounts."[1239]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1240]

**Julian** did not dispute that the cited Exhibit contains the quoted text.[1241] Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that based on 100 interviews of Bank employees and review across 35 million documents, the Board Report concluded that "[t]he root cause of sales practice failures was the distortion of the Community Bank's sales culture and performance management system, which, when combined with aggressive sales management, created pressure on employees to sell unwanted or unneeded products to customers and, in some cases, to open unauthorized accounts."

---

[1236] Julian's ECSFM at No. 60.

[1237] Russ Anderson Amended Answer ¶ 21; MSD-280). (Julian Amended Answer ¶ 21; McLinko Amended Answer ¶ 21; MSD-280.

[1238] McLinko's ECSFM at No. 60.

[1239] MSD-280 at 2.

[1240] Russ Anderson's ECSFM at No. 64.

[1241] Julian's ECSFM at No. 61.

**McLinko** incorporated Respondent Julian's Response.[1242]


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 65 and (Julian and McLinko) No. 62**

Further, the Board Report pointed out Community Bank senior management's failure to recognize the sales model as the root of the problem: "[t]hey … failed to adequately consider that low quality accounts could be indicative of unauthorized accounts. It was convenient instead to blame the problem of low quality and unauthorized accounts and other employee misconduct on individual wrongdoers and poor management in the field rather than on the Community Bank's sales model."[1243]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1244]

**Julian** did not dispute that the cited Exhibit contains the quoted text.[1245] Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that the Board Report pointed out Community Bank senior management's failure to recognize the sales model as the root of the problem: "[t]hey … failed to adequately consider that low quality accounts could be indicative of unauthorized accounts. It was convenient instead to blame the problem of low quality and unauthorized accounts and other employee misconduct on individual wrongdoers and poor management in the field rather than on the Community Bank's sales model."

**McLinko** incorporated Respondent Julian's Response.[1246]


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 66 and (Julian and McLinko) No. 63**

**Responses:**

Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 66 and (Julian and McLinko) No. 63 rely on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are

---

[1242] McLinko's ECSFM at No. 61.

[1243] MSD-280 at 5.

[1244] Russ Anderson's ECSFM at No. 65.

[1245] Julian's ECSFM at No. 62.

[1246] McLinko's ECSFM at No. 62.

expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[1247] Upon my review of the confidential documents supporting these Statements of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in these Statements of Material Fact.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 67 and (Julian and McLinko) No. 64

**Responses:**

Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 67 and (Julian and McLinko) No. 64 rely on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[1248] Upon my review of the confidential documents supporting these Statements of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in these Statements of Material Fact.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 68 and (Julian and McLinko) No. 65

Finally, as part of a Deferred Prosecution Agreement the Bank entered into after the Department of Justice concluded its investigation regarding the Bank's sales practices, the Bank admitted, accepted, and acknowledged as true the following facts:

    (a) "The Community Bank's onerous sales goals and accompanying management pressure led thousands of its employees to engage in: (1) unlawful conduct to attain sales through fraud, identity theft, and the falsification of bank records, and (2) unethical practices to sell products of no or low value to the customer, while believing that the customer did not actually need the account and was not going to

---

[1247] See 12 C.F.R. § 19.33(b).

[1248] See 12 C.F.R. § 19.33(b).

Appellate Case: 25-1079    Page: 226    Date Filed: 05/16/2025  Entry ID: 5517644

use the account";

(b) "Despite knowledge of the widespread sales practices problems, including the pervasive illegal and unethical conduct tied to the sales goals, Community Bank senior leadership failed to take sufficient action to prevent and reduce the incidence of unlawful and unethical sales practices"; and

(c) From 2002 to 2016, Wells Fargo opened millions of accounts or financial products that were unauthorized or fraudulent. During that same time period, Wells Fargo employees also opened significant numbers of additional unneeded, unwanted, or otherwise low value products that were not consistent with Wells Fargo's purported needs-based selling model. Wells Fargo collected millions of dollars in fees and interest to which the Company was not entitled, harmed the credit ratings of certain customers, and unlawfully misused customers' sensitive personal information (including customers' means of identification). In general, the unauthorized, fraudulent, unneeded, and unwanted accounts were created as a result of the Community Bank's systemic sales pressure and excessive sales goals.[1249]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1250]

**Julian** did not dispute that the cited Exhibit contains the quoted text.[1251] Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that as part of a Deferred Prosecution Agreement the Bank entered into after the Department of Justice concluded its investigation regarding the Bank's sales practices, the Bank admitted, accepted, and acknowledged as true the facts set forth in the above Statement.

**McLinko** incorporated Respondent Julian's Response.[1252]

### The Community Bank's sales goals were unreasonable

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 66

The Community Bank imposed unreasonable sales goals on its employees until October 2016, including when Respondent Julian served as Chief Auditor of the Bank and Respondent

---

[1249] MSD-1 at 25, 30, 31 ¶¶ 15, 25, 32.

[1250] Russ Anderson's ECSFM at No. 68.

[1251] Julian's ECSFM at No. 65.

[1252] McLinko's ECSFM at No. 65.

McLinko served as Executive Audit Director of the Community Bank.[1253]

**Responses:**

**Julian** objected to the claim, asserting the proposition in the paragraph is "vague, confusing, and unsubstantiated."[1254] Evidence presented in opposition, however, did not controvert the claim, but challenged the opinions expressed by the OCC's Examiners[1255] and offered the argument that Paragraph 66 cites to two deposition transcripts of individuals not disclosed as OCC witnesses,[1256] arguing that "the veracity of his statements has not been tested in this litigation" seeking the conclusion that the testimony cannot "be relied on to establish that a fact is undisputed on summary disposition", but citing no authority in support of this legal proposition.[1257]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that the Community Bank imposed unreasonable sales goals on its employees until October 2016, including when Respondent Julian served as Chief Auditor of the Bank and Respondent McLinko served as Executive Audit Director of the Community Bank.

**McLinko** incorporated Respondent Julian's Response.[1258]

---

[1253] MSD-50 ("In retrospect, we missed some clear indications that our goals were unrealistic, making the problem worse than it should've been."); MSD-131; MSD-269 (NBE Candy Expert Report) at ¶¶ 48-51; MSD-268 (NBE Crosthwaite Expert Report) at ¶¶ 43a-g; MSD-257 (NBE Coleman Expert Report) at ¶¶ 56, 69, 106; MSD-267(NBE Smith Expert Report) at ¶¶ 67-85; MSD-349 (Schumacher Tr.) at 30:12-33:3, 35:4-20, MSD-82; MSD-581 (Clegg Tr.) at 44:1-46:6, 84:8-11; MSD-300 (Rawson Tr.) at 237:2-7; MSD-582 (Sotoodeh Tr.) at 61:20-62:7, 73:21-74:12; MSD- 577 (Foley Tr.) at 134:19-135:9, 163:17-19; MSD-546 (Stevens Tr.) at 72:23-73:5; MSD-579 (Schulte Tr.) at 50:12-16; MSD-290B (Loughlin Tr.) at 304:3-14; MSD-297 (Richards Tr.) at 191:5-20; MSD-289A (Sloan Tr.) at 79:3-80:25.

[1254] Julian's ECSFM at No. 66.

[1255] Julian's ECSFM at No. 66, citing the Reports of Examiners Crosthwaite, Coleman, and Smith.

[1256] Julian's ECSFM at No. 66, citing MSD-349 (sworn statement of Jeffrey Schumacher); MSD-581 (sworn statement of George Clegg).

[1257] Julian's ECSFM at No. 66.

[1258] McLinko's ECSFM at No. 66.

Appellate Case: 25-1079     Page: 228     Date Filed: 05/16/2025 Entry ID: 5517644

**The Community Bank's sales goals remained unreasonable during Respondent Russ Anderson's tenure as the Group Risk Officer[1259]**

## Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 69

During Respondent Russ Anderson's tenure as Group Risk Officer, the Community Bank imposed unreasonable sales goals on its employees. This persisted until October 2016.[1260] Similarly, the Community Bank imposed unreasonable sales goals on its employees until October 2016, including when Respondent Julian served as Chief Auditor of the Bank and Respondent McLinko served as Executive Audit Director of the Community Bank.[1261]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response to (Julian and McLinko) No. 66.[1262]

In response to (Julian and McLinko) No. 66, Julian objected to the claim, asserting the proposition in the paragraph is "vague, confusing, and unsubstantiated."[1263] Evidence presented in opposition, however, did not controvert the claim, but challenged the opinions expressed by the OCC's Examiners[1264] and offered the argument that Paragraph 66 cites to two deposition

---

[1259] Respondent Russ Anderson included a claim of dispute regarding the subheading shown here. As there is no Statement of Material Fact expressed in the subheading, no response is warranted and no ruling is required.

[1260] MSD-50 ("In retrospect, we missed some clear indications that our goals were unrealistic, making the problem worse than it should've been."); MSD-131; MSD-269 (NBE Candy Expert Report) at ¶¶ 48-51; MSD-268 (NBE Crosthwaite Expert Report) at ¶¶ 43a-g; MSD-257 (NBE Coleman Expert Report) at ¶¶ 56, 69, 106; MSD-267(NBE Smith Expert Report) at ¶¶ 67-85; MSD-349 (Schumacher Tr.) at 30:12-33:3, 35:4-20, MSD-82; MSD-581 (Clegg Tr.) at 44:1-46:6, 84:8-11; MSD-300 (Rawson Tr.) at 237:2-7; MSD-582 (Sotoodeh Tr.) at 61:20-62:7, 73:21-74:12; MSD-577 (Foley Tr.) at 134:19-135:9, 163:17-19; MSD-546 (Stevens Tr.) at 72:23-73:5; MSD-579 (Schulte Tr.) at 50:12-16; MSD-290B (Loughlin Tr.) at 304:3-14; MSD-297 (Richards Tr.) at 191:5-20; MSD-289A (Sloan Tr.) at 79:3-80:25.

[1261] MSD-50 ("In retrospect, we missed some clear indications that our goals were unrealistic, making the problem worse than it should've been."); MSD-131; MSD-269 (NBE Candy Expert Report) at ¶¶ 48-51; MSD-268 (NBE Crosthwaite Expert Report) at ¶¶ 43a-g; MSD-257 (NBE Coleman Expert Report) at ¶¶ 56, 69, 106; MSD-267(NBE Smith Expert Report) at ¶¶ 67-85; MSD-349 (Schumacher Tr.) at 30:12-33:3, 35:4-20, MSD-82; MSD-581 (Clegg Tr.) at 44:1-46:6, 84:8-11; MSD-300 (Rawson Tr.) at 237:2-7; MSD-582 (Sotoodeh Tr.) at 61:20-62:7, 73:21-74:12; MSD- 577 (Foley Tr.) at 134:19-135:9, 163:17-19; MSD-546 (Stevens Tr.) at 72:23-73:5; MSD-579 (Schulte Tr.) at 50:12-16; MSD-290B (Loughlin Tr.) at 304:3-14; MSD-297 (Richards Tr.) at 191:5-20; MSD-289A (Sloan Tr.) at 79:3-80:25.

[1262] Russ Anderson's ECSFM at No. 69.

[1263] Julian's ECSFM at No. 66.

[1264] Julian's ECSFM at No. 66, citing the Reports of Examiners Crosthwaite, Coleman, and Smith.

Add. 227

transcripts of individuals not disclosed as OCC witnesses,[1265] arguing that "the veracity of his statements has not been tested in this litigation" seeking the conclusion that the testimony cannot "be relied on to establish that a fact is undisputed on summary disposition", but citing no authority in support of this legal proposition.[1266]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the Community Bank imposed unreasonable sales goals on its employees until October 2016, including when Respondent Julian served as Chief Auditor of the Bank and Respondent McLinko served as Executive Audit Director of the Community Bank.

## Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 70 and (Julian and McLinko) No. 67

**Responses:**

Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 70 and (Julian and McLinko) No. 67 rely on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[1267] Upon my review of the confidential documents supporting these Statements of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in these Statements of Material Fact.

## Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 71 and (Julian and McLinko) No. 68

The Bank internally and publicly identified a metric known as "cross-sell" which related to

---

[1265] Julian's ECSFM at No. 66, citing MSD-349 (sworn statement of Jeffrey Schumacher); MSD-581 (sworn statement of George Clegg).

[1266] Julian's ECSFM at No. 66.

[1267] See 12 C.F.R. § 19.33(b).

the number of products sold per household.[1268]  The cross-sell ratio was a measure of products sold per customer household, as a perceived driver of future revenue. The more products sold to existing households, the more money the Bank expected to earn from each relationship and the less likely those customers would exit their relationship with the Bank.[1269]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1270]

**Julian** did not dispute that in his Amended Answer he admitted that the Bank publicly reported a metric known as the 'cross-sell ratio, but offered evidence that the claim in this Statement "confuses the cross-sell metric with sales practices. The cross-sell metric was a key metric tracking the number of products per household and was reviewed by the Retail Bank Cross Sell Steering Committee for data integrity."[1271]

It may be a material fact in issue whether the cross-sell ratio was a measure of products sold per customer household, and whether the Statement confuses the cross-sell metric with sales practices.

I find that in his Response to (Julian and McLinko) Statement No. 68 (and by incorporation Russ Anderson No. 71) sufficiently demonstrated a factual controversy exists regarding whether the claim:

> The Bank internally and publicly identified a metric known as "cross-sell" which related to the number of products sold per household.[1272]  The cross-sell ratio was a measure of products sold per customer household, as a perceived driver of future revenue. The more products sold to existing households, the more money the Bank expected to earn from each relationship and the less likely those customers would exit their relationship with the Bank confuses the cross-sell metric with sales practices.

Because of the existence of these potentially material controverted facts, summary disposition is not available on this claim with respect to Respondents Russ Anderson, Julian or McLinko. Pursuant to the OCC's Uniform Rules, the merits of the disputed claims raised in (Julian and

---

[1268] Russ Anderson Amended Answer ¶¶ 6, 59; Julian Amended Answer ¶ 6; McLinko Amended Answer ¶ 6.

[1269] MSD-411 (Raphaelson Decl.); MSD-547 (Bredensteiner Tr.) at 17:3-21:23, 23:12-23, 153:12-154:10; MSD-267 (Expert Report of Tanya K. Smith, NBE, CFA) at ¶¶ 71-72); MSD-692 at 100 ("'cross-selling' – is very important to our business model and key to our ability to grow revenue and earnings".

[1270] Russ Anderson's ECSFM at No. 71.

[1271] Julian's ECSFM at No. 68, citing DJ0576 at 1-2 OCC-SP0913943.

[1272] Russ Anderson Amended Answer ¶¶ 6, 59; Julian Amended Answer ¶ 6; McLinko Amended Answer ¶ 6.

Appellate Case: 25-1079     Page: 231     Date Filed: 05/16/2025 Entry ID: 5517644

McLinko) Statement No. 68 (Russ Anderson No. 71) will be addressed during the hearing set to begin on September 13, 2021.

**McLinko** incorporated Respondent Julian's Response.[1273]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 72 and (Julian and McLinko) No. 69**

The Bank aimed to sell at least eight products to every household, and used slogans such as "Going for Gr-Eight."[1274]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1275]

**Julian** objected to the Statement on the ground that the supporting exhibits were irrelevant, immaterial, unreliable, or repetitive.[1276] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Given the passage of time between the events reported in the supporting exhibits and the filing of the Notice of Charges, given the remote and tangential relationship with the material claims presented in the Notice of Charges, given the potential for confusion that admitting the evidence cited by Enforcement Counsel presents, given the redundant nature of the material facts presented in the Statement when compared with Exhibits that are more closely related in time, and given the marginal relevance of the claim presented in the Statement, the supporting exhibits will not be admitted in support of Enforcement Counsel's Motion as to Respondents Russ

---

[1273] McLinko's ECSFM at No. 68.

[1274] MSD-411 (Raphaelson Decl.); MSD-692 at 8 ("Thirteen years ago, when I was head of Community Banking for Norwest Bank in Texas (before Norwest acquired Wells Fargo), our company set an ambitious goal to have our average banking household have eight products with us. Many analysts, focused only on the next quarter, yawned. That year, we averaged nearly four products per retail banking household. The next year, at the merger of Norwest and Wells Fargo, it was 3.2. 1999: 3.4. 2000: 3.7. 2001: 3.8. 2002: 4.2. 2003: 4.3. 2004: 4.6. 2005: 4.8. 2006: 5.2. 2007: 5.5. 2008: 5.7. 2009: our legacy Wells Fargo households, just under 6.0. This year, we crossed a major cross-sell threshold. Our banking households in the western U.S. now have an average of 6.14 products with us. Even when we get to eight, we're only halfway home. The average banking household has about 16. I'm often asked why we set a cross-sell goal of eight. The answer is, it rhymed with 'great.' Perhaps our new cheer should be: 'Let's go again, for ten!'"); (Wells Fargo 2004 Annual Report, page 6, 18, at https://www.wellsfargohistory.com/assets/pdf/annual-reports/2004-annual- report.pdf; MSD-267 (NBE Smith Expert Report) at ¶ 74.

[1275] Russ Anderson's ECSFM at No. 72.

[1276] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

Anderson, Julian and McLinko. Accordingly, the claims presented in Statement of Material Fact (Russ Anderson) No. 72 and (Julian and McLinko) No. 69 will not support Enforcement Counsel's Motion. The exclusion of the evidence supporting these claims does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[1277]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 73 and (Julian and McLinko) No. 70

From the early 2000s, there was an expectation in the Community Bank that regions would achieve double-digit annual sales growth over the prior year's sales performance, or "run rate."[1278]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1279]

**Julian** objected to the Statement on the ground that the supporting exhibits were irrelevant, immaterial, unreliable, or repetitive.[1280] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Given the passage of time between the events reported in the supporting exhibits and the filing of the Notice of Charges, given the remote and tangential relationship with the material claims

---

[1277] McLinko's ECSFM at No. 69.

[1278] MSD-411 (Raphaelson Decl.); MSD-40 (Tolstedt commenting to her direct report in 2002 that "[y]our sales unit plan is at 4%" and instructing him to "change your sales plan to reflect a growth rate of between 10% and 15%."); MSD-551 (Bank data reflecting growth in each region's annual sales plans between 2005 and 2013); MSD-266 (Russ Anderson Dep. Tr.) 31:24-32:11 ("As I interpreted the question, you know, about the 10 percent growth, the C-suite always recognized that there was pressure in the sales plans. That -- that was part and parcel of how sales plans were put together. And as long as I can remember, 10 percent was the bogie."); MSD-31 ("As with last year, the regions have double-digit revenue growth plan and a 15% increase in sales goals."); see also MSD-1 at A-5-A-6 ¶¶ 13-14; MSD-35, MSD-40; MSD-49 (2008 presentation discussing that to reach the corporate goal of eight products per household, the Bank needed to increase its sales goals by double digits every year); MSD-546 (Stevens Tr.) at 20:15-21:12, 23:8-24:24; MSD-545 (Coyne Tr.) at 39:3-41:13, 49:15-52:6, 147:21-151:10; MSD-579 (Schulte Tr.) at 105:2-13 ("Carrie and Matthew have had historically wanted us to increase solutions by double digits."); MSD-280 (Board Report) at 44 ("The problem built on itself: attaining growth when the prior year's sales included a large number of low quality accounts meant that even more low quality accounts had to be opened to hit the increased target.").

[1279] Russ Anderson's ECSFM at No. 73.

[1280] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

presented in the Notice of Charges, given the potential for confusion that admitting the evidence cited by Enforcement Counsel presents, given the redundant nature of the material facts presented in the Statement when compared with Exhibits that are more closely related in time, and given the marginal relevance of the claim presented in the Statement, the supporting exhibits will not be admitted in support of Enforcement Counsel's Motion as to Respondents Russ Anderson, Julian and McLinko. Accordingly, the claims presented in Statement of Material Fact (Russ Anderson) No. 73 and (Julian and McLinko) No. 70 will not support Enforcement Counsel's Motion. The exclusion of the evidence supporting these claims does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[1281]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 74 and (Julian and McLinko) No. 71

A senior leader in the human resources function in the Community Bank testified that it was "the Wells Fargo way" to increase sales goals every year:

> A: . . . I can confirm that goals did go up every year.
>
> Q: Okay. Okay. And how are you able to confirm that goals went up every year?
>
> A: It was the Wells Fargo way. (Laughter.) Double digit, year over year, increasing goals.[1282]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1283]

**Julian** did not aver the quoted text does not appear in the cited exhibit, but avers the presentation "misconstrues Ms. Nelson's testimony" because later in her testimony she testified "I would say in more recent years, it wasn't double digits. Listening to my businesses talk, I think it was less than ten percent, probably anywhere from one to nine percent, depending on the business, my

---

[1281] McLinko's ECSFM at No. 70.

[1282] MSD-548 (Nelson Tr.) at 116:15-20.

[1283] Russ Anderson's ECSFM at No. 74.

guess is. … I'm going to say possibly in late … 2008, 2009" the "double digit pace kicked down."[1284]

Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that a senior leader in the human resources function in the Community Bank testified that it was "the Wells Fargo way" to increase sales goals every year:

> A: . . . I can confirm that goals did go up every year.

> Q: Okay. Okay. And how are you able to confirm that goals went up every year?

> A: It was the Wells Fargo way. (Laughter.) Double digit, year over year, increasing goals.

And later testified:

> "I would say in more recent years, it wasn't double digits. Listening to my businesses talk, I think it was less than ten percent, probably anywhere from one to nine percent, depending on the business, my guess is. … I'm going to say possibly in late … 2008, 2009" the "double digit pace kicked down."

**McLinko** incorporated Respondent Julian's Response.[1285]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 75

While Respondent Russ Anderson was Group Risk Officer, the Community Bank increased sales goals every year from 2004 until 2013. [1286]

**Responses:**

**Russ Anderson** disputed that the evidence cited by Enforcement Counsel established that the Community Bank's sales goals remained unreasonable during Respondent Russ Anderson's tenure as the Group Risk Officer.[1287] She further averred the statement that "[w]hile Respondent Russ Anderson was Group Risk Officer, the Community Bank increased sales goals every year from 2004 until 2013[]", is misleading in that it improperly places responsibility for sales goals on Respondent Russ Anderson when she was not responsible for setting those goals.

---

[1284] Julian's ECSFM at No. 71.

[1285] McLinko's ECSFM at No. 71.

[1286] MSD-49; see also MSD-280 (Board Report) at 50 ("Under her [Carrie Tolstedt's] direction, the Community Bank continued to increase its sales goals until 2013, and then lowered them only modestly"); MSD-84; MSD-131; MSD-199 (Freeman Decl.) at ¶¶ 4, 5; MSD-266 (Russ Anderson Dep. Tr.) 31:24-32:11.

[1287] Russ Anderson's ECSFM at No. 75.

This Statement of Material Fact is silent with respect to whether the sales goals remained unreasonable, and with respect to placing responsibility on Respondent Russ Anderson.

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that while she was Group Risk Officer, the Community Bank increased sales goals every year from 2004 until 2013.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 76 and (Julian and McLinko) No. 72**

By no later than 2004, Bank employees already considered the sales goals in the Community Bank to be "unattainable."[1288]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1289]

**Julian** objected to the use of the exhibits supporting this Statement on the grounds that the evidence is irrelevant, immaterial, unreliable, or repetitive.[1290] The objection is sustained. Given the passage of time between the claimed facts and the filing of the Notice of Charges, given the remote and tangential relationship of the evidence presented in support of the Statement with the material claims presented in the Notice of Charges, given the potential for confusion that admitting the evidence presented here, given the redundant nature of the material facts presented in the Statement when compared with Exhibits that are more closely related in time, and given the marginal relevance of the claims in the Statement, the evidence supporting the Statement will not be admitted in support of Enforcement Counsel's Motion as to Respondents Russ Anderson, Julian, and McLinko. Accordingly, the claims presented in (Russ Anderson) No. 76 and (Julian and McLinko) No. 72 will not support Enforcement Counsel's Motion as to Respondents Russ Anderson, Julian, or McLinko. The exclusion of this evidence does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

---

[1288] MSD-527 at 14 (describing a "perception of 'unattainable' goals"); MSD-340 ("Every year before IC [incentive compensation] planning starts, extensive focus groups are conducted asking for feedback on the IC plans, and more and more often 'sales goals are becoming unattainable' is one of the criticisms.")); MSD-2 at 3; MSD-236 (describing "[r]elative inability of employees to meet sales goals in mature markets").

[1289] Russ Anderson's ECSFM at No. 76.

[1290] Julian's ECSFM at No.72; Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

Appellate Case: 25-1079    Page: 236    Date Filed: 05/16/2025 Entry ID: 5517644

**McLinko** incorporated Respondent Julian's Response.[1291]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 73**

There was an expectation of cross-sell growth in every region of the retail branch network. For example, in 2012, the Head of the Community Bank Carrie Tolstedt wrote: "As set out in our vision and values, 'the core of our vision and our strategy is cross selling'. As such, as leaders, we need to ensure we know what our teams need to do specifically to deliver for each region to grow cross sell. Clearly, solutions growth is a driver as is our views on demonstrated performance on retention of certain products. Next year, cross sell will be a key focus and one that we will be monitoring processes in our monthly operating review ..." She elaborated: "In my mind, [e]very region must grow cross-sell – some faster than others. If you want me to be more specific by saying we need solutions growth of 6 to 8 percent, that is clear and I can do that."[1292]

**Responses:**

**Julian** objected to the use of the exhibits supporting this Statement on the grounds that the evidence is irrelevant, immaterial, unreliable, or repetitive.[1293] The objection is sustained. Given the passage of time between the claimed facts and the filing of the Notice of Charges, given the remote and tangential relationship of the evidence presented in support of the Statement with the material claims presented in the Notice of Charges, given the potential for confusion that admitting the evidence presented here, given the redundant nature of the material facts presented in the Statement when compared with Exhibits that are more closely related in time, and given the marginal relevance of the claims in the Statement, the evidence supporting the Statement will not be admitted in support of Enforcement Counsel's Motion as to Respondents Julian and McLinko. Accordingly, the claims presented in (Julian and McLinko) No. 73 will not support Enforcement Counsel's Motion as to Respondents Julian and McLinko. The exclusion of this evidence does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[1294]

---

[1291] McLinko's ECSFM at No. 72.

[1292] MSD-32; see also MSD-33 ("Market and store level goals in recent years, in many cases, were too aggressive and disconnected from realities of existing resources and current productivity levels, and not properly focused on real potential and existing customer segment opportunities."); MSD-36; MSD-37 ("I am all about cross sell next year. We have to help people understand this is our core strategy and is up to everyone to deliver."); MSD-38; MSD-267 (NBE Smith Expert Report) at ¶¶ 75-83; MSD-131.

[1293] Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[1294] McLinko's ECSFM at No. 73.

Add. 235

Appellate Case: 25-1079    Page: 237    Date Filed: 05/16/2025 Entry ID: 5517644

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 77 and (Julian and McLinko) No. 74**

During 2004, Mr. Stumpf and Ms. Tolstedt, with the assistance of the Community Bank's Group Finance Officer, embarked on a plan to "push the envelope" to "grow sales 10- 15% each year for the next four years" and increase cross-sell growth.[1295]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1296]

**Julian** objected to the use of the evidence supporting this Statement on the grounds that the evidence is irrelevant, immaterial, unreliable, or repetitive.[1297] The objection is sustained. Given the passage of time between the acts averred in the Statement and the filing of the Notice of Charges, given the acts' remote and tangential relationship with the material claims presented in the Notice of Charges, given the potential for confusion that admitting the acts presents, given the redundant nature of the material facts presented in the Statement when compared with Exhibits that are more closely related in time, and given the marginal relevance of the claim Statement, the evidence supporting the Statement will not be admitted in support of Enforcement Counsel's Motion as to Respondents Russ Anderson, Julian, and McLinko. Accordingly, the claims presented in Statement of Material Fact (Russ Anderson) No. 77 and (Julian and McLinko) No. 74 will not support Enforcement Counsel's Motion. The exclusion of this evidence does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[1298]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 78**

While Respondent Russ Anderson was Group Risk Officer, there was an expectation of

---

[1295] MSD-552 at 46, 55. The Community Bank's strategy for increasing sales and growing cross-sell focused on sales to existing customers and "pack sales" (i.e. sales of multiple products as a package) to new customers. (Id.; Raphaelson Declaration). The Group Finance Officer wrote in 2009 that the growth forecast for 2008 in the 2004 presentation had been "'breaking the envelope,' driven by what we considered wild, almost unimaginable, assumptions." (MSD-49 (The Road to 8 Cross- Sell) at 2).

[1296] Russ Anderson's ECSFM at No. 77.

[1297] Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[1298] McLinko's ECSFM at No. 74.

Add. 236

Appellate Case: 25-1079    Page: 238    Date Filed: 05/16/2025 Entry ID: 5517644

cross-sell growth in every region of the retail branch network.[1299]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response to (Julian and McLinko) No. 73.[1300]

**Julian** objected to the use of the exhibits supporting this Statement on the grounds that the evidence is irrelevant, immaterial, unreliable, or repetitive.[1301] The objection is sustained. Given the passage of time between the claimed facts and the filing of the Notice of Charges, given the remote and tangential relationship of the evidence presented in support of the Statement with the material claims presented in the Notice of Charges, given the potential for confusion that admitting the evidence presented here, given the redundant nature of the material facts presented in the Statement when compared with Exhibits that are more closely related in time, and given the marginal relevance of the claims in the Statement, the evidence supporting the Statement will not be admitted in support of Enforcement Counsel's Motion as to Respondent Julian. Accordingly, the claims presented in (Russ Anderson) No. 78 will not support Enforcement Counsel's Motion as to Respondent Russ Anderson. The exclusion of this evidence does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.


### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 75

Sales plans in the Community Bank continued to call for double-digit sales growth through around 2013.[1302]

**Responses:**

**Julian** objected to the use of the exhibits supporting this Statement on the grounds that the evidence is irrelevant, immaterial, unreliable, or repetitive.[1303] The objection is sustained. Given the passage of time between the claimed facts and the filing of the Notice of Charges, given the remote and tangential relationship of the evidence presented in support of the Statement with the material claims presented in the Notice of Charges, given the potential for

---

[1299] MSD-32; see also MSD-33 ("Market and store level goals in recent years, in many cases, were too aggressive and disconnected from realities of existing resources and current productivity levels, and not properly focused on real potential and existing customer segment opportunities."); MSD-36; MSD-37 ("I am all about cross sell next year. We have to help people understand this is our core strategy and is up to everyone to deliver."); MSD-38; MSD-267 (NBE Smith Expert Report) at ¶¶ 75-83; MSD-131.

[1300] Russ Anderson's ECSFM at No. 74.

[1301] Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[1302] MSD-411 (Raphaelson Decl.) at 2; MSD-199 (S. Freeman Decl.) at 2.

[1303] Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

Appellate Case: 25-1079    Page: 239    Date Filed: 05/16/2025 Entry ID: 5517644

confusion that admitting the evidence presented here, given the redundant nature of the material facts presented in the Statement when compared with Exhibits that are more closely related in time, and given the marginal relevance of the claims in the Statement, the evidence supporting the Statement will not be admitted in support of Enforcement Counsel's Motion as to Respondent Julian. Accordingly, the claims presented in (Julian and McLinko) No. 75 will not support Enforcement Counsel's Motion as to Respondents Julian or McLinko. The exclusion of this evidence does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[1304]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 79 and (Julian and McLinko) No. 76

The Community Bank began lowering sales goals modestly in 2013.[1305] Accenture, an independent consultant hired by the Bank in 2015 to conduct an independent review of sales practices, issued a report in October 2015, noting that even after sales goals were lowered in 2013, they still had not been met in 2013 or thereafter.[1306]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1307]

Julian objected to the use of the Accenture report on the grounds that the evidence is irrelevant, immaterial, unreliable, or repetitive.[1308] The objection is sustained as to the claims presented in this Statement, on finding the claims in this Statement are insufficiently material to warrant the admission of the supporting evidence. Accordingly, the claims presented in (Russ Anderson) No. 79 and (Julian and McLinko) No. 76 will not support Enforcement Counsel's Motion as to Respondents Russ Anderson, Julian, and McLinko. The exclusion of the claims in this Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

---

[1304] McLinko's ECSFM at No. 75.

[1305] MSD-280 (Board Report) at 44-45; MSD-199 (Freeman Decl.) at 5-6.

[1306] MSD-51 at 27 ("Based on the monthly motivator report, which tracks actual solutions sold against solution sales goals, solution sales goals have not been met since 2013 (even after accounting for adjustments made throughout the year to improve achievement rates.").

[1307] Russ Anderson's ECSFM at No. 79.

[1308] Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

**McLinko** incorporated Respondent Julian's Response.[1309]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 80 and (Julian and McLinko) No. 77**

The Board Report found that, even after the Community Bank lowered sales goals mid-year in 2013 and 2014, "they were still set at an unachievable level," and described the Community Bank's sales goals as "untenable," "unrealistic," and "unattainable."[1310]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1311]

**Julian** did not dispute that the cited report contains the quoted text shown in the Statement, and he offered no countervailing evidence, but disputed the reliability of the report on the ground that it was prepared by the same law firm that was representing the supposed "Independent Directors" in a shareholder action accusing those directors of the very misconduct about which the Board Report purports to address and was written in coordination with the OCC's investigation into the Bank.[1312]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that the cited Board Report found that, even after the Community Bank lowered sales goals mid-year in 2013 and 2014, "they were still set at an unachievable level," and described the Community Bank's sales goals as "untenable," "unrealistic," and "unattainable."

**McLinko** incorporated Respondent Julian's Response.[1313]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 81 and (Julian and McLinko) No. 78**

Enforcement Counsel's Statements of Material Fact (Russ Anderson) No. 81 and (Julian and McLinko) No. 78 rely on exhibits presented to this Tribunal as being non-public. Pursuant to the

---

[1309] McLinko's ECSFM at No. 76.

[1310] MSD-280 at 5, 19, 44-45; see also MSD-199 (Freeman Decl.) at 2 ("I believed the sales goals were too high . . . despite the fact that the Community Bank at that time had been retroactively reducing sales goals . . . .").

[1311] Russ Anderson's ECSFM at No. 80.

[1312] Julian's ECSFM at No. 77.

[1313] McLinko's ECSFM at No. 77.

Add. 239

Appellate Case: 25-1079     Page: 241     Date Filed: 05/16/2025 Entry ID: 5517644

OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[1314] Upon my review of the confidential documents supporting these Statements of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in these Statements of Material Fact.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 82 and (Julian and McLinko) No. 79**

Multiple senior regional leaders in the Community Bank testified that the Community Bank's sales goals were unreasonable.[1315]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1316]

**Julian** offered no evidence in disputing the claim, but objects on the ground that the Statement cites to "inadmissible investigative testimony," but offered no authority for the proposition that such testimony cannot be presented in support of a motion seeking summary disposition.[1317] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that multiple senior regional leaders in the Community Bank testified that the Community Bank's sales goals were unreasonable.

**McLinko** incorporated Respondent Julian's Response.[1318]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 83 and (Julian**

---

[1314] See 12 C.F.R. § 19.33(b).

[1315] See, e.g., MSD-546 (Stevens Tr.) at 72:23- 73:5; MSD-579 (Schulte Tr.) at 50:12-51:9; MSD-349 (Schumacher Tr.) at 36:3-25; MSD-575 (Lee Tr.) at 87:13-16; MSD-576 (Perry Tr.) at 35:2-9; MSD-577 (Foley) Tr. 62:23-63:5; see also MSD-199 (Freeman Decl.) at 2, 5-6.

[1316] Russ Anderson's ECSFM at No. 82.

[1317] Julian's ECSFM at No. 79.

[1318] McLinko's ECSFM at No. 79.

**and McLinko) No. 80**

The Bank's former Chief Risk Officer Michael Loughlin testified that he had no doubt that the sales goals in the Community Bank were unreasonable:

> Q: And did you at some point conclude that the goals in Community Bank
>
> – well, let me put it this way; sitting here today, do you have any doubt in your mind that Community Bank's sales goals were unreasonable?
>
> A: I don't have any doubt.[1319]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1320]

**Julian** did not dispute that the quoted phrase appears in the witness's testimony.[1321] Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that when the Bank's former Chief Risk Officer Michael Loughlin was asked "And did you at some point conclude that the goals in Community Bank – well, let me put it this way; sitting here today, do you have any doubt in your mind that Community Bank's sales goals were unreasonable?" he responded "A: I don't have any doubt."

**McLinko** incorporated Respondent Julian's Response.[1322]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 84 and (Julian and McLinko) No. 81**

A former regional leader Jeffrey Schumacher provided the following sworn testimony to the OCC about the impact of the sales goals:

> Q: Okay. You also eluded [sic] to some emails that you sent, and some statements you made to others that high goals, that the goals were so unreasonable or aggressive that they are likely to cause that behavior. At least that's what I understood you to say. Is that what happened?
>
> A: Yes.

---

[1319] MSD-290B (Loughlin Tr.) at 303:13-18.

[1320] Russ Anderson's ECSFM at No. 83.

[1321] Julian's ECSFM at No. 80

[1322] McLinko's ECSFM at No. 80.

Q: Okay. And why did you think that these unreasonable goals that you were assigned would lead to bad behavior?

A: Well, because people need jobs. I mean, they have families to feed, they have people that depend on them. And you know, the goals were part, the sales goals were part of their incentive plan which was how much extra money they made. And it was part of their performance review, which was obviously could determine whether they stay with the company. And so for a long period of time, sales were a pretty big part of what Wells Fargo did. And I actually, the common term was solutions are king. And I think senior management projected that. ***And so when sales goals** are aggressive, I think that creates a lot of pressure on someone that's trying to keep their job and keep their family and it's a lot of pressure to make those goals.* . . . [1323]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1324]

**Julian** did not dispute that the transcript contains the quoted testimony.[1325] Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that Mr. Schumacher testified as shown above.

**McLinko** incorporated Respondent Julian's Response.[1326]


**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 82**

Respondent McLinko testified that sales goals within the Community Bank were unreasonable. Specifically, he testified:

Q: All right. From reading this and from what you now know from everything, do you have a belief as to whether these sales goals that Wells Fargo set for members of the community bank were unreasonable?

MR. CRUDO: Foundation.

---

[1323] MSD-349 (Schumacher Tr.) at 36:3-25 (emphasis added).

[1324] Russ Anderson's ECSFM at No. 84.

[1325] Julian's ECSFM at No. 81.

[1326] McLinko's ECSFM at No. 81.

A: Again, yes, based upon what I know now and reading this, they were certainly very difficult to attain.[1327]

**Responses:**

**Julian** incorporated the response by Respondent McLinko.[1328]

**McLinko** disputed giving the testimony presented in this Statement.[1329] Enforcement Counsel supported the Statement first by referencing Respondent McLinko's Amended Answer to Paragraph 5 of the Notice of Charges.[1330]

That Paragraph alleges as follows:

> The root cause of the sales practices misconduct problem was the Community Bank's business model, which imposed intentionally unreasonable sales goals and unreasonable pressure on its employees to meet those goals and fostered an atmosphere that perpetuated improper and illegal conduct. Community Bank management intimidated and badgered employees to meet unattainable sales goals year after year, including by monitoring employees daily or hourly and reporting their sales performance to their managers, subjecting employees to hazing-like abuse, and threatening to terminate and actually terminating employees for failure to meet the goals.

Respondent McLinko gave this response in his Amended Answer to Paragraph 5:

> Respondent Paul McLinko admits that the transcript of his testimony before the OCC states, in part:
>
> Q: All right. From reading this and from what you now know from everything, do you have a belief as to whether these sales goals that Wells Fargo set for members of the community bank were unreasonable?
>
> MR. CRUDO: Foundation.
>
> THE WITNESS: Again, yes, based upon what I know now and reading this, they were certainly very difficult to attain.
>
> BY MR. SAWI

---

[1327] McLinko Amended Answer ¶ 5; MSD-276 (McLinko Tr.) at 74:9-17; *see also id.* at 95:19-24.

[1328] Julian's ECSFM at No. 82.

[1329] McLinko's ECSFM at No. 81.

[1330] McLinko Amended Answer ¶ 5.

Q: All right. And based on what you know now, these goals were monitored daily by management. Is that fair to say?

MR. CRUDO: Same objection.

THE WITNESS: I know they were monitored. I've heard examples of huddles and things like that, but I don't know in all the cases, but I know they were monitored a lot.

BY MR. SAWI:

Q: Fair enough. And you know now that there was significant and, in many times, severe pressure on employees to meet these sales goals?

A: I have --

MR. CRUDO: Same objection.

THE WITNESS: I've read about the significant pressure to meet goals. Yes.

Q: Okay. And from what we know now, the goals were unreasonable, and if you didn't meet them, you were terminated. Is that fair to say?

MR. CRUDO: Foundation.

THE WITNESS: Based on examples I've seen, yes.

Except as specifically admitted, Respondent lacks sufficient information to admit or deny the allegations in ¶ 5 and on that basis denies the allegations.

Enforcement Counsel relied upon Mr. McLinko's testimony as shown in the transcript, which is the same as what Respondent McLinko presented in his Amended Answer,[1331] and also supported this Statement by referring to the following excerpts of Mr. McLinko's testimony before the OCC:

Q: And from what we now know, the goals were unreasonable, and if you didn't meet them, you were terminated. Is that fair to say? [Objection by Mr. Crudo, "foundation"] A: Based on the examples I've seen, yes.[1332]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that Respondent McLinko testified that sales goals within the Community Bank were unreasonable. Specifically, he testified:

Q: All right. From reading this and from what you now know from everything, do you have a belief as to whether these sales goals that Wells Fargo set for members

---

[1331] Cf MSD-276 (McLinko Tr.) at 74:9-17 with McLinko's Amended Answer at ⁋5.

[1332] MSD-276 (McLinko Tr.) at 95:19-24.

of the community bank were unreasonable?

MR. CRUDO: Foundation.

A: Again, yes, based upon what I know now and reading this, they were certainly very difficult to attain.

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 83

Respondent Julian testified that the Community Bank's sales goals were unreasonable. Specifically, he testified:

Q: Okay. So, it's fair to say that you now know that the bank gave its employees unreasonable sales goals. Is that correct?

A: Yes.[1333]

**Responses:**

**Julian** did not dispute that the transcript contains the cited testimony.[1334] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that when he was asked whether it was "fair to say that you now know that the bank gave its employees unreasonable sales goals. Is that correct?" he answered "Yes."

**McLinko** incorporated Respondent Julian's Response.[1335]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 85

Respondent Russ Anderson participated in sales planning meetings, conferences, and individual meetings with regional leaders, including Carrie Tolstedt's direct reports, where, among other things, the regional leaders expressed concerns about sales goals, and shared their concerns about sales quality, team member misconduct, and cross-sell reporting.[1336]

---

[1333] MSD-278 (Julian Tr.) at 121:4-7.

[1334] Julian's ECSFM at No. 83.

[1335] McLinko's ECSFM at No. 83.

[1336] MSD-45; MSD-46; MSD-47; MSD-67 (Russ Anderson acknowledging in October 2013 that "folks are already really worried about goals."); MSD-68 (regional banking leadership continuing to express concerns about sales goals in September 2015 to Respondent Russ Anderson and others); MSD-546 (Stevens Tr.) at 140:20 –142:8, 150:1-21, 158:8-17, 167:11-171:5, 187:6-189:13; MSD-582 (Sotoodeh Tr.) at 124:7-130:3, 193:10-194:25; Foley Tr. 90:14-95:24; Kvamme Tr. 125:17-128:8; J. Freeman Tr. 27:20-30:5, 76:17-78:20; MSD-199 (Freeman Decl.) at ¶¶ 14, 18; MSD-411 (Raphaelson Decl.) at ¶¶ 24, 29, 32.

**Responses:**

**Russ Anderson** disputed that the evidence cited in this Statement establishes the Community Bank's sales goals remained unreasonable; and disputed the Statement "to the extent Enforcement Counsel attempts to suggest that [Respondent] had the ability to set sales goals based on this feedback."[1337]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she participated in sales planning meetings, conferences, and individual meetings with regional leaders, including Carrie Tolstedt's direct reports, where, among other things, the regional leaders expressed concerns about sales goals, and shared their concerns about sales quality, team member misconduct, and cross-sell reporting.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 86**

Respondent Russ Anderson testified she believed the sales goals became unreasonable in the 2012 and 2013 timeframe, but did not share that information with the Chief Risk Officer Michael Loughlin (to whom she had dotted line reporting), the Enterprise Risk Management Committee, or the OCC:

> Q: Okay. Just a couple more. Sitting here today, do you believe that the sales goals in the community bank were unreasonable? A: I believe that in the 2012 and 2013 time frame, I think that they had – they weren't -- they were not – they -- they had reached unreasonable, yes. Invertently [verbatim] -- or inadvertently, they had reached that point, yes.
>
> Q: And did you ever tell Mr. Loughlin that in the 2012 to 2013 time frame the sales goals had reached the point of being unreasonable?
>
> A: I do not recall that I did that, no.
>
> . . .
>
> Q: Understood. And I'm very familiar with the presentation you're referencing, but I just want to make sure I'm clear. Did you ever tell the enterprise risk management committee that you yourself concluded that in the 2012 to 2013 time frame the sales goals had reached a point of being unreasonable? Did you ever say those words to the enterprise risk management committee?

_____

[1337] Russ Anderson's ECSFM at No. 85.

A: I did not say those exact words . . .

. . .

Q: Did you ever tell the OCC that in the 2012 to 2013 time frame, you yourself concluded that the goals had reached the level of being unreasonable?

A: I did not. As the bank was making alterations to those sales goals and was backing off from them and making adjustments, I -- I did not. . . .[1338]

**Responses:**

**Russ Anderson** did not dispute the accuracy of the transcript presented, but disputed, without citation to authority, the admissibility of the testimony, and averred the testimony "does not establish the alleged fact that the Community Bank's sales goals remained unreasonable during Ms. Russ Anderson's tenure" and disputed the Statement for the reasons set forth in Respondent Julian's Statement No. 66.[1339] In that response, Respondent Julian disputed claims other than the above transcript testimony, made no claim that the transcript was inaccurate, but described the factual claims in (Julian and McLinko) No. 66 as vague, confusing, and unsubstantiated.

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that testified as shown above, and that she believed the sales goals became unreasonable in the 2012 and 2013 timeframe but did not share that information with the Chief Risk Officer Michael Loughlin (to whom she had dotted line reporting), the Enterprise Risk Management Committee, or the OCC.

**Respondent Russ Anderson approved incentive compensation plans based on unreasonable sales goals[1340]**

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 87 and (Julian and McLinko) No. 84**

The Community Bank maintained "an incentive compensation system that was poorly

---

[1338] MSD-266 (Russ Anderson Dep. Tr.) at 119:16-122:9; see also MSD-48 (October 25, 2012 email exchange where Respondent Russ Anderson acknowledges sales plan was knowingly not attainable).

[1339] Russ Anderson's ECSFM at No. 86.

[1340] Respondent Russ Anderson included a claim of dispute regarding the subheading shown here. As there is no Statement of Material Fact expressed in the subheading, no response is warranted and no ruling is required.

designed, poorly monitored and managed and allowed to remain in place too long."[1341]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1342]

**Julian** did not dispute that the Bank maintained "an incentive compensation system that was poorly designed, poorly monitored and managed and allowed to remain in place too long", nor did he present controverting evidence, but instead averred the text does not indicate the time period in which the proposition it quotes was relevant, nor does it include the necessary context to understand the quotation.[1343]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that the Community Bank maintained "an incentive compensation system that was poorly designed, poorly monitored and managed and allowed to remain in place too long."

**McLinko** incorporated Respondent Julian's Response.[1344]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 88 and (Julian and McLinko) No. 85**

The incentive compensation plans in the Community Bank were based upon and consisted of unreasonable sales goals.[1345]

---

[1341] MSD-6; see also MSD-5; MSD-289A (Sloan Tr.) at 79:3-80:25.

[1342] Russ Anderson's ECSFM at No. 87.

[1343] Julian's ECSFM at No. 84.

[1344] McLinko's ECSFM at No. 84.

[1345] MSD-5; MSD-6; MSD-213 (SL 2015-36) at 2 ("Cross-selling, if not properly governed, can lead to excessive sales pressure on employees to meet sales goals and achieve financial incentives. Incentive compensation is a key factor in motivating employee behavior and should be reevaluated across all sales activities enterprise-wide given these events."); MSD-280 (Board Report) at 23, 29, 31-33, 57, 78, 84 ("The Community Bank did not drop teller referral goals, and, while it lowered overall sales goals slightly for 2013, it did not revise the sales goals embedded in the eligibility thresholds for incentive compensation until 2014 (and then only slightly)."); MSD-570 (SL 2016-36); MSD-600 (SL-2016-49) at 1, 3, 7 ("the CB management team implemented aggressive sales goals and a poorly designed incentive compensation program which resulted in the widespread unethical activity, significant customer harm and reputational damage to the bank."); MSD-651 (SL 2016-35); MSD-343 (Sales Practices Consent Order); MSD-269 (NBE Candy Expert Report) at ¶¶ 37-59; MSD-382 (Byers Tr.) at 231:20-232:6; MSD-199 (Freeman Decl.) at ¶ 8, 17; MSD-411 (Raphaelson Decl.) at ¶¶ 5, 14, 15, 16, 19, 20, 23.

Add. 248

Appellate Case: 25-1079    Page: 250    Date Filed: 05/16/2025 Entry ID: 5517644

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1346]

**Julian**: Without offering evidence in support, Respondent Julian controverted the Statement by questioning the reliability of the relied-upon Board Report because it was "prepared by the same law firm that was representing the supposed "Independent Directors" in a shareholder action accusing those directors of the very misconduct about which the Board Report purports to address and was written in coordination with the OCC's investigation into the Bank."[1347]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that incentive compensation plans in the Community Bank were based upon and consisted of unreasonable sales goals.

**McLinko** incorporated Respondent Julian's Response.[1348]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 89 and (Julian and McLinko) No. 86**

The Bank's Incentive Compensation Risk Management Policy, adopted in 2011 ("ICRM Policy") governed all incentive compensation plans, including those in the Community Bank.[1349]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1350]

**Julian** disputed Enforcement Counsel's articulation of Julian's Amended Answer, averring the Answer "admitted merely 'that a July 13, 2011 Incentive Compensation Risk Management Policy states that "[t]his policy applies to any Wells Fargo business that pays team members under an incentive compensation arrangement." (Julian Amended Answer ¶ 150). Moreover, Mr. Julian specifically denied that the ICRM Policy "imposed oversight responsibilities on the Head

---

[1346] Russ Anderson's ECSFM at No. 88.

[1347] Julian's ECSFM at No. 85, citing MSD-280.

[1348] McLinko's ECSFM at No. 85.

[1349] Russ Anderson Amended Answer ¶ 150; MSD-211; MSD-212; MSD-224 at 10, 24; McLinko Amended Answer ¶ 150; Julian Amended Answer ¶ 150; MSD-211; MSD-212; MSD-224 at 10, 24.

[1350] Russ Anderson's ECSFM at No. 89.

of the Community Bank, the Community Bank Group Risk Officer, and the Law Department."[1351]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that the Bank's Incentive Compensation Risk Management Policy, adopted in 2011 ("ICRM Policy") governed all incentive compensation plans, including those in the Community Bank, but did not impose oversight responsibilities on the Head of the Community Bank, the Community Bank Group Risk Officer, and the Law Department."

**McLinko** incorporated Respondent Julian's Response.[1352]


### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 90

The purpose of the ICRM Policy was "to align Wells Fargo's incentive compensation arrangement with appropriate risk taking to ensure the strength and stability of the company."[1353]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response at (Julian and McLinko) No. 86.[1354] Respondent Julian's response in No. 86 concerns Enforcement Counsel's construction of a response given by Mr. Julian in his Amended Answer. The response by Mr. Julian is not responsive to the claim presented in (Russ Anderson) No. 90.

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the purpose of the Bank's ICRM Policy was to align Wells Fargo's incentive compensation arrangement with appropriate risk taking to ensure the strength and stability of the company.


### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 91

The ICRM Policy stated: "Incentive compensation arrangements should balance risk and rewards in a manner that does not encourage team members to expose Wells Fargo to

---

[1351]  Julian's ECSFM at No. 86, quoting NOC ¶ 150; Julian Amended Answer ¶ 150.

[1352] McLinko's ECSFM at No. 86.

[1353] MSD-211; MSD-212.

[1354] Russ Anderson's ECSFM at No. 90.

imprudent risks."[1355]

**Responses:**

**Russ Anderson** again incorporated Respondent Julian's response at (Julian and McLinko) No. 86.[1356] Respondent Julian's response in No. 86 concerns Enforcement Counsel's construction of a response given by Mr. Julian in his Amended Answer. The response by Mr. Julian is not responsive to the claim presented in (Russ Anderson) No. 91.

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the Bank's ICRM Policy stated: "Incentive compensation arrangements should balance risk and rewards in a manner that does not encourage team members to expose Wells Fargo to imprudent risks."

## Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 92

The ICRM Policy stated: "Risk-management processes and internal controls reinforce and support the development and maintenance of balanced incentive compensation arrangements."[1357]

**Responses:**

**Russ Anderson** again incorporated Respondent Julian's response at (Julian and McLinko) No. 86.[1358] Respondent Julian's response in No. 86 concerns Enforcement Counsel's construction of a response given by Mr. Julian in his Amended Answer. The response by Mr. Julian is not responsive to the claim presented in (Russ Anderson) No. 92.

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the Bank's ICRM Policy stated: "Risk-management processes and internal controls reinforce and support the development and maintenance of balanced incentive compensation arrangements."

## Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 93

---

[1355] MSD-211 at 1.

[1356] Russ Anderson's ECSFM at No. 91.

[1357] MSD-211 at 2.

[1358] Russ Anderson's ECSFM at No. 92.

The ICRM Policy imposed oversight responsibilities on Respondent Russ Anderson as the Community Bank Group Risk Officer.[1359]

**Responses:**

Russ Anderson responded that it was undisputed that she admitted in her Amended Answer the factual claims shown here. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the Bank's ICRM Policy imposed oversight responsibilities on Respondent Russ Anderson as the Community Bank Group Risk Officer.


### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 94

Under the ICRM Policy, Respondent Russ Anderson had "to provide independent reviews of incentive compensation arrangements and balancing features used" and was "accountable to Wells Fargo's Chief Risk Officer to ensure appropriate balance is achieved."[1360]

**Responses:**

**Russ Anderson** responded that it was undisputed that she admitted in her Amended Answer the factual claims shown here. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that under the ICRM Policy, Respondent Russ Anderson had "to provide independent reviews of incentive compensation arrangements and balancing features used" and was "accountable to Wells Fargo's Chief Risk Officer to ensure appropriate balance is achieved."


### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 95

Respondent Russ Anderson failed to provide to the Bank's Chief Risk Officer Michael Loughlin independent assessments of Community Bank's incentive compensation and whether it had the requisite balancing features as required by the Bank's own ICRM Policy.[1361]

**Responses:**

**Russ Anderson** responded that it was undisputed that she testified that she never directly addressed incentive compensation and balancing features, but disputed the claim generally because she "believed the balancing features were sufficient to disincent sales practices misconduct, citing her testimony, given on January 13, 2021, at 68:16-20.

---

[1359] Russ Anderson Amended Answer ¶ 150; MSD-211; MSD-212.

[1360] Russ Anderson Amended Answer ¶ 253; MSD-211 at 3; MSD-212 at 3.

[1361] MSD-290B (Loughlin Tr.) at 478:7-11; MSD-269 (NBE Candy Expert Report) at ¶ 61; MSD- 266 (Russ Anderson Dep. Tr.) at 67:23-68:2.

Add. 252

Appellate Case: 25-1079    Page: 254    Date Filed: 05/16/2025 Entry ID: 5517644

That testimony is shown as follows:

> Q Do you believe it now, that incentive compensation plans in the community bank in retrospect did not adequately balance risk and reward?
>
> A The incentive compensation plans in the community bank were not designed for – and particularly I'll talk about it at the branch level -- were never designed for a banker or a teller to make a ton of money. So that was never -- I would -- I would never -- I never believed then, nor do I believe now that the incentive compensation plan would incent a person at the branch level to do -- to -- to commit incentive -- to commit sales practice misconduct.[1362]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she failed to provide to the Bank's Chief Risk Officer Michael Loughlin independent assessments of Community Bank's incentive compensation and whether it had the requisite balancing features as required by the Bank's own ICRM Policy.


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 96**

Respondent Russ Anderson was a member of the Incentive Compensation Risk Management Steering Committee, which was responsible for reviewing and approving incentive compensation plans and ensuring their compliance with the ICRM Policy.[1363]

**Responses**:

**Russ Anderson** disputed that the Statement establishes the alleged fact that Community Bank had a systemic sales practice misconduct problem from at least 2002 until at least 2016, and that she approved incentive compensation plans based on unreasonable sales goals.[1364] These allegations, however, are not presented in Statement No. 96.

Respondent further incorporated Respondent Julian's response to (Julian and McLinko) No. 251.[1365] That paragraph, however, does not relate to the material facts alleged in (Russ Anderson) No. 96.

---

[1362] MSD-266 at 68:16-20.

[1363] MSD-215 at 1-2.

[1364] Russ Anderson's ECSFM at No. 96.

[1365] Russ Anderson's ECSFM at No. 96.

Appellate Case: 25-1079    Page: 255    Date Filed: 05/16/2025  Entry ID: 5517644

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she was a member of the Incentive Compensation Risk Management Steering Committee, which was responsible for reviewing and approving incentive compensation plans and ensuring their compliance with the ICRM Policy.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 97**

Respondent Russ Anderson reviewed and approved incentive compensation plans consisting of unreasonable sales goals.[1366]

**Responses:**

**Russ Anderson** disputed that the alleged facts established that Community Bank had a "systemic sales practices misconduct problem from at least 2002 until at least 2016" and that she had "approved incentive compensation plans based on unreasonable sales goals."[1367] She offered in support references to MSD-214 (an email chain circa April 25, 2015 that included Respondent and other Bank employees regarding proposed "material changes" to the incentive plan), MSD-215 (an email chain circa Jun 1, 2015 that raised questions about the corporate policy applicable to Sales Practices), and MSD-216 (an email chain circa November 30, 2015 pertaining to the Wells Fargo Financial Consent Order). Respondent offered the documents in support of the proposition that "none of the documents cited contain any reference to an incentive compensation plan containing unreasonable sales goals."[1368]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson reviewed and approved incentive compensation plans consisting of unreasonable sales goals

**Throughout Respondent Russ Anderson's tenure as the Group Risk Officer, the Community Bank imposed significant pressure on its employees to meet its unreasonable goals**

---

[1366] MSD-269 (NBE Candy Expert Report) at ¶ 63; MSD- 48; MSD-214 ("I agree and approve the Q2 Store plan changes also for RB [Regional Banking]."); MSD-215; MSD-216.

[1367] Russ Anderson's ECSFM at No. 97.

[1368] Russ Anderson's ECSFM at No. 97.

Add. 254

Appellate Case: 25-1079     Page: 256     Date Filed: 05/16/2025 Entry ID: 5517644

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 98 and (Julian and McLinko) No. 87**

From the early 2000s during Respondent Russ Anderson's tenure as the Group Risk Officer and until sales goals were eliminated in the Community Bank effective October 1, 2016, employees in the retail branch network of the Community Bank faced significant pressure to meet sales goals. [1369]

**Responses:**

**Russ Anderson** disputed that the documents cited by Enforcement Counsel establish the facts alleged; and aver that MSD-128 and MSD-129 "confirm that Ms. Russ Anderson was requesting more information about sales pressure to understand who was feeling it and why, and looking for ways to ensure that regional bank leaders did not exert pressure on team members." [1370]

Having reviewed the exhibits cited by Respondent Russ Anderson, including the contents of MSD-128 (an email chain circa January 4, 2012 regarding sales goals) and MSD-129 (an email chain circa January 4, 2012 regarding "performance commitments"), I find nothing that controverts the factual claims in this Statement.

Accordingly, I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Thus, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that from the early 2000s during Respondent Russ Anderson's tenure as the Group Risk Officer and until sales goals were eliminated in the

---

[1369] MSD-266 (Russ Anderson Dep. Tr.) at 32:17-33:9, 61:16-63:23, 78:18-79:17; MSD-268 (NBE Crosthwaite Expert Report) at ¶¶ 44, 46; MSD-580 (Henderson Tr.) at 131:18- 132:19 (describing call nights whereby employees who did not meet sales goals had to stay overtime to make calls in order to get sales); MSD-382 (Byers Tr.) at 231:20-232:6; MSD-128; MSD-129; MSD-81 ("We have a lot of markets and regions that are significantly below minimum standards, and you have to believe there is unbearable pressure. In light of that, you have to predict there will be more gaming."); MSD-141; MSD-142; MSD-158 at 4 ("Make your goals at any cost to the team member or customer – this is our environment."); MSD-159; MSD- 160; MSD-296A (Bacon Dep. Tr.) at 222:1-24, 225:20-226:3, MSD-296B (Bacon Dep. Tr.) at 180:17-181:9, 190:12-192:15, 200:4-202:24); MSD-544 (Weber Tr.) at 20:16-23:10, 27:20-32:8, 50:18-52:7, 146:23-148:4, 151:1-152:3 (Dec. 21, 2017); MSD-294 (Wipprecht Tr.) 35:1-38:3, 79:7-14, 94:1-21, 112:6-19; MSD-549 (Holliday Tr.) at 51:19-52:9, 69:14-71:22); MSD-73; MSD-74; MSD-75 ("…I do know gaming has everyone's attention at the moment. We've been preaching it for ten years largely ignored . . ."); MSD-76 (October 21, 2005 email from an Investigations Manager stating: "We have seen a recent surge in complaints regarding on-line banking enrolling, bill-pay enrollment and ordering debit cards without customer consent or knowledge. I don't know what's going on but I think we need to address the issue, as it is spiraling out of control."); MSD-581 (Clegg Tr.) at 50:3-12; 51:14-21, 81:4-82:7; MSD-287B (Otsuka Tr.) at 9:15-19; MSD-546 (Stevens Tr.) at 88:2-9, 111:5-18; MSD-582(Sotoodeh Tr.) at 81:16-82:2, 106:14-24, 107:3-10; MSD-579 (Schulte Tr.) at 71:9-11, 93:21-94:1.

[1370] Russ Anderson's ECSFM at No. 98.

Add. 255

Appellate Case: 25-1079     Page: 257     Date Filed: 05/16/2025 Entry ID: 5517644

Community Bank effective October 1, 2016, employees in the retail branch network of the Community Bank faced significant pressure to meet sales goals.

**Julian** disputed the claim, citing testimony by Respondent Russ Anderson, who testified in response to the question "Did there come a point in time when you, yourself determined that a significant number of EthicsLine complaints were indicating as a theme that employees were under significant pressure to meet unreasonable sales goals? A. I did not ever come to that conclusion, no."[1371] Thus, the question presented in this excerpt addressed not whether employees in the retail branch network of the Community Bank faced significant pressure to meet sales goals, but whether Russ Anderson construed EthicsLine complaints as indicating "a theme" that employees were under pressure to meet unreasonable sales goals – a question more narrowly drawn than the one presented in the Statement.

Accordingly, I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Thus, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that from the early 2000s during Respondent Russ Anderson's tenure as the Group Risk Officer and until sales goals were eliminated in the Community Bank effective October 1, 2016, employees in the retail branch network of the Community Bank faced significant pressure to meet sales goals.

**McLinko** incorporated Respondent Julian's Response.[1372]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 99

The significant pressure to meet sales goals existed at the Bank beginning no later than 2002. Respondent Russ Anderson testified that sales pressure existed for the entirety of her career at the Bank, dating back to 1980:

> Q: Okay. And you respond, "Ms. Tolstedt was a 'yes, I can do it' person. There were only so many expenses she could cut, since she did not want to cut stores. Most of her expenses was people. Furthermore, you had to keep up with the industry by pumping money into the internet bank. Sooner or later the pot runs out and you recognize that you have all this pressure with the sales force." And I take it, you believe that this was a truthful response to Grant Thornton when you responded to their question; is that fair to say?
>
> A: I'd say that's fair, yes.

---

[1371] Julian's ECSFM at No.87, quoting MSD-266 at 78:11-17.

[1372] McLinko's ECSFM at No. 87.

Appellate Case: 25-1079    Page: 258    Date Filed: 05/16/2025 Entry ID: 5517644

Q: When did you first recognize that there was all this pressure within the sales force?

A: Ag -- again, there's been pressure on the sales force for the entirety of my career. That's part of being in a sales organization, there's pressure to reach certain levels of performance.[1373]

**Responses:**

**Russ Anderson** did not dispute the accuracy of the transcription shown above, but disputed that the evidence cited by Enforcement Counsel establishes the alleged fact that Community Bank had a systemic sales practices misconduct problem from at least 2002 until at least 2016, and that throughout Ms. Russ Anderson's tenure as the Group Risk Officer, the Community Bank imposed significant pressure on its employees to meet its unreasonable goals.[1374] Further, she cited the Report of the Independent Directors of the Board of Wells Fargo & Company, Sales Practices Investigation Report, which included the finding that "[w]hile the level of input into each year's goals by regional banking leaders - those responsible for particular retail banking regions - rose and fell over time, sales goals were ultimately the responsibility of Community Bank leadership, in particular Carrie Tolstedt and Matthew Raphaelson, the Community Bank's head of Strategic Planning and Finance."[1375]

Respondent Russ Anderson also cited the report of Ms. Farrell (MSD-264), in which the author averred "Ms. Russ Anderson had no input into the sales goals and no input into the incentive compensation for the Community Bank."[1376] There is, however, no substantial evidence supporting this factual claim, nor is there foundation establishing the time frame covered by this averment.

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she provided the sworn testimony shown above and that there was significant pressure to meet sales goals existed at the Bank beginning no later than 2002.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 100**

Respondent Russ Anderson testified that she suspected that pressure was an underlying issue

---

[1373] MSD-266 (Russ Anderson Dep. Tr.) at 32:17-33:9, 63:16-23 (emphasis added).

[1374] Russ Anderson's ECSFM at No. 99.

[1375] Russ Anderson's ECSFM at No. 99, quoting from MSD-280 at 19.

[1376] Russ Anderson's ECSFM at No. 99, quoting from MSD-264 (Farrell Report).

behind employees engaging in sales practices misconduct:

> Q: Okay. Did you also suspect that pressure was an underlying issue behind employees engaging in sales practices misconduct? A: Just generally speaking?
>
> Q: Sure.
>
> A: Generally speaking, I think that, yes. As I think I've testified before, pressure in various hotspots but, you know, not across the whole footprint, since I started in 1980, it – the pres -- predecessor to even Norwest.[1377]

**Responses:**

**Russ Anderson** did not dispute the accuracy of the transcribed testimony, but disputed that the testimony presented in the Statement establishes the alleged fact that Community Bank had systemic sales practices.[1378]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she provided the sworn testimony shown above.


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 101**

Respondent Russ Anderson knew that the following areas were "hot spots" for sales practices misconduct: Los Angeles, Orange County, Arizona, New Jersey. She also knew employees were under significant pressure to meet unreasonable sales goals in the following locations: Los Angeles, Orange County, New Jersey, and Florida:

> Q: When did you first realize that L.A./O.C., Arizona, and New Jersey were hot spots for sales practice misconduct?
>
> A: Well, I think that was true even before I got the SSCOT team. But certainly once I got the SSCOT team in January of 2012 and working with my leadership in that organization and getting more direct data from them underscored it. But certainly there had been conversations with Ken Zimmerman, Debra Patterson, before then, even Carrie before then, that those were places of you needed to keep a watch on it.

---

[1377] MSD-266 (Russ Anderson Dep. Tr.) at 187:8-17; MSD-142.

[1378] Russ Anderson's ECSFM at No. 100.

Q: So Ms. Tolstedt was aware well before 2012 that there were hot spots for sales practice misconduct; is that fair to say?

A: I would say that's fair, yes.

. . .

Q: Do you believe that to be true now, that employees were under significant pressure to meet unreasonable sales goals in the Community Bank?

A: I think there were pockets within regional banking where that is true, but I did not think it was footprint-wide, no.

Q: Okay. And the pockets where you believed it was true that employees were under significant pressure to meet unreasonable sales goals were L.A./O.C., Arizona, and New Jersey; is that fair to say?

A: Those would be the large areas, yes. There could have been little hotspots and, you know, other states just, you know, with little pockets here and there because there's 6,000 branches. But those were the places where -- you know with the data we would get from Ken – Ken Zimmerman and corporate investigations, it would lead you to those conclusions. Florida would pop up once in a while, particularly down in the Miami area. . . .[1379]

**Responses:**

**Russ Anderson** did not dispute the accuracy of the transcribed testimony, but disputed that the testimony presented in the Statement establishes the alleged fact that Community Bank had systemic sales practices.[1380]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she provided the sworn testimony shown above.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 102 and (Julian and McLinko) No. 88**

---

[1379] (MSD-266 (Russ Anderson Dep. Tr.) at 77:14-79:17).

[1380] Russ Anderson's ECSFM at No. 101.

The Community Bank tracked employees' sales performance on a daily and at times hourly basis.[1381]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1382]

Julian disputed the claim, averring that in the statement relied upon by Enforcement Counsel, Ms. Holliday testified that she did not "know if [sales goals] were monitored daily ... at a higher level" in the Community Bank.[1383]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that the Community Bank tracked employees' sales performance on a daily and at times hourly basis.

**McLinko** incorporated Respondent Julian's Response.[1384]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 103 and (Julian and McLinko) No. 89

The Community Bank employed stack rankings, which ordered sales performers from best to worst.[1385]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1386]

**Julian** objected to the use of evidence in support of this claim on the grounds that the evidence is irrelevant, immaterial, unreliable, or repetitive.[1387] The objection is sustained. Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Russ Anderson) No. 103

---

[1381] MSD-549 (Holliday Tr.) at 25:7-27:25, 59:11-18; MSD-541 (J. Freeman Tr.) 76:20-77:12; MSD-350 (Ramage Tr.) at 33:13-36:18; MSD-199 (Freeman Decl.) at ¶ 10; MSD- 411 (Raphaelson Decl.) at ¶ 21.

[1382] Russ Anderson's ECSFM at No. 102.

[1383] Julian's ECSFM at No. 88, quoting MSD-549 at 24:24-25:6.

[1384] McLinko's ECSFM at No. 88.

[1385] MSD-541 (J. Freeman Tr.) at 76:17-78:20, 92:11-93:12; MSD-300 (Rawson Tr.) at 24:2-27:1; MSD-349 (Schumacher Tr.) at 37:23-40:24; MSD-584 (Kaczor Tr.) at 33:7-15; MSD-199 (Freeman Decl.).

[1386] Russ Anderson's ECSFM at No. 103.

[1387] Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

and (Julian and McLinko) No. 89 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[1388]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 104 and (Julian and McLinko) No. 90

Incentive compensation and promotional opportunities in the Community Bank depended on an employee's ability to meet sales goals.[1389]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1390]

**Julian** disputed the claim, averring it to be vague and lacking sufficient context to understand the incentive compensation and promotional opportunities in the Community Bank.[1391] Without controverting the material factual premises in the Statement, Julian proffered testimonial evidence to the effect that there were ways to be promoted other than through meeting sales goals – evidence that does not contradict the factual premise that incentive compensation and promotional opportunities depended on meeting sales goals. Julian presented testimony showing that the relevant factors varied depending on the level of the position and, for some positions, an employee's ability to meet sales goals was, in fact, immaterial.[1392]

> "Q. You also mentioned that people were promoted to management because of sales? A. In some cases, not in all cases. Q.Was it more typical at the lower levels of branch managers, district managers, that the primary reason for their promotion would be sales numbers? A. Yes. Q. Did promotions at higher levels, let's say to lead regional president or regional president, was it less dependent on sales atthat level? A. I would say, yes, it was. You know, you had to have other skills to

---

[1388] McLinko's ECSFM at No. 89.

[1389] MSD-266 (Russ Anderson Dep. Tr. ) at 22:13-23:3; MSD-349 (Schumacher Tr.) at 40:25-44:11; MSD-549 (Holliday Tr.) at 28:3-23; MSD-579 (Schulte Tr.) at 97:8-15; MSD-591 (Najvar Tr.) at 305:1– 308:2; MSD-350 (Ramage Tr.) at 112:1-113:4; MSD-595 (Vasquez Tr.) at 37:5-10, 98:12-18; MSD-508).

[1390] Russ Anderson's ECSFM at No. 104.

[1391] Julian's ECSFM at No. 90.

[1392] Julian's ECSFM at No. 90, quoting MSD-579 at 97:8-23.

command those positions. The higher up you got the less important it was that you had sales."[1393]

This testimony does not controvert the material factual claim presented in the Statement. I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that incentive compensation and promotional opportunities in the Community Bank depended on an employee's ability to meet sales goals.

**McLinko** incorporated Respondent Julian's Response.[1394]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 105 and (Julian and McLinko) No. 91

From 2003 through 2013, the Community Bank promoted an annual sales campaign known as "Jump into January." As part of this campaign, Community Bank imposed higher-than-normal sales goals in the month of January.[1395]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1396]

**Julian** objected to the use of exhibits supporting this Statement on the grounds that the evidence is irrelevant, immaterial, unreliable, or repetitive.[1397] The objection is sustained. Given the passage of time between the campaign cited and the filing of the Notice of Charges, given the campaign's remote and tangential relationship with the material claims presented in the Notice of Charges, given the potential for confusion that admitting evidence of the campaign presents, given the redundant nature of the material facts presented regarding the campaign when compared with Exhibits that are more closely related in time, and given the marginal relevance of the campaign, evidence of the campaign will not be admitted in support of Enforcement

---

[1393] Julian's ECSFM at No. 90, quoting MSD-579 at 97:8-23.

[1394] McLinko's ECSFM at No. 90.

[1395] MSD-280 (Board Report) at 21-22; MSD-141; MSD-582 (Sotoodeh Tr.) at 147:19-149:24; MSD-592 (Delay-Helser Tr.) at 22:13- 24:1; MSD-566; MSD-545 (Coyne Tr.) at 156:3-158:12; MSD-546 (Stevens Tr.) at 33:22-35:2 ("Jump into January . . . turned into a complete nightmare of team members feeling pressured."); MSD-593 (Riley Tr.) at 167:5-20 ("So if you couldn't get your January goal in line, your whole year was done. . . They put so much weight into that one month that there was so much pressure"); MSD-594 (Terrazas Tr.) at 174:22-175:1 ("every year for Jump into January, every year it was very stressful on our team members"); MSD-199 (Freeman Decl.) at ¶ 13.

[1396] Russ Anderson's ECSFM at No. 105.

[1397] Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

Add. 262

Appellate Case: 25-1079   Page: 264   Date Filed: 05/16/2025 Entry ID: 5517644

Counsel's Motion. Accordingly, the claims presented in (Russ Anderson) 105 and (Julian and McLinko) No. 91 will not support Enforcement Counsel's Motion. The exclusion of evidence of the campaign does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[1398]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 106**

Jump into January was a "breeding ground for bad behavior."[1399] The pressure imposed on employees by Jump into January and the campaign's impact on increased sales practices misconduct and other gaming was widely known within the Community Bank.[1400]

**Responses:**

**Russ Anderson:** In Statement No. 105 Russ Anderson objected to the use of exhibits supporting this Statement on the grounds that the evidence is irrelevant, immaterial, unreliable, or repetitive.[1401] The objection applies here as well, and is sustained for the reasons given regarding (Russ Anderson) No. 105.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 107**

"Jump into January" was especially associated with a practice known as "sandbagging," which involved bankers delaying the opening of requested accounts and other products to the next sales reporting period.[1402]

**Responses:**

**Russ Anderson:** In Statement No. 105 Russ Anderson objected to the use of exhibits supporting this Statement on the grounds that the evidence is irrelevant, immaterial, unreliable, or repetitive.[1403] The objection applies here as well, and is sustained for the reasons given regarding (Russ Anderson) No. 105.

---

[1398] McLinko's ECSFM at No. 91.

[1399] MSD-280 (Board Report) at 21.

[1400] MSD-300 (Rawson Tr.) at 84:3-86:1; MSD-581 (Clegg Tr.) at 48:20-50:1.

[1401] Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[1402] MSD-101; MSD-546 (Stevens Tr.) at 34:13-35:25; 184:9-16; MSD-582 (Sotoodeh Tr.) at 148:20-149:16; DiCristofaro Tr. 53:22-60:14, 62:2-63:25; MSD-128; MSD-129.

[1403] Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

Appellate Case: 25-1079    Page: 265    Date Filed: 05/16/2025 Entry ID: 5517644

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 108**

**Russ Anderson:** Respondent Russ Anderson was aware that sandbagging was a common practice associated with the Jump into January campaign.[1404]

**Responses:**

**Russ Anderson:** In Statement No. 105 Russ Anderson objected to the use of exhibits supporting this Statement on the grounds that the evidence is irrelevant, immaterial, unreliable, or repetitive.[1405] The objection applies here as well, and is sustained for the reasons given regarding (Russ Anderson) No. 105.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 109**

The Bank had data capabilities to show a strong correlation between Jump into January and sales practices misconduct.[1406] Nonetheless, Respondent Russ Anderson never asked the Bank's Financial Crimes Risk Management Team to run analytics and discern a relationship between Jump into January and sales practices misconduct.[1407]

**Responses:**

**Russ Anderson:** In Statement No. 105 Russ Anderson objected to the use of exhibits supporting this Statement on the grounds that the evidence is irrelevant, immaterial, unreliable, or repetitive.[1408] The objection applies here as well, and is sustained for the reasons given regarding (Russ Anderson) No. 105.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 110 and (Julian and McLinko) No. 92**

Bank employees faced corrective actions for failing to meet their sales goals up to and including termination. [1409]

---

[1404] MSD-225 at 1.

[1405] Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[1406] MSD-101; MSD-297 (Richards Tr.) at 217:3-222:21 (May 1, 2018).

[1407] MSD-297 (Richards Tr.) at 222:6-10.

[1408] Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[1409] MSD-78; MSD-549 (Holliday Tr.) at 25:7-27:25; MSD-300 (Rawson Tr.) at 27:2-29:20; MSD-142; MSD-578 (Hurley Tr.) at 34:15-35:14; MSD-580 (Henderson Tr.) at 133:5-10; MSD-291 (Callahan Tr.) at 23:13-24:13; MSD-579 (Schulte Tr.) at 97:11-99:7; MSD-78; MSD-79 ("We have been made aware that some team members have actually be[en] form[ally] counseled for making $104% and 110% of their goals. In addition we discovered that one manager was getting ready to terminate a banker for being at [only] 105% [of his sales goals]."); MSD-142; MSD-

**Responses:**

**Russ Anderson** responded by averring that the cited documentation does not establish that the Community Bank imposed significant pressure on its employees to meet its unreasonable sales goals throughout Ms. Russ Anderson's tenure as Group Risk Officer; and incorporated Respondent Julian's response.[1410]

**Julian** disputed the claim by asserting that there were other corrective actions that may be used, that the consequences of not meeting sales goals "varied a little bit by manager" and "corrective action" could include teaching or coaching the employee on how to meet the sales goals and did not necessarily involve adverse consequences for the employee.[1411]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that Bank employees faced corrective actions for failing to meet their sales goals up to and including termination.

**McLinko** incorporated Respondent Julian's Response.[1412]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 111 and (Julian and McLinko) No. 94**

Standard language on Informal Warning corrective action documents stated, "If your sales performance does not improve to an acceptable level, further action up to and including termination of employment may result. If, at any time after this corrective action, you do not sustain your performance at an overall acceptable level, further action up to and including termination of employment may result."[1413]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1414]

---

44; MSD-199 (Freeman Decl.) at 3 ("If employees consistently failed to meet sales goals, they could receive counseling and a low or non-satisfactory performance rating, which could eventually lead to termination.".

[1410] Russ Anderson's ECSFM at No. 110.

[1411] Julian's ECSFM at No. 92, quoting MSD-549 at 25:19-27:18); citing also MSD-300 at 28:22-29:23 (testifying that depending on the "boss that [she] was talking to" and the "approach" they had, reactions would differ when she failed to meet her sales goals).

[1412] McLinko's ECSFM at No. 92.

[1413] MSD-78 at 2 (emphasis added).

[1414] Russ Anderson's ECSFM at No. 111.

**Julian** objected to the use of the Informal Warning on the grounds that the evidence is irrelevant, immaterial, unreliable, or repetitive.[1415] The objection is sustained. Given the passage of time between the issuance of the Warning and the filing of the Notice of Charges, given the Warning's remote and tangential relationship with the material claims presented in the Notice of Charges, given the potential for confusion that admitting evidence of the Warning presents, given the redundant nature of the material facts presented in the Warning when compared with Exhibits that are more closely related in time, and given the marginal relevance of the claim, the Informal Warning will not be admitted in support of Enforcement Counsel's Motion. Accordingly, the claims presented in (Russ Anderson) No. 111 and (Julian and McLinko) No. 94 will not support Enforcement Counsel's Motion. The exclusion of the evidence does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[1416]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 112 and (Julian and McLinko) No. 93

From 2011 through third quarter 2016, the Bank terminated approximately 8,520 employees for sales performance issues, including failure to meet sales goals.[1417]

**Responses:**

**Russ Anderson** responded by averring that the cited documentation does not establish that the Community Bank imposed significant pressure on its employees to meet its unreasonable sales goals throughout Ms. Russ Anderson's tenure as Group Risk Officer; and incorporated Respondent Julian's response.[1418]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that from 2011 through third quarter 2016, the Bank terminated approximately 8,520 employees for sales performance issues, including failure to meet sales goals.

**Julian** disputed the claim by asserting the email "appears to refer to employees "[t]erminated for sales performance issues," which included "failing to meet sales goals related to sales

---

[1415] Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[1416] McLinko's ECSFM at No. 94.

[1417] MSD-44.

[1418] Russ Anderson's ECSFM at No. 112.

Add. 266

Appellate Case: 25-1079    Page: 268    Date Filed: 05/16/2025 Entry ID: 5517644

production, sales activities or appropriate sales behavior."[1419] Therefore he avers the evidence shows that "[s]ales performance issues," as Paragraph 93 describes, were not limited to "failure to meet sales goals." The quoted language does not create a material controverted fact, as the quoted language states the terminations were for failure to reach sales goals – which is what the Statement avers.

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that from 2011 through third quarter 2016, the Bank terminated approximately 8,520 employees for sales performance issues, including failure to meet sales goals.

**McLinko** incorporated Respondent Julian's Response.[1420]


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 113 and (Julian and McLinko) No. 95**

The Board Report found that Community Bank's sales performance stack rankings, and its determination of employees' incentive compensation and promotional opportunities relative to sales goals, created an "intense pressure to perform. . . ."[1421]

**Responses:**

**Russ Anderson** responded by averring that the cited documentation does not establish that the Community Bank imposed significant pressure on its employees to meet its unreasonable sales goals throughout Ms. Russ Anderson's tenure as Group Risk Officer; and incorporated Respondent Julian's response.[1422]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the Board Report found that Community Bank's sales performance stack rankings, and its determination of employees' incentive compensation and promotional opportunities relative to sales goals, created an "intense pressure to perform.

**Julian** did not present evidence controverting the claim, but instead averred the Board Report was unreliable because it had been prepared by the same firm that represented the

---

[1419] Julian's ECSFM at No.93, quoting MSD-044 at 2.

[1420] McLinko's ECSFM at No. 93.

[1421] MSD-280 (Board Report) at 20.

[1422] Russ Anderson's ECSFM at No. 113.

Appellate Case: 25-1079    Page: 269    Date Filed: 05/16/2025 Entry ID: 5517644

Independent Directors against a shareholder action.[1423]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that the Board Report found that Community Bank's sales performance stack rankings, and its determination of employees' incentive compensation and promotional opportunities relative to sales goals, created an "intense pressure to perform."

**McLinko** incorporated Respondent Julian's Response.[1424]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 114 and (Julian and McLinko) No. 96

The Board Report concluded that the Community Bank's performance management, including the pressure imposed on employees to meet sales goals, added significant additional risk to the Community Bank's sales model. Due to Community Bank leadership's view that the retail bank should be compared not to other banks but to non-bank retailers, there was a tolerance for high employee turnover. The Board Report found that "Community Bank- wide rolling 12-month average turnover reached at least 30% in every period from January 2011 to December 2015, and as high as 41% for the 12-month period ending in October 2012."[1425]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1426]

**Julian** objected to the use of the findings pertaining to turnover between January 2011 and December 2015 on the grounds that the evidence is irrelevant, immaterial, unreliable, or repetitive.[1427] The objection is sustained. Given the passage of time between the turnover data and the filing of the Notice of Charges, given the data's remote and tangential relationship with the material claims presented in the Notice of Charges, given the potential for confusion that admitting the data presents, given the redundant nature of the material facts presented in the data when compared with Exhibits that are more closely related in time, and given the marginal relevance of the data, the data will not be admitted in support of Enforcement Counsel's Motion.

---

[1423] Julian's ECSFM at No.95.

[1424] McLinko's ECSFM at No. 95.

[1425] MSD-280 at 27-28.

[1426] Russ Anderson's ECSFM at No. 114.

[1427] Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

Appellate Case: 25-1079    Page: 270    Date Filed: 05/16/2025 Entry ID: 5517644

Accordingly, the claims presented in (Russ Anderson) No. 114 and (Julian and McLinko) No. 96 will not support Enforcement Counsel's Motion. The exclusion of the data does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[1428]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 115 and (Julian and McLinko) No. 97

**Responses:**

Enforcement Counsel's Statements of Material Fact (Russ Anderson) No. 115 and (Julian and McLinko) No. 97 rely on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[1429] Upon my review of the confidential documents supporting these Statements of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in these Statements of Material Fact.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 116 and (Julian and McLinko) No. 98

Enforcement Counsel's Statements of Material Fact (Russ Anderson) No. 116 and (Julian and McLinko) No. 98 rely on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[1430] Upon my review of the confidential documents supporting these Statements of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant

---

[1428] McLinko's ECSFM at No. 6.

[1429] See 12 C.F.R. § 19.33(b).

[1430] See 12 C.F.R. § 19.33(b).

Appellate Case: 25-1079    Page: 271    Date Filed: 05/16/2025  Entry ID: 5517644

exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in these Statements of Material Fact.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 117 and (Julian and McLinko) No. 100**

Employees remained under significant pressure to meet unreasonable sales goals even in September 2016, a month before the sales goals in the Community Bank were officially eliminated.[1431]

**Responses:**

**Russ Anderson** responded by noting the emails used in support of the claims were sent after she began her leave of absence; and described Ms. Hardison's testimony as "speculative."[1432]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that employees remained under significant pressure to meet unreasonable sales goals even in September 2016, a month before the sales goals in the Community Bank were officially eliminated.

**Julian** offered no evidence that controverted a material claim, but disputed the claim by asserting that "even if employees faced 'significant pressure' that does not mean that sales goals were necessarily unreasonable."[1433]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that employees remained under significant pressure to meet unreasonable sales goals even in September 2016, a month before the sales goals in the Community Bank were officially eliminated.

**McLinko** incorporated Respondent Julian's Response.[1434]

---

[1431] MSD-103; MSD-83 ("For the day, volume was up 177% over YTD daily volume and Sales Practice allegations almost doubled. I just read the 19 sales practice allegations and at least 50% are exactly 'pressure and gaming' related.  It made my hair curl"); MSD-293A (Hardison Tr.) at 148:7-160:18 (testifying that employees were complaining about pressure and gaming for many years and reflected what was actually going on in the Community Bank for many years)); CRA-148; MSD-472 (Mack Tr.) at 179:19-181:9.

[1432] Russ Anderson's ECSFM at No. 117.

[1433] Julian's ECSFM at No. 100.

[1434] McLinko's ECSFM at No. 100.

Appellate Case: 25-1079    Page: 272    Date Filed: 05/16/2025 Entry ID: 5517644

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 118 and (Julian and McLinko) No. 99**

In an email dated October 5, 2016, the former Chief Administrative Officer and Head of Corporate Human Resources wrote the following: "Don't say there was nothing wrong with our culture. At least in the case of parts of the Community Bank, to suggest so just ignores a reality that everyone knows *there was insane pressure on people to produce 'widgets' new account sales.* That is a reality people know, and we will hear more about in the media as former team member exposes' will show."[1435]

**Responses:**

**Russ Anderson** disputed the claim upon the basis that she had left the Bank by the time the statement was made, and on the basis that the statement lacks any date references. [1436]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that in an email dated October 5, 2016, the former Chief Administrative Officer and Head of Corporate Human Resources wrote the following: "Don't say there was nothing wrong with our culture. At least in the case of parts of the Community Bank, to suggest so just ignores a reality that everyone knows there was insane pressure on people to produce 'widgets' new account sales. That is a reality people know, and we will hear more about in the media as former team member exposes' will show."

**Julian** did not dispute the quoted language appears in the cited exhibit.[1437] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that in an email dated October 5, 2016, the former Chief Administrative Officer and Head of Corporate Human Resources wrote the following: "Don't say there was nothing wrong with our culture. At least in the case of parts of the Community Bank, to suggest so just ignores a reality that everyone knows there was insane pressure on people to produce 'widgets' new account sales. That is a reality people know, and we will hear more about in the media as former team member exposes' will show."

**McLinko** incorporated Respondent Julian's Response.[1438]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 119**

---

[1435] MSD-77; MSD-293A (Hardison Tr.) at 134:4- 137:11; McLinko Amended Answer ¶ 134.

[1436] Russ Anderson's ECSFM at No. 118.

[1437] Julian's ECSFM at No. 99.

[1438] McLinko's ECSFM at No. 99.

Add. 271

Appellate Case: 25-1079    Page: 273    Date Filed: 05/16/2025 Entry ID: 5517644

Respondent Russ Anderson knew that employees feared termination for not meeting sales goals and were actually terminated for not meeting sales goals.[1439]

**Responses:**

**Russ Anderson** disputed the factual claim by averring that that the first time she heard rumors about terminations for failure to meet sales goals was sometime around 2013, and that she took steps thereafter to address the issue.[1440]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she knew that employees feared termination for not meeting sales goals and were actually terminated for not meeting sales goals.

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 101

During his May 2018 sworn statement, Respondent Julian testified that, "having seen the information, read the various reports, read the – what's out there in the public, read team members' allegations, read customer complaints, it – it's clear to me that we had a culture within the general bank, within the retail bank at Wells Fargo that was putting goal-oriented, undue -- my words -- undue pressure on team members to reach goals that either were unattainable or were very challenging to be able to reach, and it put pressure on the culture of not only setting goals that appeared to have been in a number of appearances unattainable."[1441]

**Responses:**

**Julian** did not dispute that the Statement accurately quote's Mr. Julian's sworn statement.[1442] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that during his May 2018 sworn statement, Respondent Julian testified that, "having seen the information, read the various reports, read the – what's out there in the public, read team members' allegations, read customer complaints, it – it's clear to me that we had a culture within the general bank, within the retail bank at Wells Fargo that was putting goal-oriented, undue -- my words -- undue pressure on team members to reach goals that either were unattainable or were very challenging to be able to reach, and it put pressure

---

[1439] MSD-94 at 10; MSD-98; MSD-142; MSD-128; MSD-129 (Respondent Russ Anderson being informed in January 2012 that employees were being given performance commitment forms if they do not meet goals); MSD-127; MSD-295 (Bacon Tr.) at 51:9-52:20; MSD-580 (Henderson Tr.) at 133:5-134:16.

[1440] Russ Anderson's ECSFM at No. 119.

[1441] MSD-278 (Julian Tr.) at 25:4-26:11.

[1442] Julian's ECSFM at No. 101.

Add. 272

Appellate Case: 25-1079    Page: 274    Date Filed: 05/16/2025 Entry ID: 5517644

on the culture of not only setting goals that appeared to have been in a number of appearances unattainable."

**McLinko** incorporated Respondent Julian's Response.[1443]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 102

Similarly, during his March 2018 sworn statement, Respondent McLinko testified: "There was certainly the pressure of the goals and that sort of stuff, sales goals."[1444]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[1445]

**McLinko** did not dispute that he gave the testimony shown in this Statement.[1446] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that during his March 2018 sworn statement, Respondent McLinko testified: "There was certainly the pressure of the goals and that sort of stuff, sales goals."

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 120

Respondent Russ Anderson testified that she was never aware of any formal written policy at the Bank that said employees could <u>not</u> be fired for failing to meet sales goals:

> Q: Are you aware of any formal written policy at the bank that said employees could not be fired for failing to meet sales goals?
>
> A: Well, I'm not – I'm not – steeply knowledgeable of the HR policies around that, but I did not have a knowledge of a policy like that. Doesn't mean it didn't exist. I just – I can't say that I had one many my possession.
>
> Q: You've never seen one poli - -- a policy like that; is that fair to say?
>
> A: That would be fair to say,

---

[1443] McLinko's ECSFM at No. 101.

[1444] MSD-276 (McLinko Tr.) at 125:11-13.

[1445] Julian's ECSFM at No. 102.

[1446] McLinko's ECSFM at No. 102.

Appellate Case: 25-1079     Page: 275     Date Filed: 05/16/2025 Entry ID: 5517644

yes.[1447]

**Responses:**

**Russ Anderson** did not dispute that the quoted text was accurate.[1448] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she gave testimony as shown above.


### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 121

In an email dated October 5, 2016, the former Chief Administrative Officer and Head of Corporate Human Resources wrote the following: "Don't say there was nothing wrong with our culture. At least in the case of parts of the Community Bank, to suggest so just ignores a reality that everyone knows . . . there was insane pressure on people to produce 'widgets'/ new account sales. That is a reality people know, and we will hear more about in the media as former team member exposes' [*sic*] will show."[1449]

**Responses:**

**Russ Anderson** disputed the claim on the ground that the statement quoted was made after she left the company.[1450]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that in an email dated October 5, 2016, the former Chief Administrative Officer and Head of Corporate Human Resources wrote the following: "Don't say there was nothing wrong with our culture. At least in the case of parts of the Community Bank, to suggest so just ignores a reality that everyone knows . . . there was insane pressure on people to produce 'widgets'/ new account sales. That is a reality people know, and we will hear more about in the media as former team member exposes' [*sic*] will show."


### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 122

Only after sales goals in the Community Bank were eliminated in October 2016 did the Bank issue internal guidance stating that terminations for failure to meet sales goals would not be

---

[1447] MSD-266 (Russ Anderson Dep. Tr.) at 53:14-24.

[1448] Russ Anderson's ECSFM at No. 120.

[1449] MSD-77; MSD-293A (Hardison Tr.) at 134:4- 137:11, McLinko Amended Answer ¶ 134.

[1450] Russ Anderson's ECSFM at No. 121.

permitted.[1451]

**Responses:**

**Russ Anderson** disputed the claim, averring that she believed throughout her entire tenure that an employee could not be fired for failure to meet sales goal.[1452]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that only after sales goals in the Community Bank were eliminated in October 2016 did the Bank issue internal guidance stating that terminations for failure to meet sales goals would not be permitted.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 123**

Employees remained under significant pressure to meet unreasonable sales goals even in September 2016, a month before the sales goals in the Community Bank were officially eliminated.[1453]

**Responses:**

**Russ Anderson** responded by averring that the cited documentation does not establish that the Community Bank imposed significant pressure on its employees to meet its unreasonable sales goals throughout Ms. Russ Anderson's tenure as Group Risk Officer; and incorporated Respondent Julian's response to (Julian and McLinko) No. 100.[1454]

**Julian** disputed claims in (Julian and McLinko) No. 100 – which averred that employees remained under significant pressure to meet unreasonable sales goals even in September 2016, a month before the Bank eliminated sales goals in the Community Bank. He asserted that "even if

---

[1451] MSD-80.

[1452] Russ Anderson's ECSFM at No. 122.

[1453] MSD-103 ("During one interview a team member was warned that if he did not achieve his sales goals that he would be transferred to a store where someone had been shot and killed. If team members did not hit their sales goal, they would acquire an additional call night on top of the already scheduled call night in the store. Lastly, separate team member indicated that if they did not make enough appointments they will be forced to walk out in the hot sun around the block." MSD-83 ("For the day, volume was up 177% over YTD daily volume and Sales Practice allegations almost doubled. I just read the 19 sales practice allegations and at least 50% are exactly 'pressure and gaming' related. It made my hair curl . . ."); MSD-293A (Hardison Tr.) at 148:7-160:18 (testifying that employees were complaining about pressure and gaming for many years and reflected what was actually going on in the Community Bank for many years)); MSD-148.

[1454] Russ Anderson's ECSFM at No. 114.

employees faced 'significant pressure,' that does not mean that sales goals were necessarily unreasonable.[1455]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that employees remained under significant pressure to meet unreasonable sales goals even in September 2016, a month before the sales goals in the Community Bank were officially eliminated.

**The significant pressure to meet unreasonable sales goals led Bank employees to engage in sales practices misconduct**

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 124 and (Julian and McLinko) No. 103**

By no later than 2002, pressure to meet the Community Bank's unreasonable sales goals led employees to engage in sales practices misconduct.[1456]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1457]

**Julian** objected to the use of evidence supporting this Statement on the grounds that the evidence is irrelevant, immaterial, unreliable, or repetitive.[1458] The objection is sustained. Given the passage of time between the creation of the relied-upon documents and the filing of the Notice of Charges, given the documents' remote and tangential relationship with the material claims presented in the Notice of Charges, given the potential for confusion that admitting the documents presents, and given the redundant nature of the material facts presented in the documents when compared with Exhibits that are more closely related in time, the relied-upon contents of the documents will not be admitted in support of Enforcement Counsel's Motion. Accordingly, the claims presented in (Russ Anderson) No. 124 and (Julian and McLinko) No. 103 will not support Enforcement Counsel's Motion. The exclusion of the relied-upon contents of the documents does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

---

[1455] Julian's ECSFM at No. 100.

[1456] MSD-2; MSD-81; MSD- 236; MSD-556; MSD-559; MSD-613.

[1457] Russ Anderson's ECSFM at No. 124.

[1458] Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

Appellate Case: 25-1079     Page: 278     Date Filed: 05/16/2025 Entry ID: 5517644

**McLinko** incorporated Respondent Julian's Response.[1459]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 125 and (Julian and McLinko) No. 104

In 2002, nearly an entire branch of Bank employees in Fort Collins, Colorado had been involved in gaming, including submitting improper teller referrals and ordering debit cards for customers without consent. (MSD-559). During the investigation of the misconduct, the "consistent response form many of the tellers and the Teller Manager was that they did not do this for the sake of the bonuses but because the Branch Manager was putting the staff under severe pressure to increase sales and it was a way to get her off of their backs."[1460]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1461]

**Julian** objected to the use of evidence supporting this Statement on the grounds that the evidence is irrelevant, immaterial, unreliable, or repetitive.[1462] The objection is sustained. Given the passage of time between the creation of the relied-upon documents and the filing of the Notice of Charges, given the documents' remote and tangential relationship with the material claims presented in the Notice of Charges, given the potential for confusion that admitting the documents presents, and given the redundant nature of the material facts presented in the documents when compared with Exhibits that are more closely related in time, the relied-upon contents of the documents will not be admitted in support of Enforcement Counsel's Motion. Accordingly, the claims presented in (Russ Anderson) No. 125 and (Julian and McLinko) No. 104 will not support Enforcement Counsel's Motion. The exclusion of the relied-upon contents of the documents does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[1463]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 126 and

---

[1459] McLinko's ECSFM at No. 103.

[1460] MSD-613.

[1461] Russ Anderson's ECSFM at No. 125.

[1462] Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[1463] McLinko's ECSFM at No. 104.

Add. 277

**(Julian and McLinko) No. 105**

In 2003, on a Community Bank leadership call, the Community Bank's former Group Finance Officer observed during a sales integrity update: "We have a lot of markets and regions that are significantly below minimum standards, and you have to believe there is unbearable pressure. In light of that, you have to predict there will be more gaming."[1464]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1465]

**Julian** objected to the use of evidence supporting this Statement on the grounds that the evidence is irrelevant, immaterial, unreliable, or repetitive.[1466] The objection is sustained. Given the passage of time between the creation of the relied-upon documents and the filing of the Notice of Charges, given the documents' remote and tangential relationship with the material claims presented in the Notice of Charges, given the potential for confusion that admitting the documents presents, and given the redundant nature of the material facts presented in the documents when compared with Exhibits that are more closely related in time, the relied-upon contents of the documents will not be admitted in support of Enforcement Counsel's Motion. Accordingly, the claims presented in (Russ Anderson) No. 126 and (Julian and McLinko) No. 105 will not support Enforcement Counsel's Motion. The exclusion of the relied-upon contents of the documents does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[1467]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 127 and (Julian and McLinko) No. 106**

Corporate Investigations was a department within the Bank responsible for investigating employee misconduct.[1468]

**Responses:**

---

[1464] MSD-81.

[1465] Russ Anderson's ECSFM at No. 126.

[1466] Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[1467] McLinko's ECSFM at No. 105.

[1468] Russ Anderson Amended Answer, ¶ 50; Julian Amended Answer ¶ 50; McLinko Amended Answer ¶ 50.

Appellate Case: 25-1079    Page: 280    Date Filed: 05/16/2025 Entry ID: 5517644

**Russ Anderson** did not dispute this claim.[1469] **Julian** did not dispute this claim.[1470] **McLinko** did not dispute this claim.[1471] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that Corporate Investigations was a department within the Bank responsible for investigating employee misconduct.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 128 and (Julian and McLinko) No. 107

In 2004, Corporate Investigations (over the years, this department also had other names, including "Corporate Security," "Special Investigations," and "Internal Investigations") disseminated to senior Bank executives a report prepared by Marty Weber, Special Investigations Manager ("2004 Investigation Report"). The 2004 Investigation Report concluded, regarding the root cause of employee sales gaming, that "whether real or perceived, team members on the current Corporate Sales Incentive Plan feel they cannot make sales goals without gaming the system. The incentive to cheat is based on the fear of losing their jobs for not meeting performance expectations."[1472] The report continued: "in approximately 90% of the cases where confessions are obtained, the confessed team member related they did not cheat the system for the purpose of monetary gain. In almost every case they related they 'gamed' the system in order to preserve their employment based on the fact that they are expected to meet certain goals or lose their job."[1473]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1474]

**Julian** objected to the use of evidence supporting this Statement on the grounds that the evidence is irrelevant, immaterial, unreliable, or repetitive.[1475] The objection is sustained. Given the passage of time between the creation of the relied-upon documents and the filing of the Notice of Charges, given the documents' remote and tangential relationship with the material claims presented in the Notice of Charges, given the potential for confusion that admitting the documents presents, and given the redundant nature of the material facts presented in the

---

[1469] Russ Anderson's ECSFM at No. 127.

[1470] Julian's ECSFM at No. 106.

[1471] McLinko's ECSFM at No. 106.

[1472] MSD-2 at 3.

[1473] MSD-2 at 5.

[1474] Russ Anderson's ECSFM at No. 128.

[1475] Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

documents when compared with Exhibits that are more closely related in time, the relied-upon contents of the documents will not be admitted in support of Enforcement Counsel's Motion. Accordingly, the claims presented in (Russ Anderson) No. 126 and (Julian and McLinko) No. 107 will not support Enforcement Counsel's Motion. The exclusion of the relied-upon contents of the documents does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[1476]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 129 and (Julian and McLinko) No. 108**

The 2004 Investigation Report warned about reputational risks to the Bank and noted that judges had "almost exclusively rule[d] in favor of the former team member" in unemployment insurance cases involving Bank employees terminated for sales integrity violations. The judges made "made disparaging comments" about the sales incentive plan.[1477]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1478]

**Julian** objected to the use of evidence supporting this Statement on the grounds that the evidence is irrelevant, immaterial, unreliable, or repetitive.[1479] The objection is sustained. Given the passage of time between the creation of the relied-upon documents and the filing of the Notice of Charges, given the documents' remote and tangential relationship with the material claims presented in the Notice of Charges, given the potential for confusion that admitting the documents presents, and given the redundant nature of the material facts presented in the documents when compared with Exhibits that are more closely related in time, the relied-upon contents of the documents will not be admitted in support of Enforcement Counsel's Motion. Accordingly, the claims presented in (Russ Anderson) No. 126 and (Julian and McLinko) No. 108 will not support Enforcement Counsel's Motion. The exclusion of the relied-upon contents of the documents does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

---

[1476] McLinko's ECSFM at No. 107.

[1477] MSD-2 at 5; MSD-544 (Weber Tr.) at 27:20-32:8.

[1478] Russ Anderson's ECSFM at No. 129.

[1479] Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

**McLinko** incorporated Respondent Julian's Response.[1480]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 130 and (Julian and McLinko) No. 109**

Special Investigations Manager Weber conveyed a similar message in other contemporaneous emails about gaming, explaining in one email that "we are hearing from almost all gaming suspects that they do so in order to preserve their jobs."[1481]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1482]

**Julian** objected to the use of evidence supporting this Statement on the grounds that the evidence is irrelevant, immaterial, unreliable, or repetitive.[1483] The objection is sustained. Given the passage of time between the creation of the relied-upon documents and the filing of the Notice of Charges, given the documents' remote and tangential relationship with the material claims presented in the Notice of Charges, given the potential for confusion that admitting the documents presents, and given the redundant nature of the material facts presented in the documents when compared with Exhibits that are more closely related in time, the relied-upon contents of the documents will not be admitted in support of Enforcement Counsel's Motion. Accordingly, the claims presented in (Russ Anderson) No. 126 and (Julian and McLinko) No. 109 will not support Enforcement Counsel's Motion. The exclusion of the relied-upon contents of the documents does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[1484]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 110**

---

[1480] McLinko's ECSFM at No. 108.

[1481] MSD-556 (in 2004). In another 2004 email about gaming, Mr. Weber explained: "The majority of terminated employees received no financial benefit but stated they 'knew it was wrong but could either follow the Code of Ethics and get fired for poor performance or cheat and hope not to get caught, thereby maintaining their jobs'. Each and everyone stated they were in a 'no win situation'." (MSD-236 (adding that the case and termination numbers "of course, are only the situations we know of. There is undoubtedly more occurring."")).

[1482] Russ Anderson's ECSFM at No. 130.

[1483] Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[1484] McLinko's ECSFM at No. 110.

Add. 281

Appellate Case: 25-1079    Page: 283    Date Filed: 05/16/2025 Entry ID: 5517644

Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 110 relies on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[1485] Upon my review of the confidential documents supporting this Statement of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in this Statement of Material Fact.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 131

Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 131 relies on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[1486] Upon my review of the confidential documents supporting this Statement of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in this Statement of Material Fact.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 132 and (Julian and McLinko) No. 111

In 2009, the Head of Corporate Investigations wrote: "[W]e have heard for years that the sales pressure is the cause [of sales practices misconduct], and I for one do not doubt it for a minute. A standard line we hear is 'I can play by the rules and get fired for not making unrealistic goals or I can cheat and hope I don't get caught'."[1487]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1488]

**Julian** disputed the claim, stating "Mr. Weber did not use the term "sales practices

---

[1485] See 12 C.F.R. § 19.33(b).

[1486] See 12 C.F.R. § 19.33(b).

[1487] MSD-555.

[1488] Russ Anderson's ECSFM at No. 131.

Appellate Case: 25-1079     Page: 284     Date Filed: 05/16/2025 Entry ID: 5517644

misconduct" nor, even if he had, would it possess the same definition that is currently used by Enforcement Counsel in this litigation."

Enforcement Counsel cited MSD-555 in support of their Statement. That exhibit consists of an email dated April 14, 2009 from Michael Bacon to Marty Weber, an email dated April 14, 2009 from Marty Weber to Karen Emanuelson, an email dated April 14, 2009 from Karen Emanuelson to Marty Weber, and an email dated April 8, 2009 from Jonathan Evans to Marty Weber.[1489] Julian objected to the Statement on the ground that the supporting exhibit was irrelevant.[1490] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Russ Anderson) No. 132 and (Julian and McLinko) No. 111 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[1491]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 133 and (Julian and McLinko) No. 112

Employees investigated for engaging in sales practices misconduct expressed to investigators in Corporate Investigations that they committed the misconduct because of sales pressure and fear that they could and would be fired for failing to meet sales goals. Multiple senior leaders in Corporate Investigations testified before the OCC that employees who engaged in sales practices misconduct did so because of significant pressure to meet unreasonable sales goals.[1492]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1493]

**Julian** did not offer evidence that contradicted the Statement's claim, but he disputed the claim, averring that "from 2011 through 2015, only 2,112 employees engaged in likely simulated funding for purposes of "influenc[ing] compensation or career"—i.e., they

---

[1489] Julian's ECSFM at No. 111, citing MSD-555.

[1490] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[1491] McLinko's ECSFM at No. 111.

[1492] MSD-544 (Weber Tr.) 21:24-23:20; MSD-299 (Sperle Tr.) at 67:4-25, 139:10-140:1, 146:1-13, 162:8-25; MSD-294 (Wipprecht Tr.) 38:23-39:25; MSD-297 (Richards Tr.) at 79:11-80:22; MSD-581 (Clegg Tr.) at 44:1-46:6.

[1493] Russ Anderson's ECSFM at No. 133.

committed simulated funding out of fear of adverse consequences for missing sales goals."[1494]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian and McLinko that Employees investigated for engaging in sales practices misconduct expressed to investigators in Corporate Investigations that they committed the misconduct because of sales pressure and fear that they could and would be fired for failing to meet sales goals. Multiple senior leaders in Corporate Investigations testified before the OCC that employees who engaged in sales practices misconduct did so because of significant pressure to meet unreasonable sales goals.

**McLinko** incorporated Respondent Julian's Response.[1495]


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 134**

Respondent Russ Anderson was the Chair of the Community Banking Risk Management Committee.[1496]

**Responses:**

Russ Anderson did not dispute this claim. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she was the Chair of the Community Banking Risk Management Committee.


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 135 and (Julian and McLinko) No. 113**

In 2011, Respondent Russ Anderson identified sales practices misconduct as a "key scenario" for risk in two separate meeting packages for the Community Banking Risk Management Committee.[1497]

**Responses:**

---

[1494] Julian's ECSFM at No. 111, quoting MSD-226 at 7.

[1495] McLinko's ECSFM at No. 112.

[1496] Russ Anderson Amended Answer ¶ 161; MSD-266 (Russ Anderson Dep. Tr.) at 172:6-8; MSD-208 (CBRMC 2013 charter).

[1497] Russ Anderson Amended Answer ¶ 164; MSD-94; MSD-255; MSD- 266 (Russ Anderson Dep. Tr.) at 149:9-23, 174:4-8. The presentation stated that "Team members manipulate or game product sales to increase compensation or sustain employment." MSD-94 at 10 (emphasis added).

**Russ Anderson** incorporated Respondent Julian's response.[1498]

**Julian** objected to the use of the 2011 data on the grounds that the evidence is irrelevant, immaterial, unreliable, or repetitive.[1499] The objection is sustained. Given the passage of time between the events the data refers to and the filing of the Notice of Charges, given the data's remote and tangential relationship with the material claims presented in the Notice of Charges, given the potential for confusion that admitting the data presents, and given the redundant nature of the material facts presented in the data when compared with Exhibits that are more closely related in time, the data will not be admitted in support of Enforcement Counsel's Motion. Accordingly, the claims presented in (Russ Anderson) No. 135 and (Julian and McLinko) No. 113 will not support Enforcement Counsel's Motion. The exclusion of the data used in this Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[1500]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 136

Respondent Russ Anderson prepared the December 2011 presentation to the Community Banking Risk Management Committee.[1501] The presentation indicated that "[k]ey scenarios were identified based on estimated exposures and the ease of identifying and taking action to better mitigate the risk."[1502]

**Responses:**

Russ Anderson did not dispute that she prepared the December 2011 presentation to the Community Banking Risk Management Committee, nor did she dispute the presentation included what is shown above.[1503]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she prepared the December 2011 presentation to the Community Banking Risk Management Committee, and that the presentation

---

[1498] Russ Anderson's ECSFM at No. 135.

[1499] Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[1500] McLinko's ECSFM at No. 113.

[1501] MSD-266 (Russ Anderson Dep. Tr.) at 173:14-19.

[1502] MSD-94 at 5.

[1503] Russ Anderson's ECSFM at No. 136.

indicated that "[k]ey scenarios were identified based on estimated exposures and the ease of identifying and taking action to better mitigate the risk."

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 137**

By 2011 at the latest, Respondent Russ Anderson understood that team members engaged in sales practices misconduct to increase compensation or to keep their jobs.[1504]

**Responses:**

**Russ Anderson** disputed that she knew by 2011 that sales pressure caused sales practices misconduct.[1505] She objected to the use of MSD-94 on the grounds of relevance, which exhibit includes an email from Ms. Russ Anderson and an attached Scenario Analysis regarding "risk drivers" presented in a 2011 Community Banking Executive Summary.[1506]

Enforcement Counsel supported this Statement by referring to MSD-94, which has been attributed to Respondent Russ Anderson and which appears to have been created in 2011. Given the passage of time between the creation of this Exhibit and the filing of the Notice of Charges, given the Exhibit's remote and tangential relationship with the material claims presented in the Notice of Charges, given the potential for confusion that admitting the Exhibit presents, given the redundant nature of the material facts presented in the Exhibit when compared with Exhibits that are more closely related in time, and given the marginal relevance of the claim regarding what Respondent Russ Anderson did or did not know in 2011, the Exhibit will not be admitted in support of Enforcement Counsel's Motion. Accordingly, the claims presented in (Russ Anderson) No. 137 will not support Enforcement Counsel's Motion as to Respondent Russ Anderson. The exclusion of the Exhibit does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 138**

By 2011 at the latest, Respondent Russ Anderson understood that the loss estimate for the bank associated with sales practices misconduct was $187 million.[1507]

---

[1504] MSD-266 (Russ Anderson Dep. Tr.) at 176:8-12; MSD-94 at 10 ("Team members manipulate or game product sales to increase compensation or sustain employment. This misconduct could also lead to allegations of abusive practices or disparate impact."); MSD-142.

[1505] Russ Anderson's ECSFM at No. 137

[1506] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 35.

[1507] MSD-266 (Russ Anderson Dep. Tr.) at 177:7-18; MSD-94 at 10.

Add. 286

Appellate Case: 25-1079   Page: 288   Date Filed: 05/16/2025 Entry ID: 5517644

**Responses:**

**Russ Anderson** averred that the purported $187 million loss estimate for the Bank associated with sales practices misconduct is misleading because it lacks the context in which the estimate was generated. She averred that the sales practices misconduct analysis in MSD-94 was a "black swan" hypothetical and the $187 million loss estimate was generated by Mr. Raphaelson for inclusion in the hypothetical exercise. (MSD-266 (Russ Anderson Dep. Tr.) at 178:3-5).[1508] She objected to the use of MSD-94 on the grounds of relevance, which exhibit includes an email from Ms. Russ Anderson and an attached Scenario Analysis regarding "risk drivers" presented in a 2011 Community Banking Executive Summary.[1509]

Enforcement Counsel supported this Statement by referring to MSD-94, which has been attributed to Respondent Russ Anderson and which appears to have been created in 2011. Given the passage of time between the creation of this Exhibit and the filing of the Notice of Charges, given the Exhibit's remote and tangential relationship with the material claims presented in the Notice of Charges, given the potential for confusion that admitting the Exhibit presents, given the redundant nature of the material facts presented in the Exhibit when compared with Exhibits that are more closely related in time, and given the marginal relevance of the claim regarding what Respondent Russ Anderson did or did not know in 2011, the Exhibit will not be admitted in support of Enforcement Counsel's Motion as to Respondent Russ Anderson. Accordingly, the claims presented in (Russ Anderson) No. 138 will not support Enforcement Counsel's Motion. The exclusion of the Exhibit does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 139

By 2011 at the latest, Respondent Russ Anderson understood that employees engaging in sales practices misconduct could cause customer harm.[1510]

**Responses:**

**Russ Anderson** did not dispute that she understood throughout the entirety of her career that employees who engage in sales practices misconduct create the potential for customer harm. She disputed that she had any knowledge in 2011 or prior thereto ofactual, ongoing sales

---

[1508] Russ Anderson's ECSFM at No. 138.

[1509] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 35.

[1510] MSD-266 (Russ Anderson Dep. Tr.) at 177:20-178:16; MSD-94 at 10.

Appellate Case: 25-1079     Page: 289     Date Filed: 05/16/2025 Entry ID: 5517644

practices misconduct within Community Bank.[1511]

Enforcement Counsel supported this Statement by referring to MSD-94, which has been attributed to Respondent Russ Anderson and which appears to have been created in 2011. Given the passage of time between the creation of this Exhibit and the filing of the Notice of Charges, given the Exhibit's remote and tangential relationship with the material claims presented in the Notice of Charges, given the potential for confusion that admitting the Exhibit presents, given the redundant nature of the material facts presented in the Exhibit when compared with Exhibits that are more closely related in time, and given the marginal relevance of the claim regarding what Respondent Russ Anderson did or did not know in 2011, the Exhibit will not be admitted in support of Enforcement Counsel's Motion as to Respondent Russ Anderson. Accordingly, the claims presented in (Russ Anderson) No. 139 will not support Enforcement Counsel's Motion. The exclusion of the Exhibit does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 140**

By 2011 at the latest, Respondent Russ Anderson anticipated litigation arising from employees engaging in sales practices misconduct.[1512]

**Responses:**

**Russ Anderson** did not dispute that that as early as 2011 she recognized that a "black swan" sales practices misconduct event could trigger litigation.[1513] She objected, however, to the use of MSD-94 on the grounds of relevance, which exhibit includes an email from Ms. Russ Anderson and an attached Scenario Analysis regarding "risk drivers" presented in a 2011 Community Banking Executive Summary.[1514]


Enforcement Counsel supported this Statement by referring to MSD-94, which has been attributed to Respondent Russ Anderson and which appears to have been created in 2011. Given the passage of time between the creation of this Exhibit and the filing of the Notice of Charges, given the Exhibit's remote and tangential relationship with the material claims presented in the Notice of Charges, given the potential for confusion that admitting the Exhibit presents, given the redundant nature of the material facts presented in the Exhibit when compared with Exhibits that are more closely related in time, and given the marginal relevance of the claim regarding

---

[1511] Russ Anderson's ECSFM at No. 139.

[1512] MSD-266 (Russ Anderson Dep. Tr.) at 178:18-25; MSD-94 at 10.

[1513] Russ Anderson's ECSFM at No. 140.

[1514] Russ Anderson's ECSFM at No. 140.

Appellate Case: 25-1079    Page: 290    Date Filed: 05/16/2025 Entry ID: 5517644

what Respondent Russ Anderson did or did not know in 2011, the Exhibit will not be admitted in support of Enforcement Counsel's Motion as to Respondent Russ Anderson. Accordingly, the claims presented in (Russ Anderson) No. 140 will not support Enforcement Counsel's Motion. The exclusion of the Exhibit does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 141**

In 2011, the Community Bank formed a "Sales Integrity Project Team" "to study and offer recommendations around the sales and sales integrity programs of the Community Bank."[1515] Respondent Russ Anderson became the executive sponsor for the Sales Integrity Project Team.[1516] "Majority of the working team believe[d] that the sales culture, sales plan pressure, local performance expectations and messaging create fear among team member populations."[1517]

**Responses:**

**Russ Anderson** disputed that the Exhibits cited in this Statement establish any knowledge on her part of the facts contained in the relied-upon Exhibits.[1518] Referring to MSD-95, she avers the exhibit is a copy of an email message from David Otsuka where he states that "Glen [] said that this project has been moved to Claudia Russ Anderson (presumably as Executive Sponsor) He said he'd connect back with me after his meeting with Claudia." (MSD-95 at 1).[1519] She avers that she is not included in MSD-95 and there is no evidence that she took over this project.[1520]

Enforcement Counsel supported this Statement by referring to MSD-95, consisting of documents that have been attributed to an employee other than Respondent Russ Anderson and which appear to have been created in 2011 and 2012. Given the passage of time between the creation of the documents in this Exhibit and the filing of the Notice of Charges, given the Exhibit's remote and tangential relationship with the material claims presented in the Notice of Charges, given the potential for confusion that admitting the Exhibit presents, given the redundant nature of the material facts presented in the Exhibit when compared with Exhibits that are more closely related

---

[1515] MSD-95.

[1516] MSD-95.

[1517] MSD-96 at 11; *see also* MSD-232 (noting that "sales plan pressure and keeping your seat" and "managers telling [employees] they'll be fired if they don't hit the minimums causes sales integrity issues.

[1518] Russ Anderson's ECSFM at No. 141.

[1519] Russ Anderson's ECSFM at No. 141.

[1520] Russ Anderson's ECSFM at No. 141.

Add. 289

Appellate Case: 25-1079    Page: 291    Date Filed: 05/16/2025 Entry ID: 5517644

in time, and given the marginal relevance of the claim regarding whether Respondent Russ Anderson was or was not the corporate sponsor for the Sales Integrity Project Team, the Exhibit will not be admitted in support of Enforcement Counsel's Motion as to Respondent Russ Anderson. Accordingly, the claims presented in (Russ Anderson) No. 140 will not support Enforcement Counsel's Motion. The exclusion of the Exhibit does not, however, create a controversy or factual basis that would prevent granting Enforcement Counsel's Motion for Summary Disposition.

## Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 114

In January 2013, Bart Deese, Respondent McLinko's direct report, informed himabout a meeting with the Head of Corporate Investigations and stated, "Sales Integrity is still his#1 concern." Mr. Deese indicated he had "questioned [the Head of Corporate Investigations] as to whether they had discussed root cause for some of the items listed above and was it related to sales pressure. [The Head of Corporate Investigations] said he felt a lot of it was related to the sales goals and pressure..."[1521]

**Responses:**

Julian objected to the use of the 2013 data on the grounds that the evidence is irrelevant, immaterial, unreliable, or repetitive.[1522] The objection is sustained. Given the passage of time between the events the data refers to and the filing of the Notice of Charges, given the data's remote and tangential relationship with the material claims presented in the Notice of Charges, given the potential for confusion that admitting the data presents, and given the redundant nature of the material facts presented in the data when compared with Exhibits that are more closely related in time, the data will not be admitted in support of Enforcement Counsel's Motion. Accordingly, the claims presented in (Julian and McLinko) No. 114 will not support Enforcement Counsel's Motion. The exclusion of the data used in this Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[1523]

## Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 142

On or around November 18, 2013, three senior leaders in the human resources function informed Respondent Russ Anderson about pressure placed on team members, including "aggressive performance coaching/disciplinary action," that "we see this more often than

---

[1521] McLinko Amended Answer ¶ 456; MSD-323.

[1522] Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[1523] McLinko's ECSFM at No. 114.

not; TM [team member] perceived threats/pressure behind the motive which might come from the TM's fear of termination, TM store peer pressure or by something the manager said."[1524] The Head of Community Bank Human Resources Debra Paterson informed Respondent Russ Anderson about the continual feedback received from employees: "Also, just an FYI, the continual feedback we get is that ICP [incentive compensation plan] is not driving this behavior. It's sales and service goals and performance – fear of losing the job or being perceived as not 'cutting it.'"[1525]

**Responses:**

**Russ Anderson** did not dispute the contents of the email messages, but asserted that the discussion "is not about unreasonable sales goals" – that the discussion was instead about both sales and service goals.[1526] She also asserted that the selected quote was the "opinion of one person, Ms. Henderson, and the underlying basis for her opinion is unknown.[1527]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that on November 18, 2013, three senior leaders in the human resources function informed Respondent Russ Anderson about pressure placed on team members, including "aggressive performance coaching/disciplinary action," that "we see this more often than not; TM [team member] perceived threats/pressure behind the motive which might come from the TM's fear of termination, TM store peer pressure or by something the manager said." The Head of Community Bank Human Resources Debra Paterson informed Respondent Russ Anderson about the continual feedback received from employees: "Also, just an FYI, the continual feedback we get is that ICP [incentive compensation plan] is not driving this behavior. It's sales and service goals and performance – fear of losing the job or being perceived as not 'cutting it.'"

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 143**

In December 2013, Respondent Russ Anderson discussed the creation of a "Sales Pressure Hotline" with Community Bank leaders.[1528]

---

[1524] MSD-127 at 1-2; MSD-266 (Russ Anderson Dep. Tr.) at 184:15-185:6.

[1525] MSD-127 at 1); MSD-266 (Russ Anderson Dep. Tr.) at 188:18-192:6); MSD-149 ("the activity appears to serve no other purpose but to help them meet sales goals.")

[1526] Russ Anderson's ECSFM at No. 142.

[1527] Russ Anderson's ECSFM at No. 142.

[1528] MSD-88.

Appellate Case: 25-1079     Page: 293     Date Filed: 05/16/2025 Entry ID: 5517644

**Responses:**

**Russ Anderson** did not dispute that the discussion that occurred on December 21, 2013 concerned "an idea about giving team members a dedicated phone number to call 'if they felt pressure to make sales for the wrong reasons.'"[1529] She disputed that all of the individuals on the email thread were Community Bank Leaders, disputed that the evidence establishes the alleged fact that pressure led to misconduct, and averred the evidence establishes that in December 2013 Community Bank was attempting to determine whether sales goals were causing misconduct.[1530]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that in December 2013, she discussed the creation of a "Sales Pressure Hotline" with Community Bank leaders.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 144

In an email from September 2016, the Head of Conduct Risk Review in the Community Bank reported that his team became aware of the following activities occurring in the retail branch network:

    a.    "The District Manager (DM) has been supervising the store and overseeing sales activities since December 2015 . . . . Additionally, it was shared that there has been a great focus on sales and team members are pressured to perform with little coaching."[1531]

    b.    "During interviews, team members expressed concern over the tactics used by management related to sales. During one interview a team member was warned that if he did not achieve his sales goals that he would be transferred to a store where someone had been shot and killed. If team members did not hit their sales goal, they would acquire an additional call night on top of the already scheduled call night in the store. Lastly, separate team member indicated that if they did not make enough appointments they will be forced to walk out in the hot sun around the block."[1532]

**Responses:**

**Russ Anderson** disputed the claim because "MSD-103 is an email dated September 23, 2016, after Ms. Russ Anderson took personal leave to take care of her ailing parents" and because it is "inaccurate" because it included references to testimony by Ms. Rawson, who was mistaken

---

[1529] Russ Anderson's ECSFM at No. 143.

[1530] Russ Anderson's ECSFM at No. 143.

[1531] MSD-103 at 3.

[1532] MSD-103 at 3 (emphasis in original); MSD-300 (Rawson Tr.) at 61:18-66:8; MSD-104.

when she testified that Respondent Russ Anderson was still employed at the Bank at the time the email was issued.[1533]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that in an email from September 2016, the Head of Conduct Risk Review in the Community Bank reported that his team became aware of the following activities occurring in the retail branch network: (a) The District Manager has been supervising the store and overseeing sales activities since December 2015 . . . . Additionally, it was shared that there has been a great focus on sales and team members are pressured to perform with little coaching. (b) During interviews, team members expressed concern over the tactics used by management related to sales. During one interview a team member was warned that if he did not achieve his sales goals that he would be transferred to a store where someone had been shot and killed. If team members did not hit their sales goal, they would acquire an additional call night on top of the already scheduled call night in the store. Lastly, separate team member indicated that if they did not make enough appointments they will be forced to walk out in the hot sun around the block.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 145 and (Julian and McLinko) No. 115

Enforcement Counsel's Statements of Material Fact (Russ Anderson) No. 145 and (Julian and McLinko) No. 115 rely on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[1534] Upon my review of the confidential documents supporting these Statements of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in these Statements of Material Fact.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 146

The head of SSCOT testified that the Bank's "elimination of sales goals [in early October 2016] help[ed] dramatically reduce the sales practices problem," a conclusion she testified

---

[1533] Russ Anderson's ECSFM at No. 144.

[1534] See 12 C.F.R. § 19.33(b).

was supported by SSCOT's own data.[1535]

**Responses:**

**Russ Anderson** disputed that the establishes the alleged fact that Community Bank had a systemic sales practices misconduct problem from at least 2002 until at least 2016, but did not dispute the text of the quoted statement was accurately attributed to Ms. Rawson.[1536] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the head of SSCOT testified that the Bank's "elimination of sales goals [in early October 2016] help[ed] dramatically reduce the sales practices problem," a conclusion she testified was supported by SSCOT's own data.

**Respondent Russ Anderson was responsible for ensuring controls to prevent and detect sales practices misconduct were effective**

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 147

Respondent Russ Anderson's position as Group Risk Officer of the Community Bank required her to understand and report on systemic risks in the Community Bank.[1537]

**Responses:**

**Russ Anderson** did not dispute that she was "required to understand and report on risks in the Community Bank, but disputed that the word "systemic" appears in the cited references, and averred that the Group Risk Officer is only "one of several individuals who would be responsible for identifying risk in the Community Bank, including executive management and the board of directors."[1538]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that her position as Group Risk Officer of the

---

[1535] MSD-300 (Rawson Tr.) at 66:3-66:8.

[1536] Russ Anderson's ECSFM at No. 146.

[1537] MSD- 203; MSD-204; MSD-206; MSD-207; MSD-210; MSD-267 (NBE Smith Expert Report) at ¶¶ 23, 105-106, 117; MSD-269 (NBE Candy Expert Report) at ¶¶ 23, 64, 98, 116-124, 126; Abshier Dep. Tr. 60:19-61:8, 102:22-103:13.

[1538] Russ Anderson's ECSFM at No. 147.

Appellate Case: 25-1079     Page: 296     Date Filed: 05/16/2025 Entry ID: 5517644

Community Bank required her to understand and report on systemic risks in the Community Bank.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 148**

The Bank's former Chief Risk Officer Michael Loughlin, to whom Respondent Russ Anderson had dotted-line reporting, testified about her responsibility to understand the systemic nature of the sales practices misconduct problem:

> Q: How about Ms. Russ Anderson, given her role within community bank, was she in a position to understand the systemic nature of sales practice misconduct problem?
>
> A: Yes.
>
> Q: Why do you say that?
>
> A: She was the group risk officer for the community and had worked in the community bank for many years and could and should have known the nature of the problem.[1539]

**Responses:**

**Russ Anderson** did not dispute the accuracy of the testimonial transcription, but averred the testimony does not refer to the time period being described and the Statement fails to reference any contemporaneous records indicating that Mr. Loughlin had determined that there was a systemic problem with sales practices misconduct.[1540]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the Bank's former Chief Risk Officer Michael Loughlin, to whom Respondent Russ Anderson had dotted-line reporting, testified as shown above regarding Respondent Russ Anderson's responsibility to understand the systemic nature of the sales practices misconduct problem.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 149 and (Julian and McLinko) No. 117**

From no later than 2004 until 2016, the controls to prevent and detect sales practices

---

[1539] MSD-290A (Loughlin Tr.) at 57:14-23; see also MSD-297 (Richards Tr.) at 209:16-210:3; MSD-545 (Coyne Tr.) at 84:8-85:1; MSD-382 (Byers Tr.) at 23:23-24:22.

[1540] Russ Anderson's ECSFM at No. 148.

misconduct were inadequate.[1541]

**Russ Anderson** incorporated Respondent Julian's response.[1542]

**Julian** disputed the claim, offering as evidence that "WFAS noted that '"[f]ormal controls and oversight need to be enhanced in Community Banking and Wholesale Banking to ensure each team member receives a performance rating and underperforming team members receive coaching.' (DJ0461 at 4 OCC-SP1264059). This shows WFAS directly engaging in audit work across the enterprise, in order to determine the weaknesses and allow for improvements within the Bank's controls."[1543]

Whether WFAS acted between 2013 and 2016 to work across the enterprise to determine the weaknesses alleged in this Statement is a material fact in issue.

I find that in his Response to (Russ Anderson) No. 149 and (Julian and McLinko) No. 117, Julian sufficiently demonstrated a factual controversy exists regarding how WFAS noted that "[f]ormal controls and oversight need to be enhanced in Community Banking and Wholesale Banking to ensure each team member receives a performance rating and underperforming team members receive coaching." and what WFAS – and Julian and McLinko – did with that knowledge between 2013 and 2016.

Because of the existence of these material controverted facts, summary disposition is not available with respect to Respondent Russ Anderson, Julian, or McLinko regarding this claim. Pursuant to the OCC's Uniform Rules, the merits of the disputed claims raised in (Russ Anderson) No. 149 and (Julian and McLinko) No. 117 will be addressed during the hearing set to begin on September 13, 2021.

**McLinko** incorporated Respondent Julian's Response.[1544]


**Respondent Russ Anderson failed to institute adequate controls to prevent sales practices misconduct**

---

[1541] MSD-269 (Expert Report of NBE Elizabeth Candy); MSD-267 (Expert Report of Tanya K. Smith, NBE, CFA); MSD-92; MSD-297 (Richards Tr.) at 175:21-178:13; MSD-300 (Rawson Tr.) at 49:5-50:22; 211:21-212:2; MSD-92 ("With the recent sales practices matter, we have recognized the consumer and customer impact, reputational impact, legal and regulatory impact of conduct risk. Fragmented, complex controls spread across the company have not proven to be effective."); MSD-643A (DiCristofaro Tr.) at 109:18-21; MSD-472 (Mack Tr.) at 111:3-112:8; MSD-59.

[1542] Russ Anderson's ECSFM at No. 149.

[1543] Julian's ECSFM at No. 117.

[1544] McLinko's ECSFM at No. 117.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 150 and (Julian and McLinko) No. 118**

The Bank's systems did not prevent employees from engaging in sales practices misconduct. The Bank's Head of SSCOT, Rebecca Rawson, who reported to Respondent Russ Anderson, provided the following sworn testimony about the deficiencies in controls to prevent sales practices misconduct:

> A: . . . And also looking at controls within our operations, so the systems that are used by the bankers, so store vision platform. And if we say a signature is required, or whatever by policy, why does the system not prevent the banker from going against policy? So in other words, making it harder for someone to get something -- for a banker to get it wrong.
>
> Because I think in that point in time, we have policies and procedures that stated X, but the system really could just allow you to proceed.
>
> Q: Okay.
>
> A: So I think that is what I think about with the root cause a little bit.
>
> Q: I see. Again, I will tell you what I got from your testimony, and please correct me if I misunderstood you.
>
> A: Okay.
>
> Q: At the Community Bank, I take it there was a significant problem with controls that are supposed to detect and prevent sales practice misconduct? Is that fair to say?
>
> A: I do not know if it would be -- it depends in how you define the system. Q: Okay.
>
> A: If the system is a control. I think we should have -- this is my opinion. We should have built into our systems places where it stops the team member from advancing if they are not acting in accordance with policy. Q: Okay. So I take it the bank had a policy that you should not issue credit cards or debit cards without the customer's consent?
>
> A: Correct.
>
> Q: All right. But the system allowed team members to actually issue credit cards and debit cards without the customer's consent or the customer's signature?
>
> A: I think that is right.

> Q: Okay. And you view that as a failure in
> controls? A: I think that is fair.[1545]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1546] She also asserted that the controls she advocated for resulted in improved metrics, indicating an improvement in "the controls and the control environment."[1547]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the testimony shown above was provided as shown and is properly attributed to the Bank's Head of SSCOT, Rebecca Rawson.

**Julian** did not dispute that Ms. Rawson gave the testimony shown above, but disputed that the testimony "supports any conclusions about controls."[1548] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that the testimony shown above was provided as shown and is properly attributed to the Bank's Head of SSCOT, Rebecca Rawson.

**McLinko** incorporated Respondent Julian's Response.[1549]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 151 and (Julian and McLinko) No. 119**

Community Bank employees across its nationwide branch network used a Bank system known as the Store Vision Platform ("SVP") to open and issue products and services for bank customers.[1550]

**Responses:**

---

[1545] MSD-300 (Rawson Tr.) at 49:5-50:22; 211:21-212:2; see also MSD-150 ("Lines of Credit, Cards, and ancillary services such as online, bill pay, rewards, etc. do not require signatures and thus are hard to track internally.".

[1546] Russ Anderson's ECSFM at No. 150.

[1547] Russ Anderson's ECSFM at No. 150.

[1548] Julian's ECSFM at No. 118.

[1549] McLinko's ECSFM at No. 118.

[1550] MSD-200 (Hughes Decl.) at 1; MSD-596 at 3.

Add. 298

Appellate Case: 25-1079    Page: 300    Date Filed: 05/16/2025 Entry ID: 5517644

**Russ Anderson** incorporated Respondent Julian's response.[1551]

Julian did not dispute the claim.[1552] Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that Community Bank employees across its nationwide branch network used a Bank system known as the Store Vision Platform ("SVP") to open and issue products and services for bank customers.

**McLinko** incorporated Respondent Julian's Response.[1553]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 152 and (Julian and McLinko) No. 120

SVP required bank employees to enter or confirm customers' personal data and select options within the platform to open or issue any product or service.[1554]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1555]

**Julian** did not dispute the claim as stated, but averred it was "missing context".[1556] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson and Julian that SVP required bank employees to enter or confirm customers' personal data and select options within the platform to open or issue any product or service.

**McLinko** incorporated Respondent Julian's Response.[1557]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 153 and (Julian and McLinko) No. 121

Bank policies required Bank employees to obtain express consent from customers prior to

---

[1551] Russ Anderson's ECSFM at No. 151.

[1552] Julian's ECSFM at No. 119.

[1553] McLinko's ECSFM at No. 119.

[1554] MSD-200 (Hughes Decl.); MSD-596.

[1555] Russ Anderson's ECSFM at No. 152.

[1556] Julian's ECSFM at No. 120.

[1557] McLinko's ECSFM at No. 120.

Add. 299

Appellate Case: 25-1079      Page: 301      Date Filed: 05/16/2025 Entry ID: 5517644

opening accounts or services.[1558]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1559]

Without disputing that express consent was required, Julian disputed the claim by averring that Bank policies allowed employees to gain consent through a variety of means, including pins, signatures, and verbal consent.[1560]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that Bank policies required Bank employees to obtain express consent from customers prior to opening accounts or services, where such consent could be through a variety of means, including pins, signatures, and verbal consent.

**McLinko** incorporated Respondent Julian's Response.[1561]


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 154 and (Julian and McLinko) No. 122**

SVP did not require Community Bank employees to obtain evidence of customer consent, such as a customer signature, before they could open or issue credit cards, debit cards, lines of credit, or certain other products and services, or transfer customer funds.[1562]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1563]

**Julian**: (see below for the claim presented in (Julian and McLinko) No. 122)

**McLinko** incorporated Respondent Julian's Response.[1564]

---

[1558] MSD-10 (2008 Sales Quality Manual) at 5; MSD-9 (2014 Sales and Service Quality Manual) at 7.

[1559] Russ Anderson's ECSFM at No. 153.

[1560] Julian's ECSFM at No., citing MSD-010 at 5; MSD-009 at 7.

[1561] McLinko's ECSFM at No. 121.

[1562] MSD-150; MSD-229; MSD-356.

[1563] Russ Anderson's ECSFM at No. 154.

[1564] McLinko's ECSFM at No. 121.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 122**

Respondent Russ Anderson explained in 2015 that the Bank "will process [a credit card] application without a signature (since it is not required by law) unless the applicant is under the age of 21 . . . . So, if the customer complains [that a card was unauthorized] and there is not a signature there isn't anything we 'do' about it." (MSD-66)

**Responses:**

**Julian** did not dispute the text attributed to Respondent Russ Anderson, but disputed the claim specifically, with respect to credit cards: "Paragraph 122 leaves out important details from Ms. Russ Anderson's email cited by Enforcement Counsel. Ms. Russ Anderson noted in her June 2015 email that "the lack of a signature on an application did not necessarily indicate an issue regarding customer consent," and that "signatures on credit card applications were not required until recently."[1565]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian and McLinko that SVP did not require Community Bank employees to obtain evidence of customer consent, such as a customer signature, before they could open or issue credit cards, debit cards, lines of credit, or certain other products and services, or transfer customer funds; and Respondent Russ Anderson explained in 2015 that the Bank "will process [a credit card] application without a signature (since it is not required by law) unless the applicant is under the age of 21 . . . . So, if the customer complains [that a card was unauthorized] and there is not a signature there isn't anything we 'do' about it."

**McLinko** incorporated Respondent Julian's Response.[1566]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 155 and (Julian and McLinko) No. 123**

Until approximately 2014, it was an acceptable practice for Community Bank employees to open accounts over the phone and not obtain customer signature.[1567]

**Responses:**

---

[1565] Julian's ECSFM at No. 122, citing MSD-066 at 1.

[1566] McLinko's ECSFM at No. 122.

[1567] MSD-65.

Appellate Case: 25-1079    Page: 303    Date Filed: 05/16/2025 Entry ID: 5517644

**Russ Anderson** incorporated Respondent Julian's response.[1568]

**Julian** did not controvert that customer signatures were not obtained when Community Bank employees opened accounts over the phone.[1569]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian and McLinko that until approximately 2014, it was an acceptable practice for Community Bank employees to open accounts over the phone and not obtain customer signature.

**McLinko** incorporated Respondent Julian's Response.[1570]


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 156**

Respondent Russ Anderson knew that even in 2015, the Bank "will process [a credit card] application without a signature (since it is not required by law) unless the applicant is under the age of 21. So, if the customer complains [that a card was unauthorized] and there is not a signature there isn't anything we 'do' about it."[1571]

**Responses:**

**Russ Anderson** disputed the claim, averring that MSD-66 itself (the admissibility of which is not conceded) contains ample evidence that to the extent a signature was not involved in a credit card sale, there were controls issued by SSCOT to detect misconduct involving customer consent.[1572] Referring to the email chain shown as MSD-66, Respondent Russ Anderson noted the language that "SSCOT obtained access to signature data for credit card sales and incorporated looking for signatures captured on credit cards as part of our case research related to inquiries on credit card consent".[1573]

It is a material fact in issue whether Respondent Russ Anderson knew, as alleged by Enforcement Counsel in this Statement, that the Bank would – even in 2015 – process a credit card application without an applicant's signature. In her Response to Statement No. 155, Russ Anderson sufficiently demonstrated a factual controversy exists regarding her knowledge in

---

[1568] Russ Anderson's ECSFM at No. 155.

[1569] Julian's ECSFM at No. 123.

[1570] McLinko's ECSFM at No. 123.

[1571] MSD-66 (emphasis added).

[1572] Russ Anderson's ECSFM at No. 156.

[1573] Russ Anderson's ECSFM at No. 156, quoting from MSD-66 at 1.

Add. 302

2015 of the Bank's practice of processing credit card applications without an applicant's signature; and whether she told Bank employees that if a customer complains about the issuance of a card that the customer did not authorize, there is nothing the Bank could or would do about it.

Because of the existence of a material controverted fact, summary disposition is not available with respect to Respondent Russ Anderson regarding this claim. Pursuant to the OCC's Uniform Rules, the merits of the claims raised in (Russ Anderson) Statement No. 156 will be addressed during the hearing set to begin on September 13, 2021.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 157 and (Julian and McLinko) No. 124**

Not until approximately 2016 were Bank systems modified to require evidence of customer consent before Community Bank employees could issue credit cards or transfer funds in customer accounts.[1574] Consent capture for non-credit card products had not yet been implemented as of May 2016.[1575] Up until March 2018, customer signatures still were not required to obtain a debit card.[1576]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1577] She also disputed the claim that only the Consumer Lending Group could issue credit cards, not Bank employees, but admitted that the decision to require signatures on debit cards was not implemented until March 2018.[1578]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that it was not until approximately 2016 that were Bank systems were modified to require evidence of customer consent before Community Bank employees could issue credit cards or transfer funds in customer accounts. Consent capture for non-credit card products had not yet been implemented as of May 2016. Up until March 2018, customer signatures still were not required to obtain a debit card.

**Julian** described "express consent" as being accomplished by "a variety of means, such as pins

---

[1574] MSD-356.

[1575] MSD-356; MSD-598.

[1576] MSD-655 at 6-7 ("signatures are still not required to obtain a debit card.").

[1577] Russ Anderson's ECSFM at No. 157.

[1578] Russ Anderson's ECSFM at No. 157.

and verbal consent."[1579] He also cites to a letter dated March 23, 2018 addressed to Enforcement Counsel of the OCC; Julian avers the exhibit establishes that "the Bank began requiring signatures for all credit card applications beginning in May 2015."[1580] That document averred that counsel for Mr. Julian "produced at WF-OCC2-000006061 to 6072 three documents demonstrating that signatures were required for all credit applications starting in May 2015."[1581] If the referenced three documents supported Julian's dispute, those documents should have been produced. They were not.

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that not until approximately 2016 were Bank systems modified to require evidence of customer consent before Community Bank employees could issue credit cards or transfer funds in customer accounts. Consent capture for non-credit card products had not yet been implemented as of May 2016. Up until March 2018, customer signatures still were not required to obtain a debit card.

**McLinko** incorporated Respondent Julian's Response.[1582]

## Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 158 and (Julian and McLinko) No. 125

Community Bank leaders, including Respondent Russ Anderson, knew that the "vast majority of customer consent sales integrity cases" were related to the Community Bank's failure to capture evidence of customer consent. In 2008, Respondent Russ Anderson was informed by Tyson Pyles, a senior leader in the Community Bank, that bankers were not required to obtain customer signatures in order to open a personal line of credit. In response, Respondent Russ Anderson asked: "Tyson – do we know why the product does not require a signature?" Mr. Pyles responded: "Well . . . Many of our product groups in the early 90's lobbied to remove the signature requirements because they slowed down the account opening process and carried a back room cost of filing and storing the paper application. The vast majority of customer consent sales integrity cases are directly related to this issue. This is why we have been pressing so hard for PIN or E- Signature Consent on ALL product sales. If we had a requirement that all product or services had one or the other, then most of our consent issues

---

[1579] Julian's ECSFM at No. 124.

[1580] Julian's ECSFM at No. 124, citing MSD-655 at 6.

[1581] Julian's ECSFM at No. 124, citing MSD-655 at 6.

[1582] McLinko's ECSFM at No. 124.

Add. 304

Appellate Case: 25-1079     Page: 306     Date Filed: 05/16/2025 Entry ID: 5517644

would become moot."[1583]

**Responses:**

**Russ Anderson** disputed the conclusion that she knew that the vast majority of customer consent sales integrity cases were related to the Community Bank's failure to capture evidence of customer consent.[1584] In support, she referred to the limited nature of the exchange between herself and Ms. Rawson – which concerned a single customer complaint, not the "vast majority of sales integrity cases" alleged by Enforcement Counsel.

It is a material fact in issue whether Respondent Russ Anderson knew, as alleged by Enforcement Counsel in this Statement, that the "vast majority of customer consent sales integrity cases" were related to the Community Bank's failure to capture evidence of customer consent. In her Response to Statement No. 158, Russ Anderson sufficiently demonstrated a factual controversy exists regarding her knowledge that the vast majority of customer consent sales integrity cases were related to the Community Bank's failure to capture evidence of customer consent. Because of the existence of a material controverted fact, summary disposition is not available with respect to Respondent Russ Anderson regarding this claim. Pursuant to the OCC's Uniform Rules, the merits of the claims raised in (Russ Anderson) Statement No. 158 will be addressed during the hearing set to begin on September 11, 2021

**Julian** averred that "[i]n order to identify potential sales integrity cases, the Bank looked at the rates of debit card activation as an indication of consent quality" but did not controvert the material claims in this Statement.[1585] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that Community Bank leaders, including Respondent Russ Anderson, knew that the "vast majority of customer consent sales integrity cases" were related to the Community Bank's failure to capture evidence of customer consent. In 2008, Respondent Russ Anderson was informed by Tyson Pyles, a senior leader in the Community Bank, that bankers were not required to obtain customer signatures in order to open a personal line of credit. In response, Respondent Russ Anderson asked: "Tyson – do we know why the product does not require a signature?" Mr. Pyles responded: "Well . . . Many of our product groups in the early 90's lobbied to remove the signature requirements because they slowed down the account opening process and carried a back room cost of filing and storing the paper application. The vast majority of customer consent sales integrity cases are directly related to this issue. This is why we have been pressing so hard for PIN or E- Signature Consent on ALL product sales. If we had a requirement that all product

---

[1583] MSD-58 (emphasis added); MSD-59; MSD-60; MSD-150.

[1584] Russ Anderson's ECSFM at No. 158.

[1585] Julian's ECSFM at No. 125, citing MSD-300 at 82:20-83:10.

or services had one or the other, then most of our consent issues would become moot."

**McLinko** incorporated Respondent Julian's Response.[1586]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 159 and (Julian and McLinko) No. 126

In spring and summer 2012, the Community Bank piloted a program that would require explicit customer consent before allowing bankers to issue debit cards to customers.[1587] On June 28, 2012, Respondent Russ Anderson received a PowerPoint presentation explaining the "[p]ositive impacts of store pilot for consumer and business debit cards" included: "Strong customer preference per market research"; (2)"Banker feedback that debit consent screen flow and process easy to adopt, and represents a sales quality improvement"; and (3) "Lifts in debit card fraud activation and POS [point of sale] activation – especially where customer provides consent electronically (on the signature pad)."[1588] She was also informed that "Debit card 'lack of consent' contributes more than fair share of enterprise quality issues and corrective actions."[1589]

**Responses:**

**Russ Anderson** did not dispute that the above factual claim accurately reflects the contents of the document cited by Enforcement Counsel (MSD-90, an email chain circa October 17, 2012); nor did she dispute her receipt of the referenced PowerPoint presentation; nor that she was informed that lack of consent contributed to "more than fair share" of issues needing corrective actions.[1590] She averred, however, that "[t]hese facts establish that senior leadership responsible for rolling out the project determined that the project was not an effective solution to cure the problems."[1591]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that in the spring and summer of 2012, the Community Bank piloted a program that would require explicit customer consent before allowing bankers to issue debit cards to customers. On June 28, 2012, Respondent Russ

---

[1586] McLinko's ECSFM at No. 125.

[1587] MSD-229.

[1588] MSD-229 at 3.

[1589] MSD-229 at 4; see also id. at 7 (noting that "Debit explicit consent has strong customer appeal.").

[1590] Russ Anderson's ECSFM at No. 159.

[1591] Russ Anderson's ECSFM at No. 159.

Add. 306

Appellate Case: 25-1079    Page: 308    Date Filed: 05/16/2025 Entry ID: 5517644

Anderson received a PowerPoint presentation explaining the "[p]ositive impacts of store pilot for consumer and business debit cards" included: "Strong customer preference per market research"; (2) "Banker feedback that debit consent screen flow and process easy to adopt, and represents a sales quality improvement"; and (3) "Lifts in debit card fraud activation and POS [point of sale] activation – especially where customer provides consent electronically (on the signature pad)." She was also informed that "Debit card 'lack of consent' contributes more than fair share of enterprise quality issues and corrective actions."

**Julian** presented his response as "disputed," but the substance of his response did not controvert the material allegations presented in this Statement.[1592] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that in the spring and summer of 2012, the Community Bank piloted a program that would require explicit customer consent before allowing bankers to issue debit cards to customers. On June 28, 2012, Respondent Russ Anderson received a PowerPoint presentation explaining the "[p]ositive impacts of store pilot for consumer and business debit cards" included: "Strong customer preference per market research"; (2)"Banker feedback that debit consent screen flow and process easy to adopt, and represents a sales quality improvement"; and (3) "Lifts in debit card fraud activation and POS [point of sale] activation – especially where customer provides consent electronically (on the signature pad)." She was also informed that "Debit card 'lack of consent' contributes more than fair share of enterprise quality issues and corrective actions."

**McLinko** incorporated Respondent Julian's Response.[1593]


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 160**

Nonetheless, in July 2012, Respondent Russ Anderson agreed to shut down the pilot that would require explicit customer consent before allowing bankers to issue a debit card.[1594]

**Responses:**

**Russ Anderson** disputed the claim that she agreed to shut down the pilot program, averring that the decision to shut it down was made by others, and it was made "based on the fact that the pilot was a failure."[1595]

---

[1592] Julian's ECSFM at No. 126.

[1593] McLinko's ECSFM at No. 126.

[1594] MSD-90 ("Claudia was on the call when the decision was made to pull the plug and was in agreement").

[1595] Russ Anderson's ECSFM at No. 160.

Appellate Case: 25-1079     Page: 309     Date Filed: 05/16/2025 Entry ID: 5517644

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that in July 2012, Respondent Russ Anderson agreed to shut down the pilot that would require explicit customer consent before allowing bankers to issue a debit card.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 161

In November 2013, Respondent Russ Anderson was again informed that the "customer is not required to sign for personal lines of credit." In response, she acknowledged that not requiring customer signatures "[s]eems like a bad practice."[1596]

**Responses:**

**Russ Anderson** did not dispute that she knew that customers were not required to sign for personal lines of credit, and otherwise did not dispute the quoted text shown above.[1597] She disputed, however, that the factual claims shown above established the alleged fact that Ms. Russ Anderson failed to institute adequate controls to prevent sales practices misconduct.[1598]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that in November 2013, Respondent Russ Anderson was again informed that the "customer is not required to sign for personal lines of credit." In response, she acknowledged that *not* requiring customer signatures "[s]eems like a bad practice."

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 162 and (Julian and McLinko) No. 127

In a Supervisory Letter issued on June 26, 2015 to the Bank, the OCC stated: "[o]ur sampling of customer complaints noted in many cases there was no method to prove customer consent in the form of a signature for either the deposit or credit card product."[1599]

**Responses:**

---

[1596] MSD-59.

[1597] Russ Anderson's ECSFM at No. 161.

[1598] Russ Anderson's ECSFM at No. 161.

[1599] MSD- 213 (SL 2015-36) at 3; see also MSD-570 (SL 2016-36) at 4 ("The root causes include excessive sales pressure and the absence of a control process that required documentation of explicit customer consent").

Add. 308

Appellate Case: 25-1079    Page: 310    Date Filed: 05/16/2025 Entry ID: 5517644

**Russ Anderson** did not dispute that the Supervisory Letter cited in this Statement contained the above-cited observation and conclusion, but disputed that the facts alleged in the Supervisory Letter established that Ms. Russ Anderson failed to institute adequate controls to prevent sales practices misconduct, and disputed that the "root causes included excessive sales pressure and the absence of a control process that required documentation of explicit customer consent."[1600] She also averred the OCC was aware of the absence of a control process in 2016 but that customer signatures still were not required until March 2018.[1601]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that in a Supervisory Letter issued on June 26, 2015 to the Bank, the OCC stated: "[o]ur sampling of customer complaints noted in many cases there was no method to prove customer consent in the form of a signature for either the deposit or credit card product."

**Julian** did not dispute that the Supervisory Letter contains the quoted text.[1602] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that in a Supervisory Letter issued on June 26, 2015 to the Bank, the OCC stated: "[o]ur sampling of customer complaints noted in many cases there was no method to prove customer consent in the form of a signature for either the deposit or credit card product."

**McLinko** incorporated Respondent Julian's Response.[1603]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 163 and (Julian and McLinko) No. 128

Another preventative control that the Community Bank failed to institute was awarding sales credit to employees only for accounts that customers use. This was Accenture's first recommendation to the Community Bank in October 2015.[1604]

---

[1600] Russ Anderson's ECSFM at No. 162.

[1601] Russ Anderson's ECSFM at No. 162.

[1602] Julian's ECSFM at No. 127.

[1603] McLinko's ECSFM at No. 127.

[1604] MSD-51 at 12 ("Reward team members based more on positive customer outcomes (e.g., account utilization) with less emphasis on solutions sold."). "As of January 2016, the Community Bank allowed employees to have approximately 30 percent of the new accounts they opened to remain unfunded; they would still be eligible to receive sales credit for the unfunded accounts." (MSD-269 (NBE Candy Expert Report) at ¶ 107c; MSD-647); see also MSD-295 (Bacon Tr.) at 121:15-125:1 (suggestions of preventative controls).

Add. 309

Appellate Case: 25-1079    Page: 311    Date Filed: 05/16/2025 Entry ID: 5517644

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1605]

**Julian** presented his response as "disputed," but the substance of his response did not controvert the material allegations presented in this Statement.[1606]   Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian and McLinko that another preventative control that the Community Bank failed to institute was awarding sales credit to employees only for accounts that customers use. This was Accenture's first recommendation to the Community Bank in October 2015.

**McLinko** incorporated Respondent Julian's Response.[1607]

> ### The Bank's Controls to detect sales practices misconduct were inadequate
>
> ### Respondent Russ Anderson failed to institute adequate controls to detect sales practices misconduct

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 164 and (Julian and McLinko) No. 129**

There were four primary mechanisms the Bank employed to detect sales practices misconduct. Three were reactive tools that relied on employees or customers to surface problems: 1) a whistleblower hotline known as the EthicsLine established for employees to raise concerns about behavior that may violate the Bank's Code of Ethics, or any laws, rules or regulations, 2) employee complaints sent directly to senior management or others within the Bank, and 3) customer complaints. The fourth tool involved using data analytics to detect activity indicative of certain sales practices misconduct, referred to as "proactive monitoring." The Bank did not begin employing proactive monitoring until around 2012; before then, the primary way the Bank detected sales practices misconduct was if a customer or a Bank employee reported it.[1608]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1609] She also averred that the description of the tools in place is neither quantitative nor qualitative analysis and provides

---

[1605] Russ Anderson's ECSFM at No. 163.

[1606] Julian's ECSFM at No. 128.

[1607] McLinko's ECSFM at No. 128.

[1608] Russ Anderson Amended Answer ¶ 92; MSD-290A (Loughlin Tr.) 236:1-13; MSD- 300 (Rawson Tr.) at 86:2-88:15, 213:2-8; MSD-299 (Sperle Tr.) at 41:6-42:2, 53:13-19.

[1609] Russ Anderson's ECSFM at No. 164.

Appellate Case: 25-1079     Page: 312     Date Filed: 05/16/2025 Entry ID: 5517644

no support for the allegation that she failed to institute adequate controls to detect sales practices misconduct.[1610]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that there were four primary mechanisms the Bank employed to detect sales practices misconduct. Three were reactive tools that relied on employees or customers to surface problems: 1) a whistleblower hotline known as the EthicsLine established for employees to raise concerns about behavior that may violate the Bank's Code of Ethics, or any laws, rules or regulations, 2) employee complaints sent directly to senior management or others within the Bank, and 3) customer complaints. The fourth tool involved using data analytics to detect activity indicative of certain sales practices misconduct, referred to as "proactive monitoring." The Bank did not begin employing proactive monitoring until around 2012; before then, the primary way the Bank detected sales practices misconduct was if a customer or a Bank employee reported it.

**Julian** presented his response as "disputed," but the substance of his response did not controvert the material allegations presented in this Statement.[1611] He averred the Bank" relied of a variety of tools to detect sales practices misconduct, including—but not limited to—EthicsLine reporting, employee complaints sent directly to management and others within the bank, customer complaints, and SSCOT proactive monitoring," but offered no evidence controverting that the Bank used the four cited tools as primary, nor that the Bank did not employ proactive monitoring until around 2012.[1612]

Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that there were four primary mechanisms the Bank employed to detect sales practices misconduct. Three were reactive tools that relied on employees or customers to surface problems: 1) a whistleblower hotline known as the EthicsLine established for employees to raise concerns about behavior that may violate the Bank's Code of Ethics, or any laws, rules or regulations, 2) employee complaints sent directly to senior management or others within the Bank, and 3) customer complaints. The fourth tool involved using data analytics to detect activity indicative of certain sales practices misconduct, referred to as "proactive monitoring." The Bank did not begin employing proactive monitoring until around 2012; before then, the primary way the Bank detected sales practices misconduct was if a customer or a Bank employee reported it.

---

[1610] Russ Anderson's ECSFM at No. 164.

[1611] Julian's ECSFM at No. 128.

[1612] Julian's ECSFM at No. 129 citing Julian Amended Answer ¶ 92; MSD-290A at 236:1-13.

**McLinko** incorporated Respondent Julian's Response.[1613]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 165 and (Julian and McLinko) No. 130**

From 2004 to 2012, while Respondent Russ Anderson served as the Group Risk Officer, the Bank's controls to detect sales practices misconduct were "reactive by design." In other words, such controls relied on branch employees or customers identifying and reporting misconduct, as opposed to the Bank proactively detecting sales practices misconduct.[1614]

**Responses:**

**Russ Anderson** disputed that the controls identified in this Statement were the only controls available, noting controls within Retail Banking, controls within product lines, and controls within Human Resources.[1615]

Enforcement Counsel supported this Statement by referring to two email threads circa 2012 discussing reactive versus proactive monitoring measures. Given the passage of time between the creation of these Exhibits and the filing of the Notice of Charges, given the Exhibits' remote and tangential relationship with the material claims presented in the Notice of Charges, given the potential for confusion that admitting the Exhibits presents, given the redundant nature of the material facts presented in the Exhibits when compared with Exhibits that are more closely related in time, and given the marginal relevance of the claim regarding whether in 2012 the Bank's controls were reactive or proactive, the Exhibits will not be admitted in support of Enforcement Counsel's Motion as to Respondent Russ Anderson. Accordingly, the claims presented in (Russ Anderson) No. 165 will not support Enforcement Counsel's Motion. The exclusion of the Exhibits does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**Julian** objected to the use of MSD-70 (Respondent Russ Anderson's June 2012) email on the grounds that the evidence is irrelevant, immaterial, unreliable, or repetitive.[1616] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 130 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement

---

[1613] McLinko's ECSFM at No. 129.

[1614] MSD-69; see also MSD-70 (Respondent Russ Anderson acknowledging in a June 2012 email that "[i]f I only depend on ethics line complaints we'll never catch up.").

[1615] Russ Anderson's ECSFM at No. 165.

[1616] Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

**Page 312 of 753**

Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[1617]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 166**

The Community Bank's former Chief Compliance Officer told Respondent Russ Anderson that "the first line of defense lacked the appropriate tools to detect sales integrity violations."[1618]

**Responses:**

**Russ Anderson** averred the Declaration by Mr. Christoff lacked context and appears to relate to a specific "mystery shopping program" that he was advocating for in or around 2013.[1619] (MSD-56 (Christoff Decl.)[1620] at ¶¶ 11-15)

Enforcement Counsel supported this Statement by referring to a declaration by Jay Christoff, who served as Chief Compliance Officer of the Community Bank between May 2014 and October 2015. His declaration concerns his averment that from 2011 to 2015, he had "ongoing conversations" with Respondent Russ Anderson "regarding the inadequacy of the Community Bank's tracking of customer complaints."[1621]

Given the passage of time between the discussions related by Mr. Christoff in his Declaration and the filing of the Notice of Charges, given the Declaration's remote and tangential relationship with the material claims presented in the Notice of Charges, given the potential for confusion that admitting the Declaration presents, given the redundant nature of the material facts presented in the Declaration when compared with Exhibits that are more closely related in time, and given the marginal relevance of the claim regarding his discussions with Respondent Russ Anderson, the Declaration will not be admitted in support of Enforcement Counsel's Motion as to Respondent Russ Anderson. Accordingly, the claims presented in (Russ Anderson) No. 166 will not support Enforcement Counsel's Motion. The exclusion of the Declaration does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

---

[1617] McLinko's ECSFM at No. 130.

[1618] MSD-56 (Christoff Decl.) at ¶ 11; see id. at ¶¶ 13-15 (explaining that Respondent Russ Anderson declined to follow suggestions about the Community Bank doing unannounced branch visits program).

[1619] Russ Anderson's ECSFM at No. 166.

[1620] MSD-56 (Christoff Decl.).

[1621] MSD-56 (Christoff Decl.) at ¶7.

Appellate Case: 25-1079    Page: 315    Date Filed: 05/16/2025  Entry ID: 5517644

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 167 and (Julian and McLinko) No. 131**

The Bank's former Head of Corporate Investigations Loretta Sperle testified before the OCC that there was nearly a 100% chance an employee's boss would know if she failed to meet her sales goals. By contrast, the chances were very small that an employee would be caught for issuing an unauthorized product or service. Ms. Sperle testified:

> Q: Okay. So if [employees] were doing it when nobody is watching, and they don't do it enough to trigger the outlier thresholds that you've had, the chances of them getting caught is very small?
>
> A: Yes. I would agree.[1622]

**Responses:**

**Russ Anderson** did not dispute that the above accurately reflects Ms. Sperle's testimony, disputing only whether the testimony established Respondent Russ Anderson's failure to detect sales practices misconduct.[1623]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the Bank's former Head of Corporate Investigations Loretta Sperle testified before the OCC that there was nearly a 100% chance an employee's boss would know if she failed to meet her sales goals, that by contrast, the chances were very small that an employee would be caught for issuing an unauthorized product or service, and that Ms. Sperle testified as shown above.

**Julian** did not dispute that the statement was given as shown.[1624] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that Ms. Sperle testified as shown above.

**McLinko** incorporated Respondent Julian's Response.[1625]


**EthicsLine**

---

[1622] MSD-299 (Sperle Tr.) at 157:1-160:1.

[1623] Russ Anderson's ECSFM at No. 167.

[1624] Julian's ECSFM at No. 131.

[1625] McLinko's ECSFM at No. 131.

Appellate Case: 25-1079    Page: 316    Date Filed: 05/16/2025 Entry ID: 5517644

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 168 and (Julian and McLinko) No. 132**

Although the EthicsLine was one of the Community Bank's mechanisms for detecting sales practices misconduct, Community Bank employees did not consistently use the EthicsLine to report issues. In its 2015 independent review of sales practices, Accenture reported, based on its interviews of over 300 Community Bank employees, that "[m]any bankers stated that ethics issues are usually escalated through management and rarely escalated through the Ethics Line," and "some Service Managers and Bankers stated that they do not utilize the Ethics Line as they fear retribution or that it may not be anonymous."[1626]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's Response.[1627]

**Julian** presented his response as "disputed," but the substance of his response did not controvert the material allegations presented in this Statement.[1628] He averred "[t]he Accenture report states, 'Evidence from field interviews showed that team members seek to resolve potential ethical issues quickly by escalating to their immediate supervisor.'"[1629] Without offering supporting evidence, he averred "While these issues may not have been submitted directly to Ethics Line, the issues could nevertheless be investigated and dealt with directly by the manager."[1630]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that although the EthicsLine was one of the Community Bank's mechanisms for detecting sales practices misconduct, Community Bank employees did not consistently use the EthicsLine to report issues. In its 2015 independent review of sales practices, Accenture reported, based on its interviews of over 300 Community Bank employees, that "[m]any bankers stated that ethics issues are usually escalated through management and rarely escalated through the Ethics Line," and "some Service Managers and Bankers stated that they do not utilize the Ethics Line as they fear retribution or that it may not be anonymous."

**McLinko** incorporated Respondent Julian's Response.[1631]

---

[1626] MSD-51 at 41; see also *id*. at 11.

[1627] Russ Anderson's ECSFM at No. 168.

[1628] Julian's ECSFM at No. 132.

[1629] Julian's ECSFM at No. 132, citing MSD-051 at 11.

[1630] Julian's ECSFM at No. 132.

[1631] McLinko's ECSFM at No. 132.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 169 and (Julian and McLinko) No. 133**

Enforcement Counsel's Statements of Material Fact (Russ Anderson) No. 169 and (Julian and McLinko) No. 133 rely on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[1632] Upon my review of the confidential documents supporting these Statements of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in these Statements of Material Fact.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 170 and (Julian and McLinko) No. 134**

Sales integrity-related EthicsLine complaints were referred to Community Bank's Sales Quality team, later known as SSCOT.[1633]

**Responses:**

**Russ Anderson** disputed that the allegation established any facts regarding her failure to institute adequate controls, and incorporated Respondent Julian's response.[1634]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that sales integrity-related EthicsLine complaints were referred to Community Bank's Sales Quality team, later known as SSCOT

**Julian** confirmed that SSCOT could refer violation reports back to Corporate Security for further investigation[1635] but disputed, without providing evidence in support, the remaining claims in the Statement.

---

[1632] See 12 C.F.R. § 19.33(b).

[1633] MSD-381 at 15.

[1634] Russ Anderson's ECSFM at No. 170.

[1635] Julian's ECSFM at No.134, citing MSD-381 at 15.

Add. 316

Appellate Case: 25-1079    Page: 318    Date Filed: 05/16/2025 Entry ID: 5517644

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that Sales integrity-related EthicsLine complaints were referred to Community Bank's Sales Quality team, later known as SSCOT.

**McLinko** incorporated Respondent Julian's Response.[1636]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 171 and (Julian and McLinko) No. 135

Sales Quality/SSCOT referred only a small percentage of the EthicsLine complaints to the Bank's Corporate Investigations group for investigation. Sales Quality imposed various preliminary thresholds including, among other things, polling of other customers of the accused employee, to determine which allegations to send to Corporate Investigations for investigation. An employee accused of sales practices misconduct might only be referred to Corporate Investigations if telephone "polling" of <u>other</u> customers of the same employee revealed other incidents, or "substantiations," of similar misconduct.[1637]

**Responses:**

**Russ Anderson** disputed that the allegation established any facts regarding her failure to institute adequate controls, and incorporated Respondent Julian's response.[1638]

**Julian** presented his response as "disputed," but the substance of his response did not controvert the material allegations presented in this Statement.[1639] Confirming the material facts found in the Statement, Julian averred: "Polling was used to determine when an EthicsLine report was substantiated, and thus should be sent to Corporate Investigations. The number of individuals who needed to be polled varied by the type of misconduct and the seniority of the employee. If a certain number of individuals substantiated a claim, the case would be referred to Corporate."

I find an insufficient factual basis has been presented to establish a dispute in this Response to

---

[1636] McLinko's ECSFM at No. 134.

[1637] MSD-245 at 9; MSD-381; MSD-122 ("Generally speaking, if there are fewer than 3 polling substantiations, there's no referral to Investigations."); MSD-93 ("No single LOB [Line of Business] or Second Line of Defense 'owns' EthicsLine/Sales Integrity/Sales Practices, and Corporate Investigations only sees a sliver of these.") (emphasis added); MSD-297 (Richards Tr.) at 226:18-229:20; MSD-591 (Najvar Tr.) at 142:24-144:25; MSD-75; MSD-150; MSD-151 at 1 ("There are lots of situations where we do polling. Generally speaking, if the team member denied the conduct and there was just one polling confirmation, we're not likely to terminate (and it might not even get sent to Investigations."); MSD-245.

[1638] Russ Anderson's ECSFM at No. 171.

[1639] Julian's ECSFM at No. 135.

create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that Sales Quality/SSCOT referred only a small percentage of the EthicsLine complaints to the Bank's Corporate Investigations group for investigation. Sales Quality imposed various preliminary thresholds including, among other things, polling of other customers of the accused employee, to determine which allegations to send to Corporate Investigations for investigation. An employee accused of sales practices misconduct might only be referred to Corporate Investigations if telephone "polling" of <u>other</u> customers of the same employee revealed other incidents, or "substantiations," of similar misconduct.

**McLinko** incorporated Respondent Julian's Response.[1640]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 172 and (Julian and McLinko) No. 136

The Bank's former CEO John Stumpf agreed in testimony before the OCC that employees did all they could to complain about the unreasonable sales goals to Bank senior leadership in numerous ways over many years, by calling the EthicsLine, sending emails, holding protests, and approaching newspapers. He further stated that the senior leadership team and not the employees, is to blame for the Bank not moving fast enough to address the sales practices misconduct problem.[1641]

**Responses:**

**Russ Anderson** disputed that the allegation established any facts regarding her failure to institute adequate controls, and incorporated Respondent Julian's response.[1642]

**Julian** averred that Mr. Stumpf did not respond in the affirmative "as Paragraph 136 suggests; instead, Mr. Stumpf testified, "As I sit here today looking back, there were a number of outreaches by team members that were informing the company and senior leadership about these issues. And I wish we would have moved faster on those."[1643] Mr. Stumpf also took responsibility that he personally should have moved faster.[1644]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a

---

[1640] McLinko's ECSFM at No. 135.

[1641] MSD-8B (Stumpf Tr.) at 401:9-402:6.

[1642] Russ Anderson's ECSFM at No. 172.

[1643] Julian's ECSFM at No. 136, quoting MSD-008B at 401:21-25.

[1644] Julian's ECSFM at No. 136, quoting MSD-008B at 402:1-6.

Appellate Case: 25-1079    Page: 320    Date Filed: 05/16/2025 Entry ID: 5517644

factual finding as to Respondents Russ Anderson, Julian, and McLinko that the Bank's former CEO John Stumpf testimony before the OCC that "As I sit here today looking back, there were a number of outreaches by team members that were informing the company and senior leadership about these issues. And I wish we would have moved faster on those," took responsibility that he personally should have moved faster, and testified that employees did all they could to complain about the unreasonable sales goals to Bank senior leadership in numerous ways over many years, by calling the EthicsLine, sending emails, holding protests, and approaching newspapers. He further stated that the senior leadership team and not the employees, is to blame for the Bank not moving fast enough to address the sales practices misconduct problem.

**McLinko** incorporated Respondent Julian's Response.[1645]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 173

While thousands of employees flooded the EthicsLine warning senior leadership for years about the retail branch environment of significant pressure to meet unreasonable sales goals and resulting misconduct, Respondent Russ Anderson "did not make a habit of reading the EthicsLine allegations that came in. I had a pretty busy job. That would have been not a wise use of my time."[1646]

**Responses:**

**Russ Anderson** did not dispute that she testified as presented, but clarified that she would "read the ones that [her] SSCOT team felt were important for [her] to know about" because the EthicsLine complaints contain "a broad variety of information" and so she "depended on [her] team, who did get EthicsLine allegations, to point situations out to [her] that they felt were noteworthy."[1647]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that while thousands of employees flooded the EthicsLine warning senior leadership for years about the retail branch environment of significant pressure to meet unreasonable sales goals and resulting misconduct, Respondent Russ Anderson "did not make a habit of reading the EthicsLine allegations that came in. I had a pretty busy job. That would have been not a wise use of my time."

---

[1645] McLinko's ECSFM at No. 136.

[1646] MSD-266 (Russ Anderson Dep. Tr.) at 58:13-16.

[1647] Russ Anderson's ECSFM at No. 173, quoting from MSD-266 (Russ Anderson Dep. Tr.) at 58:5-59:8.

## Customer Complaints

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 174 and (Julian and McLinko) No. 137**

According to the Community Bank's former Chief Compliance Officer, who reported to Respondent Russ Anderson, the "Community Bank did not have an adequate system to track customer complaints from 2011 until [his] departure in 2015. Specifically:

a. Retail branches lacked the technology to track customer complaints in a consistent manner;

b. Complaints that were tracked were captured via disparate systems and inputted into various spreadsheets; and

c. The Community Bank did not have a centralized repository for customer complaints."[1648]

**Responses:**

**Russ Anderson** disputed any claim that the Statement portrays issues with the tracking of customer complaints as something that was exclusively under her control.[1649]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that, according to the Community Bank's former Chief Compliance Officer (who reported to Respondent Russ Anderson), the "Community Bank did not have an adequate system to track customer complaints from 2011 until [his] departure in 2015. Specifically: a. Retail branches lacked the technology to track customer complaints in a consistent manner; b. Complaints that were tracked were captured via disparate systems and inputted into various spreadsheets; and c. The Community Bank did not have a centralized repository for customer complaints."

**Julian** did not dispute the quoted text was reported to Respondent Russ Anderson.[1650] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that the Community Bank's former Chief Compliance Officer (Mr. Christoff) reported to Respondent Russ Anderson, the "Community Bank did not have an adequate system to track customer complaints from 2011 until [his] departure in 2015. Specifically: a. Retail branches lacked the technology to track customer complaints in a consistent manner; b. Complaints that were tracked were captured via disparate systems and inputted into various spreadsheets; and c. The Community Bank did not have a centralized repository for customer complaints."

---

[1648] MSD-56 (Christoff Decl.).

[1649] Russ Anderson's ECSFM at No. 174.

[1650] Julian's ECSFM at No. 137.

Appellate Case: 25-1079    Page: 322    Date Filed: 05/16/2025 Entry ID: 5517644

**McLinko** incorporated Respondent Julian's Response.[1651]


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 175**

From 2011 through 2015, the Chief Compliance Officer had ongoing conversations with Respondent Russ Anderson regarding the inadequacy of the Community Bank's tracking of customer complaints.[1652]

**Responses:**

**Russ Anderson** disputed any claim that the Statement portrays issues with the tracking of customer complaints as something that was exclusively under her control.[1653]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that from 2011 through 2015, the Chief Compliance Officer had ongoing conversations with Respondent Russ Anderson regarding the inadequacy of the Community Bank's tracking of customer complaints.


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 176 and (Julian and McLinko) No. 138**

The Community Bank did not consistently capture customer complaints from customers affected by sales practices misconduct. When Accenture conducted its 2015 independent review of sales practices within the Community Bank, it found in its interviews of over 300 Community Bank employees that "team members . . . do not have a clear understanding of what constitutes a customer complaint and frequently do not capture or document complaints for further analysis." Accenture's review "did not identify a clear and consistent process or governance model to ensure all customer complaints are captured, monitored, addressed, and reported across all stores within the Community Bank."[1654]

**Responses:**

**Russ Anderson** disputed that the allegation established any facts regarding her failure to

---

[1651] McLinko's ECSFM at No. 138.

[1652] MSD-56 (Christoff Decl.) at ¶ 7; see id. at ¶ 10 ("The customer complaints tracking system was deficient and continued to be deficient as of my departure from Wells Fargo in October 2015.")

[1653] Russ Anderson's ECSFM at No. 175.

[1654] MSD-51 at 10.

institute adequate controls, and incorporated Respondent Julian's response.[1655]

**Julian** presented his response as "disputed," but the substance of his response did not controvert the material allegations presented in this Statement.[1656] He averred that the Bank began work on the revised Enterprise Complaints Management Policy in 2013, scheduled to take full effect by the end of 2016;[1657] adding that in August 2015 the Bank agreed to accelerate the work to comply with MRAs issued by the OCC.[1658]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that the Community Bank did not consistently capture customer complaints from customers affected by sales practices misconduct. When Accenture conducted its 2015 independent review of sales practices within the Community Bank, it found in its interviews of over 300 Community Bank employees that "team members . . . do not have a clear understanding of what constitutes a customer complaint and frequently do not capture or document complaints for further analysis." Accenture's review "did not identify a clear and consistent process or governance model to ensure all customer complaints are captured, monitored, addressed, and reported across all stores within the Community Bank."

**McLinko** incorporated Respondent Julian's Response.[1659]


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 177 and (Julian and McLinko) No. 139**

Of the customer complaints Community Bank Sales Quality/SSCOT captured, lack of consent was the most common customer complaint type. Accenture "review[ed] all SSCOT cases with 'an element of a customer complaint' provided by SSCOT." Its review "revealed that 'Consent' is the greatest case type (68%). The remaining case types are related to 'Account Openings' (14%) and case types that are a combination of the consent and account opening case types."[1660]

---

[1655] Russ Anderson's ECSFM at No. 176.

[1656] Julian's ECSFM at No. 138.

[1657] MSD-213 at 7

[1658] Julian's ECSFM at No. 138.

[1659] McLinko's ECSFM at No. 138.

[1660] Julian's ECSFM at No. 138 citing MSD-51 at 43.

Appellate Case: 25-1079     Page: 324     Date Filed: 05/16/2025 Entry ID: 5517644

**Responses:**

**Russ Anderson** disputed that the allegation established any facts regarding her failure to institute adequate controls, and incorporated Respondent Julian's response.[1661]

**Julian** presented his response as "disputed," but the substance of his response did not controvert the material allegations presented in this Statement.[1662] He averred the review "did not include any statistics on the percentage of complaints that were actually substantiated," but did not dispute the material claims in the statement.

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that of the customer complaints Community Bank Sales Quality/SSCOT captured, lack of consent was the most common customer complaint type. Accenture "review[ed] all SSCOT cases with 'an element of a customer complaint' provided by SSCOT." Its review "revealed that 'Consent' is the greatest case type (68%). The remaining case types are related to 'Account Openings' (14%) and case types that are a combination of the consent and account opening case types."

**McLinko** incorporated Respondent Julian's Response.[1663]


### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 178 and (Julian and McLinko) No. 140

Lack of consent had been the greatest customer complaint type since long before Accenture conducted its review in 2015. A September 5, 2007 presentation by the Sales Quality Team, the predecessor to SSCOT, showed that by 2007, the Bank as a whole was receiving 25,000-48,000 "Customer Calls Annually Stating 'Did Not Request'" (i.e. lack of consent) for certain Bank products.[1664] The presentation explained: "The content of these calls is very similar to content in [approximately] 50% of the formal EthicsLine/HR allegations that Sales Quality allegations currently processes."[1665] The presentation depicted an iceberg, representing the Bank was only detecting the tip of the iceberg of sales practices misconduct.[1666]

---

[1661] Russ Anderson's ECSFM at No. 177.

[1662] Julian's ECSFM at No. 139.

[1663] McLinko's ECSFM at No. 139.

[1664] MSD-51 at 7.

[1665] MSD-51 at 7.

[1666] MSD-51 at 7; MSD-539 (Dement Tr.) at 159:20-163:20.

**Responses:**

**Russ Anderson** disputed that the allegation established any facts regarding her failure to institute adequate controls, and incorporated Respondent Julian's response.[1667]

**Julian** presented his response as "disputed," but the substance of his response did not controvert the material allegations presented in this Statement.[1668] He offered no controverting statistics but averred that Dwaine Dement, who created the slide deck, testified that this presentation was comprised of each group's "best guess" regarding lack of consent complaints and that these were not actual numbers,"[1669] and that he saw allegations from the phone bank and realized there might be other channels where complaints were coming in aside from formal Ethicsline/HR allegations.[1670]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that lack of consent had been the greatest customer complaint type since long before Accenture conducted its review in 2015. A September 5, 2007 presentation by the Sales Quality Team, the predecessor to SSCOT, showed that by 2007, the Bank as a whole was receiving 25,000-48,000 "Customer Calls Annually Stating 'Did Not Request'" (i.e. lack of consent) for certain Bank products.[1671] The presentation explained: "The content of these calls is very similar to content in [approximately] 50% of the formal EthicsLine/HR allegations that Sales Quality allegations currently processes."[1672] The presentation depicted an iceberg, representing the Bank was only detecting the tip of the iceberg of sales practices misconduct.

**McLinko** incorporated Respondent Julian's Response.[1673]

---

[1667] Russ Anderson's ECSFM at No. 178.

[1668] Julian's ECSFM at No. 140.

[1669] Julian's ECSFM at No. 140, quoting MSD-539 at 159:20-160:19.

[1670] Julian's ECSFM at No. 140 citing MSD-539 at 160:11- 161:5.

[1671] MSD-51 at 7.

[1672] MSD-51 at 7.

[1673] McLinko's ECSFM at No. 140.

Add. 324

Appellate Case: 25-1079    Page: 326    Date Filed: 05/16/2025 Entry ID: 5517644



**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 179 and (Julian and McLinko) No. 141**

The presentation separately stated that the primary allegations handled by the Sales Quality Team "continue to be customer consent issues and account opening procedural issues" and that sales quality allegations were occurring across the Bank geography wide.[1674]

**Responses:**

**Russ Anderson** disputed that the allegation established any facts regarding her failure to institute adequate controls, and incorporated Respondent Julian's response.[1675]

**Julian** presented his response as "disputed," but the substance of his response did not controvert the material allegations presented in this Statement.[1676] He offered no evidence controverting the presentation, but averred that "[t]he presentation lists the regions making up the top quartile of

---

[1674] MSD- 72 at 3-4 (emphasis added).

[1675] Russ Anderson's ECSFM at No. 179.

[1676] Julian's ECSFM at No. 141.

Add. 325

Appellate Case: 25-1079      Page: 327      Date Filed: 05/16/2025 Entry ID: 5517644

regions by the percent of stores with allegations. It does not show allegations occurring across the Bank geography wide."[1677]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that the presentation separately stated that the primary allegations handled by the Sales Quality Team "continue to be customer consent issues and account opening procedural issues" and that sales quality allegations were occurring across the Bank geography wide.

**McLinko** incorporated Respondent Julian's Response.[1678]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 180 and (Julian and McLinko) No. 142

In a Supervisory Letter issued on June 26, 2015 to the Bank, the OCC cited a Matter Requiring Attention ("MRA") related to the Bank's complaint management systems.[1679]

**Responses:**

**Russ Anderson** disputed that the allegation established any facts regarding her failure to institute adequate controls, and incorporated Respondent Julian's response.[1680]

**Julian** did not dispute the Letter contained the cited MRA.[1681]  I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that in a Supervisory Letter issued on June 26, 2015 to the Bank, the OCC cited a Matter Requiring Attention ("MRA") related to the Bank's complaint management systems.

**McLinko** incorporated Respondent Julian's Response.[1682]

### Proactive Monitoring

---

[1677] Julian's ECSFM at No. 141, citing MSD-072 at 4.

[1678] McLinko's ECSFM at No. 141.

[1679] MSD-213 at 4, 7-8.

[1680] Russ Anderson's ECSFM at No. 180.

[1681] Julian's ECSFM at No. 142.

[1682] McLinko's ECSFM at No. 142.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 181 and (Julian and McLinko) No. 143**

The group within the Community Bank that performed proactive monitoring was SSCOT, which reported to Respondent Russ Anderson beginning from 2012 through 2016.[1683]

**Responses:**

**Russ Anderson** acknowledged SSCOT began performing proactive monitoring in 2013 and that the group reported directly to her from 2012 to 2016.[1684] She reported name changes for the group and disputed the Statement to the extent it establishes the alleged fact that she failed to institute adequate controls to prevent sales practices misconduct.[1685]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the group within the Community Bank that performed proactive monitoring was Sales Quality/SSCOT, which reported to Respondent Russ Anderson beginning from 2012 through 2016

**Julian** responded that the claim was disputed, but did not dispute the claim and instead averred that SSCOT completed its first official proactive analysis into simulated funding across the Regional Bank in the summer 2013.[1686] Before 2013, SSCOT was primarily reactive rather than proactive.[1687] Rebecca Rawson instituted proactive monitoring in 2013 to help build out more proactive/detective controls."[1688] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Julian that the group within the Community Bank that performed proactive monitoring was SSCOT, which reported to Respondent Russ Anderson beginning from 2012 through 2016.

**McLinko** responded that the claim was disputed, but did not dispute the claim and instead averred that it was likely that the Community Bank began proactive monitoring in 2012.[1689] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a

---

[1683] Russ Anderson Amended Answer ¶ 260; Julian Amended Answer ¶ 260; McLinko Amended Answer ¶ 260.

[1684] Russ Anderson's ECSFM at No. 181.

[1685] Russ Anderson's ECSFM at No. 181.

[1686] Julian's ECSFM at No. 143, citing DJ0172 at 12 OCC-WF-SP-07666076.

[1687] Julian's ECSFM at No. 143, citing MSD-300 at 21:2-8; MSD-629 at 41:17–42:5.

[1688] Julian's ECSFM at No. 143, citing DJ0173 at 1 OCC-WF-SP-07667133.

[1689] McLinko's ECSFM at No. 143.

factual finding as to Respondent McLinko that the group within the Community Bank that performed proactive monitoring was SSCOT, which reported to Respondent Russ Anderson beginning from 2012 through 2016.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 182 and (Julian and McLinko) No. 144

SSCOT proactively monitored for simulated funding and phone number changes.[1690]

**Responses:**

**Russ Anderson** did not dispute that Sales Quality/SSCOT performed proactive monitoring for simulated funding and phone number changes.[1691] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that Sales Quality/SSCOT proactively monitored for simulated funding and phone number changes.

**Julian** presented his response as "disputed," but the substance of his response did not controvert the material allegations presented in this Statement, averring only that the Statement "is missing context."[1692] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that SSCOT proactively monitored for simulated funding and phone number changes.

**McLinko** incorporated Respondent Julian's Response.[1693]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 183 and (Julian and McLinko) No. 145

The practice that the Bank referred to as simulated funding involved the unauthorized transfer of customer funds between one customer account and another, unauthorized customer account.[1694]

**Responses:**

---

[1690] Russ Anderson Amended Answer ¶ 97; Julian Amended Answer ¶ 260; McLinko Amended Answer ¶ 260.

[1691] Russ Anderson's ECSFM at No. 182.

[1692] Julian's ECSFM at No. 144.

[1693] McLinko's ECSFM at No. 144.

[1694] MSD-297 (Richards Tr.) at 82:4-84:4.

Add. 328

Appellate Case: 25-1079      Page: 330      Date Filed: 05/16/2025 Entry ID: 5517644

**Russ Anderson** did not dispute the claim that the Bank referred to the unauthorized transfer of customer funds between one customer account and another, unauthorized customer account as "simulated funding".[1695]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that practice that the Bank referred to as simulated funding involved the unauthorized transfer of customer funds between one customer account and another, unauthorized customer account.

**Julian** presented his response as "disputed," but the substance of his response did not controvert the material allegations presented in this Statement, averring only that in his Amended Answer he did not object to defining "simulated funding" to refer to "transferring customer funds from one account to another without customer consent."[1696]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that the practice that the Bank referred to as simulated funding involved the unauthorized transfer of customer funds between one customer account and another, unauthorized customer account.

**McLinko** incorporated Respondent Julian's Response.[1697]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 184 and (Julian and McLinko) No. 146

The Community Bank did not proactively monitor other types of sales practices misconduct, including pinning, bundling, sandbagging, and the issuance of unauthorized debit and credit cards.[1698]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1699]

---

[1695] Russ Anderson's ECSFM at No. 183.

[1696] Julian's ECSFM at No. 145, quoting Julian Amended Answer ¶ 144.

[1697] McLinko's ECSFM at No. 145.

[1698] MSD-300 (Rawson Tr.) at 79:16-83:17; MSD-297 (Richards Tr.) at 96:6- 97:19; MSD-299 (Sperle Tr.) at 56:10-62:3.

[1699] Russ Anderson's ECSFM at No. 184.

Appellate Case: 25-1079    Page: 331    Date Filed: 05/16/2025 Entry ID: 5517644

**Julian** presented his response as "disputed," but the substance of his response did not controvert the material allegations presented in this Statement.[1700] For example, he averred the Statement "misrepresents the data collected," and in support avers that with respect to pinning, Ms. Rawson said she had never heard their definition of pinning,[1701] "so, 'allegedly enrolling the customer in online bill payments without the customer's consent.' I've never heard that definition of pinning."[1702]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that the Community Bank did not proactively monitor other types of sales practices misconduct, including pinning, bundling, sandbagging, and the issuance of unauthorized debit and credit cards.

**McLinko** incorporated Respondent Julian's Response.[1703]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 185 and (Julian and McLinko) No. 147

In the summer and fall of 2013, SSCOT conducted an analysis to detect instances of simulated funding and of employees changing customer phone numbers without customer authorization in Los Angeles/Orange County, and then across the regional footprint.[1704]

**Responses:**

**Russ Anderson** disputed that the allegation established any facts regarding her failure to institute adequate controls, and incorporated Respondent Julian's response.[1705]

**Julian** presented his response as "disputed," but the substance of his response did not controvert the material allegations presented in this Statement.[1706] He averred that SSCOT "looked more closely at team members within the outlying regions, looking specifically for instances where team members had made automatic transfers from one account to another and pulled back the

---

[1700] Julian's ECSFM at No. 146.

[1701] Julian's ECSFM at No. 146, citing MSD-300 at 80:22-25.

[1702] Julian's ECSFM at No. 146, citing MSD-300 at 80:22-25.

[1703] McLinko's ECSFM at No. 146.

[1704] MSD-105; MSD-106; MSD-107; MSD-155 at 4.

[1705] Russ Anderson's ECSFM at No. 185.

[1706] Julian's ECSFM at No. 147.

money within the same day."[1707]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that in the summer and fall of 2013, SSCOT conducted an analysis to detect instances of simulated funding and of employees changing customer phone numbers without customer authorization in Los Angeles/Orange County, and then across the regional footprint.

**McLinko** incorporated Respondent Julian's Response.[1708]


### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 186 and (Julian and McLinko) No. 148

For the Los Angeles/Orange County and then regional footprint analysis, Respondent Russ Anderson approved SSCOT applying the following methodology to identify employees who, based on data analytics, exhibited activity that was a red flag for simulated funding: "account X was opened, account X was funded by virtue of an auto transfer from account Y, within one day funds were auto transferred from Account X back to account Y leaving account X with a $0 or possibly a negative balance," and "account X had no further funding activity within [] 60 day[s]."[1709]

**Responses:**

**Russ Anderson** disputed the Statement as "incomplete."[1710]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that for the Los Angeles/Orange County and then regional footprint analysis, she approved SSCOT applying the following methodology to identify employees who, based on data analytics, exhibited activity that was a red flag for simulated funding: "account X was opened, account X was funded by virtue of an auto transfer from account Y, within one day funds were auto transferred from Account X back to account Y

---

[1707] Julian's ECSFM at No. 147, citing DJ0176 at 17 OCC-WF-SP- 07138420.

[1708] McLinko's ECSFM at No. 147.

[1709] MSD-105 (emphasis in original); MSD-106; MSD-107; ("...the fact that the accounts only had one deposit and one withdrawal with no additional transactions ultimately resulting in a zero balance seems unusual"); MSD-265 (Farrell Dep. Tr.) at 369:16-370:24.

[1710] Russ Anderson's ECSFM at No. 186.

leaving account X with a \$0 or possibly a negative balance," and "account X had no further funding activity within [] 60 day[s]."

**Julian** averred that accounts flagged as potentially being an instance of simulated funding could have been legitimate, citing in support the report of his expert, Kathlyn Farrell, who stated that "an account that was opened accidentally, an account opened for one transaction (such as the sale of an asset) or an account where the customer changed his or her mind or expected money to come in that did not eventually come."[1711] This speculative assessment does not, however, controvert the material facts presented in the Statement.

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that for the Los Angeles/Orange County and then regional footprint analysis, Respondent Russ Anderson approved SSCOT applying the following methodology to identify employees who, based on data analytics, exhibited activity that was a red flag for simulated funding: "account X was opened, account X was funded by virtue of an auto transfer from account Y, within one day funds were auto transferred from Account X *back* to account Y leaving account X with a \$0 or possibly a negative balance," and "account X had no further funding activity within [] 60 day[s]

**McLinko** incorporated Respondent Julian's Response.[1712]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 187 and (Julian and McLinko) No. 149

After applying this methodology for identifying red flag simulated funding activity, SSCOT then referred for investigation only those employees who were "extreme outliers" for simulated funding (e.g., those who met the following restrictive criteria): "50 or more instances of the above activity occurring over the five month period review OR Four of the five months reflected 10+ accounts involved in this activity and 10% or more of checking/savings sales was involved in this activity."[1713]

**Responses:**

---

[1711] Julian's ECSFM at No. 148, quoting MSD-264 at 20.

[1712] McLinko's ECSFM at No. 148.

[1713] MSD-105 (emphasis added); MSD-106; MSD-107.

Appellate Case: 25-1079    Page: 334    Date Filed: 05/16/2025 Entry ID: 5517644

**Russ Anderson** disputed the accuracy of the quote, stating that the text "50 or more instances of the above activity" should read "50 or more instances of this activity"; and did not dispute that the description of the methodology in the Statement is accurate.[1714]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that after applying this methodology for identifying red flag simulated funding activity, SSCOT then referred for investigation only those employees who were "extreme outliers" for simulated funding (e.g., those who met the following restrictive criteria): "50 or more instances of the above activity occurring over the five month period review OR Four of the five months reflected 10+ accounts involved in this activity and 10% or more of checking/savings sales was involved in this activity."

**Julian** presented his response as "disputed," but the substance of his response did not controvert the material allegations presented in this Statement.[1715] Referring to an October 9, 2013 Significant Investigation Notification that discussed evidence of possible significant funding, Julian averred this was evidence that the Bank "wanted to conduct interviews with the most egregious instances first." Nothing in Julian's Response controverted the material claims in this Statement.[1716]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that after applying this methodology for identifying red flag simulated funding activity, SSCOT then referred for investigation only those employees who were "extreme outliers" for simulated funding (e.g., those who met the following restrictive criteria): "50 or more instances of the above activity occurring over the five month period review OR Four of the five months reflected 10+ accounts involved in this activity and 10% or more of checking/savings sales was involved in this activity."

**McLinko** incorporated Respondent Julian's Response.[1717]


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 188 and (Julian and McLinko) No. 150**

For the Los Angeles/Orange County and then regional footprint analysis, SSCOT identified employees who engaged in "potential falsification of customer phone numbers

---

[1714] Russ Anderson's ECSFM at No. 187.

[1715] Julian's ECSFM at No. 149.

[1716] Julian's ECSFM at No. 149, citing DJ0582 at 2 OCC-SP00046660.

[1717] McLinko's ECSFM at No. 149.

Appellate Case: 25-1079   Page: 335   Date Filed: 05/16/2025 Entry ID: 5517644

(possibly to circumvent 11Ways to Wow Customer Surveys)" by identifying instances in which a "Customer's existing phone number was changed by 1-3 digits."[1718] After applying this methodology, SSCOT then referred for investigation only those employees "having greater than 50 examples of unique phone number changes" in a three month period.[1719]

**Responses:**

**Russ Anderson** did not dispute that the quoted text is an accurate quote, nor did she dispute the extent the description of the methodology for investigations of phone number changes is accurate, and that the described methodology was employed.[1720] She averred the quote "lacks context" and that there were other forms of proactive monitoring in use.[1721]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that for the Los Angeles/Orange County and then regional footprint analysis, SSCOT identified employees who engaged in "potential falsification of customer phone numbers (possibly to circumvent 11Ways to Wow Customer Surveys)" by identifying instances in which a "Customer's existing phone number was changed by 1-3 digits." After applying this methodology, SSCOT then referred for investigation only those employees "having greater than 50 examples of unique phone number changes" in a three month period.

**Julian** did not dispute that the quoted text is an accurate quote, nor did he dispute the extent the description of the methodology for investigations of phone number changes is accurate, and that the described methodology was employed.[1722] He averred only that "[t]his was considered to be the first slice of the data" and that SSCOT "was expected to run the report monthly".[1723]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that for the Los Angeles/Orange County and then regional footprint analysis, SSCOT identified employees who engaged in "potential falsification of customer phone numbers (possibly to circumvent 11Ways to Wow Customer

---

[1718] MSD-105; MSD-106; MSD-107.

[1719] MSD-105; MSD-106; MSD-107.

[1720] Russ Anderson's ECSFM at No. 188.

[1721] Russ Anderson's ECSFM at No. 188.

[1722] Julian's ECSFM at No. 150.

[1723] Julian's ECSFM at No. 150, citing MSD-107 at 1.

Appellate Case: 25-1079     Page: 336     Date Filed: 05/16/2025 Entry ID: 5517644

Surveys)" by identifying instances in which a "Customer's existing phone number was changed by 1-3 digits." After applying this methodology, SSCOT then referred for investigation only those employees "having greater than 50 examples of unique phone number changes" in a three month period.

**McLinko** incorporated Respondent Julian's Response.[1724]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 189 and (Julian and McLinko) No. 151

On October 18, 2013, Corporate Investigations sent Respondent Russ Anderson a Significant Investigation Notification.[1725] Respondent McLinko's direct report Bart Deese received the Significant Investigation Notification from Corporate Investigations.[1726] Mr. Deese provided Respondent McLinko with an updated Significant Investigation Notification on November 1, 2013.[1727] The Significant Incident Notification stated that "Corporate Investigations has deemed this case significant based on the number of team members impacted and the specific misconduct identified."[1728] The Significant Investigation Notification noted that 177 bankers were identified for possible simulated funding.[1729] The allegation was that "Simulated funding falsified entries were made to meet individual and store sales goals."[1730] Individuals with "the most egregious simulated funding numbers were to be interviewed first."[1731] The criteria for identifying employees with the most egregious simulated funding numbers was the criteria of "50 or more accounts opened in 1 month or 10% of total accounts opened in a 4 month period."[1732] Those individuals with the most egregious phone number changes were also interviewed.[1733]

---

[1724] McLinko's ECSFM at No. 150.

[1725] MSD-108.

[1726] MSD-108.

[1727] MSD-333.

[1728] MSD-108 at 2.

[1729] MSD-108 at 2.

[1730] MSD-108 at 3 (emphasis added).

[1731] MSD-108 at 3.

[1732] MSD-108 at 3.

[1733] MSD-108 at 3.

Add. 335

Appellate Case: 25-1079     Page: 337     Date Filed: 05/16/2025 Entry ID: 5517644

**Responses:**

**Russ Anderson** did not dispute that the quoted statements reflect what was said, but disputed this showed she failed to institute adequate controls to prevent sales practices misconduct.[1734]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that on October 18, 2013, Corporate Investigations sent Respondent Russ Anderson a Significant Investigation Notification. Respondent McLinko's direct report Bart Deese received the Significant Investigation Notification from Corporate Investigations. Mr. Deese provided Respondent McLinko with an updated Significant Investigation Notification on November 1, 2013. The Significant Incident Notification stated that "Corporate Investigations has deemed this case significant based on the number of team members impacted and the specific misconduct identified." The Significant Investigation Notification noted that 177 bankers were identified for possible simulated funding. The allegation was that "Simulated funding falsified entries were made *to meet individual and store sales goals.*" Individuals with "the most egregious simulated funding numbers were to be interviewed first." The criteria for identifying employees with the most egregious simulated funding numbers was the criteria of "50 or more accounts opened in 1 month or 10% of total accounts opened in a 4 month period." Those individuals with the most egregious phone number changes were also interviewed.

**Julian** incorporated Respondent McLinko's Response.[1735]

**McLinko** did not dispute that he received the cited email and that it contained the quoted language, except that it did not contain any added emphasis[1736] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on October 18, 2013, Corporate Investigations sent Respondent Russ Anderson a Significant Investigation Notification. Respondent McLinko's direct report Bart Deese received the Significant Investigation Notification from Corporate Investigations. Mr. Deese provided Respondent McLinko with an updated Significant Investigation Notification on November 1, 2013. The Significant Incident Notification stated that "Corporate Investigations has deemed this case significant based on the number of team members impacted and the specific misconduct identified." The Significant Investigation Notification noted that 177

---

[1734] Russ Anderson's ECSFM at No. 189.

[1735] Julian's ECSFM at No. 151.

[1736] McLinko's ECSFM at No. 151

Add. 336

Appellate Case: 25-1079     Page: 338     Date Filed: 05/16/2025 Entry ID: 5517644

bankers were identified for possible simulated funding. The allegation was that "Simulated funding falsified entries were made to meet individual and store sales goals." Individuals with "the most egregious simulated funding numbers were to be interviewed first." The criteria for identifying employees with the most egregious simulated funding numbers was the criteria of "50 or more accounts opened in 1 month or 10% of total accounts opened in a 4 month period." Those individuals with the most egregious phone number changes were also interviewed.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 190

Respondent Russ Anderson testified that she did not disagree that the criteria detected the most egregious offenders.[1737]

**Responses:**

**Russ Anderson** disputed the Statement as referring to criteria that is vague and undefined; but did not dispute the testimony attributed to her.[1738]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she testified that she did not disagree that the criteria detected the most egregious offenders.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 191 and (Julian and McLinko) No. 152

The Significant Investigation Notification Respondent Russ Anderson received contained the following key findings based on the investigation of employees with the most egregious simulated funding numbers: "[k]nowing their actions were against wfb [wells fargo bank] policy[;] [t]o meet quarterly sales goals; following manager and/or prior manager's guidance[;] [l]earned from observing/talking to other team members[;] [h]ad customer's [sic] fund accounts with a $50 deposit and then withdraw from atm[;] [a]ttempt to contact customer with unfunded accounts but would resort to auto transfers w/o customer consent to meet goals timely[.]"[1739]

---

[1737] MSD-266 (Russ Anderson Dep. Tr.) at 224:2-229:17; MSD-117 (email to Respondent Russ Anderson, "Second, we need to keep in mind that we've already terminated team members in LA/OC for this activity and those who were identified met the threshold of having 50 or more phone number changes of 1-3 digit in a 3 month period (which I think we would all acknowledge is just capturing the worst of the worst offenders)".

[1738] Russ Anderson's ECSFM at No. 190.

[1739] MSD-108 at 3.

**Responses:**

**Russ Anderson** did not dispute that the exhibit relied upon by Enforcement Counsel contained the above-cited statements, but disputed the statements establish that she failed to institute adequate controls to detect sales practices misconduct.[1740]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the Significant Investigation Notification that she received contained the following key findings based on the investigation of employees with the most egregious simulated funding numbers: "[k]nowing their actions were against wfb [wells fargo bank] policy[;] [t]o meet quarterly sales goals; following manager and/or prior manager's guidance[;] [l]earned from observing/talking to other team members[;] [h]ad customer's [sic] fund accounts with a $50 deposit and then withdraw from atm[;] [a]ttempt to contact customer with unfunded accounts but would resort to auto transfers w/o customer consent to meet goals timely[.]"

**Julian** incorporated Respondent McLinko's Response.[1741]

**McLinko** disputed the relied-upon exhibit is an accurate or complete recitation of the cited evidence, but presented no evidence establishing that the language presented was not found in the exhibit relied upon by Enforcement Counsel.[1742] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that the Significant Investigation Notification that Respondent Russ Anderson received contained the following key findings based on the investigation of employees with the most egregious simulated funding numbers: "[k]nowing their actions were against wfb [wells fargo bank] policy[;] [t]o meet quarterly sales goals; following manager and/or prior manager's guidance[;] [l]earned from observing/talking to other team members[;] [h]ad customer's [sic] fund accounts with a $50 deposit and then withdraw from atm[;] [a]ttempt to contact customer with unfunded accounts but would resort to auto transfers w/o customer consent to meet goals timely[.]"

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 192**

Respondent Russ Anderson testified that she had no reason to doubt the findings in the

---

[1740] Russ Anderson's ECSFM at No. 191.

[1741] Julian's ECSFM at No. 152.

[1742] McLinko's ECSFM at No. 152.

Appellate Case: 25-1079    Page: 340    Date Filed: 05/16/2025 Entry ID: 5517644

Significant Investigation Notification.[1743]

**Responses:**

**Russ Anderson** did not dispute that the exhibit relied upon by Enforcement Counsel contained the above-cited statements, but disputed the statements establish that she failed to institute adequate controls to detect sales practices misconduct.[1744]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she testified that she had no reason to doubt the findings in the Significant Investigation Notification.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 193 and (Julian and McLinko) No. 153**

As Corporate Investigations explained, "The SIN and IDEA notifications are designed to ensure that the investigative findings are appropriately shared with all appropriate key stakeholders. The goal of the SIN and IDEA is to ensure all key stakeholders are aware of the issue and that they review for possible follow-up specific to their role and responsibility within the organization. A primary role for each LOB [line of business] Group Risk Officer is to mitigate risks and acts of TM [team member] misconduct and fraud are a key part of these risks."[1745]

**Responses:**

**Russ Anderson** did not dispute the text is accurately quoted but disputed the text shows she failed to institute adequate controls to prevent sales practices misconduct.[1746]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that Corporate Investigations explained, "The SIN and IDEA notifications are designed to ensure that the investigative findings are appropriately shared with all appropriate key stakeholders. The goal of the SIN and IDEA is to ensure all key stakeholders are aware of the issue and that they review for possible follow-up specific to their role and responsibility within the organization. A primary role for each LOB

---

[1743] MSD-266 (Russ Anderson Dep. Tr.) at 226:4- 227:10.

[1744] Russ Anderson's ECSFM at No. 192.

[1745] MSD-221 at 2.

[1746] Russ Anderson's ECSFM at No. 193.

Appellate Case: 25-1079   Page: 341   Date Filed: 05/16/2025 Entry ID: 5517644

[line of business] Group Risk Officer is to mitigate risks and acts of TM [team member] misconduct and fraud are a key part of these risks."

**Julian** incorporated Respondent McLinko's Response.[1747]

**McLinko** disputed the relied-upon exhibit is an accurate or complete recitation of the cited evidence, but presented no evidence establishing that the language presented was not found in the exhibit relied upon by Enforcement Counsel.[1748] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that As Corporate Investigations explained, "The SIN and IDEA notifications are designed to ensure that the investigative findings are appropriately shared with all appropriate key stakeholders. The goal of the SIN and IDEA is to ensure all key stakeholders are aware of the issue and that they review for possible follow-up specific to their role and responsibility within the organization. A primary role for each LOB [line of business] Group Risk Officer is to mitigate risks and acts of TM [team member] misconduct and fraud are a key part of these risks."

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 194 and (Julian and McLinko) No. 154

Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 194 and (Julian and McLinko) No. 154 rely on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[1749] Upon my review of the confidential documents supporting these Statements of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in these Statements of Material Fact.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 195 and (Julian and McLinko) No. 155

The analysis from SSCOT in the summer and fall of 2013 to identify employees engaged in

---

[1747] Julian's ECSFM at No. 153.

[1748] McLinko's ECSFM at No. 153.

[1749] See 12 C.F.R. § 19.33(b).

Add. 340

Appellate Case: 25-1079    Page: 342    Date Filed: 05/16/2025 Entry ID: 5517644

egregious patterns of simulated funding and phone number changes led to an initial round of investigations that resulted in terminations of approximately 35 employees in the fall of 2013, followed by a footprint-wide investigation of similar conduct across the Regional Bank.[1750]

**Responses:**

**Russ Anderson** does not dispute that the analysis reached the conclusions stated, but disputed its admissibility as it relies upon a legal opinion, lacks documentation, and Respondent was "not part of the exchange."[1751]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the referenced analysis from SSCOT in the summer and fall of 2013 to identify employees engaged in egregious patterns of simulated funding and phone number changes led to an initial round of investigations that resulted in terminations of approximately 35 employees in the fall of 2013, followed by a footprint-wide investigation of similar conduct across the Regional Bank.

**Julian** presented his response as "disputed," but the substance of his response did not controvert the material allegations presented in this Statement.[1752] He does not dispute that the analysis reached the conclusions shown in the Statement, but avers the Statement "mischaracterizes the SSCOT investigation, that "[t]o identify outlier behavior, SSCOT focused on individuals that had opened more than 50 accounts in one month or those where more than 10% of their total accounts opened in four months showed potential simulated funding activity.[1753] Based on this analysis, SSCOT confirmed that higher than acceptable incidents of simulated funding appeared to be taking place and referred the matter to CIS.[1754] Corporate Investigations then decided to conduct an intensive investigation into simulated funding activity, starting with the Los Angeles and Orange County markets."[1755]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that the referenced analysis from SSCOT in the summer and fall of 2013 to identify employees engaged in egregious patterns of simulated funding and phone number changes led to an initial round of investigations that resulted in

---

[1750] Russ Anderson Amended Answer ¶ 99; MSD-114 at 2-3.

[1751] Russ Anderson's ECSFM at No. 195.

[1752] Julian's ECSFM at No. 155.

[1753] Julian's ECSFM at No. 155, citing DJ0177 at 2 OCC-WF-SP- 07607271.

[1754] Julian's ECSFM at No. 155, citing DJ0177 at 2 OCC-WF-SP-07607271.

[1755] Julian's ECSFM at No. 155, citing DJ0177 at 1 OCC-WF-SP-07607271.

Add. 341

Appellate Case: 25-1079      Page: 343      Date Filed: 05/16/2025 Entry ID: 5517644

terminations of approximately 35 employees in the fall of 2013, followed by a footprint-wide investigation of similar conduct across the Regional Bank.

**McLinko** incorporated Respondent Julian's Response.[1756]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 196 and (Julian and McLinko) No. 156**

On October 3, 2013, the *Los Angeles Times* published an article under the headline, "Wells Fargo Fires Workers Accused of Cheating on Sales Goals." The article reported that the Bank had fired 30 employees in the Los Angeles region for "open[ing] accounts that were never used and attempt[ing] to manipulate customer-satisfaction surveys." The article further reported "the pressure to meet sales goals was intense" and that there were cases of forged customer signatures and accounts opened without customer knowledge.[1757]

**Responses:**

**Russ Anderson** did not dispute that the text was accurately quoted, but disputed the claim "for its mischaracterization of Ms. Russ Anderson's knowledge of the simulated funding investigation."[1758]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that on October 3, 2013, the *Los Angeles Times* published an article under the headline, "Wells Fargo Fires Workers Accused of Cheating on Sales Goals." The article reported that the Bank had fired 30 employees in the Los Angeles region for "open[ing] accounts that were never used and attempt[ing] to manipulate customer-satisfaction surveys." The article further reported "the pressure to meet sales goals was intense" and that there were cases of forged customer signatures and accounts opened without customer knowledge.

**Julian** did not dispute that the text was accurately quoted, but disputed the Statement "lacks additional context."[1759] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on October 3,

---

[1756] McLinko's ECSFM at No. 155.

[1757] Russ Anderson Amended Answer ¶ 100; MSD-331 (email forwarding Oct. 2013 LA Times Article) (Russ Anderson asking Mr. Bacon for "some context" because she "wasn't aware of this situation"); MSD-56 (Christoff Decl.) at ¶ 16.

[1758] Russ Anderson's ECSFM at No. 196.

[1759] Julian's ECSFM at No. 156.

Appellate Case: 25-1079    Page: 344    Date Filed: 05/16/2025 Entry ID: 5517644

2013, the *Los Angeles Times* published an article under the headline, "Wells Fargo Fires Workers Accused of Cheating on Sales Goals." The article reported that the Bank had fired 30 employees in the Los Angeles region for "open[ing] accounts that were never used and attempt[ing] to manipulate customer-satisfaction surveys." The article further reported "the pressure to meet sales goals was intense" and that there were cases of forged customer signatures and accounts opened without customer knowledge.

**McLinko** incorporated Respondent Julian's Response.[1760]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 197 and (Julian and McLinko) No. 157

Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 197 and (Julian and McLinko) No. 157 rely on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[1761] Upon my review of the confidential documents supporting these Statements of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in these Statements of Material Fact.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 198

Only weeks after the October *Los Angeles Times* article, or around November 15, 2013, Respondent Russ Anderson provided feedback on a draft "Issue and Recommendation memo" from Audit (on which Respondent McLinko was copied).[1762] The original language of the "Issue and Recommendation memo" regarding Sales Quality / Sales Integrity stated: "Enhance the training notification process and increased visibility of repeat sales offenders."[1763] The edits from Respondent Russ Anderson included, among other things, deleting the term "repeat sales

---

[1760] McLinko's ECSFM at No. 156.

[1761] See 12 C.F.R. § 19.33(b).

[1762] MSD-198 at 2.

[1763] MSD-198 at 4.

offenders" throughout the document.[1764]

**Responses:**

**Russ Anderson** did not dispute the claim that she made the edits described above, but disputed that making edits to a document is grounds for a conclusion that Ms. Russ Anderson failed to institute adequate controls to prevent sales practices misconduct.[1765]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that only weeks after the October *Los Angeles Times* article, or around November 15, 2013, Respondent Russ Anderson provided feedback on a draft "Issue and Recommendation memo" from Audit (on which Respondent McLinko was copied). The original language of the "Issue and Recommendation memo" regarding Sales Quality / Sales Integrity stated: "Enhance the training notification process and increased visibility of repeat sales offenders." The edits from Respondent Russ Anderson included, among other things, deleting the term "repeat sales offenders" throughout the document.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 199 and (Julian and McLinko) No. 158

On December 21, 2013, the *Los Angeles Times* published a second article, with the headline: "Wells Fargo's Pressure-Cooker Sales Culture Comes at a Cost." The article stated it was based on interviews with 28 former and seven current employees across nine states. This article reported that employees were threatened with termination if they failed to meet their sales goals.[1766]

**Responses:**

**Russ Anderson** did not dispute that the article contains the quoted material, but averred the newspaper article is not evidence that employees were threatened with termination if they failed to meet sales goals, and that media outlets are known to generate articles and reports that are inaccurate.[1767]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that on December 21, 2013, the *Los Angeles*

---

[1764] MSD-198 at 4, 6-8.

[1765] Russ Anderson's ECSFM at No. 198.

[1766] Russ Anderson Amended Answer ¶ 101; MSD-111.

[1767] Russ Anderson's ECSFM at No. 199.

Appellate Case: 25-1079     Page: 346     Date Filed: 05/16/2025 Entry ID: 5517644

*Times* published a second article, with the headline: "Wells Fargo's Pressure-Cooker Sales Culture Comes at a Cost." The article stated it was based on interviews with 28 former and seven current employees across nine states. This article reported that employees were threatened with termination if they failed to meet their sales goals.

**Julian** did not dispute that the article contains the quoted material, but averred the Statement "lacks additional context."[1768]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on December 21, 2013, the *Los Angeles Times* published a second article, with the headline: "Wells Fargo's Pressure-Cooker Sales Culture Comes at a Cost." The article stated it was based on interviews with 28 former and seven current employees across nine states. This article reported that employees were threatened with termination if they failed to meet their sales goals.

**McLinko** incorporated Respondent Julian's Response.[1769]


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 200**

Respondent Russ Anderson read both the October 2013 and December 2013 *Los Angeles Times* articles.[1770]

**Responses:**

**Russ Anderson** did not dispute that the articles contained the quoted text or that she read both articles, but disputed the claims because references to her transcript "are incomplete as they do not include her subsequent response that that article was "not necessarily" credible and some accusations not accurate.[1771]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she read both the October 2013 and December 2013 *Los Angeles Times* articles.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 159**

Respondents Julian and McLinko were both aware of the October 2013 and December 2013

---

[1768] Julian's ECSFM at No. 158.

[1769] McLinko's ECSFM at No. 158.

[1770] MSD-266 (Russ Anderson Dep. Tr.) at 160:20-23; Russ Anderson Amended Answer ¶ 102.

[1771] Russ Anderson's ECSFM at No. 200, citing MSD-266 at 160:24-162:12.

Los Angeles Times articles about the Community Bank's sales practices.[1772]

**Responses:**

**Julian** did not dispute the claim.[1773] **McLinko**: did not dispute the claim. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that Respondents Julian and McLinko were both aware of the October 2013 and December 2013 Los Angeles Times articles about the Community Bank's sales practices.[1774]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 201 and (Julian and McLinko) No. 160

Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 201 and (Julian and McLinko) No. 160 rely on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[1775] Upon my review of the confidential documents supporting these Statements of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in these Statements of Material Fact.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 202 and (Julian and McLinko) No. 161

The pause on the Community Bank's proactive monitoring of simulated funding and phone number changes did not end until July 2014, in that SSCOT did not begin to refer cases generated from the proactive monitoring reports to Corporate Investigations until then.[1776] There was no lookback conducted of potential simulated funding and phone number changes

---

[1772] Julian Amended Answer ¶ 55, 102; McLinko Amended Answer ¶ 55, 102; MSD-531 (a colleague warning Respondent McLinko that "it poses reputation risk to the firm").

[1773] Julian's ECSFM at No. 159.

[1774] McLinko's ECSFM at No. 159.

[1775] See 12 C.F.R. § 19.33(b).

[1776] MSD-115 at 2, 3.

Add. 346

Appellate Case: 25-1079    Page: 348    Date Filed: 05/16/2025 Entry ID: 5517644

that occurred prior to April 2014.[1777]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1778]

**Julian** did not dispute the claim, but stated "it lacks necessary context," referring to evidence showing that the Core Team agreed to pause in order to give them time to "understand and address the root causes of the issue and tak[e] appropriate action in response to our findings."[1779]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Julian that the pause on the Community Bank's proactive monitoring of simulated funding and phone number changes did not end until July 2014, in that SSCOT did not begin to refer cases generated from the proactive monitoring reports to Corporate Investigations until then. There was no lookback conducted of potential simulated funding and phone number changes that occurred prior to April 2014.

**McLinko** incorporated Respondent Julian's Response.[1780]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 203 and (Julian and McLinko) No. 162

When SSCOT resumed proactive monitoring of simulated funding in July 2014, the Community Bank used a threshold that identified for further investigation only the top 0.01% of employees who engaged in "red flag" simulated funding activity. The other 99.99% of employees engaging in "red flag" activity were not referred for investigation as a result of the proactive monitoring.

**Responses:**

**Russ Anderson** did not dispute that in her Amended Answer she admitted to the threshold used as described above, but disputed how the threshold worked.[1781]

---

[1777] MSD-115.

[1778] Russ Anderson's ECSFM at No. 202.

[1779] Julian's ECSFM at No. 161, quoting MSD-112 at 1.

[1780] McLinko's ECSFM at No. 161.

[1781] Russ Anderson's ECSFM at No. 203.

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that when SSCOT resumed proactive monitoring of simulated funding in July 2014, the Community Bank used a threshold that identified for further investigation only the top 0.01% of employees who engaged in "red flag" simulated funding activity. The other 99.99% of employees engaging in "red flag" activity were not referred for investigation as a result of the proactive monitoring.

**Julian** responded that the claim was disputed, but did not dispute the claim and instead averred Enforcement Counsel has misrepresented the data.[1782] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that when SSCOT resumed proactive monitoring of simulated funding in July 2014, the Community Bank used a threshold that identified for further investigation only the top 0.01% of employees who engaged in "red flag" simulated funding activity. The other 99.99% of employees engaging in "red flag" activity were not referred for investigation as a result of the proactive monitoring.

**McLinko** incorporated Respondent Julian's Response.[1783]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 204 and (Julian and McLinko) No. 163

SSCOT's application of the 99.99% threshold beginning in July 2014 identified approximately 30,000 employees per month who exhibited activity that was a red flag for simulated funding. SSCOT referred for investigation only the top 0.01% of those employees who had the most activity indicative of simulated funding, or 3 employees per month. In other words, SSCOT referring for investigation only 1 out of every 10,000 employees who exhibited red flag activity for simulated funding.[1784]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1785]

**Julian** disputed the claim, averring that 99.99% includes the bankers who did not have any instances of potential instances of simulated funding and is not limited to the bankers with "red flag" activity identified; thus, the bank was proactively monitoring the top 0.01% of all

---

[1782] Julian's ECSFM at No. 162.

[1783] McLinko's ECSFM at No. 162.

[1784] MSD-116 at 3; see also MSD-300 (Rawson Tr.) at 176:17-179:11.

[1785] Russ Anderson's ECSFM at No. 204.

employees.[1786]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that SSCOT's application of the 99.99% threshold beginning in July 2014 identified approximately 30,000 employees per month who exhibited activity that was a red flag for simulated funding. SSCOT referred for investigation only the top 0.01% of those employees who had the most activity indicative of simulated funding, or 3 employees per month. In other words, SSCOT referring for investigation only 1 out of every 10,000 employees who exhibited red flag activity for simulated funding.

**McLinko** incorporated Respondent Julian's Response.[1787]


**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 163**

The "extreme outlier" employees identified for further investigation through SSCOT's proactive monitoring of simulated funding had not been previously identified and terminated through the Bank's other reactive detective means, such as the EthicsLine or customer complaints.[1788]

**Responses:**

**Julian** averred that Enforcement Counsel rely solely on their own calculation, which shows a "fundamental misunderstanding of how the threshold was calculated" and averred that the 99.99% "includes the bankers who did not have any instances of potential instances of simulated funding"[1789] [and i]t is not limited to the bankers with 'red flag' activity identified; thus, the bank was proactively monitoring the top 0.01% of all employees."[1790]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that the "extreme outlier" employees identified for further investigation through SSCOT's proactive monitoring of simulated funding had not been previously identified and terminated through the Bank's other reactive detective means, such as the EthicsLine or customer complaints.

---

[1786] Julian's ECSFM at No. 162, citing MSD- 119 at 2.

[1787] McLinko's ECSFM at No. 162.

[1788] MSD- 300 (Rawson Tr.) at 90:18-91:20.

[1789] Julian's ECSFM at No. 163, citing MSD- 119 at 2.

[1790] Julian's ECSFM at No. 163, citing MSD- 119 at 2.

Appellate Case: 25-1079    Page: 351    Date Filed: 05/16/2025 Entry ID: 5517644

**McLinko** incorporated Respondent Julian's Response.[1791]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 205**

From April 2015 through October 2016, SSCOT lowered the threshold slightly to refer for investigation those employees at or above the 99.95th percentile of activity that was a red flag for simulated funding.[1792]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response in (Julian and McLinko) No. 164.[1793] In that Response, Respondent Julian did not dispute that SSCOT lowered the threshold as stated, admitting that the Bank decided to lower the threshold in April 2015 because "simulated behavior decreased with only on average three team members identified per month" so "the SSCOT expanded the threshold for review by flagging all in-out transactions within one day, which could include cash deposits, and lowering the percentile to the top 99.95%.[1794]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Julian that from April 2015 through October 2016, SSCOT lowered the threshold slightly to refer for investigation those employees at or above the 99.95th percentile of activity that was a red flag for simulated funding.

**Enforcement Counsel's Statement of Material Facts (Julian and McLinko) No. 164**

From April 2015 through October 2016, SSCOT lowered the threshold slightly to refer for investigation those employees at or above the 99.95th percentile of activity that was a red flag for simulated funding. SSCOT's proactive monitoring of simulated funding never looked beyond the most egregious offenders.[1795]

---

[1791] McLinko's ECSFM at No. 163.

[1792] Russ Anderson Amended Answer ¶ 106; MSD-116 at 3; MSD- 115 at 3 (describing the evolution of thresholds); MSD-300 (Rawson Tr.) at 225:11-22; MSD- 299 (Sperle Tr.) at 110:20-111:1 (testifying that SSCOT continued using the 99.95% threshold for identifying simulated funding, even in 2016.

[1793] Russ Anderson's ECSFM at No. 205.

[1794] Julian's ECSFM at No. 164, quoting MSD-116 at 1.

[1795] Russ Anderson Amended Answer ¶ 106; MSD- 116 at 3; MSD-115 at 3 (describing the evolution of thresholds); MSD-300 (Rawson Tr.) at 158:24-163:3 225:11-22 (testifying that plan to expand thresholds was not approved); Russ Anderson Dep. Tr. 229:6-17, 225:4-22; MSD-299 (Sperle Tr.) at 110:20-111:1 (testifying that SSCOT

Appellate Case: 25-1079    Page: 352    Date Filed: 05/16/2025 Entry ID: 5517644

**Responses:**

**Julian** did not dispute that SSCOT lowered the threshold as stated, admitting that the Bank decided to lower the threshold in April 2015 because "simulated behavior decreased with only on average three team members identified per month" so "the SSCOT expanded the threshold for review by flagging all in-out transactions within one day, which could include cash deposits, and lowering the percentile to the top 99.95%.[1796]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that from April 2015 through October 2016, SSCOT lowered the threshold slightly to refer for investigation those employees at or above the 99.95th percentile of activity that was a red flag for simulated funding. SSCOT's proactive monitoring of simulated funding never looked beyond the most egregious offenders.

**McLinko** incorporated Respondent Julian's Response.[1797]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 206 and (Julian and McLinko) No. 165**

Lowering the threshold to the 99.95th percentile resulted in the identification and referral of approximately 15 to 23 employees per month.[1798]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1799]

**Julian** did not dispute the claim in the Statement, but averred that "lowering threshold from the 99.99th percentile to the 99.95th percentile was just one of the enhancements made in April of 2015.[1800]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will

---

continued using the 99.95 threshold for identifying simulated funding, even in 2016); MSD-118; MSD-119; MSD-121.

[1796] Julian's ECSFM at No. 164, quoting MSD-116 at 1.

[1797] McLinko's ECSFM at No. 3.

[1798] MSD-603; MSD-116 at 3; MSD-119 at 1-2 (noting that application of the 99.95% captures the "more egregious behavior"); MSD- 122; MSD-300 (Rawson Tr.) at 169:7-172:10, 213:16-23; MSD-299 (Sperle Tr.) at 170:9-171:13.

[1799] Russ Anderson's ECSFM at No. 206.

[1800] Julian's ECSFM at No. 164, citing MSD-603 at 2-3.

include a factual finding as to Respondent Julian that lowering the threshold to the 99.95[th] percentile resulted in the identification and referral of approximately 15 to 23 employees per month.

**McLinko** incorporated Respondent Julian's Response.[1801]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 207 and (Julian and McLinko) No. 166

The 99.95% percent threshold captured employees who had on average 10.3 occurrences of red flag activity for simulated funding each month.[1802]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1803]

**Julian** averred that SSCOT collected data over a period of time, and found that of the bankers that made up the top 0.05%, the average number of "red flag" activity for simulated funding overall was 10.3 occurrences per month,[1804] asserting that "[t]his does not mean that each employee individually had 10.3 occurrences per month, seeing as the employees with the most egregious behavior (e.g., opening 50 or more accounts in a month) would dramatically skew the average per employee."[1805]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson and Julian that 99.95% percent threshold captured employees who had on average 10.3 occurrences of red flag activity for simulated funding each month.

**McLinko** incorporated Respondent Julian's Response.[1806]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 208 and (Julian and McLinko) No. 167

---

[1801] McLinko's ECSFM at No. 4.

[1802] MSD-119; MSD-300 (Rawson Tr.) at 165:11-19.

[1803] Russ Anderson's ECSFM at No. 207.

[1804] Julian's ECSFM at No. 166, citing MSD-119 at 2.

[1805] Julian's ECSFM at No. 166, citing, e.g., (MSD-119 at 2) (DJ0177 at 2 OCC-WF- SP-07607271).

[1806] McLinko's ECSFM at No. 166.

Enforcement Counsel's Statements of Material Fact (Russ Anderson) No. 208 and (Julian and McLinko) No. 167 rely on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[1807] Upon my review of the confidential documents supporting these Statements of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in these Statements of Material Fact.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 209**

Respondent Russ Anderson knew of and approved the use of the 99.99% and 99.95% thresholds.[1808]

**Responses:**

**Russ Anderson** did not dispute the testimony upon which this Statement is based, acknowledging that she testified that she knew of and approved the use of the 99.99% and 99.95% thresholds "[a]s part of the core committee, which was a recommendation that came through David Otsuka and the legal department",[1809] but disputed the Statement as "incomplete."[1810]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she knew of and approved the use of the 99.99% and 99.95% thresholds.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 210**

Respondent Russ Anderson testified she could not recall a point in time during her entire tenure as Group Risk Officer when SSCOT's proactive monitoring referred for investigation

---

[1807] See 12 C.F.R. § 19.33(b).

[1808] MSD-266 (Russ Anderson Dep. Tr.) at 101:9-102:12.

[1809] Russ Anderson's ECSFM at No. 209, citing MSD-266 (Russ Anderson Dep. Tr.) at 101:9-102:12.

[1810] Russ Anderson's ECSFM at No. 209.

Appellate Case: 25-1079    Page: 355    Date Filed: 05/16/2025 Entry ID: 5517644

anyone other than the most egregious offenders of sales practices misconduct.[1811]

**Responses:**

**Russ Anderson** did not dispute the testimony attributed to her but averred the Statement "mischaracterizes" the testimony.[1812]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she testified she could not recall a point in time during her entire tenure as Group Risk Officer when SSCOT's proactive monitoring referred for investigation anyone other than the most egregious offenders of sales practices misconduct.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 211

Russ Anderson was aware of concerns regarding SSCOT's methodology to detect sales practices misconduct, including from her own staff within SSCOT.[1813]

**Responses:**

**Russ Anderson** did not dispute that she was present at the meetings referred to by Ms. Rawson's testimony, disputing only that Ms. Rawson's testimony was vague when specifically asked whether Ms. Russ Anderson was present.[1814]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she was aware of concerns regarding SSCOT's methodology to detect sales practices misconduct, including from her own staff within SSCOT.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 212 and (Julian and McLinko) No. 168

---

[1811] MSD-266 (Russ Anderson Dep. Tr.) at 229:6-17; see also MSD-300 (Rawson Tr.) at 158:24- 163:3 (testifying that a plan to expand thresholds was not approved), 225:4-22; MSD-115 at 3 (describing those in the 99.99 percentile as "the worst of the worst"); MSD-118; MSD-119; MSD-121 ("However, where proactive monitoring identifies potential dishonest conduct involving a significant number of team members, we generally rely on established threshold to target more egregious conduct . . . [i]nappropriate conduct identified through proactive monitoring falling below an established threshold generally is . . . not reviewed for dishonesty, and in most of those situations, no other corrective action is taken.").

[1812] Russ Anderson's ECSFM at No. 210.

[1813] MSD-300 (Rawson Tr.) at 173:18-176:6, 187:3-190:15; MSD-546 (Stevens Tr.) at 215:4-18.

[1814] Russ Anderson's ECSFM at No. 211.

The Bank's former Head of Financial Crimes Risk Management James Richards explained to Respondent Russ Anderson that "applying percentage based, purely percentage based thresholds allows you to manage to the output from those thresholds rather than to manage to the underlying risk or underlying activity that you're monitoring. It allows you to manage the output."[1815]

**Responses:**

**Russ Anderson** did not dispute that Mr. Richards gave the above explanation to her, but averred that Mr. Richards' transcript is the only citation for this statement and is not proof of the statement."[1816]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the Bank's former Head of Financial Crimes Risk Management James Richards explained to her that "applying percentage based, purely percentage based thresholds allows you to manage to the output from those thresholds rather than to manage to the underlying risk or underlying activity that you're monitoring. It allows you to manage the output."

**Julian** presented his response as "disputed," but he did not dispute that Mr. Richards gave the above explanation to Respondent Russ Anderson.[1817] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that the Bank's former Head of Financial Crimes Risk Management James Richards explained to Respondent Russ Anderson that "applying percentage based, purely percentage based thresholds allows you to manage to the output from those thresholds rather than to manage to the underlying risk or underlying activity that you're monitoring. It allows you to manage the output."

**McLinko** incorporated Respondent Julian's Response.[1818]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 213

In response, Respondent Russ Anderson suggested that "if they changed or dramatically changed their monitoring thresholds that they would have, and I can't recall her phrase, but

---

[1815] MSD-297 (Richards Tr.) at 146:11-148:20.

[1816] Russ Anderson's ECSFM at No. 212

[1817] Julian's ECSFM at No. 168.

[1818] McLinko's ECSFM at No. 168.

many, many more identified team members than they could reasonably handle."[1819] Mr. Richards offered his team to assist SSCOT with their modeling and monitoring, but Respondent Russ Anderson refused.[1820]

**Responses:**

**Russ Anderson** did not dispute that Mr. Richards gave the above explanation to her, but averred that Mr. Richards' transcript is the only citation for this statement and is not proof of the statement."[1821]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that in response, she suggested that "if they changed or dramatically changed their monitoring thresholds that they would have, and I can't recall her phrase, but many, many more identified team members than they could reasonably handle."[1822] Mr. Richards offered his team to assist SSCOT with their modeling and monitoring, but Respondent Russ Anderson refused.

**The Community Bank's sales practices misconduct problem was pervasive and widespread**

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 214 and (Julian and McLinko) No. 169**

The Bank had a systemic problem with sales practices misconduct from no later than 2002 until sales goals were eliminated in October 2016. Sales practices misconduct was widespread across the Community Bank and involved tens of thousands of employees issuing millions of products and services to customers without their consent.[1823]

---

[1819] MSD-297 (Richards Tr.) at 149:11-150:19.

[1820] MSD-297 (Richards Tr.) at 138:17-151:16, 154:14-155:10.

[1821] Russ Anderson's ECSFM at No. 213

[1822] MSD-297 (Richards Tr.) at 149:11-150:19.

[1823] MSD-1 (DOJ SOF) (containing the Bank's admission that it "opened millions of accounts or financial products that were unauthorized or fraudulent."); MSD-2 at 3-4 (stating gaming cases and associated terminations had both increased by over 950% between 2000 and 2004 and were "geographically consistent corporate-wide"); MSD-57 (showing 5,367 terminations for sales practices misconduct); MSD-72 (stating that the primary allegations are related to consent and are occurring across the Bank geography-wide and that the bank receives 25-48,000 customer calls each year from customers stating they did not request certain bank products); MSD-116; MSD- 268 (NBE Crosthwaite Expert Report) at ¶¶ 52; MSD-269 (NBE Candy Expert Report) at ¶¶ 101-114; MSD-53; MSD-161-168; (sales integrity case comprised approximately half of all EthicsLine complaints); MSD-604 (showing 12

Enforcement Counsel's Statements of Material Fact (Russ Anderson) No. 214 and (Julian and McLinko) No. 169 rely on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[1824] Upon my review of the confidential documents supporting these Statements of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in these Statements of Material Fact.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 215 and (Julian and McLinko) No. 170

The 2004 Investigation Report reported that gaming cases were "geographically consistent corporate-wide."[1825]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1826]

**Julian** did not dispute the Report includes the text presented in the Statement, but averred that the Statement "lacks important context," because the term "gaming" as used in the cited evidence "is broader than the term 'sales practices misconduct'"[1827]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian and McLinko that the 2004 Investigation Report reported that gaming cases were "geographically consistent corporate-wide."

---

million inactive accounts and 7 million inactive debit cards); (MSD-199 (Freeman Decl.) at 2- 3 ("[S]ales practices misconduct had occurred throughout the Bank's geographic footprint, with higher concentrations in certain parts of the country.")); MSD-558 ("When I assumed responsibility for investigations at the first of the year [2004] I was told that the biggest internal problem was gaming.").

[1824] See 12 C.F.R. § 19.33(b).

[1825] MSD-2; Russ Anderson Amended Answer ¶ 52.

[1826] Russ Anderson's ECSFM at No. 216.

[1827] Julian's ECSFM at No. 170.

Add. 357

Appellate Case: 25-1079   Page: 359   Date Filed: 05/16/2025 Entry ID: 5517644

**McLinko** incorporated Respondent Julian's Response.[1828]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 216 and (Julian and McLinko) No. 171

The 2004 Investigation Report reported that "[b]etween 2000 and 2004, gaming cases have increased 979% and associated terminations have increased 962%."[1829]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1830]

**Julian**[1831] and **McLinko**[1832] objected to the use of the exhibit supporting this claim (MSD-2, an interoffice memo dated August 24, 2004) on the grounds that the evidence is irrelevant, immaterial, unreliable, or repetitive. The objection is sustained. Given the passage of time between the events reported in the exhibit and the filing of the Notice of Charges, given the remote and tangential relationship of those events with the material claims presented in the Notice of Charges, given the potential for confusion that admitting the email chain presents, given the redundant nature of the material facts presented in the exhibit when compared with Exhibits that are more closely related in time, the exhibit will not be admitted in support of Enforcement Counsel's Motion. Accordingly, the claims presented in (Russ Anderson) No. 216 and (Julian and McLinko) No. 171 will not support Enforcement Counsel's Motion. The exclusion of the exhibit does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 217 and (Julian and McLinko) No. 172

Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 217 and (Julian and McLinko) No. 172 rely on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[1833] Upon my review of the confidential documents supporting these Statements of

---

[1828] McLinko's ECSFM at No. 170.

[1829] MSD-2 at 3-4.

[1830] Russ Anderson's ECSFM at No. 207.

[1831] Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[1832] McLinko's ECSFM at No. 171.

[1833] See 12 C.F.R. § 19.33(b).

Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in these Statements of Material Fact.


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 218 and (Julian and McLinko) No. 173**

As part of the Bank's February 2020 Deferred Prosecution Agreement with the U.S. Department of Justice related to its sales practices, the Bank admitted, accepted, and acknowledged as true the following:

- Gaming conduct and the practice of pushing unnecessary accounts on customers began in at least 2002 and became widespread over time, lasting through 2016, when the community Bank eliminated product sales goals for its employees.

- From 2002 to 2016, Wells Fargo opened millions of accounts or financial products that were unauthorized or fraudulent. During that same time period, Wells Fargo employees also opened significant numbers of additional unneeded, unwanted, or otherwise low-value products that were not consistent with Wells Fargo's purported needs-based selling model. Wells Fargo collected millions of dollars in fees and interest to which the Company was not entitled, harmed the credit ratings of certain customers, and unlawfully misused customers' sensitive personal information (including customers' means of identification).

- Millions of non-Wells Fargo-employee customer accounts reflected a Wells Fargo email address as the customer's email address, contained a generic and incorrect customer phone number, or were linked to a Wells Fargo branch or Wells Fargo employee's home address.

- Millions of secondary accounts and products were opened from 2002 to 2016, and many of these were never used by customers.[1834]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1835]

---

[1834] MSD-1 at 27, 31 ¶¶ 17-18, 32.

[1835] Russ Anderson's ECSFM at No. 218.

Add. 359

**Julian** presented his response as "disputed," but the substance of his response did not controvert that the cited Agreement contained the text presented in the Statement.[1836] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that the Deferred Prosecution Agreement contained the terms shown above.

**McLinko** incorporated Respondent Julian's Response.[1837]

### Enforcement Counsel's Statement of Material Facts (Julian and McLinko) No. 174

Respondent McLinko testified in March 2018 that thousands of Wells Fargo employees issued millions of products and services without customers' consent:

> Q      All right. You -- I think that based on everything you've read, that central report, the PricewaterhouseCooper report, and your audit work, do you believe now that, over the years, let's say from 2009 to 2016, thousands of Wells Fargo employees issued products and services to customers without the customers' consent?
>
> A      Based upon everything that I've read, that's correct.
>
> Q: Okay. And based on what you have seen and all the information you gathered, those thousands of Wells Fargo employees have issued millions of products and services without customers' consent?
>
> MR. CRUDO: Foundation.
>
> THE WITNESS: Based upon the data that was produced, on the filing of the data analysis that's done, and the modeling, yes.[1838]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[1839]

**McLinko** did not dispute that the Statement accurately quotes his testimony.[1840]  Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko

---

[1836] Julian's ECSFM at No. 173.

[1837] McLinko's ECSFM at No. 7.

[1838] McLinko Amended Answer ¶ 8; SS at 124:1-18.

[1839] Julian's ECSFM at No. 174.

[1840] McLinko's ECSFM at No. 17.

that Respondent McLinko testified as shown in this Statement.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 219 and (Julian and McLinko) No. 175**

The Bank's former Chief Risk Officer testified that "the sales practice problem as described in this 2004 [Investigation Report] is essentially the same problem that existed at the bank up until the elimination of sales goals in the fall of 2016."[1841]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1842]

**Julian** presented his response as "disputed," but the substance of his response did not controvert the material allegations presented in this Statement, but instead averred the Statement omits important context.[1843] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that the Bank's former Chief Risk Officer testified that "the sales practice problem as described in this 2004 [Investigation Report] is essentially the same problem that existed at the bank up until the elimination of sales goals in the fall of 2016."

**McLinko** incorporated Respondent Julian's Response.[1844]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 220 and (Julian and McLinko) No. 176**

After publication of the 2016 Consent Orders with the OCC and CFPB and settlement with the City of LA, a regional leader in California forwarded negative media coverage of the Bank's sales practices "crisis", commenting that the "[o]nly thing this article is missing is that [the sales practices crisis] wasn't created over the span of 5 years – this was created since 2002!"[1845]

**Responses:**

---

[1841] MSD-290B (Loughlin Tr.) at 332:22-333:7.

[1842] Russ Anderson's ECSFM at No. 219.

[1843] Julian's ECSFM at No. 175.

[1844] McLinko's ECSFM at No. 175.

[1845] MSD-550.

Add. 361

Appellate Case: 25-1079    Page: 363    Date Filed: 05/16/2025 Entry ID: 5517644

**Russ Anderson** incorporated Respondent Julian's response.[1846]

**Julian** did not dispute the document contains the quoted language, but averred the information presented is immaterial.[1847] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that after publication of the 2016 Consent Orders with the OCC and CFPB and settlement with the City of LA, a regional leader in California forwarded negative media coverage of the Bank's sales practices "crisis", commenting that the "[o]nly thing this article is missing is that [the sales practices crisis] wasn't created over the span of 5 years – this was created since 2002!"

**McLinko** incorporated Respondent Julian's Response.[1848]


### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 221 and (Julian and McLinko) No. 177

The Bank's former Head of Corporate Investigations Loretta Sperle agreed in sworn testimony that given the Community Bank's business model and the controls that existed at the Bank, every customer-facing employee had a daily temptation and opportunity to cheat. She testified before the OCC that given the amount of pressure that existed at the Bank, it would not be surprising "that there is going to be a high percentage of people that will cheat."[1849]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1850]

**Julian** did not dispute that the witness gave the testimony described above, but averred that it was inadmissible layperson opinion testimony containing the witness's speculation about the root cause of misconduct.[1851] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson,

---

[1846] Russ Anderson's ECSFM at No. 220.

[1847] Julian's ECSFM at No. 176.

[1848] McLinko's ECSFM at No. 176.

[1849] MSD- 299 (Sperle Tr.) at 160:16-163:4; see also MSD-269 (NBE Candy Expert Report) at ¶ 108, 114; MSD-581 (Clegg Tr.) at 46:11-48:13; MSD-223 at OCC-WF-SP-06963006 ("Focus on 'business practices & business processes' (are they creating need or opportunity)".

[1850] Russ Anderson's ECSFM at No. 221.

[1851] Julian's ECSFM at No. 177.

Add. 362

Appellate Case: 25-1079      Page: 364      Date Filed: 05/16/2025 Entry ID: 5517644

Julian, and McLinko that the Bank's former Head of Corporate Investigations Loretta Sperle agreed in sworn testimony that given the Community Bank's business model and the controls that existed at the Bank, every customer-facing employee had a daily temptation and opportunity to cheat. She testified before the OCC that given the amount of pressure that existed at the Bank, it would not be surprising "that there is going to be a high percentage of people that will cheat."

**McLinko** incorporated Respondent Julian's Response.[1852]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 222 and (Julian and McLinko) No. 178

Bankers received sales credit for unfunded accounts.[1853]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response and disputed that any policies in place before or after her tenure as GRO can properly be imputed to her.[1854]

**Julian** did not dispute the claim, but averred the Statement does not establish that Community Bank employees were incentivized to open unfunded accounts during Mr. Julian's tenure as Chief Auditor.[1855] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson and Julian that Bankers received sales credit for unfunded accounts.

**McLinko** incorporated Respondent Julian's Response.[1856]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 223 and (Julian and McLinko) No. 179

Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 223 and (Julian and McLinko) No. 179 rely on exhibits presented to this Tribunal as being non-public. Pursuant to

---

[1852] McLinko's ECSFM at No. 177.

[1853] MSD-243; MSD-269 (NBE Candy Expert Report) at ¶ 107(c) ("the Community Bank allowed employees to have approximately 30 percent of the new accounts they opened to remain unfunded; they would still be eligible to receive sales credit for the unfunded accounts."

[1854] Russ Anderson's ECSFM at No. 222.

[1855] Julian's ECSFM at No. 178

[1856] McLinko's ECSFM at No. 178.

the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[1857] Upon my review of the confidential documents supporting these Statements of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in these Statements of Material Fact.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 224 and (Julian and McLinko) No. 180**

As of December 2015, the Bank had approximately 12.4 million accounts that had been inactive for the last 12 months, including nearly 7 million debit cards (approximately 18% of all debit cards accounts had been inactive for the last 12 months).[1858]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1859]

**Julian** presented his response as "disputed," but the substance of his response did not controvert the material allegations presented in this Statement, which he characterized as immaterial.[1860] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that as of December 2015, the Bank had approximately 12.4 million accounts that had been inactive for the last 12 months, including nearly 7 million debit cards (approximately 18% of all debit cards accounts had been inactive for the last 12 months).

**McLinko** incorporated Respondent Julian's Response.[1861]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 225 and (Julian and McLinko) No. 181**

Debit card accounts were a "major contributor" to customer consent cases and represented an

---

[1857] See 12 C.F.R. § 19.33(b).

[1858] MSD-604.

[1859] Russ Anderson's ECSFM at No. 224.

[1860] Julian's ECSFM at No. 180.

[1861] McLinko's ECSFM at No. 180.

"outsize portion of conduct risk."[1862]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response and disputed that the Statement proves actual instances of sales practices misconduct during her tenure as GRO.[1863]

**Julian** disputed the claim, averring the Statement does not establish that unauthorized debit cards were a "major contributor" of actual instances of sales practices misconduct during Mr. Julian's tenure as Chief Auditor.[1864]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that debit card accounts were a major contributor to customer consent cases and represented an outsize portion of conduct risk.

**McLinko** incorporated Respondent Julian's Response.[1865]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 226 and (Julian and McLinko) No. 182**

Debit cards generally represented about 25% of all solutions sold by the Community Bank each year.[1866] For example, in 2013, approximately 10.3 million consumer and business debits cards were sold, which comprised about 24.1% of total solutions sold that year.[1867]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response and disputed that the Statement

---

[1862] MSD-239; MSD-60 ("This furthers my view that debit cards should be one of our primary areas of focus . . . It's a major contributor in cases involving both Tellers and PBs [Personal Bankers], and it's the primary factor in customer consent allegations. Also, as we noted in previous conversations, the debit card can be a 'doorway' to additional unethical sales (online, billpay, rewards.)"); see also MSD-18; MSD-23; MSD-46; MSD-61; MSD-62; MSD-63 (discussing that "an outsize portion of conduct risk is related to" issuance of secondary checking and secondary debit cards); MSD-64; MSD-150.

[1863] Russ Anderson's ECSFM at No. 225.

[1864] Julian's ECSFM at No. 181

[1865] McLinko's ECSFM at No. 181.

[1866] MSD-605; MSD-606; MSD-607; MSD-608.

[1867] MSD-608.

Add. 365

Appellate Case: 25-1079      Page: 367      Date Filed: 05/16/2025 Entry ID: 5517644

proves actual instances of sales practices misconduct during her tenure as GRO.[1868]

**Julian** did not dispute the claim other than to aver that the Statement does not establish the volume or rate of unauthorized debit cards issued by Community Bank employees during Mr. Julian's tenure as Chief Auditor.[1869] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that debit cards generally represented about 25% of all solutions sold by the Community Bank each year. For example, in 2013, approximately 10.3 million consumer and business debits cards were sold, which comprised about 24.1% of total solutions sold that year.

**McLinko** incorporated Respondent Julian's Response.[1870]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 227 and (Julian and McLinko) No. 183

Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 208 and (Julian and McLinko) No. 167 rely on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[1871] Upon my review of the confidential documents supporting these Statements of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in these Statements of Material Fact.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 228 and (Julian and McLinko) No. 184

Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 228 and (Julian and McLinko) No. 184 rely on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are

---

[1868] Russ Anderson's ECSFM at No. 226.

[1869] Julian's ECSFM at No. 182.

[1870] McLinko's ECSFM at No. 182.

[1871] See 12 C.F.R. § 19.33(b).

Appellate Case: 25-1079    Page: 368    Date Filed: 05/16/2025 Entry ID: 5517644

expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[1872] Upon my review of the confidential documents supporting these Statements of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in these Statements of Material Fact.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 229 and (Julian and McLinko) No. 185

Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 229 and (Julian and McLinko) No. 185 rely on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[1873] Upon my review of the confidential documents supporting these Statements of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in these Statements of Material Fact.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 230 and (Julian and McLinko) No. 186

Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 230 and (Julian and McLinko) No. 186 rely on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[1874] Upon my review of the confidential documents supporting these Statements of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the

---

[1872] See 12 C.F.R. § 19.33(b).

[1873] See 12 C.F.R. § 19.33(b).

[1874] See 12 C.F.R. § 19.33(b).

Add. 367

Appellate Case: 25-1079    Page: 369    Date Filed: 05/16/2025 Entry ID: 5517644

evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in these Statements of Material Fact.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 231 and (Julian and McLinko) No. 187

Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 231 and (Julian and McLinko) No. 187 rely on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[1875] Upon my review of the confidential documents supporting these Statements of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in these Statements of Material Fact.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 232 and (Julian and McLinko) No. 188

Respondents' only expert to opine on the PwC work admitted he has done no analysis to confirm or quantify false negatives related to the PwC data (i.e. unauthorized accounts in fact affected by simulated funding that were excluded from PwC's estimate of potentially unauthorized accounts), though he testified "it seems very likely that there would be, you know, false – some false negatives."[1876]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1877]

**Julian** presented his response as "disputed," but did not dispute that the witness opined as shown, and the substance of the rest of his response did not otherwise controvert the material allegations presented in this Statement.[1878] I find an insufficient factual basis has been presented

---

[1875] See 12 C.F.R. § 19.33(b).

[1876] MSD-282A (Wilcox Dep. Tr.) at 125:12-126:10.

[1877] Russ Anderson's ECSFM at No. 232.

[1878] Julian's ECSFM at No. 188.

Appellate Case: 25-1079    Page: 370    Date Filed: 05/16/2025 Entry ID: 5517644

to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that Respondents' only expert to opine on the PwC work admitted he has done no analysis to confirm or quantify false negatives related to the PwC data (i.e. unauthorized accounts in fact affected by simulated funding that were excluded from PwC's estimate of potentially unauthorized accounts), though he testified "it seems very likely that there would be, you know, false – some false negatives."

**McLinko** incorporated Respondent Julian's Response.[1879]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 233 and (Julian and McLinko) No. 189

Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 233 and (Julian and McLinko) No. 189 rely on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[1880] Upon my review of the confidential documents supporting these Statements of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in these Statements of Material Fact.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 234 and (Julian and McLinko) No. 190

Audit relied on PwC's sales practices work and did not conduct its own analysis of the scope of the sales practices. Audit noted that its work on the identification of customers and associated financial harm for the customer account analysis and the historical complaints analysis was complete: "For the customer account analysis, based on our assessment of the implementation of the analytical approach by PwC to identify potentially impacted customers, and the identification of the associated reimbursement amounts, we are reasonably confident that the work is accurate and complete."[1881]

---

[1879] McLinko's ECSFM at No. 188.

[1880] See 12 C.F.R. § 19.33(b).

[1881] MSD-347; MSD-413 at 14.

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1882]

**Julian** disputed that the cited evidence shows that WFAS "relied" on PwC's sales practices work.[1883] He averred that WFAS believed that PricewaterhouseCoopers had "accurately" reimbursed the customers that PricewaterhouseCoopers had identified as potentially harmed, not that PricewaterhouseCoopers had accurately identified potentially unauthorized accounts.[1884]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that Audit relied on PwC's sales practices work and did not conduct its own analysis of the scope of the sales practices. Audit noted that its work on the identification of customers and associated financial harm for the customer account analysis and the historical complaints analysis was complete: "For the customer account analysis, based on our assessment of the implementation of the analytical approach by PwC to identify potentially impacted customers, and the identification of the associated reimbursement amounts, we are reasonably confident that the work is accurate and complete."

**McLinko** incorporated Respondent Julian's Response.[1885]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 235**

Respondent McLinko testified that the model used by PwC was "probably substantially correct."[1886]

**Responses:**

**Russ Anderson** incorporated Respondent McLinko's response to (Julian and McLinko) No. 192.[1887] Respondent McLinko's Response to Statement No. 192 did not dispute that his

---

[1882] Russ Anderson's ECSFM at No. 234.

[1883] Julian's ECSFM at No. 190.

[1884] Julian's ECSFM at No. 190.

[1885] McLinko's ECSFM at No. 190.

[1886] MSD-276 (McLinko Tr.) at 124:20-125:4.

[1887] Russ Anderson's ECSFM at No. 235.

testimony included the quoted language, but disputed it was accurate or complete, particularly as it relates to the time period from 4th Quarter 2010 through October 2016.[1888]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that Respondent McLinko testified that the model used by PwC was "probably substantially correct."

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 191

Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 191 relies on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[1889] Upon my review of the confidential documents supporting this Statement of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in this Statement of Material Fact.

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 192

Respondent McLinko testified that the model used by PwC was "probably substantially correct."[1890]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[1891]

**McLinko** did not dispute that his testimony included the quoted language.[1892]  Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko

---

[1888] McLinko's ECSFM at No. 192.

[1889] See 12 C.F.R. § 19.33(b).

[1890] MSD-276 (McLinko Tr.) at 124:20-125:4.

[1891] Julian's ECSFM at No. 192.

[1892] McLinko's ECSFM at No. 192.

Appellate Case: 25-1079     Page: 373     Date Filed: 05/16/2025 Entry ID: 5517644

that Respondent McLinko testified as shown in this Statement.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 236 and (Julian and McLinko) No. 193

Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 236 and (Julian and McLinko) No. 193 rely on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[1893] Upon my review of the confidential documents supporting these Statements of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in these Statements of Material Fact.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 237 and (Julian and McLinko) No. 194

Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 237 and (Julian and McLinko) No. 194 rely on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[1894] Upon my review of the confidential documents supporting these Statements of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in these Statements of Material Fact.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 238 and (Julian and McLinko) No. 195

---

[1893] See 12 C.F.R. § 19.33(b).

[1894] See 12 C.F.R. § 19.33(b).

Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 238 and (Julian and McLinko) No. 195 rely on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[1895] Upon my review of the confidential documents supporting these Statements of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in these Statements of Material Fact.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 239 and (Julian and McLinko) No. 196

Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 239 and (Julian and McLinko) No. 196 rely on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[1896] Upon my review of the confidential documents supporting these Statements of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in these Statements of Material Fact.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 240 and (Julian and McLinko) No. 197

Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 240 and (Julian and McLinko) No. 197 rely on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such

---

[1895] See 12 C.F.R. § 19.33(b).

[1896] See 12 C.F.R. § 19.33(b).

Add. 373

Appellate Case: 25-1079     Page: 375     Date Filed: 05/16/2025 Entry ID: 5517644

documents.[1897] Upon my review of the confidential documents supporting these Statements of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in these Statements of Material Fact.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 241 and (Julian and McLinko) No. 198

Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 241 and (Julian and McLinko) No. 198 rely on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[1898] Upon my review of the confidential documents supporting these Statements of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in these Statements of Material Fact.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 242 and (Julian and McLinko) No. 199

A report distributed to regional leaders on July 2, 2013 showed that "11.26% of accounts that are funded in West Coast are done so using simulated funding (vs 6.82% for regional banking [nationwide]) and approx[imately] 60% of those accounts are closed within 90 days."[1899]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response and avers there is no evidence that she received the cited report.[1900]

I find an insufficient factual basis has been presented to establish a dispute in this Response to

---

[1897] See 12 C.F.R. § 19.33(b).

[1898] See 12 C.F.R. § 19.33(b).

[1899] MSD-227.

[1900] Russ Anderson's ECSFM at No. 242.

create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that a report distributed to regional leaders on July 2, 2013 showed that "11.26% of accounts that are funded in West Coast are done so using simulated funding (vs 6.82% for regional banking [nationwide]) and approx[imately] 60% of those accounts are closed within 90 days."

**Julian** did not dispute that the report cited contained the findings reported in the Statement, but averred the report only identified "potential simulated funding," not instances of confirmed simulated funding.[1901] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that a report distributed to regional leaders on July 2, 2013 showed that "11.26% of accounts that are funded in West Coast are done so using simulated funding (vs 6.82% for regional banking [nationwide]) and approx[imately] 60% of those accounts are closed within 90 days."

**McLinko** incorporated Respondent Julian's Response.[1902]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 243 and (Julian and McLinko) No. 200

Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 243 and (Julian and McLinko) No. 200 rely on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[1903] Upon my review of the confidential documents supporting these Statements of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in these Statements of Material Fact.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 244 and (Julian and McLinko) No. 201

The former Head of Corporate Investigations Michael Bacon testified that the senior

---

[1901] Julian's ECSFM at No. 199.

[1902] McLinko's ECSFM at No. 199.

[1903] See 12 C.F.R. § 19.33(b).

leadership in the Community Bank wanted to minimize terminations even with strong evidence that an employee engaged in sales integrity violations.[1904]

**Responses:**

Russ Anderson disputed the claim "because it fails to establish Community Bank leaders "wanted to minimize terminations" during Ms. Russ Anderson's tenure as Group Risk Officer."[1905]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the former Head of Corporate Investigations Michael Bacon testified that the senior leadership in the Community Bank wanted to minimize terminations even with strong evidence that an employee engaged in sales integrity violations.

**Julian** disputed that the cited evidence established that Community Bank leaders "wanted to minimize termination – adding the clause "during Mr. Julian's tenure".[1906] The Statement did not aver this clause, and the testimony cited is as follows:

> Q And is it fair to say that the senior leadership in Community Bank wanted to minimize terminations even if there is strong evidence that an employee engaged in sales integrity violations?
>
> A Absolutely, yes.[1907]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that the former Head of Corporate Investigations Michael Bacon testified that the senior leadership in the Community Bank wanted to minimize terminations even with strong evidence that an employee engaged in sales integrity violations.

**McLinko** incorporated Respondent Julian's Response.[1908]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 245 and (Julian**

---

[1904] MSD-295 (Bacon Tr.) at 62:8- 25.

[1905] Russ Anderson's ECSFM at No. 242.

[1906] Julian's ECSFM at No. 201.

[1907] MSD-295 (Bacon Tr.) at 62:8- 25.

[1908] McLinko's ECSFM at No. 201.

Appellate Case: 25-1079      Page: 378      Date Filed: 05/16/2025 Entry ID: 5517644

**and McLinko) No. 202**

From January 2011 through March 2016, the Bank terminated over 5,300 employees for engaging in improper sales practices. (MSD-52; MSD-661 at 96). Improper sales practices included:

      (a)    Opening any account without the consumer's consent;

      (b)    Transferring funds between a consumer's accounts without the consumer's consent;

      (c)    Applying for any credit card without the consumer's consent;

      (d)    Issuing any debit card without the consumer's consent;

      (e)    Enrolling any consumer in online-banking services without the consumer's consent.[1909]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1910]

**Julian** disputed that the cited evidence established that any of the 5,300 employees who were terminated actually engaged in improper sales practices, and cited MDS-661 at 100 in support.[1911] Having reviewed that page of the Congressional transcript of proceedings before the Committee on Banking, Housing, and Urban Affairs, I find no evidence controverting the claims presented in this Statement, and find the evidence cited in support of the Statement has been accurately presented here.

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that from January 2011 through March 2016, the Bank terminated over 5,300 employees for engaging in improper sales practices.

---

[1909] MSD-295 (Bacon Tr.) at 62:8- 25; see also MSD-44 (showing that the Bank terminated 8,713 employees for sales ethics, including creating false email account, assigning PINS without customer consent, unauthorized transactions, and unearned sales referral credit). The Bank terminated employees in the following states: Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, Washington, DC, Wisconsin, and Wyoming. (MSD-661 at 99-100).

[1910] Russ Anderson's ECSFM at No. 245.

[1911] Julian's ECSFM at No. 202.

Appellate Case: 25-1079    Page: 379    Date Filed: 05/16/2025 Entry ID: 5517644

Improper sales practices included:

(a)     Opening any account without the consumer's consent;

(b)     Transferring funds between a consumer's accounts without the consumer's consent;

(c)     Applying for any credit card without the consumer's consent;

(d)     Issuing any debit card without the consumer's consent;

(e)     Enrolling any consumer in online-banking services without the consumer's consent.

**McLinko** incorporated Respondent Julian's Response.[1912]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 246

Respondent Russ Anderson testified that she was not surprised 5,300 employees were terminated for sales practices misconduct from 2011-2016, because she knew in the 2012 and 2013 timeframe that the Community Bank terminated roughly 1,000 employees per year for sales practices misconduct, and what concerned her was how the number was being reported in the press:

> Q: . . . Do you recall reporting in the fall of 2016 that Wells Fargo terminated 5,300 employees for sales practices misconduct from 2011 to 2016?
>
> A: That I reported that?
>
> Q: No. That Wells Fargo reported that 5,300 employees had been terminated for sales practice misconduct from 2011 to 2016. Do you recall that number?
>
> A: I recall that number and that timeframe, yes.
>
> Q: Understand. And were you surprised by that number?
>
> A: No. Because we knew approximately 1,000 team members a year were being terminated. So over five years, that's 5300 team members and that's over 6,000 branches, so that's less than one team member per year, per branch.
>
> Q: Okay. And in your view, is 5300 employees engaging in sales practice misconduct a significant number of employees

---

[1912] McLinko's ECSFM at No. 202.

Add. 378

Appellate Case: 25-1079    Page: 380    Date Filed: 05/16/2025 Entry ID: 5517644

who engage in sales practice misconduct?

A: Again --

Q: I'm trying to understand whether you view the 5300 number as a significant number.

A: Okay. Let's break it down, again, though. 5300 over a five-year period of time. That's approximately 1,000 team members per year, over 6,000 branches, is a number we knew. It – it no bothered me differently in 2016 than when I first knew about it in the 2013/2012 timeframe. No. I -- what bothered me was how it was represented in the press because it did not, in my mind, represent the true risk. It was a headliner.[1913]

**Responses:**

**Russ Anderson** did not dispute that the quoted material accurately reflects her testimony, and disputed the suggestion that she should have been surprised by the number reflected above.[1914]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she testified as shown above.


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 247 and (Julian and McLinko) No. 203**

SSCOT's application the 99.99% threshold beginning in July 2014 identified approximately 30,000 employees per month who exhibited activity that was a red flag for simulated funding. Only 1 out of every 10,000 employees were referred for further investigation.[1915]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1916]

**Julian** disputed the claim, averring the Exhibit cited in support of the claim does not establish that the 99.99% SSCOT threshold identified approximately 30,000 employees per

---

[1913] MSD-266 (Russ Anderson Dep. Tr.) at 179:22-181:4.

[1914] Russ Anderson's ECSFM at No. 246.

[1915] MSD-116 at 3.

[1916] Russ Anderson's ECSFM at No. 247.

month who exhibited activity that was a red flag for simulated funding. Rather, the 99.99% threshold identified between 3-6 team members per month;[1917] and that Enforcement Counsel "have cited no expert testimony establish that it is proper to divide 3 by 0.0001 to determine the total amount of employees exhibiting purported 'red flag' activity."[1918]

The number of employees per month who exhibited activity that was a red flag for simulated funding and who subsequently were referred for further investigation is a material fact in issue.

I find that in his Response to (Julian and McLinko) Statement No. 203, Julian has sufficiently demonstrated a factual controversy exists regarding the number of employees per month who exhibited activity that was a red flag for simulated funding and who subsequently were referred for further investigation. Because of the existence of this material controverted fact, summary disposition is not available with respect to Respondent Julian (and through incorporation, Respondents Russ Anderson and McLinko) regarding this claim. Pursuant to the OCC's Uniform Rules, the merits of the disputed claims raised in Statement of Material Fact (Russ Anderson) No. 247 and (Julian and McLinko) No. 203 will be addressed during the hearing set to begin on September 13, 2021.

McLinko incorporated Respondent Julian's Response.[1919]


### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 248 and (Julian and McLinko) No. 204

Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 248 and (Julian and McLinko) No. 204 rely on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[1920] Upon my review of the confidential documents supporting these Statements of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in these Statements of Material Fact.

---

[1917] Julian's ECSFM at No. 203, citing MSD-116 at 3.

[1918] Julian's ECSFM at No. 203.

[1919] McLinko's ECSFM at No. 205.

[1920] See 12 C.F.R. § 19.33(b).

Appellate Case: 25-1079    Page: 382    Date Filed: 05/16/2025 Entry ID: 5517644

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 249 and (Julian and McLinko) No. 205**

Of all the issues Bank employees could report to the EthicsLine (the whistleblower hotline), the most common issue was sales integrity, ultimately comprising more than half of all EthicsLine complaints.[1921]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1922]

**Julian** presented his response as "disputed," but the substance of his response did not controvert the material allegations presented in this Statement.[1923] Rather than refer to what the most common issue that employees could report to the EthicsLine was, Julian averred that the EthicsLine complaints consisted of allegations of misconduct, not confirmed instances of misconduct.[1924]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that of all the issues Bank employees could report to the EthicsLine (the whistleblower hotline), the most common issue was sales integrity, ultimately comprising more than half of all EthicsLine complaints.

**McLinko** incorporated Respondent Julian's Response.[1925]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 250 and (Julian and McLinko) No. 206**

As of 2007, the Bank as a whole was receiving 25,000-48,000 "Customer Calls Annually Stating 'Did Not Request'" (i.e. lack of consent) for certain Bank products, the content of which was "very similar to content in [approximately] 50% of the formal Ethicsline/HR allegations that Sales Quality allegations currently processes."[1926]

**Responses:**

---

[1921] MSD-3 at 52; MSD-161-168; MSD-430 at 15 ("Over 50% of [EthicsLine] calls were related to sales integrity."); MSD-324 at 5 (showing that sales integrity cases made up 48% of EthicsLine cases).

[1922] Russ Anderson's ECSFM at No. 249.

[1923] Julian's ECSFM at No. 205.

[1924] Julian's ECSFM at No. 205.

[1925] McLinko's ECSFM at No. 205.

[1926] MSD-72 at 7.

**Russ Anderson** incorporated Respondent Julian's response.[1927]

Julian objected to the Statement on the ground that the supporting exhibit was irrelevant.[1928] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Russ Anderson) No. 250 and (Julian and McLinko) No. 206 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[1929]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 251 and (Julian and McLinko) No. 207

Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 251 and (Julian and McLinko) No. 207 rely on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[1930] Upon my review of the confidential documents supporting these Statements of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in these Statements of Material Fact.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 252 and (Julian and McLinko) No. 208

Multiple senior leaders of the Bank, who were also Bank customers, were affected by sales practices misconduct. For example, in the first half of 2012, the former Chief Risk Officer's Michael Loughlin's wife received two debit cards in the mail she did not request.[1931]

---

[1927] Russ Anderson's ECSFM at No. 250.

[1928] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[1929] McLinko's ECSFM at No. 206.

[1930] See 12 C.F.R. § 19.33(b).

[1931] MSD-611) (Loughlin Dep. Tr.) at 30:24-31:4; MSD-290A (Loughlin Tr.) at 36:23-37:19.

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1932]

**Julian** objected to the Statement on the ground that the supporting exhibit was irrelevant.[1933] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Russ Anderson) No. 252 and (Julian and McLinko) No. 208 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[1934]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 253 and (Julian and McLinko) No. 209

The Community Bank's Group Finance Officer and Head of Finance/Strategic Planning Matthew Raphaelson's wife also received a teen debit card that she did not order for one of their children.[1935]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1936]

**Julian** objected to the Statement on the ground that the supporting exhibit was irrelevant.[1937] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Russ Anderson) No. 253 and (Julian and McLinko) No. 209 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

---

[1932] Russ Anderson's ECSFM at No. 252.

[1933] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[1934] McLinko's ECSFM at No. 208.

[1935] MSD-411 (Raphaelson Decl.) at 7; MSD-572.

[1936] Russ Anderson's ECSFM at No. 253.

[1937] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

**McLinko** incorporated Respondent Julian's Response.[1938]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 254 and (Julian and McLinko) No. 210**

Respondent Russ Anderson knew that Rose Koning, a human resources manager at the Bank, was the subject of gaming having been sold a "travel account" by a teller even though the Bank did not offer travel accounts.[1939]

**Responses:**

Russ Anderson offered no evidence but averred the cited evidence does not support that Rose Koning was the subject of gaming as there was no investigation or final determination as to the propriety of the account sale.[1940]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she knew that Rose Koning, a human resources manager at the Bank, was the subject of gaming having been sold a "travel account" by a teller even though the Bank did not offer travel accounts.

**Julian** objected to the Statement on the ground that the supporting exhibit was irrelevant.[1941] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 210 will not support Enforcement Counsel's Motion as to Respondent Julian. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[1942]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 255 and (Julian and McLinko) No. 211**

---

[1938] McLinko's ECSFM at No. 209.

[1939] MSD-71 ("Unfortunately we do not have a travel account. This sounds like gaming to me."); see also MSD-70 (referencing Rose Koning and a 'travel account.').

[1940] Russ Anderson's ECSFM at No. 254.

[1941] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[1942] McLinko's ECSFM at No. 210.

"'[U]ndercover' law enforcement accounts" were affected by sales practices misconduct. On one occasion Corporate Investigations opened three such accounts in California "and within 45 minutes two bankers . . . ordered debit cards for the without any customer consent or discussion."[1943]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1944]

**Julian** objected to the use of the exhibit supporting this claim (MSD-22) on the grounds that the evidence is irrelevant, immaterial, unreliable, or repetitive.[1945] The objection is sustained. Given the passage of time between the events reported in the email chain in MSD-22 and the filing of the Notice of Charges, given the remote and tangential relationship of those events with the material claims presented in the Notice of Charges, given the potential for confusion that admitting the email chain presents, given the redundant nature of the material facts presented in the exhibit when compared with Exhibits that are more closely related in time, the exhibit will not be admitted in support of Enforcement Counsel's Motion. Accordingly, the claims presented in (Russ Anderson) No. 255 and (Julian and McLinko) No. 211 will not support Enforcement Counsel's Motion. The exclusion of the exhibit does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[1946]


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 256 and (Julian and McLinko) No. 212**

Even animals were affected by sales practices misconduct. In 2009, Martin Weber, a Special Investigations Manager with Corporate Investigations and the author of the 2004 Investigation Report, sent the following in an email to his staff: "You just can't make this stuff up. The district manager was completing polling regarding customer consent and contacted a customer who had 3 accounts each with a different joint account signer with an odd name. The customer stated that she had spoken to a banker and declined opening the account in question since the 'odd' named account signers were her dogs. The banker allegedly stated that she should have 3 different accounts for each dog's expenses, the customer initially told the banker that she did not want the account in question since 'her dogs do not write checks'."[1947] The email

---

[1943] MSD-22.

[1944] Russ Anderson's ECSFM at No. 255.

[1945] Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[1946] McLinko's ECSFM at No. 212.

[1947] MSD-26.

Appellate Case: 25-1079     Page: 387     Date Filed: 05/16/2025 Entry ID: 5517644

continued: "At least the customer profile appears to be complete. I reviewed one and the dog has a passport and a B of A [Bank of America] debit card as ID, the employer was listed as 'Minor' since the DOB [date of birth] indicates that the customer was born in 2005."[1948]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[1949]

Julian objected to the Statement on the ground that the supporting exhibit was irrelevant.[1950] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in Statement of Material Fact (Russ Anderson) No. 256 and (Julian and McLinko) No. 212 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[1951]


### Enforcement Counsel's Statement of Material Facts (Julian and McLinko) No. 213

An investigator testified that there were a "multitude of ways" employees engaged in sales practices misconduct: "Oh, simulated funding, opening accounts for nonexistent people, opening accounts for deceased people, opening multiple checking accounts where a person should only have one, if that.  It would depend on the emphasis during that time period."[1952]

**Responses:**

**Julian** did not dispute the cited Exhibit contains the text presented here.[1953] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that an investigator testified that there were a "multitude of ways" employees engaged in sales practices misconduct: "Oh, simulated funding, opening accounts for nonexistent people, opening accounts for deceased people, opening multiple checking accounts where a person should only have one, if that.  It would depend on the emphasis during that time period."

---

[1948] MSD-26.

[1949] Russ Anderson's ECSFM at No. 256.

[1950] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[1951] McLinko's ECSFM at No. 212.

[1952] MSD-581 (Clegg Tr.) at 47:9-48:1.

[1953] Julian's ECSFM at No.231.

**McLinko** incorporated Respondent Julian's Response.[1954]

**Respondents Julian and McLinko had responsibilities to assess and assure the Bank had effective controls and risk management over sales practices while the systemic sales practices misconduct problem persisted within the Community Bank**

### Responsibilities of the Audit Department and executives generally

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 232**

Audit, including Respondents Julian and McLinko, had certain oversight responsibilities with respect to incentive compensation, risk, compliance, and/or preparing audit reports.[1955]

**Responses:**

**Julian** did not dispute the claim.[1956] **McLinko** did not dispute the claim.[1957] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that Audit, including Respondents Julian and McLinko, had certain oversight responsibilities with respect to incentive compensation, risk, compliance, and/or preparing audit reports.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 233**

According to the *Comptrollers Handbook on Internal and External Audits*, "Well-planned, properly structured auditing programs are essential to effective risk management and adequate internal control systems. Effective internal and external audit programs are also a critical defense against fraud and provide vital information to the board of directors about the effectiveness of internal control systems."

**Responses:**

Julian did not dispute that the Handbook contained the quoted text.[1958] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko

---

[1954] McLinko's ECSFM at No. 213.

[1955] Julian Amended Answer ¶ 16.

[1956] Julian's ECSFM at No. 232.

[1957] McLinko's ECSFM at No. 232.

[1958] Julian's ECSFM at No. 233.

Appellate Case: 25-1079    Page: 389    Date Filed: 05/16/2025 Entry ID: 5517644

that according to the *Comptrollers Handbook on Internal and External Audits*, "Well-planned, properly structured auditing programs are essential to effective risk management and adequate internal control systems. Effective internal and external audit programs are also a critical defense against fraud and provide vital information to the board of directors about the effectiveness of internal control systems."

**McLinko** disputed the claim in the statement on the ground there was no evidence cited in support, and incorporated Respondent Julian's Response.[1959]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 234

The *Comptrollers Handbook on Internal and External Audits* "Internal audit programs are a bank's primary mechanism for assessing controls and operations and performingwhatever work is necessary to allow the board and management to accurately attest to the adequacy of the bank's internal control system."[1960] The handbook continues: "Internal auditors must understand a bank's strategic direction, objectives, products, services, and processes to conduct these activities. The auditors then communicate findings to the board of directors or its audit committee and senior management."[1961]

**Responses:**

**Julian** did not dispute that the Handbook contains the quoted text.[1962]**McLinko** did not dispute the claim.[1963] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that the *Comptrollers Handbook on Internal and External Audits* "Internal audit programs are a bank's primary mechanism for assessing controls and operations and performingwhatever work is necessary to allow the board and management to accurately attest to the adequacy of the bank's internal control system."[1964] The handbook continues: "Internal auditors must understand a bank's strategic direction, objectives, products, services, and processes to conduct these activities. The auditors then communicate findings to

---

[1959] McLinko's ECSFM at No. 233.

[1960] MSD-273 at 10; *see id.* at 12 ("The primary role of internal auditors is to independently and objectively review and evaluate bank activities tomaintain or improve the efficiency and effectiveness of a bank's risk management, internal controls, and corporate governance.")

[1961] MSD-273 at 12.

[1962] Julian's ECSFM at No. 234.

[1963] McLinko's ECSFM at No. 234.

[1964] MSD-273 at 10; *see id.* at 12 ("The primary role of internal auditors is to independently and objectively review and evaluate bank activities tomaintain or improve the efficiency and effectiveness of a bank's risk management, internal controls, and corporate governance.")

the board of directors or its audit committee and senior management."

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 235**

Wells Fargo Audit Services was the Bank's third line of defense.[1965]

**Responses:**

**Julian** did not dispute the claim.[1966] **McLinko** did not dispute the claim.[1967] Accordingly, the Recommended Decision will include a factual finding as to Respondent Julian and McLinko that Wells Fargo Audit Services was the Bank's third line of defense.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 236**

The responsibilities of WFAS were set forth in its charter. According to its charter, "The scope of internal audit work is to determine if the Company's risk management, systems of control, and governance processes are adequate and functioning as intended."[1968]

**Responses:**

**Julian** did not dispute this claim "to the extent that WFAS's charter dated February 24, 2015 contains the quoted language."[1969] Accordingly, the Recommended Decision will include a factual finding as to Respondent Julian that the responsibilities of WFAS were set forth in its charter. According to its charter, "The scope of internal audit work is to determine if the Company's risk management, systems of control, and governance processes are adequate and functioning as intended."

**McLinko** did not dispute that the WFAS charters included the quoted language.[1970] Accordingly, the Recommended Decision will include a factual finding as to Respondent McLinko that the responsibilities of WFAS were set forth in its charter. According to its charter, "The scope of internal audit work is to determine if the Company's risk management, systems of control, and governance processes are adequate and functioning as intended."

---

[1965] Julian Amended Answer ¶ 388; McLinko Amended Answer ¶ 388.

[1966] Julian's ECSFM at No. 235.

[1967] McLinko's ECSFM at No. 235.

[1968] MSD-422B (2012) at 3; MSD-422C (2013) at 3; MSD-422D (2014) at 1; MSD-422E (2015) at 24; Julian Amended Answer ¶ 388; McLinko Amended Answer ¶ 388.

[1969] Julian's ECSFM at No. 236.

[1970] McLinko's ECSFM at No. 236.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 237**

WFAS's charter further states that Audit "[c]onducts tests and provides conclusive reporting regarding the health of the [Bank's] risk management and internal control structure" and "[f]unctions as a change agent to ensure risk issues are escalated and resolved."[1971]

**Responses:**

**Julian** did not dispute this claim "to the extent that WFAS's charter dated February 24, 2015 contains the quoted language."[1972] Accordingly, the Recommended Decision will include a factual finding as to Respondent Julian that WFAS's charter further states that Audit "[c]onducts tests and provides conclusive reporting regarding the health of the [Bank's] risk management and internal control structure" and "[f]unctions as a change agent to ensure risk issues are escalated and resolved."

**McLinko** did not dispute that the WFAS charters included the quoted language.[1973] Accordingly, the Recommended Decision will include a factual finding as to Respondent McLinko that WFAS's charter further states that Audit "[c]onducts tests and provides conclusive reporting regarding the health of the [Bank's] risk management and internal control structure" and "[f]unctions as a change agent to ensure risk issues are escalated and resolved."

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 238**

WFAS's charter further states that Audit performs work to assure:

(a) "Corporate Governance functions and processes provide adequate direction and oversight;"

(b) "An appropriate culture has been established, understood, and consistently complied with across the organization;"

(c) "The risk management system is adequately designed to ensure risks, including emerging risks, are appropriately identified and managed, and risk approvals, acceptances, and escalations are appropriately administered;"

(d) "Operational risk is effective so that risk of loss resulting from inadequate or failed internal processes, people and systems or from

---

[1971] MSD-422B (2012) at 3; MSD-422C (2013) at 3; MSD-422D (2014) at 1; MSD-422E (2015) at 24.

[1972] Julian's ECSFM at No. 237.

[1973] McLinko's ECSFM at No. 237.

Add. 390

Appellate Case: 25-1079     Page: 392     Date Filed: 05/16/2025 Entry ID: 5517644

external events isadequately controlled;"

(e)    "Fraud risk management is effectively managed and the company'scustomers and internal resources are protected;"

(f)    "Reputation risk is effectively managed and the company's brandprotected;"

(g)    "Compensation programs incent appropriate and desired behavior;" and

(h)    "Policies are sound/strong and employees' actions are in compliance withthe policies, standards, procedures, and applicable laws and regulations."[1974]

**Responses:**

**Julian** did not dispute this claim "to the extent that WFAS's charter dated February 24, 2015 contains the quoted language."[1975] Accordingly, the Recommended Decision will include a factual finding as to Respondent Julian that WFAS's charter further states that Audit performs work to assure each of the above-listed areas.

**McLinko** did not dispute that the WFAS charters included the quoted language.[1976] Accordingly, the Recommended Decision will include a factual finding as to Respondent McLinko that WFAS's charter further states that Audit performs work to assure each of the above-listed areas.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 239**

Respondent Julian testified before the OCC: "Audit's role is to come in and to assess the adequacy of those controls to ensure that . . . they're working as appropriate. And if not, then to provide . . . comment, provide issues, raise concerns to management, raise concerns to the Board[.]"[1977]

**Responses:**

**Julian** did not dispute the transcript contains the quoted language.[1978] **McLinko** did not

---

[1974] MSD-422C (2013) at 3; MSD-422D (2014) at 1; MSD-422E (2015) at 24; Julian Amended Answer ¶ 390; McLinko Amended Answer ¶ 390.

[1975] Julian's ECSFM at No. 238.

[1976] McLinko's ECSFM at No. 238.

[1977] MSD-278 (Julian Tr.) at 21:18-22:23; Julian Amended Answer ¶ 391; McLinko Amended Answer ¶ 391; see MSD-413 at 1.

[1978] Julian's ECSFM at No. 239.

dispute the transcript contains the quoted language.[1979] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that Respondent Julian testified before the OCC: "Audit's role is to come in and to assess the adequacy of those controls to ensure that . . . they're working as appropriate. And if not, then to provide . . . comment, provide issues, raise concerns to management, raise concerns to the Board[.]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 240**

The Bank had a Fraud Risk Management Policy. With respect to WFAS's fraud risk management responsibilities, the Bank's Fraud Risk Management Policy states that WFAS "[p]rovides independent evaluation of the fraud controls that management has designed and implemented, including direct business controls" and "[p]erforms direct audits of business fraudprograms and controls." [1980]

Responses:

**Julian** did not dispute the Policy contains the quoted language.[1981] **McLinko** did not dispute the Policy contains the quoted language.[1982] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that the Bank had a Fraud Risk Management Policy. With respect to WFAS's fraud risk management responsibilities, the Bank's Fraud Risk Management Policy states that WFAS "[p]rovides independent evaluation of the fraud controls that management has designed and implemented, including direct business controls" and "[p]erforms direct audits of business fraudprograms and controls."


**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 241**

The Bank also had a Responsible Business Policy. The policy stated that "WFAS carries out its responsibilities as risk management's 'third line of defense' by auditing for UD(A)AP and "[r]eferring suspected violations of law or regulation to the Law Department and Business Compliance" and "Providing independent evaluations of [UD(A)AP] controls."[1983]

**Responses:**

---

[1979] McLinko's ECSFM at No. 239.

[1980] MSD-238 at 7.

[1981] Julian's ECSFM at No. 240.

[1982] McLinko's ECSFM at No. 240.

[1983] MSD- 306 at 13.

Appellate Case: 25-1079     Page: 394     Date Filed: 05/16/2025 Entry ID: 5517644

**Julian** did not dispute that the Policy had the quoted language.[1984] **McLinko** did not dispute that the Policy had the quoted language.[1985] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that the Bank also had a Responsible Business Policy. The policy stated that "WFAScarries out its responsibilities as risk management's 'third line of defense' by auditing for UD(A)AP and "[r]eferring suspected violations of law or regulation to the Law Department and Business Compliance" and "Providing independent evaluations of [UD(A)AP] controls."

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 242

WFAS had significant resources to satisfy its essential auditing responsibilities with respect to risk management and control. For example, in 2014, WFAS's annual budget was around $120 million, it had 941,000 planned audit hours, 753 approved FTEs, and 555 audit engagements.[1986]

**Responses:**

**Julian** did not dispute the claim to the extent that WFAS's 2014 and 2015 Audit Plans are characterized. Accordingly, the Recommended Decision will include a factual finding as to Respondent Julian that WFAS had significant resources to satisfy its essential auditing responsibilities with respect to risk management and control. For example, in 2014, WFAS's annual budget was around $120 million, it had 941,000 planned audit hours, 753 approved FTEs, and 555 audit engagements.

**McLinko** did not dispute that the cited document included the annual budget.[1987] Accordingly, the Recommended Decision will include a factual finding as to Respondent McLinko that WFAS had significant resources to satisfy its essential auditing responsibilities with respect to risk management and control. For example, in 2014, WFAS's annual budget was around $120 million, it had 941,000 planned audit hours, 753 approved FTEs, and 555 audit engagements.

---

[1984] Julian's ECSFM at No. 241.

[1985] McLinko's ECSFM at No. 241.

[1986] MSD-636 at 3, 20; MSD-637 at 18-19.

[1987] McLinko's ECSFM at No. 242.

**Respondent Julian had responsibilities as the Chief Auditor for the Bank from 2012 to 2016, while the systemic sales practices misconduct problem persisted in the Community Bank**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 243**

Respondent Julian was Chief Auditor from around March 2012 to October 2018.[1988]

**Responses:**

**Julian** disputed the claim, averring that it contains no evidence that he was appointed as an officer or the Chief Auditor of the Bank.[1989]

It is a material fact whether Respondent Julian is an institution-affiliated party. I find that in his Response to (Julian and McLinko) Statement No. 243 Respondent Julian sufficiently demonstrated a factual controversy exists regarding his appointment. Because of the existence of these material controverted facts, summary disposition is not available with respect to Respondents Julian and McLinko regarding this claim. Pursuant to the OCC's Uniform Rules, the merits of the disputed claims raised in (Russ Anderson) Statement No. 305 will be addressed during the hearing set to begin on September 13, 2021.

**McLinko** incorporated Respondent Julian's Response.[1990]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 244**

In that role, Respondent Julian reported directly to the Audit and Examination Committee of the Board ("Audit and Examination Committee") and administratively to the Chief Executive Officer ("CEO") and oversaw the work of Audit.[1991] As Respondent Julian testified: "the reason I report to the -- to the chair of the Audit Committee is because I am assessing and providing criticism on the entire company. That includes the CEO. So I need or have the independence to be able – and the confidence to be able to criticize, if I had an occasion, the CEO knowing that he wouldn't then turn around and fire me for it."[1992]

**Responses:**

---

[1988] Julian Amended Answer ¶ 380; MSD-477 at 7.

[1989] Julian's ECSFM at No. 243.

[1990] McLinko's ECSFM at No. 243.

[1991] Julian Amended Answer ¶¶ 9, 381, 382, 391, 392; MSD-278 (Julian Tr.) at 65:13-21.

[1992] MSD-278 (Julian Tr.) at 65:13-21.

Add. 394

Appellate Case: 25-1079   Page: 396   Date Filed: 05/16/2025 Entry ID: 5517644

**Julian** did not dispute that the testimony transcript contains the quoted text.[1993] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that Respondent Julian testified: "the reason I report to the -- to the chair of the Audit Committee is because I am assessing and providing criticism on the entire company. That includes the CEO. So I need or have the independence to be able – and the confidence to be able to criticize, if I had an occasion, the CEO knowing that he wouldn't then turn around and fire me for it."

**McLinko** incorporated Respondent Julian's Response.[1994]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 245**

The WFAS charter states that the "Chief Auditor, along with the staff of the internal audit department, has the responsibility to:

> (a)     Prepare and distribute to business unit management a written report at the conclusion of audit engagements that includes issues related to the business unit's control processes and management's corrective actions.

> (b)     Issue periodic reports to the Audit & Examination committee and management summarizing results of audit activities.

> (c)     Report significant issues related to the processes for controlling the activities of the organization and its affiliates to the Audit & Examination committee.

> (d)     Provide a quarterly assessment on the adequacy and effectiveness of the organization's processes for controlling its activities and managing its risks in the areas set forth under the mission and scope of work." [1995]

**Responses:**

**Julian** objected to the use of the supporting exhibits on the grounds that the evidence is irrelevant, immaterial, unreliable, or repetitive.[1996] The objection is sustained. Given the passage of time between the Charter's creation and the filing of the Notice of Charges, given the redundant nature of the material facts presented in the Charter when compared with Exhibits that are more closely related in time, the Charter will not be admitted in support of Enforcement Counsel's Motion. Accordingly, the claims presented in (Julian and McLinko) No. 245 will not support Enforcement Counsel's Motion. The exclusion of the exhibit does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

---

[1993] Julian's ECSFM at No. 244.

[1994] McLinko's ECSFM at No. 244.

[1995] MSD- 422C (2013) at 6; MSD-422D (2014) at 3; MSD-422E (2015) at 26; MSD- 422B (2012) at 4.

[1996] Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

Appellate Case: 25-1079     Page: 397     Date Filed: 05/16/2025 Entry ID: 5517644

**McLinko** incorporated Respondent Julian's Response.[1997]

## Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 246

The WFAS charter also provides that the "Chief Auditor and staff of the internal audit department are authorized to: Have unrestricted access to all functions, records, property, and personnel."[1998]

**Responses:**

**Julian** objected to the use of the supporting exhibits on the grounds that the evidence is irrelevant, immaterial, unreliable, or repetitive.[1999] The objection is sustained. Given the passage of time between the Charter's creation and the filing of the Notice of Charges, given the redundant nature of the material facts presented in the Charter when compared with Exhibits that are more closely related in time, the Charter will not be admitted in support of Enforcement Counsel's Motion. Accordingly, the claims presented in (Julian and McLinko) No. 246 will not support Enforcement Counsel's Motion. The exclusion of the exhibit does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2000]

## Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 247

Respondent Julian was a member of the Operating Committee, a group of the most senior executives of the Bank, including the CEO and Carrie Tolstedt.[2001]

**Responses:**

**Julian** admitted that, at various times during his tenure as Chief Auditor, Respondent Julian was a non-voting, observing member of the Operating Committee."[2002] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material

---

[1997] McLinko's ECSFM at No. 245.

[1998] MSD-422B (2012) at 5; MSD-422C (2013) at 6; MSD-422D (2014) at 4; MSD- 422E (2015) at 27.

[1999] Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2000] McLinko's ECSFM at No. 246.

[2001] Julian Amended Answer ¶¶ 11, 383.

[2002] Julian's ECSFM at No. 247, quoting Julian Amended Answer ¶ 383.

Add. 396

Appellate Case: 25-1079    Page: 398    Date Filed: 05/16/2025 Entry ID: 5517644

fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Julian that Respondent Julian was a non-voting, observing member of the Operating Committee, a group of the most senior executives of the Bank, including the CEO and Carrie Tolstedt.

**McLinko** incorporated Respondent Julian's Response.[2003]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 248

Respondent Julian was a member of the Bank's Enterprise Risk Management Committee. The committee's charter stated the committee was responsible for "understand[ing]and evaluat[ing] risk, address[ing] escalated issues, and provid[ing] active oversight of risk mitigation." The Enterprise Risk Management Committee could escalate any issue to the Operating Committee or the CEO, and reported quarterly to the Operating Committee and RiskCommittee of the Board.[2004]

**Responses:**

**Julian** disputed the claim but offered no evidence to controvert the claim, proffering only that his role on the Enterprise Risk Management Committee was limited in order to maintain the independence of Internal Audit.[2005]  I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that Respondent Julian was a member of the Bank's Enterprise Risk Management Committee. The committee's charter stated the committee was responsible for "understand[ing]and evaluat[ing] risk, address[ing] escalated issues, and provid[ing] active oversight of risk mitigation." The Enterprise Risk Management Committee could escalate any issue to the Operating Committee or the CEO, and reported quarterly to the Operating Committee and Risk Committee of the Board.

**McLinko** incorporated Respondent Julian's Response.[2006]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 249

Respondent Julian was a member of the Bank's Team Member Misconduct Executive

---

[2003] McLinko's ECSFM at No. 247.

[2004] Julian Amended Answer ¶ 155; MSD-435.

[2005] Julian's ECSFM at No. 248, quoting DJ0053 OCC-WF-SP-10771312); (DJ0071 OCC-WF-SP-03809376.

[2006] McLinko's ECSFM at No. 248.

Committee ("TMMEC").[2007] The TMMEC charter stated that the "committee consists of senior executive who share responsibility for the appropriate management of team member misconduct and internal fraud matters" and the "purpose of the Team Member Misconduct Executive Committee is to provide a forum for Wells Fargo executive management to provide leadership, oversight and direction related to team member misconduct and internal fraud risk management."[2008]

**Responses:**

**Julian** disputed the claim but offered no evidence controverting the material claims in the Statement.[2009] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact.

Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that Respondent Julian was a member of the Bank's Team Member Misconduct Executive Committee ("TMMEC"). The TMMEC charter stated that the "committee consists of senior executive who share responsibility for the appropriate management of team member misconduct and internal fraud matters" and the "purpose of the Team Member Misconduct Executive Committee is to provide a forum for Wells Fargo executive management to provide leadership, oversight and direction related to team member misconduct and internal fraud risk management."

**McLinko** incorporated Respondent Julian's Response.[2010]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 250**

Respondent Julian was a member of the Bank's Ethics Committee. The 2013"Wells Fargo's Risk Management Framework" stated that "[t]he Ethics Committee is responsible for administering and interpreting the Wells Fargo Code of Ethics and Business Conduct, as well as approving its content."[2011]

**Responses:**

**Julian** disputed the claim but offered no evidence controverting the material claims in the Statement.[2012] I find an insufficient factual basis has been presented to establish a dispute in this

---

[2007] Julian Amended Answer ¶¶ 157, 383.

[2008] Julian Amended Answer ¶ 157; MSD-417.

[2009] Julian's ECSFM at No. 249.

[2010] McLinko's ECSFM at No. 249.

[2011] Julian Amended Answer ¶ 159; 383; MSD-418 at 2.

[2012] Julian's ECSFM at No. 250.

Appellate Case: 25-1079    Page: 400    Date Filed: 05/16/2025 Entry ID: 5517644

Response to create a controverted material fact.

Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that Respondent Julian was a member of the Bank's Ethics Committee. The 2013"Wells Fargo's Risk Management Framework" stated that "[t]he Ethics Committee is responsible for administering and interpreting the Wells Fargo Code of Ethics and Business Conduct, as well as approving its content."

**McLinko** incorporated Respondent Julian's Response.[2013]


### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 251

Respondent Julian was a member of the Bank's Incentive Compensation Steering Committee, later renamed the Incentive Compensation Committee.[2014] The Incentive Compensation Committee charter stated that the committee "is chartered to . . . provide oversight around the design and outcomes of the business line incentive plans, and lead Wells Fargo's enterprise efforts to enhance incentive compensation practices throughout the Company."[2015]

At his deposition in this proceeding, Respondent Julian could not remember attending any Incentive Compensation Committee meetings. He could not remember the committee issuing any policy statements or reviewing any compensation plans, and did not know whether the committee had criticized any individual incentive compensation plans.[2016]

Similarly, Ken Zimmerman, the Community Bank's representative on the Incentive Compensation Committee could not recall serving on the Incentive Compensation Committee, even though he believed he would have remembered it "[b]ecause it looks like it's kind of a big deal."[2017]

**Responses:**

**Julian** disputed the claim but offered no evidence controverting the material claims in the Statement.[2018] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact.

Accordingly, the Recommended Decision will include a factual finding as to Respondents

---

[2013] McLinko's ECSFM at No. 250.

[2014] MSD-279 (Julian Dep. Tr.) at 36:18-23; MSD-421 at 27-28; MSD-687; MSD-712.

[2015] Julian Amended Answer ¶ 153; (MSD-421 at 24.

[2016] MSD-279 (Julian Dep. Tr.) at 37:11-41:15.

[2017] MSD-583B (Zimmerman Tr.) at 505:4-506:12.

[2018] Julian's ECSFM at No. 251.

Appellate Case: 25-1079      Page: 401      Date Filed: 05/16/2025 Entry ID: 5517644

Julian and McLinko that Respondent Julian was a member of the Bank's Incentive Compensation Steering Committee, later renamed the Incentive Compensation Committee. The Incentive Compensation Committee charter stated that the committee "is chartered to . . . provide oversight around the design and outcomes of the business line incentive plans, and lead Wells Fargo's enterprise efforts to enhance incentive compensation practices throughout the Company."

At his deposition in this proceeding, Respondent Julian could not remember attending any Incentive Compensation Committee meetings. He could not remember the committee issuing any policy statements or reviewing any compensation plans, and did not know whether the committee had criticized any individual incentive compensation plans.

Similarly, Ken Zimmerman, the Community Bank's representative on the Incentive Compensation Committee could not recall serving on the Incentive Compensation Committee, even though he believed he would have remembered it "[b]ecause it looks like it's kind of a big deal."

**McLinko** incorporated Respondent Julian's Response.[2019]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 252

Respondent Julian was a member of the WFAS Audit Management Committee ("AMC") which performed quarterly look backs and look forwards of WFAS's audit coverage. The look back was to evaluate coverage, results, and impact and the look forward was to "evaluate risk profile changes, subsiding risks, and emerging risks."[2020]

**Responses:**

Julian objected to the Statement on the ground that the supporting exhibit was irrelevant.[2021] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 502 will not support Enforcement Counsel's Motion as to Respondent Julian. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2022]

---

[2019] McLinko's ECSFM at No. 251.

[2020] MSD-502 at 13.

[2021] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2022] McLinko's ECSFM at No. 252.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 253**

In or around October 2018, the Bank placed Respondent Julian on administrative leave.[2023]

**Responses:**

**Julian** did not dispute the claim.[2024] **McLinko** did not dispute this claim.[2025] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that in or around October 2018, the Bank placed Respondent Julian on administrative leave.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 254**

Respondent Julian retired from the Bank in or around October 2019.[2026]

**Responses:**

**Julian** did not dispute the claim.[2027] **McLinko** did not dispute this claim.[2028] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that Respondent Julian retired from the Bank in or around October 2019.

**Respondent McLinko had responsibilities as the Executive Audit Director for the Community Bank from 2011 to 2016, while the systemic sales practices misconduct problem persisted in the Community Bank**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 255**

Respondent McLinko held the title of Executive Audit Director at the Bank from approximately late 2008 to at least 2018. With the exception of an approximately six-month period during 2012, he was an Executive Audit Director for the Community Bank from the fourth quarter of 2010

---

[2023] Julian Amended Answer ¶ 384.

[2024] Julian's ECSFM at No. 253.

[2025] McLinko's ECSFM at No. 253.

[2026] Julian Amended Answer ¶ 385.

[2027] Julian's ECSFM at No. 254.

[2028] McLinko's ECSFM at No. 254.

Appellate Case: 25-1079    Page: 403    Date Filed: 05/16/2025 Entry ID: 5517644

to 2017.[2029]  He had responsibilities for overseeing the auditing of the Community Bank.[2030]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2031]

**McLinko** disputed that he held the title shown in the claim, and disputed he had the responsibilities described in the claim.[2032]

Respondent McLinko's duties may constitute material facts in issue whether he had the duties Enforcement Counsel attributed to him in this claim. Because of the existence of these material controverted facts, summary disposition is not available with respect to Respondents Julian and McLinko regarding this claim. Pursuant to the OCC's Uniform Rules, the merits of the claims raised in (Julian and McLinko) No. 255 will be addressed during the hearing set to begin on September 13, 2021.

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 256

From March 2012 to 2018, Respondent McLinko reported to Respondent Julian.[2033]

**Julian** incorporated Respondent McLinko's Response.[2034]

McLinko did not dispute this claim.[2035]  Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that from March 2012 to 2018, Respondent McLinko reported to Respondent Julian.

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 257

During his tenure as Executive Audit Director for the Community Bank between 2010 and 2017, Respondent McLinko had responsibilities concerning "oversight of the audits performed by WFAS's Community Bank & Operations Group, which included setting the audit strategy, reviewing and approving draft audit reports, complying with Audit's charter, and providing

---

[2029] MSD-275 at 255.

[2030] McLinko Amended Answer ¶ 439.

[2031] Julian's ECSFM at No. 255.

[2032] McLinko's ECSFM at No. 254, citing MMF ¶¶ 592, 598, 658, 662, 848 (Mr. McLinko's tenure).

[2033] Julian Amended Answer ¶ 440, McLinko Amended Answer ¶ 440.

[2034] Julian's ECSFM at No. 256.

[2035] McLinko's ECSFM at No. 256.

Add. 402

Appellate Case: 25-1079    Page: 404    Date Filed: 05/16/2025 Entry ID: 5517644

credible challenge to Community Bank management, as necessary."[2036]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2037]

**McLinko** disputed the claim but presented no controverting evidence.[2038] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a finding as to Respondents Julian and McLinko that during his tenure as Executive Audit Director for the Community Bank between 2010 and 2017, Respondent McLinko had responsibilities concerning "oversight of the audits performed by WFAS's Community Bank & Operations Group, which included setting the auditstrategy, reviewing and approving draft audit reports, complying with Audit's charter, and providing credible challenge to Community Bank management, as necessary."

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 258

As EAD, Respondent McLinko had responsibilities concerning "oversight of the Community Bank's audit team's execution of their duties consistent with Audit's responsibilities" and "the accuracy and completeness of the Community Bank's audits."[2039]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2040]

**McLinko** disputed the claim but presented no controverting evidence.[2041] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a finding as to Respondents Julian and McLinko that as EAD, Respondent McLinko had responsibilities concerning "oversight of the Community Bank's audit team's execution of their duties consistent with Audit's responsibilities" and "the accuracy and completeness of the Community Bank's audits."

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 259

---

[2036] McLinko Amended Answer ¶ 444.

[2037] Julian's ECSFM at No. 257.

[2038] McLinko's ECSFM at No. 257.

[2039] McLinko Amended Answer ¶¶ 445-46.

[2040] Julian's ECSFM at No. 258.

[2041][2041] McLinko's ECSFM at No. 257.

Respondent McLinko was a member of the Community Bank's Internal Fraud Committee, which received reporting from Corporate Investigations regarding, in part, sales integrity cases and investigations related to lack of customer consent for products and services.[2042]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2043]

**McLinko** offered no evidence on the point but disputed the claim "to the extent the alleged fact it is meant to establish that Mr. McLinko was a member of the Internal Fraud Committee throughout his tenure as an Executive Audit Director of Community Bank, or that he always received reporting from CIS".[2044] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a finding as to Respondents Julian and McLinko that Respondent McLinko was a member of the Community Bank's Internal Fraud Committee, which received reporting from Corporate Investigations regarding, in part, sales integrity cases and investigations related to lack of customer consent for products and services.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 260**

By no later than February 2015, Respondent McLinko was a member of the Community Banking Risk Management Committee.[2045] The Committee was responsible for understanding the Community Bank's risk profile and to ensure risks were managed effectively. Specifically, the committee identified and evaluated current and emerging material risks, determined whether appropriate balances exist between risk and reward, and identified exposures that may change the operational risk portfolio.[2046]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2047]

**McLinko** disputed the claim but presented no controverting evidence.[2048] I find an

---

[2042] McLinko Amended Answer ¶ 449.

[2043] Julian's ECSFM at No. 259.

[2044] McLinko's ECSFM at No. 258

[2045] MSD-307 at 40 (showing Respondent McLinko as a member of the Community Bank Risk Management Committee)

[2046] MSD-307 at 36; McLinko Amended Answer ¶¶ 161, 255.

[2047] Julian's ECSFM at No. 260.

[2048] McLinko's ECSFM at No. 260.

insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a finding as to Respondents Julian and McLinko that by no later than February 2015, Respondent McLinko was a member of the Community Banking Risk Management Committee. The Committee was responsible for understanding the Community Bank's risk profile and to ensure risks were managed effectively. Specifically, the committee identified and evaluated current and emergingmaterial risks, determined whether appropriate balances exist between risk and reward, and identified exposures that may change the operational risk portfolio.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 261**

The Community Banking Risk Management Committee also was to ensure risk appetite was considered throughout the new product planning processes, strategic decision making, and business practices process by each appropriate line of business. The committee served "as the primary management-level forum for the consideration of the highest priority riskissues resident in Community Banking . . . and support and assist Wells Fargo's Enterprise Risk Management Committee (ERMC) in carrying out its risk oversight responsibilities."[2049]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2050]

**McLinko** disputed the claim but presented no controverting evidence.[2051] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a finding as to Respondents Julian and McLinko that the Community Banking Risk Management Committee also was to ensure risk appetite was considered throughout the new product planning processes, strategic decision making, and business practices process by each appropriate line of business. The committee served "as the primary management-level forum for the consideration of the highest priority riskissues resident in Community Banking . . . and support and assist Wells Fargo's Enterprise RiskManagement Committee (ERMC) in carrying out its risk oversight responsibilities."

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 262**

By at least October 2015, Respondent McLinko was a member of the Community Banking Conduct Risk Oversight Committee.[2052] The Committee was established to understand Community Bank's risk profile and work to provide visibility and transparency into business

---

[2049] MSD-307 at 36.

[2050] Julian's ECSFM at No. 261.

[2051] McLinko's ECSFM at No. 261.

[2052] MSD-309 at 4; MSD-338 at 4.

Add. 405

Appellate Case: 25-1079    Page: 407    Date Filed: 05/16/2025 Entry ID: 5517644

line strategy, progress, risks, and future opportunities to ensure sales practices risk are managed effectively. The committee defined sales practices as: "risk of customer harm, reputational damage, financial loss, litigation, and regulator non-compliance associated with sales practices" within Community Bank.[2053]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2054]

**McLinko** did not dispute the claim.[2055] Accordingly, the Recommended Decision will include a finding as to Respondents Julian and McLinko that by at least October 2015, Respondent McLinko was a member of the Community Banking Conduct Risk Oversight Committee. The Committee was established to understand Community Bank's risk profile and work to provide visibility and transparency into business line strategy, progress, risks, and future opportunities to ensure sales practices risk are managed effectively. The committee defined sales practices as: "risk of customer harm, reputational damage, financial loss, litigation, and regulator non-compliance associated with sales practices" within Community Bank.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 263**

The Community Banking Conduct Risk Oversight Committee was accountable for: "1. Identify[ing] and evaluat[ing] current and emerging material risks and examine trends appropriate for conduct risk oversight. Assess[ing] strategic implications for business objectives and sales practices risk management. 2. Review[ing] conduct risk activities, including: cross- selling, the drive to meet financial targets (including, potentially, sales goals) and key behavioral motivators (including incentive compensation arrangements and team member recognition and rewards practices) as well as important HR processes (including recruitment and training and performance management) for, in particular, customer-facing team members."[2056]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2057]

---

[2053] MSD-309 at 1; MSD-338 at 1.

[2054] Julian's ECSFM at No. 262.

[2055] McLinko's ECSFM at No. 262.

[2056] MSD-309 at 1; MSD-338 at 1.

[2057] Julian's ECSFM at No. 263.

McLinko did not dispute the claim.[2058] Accordingly, the Recommended Decision will include a finding as to Respondents Julian and McLinko that the Community Banking Conduct Risk Oversight Committee was accountable for: "1. Identify[ing] and evaluat[ing] current and emerging material risks and examine trends appropriate for conduct risk oversight. Assess[ing] strategic implications for business objectives and sales practices risk management. 2. Review[ing] conduct risk activities, including: cross- selling, the drive to meet financial targets (including, potentially, sales goals) and key behavioral  motivators (including incentive compensation arrangements and team member recognition and rewards practices) as well as important HR processes (including recruitment and training and performance management) for, in particular, customer-facing team members."

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 264

Respondent McLinko retired from the Bank on or around April 2019.[2059]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2060]

**McLinko** did not dispute the claim.[2061] Accordingly, the Recommended Decision will include a finding as to Respondents Julian and McLinko that Respondent McLinko retired from the Bank on or around April 2019.

### Respondents Julian and McLinko received extensive information regarding sales practices misconduct at the Community Bank

#### Respondent Julian Received extensive information from Corporate Investigations and others regarding sales practices misconduct at theCommunity Bank

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 265

Respondent Julian testified that, from time to time, he received information related to

---

[2058] McLinko's ECSFM at No. 263.

[2059] McLinko Amended Answer ¶ 441.

[2060] Julian's ECSFM at No. 264.

[2061] McLinko's ECSFM at No. 264.

Add. 407

sales integrity from different sources.[2062]

**Responses:**

**Julian** disputed the claim but presented no controverting evidence.[2063] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that Respondent Julian testified that, from time to time, he received information related to sales integrity from different sources.

**McLinko** incorporated Respondent Julian's Response.[2064]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 266

Respondent Julian received a steady stream of information from a variety of sources about sales integrity and sales practices misconduct in the Community Bank that indicated its widespread and systemic nature.[2065]

**Responses:**

Julian disputed the claim but presented no controverting evidence.[2066] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that Respondent Julian received a steady stream of information from a variety of sources about sales integrity and sales practices misconduct in the Community Bank that indicated its widespread and systemic nature.

**McLinko** incorporated Respondent Julian's Response.[2067]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 267

Under the Bank's EthicsLine Policy, Corporate Investigations sent certain types of EthicsLine complaints (i.e. whistleblower complaints) to Respondent Julian as the Bank's Chief

---

[2062] Julian Amended Answer ¶ 396.

[2063] Julian's ECSFM at No. 265.

[2064] McLinko's ECSFM at No. 265.

[2065] See, e.g., MSD-324 at 5; MSD-420 at 9; MSD- 430 at 15; MSD-484-487; MSD-442-446; MSD-524 at 49.

[2066] Julian's ECSFM at No. 266.

[2067] McLinko's ECSFM at No. 266.

Auditor.[2068] Respondent Julian directly received dozens of EthicsLine whistleblower complaints from Bank employees around the country detailing undue sales pressure, unreasonable sales goals, and sales practices misconduct in the Community Bank.[2069] He received information showing that Bank employees submitted thousands of similar complaints each year, and that such complaints comprised roughly 50% of all EthicsLine complaints received annually.[2070]

**Responses:**

**Julian** objected to the Statement on the ground that the supporting exhibits were irrelevant, noting the time they were last updated.[2071] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 267 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2072]


**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 268**

Shearman & Sterling LLP interviewed David Julian on behalf of the Oversight Committee of the Board of Directors in 2016 in connection with the Board Report. According to the interview notes, Respondent Julian said "he receives notice of certain EthicsLine complaints, and that, given the content of some examples he had seen over time, he found it difficult to believe that Ms. Tolstedt had been unaware of team-member reactions to the high-pressure sales environment in CB."[2073]

**Responses:**

**Julian** did not dispute that the notes from the interview contained the phrase "Mr. Julian further stated that he receives notice of certain EthicsLine complaints, and that, given the content of some examples he had seen over time, he found it difficult to believe that Ms. Tolstedt had been unaware of team-member reactions to the high-pressure sales

---

[2068] MSD-240 at 11; MSD-381 at 11.

[2069] See, e.g., MSD-442-446; MSD-484-487.

[2070] See, e.g., MSD-324 at 5; MSD-430; MSD-524 at 49.

[2071] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2072] McLinko's ECSFM at No. 267.

[2073] MSD-501 at 6.

Add. 409

environment in CB."[2074]

Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that after Shearman & Sterling LLP interviewed David Julian on behalf of the Oversight Committee of the Board of Directors in 2016 in connection with the Board Report, notes from the interview contained the phrase "Mr. Julian further stated that he receives notice of certain EthicsLine complaints, and that, given the content of some examples he had seen over time, he found it difficult to believe that Ms. Tolstedt had been unaware of team-member reactions to the high-pressure sales environment in CB."

**McLinko** incorporated Respondent Julian's Response.[2075]


### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 269

Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 269 relies on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[2076] Upon my review of the confidential documents supporting this Statement of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in this Statement of Material Fact.


### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 270

Respondent Julian also received information showing that there were sales integrity cases in every region in the Community Bank and that customer consent cases were the most common sales integrity case type.[2077]

**Responses:**

**Julian** disputed the claim, asserting that while the cited chart does show the number of confirmed fraud cases for Corporate Investigation Sales Integrity cases overall, it does not detail

---

[2074] Julian's ECSFM at No. 268, citing MSD-501 at 6.

[2075] McLinko's ECSFM at No. 268.

[2076] See 12 C.F.R. § 19.33(b).

[2077] See, e.g., MSD-420 at 9.

Appellate Case: 25-1079     Page: 412     Date Filed: 05/16/2025  Entry ID: 5517644

how many of those cases are specific to customer consent.[2078] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that he received information showing that there were sales integrity cases in every region in the Community Bank and that customer consent cases were the most common sales integrity case type.

**McLinko** incorporated Respondent Julian's Response.[2079]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 271

Respondent Julian was reminded about internal audit's critical role with respect to team member misconduct and internal fraud and repeatedly asked to consider whether the controls were allowing too much opportunity and whether the line of business was "creating an environment whereby the employee must commit misconduct."[2080]

**Responses:**

**Julian** disputed the claim, averring it does not provide sufficient context regarding whether Mr. Julian reviewed the cited presentations.[2081] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that he was reminded about internal audit's critical role with respect to team member misconduct and internal fraud and repeatedly asked to consider whether the controls were allowing too much opportunity and whether the line of business was "creating an environment whereby the employee must commit misconduct."

**McLinko** incorporated Respondent Julian's Response.[2082]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 272

Corporate Investigations (also called Corporate Security) prepared quarterly updates that were included in WFAS's quarterly reports to the Audit and Examination Committee of the

---

[2078] Julian's ECSFM at No. 270.

[2079] McLinko's ECSFM at No. 271.

[2080] See, e.g., MSD-420, MSD-311.

[2081] Julian's ECSFM at No. 271.

[2082] McLinko's ECSFM at No. 271.

Board.[2083]  In Audit's February 2012 report to the Audit and Examination Committee, Corporate Security noted a 44% increasein Suspicious Activity Report ("SAR") filings in 2011 related to team member misconduct and attributed the increases in part to "sales integrity issues involving a possible violation of law." Corporate Investigation's report also noted 42% of all EthicsLine reports were referred to the Community Bank's Sales Quality Team (i.e. they were related to possible sales integrity violations).[2084]

**Responses:**

Julian disputed the claim, averring it does not provide sufficient context regarding whether Mr. Julian reviewed the cited presentations.[2085]  I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that Corporate Investigations (also called Corporate Security) prepared quarterly updates that were included in WFAS's quarterly reports to the Audit and Examination Committee of the Board.[2086]  In Audit's February 2012 report to the Audit and Examination Committee, Corporate Security noted a 44% increasein Suspicious Activity Report ("SAR") filings in 2011 related to team member misconduct and attributed the increases in part to "sales integrity issues involving a possible violation of law." Corporate Investigation's report also noted 42% of all EthicsLine reports were referred to the Community Bank's Sales Quality Team (i.e. they were related to possible sales integrity violations).

**McLinko** incorporated Respondent Julian's Response.[2087]


**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 273**

Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 273 relies on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[2088] Upon my review of the confidential documents supporting this Statement of Material Fact, and after weighing the

---

[2083] MSD-279 (Julian Dep. Tr.) at 204:15-207:1.

[2084] MSD-425 at 3-4.

[2085] Julian's ECSFM at No. 272.

[2086] MSD-279 (Julian Dep. Tr.) at 204:15-207:1.

[2087] McLinko's ECSFM at No. 273.

[2088] See 12 C.F.R. § 19.33(b).

Appellate Case: 25-1079     Page: 414     Date Filed: 05/16/2025 Entry ID: 5517644

expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in this Statement of Material Fact.

## Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 274

During the April 2012 Ethics Committee meeting, Head of Corporate Investigations Michael Bacon provided a written presentation to the Ethics Committee that showed that over 90% of EthicsLine reports in 2011 related to Community Banking and the vastmajority of EthicsLine cases referred to Corporate Investigations related to sales integrity violations. Specifically, it showed that Corporate Investigations opened 1,339 sales integrity violations cases from EthicsLine complaints in 2010 and opened 1,220 sales integrity violationscases from EthicsLine complaints in 2011.[2089]

**Responses:**

**Julian** disputed the claim, averring it does not provide sufficient context regarding whether Mr. Julian reviewed the cited presentations.[2090] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that during the April 2012 Ethics Committee meeting, Head of Corporate Investigations Michael Bacon provided a written presentation to the Ethics Committee that showed that over 90% of EthicsLine reports in 2011 related to Community Banking and the vastmajority of EthicsLine cases referred to Corporate Investigations related to sales integrity violations. Specifically, it showed that Corporate Investigations opened 1,339 sales integrity violations cases from EthicsLine complaints in 2010 and opened 1,220 sales integrity violationscases from EthicsLine complaints in 2011.

**McLinko** incorporated Respondent Julian's Response.[2091]

## Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 275

Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 275 relies on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to

---

[2089] MSD-506 at 8, 10.

[2090] Julian's ECSFM at No. 274.

[2091] McLinko's ECSFM at No. 274.

Add. 413

Appellate Case: 25-1079    Page: 415    Date Filed: 05/16/2025 Entry ID: 5517644

take all appropriate steps to preserve the confidentiality of such documents.[2092] Upon my review of the confidential documents supporting this Statement of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in this Statement of Material Fact.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 276**

On May 16, 2012, Respondent Julian received an EthicsLine complaint about a team member in Alaska "open[ing] two savings accounts for a customer without his consent." The investigator also noted that she located an April 2012 complaint from a different employee where four accounts were opened without a customer's consent.[2093]

**Responses:**

**Julian** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2094] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 276 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2095]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 277**

Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 277 relies on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[2096] Upon my review of the confidential documents supporting this Statement of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to

---

[2092] See 12 C.F.R. § 19.33(b).

[2093] MSD-426.

[2094] Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2095] McLinko's ECSFM at No. 276.

[2096] See 12 C.F.R. § 19.33(b).

be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in this Statement of Material Fact.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 278**

On May 18, 2012, Respondent Julian received an EthicsLine report from NewMexico that "tellers, lead tellers, bankers, and managers" were opening savings accounts for customers without funding the accounts, which caused overdraft fees. The investigator notedthat the case was referred to the Sales Quality group. This report was generated as an update from the original March 5, 2012 complaint.[2097]

**Responses:**

**Julian** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2098] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 278 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2099]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 279**

Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 279 relies on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[2100] Upon my review of the confidential documents supporting this Statement of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in this Statement of Material Fact.

---

[2097] MSD-482.

[2098] Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2099] McLinko's ECSFM at No. 278.

[2100] See 12 C.F.R. § 19.33(b).

Add. 415

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 280**

On May 31, 2012 Respondent Julian received an EthicsLine complaint about teammembers in Florida who "opened accounts without the consent of the customers."[2101]

**Responses:**

Julian objected to the Statement on the ground that the supporting exhibit was irrelevant.[2102] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 280 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2103]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 281**

On July 20, 2012, Head of Corporate Investigations Michael Bacon forwarded an email chain to Respondent Julian informing him that the attached email chain was a "classic case" of Respondent Russ Anderson "minimizing the negative information being submitted to executive management." Mr. Bacon stated that Respondent Russ Anderson "often challenges the Audit and [Corporate Security] [Audit and Examination Committee of the Board] reporting verbiage."[2104]

**Responses:**

Julian objected to the Statement on the ground that the supporting exhibit was irrelevant.[2105] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 281 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** did not dispute the email chain contained the language presented, but disputed that the

---

[2101] MSD-429.

[2102] Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2103] McLinko's ECSFM at No. 280.

[2104] Julian Amended Answer ¶¶ 402, 455; McLinko Amended Answer ¶¶ 402, 455; MSD-25.

[2105] Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

Statement is an accurate or complete statement of the cited email.[2106] He averred MSD- 25 does not state that the email chain he forwarded was a "'classic case' of Ms. Russ Anderson 'minimizing the negative information being submitted to executive management'" but instead states: "Claudia is a fantastic business partner and I enjoy a great relationship with her, but she often challenges the Audit and CS A&E reporting verbiage. It is often a classic case of minimizing the negative information being submitted to executive management." For the reasons advanced by Respondent Julian, the claims presented in (Julian and McLinko) No. 281 will not support Enforcement Counsel's Motion.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 282**

Head of Corporate Investigations Michael Bacon also reported in the email that his "data continues to highlight a concerning trend in the area of Sales Integrity – from the increase in EthicsLine reports, to the increase in executive complaint letters/OCC referrals, and increases in confirmed fraud, thus, we need to escalate this issue with senior leadership . . . our data continues to point to a very negative trend." The email chain itself began with Mr. Bacon providing Respondent Russ Anderson with a summary report of SAR filing trends that stated: "Although internal cases involving sales integrity matters decreased … related SAR filings increased. Specifically, SAR filings involving fictitious sales referrals increased 49%, customer consent concerns increased 29%, and false entry of customer identification information increased 24%." Respondent Russ Anderson replied that the context needed rethinking as "it sounds much worse than it really is…" Mr. Bacon replied to Respondent Russ Anderson, reminding her that "we have had a spike in egregious Sales Integrity matters, which added to the upward trend."[2107]

**Responses:**

**Julian** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2108] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 282 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** objected to the Statement on the ground that it omitted words without identifying them.[2109] For the reasons advanced by Respondent Julian, the claims presented in (Julian

---

[2106] McLinko's ECSFM at No. 281.

[2107] Julian Amended Answer ¶ 402; MSD-25 (emphasis added).

[2108] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2109] McLinko's ECSFM at No. 282.

Appellate Case: 25-1079    Page: 419    Date Filed: 05/16/2025 Entry ID: 5517644

and McLinko) No. 282 will not support Enforcement Counsel's Motion.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 283**

Respondent Julian testified to the OCC during its investigation:

> Q. Once Mr. McLinko and yourself got this email is there any excuse for audit not to investigate further to see whether what Mr. Bacon is pointing to is a serious issue or not?

> A. Yes. Again, I am not sure what Paul would have or did do in this. I can't say that he didn't. We get, not an excuse, we cover a broad range.

> This was one example where it appears Michael is raising a concern that ultimately turned out to be a valid concern. Whether it was looked into by Paul or not at that time I am not sure, but –

> Q. Okay. I'm sorry.

> A. So you used the word "excuse," I'm not sure I am in the excuse making. I mean it's clear we didn't do enough based on what I know now to investigate.

> Q. No, I understand that historically you don't know what, if anything, Mr. McLinko did in response to getting to this email, is that correct?

> A. I don't recall, yes, what he would have did or didn't do.

> Q. Okay, all right. My question is not like a historical question on what Mr. McLinko or anybody in audit did or didn't do, my question is more about what you would expect a competent audit department or competent auditor to do. I a competent auditor gets an email like this from corporate investigation what should they do?

> A.        Again, depending on the overall context, but they should look further into to see if the concerns raised by, in this case, Michael Bacon were valid and relevant or not relevant valid concerns.[2110]

**Responses:**

Julian did not dispute the transcript includes the quoted material.[2111] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that he gave the testimony presented above.

_____

[2110] Julian Amended Answer ¶ 402; MSD-278 (Julian Tr.) at 166:19-168:5; 168:6-170:19).

[2111] Julian's ECSFM at No. 283.

Appellate Case: 25-1079     Page: 420     Date Filed: 05/16/2025 Entry ID: 5517644

**McLinko** incorporated Respondent Julian's Response.[2112]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 284**

On July 30, 2012, Respondent Julian received a PowerPoint presentation from Head of Corporate Investigations Michael Bacon for an Audit Management Committee meeting. The presentation deck listed general trends, including:

> (a)    "Pressure on company to save [money] and to perform is at all time high - this can easily lead to [team member] misconduct (pressure combined with less controls);"

> (b)    "Audits involving a [team member] related process (TM loans, accts, HR items, etc.) - if business process could identify [team member] conduct, then detection efforts should be coordinated with Corporate Investigations/ Business process should not just be 'call EthicsLine';"

> (c)    "WFF Consent Order Update - New Team Member Misconduct Executive Committee, Implementation of formal [line of business] Internal Fraud Committees (IFC) - Internal TM Misconduct & Fraud is a Team Sport -

Audit has a primary seat at the prevention table" (emphasis in original). (MSD-311 at 4).

> (a)    The Audit Management Committee presentation also included the "Academic Fraud Triangle" which shows that three elements must be present for fraud to occur: Opportunity (an associated bullet asks whether the line of business's controls are allowing too much opportunity), Pressure (the associated bullet asks whether the line business is creating an environment whereby the [employee] must commit fraud), and Rationalization (the associated bullet states that "[t]oo much opportunity or too much pressure can sway most anyone.")[2113]

**Responses:**

**Julian** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2114] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and

---

[2112] McLinko's ECSFM at No. 283.

[2113] MSD-311 at 5.

[2114] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

Appellate Case: 25-1079    Page: 421    Date Filed: 05/16/2025    Entry ID: 5517644

McLinko) No. 284 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2115]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 285

In the August 2012 WFAS Second Quarter 2012 Summary to the Audit and Examination Committee, Corporate Investigations provided a mid-year summary, which reflected that sales integrity violations were one of the top five case types and although there wasa decrease in violations, it only reflected the gross number of cases opened because there was an increase in related terminations (up 7%) and an increase in required Suspicious Activity Report filing (up 27%).[2116]

**Responses:**

Julian objected to the Statement on the ground that the supporting exhibit was irrelevant.[2117] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 285 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2118]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 286

Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 286 relies on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[2119] Upon my review

---

[2115] McLinko's ECSFM at No. 284.

[2116] MSD-521 at 43, 46.

[2117] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2118] McLinko's ECSFM at No. 285.

[2119] See 12 C.F.R. § 19.33(b).

Add. 420

Appellate Case: 25-1079    Page: 422    Date Filed: 05/16/2025 Entry ID: 5517644

of the confidential documents supporting this Statement of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in this Statement of Material Fact.

## Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 287

Although Respondent Julian was not in attendance of the October 2012 EthicsCommittee meeting, he attended the next meeting in January 2013, where the October 2012 minutes were approved.[2120] Respondent Julian received a copy of the minutes from theOctober 2012 Ethics Committee meeting.[2121]

**Responses:**

**Julian** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2122] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 287 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2123]

## Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 288

On October 24, 2012, Respondent Julian received an EthicsLine report of an employee claiming he was terminated for gaming in retaliation for reporting sales integrity violations. He reported that at least three other employees at the California branch were gaming.[2124]

**Responses:**

---

[2120] MSD-432.

[2121] MSD-504.

[2122] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2123] McLinko's ECSFM at No. 287.

[2124] MSD-483.

Appellate Case: 25-1079    Page: 423    Date Filed: 05/16/2025 Entry ID: 5517644

Julian objected to the Statement on the ground that the supporting exhibit was irrelevant.[2125] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 288 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2126]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 289

On November 5, 2012, Respondent Julian received an invite to the quarterly Code of Ethics Administrators meeting. The attached presentation included an update from Michael Bacon, which observed an increase in allegations involving team member misconduct and an increase in EthicsLine reports. One of the top four categories of EthicsLine reports was Sales Integrity.[2127]

**Responses:**

**Julian** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2128] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 289 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2129]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 290

In the November 27, 2012 WFAS Third Quarter 2012 Summary to the Audit and Examination

---

[2125] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2126] McLinko's ECSFM at No. 288.

[2127] MSD-431.

[2128] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2129] McLinko's ECSFM at No. 289.

Appellate Case: 25-1079    Page: 424    Date Filed: 05/16/2025 Entry ID: 5517644

Committee, Corporate Investigations reported that "internal cases involving sales integrity matters increased overall by 1% compared to the same time period in 2011; however, related SAR filings increased 30%. This is a result of higher quality referrals and an increase in reportable misconduct. Specifically, SAR filings involving fictitious sales referrals increased 40%, customer consent concerns increased 36%, and false entry of customer identification information increased 24%. Corporate Security Investigations continues to work on several Community Bank project teams to analyze root causes and implement additional controls that are focused on minimizing future occurrences and mitigating the risks associated with these issues."[2130]

**Responses:**

**Julian** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2131] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 290 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2132]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 291**

On November 30, 2012, Respondent Julian received an EthicsLine complaint that a Pennsylvania store manager opened a checking account that a customer did not want.[2133]

**Responses:**

**Julian** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2134] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 291 will not support Enforcement Counsel's Motion. The exclusion of the claims

---

[2130] MSD-522 at 51.

[2131] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2132] McLinko's ECSFM at No. 290.

[2133] MSD- 484.

[2134] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

Add. 423

Appellate Case: 25-1079     Page: 425     Date Filed: 05/16/2025 Entry ID: 5517644

appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2135]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 292

On December 10, 2012, Respondent Julian received an EthicsLine report that a team member felt he/she was being retaliated against because he/she reported a California manager took a teller's personal information and opened an account and debit card without that teller's permission.[2136]

**Responses:**

**Julian** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2137] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 292 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2138]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 293

On December 12, 2012, Respondent Julian received an EthicsLine report that a customer in South Carolina reported she had inquired about opening an account at a branch and later received information that an account had been opened. The customer reported that the account was opened without her permission.[2139]

**Responses:**

---

[2135] McLinko's ECSFM at No. 291.

[2136] MSD-485.

[2137] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2138] McLinko's ECSFM at No. 292.

[2139] MSD-486.

**Julian** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2140] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 293 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2141]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 294

Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 294 relies on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[2142] Upon my review of the confidential documents supporting this Statement of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in this Statement of Material Fact.

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 295

Also on January 28, 2013, Respondent Julian received an EthicsLine report that two California employees were "pinning, enrolling, and activating online banking on behalf of customers, who are not present, in order to get sales credit."[2143]

**Responses:**

**Julian** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2144] Finding an insufficient nexus between the averments presented in the Statement and the material

---

[2140] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2141] McLinko's ECSFM at No. 293.

[2142] See 12 C.F.R. § 19.33(b).

[2143] MSD-488.

[2144] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 295 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2145]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 296

On February 1, 2013, Respondent Julian received an EthicsLine complaint about an employee in Texas resigning from the Bank because the store manager allowed and encouraged gaming and other unethical practices. The manager told the employee to "straighten the screws in your head" after he failed to get his sales for the day. The summary described further research into the complaint, which showed other allegations of gaming at the same branch, which had resulted in three terminations to date because the investigation was ongoing.[2146]

**Responses:**

**Julian** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2147] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 296 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2148]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 297

On February 6, 2013 Respondent Julian received an EthicsLine complaint that an employee felt he was terminated because he reported sales integrity issues and fake accounts to the EthicsLine.[2149]

---

[2145] McLinko's ECSFM at No. 295.

[2146] MSD-434.

[2147] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2148] McLinko's ECSFM at No. 296.

[2149] MSD-489.

Appellate Case: 25-1079      Page: 428      Date Filed: 05/16/2025 Entry ID: 5517644

**Responses:**

**Julian** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2150] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 297 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2151]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 298

On February 23, 2013, Respondent Julian received an EthicsLine complaint that a manager in Florida was retaliating against an employee for reporting sales integrity concerns. The investigator observed that there were four other complaints against the manager for sales integrity concerns.[2152]

**Responses:**

Julian objected to the Statement on the ground that the supporting exhibit was irrelevant.[2153] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 298 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2154]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 299

On February 24, 2013, Head of Corporate Investigations Michael Bacon provideda presentation to the members of the TMMEC, including Respondent Julian. The presentation

---

[2150] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2151] McLinko's ECSFM at No. 297.

[2152] MSD-490.

[2153] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2154] McLinko's ECSFM at No. 298.

Appellate Case: 25-1079    Page: 429    Date Filed: 05/16/2025 Entry ID: 5517644

stated that the TMMEC was created in response to the WFF Consent Order, which required the Bank "demonstrate effective oversight through policies and procedures designed to ensure adequate fraud investigation and response to the results of such investigations, including escalation protocols for reporting to appropriate senior management and the board of directors."[2155]

**Responses:**

**Julian** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2156] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 299 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2157]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 300**

The TMMEC presentation listed misconduct governance supporting policies andprocesses, including:

> (a) "Comprehensive Team Member Misconduct/Fraud Investigations Program (includes routine reporting of results, escalation or risks/controlbreakdowns/systemic issues, partnering with audit, and components specific to strategic internal fraud testing and ongoing internal fraud assessments);"
>
> (b) Senior Leader / Operating Committee / A&E / GRO & Audit escalationprocesses;" and
>
> (c) "Investigative Key Activity reporting to all key stakeholders, LOBInternal Fraud Committees, GEVPS, and Audit & Examination Committee.[2158]

**Responses:**

**Julian** did not dispute that the TMMEC presentation contains the quoted text.[2159] **McLinko**

---

[2155] MSD-436 at 6; Julian Amended Answer ¶ 164, 398; McLinko Amended Answer ¶ 164, 398.

[2156] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2157] McLinko's ECSFM at No. 299.

[2158] MSD-436 at 7.

[2159] Julian's ECSFM at No. 300.

Add. 428

did not dispute the claim.[2160] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that the TMMEC presentation listed misconduct governance supporting policies andprocesses, including:

(a) "Comprehensive Team Member Misconduct/Fraud Investigations Program (includes routine reporting of results, escalation or risks/controlbreakdowns/systemic issues, partnering with audit, and components specific to strategic internal fraud testing and ongoing internal fraud assessments);"

(b) Senior Leader / Operating Committee / A&E / GRO & Audit escalationprocesses;" and "Investigative Key Activity reporting to all key stakeholders, LOB Internal Fraud Committees, GEVPS, and Audit & Examination Committee.

(c) "Investigative Key Activity reporting to all key stakeholders, LOB Internal Fraud Committees, GEVPS, and Audit & Examination Committee.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 301**

The TMMEC presentation provided an update on the establishment of Internal Fraud Committees within each line of business, including the Community Bank. The update provided: "[a]s stated within the Corporate Fraud Policy, the primary responsibility for adequateresponse to investigation results lies with LOB senior leaders, GROs, and LOB specific internal fraud committee members" and "LOB [Internal Fraud Committee] membership includes, but [is]not limited to . . . *Audit*."[2161]

**Julian** did not dispute that the TMMEC presentation contains the quoted text.[2162] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that the TMMEC presentation provided an update on the establishment of Internal Fraud Committees within each line of business, including the Community Bank. The update provided: "[a]s stated within the Corporate Fraud Policy, the primary responsibility for adequateresponse to investigation results lies with LOB senior leaders, GROs, and LOB specific internal fraud committee members" and "LOB [Internal Fraud Committee] membership includes, but [is]not limited to . . . Audit."

---

[2160] McLinko's ECSFM at No. 300.

[2161] MSD-436 at 10.

[2162] Julian's ECSFM at No. 301.

**McLinko** incorporated Respondent Julian's Response.[2163]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 302**

The presentation further showed the TMMEC that sales integrity violations was the second-most common Corporate Investigations case type and that sales integrity violations were at 3,108 for 2012, up from 2,992 in 2011. It also showed that the vast majority of Corporate Investigation cases in both 2011 and 2012 originated in the Community Bank.[2164]

**Responses:**

**Julian** disputed the claim on the basis that the report did not report on confirmed violations.[2165] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Julian that the presentation further showed the TMMEC that sales integrity violations was the second-most common Corporate Investigations case type and that sales integrity violations were at 3,108 for 2012, up from 2,992 in 2011. It also showed that the vast majority of Corporate Investigation cases in both 2011 and 2012 originated in the Community Bank.

**McLinko** did not dispute that the cited exhibit identifies the total number of sales integrity violations investigation cases but disputed that this establishes he or Mr. Julian received extensive information regarding sales practices misconduct (a claim that does not appear in this Statement).[2166] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent McLinko that the presentation further showed the TMMEC that sales integrity violations was the second-most common Corporate Investigations case type and that sales integrity violations were at 3,108 for 2012, up from 2,992 in 2011. It also showed that the vast majority of Corporate Investigation cases in both 2011 and 2012 originated in the Community Bank.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 303**

In the February 26, 2013 WFAS Fourth Quarter 2012 Summary to the Audit and Examination Committee, Corporate Security reported that sales integrity violations and related

---

[2163] McLinko's ECSFM at No. 301.

[2164] MSD-436 at 11.

[2165] Julian's ECSFM at No. 302.

[2166] McLinko's ECSFM at No. 302.

Appellate Case: 25-1079    Page: 432    Date Filed: 05/16/2025 Entry ID: 5517644

falsifications were one of the top four case types and had increased 4% over the prior year's volume. The report explained that the increase could be partly attributed to enhanced monitoring and detection, and a slight increase in misconduct in some regions.[2167]

**Responses:**

**Julian** disputed the claim on the basis that it lacked necessary context.[2168] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that in the February 26, 2013 WFAS Fourth Quarter 2012 Summary to the Audit and Examination Committee, Corporate Security reported that sales integrity violations and related falsifications were one of the top four case types and had increased 4% over the prior year's volume. The report explained that the increase could be partly attributed to enhanced monitoring and detection, and a slight increase in misconduct in some regions.

**McLinko** incorporated Respondent Julian's Response.[2169]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 304**

On March 3, 2013, Respondent Julian received an EthicsLine complaint that an employee was being retaliated against by a Florida manager after the manager learned someone had reported him for "influencing team members to violate sales incentive policies." Specifically, the employee said the manager "instructed team members to open accounts despite the customers' need for the products."[2170]

**Responses:**

**Julian** disputed the claim on the basis that it lacked necessary context.[2171] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on March 3, 2013, Respondent Julian received an EthicsLine complaint that an employee was being retaliated against by a Florida manager after the manager learned someone had reported him for "influencing team members to violate sales incentive policies." Specifically, the employee said the manager

---

[2167] MSD-523 at 51.

[2168] Julian's ECSFM at No. 303.

[2169] McLinko's ECSFM at No. 303.

[2170] MSD-491.

[2171] Julian's ECSFM at No. 304.

Add. 431

Appellate Case: 25-1079      Page: 433      Date Filed: 05/16/2025 Entry ID: 5517644

"instructed team members to open accounts despitethe customers' need for the products."

**McLinko** incorporated Respondent Julian's Response.[2172]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 305

On March 4, 2013, Respondent Julian received an EthicsLine report that a bankerhad opened a business credit card for a customer without his consent and he had called the National Business Banking Center "because he was upset about fees charged to a business creditcard that he did not authorize."[2173]

**Responses:**

**Julian** disputed the claim on the basis that it lacked necessary context.[2174] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on March 4, 2013, received an EthicsLine report that a bankerhad opened a business credit card for a customer without his consent and he had called the National Business Banking Center "because he was upset about fees charged to a business creditcard that he did not authorize."

**McLinko** incorporated Respondent Julian's Response.[2175]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 306

Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 306 relies on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[2176] Upon my review of the confidential documents supporting this Statement of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to

---

[2172] McLinko's ECSFM at No. 304.

[2173] MSD-492.

[2174] Julian's ECSFM at No. 305.

[2175] McLinko's ECSFM at No. 305.

[2176] See 12 C.F.R. § 19.33(b).

Add. 432

Appellate Case: 25-1079    Page: 434    Date Filed: 05/16/2025 Entry ID: 5517644

be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in this Statement of Material Fact.

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 307

On March 4, 2013, Respondent Julian attended a TMMEC meeting at which Head of Corporate Investigations Michael Bacon reported in YTD 2012, 3,108 corporate investigations cases related to sales integrity violations up from 2,992 in 2011. It also showed that the vast majority of Corporate Investigation cases in both 2011 and 2012 originated in the Community Bank.[2177]

**Responses:**

**Julian** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2178] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 307 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2179]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 308

The same day as the TMMEC meeting (March 4, 2013), Respondent Julian emailed Respondent McLinko stating that Mr. Bacon "is presenting some data and Community Banking has a lot of issues [related to team member fraud] each year."[2180]

**Responses:**

**Julian** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2181] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 307 will not support Enforcement Counsel's Motion. The exclusion of the claims

---

[2177] MSD-419.

[2178] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2179] McLinko's ECSFM at No. 307.

[2180] Julian Amended Answer ¶ 397; McLinko Amended Answer ¶ 397; MSD-312.

[2181] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

Appellate Case: 25-1079      Page: 435      Date Filed: 05/16/2025 Entry ID: 5517644

appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2182]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 309

Respondent Julian then asked Respondent McLinko what work WFAS performedrelated to team member fraud. Respondent McLinko replied with a description of the audit process for Community Bank team member fraud: audit performed a control testing audit of Store Operations Control Review (SOCR), audit performed a control testing of sales quality/sales integrity, and other potential indirect reviews such as customer complaints or incentive compensation. Respondent McLinko further replied, "Interesting that you asked this. Over the last month I had my managers put together a picture (1 pager) of a Sales Quality Overview, which includes coverage of Fraud" and stated he would set up a meeting to review thediagram. Respondent Julian replied, "Good. Thanks".[2183]

**Responses:**

**Julian** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2184] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 309 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2185]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 310

On March 11, 2013, Respondent Julian received a "Corporate Investigations 2012 Year End Key Activity Overview/ General Update" presentation for the Head of Corporate Investigations' presentation to the Audit Management Committee. The presentation showed sales integrity violations as the number two case type for both 2011 and 2012, with 2,992 and

---

[2182] McLinko's ECSFM at No. 308.

[2183] McLinko Amended Answer ¶ 397; MSD- 312; MSD-437.

[2184] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2185] McLinko's ECSFM at No. 309.

Add. 434

Appellate Case: 25-1079     Page: 436     Date Filed: 05/16/2025 Entry ID: 5517644

3,108 respectively. The Community Bank comprised the vast majority of cases: 10,616 cases in Community Bank versus 1,267 in the other lines of business in 2011 and 11,597 cases in Community Bank versus 1,586 in the other lines of business in 2012. The presentation also reported the number of EthicsLine reports referred to Regional Banking Sales Quality (i.e. EthicsLine complaints related to sales practices) as 3,068 in 2011 and 3,899 in 2012, up 27% and comprising 48% of the 8,354 EthicsLine complaints in 2012.[2186]

**Responses:**

**Julian** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2187] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 310 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2188]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 311**

On March 12, 2013, Respondent Julian attended the International Institute of Auditors Mid-Atlantic District Conference ("IIA Conference") and gave a presentation on "Leading Internal Audit at Financial Institutions: Chief Audit Executive View."[2189] Immediately following Respondent Julian's presentation, Respondent McLinko introduced Head of Corporate Investigations Michael Bacon to give a presentation on "The Complexities of Internal Fraud."[2190]

**Responses:**

**Julian** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2191] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and

---

[2186] MSD-324 at 5.

[2187] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2188] McLinko's ECSFM at No. 310.

[2189] MSD-528 at 3.

[2190] MSD-325; MSD-327.

[2191] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

McLinko) No. 311 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2192]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) Nos. 312 and 382

Mr. Bacon's presentation began with a slide of the former CEO of the Bank on the cover of a January 2012 issue of Forbes magazine with the headline, "the bank that works." The next slide showed an image of Respondent Julian superimposed over the former CEO's image with a different headline, "the bank that fails: where were the auditors?" and a nearby bubble stating: "IIA bans David Julian."[2193]



**Responses:**

**Julian** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2194] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) Nos. 312 and 382 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

---

[2192] McLinko's ECSFM at No. 311.

[2193] MSD-325 at 3-4.

[2194] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

**McLinko** incorporated Respondent Julian's Response.[2195]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) Nos. 313 and 383

Head of Corporate Investigations Bacon testified that he used this slide to "draw attention to the criticality of the [audit] business."[2196]

**Responses:**

**Julian** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2197] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) Nos. 313 and 383 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2198]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) Nos. 314 and 384

Mr. Bacon's presentation next described internal auditing as "all about detecting or preventing Employee Misconduct or Internal Fraud."[2199] It explained that internal audit's "fraud role" was to "support management with evaluation of internal controls used to detect or mitigate fraud" and "evaluate the organization's assessment of fraud risk."[2200]

**Responses:**

**Julian** objected to the Statement on the ground that the supporting exhibit was

---

[2195] McLinko's ECSFM at Nos. 312 and 382.

[2196] MSD-296B (Bacon Depo. Tr.) at 421:8-10.

[2197] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2198] McLinko's ECSFM at Nos. 313 and 383.

[2199] MSD-325 at 5.

[2200] MSD-325 at 18.

irrelevant.[2201] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) Nos. 314 and 384 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2202]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) Nos. 315 and 385

Mr. Bacon's presentation also explained that fraud "risks are very specific to theorganization and every organization is unique" and "For most organizations internal fraud is nolonger about losses or the traditional definition of occupational fraud – it is now all about reputation and brand protection."[2203] It further explained that the "complexities of internal misconduct and fraud is as complex as the organization's business practices and businessprocesses" and asked whether a "practice or process create[s] a need or an opportunity for fraud?"[2204]

**Responses:**

**Julian** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2205] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) Nos. 315 and 385 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2206]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) Nos. 316 and

---

[2201] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2202] McLinko's ECSFM at Nos. 314 and 384.

[2203] MSD-325 at 8, 14.

[2204] MSD-325 at 23.

[2205] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2206] McLinko's ECSFM at Nos. 315 and 385.

386

The presentation illustrated the "Academic Fraud Triangle" which showed that three elements must be present for fraud to occur: Opportunity (an associated bullet asks whether the business controls are allowing too much opportunity), Pressure (the associated bullet asks whether the business is creating an environment whereby the employee must commit fraud), and Rationalization (the associated bullet states that too much opportunity or too much pressurecan sway most anyone.).[2207]

**Responses:**

**Julian** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2208] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) Nos. 316 and 386 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2209]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) Nos. 317 and 387**

One of the final slides of Head of Corporate Investigations Michael Bacon's presentation on "The Complexities of Internal Fraud" at the IIA Conference provided "Keys toSuccess" and recommended the audience "question rainbows and butterflies / absence of issuesis a red flag."[2210]

**Responses:**

**Julian** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2211] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) Nos. 317 and 387 will not support Enforcement

---

[2207] MSD-325 at 24.

[2208] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2209] McLinko's ECSFM at Nos. 316, 386.

[2210] MSD-325 at 30.

[2211] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

Appellate Case: 25-1079    Page: 441    Date Filed: 05/16/2025 Entry ID: 5517644

Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2212]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 318 and 388

Mr. Bacon explained in testimony that what he meant by "question rainbows andbutterflies / absence of issues is a red flag" is that "when an executive's not open or welcome tonegative news, negative discussions, that it all has to be rosy, [it] is certainly a concern."[2213]

**Responses:**

**Julian** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2214] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) Nos. 318 and 388 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2215]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 319

On March 14, 2013, Respondent Julian received an EthicsLine complaint that a store manager in Florida was instructing employees "to open accounts without customers' signatures and without funding… the team member feels they are being asked to make bad sales."[2216]

**Responses:**

**Julian** objected to the Statement on the ground that the supporting exhibit was

---

[2212] McLinko's ECSFM at Nos. 317, 387.

[2213] MSD- 296B (Bacon Depo. Tr.) at 439:3-13.

[2214] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2215] McLinko's ECSFM at Nos. 318, 388.

[2216] MSD-494.

irrelevant.[2217] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 319 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2218]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 320

Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 320 relies on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[2219] Upon my review of the confidential documents supporting this Statement of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in this Statement of Material Fact.

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 321

Corporate Security's update in WFAS's May 6, 2013 First Quarter 2013 Summary to the Audit and Examination Committee listed "sales integrity misconduct" as a major case type.[2220] Additionally, the report noted that 51% of EthicsLine reports were referred to Community Bank Sales Quality (i.e. they were related to sales practices).[2221]

**Responses:**

**Julian** objected to the Statement on the ground that the supporting exhibit was

---

[2217] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2218] McLinko's ECSFM at No. 319.

[2219] See 12 C.F.R. § 19.33(b).

[2220] MSD-524 at 48.

[2221] MSD-524 at 49.

Add. 441

Appellate Case: 25-1079     Page: 443     Date Filed: 05/16/2025 Entry ID: 5517644

irrelevant.[2222] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 321 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2223]


### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 322

Corporate Security's update in WFAS's August 5, 2013 Second Quarter 2013 Summary to the Audit and Examination Committee noted that sales integrity violations allegations had increased.[2224] Community Bank had experienced a 5% increase in cases primarily due to allegations involving possible sales integrity misconduct and falsification of records.[2225] The report further noted an increase in SAR filings related to "the falsification of bank records related to sales integrity misconduct of 19%." Lastly the report noted that 46% of EthicsLine report were referred to Community Bank Sales Quality (i.e. they were related to sales practices).[2226]

**Responses:**

**Julian** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2227] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 322 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2228]

---

[2222] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2223] McLinko's ECSFM at No. 321.

[2224] MSD-525 at 44.

[2225] MSD-525 at 44-45.

[2226] MSD-525 at 47.

[2227] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2228] McLinko's ECSFM at No. 322.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 323**

During an August 22, 2013 Ethics Committee meeting, the Head of Corporate Investigations reported that "misconduct and ethics violations were up," that the Community Bank had the "highest number of [EthicsLine] reports per 1000 team members and most associated with Sales Integrity issues," that "March tends to be the highest month for reports –associated with campaign results activity" (i.e. Jump into January), and that "Sales Integrity issues are most prevalent – there needs to be continued focus in this area."[2229]

**Responses:**

**Julian** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2230] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 323 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2231]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 324**

According to the data presented by Head of Corporate Investigations Michael Bacon at the Ethics Committee meeting: there were 1,655 sales integrity violations cases YTD in2013 compared with 1,532 YTD in 2012; Community Banking made up over 88% of EthicsLine complaints in 2012 and over 83% of EthicsLine complaints in 2013; and Corporate Investigations opened 1,339 sales integrity violations cases from EthicsLine complaints in 2010,1,236 in 2011, 1,091 in 2012, and 576 through mid-year 2013.[2232]

**Responses:**

**Julian** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2233] Finding an insufficient nexus between the averments presented in the

---

[2229] MSD-133; MSD- 519; Julian Amended Answer ¶ 164; McLinko Amended Answer ¶ 164.

[2230] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2231] McLinko's ECSFM at No. 323.

[2232] MSD-519 at 5, 9, 13.

[2233] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

Appellate Case: 25-1079    Page: 445    Date Filed: 05/16/2025 Entry ID: 5517644

Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 324 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2234]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 325

At an August 26, 2013 TMMEC General Semi-Annual Meeting, Head of Corporate Investigations Michael Bacon provided corporate investigations updates. Mr. Bacon's presentation for the meeting showed that sales integrity violations were the second highest case type in both 2012 and to-date in 2013, with 1,655 sales integrity violations cases YTD in 2013 compared with 1,532 YTD in 2012. Mr. Bacon's presentation also contained the following misconduct considerations: "Does practice or process create a need or opportunity for misconduct? Are controls allowing too much opportunity? Is the LOB creating an environment whereby the TM must commit misconduct? Too much opportunity or too much personal or business pressure can sway most anyone."[2235]

**Responses:**

**Julian** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2236] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 325 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2237]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 326

Attached to Mr. Bacon's presentation was a "2013 Mid-year – Regional Banking Sales Integrity Case & EthicsLine Update" prepared by Special Investigations Manager Marty Weber (the author of the 2004 Investigation Report). Mr. Weber's presentation showed that

---

[2234] McLinko's ECSFM at No. 324.

[2235] MSD-420 at 7.

[2236] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2237] McLinko's ECSFM at No. 325.

Add. 444

Appellate Case: 25-1079    Page: 446    Date Filed: 05/16/2025 Entry ID: 5517644

there were sales integrity cases in every region in the Community Bank and that customer consent cases were the most common sales integrity case type. Mr. Weber's presentation also showed that Community Banking made up over 88% of EthicsLine complaints in 2012 and over 83% of EthicsLine complaints in 2013 and that sales integrity was the most common Corporate Investigations case type stemming from EthicsLine complaints, with 1,339 cases in 2010, 1,236 in 2011, 1,091 in 2012, and 576 through mid-year 2013.[2238]

**Responses:**

**Julian** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2239] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 326 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2240]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 327

In September 2013, Respondent Julian received an EthicsLine complaint about a team member in North Carolina "may have opened an account for a customer (no name provided) without the customer's consent." The complaint noted that there were two prior EthicsLine reports that the same team member opened accounts for customers that "they did not want or need."[2241]

**Responses:**

**Julian** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2242] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 327 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a

---

[2238] MSD-420 at 9, 10, 14.

[2239] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2240] McLinko's ECSFM at No. 326.

[2241] MSD-439.

[2242] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2243]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 328

In October 2013, Respondent Julian received an EthicsLine complaint about a team member in Pennsylvania who felt he was terminated for "raising ethical issues and salesintegrity concerns" to his district manager. The team member stated that he was "instructed toadd online banking and debit card accounts for customers that did not request them."[2244]

**Responses:**

**Julian** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2245] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 328 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2246]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 329

On October 4, 2013, Respondent Julian received the October 3, 2013 *Los AngelesTimes* Article, "Wells Fargo Fires Workers Accused of Cheating on Sales Goals," from Head of Corporate Investigations Michael Bacon. Mr. Bacon wrote that the article was a "big deal and very interesting."[2247]

**Responses:**

**Julian** objected to the Statement on the ground that the supporting exhibit was

---

[2243] McLinko's ECSFM at No. 327.

[2244] MSD- 440.

[2245] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2246] McLinko's ECSFM at No. 328.

[2247] MSD-331; Julian Amended Answer ¶ 404; McLinko Amended Answer ¶ 457.

Add. 446

Appellate Case: 25-1079    Page: 448    Date Filed: 05/16/2025 Entry ID: 5517644

irrelevant.[2248] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 329 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2249]


**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 330**

The October 4, 2013 *Los Angeles Times* article stated that the Bank "fired about 30 branch employees in the Los Angeles region who the bank said had opened accounts that were never used and attempted to manipulate customer-satisfaction surveys." According to the article, a Bank spokesperson explained that "[t]he employees were trying to take shortcuts to meet sales goals." The article also stated that one of the fired employees said "in some cases signatures were forged and customers had accounts opened in their names without their knowledge" and "the pressure to meet sales goals was intense at Wells Fargo."[2250]

**Responses:**

**Julian** did not dispute the cited article contains the quoted language.[2251] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that the October 4, 2013 *Los Angeles Times* article stated that the Bank "fired about 30 branch employees in the Los Angeles region who the bank said had opened accounts that were never used and attempted to manipulate customer-satisfaction surveys." According to the article, a Bank spokesperson explained that "[t]he employees were trying to take shortcuts to meet sales goals." The article also stated that one of the fired employees said "in some cases signatures were forged and customers had accounts opened in their names without their knowledge" and "the pressure to meet sales goals was intense at Wells Fargo."

**McLinko** incorporated Respondent Julian's Response.[2252]

---

[2248] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2249] McLinko's ECSFM at No. 329.

[2250] MSD-331.

[2251] Julian's ECSFM at No. 330.

[2252] McLinko's ECSFM at No. 330.

Add. 447

Appellate Case: 25-1079      Page: 449      Date Filed: 05/16/2025 Entry ID: 5517644

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 331**

On October 14, 2013, Respondent Julian received a link to an online petition to Wells Fargo to "End the Obsession with Sales Goals" from a WFAS colleague.[2253] Comments left by current and former employees on the online petition detailed undue pressure to meet unreasonable sales goals, and unethical sales practices, including sales practices misconduct.[2254]

**Responses:**

**Julian** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2255] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 331 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2256]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 332**

On October 28, 2013, Respondent Julian received an EthicsLine complaint that a district manager in Florida "may be encouraging an unethical and stressful sales environment by personally setting district sales goals that exceed stated sales goals in personal banker and CSSR sales matrices.  The team member stated that [the manager] requires personal bankers and CSSRs in her district to have 10 approved credit cards each per week; however, the personal banker matrix only requires 18 for the quarter, and the CSSR matrix does not require any credit production goals (loans or credit cards). The team member also stated that personal bankers are supposed to average 3 appointments per day based on their matrix; however, [the manager] is requiring them to average 6 per day. The team member said they feel bullied into meeting the goals because they are told they will receive documented coaching if they do not meet these goals. The team member stated that he/she is concerned because the constant harassment and threat of being written up for not meeting [the manager's] goals is creating an

---

[2253] MSD-332.

[2254] MSD-140.

[2255] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2256] McLinko's ECSFM at No. 331.

Add. 448

Appellate Case: 25-1079     Page: 450     Date Filed: 05/16/2025 Entry ID: 5517644

unhealthy work environment and could lead to unethical practices by team members in fear of losing their jobs."[2257]

**Responses:**

**Julian** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2258] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 332 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2259]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 333

On October 29, 2013, Respondent Julian received an EthicsLine complaint about two customers in Texas who "received credit cards that they did not request."[2260] On November 12, 2013, Respondent Julian received an EthicsLine complaint about a customer in Utah who "received a debit card for a new account that she did not open."[2261]

**Responses:**

**Julian** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2262] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 333 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

---

[2257] MSD-442.

[2258] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2259] McLinko's ECSFM at No. 332.

[2260] MSD-443.

[2261] MSD-444.

[2262] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

**McLinko** incorporated Respondent Julian's Response.[2263]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 334**

On November 12, 2013, Respondent Julian received an EthicsLine complaint about a customer in Utah who "received a debit card for a new account that she did not open."[2264]

**Responses:**

**Julian** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2265] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 334 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**McLinko** incorporated Respondent Julian's Response.[2266]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 335**

On December 21, 2013, the Los Angeles Times published an article titled "Wells Fargo's Pressure-Cooker Sales Culture Comes at a Cost." The article stated it was based on interviews with 28 former and seven current employees across nine states and reported that "To meet quotas, employees have opened unneeded accounts for customers, ordered credit cards without customers' permission and forged client signatures on paperwork" and employees were threatened with termination if they failed to meet their sales goals.[2267]

**Responses:**

---

[2263] McLinko's ECSFM at No. 333.

[2264] MSD-444.

[2265] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2266] McLinko's ECSFM at No. 334.

[2267] Julian Amended Answer ¶ 101; MSD-111 at 1-2). Respondent Julian was aware of the article. (Julian Amended Answer ¶ 55, 102; 404.

Appellate Case: 25-1079    Page: 452    Date Filed: 05/16/2025 Entry ID: 5517644

**Julian** did not dispute that the cited article contained the quoted language.[2268] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on December 21, 2013, the Los Angeles Times published an article titled "Wells Fargo's Pressure-Cooker Sales Culture Comes at a Cost." The article stated it was based on interviews with 28 former and seven current employees across nine states and reported that "To meet quotas, employees have opened unneeded accounts for customers, ordered credit cards without customers' permission and forged client signatures on paperwork" and employees were threatened with termination if they failed to meet their sales goals.

**McLinko** incorporated Respondent Julian's Response.[2269]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 336

Respondent Julian testified to the OCC during its investigation that after he read the 2013 Los Angeles Times articles, he started "thinking that, gosh, is there a problem" with Community Bank sales practices misconduct.[2270]

**Responses:**

**Julian** did not dispute that he previously testified as reflected in the Statement.[2271] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that Respondent Julian testified to the OCC during its investigation that after he read the 2013 Los Angeles Times articles, he started "thinking that, gosh, is there a problem" with Community Bank sales practices misconduct.

**McLinko** incorporated Respondent Julian's Response.[2272]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 337

In January 2014, Respondent Julian received an EthicsLine complaint about a team member in Delaware who "opened accounts for a customer … that the customer said he did not authorize or want."[2273]

---

[2268] Julian's ECSFM at No. 335.

[2269] McLinko's ECSFM at No. 335.

[2270] Julian Amended Answer ¶ 405.

[2271] Julian's ECSFM at No. 336.

[2272] McLinko's ECSFM at No. 336.

[2273] MSD-445.

**Responses:**

**Julian** did not dispute that he received the cited complaint, but averred there is no evidence that he opened or reviewed the email and attachment, and that he received information indicating that the majority of EthicsLine complaints were not substantiated.[2274]

Whether Respondent Julian received and reviewed this specific complaint is not a material fact, such that disputing the same will not create a controverted material fact that would prevent granting Enforcement Counsel's summary disposition motion. The Recommended Decision will not, however, include the claim presented in (Julian and McLinko) No. 337 as to Respondents Julian and McLinko, in the absence of evidence warranting such inclusion as may be presented during the hearing.

**McLinko** incorporated Respondent Julian's Response.[2275]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 338

Corporate Security's update in the February 25, 2014 WFAS Fourth Quarter 2013 Summary to the Audit and Examination Committee explained that a "case is defined as an allegation of team member misconduct involving a possible violation of law or a code of ethics policy violation or information security policy violation, which has resulted in a financial loss and/or exposure or represents a significant compliance or reputational risk." It further stated that "The major case types that increased year-over-year include Sales Integrity up 5%" and that "43% [of EthicsLine complaints] were referred to Community Bank Sales Quality" (i.e. related to sales practices).[2276]

**Responses:**

**Julian** disputed the claim, averring that the definition quoted in the Statement is not limited to sales practices misconduct or issues related to customer consent.[2277] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that Corporate Security's update in the February 25, 2014 WFAS Fourth Quarter 2013 Summary to the Audit and Examination Committee explained that a "case is defined as an allegation of team member misconduct involving a possible violation of law or a code of ethics policy violation or information security policy violation, which has resulted in a financial loss and/or exposure or represents a significant compliance or reputational risk." It

---

[2274] Julian's ECSFM at No. 337.

[2275] McLinko's ECSFM at No. 337.

[2276] MSD-526 at 47-48, 51.

[2277] Julian's ECSFM at No. 338.

Add. 452

Appellate Case: 25-1079     Page: 454     Date Filed: 05/16/2025 Entry ID: 5517644

further stated that "The major case types that increased year-over-year include Sales Integrity up 5%" and that "43% [of EthicsLine complaints] were referred to Community Bank Sales Quality" (i.e. related to sales practices).

**McLinko** incorporated Respondent Julian's Response.[2278]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 339

On February 28, 2014, Respondent Julian received a "Corporate Investigations 2013 Year End Update/2014 Priorities" slide deck for the Head of Corporate Investigations' presentation to the Audit Management Committee on March 3, 2014. The presentation showed sales integrity violations as the number two case type for both 2012 and 2013, with 3,167 and 3,330 respectively.[2279]

**Responses:**

**Julian** did not dispute that he received the Update identified in the Statement, but averred the cited evidence does not contain the appropriate context.[2280] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on February 28, 2014, Respondent Julian received a "Corporate Investigations 2013 Year End Update/2014 Priorities" slide deck for the Head of Corporate Investigations' presentation to the Audit Management Committee on March 3, 2014. The presentation showed sales integrity violations as the number two case type for both 2012 and 2013, with 3,167 and 3,330 respectively.

**McLinko** incorporated Respondent Julian's Response.[2281]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 340

On March 3, 2014, Respondent Julian received an EthicsLine complaint about a team member in New Jersey whose district manager "'threatens' the team and tells them they must hit 200% of their sales goal at any cost on a daily basis, . . . that bankers and tellers are required to stay late to make sales calls if they have not met their goal for the day , [and that they are

---

[2278] McLinko's ECSFM at No. 338.

[2279] MSD-335 at 4.

[2280] Julian's ECSFM at No. 339.

[2281] McLinko's ECSFM at No. 339.

Appellate Case: 25-1079     Page: 455     Date Filed: 05/16/2025 Entry ID: 5517644

treated like 'garbage' and the situation makes him/her want to leave the company."[2282]

**Responses:**

**Julian** did not dispute that he received the cited complaint, but averred there is no evidence that he opened or reviewed the email and attachment.[2283]

Whether Respondent Julian received and reviewed this specific complaint is not a material fact, such that disputing the same will not create a controverted material fact that would prevent granting Enforcement Counsel's summary disposition motion. The Recommended Decision will not, however, include the claim presented in (Julian and McLinko) No. 340 as to Respondents Julian or McLinko, in the absence of evidence warranting such inclusion as may be presented during the hearing.

**McLinko** incorporated Respondent Julian's Response.[2284]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 341

On March 4, 2014, Respondent Julian received a 2013 year-end update from Head of Corporate Investigations Michael Bacon as part of his TMMEC membership. The report showed that sales integrity violations were the second highest case type at the Bank in 2012 and 2013, with 3,330 sales integrity violations cases YTD in 2013 compared with 3,167 sales integrity violations cases YTD in 2012.[2285] The report also reflected that the vast majority of EthicsLine complaints related to the Community Bank[2286] and that 3,653 of 8,535 (42.8%) EthicsLine reports in 2013 were referred to Sales Quality (i.e. related to sales practices) compared with 3,739 of 8,354 (44.7%) in 2012.[2287]

**Responses:**

**Julian** did not dispute that he received the year-end update identified in the Statement, nor did he dispute the contents included the language shown above, but averred the evidence does not contain the appropriate context.[2288] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the

---

[2282] MSD-446.

[2283] Julian's ECSFM at No. 340.

[2284] McLinko's ECSFM at No. 340.

[2285] MSD-447 at 4.

[2286] MSD-447 at 4.

[2287] MSD-447 at 7.

[2288] Julian's ECSFM at No. 341.

Appellate Case: 25-1079    Page: 456    Date Filed: 05/16/2025 Entry ID: 5517644

Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on March 4, 2014, Respondent Julian received a 2013 year-end update from Head of Corporate Investigations Michael Bacon as part of his TMMEC membership. The report showed that sales integrity violations were the second highest case type at the Bank in 2012 and 2013, with 3,330 sales integrity violations cases YTD in 2013 compared with 3,167 sales integrity violations cases YTD in 2012.[2289] The report also reflected that the vast majority of EthicsLine complaints related to the Community Bank[2290] and that 3,653 of 8,535 (42.8%) EthicsLine reports in 2013 were referred to Sales Quality (i.e. related to sales practices) compared with 3,739 of 8,354 (44.7%) in 2012.

**McLinko** incorporated Respondent Julian's Response.[2291]


**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 342**

On March 5, 2014, Respondent Julian received an EthicsLine report summary in which a Store Manager in Ardmore, Pennsylvania reported that his District Manager directed employees to tell customers to activate billpay while in the branch, open multiple savings accounts for customers intending to open one account, and improve the Quality Sales Report Card ratings by selling credit cards rather than deposit accounts, because credit card applications do not require signatures.[2292]

**Responses:**

**Julian** did not dispute that he received the cited report, but averred there is no evidence that he opened or reviewed the email and attachment.[2293]

Whether Respondent Julian received and reviewed this specific report is not a material fact, such that disputing the same will not create a controverted material fact that would prevent granting Enforcement Counsel's summary disposition motion. The Recommended Decision will not, however, include the claim presented in (Julian and McLinko) No. 342 as to Respondents Julian or McLinko, in the absence of evidence warranting such inclusion as may be presented during the hearing.

---

[2289] MSD-447 at 4.

[2290] MSD-447 at 4.

[2291] McLinko's ECSFM at No. 341.

[2292] MSD-448.

[2293] Julian's ECSFM at No. 342.

Appellate Case: 25-1079    Page: 457    Date Filed: 05/16/2025 Entry ID: 5517644

**McLinko** incorporated Respondent Julian's Response.[2294]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 343**

At the April 9, 2014 Enterprise Risk Management Committee meeting, Community Bank leadership, including Respondent Russ Anderson, informed the committee that one to two percent of the Community Bank employees (1,000-2,000) were terminated each year for sales practices-related wrongdoing.[2295]

**Responses:**

**Julian** disputed the claim, averring the statistic referred to termination for wrongdoing by "[a]nyone acting outside of policy" or "[a]nyone who was terminated for … any reason for not behaving as they should have been behaving."[2296]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that at the April 9, 2014 Enterprise Risk Management Committee meeting, Community Bank leadership, including Respondent Russ Anderson, informed the committee that one  to two percent of the Community Bank employees (1,000-2,000) were terminated each year for "not behaving as they should have been behaving."

**McLinko** incorporated Respondent Julian's Response.[2297]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 344**

On April 25, 2014, Respondent Julian received an EthicsLine complaint about a district manager in Georgia that "set unreasonable performance expectations and expects them toharass customers about products and services they do not want. He/She said [the manager] berates people when they are unable to meet sales goals and has forced them to stay several hours late on a regular basis."[2298]

**Responses:**

**Julian** did not dispute that he received the cited complaint, but averred there is no evidence

---

[2294] McLinko's ECSFM at No. 342.

[2295] MSD-28 at 1; Julian Amended Answer ¶¶ 164, 271, 398; McLinko Amended Answer ¶ 164, 271, 398.

[2296] Julian's ECSFM at No.342, citing MSD-611 at 121:05-13; 122:08-17.

[2297] McLinko's ECSFM at No. 343.

[2298] MSD-451.

Add. 456

Appellate Case: 25-1079     Page: 458     Date Filed: 05/16/2025 Entry ID: 5517644

that he opened or reviewed the email and attachment.[2299]

Whether Respondent Julian reviewed this specific complaint is not a material fact, such that disputing the same will not create a controverted material fact that would prevent granting Enforcement Counsel's summary disposition motion. The Recommended Decision will not, however, include the claim presented in (Julian and McLinko) No. 344 as to Respondents Julian or McLinko, in the absence of evidence warranting such inclusion as may be presented during the hearing.

**McLinko** incorporated Respondent Julian's Response.[2300]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 345

The Corporate Security update in WFAS's May 5, 2014 First Quarter 2014 Summary to the Audit and Examination Committee stated that, of the 2,168 total EthicsLine complaints received in YTD 1Q14, 46% were referred to Community Bank Sales Quality (i.e. were related to sales practices).[2301]

**Responses:**

**Julian** did not dispute the cited Security update contained the data presented in this Statement.[2302] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that the Corporate Security update in WFAS's May 5, 2014 First Quarter 2014 Summary to the Audit and Examination Committee stated that, of the 2,168 total EthicsLine complaints received in YTD 1Q14, 46% were referred to Community Bank Sales Quality (i.e. were related to sales practices).

**McLinko** incorporated Respondent Julian's Response.[2303]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 346

On May 9, 2014, Respondent Julian received an EthicsLine report which stated aLead Regional President was the "core of all wrongdoing in LA/OC," which included issues in

---

[2299] Julian's ECSFM at No. 344.

[2300] McLinko's ECSFM at No. 344.

[2301] MSD-451 at 52.

[2302] Julian's ECSFM at No. 345.

[2303] McLinko's ECSFM at No. 345.

Add. 457

Appellate Case: 25-1079      Page: 459      Date Filed: 05/16/2025 Entry ID: 5517644

hiring, sales quality, and overall ethics.[2304]

**Responses:**

**Julian** did not dispute that he received the cited complaint, but averred there is no evidence that he opened or reviewed the email and attachment.[2305]

Whether Respondent Julian reviewed this specific complaint is not a material fact, such that disputing the same will not create a controverted material fact that would prevent granting Enforcement Counsel's summary disposition motion. The Recommended Decision will not, however, include the claim presented in (Julian and McLinko) No. 346 as to Respondents Julian or McLinko, in the absence of evidence warranting such inclusion as may be presented during the hearing.

**McLinko** incorporated Respondent Julian's Response.[2306]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 347

On June 5, 2014, Respondent Julian received an EthicsLine complaint allegingunethical sales practices at a branch in South Dakota. The investigator noted there were three other EthicsLine reports containing allegations of the managing gaming at the branch.[2307]

**Responses:**

**Julian** did not dispute that he received the cited complaint, but averred there is no evidence that he opened or reviewed the email and attachment.[2308]

Whether Respondent Julian reviewed this specific complaint is not a material fact, such that disputing the same will not create a controverted material fact that would prevent granting Enforcement Counsel's summary disposition motion. The Recommended Decision will not, however, include the claim presented in (Julian and McLinko) No. 347 as to Respondents Julian or McLinko, in the absence of evidence warranting such inclusion as may be presented during the hearing.

**McLinko** incorporated Respondent Julian's Response.[2309]

---

[2304] MSD-452.

[2305] Julian's ECSFM at No. 346.

[2306] McLinko's ECSFM at No. 346.

[2307] MSD-495.

[2308] Julian's ECSFM at No. 347.

[2309] McLinko's ECSFM at No. 347.

Appellate Case: 25-1079    Page: 460    Date Filed: 05/16/2025 Entry ID: 5517644

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 348**

On June 17, 2014, Respondent Julian received an EthicsLine complaint about a store manager in Virginia "instruct[ing] his staff to 'double pack' customers and communicate to customers that they need to open two checking accounts and two savings accounts" (i.e. bundling).[2310]

**Responses:**

**Julian** did not dispute that he received the cited complaint, but averred there is no evidence that he opened or reviewed the email and attachment.[2311]

Whether Respondent Julian reviewed this specific complaint is not a material fact, such that disputing the same will not create a controverted material fact that would prevent granting Enforcement Counsel's summary disposition motion. The Recommended Decision will not, however, include the claim presented in (Julian and McLinko) No. 348 as to Respondents Julian or McLinko, in the absence of evidence warranting such inclusion as may be presented during the hearing.

**McLinko** incorporated Respondent Julian's Response.[2312]


**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 349**

Corporate Security's update in WFAS's August 4, 2014 Second Quarter 2014 Summary to the Audit and Examination Committee stated that sales integrity was one of Corporate Investigations' major case types[2313] and 42% of the 4,536 total EthicsLine received YTD in 2Q14 "were referred to Community Bank Sales Quality" (i.e. were related to sales practices).[2314]

**Responses:**

**Julian** did not dispute that the update identified in the Statement contains the information presented above, but averred that not all Community Bank Sales Quality referrals deal with

---

[2310] MSD-453.

[2311] Julian's ECSFM at No. 348.

[2312] McLinko's ECSFM at No. 348.

[2313] MSD-397 at 64.

[2314] MSD-397 at 68.

Appellate Case: 25-1079     Page: 461     Date Filed: 05/16/2025 Entry ID: 5517644

sales practices issues.[2315]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that Corporate Security's update in WFAS's August 4, 2014 Second Quarter 2014 Summary to the Audit and Examination Committee stated that sales integrity was one of Corporate Investigations' major case types and 42% of the 4,536 total EthicsLine received YTD in 2Q14 "were referred to Community Bank Sales Quality" (i.e. were related to sales practices).

**McLinko** incorporated Respondent Julian's Response.[2316]


### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 350

On August 12, 2014, Respondent Julian received an EthicsLine complaint from aGeorgia District Manager that a store manager had transferred funds from a customer's checking account to the customer's savings account without the customer's permission. The customer questioned the transfer because he did not authorize it.[2317]

**Responses:**

**Julian** did not dispute that he received the cited complaint, but averred there is no evidence that he opened or reviewed the email and attachment.[2318]

Whether Respondent Julian reviewed this specific complaint is not a material fact, such that disputing the same will not create a controverted material fact that would prevent granting Enforcement Counsel's summary disposition motion. The Recommended Decision will not, however, include the claim presented in (Julian and McLinko) No. 350 as to Respondents Julian or McLinko, in the absence of evidence warranting such inclusion as may be presented during the hearing.

**McLinko** incorporated Respondent Julian's Response.[2319]


### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 351

---

[2315] Julian's ECSFM at No. 349.

[2316] McLinko's ECSFM at No. 349.

[2317] MSD-454.

[2318] Julian's ECSFM at No. 350.

[2319] McLinko's ECSFM at No. 350.

On August 25, 2014, Respondent Julian received an EthicsLine complaint about team members in North Carolina being trained to "enroll[] customers in checking accounts on dates later than requested and also to open more than one account for customers when they only requested one account. [T]he purpose of these actions were to help them meet their 'quotas.'"[2320]

**Responses:**

**Julian** did not dispute that he received the cited complaint, but averred there is no evidence that he opened or reviewed the email and attachment.[2321]

Whether Respondent Julian reviewed this specific complaint is not a material fact, such that disputing the same will not create a controverted material fact that would prevent granting Enforcement Counsel's summary disposition motion. The Recommended Decision will not, however, include the claim presented in (Julian and McLinko) No. 351 as to Respondents Julian or McLinko, in the absence of evidence warranting such inclusion as may be presented during the hearing.

**McLinko** incorporated Respondent Julian's Response.[2322]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 352

On September 7, 2014, Respondent Julian received an EthicsLine complaint referencing 19 EthicsLine reports made about a single store manager in California that included concerns related to sales integrity and retaliation.[2323]

**Responses:**

**Julian** did not dispute that he received the cited complaint, but averred there is no evidence that he opened or reviewed the email and attachment.[2324]

Whether Respondent Julian reviewed this specific complaint is not a material fact, such that disputing the same will not create a controverted material fact that would prevent granting Enforcement Counsel's summary disposition motion. The Recommended Decision will not, however, include the claim presented in (Julian and McLinko) No. 352 as to Respondents Julian or McLinko, in the absence of evidence warranting such inclusion as may be presented during the hearing.

---

[2320] MSD-455.

[2321] Julian's ECSFM at No. 351.

[2322] McLinko's ECSFM at No. 351.

[2323] MSD-457.

[2324] Julian's ECSFM at No. 352.

**McLinko** incorporated Respondent Julian's Response.[2325]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 353

On October 21, 2014, Respondent Julian received an EthicsLine complaint from Utah, where additional accounts were opened for customers and accounts were being opened for minors without a family member or guardian. The complaint specified a particular branch manager but observed there had been other sales quality cases under a particular District Manager.[2326]

**Responses:**

**Julian** did not dispute that he received the cited complaint, but averred there is no evidence that he opened or reviewed the email and attachment.[2327]

Whether Respondent Julian reviewed this specific complaint is not a material fact, such that disputing the same will not create a controverted material fact that would prevent granting Enforcement Counsel's summary disposition motion. The Recommended Decision will not, however, include the claim presented in (Julian and McLinko) No. 353 as to Respondents Julian or McLinko, in the absence of evidence warranting such inclusion as may be presented during the hearing.

**McLinko** incorporated Respondent Julian's Response.[2328]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 354

The Corporate Security update in WFAS's November 18, 2014 Third Quarter 2014 Summary to the Audit and Examination Committee stated that 40% of the 6,700 EthicsLine complaints received 3Q14 YTD were "referred to Community Bank Sales Quality" (i.e. were related to sales practices).[2329]

**Responses:**

**Julian** did not dispute that the cited Security update contained the language presented in the Statement.[2330] Accordingly, the Recommended Decision will include a factual finding as to

---

[2325] McLinko's ECSFM at No. 352.

[2326] MSD-497.

[2327] Julian's ECSFM at No. 353.

[2328] McLinko's ECSFM at No. 353.

[2329] MSD-398 at 69.

[2330] Julian's ECSFM at No. 354.

Appellate Case: 25-1079    Page: 464    Date Filed: 05/16/2025 Entry ID: 5517644

Respondent Julian that the Corporate Security update in WFAS's November 18, 2014 Third Quarter 2014 Summary to the Audit and Examination Committee stated that 40% of the 6,700 EthicsLine complaints received 3Q14 YTD were "referred to Community Bank Sales Quality" (i.e. were related to sales practices)

**McLinko** incorporated Respondent Julian's Response.[2331]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 355

On December 8, 2014, Respondent Julian received an EthicsLine complaint that a banker had opened an account for a customer and his/her nephew without proper consent in New York.[2332]

**Responses:**

**Julian** did not dispute that he received the cited complaint, but averred there is no evidence that he opened or reviewed the email and attachment.[2333]

Whether Respondent Julian reviewed this specific complaint is not a material fact, such that disputing the same will not create a controverted material fact that would prevent granting Enforcement Counsel's summary disposition motion. The Recommended Decision will not, however, include the claim presented in (Julian and McLinko) No. 355 as to Respondents Julian or McLinko, in the absence of evidence warranting such inclusion as may be presented during the hearing.

**McLinko** incorporated Respondent Julian's Response.[2334]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 356

On December 31, 2014, Respondent Julian received an EthicsLine complaint about a team member in Arizona that "transferred $25 between a customer's checking and savings accounts without the customer's authorization" (i.e. simulated funding).[2335]

**Responses:**

**Julian** did not dispute that he received the cited complaint, but averred there is no evidence

---

[2331] McLinko's ECSFM at No. 354.

[2332] MSD-498.

[2333] Julian's ECSFM at No. 355.

[2334] McLinko's ECSFM at No. 355.

[2335] MSD-458.

that he opened or reviewed the email and attachment.[2336]

Whether Respondent Julian reviewed this specific complaint is not a material fact, such that disputing the same will not create a controverted material fact that would prevent granting Enforcement Counsel's summary disposition motion. The Recommended Decision will not, however, include the claim presented in (Julian and McLinko) No. 356 as to Respondents Julian or McLinko, in the absence of evidence warranting such inclusion as may be presented during the hearing.

**McLinko** incorporated Respondent Julian's Response.[2337]


### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 357

On February 4, 2015, Respondent Julian received an EthicsLine complaint abouta team member in New Jersey whose district manager threatened to "terminate him if he did not report to [another branch] and continue to meet his sales goals. [H]e feels he is being set up for failure because the production rates at the [branch] are low, and it will be hard for him tomeet his sales goals." The complaint also described a previous report from the same team member that his store manager had opened accounts "under various team members' names inorder for those team members to receive sales credit."[2338]

**Responses:**

**Julian** did not dispute that he received the cited complaint, but averred there is no evidence that he opened or reviewed the email and attachment.[2339]

Whether Respondent Julian reviewed this specific complaint is not a material fact, such that disputing the same will not create a controverted material fact that would prevent granting Enforcement Counsel's summary disposition motion. The Recommended Decision will not, however, include the claim presented in (Julian and McLinko) No. 357 as to Respondents Julian or McLinko, in the absence of evidence warranting such inclusion as may be presented during the hearing.

**McLinko** incorporated Respondent Julian's Response.[2340]

---

[2336] Julian's ECSFM at No. 356.

[2337] McLinko's ECSFM at No. 356.

[2338] MSD-459.

[2339] Julian's ECSFM at No. 357.

[2340] McLinko's ECSFM at No. 357.

Add. 464

Appellate Case: 25-1079      Page: 466      Date Filed: 05/16/2025 Entry ID: 5517644

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 358**

The Corporate Security update in WFAS's February 24, 2015 WFAS Fourth Quarter 2014 Summary to the Audit and Examination Committee stated that 39% of the 8,707 EthicsLine complaints received 4Q14 YTD were referred to Community Bank Sales Quality (i.e. were related to sales practices).[2341]

**Responses:**

**Julian** did not dispute that the cited Security update contained the information presented in the Statement.[2342] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that the Corporate Security update in WFAS's February 24, 2015 WFAS Fourth Quarter 2014 Summary to the Audit and Examination Committee stated that 39% of the 8,707 EthicsLine complaints received 4Q14 YTD were referred to Community Bank Sales Quality (i.e. were related to sales practices).

**McLinko** incorporated Respondent Julian's Response.[2343]


**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 359**

On March 27, 2015, Respondent Julian received an EthicsLine complaint that a team member in Texas felt she was being retaliated against after she reported her store manager and other employees for gaming and harassment.[2344]

**Responses:**

**Julian** did not dispute that he received the cited complaint, but averred there is no evidence that he opened or reviewed the email and attachment.[2345]

Whether Respondent Julian reviewed this specific complaint is not a material fact, such that disputing the same will not create a controverted material fact that would prevent granting Enforcement Counsel's summary disposition motion. The Recommended Decision will not, however, include the claim presented in (Julian and McLinko) No. 359 as to Respondents Julian or McLinko, in the absence of evidence warranting such inclusion as may be presented during the hearing.

---

[2341] MSD-400 at 79.

[2342] Julian's ECSFM at No. 358.

[2343] McLinko's ECSFM at No. 358.

[2344] MSD-460.

[2345] Julian's ECSFM at No. 359.

Add. 465

Appellate Case: 25-1079     Page: 467     Date Filed: 05/16/2025 Entry ID: 5517644

**McLinko** incorporated Respondent Julian's Response.[2346]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 360**

On April 30, 2015, Respondent Julian received an EthicsLine complaint that ateam member was being retaliated against in Alaska for reporting dishonest sales activity.[2347]

**Responses:**

**Julian** did not dispute that he received the cited complaint, but averred there is no evidence that he opened or reviewed the email and attachment.[2348]

Whether Respondent Julian reviewed this specific complaint is not a material fact, such that disputing the same will not create a controverted material fact that would prevent granting Enforcement Counsel's summary disposition motion. The Recommended Decision will not, however, include the claim presented in (Julian and McLinko) No. 360 as to Respondents Julian or McLinko, in the absence of evidence warranting such inclusion as may be presented during the hearing.

**McLinko** incorporated Respondent Julian's Response.[2349]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 361**

On May 4, 2015, Respondent Julian received an EthicsLine complaint that a customer in Connecticut complained that he did not authorize a banker to open accounts.[2350]

**Responses:**

**Julian** did not dispute that he received the cited complaint, but averred there is no evidence that he opened or reviewed the email and attachment.[2351]

Whether Respondent Julian reviewed this specific complaint is not a material fact, such that disputing the same will not create a controverted material fact that would prevent granting Enforcement Counsel's summary disposition motion. The Recommended Decision will not, however, include the claim presented in (Julian and McLinko) No. 361 as to Respondents

---

[2346] McLinko's ECSFM at No. 359.

[2347] MSD-461.

[2348] Julian's ECSFM at No. 360.

[2349] McLinko's ECSFM at No. 360.

[2350] MSD- 462.

[2351] Julian's ECSFM at No. 361.

Add. 466

Appellate Case: 25-1079    Page: 468    Date Filed: 05/16/2025 Entry ID: 5517644

Julian or McLinko, in the absence of evidence warranting such inclusion as may be presented during the hearing.

**McLinko** incorporated Respondent Julian's Response.[2352]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 362**

Also on May 4, 2015, the City Attorney of Los Angeles sued the Bank in connection with the Community Bank's sales practices. The Complaint, which was consistent with the information Respondents Julian had received over the years related to the Bank's salepractices, alleged the following:

> For years, Wells Fargo & Company and Wells Fargo Bank, National Association (collectively "Wells Fargo") have victimized their customers by using pernicious and often illegal sales tactics to maintain high levels of sales of their banking and financial products. The banking business model employed by Wells Fargo is based on selling customers multiple banking products, which Wells Fargo calls "solutions." In order to achieveits goal of selling a high number of "solutions" to each customer, Wells Fargo imposes unrealistic sales quotas on its employees, and has adopted policies that have, predictably and naturally, driven its bankers to engage in fraudulent behavior to meet those unreachable goals. As a result. Wells Fargo's employees have engaged in unfair, unlawful, and fraudulent conduct, including opening customer accounts, and issuing credit cards, without authorization. Wells Fargo has known about and encouraged these practices for years. It has done little, if anything, to discourage its employees' behavior and protect its customers. Worse, on the rare occasions when Wells Fargo did take action against its employees for unethical sales conduct, Wells Fargo further victimized its customers by failing to inform them of the breaches, refund fees they were owed, or otherwise remedy the injuries that Wells Fargo and its bankers have caused. The result is that Wells Fargo has engineered a virtual fee-generating machine, through which its customers are harmed, its employees take the blame, and Wells Fargo reaps the profits.[2353]

**Responses:**

---

[2352] McLinko's ECSFM at No. 361.

[2353] MSD-169 at 3.

Add. 467

Appellate Case: 25-1079    Page: 469    Date Filed: 05/16/2025  Entry ID: 5517644

**Julian** did not dispute the cited Complaint contains the language quoted in the Statement.[2354] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on May 4, 2015, the City Attorney of Los Angeles sued the Bank in connection with the Community Bank's sales practices. The Complaint, which was consistent with the information Respondents Julian had received over the years related to the Bank's sale practices, alleged the facts shown above.

**McLinko** incorporated Respondent Julian's Response.[2355]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 363

On May 4, 2015, Respondent Julian received a *Los Angeles Times* article titled,"L.A. Sues Wells Fargo, alleging 'unlawful and fraudulent conduct," which described the allegations in the City Attorney of Los Angeles lawsuit.[2356]

**Responses:**

**Julian** did not dispute that he received a copy of the Times as reported in the Statement.[2357] Accordingly, the Recommended Decision will include a factual finding as to Respondent Julian that on May 4, 2015, he received a *Los Angeles Times* article titled,"L.A. Sues Wells Fargo, alleging 'unlawful and fraudulent conduct,'" which described the allegations in the City Attorney of Los Angeles lawsuit.

**McLinko** incorporated Respondent Julian's Response.[2358]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 364

On June 3, 2015, Respondent Julian received an EthicsLine complaint in which ateam member reported that they witnessed a California Branch Manager take a customer to another team member "and pushed the customer to open teen checking accounts for his/her children when the children were not present to sign anything. The team member said the accounts were opened anyway."[2359]

---

[2354] Julian's ECSFM at No. 362.

[2355] McLinko's ECSFM at No. 362.

[2356] MSD-463.

[2357] Julian's ECSFM at No. 363.

[2358] McLinko's ECSFM at No. 363.

[2359] MSD-464.

Add. 468

Appellate Case: 25-1079     Page: 470     Date Filed: 05/16/2025 Entry ID: 5517644

**Responses:**

**Julian** did not dispute that he received the cited complaint, but averred there is no evidence that he opened or reviewed the email and attachment.[2360]

Whether Respondent Julian reviewed this specific complaint is not a material fact, such that disputing the same will not create a controverted material fact that would prevent granting Enforcement Counsel's summary disposition motion. The Recommended Decision will not, however, include the claim presented in (Julian and McLinko) No. 364 as to Respondents Julian or McLinko, in the absence of evidence warranting such inclusion as may be presented during the hearing.

**McLinko** incorporated Respondent Julian's Response.[2361]

### Respondent McLinko received extensive information regarding sales practices misconduct at the Bank

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 365

On July 6, 2010, Respondent McLinko received notification from the Head of Corporate Investigations regarding an investigation of Bank employees in Michigan that was expected to result in at least 17 terminations. The Significant Investigation Notification ("SIN") described allegations including ordering debit cards without customer consent, closing and opening accounts on the same day with same ownership and account type, opening multiple "pack" accounts for the same customer. The SIN stated that the substantiated allegations occurred at 11 branch locations.[2362]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2363]

**McLinko** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2364] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and

---

[2360] Julian's ECSFM at No. 364.

[2361] McLinko's ECSFM at No. 364.

[2362] MSD-314.

[2363] Julian's ECSFM at No. 365.

[2364] See Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition Against Respondents David Julian and Paul McLinko at 1, incorporating the objections by Respondent Julian in Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

Add. 469

McLinko) No. 365 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 366

During an October 6, 2010 meeting, Respondent McLinko was informed thatthere was a rise in East Coast sales quality cases.[2365]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2366]

**McLinko** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2367] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 366 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 367

On January 14, 2011, Head of Corporate Investigations Michael Bacon informed Respondent McLinko that two Community Bank employees had been arrested for identity theft. He wrote, "Community Bank sales integrity issue has resulted in two arrests. This is highly unusual, but reinforces the fact that this type of activity is unlawful and certainly poses a significant reputation risk to our company. [Respondent McLinko], you and I can discuss in more detail, but wanted everyone to have a heads up on this."[2368]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2369]

---

[2365] MSD-315.

[2366] Julian's ECSFM at No. 366.

[2367] See Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition Against Respondents David Julian and Paul McLinko at 1, incorporating the objections by Respondent Julian in Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2368] MSD-316; McLinko Amended Answer ¶ 452.

[2369] Julian's ECSFM at No. 367.

**McLinko** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2370] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 367 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 368

On March 4, 2011, the Head of Corporate Investigations notified Respondent McLinko of a "significant sales integrity case" in which team members located in legacy Wells Fargo branches issued debit cards to legacy Wachovia customers in other states without their knowledge or consent.[2371] The email to Respondent McLinko added that it was a "very disappointing situation that reflects very poorly on Wells Fargo" and highlighted that between January and February 2011, 6,450 cards were opened by Bank employees located in other states than the customers. The highest concentration of this activity occurred in the Los Angeles area, where 2,574 cards were opened for customers located in Alabama, Delaware, Georgia, Mississippi, New Jersey, and Tennessee. The out of state sales in the Los Angeles area comprised 18.91% of total sales in the Los Angeles market. 37 employees had opened 20 or more out of state cards and 18 bankers had opened over 70 cards. Respondent McLinko forwarded the email to his direct reports, writing "FYI."[2372]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2373]

**McLinko** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2374] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 368 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting

---

[2370] See Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition Against Respondents David Julian and Paul McLinko at 1, incorporating the objections by Respondent Julian in Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2371] MSD-317.

[2372] MSD-317.

[2373] Julian's ECSFM at No. 368.

[2374] See Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition Against Respondents David Julian and Paul McLinko at 1, incorporating the objections by Respondent Julian in Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

Enforcement Counsel's Motion.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 369**

On March 15, 2011, the Head of Corporate Investigations notified Respondent McLinko that a significant sales integrity case in Northern California had resulted in 12 terminations.[2375]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2376]

**McLinko** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2377] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 369 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 370**

On March 23, 2011, the Head of Corporate Investigations informed Respondent McLinko that "13 Community Bank team members were terminated yesterday as a result of our investigation into team members ordering unsolicited debit cards to out of state customers, primarily Alabama." He further stated: This case also has resulted in enhanced monitoring by Sales Quality, since in retrospect this item should have been detected prior to the customer complaints."[2378]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2379]

---

[2375] MSD-318.

[2376] Julian's ECSFM at No. 369.

[2377] See Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition Against Respondents David Julian and Paul McLinko at 1, incorporating the objections by Respondent Julian in Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2378] MSD-424.

[2379] Julian's ECSFM at No. 370.

**McLinko** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2380] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 370 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 371

On March 31, 2011, the Head of Corporate Investigations updated Respondent McLinko on the investigation related to out-of-state debit cards, informing him that 26 employees had been terminated, with eight more pending termination.[2381]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2382]

**McLinko** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2383] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 371 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 372

On July 15, 2011, Head of Corporate Investigations Michael Bacon informed Respondent McLinko that "sales integrity cases continue to surge."[2384]

**Responses:**

---

[2380] See Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition Against Respondents David Julian and Paul McLinko at 1, incorporating the objections by Respondent Julian in Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2381] MSD-319.

[2382] Julian's ECSFM at No. 371.

[2383] See Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition Against Respondents David Julian and Paul McLinko at 1, incorporating the objections by Respondent Julian in Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2384] McLinko Amended Answer ¶ 454; MSD-320.

**Julian** incorporated Respondent McLinko's Response.[2385]

**McLinko** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2386] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 372 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 373

On November 29, 2011, Head of Corporate Investigations Michael Bacon forwarded an email he had sent to Respondent Russ Anderson, with a comment to Respondent McLinko noting that "everyone continues to avoid any negativity - no matter the topic. I just wanted to go on record - again." The portion of Mr. Bacon's email to Respondent Russ Andersonstated, "my only concern within Community Bank continues to be with Sales Integrity cases and their continued increase."[2387]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2388]

**McLinko** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2389] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 373 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 374

On July 20, 2012, Head of Corporate Investigations Michael Bacon forwarded an email chain

---

[2385] Julian's ECSFM at No. 372.

[2386] See Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition Against Respondents David Julian and Paul McLinko at 1, incorporating the objections by Respondent Julian in Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2387] MSD-322.

[2388] Julian's ECSFM at No. 373.

[2389] See Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition Against Respondents David Julian and Paul McLinko at 1, incorporating the objections by Respondent Julian in Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

Appellate Case: 25-1079    Page: 476    Date Filed: 05/16/2025  Entry ID: 5517644

to Respondent McLinko informing him that the attached email chain was a "classic case" of Respondent Russ Anderson "minimizing the negative information being submitted to executive management." Mr. Bacon stated that Respondent Russ Anderson "often challenges the Audit and [Corporate Security] [Audit and Examination Committee of the Board] reporting verbiage."[2390]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2391]

**McLinko** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2392] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 374 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.


### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 375

Head of Corporate Investigations Michael Bacon also reported in the email that his "data continues to highlight a concerning trend in the area of Sales Integrity – from the increase in EthicsLine reports, to the increase in executive complaint letters/OCC referrals, and increases in confirmed fraud, thus, we need to escalate this issue with senior leadership . . . our data continues to point to a very negative trend." The email chain itself began with Mr. Bacon providing Respondent Russ Anderson with a summary report of SAR filing trends that stated: "Although internal cases involving sales integrity matters decreased … related SAR filings increased. Specifically, SAR filings involving fictitious sales referrals increased 49%, customer consent concerns increased 29%, and false entry of customer identification information increased 24%." Respondent Russ Anderson replied that the context needed rethinking as "it sounds much worse than it really is…" Mr. Bacon replied to Respondent Russ Anderson, reminding her that "we have had a spike in egregious Sales Integrity matters, which added to the upward trend."[2393]

**Responses:**

---

[2390] Julian Amended Answer ¶¶ 402, 455; McLinko Amended Answer ¶¶ 402, 455; MSD-25.

[2391] Julian's ECSFM at No. 374.

[2392] See Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition Against Respondents David Julian and Paul McLinko at 1, incorporating the objections by Respondent Julian in Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2393] Julian Amended Answer ¶ 402; MSD-25.

**Julian** incorporated Respondent McLinko's Response.[2394]

**McLinko** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2395] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 375 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

## Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 376

On July 30, 2012, Respondent McLinko received a PowerPoint presentation from Head of Corporate Investigations Michael Bacon for an Audit Management Committee meeting. The presentation deck listed general trends, including:

(a)    "Pressure on company to save [money] and to perform is at all time high - this can easily lead to [team member] misconduct (pressure combined with less controls);"

(b)    "Audits involving a [team member] related process (TM loans, accts, HR items, etc.) - if business process could identify [team member] conduct, then detection efforts should be coordinated with Corporate Investigations/ Business process should not just be 'call EthicsLine';"

(c)    "WFF Consent Order Update - New Team Member Misconduct Executive Committee, Implementation of formal [line of business] Internal Fraud Committees (IFC) - Internal TM Misconduct & Fraud is a Team Sport - Audit has a primary seat at the prevention table" (emphasis in original). (MSD-311 at 4).

(d)    The Audit Management Committee presentation also included the "Academic Fraud Triangle" which shows that three elements must be present for fraud to occur: Opportunity (an associated bullet asks whether the line of business's controls are allowing too much opportunity), Pressure (the associated bullet asks whether the line business is creating an environment whereby the employee must commit fraud), and Rationalization (the associated bullet states that too much opportunity or too much pressure can sway most anyone.)[2396]

**Responses:**

---

[2394] Julian's ECSFM at No. 375.

[2395] See Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition Against Respondents David Julian and Paul McLinko at 1, incorporating the objections by Respondent Julian in Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2396] MSD- 311 at 5.

Appellate Case: 25-1079     Page: 478     Date Filed: 05/16/2025 Entry ID: 5517644

**Julian** incorporated Respondent McLinko's Response.[2397]

**McLinko** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2398] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 376 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 377

On November 26, 2012, Respondent McLinko asked his direct report Bart Deese to "provide your definitional distinction between Sales Quality, Sales Integrity and Product Suitability?" Mr. Deese responded on November 27, 2012, explaining that he had heard sales quality and sales integrity used interchangeably across the Community Bank and he thought of them together. For example, when a banker records "inappropriate sales (e.g. adding debit cards to customers without consent, creating bogus accounts, etc.)" and the team under Respondent Russ Anderson that monitors this inappropriate behavior is the "Sales Quality" team. When they provide updates, they're called "sales quality" updates. Mr. Deese further explained that he believed suitability was whether the banker sold "the customer the best product given their account relationships, specific situation, etc.? Did they try to push the customer in one direction when the customer really wanted something else? … [sales quality] and Suitability to me are tied at the hip in many cases because bankers can be tempted to provide unsuitable or inappropriate products to a customer to gain more incentive. Not to belabor the point but using debit cards as an example. A customer has 2 checking accounts, the [banker] signs them up for a debit card. It's usually a product associated with checking accounts so it would probably pass most suitability tests; however, if the customer didn't ask for it and complained, it would be a sales quality issue."[2399]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2400]

---

[2397] Julian's ECSFM at No. 376.

[2398] See Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition Against Respondents David Julian and Paul McLinko at 1, incorporating the objections by Respondent Julian in Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2399] MSD-479.

[2400] Julian's ECSFM at No. 377.

Appellate Case: 25-1079     Page: 479     Date Filed: 05/16/2025 Entry ID: 5517644

**McLinko** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2401] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 377 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 378

In an email to Respondent McLinko on January 3, 2013, Respondent McLinko's direct report Bart Deese summarized a January 2013 meeting with the Head of Corporate Investigations and stated "Sales Integrity is still his #1 concern. During mid-year 2012 the case numbers leveled out, but they saw an uptick in the last half of 2012." Respondent McLinko's direct report further reported that he "questioned [the Head of Corporate Investigations] as to whether they had discussed root cause for some of the items listed above and was it related to sales pressure. He said he felt a lot of it was related to the sales goals and pressure. He feels there's an issue that RB is trying to work through, but not a lot of people want to address it with Carrie."[2402]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2403]

**McLinko** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2404] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 378 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 379

As a member of the Bank's Internal Fraud Risk Management Committee, Respondent

---

[2401] See Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition Against Respondents David Julian and Paul McLinko at 1, incorporating the objections by Respondent Julian in Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2402] McLinko Amended Answer ¶ 456; MSD-323.

[2403] Julian's ECSFM at No. 378.

[2404] See Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition Against Respondents David Julian and Paul McLinko at 1, incorporating the objections by Respondent Julian in Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

McLinko received reporting on sales integrity violations, including trends.[2405] For example, a report provided to Respondent McLinko on February 20, 2013 showed that customer consent was the largest category of Sales Integrity Violations cases, and the total number of Sales Integrity Violations cases increased from 2,609 in 2011 to 2,699 in 2012.[2406] The report also informed her that the number of terminations and resignations association with Sales Integrity Violations increased from 935 in 2011 to 1,152 in 2012, with customer consent being the largest category associated with such terminations and resignations. The report also showed 86 resignations for sales integrity violations in 2011 and 100 in 2012 (i.e. 1,252 total terminations and resignations for sales integrity violations in 2012).[2407]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2408]

**McLinko** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2409] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 379 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 380

On March 11, 2013, Respondent McLinko received a "Corporate Investigations 2012 Year End Key Activity Overview/ General Update" presentation for the Head of Corporate Investigations' presentation to the Audit Management Committee. The presentation showed sales integrity violations as the number two case type for both 2011 and 2012, with 2,992 and 3,108 respectively. The Community Bank comprised of the vast majority of cases: 10,616 cases in Community Bank versus 1,267 in the other lines of business in 2011 and 11,597 cases in Community Bank versus 1,586 in the other lines of business in 2012. The presentation also reported the number of EthicsLine reports referred to Regional Banking Sales Quality (i.e. EthicsLine complaints related to sales practices) as 3,068 in 2011 and 3,899 in 2012, up 27%

---

[2405] MSD- 218.

[2406] MSD- 218 at 7.

[2407] MSD- 218 at 11.

[2408] Julian's ECSFM at No. 379.

[2409] See Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition Against Respondents David Julian and Paul McLinko at 1, incorporating the objections by Respondent Julian in Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

Appellate Case: 25-1079    Page: 481    Date Filed: 05/16/2025 Entry ID: 5517644

and comprising 48% of the 8,354 EthicsLine complaints in 2012.[2410]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2411]

**McLinko** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2412] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 380 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 381

On March 12, 2013, Respondent McLinko attended the International Institute of Auditors Mid-Atlantic District Conference. Respondent McLinko introduced Head of Corporate Investigations Michael Bacon to give a presentation at the IIA Conference on "The Complexities of Internal Fraud."[2413]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2414]

**McLinko** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2415] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 381 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

---

[2410] MSD-324 at 5.

[2411] Julian's ECSFM at No. 380.

[2412] See Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition Against Respondents David Julian and Paul McLinko at 1, incorporating the objections by Respondent Julian in Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2413] MSD-325; MSD-327.

[2414] Julian's ECSFM at No. 381.

[2415] See Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition Against Respondents David Julian and Paul McLinko at 1, incorporating the objections by Respondent Julian in Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

Appellate Case: 25-1079      Page: 482      Date Filed: 05/16/2025 Entry ID: 5517644

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 382 – see (Julian and McLinko No. 312)**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 383 – see (Julian and McLinko No. 313)**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 384 – see (Julian and McLinko No. 314)**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 385 – see (Julian and McLinko No. 315)**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 386 – see (Julian and McLinko No. 316)**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 387 – see (Julian and McLinko No. 317)**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 388 – see (Julian and McLinko No. 318)**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 389**

On May 9, 2013, Head of Corporate Investigations Michael Bacon forwarded Respondent McLinko a whistleblower complaint that had been sent to former CEO Stumpf, Carrie Tolstedt and Respondent Russ Anderson, complaining about the "huge amount of unethical practices" and "threats of being placed on corrective action." The complaint described opening accounts without customers being present and falsifying customer information to open accounts. Mr. Bacon wrote to Respondent McLinko: "classic given our discussion."[2416]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2417]

**McLinko** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2418] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 389 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

---

[2416] MSD-41.

[2417] Julian's ECSFM at No. 389.

[2418] See Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition Against Respondents David Julian and Paul McLinko at 1, incorporating the objections by Respondent Julian in Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

Add. 481

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 390**

On July 23, 2013, Respondent McLinko received an invitation for an August 13, 2013 Community Banking Internal Fraud Committee Mid-year Meeting from the Head of Corporate Investigations.[2419] The presentation material showed there to be 774 sales integrity violations cases in 2Q12, 848 in 3Q12, 740 in 4Q12, 798 in 1Q13, and 822 in 2Q13 and 376 terminations/resignations for sales integrity violations in 2Q12, 371 in 3Q12, 360 in 4Q12, 326 in 1Q13, and 371 in 2Q13.[2420]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2421]

**McLinko** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2422] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 390 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 391**

On August 20, 2013, a Senior Investigations Manager Marty Weber provided Respondent McLinko and others with a sales integrity and EthicsLine update, stating: "I assume you will take appropriate action as you deem necessary."[2423] The attached materials showed there to be 1,885 sales integrity violations YTD in 2013 and 1,712 YTD in 2012, that customer consent was the biggest sales integrity violations sub-type, and that there were sales integrity violations cases in every region.[2424] The reporting further showed that Corporate Investigations opened 1,339 sales integrity violations cases from EthicsLine complaints in

---

[2419] MSD-328 at 1.

[2420] MSD-328 at 11, 20.

[2421] Julian's ECSFM at No. 390.

[2422] See Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition Against Respondents David Julian and Paul McLinko at 1, incorporating the objections by Respondent Julian in Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2423] MSD-250 at 1.

[2424] MSD-250 at 2-50.

Add. 482

Appellate Case: 25-1079     Page: 484     Date Filed: 05/16/2025 Entry ID: 5517644

2010, 1,236 in 2011, 1,091 in 2012, and 576 through mid-year 2013.[2425]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2426]

**McLinko** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2427] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 391 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 392

On September 12, 2013, Respondent McLinko received an invitation to attend a "West Coast – Semi Annual Audit/Security/Sales Quality Update," along with the meeting attachments.[2428] The attached Sales Quality Regional Update reflected 4,087 salesquality allegations in 42.31% of stores across the Regional Bank in 2012. For January – June 2013, the Regional Bank reflected 3,739 sales quality allegations in 40.66% of stores.[2429] The attached Corporate Security Update also reflected 412 sales integrity violations in 2012 and 436 sales integrity violations through 2Q 2013 in the West Coast region. The largest category of sales integrity violations for both years were customer consent.[2430]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2431]

---

[2425] MSD-250 at 58.

[2426] Julian's ECSFM at No. 391.

[2427] See Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition Against Respondents David Julian and Paul McLinko at 1, incorporating the objections by Respondent Julian in Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2428] MSD-330 at 1.

[2429] MSD-330 at 19.

[2430] MSD-330 at 3.

[2431] Julian's ECSFM at No. 392.

Page **483** of **753**

**McLinko** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2432] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 392 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 393

On October 4, 2013, Respondent McLinko was forwarded the October 3, 2013 *Los Angeles Times* Article, "Wells Fargo Fires Workers Accused of Cheating on Sales Goals," from the Head of Corporate Investigations. The Head of Corporate Investigations wrote that the article was a "big deal and very interesting."[2433]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2434]

**McLinko** did not dispute receiving the cited email but disputes the cited text is an accurate or complete statement of the article.[2435] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on October 4, 2013, Respondent McLinko was forwarded the October 3, 2013 *Los Angeles Times* Article, "Wells Fargo Fires Workers Accused of Cheating on Sales Goals," from the Head of Corporate Investigations. The Head of Corporate Investigations wrote that the article was a "big deal and very interesting."

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 394

October 4, 2013 *Los Angeles Times* article stated that the Bank "fired about 30 branch employees in the Los Angeles region who the bank said had opened accounts that were never used and attempted to manipulate customer-satisfaction surveys." According to the article, a Bank spokesperson explained that "[t]he employees were trying to take shortcuts to meet sales goals." The article also stated that one of the fired employees said "in some cases

---

[2432] See Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition Against Respondents David Julian and Paul McLinko at 1, incorporating the objections by Respondent Julian in Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2433] McLinko Amended Answer ¶¶ 55, 102, 404, 457; MSD-331.

[2434] Julian's ECSFM at No. 393.

[2435] McLinko's ECSFM at No. 393.

Add. 484

signatures were forged and customers had accounts opened in their names without their knowledge" and "the pressure to meet sales goals was intense at Wells Fargo."[2436]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2437]

**McLinko** did not dispute the claims in this Statement.[2438] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that the October 4, 2013 *Los Angeles Times* article stated that the Bank "fired about 30 branch employees in the Los Angeles region who the bank said had opened accounts that were never used and attempted to manipulate customer-satisfaction surveys." According to the article, a Bank spokesperson explained that "[t]he employees were trying to take shortcuts to meet sales goals." The article also stated that one of the fired employees said "in some cases signatures were forged and customers had accounts opened in their names without their knowledge" and "the pressure to meet sales goals was intense at Wells Fargo."

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 395**

On October 14, 2013, Respondent McLinko received a link to an online petition to Wells Fargo to "End the Obsession with Sales Goals" from a WFAS colleague.[2439] Comments left by current and former employees on the online petition detailed undue pressure to meet unreasonable sales goals, and unethical sales practices, including sales practices misconduct.[2440]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2441]

**McLinko** disputed the claim but presented no controverting evidence, other than to assert there is no evidence he ever saw the cited contents.[2442] Whether Respondent McLinko received and reviewed the cited contents is not a material fact, such that disputing the same will not create a controverted material fact that would prevent granting Enforcement

---

[2436] MSD-331.

[2437] Julian's ECSFM at No. 394.

[2438] McLinko's ECSFM at No. 394.

[2439] MSD-332.

[2440] MSD-140.

[2441] Julian's ECSFM at No. 395.

[2442] McLinko's ECSFM at No. 395.

Counsel's summary disposition motion. The Recommended Decision will not, however, include the claim presented in (Julian and McLinko) No. 395 as to Respondents Julian or McLinko, in the absence of evidence warranting such inclusion as may be presented during the hearing.


**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 396**

On November 1, 2013, Bart Deese (a direct report of Respondent McLinko) forwarded Respondent McLinko a Significant Investigation Notification he received from Corporate Investigations about the investigation that gave rise to the October 2013 *Los Angeles Times* article. The notification stated that: the allegation was that "[s]imulated funding falsified entries were made to meet individual and store sales goals;" twenty employees "with the most egregious simulated funding numbers were to be interviewed first" and that the "Criteria for egregious [was] 50 or more accounts opened in 1 month or 10% of total accounts opened in a 4 month period" that met the simulated funding criteria; and the investigation found that employees engaged in simulated funding "[t]o meet quarterly sales goals" despite "[k]nowing their actions were against [Bank] policy."[2443]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2444]

**McLinko** did not dispute the claim.[2445] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on November 1, 2013, Bart Deese (a direct report of Respondent McLinko) forwarded Respondent McLinko a Significant Investigation Notification he received from Corporate Investigations about the investigation that gave rise to the October 2013 *Los Angeles Times* article. The notification stated that: the allegation was that "[s]imulated funding falsified entries were made to meet individual and store sales goals;" twenty employees "with the most egregious simulated funding numbers were to be interviewed first" and that the "Criteria for egregious [was] 50 or more accounts opened in 1 month or 10% of total accounts opened in a 4 month period" that met the simulated funding criteria; and the investigation found that employees engaged in simulated funding "[t]o meet quarterly sales goals" despite "[k]nowingtheir actions were against [Bank] policy."


**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 397**

After the *Los Angeles Times* published its second article about the Bank's sales practices,

---

[2443] MSD-333 at 3.

[2444] Julian's ECSFM at No. 396.

[2445] McLinko's ECSFM at No. 396.

Appellate Case: 25-1079    Page: 488    Date Filed: 05/16/2025 Entry ID: 5517644

*Wells Fargo's Pressure-Cooker Sales Culture Comes at a Cost*, a fellow WFAS corporate risk auditor sent a link to article to Respondent McLinko the and wrote: "I am not sure how much merit there is to this story (LA Times), but it poses reputation risk to the firm."[2446]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2447]

**McLinko** did not dispute that the article contained the quoted language.[2448] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that after the *Los Angeles Times* published its second article about the Bank's sales practices, *Wells Fargo's Pressure-Cooker Sales Culture Comes at a Cost*, a fellow WFAS corporate risk auditor sent a link to article to Respondent McLinko the and wrote: "I am not sure how much merit there is to this story (LA Times), but it poses reputation risk to the firm."

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 398

The article stated it was based on interviews with 28 former and seven current employees across nine states and reported that "To meet quotas, employees have opened unneeded accounts for customers, ordered credit cards without customers' permission and forged client signatures on paperwork" and employees were threatened with termination if they failed to meet their sales goals.[2449]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2450]

**McLinko** did not dispute that the article contained the quoted language.[2451] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that the article stated it was based on interviews with 28 former and seven current employees across nine states and reported that "To meet quotas, employees have opened unneeded accounts for customers, ordered credit cards without customers' permission and forged client signatures on paperwork" and employees were threatened with termination if they failed to

---

[2446] MSD-531.

[2447] Julian's ECSFM at No. 397.

[2448] McLinko's ECSFM at No. 397.

[2449] McLinko Amended Answer ¶ 101; MSD-111 at 1-2. Respondent McLinko was aware of the article; McLinko Amended Answer ¶ 55, 102.

[2450] Julian's ECSFM at No. 398.

[2451] McLinko's ECSFM at No. 398.

meet their sales goals.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 399**

On February 28, 2014, Respondent McLinko received a "Corporate Investigations2013 Year End Update/2014 Priorities" slide deck for the Head of Corporate Investigations' presentation to the Audit Management Committee on March 3, 2014. The presentation showed sales integrity violations as the number two case type for both 2012 and 2013, with 3,167 and 3,330 respectively. Although sales integrity violation cases are not specifically tied to the Community Bank, the Community Bank comprises of the vast majority of cases: 11,591 cases in Community Bank versus 1,583 in the other lines of business in 2012 and 11,915 cases in Community Bank versus 1,821 in the other lines of business in 2013.[2452]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2453]

**McLinko** did not dispute that the article contained the quoted language.[2454] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on February 28, 2014, Respondent McLinko received a "Corporate Investigations 2013 Year End Update/2014 Priorities" slide deck for the Head of Corporate Investigations' presentation to the Audit Management Committee on March 3, 2014. The presentation showed sales integrity violations as the number two case type for both 2012 and 2013, with 3,167 and 3,330 respectively. Although sales integrity violation cases are not specifically tied to the Community Bank, the Community Bank comprises of the vast majority of cases: 11,591 cases inCommunity Bank versus 1,583 in the other lines of business in 2012 and 11,915 cases in Community Bank versus 1,821 in the other lines of business in 2013.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 400**

Respondent McLinko received a presentation and agenda for an Internal Fraud Committee meeting. The agenda stated: "Sales Integrity key activity is mixed, but expected to increase due to proactive initiatives" (i.e. the Community Bank will identify more sales integrity violations when it increases proactive monitoring). The presentation showed: 740 sales integrity violations cases in 4Q12, 798 in 1Q13, 823 in 2Q13, 822 in 3Q13, and 824 in 4Q13 (i.e. 3,267 total sales integrity cases in 2013); and 361 terminations/resignations for sales integrity violations in 4Q12, 335 in 1Q13, 383 in 2Q13, 389 in 3Q13, and 348 in 4Q13 (i.e. 1,455 terminations/resignations for sales integrity violations in 2013).[2455]

---

[2452] MSD-335 at 4.

[2453] Julian's ECSFM at No. 399.

[2454] McLinko's ECSFM at No. 399.

[2455] MSD-336 at 7, 28.

Appellate Case: 25-1079     Page: 490     Date Filed: 05/16/2025 Entry ID: 5517644

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2456]

**McLinko** responded that the claim was disputed, but did not dispute the claim and instead disputed that the cited language is "an accurate and complete statement of the cited document".[2457] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that Respondent McLinko received a presentation and agenda for an Internal Fraud Committee meeting. The agenda stated: "Sales Integrity key activity is mixed, but expected to increase due to proactive initiatives" (i.e. the Community Bank will identify more sales integrity violations when it increases proactive monitoring). The presentation showed: 740 sales integrity violations cases in 4Q12, 798 in 1Q13, 823 in 2Q13, 822 in 3Q13, and 824 in 4Q13 (i.e. 3,267 total sales integrity cases in 2013); and 361 terminations/resignations for sales integrity violations in 4Q12, 335 in 1Q13, 383 in 2Q13, 389 in 3Q13, and 348 in 4Q13 (i.e. 1,455 terminations/resignations for sales integrity violations in 2013).

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 401

On August 18, 2014, Respondent McLinko received a presentation for an October 2, 2014 Internal Fraud Committee meeting showing: 824 sales integrity violations cases in 2Q13, 822 in 3Q13, 822 in 4Q13, 746 in 1Q14, and 744 in 2Q14; and 386 terminations/resignations for sales integrity violations in 2Q13, 389 in 3Q13, 368 in 4Q13, 381 in 1Q14, and 393 in 2Q14.[2458]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2459]

**McLinko** did not dispute that the Statement contains a presentation deck that included the stated information.[2460] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on August 18, 2014, Respondent McLinko received a presentation for an October 2, 2014 Internal Fraud Committee meeting showing: 824 sales integrity violations cases in 2Q13, 822 in 3Q13, 822 in 4Q13, 746 in 1Q14, and 744 in 2Q14; and 386 terminations/resignations for sales integrity violations in 2Q13, 389 in 3Q13, 368 in

---

[2456] Julian's ECSFM at No. 400.

[2457] McLinko's ECSFM at No. 400.

[2458] MSD-614 at 6, 30.

[2459] Julian's ECSFM at No. 401.

[2460] McLinko's ECSFM at No. 401.

4Q13, 381 in 1Q14, and 393 in 2Q14.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 402**

Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 402 relies on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[2461] Upon my review of the confidential documents supporting this Statement of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in this Statement of Material Fact.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 403**

According to a February 2015 presentation made to the OCC by Respondent McLinko (and his direct report Bart Deese) on WFAS Community Bank Sales Coverage, WFAS had a "[p]artnership with Corporate Investigations" and interacted with Corporate Investigations in several ways.[2462] For example, WFAS was "[c]opied on all significant cases above established dollar thresholds for review and assessment," it had "[o]ngoing dialogue throughout the year on open cases (where needed)," and it "[p]articipat[ed] in semi-annual CMBK Internal Fraud Committee Meeting."[2463] The presentation also noted that WFAS attended "Semi-annual Regional President meetings," in which "RB – Sales Quality and Corporate Investigations attend and share information."[2464]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2465]

**McLinko** did not dispute that the Statement contains the quoted language.[2466]  Accordingly,

---

[2461] See 12 C.F.R. § 19.33(b).

[2462] MSD-476 at 6.

[2463] MSD-476 at 6.

[2464] MSD-476 at 6.

[2465] Julian's ECSFM at No. 403.

[2466] McLinko's ECSFM at No. 403.

Add. 490

the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that according to a February 2015 presentation made to the OCC by Respondent McLinko (and his direct report Bart Deese) on WFAS Community Bank Sales Coverage, WFAS had a "[p]artnership with Corporate Investigations" and interacted with Corporate Investigations in several ways.[2467] For example, WFAS was "[c]opied on all significant cases above established dollar thresholds for review and assessment," it had "[o]ngoing dialogue throughout the year on open cases (where needed)," and it "[p]articipat[ed] in semi-annual CMBK Internal Fraud Committee Meeting."[2468] The presentation also noted that WFAS attended "Semi-annual Regional President meetings," in which "RB – Sales Quality and Corporate Investigations attend and share information."

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 404**

Similarly, in a May 27, 2015 email to the OCC, Respondent Julian wrote that WFAS's "audit methodology includes contacting Corporate Investigations at the beginning of each audit to determine if there are any cases/trends related to the area under review. In addition, the Community Banking (CB) audit team interact with Corporate Investigations in a number of ways throughout the year (e.g., Semi-annual Regional President meetings, Semi-annual CMBK Internal Fraud Committee, Copied on SINs and IDEAs, Ad hoc discussions) to understand cases/trends, etc."[2469]

**Responses:**

**Julian** did not dispute the email contained the language presented in the Statement.[2470] **McLinko** did not dispute that the document cited in the Statement contains the quoted language.[2471] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that in a May 27, 2015 email to the OCC, Respondent Julian wrote that WFAS's "audit methodology includes contacting Corporate Investigations at the beginning of each audit to determine if there are any cases/trends related to the area under review. In addition, the Community Banking (CB) audit team interact with Corporate Investigations in a number of ways throughout the year (e.g., Semi-annual Regional President meetings, Semi-annual CMBK Internal Fraud Committee, Copied on SINs and IDEAs, Ad hoc discussions) to understand cases/trends, etc."

---

[2467] MSD-476 at 6.

[2468] MSD-476 at 6.

[2469] MSD-416; Julian Amended Answer ¶ 400, 451; McLinko Amended Answer ¶¶ 400, 451; MSD-369 (providing Respondent Julian with a draft email to send to the OCC).

[2470] Julian's ECSFM at No. 404.

[2471] McLinko's ECSFM at No. 404.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 405**

Like Respondent Julian, Respondent McLinko's direct reports also received extensive information from both Corporate Investigations and the Community Bank's Sales Quality team indicating that sales practices misconduct existed throughout the Community Bank, that consent was the number one sales integrity issue, and that the root cause of the misconduct was pressure to meet sales goals.[2472]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2473]

**McLinko** incorporated by reference his responses to Statement of Facts Nos. 265-418, and avers the claim contains data that is difficult to understand.[2474] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that like Respondent Julian, Respondent McLinko's direct reports also received extensive information from both Corporate Investigations and the Community Bank's Sales Quality team indicating that sales practices misconduct existed throughout the Community Bank, that consent was the number one sales integrity issue, and that the root cause of the misconduct was pressure to meet sales goals.


**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 406**

The below paragraphs list some of the information Respondent McLinko's direct reports received.

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2475] **McLinko** disputed the claim because there is no evidence cited as support.[2476] Inasmuch as the Statement contains no claim other than to refer to the subsequent paragraphs, I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact.

---

[2472] SOF ¶¶ 265-418.

[2473] Julian's ECSFM at No. 405.

[2474] McLinko's ECSFM at No. 405.

[2475] Julian's ECSFM at No. 406.

[2476] McLinko's ECSFM at No. 406.

Add. 492

Appellate Case: 25-1079    Page: 494    Date Filed: 05/16/2025 Entry ID: 5517644

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 407**

At a July 6, 2010 Regional President meeting (Southwest region) attended by Bart Deese, Corporate Investigations reported that "sales integrity cases continue to increase."[2477]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2478]

**McLinko** did not dispute that the document cited in the Statement contains the quoted language.[2479] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that at a July 6, 2010 Regional President meeting (Southwest region) attended by Bart Deese, Corporate Investigations reported that "sales integrity cases continue to increase."

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 408**

At a July 7, 2010 Regional President meeting (Carolinas region) attended by Bart Deese, Corporate Investigations reported that "due to a more aggressive sales culture, sales integrity is going to be a challenge."[2480]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2481]

**McLinko** did not dispute that the document cited in the Statement contains the quoted language.[2482] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that at a July 7, 2010 Regional President meeting (Carolinas region) attended by Bart Deese, Corporate Investigations reported that "due to a more aggressive sales culture, sales integrity is going to be a challenge."

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 409**

---

[2477] MSD- 615.

[2478] Julian's ECSFM at No. 407.

[2479] McLinko's ECSFM at No. 407.

[2480] MSD-616.

[2481] Julian's ECSFM at No. 408.

[2482] McLinko's ECSFM at No. 408.

Add. 493

Appellate Case: 25-1079    Page: 495    Date Filed: 05/16/2025 Entry ID: 5517644

At a July 8, 2010 Regional President meeting (Great Lakes region) attended by Bart Deese, Corporate Investigations reported that "[s]ales integrity cases continue to be a challenge."[2483]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2484]

**McLinko** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2485] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 409 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.


### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 410

At a December 10, 2010 Regional President meeting (Mid-Atlantic region) attended by Bart Deese, Corporate Investigations reported that "[s]ales integrity cases are up 280%."[2486]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2487]

**McLinko** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2488] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 410 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

---

[2483] MSD-627.

[2484] Julian's ECSFM at No. 409.

[2485] See Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition Against Respondents David Julian and Paul McLinko at 1, incorporating the objections by Respondent Julian in Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2486] MSD-624.

[2487] Julian's ECSFM at No. 410.

[2488] See Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition Against Respondents David Julian and Paul McLinko at 1, incorporating the objections by Respondent Julian in Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 411**

At a December 13, 2010 Regional President meeting (Mountain West region) attended by Bart Deese, Corporate Investigations reported that "[s]ales integrity cases in Denver are up 51%" and the Regional President stated he was "concerned with the number of unauthorized debit cards and the result number of team member terminations."[2489]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2490]

**McLinko** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2491] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 411 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 412**

At a December 16, 2010 Regional President meeting (Southeast region) attended by Bart Deese, Corporate Investigations reported on "the increase in . . . sales integrity cases primarily due to . . . selling of unwanted debit cards and opening of unnecessary accounts."[2492]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2493]

**McLinko** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2494] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 412 will not support Enforcement Counsel's Motion. The exclusion of the claims

---

[2489] MSD-625.

[2490] Julian's ECSFM at No. 411.

[2491] See Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition Against Respondents David Julian and Paul McLinko at 1, incorporating the objections by Respondent Julian in Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2492] MSD-626.

[2493] Julian's ECSFM at No. 412.

[2494] See Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition Against Respondents David Julian and Paul McLinko at 1, incorporating the objections by Respondent Julian in Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 413**

At February 8 and 9, 2011 meetings with Corporate Investigations prior to aCommunity Bank audit attended by Bart Deese, Corporate Investigations reported:

    (a)    "2,607 sales integrity cases for 2010," of which "Customer Consent" was the number one issue with "1000+ cases."

    (b)    For Customer Consent cases, there are "No geographical 'hot spots.'"

    (c)    "Many employees say it's undue pressure vs. monetary gain."

    (d)    "70% of cases" come from "Ethics Line Calls" (i.e. the detective controls are reactive in nature).[2495]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2496]

**McLinko** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2497] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 413 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 414**

In a July 15, 2011 email from Head of Corporate Investigations Michael Bacon, Mr. Bacon informed Bart Deese and others that the OCC "noted the trend in the increase of related complaints over the last several months received by the OCC and our overall increases inSales

---

[2495] MSD-627; MSD-628; MSD-638 (Deese Dep. Tr.) at 243:2-16 (testifying that Corporate Investigations told him that the reason employees opened accounts without consent was "due to pressure versus actually due to incentive [compensation] gain.").

[2496] Julian's ECSFM at No. 413.

[2497] See Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition Against Respondents David Julian and Paul McLinko at 1, incorporating the objections by Respondent Julian in Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

Add. 496

Appellate Case: 25-1079    Page: 498    Date Filed: 05/16/2025    Entry ID: 5517644

Integrity cases and related EthicsLine reports."[2498]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2499]

**McLinko** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2500] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 414 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.


### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 415

In a November 29, 2011 email from Head of Corporate Investigations Michael Bacon, Mr. Bacon forwarded to the former Chief Auditor and Erica Ocana (a direct report of Respondent McLinko) an email to Respondent Russ Anderson, which stated:

> My only concern within Community Bank continues to be with Sales Integrity cases and their continued increase. As previously noted, everyone expected a slight increase in cases once SQ began doing customer polling, but I can only speak for my team, we did not expect the increase we have been experiencing. This is especially true of the west and specifically in some mature markets within CA. . . . During the call, Carrie was fairly adamant about being cautious in regards to our language, but I don't feel comfortable not pointing out to you, that we have either in fact 'detected' more misconduct that wasn't previously detected or managed appropriately or we simply have an increase.

The Head of Corporate Investigations noted in his email to WFAS that "everyone [in Community Bank] continues to avoid any negativity – no matter the topic. I just wanted to go on record – again."[2501]

This email followed a November 14, 2011 email from Mr. Bacon to Ms. Ocana, in which he expressed that Respondent Russ Anderson's edits to Corporate Security's update to the Audit and Examination Committee, which included changing "misconduct" to "behaviors," were

---

[2498] MSD-320.

[2499] Julian's ECSFM at No. 414.

[2500] See Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition Against Respondents David Julian and Paul McLinko at 1, incorporating the objections by Respondent Julian in Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2501] MSD-322.

Appellate Case: 25-1079     Page: 499     Date Filed: 05/16/2025 Entry ID: 5517644

"very frustrating".[2502]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2503]

**McLinko** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2504] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 415 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 416

In connection with a December 12, 2011 Regional President meeting (Southwest region) attended by Bart Deese and Erica Ocana with Corporate Investigations and Sales Quality, WFAS received a Sales Quality presentation for the Southwest showing:

> (a)   "Overall 23% increase in 'total allegations' YTD 2011. (662 in 2011 vs. 537 in 2010)";

> (b)   56% percent of stores had sales integrity allegations;

> (c)   51% of sales integrity allegations related to Consent;

> (d)   61% of sales integrity allegations related to Checking/Savings accounts; and

> (e)   "The most common drivers of allegations are issues related to customer consent & account opening procedural issues (ex: closing existing to open new account)."[2505]

**Responses:**

---

[2502] MSD-12A; see also MSD-12 (explaining to Respondent Russ Anderson that "sales integrity matters are not necessarily [Wachovia] integration related. We are up in the West as well. [A]lthough our cases related to the [EthicsLine] are down those sent to Sales Quality are up – but we made no mention of this. We simply provide the percentage up.")

[2503] Julian's ECSFM at No. 415.

[2504] See Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition Against Respondents David Julian and Paul McLinko at 1, incorporating the objections by Respondent Julian in Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2505] MSD-621 at 10, 11.

Add. 498

Appellate Case: 25-1079    Page: 500    Date Filed: 05/16/2025 Entry ID: 5517644

**Julian** incorporated Respondent McLinko's Response.[2506]

**McLinko** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2507] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 416 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 417

In connection with a January 12, 2012 Regional President meeting (West Coast region) attended by Bart Deese and Erica Ocana with Corporate Investigations and Sales Quality, WFAS received a Sales Quality presentation for the West Coast showing:

    (a)    "Overall increase in 'total allegations' YTD 2011 as follows: 1,693 in 2011 vs. 1,563 in 2010";

    (b)    70% percent of stores had sales integrity allegations;

    (c)    55% of sales integrity allegations related to Consent;

    (d)    65% of sales integrity allegations related to Checking/Savings accounts, 21% related to Debit Cards/ExpressSend (remittance product); and

    (e)    "The most common drivers of allegations are issues related to customer consent & account opening procedural issues (ex: closing existing to open new account)."[2508]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2509]

---

[2506] Julian's ECSFM at No. 416.

[2507] See Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition Against Respondents David Julian and Paul McLinko at 1, incorporating the objections by Respondent Julian in Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2508] MSD-617 at 2, 3.

[2509] Julian's ECSFM at No. 417.

Add. 499

Appellate Case: 25-1079    Page: 501    Date Filed: 05/16/2025    Entry ID: 5517644

**McLinko** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2510] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 417 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 418

At an August 21, 2013 Kick-Off Meeting for WFAS's audit of Sales Quality / Integrity in the Community Bank, Bart Deese received a presentation that:

> (a)     Defines Sales Integrity as a "Subset of sales quality issues which typically involve the manipulation and/or misrepresentation of sales or referrals in order to receive compensation or to meet sales goals; including potential unethical and/or illegal behavior."[2511]

> (b)     Shows that sales integrity allegations rose from 177 in 2003 to 7,543 in 2012.[2512]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2513]

**McLinko** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2514] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 418 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

---

[2510] See Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition Against Respondents David Julian and Paul McLinko at 1, incorporating the objections by Respondent Julian in Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2511] MSD-622 at 4.

[2512] MSD-622 at 5.

[2513] Julian's ECSFM at No. 418.

[2514] See Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition Against Respondents David Julian and Paul McLinko at 1, incorporating the objections by Respondent Julian in Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

**Respondent Julian and Respondent McLinko failed to identify and escalate the systemic sales practices misconduct problem and the significant sales practices risk management and internal controls weaknesses; and Respondent Julian's and Audit's reporting to the Board on sales practices was misleading**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 419**

Respondents Julian and McLinko failed to identify the systemic sales practices misconduct problem and the significant sales practices risk management and internal controls weaknesses in any audit report or Enterprise Risk Management Assessment.[2515]

**Responses:**

**Julian** disputed the Statement, averring the meaning of the term "audit report" and "Enterprise Risk Management Assessment is disputed, and identified what he asserted were numerous occasions through which WFAS raised issues around controls related to sales practices.[2516]

It is a material fact in issue whether Respondents Julian and McLinko failed to identify the systemic sales practices misconduct problem and the significant sales practices risk management and internal controls weaknesses in any audit report or Enterprise Risk Management Assessment. I find that in his response to (Julian and McLinko) No. 419, Julian has sufficiently demonstrated that a factual controversy exists regarding whether Julian or McLinko (or both) ailed to identify the systemic sales practices misconduct problem and the significant sales practices risk management and internal controls weaknesses in any audit report or Enterprise Risk Management Assessment. Pursuant to the OCC's Uniform Rules, the merits of the claims raised in (Julian and McLinko) No. 419, will be addressed during the hearing set to begin on September 13, 2021.

**McLinko** incorporated Respondent Julian's Response.[2517]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 420**

Respondent Julian admitted in his Amended Answer that, "As to the allegation in the first sentence that '[u]nder Respondent Julian's leadership, Audit never . . . identified [the sales practices misconduct problem's] root cause in any audit report,' admitted that Audit did not discuss the root cause of sales practices misconduct in audit reports, which reports were

---

[2515] See SOF ¶¶ 419- 522; MSD-638 (Deese Dep. Tr.) 245:22-251:17.

[2516] Julian's ECSFM at No. 419.

[2517] McLinko's ECSFM at No. 419.

Add. 501

Appellate Case: 25-1079    Page: 503    Date Filed: 05/16/2025 Entry ID: 5517644

focused on the testing and assessment of specific controls."[2518]

**Responses:**

**Julian** did not dispute that his Amended Answer contains the quoted language.[2519] Accordingly, the Recommended Decision will include a factual finding as to Respondent Julian that he stated in his Amended Answer: "As to the allegation in the first sentence that '[u]nder Respondent Julian's leadership, Audit never . . . identified [the sales practices misconduct problem's] root cause in any audit report,' admitted that Audit did notdiscuss the root cause of sales practices misconduct in audit reports, which reports were focused on the testing and assessment of specific controls."

**McLinko** incorporated Respondent Julian's Response.[2520]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 421

Respondent Paul McLinko admitted in his Amended Answer that "his 15-Day Letter response states, in part, that: 'Mr. McLinko did not identify the depth and breadth of the systemic sales practices misconduct that ultimately were revealed in the Board Report.' Respondent further admits that the Community Bank audit team did not identify in any audit reports what the Notice of Charges alleges is the root cause of the alleged systemic sales practices misconduct problem."[2521]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2522]

**McLinko** did not dispute that Enforcement Counsel accurately quoted the cited section of his Amended Answer.[2523] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that Respondent Paul McLinko admitted in his Amended Answer that "his 15-Day Letter response states, in part, that: 'Mr. McLinko did not identify the depth and breadth of the systemic sales practices misconduct that ultimately were revealed in the Board Report.' Respondent further admits that the Community Bank audit team did not identify in any audit reports what the Notice of Charges alleges is the root cause of the alleged systemic

---

[2518] Julian Amended Answer ¶ 411.

[2519] Julian's ECSFM at No. 420.

[2520] McLinko's ECSFM at No. 420...

[2521] McLinko Amended Answer ¶ 411.

[2522] Julian's ECSFM at No. 421.

[2523] McLinko's ECSFM at No. 421.

sales practices misconduct problem."

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 422**

On February 5, 2015, the Bank provided OCC examiners with a presentation prepared by Respondent McLinko and his direct report Bart Deese on "WFAS Community Sales Coverage." The presentation identified audits that had been completed since 2013 or were expected to be completed in 2015.[2524]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2525]

**McLinko** did not dispute the claim.[2526] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on February 5, 2015, the Bank provided OCC examiners with a presentation prepared by Respondent McLinko and his direct report Bart Deese on "WFAS Community Sales Coverage." The presentation identified audits that had been completed since 2013 or were expected to be completed in 2015.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 423**

On May 27, 2015, Respondents Julian provided OCC examiners with a list detailing WFAS Community Bank Sales Coverage, which identified audits that had been completed since 2013 or were expected to be completed in 2015.[2527]

**Responses:**

**Julian** did not dispute that he provided the OCC examiners with the list described in the Statement, but averred the cited evidence "details only part of WFAS's coverage of sales practices in the Community Bank from 2013 through 2015."[2528] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on May 27, 2015, he provided OCC examiners with a list detailing

---

[2524] MSD-630.

[2525] Julian's ECSFM at No. 422.

[2526] McLinko's ECSFM at No. 422.

[2527] MSD-416.

[2528] Julian's ECSFM at No. 423.

Appellate Case: 25-1079    Page: 505    Date Filed: 05/16/2025 Entry ID: 5517644

WFAS Community Bank Sales Coverage, which identified audits that had been completed since 2013 or were expected to be completed in 2015.

**McLinko** incorporated Respondent Julian's Response.[2529]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 424

Respondent McLinko identified the following audit as covering sales practices in 2012: RB [Regional Bank] – Human Resources.[2530]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2531]

**McLinko** objected to the Statement on the ground that the supporting exhibit was irrelevant.[2532] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 424 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 425

Respondents Julian and McLinko identified the following audits as covering sales practices in 2013: RB Sales Quality;[2533] Wells Fargo Customer Connection Incentive Compensation;[2534] Business Banking Group Sales, Service, Product Suitability & Marketing;[2535] and, Community Bank Household Metrics Reporting.[2536]

**Responses:**

---

[2529] McLinko's ECSFM at No. 423.

[2530] MSD-631.

[2531] Julian's ECSFM at No. 424.

[2532] See Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition Against Respondents David Julian and Paul McLinko at 1, incorporating the objections by Respondent Julian in Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2533] MSD-376.

[2534] MSD-512.

[2535] MSD-518.

[2536] MSD-375.

**Julian**[2537] and **McLinko**[2538] objected to the Statement on the ground that the supporting exhibit was irrelevant. Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Julian and McLinko) No. 425 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 426

Respondents Julian and McLinko identified the following audits as covering sales practices in 2014: Wells Fargo Customer Connection Account Opening & Fulfillment;[2539] Digital Channels Group Online Sales & Marketing;[2540] Regional Bank SOCR;[2541] Enterprise Incentive Compensation;[2542] and Business Banking Group Accounting & Finance.[2543]

**Responses:**

**Julian** did not dispute that he and Respondent McLinko identified the referenced audits, but averred those audits "did not represent the totality" of WFAS's coverage of sales practices in 2014.[2544] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Julian that he and Respondent McLinko identified the following audits as covering sales practices in 2014: Wells Fargo Customer Connection Account Opening & Fulfillment; Digital Channels Group Online Sales & Marketing; Regional Bank SOCR; Enterprise Incentive Compensation; and Business Banking Group Accounting & Finance.

**McLinko** did not dispute that he and Respondent Julian identified the referenced audits,

---

[2537] See Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2538] See Respondent Paul McLinko's Brief in Opposition to Enforcement Counsel's Motion for Summary Disposition Against Respondents David Julian and Paul McLinko at 1, incorporating the objections by Respondent Julian in Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2539] MSD- 513.

[2540] MSD-514.

[2541] MSD-520.

[2542] MSD-515.

[2543] MSD-516.

[2544] Julian's ECSFM at No. 426.

Add. 505

but incorporated Respondent Julian's response and disputed the claim because none of the cited documents "identifies Mr. Julian or Mr. McLinko as having performed the audits" referred to in the Statement.[2545]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 427

Respondents Julian and McLinko identified the following audit as covering sales practices in 2015: RB Account Opening & Closing.[2546]

**Julian** did not dispute that he and Respondent McLinko identified the referenced audit, but averred the audit did not "represent the totality" of WFAS's coverage of sales practices in 2014.[2547] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Julian that he and Respondent McLinko identified the following audits as covering sales practices in 2015: RB Account Opening & Closing.

**McLinko** did not dispute that he and Respondent Julian identified the referenced audit, but incorporated Mr. Julian's response and disputed the claim because it did not identify him "as an author, or auditor who performed the work described.[2548] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent McLinko that Respondents Julian and McLinko identified the following audit as covering sales practices in 2015: RB Account Opening & Closing.

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 428

WFAS rated all but one of the audits Respondents Julian and McLinko identified as relating to sales practices issues in the Community Bank as "Effective" or "Satisfactory."[2549]

---

[2545] McLinko's ECSFM at No. 426

[2546] MSD-385.

[2547] Julian's ECSFM at No. 427.

[2548] McLinko's ECSFM at No. 427.

[2549] Julian Amended Answer ¶ 413 ("Admitted that, between 2012 and 2016, some controls related to sales practices were audited and received ratings of 'effective' between 2012 and 2016."); McLinko Amended Answer ¶ 463 ("Respondent Paul McLinko admits that Audit periodically issued audit reports pertinent to aspects of sales practices misconduct at the Community Bank, certain of which reports provided overall 'effective' ratings"); see SOF ¶¶ 439-41, 443, 452-53, 456, 465, 467, 487.

**Responses:**

**Julian** did not dispute the claim, but averred it "lacked context".[2550] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Julian that WFAS rated all but one of the audits Respondents Julian and McLinko identified as relating to sales practices issues in the Community Bank as "Effective" or "Satisfactory."

**McLinko** did not dispute the "Effective" or "Satisfactory" ratings were given, but incorporated Mr. Julian's response and disputed the claim on the ground that the cited exhibits "do not establish the facts alleged.[2551] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent McLinko that WFAS rated all but one of the audits Respondents Julian and McLinko identified as relating to sales practices issues in the Community Bank as "Effective" or "Satisfactory."

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 429

In addition to audit activities that were scoped to assess a particular area of operations within the Community Bank, the WFAS Community Bank audit team also completed annual Enterprise Risk Management ("ERM") Assessments of the overall risk management within the Community Bank. Like the audit activities completed during Respondents Julian and McLinko's tenures, the annual ERM Assessments (or "ERMAs") reported each year from 2012 to 2016 that the Community Bank had Satisfactory risk management, including management of sales practices risk, and reported Strong or Satisfactory ratings of the Community Bank's "Governance" and "Culture."

**Responses:**

**Julian** did not dispute the claims, but averred the Statement "lacked context".[2552] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Julian that in addition to audit activities that were scoped to assess a particular area of operations within the Community Bank, the WFAS Community Bank audit team also completed annual Enterprise Risk Management ("ERM") Assessments of the overall risk management within the Community Bank. Like the audit activities completed during Respondents Julian and McLinko's tenures, the annual ERM Assessments (or "ERMAs") reported each year from 2012 to 2016 that the Community Bank had Satisfactory risk management, including management of sales practices risk, and reported Strong or Satisfactory

---

[2550] Julian's ECSFM at No. 428.

[2551] McLinko's ECSFM at No. 428.

[2552] Julian's ECSFM at No. 429.

Add. 507

Appellate Case: 25-1079     Page: 509     Date Filed: 05/16/2025 Entry ID: 5517644

ratings of the Community Bank's "Governance" and "Culture."

**McLinko** did not dispute the cited ratings were given, but incorporated Mr. Julian's response and disputed the claim on the ground that the claim "mischaracterizes ERMAs performed at the Community Bank."[2553] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Julian that in addition to audit activities that were scoped to assess a particular area of operations within the Community Bank, the WFAS Community Bank audit team also completed annual Enterprise Risk Management ("ERM") Assessments of the overall risk management within the Community Bank. Like the audit activities completed during Respondents Julian and McLinko's tenures, the annual ERM Assessments (or "ERMAs") reported each year from 2012 to 2016 that the Community Bank had Satisfactory risk management, including management of sales practices risk, and reported Strong or Satisfactory ratings of the Community Bank's "Governance" and "Culture."

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 430

WFAS awarded the Community Bank Effective ratings in other audits that touched on sales practices that were not included on the lists of sales practices-related audits Respondents Julian and McLinko provided to the OCC.[2554]

**Responses:**

**Julian** did not dispute the claims, but averred the Statement "lacked context".[2555]  I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that WFAS awarded the Community Bank Effective ratings in other audits that touched on sales practices that were not included on the lists of sales practices-related audits Respondents Julian and McLinko provided to the OCC.

**McLinko** incorporated Respondent Julian's Response.[2556]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 431

On April 11, 2011, WFAS issued its audit report on *Regional Bank - Sales, Service &*

---

[2553] McLinko's ECSFM at No. 429.

[2554] MSD-371; MSD-348; MSD-379.

[2555] Julian's ECSFM at No. 430.

[2556] McLinko's ECSFM at No. 430.

*Development*, rating internal controls Effective. The audit assessed controls related to sales quality, incentive compensation plan administration, incentive compensation plan design, approval, implementation, and governance, and the control environment quality of risk management.[2557]

**Responses:**

**Julian** did not dispute the claims, but averred the Statement "lacked context".[2558] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Julian that an April 11, 2011, WFAS issued its audit report on *Regional Bank - Sales, Service & Development*, rating internal controls Effective. The audit assessed controls related tosales quality, incentive compensation plan administration, incentive compensation plan design, approval, implementation, and governance, and the control environment quality of risk management.

**McLinko** did not dispute the claims, but disputed that the Statement establishes the alleged fact that Respondents Julian and McLinko failed to identify and escalate the systemic sales practices misconduct problem and the significant sales practices risk management and internal controls weaknesses, or that Respondent Julian's and Audit's reporting to the Board on sales practices was misleading (allegations that do not appear in this Statement).[2559] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent McLinko that an April 11, 2011, WFAS issued its audit report on *Regional Bank - Sales, Service & Development*, rating internal controls Effective. The audit assessed controls related tosales quality, incentive compensation plan administration, incentive compensation plan design, approval, implementation, and governance, and the control environment quality of risk management.


**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 432**

On March 22, 2012, WFAS issued its audit report on *Regional Banking – HumanResources*, rating internal controls as **Effective**.[2560]

**Responses:**

_____

[2557] MSD-371.

[2558] Julian's ECSFM at No. 431.

[2559] McLinko's ECSFM at No. 431.

[2560] MSD-631.

**Julian** did not dispute the claim, but averred the Statement "was misleading".[2561] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Julian that on March 22, 2012, WFAS issued its audit report on *Regional Banking – HumanResources*, rating internal controls as **Effective.**

**McLinko** did not dispute that WFAS issued the referenced audit report on March 22, 2012.[2562] Accordingly, the Recommended Decision will include a factual finding as to Respondent McLinko that on March 22, 2012, WFAS issued its audit report on *Regional Banking – Human Resources*, rating internal controls as **Effective**.

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 433

On October 26, 2012 WFAS issued its audit report on *Regional Banking Compensation*, rating internal controls as **Effective**. Although the report identified Incentive Compensation Risk Management - Incentive Compensation as a risk, because "[i]nadequate review and execution of [incentive] plan balancing activities could negatively impact Wells Fargo's safety and soundness, resulting in adverse impact on Wells Fargo's reputation, regulatory scrutiny, negative market opinion, an increase in cost of capital, and a decrease in share price," the report concluded that compensation processes were "very robust within both administrative and control functions" and "management has historically focused on and continues to be attentive to the inherent risks associated with incentive compensation."[2563]

**Responses:**

**Julian** did not dispute the claim, but averred the Statement "was misleading".[2564] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Julian that on October 26, 2012 WFAS issued its audit report on *Regional Banking Compensation*, rating internal controls as **Effective**. Although the report identified Incentive Compensation Risk Management - Incentive Compensation as a risk, because "[i]nadequate review and execution of [incentive] plan balancing activities could negatively impact Wells Fargo's safety and soundness, resulting in adverse impact on Wells Fargo's reputation, regulatory scrutiny, negative market opinion, an

---

[2561] Julian's ECSFM at No. 432.

[2562] McLinko's ECSFM at No. 432.

[2563] Julian Amended Answer ¶¶ 415, 464; McLinko Amended Answer ¶¶ 415, 464; MSD-348.

[2564] Julian's ECSFM at No. 433.

Appellate Case: 25-1079      Page: 512      Date Filed: 05/16/2025 Entry ID: 5517644

increase in cost of capital, and a decrease in share price," the report concluded that compensation processes were "very robust within both administrative and control functions" and "management has historically focused on and continues to be attentive to the inherent risks associated with incentive compensation."

**McLinko** incorporated Respondent Julian's response and did not dispute that on October 26, 2012 WFAS issued its audit report on *Regional BankingCompensation*, rating internal controls as Effective, and that it included the quoted statements.[2565] Accordingly, the Recommended Decision will include a factual finding as to Respondent McLinko that on October 26, 2012 WFAS issued its audit report on *Regional Banking Compensation*, rating internal controls as **Effective**. Although the report identified Incentive Compensation Risk Management - Incentive Compensation as a risk, because "[i]nadequate review and execution of [incentive] plan balancing activities could negatively impact Wells Fargo's safety and soundness, resulting in adverse impact on Wells Fargo's reputation, regulatory scrutiny, negative market opinion, an increase in cost of capital, and a decrease in share price," the report concluded that compensation processes were "very robust within both administrative and control functions" and "management has historically focused on and continues to be attentive to the inherent risks associated with incentive compensation."


### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 434

On November 26, 2012, after Respondent Russ Anderson learned that WFAS had contacted the OCC regarding an upcoming examination. Respondent Russ Anderson wrote: "[n]ot sure why audit would make this type of inquiry and not cc me as GRO. Help!" Respondent McLinko replied: "You have my assurance that we would never bring anything to the regulators [sic] attention without you are [sic] your team being aware. No surprises as we agreed."[2566]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2567]

**McLinko** disputed that the Statement is an accurate or complete statement of the cited email, averring that the Statement omitted a parenthetical that explains the purpose of Mr. McLinko's statement: "You have my assurance that we would never bring anything to the regulators attention without you are [sic] your team being aware (thus preventing a disconnect). No surprises as we agreed."[2568] I find an insufficient factual basis has been presented to establish a

---

[2565] McLinko's ECSFM at No. 433.

[2566] MSD-388 (emphasis added).

[2567] Julian's ECSFM at No. 434.

[2568] McLinko's ECSFM at No. 433.

Appellate Case: 25-1079    Page: 513    Date Filed: 05/16/2025 Entry ID: 5517644

dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on November 26, 2012, after Respondent Russ Anderson learned that WFAS had contacted the OCC regarding an upcoming examination, Respondent Russ Anderson wrote: "[n]ot sure why audit would make this type of inquiry and not cc me as GRO. Help!" Respondent McLinko replied: "You have my assurance that we would never bring anything to the regulators attention without you are [sic] your team being aware (thus preventing a disconnect). No surprises as we agreed."


### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 435

On December 18, 2012, Respondent McLinko described a meeting with Respondent Russ Anderson to his direct reports, where he wrote "It's either my charming personality (not or mimosa's [sic] in the morning (not on my part) or something else, but had a very good meeting with [Respondent Russ Anderson]… regarding [Respondent Russ Anderson's] expectations for me at her offsite the first week of January. As the audit lead, she's looking to partner, for me to get to know her folks better (and vice versa), and hear what the senior risk leaders … have to say. She also expects me to stay for heavy appetizers and beverages (she needs to twist my arm for that :)). " [also – I specifically brought up audits of Sales Quality, Suitability and a slip on my part Integrity. Her only comment was they don't use Integrity as those issues are referred to [the Head of Corporate Investigations]".[2569]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2570]

**McLinko** did not dispute Enforcement Counsel accurately quoted the cited excerpt from the Exhibit.[2571] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on December 18, 2012, Respondent McLinko described a meeting with Respondent Russ Anderson to his direct reports, where he wrote "It's either my charming personality (not or mimosa's [sic] in the morning (not on my part) or something else, but had a very good meeting with [Respondent Russ Anderson]… regarding [Respondent Russ Anderson's] expectations for me at her offsite the first week of January. As the audit lead, she's looking to partner, for me to get to know her folks better (and vice versa), and hear what the senior risk leaders … have to say. She also expects me to stay for heavy appetizers and beverages (she needs to twist my arm for that :)). " [also – I specifically brought up audits of Sales Quality, Suitability and a slip on my part Integrity. Her only comment was they don't use

---

[2569] MSD-389.

[2570] Julian's ECSFM at No. 435.

[2571] McLinko's ECSFM at No. 435.

Integrity as those issues are referred to [the Head of Corporate Investigations]".

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 436**

On March 4, 2013 Respondent McLinko asked his audit team to put together a presentation in advance of a March 19, 2013 meeting with Carrie Tolstedt and Respondent Russ Anderson. Respondent McLinko directed his team prepare a slide that suggests the Community Bank should consider WFAS as "more of a partner verses an auditor."[2572] The draft PowerPoint presentation that Respondent McLinko's team prepared contained a slide titled "Working Together." The slide stated: "Consider us more a partner than an auditor."[2573]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2574]

**McLinko** did not dispute Enforcement Counsel accurately quoted the cited excerpt from the Exhibit.[2575] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on March 4, 2013 Respondent McLinko asked his audit team to put together a presentation in advance of a March 19, 2013 meeting with Carrie Tolstedt and Respondent Russ Anderson. Respondent McLinko directed his team prepare a slide that suggests the Community Bank should consider WFAS as "more of a partner verses an auditor."[2576] The draft PowerPoint presentation that Respondent McLinko's team prepared contained a slide titled "Working Together." The slide stated: "Consider us more a partner than an auditor."

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 437**

On March 7, 2013, WFAS issued its Community Banking Enterprise Risk Management Assessment ("ERMA") for 2012 ("2012 CB ERMA"), concluding that "risk management within Community Banking is Satisfactory trending toward Strong. . .WFAS's evaluation of risk related to Community Banking focused on Operational Risk with an emphasis on . . . sales quality, regulatory compliance, and reputation impacts." Governance, Culture, and Risk Response and Control were rated Strong. Strategy/Objective Setting and Risk Identification,

---

[2572] MSD-390.

[2573] MSD-390.

[2574] Julian's ECSFM at No. 436.

[2575] McLinko's ECSFM at No. 436.

[2576] MSD-390.

Appellate Case: 25-1079      Page: 515      Date Filed: 05/16/2025 Entry ID: 5517644

Assessment and Analysis were rated Satisfactory.[2577] At the time, ERMA ratings were Strong, Satisfactory, or Weak.[2578]

**Responses:**

**Julian** disputed the claim without disputing the Assessment contained the information as shown here, but averring it "lacked context".[2579] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on March 7, 2013, WFAS issued its Community Banking Enterprise Risk Management Assessment ("ERMA") for 2012 ("2012 CB ERMA"), concluding that "risk management within Community Banking is Satisfactory trending toward Strong. . .WFAS's evaluation of risk related to Community Banking focused on Operational Risk with an emphasis on . . . sales quality, regulatory compliance, and reputation impacts." Governance, Culture, and Risk Response and Control were rated Strong. Strategy/Objective Setting and Risk Identification, Assessment and Analysis were rated Satisfactory.[2580] At the time, ERMA ratings were Strong, Satisfactory, or Weak.

**McLinko** did not dispute the cited evidence includes the quoted language and incorporated Respondent Julian's response.[2581]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 438**

Regarding Culture, the 2012 CB ERMA noted: "The vision and values of Wells Fargo is evident in the Community Banking culture and their key initiatives continue to focus on the customer." Regarding Risk Response and Control, the ERMA noted: "Community Banking risk management, system of controls, and governance processes are adequate and functioning as intended. Controls across Community Banking are well designed to proactively mitigate risk exposures. This includes use of automated controls and robust policies and procedures to governday-to-day activities within the business segments."[2582]

**Responses:**

---

[2577] MSD-373.

[2578] MSD-373 at 1.

[2579] Julian's ECSFM at No. 437.

[2580] MSD-373.

[2581] McLinko's ECSFM at No. 437.

[2582] MSD-373.

Appellate Case: 25-1079    Page: 516    Date Filed: 05/16/2025 Entry ID: 5517644

**Julian** did not dispute the claim, but averred the Statement "lacks necessary context".[2583]  I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko regarding Culture, the 2012 CB ERMA noted: "The vision and values of Wells Fargo is evident in the Community Banking culture and their key initiatives continue to focus onthe customer." Regarding Risk Response and Control, the ERMA noted: "Community Banking risk management, system of controls, and governance processes are adequate and functioning as intended. Controls across Community Banking are well designed to proactively mitigate risk exposures. This includes use of automated controls and robust policies and procedures to governday-to-day activities within the business segments."

**McLinko** did not dispute the cited evidence includes the quoted language and incorporated Respondent Julian's response.[2584]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 439

On September 30, 2013, WFAS issued its audit report on *Community Bank - Household Metrics Reporting*, concluding that "[t]he systemic of internal controls for [Community Bank] – Household Metrics Reporting is **Effective**, with no reportable issues. The scope of this audit included re-performance of key metrics (including cross sell). . . ."[2585]

**Responses:**

Julian did not dispute the claim but averred "the cited evidence does not contain any references to Mr. Julian."[2586]  I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on September 30, 2013, WFAS issued its audit report on *Community Bank - Household Metrics Reporting*, concluding that "[t]he systemic of internal controls for [Community Bank] – Household Metrics Reporting is **Effective**, with no reportable issues. Thescope of this audit included re-performance of key metrics (including cross sell). . . ."

**McLinko** did not dispute the cited evidence includes the quoted language and incorporated

---

[2583] Julian's ECSFM at No. 438.

[2584] McLinko's ECSFM at No. 438.

[2585] MSD-375.

[2586] Julian's ECSFM at No. 439.

Add. 515

Respondent Julian's response.[2587]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 440

On December 2, 2013, WFAS issued its audit report on Community Banking WFCC (Wells Fargo Customer Connection) – Incentive Compensation/Sales Integrity. The report found that "the system of internal controls within WFCC Incentive Compensation and Sales Integrity is Effective, noting no reportable issues."[2588]

**Responses:**

**Julian** responded that the claim was disputed, but did not dispute the claim and instead averred the claim "did not list Mr. Julian" as part of the team that conducted the audit.[2589] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on September 30, 2013, WFAS issued its audit report on Community Bank - Household Metrics Reporting, concluding that "[t]he systemic of internal controls for [Community Bank] – Household Metrics Reporting is Effective, with no reportable issues. The scope of this audit included re-performance of key metrics (including cross sell)".

**McLinko** did not dispute the cited evidence includes the quoted language and incorporated Respondent Julian's response.[2590]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 441

On December 13, 2013, WFAS issued its audit report on *Regional Banking - Sales Quality/ Sales Integrity*. In its report, WFAS concluded that "the system of internal controls with Regional Banking Sales Quality / Sales Integrity is **Effective**. This rating reflects our opinion that controls in place adequately mitigate the risks associated with sales quality allegation, case management, service management and reporting processes. WFAS did identify a moderate rated issue regarding the need to enhance the training notification process; however, this is not a significant control weakness. The scope of our audit also included a design review of the enhanced proactive monitoring and behavioral trend reporting processes. The overall design is

---

[2587] McLinko's ECSFM at No. 439.

[2588] MSD-512.

[2589] Julian's ECSFM at No. 440.

[2590] McLinko's ECSFM at No. 440.

Appellate Case: 25-1079    Page: 518    Date Filed: 05/16/2025 Entry ID: 5517644

deemed adequate . . . ."[2591]

    (a)    On October 29, 2013, WFAS had provided members of the Community Bank with a draft Issue and Recommendation Memo ("Draft I&R") in connection with its RB – Sales Quality / Sales Integrity audit. The Draft I&R and cover email described an issue identified during audit regardingenhancing training notifications and "escalation and increased visibility of repeat sales offenders."[2592] WFAS requested a writtenresponse from Community Bank about the audit issue, setting corrective actions and reasonable target dates to complete them, and designating responsible individuals. Neither the Draft I&R nor cover email requested line edits to the Draft I&R itself.[2593]

    (b)    On November 15, 2013, the Community Bank provided line edits to the 2013 Draft I&R, including edits from Respondent Russ Anderson. (MSD-198). The Draft I&R included language such as "Enhance the training notification process and increased visibility of repeat sales offenders," which was changed to "Enhance the training notification process and increased visibility of second time training notifications."[2594]

    (c)    Respondent Russ Anderson changed "The monthly regional sales reports including metrics on cases resulting in training e-mail does not differentiate between first time and repeat offenders" in the original DraftI&R to "The monthly regional sales reports including metrics on cases resulting in training e-mail notifications does not differentiate between first time and second time training notifications."[2595]

    (d)    The Risk section of the Draft I&R originally read "Failure to properly monitor training e-mail notifications and escalate/report repeat allegationscould lead to inappropriate training practices and increased numbers of repeat offenders of inappropriate sales practices," but Respondent Russ Anderson changed it to "Failure to properly monitor training e-mail notifications and differentiate between first and second time training notifications could lead to inappropriate training practices

---

[2591] MSD-376; Julian Amended Answer ¶¶ 416, 465 McLinko Amended Answer ¶¶ 416, 465.

[2592] MSD-503 at 1, 2.

[2593] MSD-503 at 1, 2.

[2594] MSD-198.

[2595] MSD-198.

           and increased numbers of additional allegations."[2596]

    (e)    WFAS incorporated Respondent Russ Anderson's edits on the Draft I&R into its final audit engagement report on RB – Sales Quality/Sales Integrityissued on December 16, 2013 and its final Issue and Recommendation Memo.[2597]

**Responses:**

**Julian** responded that the claim was disputed, but he did not dispute that the language presented appears in the cited documents; but avers that such evidence includes an audit engagement report that does not list Mr. Julian as part of the WFAS Audit Team that conducted the audit engagement.[2598]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on December 13, 2013, WFAS issued its audit report on *Regional Banking - Sales Quality/ Sales Integrity.* In its report, WFAS concluded as is shown above.

**McLinko** did not dispute the cited evidence includes the quoted language and incorporated Respondent Julian's response.[2599]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 442**

On December 16, 2013, Bart Deese, Respondent McLinko's direct report sent the OCC a presentation summarizing audits WFAS completed in 2013. The presentation was titled "Community Bank and TOG Operations and Team Update." Respondent McLinko was copied on this email and was listed as one of the presenters. Under "2013 Plan Highlights," the comments for the RB - Sales Quality/ Sales Integrity reads: "Report issued on December 16. Rating was Effective. Review included processes related to monitoring and reporting of questionable sales activity. One moderate issue identified related to the need to enhance the training notification process." (MSD-366 at 10). Under "2014 Plan Highlights," the deck lists "CMBK - Cross Sell" as a planned area of audit coverage for 2014.[2600]

---

[2596] MSD-198.

[2597] MSD-376 (not using the term "repeat offenders" or "inappropriate sales practices"); MSD-601.

[2598] Julian's ECSFM at No. 441.

[2599] McLinko's ECSFM at No. 441.

[2600] MSD-366 at 14.

Add. 518

Appellate Case: 25-1079    Page: 520    Date Filed: 05/16/2025    Entry ID: 5517644

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2601]

**McLinko** did not dispute the cited evidence includes the quoted language.[2602] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on December 16, 2013, Bart Deese, Respondent McLinko's direct report sent the OCC a presentation summarizing audits WFAS completed in 2013. The presentation was titled "Community Bank and TOG Operations and Team Update." Respondent McLinko was copied on this email and was listed as one of the presenters. Under "2013 Plan Highlights," the comments for the RB - Sales Quality/ Sales Integrity reads: "Report issued on December 16. Rating was Effective. Review included processes related to monitoring and reporting of questionable sales activity. One moderate issue identified related to the need to enhance the training notification process." (MSD-366 at 10). Under "2014 Plan Highlights," the deck lists "CMBK - Cross Sell" as a planned area of audit coverage for 2014.

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 443

On December 20, 2013, WFAS issued its audit report on *Business Banking Sales, Service, Product Suitability, and Marketing*, which assessed the marketing and product evaluation processes that are managed within [Business Banking] for use by all business bankers within Business Banking and Regional Banking." WFAS concluded that "[t]he system of internal control of this engagement scope is **Effective**. This rating reflects our opinion that the product evaluation, marketing, sales customer set up, customer servicing and user access processes and controls are working effectively to manage risk."[2603]

**Responses:**

**Julian** responded that the claim was disputed, but did not dispute the claim and instead averred the claim "did not list Mr. Julian" as part of the team that conducted the audit.[2604] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on December 20, 2013, WFAS issued its audit report on *Business Banking Sales, Service, Product Suitability, and Marketing*, which assessed the marketing and product evaluation processes that are managed within [Business Banking] for use by all business bankers within Business

---

[2601] Julian's ECSFM at No. 442.

[2602] McLinko's ECSFM at No. 442.

[2603] MSD-518.

[2604] Julian's ECSFM at No. 443.

Appellate Case: 25-1079    Page: 521    Date Filed: 05/16/2025 Entry ID: 5517644

Banking and Regional Banking." WFAS concluded that "[t]he system of internal control of this engagement scope is **Effective**. This rating reflects our opinion that the product evaluation, marketing, sales customer set up, customer servicing and user access processes and controls are working effectively to manage risk."

**McLinko** did not dispute the cited evidence includes the quoted language and incorporated Respondent Julian's response.[2605]


### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 444

Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 444 relies on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[2606] Upon my review of the confidential documents supporting this Statement of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in this Statement of Material Fact.


### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 445

Thereafter the Enterprise Risk Management Committee identified "Sales Conduct, Practices and the Consumer Business Model" for the Board as a "Noteworthy Risk" at least seven times in 2014 and 2015.[2607] Audit updated the Audit and Examination Committee on its activities related to the "Sales Conduct, Practices and the Consumer Business Model" "Noteworthy Risk."[2608] It provided similar reporting to the Operating Committee and the Enterprise Risk Management Committee.[2609]

**Responses:**

**Julian** responded that the claim was disputed, but did not dispute the claim and instead

---

[2605] McLinko's ECSFM at No. 443.

[2606] See 12 C.F.R. § 19.33(b).

[2607] See MSD-395; MSD-396; MSD-532; MSD-533; MSD-534; MSD-535; MSD-536.

[2608] SOF ¶¶ 451, 454, 457-58, 460, 470, 477, 484.

[2609] See, e.g., MSD-536, MSD-719.

Add. 520

Appellate Case: 25-1079    Page: 522    Date Filed: 05/16/2025 Entry ID: 5517644

averred the claim "lacks context".[2610]  I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that the Enterprise Risk Management Committee identified "Sales Conduct, Practices and the Consumer Business Model" for the Board as a "Noteworthy Risk" at least seven times in 2014 and 2015. Audit updated the Audit and Examination Committee on its activities related to the "Sales Conduct, Practices and the Consumer Business Model" "Noteworthy Risk." It provided similar reporting to the Operating Committee and the Enterprise Risk Management Committee.

**McLinko** did not dispute the cited evidence includes the quoted language and incorporated Respondent Julian's response.[2611]


### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 446

Each year, the Bank's Chief Risk Officer and its Director of Human Resources submitted to the Human Resources Committee of the Board a memorandum summarizing the risk assessment processes and risk outcome evaluations that informed their annual incentive compensation recommendations for senior Bank executives, including Head of the Community Bank Carrie Tolstedt. These memoranda were submitted to the CEO and the Human Resources Committee of the Board, and later provided to the OCC. Corporate Human Resources and Corporate Risk explicitly relied on WFAS's work and findings in preparing annual incentive compensation risk memoranda.[2612] Respondent Julian attended meetings regarding the executive compensation year-end risk review.[2613]

**Responses:**

**Julian** responded that the claim was disputed, but did not dispute the claim and instead averred the claim "lacks context".[2614]  I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Julian that each year, the Bank's Chief Risk Officer and its Director of Human Resources submitted to the

---

[2610] Julian's ECSFM at No. 445.

[2611] McLinko's ECSFM at No. 443.

[2612] MSD-412; MSD-433; MSD-456); Julian Amended Answer ¶ 425 (admitting that "Audit provided information in connection with annual incentive compensation risk memoranda and that memoranda were provided to the Human Resources Committee of the Board."); MSD-290B (Loughlin Tr.) at 452:16-23.

[2613] MSD-507 at 2, 4.

[2614] Julian's ECSFM at No. 446.

Appellate Case: 25-1079     Page: 523     Date Filed: 05/16/2025 Entry ID: 5517644

Human Resources Committee of the Board a memorandum summarizing the risk assessment processes and risk outcome evaluations that informed their annual incentive compensation recommendations for senior Bank executives, including Head of the Community Bank Carrie Tolstedt. These memoranda were submitted to the CEO and the Human Resources Committee of the Board, and later provided to the OCC. Corporate Human Resources and Corporate Risk explicitly relied on WFAS's work and findings in preparing annual incentive compensation risk memoranda.[2615] Respondent Julian attended meetings regarding the executive compensation year-end risk review.

**McLinko** incorporated Respondent Julian's response.[2616]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 447

In a February 18, 2014 annual incentive compensation risk memorandum from the Bank's Chief Risk Officer and its Director of Human Resources to the CEO .and the Human Resources Committee of the Board, Carrie Tolstedt received a "Satisfactory" assessment related to Sales Quality Monitoring and there was no adjustment to her compensation. A "Satisfactory" assessment indicated: "No adverse impact from management of risk. The individual has taken steps expected to prevent and manage the risk issues."[2617] The memorandum noted that the Chief Risk Officer's and Director of Human Resources' evaluation of risk outcomes was based, in part, on a "holistic review of audit findings related to the business . . . with a focus on the Unsatisfactory and high-risk Needs Improvement audit issues."[2618]

**Responses:**

**Julian** responded that the claim was disputed, but did not dispute the claim and instead averred the claim lacked evidence that Mr. Julian played any role in the cited assessment.[2619]  I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that in a February 18, 2014 annual incentive compensation risk memorandum from the Bank's Chief

---

[2615] MSD-412; MSD-433; MSD-456); Julian Amended Answer ¶ 425 (admitting that "Audit provided information in connection with annual incentive compensation risk memoranda and that memoranda were provided to the Human Resources Committee of the Board."); MSD-290B (Loughlin Tr.) at 452:16-23.

[2616] McLinko's ECSFM at No. 446.

[2617] MSD-412 at 7.

[2618] MSD-412 at 3.

[2619] Julian's ECSFM at No. 447.

Add. 522

Appellate Case: 25-1079      Page: 524      Date Filed: 05/16/2025 Entry ID: 5517644

Risk Officer and its Director of Human Resources to the CEO and the Human Resources Committee of the Board, Carrie Tolstedt received a "Satisfactory" assessment related to Sales Quality Monitoring and there was no adjustment to her compensation. A "Satisfactory" assessment indicated: "No adverse impact from management of risk. The individual has taken steps expected to prevent and manage the risk issues."[2620] The memorandum noted that the Chief Risk Officer's and Director of Human Resources' evaluation of risk outcomes was based, in part, on a "holistic review of audit findings related to the business . . . with a focus on the Unsatisfactory and high-risk Needs Improvement audit issues."

**McLinko** did not dispute the cited evidence includes the quoted language and incorporated Respondent Julian's response.[2621]


### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 448

On March 31, 2014, WFAS issued a Community Banking Enterprise Risk Management Assessment for 2013 ("2013 CB ERMA"), concluding that "risk management within Community Banking (CB) is **Satisfactory.**" Governance and Culture and Strategy and Objective Setting were rated Strong. Risk Identification, Assessment and Analysis and Risk Response and Control were rated Satisfactory.[2622] At the time, ERMA ratings were Strong, Satisfactory, Needs Improvement, or Weak.[2623]

**Responses:**

**Julian** responded that the claim was disputed, but did not dispute the claim and instead averred the claim lacked "necessary context".[2624] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on March 31, 2014, WFAS issued a Community Banking Enterprise Risk Management Assessment for 2013 ("2013 CB ERMA"), concluding that "risk management within Community Banking (CB) is **Satisfactory.**" Governance and Culture and Strategy andObjective Setting were rated Strong. Risk Identification, Assessment and Analysis and Risk Response and Control were rated Satisfactory.[2625] At

---

[2620] MSD-412 at 7.

[2621] McLinko's ECSFM at No. 447.

[2622] MSD-378.

[2623] MSD-378 at 3.

[2624] Julian's ECSFM at No. 448.

[2625] MSD-378.

Add. 523

the time, ERMA ratings were Strong, Satisfactory, Needs Improvement, or Weak.

**McLinko** did not dispute the cited evidence includes the quoted language and incorporated Respondent Julian's response.[2626]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 449

Regarding culture, the 2013 CB ERMA concluded: "The vision and values of Wells Fargo is also evident in the CB culture. Key initiatives continue to focus on the customer.Expectations regarding the company's ethical culture are frequently communicated and tangibly demonstrated throughout the Community Bank." Regarding performance management (in Risk Response and Control), the ERMA stated: "Community Banking performance measures are appropriately tied to compensations, incentive, and risk. They are aligned with shareholder interests and the long-term profitability of the company."[2627]

**Responses:**

**Julian** responded that the claim was disputed, but did not dispute the claim and instead averred the claim lacked "context".[2628] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that regarding culture, the 2013 CB ERMA concluded: "The vision and values of Wells Fargo is also evident in the CB culture. Key initiatives continue to focus on the customer.Expectations regarding the company's ethical culture are frequently communicated and tangiblydemonstrated throughout the Community Bank." Regarding performance management (in Risk Response and Control), the ERMA stated: "Community Banking performance measures are appropriately tied to compensations, incentive, and risk. They are aligned with shareholder interests and the long-term profitability of the company."

**McLinko** incorporated Respondent Julian's response.[2629]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 450

At an April 29, 2014 meeting, Respondent Julian informed the Board of Directors that there were

---

[2626] McLinko's ECSFM at No. 448.

[2627] MSD-378.

[2628] Julian's ECSFM at No. 449.

[2629] McLinko's ECSFM at No. 449.

Appellate Case: 25-1079    Page: 526    Date Filed: 05/16/2025 Entry ID: 5517644

"no alarming trends or significant issues to discuss with the Board."[2630]

**Responses:**

**Julian** responded that the claim was disputed, but did not dispute the claim and instead averred the claim lacked "context".[2631] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that at an April 29, 2014 meeting, Respondent Julian informed the Board of Directors that there were "no alarming trends or significant issues to discuss with the Board."

**McLinko** incorporated Respondent Julian's response.[2632]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 451

On May 5, 2014, WFAS presented its First Quarter 2014 Summary to the Audit and Examination Committee of the Board. Audit's quarterly report to the Board contained the following update on the "Sales Conduct, Practices and the Consumer Business Model" Noteworthy Risk: "Sales audits are being performed in Wells Fargo Customer Connection and Digital Channels Group in 2014. In addition, an assessment of cross sell audit coverage is included in the Community Banking Audit Plan. Focus of these reviews is on the sales practices and conduct to ensure customers are sold products meeting their financial needs."[2633]

Respondent McLinko and his team reviewed and advised on the language WFAS included in its quarterly reports to the Audit and Examination Committee, including regarding the "Sales Conduct, Practices and the Consumer Business Model" "Noteworthy Risk," and even provided draft language to Respondent Russ Anderson for her review and comment.[2634]

**Responses:**

**Julian** did not dispute that the First Quarter 2014 Summary contains the language shown above.[2635] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on May 5, 2014, WFAS presented its First Quarter

---

[2630] MSD-481 at 6.

[2631] Julian's ECSFM at No. 450.

[2632] McLinko's ECSFM at No. 450.

[2633] MSD-402 at 31.

[2634] See, e.g., MSD-536, MSD-719.

[2635] Julian's ECSFM at No. 451.

Appellate Case: 25-1079     Page: 527     Date Filed: 05/16/2025 Entry ID: 5517644

2014 Summary to the Audit and Examination Committee of the Board. Audit's quarterly report to the Board contained the following update on the "Sales Conduct, Practices and the Consumer Business Model" Noteworthy Risk: "Sales audits are being performed in Wells Fargo Customer Connection and Digital Channels Group in 2014. In addition, an assessment of cross sell audit coverage is included in the Community Banking Audit Plan. Focus of these reviews is on the sales practices and conduct to ensure customers are sold products meeting their financial needs." Respondent McLinko and his team reviewed and advised on the language WFAS included in its quarterly reports to the Audit and Examination Committee, including regarding the "Sales Conduct, Practices and the Consumer Business Model" "Noteworthy Risk," and even provided draft language to Respondent Russ Anderson for her review and comment.

**McLinko** did not dispute the cited evidence includes the quoted language and incorporated Respondent Julian's response.[2636]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 452

On May 9, 2014, WFAS issued an audit report on *Community Banking WFCC (Wells Fargo Customer Connection) – Account Opening/Fulfillment*. The audit rated "the system of internal controls within WFCC Account Opening/Fulfillment is **Effective.** Testing . . . noted no significant concerns or reportable issues."[2637]

**Responses:**

**Julian** responded that the claim was disputed, but did not dispute the claim and instead averred the claim was misleading because it "does not set forth the scope of the cited audit engagement".[2638] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on May 9, 2014, WFAS issued an audit report on *Community Banking WFCC (Wells Fargo Customer Connection) – Account Opening/Fulfillment*. The audit rated "the system of internal controls within WFCC Account Opening/Fulfillment is **Effective.** Testing . . . noted no significant concerns or reportable issues."

**McLinko** did not dispute the cited evidence includes the quoted language and incorporated Respondent Julian's response.[2639]

---

[2636] McLinko's ECSFM at No. 451.

[2637] MSD-513.

[2638] Julian's ECSFM at No. 452.

[2639] McLinko's ECSFM at No. 452.

Appellate Case: 25-1079    Page: 528    Date Filed: 05/16/2025 Entry ID: 5517644

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 453**

On June 27, 2014, WFAS issued an audit report on Community Banking – Digital Channels Group (DCG) – Online Sales & Marketing. The audit concluded that "The system of internal controls within DCG Online Sales and Marketing is Effective. Testing . . . noted no significant concerns or reportable issues."[2640]

**Responses:**

**Julian** responded that the claim was disputed, but did not dispute the claim and instead averred the claim was misleading because it "does not set forth the scope of the cited audit engagement".[2641] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on June 27, 2014, WFAS issued an audit report on Community Banking – Digital Channels Group (DCG) – Online Sales & Marketing. The audit concluded that "The system of internal controls within DCG Online Sales and Marketing is Effective. Testing . . . noted no significant concerns or reportable issues."

**McLinko** did not dispute the cited evidence includes the quoted language and incorporated Respondent Julian's response.[2642]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 454**

Although Respondents Julian and McLinko and WFAS implied to the OCC and the Board that its audits of Wells Fargo Customer Connection (call center) and digital channels (online) were related to its Community Bank sales practices coverage and the "Sales Conduct, Practices and the Consumer Business Model" Noteworthy Risk, these audits were scoped to review Community Bank activities in call centers and online channels, and did not look at salespractices in the Regional Banking branches/stores. In any case, WFAS's audits of these areas were rated **Effective**.[2643]

**Responses:**

**Julian** responded that the claim was disputed, but did not dispute the claim and instead averred the claim was misleading because Enforcement Counsel have presented no

---

[2640] MSD-514.

[2641] Julian's ECSFM at No. 453.

[2642] McLinko's ECSFM at No. 453.

[2643] See MSD-512; MSD-513; and MSD-514.

evidence that audits of Community Bank WFCC (Wells Fargo Customer Connection) – Account Opening/Fulfillment and Community Bank – Digital Channels Group (DCG) – Online Sales & Marketing were related to WFAS's Community Bank sales practices coverage.[2644] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Julian that although Respondents Julian and McLinko and WFAS implied to the OCC andthe Board that its audits of Wells Fargo Customer Connection (call center) and digital channels(online) were related to its Community Bank sales practices coverage and the "Sales Conduct, Practices and the Consumer Business Model" Noteworthy Risk, these audits were scoped to review Community Bank activities in call centers and online channels, and did not look at sales practices in the Regional Banking branches/stores. In any case, WFAS's audits of these areas were rated **Effective**.

**McLinko** disputed that disputed that the documents cited in the Statement in any way indicates that he "implied to the OCC and the Board" that the audits were related to sales practices other than those sales practices specifically identified in the audit reports.[2645] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent McLinko that although he and Respondent Julian and WFAS implied to the OCC and the Board that its audits of Wells Fargo Customer Connection (call center) and digital channels (online) were related to its Community Bank sales practices coverage and the "Sales Conduct, Practices and the Consumer Business Model" Noteworthy Risk, these audits were scoped to review Community Bank activities in call centers and online channels, and did not look at salespractices in the Regional Banking branches/stores. In any case, WFAS's audits of these areas were rated **Effective**.


### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 455

On June 30, 2014, WFAS issued an audit report on *Enterprise Code of Ethics*, thescope of which include the Bank's "tracking and reporting of complaints and violations." The audit was rated **Effective**.[2646]

**Responses:**

**Julian** responded that the claim was disputed, but did not dispute the claim and instead averred the claim was misleading because it does not list Mr. Julian as part of the "WFAS

---

[2644] Julian's ECSFM at No. 454.

[2645] McLinko's ECSFM at No. 454.

[2646] MSD-529 at 2.

Audit Team" that conducted the audit engagement.[2647] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on June 30, 2014, WFAS issued an audit report on *Enterprise Code of Ethics*, thescope of which include the Bank's "tracking and reporting of complaints and violations." The audit was rated **Effective**.

**McLinko** did not dispute the cited evidence includes the quoted language and incorporated Respondent Julian's response.[2648]


### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 456

On August 1, 2014, WFAS issued its audit report on *Community Banking Business Banking Group – Accounting and Finance* audit rated management of compensation processes and controls as **Effective**.[2649]

**Responses:**

**Julian** responded that the claim was disputed, but did not dispute the claim and instead averred the claim was misleading because it does not list Mr. Julian as part of the "WFAS Audit Team" that conducted the audit engagement.[2650] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on August 1, 2014, WFAS issued its audit report on *Community Banking Business Banking Group – Accounting and Finance* audit rated management of compensation processes and controls as **Effective**.

**McLinko** did not dispute the cited evidence includes the quoted language and incorporated Respondent Julian's response.[2651]


### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 457

On August 4, 2014, WFAS presented its Second Quarter 2014 Summary to the Audit and Examination Committee of the Board. Audit's quarterly report to the Board contained the

---

[2647] Julian's ECSFM at No. 455.

[2648] McLinko's ECSFM at No. 455.

[2649] MSD-516 at 2.

[2650] Julian's ECSFM at No. 456.

[2651] McLinko's ECSFM at No. 456.

following update on the "Sales Conduct, Practices and the Consumer Business Model" Noteworthy Risk: "Sales audits were completed within Community Banking in Wells Fargo Customer Connection and the Digital Channels Group. The focus of these reviews was on the sales practices and conduct to ensure customers are sold products meeting their financial needs. Both audits were rated Effective with no reportable issues."[2652]

**Responses:**

**Julian** did not dispute that the report contained the language shown in the Statement.[2653] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on August 4, 2014, WFAS presented its Second Quarter 2014 Summary to the Audit and Examination Committee of the Board. Audit's quarterly report to the Board contained the following update on the "Sales Conduct, Practices and the Consumer Business Model" Noteworthy Risk: "Sales audits were completed within Community Banking in Wells Fargo Customer Connection and the Digital Channels Group. The focus of these reviews was on the sales practices and conduct to ensure customers are sold products meeting their financial needs. Both audits were rated Effective with no reportable issues."

**McLinko** did not dispute the cited evidence includes the quoted language and incorporated Respondent Julian's response.[2654]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 458**

On November 18, 2014, WFAS presented its Third Quarter 2014 Summary to the Audit and Examination Committee of the Board. Audit's quarterly report to the Board contained the following update on the "Sales Conduct, Practices and the Consumer Business Model" Noteworthy Risk: "Sales audits were completed within Community Banking in Wells Fargo Customer Connection and the Digital Channels Group. The focus of these reviews was on the sales practices and conduct to ensure customers are sold products meeting their financial needs. Both audits were rated Effective with no reportable issues."[2655]

**Responses:**

**Julian** did not dispute that the report contained the language shown in the Statement.[2656]

---

[2652] MSD-397 at 52.

[2653] Julian's ECSFM at No. 457.

[2654] McLinko's ECSFM at No. 457.

[2655] MSD-398 at 56.

[2656] Julian's ECSFM at No. 458.

Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on November 18, 2014, WFAS presented its Third Quarter 2014 Summary to the Audit and Examination Committee of the Board. Audit's quarterly report to the Board contained the following update on the "Sales Conduct, Practices and the Consumer Business Model" Noteworthy Risk: "Sales audits were completed within Community Banking in Wells Fargo Customer Connection and the Digital Channels Group. The focus of these reviews was on the sales practices and conduct to ensure customers are sold products meeting their financial needs. Both audits were rated Effective with no reportable issues."

**McLinko** did not dispute the cited evidence includes the quoted language and incorporated Respondent Julian's response.[2657]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 459

On December 16, 2014, WFAS issued its audit report on *Regional Bank - Risk Council*. As explained in the audit report, the "Risk Council is a forum of RB Senior Management that meets on a quarterly basis to discuss operational risk topics and breaches for established Enterprise Key Indicators (EKIs). Root cause and corrective action plans for any EKI breaches are researched and monitored by the Risk Council on a quarterly basis to ensure store banker performance meets established standards." WFAS concluded in its report that "the system of internal controls related to Risk Council organizational structure and EKI monitoring is **Effective**." The report also rated "Originate and Setup Accounts – EKI Monitoring," and rated that process Effective as well.[2658]

**Responses:**

**Julian** responded that the claim was disputed, but did not dispute the claim and instead averred the claim was misleading because it does not list Mr. Julian as part of the "WFAS Audit Team" that conducted the audit engagement.[2659] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on December 16, 2014, WFAS issued its audit report on *Regional Bank - Risk Council*. As explained in the audit report, the "Risk Council is a forum of RB Senior Management that meets on a quarterly basis to discuss operational risk topics and breaches for established Enterprise Key Indicators (EKIs). Root cause and corrective action plans for any EKI breaches are researched and monitored by the Risk

---

[2657] McLinko's ECSFM at No. 458.

[2658] MSD-379.

[2659] Julian's ECSFM at No. 459.

Appellate Case: 25-1079     Page: 533     Date Filed: 05/16/2025 Entry ID: 5517644

Council on a quarterly basis to ensure store banker performance meets established standards." WFAS concluded in its report that "the system of internal controls related to Risk Council organizational structure and EKI monitoring is **Effective**." The report also rated "Originate and Setup Accounts – EKI Monitoring," and rated that process Effective as well.

**McLinko** did not dispute the cited evidence includes the quoted language and incorporated Respondent Julian's response.[2660]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 460

On February 4, 2015, WFAS presented its Fourth Quarter 2014 Summary to the Audit and Examination Committee of the Board. Audit's quarterly report to the Board contained the following update on the "Sales Conduct, Practices and the Consumer Business Model" Noteworthy Risk: "Sales audits were completed within Community Banking in Wells Fargo Customer Connection and the Digital Channels Group as part of the 2014 Community Banking plan. The focus of these reviews was on the sales practices and conduct to ensure customers are sold products meeting their financial needs. Both audits were rated Effective with no reportable issues. In addition, an assessment of cross-sell audit coverage was also completed as part of the plan with no significant additional coverage warranted. A continued focus on sales practices and conduct will continue in 2015 with account opening audits in both Regional Banking and Business Banking."[2661]

**Responses:**

**Julian** did not dispute that the cited Report contains the language presented above.[2662] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on February 4, 2015, WFAS presented its Fourth Quarter 2014 Summary to the Audit and Examination Committee of the Board. Audit's quarterly report to the Board contained the following update on the "Sales Conduct, Practices and the Consumer Business Model" Noteworthy Risk: "Sales audits were completed within Community Banking in Wells Fargo Customer Connection and the Digital Channels Group as part of the 2014 Community Banking plan. The focus of these reviews was on the sales practices and conduct to ensure customers are sold products meeting their financial needs. Both audits were rated Effective with no reportable issues. In addition, an assessment of cross-sell audit coverage was also completed as part of the plan with no significant additional coverage warranted. A continued focus on sales practices and conduct will continue in 2015 with account opening audits in both Regional

---

[2660] McLinko's ECSFM at No. 459.

[2661] MSD-400 at 63.

[2662] Julian's ECSFM at No. 460.

Appellate Case: 25-1079     Page: 534     Date Filed: 05/16/2025 Entry ID: 5517644

Banking and Business Banking."

**McLinko** did not dispute the cited evidence includes the quoted language and incorporated Respondent Julian's response.[2663]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 461

On February 9, 2015, Respondent McLinko and his reports met with OCC examiners of WFAS's Community Bank Sales Coverage. Respondent Russ Anderson attended the meeting as well.[2664] According to OCC examiner Karin Hudson, "Respondent McLinko was unable to respond to many questions around sales practices" at the February 9, 2015 meeting. Additionally, Respondent Russ Anderson interjected during the meeting and stated at the meeting "that the Community Bank group risk function had a 'good partnership with Audit.'"[2665]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2666]

**McLinko** did not dispute the cited evidence includes the quoted language.[2667] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that On February 9, 2015, Respondent McLinko and his reports met with OCC examiners of WFAS's Community Bank Sales Coverage. Respondent Russ Anderson attended the meeting as well.[2668] According to OCC examiner Karin Hudson, "Respondent McLinko was unable to respond to many questions around sales practices" at the February 9, 2015 meeting. Additionally, Respondent Russ Anderson interjected during the meeting and stated at the meeting "that the Community Bank group risk function had a 'good partnership with Audit.'"

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 462

The February 16, 2015 annual incentive compensation risk memorandum from the Bank's Chief Risk Officer and its Director of Human Resources to the CEO and the Human

---

[2663] McLinko's ECSFM at No. 460.

[2664] MSD-185.

[2665] MSD-270 (NBE Hudson Expert Report) at ¶ 25, 30.

[2666] Julian's ECSFM at No. 461.

[2667] McLinko's ECSFM at No. 461.

[2668] MSD-185.

Resources Committee of the Board stated: "As a follow up to issues identified as part of 2013 compensation process for monitoring in 2014, we reviewed the progress against Sales Integrity issue in Community Banking, specifically store level quality processes. We believe appropriate actions were taken to address the issues during the performance year and no compensation adjustment is required for the 2014 cycle."[2669] The memorandum noted that the Chief Risk Officer's and Director of Human Resources' evaluation of risk outcomes was based, in part, on a "holistic review of audit findings related to the business, with a focus on the Unsatisfactory and high-risk Needs Improvement audit issues."[2670]

**Responses:**

**Julian** responded that the claim was disputed, but did not dispute the claim and instead averred Enforcement Counsel have presented no evidence that Mr. Julian participated in drafting annual incentive compensation risk memoranda.[2671] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on February 16, 2015 annual incentive compensation risk memorandum from the Bank's Chief Risk Officer and its Director of Human Resources to the CEO and the Human Resources Committee of the Board stated: "As a follow up to issues identified as part of 2013 compensation process for monitoring in 2014, we reviewed the progress against Sales Integrity issue in Community Banking, specifically store level quality processes. We believe appropriate actions were taken to address the issues during the performance year and no compensation adjustment is required for the 2014 cycle."[2672] The memorandum noted that the Chief Risk Officer's and Director of Human Resources' evaluation of risk outcomes was based, in part, on a "holistic review of audit findings related to the business, with a focus on the Unsatisfactory and high-risk Needs Improvement audit issues."

**McLinko** did not dispute the cited evidence includes the quoted language and incorporated Respondent Julian's response.[2673]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 463**

On February 19, 2015, Respondent McLinko updated Respondent Russ Anderson on another

---

[2669] MSD-433 at 4.

[2670] MSD-433 at 3.

[2671] Julian's ECSFM at No. 462.

[2672] MSD-433 at 4.

[2673] McLinko's ECSFM at No. 460.

Appellate Case: 25-1079     Page: 536     Date Filed: 05/16/2025 Entry ID: 5517644

WFAS meeting with the OCC regarding sales and cross-sell, to provide her with additional perspective. In the update, Respondent McLinko described part of the conversation: "I took that opportunity to tell them (after we had emailed them asking them to go to you) to make all such inquiries specifically relating to Community Bank process with you and your team."[2674]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2675]

**McLinko** did not dispute the cited evidence includes the quoted language.[2676] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on February 19, 2015, Respondent McLinko updated Respondent Russ Anderson on another WFAS meeting with the OCC regarding sales and cross-sell, to provide her with additional perspective. In the update, Respondent McLinko described part of the conversation: "I took that opportunity to tell them (after we had emailed them asking them to go to you) to make all such inquiries specifically relating to Community Bank process with you and your team."

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 464

On March 12, 2015, WFAS issued its 2014 Community Banking Enterprise Risk Management Assessment ("2014 CB ERMA"), concluding again that "[r]isk management for Community Banking (CB) is **Satisfactory**. Community Banking risk management processes and controls are designed to identify, manage, monitor, and report on credit, operational, and compliance risk." Culture and Strategy & Objective Setting were rated Strong. Governance, Risk Response and Control, and Risk Identification, Assessment and Analysis were rated Satisfactory.[2677] At the time, ERMA ratings were Strong, Satisfactory, Needs Improvement, or Weak.[2678]

**Responses:**

**Julian** responded that the claim was disputed, but did not dispute the claim and instead averred the claim lacked "context".[2679] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact.

---

[2674] MSD-399.

[2675] Julian's ECSFM at No. 463.

[2676] McLinko's ECSFM at No. 463.

[2677] MSD-380 at 3.

[2678] MSD-380 at 3.

[2679] Julian's ECSFM at No. 464.

Appellate Case: 25-1079    Page: 537    Date Filed: 05/16/2025 Entry ID: 5517644

Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on March 12, 2015, WFAS issued its 2014 Community Banking Enterprise Risk Management Assessment ("2014 CB ERMA"), concluding again that "[r]isk management for Community Banking (CB) is **Satisfactory**. Community Banking risk management processes andcontrols are designed to identify, manage, monitor, and report on credit, operational, and compliance risk." Culture and Strategy & Objective Setting were rated Strong. Governance, Risk Response and Control, and Risk Identification, Assessment and Analysis were rated Satisfactory.[2680] At the time, ERMA ratings were Strong, Satisfactory, Needs Improvement, or Weak.

**McLinko** did not dispute the cited evidence includes the quoted language and incorporated Respondent Julian's response.[2681]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 465

On March 13, 2015, WFAS issued its audit report on *Enterprise Incentive Compensation*, which concluded compensation processes and the overall system of internal control was **Effective**. In the audit, WFAS had "evaluated the end-to-end processes Wells Fargouses to manage incentive compensation risk. Our scope focused on the ICRM program, key regulatory requirements related to incentive compensation, and [certain] processes put in place."[2682] The audit report also specified that the Community Bank's processes and risks related to managing incentive compensation were effective as well.[2683]

**Responses:**

**Julian** responded that the claim was disputed, but he did not dispute that the language presented appears in the cited documents; but avers that such evidence includes an audit engagement report that does not list Mr. Julian as part of the WFAS Audit Team that conducted the audit engagement.[2684]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on March 13, 2015, WFAS issued its audit report on *Enterprise Incentive Compensation*, which concluded compensation processes and the overall system of internal control was **Effective**. In the

---

[2680] MSD-380 at 3.

[2681] McLinko's ECSFM at No. 464.

[2682] MSD-515 at 3.

[2683] MSD-515 at 14.

[2684] Julian's ECSFM at No. 465.

Appellate Case: 25-1079    Page: 538    Date Filed: 05/16/2025 Entry ID: 5517644

audit, WFAS had "evaluated the end-to-end processes Wells Fargouses to manage incentive compensation risk. Our scope focused on the ICRM program, key regulatory requirements related to incentive compensation, and [certain] processes put in place."[2685] The audit report also specified that the Community Bank's processes and risks related to managing incentive compensation were effective as well.

**McLinko** did not dispute the cited evidence includes the quoted language and incorporated Respondent Julian's response.[2686]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 466

On March 24, 2015 Respondent McLinko emailed his notes from the Community Bank's March Risk Management Committee Meeting to his audit team. One discussion topic was the OCC's examination of the Community Bank's operational risk and cross sell/ sales practices and the Respondent Russ Anderson's expectation to receive a couple MRAs from the OCC. Respondent McLinko also noted, "again, [Carrie Tolstedt] and the management team, was very involved in the meeting as noted above. [Carrie Tolstedt] and team set the tone at the top and their understanding of risk. It also is a clear indication of the risk culture that [Carrie Tolstedt] instill[s] in the [Community Bank]."[2687]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2688]

**McLinko** disputed the Statement is an accurate or complete statement of the cited evidence, averring that "Ms. Tolstedt actively participated in the discussions and emphasized appropriate risk management".[2689] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents McLinko and Julian that on March 24, 2015 Respondent McLinko emailed his notes from the Community Bank's March Risk Management Committee Meeting to his audit team. One discussion topic was the OCC's examination of the Community Bank's operational risk and cross sell/ sales practices and the Respondent Russ Anderson's expectation to receive a couple MRAs from the OCC. Respondent McLinko also noted, "again, [Carrie Tolstedt] and the management team, was very involved in the meeting as noted above. [Carrie Tolstedt] and team set the tone at the top and their

---

[2685] MSD-515 at 3.

[2686] McLinko's ECSFM at No. 465.

[2687] MSD-401.

[2688] Julian's ECSFM at No. 466.

[2689] McLinko's ECSFM at No. 466.

Appellate Case: 25-1079     Page: 539     Date Filed: 05/16/2025 Entry ID: 5517644

understanding of risk. It also is a clear indication of the risk culture that [Carrie Tolstedt] instill[s] in the [Community Bank]."

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 467**

On March 30, 2015 WFAS issued its audit report on *RB – SOCR* (Regional Banking Store Operations Control Review ("SOCR")). In determining annual audit coverage, WFAS leveraged the results of SOCR on-site reviews. WFAS rated the SOCR program **Needs Improvement** because of the accuracy and completeness of program execution and supervisoryreview.[2690] On February 10, 2015, Respondent McLinko had assured Carrie Tolstedtthat the SOCR audit would not be reported to the Board.[2691]

**Responses:**

**Julian** responded that the claim was disputed, but did not dispute the claim and instead averred the claim lacked "context".[2692] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on March 30, 2015 WFAS issued its audit report on *RB – SOCR* (Regional Banking Store Operations Control Review ("SOCR")). In determining annual audit coverage, WFAS leveraged the results of SOCR on-site reviews. WFAS rated the SOCR program **Needs Improvement** because of the accuracy and completeness of program execution and supervisory review.[2693] On February 10, 2015, Respondent McLinko had assured Carrie Tolstedt that the SOCR audit would not be reported to the Board.

**McLinko** did not dispute the cited evidence includes the quoted language and incorporated Respondent Julian's response.[2694]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 468**

Neither the March 30, 2015 RB SOCR audit report nor any other audit report issued during Respondent Julian's and McLinko's tenures before October 2016 identified that: the Bank was opening up large numbers of accounts or services without customer consent; the Bank had a

---

[2690] MSD-520.

[2691] MSD-368.

[2692] Julian's ECSFM at No. 467.

[2693] MSD-520.

[2694] McLinko's ECSFM at No. 467.

Add. 538

systemic problem with sales practices misconduct; the Community Bank's sales goals were unreasonable; there was undue sales pressure in the Community Bank; or the Bank's preventative or detective controls regarding sales practices were unsatisfactory or inadequate.[2695]

**Responses:**

**Julian** responded that the claim was disputed, but did not dispute the claim and instead averred the claim lacked "context".[2696] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Julian that neither the March 30, 2015 RB SOCR audit report nor any other audit report issued during Respondent Julian's and McLinko's tenures before October 2016 identified that: the Bank was opening up large numbers of accounts or services without customer consent; the Bank had a systemic problem with sales practices misconduct; the Community Bank's sales goals were unreasonable; there was undue sales pressure in the Community Bank; or the Bank's preventative or detective controls regarding sales practices were unsatisfactory or inadequate

**McLinko** did not dispute that Mr. Deese gave the testimony cited in the Statement, but averred Mr. Deese "lacked personal knowledge of the subject matter"; and incorporated Respondent Julian's response.[2697] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent McLinko that neither the March 30, 2015 RB SOCR audit report nor any other audit report issued during Respondent Julian's and McLinko's tenures before October 2016 identified that: the Bank was opening up large numbers of accounts or services without customer consent; the Bank had a systemic problem with sales practices misconduct; the Community Bank's sales goals were unreasonable; there was undue sales pressure in the Community Bank; or the Bank's preventative or detective controls regarding sales practices were unsatisfactory or inadequate.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 469**

On May 4, 2015, the Los Angeles City Attorney filed a complaint against the Bank alleging it violated the California Unfair Competition Law, Business and Professional Code § 17200

---

[2695] MSD-638 (Deese Dep. Tr.) 245:22-251:17.

[2696] Julian's ECSFM at No. 468.

[2697] McLinko's ECSFM at No. 468.

Appellate Case: 25-1079      Page: 541      Date Filed: 05/16/2025 Entry ID: 5517644

et seq. by engaging in unlawful sales practices.[2698]

**Responses:**

**Julian** did not dispute the claim.[2699] **McLinko** did not dispute the claim.[2700] Accordingly, the Recommended Decision will include a factual finding as to Respondent Julian that on May 4, 2015, the Los Angeles City Attorney filed a complaint against the Bank alleging it violated the California Unfair Competition Law, Business and Professional Code § 17200 et seq. by engaging in unlawful sales practices.


**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 470**

On May 4, 2015, WFAS presented its First Quarter 2015 Summary to the Audit and Examination Committee of the Board. Audit's quarterly report to the Board contained the following update on the "Sales Conduct, Practices and the Consumer Business Model" Noteworthy Risk: "Sales audits are planned for Regional Banking and Business Banking in 2015. The focus of these reviews is on the sales practices and conduct to ensure customers are sold products meeting their financial needs."[2701]

**Responses:**

**Julian** did not dispute that the referenced report contained the language shown above.[2702] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on May 4, 2015, WFAS presented its First Quarter 2015 Summary to the Audit and Examination Committee of the Board. Audit's quarterly report to the Board contained the following update on the "Sales Conduct, Practices and the Consumer Business Model" Noteworthy Risk: "Sales audits are planned for Regional Banking and Business Banking in 2015. The focus of these reviews is on the sales practices and conduct to ensure customers are sold products meeting their financial needs."

**McLinko** did not dispute the cited evidence includes the quoted language and incorporated Respondent Julian's response.[2703]

---

[2698] Julian Amended Answer ¶¶ 123, 223; McLinko Amended Answer ¶¶ 123, 223.

[2699] Julian's ECSFM at No. 469.

[2700] McLinko's ECSFM at No. 469.

[2701] MSD-634 at 59-60.

[2702] Julian's ECSFM at No. 470.

[2703] McLinko's ECSFM at No. 470.

Add. 540

Appellate Case: 25-1079    Page: 542    Date Filed: 05/16/2025 Entry ID: 5517644

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 471**

In May 2015, the OCC commenced an examination of Enterprise Sales Practices at the Bank, which was prompted by the City of Attorney of Los Angeles lawsuit against the Bank relating to its sales practices. The review "focused on the events in 2013 that led to the initial employee termination, the investigation of employee misconduct that followed, and overall changes in governance intended to improve the bank's practices." (MSD-213). The former Examiner-in-Charge of the Bank explained that the purpose of the May 2015 examination was "to find the truth. We were told being one thing by the bank and management, and we were seeing something else" in the City Attorney of Los Angeles lawsuit.[2704]

**Responses:**

**Julian** responded that the claim was disputed, but did not dispute the claim and instead averred the claim lacked "context".[2705] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that in May 2015, the OCC commenced an examination of Enterprise Sales Practices at the Bank, which was prompted by the City of Attorney of Los Angeles lawsuit against the Bank relating to its sales practices. The review "focused on the events in 2013 that led to the initial employee termination, the investigation of employee misconduct that followed, and overall changes in governance intended to improve the bank's practices." (MSD-213). The former Examiner-in-Charge of the Bank explained that the purpose of the May 2015 examination was "to find the truth. We were told being one thing by the bank and management, and we were seeing something else" in the City Attorney of Los Angeles lawsuit.

**McLinko** incorporated Respondent Julian's response.[2706]


**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 472**

Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 472 relies on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[2707] Upon my review

---

[2704] MSD-302 (Linskens Dep. Tr.) at 147:12-16.

[2705] Julian's ECSFM at No. 471.

[2706] McLinko's ECSFM at No. 471.

[2707] See 12 C.F.R. § 19.33(b).

of the confidential documents supporting this Statement of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in this Statement of Material Fact.

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 473

According to the Bank's former Examiner-in-Charge Bradley Linskens, Respondent Julian delivered a similar message to the OCC around that time. Mr. Linskens testified that: "I do remember a number of meetings that I had with David, and the message thatwe received from him during that period was consistent with the other executives, that it was, you know, rogue employees and -- and that, you know, the bank was working to address it – or had worked to address it. And at that period of time, there was not one executive who was volunteering that it was more significant than a few rogue employees."[2708]

**Responses:**

**Julian** did not dispute that the witness provided testimony as shown above.[2709] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that according to the Bank's former Examiner-in-Charge Bradley Linskens, Respondent Julian delivered a similar message to the OCC around that time. Mr. Linskens testified that: "I do remember a number of meetings that I had with David, and the message thatwe received from him during that period was consistent with the other executives, that it was, you know, rogue employees and -- and that, you know, the bank was working to address it – or had worked to address it. And at that period of time, there was not one executive who was volunteering that it was more significant than a few rogue employees."

**McLinko** incorporated Respondent Julian's response.[2710]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 474

On June 26, 2015, the OCC communicated the results of its May 2015 examination of Enterprise Sales Practices in Supervisory Letter WFC 2015-36 ("SL 2015-36"). SL 2015-36 concluded that "Wells Fargo's management and oversight of Enterprise Sales Practices risk is

---

[2708] MSD-302 (Linskens Dep. Tr.) at 119:3-17.

[2709] Julian's ECSFM at No. 473.

[2710] McLinko's ECSFM at No. 473.

weak and needs to improve."[2711]

**Responses:**

**Julian** responded that the claim was disputed, but did not dispute the claim other than to aver the Letter did not use the term "sales practices misconduct."[2712] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on June 26, 2015, the OCC communicated the results of its May 2015 examination of Enterprise Sales Practices in Supervisory Letter WFC 2015-36 ("SL 2015-36"). SL 2015-36 concluded that "Wells Fargo's management and oversight of Enterprise Sales Practices risk is weak and needs to improve."

**McLinko** incorporated Respondent Julian's response.[2713]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 475**

SL 2015-36 contained five MRAs, covering all three lines of defense: Enterprise Sales Practices - Corporate; Enterprise Sales Practices - Second Line of Defense; Complaints; Community Bank Group - Sales Practices; and Audit Coverage. The Enterprise Sales Practices - Corporate MRA required the Bank to hire an independent third party consultants "to conduct a thorough review of Wells Fargo's approach to Enterprise Sales Practices" and "to ensure all allegations of inappropriate behavior (e.g., gaming, pinning, bundling, etc.) are evaluated and properly remediated."[2714]

**Responses:**

**Julian** did not dispute this claim.[2715] **McLinko** did not dispute this claim.[2716] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that SL 2015-36 contained five MRAs, covering all three lines of defense: Enterprise Sales Practices - Corporate; Enterprise Sales Practices - Second Line of Defense; Complaints; Community Bank Group - Sales Practices; and Audit Coverage. The Enterprise Sales Practices - Corporate MRA required the Bank to hire an independent third party consultants "to conduct a

---

[2711] MSD-213 at 2.

[2712] Julian's ECSFM at No. 474.

[2713] McLinko's ECSFM at No. 474.

[2714] MSD-213 at 3-4, 6-9.

[2715] Julian's ECSFM at No. 475.

[2716] McLinko's ECSFM at No. 475.

thorough review of Wells Fargo's approach to Enterprise Sales Practices" and "to ensure all allegations of inappropriate behavior (e.g., gaming, pinning, bundling, etc.) are evaluated and properly remediated."

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 476**

The concern identified by the OCC in the Community Bank Group - Sales Practices MRA, was that the Community Bank "lacks a formalized governance framework to oversee sales practices and does not have effective oversight and testing of branch (store) sales practices." The MRA explained that inaction "could impact reputation risk and cause customer harm."[2717] The concern identified by the OCC in the Audit Coverage MRA was that "Wells Fargo Audit Services (WFAS) did not identify the issues noted in this Supervisory Letter and past coverage did not provide an enterprise view of sales practices." The MRA explained that inaction "increases compliance, legal, and reputation risks."[2718]

**Responses:**

**Julian** did not dispute that the document cited contained the language shown here.[2719] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that the concern identified by the OCC in the Community Bank Group - Sales Practices MRA, was that the Community Bank "lacks a formalized governance framework to oversee sales practices and does not have effective oversight and testing of branch (store) sales practices." The MRA explained that inaction "could impact reputation risk and cause customer harm."[2720] The concern identified by the OCC in the Audit Coverage MRA was that "Wells Fargo Audit Services (WFAS) did not identify the issues noted in this Supervisory Letter and past coverage did not provide an enterprise view of sales practices." The MRA explained that inaction "increases compliance, legal, and reputation risks."

**McLinko** incorporated Respondent Julian's response.[2721]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 477**

On July 28, 2015, WFAS presented its Second Quarter 2015 Summary to the Audit and Examination Committee of the Board. Audit's quarterly report to the Board contained the

---

[2717] MSD-213 at 8.

[2718] MSD-213 at 8-9.

[2719] Julian's ECSFM at No. 476.

[2720] MSD-213 at 8.

[2721] McLinko's ECSFM at No. 476.

following update on the "Sales Conduct, Practices and the Consumer Business Model" Noteworthy Risk: "Account Opening and Closing audit, which will be prepared in conjunction with Wells Fargo's counsel, is currently in planning. A Business Banking sales audit is planned for later in 2015. The focus of these reviews will be account opening and sales practices. WFAS received one new MRA this quarter related to sales practices. The OCC issued a Supervisory Letter on June 26, 2015, which noted that WFC needs to strengthen the management and oversight of Enterprise Sales Practices (Section 3.9.1). The Supervisory Letter included five MRAs covering all lines of defense, with one MRA directed to WFAS regarding audit coverage of sales practices. The OCC communicated that WFAS needs to reassess its coverage of sales practices at an enterprise level and develop an Enterprise Risk Management Assessment (ERMA) process for sales practices. WFAS is currently reviewing the MRAs to determine how WFAS will respond and how to work with the lines of business in tracking/validating their agreed actions, when defined." "The Regional Banking – Account Opening and Closing audit, which will be prepared in conjunction with Wells Fargo's counsel, is currently in planning. A Business Banking sales audit is planned for later in 2015. The focus of these reviews will be account opening and sales practices.[2722]

**Responses:**

**Julian** disputed that the Statement accurately quoted the referenced report.[2723] Whether the cited language is the same in both the Statement and the supporting document is not a material fact, such that disputing the same will not create a controverted material fact that would prevent granting Enforcement Counsel's summary disposition motion. The Recommended Decision will not, however, include the claim presented in (Julian and McLinko) No. 447 as to Respondents Julian or McLinko, in the absence of evidence warranting such inclusion as may be presented during the hearing.

**McLinko** incorporated Respondent Julian's response.[2724]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 478**

On July 28, 2015, the OCC issued a Notice of Deficiency under 12 C.F.R. Part 30 to the Bank because based on deficiencies and weaknesses in all three lines of defense related to the Bank's compliance risk management program, which Respondents Julian and McLinko

---

[2722] MSD-404 at 61.

[2723] Julian's ECSFM at No. 477.

[2724] McLinko's ECSFM at No. 477.

Appellate Case: 25-1079    Page: 547    Date Filed: 05/16/2025 Entry ID: 5517644

received.[2725] The Part 30 Notice of Deficiency required the Bank to submit a Safety and Soundness Plan to "adequately address all of the deficiencies and weaknesses noted in compliance-related supervisory letters" and must specifically include "[d]evelop[ing] audit programs that test the first lines of defense compliance with high-risk laws and regulations" and "[r]eport[ing] Internal Audit identified deficiencies to the Bank's Audit and Examination Committee, along with the severity of the deficiencies and the corrective actions."[2726]

**Responses:**

**Julian** did not dispute that the Notice of Deficiency contains the quoted language.[2727] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on July 28, 2015, the OCC issued a Notice of Deficiency under 12 C.F.R. Part 30 to the Bank because based on deficiencies and weaknesses in all three lines of defense related to the Bank's compliance risk management program, which Respondents Julian and McLinko received.[2728] The Part 30 Notice of Deficiency required the Bank to submit a Safety and Soundness Plan to "adequately address all of the deficiencies and weaknesses noted in compliance-related supervisory letters" and must specifically include "[d]evelop[ing] audit programs that test the first lines of defense compliance with high-risk laws and regulations" and "[r]eport[ing] Internal Audit identified deficiencies to the Bank's Audit and Examination Committee, along with the severity of the deficiencies and the corrective actions."

**McLinko** incorporated Respondent Julian's response.[2729]


**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 479**

On August 10, 2015, the Bank provided a response to SL 2015-36, which stated that the Bank "recognize[s] the importance of the concerns discussed in the Supervisory Letter to Wells Fargo and its customers."[2730] The response named Respondent McLinko as an accountable executive for the Audit Coverage MRA and stated that WFAS was "committed to maintaining independence and implementing the changes needed to address the concerns noted in the MRA" and "evalu[ating] the current sales practices audit coverage and commit to develop a comprehensive audit approach." WFAS also committed to "engag[ing] with Accenture and PwC to understand the scope of their coverage as it relates to Wells Fargo's approach to

---

[2725] MSD-414 at 1-2.

[2726] MSD-414 at 2-3.

[2727] Julian's ECSFM at No. 478.

[2728] MSD-414 at 1-2.

[2729] McLinko's ECSFM at No. 478.

[2730] MSD-313 at 1.

Add. 546

Appellate Case: 25-1079   Page: 548   Date Filed: 05/16/2025 Entry ID: 5517644

Enterprise Sales Practices and assessing potential customer harm for allegations of inappropriate behavior, respectively. Their review and evaluation will be compared to our current sales practices audit coverage, and enhance coverage where appropriate. WFAS anticipate incorporating the preliminary findings from PWC and Accenture as part of our 2016 audit plan process and will enhance our coverage when additional information is available."[2731]

**Responses:**

**Julian** did not dispute that the Bank's response contains the quoted language.[2732]
**McLinko** did not dispute that the Bank's response contains the quoted language.[2733]
Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on August 10, 2015, the Bank provided a response to SL 2015-36, which stated that the Bank "recognize[s] the importance of the concerns discussed in the Supervisory Letter to Wells Fargo and its customers."[2734] The response named Respondent McLinko as an accountable executive for the Audit Coverage MRA and stated that WFAS was "committed to maintaining independence and implementing the changes needed to address the concerns noted in the MRA" and "evalu[ating] the current sales practices audit coverage and commit to develop a comprehensive audit approach." WFAS also committed to "engag[ing] with Accenture and PwC to understand the scope of their coverage as it relates to Wells Fargo's approach to Enterprise Sales Practices and assessing potential customer harm for allegations of inappropriate behavior, respectively. Their review and evaluation will be compared to our current sales practices audit coverage, and enhance coverage where appropriate. WFAS anticipate incorporating the preliminary findings from PWC and Accenture as part of our 2016 audit plan process and will enhance our coverage when additional information is available."

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 480

The Bank's August 10, 2015 response further stated that "WFAS will be engaged with the various LOBs as they develop and implement corrective actions to the Enterprise Sales Practices MRAs. The scope of WFAS's work will include: issue monitoring and validation, reviewing governance processes and enhanced policy, monitoring of projects/initiatives to enhance Enterprise Sales Practices compliance, and obtaining an understanding of key activities and functions performed to ensure compliance with enterprise sales practices along

---

[2731] MSD-313 at 11; Julian Amended Answer ¶ 418, 467; McLinko Amended Answer ¶¶ 418, 467.

[2732] Julian's ECSFM at No. 479.

[2733] Julian's ECSFM at No. 479.

[2734] MSD-313 at 1.

Add. 547

Appellate Case: 25-1079     Page: 549     Date Filed: 05/16/2025 Entry ID: 5517644

with their sustainability."[2735]

**Responses:**

**Julian** did not dispute that the Bank's response contains the quoted language.[2736]
**McLinko** did not dispute that the Bank's response contains the quoted language.[2737]
Accordingly, the Recommended Decision will include a factual finding as to Respondents
Julian and McLinko that the Bank's August 10, 2015 response further stated that "WFAS
will be engaged with the various LOBs as they develop and implement corrective actions to
the Enterprise Sales Practices MRAs. The scope of WFAS's work will include: issue
monitoring and validation, reviewing governance processes and enhanced policy,
monitoring of projects/initiatives to enhance Enterprise Sales Practices compliance, and
obtaining an understanding of key activities and functions performed to ensure compliance
with enterprise sales practices along with their sustainability."

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 481

On October 21, 2015, Respondents Julian and McLinko received Accenture's Community
Banking Sales Practices Report: Observations and Recommendations ("Accenture Report").[2738]
Accenture's review was primarily comprised of interviews with Bank employees and sales data.
Accenture was clear that its review did **not** include "deep testing of control effectiveness or
exhaustive review of tools and systems; or a large-scale survey distributed to employees."[2739]
Even so, the Accenture Report noted "[a]lthough there are multiple programs in flight to
strengthen controls within the [first line of defense], the [first lineof defense] does not have a
uniform way of evidencing sufficient control over sales practices issues."[2740]

**Responses:**

**Julian** did not dispute that the cited document contains the quoted language but averred the
cited evidence does not establish that Mr. Julian received the Accenture Report.[2741]
Whether Respondent Julian received and reviewed this report is not a material fact, such
that disputing the same will not create a controverted material fact that would prevent

---

[2735] MSD-313 at 11; Julian Amended Answer ¶ 419, 468; McLinko Amended Answer ¶¶ 419, 468.

[2736] Julian's ECSFM at No. 480.

[2737] Julian's ECSFM at No. 480.

[2738] MSD-51.

[2739] MSD-51 at 2.

[2740] MSD-51 at 42.

[2741] Julian's ECSFM at No. 481.

Appellate Case: 25-1079    Page: 550    Date Filed: 05/16/2025 Entry ID: 5517644

granting Enforcement Counsel's summary disposition motion. The Recommended Decision will not, however, include the claim presented in (Julian and McLinko) No. 481 as to Respondent Julian, in the absence of evidence warranting such inclusion as may be presented during the hearing.

**McLinko** did not dispute that the cited document contains the quoted language but disputed as to when he received the Accenture report and disputed that the Statement is an accurate or complete statement of the cited evidence.[2742] When Respondent McLinko received and reviewed this report is not a material fact, such that disputing the same will not create a controverted material fact that would prevent granting Enforcement Counsel's summary disposition motion. The Recommended Decision will not, however, include the claim presented in (Julian and McLinko) No. 481 as to Respondents McLinko, in the absence of evidence warranting such inclusion as may be presented during the hearing.


### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 482

Accenture's top recommendation was to "Review the solution sales goals setting at district/store level, and reward team members based more on positive customer outcomes (e.g., account utilization) with less emphasis on solutions sold."[2743] The report noted that "solution sales goals have not been met since 2013 (even after accounting for adjustments made throughout the year to improve achievement rates)."[2744] The Accenture Report warned of the risk that "[n]egative sales practices may occur due to pressure to meet unreasonable sales targets set by senior management, which could lead to adverse customer impact."[2745]

**Responses:**

**Julian** did not dispute that the Report contains the quoted text.[2746] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that Accenture's top recommendation was to "Review the solution sales goals setting at district/store level, and reward team members based more on positive customer outcomes (e.g., account utilization) with less emphasis on solutions sold." The report noted that "solution sales goals have not been met since 2013 (even after accounting for adjustments made throughout the year to improve achievement rates)." The Accenture Report warned of the risk that "[n]egative sales practices may occur due to pressure to meet unreasonable sales targets set by senior

---

[2742] McLinko's ECSFM at No. 481.

[2743] MSD-51 at 4.

[2744] MSD-51 at 27.

[2745] MSD-51 at 27.

[2746] Julian's ECSFM at No. 482.

management, which could lead to adverse customer impact."

**McLinko** disputed that the Statement is an accurate or complete statement of the cited evidence and incorporated Respondent Julian's response.[2747]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 483

Respondent McLinko testified "in the Accenture report, the volume of interviews that were done, the data that they had gathered on a very large sample of the community bank, they had a very strong basis to come up with their conclusions. So that led me, at least initially to like, there's a systemic issue here, from that perspective."[2748]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2749]

**McLinko** did not dispute that the Statement accurately quoted his testimony, but disputed that he now agrees that the Community Bank had a systemic sales practices misconduct problem.[2750] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that Respondent McLinko testified "in the Accenture report, the volume of interviews that were done, the data that they had gathered on a very large sample of the community bank, they had a very strong basis to come up with their conclusions. So that led me, at least initially to like, there's a systemic issue here, from that perspective."

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 484

On November 17, 2015, WFAS presented its Third Quarter 2015 Summary to the Audit and Examination Committee of the Board. Audit's quarterly report to the Board contained the following update on the "Sales Conduct, Practices and the Consumer Business Model" Noteworthy Risk: "As reported last quarter, the OCC issued a supervisory letter on June 26, 2015, that included five MRAs covering all lines of defense. In 3Q15, Wells Fargo management formally responded to the OCC with actions plans for the five issues which the OCC formally accepted on September 9, 2015. A group within WFAS has been formed to assess and monitor management's remediation efforts across the enterprise. The WFAS

---

[2747] McLinko's ECSFM at No. 482.

[2748] MSD-276 (McLinko Tr.) at 56:8- 19.

[2749] Julian's ECSFM at No. 483.

[2750] McLinko's ECSFM at No. 483.

Appellate Case: 25-1079    Page: 552    Date Filed: 05/16/2025 Entry ID: 5517644

working group, which encompasses all lines of defense audit teams, as well as Risk Management audit teams, has been formed to enhance future audit coverage of Sales Practices, but also of the associated Incentive Compensation, Human Resource, Ethics Line, Complaint Management, and Corporate Investigation functions. A Sales Practices Standard Audit Program is also being created to ensure consistency in audit coverage. In 2017, WFAS will issue the ERMA opinion for Sales Practices for 2016."[2751]

**Responses:**

**Julian** did not dispute that the Summary contains the quoted text.[2752] **McLinko** did not dispute that the Summary contains the quoted text.[2753] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on November 17, 2015, WFAS presented its Third Quarter 2015 Summary to the Audit and Examination Committee of the Board. Audit's quarterly report to the Board contained the following update on the "Sales Conduct, Practices and the Consumer Business Model" Noteworthy Risk: "As reported last quarter, the OCC issued a supervisory letter on June 26, 2015, that included five MRAs covering all lines of defense. In 3Q15, Wells Fargo management formally responded to the OCC with actions plans for the five issues which the OCC formally accepted on September 9, 2015. A group within WFAS has been formed to assess and monitor management's remediation efforts across the enterprise. The WFAS working group, which encompasses all lines of defense audit teams, as well as Risk Management audit teams, has been formed to enhance future audit coverage of Sales Practices, but also of the associated Incentive Compensation, Human Resource, Ethics Line, Complaint Management, and Corporate Investigation functions. A Sales Practices Standard Audit Program is also being created to ensure consistency in audit coverage. In 2017, WFAS will issue the ERMA opinion for Sales Practices for 2016."


### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 485

Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 485 relies on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[2754] Upon my review of the confidential documents supporting this Statement of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect

---

[2751] MSD-405 at 63.

[2752] Julian's ECSFM at No. 484.

[2753] McLinko's ECSFM at No. 484.

[2754] See 12 C.F.R. § 19.33(b).

Add. 551

against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in this Statement of Material Fact.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 486**

In the February 12, 2016, annual incentive compensation risk memorandum from the Bank's Chief Risk Officer and its Director of Human Resources to the CEO and the Human Resources Committee of the Board, sales practices received an Issue Rating of "Improvement Needed" but an "Overall Risk Performance" assessment of "Satisfactory," the highest rating.[2755] The memorandum did not recommend any incentive compensation adjustments for Head of the Community Bank Carrie Tolstedt. The memorandum noted that the Chief Risk Officer's and Director of Human Resources' evaluation of risk outcomes was based, in part, on a "holistic review of audit findings related to the business, with a focus on the Unsatisfactory and high-risk Needs Improvement audit issues."[2756]

**Responses:**

**Julian** did not dispute that the Summary contains the quoted text.[2757] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that in the February 12, 2016, annual incentive compensation risk memorandum from the Bank's Chief Risk Officer and its Director of Human Resources to the CEO and the Human Resources Committee of the Board, sales practices received an Issue Rating of "Improvement Needed" but an "Overall Risk Performance" assessment of "Satisfactory," the highest rating.[2758] The memorandum did not recommend any incentive compensation adjustments for Head of the Community Bank Carrie Tolstedt. The memorandum noted that the Chief Risk Officer's and Director of Human Resources' evaluation of risk outcomes was based, in part, on a "holistic review of audit findings related to the business, with a focus on the Unsatisfactory and high-risk Needs Improvement audit issues."

**McLinko** did not dispute that the Summary contains the quoted text and incorporated Respondent Julian's Response.[2759]

---

[2755] MSD-456 at 8, 13.

[2756] MSD-456 at 2.

[2757] Julian's ECSFM at No. 486.

[2758] MSD-456 at 8, 13.

[2759] McLinko's ECSFM at No. 486.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 487**

Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 487 relies on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[2760] Upon my review of the confidential documents supporting this Statement of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in this Statement of Material Fact.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 488**

Also on March 18, 2016, WFAS issued its Community Banking Enterprise Risk Management Assessment for 2015 ("2015 CB ERMA"), concluding yet again that "Enterprise Risk Management [] for Community Banking [] is Satisfactory." Strategy and Objective Setting, Governance, Culture, Risk Identification, Assessment, and Analysis, and Risk Control and Response were all rated Satisfactory. At the time, ERMA ratings were Satisfactory, Needs Improvement, or Weak, i.e. Satisfactory was the highest possible rating at the time.[2761]

**Responses:**

**Julian** did not dispute that the quoted language appears in the cited Assessment.[2762] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on March 18, 2016, WFAS issued its Community Banking Enterprise Risk Management Assessment for 2015 ("2015 CB ERMA"), concluding yet again that "Enterprise Risk Management [] for Community Banking [] is Satisfactory." Strategy and Objective Setting, Governance, Culture, Risk Identification, Assessment, and Analysis, and Risk Control and Response were all rated Satisfactory. At the time, ERMA ratings were Satisfactory, Needs Improvement, or Weak, i.e. Satisfactory was the highest possible rating at the time.

---

[2760] See 12 C.F.R. § 19.33(b).

[2761] MSD-384 at 1.

[2762] Julian's ECSFM at No. 488.

**McLinko** incorporated Respondent Julian's Response.[2763]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 489**

With respect to Culture, the 2015 CB ERMA noted that "actions are underway to strengthen sales practices across all channels by fostering a culture that only needs-based and value-add product and service solutions are delivered to customers. Efforts include assessing solutions goals and customer outcomes, enhanced vision and values assessments/reinforcement, additional training, enhanced Ethics Line procedures and cultural benchmark/monitoring." The 2015 CB ERMA also noted that "management is expanding sales practices oversight in areas such as enhanced reporting, trending, ethics line procedures, training and risk management (e.g., Regional Services, RB Compliance and Operational Risk, and Sales & Service Conduct Oversight teams, Conduct Risk Committee, etc.)."[2764]

On March 9, 2016, Respondent McLinko had provided Carrie Tolstedt with a copy of the final draft 2015 CB ERMA. He told her: "While many groups talk about risk management, you and your team live it, which is demonstrated in the many ways that are highlighted in the assessment."[2765]

**Responses:**

**Julian** did not dispute that the quoted text appears in the cited report.[2766] Accordingly, the Recommended Decision will include a factual finding as to Respondent Julian that With respect to Culture, the 2015 CB ERMA noted that "actions are underway to strengthen sales practices across all channels by fostering a culture that only needs-based and value-add product and service solutions are delivered to customers. Efforts include assessing solutions goals and customer outcomes, enhanced vision and values assessments/reinforcement, additional training, enhanced Ethics Line procedures and cultural benchmark/monitoring." The 2015 CB ERMA also noted that "management is expanding sales practices oversight in areas such as enhanced reporting, trending, ethics line procedures, training and risk management (e.g., Regional Services, RB Compliance and Operational Risk, and Sales & Service Conduct Oversight teams, Conduct Risk Committee, etc.)."[2767]

To the extent this paragraph relates to Mr. McLinko's Amended Answer, Julian incorporated

---

[2763] McLinko's ECSFM at No. 488.

[2764] MSD-384.

[2765] McLinko Amended Answer ¶ 470; MSD-387.

[2766] Julian's ECSFM at No. 489.

[2767] MSD-384.

Appellate Case: 25-1079     Page: 556     Date Filed: 05/16/2025 Entry ID: 5517644

Respondent McLinko's Response.[2768]

**McLinko** did not dispute that the cited documents contain the quoted language.[2769] Accordingly, the Recommended Decision will include a factual finding as to Respondent McLinko that with respect to Culture, the 2015 CB ERMA noted that "actions are underway to strengthen sales practices across all channels by fostering a culture that only needs-based and value-add product and service solutions are delivered to customers. Efforts include assessing solutions goals and customer outcomes, enhanced vision and values assessments/reinforcement, additional training, enhanced Ethics Line procedures and cultural benchmark/monitoring." The 2015 CB ERMA also noted that "management is expanding sales practices oversight in areas such as enhanced reporting, trending, ethics line procedures, training and risk management (e.g., Regional Services, RB Compliance and Operational Risk, and Sales & Service Conduct Oversight teams, Conduct Risk Committee, etc.)."

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 490

On April 21, 2016, Respondent McLinko informed Respondent Russ Anderson that his "regulator meeting to discuss the 2016 audit plan was a non-event. We discussed my sales practices audit validation coverage in some detail, along with ERMA (the area where the topic of Risk Culture has been raised). [An OCC examiner] asked the most questions, but nothing on the culture front. I'd appreciate it if you don't mention audit and the risk culture topic together when and if you approach the subject with the regulators."[2770]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2771]

**McLinko** disputed that the Statement was an accurate or complete statement of the cited evidence, averring the full statement is as follows:

> Hi Claudia,
>
> Not sure if you traveled home yet or not, but if you did, hope it was a good flight. If not, safe travels.
>
> My regulator meeting to discuss the 2016 audit plan was a non-event. We discussed my sales practices audit validation coverage in some detail, along with ERMA (the area where the topic of Risk Culture has been raised). Chris Mosses asked the most

---

[2768] Julian's ECSFM at No. 489.

[2769] McLinko's ECSFM at No. 489.

[2770] McLinko Amended Answer ¶ 471; MSD-407.

[2771] Julian's ECSFM at No. 490.

questions, but nothing on the culture front. They continue to be very interested in complaints and ethics line, the rollout, the data, and what is done with that data. Chris indicated that she thought she was meeting with you next week. If so, I'm sure the topics will come up. Jenny asked a few questions, but more on my FTE count and some specifics on my plan.

It just hit me that you and Carrie meet with regulators monthly and culture doesn't come up and I meet with them bimonthly and sometimes in between and the topic is not specifically raised with me (I hear it from my peers). Wonder what that is about?

That's the low lights. I'd appreciate it if you don't mention audit and the risk culture topic together when and if you approach the subject with the regulators.[2772]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on April 21, 2016, Respondent McLinko sent the following email message to Respondent Russ Anderson:

Hi Claudia,

Not sure if you traveled home yet or not, but if you did, hope it was a good flight. If not, safe travels.

My regulator meeting to discuss the 2016 audit plan was a non-event. We discussed my sales practices audit validation coverage in some detail, along with ERMA (the area where the topic of Risk Culture has been raised). Chris Mosses asked the most questions, but nothing on the culture front. They continue to be very interested in complaints and ethics line, the rollout, the data, and what is done with that data. Chris indicated that she thought she was meeting with you next week. If so, I'm sure the topics will come up. Jenny asked a few questions, but more on my FTE count and some specifics on my plan.

It just hit me that you and Carrie meet with regulators monthly and culture doesn't come up and I meet with them bimonthly and sometimes in between and the topic is not specifically raised with me (I hear it from my peers). Wonder what that is about?

That's the low lights. I'd appreciate it if you don't mention audit and the risk culture topic together when and if you approach the subject with the regulators.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 491**

---

[2772] McLinko's ECSFM at No. 490, quoting MSD-407.

On July 18, 2016, the OCC communicated the findings from its ongoing review of sales practices at the Bank in Supervisory Letter WFC 2016-36 ("SL 2016-36"), which Respondents Julian and McLinko received.[2773] SL 2016-36 noted that since the issuance of SL 2015-36, the OCC "reviewed additional reports and material prepared by the Bank and third-party consultants as part of our ongoing supervision. . . One of our objectives in reviewing these materials was to determine whether the findings identified instances of unsafe or unsound banking practices. Based on our ongoing review, we have concluded that the Bank's risk management of its sales practices and its sales practices themselves are unsafe or unsound."[2774]

**Responses:**

**Julian** did not dispute that the Letter contains the quoted language.[2775]  Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on July 18, 2016, the OCC communicated the findings from its ongoing review of sales practices at the Bank in Supervisory Letter WFC 2016-36 ("SL 2016-36"), which Respondents Julian and McLinko received.[2776] SL 2016-36 noted that since the issuance of SL 2015-36, the OCC "reviewed additional reports and material prepared by the Bank and third-party consultants as part of our ongoing supervision. . . One of our objectives in reviewing these materials was to determine whether the findings identified instances of unsafe or unsound banking practices. Based on our ongoing review, we have concluded that the Bank's risk management of its sales practices and its sales practices themselves are unsafe or unsound."

**McLinko** incorporated Respondent Julian's Response.[2777]


**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 492 (see Russ Anderson No. 447)**


**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 493**

The OCC informed the Bank in SL 2016-36 that the "inappropriate sales practices and the lack of adequate risk management over the sales practices referenced in this letter are considered unsafe or unsound banking practices, and the OCC is considering formal

---

[2773] MSD-342 at 1.

[2774] MSD-342 at 2.

[2775] Julian's ECSFM at No. 491.

[2776] MSD-342 at 1.

[2777] McLinko's ECSFM at No. 491.

Appellate Case: 25-1079      Page: 559      Date Filed: 05/16/2025 Entry ID: 5517644

enforcement action against the Bank."[2778]

**Responses:**

**Julian** did not dispute that the Letter contains the quoted text.[2779] **McLinko** did not dispute that the Letter contains the quoted text.[2780] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that OCC informed the Bank in SL 2016-36 that the "inappropriate sales practices and the lack of adequate risk management over the sales practices referenced in this letter are considered unsafe or unsound banking practices, and the OCC is considering formal enforcement action against the Bank."

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 494

On July 18, 2016, the same day as the OCC issued SL 2016-36 communicating to the Bank that its sales practices and sales practices risk management were unsafe or unsound, Respondent McLinko wrote to Carrie Tolstedt, "congratulations on your retirement. You have been a wonderful partner with WFAS. It's rare to find a business leader who takes risk management as seriously as you do. I've been lucky to work with one of the best; that being you. I, and Wells Fargo, will miss all that you bring on a day to day basis; but also know that I am very happy for you. Keep wearing the Wells Fargo Stagecoach pin."[2781]

**Responses:**

**Julian** did not dispute that the email contains the quoted text.[2782] **McLinko** did not dispute that the email contains the quoted text.[2783] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on July 18, 2016, the same day as the OCC issued SL 2016-36 communicating to the Bank that its sales practices and sales practices risk management were unsafe or unsound, Respondent McLinko wrote to Carrie Tolstedt, "congratulations on your retirement. You have been a wonderful partner with WFAS. It's rare to find a business leader who takes risk management as seriously as you do. I've been lucky to work with one of the best; that being you. I, and Wells Fargo, will miss all that you bring on a day to day basis; but also know that I am very happy for you. Keep wearing the Wells Fargo Stagecoach pin."

---

[2778] MSD-342 at 7; Julian Amended Answer ¶ 131; McLinko Amended Answer ¶ 131.

[2779] Julian's ECSFM at No. 493.

[2780] McLinko's ECSFM at No. 493.

[2781] McLinko Amended Answer ¶ 470; MSD-409.

[2782] Julian's ECSFM at No. 494.

[2783] McLinko's ECSFM at No. 494.

To the extent the Statement relates to Mr. McLinko's Amended Answer, Julian incorporated Respondent McLinko's Response.[2784]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 495**

On September 7, 2016, Respondent McLinko's direct report asked him whether sales practices was classified as a high risk area. Respondent McLinko replied, "Nope, not even sure who makes that classification." After discussion about whether sales practices would be considered a high risk area, Respondent McLinko stated: "the short answer is I don't see how it can't have a high risk classification, given the impact on the company and the regulatory interest."[2785]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2786]

**McLinko** did not dispute the cited documents contained the language quoted in the Statement.[2787] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on September 7, 2016, Respondent McLinko's direct report asked him whether sales practices was classified as a high risk area. Respondent McLinko replied, "Nope, not even sure who makes that classification." After discussion about whether sales practices would be considered a high risk area, Respondent McLinko stated: "the short answer is I don't see how it can't have a high risk classification, given the impact on the company and the regulatory interest."

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 496**

On September 8, 2016, the OCC issued a consent order and assessed a $35,000,000 civil money penalty to the Bank for deficiencies and unsafe or unsound practices in the Bank's risk management and oversight of the Bank's sales practices, and unsafe or unsound sales practices by the Bank.[2788]

**Responses:**

---

[2784] Julian's ECSFM at No. 494.

[2785] MSD-362.

[2786] Julian's ECSFM at No. 495.

[2787] McLinko's ECSFM at No. 495.

[2788] MSD-343.

**Julian** did not dispute the factual claim in this Statement.[2789] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that September 8, 2016, the OCC issued a consent order and assessed a $35,000,000 civil money penalty to the Bank for deficiencies and unsafe or unsound practices in the Bank's risk management and oversight of the Bank's sales practices, and unsafe or unsound sales practices by the Bank.

**McLinko** incorporated Respondent Julian's Response.[2790]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 497 (see (Julian and McLinko No. 496)**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 498 (see Russ Anderson No. 450)**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 499 (see Russ Anderson No. 451)**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 500**

In the Sales Practices Consent Order, the Comptroller further found that by reason of the unsafe or unsound sales practices and unsafe or unsound practices in the Bank's risk management and oversight of the Bank's sales practices, "the Bank engaged in reckless unsafe or unsound banking practices that were part of a pattern of misconduct."[2791]

**Responses:**

**Julian** did not dispute the factual claim in this Statement.[2792] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that in the Sales Practices Consent Order, the Comptroller further found that by reason of the unsafe or unsound sales practices and unsafe or unsound practices in the Bank's risk management and oversight of the Bank's sales practices, "the Bank engaged in reckless unsafe or unsound banking practices that were part of a pattern of misconduct."

**McLinko** incorporated Respondent Julian's Response.[2793]

---

[2789] Julian's ECSFM at No. 496.

[2790] McLinko's ECSFM at No. 496.

[2791] MSD-343 at 3.

[2792] Julian's ECSFM at No. 500.

[2793] McLinko's ECSFM at No. 500.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 501**

The Sales Practices Consent Order contained actionable articles covering an Enterprise-Wide Risk Review of Sales Practices Risk, an Enterprise-Wide Sales Practices Risk Management and Oversight Program, an Enterprise Complaints Management Policy, Internal Audit, and Customer Reimbursement.[2794]

**Responses:**

**Julian** did not dispute the factual claim in this Statement.[2795] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that the Sales Practices Consent Order contained actionable articles covering an Enterprise-Wide Risk Review of Sales Practices Risk, an Enterprise-Wide Sales Practices Risk Management and Oversight Program, an Enterprise Complaints Management Policy, Internal Audit, and Customer Reimbursement.

**McLinko** incorporated Respondent Julian's Response.[2796]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 502**

On September 11, 2016, Respondent Julian emailed WFAS's Executive Audit Directors, including Respondent McLinko, asking, "How would we answer the question[:] What has WFAS done to determine if we have sales practices issue in the other businesses?" Several of the Executive Audit Directors responded, including Respondent McLinko, who described, not WFAS activities completed before 2016, but the development of the 2016 sales practices coverage strategy.[2797]

**Responses:**

**Julian** did not dispute the factual claim in this Statement.[2798] Accordingly, the Recommended Decision will include a factual finding as to Respondent Julian that on September 11, 2016, Respondent Julian emailed WFAS's Executive Audit Directors, including Respondent McLinko, asking, "How would we answer the question[:] What has WFAS done to determine if we have sales practices issue in the other businesses?" Several of the Executive Audit Directors responded, including Respondent McLinko, who described, not WFAS activities completed before 2016, but the development of the 2016

---

[2794] MSMSD-469.D-343.

[2795] Julian's ECSFM at No. 501.

[2796] McLinko's ECSFM at No. 501.

[2797] MSD-469.

[2798] Julian's ECSFM at No. 502.

Add. 561

Appellate Case: 25-1079    Page: 563    Date Filed: 05/16/2025 Entry ID: 5517644

sales practices coverage strategy

**McLinko** disputed that the Statement was accurate or complete, averring that "[f]ollowing up on another auditor's response, Mr. McLinko states:

> David,
>
> Mark provided a well-rounded response to your questions. We have a centralized working group that is coordinating our coverage of Sales Practices. Kathy Sheng is leading that group and it included representatives from all LOB audit teams, as well as teams that cover Internal Investigations, Ethics Line and Compensation. We've developed sales practices coverage strategy for 2016 (which will be updated in response to the CO) as well as a Sales Practices Standard Audit Program which all teams all [sic] using to test sales practices. In addition, and like Mark indicated, all teams are in the initial stages of using the complaints data (is a large complaints initiative at the top of the house) to target testing.
>
> In my absence, Kathy Sheng for the overall sales practices project, and Bart Deese for Community Banking are the key contacts.
>
> Let me know if you have other questions.[2799]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent McLinko that on September 11, 2016, Respondent Julian emailed WFAS's Executive Audit Directors, including Respondent McLinko, asking, "How would we answer the question[:] What has WFAS done to determine if we have sales practices issue in the other businesses?" Several of the Executive Audit Directors responded, including Respondent McLinko, who described, not WFAS activities completed before 2016, but the development of the 2016 sales practices coverage strategy. In response to another auditor's inquiry, Mr. McLinko stated:

> David,
>
> Mark provided a well-rounded response to your questions. We have a centralized working group that is coordinating our coverage of Sales Practices. Kathy Sheng is leading that group and it included representatives from all LOB audit teams, as well as teams that cover Internal Investigations, Ethics Line and Compensation. We've developed sales practices coverage strategy for 2016 (which will be updated in response to the CO) as well as a Sales Practices Standard Audit Program which all teams all [sic] using to test sales practices. In addition, and like Mark indicated, all teams are in the initial stages of using the complaints data (is a large complaints initiative at the top of the house) to target testing.

---

[2799] McLinko's ECSFM at No. 502, quoting MSD-469 at -624.

In my absence, Kathy Sheng for the overall sales practices project, and Bart Deese for Community Banking are the key contacts.

Let me know if you have other questions.

## Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 503

On September 12, 2016, Respondent Julian asked in the same email chain, "I could use some help with this question: Where was audit while this [sales practices] activity was taking place? To be honest, I'm not sure how to answer this but am sure the AE Committee will and should be asking. Any thoughts would be welcomed."[2800]

**Responses:**

**Julian** did not dispute the factual claim in this Statement.[2801] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on September 12, 2016, Respondent Julian asked in the same email chain, "I could use some help with this question: Where was audit while this [sales practices] activity was taking place? To be honest, I'm not sure how to answer this but am sure the AE Committee will and should be asking. Any thoughts would be welcomed."

**McLinko** incorporated Respondent Julian's Response.[2802]

## Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 504

On September 12, 2016, Respondent McLinko responded, describing WFAS's reliance on the Community Bank's SOCR program; and, after WFAS failed SOCR's review documentation, the addition of an account opening audit in the 2015 audit plan.[2803]

**Responses:**

**Julian** did not dispute that Respondent McLinko responded as shown, other than to aver this "does not provide the full context" of the response.[2804] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Julian

---

[2800] MSD-469; Julian Amended Answer ¶ 435, 472; McLinko Amended Answer ¶ 435, 472.

[2801] Julian's ECSFM at No. 503.

[2802] McLinko's ECSFM at No. 503.

[2803] MSD-469; MSD-364.

[2804] Julian's ECSFM at No. 504.

that on September 12, 2016, Respondent McLinko responded, describing WFAS's reliance on the Community Bank's SOCR program; and, after WFAS failed SOCR's review documentation, the addition of an account opening audit in the 2015 audit plan.

**McLinko** incorporated Respondent Julian's Response[2805] and disputed that the quoted text is an accurate or complete statement of the cited evidence, averring the following is the complete statement of the cited evidence:

> My response is related to the Stores as in the Call Centers, all Sales are recorded, which gives us the ability to select samples of sales from the recordings and test for consent, etc.

> Regarding the Stores:

- In many ways, we have leveraged the Store Operations Control Review (SOCR) which ispart: of the 1LOD. SOCR goes into every store every year and performs a variety of functions, one being a review of account opening documentation and signatures. Every two years we test: the program by going into a sample of stores and re-performing the work the SOCR team does. Several years back we raised a moderate rated issues as it relates to the documentation supporting the process (not that they weren't performing the work). Audit validation of the corrective actions failed the issue and at that time we raised it to a high rated issue.

- Because of that: fail, we added an account opening audit: to our plan in 2015. We announced the audit: and then the LA lawsuit happened. As a result, the scope of theaudit was changed and put under ACP.

- We have also tested for new account documentation in an audit called Deposit Products Support Services. This audit would review for account documentation and customer signature.

- We have also tested the Sales and Services Conduct Oversight Team, which is the groupthat was part: of researching the sales practices issues back in 2013. That led to the investigation and subsequent TM firings; that led to the LA lawsuit.

- In 2014, we tested incentive plans in coordination with Andrew's team, During that audit we tested: Customer Connection (WFCC), Personal Banker 1/Assistant Store Mgr. (Regional Banking), and RBPB/Private Banker (Regional Banking) incentive plans.

---

[2805] McLinko's ECSFM at No. 504.

Add. 564

Appellate Case: 25-1079    Page: 566    Date Filed: 05/16/2025 Entry ID: 5517644

In short, over the years, we have relied on the SOCR program. Once we failed the SOCRissue validation, during annual audit planning in 2014, we added a Regional Banking account opening audit to the 2015 audit plan which is mentioned above.

In addition:

- As you're aware, complaints has been an issue at the top of the house with continued rollout of the program, thus we're beginning to be able to utilize that: information (which was also part of our response to the MRA).

- The new technology that captures customer consent for deposits, credit: cards and unsecured lines of credit just: went live recently which we are testing as part of the IVRA validation.

- A retrospective review for this topic was performed in response to the OCC MRA's. In a nutshell this covers what we've done.[2806]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent McLinko that on September 12, 2016, Respondent McLinko responded as shown above, describing WFAS's reliance on the Community Bank's SOCR program; and, after WFAS failed SOCR's review documentation, the addition of an account opening audit in the 2015 audit plan.


**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 505**

Another Executive Audit Director responded with some suggestions for moving forward and Respondent Julian replied, "I will really need to respond to 'where was Audit' and while I'd like to be able to say we tested for activity like this, specifically in the Community Bank, I don't think we did."[2807]

**Responses:**

**Julian** did not dispute the email had the quoted text.[2808] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that another Executive Audit Director responded with some suggestions for moving forward and Respondent

---

[2806] McLinko's ECSFM at No. 504, quoting MSD-364 at -513-514.

[2807] MSD-469.

[2808] Julian's ECSFM at No. 505.

Appellate Case: 25-1079    Page: 567    Date Filed: 05/16/2025 Entry ID: 5517644

Julian replied, "I will really need to respond to 'where was Audit' and while I'd like to be able to say we tested for activity like this, specifically in the Community Bank, I don't think we did."

**McLinko** incorporated Respondent Julian's Response.[2809]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 506**

On September 12, 2016, after receiving Respondent Julian's question ,"Where was audit while this [sales practices] activity was taking place?," Respondent McLinko sent an instant message to two of his direct reports asking, "have we audited new account opening in the past as to customer consent?" His direct reports responded that the first account opening audit in branches occurred in 2016. Respondent McLinko stated: "something doesn't add up. [W]e added the account opening audit to the plan in 2015. [I] would have thought we knew earlier."[2810]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2811]

**McLinko** disputed the Statement provided an accurate or complete statement of the cited evidence.[2812] He described the "relevant exchange" as shown here:

> McLinko, Paul M [10:50 AM]:
>
> when did we fail the SOCR validation and move it to a high
>
> if you can't tell, David is being asked where was audit during this time.
>
> McCadney, Regina D. [10:50 AM]:
>
> I figured that would come up ...
>
> let me check the date ... it was the last audit
>
> The March 30, 2015 audit was closed with a NI rating and High issue.
>
> Mclinko, Paul M [10:53 AM]:
>
> something doesn't add up. we added the account opening audit to the plan in 2015. i would have thought we knew earlier.

---

[2809] McLinko's ECSFM at No. 505.

[2810] MSD-345.

[2811] Julian's ECSFM at No. 506.

[2812] McLinko's ECSFM at No. 506.

McCadney, Regina D. [10:54 AM]:

We knew there were issues with SOCR from the first two times they had to make changes to the corrective action ... so when I became a SAM we started looking at the coverage and looked for ways to add coverage outside of SOCR ... that is where the RB Account Opening and Wire CCA came from. . .[2813]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on September 12, 2016, after receiving Respondent Julian's question, "Where was audit while this [sales practices] activity was taking place?," Respondent McLinko sent an instant message to two of his direct reports as shown above, asking, "have we audited new account opening in the past as to customer consent?" His direct reports responded that the first account opening audit in branches occurred in 2016. Respondent McLinko stated: "something doesn't add up. [W]e added the account opening audit to the plan in 2015. [I] would have thought we knew earlier."

## Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 507

Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 507 relies on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[2814] Upon my review of the confidential documents supporting this Statement of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in this Statement of Material Fact.

## Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 508

On November 8, 2016, Respondent Julian was interviewed by Shearman & Sterling LLP on behalf of the Oversight Committee of the Board of Directors.[2815] According to the notes from

---

[2813] McLinko's ECSFM at No. 506, quoting MSD-345 at -311-312.

[2814] See 12 C.F.R. § 19.33(b).

[2815] MSD-501.

Appellate Case: 25-1079    Page: 569    Date Filed: 05/16/2025 Entry ID: 5517644

the November 8, 2016 interview, Respondent Julian "stated that Audit first became aware of the need to plan additional audits around [Community Bank's] sales practice controls in [Community Bank] in late 2013, shortly before the L.A. Times article was published. Audit's awareness arose in part from data showing an increasing number of sales practice-related issues."[2816] "He was, however, unaware of SAR and EthicsLine metrics related to sales practices having resulted in a change to any particular audit's scope."[2817] "He also stated that he was unaware of Audit having conducted any audit into the ways incentivecompensation policies had motivated lower level team members."[2818] According to the interview notes, Respondent Julian stated that "To the extent Audit had failed to review issues orfunctions that it should have, he said, this was Audit's responsibility."[2819]

**Responses:**

**Julian** did not dispute that the referenced notes include the quoted text.[2820] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on November 8, 2016, Respondent Julian was interviewed by Shearman & Sterling LLP on behalf of the Oversight Committee of the Board of Directors. According to the notes from the November 8, 2016 interview, Respondent Julian "stated that Audit first became aware of the need to plan additional audits around [Community Bank's] sales practice controls in [Community Bank] in late 2013, shortly before the L.A. Times article was published. Audit's awareness arose in part from data showing an increasing number of sales practice-related issues." "He was, however, unaware of SAR and EthicsLine metrics related to sales practices having resulted in a change to any particular audit's scope." "He also stated that he was unaware of Audit having conducted any audit into the ways incentivecompensation policies had motivated lower level team members." According to the interview notes, Respondent Julian stated that "To the extent Audit had failed to review issues orfunctions that it should have, he said, this was Audit's responsibility."

**McLinko** incorporated Respondent Julian's Response.[2821]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 509**

On April 27, 2017, WFAS issued its 2016 Sales Practices Enterprise Risk Management

---

[2816] MSD-501 at 5.

[2817] MSD-501 at 5.

[2818] MSD-501 at 7.

[2819] MSD-501 at 5.

[2820] Julian's ECSFM at No. 508.

[2821] McLinko's ECSFM at No. 508.

Assessment for 2016 ("2016 SP ERMA"). The 2016 SP ERMA concluded that Enterprise Risk Management for sales practices risk was Weak, the lowest WFAS audit rating. WFAS defined sales practices risk as sales practices, complaints, team member allegations including EthicsLine, and Internal Investigations. The weak rating was driven by several factors, including the lack of an overall view of sales practices risk across the Bank and the effectiveness and sustainability of the recently implemented enhancements needed to be demonstrated.[2822]

**Responses:**

**Julian** did not dispute that the 2016 Sales Practices Enterprise Risk Management Assessment ("2016 SP ERMA") was issued on April 27, 2017 and concluded that the risk management for sales practices was weak across the enterprise; and that sales practices risk is defined as "sales practices, complaints, team member allegations including EthicsLine, and Internal Investigations"; but disputed to the extent that Paragraph 509 fails to list all three predominant factors for the weak rating.[2823] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on April 27, 2017, WFAS issued its 2016 Sales Practices Enterprise Risk Management Assessment for 2016 ("2016 SP ERMA"). The 2016 SP ERMA concluded that Enterprise Risk Management for sales practices risk was Weak, the lowest WFAS audit rating. WFAS defined sales practices risk as sales practices, complaints, team member allegations including EthicsLine, and Internal Investigations. The weak rating was driven by several factors, including the lack of an overall view of sales practices risk across the Bank and the effectiveness and sustainability of the recently implemented enhancements needed to be demonstrated.

**McLinko** incorporated Respondent Julian's Response.[2824]


**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 510**

The 2016 SP ERMA issued on April 27, 2017 rated the First Line of Defense (i.e., the Community Bank) as Weak due to the need to better understand where sales practices risk reside, the need to implement the Sales Practices Risk Governance Document, and additional time to demonstrate the recently implemented enhancements to demonstrate effectiveness and sustainability.[2825] The 2016 SP ERMA rated the Second Line of DefenseWeak due to the magnitude and complexity of the corrective actions that remained to build and sustain an

---

[2822] MSD- 386 at 1.

[2823] Julian's ECSFM at No. 509.

[2824] McLinko's ECSFM at No. 508.

[2825] MSD- 386 at 3.

effective sales practices risk management program.[2826] Finally, the 2016 SP ERMA rated Team Member Allegations processes as Weak and Complaints and Internal Investigations processes as Needs Improvement.[2827]

**Responses:**

**Julian** did not dispute that the 2016 SP ERMA rated the first line of defense, second line of defense, and team member allegations process "weak," and the complaints process and Internal Investigations process as "needs improvement"; but disputed to the extent that Paragraph 510 does not provide the necessary context for the ratings.[2828] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that the 2016 SP ERMA issued on April 27, 2017 rated the First Line of Defense (i.e., the Community Bank) as Weak due to the need to better understand where sales practices risk reside, the need to implement the Sales Practices Risk Governance Document, and additional time to demonstrate the recently implemented enhancements to demonstrate effectiveness and sustainability. The 2016 SP ERMA rated the Second Line of DefenseWeak due to the magnitude and complexity of the corrective actions that remained to build and sustain an effective sales practices risk management program. Finally, the 2016 SP ERMA rated Team Member Allegations processes as Weak and Complaints and Internal Investigations processes as Needs Improvement.

McLinko did not dispute that 2016 SP ERMA provided the stated ratings, and incorporated Respondent Julian's Response.[2829]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 511**

One of the auditors responsible for the 2016 SP ERMA testified that despite the improvements made by the Bank in 2015 and 2016 in response to OCC Matters Requiring Attention, controls and risk management related to sales practices were still weak.

> Q: So notwithstanding the risk management and control improvements to address the MRAs from 2015 through 2016, auditstill gave sales practices risk a weak rating overall; is that correct?

---

[2826] MSD- 386 at 2.

[2827] MSD- 386 at 4.

[2828] Julian's ECSFM at No. 510.

[2829] McLinko's ECSFM at No. 510.

Add. 570

Appellate Case: 25-1079     Page: 572     Date Filed: 05/16/2025 Entry ID: 5517644

> A: We - - we concluded the overall sales practices risk is weak,
> as of December 31, 2016.[2830]

**Responses:**

**Julian** responded that the claim was disputed, but did not dispute the claim and instead averred the claim lacked "context".[2831] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Julian that one of the auditors responsible for the 2016 SP ERMA testified that despite the improvements made by the Bank in 2015 and 2016 in response to OCC Matters Requiring Attention, controls and risk management related to sales practices was still weak.

> Q: So notwithstanding the risk management and control improvements to address the MRAs from 2015 through 2016, auditstill gave sales practices risk a weak rating overall; is that correct?

> A: We - - we concluded the overall sales practices risk is weak, as of December 31, 2016.

**McLinko** disputed the claim by averring the Statement "misstates Ms. Sheng's testimony."[2832]

The Statement's citation is to the following testimony:

> Q. So notwithstanding the risk management and control improvements to address the MRAs from 2015 through 2016, audit still gave sales practices risk a weak rating overall; is that correct?

> A. (by Ms. Sheng) We -- we concluded the overall sales practice risk is weak, as of December 31, 2016.[2833]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent McLinko that one of the auditors responsible for the 2016 SP ERMA testified that despite theimprovements made by the Bank in 2015 and 2016 in response to OCC Matters Requiring Attention, controls and risk management related to sales

---

[2830] MSD-505 (Sheng Dep. Tr.) at 220:23-221:3.

[2831] Julian's ECSFM at No. 511.

[2832] McLinko's ECSFM at No. 511.

[2833] MSD-505 (Sheng Dep. Tr.) at 220:23-221:3.

Add. 571

Appellate Case: 25-1079    Page: 573    Date Filed: 05/16/2025 Entry ID: 5517644

practices was still weak.

> Q: So notwithstanding the risk management and control improvements to address the MRAs from 2015 through 2016, auditstill gave sales practices risk a weak rating overall; is that correct?

> A: We - - we concluded the overall sales practices risk is weak, as of December 31, 2016.


**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 512 Responses:**

Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 512 relies on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[2834] Upon my review of the confidential documents supporting this Statement of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in this Statement of Material Fact.


**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 513**

Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 513 relies on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[2835] Upon my review of the confidential documents supporting this Statement of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in this Statement of Material Fact.

---

[2834] See 12 C.F.R. § 19.33(b).

[2835] See 12 C.F.R. § 19.33(b).

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 514**

Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 514 relies on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[2836] Upon my review of the confidential documents supporting this Statement of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in this Statement of Material Fact.


**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 515**

Respondent Julian testified before the OCC during his May 31, 2018 sworn statement that he would now consider the Community Bank's controls over sales practices misconduct from 2012 to 2016 to be "unsatisfactory," the lowest possible rating that Audit could issue at that time:

> Q. Okay. But how about if we limit it to not just work that Audit – and the Audit Group did by itself, but work that the Audit Group did by itself, but work that the Audit Group did in conjunction with other parts of the bank or other consultants? Would you then conclude, based on that – the work that the Audit Group did by itself and in conjunction with other groups – that the controls for sales practice misconduct were unsatisfactory?
>
> A. That the controls – I'm sorry.
>
> Q. Yes, the controls to manage the risk of sales practice misconduct were unsatisfactory.
>
> A. Based on what I know now, yes.
>
> . . .
>
> Q. Okay. And if the systems did not prevent employees from issuing credit cards and debit cards without customer signatures, how would you rate the controls?
>
> A. Based on the impact and what we know the controls were unsatisfactory in that way.

---

[2836] See 12 C.F.R. § 19.33(b).

Appellate Case: 25-1079     Page: 575     Date Filed: 05/16/2025 Entry ID: 5517644

Q. Thank you. And unsatisfactory is the lowest grade you can get?

A. Yes, sir.[2837]

**Responses:**

**Julian** did not dispute giving the testimony as shown in this Statement.[2838] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that Mr. Julian testified as shown in this Statement.

**McLinko** incorporated Respondent Julian's Response.[2839]


**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 516**

Regarding the email he sent to his team asking "Where was audit?" Respondent Julian testified before the OCC during his 2018 sworn statement as follows:

A I think I concluded that audit didn't do -- certainly in retrospect -- didn't do the level of work I wish we had done around these issues throughout the process. So I didn't get an answer where was audit. What I discovered is what we did and, in cases, what we didn't do and formed the opinion I discussed earlier that I think we could have done, should have done more, should have done more sooner.

Q Did anybody in your team give you any explanation for why audit did not do what, in fact, it should have done?

A No one gave me an explanation why something wasn't done, but they talked to me about what was done and recognized that other things could have, should have been done, especially, you know, in retrospect, based on seeing information that was available, certain flags such as Michael Bacon's, and things like that. So they didn't give me an answer why they didn't do anything as much as what they did and recognized there's more that could have been done

Q But what you are absolutely sure of now is that audit, in fact, did not do what it should have done with respect to sales practices at the bank; is that fair to say?

A It's fair to say we could have done more, we should have done more.

. . .

Q Okay. Well, no, I appreciate your efforts, but could have done more could always be the case. You could do a great job and you could have done an even better one.

---

[2837] Julian Amended Answer ¶ 414; MSD-278 (Julian Tr.) at 37:2-14, 155:22-156:5.

[2838] Julian's ECSFM at No. 515.

[2839] McLinko's ECSFM at No. 515.

Appellate Case: 25-1079    Page: 576    Date Filed: 05/16/2025 Entry ID: 5517644

You could do a fabulous job, but, as long as it wasn't perfect, there's room for improvement. Is that what you're telling me?

A No, I don't think I -- Q Okay.

A -- whatsoever.

Q Fine. So I don't want your answer to be misinterpreted as that. So you can always do more, but my question is it fair to say that, without a doubt, audit should have done much more than it did with respect to the sales practice misconduct issue at the bank?

A In retrospect, yes, we should have done more specific to sales practices in relation to that.

Q And the reason you are saying that they should have done more is because they, in fact, did receive red flags and information that should have caused any competent auditor to do more; is that fair to say?

A In retrospect. Again, you know, taking it all in what we know now, seeing four emails or emails over a long period of time, taking that all into context, certainly, again, I'm going to go back to wish we would have. I'm not saying that audit did enough. I'm not making the excuse that, at the time, we did what was appropriate because we wouldn't be here, we being the company, potentially if we had done more.[2840]

**Responses:**

**Julian** did not dispute giving the testimony as shown in this Statement.[2841] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that Mr. Julian testified as shown in this Statement.

**McLinko** incorporated Respondent Julian's Response.[2842]


**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 517**

Respondent Julian admitted that WFAS under his leadership never identified in any audit report the sales practices misconduct problem's root cause and did not discuss in audit reports the root cause of sales practices misconduct.[2843] Similarly, Respondent Paul McLinko

---

[2840] MSD-278 (Julian Tr.) at 261:6-263:22.

[2841] Julian's ECSFM at No. 516.

[2842] McLinko's ECSFM at No. 516.

[2843] Julian Amended Answer ¶ 411.

admitted that he and his team did not identify in any audit reports the root cause of the systemic sales practices misconduct problem.[2844]

**Responses:**

**Julian** responded that the claim was disputed, but did not dispute the claim and instead averred the testimony was given prior to discovery, without opportunity for refreshment of Mr. Julian's memory, and without cross examination.[2845] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that Mr. Julian admitted that WFAS under his leadership never identified in any audit report the sales practices misconduct problem's root cause and did not discuss in audit reports the root cause of sales practices misconduct. Similarly, Respondent Paul McLinko admitted that he and his team did not identify in any audit reports the root cause of the systemic sales practices misconduct problem.

Julian also incorporated Mr. McLinko's response, to the extent this paragraph relates to Mr. McLinko's Amended Answer.[2846]

**McLinko** incorporated Respondent Julian's Response.[2847]

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 518**

Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 518 relies on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[2848] Upon my review of the confidential documents supporting this Statement of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in this Statement of Material Fact.

---

[2844] McLinko Amended Answer ¶ 411.

[2845] Julian's ECSFM at No. 517.

[2846] Julian's ECSFM at No. 517.

[2847] McLinko's ECSFM at No. 517.

[2848] See 12 C.F.R. § 19.33(b).

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 519**

Respondent McLinko testified before the OCC on March 2, 2018 as follows regarding the satisfactory ratings for culture Audit award the Community Bank:

> Q Okay. Based on what you know now, how would you rate the bank's culture in 2015 and 2014?
>
> A Community bank. I'm not talking about -- Q Community bank, yes.
>
> A -- the bank as a whole, just to be clear.
>
> Q Yes, yes. The community bank, absolutely. Community bank.
>
> A Yes, well, based upon what I know now and what was the information that I've learned, it certainly would not be -- have received what we would qualify as an effective rating or satisfactory rating, whatever the terms are that we had.
>
> Q It would be unsatisfactory. Right?
>
> A I -- it certainly would lead – could lead that way. Yes.[2849]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2850]

**McLinko** did not dispute that the Statement accurately quotes the cited testimony.[2851] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that Mr. McLinko gave the testimony shown above.


**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 520**

Respondent McLinko further testified:

> Q: Okay. Is it fair to say, though that audit, over the years totally missed the problem in the community bank, the systemic problem with sales practice misconduct?
>
> A: I think that, based on the approach from internal audit, the process, risk, and control that we discussed—in our approach to looking at that—to looking at the leveraging, the SOCR program that we did, and our transactional approach that we took—okay—coming up with those effective ratings in that approach, we did not

---

[2849] MSD-276 (McLinko Tr.) at 125:15-126:8.

[2850] Julian's ECSFM at No. 519.

[2851] McLinko's ECSFM at No. 519.

Add. 577

Appellate Case: 25-1079    Page: 579    Date Filed: 05/16/2025 Entry ID: 5517644

identify the sales practices issues that we've all come to see.[2852]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2853]

**McLinko** did not dispute that the Statement accurately quotes the cited testimony.[2854] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that Mr. McLinko gave the testimony shown above.


### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 521

Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 521 relies on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[2855] Upon my review of the confidential documents supporting this Statement of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in this Statement of Material Fact.


### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 522 (see (Russ Anderson) No. 453)


### Respondents Julian and McLinko received financial gain or other benefit from their misconduct


### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 523

The Community Bank was "Wells Fargo's largest operating segment in terms of revenue,"

---

[2852] MSD-276 (McLinko Tr.) at 64:14- 65:1; McLinko Amended Answer ¶ 461.

[2853] Julian's ECSFM at No. 520

[2854] McLinko's ECSFM at No. 520.

[2855] See 12 C.F.R. § 19.33(b).

Appellate Case: 25-1079    Page: 580    Date Filed: 05/16/2025 Entry ID: 5517644

contributing roughly half of the Company's average annual revenue and profits each year.[2856]

**Responses:**

**Julian** disputed the claim on the ground that it relates to the financial performance of Wells Fargo & Co., not Wells Fargo Bank, N.A., the relevant entity in this litigation.[2857] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that the Community Bank was "Wells Fargo's largest operating segment in terms of revenue," contributing roughly half of the Company's average annual revenue and profits each year.

**McLinko** incorporated Respondent Julian's Response.[2858]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 524

The Community Bank's business model was financially profitable for Wells Fargo and was key to its growth and cross-sell success.[2859]

**Responses:**

**Julian** responded that the claim was disputed, but did not dispute the claim and instead averred the claim does not establish that the cross-sell metric materially affected the CommunityBank's financial performance during Mr. Julian's tenure,[2860] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that the Community Bank's business model was financially profitable for Wells Fargo and was key to its growth and cross-sell

---

[2856] Julian Amended Answer ¶ 2; MSD-1 at 20 ¶ 4 ("Wells Fargo's largest business unit was the Community Bank, which contributed more than half (and in some years more than two- thirds) of the Company's revenue from 2007 through 2016."); MSD-692 at 50; MSD-693 at 42; MSD-694 at 46; MSD-695 at 44; MSD-696 at 46; MSD-697 at 45; MSD-698 at 53; MSD-658 (Pocock Expert Report) at 9-10 ¶ 44-45).

[2857] Julian's ECSFM at No. 523.

[2858] McLinko's ECSFM at No. 523.

[2859] MSD-266 (Russ Anderson Dep. Tr.) at 87:16-88:24; see also MSD-294 (Wipprecht Tr.) at 133:4-11; See MSD-658 (Pocock Expert Report) at ¶ 13, 18, 19; MSD-267 (Expert Report of Tanya Smith) at ¶ 72 ("The Bank described the 'cross-sell' as 'its primary strategy' and 'the foundation of our business model.'"); MSD- 304A (Candy Dep. Tr.) at 234:4-13; MSD-649 ("The Community Bank is 'Rome' in our company—all roads lead to and from it."); MSD-692 at 100 ("'cross-selling' – is very important to our business model and key to our ability to grow revenue and earnings.").

[2860] Julian's ECSFM at No. 524.

Add. 579

Appellate Case: 25-1079    Page: 581    Date Filed: 05/16/2025 Entry ID: 5517644

success.

**McLinko** incorporated Respondent Julian's Response.[2861]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 525

From January 1, 2002 through September 8, 2016 (the date of the Sales Practices Consent Order), Wells Fargo's stock price performed "significantly better than the stock price of its peers and the financial services sector."[2862]

**Responses:**

**Julian** disputed the claim on the basis that the cited evidence and its conclusions are inadmissible expert testimony based on flawed underlying reasoning and analysis that render it unreliable.[2863] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that From January 1, 2002 through September 8, 2016 (the date of the Sales Practices Consent Order), Wells Fargo's stock price performed "significantly better than the stock price of its peers and the financial services sector."

**McLinko** incorporated Respondent Julian's Response.[2864]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 526

Respondent Julian and Respondent McLinko received equity incentive compensation from Wells Fargo that was dependent on or tied to Wells Fargo's financial performance.[2865]

**Responses:**

**Julian** disputed the claim on the basis that Enforcement Counsel has cited no evidence showing that Mr. Julian received additional equity compensation as a result of sales practices misconduct at the Community Bank; and averring that the expert report of Bruce Deal extensively analyzes Mr. Julian's compensation and opines that there is no basis to

---

[2861] McLinko's ECSFM at No. 524.

[2862] MSD-658 (Pocock Expert Report) at 5, 11-14.

[2863] Julian's ECSFM at No. 525.

[2864] McLinko's ECSFM at No. 525.

[2865] MSD-283A (Julian Expert Report of Bruce Deal) at 12, 20-21; MSD-283B (McLinko Expert Report of Bruce Deal) at 15, 19.

Add. 580

Appellate Case: 25-1079    Page: 582    Date Filed: 05/16/2025 Entry ID: 5517644

conclude that he received pecuniary gain due to sales practices misconduct.[2866]

Whether Respondents received equity incentive compensation from Wells Fargo that was dependent on or tied to Wells Fargo's financial performance may be a material fact. I find that in his Response to Statement No. 526, Respondents Julian and (by incorporation) Respondent McLinko have sufficiently demonstrated a factual controversy exists regarding a material issue in question. Pursuant to the OCC's Uniform Rules, the merits of the claims raised in (Julian and McLinko) Statement No. 526 will be addressed during the hearing set to begin on September 13, 2021.

**McLinko** incorporated Respondent Julian's Response.[2867]


### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 527

Between 2012 and 2016, Respondent Julian earned over $11.1 million in equity compensation in addition to $5,175,000 in cash compensation (salary and bonus).[2868]

**Responses:**

**Julian** disputed the claim averring that the cited evidence shows that Mr. Julian actually suffered pecuniary loss as a result of sales practices misconduct in the form of withheld and cancelled compensation.[2869]

Whether Respondent received equity incentive compensation from Wells Fargo that was dependent on or tied to Wells Fargo's financial performance may be a material fact. I find that in his Response to Statement No. 527, Respondents Julian and (by incorporation) Respondent McLinko have sufficiently demonstrated a factual controversy exists regarding a material issue in question. Pursuant to the OCC's Uniform Rules, the merits of the claims raised in (Julian and McLinko) Statement No. 527 will be addressed during the hearing set to begin on September 13, 2021.

**McLinko** incorporated Respondent Julian's Response.[2870]


### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 528

---

[2866] Julian's ECSFM at No. 526.

[2867] McLinko's ECSFM at No. 526.

[2868] MSD-283A (Julian Expert Report of Bruce Deal) at 16-18.

[2869] Julian's ECSFM at No. 527.

[2870] McLinko's ECSFM at No. 527.

Appellate Case: 25-1079     Page: 583     Date Filed: 05/16/2025 Entry ID: 5517644

Between 2012 and 2016, Respondent McLinko earned approximately $880,000 in equity compensation in addition to $2,073,000 in cash compensation (salary and bonus).[2871]

**Responses:**

**Julian** incorporated Respondent McLinko's Response.[2872]

**McLinko** offered no evidence in support, but disputed that the Expert Report established the alleged fact that Mr. McLinko received financial gain or other benefit from his alleged misconduct.[2873] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that between 2012 and 2016, Respondent McLinko earned approximately $880,000 in equity compensation in addition to $2,073,000 in cash compensation (salary and bonus).

### Respondent Julian's and Respondent McLinko's conduct with respect to sales practices misconduct resulted in loss to the Bank

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 529

On or about September 8, 2016, the Bank paid a total of $185 million as part of a stipulated judgment to settle the Los Angeles City Attorney lawsuit, and to pay civil money penalties assessed by the CFPB and OCC related to the Bank's systemic sales practices misconduct.[2874]

**Responses:**

**Julian** did not dispute the claim.[2875] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that on or about September 8, 2016, the Bank paid a total of $185 million as part of a stipulated judgment to settle the Los Angeles City Attorney lawsuit, and to pay civil money penalties assessed by the CFPB and OCC related to the Bank's systemic sales practices misconduct.

**McLinko** incorporated Respondent Julian's Response.[2876]

---

[2871] MSD- 283B (McLinko Expert Report of Bruce Deal) at 17-18.

[2872] Julian's ECSFM at No. 528.

[2873] McLinko's ECSFM at No. 528.

[2874] Julian Amended Answer ¶ 132; McLinko Amended Answer ¶ 132; MSD-562.

[2875] Julian's ECSFM at No. 529.

[2876] McLinko's ECSFM at No. 529.

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 530**

The September 2016 announcement of the settlement and subsequent public awareness of the sales practices misconduct problem, which resulted from Respondents' misconduct, significantly damaged the Bank's reputation. The May 2017 results of a corporate reputation tracking study indicated the Bank's favorability rating plummeted 50% between September and October 2016, and by May 2017 had recovered only to 65% of its previous level.[2877]

**Responses:**

**Julian** did not dispute the claim.[2878] Accordingly, the Recommended Decision will include a factual finding as to Respondent Julian that September 2016 announcement of the settlement and subsequent public awareness of the sales practices misconduct problem, which resulted from Respondents' misconduct, significantly damaged the Bank's reputation. The May 2017 results of a corporate reputation tracking study indicated the Bank's favorability rating plummeted 50% between September and October 2016, and by May 2017 had recovered only to 65% of its previous level.

**McLinko** incorporated Respondent Julian's Response.[2879]


**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 531**

The announcement of the September 2016 settlement and subsequent public backlash caused the Bank to change the Community Bank's business model and eliminate product sales goals, effective October 1, 2016.[2880]

**Responses:**

**Julian** did not dispute the claim.[2881] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that the announcement of the September 2016 settlement and subsequent public backlash caused the Bank to change the Community Bank's business model and eliminate product sales goals, effective October 1,

---

[2877] MSD-565 at 9.

[2878] Julian's ECSFM at No. 529.

[2879] McLinko's ECSFM at No. 530.

[2880] MSD-289A (Sloan Tr.) at 251:2-253:6; MSD- 288-B (Strother Tr.) at 49:22-50:10; MSD-8B (Stumpf Tr.) at 228:11-229:16; MSD-563.

[2881] Julian's ECSFM at No. 531.

2016.

**McLinko** incorporated Respondent Julian's Response.[2882]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 532

Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 532 relies on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[2883] Upon my review of the confidential documents supporting this Statement of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in this Statement of Material Fact.

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 533

After the September 8, 2016 settlement announcement, and continuing over the next several years, the Bank suffered a series of other losses related to sales practices misconduct, including civil judgments to settle class action lawsuits, investigations commissioned to root out malfeasance, the costs of advertising campaigns aimed at rehabilitating its reputation, and in February 2020, a $3 billion settlement with the DOJ and the SEC.[2884]

**Responses:**

**Julian** responded that the claim was disputed, but offered no evidence to dispute the claim.[2885] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that after the September 8, 2016 settlement announcement, and continuing over the next several years, the Bank suffered a series of other losses related to sales practices misconduct, including civil judgments to settle class action lawsuits, investigations commissioned to root out malfeasance, the costs of advertising campaigns aimed at rehabilitating its reputation, and

---

[2882] McLinko's ECSFM at No. 531.

[2883] See 12 C.F.R. § 19.33(b).

[2884] MSD- 293A (Hardison Tr.) at 34:4-36:18; MSD-289A (Sloan Tr.) at 251:2-253:6; MSD-564; MSD-1.

[2885] Julian's ECSFM at No. 533.

Add. 584

Appellate Case: 25-1079     Page: 586     Date Filed: 05/16/2025 Entry ID: 5517644

in February 2020, a $3 billion settlement with the DOJ and the SEC

**McLinko** incorporated Respondent Julian's Response.[2886]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 534

Respondent Julian testified before the OCC in May 2018 as follows: "I'm not saying that audit did enough. I'm not making the excuse that, at the time, we did what was appropriate because we wouldn't be here, we being the company, potentially if we had done more."[2887]

**Responses:**

**Julian** responded that the claim was disputed, but he did not dispute he testified as shown, but averred that it was a potentiality that had "the company" acted differently, the company would have been in a different position in May 2018.[2888] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that he testified before the OCC in May 2018 as follows: "I'm not saying that audit did enough. I'm not making the excuse that, at the time, we did what was appropriate because we wouldn't be here, we being the company, potentially if we had done more."

**McLinko** incorporated Respondent Julian's Response.[2889]

### Sales practices misconduct constituted unethical and illegal activity that violated Bank policy

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 257 and (Julian and McLinko) No. 219

Respondent Russ Anderson testified, based on her experience as a senior risk professional with years of experience in the risk business, that when employees engage in various types of sales practices misconduct, they are violating applicable laws and regulations:

Q: Understand. So just so we're clear, you agree that when

---

[2886] McLinko's ECSFM at No. 33.

[2887] MSD-278 (Julian Tr.) at 263:18-22; see also id. at 269:12-270:1 ("Certainly I think management would admit that we were too slow to act."

[2888] Julian's ECSFM at No. 534, citing MSD-278 at 263:18-263:22.

[2889] McLinko's ECSFM at No. 534.

Add. 585

Appellate Case: 25-1079    Page: 587    Date Filed: 05/16/2025 Entry ID: 5517644

employees issue a product or service to a customer without the customer's consent, they're violating applicable laws and regulations; correct?

A: I would agree, yes.

Q: Okay. And you also agree that when employees transfer customer funds without customer consent, they're violating applicable laws and regulations; correct?

A: I would agree, yes.[2890]

**Responses:**

**Russ Anderson** did not dispute the transcript of her testimony included the above statements; but averred that the quote "lacks context" and that "[s]weeping statements by witnesses do not alter such legal analysis."[2891]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she testified as shown above.

**Julian** did not dispute that Respondent Russ Anderson testified as shown.[2892] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that Respondent Russ Anderson testified as shown above.

**McLinko** incorporated Respondent Julian's Response.[2893]


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 258 and (Julian and McLinko) No. 223**

Respondent Russ Anderson's expert witness, Kathlyn Farrell, testified that sales practices misconduct violated UDAP, Regulation Z, Regulation DD, and Truth in Savings Act.[2894]

**Responses:**

Russ Anderson: Disputed the claim because "Ms. Farrell did not unequivocally testify that

---

[2890] MSD-266 (Russ Anderson Dep. Tr.) at 122:22-124:19.

[2891] Russ Anderson's ECSFM at No. 257.

[2892] Julian's ECSFM at No. 219.

[2893] McLinko's ECSFM at No. 219.

[2894] MSD-265 (Farrell Dep. Tr.) at 63:5-66:1.

sales practices misconduct violated the referenced laws and regulations.[2895] Ms. Farrell testified that she "would have to look" at whether opening an unauthorized deposition account violated the Truth in Saving Act, and that she "would have to look" at those "disclosure laws that are hard to remember" to opine whether opening an unauthorized deposition account violated Regulation."

The testimony by Ms. Farrell that was relied upon by Enforcement Counsel is as follows:

Q. Okay. I'm going to read part of this e-mail to you. In -- in the body of the e-mail starting with the third sentence, Ms. Bresee wrote: "To be honest, if the allegations are proven to be correct, they violate a series of laws which are in the talking points we drafted. So, to the extent a team member gives a customer a credit card they didn't want/didn't consent to, it likely violates: UDAAP (OCC), UDAAP," with two As, "(CFPB), TILA, Reg Z, and the Fair" -- "and FCRA. On the deposit side, providing a savings/checking account that a customer didn't want/didn't consent to likely violates: UDAP, UDAAP" with two As, "the Truth in Savings Act, and Reg DD. (As well as similar state laws.)" Do you see that?

A. I do.

Q. Okay. You mentioned previously that whether there were any violations of law as a result of the sales practices misconduct issues crossed your mind; is that right?

A. Yes.

Q. Okay. Does sales practice misconduct, as we defined it earlier, violate UDAP with one As [verbatim]?

A. I think so.

Q. Does sales practice misconduct, as we described it before, violate UDAAP with two As?

A. I think it probably does.

Q. Okay. Does opening an unauthorized account violate TILA?

A. Probably. I'm saying that without looking it up, but I suspect that it does.

Q. Why?

A. Because I don't think you're supposed -- well, now that I think about it, I don't think you're supposed to issue any activated credit card to anybody without their consent. So, yes, if the card was activated before -- you used to

---

[2895] Russ Anderson's ECSFM at No. 258.

Add. 587

Appellate Case: 25-1079    Page: 589    Date Filed: 05/16/2025 Entry ID: 5517644

could send them out unactivated, but I -- I don't -- so if these were activated, then, yes, it's clearly a violation of Truth in Lending.

Q. Does opening an unauthorized credit card account also violate Reg Z?

A. Yes. It would be the same.

Q. Does opening an unauthorized credit card account violate FCRA?

A. That completely would depend upon whether it is reported to the credit bureaus. I have no idea if they did in this case.

Q. Okay. And if they were reported to the credit card bureaus, would there be a violation of the FCRA if there was an unauthorized credit card account opened?

A. I think so.

Q. Does opening an unauthorized deposit account violate the Truth in Savings Act?

A. I would have to look at it.

Q. Does opening an unauthorized deposit account violate Reg DD?

A. Again, I would have to -- to look at that for sure. Those are disclosure laws that are hard to remember. I'm sorry.

Q. Okay. It's all right. If -- if an unauthorized deposit account was opened and the required disclosures weren't made, would that violate Reg DD?

A. Yes, it would.

Q. Would that also violate the Truth in Savings Act?

A. Yes, it would.[2896]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that her expert witness, Kathlyn Farrell, testified that sales practices misconduct violated UDAP, Regulation Z, Regulation DD, and Truth in Savings Act.

**Julian** disputed the claim, averring that Ms. Farrell testified that she "would have to look" at whether opening an unauthorized deposition account violated the Truth in Saving Act, and that she "would have to look" at those "disclosure laws that are hard to remember" to opine whether

_____

[2896] MSD-265 (Farrell Dep. Tr.) at 63:5-66:1.

opening an unauthorized deposition account violated Regulation DD.[2897] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that Ms. Farrell testified that sales practices misconduct violated UDAP, Regulation Z, Regulation DD, and Truth in Savings Act.

**McLinko** incorporated Respondent Julian's Response.[2898]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 259 and (Julian and McLinko) No. 214

As part of its Deferred Prosecution Agreement with the U.S. Department of Justice "to resolve the federal criminal investigation of violations of, among other statutes, Title 18, United States Code, Sections 1005 and 1028A, arising out of Wells Fargo's improper sales practices," the Bank admitted, accepted, and acknowledged as true that the "Community Bank's onerous sales goals and accompanying management pressure led thousands of its employees to engage in: (1) unlawful conduct to attain sales through fraud, identity theft, and the falsification of bank records." Wells Fargo agreed that "the acts and omissions described in the Statement of Facts" attached to the Deferred Prosecution Agreement "are sufficient to establish violations by Wells Fargo of Title 18, United States Code, Sections 1005 and 1028A."[2899]

**Responses:**

**Russ Anderson** did not dispute that the Deferred Prosecution Agreement contains the quoted language, but avers that Wells Fargo's statements in the Agreement are not admissible for the truth of the matter asserted in the current proceeding against the Respondent and are not binding on Respondent Russ Anderson.[2900]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that as part of its Deferred Prosecution Agreement with the U.S. Department of Justice "to resolve the federal criminal investigation of violations of, among other statutes, Title 18, United States Code, Sections 1005 and 1028A, arising out of Wells Fargo's improper sales practices," the Bank admitted, accepted, and acknowledged as true that the "Community Bank's onerous sales goals and accompanying management pressure led thousands of its employees to engage in: (1)

---

[2897] Julian's ECSFM at No. 223, quoting MSD-265A at 65:11-18.

[2898] McLinko's ECSFM at No. 223.

[2899] MSD-1 (DOJ SOF) at 7, 10, 25.

[2900] Russ Anderson's ECSFM at No. 259.

Appellate Case: 25-1079     Page: 591     Date Filed: 05/16/2025 Entry ID: 5517644

unlawful conduct to attain sales through fraud, identity theft, and the falsification of bank records." Wells Fargo agreed that "the acts and omissions described in the Statement of Facts" attached to the Deferred Prosecution Agreement "are sufficient to establish violations by Wells Fargo of Title 18, United States Code, Sections 1005 and 1028A."

**Julian** did not dispute that the Deferred Prosecution Agreement contains the quoted language, but avers that Wells Fargo's statements in the Agreement are not admissible because the Agreement is not binding on him.[2901]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that as part of its Deferred Prosecution Agreement with the U.S. Department of Justice "to resolve the federal criminal investigation of violations of, among other statutes, Title 18, United States Code, Sections 1005 and 1028A, arising out of Wells Fargo's improper sales practices," the Bank admitted, accepted, and acknowledged as true that the "Community Bank's onerous sales goals and accompanying management pressure led thousands of its employees to engage in: (1) unlawful conduct to attain sales through fraud, identity theft, and the falsification of bank records." Wells Fargo agreed that "the acts and omissions described in the Statement of Facts" attached to the Deferred Prosecution Agreement "are sufficient to establish violations by Wells Fargo of Title 18, United States Code, Sections 1005 and 1028A."

**McLinko** incorporated Respondent Julian's Response.[2902]


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 260 and (Julian and McLinko) No. 215**

Under the Bank's June 2010 Corporate Security Policy Manual, sales integrity violations, including but not limited to customer consent and funding manipulation cases, were considered to result in violations of 18 U.S.C. §§ 656 (misapplication), 1001 (false statements), and 1005 (false bank entries).[2903]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[2904]

---

[2901] Julian's ECSFM at No. 214.

[2902] McLinko's ECSFM at No. 214.

[2903] MSD-423 at 7-9.

[2904] Russ Anderson's ECSFM at No. 260.

Add. 590

**Julian** did not dispute that the Manual includes the language shown here.[2905] Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that under the Bank's June 2010 Corporate Security Policy Manual, sales integrity violations, including but not limited to customer consent and funding manipulation cases, were considered to result in violations of 18 U.S.C. §§ 656 (misapplication), 1001 (false statements), and 1005 (false bank entries).

**McLinko** incorporated Respondent Julian's Response.[2906]


### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 261 and (Julian and McLinko) No. 216

Authoritative sources within the Bank testified about the illegal nature of sales practices misconduct.[2907] For example, James Strother, the Bank's former General Counsel, testified before the OCC that sales practices misconduct violated applicable laws and regulations and that "for sure it is [an] unfair and deceptive practice There are laws in every state that prohibit that" in addition to federal laws. He agreed under oath that such practices constitute "fraud" and "falsification of bank records" and might constitute identity theft in some states.[2908]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[2909]

**Julian** did not dispute that Mr. Strother's transcript contains the quoted text.[2910] Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that James Strother, the Bank's former General Counsel, testified before the OCC that sales practices misconduct violated applicable laws and regulations and that "for sure it is [an] unfair and deceptive practice. There are laws in every state that prohibit that" in addition to federal laws. He agreed under oath that such practices constitute "fraud" and "falsification of

---

[2905] Julian's ECSFM at No. 215.

[2906] McLinko's ECSFM at No. 215.

[2907] MSD-544 (Weber Tr.) at 82:13-22, 91:22-93:21; MSD-297 (Richards Tr.) at 84:5-11.

[2908] MSD-288A (Strother Tr.) at 26:19-28:13, 142:25-143:10, 192:23-193:24 (testifying that issuing products and services to customers without their consent "is serious and violates law."); James Strother Amended Answer ¶¶ 141 ("Admitted that sales practices misconduct involved serious misconduct that likely included violations of criminal laws"); MSD-382 (Byers Tr.) at 135:6- 136:5; MSD-297 (Richards Tr.) at 82:4-84:11, 105:4-9 (explaining why simulated funding is improper and that it is a form of fraud), 200:4-201:2, 251:8-15; MSD-599 (Meuers Tr.) at 11:3-11; MSD-549 (Holliday Tr.) at 69:14-70:9; MSD-149.

[2909] Russ Anderson's ECSFM at No. 261.

[2910] Julian's ECSFM at No. 216.

bank records" and might constitute identity theft in some states.

**McLinko** incorporated Respondent Julian's Response.[2911]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 262 and (Julian and McLinko) No. 217

Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 262 and (Julian and McLinko) No. 217 rely on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[2912] Upon my review of the confidential documents supporting these Statements of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in these Statements of Material Fact.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 263

Paula Herzberg, who worked as Head of Compliance and Operational Risk within the Community Bank reporting to Respondent Russ Anderson, testified before the OCC that in many cases Bank customers did not receive electronic disclosures because Community Bank employees were sending the disclosures to their own email addresses or entering a fake email address for the customer. She testified that the entry of fake email addresses constitutes falsification of bank records and violates Regulation DD.[2913]

**Responses:**

**Russ Anderson** offered no evidence to dispute the claims but averred the claims were vague as to timeframe and vague and ambiguous as to how many Bank customers Ms. Herzberg is referring to and what constitutes "many".[2914]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a

---

[2911] McLinko's ECSFM at No. 216.

[2912] See 12 C.F.R. § 19.33(b).

[2913] MSD-585 (Herzberg Tr.) at 21:24- 22:22, 164:4-167:4.

[2914] Russ Anderson's ECSFM at No. 263.

Add. 592

factual finding as to Respondent Russ Anderson that Paula Herzberg, who worked as Head of Compliance and Operational Risk within the Community Bank reporting to Respondent Russ Anderson, testified before the OCC that in many cases Bank customers did not receive electronic disclosures because Community Bank employees were sending the disclosures to their own email addresses or entering a fake email address for the customer. She testified that the entry of fake email addresses constitutes falsification of bank records and violates Regulation DD.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 264 and (Julian and McLinko) No. 218**

Ms. Herzberg, who formerly worked as an examiner for the Office of Thrift Supervision ("OTS") and was a "safety and soundness regulator" and did work in compliance before working at the Bank, gave the following testimony under oath before the OCC:

> Q: …As I understand your testimony, now you believe that sales practice misconduct at the bank was systemic. Is that correct?
>
> A: Yes.  Now I believe that.
>
> Q: All right. And you believe the sales practice misconduct at the bank that was systemic also constituted unsafe and unsound banking practices. Is that --
>
> A: Yes.
>
> Q: Okay. And you also believe that the sales practices misconduct at the bank that was systemic also constituted violations of applicable laws and regulations.
>
> A: That's right.
>
> Q: All right. And that includes violations of – and that includes unsafe and unsound practices, as well as unfair and deceptive practices.
>
> A: Yes.[2915]

**Responses:**

**Russ Anderson** did not dispute that the quoted text is an accurate depiction of a portion of Ms. Herzberg's testimony, but disputed that the testimony "proves systemic sales pressure

---

[2915] MSD-585 (Herzberg Tr.) at 17:18-19:5, 220:21-222:4, 26:9-27:20, 30:15-32:8.

existed."[2916]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that Ms. Herzberg gave the testimony shown above.

**Julian** did not dispute that the cited transcript contains the quoted text.[2917] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that Ms. Herzberg testified as shown in this Statement.

**McLinko** incorporated Respondent Julian's Response.[2918]

### Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 218

Ms. Herzberg also testified as follows:

> Q.    Regardless of the motivation, the behavior of inputting fake email addresses essentially constitutes falsification of bank records.
>
> A.    Yes. Regardless of why they did it. Yes.
>
> Q.    Are you familiar with Reg DD?
>
> A.    Yes.
>
> Q.    Would the behavior also violate Reg DD?
>
> A.    Yes. They didn't receive their deposit account disclosures. Yes.[2919]

**Responses:**

**Julian** did not dispute that the cited transcript contains the quoted text.[2920] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that Ms. Herzberg testified as shown in this Statement.

**McLinko** incorporated Respondent Julian's Response.[2921]

---

[2916] Russ Anderson's ECSFM at No. 264.

[2917] Julian's ECSFM at No. 217.

[2918] McLinko's ECSFM at No. 217.

[2919] MSD-257 (Herzberg Tr.) at 166:18-167:4; 221:14-23.

[2920] Julian's ECSFM at No. 218.

[2921] McLinko's ECSFM at No. 218.

Add. 594

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 265 and (Julian and McLinko) No. 220**

Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 265 and (Julian and McLinko) No. 220 rely on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents. Upon my review of the confidential documents supporting these Statements of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in these Statements of Material Fact.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 266 and (Julian and McLinko) No. 221**

In the Bank's September 2016, CFPB Sales Practices Consent Order, the CFPB concluded that the Bank, by engaging in sales practices misconduct, "engaged in 'unfair' and 'abusive' acts or practices that violate §§ 1031(c)(1), (d)(1), (d)(2)(B), and 1036(a)(1)(B) of the [Consumer Financial Protection Act]. 12 U.S.C. §§ 5531(c)(1), (d)(1), (d)(2)(B), 5536(a)(1)(B)" (UDAAP).[2922]

**Responses:**

**Russ Anderson** did not dispute the characterization of the CFPB Practices Consent Order, but disputed that the CFPB "contained no findings as to Ms. Russ Anderson specifically."[2923]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that in the Bank's September 2016, CFPB Sales Practices Consent Order, the CFPB concluded that the Bank, by engaging in sales practices misconduct, "engaged in 'unfair' and 'abusive' acts or practices that violate §§ 1031(c)(1), (d)(1), (d)(2)(B), and 1036(a)(1)(B) of the [Consumer Financial Protection Act]. 12 U.S.C. §§ 5531(c)(1), (d)(1), (d)(2)(B), 5536(a)(1)(B)" (UDAAP).

---

[2922] MSD-52 (CFPB Consent Order) (citing violations of UDAAP against the Bank for sales practices misconduct).

[2923] Russ Anderson's ECSFM at No. 266.

Add. 595

Appellate Case: 25-1079    Page: 597    Date Filed: 05/16/2025 Entry ID: 5517644

**Julian** did not dispute that the cited Order contains the quoted text.[2924] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that in the Bank's September 2016, CFPB Sales Practices Consent Order, the CFPB concluded that the Bank, by engaging in sales practices misconduct, "engaged in 'unfair' and 'abusive' acts or practices that violate §§ 1031(c)(1), (d)(1), (d)(2)(B), and 1036(a)(1)(B) of the [Consumer Financial Protection Act]. 12 U.S.C. §§ 5531(c)(1), (d)(1), (d)(2)(B), 5536(a)(1)(B)" (UDAAP).

**McLinko** incorporated Respondent Julian's Response.[2925]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 267 and (Julian and McLinko) No. 222

OCC examiners have concluded that sales practices misconduct violates multiple consumer and criminal laws and regulations, including: 18 U.S.C. §§ 656 (theft/misapplication by bank employee), 1005 (false entries), 1028(a)(7) (identity theft), and 1344(2) (bank fraud); 15 U.S.C. § 45(a) (unfair or deceptive acts and practices); 12 C.F.R. § 1030.4(a) (Regulation DD/Truth in Savings); and 12 C.F.R. § 1026.12(a) (Regulation Z/Truth in Lending).[2926]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[2927]

**Julian** responded that the claim was disputed, but did not dispute the claim and instead averred the Examiners' conclusions were "not reliable."[2928] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that OCC examiners have concluded that sales practices misconduct violates multiple consumer and criminal laws and regulations, including: 18 U.S.C. §§ 656 (theft/misapplication by bank employee), 1005 (false entries), 1028(a)(7) (identity theft), and 1344(2) (bank fraud); 15 U.S.C. § 45(a) (unfair or deceptive acts and practices); 12 C.F.R. § 1030.4(a) (Regulation DD/Truth in Savings); and 12 C.F.R. § 1026.12(a) (Regulation Z/Truth in Lending).

---

[2924] Julian's ECSFM at No. 221.

[2925] McLinko's ECSFM at No. 221.

[2926] MSD-257 (NBE Coleman Expert Report) at 6; MSD-267 (NBE Smith Expert Report) at 7; MSD-268 (NBE Crosthwaite Expert Report) at 7; MSD-269 (NBE Candy Expert Report) at 8.

[2927] Russ Anderson's ECSFM at No. 267.

[2928] Julian's ECSFM at No. 222.

**McLinko** incorporated Respondent Julian's Response.[2929]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 268 and (Julian and McLinko) No. 224**

In its Deferred Prosecution Agreement with the U.S. Department of Justice, the Bank further admitted, accepted, and acknowledged as true the following:

> (a) "Employees created false records and forged customers' signatures on account opening documents to open accounts that were not authorized by customers."[2930]
>
> (b) "After opening debit cards using customers' personal information without consent, employees falsely created a personal identification number ('PIN') to activate the unauthorized debit card. Employees often did so because the Community Bank rewarded them for opening online banking profiles, which required a debit card PIN to be activated."[2931]
>
> (c) "employees created false records by opening unauthorized checking and savings accounts to hit sales goals."[2932]
>
> (d) "unlawfully misused customers' sensitive personal information (including customers' means of identification)."[2933]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[2934]

**Julian** did not dispute that the Agreement contains the quoted language.[2935] Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that the Agreement contains the terms quoted above.

---

[2929] McLinko's ECSFM at No. 222.

[2930] MSD-1 at 25.

[2931] MSD-1 at 25.

[2932] MSD-1 at 26.

[2933] MSD-1 at 31.

[2934] Russ Anderson's ECSFM at No. 268.

[2935] Julian's ECSFM at No. 224.

Add. 597

Appellate Case: 25-1079     Page: 599     Date Filed: 05/16/2025 Entry ID: 5517644

**McLinko** incorporated Respondent Julian's Response.[2936]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 269 and (Julian and McLinko) No. 225**

Bank policies did not permit employees to open accounts or issue products not authorized by a customer or to engage in simulated funding.[2937] Bank employees who confessed to opening unauthorized accounts or engaging in simulated funding admitted they knew it was against Bank policy and ethics guidelines.[2938]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[2939]

**Julian** responded that the claim was disputed, but did not dispute the claim and instead averred the claim lacked "necessary context".[2940] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that Bank policies did not permit employees to open accounts or issue products not authorized by a customer or to engage in simulated funding.[2941] Bank employees who confessed to opening unauthorized accounts or engaging in simulated funding admitted they knew it was against Bank policy and ethics guidelines.

**McLinko** incorporated Respondent Julian's Response.[2942]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 270 and (Julian and McLinko) No. 226**

To open or issue an unauthorized account, product, or service for a customer, Bank employees

---

[2936] McLinko's ECSFM at No. 224.

[2937] MSD-9 at 7; MSD-10.

[2938] See, e.g., MSD-108 (concluding that employees engaged in simulated funding to meet sales goals despite knowing it was against Bank policy).

[2939] Russ Anderson's ECSFM at No. 269.

[2940] Julian's ECSFM at No. 225.

[2941] MSD-9 at 7; MSD-10.

[2942] McLinko's ECSFM at No. 225.

Appellate Case: 25-1079    Page: 600    Date Filed: 05/16/2025 Entry ID: 5517644

generally would have had to enter false information into the Bank's systems.[2943]  Bank employees used the Bank's Store Vision Platform ("SVP") "to open accounts for new and existing Bank customers, and the provision to customers of new accounts kits, including electronic new account kits ('eNAK')."[2944]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[2945]

**Julian** responded that the claim was disputed, but did not dispute the claim presented and instead averred the claim lacked "necessary context".[2946]  I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that to open or issue an unauthorized account, product, or service for a customer, Bank employees generally would have had to enter false information into the Bank's systems.  Bank employees used the Bank's Store Vision Platform ("SVP") "to open accounts for new and existing Bank customers, and the provision to customers of new accounts kits, including electronic new account kits ('eNAK').

**McLinko** incorporated Respondent Julian's Response.[2947]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 271 and (Julian and McLinko) No. 227**

"When opening or issuing an account, product or service for a customer, SVP required Bank employees to indicate in the system whether the customer was present in the branch. If an employee issued a product or service to a customer without customer consent, the employee would have had to indicate that the customer was present when in fact the customer was not present to avoid" appearing on a "report reflecting products and services issued to a customer when the customer was not present."[2948]

**Responses:**

---

[2943] See MSD-200 (Hughes Decl.).

[2944] See MSD-200 (Hughes Decl.) at 1.

[2945] Russ Anderson's ECSFM at No. 270.

[2946] Julian's ECSFM at No. 226.

[2947] McLinko's ECSFM at No. 226.

[2948] See MSD-200 (Hughes Decl.) at 1-2.

**Russ Anderson** incorporated Respondent Julian's response.[2949]

**Julian** responded that the claim was disputed, but did not dispute the claim presented and instead averred the claim lacked "necessary context".[2950] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that "When opening or issuing an account, product or service for a customer, SVP required Bank employees to indicate in the system whether the customer was present in the branch. If an employee issued a product or service to a customer without customer consent, the employee would have had to indicate that the customer was present when in fact the customer was not present to avoid" appearing on a "report reflecting products and services issued to a customer when the customer was not present."

**McLinko** incorporated Respondent Julian's Response.[2951]


### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 272 and (Julian and McLinko) No. 228

"When opening a savings or checking account or issuing a debit card to a customer, SVP required Bank employees to enter into the system, as applicable, information related to the nature of the Bank employee's interaction with the customer, the customer request method, the source of funds for the opening deposit, the purpose of the account, the estimated monthly account activity, and whether the customer was present. In situations where employees opened a checking or savings account or issued a debit card for a customer without customer consent, Bank employees would have had to fabricate (or use without consent) some or all of this information in order to open the account or issue the card."[2952]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[2953]

**Julian** responded that the claim was disputed, but did not dispute the claim presented and

---

[2949] Russ Anderson's ECSFM at No. 271.

[2950] Julian's ECSFM at No. 227.

[2951] McLinko's ECSFM at No. 227.

[2952] See MSD-200 (Hughes Decl.) at 2.

[2953] Russ Anderson's ECSFM at No. 272.

instead averred the claim lacked "necessary context".[2954] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that "When opening a savings or checking account or issuing a debit card to a customer, SVP required Bank employees to enter into the system, as applicable, information related to the nature of the Bank employee's interaction with the customer, the customer request method, the source of funds for the opening deposit, the purpose of the account, the estimated monthly account activity, and whether the customer was present. In situations where employees opened a checking or savings account or issued a debit card for a customer without customer consent, Bank employees would have had to fabricate (or use without consent) some or all of this information in order to open the account or issue the card."

**McLinko** incorporated Respondent Julian's Response.[2955]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 273 and (Julian and McLinko) No. 229

"When opening a savings, checking, or credit card account for a customer, the Bank requires its employees to provide the customer with certain account opening disclosures, either in paper form or electronically via eNAK. SVP required Bank employees to indicate in the system that the required disclosures were provided to the customer; otherwise, SVP would not allow the employee to continue with the account opening process. In situations where Bank employees opened a savings, checking, or credit card account for a customer without customer consent, Bank employees would have had to indicate in SVP that the required disclosures were provided to the customer when, in fact, they were not."[2956]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[2957]

**Julian** responded that the claim was disputed, but did not dispute the claim presented and instead averred the claim lacked "necessary context".[2958] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to

---

[2954] Julian's ECSFM at No. 228.

[2955] McLinko's ECSFM at No. 228.

[2956] See MSD-200 (Hughes Decl.) at 4.

[2957] Russ Anderson's ECSFM at No. 273.

[2958] Julian's ECSFM at No. 229.

Add. 601

Appellate Case: 25-1079   Page: 603   Date Filed: 05/16/2025 Entry ID: 5517644

Respondents Russ Anderson, Julian, and McLinko that "When opening a savings, checking, or credit card account for a customer, the Bank requires its employees to provide the customer with certain account opening disclosures, either in paper form or electronically via eNAK. SVP required Bank employees to indicate in the system that the required disclosures were provided to the customer; otherwise, SVP would not allow the employee to continue with the account opening process. In situations where Bank employees opened a savings, checking, or credit card account for a customer without customer consent, Bank employees would have had to indicate in SVP that the required disclosures were provided to the customer when, in fact, they were not."

**McLinko** incorporated Respondent Julian's Response.[2959]


### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 274 and (Julian and McLinko) No. 230

"When opening a credit card account for a customer, SVP required Bank employees to enter into the system the customer's current income information. In situations where employees opened a credit card account for a customer without customer consent, Bank employees would have had to fabricate (or use without consent) this information."[2960]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[2961]

**Julian** responded that the claim was disputed, but did not dispute the claim presented and instead averred the claim lacked "necessary context".[2962] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that "When opening a credit card account for a customer, SVP required Bank employees to enter into the system the customer's current income information. In situations where employees opened a credit card account for a customer without customer consent, Bank employees would have had to fabricate (or use without consent) this information."

---

[2959] McLinko's ECSFM at No. 229.

[2960] See MSD-200 (Hughes Decl.) at 5.

[2961] Russ Anderson's ECSFM at No. 274.

[2962] Julian's ECSFM at No. 230.

Appellate Case: 25-1079    Page: 604    Date Filed: 05/16/2025 Entry ID: 5517644

**McLinko** incorporated Respondent Julian's Response.[2963]


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 27**5 **and (Julian and McLinko) No. 231**

"When opening or issuing an account, product or service for a customer, SVP required Bank employees to enter into the system the customer's identification information, such as a driver's license number. In situations where employees issued a product or service to an existing customer without customer consent, Bank employees could have populated customer identification information with information previously supplied by the customer."[2964]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[2965]

**Julian** responded that the claim was disputed, but did not dispute the claim presented and instead averred the claim lacked "necessary context".[2966] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that "When opening or issuing an account, product or service for a customer, SVP required Bank employees to enter into the system the customer's identification information, such as a driver's license number. In situations where employees issued a product or service to an existing customer without customer consent, Bank employees could have populated customer identification information with information previously supplied by the customer."

**McLinko** incorporated Respondent Julian's Response.[2967]


**Throughout her Group Risk Officer tenure, Respondent Russ Anderson received extensive information about ongoing sales practices misconduct in the Community Bank**

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 276**

On April 26, 2005, the then-Chief Auditor Kevin McCabe sent to Respondent Russ Anderson

---

[2963] McLinko's ECSFM at No. 230.

[2964] See MSD-200 (Hughes Decl.) at 6.

[2965] Russ Anderson's ECSFM at No. 275.

[2966] Julian's ECSFM at No. 231.

[2967] McLinko's ECSFM at No. 231.

Add. 603

the final draft of a report that would be submitted to the Audit & Examination Committee of the Board. The report included Corporate Security Activities, including "Special Investigation Fraud Type." One of the "Special Investigation Fraud Type[s]" was Code of Ethics violations. The report showed an increase in the number of cases opened involving Code of Ethics violations, from 360 cases in first quarter 2004 to 467 cases opened in first quarter 2005. The comments stated: "Gaming of sales incentive cases continues to account for 50% of such cases. 48 cases involving the improper release/access of customer information were investigated in 1Q2005, an increasing trend. One case with $192,000 loss involved a team member assisting with false ATM claims."[2968]

**Responses:**

**Russ Anderson**, citing lack of relevance, objected to Enforcement Counsel's reliance on the reports presented as MSD-15 (a Bank audit report circa 2005) and MSD-249 (a Bank audit update report circa 2005).[2969]

Given the passage of time between the creation of the two reports and the filing of the Notice of Charges, given the reports' remote and tangential relationship with the material claims presented in the Notice of Charges, given the potential for confusion that admitting the reports presents, given the redundant nature of the material facts presented in the reports when compared with Exhibits that are more closely related in time, and given the marginal relevance of the claim regarding 2005 audit findings, the reports will not be admitted in support of Enforcement Counsel's Motion as to Respondent Russ Anderson. Accordingly, the claims presented in (Russ Anderson) No. 276 will not support Enforcement Counsel's Motion. The exclusion of the 276 does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 277

On July 19, 2005, the-then Chief Auditor Kevin McCabe sent to Respondent Russ Anderson a draft report that would be submitted to the Audit & Examination Committee of the Board. The report stated: "The EthicsLine is the 24/7 hotline which allows team members to anonymously report possible ethics violations. All fraud-related calls are referred to Special Investigations for review and investigation. Refer to Appendix 6 for additional information regarding case types

---

[2968] MSD-15 at 26; see also MSD-249 at 16 ("The number of EthicsLine calls that resulted in cases in 2004 is 428 compared to 225 in 2003, an increase of 90%. This increase is primarily due to an increase in EthicsLine calls relating to sales incentive gaming activity.").

[2969] See Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 35, incorporating the objections by Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

and confirmed fraud relating to EthicsLine calls. Special EthicsLine data is located in the matrix on the following page."[2970]  The matrix showed a 53% increase in "Internal Cases Resulting from EthicsLine Calls" from 2004 to 2005. The comments indicated that the volume was "[d]ue to increase in volume of calls, specifically sales incentive gaming calls."[2971]

**Responses:**

**Russ Anderson**, citing lack of relevance, objected to Enforcement Counsel's reliance on the reports presented as MSD-16 (a Bank audit report circa 2005).[2972]

Given the passage of time between the creation of the cited report and the filing of the Notice of Charges, given the report's remote and tangential relationship with the material claims presented in the Notice of Charges, given the potential for confusion that admitting the report presents, given the redundant nature of the material facts presented in the report when compared with Exhibits that are more closely related in time, and given the marginal relevance of the claim regarding 2005 audit findings, the reports will not be admitted in support of Enforcement Counsel's Motion as to Respondent Russ Anderson. Accordingly, the claims presented in (Russ Anderson) No. 277 will not support Enforcement Counsel's Motion. The exclusion of the 277 does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.


### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 278

Appendix 6 of the document that Respondent Russ Anderson received showed that the number of EthicsLine reports related to "Gaming of Sales Incentive Programs" by far exceeded any other category of Code of Ethics Violations. (MSD-16 at 51).

**Responses:**

**Russ Anderson**, citing lack of relevance, objected to Enforcement Counsel's reliance on the reports presented as Appendix 6 in MSD-16 (a Bank audit report circa 2005).[2973]

---

[2970] MSD-16 at 25-26.

[2971] MSD-16 at 26.

[2972] See Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 35, incorporating the objections by Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2973] See Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 35, incorporating the objections by Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

Add. 605

Appellate Case: 25-1079     Page: 607     Date Filed: 05/16/2025 Entry ID: 5517644

Given the passage of time between the creation of the cited report and the filing of the Notice of Charges, given the report's remote and tangential relationship with the material claims presented in the Notice of Charges, given the potential for confusion that admitting the report presents, given the redundant nature of the material facts presented in the report when compared with Exhibits that are more closely related in time, and given the marginal relevance of the claim regarding 2005 audit findings, the reports will not be admitted in support of Enforcement Counsel's Motion as to Respondent Russ Anderson. Accordingly, the claims presented in (Russ Anderson) No. 278 will not support Enforcement Counsel's Motion. The exclusion of the 278 does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 279

Michael Bacon was the Head of Corporate Investigations from approximately 2007 until September 2014.[2974]

**Responses:**

**Russ Anderson** offered no evidence to controvert the claim made in this Statement, disputing the claim based on the averment that the exhibit presented in support "does not provide an end date" for Mr. Bacon's service.[2975]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that Michael Bacon was the Head of Corporate Investigations from approximately 2007 until September 2014.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 280

During Respondent Russ Anderson's tenure as Group Risk Officer of the Community Bank, Mr. Bacon and Corporate Investigations regularly informed Respondent Russ Anderson about continuing sales practices misconduct.[2976] Mr. Bacon and his team also informed her that employees engaged in sales practices misconduct because they feared losing their jobs if they do not meet sales goals.[2977]

_____

[2974] MSD-295 (Bacon Tr.) at 15:1-7.

[2975] Russ Anderson's ECSFM at No. 279.

[2976] MSD-11; MSD-14; MSD-18; MSD-21; MSD-24; MSD-25; MSD-42; MSD-149; MSD-242; MSD-244; MSD-322.

[2977] MSD-295 (Bacon Tr.) at 44:5-15; 51:3- 52:20.

Add. 606

Appellate Case: 25-1079     Page: 608     Date Filed: 05/16/2025 Entry ID: 5517644

**Responses:**

**Russ Anderson** did not dispute that Mr. Bacon informed her as reported in this Statement, but instead asserts the documents cited by Enforcement Counsel provide examples of Ms. Russ Anderson being aware of sales integrity and sales practice misconduct and addressing the issues.[2978]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that during her tenure as Group Risk Officer of the Community Bank, Mr. Bacon and Corporate Investigations regularly informed Respondent Russ Anderson about continuing sales practices misconduct. Mr. Bacon and his team also informed her that employees engaged in sales practices misconduct because they feared losing their jobs if they do not meet sales goals.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 281**

On August 20, 2007, Mr. Bacon sent a presentation to Respondent Russ Anderson regarding sales integrity violations. The subject of the email stated: "For our meeting today – YTD [Year-to-Date] Sales Integrity Overview Meeting presentation items[.]" The presentation to Respondent Russ Anderson showed a 196% increase from YTD 2006 to YTD 2007 in the number of EthicsLine reports specific to sales integrity. (MSD-18 at 4). The presentation further showed that Sales Incentive Program Violations was the largest case sub-type within Code of Ethics Case, and that the number of cases related to Sales Incentive Program Violations increased by 65% from YTD 2006 to YTD 2007.[2979] The presentation provided to Respondent Russ Anderson also informed her that:

- "Customer Consent & Account Procedural Issues Primary Drivers of Allegations," that "[f]ailure to capture customer consent enables unethical behaviors" (MSD-18 at 7, 11);

- "43% of allegations originated from customer consent issues" (MSD-18 at 7);

- Sales integrity violations posed regulatory compliance risks (MSD-18 at 9);

- "Majority of Sales Integrity Allegations stem from Ethics Line reports (MSD-18 at 9);

- "SOX [Sarbanes Oxley] guidance regarding company-level control considerations include:

    o Pressure to meet unrealistic or short term performance targets

    o Extent to which management monitors whether internal control systems

---

[2978] Russ Anderson's ECSFM at No. 280.

[2979] MSD-18 at 5.

Add. 607

Appellate Case: 25-1079    Page: 609    Date Filed: 05/16/2025 Entry ID: 5517644

are working"[2980]

- Majority of sales integrity allegations related to lack of customer consent involved checking/saving funding and procedural issues and debit cards.[2981]

**Responses:**

**Russ Anderson** objected to the use of MSD-18 (a report on corporate security statistics and sales integrity circa 2007) on the grounds of relevance.[2982]

Given the passage of time between the issuance of the relied-upon Exhibit and the filing of the Notice of Charges, given the Exhibit's remote and tangential relationship with the material claims presented in the Notice of Charges, given the potential for confusion that admitting the Exhibit presents, and given the redundant nature of the material facts presented in the Exhibit when compared with Exhibits that are more closely related in time, the Exhibit will not be admitted in support of Enforcement Counsel's Motion as to Respondent Russ Anderson. Accordingly, the claims presented in (Russ Anderson) No. 281 will not support Enforcement Counsel's Motion. The exclusion of the 281 does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 282

On May 22, 2008, Tyson Pyles, who managed the Sales Quality Team within the Community Bank at the time provided the following information to Respondent Russ Anderson[2983]:

- "Allegations sent to SQ [Sales Quality Team] are up YOY [Year-Over-Year]";[2984]

- "Consent issues & reclassifying existing business are still the two primary issues."[2985]

---

[2980] MSD-18 at 9.

[2981] MSD-18 at 14, 22.

[2982] See Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 35, incorporating the objections by Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2983] MSD-19.

[2984] MSD-19 at 8.

[2985] MSD-19 at 8.

Add. 608

- "Lack of documentation = Increased Opportunity for Consent Issues."[2986]

- "Many products require no documented customer consent."[2987]

- "Current systems do not support consent capture or investigation of issues after the account is opened."[2988]

- "Phone Bank approached Sales Quality in Q1 2008 concerning customer calls related to lack of consent for products."[2989]

- "Primary activity driving allegation volumes is lack of customer consent for solutions (red bars) although account opening procedural issues also contribute a significant volume (green bars)."[2990]

**Responses:**

**Russ Anderson** objected to the use of the cited evidence on the grounds of relevance.[2991]

Given the passage of time between the issuance of the relied-upon Exhibit and the filing of the Notice of Charges, given the Exhibit's remote and tangential relationship with the material claims presented in the Notice of Charges, given the potential for confusion that admitting the Exhibit presents, and given the redundant nature of the material facts presented in the Exhibit when compared with Exhibits that are more closely related in time, the Exhibit will not be admitted in support of Enforcement Counsel's Motion as to Respondent Russ Anderson. Accordingly, the claims presented in (Russ Anderson) No. 282 will not support Enforcement Counsel's Motion. The exclusion of the 282 does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 283**

In or around 2011 or 2012, Respondent Russ Anderson received a "Case Escalation Memorandum" from Corporate Investigations. This memorandum informed her, among other things, that customers were enrolled in on-line banking without their knowledge or consent. She

---

[2986] MSD-19 at 9

[2987] MSD-19 at 9.

[2988] MSD-19 at 9.

[2989] MSD-19 at 11.

[2990] MSD-19 at 12, 16.

[2991] See Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 35, incorporating the objections by Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

was also informed that employees who commit various forms of sales practices misconduct violate 18 U.S.C. §§ 1005 and 1006.[2992]

**Responses:**

**Russ Anderson** objected to the use of the cited evidence on the grounds of relevance.[2993]

Given the passage of time between the issuance of the relied-upon Exhibit and the filing of the Notice of Charges, given the Exhibit's remote and tangential relationship with the material claims presented in the Notice of Charges, given the potential for confusion that admitting the Exhibit presents, and given the redundant nature of the material facts presented in the Exhibit when compared with Exhibits that are more closely related in time, the Exhibit will not be admitted in support of Enforcement Counsel's Motion as to Respondent Russ Anderson. Accordingly, the claims presented in (Russ Anderson) No. 283 will not support Enforcement Counsel's Motion. The exclusion of the 283 does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 284

On September 10, 2011, the Head of Corporate Investigation Michael Bacon informed Respondent Russ Anderson about key activity in the Community Bank. He stated: "As you may recall we broke out Sales Integrity from the Code of Ethics Case Type in an effort to improve reporting and provide more insight as to the specific trends. You will see that Sales has several subtypes as to the specific activity."[2994] Respondent Russ Anderson received information about the types of Sales Integrity Violations, their associated volumes, and their disposition.[2995] The document provided to Respondent Russ Anderson reflected that in 2010 and 2011, most employee terminations and resignations for Sales Integrity Violations related to lack of customer consent, and that such terminations increased by 54% from 2010 to 2011.[2996] The reporting also showed that cases involving Sales Integrity Violations that resulted in confirmed fraud increased by 19% from 2010 to 2011.[2997]

---

[2992] MSD-711 at 2, 3, 6.

[2993] See Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 35, incorporating the objections by Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2994] MSD-21.

[2995] MSD-21.

[2996] MSD-21 at 9.

[2997] MSD-21 at 12.

**Responses:**

**Russ Anderson** objected to the use of the cited evidence on the grounds of relevance.[2998]

Given the passage of time between the issuance of the relied-upon Exhibit and the filing of the Notice of Charges, given the Exhibit's remote and tangential relationship with the material claims presented in the Notice of Charges, given the potential for confusion that admitting the Exhibit presents, and given the redundant nature of the material facts presented in the Exhibit when compared with Exhibits that are more closely related in time, the Exhibit will not be admitted in support of Enforcement Counsel's Motion as to Respondent Russ Anderson. Accordingly, the claims presented in (Russ Anderson) No. 284 will not support Enforcement Counsel's Motion. The exclusion of the 284 does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 285

On or about November 10, 2011, Mr. Bacon sent Respondent Russ Anderson another report, which informed her of a "significant increase in misconduct specific to falsification of bank records related to sales."[2999] Respondent Russ Anderson replied, "Obviously this is a very concerning report . . ."[3000] Mr. Bacon responded that this concerning report "is nearly identical to previous quarters, the trend just keep[s] increasing."[3001]

**Responses:**

**Russ Anderson** objected to the use of the cited evidence on the grounds of relevance.[3002]

Given the passage of time between the issuance of the relied-upon Exhibit and the filing of the Notice of Charges, given the Exhibit's remote and tangential relationship with the material claims presented in the Notice of Charges, given the potential for confusion that admitting the Exhibit presents, and given the redundant nature of the material facts presented in the Exhibit

---

[2998] See Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 35, incorporating the objections by Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[2999] MSD-231 at 3.

[3000] MSD-231 at 3.

[3001] MSD-231 at 2; MSD-267 (NBE Smith Expert Report) at ¶ 107.

[3002] See Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 35, incorporating the objections by Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

Appellate Case: 25-1079    Page: 613    Date Filed: 05/16/2025 Entry ID: 5517644

when compared with Exhibits that are more closely related in time, the Exhibit will not be admitted in support of Enforcement Counsel's Motion as to Respondent Russ Anderson. Accordingly, the claims presented in (Russ Anderson) No. 285 will not support Enforcement Counsel's Motion. The exclusion of the 285 does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 286

On November 14, 2011, Mr. Bacon informed Respondent Russ Anderson about his proposed submission to the Audit and Examination Committee of the Board. He wrote: ". . . Eastern Community Bank volume has seen a *significant increase* in misconduct specific to the falsification of bank records related to sales . . ." In response, Respondent Russ Anderson stated that Mr. Bacon's reporting "is not a well-balanced report." She further commented: "I just think there is so much more to this story than what is shown here. Have we done any research to figure this out? Also, is the relative number important given the size of the company?" Mr. Bacon explained to Respondent Russ Anderson: "Claudia, these items must be commented on and I believe our comments are very accurate. None of these issues should be new. The trends have consistently been heading up quarter over quarter, year after year."[3003]

### Responses:

**Russ Anderson** objected to the use of the cited evidence on the grounds of relevance.[3004]

Given the passage of time between the issuance of the relied-upon Exhibit and the filing of the Notice of Charges, given the Exhibit's remote and tangential relationship with the material claims presented in the Notice of Charges, given the potential for confusion that admitting the Exhibit presents, and given the redundant nature of the material facts presented in the Exhibit when compared with Exhibits that are more closely related in time, the Exhibit will not be admitted in support of Enforcement Counsel's Motion as to Respondent Russ Anderson. Accordingly, the claims presented in (Russ Anderson) No. 286 will not support Enforcement Counsel's Motion. The exclusion of the 286 does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 287

---

[3003] MSD-12; see also MSD-42 (Mr. Bacon informing Respondent Russ Anderson of increasing trend in misconduct cases and providing data in support).

[3004] See Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 35, incorporating the objections by Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

Appellate Case: 25-1079    Page: 614    Date Filed: 05/16/2025 Entry ID: 5517644

On November 27, 2011, Respondent Russ Anderson emailed Mr. Bacon and others stating that "[t]he number of Sales Integrity SAR [Suspicious Activity Reports] are up 190 year over year (33.75%) . . . The 2011 losses ytd 9/30 were $1,083,000 vs. $160,000 in 2010. While on the face of it this is a significant % increase the dollars relative to the size of Regional Banking are not significant." In response, Mr. Bacon informed Respondent Russ Anderson: "The Sales Integrity loss data is not millions- it is only – 1,083 versus 160. These types of cases don't usually have a hard dollar loss – in these instances a debit card was ordered without consent and was fraudulently used." Respondent Russ Anderson responded: "Oh – my bad I just assumed it was millions so it is even more insignificant."[3005]

**Responses:**

**Russ Anderson** objected to the Statement on the ground that the supporting exhibit was irrelevant.[3006] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Russ Anderson) No. 287 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.


### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 288

On November 29, 2011, Mr. Bacon emailed Respondent Russ Anderson highlighting his continued concern with sales integrity cases and their continued increase: "My only concern within Community Bank continues to be with Sales Integrity cases and their continued increase. As previously noted, everyone expected a slight increase in cases once SQ [Sales Quality Team] began doing the customer polling, but I can only speak for my team, we did not expect the increase we have been experiencing. . . . During the call, Carrie [Tolstedt] was fairly adamant about being cautious in regards to our language, but I don't feel comfortable not pointing out to you, that we have either in fact 'detected' more misconduct that wasn't previously detected or managed appropriately or we simply have an increase."[3007]

**Responses:**

---

[3005] MSD-23.

[3006] See Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 35, incorporating the objections by Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[3007] MSD-11.

**Russ Anderson** objected to the use of the cited evidence on the grounds of relevance.[3008]

Given the passage of time between the issuance of the relied-upon Exhibit and the filing of the Notice of Charges, given the Exhibit's remote and tangential relationship with the material claims presented in the Notice of Charges, given the potential for confusion that admitting the Exhibit presents, and given the redundant nature of the material facts presented in the Exhibit when compared with Exhibits that are more closely related in time, the Exhibit will not be admitted in support of Enforcement Counsel's Motion as to Respondent Russ Anderson. Accordingly, the claims presented in (Russ Anderson) No. 288 will not support Enforcement Counsel's Motion. The exclusion of the 288 does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 289

On or around March 28, 2012, a Regional Investigations Manager provided an update to Respondent Russ Anderson regarding 11 terminations in a branch due to sales integrity violations.[3009] The email to Respondent Russ Anderson informed her that:

- "Bankers admitted to forging customer account applications, pinning debit cards, signing customer's [sic] up for on line banking and forging withdrawal slips";

- "Research also indicated that On Line Banking is being set up for these customers at the time the accounts are being opened and the customers are not present";

- "Several complaints received alleging that the Napa store is opening multiple accounts for customers using team member's home addresses, phone numbers, and common email addresses";

- (4) "Interviews were conducted and 11 team members were terminated, including the store manager resigned prior to termination and will be coded as in-eligible for re-hire."[3010]

Mr. Bacon forwarded this email to the Director of Corporate Human Resources, stating that "Cases involving Sales Integrity continue to increase across the enterprise." He also commented that "Sales Integrity cases are plentiful – we ended the year with almost 3K and

---

[3008] See Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 35, incorporating the objections by Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[3009] MSD-242 at 2.

[3010] MSD-242 at 2.

Add. 614

Appellate Case: 25-1079    Page: 616    Date Filed: 05/16/2025 Entry ID: 5517644

allegations dominate the EthicsLine, . . . Our focus and one we are sharing with Claudia is we need to focus on Manager accountability – many of the Sales Integrity items can already been [sic] seen in the management reports and in Claudia's Sales Quality data – we terminate way too many good TMs [team members] for activity either directly caused by management sales pressure or bad behaviors not detected soon enough by management."[3011]

**Responses:**

**Russ Anderson** objected to the use of the cited evidence on the grounds of relevance.[3012]

Given the passage of time between the issuance of the relied-upon Exhibit and the filing of the Notice of Charges, given the Exhibit's remote and tangential relationship with the material claims presented in the Notice of Charges, given the potential for confusion that admitting the Exhibit presents, and given the redundant nature of the material facts presented in the Exhibit when compared with Exhibits that are more closely related in time, the Exhibit will not be admitted in support of Enforcement Counsel's Motion as to Respondent Russ Anderson. Accordingly, the claims presented in (Russ Anderson) No. 289 will not support Enforcement Counsel's Motion. The exclusion of the 289 does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 290

Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 290 relies on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[3013] Upon my review of the confidential documents supporting this Statement of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in this Statement of Material Fact.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 291

---

[3011] MSD-242 at 1.

[3012] See Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 35, incorporating the objections by Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[3013] See 12 C.F.R. § 19.33(b).

Appellate Case: 25-1079    Page: 617    Date Filed: 05/16/2025 Entry ID: 5517644

On July 20, 2012, the Head of Corporate Investigations Michael Bacon emailed Respondent Russ Anderson informing her of his proposed submission to the Audit and Examination Committee of the Board. In the email, Mr. Bacon noted, among other things, that "customer consent concerns increased 29% and false entry of customer identification information increased 24%." In response, Respondent Russ Anderson told Mr. Bacon that "it is the context that I think needs rethinking. As we discussed last year this sounds so much worse than it really is . . ." Mr. Bacon responded to Russ Anderson: "Claudia, I am not sure the data supports this conclusion. The content of our submittal is very accurate and I actually think there are items of concern in the data. Also of note, as you know, we have had a spike in egregious Sales Integrity matters, which added to the upward trend. As previously discussed, we are preparing a deep dive report for each region highlighting the Sales Integrity cases and related key activity."[3014]

**Responses:**

**Russ Anderson** did not dispute receipt of the email cited in the Statement, but disputed its relevance, averring the quoted language referred to Suspicious Activity Reports and not sales practices misconduct.[3015] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Russ Anderson) No. 291 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.


### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 292

During her tenure as Group Risk Officer, Respondent Russ Anderson also received employee complaints regarding unethical sales practices. For example, on May 9, 2013, an employee forwarded her an email that stated, in part: "I have some serious concerns about the leadership in our market. There is a huge amount of unethical sales practices going on within the market. We are being coerced to open checking accounts so the market is at goal, when the branches are closed. I have emails printed out, showing the threats of being placed on corrective action. There are branches where bankers are falsifying Drivers Licenses for customers just to get an account. I could go on for hours with the knowledge and things I have seen."[3016]

**Responses:**

---

[3014] MSD-25.

[3015] See Russ Anderson's ECSFM at No. 291 and Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 35, incorporating the objections by Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[3016] MSD-41.

Appellate Case: 25-1079     Page: 618     Date Filed: 05/16/2025 Entry ID: 5517644

**Russ Anderson** did not dispute her receipt of the email cited in the Statement, but averred it was "actually an email that was sent to Mr. Stumpf and copied to Ms. Tolstedt, who forwarded it to Ms. Russ Anderson"; and averred the email "demonstrates that numerous individuals within the organization, including the CEO of Wells Fargo, received the same information."[3017]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that during her tenure as Group Risk Officer, Respondent Russ Anderson also received employee complaints regarding unethical sales practices. For example, on May 9, 2013, an employee forwarded her an email that stated, in part: "I have some serious concerns about the leadership in our market. There is a huge amount of unethical sales practices going on within the market. We are being coerced to open checking accounts so the market is at goal, when the branches are closed. I have emails printed out, showing the threats of being placed on corrective action. There are branches where bankers are falsifying Drivers Licenses for customers just to get an account. I could go on for hours with the knowledge and things I have seen."


### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 293

On November 1, 2013, Respondent Russ Anderson received an anonymous email from "You LA/OC Region Team Members."[3018] The email stated, among other things: "The breakdown of our internal controls has been detrimental to our team members, who are being treated as seasonal workers every quarter. Pay attention to fluctuation reports. More duplicate premier checking and fake business accounts are demanded to be opened just so they can clinch a higher tier in their bonus payouts. Sure enough, months later, the bankers would get fired and we bring along a fresher batch of hopeful bankers. The proof is in the pudding."[3019]

**Responses:**

**Russ Anderson** did not dispute her receipt of the email cited in the Statement.[3020] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that on November 1, 2013, she received an anonymous email from "You LA/OC

---

[3017] Russ Anderson's ECSFM at No. 292.

[3018] MSD-248.

[3019] MSD-248 at 3.

[3020] Russ Anderson's ECSFM at No. 293.

Add. 617

Appellate Case: 25-1079     Page: 619     Date Filed: 05/16/2025 Entry ID: 5517644

Region Team Members."[3021] The email stated, among other things: "The breakdown of our internal controls has been detrimental to our team members, who are being treated as seasonal workers every quarter. Pay attention to fluctuation reports. More duplicate premier checking and fake business accounts are demanded to be opened just so they can clinch a higher tier in their bonus payouts. Sure enough, months later, the bankers would get fired and we bring along a fresher batch of hopeful bankers. The proof is in the pudding."

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 294

Respondent Russ Anderson read both *Los Angeles Times* articles.[3022]

**Responses:**

**Russ Anderson** did not dispute that she had read both articles.[3023] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she read both of the cited *Los Angeles Times* articles.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 295

On November 15, 2013, after the first *Los Angeles Times* article, Mickey Delay- Helser, a Community Bank leader, emailed Respondent Russ Anderson the subject line of which read "This is worrying me."[3024] Ms. Delay-Helser wrote: "As I think I've shared with you, in a 10-day period I had four complaints raised [to me] by friends about family about issues in 4 different stores. Three of them were Sales Integrity issues. None of these people complained internally and so if they had not complained to me, we would never have heard about these complaints. . . .So I worry that we look at the Ethics line reporting only."[3025]

**Responses:**

Russ Anderson did not dispute her receipt of the cited email.[3026] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that on November 15, 2013, after the first *Los Angeles Times* article, Mickey Delay- Helser, a Community Bank leader, emailed Respondent Russ Anderson the subject line of which read

---

[3021] MSD-248.

[3022] MSD-266 (Russ Anderson Dep. Tr.) at 160:20-23.

[3023] Russ Anderson's ECSFM at No. 294.

[3024] MSD-237.

[3025] MSD-237.

[3026] Russ Anderson's ECSFM at No. 295.

Appellate Case: 25-1079      Page: 620      Date Filed: 05/16/2025 Entry ID: 5517644

"This is worrying me."[3027] Ms. Delay-Helser wrote: "As I think I've shared with you, in a 10-day period I had four complaints raised [to me] by friends about family about issues in 4 different stores. Three of them were Sales Integrity issues. None of these people complained internally and so if they had not complained to me, we would never have heard about these complaints. . . .So I worry that we look at the Ethics line reporting only."

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 296

Respondent Russ Anderson, however, "did not make a habit of reading the EthicsLine allegations that came in. I had a pretty busy job. That would have been not a wise use of my time."[3028]

**Responses:**

**Russ Anderson** did not dispute that she testified as shown in the Statement.[3029] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she testified that she "did not make a habit of reading the EthicsLine allegations that came in. I had a pretty busy job. That would have been not a wise use of my time."

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 297

Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 297 relies on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[3030] Upon my review of the confidential documents supporting this Statement of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in this Statement of Material Fact.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 298

---

[3027] MSD-237.

[3028] MSD-266 (Russ Anderson Dep. Tr.) at 58:13-16.

[3029] Russ Anderson's ECSFM at No. 296.

[3030] See 12 C.F.R. § 19.33(b).

Page **619** of **753**

On July 31, 2013, the Head of Corporate Investigations Michael Bacon informed Respondent Russ Anderson: "Three 'undercover' law enforcement accounts were opened up in CA [California] and within 45 minutes two bankers at SF main ordered debit cards for them without any customer consent or discussion. Clearly the bankers were monitoring the system."[3031]

**Responses:**

**Russ Anderson** did not dispute being informed as shown in this Statement. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that on July 31, 2013, the Head of Corporate Investigations Michael Bacon informed Respondent Russ Anderson: "Three 'undercover' law enforcement accounts were opened up in CA [California] and within 45 minutes two bankers at SF main ordered debit cards for them without any customer consent or discussion. Clearly the bankers were monitoring the system."

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 299

On August 20, 2013, Respondent Russ Anderson received reporting on sales integrity violations broken out by region.[3032]   The data showed: (1) an increase in Sales Integrity Violations cases from year to date 2012 through 2013; (2) that customer consent constituted the largest sub-type of Sales Integrity Violations; (3) every region had Sales Integrity Violations.[3033] The email stated: "I assume you will take additional appropriate action as you deem necessary."[3034]

**Responses:**

**Russ Anderson** did not dispute receipt of the cited email message, but asserted it was "unclear to whom the 'you' in "I assume you will take additional appropriate action as you deem necessary" was referencing.[3035]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that on August 20, 2013, Respondent Russ Anderson received reporting on sales integrity violations broken out by region.  The data showed: (1) an increase in Sales Integrity Violations cases from year to date 2012 through 2013;

---

[3031] MSD-22; see also MSD-55.

[3032] MSD-250.

[3033] MSD-250.

[3034] MSD-250.

[3035] Russ Anderson's ECSFM at No. 299.

Appellate Case: 25-1079      Page: 622      Date Filed: 05/16/2025 Entry ID: 5517644

(2) that customer consent constituted the largest sub-type of Sales Integrity Violations; (3) every region had Sales Integrity Violations. The email stated: "I assume you will take additional appropriate action as you deem necessary."

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 300

After the *Los Angeles Times* articles were published in October and December 2013, the Bank formed a "Core Team."[3036] The Core Team was a cross-functional group created to ensure consistency in employee termination decisions in the wake of the *Los Angeles Times* articles.[3037]

**Responses:**

**Russ Anderson** did not dispute that the Bank formed a "Core Team" after the publication of the two news articles, nor that it was a cross functional group created to ensure consistency in employee terminations in the wake of the articles.[3038] She disputed the Statement as to context and "mischaracterization of the facts related to the Core Team."[3039]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 301

Respondent Russ Anderson was a member of the Core Team.[3040]

**Responses:**

**Russ Anderson** did not dispute that she was a member of the Core Team. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she was a member of the Core Team.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 302

As a member of the Core Team from 2013 through 2016, Respondent Russ Anderson was aware of continuing sales practices misconduct in the Community Bank and that employees'

---

[3036] MSD-124 (describing criteria for escalation to Core Team); MSD-280 (Board Report) at 80; MSD-580 (Henderson Tr.) at 45:14-47:17.

[3037] MSD-580 (Henderson Tr.) at 45:14- 47:17, 50:2-51:13.

[3038] Russ Anderson's ECSFM at No. 300.

[3039] Russ Anderson's ECSFM at No. 300.

[3040] MSD-287A (Otsuka Tr.) at 38:15-40:16; MSD-548 (Nelson Tr.) at 46:1-47:22.

Appellate Case: 25-1079    Page: 623    Date Filed: 05/16/2025 Entry ID: 5517644

fear of losing their jobs if they do not meet sales goals incentivized them to engage in sales practices misconduct.[3041]

**Responses:**

**Russ Anderson** disputed the claim regarding her awareness of both the continuing sales practices misconduct in the Community Bank during the period from 2013 to 2016, and the employees' fear of losing their jobs if they did not meet sales goals that incentivized sales practices misconduct. She noted the cited evidence does not include testimony on the relevant points, and asserted the testimony presented was unreliable as based on hearsay and rumor.[3042]

It is a material fact in issue whether Respondent Russ Anderson, as alleged by Enforcement Counsel in this Statement, was aware of the continuing sales practices misconduct in the Community Bank during the period from 2013 to 2016, and was aware of Bank employees' fear of losing their jobs if they do not meet sales goals incentivized them to engage in sales practices misconduct.

While I find uncontroverted (1) that sales practices misconduct continued in the Community Bank from 2013 through 2016, and (2) that Community Bank employees feared they would lose their jobs if they did not meet sales practices goals between 2013 and 2016, and (3) that such fear incentivized sales practices misconduct by Community Bank employees between 2013 and 2016, I find that in her Response to Statement No. 302, Russ Anderson sufficiently demonstrated a factual controversy exists regarding her knowledge of these conditions between 2013 and 2016. Because of the existence of these material controverted facts, summary disposition is not available with respect to Respondent Russ Anderson regarding this claim. Pursuant to the OCC's Uniform Rules, the merits of the claims raised in (Russ Anderson) Statement No. 302 will be addressed during the hearing set to begin on September 13, 2021.


### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 303

Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 303 relies on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[3043] Upon my review of the confidential documents supporting this Statement of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to

---

[3041] MSD-580 (Henderson Tr.) at 21:16-22:16, 25:20-26:16, 118:22- 119:2, 133:11-134:16.

[3042] Russ Anderson's ECSFM at No. 302.

[3043] See 12 C.F.R. § 19.33(b).

be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in this Statements of Material Fact.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 304**

On December 19, 2013, Susan Nelson, a senior leader in the Human Resources function, again emailed Respondent Russ Anderson expressing concerns about large number of terminations for sales integrity violations:

> "Corporate Investigations' hiatus on running sales integrity reporting will end at the end of this month. At that point, they will start to run reports going back to beginning of November. I'm hugely concerned that that is going to re-open the floodgates on large number of involuntary terminations.    This is feeling very, very time sensitive to me. I'm so worried that the flood gates are opening up again and I'm feeling a little like Nero playing my violin while Rome is burning. So at least wanted to move the dialogue forward a little. I'm not sure how many more hours we can all continue to invest in Core Group meetings to hammer through same issues – different names again and again."[3044]

**Responses:**

**Russ Anderson** did not dispute that the above text is an accurate depiction of contents of an email sent by Ms. Nelson to a group that included Respondent Russ Anderson.[3045] She disputed whether the exhibit supporting the Statement establishes a timeframe for the events described in the text.

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that on December 19, 2013, Susan Nelson, a senior leader in the Human Resources function, emailed Respondent Russ Anderson expressing concerns, through the text shown above, about large number of terminations for sales integrity violations.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 305**

---

[3044] MSD-123.

[3045] Russ Anderson's ECSFM at No.304

As a member of the Bank's Internal Fraud Committee, Respondent Russ Anderson received reporting on sales integrity violations, including trends.[3046] For example, a report Respondent Russ Anderson received on February 20, 2013 showed that customer consent was the largest category of Sales Integrity Violations cases, and the total number of Sales Integrity Violations cases increased from 2,609 in 2011 to 2,699 in 2012.[3047] The report also informed Respondent Russ Anderson that the number of terminations and resignations associated with Sales Integrity Violations increased from 935 in 2011 to 1,152 in 2012, with customer consent being the largest category associated with such terminations and resignations.[3048] Confirmed fraud associated with Sales Integrity Violations cases also increased from 2011 to 2012.[3049]

**Responses:**

**Russ Anderson** did not dispute that she received regular reports on multiple topics including sales integrity violations and termination/resignation statistics, and that the referenced reports contain the referenced statistics. She disputed that received MSD-244 or had knowledge of the information contained in MSD-244, and disputed that she received MSD-223 or had knowledge of the information contained in MSD-223.

It is a material fact in issue whether Respondent Russ Anderson, as alleged by Enforcement Counsel in this Statement, was aware of the trends described in this Statement, as reflected in the cited Reports (MSD-223 and MSD-244).

While I find uncontroverted that (1) a report sent to Respondent Russ Anderson dated February 20, 2013 showed that customer consent was the largest category of Sales Integrity Violations cases, and the total number of Sales Integrity Violations cases increased from 2,609 in 2011 to 2,699 in 2012;[3050] (2) the report also stated that the number of terminations and resignations associated with Sales Integrity Violations increased from 935 in 2011 to 1,152 in 2012, with customer consent being the largest category associated with such terminations and resignations;[3051] and (3) confirmed fraud associated with Sales Integrity Violations cases also increased from 2011 to 2012; I find that in her Response to Statement No. 305, Russ Anderson sufficiently demonstrated a factual controversy exists regarding her knowledge of the contents of these reports circa 2013. Because of the existence of these material controverted facts, summary disposition is not available with respect to Respondent Russ Anderson regarding this claim.

---

[3046] MSD-218; MSD- 219; MSD-222 at 9-14; MSD-223.

[3047] MSD-218 at 7.

[3048] MSD-218 at 11.

[3049] MSD-218 at 12, 13); MSD- 244.

[3050] MSD-218 at 7.

[3051] MSD-218 at 11.

Pursuant to the OCC's Uniform Rules, the merits of the disputed claims raised in (Russ Anderson) Statement No. 305 will be addressed during the hearing set to begin on September 13, 2021.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 306**

In or around September 2015, Respondent Russ Anderson received information that employee survey results revealed continued sales pressure: "Sales pressure makes people make unethical decisions and damage customer loyalty to the bank and sometimes cause harm to their credit. I see so many bankers selling or lying to customer about our fees on some [of] our products just to meet their solutions at the end of the day to keep their jobs."[3052] Respondent Russ Anderson wanted to shut down the survey. She replied by email dated September 11, 2015: "What I think we need to consider is do we want to allow these kind of 'surveys' to occur any longer. It is a new world."[3053]

**Responses:**

**Russ Anderson** did not dispute that the quoted text is an accurate depiction of what it purports to be, but disputed the characterization that she wanted to shut down the survey, and averred that she "is entitled to seek and rely upon the advice of legal counsel."[3054]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that in or around September 2015, she received information that employee survey results revealed continued sales pressure: "Sales pressure makes people make unethical decisions and damage customer loyalty to the bank and sometimes cause harm to their credit. I see so many bankers selling or lying to customer about our fees on some [of] our products just to meet their solutions at the end of the day to keep their jobs." She replied by email dated September 11, 2015: "What I think we need to consider is do we want to allow these kind of 'surveys' to occur any longer. It is a new world."

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 307**

The Community Bank's former Chief Compliance Officer, who reported to Respondent Russ Anderson from 2011 through 2015, determined:

> It is my opinion that as the Community Bank's Group Risk Officer, Claudia Russ Anderson was in a position to understand the full scope and systemic nature of sales integrity violations

---

[3052] MSD-217 at 6.

[3053] MSD-217 at 1.

[3054] Russ Anderson's ECSFM at No. 306.

within the Community Bank. She had access to important data points such as customer complaints and the employee EthicsLine. She also had responsibility for the Sales [and] Service Conduct Oversight Team (SSCOT), including its proactive monitoring work. She also had the authority to ask for whatever additional information she needed to execute her risk management and control responsibilities.[3055]

**Responses:**

**Russ Anderson** did not dispute that the quoted text is an accurate depiction of a portion of what it purports to be, but disputed that the Statement proves the allegations it contains.[3056]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the Community Bank's former Chief Compliance Officer, who reported to Respondent Russ Anderson from 2011 through 2015, opined that as the Community Bank's Group Risk Officer, Claudia Russ Anderson was in a position to understand the full scope and systemic nature of sales integrity violations within the Community Bank. She had access to important data points such as customer complaints and the employee EthicsLine. She also had responsibility for the Sales and Service Conduct Oversight Team (SSCOT), including its proactive monitoring work. She also had the authority to ask for whatever additional information she needed to execute her risk management and control responsibilities.

**For years, customers complained about being victimized from sales practices misconduct**

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 308 and (Julian and McLinko) No. 137**

Customers contacted the Bank alleging lack of consent for Bank products and services.[3057]

**Responses:**

Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 308 and (Julian and McLinko) No. 137 rely on exhibits presented to this Tribunal as being non-public. Pursuant to

---

[3055] MSD-56 (Christoff Decl.) at ¶ 19.

[3056] Russ Anderson's ECSFM at No. 307.

[3057] (MSD-72 at 7; MSD-151; MSD-247.

Add. 626

Appellate Case: 25-1079     Page: 628     Date Filed: 05/16/2025 Entry ID: 5517644

the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[3058] Upon my review of the confidential documents supporting these Statements of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in these Statements of Material Fact.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 309**

On or around November 2011, Respondent Russ Anderson was informed that a customer received two debit cards in the mail that he never ordered. "On the day he was writing this letter to Carrie Tolstedt and the RP [Regional President] . . . he received another debit card in the mail. . . ."[3059]

**Responses:**

**Russ Anderson** did not dispute that the cited evidence references a 2011 incident where a single customer purportedly received two debit cards he did not order, but disputed that there is sufficient information to determine whether the single incident referenced from 2011, (MSD-700), involved a confirmed violation of law or Bank policy at the time.[3060]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that on or around November 2011, she was informed that a customer received two debit cards in the mail that he never ordered. "On the day he was writing this letter to Carrie Tolstedt and the RP [Regional President] . . . he received another debit card in the mail. . . ."

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 310**

On February 27, 2013, Respondent Russ Anderson wrote in an email that "this week has been busy with unauthorized account opening complaints."[3061]

---

[3058] See 12 C.F.R. § 19.33(b).

[3059] MSD-700.

[3060] Russ Anderson's ECSFM at No. 309.

[3061] MSD-102.

Appellate Case: 25-1079     Page: 629     Date Filed: 05/16/2025 Entry ID: 5517644

**Responses:**

**Russ Anderson** did not dispute that the evidence cited contains the quoted language, but disputed the Statement because the relied-upon exhibit provides no information on whether this single complaint was confirmed as factually true or a violation of law or Bank policy[3062]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that on February 27, 2013, she wrote in an email that "this week has been busy with unauthorized account opening complaints."

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 311

On or around December 19, 2013, Respondent Russ Anderson was informed about concerns from a customer "that an additional checking account was opened and funded with $50.00 without her knowledge or consent."[3063]

**Responses:**

**Russ Anderson** objected to the Statement on the ground that the supporting exhibit was irrelevant.[3064] Finding an insufficient nexus between the averments presented in the Statement and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Russ Anderson) No. 311 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 312

In a 2014 complaint forwarded to Respondent Russ Anderson, a customer pointed out: "If I were to take a [stranger's] information and apply for credit cards with it, I would go to jail. It is morally and legally criminal. In a world where a credit score controls many important aspects of your life, it is truly scary that an employee of a financial institution can manipulate my information and assert himself into my personal and financial life."[3065]

**Responses:**

---

[3062] Russ Anderson's ECSFM at No. 310.

[3063] MSD-700.

[3064] See Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 35, incorporating the objections by Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[3065] Russ Anderson Amended Answer ¶ 46; MSD-110.

**Russ Anderson** did not dispute that the cited exhibit contains the quoted language, but disputed the claim because the evidence cited does not demonstrate whether the customer's complaint quoted in the Statement was validated, or whether the allegations against the Bank employee were confirmed as a violation of law or Bank policy.

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that in a 2014 complaint forwarded to her, a customer pointed out: "If I were to take a [stranger's] information and apply for credit cards with it, I would go to jail. It is morally and legally criminal. In a world where a credit score controls many important aspects of your life, it is truly scary that an employee of a financial institution can manipulate my information and assert himself into my personal and financial life."

**Employees repeatedly informed senior leadership about significant pressure to meet unreasonable sales goals and its impact on gaming and sales practices misconduct**

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 313

During her tenure as Group Risk Officer, Respondent Russ Anderson received employee complaints and petitions related to sales goals, sales pressure, gaming, sales integrity violations, and various forms of sales practices misconduct.[3066]

**Responses:**

**Russ Anderson**: The Statement is "[u]ndisputed to the extent Ms. Russ Anderson admitted 'there were some complaints about sales goals' during her tenure as Group Risk Officer," but disputed as the dates cited in the supporting exhibits "do not span [her] tenure as Group Risk Officer," and refer to anonymous complaints posted to an online petition by unidentified people and people claiming to be current and former Bank employees.

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that during her tenure as Group Risk Officer, she received employee complaints and petitions related to sales goals, sales pressure, gaming, sales integrity violations, and various forms of sales practices misconduct.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 314

---

[3066] Russ Anderson Amended Answer ¶ 30; MSD-138; MSD-139; MSD-140.

Each year, nearly half of all EthicsLine cases related to employee sales integrity violations.[3067]

**Responses:**

**Russ Anderson** disputed the factual premises presented in this Statement. She asserted that when asked if "sales incentive program violations constituted a significant portion of the EthicsLine submissions[,]" Ms. Russ Anderson responded, "I don't know that I – that that was a conscious thought, no." (Id. at 59:24-60:6). She asserted that while she testified that she recalled receiving EthicsLine reports by category, (Id. at 59:17-23, 60:7-9), she disagreed that "sales incentive program violations constituted a significant portion of the EthicsLine submissions" as SOF ¶ 314 alleges. (Id. at 59:17-60:9).

While the metric of "nearly half" is not material in itself, the number and proportion of EthicsLine cases that related to employee sales integrity violations is material to the issues raised in the Notice of Charges, at least during the years 2013 through 2016.

I find that in her Response to Statement No. 314, Russ Anderson sufficiently demonstrated a factual controversy exists regarding (1) the number of EthicsLine cases that related to employee sales integrity violations when compared with other issues between 2013 and 2016; and (2) her knowledge of the correct metric during that period. Pursuant to the OCC's Uniform Rules, the merits of the disputed claims raised in (Russ Anderson) Statement No. 314 will be addressed during the hearing set to begin on September 13, 2021.


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 315**

By 2010, there was "a significant increase in EthicsLine reports within the Eastern Community Bank, up approximately 200%, primarily related to Sales Integrity matters."[3068]

**Responses:**

**Russ Anderson** did not dispute that the exhibit cited contains the quoted language, but disputed the relevance and materiality of the claim on the basis that "Sales integrity violations" include potential types of misconduct that are immaterial to "sales practices

---

[3067] Russ Anderson Amended Answer ¶ 35; MSD-132; MSD-133 ("CFPB and Sales Integrity issues are most prevalent – there needs to be continued focus in this area."); MSD-134 ("As of June 30, 2015, Ethics Line reports aggregated 4,344, the majority (57%) of which pertained to allegations of sales incentive program violations, followed by policy issues and fraud."); MSD-135; MSD-136; MSD-266 (Russ Anderson Dep. Tr.) at 59:17-60:9 (testifying that she received EthicsLine reporting by categories and that EthicsLine complaints related to sales integrity violations or sales incentive program violations constituted a significant portion of the EthicsLine submissions); (MSD-161 at 4, 7); MSD-162 at 3,4; MSD-163; MSD-164; MSD- 165; MSD-166; MSD-167; MSD-168.

[3068] MSD-230.

Add. 630

Appellate Case: 25-1079    Page: 632    Date Filed: 05/16/2025 Entry ID: 5517644

misconduct."[3069]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that by 2010, there was "a significant increase in EthicsLine reports within the Eastern Community Bank, up approximately 200%, primarily related to Sales Integrity matters."

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 316

Employees also sent letters and emails to senior leadership, and in some cases Respondent Russ Anderson directly, regarding sales pressure to meet sales goals and gaming within the regional branch network.[3070]

    a. On or around July 5, 2012, Respondent Russ Anderson became aware of an employee complaint, which stated the reality in the branches was the continual opening of fake accounts: "As I mentioned above, I have undergone company training, based on the ethics and values of Wells Fargo, which I really appreciate on a personal level, I have found many inconsistencies from my training to the reality in the branch. . . . The reason for the call [to the EthicsLine] was watching them continually open fake accounts. In the branch they call them travel accounts (an extra account for customers who often already maintain multiple checking and savings). More than simply opening the accounts, they were using fear tactics, creating a need when there was none – creating theoretical scenarios where a customer money is in danger, all in the name of making the store's goals . . ."[3071]

**Responses:**

**Russ Anderson** objected to the Statement on the ground that the supporting exhibits (MSD-158, MSD-159, MSD-160, MSD-248, and MSD-699) were inadmissible on the grounds that their contents were irrelevant, immaterial, unreliable, or repetitive.[3072] Finding that given the passage of time an insufficient nexus has been shown between the averments presented in the Statement

---

[3069] Russ Anderson's ECSFM at No. 315.

[3070] MSD-158; MSD-159 ("This is not a call for a major investigation to root out the cheaters. This is a call to change the sales goals. Markets and solution goals need to [be] re-evaluated and changed to allow honesty and integrity in dealing with the customers"); MSD-160; MSD-248.

[3071] MSD-699.

[3072] See Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 35, incorporating the objections by Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

through these specific exhibits and the material facts in issue, the objection is sustained on the ground that the contents are not material to the charges presented against Respondent Russ Anderson. Accordingly, the claims presented in (Russ Anderson) No. 316 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in this Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 317**

On or around October 18, 2013, after the first *Los Angeles Times* article, Respondent Russ Anderson received a petition from employees.[3073] A word cloud of the comments from the petition included the following repeated themes: pressure; unethical; sales; harassed; unrealistic; sell.[3074] The petition contained testimonials from current and former employees and customers.[3075] The testimonials included complaints about pressure to meet excessive and unrealistic sales goals creating an environment for unethical behaviors.[3076]

**Responses:**

**Russ Anderson** did not dispute her receipt of the cited petition, but disputed its reliability.[3077]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that on or around October 18, 2013, after the first *Los Angeles Times* article, Respondent Russ Anderson received a petition from employees. A word cloud of the comments from the petition included the following repeated themes: pressure; unethical; sales; harassed; unrealistic; sell. The petition contained testimonials from current and former employees and customers. The testimonials included complaints about pressure to meet excessive and unrealistic sales goals creating an environment for unethical behaviors.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 318**

On April 28, 2016, the Head of the Ethics Office informed Respondent Russ Anderson that in the first quarter of 2016, "Sales Incentive Program Violations" remained the largest

---

[3073] MSD-140.

[3074] MSD-140 at 2.

[3075] MSD-140 at 4-15.

[3076] MSD-140 at 4-15/

[3077] Russ Anderson's ECSFM at No. 317.

Appellate Case: 25-1079     Page: 634     Date Filed: 05/16/2025 Entry ID: 5517644

EthicsLine case type, constituting 47% of EthicsLine cases.[3078]

**Responses:**

**Russ Anderson** did not dispute being informed as presented in the Statement, but disputed its import on the ground that the Statement does not state that any of the EthicsLine complaints referenced were confirmed as actual sales incentive program violations or sales practices misconduct.[3079]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that on April 28, 2016, the Head of the Ethics Office informed her that in the first quarter of 2016, "Sales Incentive Program Violations" remained the largest EthicsLine case type, constituting 47% of EthicsLine cases.

**Respondent Russ Anderson downplayed the sales practices misconduct problem and failed to escalate and accurately report the root cause, scope, and duration of the problem to senior management and the Enterprise Risk Management Committee**

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 319

Respondent Russ Anderson continually downplayed negative information about what was actually happening in the Community Bank with respect to sales integrity violations.[3080]

**Responses:**

**Russ Anderson** disputed the claim on the ground that it was vague as to time and does not specify the kind of misconduct being discussed; on the ground that the expert report of David Abshier documented that the OCC had been aware of sales integrity violations going back to at least 2010; and on the ground that there is evidence that she "contributed to the development of improved systems and processes in the Community Bank's SSCOT unit to detect sales misconduct, and, particularly after the Los Angeles Times articles, participated in efforts by the Community Bank to communicate to managers that undue sales pressure and

---

[3078] MSD-135.

[3079] Russ Anderson's ECSFM at No. 318.

[3080] MSD-280 (Board Report) at 52, 53 ("Russ Anderson minimized and obscured issues in reporting on the Community Bank, including sales practices."); MSD-13; MSD-14; MSD-295 (Bacon Tr.) 41:13-42:1; 44:5-45:18; see also 296A (Bacon Dep. Tr.) at 62:8-16; 107:10-108:1); MSD-297 (Richards Tr.) at 230:3-8; MSD-93; MSD-293A (Hardison Tr.) at 49:16-51:11; MSD-642 (Hardison Dep. Tr.) at 86:22-87:25, 88:1-18; MSD-297 (Richards Tr.) at 44:5-46:22.

Add. 633

Appellate Case: 25-1079     Page: 635     Date Filed: 05/16/2025 Entry ID: 5517644

sales misconduct were not acceptable."[3081]

Whether (and the extent to which) Respondent Russ Anderson downplayed negative information about what was actually happening in the Community Bank between 2013 and 2016 with respect to sales integrity violations is a material fact in issue. I find that in her Response to Statement No. 319, Russ Anderson sufficiently demonstrated a factual controversy exists regarding her response to the sales integrity violations occurring between 2013 and 2016. Because of the existence of these material controverted facts, summary disposition is not available with respect to Respondent Russ Anderson regarding this claim. Pursuant to the OCC's Uniform Rules, the merits of the disputed claims raised in (Russ Anderson) Statement No. 319 will be addressed during the hearing set to begin on September 13, 2021.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 320

After she received the first *Los Angeles Times article*, in November 2013, Respondent Russ Anderson received detailed reporting showing the number of employees terminated for sales integrity violations and the number of employees who resigned related to sales integrity violations for the years 2012 and 2013.[3082] The reporting broke out the number of cases Corporate Investigations investigated by case type, including sales integrity violations and the sub-types of cases that comprised sales integrity violations, including "customer consent," "funding manipulation," and "fictitious customer." The reporting also identified the number of cases investigated by region. Respondent Russ Anderson was explicitly informed: "Look at customer consent, #1 issue." Instead of expressing concern about this, Respondent Russ Anderson stated in an email: "I also don't know how they classify cases so take this with somewhat of a grain of salt."[3083]

**Responses:**

**Russ Anderson** did not dispute her receipt of the reports presented in the Statement or the responses attributed to her in the Statement, but disputed how the term "sales integrity violations" was used, such that it would encompass practices that are not material to the issues raised in the Notice of Charges.[3084]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that after she received the first *Los Angeles*

---

[3081] Russ Anderson's ECSFM at No.319, quoting MSD-280 at 52.

[3082] MSD-13.

[3083] MSD-14.

[3084] Russ Anderson's ECSFM at No. 320.

Appellate Case: 25-1079    Page: 636    Date Filed: 05/16/2025 Entry ID: 5517644

*Times article*, in November 2013, Respondent Russ Anderson received detailed reporting showing the number of employees terminated for sales integrity violations and the number of employees who resigned related to sales integrity violations for the years 2012 and 2013. The reporting broke out the number of cases Corporate Investigations investigated by case type, including sales integrity violations and the sub-types of cases that comprised sales integrity violations, including "customer consent," "funding manipulation," and "fictitious customer." The reporting also identified the number of cases investigated by region. Respondent Russ Anderson was explicitly informed: "Look at customer consent, #1 issue." Instead of expressing concern about this, Respondent Russ Anderson stated in an email: "I also don't know how they classify cases so take this with somewhat of a grain of salt."

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 321

The former Head of Corporate Investigations Michael Bacon testified that he "had continuing, ongoing conversations with [Respondent Russ Anderson] from day 1 until I left."[3085] Mr. Bacon testified that Respondent Russ Anderson was "very aware that [sales integrity] was a problem." He based his testimony on "six to eight years of conversations with her, verbally, face to face, telephonically, emails, *and it was a continuous conversation*."[3086] He explained that she often downplayed the information he provided to her related to sales integrity violations:

> A: You know Claudia often pushed back on certain numbers, certain verbiage that were in our reports. And so we would have either an email exchange or, probably more frequently, a verbal discussion around it. And she did follow the Carrie Tolstedt approach of trying to minimize it, and so there was a lot of, you know, detailed discussions in support of why I was reporting what I reported. There is no question she acknowledged it, but she certainly leaned towards downplaying it, if you will, or trying to find another metric to soften the obvious – what I would call an obvious number or concern. And again, that was just frequent discussions.[3087]

**Responses:**

**Russ Anderson** did not dispute the text as presented is an accurate quote from the sources

---

[3085] MSD-295 (Bacon Tr.) at 39:6-19.

[3086] MSD-295 (Bacon Tr.) at 40:12-41:11.

[3087] MSD-295 (Bacon Tr.) 41:13-42:1; 44:5-45:18; see also 296A (Bacon Dep. Tr.) at 62:8-16; 107:10-108:1).

cited, but disputed the materiality of the citations.[3088] She also offered the following additional testimony from Mr. Bacon:

> Q. Okay. And I think you testified when you gave your sworn statement to the OCC, that you had issues with Claudia minimizing the details and data around the issue of sales practices misconduct that we're talking about; is that correct?
>
> A. Yes, sir.
>
> Q. Okay. And can you tell us, what were the -- what were the nature of your -- your disagreements with Ms. Russ Anderson.
>
> A. Sure. First, I had the utmost respect for Claudia Russ, and I -- I think we had a -- a great relationship and a -- a great technically business partnership. But Claudia was known to challenge just numbers, trends, stats, definitions. That was just her -- her style and her role. So, you know, minimizing was certainly part of it. She also certainly wanted to understand it, which I applauded, but -- but, yes, there was a trend of -- of challenge and -- and an issue of trying to minimize some of the negative that -- that was in -- in our trends or in our data.[3089]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the former Head of Corporate Investigations Michael Bacon testified that he "had continuing, ongoing conversations with [Respondent Russ Anderson] from day 1 until I left." Mr. Bacon testified that Respondent Russ Anderson was "very aware that [sales integrity] was a problem." He based his testimony on "six to eight years of conversations with her, verbally, face to face, telephonically, emails, and it was a continuous conversation." He explained that she often downplayed the information he provided to her related to sales integrity violations:

> You know Claudia often pushed back on certain numbers, certain verbiage that were in our reports. And so we would have either an email exchange or, probably more frequently, a verbal discussion around it. And she did follow the Carrie Tolstedt approach of trying to minimize it, and so there was a lot of, you know, detailed discussions in support of why I was reporting what I reported. There is no question she acknowledged it, but she certainly leaned towards downplaying it, if you will, or trying to find another metric to soften the obvious – what I would call an obvious number or concern. And again, that was just frequent discussions.

---

[3088] Russ Anderson's ECSFM at No. 321.

[3089] Russ Anderson's ECSFM at No. 321, quoting MSD-296A (Bacon Tr.) at 61:19-62:16.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 322**

James Richards, Mr. Bacon's successor as the Head of Corporate Investigations and the Director of the Bank's Financial Crimes Risk Management Group, testified that Respondent Russ Anderson continued to challenge the characterization of sales integrity violations:

> Q: . . . And then the last point, note that Community Banking often challenges our characterization of sales integrity. Is there anyone specifically from Community Banking that you're referring to here?
>
> A: Claudia Russ Anderson.[3090]

**Responses:**

**Russ Anderson** did not dispute that the quoted language accurately reflects the witness's testimony, but disputed the Statement because it fails to take into consideration Mr. Richards' testimony as to why he felt Ms. Russ Anderson challenged the characterization of sales integrity violations.[3091]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that James Richards, Mr. Bacon's successor as the Head of Corporate Investigations and the Director of the Bank's Financial Crimes Risk Management Group, testified as is shown above.


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 323**

In September 2012, the Bank's Chief Risk Officer Michael Loughlin asked the Community Bank to present to the Enterprise Risk Management Committee to address his concerns with turnover and sales goals.[3092] He provided seven specific questions for the Community Bank to answer. Respondent Russ Anderson knew the questions that the Chief Risk Officer requested be answered.[3093] Mr. Loughlin asked the following questions: (1) does our emphasis on cross sell increase turnover; (2) how do we, or the managers on the front line, know that our cross sells (solutions) are high quality and in the customer's benefit?; (3) Does emphasizing the number of solutions mean we run the risk of flogging product and potentially irritating the

---

[3090] MSD-297 (Richards Tr.) at 230:3-8; MSD-93.

[3091] Russ Anderson's ECSFM at No. 322.

[3092] MSD-233; MSD-290A (Loughlin Tr.) at 113:17-115:1; Loughlin Dep. Tr. 30:17-33:1.

[3093] MSD-233; MSD-290A (Loughlin Tr.) at 113:17-115:1; Loughlin Dep. Tr. 30:17-33:1.

customer?; (4) Are we selling too many products?; (5) How do we pay our people for cross sell?; (6) How does the competition cross sell and pay their people?; and (7) How does 11 ways to wow fit in to the cross sell strategy?[3094]

**Responses:**

**Russ Anderson** objected to the Statement on the ground that the supporting exhibit was irrelevant, immaterial, unreliable, or repetitive.[3095] Finding an insufficient nexus between the averments presented in the Statement concerning Mr. Loughlin's 2012 questions he presented to Respondent Russ Anderson and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Russ Anderson) No. 323 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 324

Respondent Russ Anderson reviewed and provided feedback on the written materials Community Bank senior leadership planned to present at the Enterprise Risk Management Committee meeting in September 2012.[3096]

**Responses:**

**Russ Anderson** objected to the Statement on the ground that the supporting exhibits were irrelevant, immaterial, unreliable, or repetitive.[3097] Finding an insufficient nexus between the averments presented in the Statement concerning the feedback she gave to materials to be presented to the Enterprise Risk Management Committee meeting in September 2012 and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Russ Anderson) No. 324 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 325

---

[3094] MSD-233.

[3095] See Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 35, incorporating the objections by Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[3096] MSD-234; MSD-235.

[3097] See Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 35, incorporating the objections by Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

The presentation made no mention of: (1) undue pressure to meet unreasonable sales goals; (2) that employees engaged in sales practices misconduct in order to sustain employment or gain incentive compensation; and (3) that the Bank did not have sufficient preventative or detective controls.[3098] Respondent Russ Anderson did not suggest that any of the above points be added.[3099]

**Responses:**

**Russ Anderson** objected to the Statement on the ground that the supporting exhibits were irrelevant, immaterial, unreliable, or repetitive.[3100] Finding an insufficient nexus between the averments presented in the Statement concerning the referenced presentation and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Russ Anderson) No. 325 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 326

The Chief Risk Officer Michael Loughlin testified that he was dissatisfied with the Community Bank's presentation to the Enterprise Risk Management Committee in September 2012 because "[i]t was high level, jargon filled, and he [Matthew Raphaelson] did not answer the questions that I had sent him before the meeting."[3101]

**Responses:**

**Russ Anderson** objected to the Statement on the ground that the supporting exhibits were irrelevant, immaterial, unreliable, or repetitive.[3102] Finding an insufficient nexus between the averments presented in the Statement concerning the Mr. Loughlin's testimony and the material facts in issue, the objection is sustained. Accordingly, the claims presented in (Russ Anderson) No. 326 will not support Enforcement Counsel's Motion. The exclusion of the claims appearing in the Statement does not, however, create a factual basis that would prevent granting

---

[3098] See MSD-235 at 10-37.

[3099] MSD-234.

[3100] See Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 35, incorporating the objections by Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

[3101] MSD-611 (Loughlin Dep. Tr.) at 32:4-14.

[3102] See Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 35, incorporating the objections by Respondent Julian at Respondent Julian's Objections to Enforcement Counsel's Motion for Summary Disposition Exhibits.

Enforcement Counsel's Motion.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 327**

In March 2014, in preparation for an Internal Fraud Committee meeting, a committee on which Respondent Russ Anderson was a member, a compliance consultant in the Community Bank asked: "Does it make sense to provide an update as it relates to the Corrective Action Task Force that was formed to address the LA Times Issues?"[3103] Respondent Russ Anderson replied: "No need to mention anything on the LA Times article."[3104]

**Responses:**

**Russ Anderson** did not dispute the language attributed to the compliance consultant and her response thereto, but averred that Enforcement Counsel "avoids providing any context for the discussion between Ms. Russ Anderson and Justin Richards, CAMS Compliance Consultant."[3105]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that on March 2014, in preparation for an Internal Fraud Committee meeting, a committee on which Respondent Russ Anderson was a member, a compliance consultant in the Community Bank asked: "Does it make sense to provide an update as it relates to the Corrective Action Task Force that was formed to address the LA Times Issues?" Respondent Russ Anderson replied: "No need to mention anything on the LA Times article."

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 328**

Respondent Russ Anderson presented to the Enterprise Risk Management Committee on April 9, 2014.[3106]

**Responses:**

**Russ Anderson** disputed that she made a presentation, averring that she was at an airport at the time of the meeting, that she was "an ERMC Guest during the April 9, 2014 meeting," and that although the minutes of the meeting state she "presented" at the meeting she spoke "very

---

[3103] MSD-220 at 3.

[3104] MSD-220 at 1.

[3105] Russ Anderson's ECSFM at No. 327.

[3106] Russ Anderson Amended Answer ¶ 270; MSD-28.

"little" and the presentation itself was made by Jason MacDuff.[3107]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that Respondent Russ Anderson presented to the Enterprise Risk Management Committee on April 9, 2014.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 329

The Bank's Chief Risk Officer Michael Loughlin asked Respondent Russ Anderson and another member of the Community Bank leadership team (Jason MacDuff) to present at the April 9, 2014 Enterprise Risk Management Committee meeting.[3108]

**Responses:**

**Russ Anderson** did not dispute that Mr. Loughlin testified as cited in the Statement, and disputed that she downplayed the sales practices misconduct.[3109]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the Bank's Chief Risk Officer Michael Loughlin asked Respondent Russ Anderson and another member of the Community Bank leadership team (Jason MacDuff) to present at the April 9, 2014 Enterprise Risk Management Committee meeting.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 330

Mr. Loughlin testified that he asked Respondent Russ Anderson and another member of the Community Bank to present at the April 9, 2014 Enterprise Risk Management Committee meeting because between the *Los Angeles Times* articles "and April of 2014 was a good time to bring the community bank in front of the ERMC [Enterprise Risk Management Committee], as they would have had approximately six months to analyze the issue and come up with some solutions."[3110]

**Responses:**

**Russ Anderson** did not dispute that Mr. Loughlin testified as cited in the Statement, and

---

[3107] Russ Anderson's ECSFM at No. 328.

[3108] MSD-290A (Loughlin Tr.) at 154:15-155:24.

[3109] Russ Anderson's ECSFM at No. 329.

[3110] MSD-611 (Loughlin Dep. Tr.) at 121:23-122:6.

Appellate Case: 25-1079     Page: 643     Date Filed: 05/16/2025 Entry ID: 5517644

disputed that she downplayed the sales practices misconduct.[3111]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that Mr. Loughlin asked Respondent Russ Anderson and another member of the Community Bank to present at the April 9, 2014 Enterprise Risk Management Committee meeting because between the *Los Angeles Times* articles "and April of 2014 was a good time to bring the community bank in front of the ERMC [Enterprise Risk Management Committee], as they would have had approximately six months to analyze the issue and come up with some solutions."

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 331

Approximately two and a half months earlier, on or around January 23, 2014, a member of SSCOT, which reported to Respondent Russ Anderson, informed her that SSCOT had seen a "33% Year over Year" increase in sales quality allegations from fourth quarter 2013 versus fourth quarter 2012 and that "allegations as a whole are up; not just concentrated in LA- OC [Los Angeles - Orange County]." The SSCOT member also provided data showing allegations by product (e.g., credit card, line of credit, online/bill pay, etc.). Respondent Russ Anderson asked: "Of the products listed were the allegations re: consent?" In response, the SSCOT team member told Respondent Russ Anderson, "[f]or the most part yes."[3112]

**Responses:**

**Russ Anderson** did not dispute that she had been informed as reported in the Statement, but averred the data referenced as the basis for increase cited by Enforcement Counsel was preliminary, raising questions as to its ultimate accuracy.[3113]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that approximately two and a half months earlier, on or around January 23, 2014, a member of SSCOT, which reported to Respondent Russ Anderson, informed her that SSCOT had seen a "33% Year over Year" increase in sales quality allegations from fourth quarter 2013 versus fourth quarter 2012 and that "allegations as a whole are up; not just concentrated in LA- OC [Los Angeles - Orange County]." The SSCOT member also provided data showing allegations by product (e.g., credit card, line of credit, online/bill pay, etc.). Respondent Russ Anderson asked: "Of the products listed were the allegations re: consent?" In response, the SSCOT team member told Respondent Russ Anderson, "[f]or the most part yes."

---

[3111] Russ Anderson's ECSFM at No. 330.

[3112] MSD-27.

[3113] Russ Anderson's ECSFM at No. 331.

Appellate Case: 25-1079    Page: 644    Date Filed: 05/16/2025 Entry ID: 5517644

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 332**

Prior to the April 9, 2014 Enterprise Risk Management Committee meeting, Respondent Russ Anderson was informed that Corporate Risk wanted more information in the written deck from her to the Committee. Specifically, Respondent Russ Anderson received an email on April 4, 2014, telling her: "Specifically, Keb [Byers] is looking what doesn't work well today in our existing sales practices, referencing a discussion with Mike [Loughlin] and the 'team member misconduct committee?' They are looking for the committee to have insight into understanding of the current state vs. future state. The deck is heavy on what is being done to bring us to a future state."[3114] Respondent Russ Anderson replied: "I am worried about putting something like that into a deck. I'd rather we did that verbally because this deck is subject to the regulators review."[3115]

**Responses:**

**Russ Anderson** did not dispute that the quoted material accurately reflects what was said, but disputed by referring to Ms. Farrell's deposition testimony to the effect that it is "not only an acceptable practice to not include negative information in presentations, but it is done in every single bank."[3116]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that prior to the April 9, 2014 Enterprise Risk Management Committee meeting, Respondent Russ Anderson was informed that Corporate Risk wanted more information in the written deck from her to the Committee. Specifically, Respondent Russ Anderson received an email on April 4, 2014, telling her: "Specifically, Keb [Byers] is looking what doesn't work well today in our existing sales practices, referencing a discussion with Mike [Loughlin] and the 'team member misconduct committee?' They are looking for the committee to have insight into understanding of the current state vs. future state. The deck is heavy on what is being done to bring us to a future state." Respondent Russ Anderson replied: "I am worried about putting something like that into a deck. I'd rather we did that verbally because this deck is subject to the regulators review."

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 333**

Despite her knowledge, Respondent Russ Anderson failed to inform the Enterprise Risk Management Committee that sales quality allegations were up year over year from 2012 to 2013, that for the most part the allegations related to lack of customer consent for Bank

---

[3114] MSD-126 at 2.

[3115] MSD-126 at 1.

[3116] Russ Anderson's ECSFM at No. 332, quoting MSD-265B (Farrell Dep. Tr.) at 288:8-290:1.

Add. 643

Appellate Case: 25-1079    Page: 645    Date Filed: 05/16/2025 Entry ID: 5517644

products, or that the allegations were not limited to Los Angeles and Orange County.[3117] She also failed to tell them that customer consent remained the #1 issue.[3118]

**Responses:**

**Russ Anderson** disputed the Statement's claims regarding her failure to inform the ERMC as stated above.[3119] She averred the meeting minutes indicate that the ERMC did receive information relating to sales quality issues, including monitoring of inappropriate activity, EthicsLine referrals, drivers of inappropriate behavior, and termination rates for wrongdoing:

> Ms. Russ Anderson and Mr. MacDuff presented an update on Community Banking's Retail Bank Model and the substantial changes to improve capabilities to manage and monitor performance quality while growing the businesses…. Ms. Russ Anderson noted there is a Sales Quality team that reviews ethic line referrals and outliers in performance metrics. There are teams within the Deposit Products Group and Corporate Security that also monitor for inappropriate activity. The committee discussed whether the current model incents inappropriate behavior, which the Community Banking team doesn't believe is the case. Ms. Russ Anderson and Mr. MacDuff indicated management tries to stress a balanced message of sales, service and quality. The committee discussion also focused on holding managers accountable in cases of team member wrongdoing and possible recommendations to improve the model such as reducing turnover and increasing the tenure of store managers before moving them to their next role. Ms. Russ Anderson also noted that the Sales Quality team looks at a manager's track record prior to an individual being promoted. Mr. Loughlin inquired how many team members are terminated for wrongdoing in the Community Bank, and it was noted that this averages 1-2% of the population (approximately 1,000-2,000 per year)."[3120]

Whether Respondent Russ Anderson failed to fully inform the ERMC regarding sales quality allegations during the meeting cited in the Statement is a material fact in issue. I find that in her Response to Statement No. 333, Russ Anderson sufficiently demonstrated that a factual controversy exists regarding whether she failed to fully inform the ERMC regarding sales quality allegations. Because of the existence of these material controverted facts, summary disposition is not available with respect to Respondent Russ Anderson regarding this claim. Pursuant to the

---

[3117] MSD-28.

[3118] MSD-14.

[3119] Russ Anderson's ECSFM at No. 333

[3120] Russ Anderson's ECSFM at No. 333, quoting MSD-28 at 1.

Appellate Case: 25-1079    Page: 646    Date Filed: 05/16/2025 Entry ID: 5517644

OCC's Uniform Rules, the merits of the disputed claims raised in (Russ Anderson) Statement No. 333 will be addressed during the hearing set to begin on September 13, 2021.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 334

Instead, at the April 9, 2014 Enterprise Risk Management Committee meeting, Respondent Russ Anderson told the Committee that:

    a.    the Community Bank's business model did <u>not</u> incent inappropriate behavior;

    b.    "management tries to stress a balanced message of sales, service, and quality"; and

    c.    "the Sales Quality team looks at a manager's track record prior to an individual being promoted."[3121]

**Responses:**

**Russ Anderson** did not dispute that the quoted statements reflect what she told the Committee, but averred the Statement did not include everything that was discussed at the meeting.

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that at the April 9, 2014 Enterprise Risk Management Committee meeting, she told the Committee that the Community Bank's business model did not incent inappropriate behavior; that "management tries to stress a balanced message of sales, service, and quality"; and "the Sales Quality team looks at a manager's track record prior to an individual being promoted."

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 335

At the April 9, 2014 Enterprise Risk Management Committee meeting, in response to a question, Community Bank leadership informed the committee that one to two percent of Community Bank employees (i.e., 1,000-2,000) were terminated each year for sales practices-related wrongdoing.[3122]

**Responses:**

**Russ Anderson** disputed that the terminations of 1,000-2,000 cited above were solely for "sales practices-related wrongdoing," citing in support testimony from Mr. Loughlin, the

---

[3121] Russ Anderson Amended Answer ¶ 271; MSD-28; MSD-290A (Loughlin Tr.) at 156:23- 157:10.

[3122] Russ Anderson Amended Answer ¶ 164 (admitting part (e) of Notice paragraph (164).

Chief Risk Officer, who said he understood that "wrongdoing" as referred to the 1,000-2,000 terminations meant "anyone acting outside of policy" and terminated "for any reason for not behaving as they should have been behaving."[3123]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that at the April 9, 2014 Enterprise Risk Management Committee meeting, in response to a question, Community Bank leadership informed the committee that one to two percent of Community Bank employees (i.e., 1,000-2,000) were terminated each year for sales practices-related wrongdoing.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 336

The Bank's former Chief Administrative Officer and Director of Corporate Human Resources Hope Hardison testified before the OCC that at the April 9, 2014 Enterprise Risk Management Committee meeting, the Committee "very specifically asked the question what is the root cause of this, and they [referring to the presenters] were like we're not -- there is it's not a root cause issue, right? They still, even at that time, didn't believe there was a root cause issue to be solved."[3124]

**Responses:**

**Russ Anderson** disputed the claim presented by Ms. Hardison, but did not dispute that the statement accurately reflects her testimony;[3125] disputed the Statement because it did not disclose Ms. Hardison's testimony in which she stated was "not an expert in sales practices misconduct" and because the data the Community Bank received was "very confusing" it was hard to tell if the cause was "idiosyncratic bad behavior" or if there was something that the company was doing to "incent the bad behavior."[3126]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the Bank's former Chief Administrative Officer and Director of Corporate Human Resources Hope Hardison testified before the OCC that at the April 9, 2014 Enterprise Risk Management Committee meeting, the Committee "very specifically asked the question what is the root cause of this, and they [referring to the presenters] were like we're not -- there is it's not a root cause issue, right? They still, even at

---

[3123] Russ Anderson's ECSFM at No.335, quoting MSD-611 (Loughlin Dep. Tr.) at 122:8-17.

[3124] MSD-293A (Hardison Tr.) at 49:16-51:11; MSD-280 (Board Report) at 52 ("Russ Anderson exhibited a lack of transparency and failed to escalate sales integrity issues . . . to Wells Fargo's Board of Directors and the ERMC.".

[3125] Russ Anderson's ECSFM at No. 336.

[3126] Russ Anderson's ECSFM at No. 336 quoting MSD-293A (Hardison Tr. at 53: 21-5; 54:16-23.

that time, didn't believe there was a root cause issue to be solved."

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 337**

In her deposition, Ms. Hardison again testified that she was "frustrated by [the April 9, 2014] presentation . . . I – I didn't think that it provided enough substance around getting to this issue of root cause as I recall."[3127] She also stated that "the prevailing view from the business in that [April 9, 2014] meeting was that there wasn't anything in the operating model, per se, that was incenting this behavior."[3128]

**Responses:**

**Russ Anderson** did not dispute that Ms. Hardison testified as quoted above, but averred that "other ERMC Board members felt differently" and complimented the presenters.[3129]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that Ms. Hardison testified that she was "frustrated by [the April 9, 2014] presentation . . . I – I didn't think that it provided enough substance around getting to this issue of root cause as I recall."[3130] She also stated that "the prevailing view from the business in that [April 9, 2014] meeting was that there wasn't anything in the operating model, per se, that was incenting this behavior."

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 338**

Respondent Russ Anderson failed to disclose the unreasonable or unattainable sales goals at the April 9, 2014 Enterprise Risk Management Committee meeting.[3131]

**Responses:**

**Russ Anderson** disputed the claim, averring that that sales goals were in fact being addressed and moderated beginning in 2013 - months prior to the April 2014 ERMC meeting. She gave as an example the Board Report that noted that sales goals moderated starting in 2013,[3132] and averred that she had discussed sales goals, the reasonableness of sales goals, and the

---

[3127] MSD-642 (Hardison Dep. Tr.) at 86:22-87:25.

[3128] MSD-642 (Hardison Dep. Tr.) at 88:1- 18.

[3129] Russ Anderson's ECSFM at No. 337.

[3130] MSD-642 (Hardison Dep. Tr.) at 86:22-87:25.

[3131] MSD-28.

[3132] Russ Anderson's ECSFM at No. 338, citing MSD-280 at 9.

Appellate Case: 25-1079     Page: 649     Date Filed: 05/16/2025 Entry ID: 5517644

adjustments being made to sales goals to the ERMC in a previous meeting.[3133]

Whether Respondent Russ Anderson failed to disclose the unreasonable or unattainable sales goals at the April 9, 2014 ERMC meeting is a material fact in issue.

I find that in her Response to Statement No. 338, Russ Anderson sufficiently demonstrated a factual controversy exists regarding the extent to which she disclosed the unreasonable or unattainable sales goals at the April 9, 2014 Enterprise Risk Management Committee meeting. Because of the existence of these material controverted facts, summary disposition is not available with respect to Respondent Russ Anderson regarding this claim. Pursuant to the OCC's Uniform Rules, the merits of the disputed claims raised in (Russ Anderson) Statement No. 338 will be addressed during the hearing set to begin on September 13, 2021.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 339

Respondent Russ Anderson failed to inform the Committee about pressure placed on employees to meet sales goals at the April 9, 2014 Enterprise Risk Management Committee meeting.[3134]

**Responses:**

**Russ Anderson** disputed the Statement on the basis that the cited exhibits do not provide direct or indirect evidence that she failed to inform the Committee about pressure placed on employees to meet sales goals.[3135]

Inasmuch as the claims presented in (Russ Anderson) No. 338 are to be included in the evidentiary hearing, and inasmuch as the claims raised in (Russ Anderson) No. 339 are closely related to the claims raised in No. 338, the merits of the disputed claims raised in (Russ Anderson) Statement No. 339 will be addressed during the hearing set to begin on September 13, 2021.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 340

Respondent Russ Anderson failed to inform the Committee of the pause on proactive monitoring at the April 9, 2014 Enterprise Risk Management Committee meeting.[3136]

---

[3133] Russ Anderson's ECSFM at No. 338, citing MSD-266 (Russ Anderson Dep. Tr.) at 120:7-121:1.

[3134] MSD-28.

[3135] Russ Anderson's ECSFM at No. 339.

[3136] MSD-28.

Add. 648

Appellate Case: 25-1079    Page: 650    Date Filed: 05/16/2025 Entry ID: 5517644

Inasmuch as the claims presented in (Russ Anderson) No. 338 are to be included in the evidentiary hearing, and inasmuch as the claims raised in (Russ Anderson) No. 339 are closely related to the claims raised in No. 340, the merits of the disputed claims raised in (Russ Anderson) Statement No. 340 will be addressed during the hearing set to begin on September 13, 2021.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 341**

Respondent Russ Anderson failed to inform the Enterprise Risk Management Committee that she was uncomfortable with the pause on proactive monitoring or that it hindered SSCOT's ability to detect additional sales practices misconduct.[3137]

**Responses:**

Inasmuch as the claims presented in (Russ Anderson) No. 338 are to be included in the evidentiary hearing, and inasmuch as the claims raised in (Russ Anderson) No. 341 are closely related to the claims raised in No. 338, the merits of the disputed claims raised in (Russ Anderson) Statement No. 341 will be addressed during the hearing set to begin on September 13, 2021.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 342**

Respondent Russ Anderson testified that she has no regrets about what she communicated to the Enterprise Risk Management Committee on April 9, 2014:

> Q: Okay. Do you have any regrets about what you communicated to the enterprise risk management committee at this meeting on April 9, 2014?
>
> A: I have no regrets.[3138]

**Responses:**

**Russ Anderson** did not dispute that she provided the testimony shown above, and averred there was no reason for her to have any regrets.[3139] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she provided the testimony shown above.

---

[3137] MSD-266 (Russ Anderson Dep. Tr.) at 136:9-25.

[3138] MSD-266 (Russ Anderson Dep. Tr.) at 202:19-22.

[3139] Russ Anderson's ECSFM at No. 342.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 343**

In April 2015, Mr. Richards reported to the Audit & Examination Committee of the Board that the Community Bank terminated 14 team members per business day.[3140] He testified that Respondent Russ Anderson was frustrated by his reporting of this statistic to the Board:

> Q: . . . How were you able to get the 14 team members terminated statistic? Was this something that you were able to get once you reviewed Corporate Investigations database?
>
> A: That's correct.
>
> Q: And, as far as you knew, by this point, the Board has never seen that statistic, that 14 team members are terminated per day within Community Bank, correct?
>
> A: Per business day, yes, that was my belief, yes.
>
> Q: And, take a look at the second page again. I take it Ms. Claudia Russ-Anderson responded to your email on April 25th, 2015. And, Ms. Tolstedt and Mr. Neitz are also copied on the email that she's sending you. And, she writes, Jim, do we know what makes up that statistic in terms of reason for termination? Did you have any conversations with Ms. Claudia Russ-Anderson related to you reporting this statistic to the A&E Committee?
>
> A: Yes.
>
> Q: Can you tell me about those conversations, please?
>
> A: She called me at home, I'm sorry, she called my cell phone, I was at home, it was the weekend. And, to talk about it and ask me questions about it.
>
> Q: What is it that she asked you about it?
>
> A: She asked me why I did it. She asked me why I expressed it as 14 a day. And, I believe I fairly characterized the conversation as being – as she was extremely irritated and disappointed in me, both professionally and personally.
>
> Q: Did you develop an understanding as to the source of her disappointment throughout the conversation with her?
>
> A: A source, I can't say it was the source, but a source. That she

---

[3140] MSD-144 at 6; MSD-145; MSD-146, MSD-147 at 1.

Add. 650

Appellate Case: 25-1079    Page: 652    Date Filed: 05/16/2025 Entry ID: 5517644

expressed to me that Carrie was very irritated and was assembling the team to try to refute what I had written.

Q: And, what you had written is information that you got from Corporate Investigations database, correct?

A: That's correct.

Q: From your understanding, I'm just trying to understand, what is it that would be irritating about reporting a statistic to the A&E Committee about the number of terminations within Community Bank per working day?

A: She expressed to me that it lacked context.

Q: What context did it lack according to Ms. Claudia Russ- Anderson?

A: It was a tiny percentage of the total number of tellers and bankers they had. It -- there was no breakdown on the reasons for the termination or the nature of the case, whether it was defalcation, embezzlement, forced balancing, you know, sort of the theft and type nefarious aspects of or reasons for termination or resignation.  And, that it was, frankly, not my business really to be weighing in on community banking's business.[3141]

**Responses:**

**Russ Anderson** did not dispute thee quoted text is an accurate depiction of Mr. Richards' testimony and that he reported the termination of fourteen team members per business day.[3142] She disputed that the quoted language was an accurate depiction of any conversation they had, but offered no evidence to support this claim.[3143]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that Mr. Richards provided the testimony shown above.

**Respondent Russ Anderson provided false, misleading, and incomplete reporting on sales**

---

[3141] MSD-297 (Richards Tr.) at 44:5-46:22 (emphases added); see also MSD-145.

[3142] Russ Anderson's ECSFM at No.  343.

[3143] Russ Anderson's ECSFM at No.  343.

**practices misconduct to the Risk Committee of the Board and the OCC**

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 344**

The Risk Committee of the Board requested a briefing from Community Bank senior leadership on sales practices at a meeting to be held in April 2014.[3144] After reading the draft materials, the Bank's then-Chief Risk Officer Michael Loughlin wrote in an email, on which Respondent Russ Anderson was copied: "The risk committee will want to hear from Carrie her view on: does the pressure of cross sell goals cause bad behaviour [sic]? That is what Rick asked." [3145] Carrie Tolstedt was called to jury duty and the presentation to the Risk Committee of the Board did not happen in 2014.[3146]

**Responses:**

**Russ Anderson** did not dispute that the cited Exhibit contains the above-quoted text and contains a reference to a request for a presentation to the Risk Committee of the Board on sales practices; but disputed that her knowledge of the Risk Committee's specific request for Carrie Tolstedt's opinion on the impact of cross-sell sales goals on employee behavior supports Enforcement Counsel's allegation that Ms. Russ Anderson provided false, misleading, or incomplete information.[3147]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the Risk Committee of the Board requested a briefing from Community Bank senior leadership on sales practices at a meeting to be held in April 2014, and that after reading the draft materials, the Bank's then-Chief Risk Officer Michael Loughlin wrote in an email, on which Respondent Russ Anderson was copied: "The risk committee will want to hear from Carrie her view on: does the pressure of cross sell goals cause bad behaviour [sic]? That is what Rick asked." [3148] Carrie Tolstedt was called to jury duty and the presentation to the Risk Committee of the Board did not happen in 2014.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 345**

In February 2015, the OCC commenced an examination of operational risk and cross-sell

---

[3144] MSD-152 at 2.

[3145] MSD-152 at 1.

[3146] MSD-266 (Russ Anderson Dep. Tr.) at 204:12-16.

[3147] Russ Anderson's ECSFM at No. 344.

[3148] MSD-152 at 1.

oversight within the Community Bank.[3149]

    a. As a result of the February 2015 OCC examination, the OCC issued a Matter Requiring Attention ("MRA") related to sales practices to the Community Bank on April 3, 2015.[3150]

    b. The OCC uses Matters Requiring Attention to communicate concern about a bank's deficient practices to a bank's board of directors and management.[3151]

    c. The sales practices Matter Requiring Attention found that the Community Bank "lack[ed] a formalized governance framework to oversee sales practices" and warned that the consequences of inaction included "heightened reputation risk and possible negative publicity."[3152]

**Responses:**

**Russ Anderson** did not dispute that the OCC investigated operational risk and cross-sell oversight in February 2015, the results of which formed the basis for the April 2015 MRA, but disputed that the Statement supports the OCC's allegations that she provided false, misleading, or incomplete information.[3153]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that in February 2015, the OCC commenced an examination of operational risk and cross-sell oversight within the Community Bank; that as a result of the February 2015 OCC examination, the OCC issued a Matter Requiring Attention ("MRA") related to sales practices to the Community Bank on April 3, 2015; that the OCC uses Matters Requiring Attention to communicate concern about a bank's deficient practices to a bank's board of directors and management; and that the sales practices Matter Requiring Attention found that the Community Bank "lack[ed] a formalized governance framework to oversee sales practices" and warned that the consequences of inaction included "heightened reputation risk and possible negative publicity."

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 346**

---

[3149] Russ Anderson Amended Answer ¶ 125; MSD-270 (NBE Hudson Expert Report – Revised) at ¶ 17.

[3150] Russ Anderson Amended Answer ¶ 125; MSD-270 (NBE Hudson Expert Report – Revised) at ¶¶ 44; MSD-688). Respondent Russ Anderson received the Supervisory Letter. (MSD-688).

[3151] MSD- 270 (NBE Hudson Expert Report – Revised) at ¶ 41.

[3152] MSD-688 at 3.

[3153] Russ Anderson's ECSFM at No. 345.

Appellate Case: 25-1079    Page: 655    Date Filed: 05/16/2025 Entry ID: 5517644

As the Group Risk Officer, Respondent Russ Anderson committed to fully address the corrective actions required by the OCC.[3154]

**Responses:**

**Russ Anderson** did not dispute the claim.[3155] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that as the Group Risk Officer, she committed to fully address the corrective actions required by the OCC.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 347

On or around March 30, 2015, prior to the issuance of the final Supervisory Letter arising from the February 2015 examination, OCC examiner Karin Hudson shared a draft of the sales practices MRA with Respondent Russ Anderson.[3156]

**Responses:**

**Russ Anderson** did not dispute this claim.[3157] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that on or around March 30, 2015, prior to the issuance of the final Supervisory Letter arising from the February 2015 examination, OCC examiner Karin Hudson shared a draft of the sales practices MRA with Respondent Russ Anderson.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 348

Respondent Russ Anderson attempted to edit the substantive requirements of the MRA.[3158]

**Responses:**

**Russ Anderson** admitted she "suggested changes to the MRA," but disputed that her suggested changes to the MRA were intended to change the substantive requirements. She noted at the time that she was confused by the nature of Ms. Hudson's inquiry because it changed in scope several times and was not in line with previous investigations Ms. Russ

---

[3154] MSD-266 (Russ Anderson Dep. Tr.) at 237:17-21.

[3155] Russ Anderson's ECSFM at No. 346.

[3156] MSD-153.

[3157] Russ Anderson's ECSFM at No. 347.

[3158] MSD-153; MSD-270 (NBE Hudson Expert Report – Revised) at ¶ 42; MSD-266 (Russ Anderson Dep. Tr.) at 237:12-16.

Appellate Case: 25-1079     Page: 656     Date Filed: 05/16/2025 Entry ID: 5517644

Anderson had been involved with.[3159]

Whether Russ Anderson attempted to edit the substantive requirements of the MRA is a material fact in issue. While I find uncontroverted that she did attempt to make changes to the MRA, I find that in her Response to Statement No. 348, Russ Anderson sufficiently demonstrated a factual controversy exists regarding whether she attempted to edit the substantive requirements of the MRA. Because of the existence of these material controverted facts, summary disposition is not available with respect to Respondent Russ Anderson regarding this claim. Pursuant to the OCC's Uniform Rules, the merits of the disputed claims raised in (Russ Anderson) Statement No. 348 will be addressed during the hearing set to begin on September 13, 2021

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 349

In an email dated March 31, 2015, examiner Karin Hudson explicitly informed Respondent Russ Anderson of the OCC's expectations following the February 2015 Exam:

> "However, more importantly, we want you to evaluate these sales goals and the pressure (the great eight) put on employees, which has in the past (as indicated in a December 2013 LA Times Article) lead [sic] them to either (1) engage in improper behavior, or (2) resign. In other words, have you struck the right balance between (1) increasing sales and (2) controlling incentives for improper behavior and turnover? We think this is the same question asked by the committee. We would expect analysis, something more substantive than just assertions, that the sales model does not incent improper behavior or that no one is terminated for failing to meet sales goals, as indicated during the exam. If that analysis shows the opposite then have plans in place to control sales misconduct and employee turnover from failure to meet sales goals."[3160]

**Responses:**

**Russ Anderson** did not dispute that the cited text is an accurate depiction of a portion of a March 31, 2015 email from Karin Hudson to Russ Anderson, but disputed that the Statement proves Ms. Russ Anderson provided false, misleading, or incomplete information to the OCC.[3161]

---

[3159] Russ Anderson's ECSFM at No. 347, citing MSD-266 (Russ Anderson Tr.) at 234:22-236:18).

[3160] MSD-153 at 2); see also MSD-270 (NBE Hudson Expert Report – Revised) at ¶¶ 42-43.

[3161] Russ Anderson's ECSFM at No. 349.

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that in an email dated March 31, 2015, examiner Karin Hudson explicitly informed Respondent Russ Anderson of the OCC's expectations following the February 2015 Exam, as shown above.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 350

Respondent Russ Anderson testified that she understood the OCC's instruction to her to evaluate the sales goals and the pressure that existed in the Community Bank:

> Q: Okay. And I take it, you understood that the OCC was instructing you, as the group risk officer, to evaluate the sales goals and the pressure that existed in the community bank; correct?

> A: So to be clear, I took it to mean that I and my partners within community bank. I could not do this alone. I would need to have my HR partners and -- and the folks in finance with me. But I was the one -- I was the point person for making it happen, yes.[3162]

**Responses:**

**Russ Anderson** did not dispute that this is an accurate representation of her testimony, but disputed that the Statement proves Ms. Russ Anderson provided false, misleading, or incomplete information to the OCC.[3163]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she testified as shown above.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 351

Carrie Tolstedt presented on sales practices to the Risk Committee of the Board on April 28, 2015.[3164]

**Responses:**

**Russ Anderson** did not dispute that Ms. Tolstedt made a presentation to the Risk Committee

---

[3162] MSD-266 (Russ Anderson Dep. Tr.) at 239:3-13.

[3163] Russ Anderson's ECSFM at No. 350.

[3164] MSD-154; MSD-586 (Hernandez Tr.) at 84:8-85:15; MSD-290B (Loughlin Tr.) at 311:15-25.

Add. 656

Appellate Case: 25-1079      Page: 658      Date Filed: 05/16/2025 Entry ID: 5517644

of the Board on April 28, 2015, but disputed that she has any personal knowledge of whether Ms. Tolstedt presented or what the contents of any such presentation may have been because was not present at the April 28, 2015 Risk Committee of the Board.[3165]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that Carrie Tolstedt presented on sales practices to the Risk Committee of the Board on April 28, 2015.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 352

Respondent Russ Anderson provided feedback on Ms. Tolstedt's written memorandum to the Risk Committee of the Board for the April 28, 2015 meeting and helped prepare her for the April 28, 2015 Risk Committee meeting. On April 9, 2015, Respondent Russ Anderson provided edits and comments to the written memorandum.[3166]

**Responses:**

**Russ Anderson** did not dispute that she participated in the preparation of Ms. Tolstedt's April 28, 2015 comments before the Risk Committee, but disputed that she had any authority whatsoever on the final contents of Ms. Tolstedt's April 28, 2015 comments to the Risk Committee; disputed that Ms. Tolstedt's April 28, 2015 comments to the Risk Committee represented Russ Anderson's views at that time; and disputed that her actions related to Ms. Tolstedt's presentation were false, misleading, or incomplete information provided to the Board.[3167]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she provided feedback on Ms. Tolstedt's written memorandum to the Risk Committee of the Board for the April 28, 2015 meeting and helped prepare her for the April 28, 2015 Risk Committee meeting. On April 9, 2015, Respondent Russ Anderson provided edits and comments to the written memorandum.


### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 353

In an email dated April 8, 2015, Jason MacDuff, a senior leader in the Community Bank, asked the following question regarding a draft of the written memorandum to be submitted to the Risk Committee of the Board for the April 28, 2015 meeting: "After reading the Supervisory Letter

---

[3165] Russ Anderson's ECSFM at No. 351.

[3166] MSD-170, MSD-172, MSD-173, MSD-174, MSD-175 (stating that Respondent Russ Anderson read the draft memorandum "like 15 times now"); MSD-176; MSD-177.

[3167] Russ Anderson's ECSFM at No. 352.

from the OCC, I made some updates to the last page covering the MRA but elected not to add the detailed context of what's required in the response. I just wonder if it's too soon to be that specific with the Board (can certainly provide more specifics later). Let me know what you think." Respondent Russ Anderson replied: "Specific to the questions you've outlined below (1) I would not add anything more than what we have in the document. We're still forming and storming and since this document will also go to the OCC I would prefer we keep it to a minimum[.]"[3168]

**Responses:**

**Russ Anderson** did not dispute that the quoted exchange is an accurate representation of an email exchange between Mr. MacDuff and Ms. Russ Anderson, but averred that "any advice Ms. Russ Anderson provided on the contents of Mr. MacDuff's memo was just that, advice, and had no controlling effect on the final contents of Mr. MacDuff's memo."[3169]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that in an email dated April 8, 2015, Jason MacDuff, a senior leader in the Community Bank, asked the following question regarding a draft of the written memorandum to be submitted to the Risk Committee of the Board for the April 28, 2015 meeting: "After reading the Supervisory Letter from the OCC, I made some updates to the last page covering the MRA but elected not to add the detailed context of what's required in the response. I just wonder if it's too soon to be that specific with the Board (can certainly provide more specifics later). Let me know what you think." Respondent Russ Anderson replied: "Specific to the questions you've outlined below (1) I would not add anything more than what we have in the document. We're still forming and storming and since this document will also go to the OCC I would prefer we keep it to a minimum[.]"

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 354**

The Bank provided to the OCC the memorandum submitted to the Risk Committee of the Board for the April 28, 2015 meeting.[3170]

**Responses:**

**Russ Anderson** did not dispute that the OCC obtained a copy of the memorandum submitted to the Risk Committee of the Board for the April 28, 2015 meeting, but disputed that the Statement proves Ms. Russ Anderson provided false, misleading, or incomplete information to

---

[3168] MSD-171 at 2.

[3169] Russ Anderson's ECSFM at No. 353.

[3170] MSD-182; MSD-573.

Add. 658

the Board; and averred she has no personal knowledge of the source of the OCC's receipt of the memorandum.[3171]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the Bank provided to the OCC the memorandum submitted to the Risk Committee of the Board for the April 28, 2015 meeting.


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 355**

The memorandum provided to the Board for the April 28, 2015 Risk Committee meeting and also shared with the OCC made no mention of:

- unreasonable or unattainable sales goals;

- significant (or any) pressure to meet sales goals;

- employees' fear of termination if sales goals are not met;

- employees being placed on corrective action and/or terminated for not meeting sales goals;

- the pause on proactive monitoring of simulated funding and phone number changes;

- the criteria used in the Los Angeles/Orange County investigation to detect those engaged in simulated funding and phone number changes and the criteria used in the footprint-wide analysis; or

- the proactive monitoring methodology and the 99.99 threshold.[3172]

**Responses:**

**Russ Anderson** did not dispute the contents of the April 28, 2015 memorandum provided as part of Ms. Tolstedt's presentation to the Risk Committee, but disputed that Ms. Russ Anderson had authority over the contents of the April 28, 2015 memorandum, or the presentation to the Risk Committee.[3173]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a

---

[3171] Russ Anderson's ECSFM at No. 354.

[3172] MSD-181.

[3173] Russ Anderson's ECSFM at No. 355.

factual finding as to Respondent Russ Anderson that the memorandum provided to the Board for the April 28, 2015 Risk Committee meeting and also shared with the OCC made no mention of:

•        unreasonable or unattainable sales goals;

•        significant (or any) pressure to meet sales goals;

•        employees' fear of termination if sales goals are not met;

•        employees being placed on corrective action and/or terminated for not meeting sales goals;

•        the pause on proactive monitoring of simulated funding and phone number changes;

•        the criteria used in the Los Angeles/Orange County investigation to detect those engaged in simulated funding and phone number changes and the criteria used in the footprint-wide analysis; or

•        the proactive monitoring methodology and the 99.99 threshold.


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 356**

The Chair of the Risk Committee of the Board testified that Ms. Tolstedt's presentation before the Committee "went very poorly. It did not address what I had asked to be addressed, which was still from the prior year even. What is the scope and substance of the sales practice issue? And in this meeting, Tolstedt presented all these belts and suspenders and efforts to ensure that misdeeds would not occur.  And that wasn't the question. But again, we walked away from there no better informed than when we walked in about the scope and substance . . . ."[3174]

**Responses:**

**Russ Anderson** did not dispute that the quoted statement is an accurate transcript of Mr. Hernandez's testimony, but disputed that she was present for Ms. Tolstedt's April 28, 2015 presentation.

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the Chair of the Risk Committee of the Board testified that Ms. Tolstedt's presentation before the Committee "went very poorly. It did not address what I had asked to be addressed, which was still from the prior year even. What is the scope and substance of the sales practice issue? And in this meeting, Tolstedt presented all these belts and suspenders and efforts to ensure that misdeeds would not occur.  And that wasn't the question. But again, we walked away

---

[3174] MSD-586 (Hernandez Tr.) at 84:8-85:10.

from there no better informed than when we walked in about the scope and substance . . . .”[3175]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 357**

After the April 28, 2015 Risk Committee meeting, the Community Bank was instructed to appear before the Risk Committee of the Board again.[3176]

**Responses:**

**Russ Anderson** did not dispute that at least one further appearance before the Risk Committee was requested of Community Bank, but disputed that the alleged negative reception by the Risk Committee of Ms. Tolstedt's April 28, 2015 presentation was the impetus for further meetings, averring that Mr. Hernandez testified that the decision to recall Community Bank before the Risk Committee was in part a reaction to the lawsuit described in SOF ¶ 358.[3177]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that after the April 28, 2015 Risk Committee meeting, the Community Bank was instructed to appear before the Risk Committee of the Board again.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 358**

On May 4, 2015, the Los Angeles City Attorney sued the Bank. The lawsuit alleged that the Community Bank engaged in unlawful sales practices, including opening unauthorized accounts for customers, pinning, bundling, and sandbagging, to meet unrealistic sales goals, resulting in customer harm and violations of state consumer protection laws.[3178]

**Responses:**

**Russ Anderson** did not dispute the claims in the Statement as to the date, suing party, and allegations of the May 4, 2019 lawsuit, but disputed that the allegations of the May 4, 2019 lawsuit were accurate.[3179]

I find an insufficient factual basis has been presented to establish a dispute in this Response to

---

[3175] MSD-586 (Hernandez Tr.) at 84:8-85:10.

[3176] MSD-586 (Hernandez Tr.) at 86:16-20.

[3177] Russ Anderson's ECSFM at No. 357 citing MSD-586; Hernandez Tr. at 86:16- 25.

[3178] Russ Anderson Amended Answer ¶ 123; MSD-169.

[3179] Russ Anderson's ECSFM at No. 358.

create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that on May 4, 2015, the Los Angeles City Attorney sued the Bank. The lawsuit alleged that the Community Bank engaged in unlawful sales practices, including opening unauthorized accounts for customers, pinning, bundling, and sandbagging, to meet unrealistic sales goals, resulting in customer harm and violations of state consumer protection laws.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 359

Respondent Russ Anderson, with assistance from the Law Department, prepared written materials for a meeting of the Risk Committee of the Board covering sales practices on May 19, 2015 ("May 19, 2015 Memo").[3180]

**Responses:**

**Russ Anderson** disputed that she prepared written materials for the Risk Committee as alleged in the Statement, averring only that, relying on advice of counsel, she participated in edits and comments in the preparation of the written materials for this meeting.[3181]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she participated in edits and comments in the preparation of the written materials for the Risk Committee of the Board covering sales practices on May 19, 2015.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 360

Respondent Russ Anderson provided comments and edits to the May 19, 2015 Memo.[3182]

**Responses:**

**Russ Anderson** did not dispute the Statement as accurate representation of Ms. Russ Anderson's limited input to the May 19, 2015 Memo. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she provided comments and edits to the May 19, 2015 Memo.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 361

Respondent Russ Anderson also participated on a call discussing the May 2015 submission

---

[3180] Russ Anderson Amended Answer ¶¶ 126, 275; Strother Amended Answer ¶ 126); (MSD-157).

[3181] Russ Anderson's ECSFM at No. 359.

[3182] MSD-266 (Russ Anderson Dep. Tr.) at 219:4-8; MSD-706; MSD-707; MSD-708; MSD-709.

Add. 662

Appellate Case: 25-1079      Page: 664      Date Filed: 05/16/2025 Entry ID: 5517644

to the OCC.[3183]

**Responses:**

**Russ Anderson** did not dispute the claim. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she participated on a call discussing the May 2015 submission to the OCC.


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 362**

Respondent Russ Anderson received a draft of the May 19, 2015 Memo stating that a trend for "Sales Integrity Violations Team Terminations/Resignations" was approximately "1 percent of total Retail Banking workforce; 2014 lower than 2013."[3184] It also stated that the goal for Sales Integrity Violations Team Terminations/Resignations was "1 to 2 percent of total workforce in any given year."[3185]

**Responses:**

**Russ Anderson** did not dispute that the evidence cited is accurately quoted. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she received a draft of the May 19, 2015 Memo stating that a trend for "Sales Integrity Violations Team Terminations/Resignations" was approximately "1 percent of total Retail Banking workforce; 2014 lower than 2013."[3186] It also stated that the goal for Sales Integrity Violations Team Terminations/Resignations was "1 to 2 percent of total workforce in any given year."


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 363**

On May 16, 2015, a lawyer in the Law Department sent an email to Respondent Russ Anderson and others, inquiring about the statistic and stated: "Wondering what the backup is/looks like if we get asked."[3187] In response to the email, Jason MacDuff, a senior leader in the Community Bank, explained that in 2014, there were 1,293 terminations for sales integrity violations and 1,229 terminations for sales integrity violations in 2013.[3188] He stated that there

---

[3183] MSD-710.

[3184] MSD-710 at 45.

[3185] MSD-710 at 45.

[3186] MSD-710 at 45.

[3187] MSD-179 at 2.

[3188] MSD-179 at 1-2

was "a data validation process last week."[3189] Respondent Russ Anderson was copied on this email. The Head of Corporate Investigations Loretta Sperle also affirmed the data in a May 16, 2015 email on which Respondent Russ Anderson was copied: "The metrics represents all allegations of sales integrity violations investigated by Corporate Investigations in those time periods, and the terms/resignations either due to confirmed fraud or a confirmed policy violation."[3190]

**Responses:**

**Russ Anderson** did not dispute that the quotes are accurate depictions of some of the contents of some emails about the number of terminations for sales integrity violations, but averred that the definition of "sales integrity violation" for purposes of the Bank's internal record-keeping and tracking is different and more broad than the OCC's definition of "sales integrity violation" for the present matter.

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that on May 16, 2015, a lawyer in the Law Department sent an email to Respondent Russ Anderson and others, inquiring about the statistic and stated: "Wondering what the backup is/looks like if we get asked." In response to the email, Jason MacDuff, a senior leader in the Community Bank, explained that in 2014, there were 1,293 terminations for sales integrity violations and 1,229 terminations for sales integrity violations in 2013. He stated that there was "a data validation process last week." Respondent Russ Anderson was copied on this email. The Head of Corporate Investigations Loretta Sperle also affirmed the data in a May 16, 2015 email on which Respondent Russ Anderson was copied: "The metrics represents all allegations of sales integrity violations investigated by Corporate Investigations in those time periods, and the terms/resignations either due to confirmed fraud or a confirmed policy violation."

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 364

Respondent Russ Anderson replied to the May 16, 2015 email stating: "I think we need to really look at the areas that are deemed 'sales integrity' violations. I looked at the excel file and would not think all of those categories would really be 'sales integrity'."[3191]

**Responses:**

**Russ Anderson** did not dispute that the quoted text is an accurate depiction of some of the

---

[3189] MSD-179 at 2.

[3190] MSD-179 at 1; MSD-280 (Board Report) at 107-108.

[3191] MSD-179.

Appellate Case: 25-1079    Page: 666    Date Filed: 05/16/2025 Entry ID: 5517644

content of a May 16, 2015 email, but disputed that MSD-364 proves that she provided false, misleading, or incomplete information to the Board or OCC, and averred the evidence lacks the context of a follow up email chain.[3192]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she replied to the May 16, 2015 email by stating: "I think we need to really look at the areas that are deemed 'sales integrity' violations. I looked at the excel file and would not think all of those categories would really be 'sales integrity'."

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 365

On May 16, 2015, Respondent Russ Anderson received a spreadsheet "of the Regional Banking Sales Integrity cases worked by Corporate Investigations in 2013-1Q 2015, broken down by subtype and by region. The second pivot includes all of the terminations for the same time period – by subtype, by region, by position."[3193]

**Responses:**

**Russ Anderson** did not dispute her receipt of the spreadsheet or the accuracy of the quoted material.[3194] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that on May 16, 2015, she received a spreadsheet "of the Regional Banking Sales Integrity cases worked by Corporate Investigations in 2013-1Q 2015, broken down by subtype and by region. The second pivot includes all of the terminations for the same time period – by subtype, by region, by position."

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 366

The data provided to Respondent Russ Anderson showed that "customer consent" was the largest sub-category of cases involving Sales Integrity Violations and was associated with the greatest number of terminations.[3195]

**Responses:**

**Russ Anderson** did not dispute the claim.[3196] Accordingly, the Recommended Decision will

---

[3192] Russ Anderson's ECSFM at No. 364.

[3193] MSD-183.

[3194] Russ Anderson's ECSFM at No. 365.

[3195] MSD-183 at 3, 6.

[3196] Russ Anderson's ECSFM at No. 366.

include a factual finding as to Respondent Russ Anderson that the data provided to her showed that "customer consent" was the largest sub-category of cases involving Sales Integrity Violations and was associated with the greatest number of terminations

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 367

Respondent Russ Anderson again expressed concern about whether certain conduct should be classified as a sales integrity violation.[3197]

**Responses:**

**Russ Anderson** did not dispute the claim.[3198] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she expressed concern about whether certain conduct should be classified as a sales integrity violation.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 368

Approximately one month earlier, on April 25, 2015, Carrie Tolstedt sent an email to Respondent Russ Anderson stating that the number of terminations and resignations for "sales" was "around 1,000 to 1200 in 2013[.]"[3199] Respondent Russ Anderson did not question the accuracy of this statistic; instead, she agreed with Ms. Tolstedt's estimate and stated: " . . . Nothing in the stats has changed much."[3200]

**Responses:**

**Russ Anderson** did not dispute that the quoted text is an accurate depiction of an email from Ms. Tolstedt to Ms. Russ Anderson or that the quoted response text accurately depicts her response to Ms. Tolstedt's email, but disputed that Ms. Russ Anderson's agreement with Ms. Tolstedt's statements prove that Ms. Russ Anderson provided false, misleading, or incomplete information to the Board or the OCC.[3201]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that approximately one month earlier, on April 25, 2015, Carrie Tolstedt sent an email to Respondent Russ Anderson stating that the number of

---

[3197] MSD-180.

[3198] Russ Anderson's ECSFM at No. 367.

[3199] MSD-145 at 2.

[3200] MSD-145.

[3201] Russ Anderson's ECSFM at No. 368.

Add. 666

Appellate Case: 25-1079    Page: 668    Date Filed: 05/16/2025 Entry ID: 5517644

terminations and resignations for "sales" was "around 1,000 to 1200 in 2013[.]" Respondent Russ Anderson did not question the accuracy of this statistic; instead, she agreed with Ms. Tolstedt's estimate and stated: " . . . Nothing in the stats has changed much."

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 369**

The final May 19, 2015 Memo provided to the Risk Committee of the Board and the OCC did not include that the trend for "Sales Integrity Violations Team Terminations/Resignations" was approximately "1 percent of total Retail Banking workforce; 2014 lower than 2013" and that the goal for such resignations and terminations was 1 to 2 percent of the total workforce in any given year.[3202]

**Responses:**

**Russ Anderson** did not dispute the text accurately reflects the contents of the cited Memo, but disputed that any exclusion(s) from the May 19, 2015 Memo proves she provided false, misleading, or incomplete information to the Board or the OCC.[3203]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the final May 19, 2015 Memo provided to the Risk Committee of the Board and the OCC did not include that the trend for "Sales Integrity Violations Team Terminations/Resignations" was approximately "1 percent of total Retail Banking workforce; 2014 lower than 2013" and that the goal for such resignations and terminations was 1 to 2 percent of the total workforce in any given year.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 370**

The May 19, 2015 Memo was also provided to the OCC during its review of sales practices at the Bank.[3204]

**Responses:**

**Russ Anderson** did not dispute the claim. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the May 19, 2015 Memo was also provided to the OCC during its review of sales practices at the Bank.

---

[3202] MSD-155.

[3203] Russ Anderson's ECSFM at No. 369.

[3204] (Russ Anderson Amended Answer ¶¶ 127, 275; Strother Amended Answer ¶ 127.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 371**

The May 19, 2015 Memo ascribed the root cause to "intentional team member misconduct based on the fact that only a small percentage of Retail Banking team members engaged in the outlier behavior issue in the investigation, and when interviewed, many of them acknowledged that they received proper training and understood the conduct violated bank policies."[3205]

**Responses:**

**Russ Anderson** did not dispute that the quote is an accurate excerpt from the May 19, 2015 Memo. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the May 19, 2015 Memo ascribed the root cause to "intentional team member misconduct based on the fact that only a small percentage of Retail Banking team members engaged in the outlier behavior issue in the investigation, and when interviewed, many of them acknowledged that they received proper training and understood the conduct violated bank policies."

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 372**

The May 19, 2015 Memo did not disclose what was meant by "outlier behavior."[3206]

**Responses:**

**Russ Anderson** did not dispute the claim, but disputed that "outlier behavior" requires a specific definition.[3207]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that May 19, 2015 Memo did not disclose what was meant by "outlier behavior."

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 373**

The May 19, 2015 Memo stated that "[w]e also determined that our controls were effective in detecting this behavior."[3208]

**Responses:**

---

[3205] MSD-155 at 5; Strother Amended Answer ¶ 126; see MSD-8C (Stumpf Tr.) at 586:16-588:15).

[3206] MSD-155 at 5.

[3207] Russ Anderson's ECSFM at No. 372.

[3208] MSD-155 at 5.

**Russ Anderson** did not dispute the claim.[3209] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the May 19, 2015 Memo stated that "[w]e also determined that our controls were effective in detecting this behavior."

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 374

The May 19, 2015 Memo made no mention of:

- unreasonable or unattainable sales goals;

- significant (or any) pressure to meet sales goals;

- employees' fear of termination if sales goals are not met; and

- employees being placed on corrective action and/or terminated for not meeting sales goals.

- the pause on proactive monitoring of simulated funding and phone number changes; or

- The proactive monitoring methodology or the 99.99 or 99.95 percent thresholds.[3210]

### Responses:

**Russ Anderson** did not dispute that the Memo made no mention of unreasonable or unattainable sales goals; significant (or any) pressure to meet sales goals; employees' fear of termination if sales goals are not met; and employees being placed on corrective action and/or terminated for not meeting sales goals; the pause on proactive monitoring of simulated funding and phone number changes; or the proactive monitoring methodology or the 99.99 or 99.95 percent thresholds. She disputed the claim that sales goals were omitted because the May 19, 2015 Memo contains references to modifications of sales policies and sales goals, and gave an example, the discussion of efforts to tie sales practices and goals to Vision and Values and business conduct expectations at all levels with improved consistency in communications;[3211] averring that references adjustments to goals in connection with an initiative relating to incentive compensation plans;[3212] and disputed the claim that alleged

---

[3209] Russ Anderson's ECSFM at No. 373.

[3210] MSD-155.

[3211] Russ Anderson's ECSFM at No. 375 citing MSD-155 at 12.

[3212] Russ Anderson's ECSFM at No. 375 citing MSD-155 at 13.

Add. 669

Appellate Case: 25-1079     Page: 671     Date Filed: 05/16/2025 Entry ID: 5517644

pressure to meet sales goals is not mentioned at all because allegations of pressure to meet sales goals are discussed in relation to the Los Angeles lawsuit.[3213]

Whether the May 19, 2015 Memo made no mention of information material to Respondent Russ Anderson's fiduciary duties owed to the Bank is a material fact in issue.

While I find uncontroverted that the Memo made no mention of employees' fear of termination if sales goals are not met; or employees being placed on corrective action and/or terminated for not meeting sales goals; or the pause on proactive monitoring of simulated funding and phone number changes; or the proactive monitoring methodology or the 99.99 or 99.95 percent thresholds, I find that in her Response to Statement No. 374, Russ Anderson sufficiently demonstrated a factual controversy exists regarding whether the Memo addressed all of the issues relating to Respondent Russ Anderson's fiduciary duties owed to the Bank, including alleged pressure to meet sales goals. Pursuant to the OCC's Uniform Rules, the merits of the disputed claims raised in (Russ Anderson) Statement No. 374 will be addressed during the hearing set to begin on September 13, 2021.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 375

The May 19, 2015 Memo stated: "In the summer of 2013, to monitor compliance with the requirement that deposit accounts are funded by the client, SSCOT generated a report to identify any activity indicative of simulated funding across Retail Banking. Simulated funding is prohibited conduct that may involve a banker transferring money between a customer's accounts to make it appear as if a certain account is funded. This report indicated that a small percentage of our team members may have engaged in this prohibited conduct."[3214]

**Responses:**

**Russ Anderson** did not dispute the quoted text as an accurate description of the 2013-2014 Investigation's findings, namely, that simulated funding accounted for approximately 69 of the 230 total footprint-wide terminations or resignations which resulted from the 2013-2014 investigation.[3215]

Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the May 19, 2015 Memo stated: "In the summer of 2013, to monitor compliance with the requirement that deposit accounts are funded by the client, SSCOT generated a report to identify any activity indicative of simulated funding across Retail Banking. Simulated funding is prohibited conduct that may involve a banker transferring

---

[3213] Russ Anderson's ECSFM at No. 375 citing MSD-155 at 19-23.

[3214] MSD-155 at 4.

[3215] Russ Anderson's ECSFM at No. 376.

Add. 670

Appellate Case: 25-1079    Page: 672    Date Filed: 05/16/2025 Entry ID: 5517644

money between a customer's accounts to make it appear as if a certain account is funded. This report indicated that a small percentage of our team members may have engaged in this prohibited conduct."

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 376

The May 19, 2015 Memo stated that "230 team members were terminated or chose to resign."[3216]

**Responses:**

**Russ Anderson** did not dispute the claim.[3217] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the May 19, 2015 Memo stated that "230 team members were terminated or chose to resign."

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 377

The May 19, 2015 Memo stated that of the 230 team member separations across the Retail Banking footprint, "the majority of the separations (approximately 70%) related to customer phone number changes."[3218]

**Responses:**

**Russ Anderson** did not dispute the claim.[3219] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the May 19, 2015 Memo stated that of the 230 team member separations across the Retail Banking footprint, "the majority of the separations (approximately 70%) related to customer phone number changes."

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 378

The May 19, 2015 Memo did not discuss the issuance of debit cards or credit cards without customer consent, bundling, pinning, sandbagging, and other forms of sales practices misconduct.[3220]

---

[3216] MSD-155 at 5.

[3217] Russ Anderson's ECSFM at No. 376.

[3218] MSD-155 at 5.

[3219] Russ Anderson's ECSFM at No. 377.

[3220] MSD-155.

Appellate Case: 25-1079     Page: 673     Date Filed: 05/16/2025 Entry ID: 5517644

**Responses:**

**Russ Anderson** disputed the claim, averring that the May 19, 2015 memo discusses issuance of debit cards or credit cards without consumer consent, bundling, pinning, sandbagging, and other forms of sales practices misconduct in the context of the Los Angeles lawsuit's allegations, and citing in support MSD-155 (materials for the Risk Committee meeting to be held on May 19, 2015) at 19.

Whether the May 19, 2015 Memo discussed the referenced subjects is a material fact in issue.

I find that in her Response to Statement No. 378, Russ Anderson sufficiently demonstrated a factual controversy exists regarding the contents of the Memo. Because of the existence of material controverted facts, summary disposition is not available with respect to Respondent Russ Anderson regarding this claim. Pursuant to the OCC's Uniform Rules, the merits of the disputed claims raised in (Russ Anderson) Statement No. 378 will be addressed during the hearing set to begin on September 13, 2021.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 379

The May 19, 2015 Memo does not mention how many products were opened that were done without the knowledge of the customers.[3221]

**Responses:**

**Russ Anderson** did not dispute the claim.[3222] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the May 19, 2015 Memo does not mention how many products were opened that were done without the knowledge of the customers.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 380

The May 19, 2015 Memo stated: "Beginning in May, 2014, the SSCOT performed a footprint-wide Behavioral Trends Analysis to evaluate the effectiveness of measures taken to address the conduct at issue. The analysis demonstrated a dramatic reduction in inappropriate practices in the past year, as only four team members were identified as outliers for phone number changes, and only three team members were identified as outliers for simulated funding. We believe the efforts described herein contributed significantly to this result."[3223]

---

[3221] MSD-155; MSD-156.

[3222] Russ Anderson's ECSFM at No. 379.

[3223] MSD-155 at 7-8.

**Responses:**

**Russ Anderson** did not dispute the claim as to what the Memo stated.[3224] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the May 19, 2015 Memo stated: "Beginning in May, 2014, the SSCOT performed a footprint-wide Behavioral Trends Analysis to evaluate the effectiveness of measures taken to address the conduct at issue. The analysis demonstrated a dramatic reduction in inappropriate practices in the past year, as only four team members were identified as outliers for phone number changes, and only three team members were identified as outliers for simulated funding. We believe the efforts described herein contributed significantly to this result."

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 381

The May 19, 2015 Memo did not explain what constituted an "outlier" (e.g., the 99.99% threshold).[3225]

**Responses:**

**Russ Anderson** objected to the Statement as duplicative of Statement of Material Fact (Russ Anderson) No. 372. The objection is sustained. Accordingly, the claim presented in (Russ Anderson) No. 381 will not support Enforcement Counsel's Motion. The exclusion of the claim appearing in the Statement does not, however, create a factual basis that would prevent granting Enforcement Counsel's Motion.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 382

The May 19, 2015 Memo stated that "SSCOT also conducts robust Proactive Monitoring to reduce inappropriate sales behaviors through early detection."[3226]

**Responses:**

**Russ Anderson** did not dispute that the quoted text is an accurate depiction of a portion of the May 19, 2015 Memo.[3227] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the May 19, 2015 Memo stated that "SSCOT also conducts robust Proactive Monitoring to reduce inappropriate sales behaviors through early detection."

---

[3224] Russ Anderson's ECSFM at No. 380.

[3225] MSD-155.

[3226] MSD-155 at 8; see also MSD-8C (Stumpf Tr.) at 590:2-22.

[3227] Russ Anderson's ECSFM at No. 382.

Appellate Case: 25-1079      Page: 675      Date Filed: 05/16/2025 Entry ID: 5517644

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 383**

The Bank's former Chief Risk Officer Michael Loughlin testified that the controls that existed at the Bank to identify people engaged in sales practices misconduct were not robust and representing the controls as such "certainly doesn't portray an accurate picture of the state of their controls."[3228]

**Responses:**

**Russ Anderson** did not dispute that the quoted text is an accurate depiction of Mr. Loughlin's testimony, but averred that the quoted testimony does not indicate any time frame for which Mr. Loughlin's opinions about the quality of the controls the Bank employed to identify sales practices misconduct apply. [3229]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the Bank's former Chief Risk Officer Michael Loughlin testified that the controls that existed at the Bank to identify people engaged in sales practices misconduct were not robust and representing the controls as such "certainly doesn't portray an accurate picture of the state of their controls."

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 384**

The Bank's former Head of SSCOT Rebecca Rawson gave the following testimony:

> Q: Okay. Right. And even after the investigation, even the things that would trigger an investigation, well, the three things that would trigger the investigation are, EthicsLine of complaints, customer complaints or SSCOT proactive monitoring, correct?
>
> A: Yes.
>
> Q: Okay. All right. We know that the EthicsLine complaint and the customer complaint were not effective because your analysis showed that they didn't even catch people who were engaged in this misconduct in the top 99.99 percentile?
>
> A: Correct.
>
> Q: All right. And the SSCOT control, given the nature of what they were doing, didn't even try to catch all misconduct

---

[3228] MSD-290A (Loughlin Tr.) at 236:1-238:3.

[3229] Russ Anderson's ECSFM at No. 383.

Appellate Case: 25-1079     Page: 676     Date Filed: 05/16/2025 Entry ID: 5517644

it only looked at three people a month and later 18 people a month.

A: The outlying activity, correct.

Q: Okay. Which turned out to be three some months and up to 18? A: Correct.

Q: Okay. So the Bank really did not have any adequate controls, and that statement that it did is misleading?

A: Yes, I could see how that would be misleading.

Q: Okay. And actually, anyone who understands how the controls worked and what SSCOT's analysis was, would know, just like you said, that the controls were not effective.

A: Yes. The only thing in the report, is because the sentence proceeding does mention engaged in the outlier behavior. Then it says, we also determined that our controls were effective in detecting the behavior. The controls were effective in detecting the outlying behavior.

Q: Okay.

A: I still think it could be misleading because the reader does not have the full context to maybe catch on to the outlying behavior sentence.

Q: Right. Okay. So, even if you can interpret the statement to be technically true, it is still misleading?

A: It could still be misleading, yes.

Q: Right. And anyone who understands what outlying behavior was would know that the statement is misleading?

A: I think they should.

Q: All right. And Ms. Claudia Russ Anderson understood what the outlying behavior that SSCOT was managing, monitoring was?

A: I believe she did.

Q: Okay, thanks. And you based that belief on the fact that you told her both verbally and in email?

Page **675** of **753**

Add. 675

A: Correct.[3230]

**Responses:**

**Russ Anderson** did not dispute that the excerpt is an accurate depiction of a portion of Ms. Rawson's testimony.[3231] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that Ms. Rawson testified as shown above.


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 385**

The Bank's former CEO John Stumpf agreed in testimony that the May 19, 2015 Memo was misleads the Board and the OCC about the root cause of sales practices misconduct and the adequacy of controls:

> Q: Okay. Sitting here today, sir, do you agree that this [May 19, 2015] memo misleads the Board, whether intentionally or not, it misleads the Board about the scope of the problem, the root cause of the problem, and the adequacy of the Bank's controls.
>
> A: I would agree with that.
>
> . . .
>
> Q: Sir, we were discussing the May memo to the Board. Would you agree that, if that – since that May memo was also presented to the OCC, then that May memo was also misleading to the OCC on the root cause, the extent of the problem, . . . and the adequacy of the bank's controls?
>
> A: I would agree with

that.[3232]

**Responses:**

**Russ Anderson** did not dispute that the excerpt is an accurate depiction of a portion of Mr. Stumpf's testimony.[3233] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that Mr. Stumpf testified as shown above.

---

[3230] MSD-300 (Rawson Tr.) at 213:2-215:10.

[3231] Russ Anderson's ECSFM at No. 384.

[3232] MSD-8C (Stumpf Tr.) at 593:24-595:17.

[3233] Russ Anderson's ECSFM at No. 385.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 386**

Respondent Russ Anderson presented to the Risk Committee of the Board at the May 19, 2015 meeting, along with Carrie Tolstedt.[3234]

**Responses:**

**Russ Anderson** did not dispute the claim.[3235] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that Respondent Russ Anderson presented to the Risk Committee of the Board at the May 19, 2015 meeting, along with Carrie Tolstedt

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 387**

Respondent Russ Anderson never communicated to the Board that the Community Bank's business model needed a wholesale change.[3236]

**Responses:**

**Russ Anderson** did not dispute the claim.[3237] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she never communicated to the Board that the Community Bank's business model needed a wholesale change.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 388**

Respondent Russ Anderson never communicated to the Board that there was systemic sales pressure in the Community Bank.[3238]

**Responses:**

**Russ Anderson** did not dispute the claim.[3239] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she never communicated to the Board that there was systemic sales pressure in the Community Bank.

---

[3234] MSD-157; MSD-266 (Russ Anderson Dep. Tr.) at 137:10-13; MSD-468; MSD-191.

[3235] Russ Anderson's ECSFM at No. 386.

[3236] MSD-266 (Russ Anderson Dep. Tr.) at 90:7-11.

[3237] Russ Anderson's ECSFM at No. 387.

[3238] MSD-266 (Russ Anderson Dep. Tr.) at 118:9- 119.

[3239] Russ Anderson's ECSFM at No. 388.

Appellate Case: 25-1079    Page: 679    Date Filed: 05/16/2025 Entry ID: 5517644

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 389**

Respondent Russ Anderson never communicated to the Board that she was uncomfortable with the instruction to pause proactive monitoring and that it hindered SSCOT's ability to detect additional sales practices misconduct.[3240]

**Responses:**

**Russ Anderson** did not dispute the claim that she never directly contacted the Board about her discomfort with the pause to proactive monitoring.[3241] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she never communicated to the Board that she was uncomfortable with the instruction to pause proactive monitoring.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 390**

Respondent Russ Anderson never communicated to the OCC that there was systemic sales pressure in the Community Bank.[3242]

**Responses:**

**Russ Anderson** did not dispute the claim.[3243] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she never communicated to the OCC that there was systemic sales pressure in the Community Bank.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 391**

Respondent Russ Anderson never communicated to the OCC that in the 2012 to 2013 time frame, she concluded that the goals had reached the level of being unreasonable.[3244]

**Responses:**

**Russ Anderson** did not dispute the claim.[3245]  Accordingly, the Recommended Decision will

---

[3240] MSD-266 (Russ Anderson Dep. Tr.) at 137:2-13.

[3241] Russ Anderson's ECSFM at No. 389.

[3242] MSD-266 (Russ Anderson Dep. Tr.) at 118:9- 119:5.

[3243] Russ Anderson's ECSFM at No. 390.

[3244] MSD-266 (Russ Anderson Dep. Tr.) at 121:13-18.

[3245] Russ Anderson's ECSFM at No. 391.

Appellate Case: 25-1079      Page: 680      Date Filed: 05/16/2025 Entry ID: 5517644

include a factual finding as to Respondent Russ Anderson that she never communicated to the OCC that in the 2012 to 2013 time frame, she concluded that the goals had reached the level of being unreasonable.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 392

Respondent Russ Anderson never communicated to the OCC that the Community Bank's business model needed a wholesale change.[3246]

**Responses:**

**Russ Anderson** did not dispute the claim.[3247] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she never communicated to the OCC that the Community Bank's business model needed a wholesale change

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 393

Respondent Russ Anderson testified that she does not regret anything that was submitted in the May 19, 2015 Memo to the Board and the OCC.[3248]

**Responses:**

**Russ Anderson** did not dispute the claim.[3249] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she testified that she does not regret anything that was submitted in the May 19, 2015 Memo to the Board and the OCC.

### Respondent Russ Anderson lied repeatedly to OCC Examiners, provided false, misleading, and incomplete information during OCC examinations, failed to supply information to the OCC known to her, and obstructed OCC Examinations

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 394

Respondent Russ Anderson testified that she was obligated to be fully transparent, forthcoming, and candid in every interaction that she had with the OCC, and provide complete information to

---

[3246] MSD-266 (Russ Anderson Dep. Tr.) at 90:12-15.

[3247] Russ Anderson's ECSFM at No. 392.

[3248] MSD-266 (Russ Anderson Dep. Tr.) at 219:4-223:15.

[3249] Russ Anderson's ECSFM at No. 393.

Add. 679

Appellate Case: 25-1079    Page: 681    Date Filed: 05/16/2025 Entry ID: 5517644

examiners:

> Q: Notwithstanding whatever you believed the OCC had access to, I take it, you always recognized that you were obligated to be fully transparent and forthcoming when communicating with OCC examiners; is that fair to say?
>
> A: I think that's very fair to say.
>
> Q: And notwithstanding whatever you believed the OCC had access to, I take it, you always recognized that you had an obligation to be fully candid with OCC examiners in every interaction that you had with the OCC; is that fair to say?
>
> A: That is very fair to say, yes.
>
> Q: Okay. And I take it, you also always recognized that you had an obligation to provide complete information to the OCC throughout your tenure as the group risk officer; is that fair to say? A: I would say, it's fair to say that I was responsible for providing the OCC with complete and accurate information for which they asked for, yes.[3250]

**Responses:**

**Russ Anderson** did not dispute that the testimony above is accurately reported.[3251] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she testified as shown above.


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 395**

The OCC commenced a target examination of operational risk management and cross sell activities of Wells Fargo's Community Bank on approximately February 2, 2015 ("February 2015 Exam").[3252] During the course of the February 2015 Exam, Respondent Russ Anderson interacted regularly with OCC examiner staff, including but not limited to Karin Hudson, a National Bank Examiner who served as Examiner-in-Charge for the Exam, and Jennifer

---

[3250] MSD-266 (Russ Anderson Dep. Tr.) at 92:24-93:18; MSD-270 (NBE Hudson Expert Report – Revised) at ¶¶ 57, 60; MSD-268 (NBE Crosthwaite Expert Report) at ¶¶ 11, 112-114.

[3251] Russ Anderson's ECSFM at No. 394.

[3252] MSD-270 (NBE Hudson Expert Report – Revised) at ¶ 17; OCC- 184.

Add. 680

Appellate Case: 25-1079    Page: 682    Date Filed: 05/16/2025 Entry ID: 5517644

Crosthwaite.[3253]

**Responses:**

**Russ Anderson** did not dispute that she interacted regularly with Karin Hudson. Disputed that she interacted regularly with other OCC examiner staff, with the exception of Christine Moses.[3254] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she interacted regularly with Karin Hudson. Disputed that she interacted regularly with other OCC examiner staff, with the exception of Christine Moses.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 396

Respondent Russ Anderson testified that she was concerned with the scope of the February 2015 Exam.[3255]

**Responses:**

**Russ Anderson** disputed the claim without presenting evidence that contradicted the limited nature of the claim (which concerned testimony by Russ Anderson); but instead raised collateral claims – including the claim that OCC Examiner Hudson was also concerned about the scope of the Exam.[3256]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she testified that she was concerned with the scope of the February 2015 Exam.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 397

At an initial cross sell meeting held on February 4, 2015, Respondent Russ Anderson stated "that team members do have referral and sales goals but meeting these is only part of the review and evaluation process. Referral fees paid to team members are capped to keep the incentive to sell products in check and keep the focus on customer service."[3257]

---

[3253] MSD- 266 (Russ Anderson Dep. Tr.) at 234:22-235:5; 238:5-12; MSD-270 (NBE Hudson Expert Report – Revised) at ¶ 59; MSD-268 (NBE Crosthwaite Expert Report) at ¶ 115.

[3254] Russ Anderson's ECSFM at No. 395.

[3255] MSD-266 (Russ Anderson Dep. Tr.) at 235:20-236:10; see also MSD- 270 (NBE Hudson Expert Report – Revised) at ¶ 20.

[3256] Russ Anderson's ECSFM at No. 396.

[3257] MSD-187 at 2; MSD-646A (Hudson Dep. Tr.) at 106:7-17.

**Responses:**

**Russ Anderso**n averred the quoted material is taken from the OCC's notes of a meeting, where the statement is not presented as a quote; and asserts that as such, to evidence that Ms. Russ Anderson actually stated these words at the meeting and to present it as a quote is false and misleading.[3258] She does not, however, dispute saying the quoted words.[3259]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that during an initial cross sell meeting with the OCC's Examiners held on February 4, 2015, Respondent Russ Anderson stated words to the effect that that team members do have referral and sales goals but meeting these is only part of the review and evaluation process, and that referral fees paid to team members are capped to keep the incentive to sell products in check and keep the focus on customer service.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 398

Respondent Russ Anderson participated in a teleconference between OCC examiners and Audit staff on February 9, 2015 ("February 9, 2015 Call").[3260] Respondent McLinko was among the audit staff who attended the meeting.[3261] During the February 9, 2015 Call, Respondent Russ Anderson stated that "incentive compensation plans are capped to balance the incentive for sales vis-à-vis customer service."[3262]

**Responses:**

**Russ Anderson** averred the quoted material is taken from the OCC's notes of a meeting, where the statement is not presented as a quote; and asserts that as such, to evidence that Ms. Russ Anderson actually stated these words at the meeting and to present it as a quote is false and misleading.[3263] She does not, however, dispute saying the quoted words.[3264]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a

---

[3258] Russ Anderson's ECSFM at No. 397.

[3259] Russ Anderson's ECSFM at No. 397.

[3260] MSD-185.

[3261] MSD-270 (NBE Hudson Expert Report – Revised) at ¶¶ 23-32; MSD-185.

[3262] MSD-185 at 2; MSD-270 (NBE Hudson Expert Report – Revised) at ¶ 27.

[3263] Russ Anderson's ECSFM at No. 398.

[3264] Russ Anderson's ECSFM at No. 398.

factual finding as to Respondent Russ Anderson that she participated in a teleconference between OCC examiners and Audit staff on February 9, 2015; that Respondent McLinko was among the audit staff who attended the meeting; and that during the February 9, 2015 Call, Respondent Russ Anderson stated words to the effect that incentive compensation plans are capped to balance the incentive for sales vis-à-vis customer service.

## Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 399

Respondent Russ Anderson also stated on the February 9, 2015 Call that "the impact of sales goals expectations on employee turnover is monitored through exit interviews and that it is not significant."[3265]

**Responses:**

**Russ Anderson** averred the quoted material is taken from the OCC's notes of a meeting, where the statement is not presented as a quote; and asserts that as such, to evidence that Ms. Russ Anderson actually stated these words at the meeting and to present it as a quote is false and misleading.[3266] She does not, however, dispute saying the quoted words.[3267]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that on the February 9, 2015 Call she stated words to the effect that the impact of sales goals expectations on employee turnover is monitored through exit interviews and that it is not significant.

## Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 400

An OCC examiner who participated on the February 9, 2015 Call, Michael DeClue, gave the following deposition testimony regarding his concerns with Respondent Russ Anderson:

> Q: Did Ms. Russ Anderson's attendance at this meeting cause you any concerns?
>
> A: Yes, sir.
>
> Q: What were those concerns? A: Independence.
>
> Q: Can you explain what you mean by "independence"?
>
> A: During this meeting, Ms. Anderson dominated the

---

[3265] MSD-185 at 2; MSD-270 (NBE Hudson Expert Report – Revised) at ¶ 27.

[3266] Russ Anderson's ECSFM at No. 399.

[3267] Russ Anderson's ECSFM at No. 399.

Add. 683

conversation on the Wells Fargo side and was essentially, an advocate versus she provided -- really, served in an advocate -- advocate role versus a challenge role -- role. And to the point where she would interrupt and speak for Mr. McLinko and Mr. Deese, et cetera. And what was noticeable is that neither Mr. Deese or Mr. McLinko seemed to object.[3268]

**Responses:**

**Russ Anderson** did not dispute that the testimony shown is accurate, but instead averred that no one from the OCC ever expressed any concern ordisagreement in advance of the meeting, or at the meeting for that matter, that Ms. Russ Anderson was invited and attended.[3269]

I find an insufficient factual basis has been presented to establish a dispute in this response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that Examiner DeClue testified as shown above.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 401

During the February 2015 examination, Respondent Russ Anderson stated that sales goals do not drive employee compensation or employee terminations.[3270]

**Responses:**

**Russ Anderson** did not dispute the testimony attributed to her, but instead added that it was her belief that employees could not be fired for failing to meet sales goals, which she averred was confirmed by the senior leader of the Community Bank's HR group.[3271]

I find an insufficient factual basis has been presented to establish a dispute in this response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that during the February 2015 examination, she stated that sales goals do not drive employee compensation or employee terminations.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 402

Respondent Russ Anderson participated in a February 10, 2015 teleconference with the OCC

---

[3268] MSD-645 (DeClue Dep. Tr.) at 231:23-232:13; see also MSD-644 (Moses Dep. Tr.) at 265:24-266:12.

[3269] Russ Anderson's ECSFM at No. 400.

[3270] MSD-270 (NBE Hudson Expert Report – Revised) at ¶ 27; MSD-646A (Hudson Dep. Tr.) at 61:17-62:1.

[3271] Russ Anderson's ECSFM at No. 401.

examination staff ("February 10, 2015 Call").[3272]

**Responses:**

**Russ Anderson** did not dispute the claim.[3273] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she was in attendance at the meeting cited above.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 403

Prior to the February 10, 2015 Call, the OCC provided a list of topics and questions to be covered at the meeting, which Respondent Russ Anderson attended.[3274]  The topics included:

- "Overview of the governance process for sales practices in Community Banking";
- "April 9, 2014 Claudia Russ-Anderson/Jason MacDuff presentation (with deck) to ERMC. Discuss presentation and proposed changes";
- "Controls and monitoring processes for identifying inappropriate behavior";
- "Testing to ensure that the incentive program encourages appropriate behavior";
- "Roles of the various monitoring groups (SSCOT, Deposit Products, Corporate Investigations, etc.)."[3275]

**Responses:**

**Russ Anderson** did not dispute the claim.[3276] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that that the OCC provided a list of topics, as cited above.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 404

On the February 10, 2015 Call, an OCC examiner asked whether pressure to meet baselines sales goals was significant and contributed to employee turnover. Respondent Russ Anderson

---

[3272] Russ Anderson Amended Answer ¶ 58; MSD-270 (NBE Hudson Expert Report – Revised) at ¶¶ 33-39.

[3273] Russ Anderson's ECSFM at No. 402.

[3274] MSD-186.

[3275] MSD-186 at 1; MSD-270 (NBE Hudson Expert Report – Revised) at ¶¶ 33-34.

[3276] Russ Anderson's ECSFM at No. 403.

answered that "no one loses their job because they did not meet sales goals."[3277]

**Responses:**

**Russ Anderson** did not dispute answering as shown above, but averred only that the meeting notes do not indicate such a statement was made.[3278] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that on the February 10, 2015 call, an OCC examiner asked whether pressure to meet baselines sales goals was significant and contributed to employee turnover, and she answered that "no one loses their job because they did not meet sales goals."


### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 405

During her deposition testimony, Respondent Russ Anderson admitted that she told OCC examiners that employees could not be terminated for failing to meet sales goals.[3279]

**Responses:**

**Russ Anderson** did not dispute testifying as shown above.[3280] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that during her deposition testimony, Respondent Russ Anderson admitted that she told OCC examiners that employees could not be terminated for failing to meet sales goals.


### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 406

On the February 10, 2015 Call, the SSCOT program was discussed.[3281] Nonetheless, Respondent Russ Anderson did not inform the OCC about the subsequent application of the 99.99 threshold used by SSCOT.[3282]

**Responses:**

---

[3277] MSD- 270 (NBE Hudson Expert Report – Revised) at ¶ 35; MSD-646A (Hudson Dep. Tr.) at 61:17- 62:1, 126:8-127:9; MSD-644 (Moses Dep. Tr.) at 144:11-145:12; MSD-187 at 3; MSD-188 at 2; MSD-268 (NBE Crosthwaite Expert Report) at ¶ 118(c).

[3278] Russ Anderson's ECSFM at No. 404.

[3279] MSD-266 (Russ Anderson Dep. Tr.) at 52:14-53:5.

[3280] Russ Anderson's ECSFM at No. 405.

[3281] MSD-187 at 3; MSD-188.

[3282] MSD-187 at 3; MSD-188; MSD-270 (NBE Hudson Expert Report – Revised) at ¶ 39; MSD-268 (NBE Crosthwaite Expert Report) at ¶ 118(b).

**Russ Anderson** did not dispute the above claim, but only disputed "to the extent Enforcement Counsel suggested the OCC requested information that Ms. Russ Anderson refused to provide."[3283] Accordingly, since no such suggestion appears in the claim, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that on the February 10, 2015 Call, the SSCOT program was discussed but she did not inform the OCC about the subsequent application of the 99.99 threshold used by SSCOT.

## Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 407

On the February 10, 2015 Call, OCC examiners were told "[i]f a banker opens up a product (like a credit card) and the customer did not request it, then the banker is terminated immediately."[3284]

**Responses:**

**Russ Anderson** did not deny making the quoted statement, but averred there is no indication in the OCC February 10, 2015 meeting notes that the statement at issue was made by Respondent RussAnderson.[3285]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that on the February 10, 2015 Call, OCC examiners were told words to the effect that if a banker opens up a product (like a credit card) and the customer did not request it, then the banker is terminated immediately.

## Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 408

On the February 10, 2015 Call, Respondent Russ Anderson stated that "customers are not cross-sold any products without first going through a formal needs assessment discussion with a banker, a process that takes about one hour."[3286]

**Responses:**

**Russ Anderson** did not dispute making the statements attributed to her, but objected to Enforcement Counsel putting material in quotes when there is no information in the

---

[3283] Russ Anderson's ECSFM at No. 406.

[3284] MSD-188 at 2; MSD-270 (NBE Hudson Expert Report – Revised) at ¶ 37.

[3285] Russ Anderson's ECSFM at No. 407.

[3286] MSD-187 at 3; MSD-270 (NBE Hudson Expert Report – Revised) at ¶ 38; MSD-266 (Russ Anderson Dep. Tr.) at 107:14-111:19.

Appellate Case: 25-1079     Page: 689     Date Filed: 05/16/2025 Entry ID: 5517644

underlying document that attributes the material as a verbatim statement spoken by Ms. Russ Anderson.[3287]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that on the February 10, 2015 Call, Respondent Russ Anderson stated words to the effect that customers are not cross-sold any products without first going through a formal needs assessment discussion with a banker, a process that takes about one hour.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 409

The Community Bank's Chief Compliance Officer "witnessed Ms. Russ Anderson editing responses to OCC questions during the OCC's February 2015 Operational Risk Exam. . . ."[3288]

**Responses:**

**Russ Anderson** did not dispute making the claimed statement, but averred that Mr. Christoff had no basis for claiming that she was attempting to edit responses "with an eye towards putting the Bank in the best possible light" because he cannot attest to what she was thinking when she made the edits.[3289]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the Community Bank's Chief Compliance Officer witnessed Ms. Russ Anderson editing responses to OCC questions during the OCC's February 2015 Operational Risk Exam.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 410

On or around April 20, 2015, an SSCOT manager who reported to Respondent Russ Anderson, Rebecca Rawson, shared with her posts from a former branch manager. The posts stated: "[Wells Fargo management] have created a toxic atmosphere of sales goals that forces employees to sell products [customers] don't want. They literally say 'every customer needs a credit card.' . . . If there is ever a company as disgusting and unethical as this one, I dare you to

---

[3287] Russ Anderson's ECSFM at No. 408.

[3288] MSD-56 (Christoff Decl.) at ¶ 17; see id. at ¶ 18 ("I observed that Ms. Russ Anderson edited the Community Bank's responses to questions posed by the OCC, with an eye towards putting the Bank in the best possible light.".

[3289] Russ Anderson's ECSFM at No. 409.

find it."[3290]

**Responses:**

**Russ Anderson** did not dispute that Rebecca Rawson shared information with Respondent Russ Anderson on April 20, 2015 regarding certain Facebook posts made by a former Wells Fargo employee, but challenged the statement as inadmissible hearsay.[3291]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that on or around April 20, 2015, an SSCOT manager who reported to Respondent Russ Anderson, Rebecca Rawson, shared with her posts from a former branch manager. The posts stated: "[Wells Fargo management] have created a toxic atmosphere of sales goals that forces employees to sell products [customers] don't want. They literally say 'every customer needs a credit card.' . . . If there is ever a company as disgusting and unethical as this one, I dare you to find it."

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 411**

In May 2015, the OCC commenced an examination of Enterprise Sales Practices at the Bank, which was prompted by the City of Attorney of Los Angeles lawsuit against the Bank relating to its sales practices ("May 2015 Exam").[3292]

**Responses:**

**Russ Anderson** incorporated the response by Respondent Julian to (Julian and McLinko) No. 471, which responded to claims that the OCC commenced a May 2015 examination of Enterprise Sales Practices at the Bank was prompted by the City of Attorney of Los Angeles lawsuit against the Bank relating to its sales practices. Julian's response was that the claim "lacks context" because the complaint "does not refer to WFAS," and the OCC's decision to blame WFAS, "in part, for the sales practices issues alleged in the LA City Attorney's Complaint was not supported by the OCC examiners focused on WFAS."[3293] She also disputed the claim because the LA City Attorney's Complaint does not refer to Ms. Russ Anderson or her role as Group Risk Officer of Community Bank.[3294]

---

[3290] MSD-190 at 3-5.

[3291] Russ Anderson's ECSFM at No. 410.

[3292] MSD-270 (NBE Hudson Expert Report – Revised) at ¶ 4.

[3293] Julian's ECSFM at No. 471.

[3294] Russ Anderson's ECSFM at No. 411.

Appellate Case: 25-1079    Page: 691    Date Filed: 05/16/2025 Entry ID: 5517644

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that in May 2015, the OCC commenced an examination of Enterprise Sales Practices at the Bank, which was prompted by the City of Attorney of Los Angeles lawsuit against the Bank relating to its sales practices.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 412**

The May 2015 Exam "focused on the events in 2013 that led to the initial employee termination, the investigation of employee misconduct that followed, and overall changes in governance intended to improve the bank's practices."[3295]

**Responses:**

**Russ Anderson** did not dispute the claim.[3296] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the May 2015 Exam focused on the events in 2013 that led to the initial employee termination, the investigation of employee misconduct that followed, and overall changes in governance intended to improve the bank's practices.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 413**

National Bank Examiners Karin Hudson, Jennifer Crosthwaite, and others again met with Respondent Russ Anderson during the May 2015 Exam.[3297]

**Responses:**

**Russ Anderson** did not dispute the claim.[3298] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that National Bank Examiners Karin Hudson, Jennifer Crosthwaite, and others again met with Respondent Russ Anderson during the May 2015 Exam.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 414**

**Responses:**

---

[3295] MSD-213 at 1.

[3296] Russ Anderson's ECSFM at No. 412.

[3297] MSD-266 (Russ Anderson Dep. Tr.) at 238:10-12; MSD-270 (NBE Hudson Expert Report – Revised) at ¶ 46; MSD-268 (NBE Crosthwaite Expert Report) at ¶ 118.

[3298] Russ Anderson's ECSFM at No. 413.

Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 414 relies on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[3299] Upon my review of the confidential documents supporting this Statement of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in this Statement of Material Fact.

## Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 415

Respondent Russ Anderson participated in a May 14, 2015 meeting with the OCC ("May 14, 2015 Meeting").[3300]

**Responses:**

**Russ Anderson** did not dispute the claim.[3301] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she participated in a May 14, 2015 meeting with the OCC.

## Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 416

Respondent Russ Anderson told examiners during the May 14, 2015 Meeting that interviews with employees "did not lead to conclusions about sales pressure," that she does not "hear" about pressure from personal bankers "at all," and that "people are positive and pleased."[3302]

**Responses:**

**Russ Anderson** did not dispute that she told the examiners what is shown above, but that the quoted material "is not a quote" but was drawn from the underlying document of meeting

---

[3299] See 12 C.F.R. § 19.33(b).

[3300] Russ Anderson Amended Answer ¶ 286; MSD-189.

[3301] Russ Anderson's ECSFM at No. 414.

[3302] MSD-266 (Russ Anderson Dep. Tr.) at 158:10-159:20; MSD-189 at 3 ("Interviews did not lead to a conclusion about sales pressure. This was not an underlying issue . . . The number of allegations in Ethics declined and no preponderance of issues discovered in interviews."); MSD-270 (NBE Hudson Expert Report – Revised) at ¶¶ 49, 52, 54; MSD-646A (Hudson Dep. Tr.) at 126:8-127:9 , 146:20-147:9, 155:20-157:1; MSD-268 (NBE Crosthwaite Expert Report) at ¶118(d); MSD-644 (Moses Dep. Tr.) at 275:23-276:23.

Add. 691

notes.[3303] She added that she testified as follows:

> A. So specifically in May of 2015 when the OCC asked me that question and I responded that I was not hearing of pressure, that is a true statement. And that is exactly what I said, because that is exactly what I had heard from my visits out into the regions, that the pressure was materially different and -- and much less, and that everybody was very pleased with the changes that had been happening.[3304]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that told examiners during the May 14, 2015 Meeting words to the effect that interviews with employees did not lead to conclusions about sales pressure, that she does not hear about pressure from personal bankers at all, and that people are positive and pleased.


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 417**

During the May 14, 2015 Meeting, Respondent Russ Anderson discussed activity that the Bank refers to as simulated funding and described it as follows: "Simulated funding can occur when a banker opens an account a customer did not ask for and uses his/her own funds by putting, in example, $25 in an account. Another example is a customer wants an account with funds coming from one account to another but the funds are expected to be put back in the original account after a certain period. The account appears funded for active use but the account is not used. Process could be signaled by money in and out in a quick basis."[3305]

**Responses:**

**Russ Anderson** did not dispute making the statements presented, but averred Enforcement Counsel misrepresents the nature of the quoted material by putting it in quotes when the quoted material is not in a quote in the underlying document of meeting notes.[3306]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that during the May 14, 2015 Meeting, Respondent Russ Anderson discussed activity that the Bank refers to as simulated funding and described it with words to the effect that "Simulated funding" can occur when a banker opens an

---

[3303] Russ Anderson's ECSFM at No. 416.

[3304] Russ Anderson's ECSFM at No. 416, quoting MSD-266 (Russ Anderson Dep. Tr.) at 158:21-159:4.

[3305] MSD- 189 at 1-2; MSD-270 (NBE Hudson Expert Report – Revised) at ¶ 46.

[3306] Russ Anderson's ECSFM at No. 417.

account a customer did not ask for and uses his/her own funds by putting, in example, $25 in an account. Another example is a customer wants an account with funds coming from one account to another but the funds are expected to be put back in the original account after a certain period. The account appears funded for active use but the account is not used. Process could be signaled by money in and out in a quick basis.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 418

Respondent Russ Anderson did not disclose at the May 14, 2015 meeting that simulated funding entailed the creation of accounts and movement of customer funds without customer consent.[3307]

**Responses:**

**Russ Anderson** disputed the claim that she did not disclose at the May 14, 2015 meeting that simulated funding entailed the creation of accounts and movement of customer funds without customer consent.[3308] In support, she cited her Declaration at ¶30 (which avers "examples of simulated funding were provided during the course of a conversation") and her response to (Russ Anderson) No. 103, which incorporated Respondent Julian's response to (Julian and McLinko) No. 89, which averred that the Statement "does not set forth the relevant information to ascertain who in the Community Bank allegedly employed stack rankings nor what those alleged rankings indicated nor when those alleged rankings were used."[3309] She did not, however, present evidence showing the disclosure referred to in the Statement.

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she did not disclose at the May 14, 2015 meeting that simulated funding entailed the creation of accounts and movement of customer funds without customer consent.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 419

At the May 14, 2015 Meeting, the OCC asked Respondent Russ Anderson how simulated funding was detected. In response, she stated: "They work with the Deposit Products Group (DPG) who uses analytics with exact filters. DPG looks at the activity and Quality Sales Report Card metric. They can see increases or decreases in that type of simulated funding. Scans occur

---

[3307] MSD-270 (NBE Hudson Expert Report – Revised) at ¶ 46.

[3308] Russ Anderson's ECSFM at No. 418.

[3309] Russ Anderson's ECSFM at No. 419.

Appellate Case: 25-1079    Page: 695    Date Filed: 05/16/2025  Entry ID: 5517644

regularly."[3310]

**Responses:**

**Russ Anderson** did not dispute that she made the statements attributed to her, but averred the quoted material is actually not a quote but is based on Exam staff notes.[3311]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that at the May 14, 2015 Meeting, the OCC asked Respondent Russ Anderson how simulated funding was detected. In response, she responded to the effect that they work with the Deposit Products Group (DPG) who uses analytics with exact filters. DPG looks at the activity and Quality Sales Report Card metric. They can see increases or decreases in that type of simulated funding. Scans occur regularly.

## Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 420

At the May 14, 2015 Meeting, Respondent Russ Anderson did not disclose the 99.99% and 99.95% thresholds used by SSCOT to detect simulated funding.[3312]

**Responses:**

**Russ Anderson** did not dispute that she did not disclose the cited thresholds, but avers Exam staff did not ask questions about thresholds.[3313]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that at the May 14, 2015 Meeting, although she was not asked about thresholds, Respondent did not disclose the 99.99% and 99.95% thresholds used by SSCOT to detect simulated funding.

## Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 421

At the May 14, 2015 Meeting, Respondent Russ Anderson discussed 190 employee

---

[3310] MSD-270 (NBE Hudson Expert Report – Revised) at ¶ 47.

[3311] Russ Anderson's ECSFM at No. 419.

[3312] MSD-270 (NBE Hudson Expert Report – Revised) at ¶ 47; MSD-266 (Russ Anderson Dep. Tr.) at 94:5-97:9; MSD-115 at 3 ("I don't believe the OCC/CFPB are aware of the details around thresholds or outliers. We didn't get into that detail in our original OCC submission."; MSD-646A (Hudson Dep. Tr.) at 111:20-112:13, 115:16-117:6; MSD-304B (Candy Dep. Tr.) at 323:14-324:17.

[3313] Russ Anderson's ECSFM at No. 420.

terminations and stated that the terminations largely related to employees changing customers' phone numbers and receiving sales credit for sales that another teller made.[3314]

**Responses:**

**Russ Anderson** did not dispute that she testified that "at the end of the day, that was the preponderance of the terminations in LA/OC. Some 70% were for phone numbers changes versus simulated funding."[3315]

Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she testified that "at the end of the day, that was the preponderance of the terminations in LA/OC. Some 70% were for phone numbers changes versus simulated funding."

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 422

At the May 14, 2015 Meeting, the OCC asked Respondent Russ Anderson about the root cause of employee terminations for sales practices.[3316] Respondent Russ Anderson did not disclose any connection between pressure to meet unreasonable sales goals causing employees to issue products for customers that they did not need, want, or consent to. Instead, she discussed Gallup surveys and stated that they had not done a formal root cause analysis.[3317]

**Responses:**

**Russ Anderson** did not dispute the above claims.[3318] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that at the May 14, 2015 Meeting, the OCC asked Respondent Russ Anderson about the root cause of employee terminations for sales practices, and she did not disclose any connection between pressure to meet unreasonable sales goals causing employees to issue products for customers that they did not need, want, or consent to. Instead, she discussed Gallup surveys and stated that they had not done a formal root cause analysis.

---

[3314] MSD- 189; MSD-270 (NBE Hudson Expert Report – Revised) at ¶ 50; MSD-646A (Hudson Dep. Tr.) at 90:23-92:8, 184:21-185:18; MSD-266 (Russ Anderson Dep. Tr.) at 98:4-13.

[3315] Russ Anderson's ECSFM at No. 421, quoting MSD-266 (Russ Anderson Dep. Tr.) at 98:4-13.

[3316] MSD-189 at 2-3; MSD-270 (NBE Hudson Expert Report – Revised) at ¶ 51.

[3317] MSD-189 at 2; MSD- 270 (NBE Hudson Expert Report – Revised) at ¶ 51; MSD-646A (Hudson Dep. Tr.) at 110:2- 111:7.

[3318] Russ Anderson's ECSFM at No. 422.

Add. 695

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 423**

At the May 14, 2015 Meeting, OCC examiners asked whether there was anything pertinent that should be shared with them during their review of sales practices.[3319] Respondent Russ Anderson stated that the "[m]ost important thing is we found something, we were proactive, we did something, and the preponderance were non-customer impact."[3320]

**Responses:**

**Russ Anderson** did not dispute the question that was presented to her and the answer she gave, as reported above.[3321] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that at the May 14, 2015 Meeting, OCC examiners asked her whether there was anything pertinent that should be shared with them during their review of sales practices, and she responding by stating that the "[m]ost important thing is we found something, we were proactive, we did something, and the preponderance were non-customer impact."

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 424**

Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 424 relies on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[3322] Upon my review of the confidential documents supporting this Statement of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in this Statement of Material Fact.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 425**

Respondent Russ Anderson continually expressed concerns regarding what information

---

[3319] MSD-189 at 4.

[3320] MSD-189 at 4; MSD-270 (NBE Hudson Expert Report – Revised) at ¶¶ 53, 54; MSD-304B (Candy Dep. Tr.) at 323:14-324:17.

[3321] Russ Anderson's ECSFM at No. 423.

[3322] See 12 C.F.R. § 19.33(b).

would be shared with the OCC.[3323]

**Responses:**

**Russ Anderson** offered no evidence to dispute the claim, averring only that the Statement mischaracterizes how Ms. Russ Anderson and her colleagues worked through determining what the OCC Exam staff requested and evaluating whether certain information was responsive to an OCC Exam request.[3324] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that Russ Anderson continually expressed concerns regarding what information would be shared with the OCC.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 426

On May 19, 2015, OCC examiner Jennifer Crosthwaite requested information from the Bank, including "[d]etails on terminations due to inappropriate sales practices since May 2013 this should include the 190 discussed in the lawsuit and any since that time."[3325]

**Responses:**

**Russ Anderson** did not dispute the claim, other than to aver the term "inappropriate sales practices" is vague.[3326] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that on May 19, 2015, OCC examiner Jennifer Crosthwaite requested information from the Bank, including "[d]etails on terminations due to inappropriate sales practices since May 2013 this should include the 190 discussed in the lawsuit and any since that time."

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 427

Three days earlier, on May 16, 2015, Respondent Russ Anderson was informed that the number of terminations/resignations for sales integrity was 1,293 in 2014 and 1,229 in 2013.[3327]

**Responses:**

---

[3323] MSD-126; MSD-171; MSD-192 ("If we don't think it advances the 'tone at the top' agenda should we provide?" MSD-195.

[3324] Russ Anderson's ECSFM at No. 425.

[3325] MSD- 192 at 3.

[3326] Russ Anderson's ECSFM at No. 426.

[3327] MSD-179; MSD-280 (Board Report) at 108; see also MSD-145 (taking no issue with Ms. Tolstedt 1,000-1,200 termination estimate for sales in 2013.

Add. 697

Appellate Case: 25-1079    Page: 699    Date Filed: 05/16/2025 Entry ID: 5517644

**Russ Anderson** did not dispute the claim but averred the Statement fails to consider that the termination figures being reported in the various documents cited by the OCC, report different data with different criteria being applied.[3328] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that three days earlier, on May 16, 2015, Respondent Russ Anderson was informed that the number of terminations/resignations for sales integrity was 1,293 in 2014 and 1,229 in 2013.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 428**

Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 428 relies on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[3329] Upon my review of the confidential documents supporting this Statement of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in this Statement of Material Fact.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 429**

On June 19, 2015, in a meeting between OCC examiners Jennifer Crosthwaite, Elizabeth Candy, Chris Moses, Karin Hudson and Respondent Russ Anderson and other Bank personnel, OCC examiners requested information about the Bank's signature requirements for deposit products: "The OCC had a general policy and procedure question around requirements for signatures and in cases where they were not obtained, are there controls or checks and balances to confirm whether a signature was there or not."[3330] The request encapsulated information about signature requirements for deposit products.[3331]

**Responses:**

**Russ Anderson** did not dispute the factual claims regarding what transpired during the meeting on June 19, 2015, other than to aver that the actual request makes no reference to deposit products and raise the claim that the purported expert report of Ms. Candy makes sweeping conclusory statements about Ms. Russ Anderson's candor to OCC exam staff, but

---

[3328] Russ Anderson's ECSFM at No. 427.

[3329] See 12 C.F.R. § 19.33(b).

[3330] MSD-194; MSD-269 (NBE Candy Expert Report) at ¶ 127.

[3331] MSD-194.

makes no mention of the specific facts alleged in the Statement.[3332]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that on June 19, 2015, in a meeting between OCC examiners Jennifer Crosthwaite, Elizabeth Candy, Chris Moses, Karin Hudson and Respondent Russ Anderson and other Bank personnel, OCC examiners requested information about the Bank's signature requirements for deposit products: "The OCC had a general policy and procedure question around requirements for signatures and in cases where they were not obtained, are there controls or checks and balances to confirm whether a signature was there or not." The request encapsulated information about signature requirements for deposit products.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 430

On June 23, 2015, employees within the Community Bank specifically stated that the scope of the OCC's questions "are related to both deposit and credit products as well as the back-end processes to review exceptions."[3333] Nonetheless, Respondent Russ Anderson decided to remove information related to deposit products from the materials submitted to the OCC: "They did not ask about deposits and we shouldn't add it. I'll edit it out when they send it."[3334]

### Responses:

**Russ Anderson** did not dispute the statement attributed to employees within the Community Bank, but averred she decided to remove information related to deposit products submitted to the OCC because she understood that the OCC exam staff did not ask for deposit products, and another team member agreed.[3335]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that on June 23, 2015, employees within the Community Bank specifically stated that the scope of the OCC's questions "are related to both deposit and credit products as well as the back-end processes to review exceptions." Nonetheless, Respondent Russ Anderson decided to remove information related to deposit products from the materials submitted to the OCC: "They did not ask about deposits and we shouldn't add it. I'll edit it out when they send it."

---

[3332] Russ Anderson's ECSFM at No. 429.

[3333] MSD-195 at 3.

[3334] MSD-195 at 2.

[3335] Russ Anderson's ECSFM at No. 430, quoting MSD-195 at 2 (Paula Herzberg stating, "ok-agreed." She states further there are "lots of emails and things are getting confused I'm afraid.").

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 431**

In March 2016, Respondent Russ Anderson expressed concerns about sales practices complaints analysis being shared with the OCC.[3336]

**Responses:**

**Russ Anderson** did not dispute that she expressed the concerns stated in the Statement, but averred that Enforcement Counsel left out the testimony of Paula Herzberg in which Ms. Herzberg testified that the concerns around the information going to the OCC exam team were that the information was 1) not complete and was still being updated; 2) was outdated; 3) there would not be the right person available to explain the information or answer questions.[3337]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that in March 2016, Respondent Russ Anderson expressed concerns about sales practices complaints analysis being shared with the OCC.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 432**

The Bank admitted that "[c]ertain Community Bank leaders also impeded scrutiny of sales practices by Wells Fargo's primary regulator, the Office of the Comptroller of the Currency ("OCC"). During OCC examinations in February and May 2015, the OCC was given information that minimized the amount of sales pressure within the Community Bank and the size and scope of Wells Fargo's sales practices problems."[3338]

**Responses:**

**Russ Anderson** did not dispute the Bank's admissions as presented above.[3339] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the Bank admitted that "[c]ertain Community Bank leaders also impeded scrutiny of sales practices by Wells Fargo's primary regulator, the Office of the Comptroller of the Currency

---

[3336] MSD-196; MSD-197 ("I have to be honest that had we known this was going to OCC without my and Carrie's final approval we would not have agreed to some of the content.")

[3337] Russ Anderson's ECSFM at No. 431, citing MSD-196 and MSD-197; MSD-585 (Paul Herzberg Tr.) at 235:12-236:17; 239:6-240:5.

[3338] MSD-1 at 30 ¶ 27; MSD-270 (NBE Hudson Expert Report – Revised) at ¶ 73.

[3339] Russ Anderson's ECSFM at No. 432.

("OCC"). During OCC examinations in February and May 2015, the OCC was given information that minimized the amount of sales pressure within the Community Bank and the size and scope of Wells Fargo's sales practices problems."

**Respondent Russ Anderson continued to obscure the sales practices misconduct problem following supervisory criticism**

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 433

On June 26, 2015, the OCC communicated the results of its May 2015 examination of Enterprise Sales Practices in Supervisory Letter WFC 2015-36 ("SL 2015-36").[3340]

**Responses:**

**Russ Anderson** did not dispute the stated communication, but incorporated by reference Respondent Julian's response to (Julian and McLinko) Statement 474. That Response averred the OCC's June 26, 2015 Supervisory Letter regarding Enterprise Sales Practices did not use the term "sales practices misconduct."[3341]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that on June 26, 2015, the OCC communicated the results of its May 2015 examination of Enterprise Sales Practices in Supervisory Letter WFC 2015-36.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 434

SL 2015-36 concluded that "Wells Fargo's management and oversight of Enterprise Sales Practices risk is weak and needs to improve."[3342]

**Responses:**

**Russ Anderson** did not dispute SL 2015-36 reached the stated conclusion, but averred the June 26, 2015 Supervisory Letter regarding Enterprise Sales Practices ("SL 2015-36") (the admissibility of which is not conceded) did not use the term "sales practices misconduct."[3343]

---

[3340] MSD-213.

[3341] Julian's ECSFM at No. 474.

[3342] MSD-213 at 2.

[3343] Russ Anderson's ECSFM at No. 434.

Add. 701

Appellate Case: 25-1079    Page: 703    Date Filed: 05/16/2025 Entry ID: 5517644

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that SL 2015-36 concluded that "Wells Fargo's management and oversight of Enterprise Sales Practices risk is weak and needs to improve."

## Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 435

SL 2015-36 contained five MRAs, covering all three lines of defense: Enterprise Sales Practices - Corporate; Enterprise Sales Practices - Second Line of Defense; Complaints; Community Bank Group - Sales Practices; and Audit Coverage.[3344]

**Responses:**

**Russ Anderson** did not dispute the stated claims but incorporated Respondent Julian's response to (Julian and McLinko) No. 475.[3345] Respondent Julian did not dispute that SL 2015-36 contained five MRAs, covering all three lines of defense: Enterprise Sales Practices - Corporate; Enterprise Sales Practices - Second Line of Defense; Complaints; Community Bank Group - Sales Practices; and Audit Coverage. The Enterprise Sales Practices - Corporate MRA required the Bank to hire an independent third party consultants "to conduct a thorough review of Wells Fargo's approach to Enterprise Sales Practices" and "to ensure all allegations of inappropriate behavior (e.g., gaming, pinning, bundling, etc.) are evaluated and properly remediated."[3346]

Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that SL 2015-36 contained five MRAs, covering all three lines of defense: Enterprise Sales Practices - Corporate; Enterprise Sales Practices - Second Line of Defense; Complaints; Community Bank Group - Sales Practices; and Audit Coverage.

## Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 436

The concern identified in the Community Bank Group - Sales Practices MRA, which replaced the CB FLOD Risk Management – Sales Practices MRA issued in SL 2015-07, was that the Community Bank "lacks a formalized governance framework to oversee sales practices and does not have effective oversight and testing of branch (store) sales practices." The MRA explained that inaction "could impact reputation risk and cause customer

---

[3344] MSD-213.

[3345] Russ Anderson's ECSFM at No. 435.

[3346] Julian's ECSFM at No. 475.

harm."[3347]

**Responses:**

**Russ Anderson** did not dispute that the concern identified in the Community Bank Group - Sales Practices MRA was that the Community Bank lacks a formalized governance framework to oversee sales practices and does not have effective oversight and testing of branch (store) sales practices,[3348] but averred that by this time, "numerous steps had been taken that were resulting in improvements around sales practice misconduct."[3349]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the concern identified in the Community Bank Group - Sales Practices MRA, which replaced the CB FLOD Risk Management – Sales Practices MRA issued in SL 2015-07, was that the Community Bank "lacks a formalized governance framework to oversee sales practices and does not have effective oversight and testing of branch (store) sales practices." The MRA explained that inaction "could impact reputation risk and cause customer harm."

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 437

The Enterprise Sales Practices - Corporate MRA required the Bank to hire an independent third party consultants "to conduct a thorough review of Wells Fargo's approach to Enterprise Sales Practices" and "to ensure all allegations of inappropriate behavior (e.g., gaming, pinning, bundling, etc.) are evaluated and properly remediated."[3350]

**Responses:**

**Russ Anderson** did not dispute that the MRA was properly quoted.[3351] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the Enterprise Sales Practices - Corporate MRA required the Bank to hire an independent third party consultants "to conduct a thorough review of Wells Fargo's approach to Enterprise Sales Practices" and "to ensure all allegations of inappropriate behavior (e.g., gaming, pinning, bundling, etc.) are evaluated and properly remediated."

---

[3347] MSD- 213 at 8.

[3348] Russ Anderson's ECSFM at No. 436.

[3349] Russ Anderson's ECSFM at No. 436, citing MSD-8C (Stumpf Tr.) at 587:2-8.

[3350] MSD-213 at 6.

[3351] Russ Anderson's ECSFM at No. 437.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 438**

The Bank retained Accenture, a consultant, to conduct a review of sales practices.[3352]

**Responses:**

**Russ Anderson** did not dispute the claim, but averred the Bank retained Accenture in mid-2015 to "to examine the sales -- the community bank in terms of sales practices and asked them to -- to determine once and for all did we have a problem and how would we continue to solve the problem."[3353]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the Bank retained Accenture, a consultant, to conduct a review of sales practices.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 439**

In August 2015, Respondent Russ Anderson agreed not to provide to Accenture exit survey verbatim comments from employees.[3354] The verbatim comments that Respondent Russ Anderson agreed not to provide to Accenture discussed pressure placed on employees to meet unreasonable sales goals and sales practices misconduct.[3355]

**Responses:**

**Russ Anderson** did not dispute the claim, but averred that she had reviewed what was sent to her and replied to Ms. Kidd that it seemed like a complete answer.[3356] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that in August 2015, Respondent Russ Anderson agreed not to provide to Accenture exit survey verbatim comments from employees. The verbatim comments that Respondent Russ Anderson agreed not to provide to Accenture discussed pressure placed on employees to meet unreasonable sales goals and sales practices misconduct.

---

[3352] Loughlin Dep. Tr. 162:10-165:19; MSD-199 at 3-4.

[3353] Russ Anderson's ECSFM at No. 438.

[3354] MSD-202.

[3355] MSD-704; MSD- 705.

[3356] Russ Anderson's ECSFM at No. 439.

Add. 704

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 440**

Prior to the issuance of the final report from Accenture on Community Bank sales practices, Respondent Russ Anderson reviewed the report and provided her feedback.[3357] Respondent Russ Anderson's "'big worry' was that the CFPB is very interested, along with the OCC and the Fed, who she says are ready to send the report off to DC and 'tear it apart'."[3358] Respondent Russ Anderson's "first specific comment was about the FLOD [first line of defense] needing to cooperate with SLOD [second line of defense]. She didn't see that as the case and thought this would get John Stumpf would grab SLOD by the neck if true. After that, she talked about the same themes Jason and Matthew raised about banker views being taken as 'facts' and misinterpretation/misalignment of actual facts . . ."[3359]

**Responses:**

**Russ Anderson** did not dispute the responses reported in this Statement, but averred the Statement is misleading and lacks context, asserting that MSD-201 (an email chain circa 2015 regarding the Accenture report) does not contain any direct statements from Ms. Russ Anderson and "is a second-hand account of a discussion with her, which could have been taken out of context or misinterpreted."[3360]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that prior to the issuance of the final report from Accenture on Community Bank sales practices, Respondent Russ Anderson reviewed the report and provided her feedback; that her 'big worry' was that the CFPB is very interested, along with the OCC and the Fed, who she says are ready to send the report off to DC and 'tear it apart'; that her "first specific comment was about the FLOD [first line of defense] needing to cooperate with SLOD [second line of defense]. She didn't see that as the case and thought this would get John Stumpf would grab SLOD by the neck if true. After that, she talked about the same themes Jason and Matthew raised about banker views being taken as 'facts' and misinterpretation/misalignment of actual facts. . . ."

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 441**

Accenture issued a report in October 2015 regarding sales practices in the Community

---

[3357] MSD- 201 at 3-5.

[3358] MSD- 201 at 3.

[3359] MSD- 201 at 3.

[3360] Russ Anderson's ECSFM at No. 440.

Bank.[3361]

**Responses:**

**Russ Anderson** did not dispute the claim.[3362] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that Accenture issued a report in October 2015 regarding sales practices in the Community Bank.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 442

Accenture observed that "[a]lthough there are multiple programs in flight to strengthen controls within the 1LOD [first line of defense], the 1LOD does not have a uniform way of evidencing sufficient control over sales practices issues."[3363]

**Responses:**

**Russ Anderson** did not dispute the claim.[3364] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that Accenture observed that "[a]lthough there are multiple programs in flight to strengthen controls within the 1LOD [first line of defense], the 1LOD does not have a uniform way of evidencing sufficient control over sales practices issues."

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 443

Accenture observed that "[t]eam members believe that executive messaging related to customer relationships is misaligned with solution sales goals, the performance management evaluation process, day-to-day performance expectations, and incentive compensation structure."[3365]

**Responses:**

**Russ Anderson** did not dispute the claim.[3366] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that Accenture observed that "[t]eam members believe that executive messaging related to customer relationships

---

[3361] MSD-51.

[3362] Russ Anderson's ECSFM at No. 441.

[3363] MSD-51 at 42.

[3364] Russ Anderson's ECSFM at No. 442.

[3365] MSD-51 at 4.

[3366] Russ Anderson's ECSFM at No. 443.

is misaligned with solution sales goals, the performance management evaluation process, day-to-day performance expectations, and incentive compensation structure."

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 444

Accenture explained that "[m]any [b]ankers stated that despite recent reductions in store sales goals, they continue to feel pressure to meet sales targets that many team members perceive to be unreasonable, and this may occur at the potential expense of sales quality."[3367]

**Responses:**

**Russ Anderson** did not dispute the claim.[3368] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that Accenture explained that "[m]any [b]ankers stated that despite recent reductions in store sales goals, they continue to feel pressure to meet sales targets that many team members perceive to be unreasonable, and this may occur at the potential expense of sales quality."

**The sales practices misconduct problem was resolved only after intense Congressional and public scrutiny**

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 445

On July 18, 2016, the OCC communicated the findings from its ongoing review of sales practices at the Bank in Supervisory Letter WFC 2016-36 ("SL 2016-36").[3369]

**Responses:**

**Russ Anderson** did not dispute the claim.[3370] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that on July 18, 2016, the OCC communicated the findings from its ongoing review of sales practices at the Bank in Supervisory Letter WFC 2016-36.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 446

SL 2016-36 noted that since the issuance of SL 2015-36, the OCC "reviewed additional reports and material prepared by the Bank and third-party consultants as part of our ongoing

---

[3367] MSD-51 at 28, 27, 37.

[3368] Russ Anderson's ECSFM at No. 444.

[3369] MSD-570.

[3370] Russ Anderson's ECSFM at No. 445.

Add. 707

Appellate Case: 25-1079      Page: 709      Date Filed: 05/16/2025 Entry ID: 5517644

supervision. . . . One of our objectives in reviewing these materials was to determine whether the findings identified instances of unsafe or unsound banking practices. Based on our ongoing review, we have concluded that the Bank's risk management of its sales practices and its sales practices themselves are unsafe or unsound."[3371]

**Responses:**

**Russ Anderson** did not dispute the claim.[3372] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that since the issuance of SL 2015-36, the OCC "reviewed additional reports and material prepared by the Bank and third-party consultants as part of our ongoing supervision. . . . One of our objectives in reviewing these materials was to determine whether the findings identified instances of unsafe or unsound banking practices. Based on our ongoing review, we have concluded that the Bank's risk management of its sales practices and its sales practices themselves are unsafe or unsound."

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 447 and (Julian and McLinko) No. 492

Regarding the unsafe or unsound practices, SL 2016-36 elaborated:

   a.   "The practice of opening deposit accounts without authorization, the practice of moving funds without customer consent (simulated funding) and the failure to timely refund or remediate fees charged are considered unsafe or unsound banking practices."[3373]

   b.   "The widespread and unauthorized opening of credit card accounts without consent . . . is considered an unsafe or unsound banking practice."[3374]

   c.   "[T]he Bank engaged in the unsafe or unsound practice of failing to adequately monitor and control sales practices to prevent such inappropriate employee behavior."[3375]

   d.   "[T]he Bank engaged in the unsafe or unsound practices of operating

---

[3371] MSD-570 at 3.

[3372] Russ Anderson's ECSFM at No. 446.

[3373] MSD-570 at 5.

[3374] MSD-570 at 6.

[3375] MSD-570 at 6.

Appellate Case: 25-1079     Page: 710     Date Filed: 05/16/2025 Entry ID: 5517644

without adequate controls and monitoring over its sales practices."[3376]

**Responses:**

**Russ Anderson** did not dispute the claim.[3377] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that SL 216-36 elaborated regarding the unsafe or unsound practices:

    a. "The practice of opening deposit accounts without authorization, the practice of moving funds without customer consent (simulated funding) and the failure to timely refund or remediate fees charged are considered unsafe or unsound banking practices."

    b. "The widespread and unauthorized opening of credit card accounts without consent . . . is considered an unsafe or unsound banking practice."

    c. "[T]he Bank engaged in the unsafe or unsound practice of failing to adequately monitor and control sales practices to prevent such inappropriate employee behavior."

"[T]he Bank engaged in the unsafe or unsound practices of operating without adequate controls and monitoring over its sales practices."

**Julian** did not dispute the claim.[3378] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that SL 216-36 elaborated regarding the unsafe or unsound practices as shown above.

**McLinko** incorporated Respondent Julian's Response.[3379]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 448**

On September 8, 2016, the OCC, the Consumer Financial Protection Bureau, and the Los Angeles City Attorney issued fines and penalties against the Bank related to sales practices misconduct, totaling $185 million.[3380]

**Responses:**

---

[3376] MSD-570 at 6; Julian Amended Answer ¶ 131; McLinko Amended Answer ¶ 131.

[3377] Russ Anderson's ECSFM at No. 447.

[3378] Julian's ECSFM at No. 492.

[3379] McLinko's ECSFM at No. 447.

[3380] Russ Anderson Amended Answer ¶ 132; Julian Amended Answer ¶ 132; MSD-343; MSD-344.

**Russ Anderson** did not dispute the claim.[3381] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that on September 8, 2016, the OCC, the Consumer Financial Protection Bureau, and the Los Angeles City Attorney issued fines and penalties against the Bank related to sales practices misconduct, totaling $185 million.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 449

The OCC also issued a Consent Order ("Sales Practices Consent Order") requiring corrective action and ordered the Bank to remediate customers who were harmed by the Bank's unsafe or unsound sales practices and to establish an enterprise-wide sales practices risk management and oversight program to prevent and detect unsafe or unsound sales practices.[3382]

**Responses:**

**Russ Anderson** did not dispute the claim.[3383] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the OCC issued a Consent Order requiring corrective action and ordered the Bank to remediate customers who were harmed by the Bank's unsafe or unsound sales practices and to establish an enterprise-wide sales practices risk management and oversight program to prevent and detect unsafe or unsound sales practices.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 450 and (Julian and McLinko) No. 498

In the Sales Practices Consent Order, the Comptroller found "that the OCC has identified the following unsafe or unsound sales practices in the Bank's Community Bank Group," which the Sales Practices Consent Order referred to as the "unsafe or unsound sales practices":

    a. "The selling of unwanted deposit or credit card accounts";

    b. "The unauthorized opening of deposit or credit card accounts";

    c. "The transfer of funds from authorized, existing accounts to unauthorized accounts ('simulated funding')"; and

    d. "Unauthorized credit

---

[3381] Russ Anderson's ECSFM at No. 448.

[3382] MSD-343.

[3383] Russ Anderson's ECSFM at No. 449.

inquiries".[3384]

Responses:

**Russ Anderson** did not dispute the claim.[3385]  Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that in the Sales Practices Consent Order, the Comptroller found "that the OCC has identified the following unsafe or unsound sales practices in the Bank's Community Bank Group," which the Sales Practices Consent Order referred to as the "unsafe or unsound sales practices":

    a.  "The selling of unwanted deposit or credit card accounts";

    b.  "The unauthorized opening of deposit or credit card accounts";

    c.  "The transfer of funds from authorized, existing accounts to unauthorized accounts ('simulated funding')"; and

    d.  "Unauthorized credit inquiries".

**Julian** did not dispute the claim.[3386]  Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that in the Sales Practices Consent Order, the Comptroller found "that the OCC has identified the following unsafe or unsound sales practices in the Bank's Community Bank Group," which the Sales Practices Consent Order referred to as the "unsafe or unsound sales practices" are as shown above.

**McLinko** incorporated Respondent Julian's Response.[3387]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 451 and (Julian and McLinko) No. 499**

In the Sales Practices Consent Order, the Comptroller also found "that the OCC has identified the following deficiencies and unsafe or unsound practices in the Bank's risk management and oversight of the Bank's sales practices:"

    a.  "The incentive compensation program and plans within the Community Bank Group were not aligned properly with local branch traffic, staff turnover, or customer

---

[3384] MSD-343.

[3385] Russ Anderson's ECSFM at No. 450

[3386] Julian's ECSFM at No. 498.

[3387] McLinko's ECSFM at No. 498.

Appellate Case: 25-1079     Page: 713     Date Filed: 05/16/2025 Entry ID: 5517644

demand, and they fostered the unsafe or unsound sales practices";

    b.  "The Bank lacked an Enterprise-Wide Sales Practices Oversight Program and thus failed to provide sufficient oversight to prevent and detect the unsafe or unsound sales practices";

    c.  "The Bank lacked a comprehensive customer complaint monitoring process that impeded the Bank's ability to: (1) assess customer complaint activity across the Bank; (2) adequately monitor, manage, and report on customer complaints; and (3) analyze and understand the potential sales practices risk";

    d.  "The Bank's Community Bank Group failed to adequately oversee sales practices and failed to adequately test and monitor branch employee sales practices"; and

    e.  "The Bank's audit coverage was inadequate because it failed to include in its scope an enterprise-wide view of the Bank's sales practices."[3388]

**Responses:**

**Russ Anderson** did not dispute the claim.[3389]    Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that in the Sales Practices Consent Order, the Comptroller also found "that the OCC has identified the following deficiencies and unsafe or unsound practices in the Bank's risk management and oversight of the Bank's sales practices:"

    a.  "The incentive compensation program and plans within the Community Bank Group were not aligned properly with local branch traffic, staff turnover, or customer demand, and they fostered the unsafe or unsound sales practices";

    b.  "The Bank lacked an Enterprise-Wide Sales Practices Oversight Program and thus failed to provide sufficient oversight to prevent and detect the unsafe or unsound sales

---

[3388] MSD-343.

[3389] Russ Anderson's ECSFM at No. 451.

Add. 712

Appellate Case: 25-1079    Page: 714    Date Filed: 05/16/2025 Entry ID: 5517644

practices";

c. "The Bank lacked a comprehensive customer complaint monitoring process that impeded the Bank's ability to: (1) assess customer complaint activity across the Bank; (2) adequately monitor, manage, and report on customer complaints; and (3) analyze and understand the potential sales practices risk";

d. "The Bank's Community Bank Group failed to adequately oversee sales practices and failed to adequately test and monitor branch employee sales practices"; and

e. "The Bank's audit coverage was inadequate because it failed to include in its scope an enterprise-wide view of the Bank's sales practices."

**Julian** did not dispute the claim. [3390] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that in the Sales Practices Consent Order, the Comptroller also found "that the OCC has identified the following deficiencies and unsafe or unsound practices in the Bank's risk management and oversight of the Bank's sales practices shown above.

**McLinko** incorporated Respondent Julian's Response.[3391]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 452 and (Julian and McLinko) No. 116**

In October 2016, the Bank finally eliminated sales goals for Community Bank employees.[3392]

**Responses:**

---

[3390] Julian's ECSFM at No. 499.

[3391] McLinko's ECSFM at No. 499.

[3392] Russ Anderson Amended Answer ¶ 135; MSD-295 (Bacon Tr.) at 194:10-197:8 (testifying that "it took an act of Congress for the company to change."; MSD-289A (Sloan Tr.) at 251:2-253:6; MSD-288-B (Strother Tr.) at 49:22-50:10; MSD-8B (Stumpf Tr.) at 228:11- 229:16; MSD-563; (Julian Amended Answer ¶ 135; McLinko Amended Answer ¶ 135. The Head of the Community Bank's Sales and Service Conduct Oversight Team ("SSCOT") testified that the Bank's "elimination of sales goals [in early October 2016] help[ed] dramatically reduce the sales practices problem," a conclusion she testified was supported by SSCOT's own data. (MSD-300 (Rawson Tr.) at 66:3- 66:8).

Add. 713

Appellate Case: 25-1079    Page: 715    Date Filed: 05/16/2025 Entry ID: 5517644

**Russ Anderson** did not dispute the claim.[3393]   Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that in October 2016, the Bank finally eliminated sales goals for Community Bank employees.

**Julian** disputed the claim, averring the Statement "mischaracterizes" his Amended Answer.[3394] That Answer stated, in full: "Admitted that Wells Fargo eliminated product sales goals in the Community Bank effective October 1, 2016. Otherwise, the allegation is denied."[3395]   I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that in October 2016, the Bank finally eliminated sales goals for Community Bank employees.

**McLinko** incorporated Respondent Julian's Response, but did not dispute that in October 2016 the Bank eliminated sales goals for the Community Bank, and did not dispute that the Statement accurately cites to Ms. Rawson's testimony.[3396]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 453 and (Julian and McLinko) No. 522

In a January 23, 2020 Wells Fargo press release about the OCC's Notice of Charges, the Bank's current CEO stated: "The OCC's actions are consistent with my belief that we should hold ourselves and individuals accountable. They also are consistent with our belief that significant parts of the operating model of our Community Bank were flawed. At the time of the sales practices issues, the Company did not have in place the appropriate people, structure, processes, controls, or culture to prevent the inappropriate conduct. This was inexcusable. Our customers and you all deserved more from the leadership of this Company."[3397]

**Responses:**

**Russ Anderson** did not dispute the claim.[3398]   Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that in a January 23, 2020 Wells Fargo press release about the OCC's Notice of Charges, the Bank's current CEO stated: "The

---

[3393] Russ Anderson's ECSFM at No. 452.

[3394] Julian's ECSFM at No. 116, citing Julian's Amended Answer ¶ 135.

[3395] Julian's Amended Answer ¶ 135.

[3396] McLinko's ECSFM at No. 116.

[3397] MSD-662.

[3398] Russ Anderson's ECSFM at No. 453.

Add. 714

Appellate Case: 25-1079    Page: 716    Date Filed: 05/16/2025 Entry ID: 5517644

OCC's actions are consistent with my belief that we should hold ourselves and individuals accountable. They also are consistent with our belief that significant parts of the operating model of our Community Bank were flawed. At the time of the sales practices issues, the Company did not have in place the appropriate people, structure, processes, controls, or culture to prevent the inappropriate conduct. This was inexcusable. Our customers and you all deserved more from the leadership of this Company."

**Julian** did not dispute the claim.[3399] Accordingly, the Recommended Decision will include a factual finding as to Respondents Julian and McLinko that in a January 23, 2020 Wells Fargo press release about the OCC's Notice of Charges, the Bank's current CEO stated: "The OCC's actions are consistent with my belief that we should hold ourselves and individuals accountable. They also are consistent with our belief that significant parts of the operating model of our Community Bank were flawed. At the time of the sales practices issues, the Company did not have in place the appropriate people, structure, processes, controls, or culture to prevent the inappropriate conduct. This was inexcusable. Our customers and you all deserved more from the leadership of this Company."

**McLinko** incorporated Respondent Julian's Response.[3400]

**Respondent Russ Anderson's conduct with respect to systemic sales practices misconduct resulted in loss to the Bank**

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 454**

On or about September 8, 2016, the Bank paid a total of $185 million as part of a stipulated judgment to settle the Los Angeles City Attorney lawsuit, and to pay civil money penalties assessed by the CFPB and OCC related to the Bank's systemic sales practices misconduct.[3401]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response to Statement (Julian and McLinko) No. 529.[3402] In that Response, Respondent Julian did not dispute the claims presented in (Julian and McLinko) No. 529.[3403]

---

[3399] Julian's ECSFM at No. 522.

[3400] McLinko's ECSFM at No. 522.

[3401] Russ Anderson Amended Answer ¶ 132; MSD-562.

[3402] Russ Anderson's ECSFM at No. 454.

[3403] Julian's ECSFM at No. 529.

Appellate Case: 25-1079     Page: 717     Date Filed: 05/16/2025 Entry ID: 5517644

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that on or about September 8, 2016, the Bank paid a total of $185 million as part of a stipulated judgment to settle the Los Angeles City Attorney lawsuit, and to pay civil money penalties assessed by the CFPB and OCC related to the Bank's systemic sales practices misconduct.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 455**

The September 2016 announcement of the settlement and subsequent public awareness of the sales practices misconduct problem, which resulted from Respondent Russ Anderson's misconduct, significantly damaged the Bank's reputation. The May 2017 results of a corporate reputation tracking study indicated the Bank's favorability rating plummeted 50% between September and October 2016, and by May 2017 had recovered only to 65% of its previous level.[3404]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response to Statement (Julian and McLinko) No. 530.[3405] In that Response, Respondent Julian did not dispute the claims presented in (Julian and McLinko) No. 530.[3406]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the September 2016 announcement of the settlement and subsequent public awareness of the sales practices misconduct problem, which resulted from Respondent Russ Anderson's misconduct, significantly damaged the Bank's reputation. The May 2017 results of a corporate reputation tracking study indicated the Bank's favorability rating plummeted 50% between September and October 2016, and by May 2017 had recovered only to 65% of its previous level.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 456**

The announcement of the September 2016 settlement and subsequent public backlash caused the Bank to change the Community Bank's business model and eliminate product sales

---

[3404] MSD-565 at 9.

[3405] Russ Anderson's ECSFM at No. 455.

[3406] Julian's ECSFM at No. 530.

Appellate Case: 25-1079     Page: 718     Date Filed: 05/16/2025  Entry ID: 5517644

goals, effective October 1, 2016.[3407]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response to Statement (Julian and McLinko) No. 531.[3408] In that Response, Respondent Julian did not dispute the claims presented in (Julian and McLinko) No. 531.[3409]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the announcement of the September 2016 settlement and subsequent public backlash caused the Bank to change the Community Bank's business model and eliminate product sales goals, effective October 1, 2016.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 457

During its investigation, the OCC requested information from the Bank, including "documentation sufficient to demonstrate any loss to the bank resulting from improper and unethical sales practices, including sales practices-related fines or money penalties, customer remediation, shareholder and class action litigation, and internal investigations."[3410] In response, the Bank provided the Declaration of W. Scott Champion, which itemized losses to the Bank dating fourth quarter 2016 and thereafter.[3411]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response to Statement (Julian and McLinko) No. 532.[3412] In that Response, Respondent Julian did not dispute the claims presented in (Julian and McLinko) No. 532.[3413]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that during its investigation, the OCC

---

[3407] MSD-289A (Sloan Tr.) at 251:2-253:6; MSD- 288-B (Strother Tr.) at 49:22-50:10; MSD-8B (Stumpf Tr.) at 228:11-229:16; MSD-563.

[3408] Russ Anderson's ECSFM at No. 456.

[3409] Julian's ECSFM at No. 531.

[3410] MSD-641 at 7¶ 43.

[3411] MSD-564 (Champion Decl.).

[3412] Russ Anderson's ECSFM at No. 457.

[3413] Julian's ECSFM at No. 532.

Appellate Case: 25-1079    Page: 719    Date Filed: 05/16/2025 Entry ID: 5517644

requested information from the Bank, including "documentation sufficient to demonstrate any loss to the bank resulting from improper and unethical sales practices, including sales practices-related fines or money penalties, customer remediation, shareholder and class action litigation, and internal investigations."[3414]  In response, the Bank provided the Declaration of W. Scott Champion, which itemized losses to the Bank dating fourth quarter 2016 and thereafter.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 458**

After the September 8, 2016 settlement announcement, and continuing over the next several years, the Bank suffered a series of other losses related to sales practices misconduct, including civil judgments to settle class action lawsuits, investigations commissioned to root out malfeasance, the costs of advertising campaigns aimed at rehabilitating its reputation, and in February 2020, a $3 billion settlement with the DOJ and the SEC.[3415]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response to Statement (Julian and McLinko) No. 533.[3416] In that Response, Respondent Julian did not dispute the claims presented in (Julian and McLinko) No. 533.[3417]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that after the September 8, 2016 settlement announcement, and continuing over the next several years, the Bank suffered a series of other losses related to sales practices misconduct, including civil judgments to settle class action lawsuits, investigations commissioned to root out malfeasance, the costs of advertising campaigns aimed at rehabilitating its reputation, and in February 2020, a $3 billion settlement with the DOJ and the SEC.

**Sales practices misconduct, which persisted at the Bank due to Respondent Russ Anderson's misconduct, harmed customers and breached their trust**

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 459**

---

[3414] MSD-641 at 7 ¶ 43.

[3415] MSD- 293A (Hardison Tr.) at 34:4-36:18; MSD-289A (Sloan Tr.) at 251:2-253:6; MSD-564; MSD-1.

[3416] Russ Anderson's ECSFM at No. 458.

[3417] Julian's ECSFM at No. 533.

Appellate Case: 25-1079     Page: 720     Date Filed: 05/16/2025 Entry ID: 5517644

Respondent Russ Anderson admits that the business of banking is built on customer trust.[3418]

**Responses:**

**Russ Anderson** did not dispute the claim.[3419] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the business of banking is built on customer trust.


### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 460

Respondent Russ Anderson admits that she recognized that when employees engaged in sales practices misconduct, that erodes customer trust and confidence in the Bank, and that she believed that in all 36 years of her career.[3420]

**Responses:**

**Russ Anderson** did not materially dispute the claim.[3421] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that when employees engaged in sales practices misconduct, such conduct can erode customer trust and confidence in the Bank.


### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 461 and (Julian and McLinko) No. 535

Sales practices misconduct at the Bank breached its customers' trust, including but not limited to by opening accounts for customers without customer consent, transferring customer funds without customer consent, and misusing its customers' personal information to do so.[3422]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[3423]

Julian disputed the claim, averring that Mr. Stumpf testified—based on an objectionable

---

[3418] MSD-266 (Russ Anderson Dep. Tr.) at 179:7-9.

[3419] Russ Anderson's ECSFM at No. 459.

[3420] MSD-266 (Russ Anderson Dep. Tr.) at 179:10-19.

[3421] Russ Anderson's ECSFM at No. 459.

[3422] MSD-8A (Stumpf Tr.) at 127:9-14; MSD-567; MSD-568; MSD-569.

[3423] Russ Anderson's ECSFM at No. 461.

Add. 719

Appellate Case: 25-1079    Page: 721    Date Filed: 05/16/2025 Entry ID: 5517644

hypothetical question posed at the time, without his memory being refreshed, and without access to the evidence—"Yes"[3424] and averred that Mr. Stumpf did not testify that the Bank breached its customers' trust.[3425] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that Sales practices misconduct at the Bank breached its customers' trust, including but not limited to by opening accounts for customers without customer consent, transferring customer funds without customer consent, and misusing its customers' personal information to do so.

**McLinko** incorporated Respondent Julian's Response.[3426]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 462 and (Julian and McLinko) No. 536

Sales practices misconduct at the Bank resulted in financial harm to the Bank's customers, including but not limited to account fees paid by the customer and increased borrowing costs borne by the customer due to a credit score impact.[3427]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[3428]

**Julian** responded that the claim was disputed, but did not dispute the claim presented and instead averred the claim lacked "necessary context".[3429] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that sales practices misconduct at the Bank resulted in financial harm to the Bank's customers, including but not limited to account fees paid by the customer and increased borrowing costs borne by the customer due to a credit score impact.

---

[3424] Julian's ECSFM at No. 535, quoting MSD-8A at 127:9-14.

[3425] Julian's ECSFM at No. 535, quoting MSD-8A at 127:9-14.

[3426] McLinko's ECSFM at No. 535.

[3427] MSD-543; MSD-663.

[3428] Russ Anderson's ECSFM at No. 462.

[3429] Julian's ECSFM at No. 536.

**McLinko** incorporated Respondent Julian's Response.[3430]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 463 and (Julian and McLinko No. 537

The Bank has acknowledged that its sales practices misconduct problem resulted in a breach of its customers' trust and financially harmed its customers. In an August 31, 2017 Wells Fargo press release related to the remediation process, former Bank CEO Tim Sloan said: "We apologize to everyone who was harmed by unacceptable sales practices that occurred in our retail bank. To rebuild trust and to build a better Wells Fargo, our first priority is to make things right for our customers, and the completion of this expanded third-party analysis is an important milestone. Through this expanded review, as well as the class action settlement, free mediation services, and ongoing outreach and complaint resolution, we've cast a wide net to reach customers and address their remaining concerns. Our commitment has never been stronger to build a better bank for our customers, team members, shareholders and communities."[3431]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[3432]

**Julian** responded that the claim was disputed, but did not dispute the claim presented and instead averred the claim lacked "necessary context".[3433] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that the Bank has acknowledged that its sales practices misconduct problem resulted in a breach of its customers' trust and financially harmed its customers. In an August 31, 2017 Wells Fargo press release related to the remediation process, former Bank CEO Tim Sloan said: "We apologize to everyone who was harmed by unacceptable sales practices that occurred in our retail bank. To rebuild trust and to build a better Wells Fargo, our first priority is to make things right for our customers, and the completion of this expanded third-party analysis is an important milestone. Through this expanded review, as well as the class action settlement, free mediation services, and ongoing outreach and complaint resolution, we've cast a wide net to reach customers and address their remaining concerns. Our commitment has never been stronger to build a better bank for our

---

[3430] McLinko's ECSFM at No. 536.

[3431] MSD- 664.

[3432] Russ Anderson's ECSFM at No. 463.

[3433] Julian's ECSFM at No. 537.

Appellate Case: 25-1079    Page: 723    Date Filed: 05/16/2025 Entry ID: 5517644

customers, team members, shareholders and communities."

**McLinko** incorporated Respondent Julian's Response.[3434]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 464 and (Julian and McLinko) No. 538**

As part of its February 20, 2020 Deferred Prosecution Agreement with the DOJ, the Bank also admitted as true that, as a result of its sales practices misconduct problem from 2002 through 2016, the Bank "collected millions of dollars in fees and interest to which the Company was not entitled, harmed the credit ratings of certain customers, and unlawfully misused customers' sensitive personal information (including customers' means of identification)."[3435]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[3436]

**Julian** responded that the claim was disputed, but did not dispute the claim presented and instead averred the claim lacked "necessary context".[3437] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that as part of its February 20, 2020 Deferred Prosecution Agreement with the DOJ, the Bank also admitted as true that, as a result of its sales practices misconduct problem from 2002 through 2016, the Bank "collected millions of dollars in fees and interest to which the Company was not entitled, harmed the credit ratings of certain customers, and unlawfully misused customers' sensitive personal information (including customers' means of identification)."

**McLinko** incorporated Respondent Julian's Response.[3438]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 465 and (Julian and McLinko) No. 539**

The Bank has paid millions of dollars of remediation to its customers to compensate

---

[3434] McLinko's ECSFM at No. 537.

[3435] MSD-1 at 31 ¶ 32.

[3436] Russ Anderson's ECSFM at No. 464.

[3437] Julian's ECSFM at No. 538.

[3438] McLinko's ECSFM at No. 538.

Appellate Case: 25-1079    Page: 724    Date Filed: 05/16/2025 Entry ID: 5517644

them for harm resulting from its sales practices.[3439]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[3440]

**Julian** responded that the claim was disputed, but did not dispute the claim presented and instead averred the claim "mischaracterized" his Amended Answer.[3441] At Paragraph 26 of the Notice of Charges, the OCC avers as follows:

> For more than 14 years, the systemic sales practices misconduct resulted in compromise of customer accounts, misuse of customer personal information, and actual financial harm to consumers. As of November 2019, the Bank has refunded at least $42.9 million to customers in connection with its review of sales practices.

In his Amended Answer to Paragraph 26, Respondent Julian stated:

> As to the first sentence, admitted that sales practices issues arose within the Community Bank. Insofar as the allegation in this sentence relates to time periods before Respondent Julian worked for the Bank and/or before he became Chief Auditor, Respondent Julian lacks sufficient knowledge or information to form a belief about the allegation, so it is denied to that extent. Denied that sales practices misconduct was "systemic," and Respondent Julian incorporates by reference his responses to paragraph 3. Any remaining allegations in this sentence are denied. As to the second sentence, admitted that the Bank has refunded money to customers in connection with its review of sales practices. Otherwise, the allegation in the second sentence is denied, as Respondent Julian lacks sufficient knowledge or information to form a belief about the amount of money the Bank has refunded.

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that the Bank has paid millions of dollars of remediation to its customers to compensate them for harm resulting from its sales practices.

**McLinko** incorporated Respondent Julian's Response.[3442]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 466 and (Julian**

---

[3439] MSD-542; Julian Amended Answer ¶ 26; MSD-665.

[3440] Russ Anderson's ECSFM at No. 465.

[3441] Julian's ECSFM at No. 539, citing Julian Amended Answer ¶ 26.

[3442] McLinko's ECSFM at No. 539.

Add. 723

**and McLinko) No. 540**

On June 14, 2018, the U.S. District Court for the Northern District of California approved a $142 million class action settlement in *Jabbari v. Wells Fargo & Co,* No. 15-cv- 02159-VC.[3443]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[3444]

Julian did not dispute the claim.[3445]  Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that on June 14, 2018, the U.S. District Court for the Northern District of California approved a $142 million class action settlement in *Jabbari v. Wells Fargo & Co,* No. 15-cv- 02159-VC.

**McLinko** incorporated Respondent Julian's Response.[3446]


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 467 and (Julian and McLinko) No. 541**

The *Jabbari* settlement class included "All Persons for whom Wells Fargo or Wells Fargo's current or former subsidiaries, affiliates, principals, officers, directors, or employees opened an Unauthorized Account or submitted an Unauthorized Application, or who obtained Identity Theft Protection Services from Wells Fargo during the period from May 1, 2002 to April 20, 2017."[3447]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[3448]

**Julian** did not dispute the Settlement included the relief quoted here.[3449]  Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that the *Jabbari* settlement class included "All Persons for whom Wells Fargo or Wells Fargo's current or former subsidiaries, affiliates, principals, officers, directors,

---

[3443] MSD-665; see also Julian Amended Answer ¶ 173.

[3444] Russ Anderson's ECSFM at No. 466.

[3445] Julian's ECSFM at No. 540.

[3446] McLinko's ECSFM at No. 540.

[3447] MSD-665.

[3448] Russ Anderson's ECSFM at No. 467.

[3449] Julian's ECSFM at No. 541.

Appellate Case: 25-1079     Page: 726     Date Filed: 05/16/2025 Entry ID: 5517644

or employees opened an Unauthorized Account or submitted an Unauthorized Application, or who obtained Identity Theft Protection Services from Wells Fargo during the period from May 1, 2002 to April 20, 2017."

**McLinko** incorporated Respondent Julian's Response.[3450]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 468 and (Julian and McLinko) No. 542

In a June 15, 2018 Wells Fargo press release about the *Jabbari* settlement, former Bank CEO Tim Sloan stated: "The court's approval of the broad and far-reaching $142 million settlement agreement is a significant step forward in making things right for our customers and further restoring trust with all of Wells Fargo's stakeholders. . . . We are pleased with this decision as it supports our efforts to help customers impacted by improper retail sales practices and ensures they have every opportunity for remediation."[3451]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[3452]

**Julian** did not dispute the press release included what was quoted here.[3453] Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that in a June 15, 2018 Wells Fargo press release about the *Jabbari* settlement, former Bank CEO Tim Sloan stated: "The court's approval of the broad and far-reaching $142 million settlement agreement is a significant step forward in making things right for our customers and further restoring trust with all of Wells Fargo's stakeholders. . . . We are pleased with this decision as it supports our efforts to help customers impacted by improper retail sales practices and ensures they have every opportunity for remediation."

**McLinko** incorporated Respondent Julian's Response.[3454]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 469 and (Julian and McLinko) No. 543

Under the *Jabbari* settlement, "Claimants will be reimbursed from the Net Settlement

---

[3450] McLinko's ECSFM at No. 541.

[3451] MSD-666.

[3452] Russ Anderson's ECSFM at No. 468.

[3453] Julian's ECSFM at No. 542.

[3454] McLinko's ECSFM at No. 542.

Amount for out-of-pocket losses stemming from Unauthorized Accounts and Unauthorized Applications. Such out-of-pocket losses shall consist of two components: (1) increased borrowing cost due to credit score impact as a result of a Credit Analysis Account ('Credit Impact Damages'); and (2) fees assessed by Wells Fargo in connection with certain Unauthorized Accounts."[3455]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[3456]

**Julian** did not dispute the cited Order included what was quoted here.[3457] Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that under the *Jabbari* settlement, "Claimants will be reimbursed from the Net Settlement Amount for out-of-pocket losses stemming from Unauthorized Accounts and Unauthorized Applications. Such out-of-pocket losses shall consist of two components: (1) increased borrowing cost due to credit score impact as a result of a Credit Analysis Account ('Credit Impact Damages'); and (2) fees assessed by Wells Fargo in connection with certain Unauthorized Accounts."

**McLinko** incorporated Respondent Julian's Response.[3458]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 470 and (Julian and McLinko) No. 544

Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 470 and (Julian and McLinko) No. 554 rely on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[3459] Upon my review of the confidential documents supporting these Statements of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant

---

[3455] MSD-664.

[3456] Russ Anderson's ECSFM at No. 469.

[3457] Julian's ECSFM at No. 543.

[3458] McLinko's ECSFM at No. 543.

[3459] See 12 C.F.R. § 19.33(b).

Add. 726

Appellate Case: 25-1079    Page: 728    Date Filed: 05/16/2025 Entry ID: 5517644

exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in these Statements of Material Fact.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 471 and (Julian and McLinko) No. 545

Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 471 and (Julian and McLinko) No. 545 rely on exhibits presented to this Tribunal as being non-public. Pursuant to the OCC's Uniform Rules, while the proceedings in this administrative enforcement action are expressly required to be public, when presented with non-public documents the Administrative Law Judge is required to take all appropriate steps to preserve the confidentiality of such documents.[3460] Upon my review of the confidential documents supporting these Statements of Material Fact, and after weighing the expectation that all of the proceedings shall be public against the requirement that I protect against the disclosure of non-public information, I find the evidentiary value of these exhibits to be sufficiently marginal and duplicative as to warrant exclusion from this Order. Accordingly, this Order will not be based on any of the claims found in these Statements of Material Fact.

### The Bank has paid billions of dollars in civil and criminal fines and incurred significant other losses as a result of the sales practices misconduct problem

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 472 and (Julian and McLinko) No. 546

On September 8, 2016, the Bank was fined $185 million by the OCC, the Consumer Financial Protection Bureau, and the Office of the Los Angeles City Attorney in connection with its sales practices.[3461]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[3462]

Julian did not dispute the claim.[3463] Accordingly, the Recommended Decision will include a factual finding as to Respondent Julian and McLinko that on September 8, 2016, the Bank was

---

[3460] See 12 C.F.R. § 19.33(b).

[3461] MSD-667; MSD-52; MSD-343; MSD-344.

[3462] Russ Anderson's ECSFM at No. 472.

[3463] Julian's ECSFM at No. 546.

Add. 727

Appellate Case: 25-1079    Page: 729    Date Filed: 05/16/2025 Entry ID: 5517644

fined $185 million by the OCC, the Consumer Financial Protection Bureau, and the Office of the Los Angeles City Attorney in connection with its sales practices.

**McLinko** incorporated Respondent Julian's Response.[3464]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 473 and (Julian and McLinko) No. 547

On February 2, 2018, the Board of Governors of the Federal Reserve imposed on Wells Fargo an "asset cap" limiting the Bank's ability to increase in asset size because it "pursued a business strategy that emphasized sales and growth without ensuring that senior management had established and maintained an adequate risk management framework commensurate with the size and complexity of the Firm, which resulted in weak compliance practices."[3465]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[3466]

**Julian** responded that the claim was disputed, but did not dispute the claim presented and instead averred the claim lacked "context".[3467] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that on February 2, 2018, the Board of Governors of the Federal Reserve imposed on Wells Fargo an "asset cap" limiting the Bank's ability to increase in asset size because it "pursued a business strategy that emphasized sales and growth without ensuring that senior management had established and maintained an adequate risk management framework commensurate with the size and complexity of the Firm, which resulted in weak compliance practices."

**McLinko** incorporated Respondent Julian's Response.[3468]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 474 and (Julian and McLinko) No. 548

---

[3464] McLinko's ECSFM at No. 546.

[3465] MSD-668; MSD-679.

[3466] Russ Anderson's ECSFM at No. 473.

[3467] Julian's ECSFM at No. 547.

[3468] McLinko's ECSFM at No. 547.

Add. 728

The "asset cap" has had a significant financial impact on the Bank.[3469]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[3470]

**Julian** responded that the claim was disputed, but did not dispute the claim presented and instead averred the claim lacked "context".[3471] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that the "asset cap" has had a significant financial impact on the Bank.

**McLinko** incorporated Respondent Julian's Response.[3472]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 475 and (Julian and McLinko) No. 549**

On October 22, 2018, Wells Fargo was fined $65 million by the Office of the Attorney General of the State of New York in connection with its sales practices.[3473]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[3474]

**Julian** responded that the claim was disputed, but did not dispute the claim presented and instead averred the claim "misrepresents" the nature of the Wells Fargo Settlement.[3475] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that October 22, 2018, Wells Fargo was fined $65 million by the Office of the Attorney General of the State of New York in connection with its sales practices.

---

[3469] MSD-267 (NBE Smith Expert Report) at ¶ 148(e); MSD-669 (noting the Bank "has missed out on roughly $4 billion in profits -- and counting -- since the cap was imposed").

[3470] Russ Anderson's ECSFM at No. 474.

[3471] Julian's ECSFM at No. 548.

[3472] McLinko's ECSFM at No. 548.

[3473] MSD-670; MSD-673; MSD-678.

[3474] Russ Anderson's ECSFM at No. 475.

[3475] Julian's ECSFM at No. 549.

Appellate Case: 25-1079     Page: 731     Date Filed: 05/16/2025 Entry ID: 5517644

**McLinko** incorporated Respondent Julian's Response.[3476]


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 476 and (Julian and McLinko) No. 550**

On December 28, 2018, the Bank was fined $575 million by all 50 state Attorneys General and the District of Columbia in connection with its sales practices and related matters.[3477]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[3478]

**Julian** responded that the claim was disputed, but did not dispute the claim presented and instead averred the claim "misrepresents" the nature of the Wells Fargo Settlement.[3479] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that on December 28, 2018, the Bank was fined $575 million by all 50 state Attorneys General and the District of Columbia in connection with its sales practices and related matters.

**McLinko** incorporated Respondent Julian's Response.[3480]


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 477 and (Julian and McLinko) No. 551**

By July 11, 2019, when former Bank CEO Tim Sloan testified before the OCC, he estimated the total financial impact of the sales practices scandal on the Bank to be already "in the tens of billions of dollars, when you add -- the most significant impact was one that we were referring to earlier, and that was the impact of the stock price. We really missed out on recovery."[3481]

**Responses:**

---

[3476] McLinko's ECSFM at No. 549.

[3477] MSD-671; MSD-672.

[3478] Russ Anderson's ECSFM at No. 476.

[3479] Julian's ECSFM at No. 550.

[3480] McLinko's ECSFM at No. 550.

[3481] MSD-289A (Sloan Tr.) at 260:8-16.

Appellate Case: 25-1079    Page: 732    Date Filed: 05/16/2025 Entry ID: 5517644

**Russ Anderson** incorporated Respondent Julian's response.[3482]

**Julian** responded that the claim was disputed, but did not dispute the testimony was as is quoted here, but avers the witness "hyperbolized" during that testimony.[3483]  I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that by July 11, 2019, when former Bank CEO Tim Sloan testified before the OCC, he estimated the total financial impact of the sales practices scandal on the Bank to be already "in the tens of billions of dollars, when you add -- the most significant impact was one that we were referring to earlier, and that was the impact of the stock price. We really missed out on recovery."

**McLinko** incorporated Respondent Julian's Response.[3484]


### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 478 and (Julian and McLinko) No. 552

The Company's stock price has significantly lagged its peers since September 8, 2016, the date of the sales practices settlements with the OCC, CFPB, and City Attorney of Los Angeles.[3485]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[3486]

**Julian** responded that the claim was disputed, but did not dispute the claim but avers the Statement relies on expert opinions for which the author is unqualified.[3487]  I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that the Company's stock price has significantly lagged its peers since September 8, 2016, the date of the sales practices settlements with the OCC, CFPB, and City Attorney of Los Angeles.

---

[3482] Russ Anderson's ECSFM at No. 477.

[3483] Julian's ECSFM at No. 551.

[3484] McLinko's ECSFM at No. 551.

[3485] MSD-658 (Pocock Expert Report) at 5, 13-14; MSD-267 (NBE Smith Expert Report) at 148(f); MSD-289A (Sloan Tr.) at 256:25-257:8; see also MSD-257 (NBE Coleman Expert Report) at ¶ 115.

[3486] Russ Anderson's ECSFM at No. 478.

[3487] Julian's ECSFM at No. 552.

**McLinko** incorporated Respondent Julian's Response.[3488]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 479 and (Julian and McLinko No. 553

The Bank has also expended significant sums of money on lawyers and consultants in connection with its sales practices. From the fourth quarter of 2016 through the first quarter of 2018, the Bank paid legal fees and consulting costs of at least $169 million related to its sales practices.[3489]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[3490]

**Julian** responded that the claim was disputed, but did not dispute the claim but avers the Statement "mischaracterizes" the Declaration of W. Scott Champion.[3491] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that the Bank has also expended significant sums of money on lawyers and consultants in connection with its sales practices. From the fourth quarter of 2016 through the first quarter of 2018, the Bank paid legal fees and consulting costs of at least $169 million related to its sales practices.

**McLinko** incorporated Respondent Julian's Response.[3492]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 480 and (Julian and McLinko) No. 554

The Bank's 10-Q dated August 2, 2019 includes the following statement: "[T]he Company establishes accruals for legal actions when potential losses associated with the actions become probable and the costs can be reasonably estimated. The high end of the range of reasonably possible potential losses in excess of the Company's accrual for probable and estimable losses

---

[3488] McLinko's ECSFM at No. 552.

[3489] MSD-564 (Champion Decl.); MSD-267 (NBE Smith Expert Report) at ¶ 148; MSD-289A (Sloan Tr.) at 255:10-18.

[3490] Russ Anderson's ECSFM at No. 479.

[3491] Julian's ECSFM at No. 553.

[3492] McLinko's ECSFM at No. 553.

Appellate Case: 25-1079     Page: 734     Date Filed: 05/16/2025 Entry ID: 5517644

was approximately $3.9 billion as of June 30, 2019."[3493]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response, adding the averment that she has no authority over settlement decisions or that any losses resulting from settlement can be attributed to her.[3494]

Julian did not dispute the claim.[3495] Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that the Bank's 10-Q dated August 2, 2019 includes the following statement: "[T]he Company establishes accruals for legal actions when potential losses associated with the actions become probable and the costs can be reasonably estimated. The high end of the range of reasonably possible potential losses in excess of the Company's accrual for probable and estimable losses was approximately $3.9 billion as of June 30, 2019."

**McLinko** incorporated Respondent Julian's Response.[3496]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 481 and Julian and McLinko No. 555

On February 20, 2020, the Bank was fined $3 billion by the U.S. Department of Justice and U.S. Securities and Exchange Commission in connection with its sales practices.[3497]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response, adding the averment that she has no authority over settlement decisions or that any losses resulting from settlement can be attributed to her.[3498]

**Julian** responded that the claim was disputed, but did not dispute the claim presented and instead averred the claim lacked "context".[3499] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact.

---

[3493] Julian Amended Answer ¶ 184; McLinko Amended Answer ¶ 184.

[3494] Russ Anderson's ECSFM at No. 480.

[3495] Julian's ECSFM at No. 554.

[3496] McLinko's ECSFM at No. 554.

[3497] MSD-1 at 1-4; MSD-674.

[3498] Russ Anderson's ECSFM at No. 481.

[3499] Julian's ECSFM at No. 555.

Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko on February 20, 2020, the Bank was fined $3 billion by the U.S. Department of Justice and U.S. Securities and Exchange Commission in connection with its sales practices.

**McLinko** incorporated Respondent Julian's Response.[3500]


### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 482 and (Julian and McLinko) No. 556

In a February 21, 2020 Wells Fargo press release related to their $3 billion Deferred Prosecution Agreement with the DOJ and SEC, the Bank's CEO said: "The conduct at the core of today's settlements — and the past culture that gave rise to it — are reprehensible and wholly inconsistent with the values on which Wells Fargo was built. Our customers, shareholders and employees deserved more from the leadership of this Company."[3501]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response, adding the averment that she has no authority over settlement decisions or that any losses resulting from settlement can be attributed to her.[3502]

**Julian** responded that the claim was disputed, but did not dispute the claim but avers the Statement "mischaracterizes" the press release issued by the Department of Justice.[3503] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that in a February 21, 2020 Wells Fargo press release related to their $3 billion Deferred Prosecution Agreement with the DOJ and SEC, the Bank's CEO said: "The conduct at the core of today's settlements — and the past culture that gave rise to it — are reprehensible and wholly inconsistent with the values on which Wells Fargo was built. Our customers, shareholders and employees deserved more from the leadership of this Company."

**McLinko** incorporated Respondent Julian's Response.[3504]

---

[3500] McLinko's ECSFM at No. 555.

[3501] MSD-674.

[3502] Russ Anderson's ECSFM at No. 482.

[3503] Julian's ECSFM at No. 556.

[3504] McLinko's ECSFM at No. 556.

Add. 734

**The Bank's reputation has suffered immense damage as a result of the sales practices misconduct problem and Respondent Russ Anderson's conduct and the Bank has spent hundreds of millions of dollars trying to repair it**

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 483 and (Julian and McLinko) No. 557**

Wells Fargo's reputation was significantly impacted as a result of the sales practices misconduct problem.[3505]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[3506]

**Julian** responded that the claim was disputed, but did not dispute the claim presented and instead averred the claim lacked "context".[3507] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that Wells Fargo's reputation was significantly impacted as a result of the sales practices misconduct problem.

**McLinko** incorporated Respondent Julian's Response.[3508]

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 484 and (Julian and McLinko) No. 558**

According to the Bank's own research, the Bank's favorability and trustworthiness scores declined significantly between September and October 2016. As of May 2017, Wells Fargo's favorability and trustworthiness scores remained "near the bottom."[3509]

**Responses:**

---

[3505] MSD-267 (NBE Smith Expert Report) at ¶ 149; MSD-257 (NBE Coleman Expert Report) at ¶¶ 114, 117; MSD-289A (Sloan Tr.) at 43:15-23; MSD-565; MSD-675.

[3506] Russ Anderson's ECSFM at No. 483.

[3507] Julian's ECSFM at No. 557.

[3508] McLinko's ECSFM at No. 557.

[3509] MSD- 565.

**Russ Anderson** incorporated Respondent Julian's response.[3510]

**Julian** responded that the claim was disputed, but did not dispute the claim presented and instead averred the quoted language was taken "out of context".[3511] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that according to the Bank's own research, the Bank's favorability and trustworthiness scores declined significantly between September and October 2016. As of May 2017, Wells Fargo's favorability and trustworthiness scores remained "near the bottom."

**McLinko** incorporated Respondent Julian's Response.[3512]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 485 and (Julian and McLinko) No. 559

In 2017, the Bank fell to last place in a bank reputation survey conducted by the *American Banker*/Reputation Institute. According to the *American Banker*, the Bank's reputation score "went into free fall . . . [and was] by far the lowest of any bank." It added: "Wells Fargo's image is in tatters — and will likely remain so for some time." Wells Fargo's declining reputation score was attributed to the sales practices scandal.[3513]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[3514]

**Julian** responded that the claim was disputed, but did not dispute the claim presented and instead averred the American Banker article contains no factual basis for its assertions.[3515] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that in 2017, the Bank fell to last place in a bank reputation survey conducted by the *American Banker*/Reputation Institute. According to the *American Banker*, the Bank's reputation score "went into free fall .

---

[3510] Russ Anderson's ECSFM at No. 484.

[3511] Julian's ECSFM at No. 558.

[3512] McLinko's ECSFM at No. 558.

[3513] MSD-675; Julian Amended Answer ¶ 175.

[3514] Russ Anderson's ECSFM at No. 485.

[3515] Julian's ECSFM at No. 559.

Add. 736

Appellate Case: 25-1079     Page: 738     Date Filed: 05/16/2025 Entry ID: 5517644

. . [and was] by far the lowest of any bank." It added: "Wells Fargo's image is in tatters — and will likely remain so for some time." Wells Fargo's declining reputation score was attributed to the sales practices scandal.

**McLinko** incorporated Respondent Julian's Response.[3516]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 486 and (Julian and McLinko) No. 560

In an August 4, 2017 news release, former Wells Fargo CEO Tim Sloan acknowledged the reputational damage resulting from the Bank's sales practices: "Rebuilding trust became our top priority when I became CEO last October. That's when we began our recovery from the reputation damage we sustained from unacceptable retail sales practices in the Community Bank."[3517]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[3518]

**Julian** responded that the claim was disputed, but did not dispute the claim presented and instead averred the news release "omits the necessary context."[3519] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that in an August 4, 2017 news release, former Wells Fargo CEO Tim Sloan acknowledged the reputational damage resulting from the Bank's sales practices: "Rebuilding trust became our top priority when I became CEO last October. That's when we began our recovery from the reputation damage we sustained from unacceptable retail sales practices in the Community Bank."

**McLinko** incorporated Respondent Julian's Response.[3520]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 487 and (Julian and McLinko) No. 561

In explaining how the Bank's sales practices misconduct problem "so clearly harmed [the

---

[3516] McLinko's ECSFM at No. 559.

[3517] MSD-676.

[3518] Russ Anderson's ECSFM at No. 486.

[3519] Julian's ECSFM at No. 560.

[3520] McLinko's ECSFM at No. 560.

Add. 737

Bank's] reputation," former Wells Fargo CEO Tim Sloan testified before the OCC: "Well, prior to [the sales practices scandal], Wells Fargo had a very stellar reputation in terms of serving our customers, serving all of our stakeholders. And because of the mistakes that we made related to sales practices, we saw significant criticism on the part of a number of those stakeholders."[3521]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[3522]

**Julian** responded that the claim was disputed, but did not dispute the claim presented and instead averred the quoted testimony was taken "out of context".[3523]  I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that in explaining how the Bank's sales practices misconduct problem "so clearly harmed [the Bank's] reputation," former Wells Fargo CEO Tim Sloan testified before the OCC: "Well, prior to [the sales practices scandal], Wells Fargo had a very stellar reputation in terms of serving our customers, serving all of our stakeholders. And because of the mistakes that we made related to sales practices, we saw significant criticism on the part of a number of those stakeholders."

**McLinko** incorporated Respondent Julian's Response.[3524]


**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 488 and (Julian and McLinko) No. 562**

On May 7, 2018, the Bank launched its "Re-Established" marketing campaign "to emphasize the company's commitment to re-establish trust with stakeholders and to demonstrate how Wells Fargo is transforming as it emerges from a challenging period in its history."[3525]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[3526]

**Julian** responded that the claim was disputed, but did not dispute the claim presented and

---

[3521] MSD-289A (Sloan Tr.) at 43:15-23.

[3522] Russ Anderson's ECSFM at No. 487.

[3523] Julian's ECSFM at No. 561.

[3524] McLinko's ECSFM at No. 561.

[3525] MSD- 677; Julian Amended Answer ¶ 178; McLinko Amended Answer ¶ 178.

[3526] Russ Anderson's ECSFM at No. 488.

Appellate Case: 25-1079     Page: 740     Date Filed: 05/16/2025 Entry ID: 5517644

instead averred the release "does not include the necessary context."[3527] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that on May 7, 2018, the Bank launched its "Re-Established" marketing campaign "to emphasize the company's commitment to re-establish trust with stakeholders and to demonstrate how Wells Fargo is transforming as it emerges from a challenging period in its history."

**McLinko** incorporated Respondent Julian's Response.[3528]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 489 and (Julian and McLinko) No. 563

The "Re-Established" marketing campaign cost the Bank hundreds of millions of dollars.[3529]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[3530]

**Julian** responded that the claim was disputed, but did not dispute the testimony was as is quoted here, but avers Mr. Sloan "hyperbolized" about the cost of the campaign.[3531] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that the "Re-Established" marketing campaign cost the Bank hundreds of millions of dollars.

**McLinko** incorporated Respondent Julian's Response.[3532]

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 490 and (Julian and McLinko) No. 564

The sales practices misconduct problem also negatively impacted the Bank's ability to attract new customers. The current Head of the Community Bank Mary Mack testified on October 26,

---

[3527] Julian's ECSFM at No. 562.

[3528] McLinko's ECSFM at No. 562.

[3529] MSD-293A (Hardison Tr.) at 36:14-38:18; MSD-289A (Sloan Tr.) at 254:3-15.

[3530] Russ Anderson's ECSFM at No. 489.

[3531] Julian's ECSFM at No. 563.

[3532] McLinko's ECSFM at No. 563.

2018 that the scandal hampered the ability of the Community Bank to attract customers.[3533] Similarly, former Wells Fargo CEO Tim Sloan testified before the OCC on July 11, 2019 that, as a result of the sales practices scandal, "on the retail side of the bank we clearly haven't grown as many new customers."[3534]

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response.[3535]

**Julian** responded that the claim was disputed, but did not dispute the claim presented and instead averred the quoted testimony was taken "out of context".[3536] I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondents Russ Anderson, Julian, and McLinko that the sales practices misconduct problem also negatively impacted the Bank's ability to attract new customers. The current Head of the Community Bank Mary Mack testified on October 26, 2018 that the scandal hampered the ability of the Community Bank to attract customers.[3537] Similarly, former Wells Fargo CEO Tim Sloan testified before the OCC on July 11, 2019 that, as a result of the sales practices scandal, "on the retail side of the bank we clearly haven't grown as many new customers."

**McLinko** incorporated Respondent Julian's Response.[3538]

**Sales Practices Misconduct, which persisted at the Bank due To respondentJulian's and Respondent McLinko's conduct, harmed its customers and breached their trust**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 535 (see Russ Anderson No. 461)**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 536 (see Russ Anderson No. 462)**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 537 (see**

---

[3533] MSD-472 (Mack Tr.) at 241:16-242:1.

[3534] MSD-289A (Sloan Tr.) at 257:18-23.

[3535] Russ Anderson's ECSFM at No. 490.

[3536] Julian's ECSFM at No. 564.

[3537] MSD-472 (Mack Tr.) at 241:16-242:1.

[3538] McLinko's ECSFM at No. 564.

Appellate Case: 25-1079    Page: 742    Date Filed: 05/16/2025 Entry ID: 5517644

**Russ Anderson No. 463)**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 538 (see Russ Anderson No. 464)**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 539 (see Russ Anderson No. 465)**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 540 (see Russ Anderson No. 466)**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 541 (see Russ Anderson No. 467)**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 542 (see Russ Anderson No. 468)**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 543 (see Russ Anderson No. 469)**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 544 (see Russ Anderson No. 470)**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 545 (see Russ Anderson No. 471)**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 546 (see Russ Anderson No. 472)**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 547 (see Russ Anderson No. 473)**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 548 (see Russ Anderson No. 474)**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 549 (see Russ Anderson No. 475)**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 550 (see Russ Anderson No. 476)**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 551 (see Russ Anderson No. 477)**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 552 (see Russ Anderson No. 478)**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 553 (see Russ Anderson No. 479)**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 554 (see**

Appellate Case: 25-1079    Page: 743    Date Filed: 05/16/2025 Entry ID: 5517644

**Russ Anderson No. 480)**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 555 (see Russ Anderson No. 481)**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 556 (see Russ Anderson No. 482)**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 557 (see Russ Anderson No. 483)**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 558 (see Russ Anderson No. 484)**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 559 (see Russ Anderson No. 485)**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 560 (see Russ Anderson No. 486)**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 561 (see Russ Anderson No. 487)**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 562 (see Russ Anderson No. 488)**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 563 (see Russ Anderson No. 489)**

**Enforcement Counsel's Statement of Material Fact (Julian and McLinko) No. 564 (see Russ Anderson No. 490)**

**Respondent Russ Anderson received financial gain or other benefit from her misconduct**

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 491**

The Community Bank was "Wells Fargo's largest operating segment in terms of revenue," contributing roughly half of the Company's average annual revenue and profits each year.[3539]

---

[3539] Russ Anderson Amended Answer ¶ 2; MSD-1 at 20 ¶ 4 ("Wells Fargo's largest business unit was the Community Bank, which contributed more than half (and in some years more than two-thirds) of the Company's revenue from 2007 through 2016."); MSD-692 at 50; MSD-693 at 42; MSD-694 at 46; MSD-695 at 44; MSD-696 at 46; MSD-697 at 45; MSD-698 at 53; MSD- 658 (Pocock Expert Report) at 9-10 ¶¶ 44-45.

**Responses:**

**Russ Anderson** incorporated Respondent Julian's response to (Julian and McLinko) No. 523.[3540] That Statement averred that the Community Bank was "Wells Fargo's largest operating segment in terms of revenue," contributing roughly half of the Company's average annual revenue and profits each year. Respondent Julian's Response was to dispute the claim on the basis that the cited evidence "relates to the financial performance of Wells Fargo & Co., not Wells Fargo Bank, N.A., the relevant entity in this litigation"; and on the disputed ground that "any material portion of the Community Bank's revenue and profits were attributable to sales practices misconduct."[3541]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the Community Bank was "Wells Fargo's largest operating segment in terms of revenue," contributing roughly half of the Company's average annual revenue and profits each year.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 492

The Community Bank's business model was financially profitable for Wells Fargo and was key to its growth and cross-sell success.[3542]

**Responses:**

**Russ Anderson** did not dispute the claim, other than to aver the cited evidence does not establish that the cross-sell metric materially affected the Community Bank's performance during her tenure.[3543] She also incorporated Respondent Julian's response to (Julian and McLinko) No. 524. In that response, Respondent Julian disputed the claim that the Community Bank's business model was financially profitable for Wells Fargo and was key to its growth and cross-sell success by citing to the report of FTI Consulting, which determined that the maximum impact on the cross-sell metric from potential sales practices misconduct

---

[3540] Russ Anderson's ECSFM at No. 491.

[3541] Julian's ECSFM at No. 523.

[3542] Russ Anderson Amended Answer ¶ 6; MSD-266 (Russ Anderson Dep. Tr.) at 87:16-88:24; see also MSD-294 (Wipprecht Tr.) at 133:4-11; See MSD-658 (Pocock Expert Report) at ¶ 13, 18, 19; MSD-267 (Expert Report of Tanya Smith) at ¶ 72 ("The Bank described the 'cross-sell' as 'its primary strategy' and 'the foundation of our business model.'"); MSD-304A (Candy Dep. Tr.) at 234:4-13; MSD-649 ("The Community Bank is 'Rome' in our Company—all roads lead to and from it."); MSD-692 at 100 ("'cross-selling' – is very important to our business model and key to our ability to grow revenue and earnings.").

[3543] Russ Anderson's ECSFM at No. 492.

Add. 743

Appellate Case: 25-1079    Page: 745    Date Filed: 05/16/2025 Entry ID: 5517644

was 0.04, which would have been immaterial to Wells Fargo's stock price[3544].

It is not clear that a factual finding that the Community Bank's business model was financially profitable for Wells Fargo and was key to its growth and cross-sell success is a material fact, given the issues presented by the Notice of Charges. In her Amended Answer, Respondent Russ Anderson admitted that the Community Bank's business model was highly profitable because it resulted in a greater number of legitimate sales than would have been possible without the unreasonable sales goals and sales pressure; and admitted that the Bank touted a metric known as "cross-sell," or the "cross-sell ratio," that measured the number of products sold per household.[3545] Given this Answer, I find the disputed claims presented by Respondent Russ Anderson are not material to the issues presented in the Notice of Charges. Accordingly, I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the Community Bank's business model was financially profitable for Wells Fargo and was key to its growth and cross-sell success

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 493

Respondent Russ Anderson admits the Community Bank's business model was financially profitable for the Bank.[3546]

**Responses:**

**Russ Anderson** did not dispute this claim.[3547] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that the Community Bank's business model was financially profitable for the Bank.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 494

None of Respondent Russ Anderson's expert witnesses deny that the business model was financially profitable for the Bank.[3548]

---

[3544] Julian's ECSFM at No. 524, citing MSD-280 at 46; MSD-283A.

[3545] Russ Anderson Amended Answer ¶ 6.

[3546] MSD-266 (Russ Anderson Dep. Tr.) at 35:15-36:10; 87:16- 88:24; see also MSD-294 (Wipprecht Tr.) at 133:4-11.

[3547] Russ Anderson's ECSFM at No. 493.

[3548] See MSD-281 (Expert Report of James Wilcox) at 13; MSD-264 (Expert Report of Kathlyn Farrell) at 5; MSD-262 (Expert Report of David Abshier) at 5.

Appellate Case: 25-1079    Page: 746    Date Filed: 05/16/2025 Entry ID: 5517644

**Responses:**

**Russ Anderson** response does not address findings presented by her expert witnesses, and as such does not controvert the claim.[3549] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that none of her expert witnesses deny that the business model was financially profitable for the Bank.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 495

Respondent Russ Anderson's compensation "was based partly on the overall performance of Wells Fargo."[3550]

**Responses:**

**Russ Anderson** did not dispute that her Amended Answer contains the quoted text.[3551] Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that none of her expert witnesses deny that the business model was financially profitable for the Bank.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 496

From 2004 through 2015, Respondent Russ Anderson received annual cash bonus payments that totaled more $2.732 million.[3552]

**Responses:**

**Russ Anderson** does not dispute the claim, but avers the supporting evidence cited by Enforcement Counsel is inadmissible.[3553] Finding an insufficient basis for exclusion, the stated objections are overruled. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that from 2004 through 2015, Respondent Russ Anderson received annual cash bonus payments that totaled more $2.732 million.

### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 497

Respondent Russ Anderson received equity compensation under the Company's Long-Term

---

[3549] Russ Anderson's ECSFM at No. 494.

[3550] Russ Anderson Amended Answer ¶ 58.

[3551] Russ Anderson's ECSFM at No. 495.

[3552] MSD-659.

[3553] Russ Anderson's ECSFM at No. 496.

Add. 745

Appellate Case: 25-1079     Page: 747     Date Filed: 05/16/2025 Entry ID: 5517644

Incentive Compensation Plan ("LTICP") in the form of stock options and Restricted Share Rights ("RSR") awards.[3554]

**Responses:**

**Russ Anderson** disputed the claim, offering no supporting evidence but asserting that the claim relies on exhibits which she avers are unreliable hearsay and which do not establish an applicable timeframe.[3555]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that she received equity compensation under the Company's Long-Term Incentive Compensation Plan in the form of stock options and Restricted Share Rights awards.


### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 498

From 2004 through 2009, Respondent Russ Anderson received annual awards of stock options.[3556]

**Responses:**

**Russ Anderson** disputed the claim, offering no supporting evidence but asserting that the claim relies on exhibits which she avers are unreliable hearsay.[3557]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that 2004 through 2009 she received annual awards of stock options.


### Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 499

Between 2012 and 2017, Respondent Russ Anderson's exercise of those options yielded a total taxable gain of over $5.037 million.[3558]

**Responses:**

---

[3554] MSD-659; MSD-686 at 1308-10.

[3555] Russ Anderson's ECSFM at No. 497.

[3556] MSD-659.

[3557] Russ Anderson's ECSFM at No. 498.

[3558] MSD-659.

Add. 746

Appellate Case: 25-1079      Page: 748      Date Filed: 05/16/2025 Entry ID: 5517644

**Russ Anderson** disputed the claim, offering no supporting evidence but asserting that the claim relies on exhibits which she avers are unreliable hearsay.[3559]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that between 2012 and 2017 her exercise of those options yielded a total taxable gain of over $5.037 million.

**Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 500**

From 2010 through 2016, Respondent Russ Anderson received annual equity awards in the form of RSR Awards that resulted in a realized taxable gain of over $2.441 million.[3560]

**Responses:**

**Russ Anderson** disputed the claim, offering no supporting evidence but asserting that the claim relies on exhibits which she avers are unreliable hearsay.[3561]

I find an insufficient factual basis has been presented to establish a dispute in this Response to create a controverted material fact. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that from 2010 through 2016 she received annual equity awards in the form of RSR Awards that resulted in a realized taxable gain of over $2.441 million.


**Statements Offering Additional Material Facts**

Respondent Julian included in his Statement "additional material fact" statements.[3562]

The process of considering a party's motion seeking summary disposition is controlled by the OCC's Uniform Rules.[3563] A party who believes there is "no genuine issue of material fact" is authorized to seek to have a determination that the party is entitled to a decision "as a matter of law."[3564] The motion seeking such a determination "must be accompanied by a statement of material facts as to which the moving party contends there is no genuine

---

[3559] Russ Anderson's ECSFM at No. 499.

[3560] MSD-659.

[3561] Russ Anderson's ECSFM at No. 500.

[3562] See David Julian's Statement of Additional Material Facts, Nos. 565 through 1129, which follow Julian's Responses to Enforcement Counsel's Statement of Material Facts Nos. 1 through 564.

[3563] 12 C.F.R. § 19.29.

[3564] 12 C.F.R. § 19.29(a).

issue."[3565] Enforcement Counsel is the movant for this Motion, and submitted their statements of material fact – one for their Motion seeking summary disposition against Respondent Russ Anderson, and another one for their Motion seeking summary disposition against Respondents Julian and McLinko.

The OCC's Uniform Rules also permit the party opposing summary disposition to file "a statement setting forth those material facts as to which he or she contends a genuine dispute exists."[3566] The Rules also permit the opposing party to submit a brief "containing the points and authorities in support of the contention that summary disposition is inappropriate."[3567]

Respondent Julian is in this instance responding to Enforcement Counsel's summary disposition motion – allowing him to file "a statement setting forth those material facts as to which he or she contends a genuine dispute exists."[3568] His submissions under Numbers 565 through 1129 do not respond to any claim raised by Enforcement Counsel – they are free-standing claims, taking the form of an affirmative claim not responsive to any claim raised by Enforcement Counsel.[3569]

The same is true with Respondent McLinko, who submitted Statements of Material Fact Nos. 565 to 852.[3570]

Unlike the claims submitted by Enforcement Counsel, which the Uniform Rules permit Respondents Julian and McLinko to respond to, there is no opportunity under the OCC's Rules that would permit Enforcement Counsel to respond to Respondent Julian's submissions Nos. 565 to 1129 or Respondent McLinko's submissions Nos. 565 to 852.[3571]

Nothing in the OCC's Uniform Rules permit a responding party to advance affirmative statements like those in Respondent Julian's submissions Nos. 565 to 1129 or Respondent McLinko's submissions Nos. 565 to 852; and neither Respondent has presented authority that would allow these submissions. Given that under those same rules Enforcement Counsel would not permitted to file responses challenging affirmative statements like

---

[3565] 12 C.F.R. § 19.29(b)(2).

[3566] 12 C.F.R. § 19.29(b)(2).

[3567] 12 C.F.R. § 19.29(b)(2).

[3568] 12 C.F.R. § 19.29(b)(2).

[3569] Response of Respondent David Julian to Enforcement Counsel's Statement of Material Facts as to Respondent David Julian, filed May 21, 2021.

[3570] Respondent Paul McLinko's Response to Enforcement Counsel's Statement of Material Facts as to Respondents David Julian and Paul McLinko, filed May 21, 2021.

[3571] 12 C.F.R. § 19.29.

those submitted by Respondents Julian and McLinko, I find no legal basis exists for Respondents Julian's or McLinko's submissions to be considered in the summary disposition process. Inasmuch as Respondents Julian or McLinko have not sought leave, or been granted leave, to present affirmative statements not tied to the Statements of Material Fact presented by Enforcement Counsel, I order stricken Respondent Julian's submissions Nos. 565 to 1129 and Respondent McLinko's submissions Nos. 565 to 852. The statements will remain in the record as proffers, but the substance of those submissions will not be taken into account in determining the merits of Enforcement Counsel's summary disposition motion regarding Respondents Julian or McLinko.

**Order on Enforcement Counsel's Motions**

Pursuant to 12 C.F.R. § 19.30, upon determining that Enforcement Counsel is entitled to summary disposition as to certain of the claims presented in their two motions seeking summary disposition, this Order denies Enforcement Counsel's Motions for Summary Disposition, enters the above determinations, and sets for hearing all of those claims not determined through these Motions.

**Supplemental Pre-Hearing Order**

Given the substantial determinations reflected above, the parties are directed to submit supplemental prehearing statements that take into account the matters that have now been determined, as further evidence will not be taken with respect to claims that have been determined through this Order. Supplemental prehearing statements will be timely if filed by August 6, 2021. The deadline for final prehearing motions, including motions in limine based on the determinations reflected above, is amended from July 30, 2021 to August 23, 2021, with responses due not later than August 30, 2021.


It is so ordered.

Date: July 20, 2021


Christopher B. McNeil
U.S. Administrative Law Judge
Office of Financial Institution Adjudication

Add. 749

## CERTIFICATE OF SERVICE

On July 20, 2021, I served by email transmission a copy of the foregoing Order Regarding Enforcement Counsel's Motions for Summary Disposition upon:

Hearing Clerk:
Office of the Controller of the Currency
400 7th Street, S.W.
Washington, D.C. 20219
By email to: hearingclerk@occ.treas.gov

Enforcement Counsel:
William Jauquet, Assistant Director
Jason E. Friedman
Zina Lapidus
Tarek Sawi
Lauren R. Snook
Melinda Barnes
Sean Young
Lee Perla
Quinn Nguyen
Gary Spencer
Office of the Comptroller of the Currency
400 7th St SW
Washington, DC 20219
william.jauquet@occ.treas.gov
jason.friedman@occ.treas.gov
zina.lapidus@occ.treas.gov
tarek.sawi@occ.treas.gov
lauren.snook@occ.treas.gov
melinda.barnes@occ.treas.gov
sean.young@occ.treas.gov
lee.perla@occ.treas.gov
quinn.nguyen@occ.treas.gov
gary.spencer@occ.treas.gov

Treana D. Bennett
Western District Office
Office of the Comptroller of the Currency
1225 17th Street, Suite 300
Denver, CO 80202
treana.bennett@occ.treas.gov

Anna K. Mills
Northeastern District Office
Office of the Comptroller of the Currency
340 Madison Avenue, 5th Floor
New York, NY 10173
Anna.mills@occ.treas.gov

**Respondents' Counsel:**

**Respondent Claudia Russ Anderson**
c/o Douglas A. Kelley
Daniel M. Scott
Stacy L. Bettison
Brett D. Kelley
Michael J. Tostengard
Perry F. Sekus
Jeffrey D. Smith
KELLEY, WOLTER & SCOTT, P.A.
Centre Village Offices
431 S. Seventh Street, Suite 2530
Minneapolis, MN 55415
dkelley@kelleywolter.com
dscott@kelleywolter.com
sbettison@kelleywolter.com
bkelley@kelleywolter.com
mtostengard@kelleywolter.com
psekus@kelleywolter.com
jsmith@kelleywolter.com

**Respondent David Julian**
c/o Franca Harris Gutierrez
Matthew T. Martens
Gannam Rifkah
Michael Carpenter
Rafael J. Gallardo Hevia
Charlie Johnson
Emily Gomez
Karin Dryhurst
Mikayla Foster
Sharon Kelleher
Kirsten Johansson

WILMER CUTLER PICKERING HALE AND DORR, LLP
1875 Pennsylvania Avenue NW Washington, DC 20006
franca.gutierrez@wilmerhale.com
matthew.martens@wilmerhale.com
Gannam.Rifkah@wilmerhale.com
Michael.Carpenter@wilmerhale.com
Rafael.GallardoHevia@wilmerhale.com
Charlie.Johnson@wilmerhale.com
Emily.Gomez@wilmerhale.com
Karin.Dryhurst@wilmerhale.com
Mikayla.Foster@wilmerhale.com
Sharon.Kelleher@wilmerhale.com
Kirsten.Johansson@wilmerhale.com


Timothy Perla
Jessica Lewis
Margaux Joselow
Dan Willey
Sierra Shear
WILMER CUTLER PICKERING HALE AND DORR, LLP
60 State Street
Boston, MA 02109
timothy.perla@wilmerhale.com
jessica.lewis@wilmerhale.com
Margaux.Joselow@wilmerhale.com
Dan.Willey@wilmerhale.com
Sierra.Shear@wilmerhale.com


Laura Goodall
WILMER CUTLER PICKERING HALE AND DORR, LLP
One Front Street, Suite 3500
San Francisco, CA 94111
Laura.Goodall@wilmerhale.com


Jose R. Valenzuela
WILMER CUTLER PICKERING HALE AND DORR, LLP
2600 El Camino Real Suite 400
Palo Alto, CA 94306
Jose.Valenzuela@wilmerhale.com

Appellate Case: 25-1079    Page: 754    Date Filed: 05/16/2025 Entry ID: 5517644

**Respondent Paul McLinko**
c/o Timothy P. Crudo
Rees F. Morgan
Benjamin C. Pulliam
Daniel M. Bruggebrew
Katharine Van Dusen
Mark Hejinian
Thomas Harvey
David Beach
Charles Z. Weiss

COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000
San Francisco, CA 94104
ef-tpc@cpdb.com
ef-rfm@cpdb.com
ef-bcp@cpdb.com
ef-dmb@cpdb.com
ef-ktv@cpdb.com
ef-mlh@cpdb.com
ef-tah@cpdb.com
ef-dcb@cpdb.com
ef-czw@cpdb.com

Christopher B. McNeil
U.S. Administrative Law Judge
Office of Financial Institution Adjudication
ofia@fdic.gov (e-mail)
(703) 562-2740 (telephone)

**UNITED STATES OF AMERICA**
**DEPARTMENT OF THE TREASURY**
**OFFICE OF THE COMPTROLLER OF THE CURRENCY**

| | |
|---|---|
| In the Matter of | |
| **Carrie Tolstedt,** Former Head of the Community Bank | OCC AA-EC-2019-82 |
| **Claudia Russ Anderson,** Former Community Bank Group Risk Officer | OCC AA-EC-2019-81 |
| **James Strother,** Former General Counsel | OCC AA-EC-2019-70 |
| **David Julian,** Former Chief Auditor | OCC AA-EC-2019-71 |
| **Paul McLinko,** Former Executive Audit Director | OCC AA-EC-2019-72 |
| Wells Fargo Bank, N.A. Sioux Falls, South Dakota | ALJ McNeil |

**RECOMMENDED DECISION – CLAUDIA RUSS ANDERSON**
**Temporarily Sealed until December 30, 2022**

What follows is the Administrative Law Judge's recommended decision, recommended findings of fact, recommended conclusions of law, and proposed order in the matter of Claudia Russ Anderson, who served as the Group Risk Officer for the Community Bank at Wells Fargo Bank, N.A. between January 2013 and December 2016.

The recommendations and the proposed order are based on proceedings initiated through the OCC's issuance of a Notice of Charges presented against Ms. Russ Anderson. Among the charges and in the record that has been developed based on those charges are documents and testimony that may include confidential supervisory information and for other reasons may be restricted from the public. Without making any determination whether those restrictions are

Add. 754

Appellate Case: 25-1079     Page: 756     Date Filed: 05/16/2025 Entry ID: 5517644

applicable here, this Recommended Decision is submitted to the OCC and the parties under temporary seal. The sealing of this Recommended Decision will expire on December 30, 2022, at which point the Decision will be available as a public record unless the OCC determines that all or part of the Decision may be withheld from the public.

1. Nature of the Case .................................................................................................... 6

2. Conditions Leading to the Charges ........................................................................... 7

    **1)**    **Community Bank team members engaged in sales practices misconduct that threatened the safety, soundness, and reputation of Wells Fargo Bank, N.A.** ............. 8

Community Bank Senior Leadership Knew the Unlawful and Unethical Misconduct was Widespread and that Sales Goals and Pressure Were the Root Cause ............................... 9

Community Bank Senior Leadership Exacerbated the Sales Practices Problem and Concealed Material Facts ........................................................................................................... 11

Scope of the Unlawful and Unethical Misconduct .................................................... 11

Impact of Sales Practices Misconduct on Cross-Sell Disclosures ............................. 12

    **2)**    **Ms. Russ Anderson, as the Community Bank's Group Risk Officer, failed to timely identify the root cause of team member sales practices misconduct in the Community Bank, failed to exercise credible challenge to the Community Bank's head (Ms. Tolstedt) regarding risk management controls relating to sales practices, failed to timely and independently evaluate the effectiveness of Community Bank's risk management controls, and failed to identify, address, and escalate risk management control failures that threatened the safety, soundness, and reputation of Wells Fargo Bank, N.A.**   14

       **3. Summary of the Evidence** ................................................................. 14

Background on Bank Supervision Generally ............................................................. 14

Bank Examiner Analyses ....................................................................................... 16

Ms. Russ Anderson's Employment Status ............................................................... 24

Ms. Russ Anderson's Reporting Relationships ......................................................... 26

Three Lines of Defense ........................................................................................... 26

Risk Appetite .......................................................................................................... 29

Code of Ethics & Business Conduct ....................................................................... 31

Risks Associated with Sales Practices Misconduct .................................................. 31

The Role of the WF&C Ethics Line ......................................................................... 31

Ms. Russ Anderson's Roles and Responsibilities – as Group Risk Officer for Community Banking ................................................................................................ 34

       Complaint Management ................................................................ 44

Add. 755

Appellate Case: 25-1079     Page: 757     Date Filed: 05/16/2025     Entry ID: 5517644

     Risk Management ........................................................................................ 45

Ms. Russ Anderson's Roles and Responsibilities – Committee Membership ......................... 46
     The Community Banking Risk Management Committee ................................... 46
     The Incentive Compensation Risk Committee ............................................... 50
     The Fraud Risk Committee .......................................................................... 54
     Membership in other Risk-Management Committees ...................................... 57
     The Evolving Model Steering Committee ....................................................... 57
     The Community Bank ICRM Steering Committee ............................................ 58

Ms. Russ Anderson's Interaction with the OCC's Examiners ........................................... 62

Ms. Russ Anderson's Relationship with WF&C's Legal Department – Applying the Attorney-Client Privilege ........................................................................................... 65

Publication of the LA Times Articles in 2013 ............................................................... 69

The October 9, 2013 Significant Investigations Notification ........................................... 71

Community Banking First Line of Defense – Case 5721, November 5, 2013 ...................... 77

Corporate Security Report – November 18, 2013, Lumberton, North Carolina .................. 79

Investigation Debrief – November 19, 2013, Philadelphia, Pennsylvania ......................... 82

November 27, 2013 - The Role of the Sales and Services Conduct Oversight Team (SSCOT) and Proactive Monitoring ........................................................................................... 87

Core Team Analyses – December 5, 2013 .................................................................. 105

Pausing Proactive Monitoring – November 2013 ........................................................ 107
     Project Clarity ......................................................................................... 118
     Mystery Shopping .................................................................................... 121
     The Quality Sales Report Card ................................................................... 121

February 4, 2014 Ethics Line Allegation – Phone Number Changes from October to December 2013 .......................................................................................................... 125

Ms. Russ Anderson's Presentation to the March 19, 2014 ERMC Meeting ..................... 126

Ms. Russ Anderson's Presentation to the April 9, 2014 ERMC Meeting ........................ 128
     Analysis of Sales Quality Allegations Concerning Lack of Customer Consent ......... 128
     Ms. Russ Anderson's Report to the ERMC on April 9, 2014 ............................ 131

The April 29, 2014 ERMC Meeting ........................................................................... 141

The Evolution of Controls ....................................................................................... 144

Pause on Proactive Monitoring ................................................................................ 146

Controls Following the Pause ................................................................................... 146

The Bank's Controls to Prevent and Detect Sales Practices Misconduct were Inadequate ...... 150

The Bank's Controls Were Intentionally Inadequate .................................................... 156

Appellate Case: 25-1079    Page: 758    Date Filed: 05/16/2025 Entry ID: 5517644

Resumption of SSOCR's Proactive Monitoring of Simulated Funding Activity in July 2014  158

Investigation Debrief Escalation Assessment (IDEA) – November 10, 2014  Corpus Christi, Texas ........................................................................................................................ 164

OCC's February 2015 Examination – Community Banking Operational Risk Management .. 167
  Ms. Russ Anderson's Participation in the February 9, 2015 OCC Meeting Regarding WFAS Community Bank Sales Coverage ................................................................. 168

Ms. Russ Anderson's Participation in the OCC's February 10, 2015 Conduct Risk Framework for the Operational Risk and Cross Sell Examination ...................................................... 177
  WFAS Audit Engagement Report: Community Banking – Regional Banking (RB-SOCR) March 30, 2015 .................................................................................................. 189

March 2015 MRAs - Community Banking FLOD Risk Management of Sales Practices ........ 191

Changing the Thresholds for Referral to Corporate Investigations ........................................... 197

Adding Phone Number Changing to SSCOT's Proactive Monitoring ..................................... 202

Corporate Security Activities – 2014 compared to 2013 ......................................................... 203

April 2015 WF&C Risk Committee Meeting ........................................................................... 206

WFAS's Noteworthy Risk Issues - May 2015 ......................................................................... 211

City of Los Angeles Complaint – May 4, 2015 ....................................................................... 212

GRO Transparency with the OCC: May 14, 2015 Meeting ..................................................... 215

Customer harm .......................................................................................................................... 223

Materials Provided to the WF&C Risk Committee - May 19, 2015 ........................................ 227

May 19, 2015 WF&C Board Risk Committee Meeting ........................................................... 242

Supervisory Letter WFC 2015-36 - Incentive Compensation Program in the Community Bank Failed to Balance Risk and Reward ............................................................................... 249

June 26, 2015: Five MRAs ....................................................................................................... 260

July 13, 2015 Report of Examination on Risks Present at Wells Fargo Bank, N.A. ............... 270

WFAS's Presentation to the A&E Committee: July 28, 2015 .................................................. 271

September 2015 – Sales Practice Oversight Report Out .......................................................... 273

October 26-27, 2015 Meeting of the WF&C Board of Directors ............................................ 275

February 2, 2016 Review of Internal Investigations of Confirmed Fraud – January 2013 through January 2016 ......................................................................................................... 276

Magnitude of Sales Practices Misconduct ............................................................................... 277

February 5, 2016 Agency-Referred Complaint to CEO John Stumpf ...................................... 279

February 12, 2016 Risk Assessment Summary by Hope Hardison (HR) and Michael Loughlin (CRO) ................................................................................................................................ 283

Page **4** of **443**

Community Banking Enterprise Risk Management Assessment (ERMA) - 2015 (issued March 8, 2016) ................................................................................................... 283

WFAS's Presentation to the A&E Committee: April 25, 2016 .................................. 285

May 3, 2016 Core Committee Meeting Regarding Root Cause of Sales Practices Misconduct ................................................................................................................ 286

Supervisory Letter WFC 2016-36: OCC Review of Enterprise Sales Practices ..................... 294

Sales Practices MRA Status Update – July 29, 2016 ................................................ 297

Podium Day – September 8, 2016 ............................................................................ 298

PwC Analysis of Deposit Accounts for Potential Simulated Funding Behavior – September 14, 2017 ......................................................................................................................... 298

The Board of Directors' Sales Practices Investigation Report .................................. 299

OCC Supervisory Letter WFC 2016-49: Sales Practices Governance and Reporting Review 304

OCC Requirements for a Heightened Standards Safety and Soundness Plan ......................... 309

Ms. Russ Anderson's Response to the OCC's 15-day Letter ..................................... 310

Each Respondent Received Personal Gain or Other Benefit from Their Misconduct.............. 314

Respondents' Misconduct Caused Financial Losses and Reputational Damage to the Bank as Well as Harm to its Customers and Employees ................................................ 314

Evidence Regarding the $10 Million Civil Money Penalty ........................................ 316

Respondent's Claim that the Tanya Smith Declaration is an Untimely, Inadmissible Expert . 348

Requirements to Support a Section 8(e) Prohibition Order ........................................ 414

5.    Civil Money Penalty ...................................................................................... 416

6.    Assessment of Civil Money Penalties............................................................ 417

7.    Key Factual Findings .................................................................................... 422

Conclusions of Law ................................................................................................. 427

Respondents' Affirmative Defenses ......................................................................... 430

Estoppel.................................................................................................................... 430

Constitutional Violations ......................................................................................... 432
        a.    Article II ................................................................................. 432
        b.    Article III ............................................................................... 432
        c.    Discovery ............................................................................... 432
        d.    Summary Disposition ............................................................ 433
        e.    Pretrial ................................................................................... 433
        f.    The Hearing ............................................................................ 433
        g.    ALJ Recusal ........................................................................... 434

Add. 758

Appellate Case: 25-1079    Page: 760    Date Filed: 05/16/2025 Entry ID: 5517644

|   | h. | Seventh Amendment | 434 |
|   | i. | Proposed Recommendation for a New Hearing | 434 |
| 6. | | Proposed Orders | 435 |
| | | ARTICLE I | 441 |
| | | ARTICLE II | 441 |
| | | ARTICLE III | 442 |
| | | ORDER FOR CIVIL MONEY PENALTY | 442 |
| | | **ARTICE IV** | 443 |

## 1. Nature of the Case

This is an administrative enforcement action taken by the Office of the Comptroller of the Currency and initiated through a Notice of Charges that was issued on January 23, 2020, by the OCC's Deputy Comptroller for Large Bank Supervision, Gregory J. Coleman. The enforcement action was taken against three senior bankers formerly affiliated with Wells Fargo Bank, N.A. (WFB-NA or the Bank). The action was taken pursuant to the federal Administrative Procedure Act as authorized by the Federal Deposit Insurance Act and uniform procedural rules of the Office of the Comptroller of the Currency.

The facts summarized here are based solely on evidence in the record, including testimony and documentary evidence taken during a hearing that began on September 13, 2021 in Sioux Falls, South Dakota and continued through intermittent presentations that concluded on January 6, 2022. After 35 days of sworn testimony and the presentation of documentary evidence, the parties presented their arguments through final briefs filed on June 26, 2022.

Through the Notice of Charges, the OCC identified David Julian as the Bank's Chief Auditor. It identified Claudia Russ Anderson as the Group Risk Officer for the Bank's Community Banking group. It identified Paul McLinko as a direct report of Mr. Julian and the Executive Audit Director for the Bank's Community Banking group.[1]

The Notice advised Ms. Russ Anderson that the OCC contends her conduct as Group Risk Officer constituted violations of law, constituted unsafe or unsound practice, and breached fiduciary duties she owed to the Bank. The Notice seeks an order prohibiting her from engaging in regulated banking activity.

The Notice advised Mr. Julian and Mr. McLinko that the OCC contends their conduct as Chief Auditor and Executive Audit Director (respectively) constituted unsafe or unsound practice and breached the fiduciary duties each owed to the Bank. There is no allegation that either Mr. Julian or Mr. McLinko violated any statute or regulation. The Notice seeks orders that

---

[1] The Notice of Charges included charges against Carrie Tolstedt, Former Head of the Community Bank, and James Strother, former General Counsel. Those charges are not addressed through this Recommended Decision.

they cease and desist engaging in certain prohibited activity.

The Notice further assessed civil money penalties against each banker.

Ms. Russ Anderson answered the Notice by denying she engaged in unsafe or unsound banking practices, and denying that she breached any fiduciary duties owed to the Bank.

Upon preponderant evidence supporting the factual allegations in the Notice of Charges against Ms. Russ Anderson, I recommend the Comptroller issue a prohibition order against her, as proposed in the Notice of Charges and as supplemented by the post-hearing submissions by Enforcement Counsel. I also recommend an order that Ms. Russ Anderson pay a $10 million civil money penalty.

**2.      Conditions Leading to the Charges**

Five key conditions led to the presentation of charges against Mr. Julian, Ms. Russ Anderson, and Mr. McLinko.

First, Bank employees working in the Bank's Community Banking unit, who were referred to as team members, engaged in sales practices misconduct throughout the relevant period – which for the purposes of these Reports and this Executive Summary was the beginning of 2013 to the end of 2016. During the relevant period, such misconduct was widespread throughout the Bank's branch system, and materially threatened the safety, soundness, and reputation of Wells Fargo Bank, N.A. and its holding company, Wells Fargo & Company.

Second, as Chief Auditor, Mr. Julian failed to timely identify the root cause of team member sales practices misconduct in the Community Bank, failed to provide credible challenge to Community Bank's risk control managers, failed to timely evaluate the effectiveness of Community Bank's risk management controls, and failed to identify, address, and escalate risk management control failures that threatened the safety, soundness, and reputation of Wells Fargo Bank, N.A.

Third, as Community Bank's Group Risk Officer, Ms. Russ Anderson failed to timely identify the root cause of team member sales practices misconduct in the Community Bank, failed to timely and independently evaluate the effectiveness of Community Bank's risk management controls, and failed to identify, address, and escalate risk management control failures that threatened the safety, soundness, and reputation of Wells Fargo Bank, N.A.

Fourth, as the Community Bank's Executive Audit Director, Mr. McLinko failed to timely identify the root cause of team member sales practices misconduct in the Community Bank, failed to provide credible challenge when evaluating the effectiveness of Community Bank's risk management controls, and failed to identify, address, and escalate risk management control failures that threatened the safety, soundness, and reputation of the Bank.

Fifth, throughout the relevant period, Ms. Russ Anderson, Mr. Julian, and Mr. McLinko separately and collectively engaged in unsafe or unsound banking practices by individually failing to identify and effectively address known issues of risks related to sales goals pressure in the Community Bank, knowingly and purposefully failing to escalate known issues related to those risks, misleading regulators and members of the Bank's Board of Directors regarding the

Add. 760

Appellate Case: 25-1079      Page: 762      Date Filed: 05/16/2025 Entry ID: 5517644

efficacy of controls over risks related to sales goals pressure, and advancing their individual pecuniary interests over the safety, soundness, and reputational interests of Wells Fargo Bank, N.A. and its holding company, Wells Fargo & Company, thereby breaching fiduciary duties each owed to the Bank. Further, Ms. Russ Anderson's efforts to restrict material information from being disseminated among the Bank's senior leaders and the WF&C Board of Directors constituted violation of federal laws.

**1) Community Bank team members engaged in sales practices misconduct that threatened the safety, soundness, and reputation of Wells Fargo Bank, N.A.**

The Community Bank's sales goals and accompanying management pressure during the relevant period led thousands of its employees to engage in: (1) unlawful conduct to attain sales through fraud, identity theft, and the falsification of bank records, and (2) unethical practices to sell products of no or low value to Bank customers, while believing that the customers did not actually need the products.[2]

Collectively, many of these practices were referred to within Wells Fargo as "gaming." "Gaming" was a term generally known at the Bank. It referred to employees' manipulation or misrepresentation of sales to meet sales goals, receive incentive compensation, or avoid negative consequences such as reprimands or termination.[3]

Gaming strategies varied widely, and included using existing customer identities—without the customer's consent—to open checking and savings, debit card, credit card, bill pay, and global remittance accounts in the customer's name. Many widespread forms of gaming constituted violations of federal criminal law.[4] Examples of gaming practices engaged in by Wells Fargo employees included:

a. Employees created false records and forged customers' signatures on account opening documents to open accounts that were not authorized by customers.[5]

b. After opening debit cards using customers' personal information without consent, employees falsely created a personal identification number (PIN) to activate the unauthorized debit card. Employees often did so because the Community Bank rewarded them for opening online banking profiles, which required a debit card PIN to be activated.[6]

c. In a practice known as "simulated funding," employees created false records by opening unauthorized checking and savings accounts to hit sales goals. They then transferred funds to the unauthorized account to meet the funding criteria required to receive credit for "selling" the new account. To achieve this "simulated funding," employees often moved funds

---

[2] Enforcement Counsel's Motion for Summary Disposition (EC MSD) Ex. 1 (Deferred Prosecution Agreement) at Exhibit A (Statement of Facts) at ¶14.

[3] EC MSD Ex. 1 at Ex. A at ¶16.

[4] *Id.*

[5] *Id.*

[6] *Id.*

from existing accounts of the customers without their consent.[7]

Millions of accounts reflected transfers of funds between two accounts that were equal in amount to the product-specific minimum amount for opening the later account and that thereafter had no further activity on the later account; many of these accounts were subject to simulated funding. In many other instances, employees used their own funds or other methods to simulate actual funding of accounts that they had opened without customer consent.[8]

    d. Employees opened unauthorized consumer and business credit card accounts without customer authorization by submitting applications for credit cards in customers' names using customers' personal information.[9]

    e. Employees opened bill-pay products without customer authorization. Employees also encouraged customers to make test or "token" payments from their bill-pay accounts to obtain employee sales credit (which was only awarded for bill-pay accounts that had made a payment).[10]

    f. Employees at times altered the customer phone numbers, email addresses, or physical addresses on account opening documents. In some instances, employees did so to prevent the customers from finding out about unauthorized accounts. They also did so to prevent customers from being contacted by the Company in customer satisfaction surveys.[11]

Millions of customer accounts falsely reflected a Wells Fargo email address as the customer's own personal email address, contained a generic and incorrect customer phone number, or were falsely linked to a Wells Fargo branch or Wells Fargo employee's home address. Employees also intentionally persuaded customers to open accounts and financial products that the customers authorized but which the employees knew the customers did not actually want, need, or intend to use. There were many ways in which employees convinced customers to open these unnecessary accounts, including by opening accounts for friends and family members who did not want them and by encouraging customers to open unnecessary, duplicate checking or savings accounts or credit or debit cards.[12]

**Community Bank Senior Leadership Knew the Unlawful and Unethical Misconduct was Widespread and that Sales Goals and Pressure Were the Root Cause**

Beginning as early as 2002, when a group of employees was fired from a branch in Fort Collins, Colorado, for sales gaming, Community Bank senior leadership became aware that employees were engaged in unlawful and unethical sales practices, that gaming conduct was

---

[7] *Id.*.

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Id.* at ¶17.

increasing over time, and that these practices were the result of onerous sales goals and management pressure to meet those sales goals.[13]

That information was reported to Community Bank senior leadership by multiple channels.[14] Those channels included Wells Fargo's internal investigations unit, the Community Bank's own internal sales quality oversight unit, and managers leading the Community Bank's geographic regions, as well as regular complaints by lower-level employees and Wells Fargo customers reporting serious sales practices violations.[15]

For example, in 2005 a corporate investigations manager described the problem as "spiraling out of control."[16] This reporting continued through 2016, and generally emphasized increases in various forms of sales practices misconduct.[17] By 2012, certain of the RBEs and their direct reports, Regional Presidents, were regularly raising objections about the sales plans.[18]

These objections included objections regarding the levels at which the plans were set, the types and categories of products for which they incented sales, the accompanying pressure, the resulting no- or low-value accounts, and unlawful and unethical sales practices at the Community Bank.[19] These complaints specifically articulated that the sales goals were too high and incented Community Bank employees to sell a significant number of low quality or valueless duplicate products, sometimes through misconduct.[20] Similar complaints continued to be made until 2016.[21]

In November 2013, a member of the senior staff wrote, "I really question the value of adding growth to secondary checking in regions that have very high rates to begin with. Based on what we know about the quality of those accounts it seems like we would want to keep their secondary DDA flat or down . . . ."[22] A year earlier, another senior staff member suggested eliminating any incentive payments tied to accounts that never funded, debit cards that were never used, and more than one demand deposit account per customer per day.[23]

---

[13] *Id.* at ¶19.

[14] *Id.* at ¶20.

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.* at ¶21.

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.* at ¶22.

**Community Bank Senior Leadership Exacerbated the Sales Practices Problem and Concealed Material Facts**

Even though Community Bank employees often did not meet the sales goals—or met them by selling products and accounts customers neither wanted nor needed—Community Bank senior leadership increased the sales plans nearly every year through 2013.[24] Pressure to meet those ever-increasing plans also increased during this time period.[25]

Even after 2012, when Wells Fargo began regularly retroactively lowering goals during the sales year in recognition that the goals were unachievable, employees still largely missed the lowered goals, an indication that they continued to be too high.[26] Despite knowledge of the widespread sales practices problems, including the pervasive illegal and unethical conduct tied to the sales goals, Community Bank senior leadership failed to take sufficient action to prevent and reduce the incidence of unlawful and unethical sales practices.[27]

Certain Community Bank leaders also impeded scrutiny of sales practices by Wells Fargo's primary regulator, the Office of the Comptroller of Currency ("OCC").[28] During OCC examinations in February and May 2015, the OCC was given information that minimized the amount of sales pressure within the Community Bank and the size and scope of Wells Fargo's sales practices problem.[29]

On numerous occasions, Community Bank senior leadership also made statements and gave assurances to the Company's management and Board of Directors that minimized the scope of the sales practices problem and led key gatekeepers to believe the root cause of the issue was individual misconduct rather than the sales model itself.[30] Until approximately 2015, Community Bank senior leadership viewed negative sales quality and integrity as a necessary byproduct of the increased sales and as merely the cost of doing business.[31] They nonetheless failed to advise key gatekeepers of the significant risks that the nonneeds-based selling posed to the Company.[32]

**Scope of the Unlawful and Unethical Misconduct**

---

[24] *Id.* at ¶24.

[25] *Id.*

[26] *Id.*

[27] *Id.* at ¶25.

[28] *Id.* at ¶27.

[29] *Id.*.

[30] *Id.* at ¶28.

[31] *Id.*

[32] *Id.*

Add. 764

Appellate Case: 25-1079    Page: 766    Date Filed: 05/16/2025 Entry ID: 5517644

Between 2011 and 2016, tens of thousands of employees were the subject of allegations of unethical sales practices.[33] During this period, the Company referred more than 23,000 employees for sales practices investigation and terminated over 5,300 employees for customer-facing sales ethics violations, including, in many cases, for falsifying bank records.[34] Thousands of additional employees received disciplinary action short of termination or resigned prior to the conclusion of the Company's investigations into their sales practices.[35]

Almost all of the terminations and resignations were of Community Bank employees at the branch level, rather than managers outside of the branches or senior leadership within the Community Bank.[36] From 2002 to 2016, Wells Fargo opened millions of accounts or financial products that were unauthorized or fraudulent.[37] During that same time period, Wells Fargo employees also opened significant numbers of additional unneeded, unwanted, or otherwise low value products that were not consistent with Wells Fargo's purported needs-based selling model.[38]

Wells Fargo collected millions of dollars in fees and interest to which the Company was not entitled, harmed the credit ratings of certain customers, and unlawfully misused customers' sensitive personal information (including customers' means of identification).[39] In general, the unauthorized, fraudulent, unneeded, and unwanted accounts were created as a result of the Community Bank's systemic sales pressure and excessive sales goals.[40]

**Impact of Sales Practices Misconduct on Cross-Sell Disclosures**

Accounts and financial products opened without customer consent or pursuant to gaming practices were included by the Company in the Community Bank cross-sell metric until such accounts were eventually closed for lack of use.[41] When Community Bank senior leadership set employee sales goals at a level to achieve year-over-year sales growth, it rarely took into consideration that the base level of sales included accounts or financial products resulting from unlawful misconduct or gaming.[42] This had the effect of imposing additional pressure on employees to continue gaming practices.[43]

---

[33]*Id.* at ¶ 30.

[34] *Id.*

[35] *Id.*

[36] *Id.* at ¶ 31.

[37] *Id.* at ¶ 32.

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] *Id.* at ¶ 33.

[42] *Id.*

[43]*Id.*

Appellate Case: 25-1079    Page: 767    Date Filed: 05/16/2025 Entry ID: 5517644

Like the accounts and financial products lacking customer consent, accounts and financial products that were never or seldom used by customers were also included by the Company in the Community Bank cross-sell metric until such accounts were eventually closed for lack of use, at which time those accounts were removed from the cross-sell metric.[44] In some cases (like checking or savings accounts), the unused accounts were closed relatively quickly (usually within 90 days if unfunded), but in other cases (like debit cards, the largest product category included in the cross-sell metric, or bill pay, another large contributor to cross-sell), the unused accounts remained open without activity for up to four years.[45]

From 2012 to 2016, Wells Fargo failed to disclose to investors that the Community Bank's sales model had caused widespread unlawful and unethical sales practices misconduct that was at odds with its investor disclosures regarding needs-based selling and that the publicly reported cross-sell metric included significant numbers of unused or unauthorized accounts.[46] Certain Community Bank senior executives who reviewed or approved the disclosures knew, or were reckless in not knowing, that these disclosures were misleading or incomplete.[47] At the end of 2012, the Community Bank decided to add existing global remittance accounts to the calculation of the cross-sell metric over the course of 2013.[48] It did so by excluding inactive global remittance accounts, in a manner inconsistent with prior practice.[49] It was never disclosed to investors that the product was added to the metric.[50]

By the end of 2013, the cross-sell metric had grown by .11 since the prior year.[51] However, .04 of that growth resulted from the addition of global remittance, and the remaining growth was attributable to an increase in accounts and financial products that had been inactive for at least 365 days.[52] Nonetheless, WFC's FY 2013 Form 10-K, filed February 2014, touted that the Community Bank had achieved record cross-sell over the prior year.[53]

Nonetheless, despite the addition of a new product, by late 2013 and early 2014, quarter-over-quarter growth in the cross-sell metric had flattened, significantly because of a slowdown in

---

[44] *Id.* at ¶34.

[45] *Id.*

[46] *Id.* at ¶35.

[47] *Id.*

[48] *Id.* at ¶36.

[49] *Id.*

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] *Id.*

sales growth as a result of, among other things, the Community Bank's belated efforts to impose increased controls to curb misconduct resulting from aggressive sales goals.[54]

Community Bank executives knew that the metric included many products that were not used by customers. Wells Fargo's inclusion of the word "used" to describe the accounts was therefore misleading.[55] Several months after changing its disclosure that described how the cross-sell metric was calculated to characterize the metric as "products used," Community Bank senior leadership began to develop an alternative metric to capture products that had been used.[56]The Community Bank referred to this metric internally as "active cross-sell."[57]

In developing the active cross-sell metric, Community Bank senior leadership recognized that as many as ten percent of accounts included in the cross-sell metric had not been used within the previous 12 months.[58] The Community Bank considered releasing this alternative metric to investors, but never did so, in part because of concerns raised that its release would cause investors to ask questions about Wells Fargo's historical sales practices.[59]

Following the Company's announcement of the September 2016 settlements with the OCC, the Consumer Financial Protection Bureau, and the City of Los Angeles that confirmed publicly for the first time the scale of the sales practices misconduct within the Community Bank, as well as the widespread media and political criticism of the Company that resulted, Wells Fargo's stock experienced three significant stock drops that translated into an approximately $7.8 billion decrease in market capitalization.[60]

**2)     Ms. Russ Anderson, as the Community Bank's Group Risk Officer, failed to timely identify the root cause of team member sales practices misconduct in the Community Bank, failed to exercise credible challenge to the Community Bank's head (Ms. Tolstedt) regarding risk management controls relating to sales practices, failed to timely and independently evaluate the effectiveness of Community Bank's risk management controls, and failed to identify, address, and escalate risk management control failures that threatened the safety, soundness, and reputation of Wells Fargo Bank, N.A.**

**3. Summary of the Evidence**

**Background on Bank Supervision Generally**

---

[54] *Id.* at ¶37.

[55] *Id.* at ¶40.

[56] *Id.* at ¶41.

[57] *Id.*

[58] *Id.*

[59] *Id.*

[60] *Id.* at ¶42.

Appellate Case: 25-1079     Page: 769     Date Filed: 05/16/2025 Entry ID: 5517644

Examiner Coleman reported that the OCC supervises the largest banks and thrifts subject to its supervision within the Large Bank Supervision division ("LBS").[61] Within the OCC, an institution supervised by LBS is referred to as a "large bank."[62] The OCC has "resident" teams of LBS examiners stationed on-site at each large bank. Those examiners, led by an examiner-in-charge, supervise the institution and regularly assess different areas of a bank, including various components of its safety and soundness, risk management, and compliance with laws and regulations.[63]

Examiner Coleman reported that the OCC uses a risk-based approach to determine its supervision strategy, prioritizing higher-risk activities and functions of the banks to assess the banks' safety and soundness and operation in compliance with applicable laws and regulations. Supervisory strategies are set in advance for each fiscal year.[64]

The OCC supervisory process relies on transparency and open communication for its effectiveness. OCC examiners request information from bank management at the inception of each supervisory activity in order to assess the area under examination, and the OCC expects bank management to provide accurate and complete information in response to such requests.[65] Further, the effectiveness of the supervisory process requires that bank management be transparent about examination-related risks, issues, and problems for areas being examined by the OCC.[66]

Examiner Coleman reported that although the OCC has a dedicated staff of examiners assigned to each large bank, the number of OCC examiners is dwarfed by the number of control function staff at each large bank, including the bank's risk management, compliance, legal, and audit personnel, among others.[67] The number of OCC examiners assigned to Wells Fargo between 2010 and 2016 generally ranged from 60 to 85 dedicated examiners. By way of comparison, Wells Fargo had more than 1,400 people in its audit department, more than 1,000 in its law department, and several thousand staff across its risk management function.[68] Each of those control function units or departments has an important role in ensuring the safe and sound operation of the Bank and its compliance with laws and regulations.[69]

---

[61] EC MSD Ex. 257 (Report of NBE Coleman) at ¶13.

[62] Id.

[63] Id.

[64] Id. at ¶14.

[65] Id. at ¶15.

[66] Id. at ¶15

[67] Id. at ¶16.

[68] Id.

[69] Id.

Add. 768

Appellate Case: 25-1079    Page: 770    Date Filed: 05/16/2025 Entry ID: 5517644

Examiner Coleman reported that one of the ways the OCC and financial institutions refer to effective risk management within an institution is by reference to a framework known as the three lines of defense.[70] He reported that this framework is well laid out in OCC guidance:

> The three lines of defense model explains governance and roles among the bank's business units, support functions, and the internal audit function from a risk management perspective. First line of defense risk management activities take place at the frontline units where risks are created. The second line of defense risk management activities occur in an area or function separate from the frontline unit, sometimes referred to as independent risk management. It oversees and assesses frontline units' risk management activities.
>
> The internal audit function is often referred to as the third line of defense in this model. In its primary responsibility of providing independent assurance and challenge, the internal audit function assesses the effectiveness of the policies, processes, personnel, and control systems created in the first and second lines of defense.[71]

Examiner Coleman reported that it is the responsibility of all three lines of defense to keep the Board of Directors informed of the Bank's risk management practices to allow the Board to provide credible challenge to management's recommendations and decisions.[72]

### Bank Examiner Analyses

Pursuant to the OCC's Uniform Rules of Practice and Procedure, if the contents of a report of examination or reports of supervisory activity or visitation contain relevant, material, and reliable evidence that is not unduly repetitive, the evidence is admissible to the fullest extent authorized by the Administrative Procedure Act and other applicable law.[73]

National Bank Examiner for the OCC Elizabeth Candy became the Corporate Risk Team Lead on the OCC's Wells Fargo supervision team in March 2018 and continues to serve in this role.[74] As the Corporate Risk Team Lead, she was and is responsible for planning, coordinating, and monitoring supervisory activities, and leading examinations and reviews of the Bank.[75] She drafts and reviews reports of examinations, Supervisory Letters, and Conclusion Memos and

---

[70] *Id.* at ¶17.

[71] *Id.* at ¶17, quoting Comptroller's Handbook, Internal and External Audits at 2 (December 2016), OCC-SP1107962.

[72] EC MSD Ex. 257 (Report of NBE Coleman) at ¶17, citing Wells Fargo Risk Management Framework, Published July 2014, OCC-WF-SP-04791987.

[73] 12 C.F.R. § 19.36.

[74] EC MSD Ex. 269 (Report of NBE Candy) at ¶10.

[75] *Id.*

oversees the preparation of such documents by other team members.[76] She also drafts and reviews progress reports for Enforcement Actions and Matters Requiring Attention (MRAs).[77]

Her job involves assessing the adequacy of those Bank functions and establishing the OCC's supervision strategy for those areas.[78] She is also responsible for evaluating the adequacy of, and safety and soundness of, risk management and corporate governance functions, including the role of the Bank's Board of Directors, management committee structure, and policies and procedures.[79] She also identifies and evaluates systemic risks and trends, analyze data and reporting, and participates in discussions with bank management throughout the OCC's supervisory activities.[80]

She assumed responsibility as the Acting Enterprise Risk Management Team Lead on August 16, 2020. In this role, she assesses the adequacy of Bank management and the Board.[81] Her responsibilities include evaluating the following areas of the Bank: enterprise risk management, audit, internal controls, incentive compensation, legal, and human resources.[82] She oversees an examination team in Large Bank Supervision focused on various risk areas and serves as an advisor to the Examiner-in-Charge and other OCC officials.[83] She provides analysis and advice on the planning and conduct of examinations and reviews, preparation of reports of examination and Supervisory Letters, and presentations of findings and recommendations to senior management at the Bank and the OCC.[84] She meets with and communicates regularly with senior Bank management, OCC staff, and other Bank regulators to discuss supervisory conclusions, share information, and resolve concerns.[85]

Examiner Candy has twelve years of professional examiner experience at the OCC, including extensive experience in the supervision of community, midsize, and large banks, problem banks, application of safety and soundness principles to bank operations, corporate governance, risk management, and controls.[86] She joined the OCC in 2008, was an examiner in Midsize and Community Bank Supervision with the OCC for six years, from June 2008 through

---

[76] *Id.* at ¶11.

[77] *Id.* at ¶10.

[78] *Id.*

[79] *Id.*

[80] *Id.*

[81] *Id.* at ¶11.

[82] *Id.*

[83] *Id.*

[84]*Id.*

[85] *Id.*

[86] *Id.* at ¶3.

Appellate Case: 25-1079     Page: 772     Date Filed: 05/16/2025 Entry ID: 5517644

April 2014, before transferring to the OCC's Large Bank Supervision.[87] During her tenure there, she participated in over 100 midsize and community bank examinations, as well as examinations of large banks, including Wells Fargo.

In her positions with Midsize and Community Bank Supervision at the OCC, Examiner Candy served as both Acting Examiner-in-Charge and Examiner-in-Charge for multiple problem banks with significant control, compliance, Bank and Secrecy Act ("BSA"), asset quality, and management deficiencies. These were banks with a composite rating of "3" or worse under the Uniform Financial Institutions Rating System of the Federal Financial Institutions Examination Council.[88]

Examiner Candy reported that she holds the following opinions as a National Bank Examiner.[89]

From no later than 2002 until October 2016, the Community Bank pursued a business model premised on unreasonable sales goals coupled with extreme pressure on its employees to meet these goals.[90] Leadership focused on increasing the cross-sell ratio year over year at all cost, instead of ensuring that Wells Fargo customers received only the products they wanted, needed, and requested.[91] The pressure included the threat of disciplinary action and termination as well as actual termination for failure to meet the unreasonable goals and contributed to hostile working conditions with managers sometimes embarrassing employees or forcing them to work overtime.[92]

In addition, the Community Bank's controls were severely deficient and intentionally so.[93] This business model was recklessly unsafe or unsound and resulted in a severe and systemic sales practices misconduct problem.[94] (The term "sales practices misconduct," as used in her report, refers to the practices of Bank employees issuing a product or service to a customer without the customer's consent, transferring customer funds without the customer's consent, or obtaining a customer's consent by making false or misleading representations.)[95]

Sales practices misconduct, or issuing products to customers without their consent or obtaining the customer's consent by making false or misleading representations, is an unsafe or unsound banking practice and violates laws and regulations. Those laws and regulations include:

---

[87] *Id.*

[88] *Id.*

[89] *Id.* at page 6.

[90] *Id.* at ¶16.

[91] *Id.*

[92] *Id.*

[93] *Id.*

[94] *Id.*

[95] *Id.* at ¶16 (a).

Appellate Case: 25-1079     Page: 773     Date Filed: 05/16/2025 Entry ID: 5517644

18 U.S.C. §§ 656 (theft/misapplication by bank employee), 1005 (false entries), 1028(a)(7) (identity theft), and 1344(2) (bank fraud); 15 U.S.C. § 45(a) (unfair or deceptive acts and practices); 12 C.F.R. § 1030.4(a) (Regulation DD/Truth in Savings); and 12 C.F.R. § 1026.12(a) (Regulation Z/Truth in Lending).[96]

The incentive compensation program and plans in the Community Bank were deficient in both design and implementation, as well as testing, oversight, and challenge, and resulted in employees engaging in sales practices misconduct over the course of fourteen years. This was recklessly unsafe or unsound and exposed the Bank to increased operational, compliance, regulatory, legal, reputational and financial risks.[97]

The Bank's controls to prevent and detect sales practices misconduct were inadequate and the Bank's risk management of its sales practices and the sales practices themselves, were recklessly unsafe or unsound.[98]

Sales practices misconduct was pervasive in the Community Bank and involved tens of thousands, if not hundreds of thousands, of Bank employees issuing millions of products to customers without their consent.[99]

It took a massive and prolonged failure by Respondents for the sales practices misconduct problem to become as severe and pervasive as it was and last as long as it did.[100] The Respondents knew, or should have known, that sales practices misconduct in the Community Bank was widespread, systemic, and the high-pressure environment and aggressive sales goals contributed to the root cause.[101]

In 2014, National Bank Examiner Jennifer Crosthwaite participated in a number of examinations related to Incentive Compensation, Compliance, and Operational Risk and issued Supervisory Letters highlighting issues in each area.[102] In February 2015, she and the Operations

---

[96] *Id.* at ¶17.

[97] *Id.* at ¶18.

[98] *Id.* at ¶19.

[99] *Id.* at ¶20.

[100] *Id.* at ¶21.

[101] *Id.*

[102] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶9. Examiner Crosthwaite has been the Enterprise Risk Management Team Lead for Wells Fargo since May 2013. In that role, she directs a team of between eight and ten OCC examiners and oversee supervisory efforts at Wells Fargo in the areas of Corporate Risk, Audit, Legal, Human Resources, Reputation Risk, Strategic Risk, Model Risk, Counterparty Credit Risk, and International Risk. Among other things, she regularly meets with Bank senior management to cover key current topics, emerging risks, and issues identified through the OCC's ongoing examination work, and provides clear and detailed feedback to the Bank in the form of Supervisory Letters. She also assists the Examiner-In-Charge in providing input into the Quarterly Management Report, the annual Report of Exam ("ROE"), the Quarterly Risk Assessments, and the supervisory strategies of the Bank. She serves as an expert advisor for the field examining staff of Large Bank Supervision ("LBS") and as an advisor to the Examiner-in-Charge ("EIC"), the Deputy Comptroller for LBS, and

Add. 772

Appellate Case: 25-1079   Page: 774   Date Filed: 05/16/2025 Entry ID: 5517644

and Compliance Team Leads examined the Community Bank's governance processes with a focus on sales practices.[103] The result of the February 2015 examination was an April 2015 Supervisory Letter including an MRA on sales practices governance.[104]

During the February 2015 exam, Examiner Crosthwaite was told that only 20 or 30 people had been terminated in connection with an investigation that was limited geographically to Los Angeles/Orange County.[105] After the City of Los Angeles filed its lawsuit against the Bank for sales practices related misconduct in May 2015, she led a targeted examination of the Community Bank specifically related to the allegations in the lawsuit.[106]

In conjunction with the examiners from the Operations and Compliance group, the ERM examiners examined the Community Bank, sampled a number of EthicsLine and customer complaints, and reviewed termination files and notes.[107] It was during this period that she learned, for the first time, that over 230 individuals had been terminated across the Bank (not just in Los Angeles/Orange County) for engaging in simulated funding and changing customer phone numbers.[108] This 230 number was drastically higher than what the Bank had previously reported to the OCC during the February 2015 exam.[109] She then realized that the sales practices problem was more severe and pervasive than what management, including Respondents, had communicated to the OCC.[110] She learned that sales practices was much more than just simulated funding and phone number changes.[111]

Some examples of other types of sales practices misconduct that the OCC's examiners discovered were: opening unauthorized deposit accounts (and in some instances 40 or 50 accounts for one individual), issuing multiple credit and debit cards without consent, and targeting the deceptive practices on protected classes.[112]

Community Bank Management also had a practice of pushing two checking and two savings accounts on customers (known as the "2 for 2" campaign).[113] Examiners reviewed over

---

other OCC officials. She participated in the OCC's examinations and investigations of the Bank's sales practices. Id. at ¶2.

[103] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶9.

[104] Id.

[105] Id. at ¶10.

[106] Id.

[107] Id.

[108] Id.

[109] Id.

[110] Id.

[111] Id.

[112] Id.

[113] Id.

Add. 773

Appellate Case: 25-1079    Page: 775    Date Filed: 05/16/2025 Entry ID: 5517644

300 EthicsLine complaints and a sizeable number of customer complaints, which provided detailed accounts of pervasive unsafe or unsound and fraudulent sales practices misconduct.[114] The Bank's EthicsLine is a 24-hour hotline and website program that serves as the primary method for employees to anonymously voice complaints, including reporting possible violations of the Bank's Code of Ethics, violations of law, and suspicious conduct involving other employees.[115]

The examination resulted in a Supervisory Letter with five MRAs that addressed the three lines of defense (the Community Bank, Corporate Risk, and Internal Audit), incentive compensation, and complaint systems.[116] The Supervisory Letter highlighted the aggressive sales culture and lack of effective Bank oversight, controls, and supervision.[117] It also highlighted that there was a lack of transparency in the front-line Community Bank leadership team.[118] This Supervisory Letter required the Bank to assess root cause and hire an independent consultant to assess customer harm. The Bank retained Accenture and PricewaterhouseCoopers ("PwC") for this work, respectively.[119]

Throughout the targeted examination in May 2015, the EIC and Examiner Crosthwaite informed the Bank's Chief Corporate Risk Officer that the OCC did not want Respondent Russ Anderson taking the lead on providing information to the OCC.[120] The EIC and Examiner Crosthwaite requested that the independent Corporate Risk function of the Bank take the lead on coordinating responses to OCC information requests, on scheduling meetings, and on ensuring that the OCC received all such requested information.[121] They made this request because the information that the Community Bank had provided to the OCC previously was not consistent with the information in the City of Los Angeles lawsuit.[122] At this time, based upon Examiner Crosthwaite's interactions throughout early 2015, she was very concerned that Community Bank leadership, and specifically Respondent Russ Anderson, was not fully transparent in meetings with OCC examiners.[123]

In July 2015, the OCC commented on sales practices in its annual Report of Examination ("ROE"),

---

[114] *Id.*

[115] *Id.*

[116] *Id.*

[117] *Id.*

[118] *Id.*

[119] *Id.*

[120] *Id.* at ₱11.

[121] *Id.x*

[122] *Id.*

[123] *Id.*

Add. 774

Appellate Case: 25-1079     Page: 776     Date Filed: 05/16/2025 Entry ID: 5517644

The Bank needs to proactively control reputational risks through more effective compliance and operational risk programs. This included a reference to our continued assessment of the LA lawsuit, which alleges branch misconduct resulting in customer harm, our early findings suggest management should have responded more proactively to independently investigate the initial allegations. Management needs to ensure that matters such as these are fully and transparently investigated, harmed customers are remediated, bank employees are properly trained, incentive programs do not encourage the alleged behavior, and controls are in place to identify and resolve potential or emerging issues.[124]

In February 2016, the OCC received the results of the PricewaterhouseCoopers (PwC) report, which confirmed that sales practices misconduct was occurring on systemic scale and affected more than 1.5 million customer accounts.[125] The PwC report, combined with the Accenture findings, confirmed the systemic nature of sales practices misconduct.[126]

The OCC issued a Supervisory Letter in July 2016, finding that the sales practices misconduct problem at Wells Fargo was unsafe or unsound.[127] The July 2016 Supervisory Letter ultimately supported the Sales Practices Consent Order issued against the Bank in September 2016.[128] By August 2017, the number of accounts that had been opened between January 2009 and September 2016 in a manner consistent with simulated funding had ballooned to 3.5 million customer accounts.[129]

Examiner Candy opined that through their actions and inactions, each Respondent engaged in recklessly unsafe or unsound practices that enabled the sales practices misconduct problem to exist and continue. Each Respondent also breached his/her fiduciary duties.[130]

As the Group Risk Officer for the Community Bank, Respondent Russ Anderson had a primary responsibility to properly identify, quantify and control all risks in the Community Bank's operations.[131] Audit—that is, Respondents Julian and McLinko—had a responsibility to ensure incentive compensation plans were designed and operated in accordance with Bank policy, evaluate risk and controls and ensure it was adequately managed and escalated, advise whether the Community Bank was operating in conformance with laws and regulations, or

---

[124] *Id.* at ¶12.

[125] *Id.* at ¶13.

[126] *Id.*

[127] *Id.*

[128] *Id.*

[129] *Id.* at ¶¶13, 52.

[130] EC MSD Ex. 269 (Report of NBE Candy) at ¶22.

[131] *Id.* at ¶23.

Appellate Case: 25-1079    Page: 777    Date Filed: 05/16/2025 Entry ID: 5517644

identify and detail significant or systemic problems in audit reports.[132] None of the Respondents, each of whom held leadership roles in those departments, adequately performed their responsibilities with respect to the sales practices misconduct problem.[133] Examiner Candy opined that all three Respondents failed in their responsibilities.[134]

Examiner Candy opined that Respondent Russ Anderson failed to execute her risk management, control, and escalation responsibilities as the Group Risk Officer, the Chairperson of the Community Bank Risk Management Committee, and under the Bank's own policies;[135] and that her conduct was recklessly unsafe or unsound and was done in disregard of or evidenced a conscious indifference to a known or obvious risk of substantial harm.[136] Examiner Candy opined that Respondent Russ Anderson's conduct constituted a breach of her fiduciary duty.[137]

Examiner Candy opined that Respondent Russ Anderson's failure to escalate the sales practices misconduct problem was recklessly unsafe or unsound and constituted a breach of her fiduciary duty,[138] and that her false, misleading, and incomplete reporting to the Enterprise Risk Management Committee, the Board, and the OCC was recklessly unsafe or unsound and constituted a breach of her fiduciary duty.[139]

Examiner Candy opined that Respondent Russ Anderson violated laws and regulations, including by causing, participating in, counseling, or aiding and abetting the following violations: 18 U.S.C. §§ 656 (theft/misapplication by bank employee), 1001(a) (false statements), 1005 (false entries), 1028(a)(7) (identity theft), 1344(2) (bank fraud), and 1517 (obstruction of bank exam); 15 U.S.C. § 45(a) (unfair or deceptive practices); 12 C.F.R. § 1030.4(a) (Regulation DD/Truth in Savings); and 12 C.F.R. § 1026.12(a) (Regulation Z/Truth in Lending).[140]

Examiner Candy opined that Respondent Russ Anderson's violations of laws and regulations, unsafe or unsound practices, and breaches of fiduciary duties involved personal dishonesty and demonstrated a willful or continuing disregard for the safety or soundness of the Bank.[141]

---

[132] *Id.*

[133] *Id.*

[134] *Id.*

[135] *Id.* at ¶24.

[136] *Id.*

[137] *Id.*

[138] *Id.* at ¶25.

[139] *Id.* at ¶26.

[140] *Id.* at ¶27.

[141] *Id.* at ¶28.

Add. 776

Appellate Case: 25-1079     Page: 778     Date Filed: 05/16/2025 Entry ID: 5517644

**Ms. Russ Anderson's Employment Status**

Ms. Russ Anderson identified a copy of her resume, supplying her relevant educational and professional background.[142] Ms. Russ Anderson testified that she began banking employment with the predecessor to Norwest as a bank trainee in Duluth, Minnesota.[143] She worked in the mailroom, learned bank operations, worked in the teller area, worked in consumer lending and as a consumer banker.[144] Following promotions to the commercial loan department, she and her husband adopted their first son, and upon this, she "step[ped] away from [her] position at [the] bank" and then returned to Norwest, working in the commercial loan workout department from 1987 through 1992.[145] After taking leave upon the adoption of their second child, she returned and was promoted to deputy and then senior chief credit officer; promoted in 1996 to a "corporate officer job" and when "Norwest purchased Wells Fargo" in 1998 she "remained in the corporate credit office in that integration."[146]

Ms. Russ Anderson testified that upon that integration she spent the first four years "helping with the credit pieces of it".[147] She said that the "legacy of Wells Fargo did not do middle market lending, and that was my background, so I helped with acquisitions and with middle market credits."[148] She said in 2002 John Stumpf, who was then head of Wells Fargo's Community Bank, asked her to be his credit officer for the Community Bank, "which is where all of the middle market lending occurred."[149] She testified then spent "about a year and a half" working on the relationship between the Bank and the OCC, and "was successful in rebuilding the trust between the OCC and Wells Fargo."[150]

After this, upon noting an "emerging issue called operational risk and regulatory compliance," Ms. Russ Anderson asked Mr. Stumpf to "hire someone for to manage it [sic] like you do for credit".[151] She said Mr. Stumpf "told me I had [the] job" so she "left my credit organization and I created the – what was then the Chief Risk Officer role, me and my administrative assistant, and started building an organization from there."[152]

---

[142] Tr. (Russ Anderson) at 9267; R. Ex. 1824.

[143] Tr. (Russ Anderson) at 9260.

[144] *Id.* at 9260-61.

[145] *Id.* at 9262.

[146] *Id.* at 9263.

[147] *Id.*

[148] *Id.*

[149] *Id.*

[150] *Id.* at 9264.

[151] *Id.*

[152] *Id.*

Appellate Case: 25-1079      Page: 779      Date Filed: 05/16/2025 Entry ID: 5517644

Ms. Russ Anderson testified that in 2008 Wells Fargo purchased Wachovia, "which then doubled the size of the Bank and made it a systematically important financial institution [SIFI]."[153] She said they spent three years integrating the two banks, a process that she described as "very complicated, as you can imagine, not only geographically but culturally different to integrate".[154]

Ms. Russ Anderson testified that after the merger, her "role expanded substantially over that time as the risks expanded. We now had things like vendor management, incentive comp[ensation][155] risk committee, data management."[156] She testified there was a "multitude of topics and risks that we were now responsible for, and particularly in Community Banking, because I had the Internet Bank, the call centers, the branches, the deposit product group, small business lending," things that were "really important and embedded in those business lines."[157]

Ms. Russ Anderson testified that the head of HR, Debra Paterson, and Carrie Tolstedt, head of Community Banking, "thought it would be a good idea" to move the oversight of Sales Practices Misconduct to Ms. Russ Anderson's organization.[158] Ms. Russ Anderson "took it as a direct report of mine, because it was a very important topic. And I felt it needed my hands-on oversight in the beginning to really get the vision going in the right direction."[159]

Ms. Russ Anderson testified that she kept that job until January 2016, when she "took SSCOT [Community Banking Sales and Service Conduct Oversight] and the Complaints Group and I married them up together under Paula Herzberg."[160] She said Ms. Herzberg "was a direct report of mine, but I took two groups and brought them together and brought in a senior leader over the two."[161]

Ms. Russ Anderson testified that as of October 3, 2013 [through 2016], she was employed at Wells Fargo Corporation as the Group Risk Officer (GRO) of Community Banking.[162] In this capacity, Ms. Russ Anderson had responsibility for sales practices misconduct in the Community Bank.[163] Ms. Russ Anderson left the Bank at the end of August

---

[153] *Id.*

[154] *Id.* at 9265.

[155] See Respondents' Amended Revised Errata Days 9 – 38" – page 75. Ordered through Second Supplemental Order.

[156] Tr. (Russ Anderson) at 9265.

[157] *Id.* at 9265-66.

[158] *Id.* at 9266.

[159] *Id.*

[160] *Id.* at 9267.

[161] *Id.*

[162] *Id.* at 9250-51.

[163] *Id.* at 9251.

Appellate Case: 25-1079     Page: 780     Date Filed: 05/16/2025 Entry ID: 5517644

2016 after more than 36 years of service.[164] She testified at that time, "my job was all-encompassing" and when she was needed to care for her parents she requested a six-month leave of absence "to be able to spend more time with them."[165] Later in her testimony, she acknowledged, "[the Bank] terminated me for cause."[166]

**Ms. Russ Anderson's Reporting Relationships**

Ms. Russ Anderson testified that in 2013 she along with about 15 others reported directly to Carrie Tolstedt, the Senior Executive Vice President of Community Banking.[167] She testified she also reported to CRO Loughlin on a dotted-line basis, and understood that as Community Banking's GRO if she faced resistance from Ms. Tolstedt she had an escalation path to Mr. Loughlin in Corporate Risk.[168]

**Three Lines of Defense**

Wells Fargo & Company and Wells Fargo Bank, N.A. employed a "Three Lines of Defense" risk management system throughout the relevant period.[169] The First Line of Defense refers to the Line of Business (LOB) organizations, including Community Bank.[170] The Second Line of Business refers to "the corporate risk function as well as a few other second line of defense activities, like HR and Legal."[171] WFAS's Internal Audit was the Third Line of Defense.[172]

The First Line of Defense – "**Lines of Business & Administrative Functions**" – is responsible "for taking, identifying, assessing, managing, and controlling the risks it generates."[173] It "owns" risk and is accountable to Senior Management and the WF&C Board of

---

[164] *Id.* at 9259-60.

[165] *Id.* at 9259.

[166] Tr. (Russ Anderson) at 9500; 10140; OCC Ex. 2126: "Upon completion of an internal investigation, in a unanimous decision, the Wells Fargo Board of Directors concluded that there is cause to terminate your employment, effective February 21, 2017, because you engaged in prohibited conduct in violation of Company policy, including the Company's Code of Ethics and Business Conduct."

[167] Tr. (Russ Anderson) at 9268, 9547.

[168] *Id. at* 9547.

[169] Tr. (Julian) at 5936.

[170] *Id.*

[171] *Id.*

[172] *Id.*

[173] R. Ex. 1780 at 41.

Add. 779

Appellate Case: 25-1079    Page: 781    Date Filed: 05/16/2025 Entry ID: 5517644

Directors.[174] This principle requires "adherence to risk framework, risk appetite and concentration limits, etc."[175]

Through the March 4, 2013 report, "Wells Fargo's Risk Management Framework," Chief Risk Officer Loughlin described the first line of defense in these terms:

> First line of defense: Lines of business.
>
> We believe placing risk identification, assessment, monitoring, ownership, management, and mitigation as close as possible to the source of risk improves risk management effectiveness and efficiencies. . . . To be effective, the line-of-business risk management process must recognize good risk management behaviors and also hold individuals accountable for poor risk management behaviors.[176]

Ms. Russ Anderson testified that she agreed with the statement that the corporate structural model enables risk managers to respond both quickly and appropriately to changing risk conditions, and to do so with deep knowledge of the business context in which the risk originates.[177] She agreed that she needed to understand the culture in the Community Bank; and needed to understand the sales goals in the Community Bank, "[a]t a high level or good enough level".[178] When asked whether she needed to understand incentive compensation plans in the Community Bank, Ms. Russ Anderson deflected, responding, "I needed to understand that the incentive compensation plan had been credibly challenged and that the risks and rewards were adequate."[179]

The Second Line of Defense – "**Corporate Risk**" – is responsible for "establishing and enforcing Wells Fargo's Risk Management Framework."[180] It "oversees risk" and is [a]ccountable to the Board, with day-to-day oversight" from the CEO.[181] It established and enforced risk management policies, standards, tools, methodologies and programs, provides oversight of risks across all businesses and functions, and performs "independent risk monitoring and reporting."[182]

CRO Loughlin described the second line of defense in these terms:

---

[174] *Id.*

[175] *Id.*

[176] Tr. (Russ Anderson) at 9453; OCC Ex. 1553 at 7-8.

[177] Tr. (Russ Anderson) at 9544; OCC Ex. 1553 at 7.

[178] Tr. (Russ Anderson) at 9545.

[179] *Id.*

[180] R. Ex. 1780 at 41.

[181] *Id.*

[182] *Id.*

Appellate Case: 25-1079     Page: 782     Date Filed: 05/16/2025 Entry ID: 5517644

Second line of defense: Corporate functions.

> Corporate Risk, Human Resources, the Law Department, Social Responsibility, Public Relations, and Corporate Controllers provide company-wide leadership, standards, support, and oversight to ensure effective understanding and management of all risk, including associated strategic and reputation risk, across Wells Fargo.[183]

The Third Line of Defense – **"Audit"** or **"Audit and Examination"** – was responsible "for providing an independent assessment of the risk framework and internal control systems to the Board."[184] It is accountable to the Board, with day-to-day oversight from the CEO.[185] The scope of Audit includes "[c]ompliance with policies and standards," the "effectiveness of the independent risk management function," and "[c]ompleteness and accuracy of information."[186]

CRO Loughlin described the third line of defense in these terms:

Third line of defense: Wells Fargo Audit Services

> [WFAS] is an independent assurance and advisory function that reports directly to the Audit & Examination (A&E) Committee of the Board of Directors. Through its assurance and advisory work, WFAS helps the company accomplish its objectives by bringing a systematic, disciplined approach to evaluate and improve the effectiveness of enterprise governance, risk management, and control processes across the enterprise.[187]

Mr. Julian testified that the Wells Fargo Community Bank LOB was one of the Bank's First Line of Defense, and Paul McLinko was the head of the Audit Group that had responsibilities for providing audit oversight for that Line of Business.[188]

Mr. Julian described the Internal Audit function served by WFAS in these terms:

> Principally, the role of Audit -- especially within an organization the size of Wells Fargo Corporation [*sic*], the role of Audit was to perform audit work to provide assurance to management and to the Board that the controls that management oversaw were, in fact, working as intended or as designed.[189]

---

[183] OCC Ex. 1553 at 8.

[184] R. Ex. 1780 at 41.

[185] *Id.*

[186] *Id.*

[187] OCC Ex. 1553 at 8.

[188] Tr. (Julian) at 5988.

[189] *Id.* at 5936.

Mr. Julian testified that the First Line of Defense (and not WFAS) was expected to design risk management controls for the Community Bank.[190] In this context, risk management controls "are intended to be designed to assure that the risks are being managed within the parameters of the risk appetite that the line of business has adopted."[191] Mr. Julian testified that the Community Bank, and not WFAS, was expected to set the "risk appetite" for the Community Bank line of business.[192]

**Risk Appetite**

Risk appetite "means the aggregate level and types of risk the board of directors and management are willing to assume to achieve a covered bank's strategic objectives and business plan, consistent with applicable capital, liquidity, and other regulatory requirements."[193]

According to its Risk Management Framework, the holding company's Board of Directors and its seven standing committees "play an active role in overseeing and guiding the company's overall approach to risk management."[194] The Framework provides that a key component of this approach is its Statement of Risk Appetite, "which is developed and refined by senior management, with updates reviewed and approved at least annually by the Board."[195]

The Framework provides thus with respect to risk appetite:

> Generally, the statement of risk appetite serves to guide business and risk leaders as they manage risk on a daily basis. It describes the nature and magnitude of risks that the company is willing to assume in pursuit of its strategic objectives, and is composed of qualitative and quantitative parameters for certain individual risk types (*e.g.* financial, capital, liquidity, credit, counterparty, market, model, operational, compliance, reputational). It also contains specific financial ranges which the company does not want to exceed or fall below over time (*e.g.*, ROE, ROA, efficiency ratio). Moreover, the enterprise statement of risk appetite informs individual legal entity, group, and in some cases LOB-specific statements of risk appetite, which the company has developed for its five risk-generating groups and Wells Fargo Bank, N.A., the company's principle banking subsidiary. The metrics

---

[190] Tr. (Julian) at 5937.

[191] *Id.* at 5938.

[192] *Id.*

[193] OCC Ex. 931 at 114 (12 CFR Ch. 1, Pt. 30, App. D at I (E)(10).

[194] Resp. Ex. 482, Wells Fargo & Company, Corporate Risk, Wells Fargo Risk Management Framework, Second Edition, published July 2014, at 12.

[195] *Id.*

Appellate Case: 25-1079    Page: 784    Date Filed: 05/16/2025 Entry ID: 5517644

included in the group and legal entity statements are harmonized with the enterprise level metrics to ensure consistency, where appropriate.[196]

Mr. Julian testified, "risk appetite" is "a level of risk that the line of business is willing to accept and the level of risk which they're expected to build controls to mitigate down to."[197] He testified that although the "lines of business were responsible for developing risk appetite metrics," by as late as April 2015 he was aware that the Community Bank had not set a risk appetite.[198] According to Mr. Julian, the Corporate and Risk Governance section of the OCC's Handbook places on Community Bank's First Line of Defense, rather than the Third Line of Defense, the responsibility for identifying, assessing, controlling and mitigating the risks associated with the Community Bank's business activities consistent with the established risk appetite.[199]

Through the OCC's Supervisory Letter WFC 2015-07, the OCC directed Carrie Tolstedt, Senior Executive Vice President for Community Banking to "establish risk appetite metrics specific to monitoring the sales practices activities as well as appropriately reporting and escalating as needed."[200] Mr. Julian reiterated that WFAS played no role in setting the risk appetite for the Community Bank.[201] Elaborating on this point, Mr. Julian testified that "[i]t would be inappropriate for WFAS to set the appetite, because WFAS was providing audit work and testing the controls against such appetite".[202]

Risk appetite for the Community Bank was supposed to be set by the Line of Business – in this case, by Community Bank's First Line of Defense.[203] While WFAS would not set Community Bank's risk appetite, it was responsible for "the testing of the controls and the testing of the risks that are being managed," and would "evaluate the effectiveness of those controls against the stated risk appetite of the Line of Business."[204]

---

[196] *Id.*

[197] Tr. (Julian) at 5945.

[198] *Id.* at 6643-44; R. Ex. 654 at 3.

[199] Tr. (Julian) at 5955-56.

[200] *Id.* at 6644.

[201] *Id.* at 5943-44, citing R. Ex. 482, Wells Fargo & Company, Corporate Risk, Wells Fargo Risk Management Framework, Second Edition, published July 2014: "The Board is also responsible for the oversight of Wells Fargo's risk management organization. In this capacity, the Board oversees senior management's efforts to ensure that the risk management organization and Wells Fargo Audit Services are adequately staffed and maintain the appropriate stature within the company. Accordingly, the Board reviews senior management reports on staffing levels and expertise in these areas and requires that both the CRO and Chief Auditor report directly to Board-level committees." *Id.* at 13.

[202] Tr. (Julian) at 5938.

[203] *Id.* at 5944, 5959, citing Resp. Exhibit 482 (Wells Fargo & Company, Corporate Risk, Wells Fargo Risk Management Framework), at 24 - Organizational Structure of the First Line of Defense.

[204] Tr. (Julian) at 5944.

**Code of Ethics & Business Conduct**

Pursuant to the Wells Fargo Code of Ethics, the Code is applicable to Wells Fargo & Company and each of its subsidiaries, including Wells Fargo Bank, N.A., and "every Wells Fargo team member."[205]

**Risks Associated with Sales Practices Misconduct**

Mr. Julian testified that the risks associated with Sales Practices Misconduct were not limited to the Community Bank.[206] He explained, "sales practices activities or the risk of sales practices activities also has the potential or the risk across other lines of business groups outside the Community Bank business group."[207]

Mr. Julian as Chief Auditor said his role during the relevant period was to engage with EADs (including Mr. McLinko) "over the various lines of business to understand the engagement that they were performing with respect to sales practices".[208] His reason for doing so was that he needed to "have an understanding and a level of assurance that they were aware of sales practice risk".[209] With that understanding, Mr. Julian said he expected the EADs to incorporate that risk "into their various audit plans."[210] He added, however, that during the relevant period, none of the EADs executed any audit engagements.[211]

**The Role of the WF&C Ethics Line**

Mr. Julian testified that the WF&C EthicsLine was a "process by which Team Members could either anonymously or, if they so choose, identify themselves, but to raise concerns they may have with respect to ethics allegations."[212]

He testified that at no time during his tenure as Chief Auditor did he have any concerns about whether the complaints he reviewed were being appropriately processed.[213] He said at some point he learned from Michael Bacon, who headed up Corporate Investigations, that approximately fifteen to twenty percent of the complaints received through the EthicsLine were substantiated after investigation.[214]

---

[205] R. Ex. 6638 at 1-2.

[206] Tr. (Julian) at 5989.

[207] *Id.*

[208] *Id.* at 5990.

[209] *Id.*

[210] *Id.*

[211] *Id.*.

[212] *Id.* at 6144.

[213] *Id.* at 6145.

[214] *Id.* at 6146.

Add. 784

Appellate Case: 25-1079    Page: 786    Date Filed: 05/16/2025 Entry ID: 5517644

Mr. Julian testified that he received EthicsLine reports from Ms. Russ Anderson's direct reports throughout 2013 to 2016, but drew no conclusion that sales integrity violations or sales practices misconduct in the Community Bank were widespread or systemic.[215] Nevertheless, he identified six EthicsLine allegations that he received during his tenure as Chief Auditor.[216]

- In a January 28, 2013 email to Mr. Julian, Katie Hall (Dallas TX) wrote regarding "Accounting Irregularities – EthicsLine Report."[217] She wrote:

  > It appears the customer, [L. I.], is reporting that she went into a Salt Lake City, UT branch because she received a debit card for a new account that she did not open. [L.] stated that [D.G.] (Personal Banker) helped her understand why the account was opened, but she still does not want it.[218]

- In a January 28, 2013 email to Mr. Julian, Katie Hall (Dallas TX) wrote regarding "Auditing Irregularities – EthicsLine Report."[219] She wrote:

  > [J.D.] (Phone Banker in El Monte, CA) reported that [K.W.] (Business Payroll Services Sales Representative in Salem, OR) opened an account for [L.E.] (customer) without her consent. [J.] also stated that there is a question about a donation of $850, which [E.] stated she has not received. [J.] said the customer wishes to have the account closed; however, she is not a signer.[220]

She also wrote that the EthicsLine web report "will not be logged for Board reporting, as the allegation does not seem to involve a material misrepresentation of an audit engagement or malicious behavior of either internal or external auditors. The allegation seems to involve concerns related to account opening procedures."[221]

- In an October 28, 2013 email to Mr. Julian, Katie Hall (Dallas TX) wrote regarding "Retaliation – EthicsLine Report."[222] She wrote that the attached EthicsLine web report "will not be logged for Board reporting, as the allegation seems related to the sales environment created by a District Manager."[223] She wrote:

---

[215] *Id.* at 6316-17.

[216] *Id.* at 6148.

[217] OCC Ex. 1588 at 1.

[218] *Id.*

[219] *Id.* at 1.

[220] *Id.*

[221] *Id.*

[222] OCC Ex. 1586 at 1.

[223] *Id.*

Appellate Case: 25-1079    Page: 787    Date Filed: 05/16/2025 Entry ID: 5517644

An anonymous Team Member reported that [S.T.] (Community Banking District Manager in Deltona, FL) may be encouraging an unethical and stressful sales environment by personally setting district sales goals that exceed stated sales goals in personal banker and CSSR sale matrices. The Team Member stated that [S.] requires personal bankers and CSSRs in her district to have 10 approved credit cards each per week; however, the personal banker matrix only requires 18 for the quarter, and the CSSR matrix does not require any credit production goals (loans or credit cards). The Team Member also stated that personal bankers are supposed to average 3 appointments per day based on their matrix; however, [S.] is requiring them to average 6 per day. The Team Member said they feel bullied into meeting the goals because they are told they will receive documented coaching if they do not meet these goals. The Team Member stated that he/she is concerned because the constant harassment and threat of being written up for not meeting [S.'] goals I creating an unhealthy work environment and could lead to unethical practices by team members in fear of losing their jobs.

The Team Member stated that his/her manager shared that [S.] has already advised him to issue the Team Member an informal write-up for not meeting credit goals. The Team Member said he/she fears being identified for making this report since he/she is the only individual singled out as not meeting sales goals.[224]

In the same email, Katie Hall noted further that she "was able to locate five additional EthicsLine reports for Deltona, FL related to sales integrity concerns received between 9/10/2013 and 10/14/2013." She wrote that three of the five "have been referred to Sales Quality for research," and two "have been referred to Corporate Investigations and are currently being investigated".[225]

- In an October 29, 2013 email to Mr. Julian, Katie Hall (Dallas TX) wrote regarding "Accounting Irregularities – EthicsLine Report."[226] She wrote:

An anonymous Team Member reported that two customers (no names provided) received credit cards that they did not request. The anonymous Team Member included in the report that [D.G.] (Personal Banker in Pasadena, TX) is responsible and that [R.S.] (Community Banking District Manager) was made aware of the issue.[227]

---

[224] OCC Ex. 1586 at 1.

[225] Id.

[226] OCC Ex. 1587 at 1.

[227] Id.

Add. 786

Appellate Case: 25-1079    Page: 788    Date Filed: 05/16/2025 Entry ID: 5517644

- In a January 14, 2014 email to Mr. Julian, Katie Hall (Dallas TX) wrote regarding "Accounting Irregularities – EthicsLine Report."[228] She wrote:

  > [B.M.] (Phone aBanker in El Monte, CA) reported that a banker in Hockessin, DE (no name provided) opened accounts for a customer (no name provided) that the customer said he did not authorize or want.[229]

- In a March 3, 2014 email to Mr. Julian, Katie Hall (Dallas TX) wrote regarding "Accounting Irregularities – EthicsLine Report."[230] She wrote that an anonymous Team Member reported that a president in a Long Beach, New Jersey branch "'threatens' the Team and tells them they must hit 200% of their sales goal at any cost on a daily basis."[231]

  > The Team Member stated that bankers and tellers are required to stay late to make sales calls if they have not met their goal for the day. The Team Member indicated that they are treated like "garbage" and the situation makes him/her want to leave the company.[232]

Mr. Julian testified that none of these documents indicated to him that sales integrity violations and sales practices misconduct in the Community Bank were widespread and systemic.[233] In support of this response, Mr. Julian said these allegations had "not yet [been] substantiated" and that he subsequently learned that "80 percent . . . were found to be unfounded."[234] Without stating how he came to this conclusion, he stated that the six allegations were, in his view, "isolated incidences in the sense that each one was an individual allegation."[235]

### Ms. Russ Anderson's Roles and Responsibilities – as Group Risk Officer for Community Banking

Ms. Russ Anderson testified that she was the head of the Sales Quality team in Community Banking, and had been throughout the relevant period.[236] She also had responsibility for Community Banking's Bank Secrecy Act and Money Laundering (BSA/AML) team, which covered "all of the 6,000 branches and the money laundering opportunities that could happen in

---

[228] OCC Ex. 1589 at 1.

[229] Id.

[230] OCC Ex. 1590 at 1.

[231] Id.

[232] Id.

[233] Tr. (Julian) at 6148.

[234] Id.

[235] Id.

[236] Tr. (Russ Anderson) at 9269.

Appellate Case: 25-1079     Page: 789     Date Filed: 05/16/2025 Entry ID: 5517644

the stores or in the branches".[237] She also was "very focused on data management and information security."[238] She testified that the Internet "was one of our business lines, and so making sure we weren't getting third parties stealing data from the Bank or compromising customers' accounts was very important."[239]

Ms. Russ Anderson testified that she had responsibilities for working with the OCC and the CFPB, the latter of which was "a new regulator that I was dealing with and helping".[240] She also reported, "model risk management . . . took a big piece of time."[241] She added, "through the branch network, we sold just about every product that Wells Fargo had."[242]

Ms. Russ Anderson testified that as Group Risk Officer (GRO) for Community Banking, "I had to make sure that all of those products were appropriately designed and that the controls were appropriate, whether it was a credit card coming from one of the other business groups at Wells Fargo or a deposit account that was coming through one of the product groups under Community Banking."[243]

Ms. Russ Anderson identified performance reviews reflecting her responsibilities as Community Banking's GRO for the years 2013 through 2016.[244] Through this series of self-assessments, Ms. Russ Anderson described the role she played in the Bank's risk management. The reviews establish that Ms. Russ Anderson was "accountable to ensure effective and efficient risk management in the Community Banking lines of business and to support effective and efficient risk management in aggregate at the enterprise level."[245] They establish that Ms. Russ Anderson needed to "ensure that Community Banking is aware of, and adhering to, the OCC's Heightened Expectations (now known as Heightened Standards) Guidance as well as all other regulatory guidance that may be issued in our work to become "Strong" in our risk management practices."[246]

Ms. Russ Anderson testified that she agreed that during the relevant period, "operational risk" was defined as "all risks excluding credit and market, inclusive of risks we have traditionally viewed as basic business risks such new product and technology development, staffing incentives, execution risk, loss prevention and team member behavior (sales

---

[237] *Id.* at 9269.

[238] *Id.*

[239] *Id.* at 9269-70.

[240] *Id.* at 9270.

[241] *Id.*

[242] *Id.*

[243] *Id.*

[244] *Id.* at 9514; R. Ex. 5214 (2013); R. Ex. 7256 (2014); OCC Ex. 626 (2015); and R. Ex. 13780 (2016).

[245] R. Ex. 7256 at 1.

[246] *Id.*

quality/sales integrity, internal fraud, ethics violations, etc.)."[247] Ms. Russ Anderson testified that when employees engaged in sales practices misconduct during the relevant period, this posed operational risk, reputational risk, regulatory risk, and compliance risk for the Bank.[248]

Through the 2013 performance review, Ms. Russ Anderson reported that it was her responsibility to "[f]ocus on reputation management and keep the Community Banking lines of business out of trouble by identifying and mitigating key operating risks in the businesses."[249] She further identified her responsibility to "[b]uild a culture of accountability with strong controls that help ensure no material operational losses."[250]

One of the events that occurred during the 2013 performance year started with a May 9, 2013 letter sent anonymously [under the name "Mule"] to CEO John Stumpf and head of Community Banking, Ms. Tolstedt.[251] Once received, Ms. Tolstedt forwarded the emailed letter to Ms. Russ Anderson, and Ms. Russ Anderson forwarded it to Michael Bacon (for Corporate Security) and Cindy Walker (SVP – Manager, Sales Quality), with a request that both look at what had been sent.[252]

The letter from Mule reads as follows:

Good morning Mr. Stumpf,

I am a current Branch Manager in the North Ocean District in New Jersey. I have some serious concerns about the leadership in our market. There is a huge amount of unethical practices going on within the market. We are being coerced to open checking accounts so the market is at goal, when the branches are closed. I have emails printed out, showing the threats of being placed on corrective action and showing that we must put a DDA on the system and to call when we get it. Until then I assume, we would just keep working into the night? It is my understanding that we cannot open any DDAs without customers being present with signatures am [sic] funding. There are branches where bankers are falsifying Drivers Licenses for customers just to get an account. I could go on for hours with the knowledge and things I have seen.

It's amusing that the upper leadership within South Jersey cannot understand why the Sales Quality can't be brought under control, when they are the ones driving the train off the tracks. I do not know what direction to take anymore. I know of so many things going on in the market it's scary. There are

[247] Id. at 9520; R. Ex. 7256 at 1.

[248] Tr. (Russ Anderson) at 9520-22.

[249] Id. at 9536; R. Ex. 5214 at 3.

[250] R. Ex. 5214 at 3.

[251] Tr. (Russ Anderson) at 10118; OCC Ex. 261.

[252] OCC Ex. 261 at 4.

managers leaving for lunch and coming back drunk, and working at a car dealership during Wells Fargo time. Over time I have accumulated quite some evidence and reported it to the ethics line.

I am a proud employee of Wells Fargo. I put Wells before my family sometimes. However, I am questioning would Wells Fargo have my back? From what I see I do not believe so. I am looking into contacting the media to let customers be aware of the predatory sales practices. I believe that most of the employees will do the same if I spoke with them about it.

I respect Wells Fargo and yourself, Mr. Stumpf – make the change.[253]

Presented with this correspondence, Mr. Bacon wrote in response to Ms. Russ Anderson's email.[254] He reported, "We have had significant issues in this market, so not a total surprise. Cases are 2 to 1 compared to rest of the northeast and up 36% since same time period last year. We will research EthicsLine reports and we will send an email to the address to see if we can't get more specifics."[255]

When questioned during cross-examination about her reaction to this letter, Ms. Russ Anderson responded, "I didn't know what to think since this came from an unknown person, which is why I forwarded it up the chain to Michael Bacon and Cindy Walker to do some research."[256] She testified that she did, however, consider Mr. Bacon's information to be truthful.[257]

Elaborating, Ms. Russ Anderson testified:

As is shown in the rest of the email, there was a lot of work done around this particular complaint in addition to reaching back out through systems to speak to the Mule, who didn't provide any further information, never responded back to corporate investigations or the SSCOT team.[258]

Ms. Walker responded as well, suggesting:

Let's have Glen and Mike touch base to work out a game plan. We can start some research regarding pattern of EL allegations and analysis from the respective area. Mike can convey any additional detail he acquires from the letter writer – '<u>mule</u>' – interesting!

---

[253] OCC Ex. 261 at 5.

[254] *Id.* at 4.

[255] *Id.*

[256] Tr. (Russ Anderson) at 10120.

[257] *Id.* at 10121.

[258] *Id.* at 10122.

Add. 790

Appellate Case: 25-1079     Page: 792     Date Filed: 05/16/2025 Entry ID: 5517644

I am aware that we continue to have issues specific to the NJ footprint and in fact were in the process of partnering with Mike to discuss with Michelle Lee SQ and CI trends. Before we do that I would like to see what surfaces from the analysis relevant to this letter.[259]

After Ms. Russ Anderson expressed support for Ms. Walker's plan, a follow up message indicated that an investigator had spoken with Mule. Notwithstanding Ms. Russ Anderson's averment that she did not know what to think about the letter because it came from an unknown person, there is nothing in the record suggesting the correspondent was anything other than what he claimed to be – a Branch Manager in the North Ocean District in New Jersey. The investigator reported, however, that she did not receive such documentation from Mule.[260]

Glen Najvar, Project Management Manager, reported that Sales Quality "conducted a comprehensive overview of all 11 stores in the Northern Ocean District (S NJ Region), and data findings "yielded potential consent concerns in 6 of the 11 stores (products ranging from checking/savings, Debit Cards, Credit Cards, and Online Banking)."[261]

Further, the "initial review indicates that ~20 team members will require polling to be conducted" and "SQ will be escalating the preparation of the case file/polling and re-convene with Corporate Investigations to share findings once completed."[262] The record is silent, however, regarding any further steps taken by Ms. Russ Anderson to determine the root cause of the concerns presented by the Mule's letter to Mr. Stumpf.[263]

Regarding complaints from the Bank's customers, the 2013 Performance Review reported that Ms. Russ Anderson would "[e]volve compliance to address the quality of the customer experience, including a strong focus on prevention, strong front-end advice and guidance and operationally excellent business processes that encourage and support compliance, without compromising the effectiveness of traditional tools."[264]

The reviews established that effective and efficient risk management "also includes providing policy and program recommendations to the Chief Risk Officer and Enterprise Risk Group leaders and working with them to ensure that corporate policies and the requirements of corporate risk management programs are followed in the businesses (i.e., compliance, fair and responsible banking, complaint management, BSA/AML, information security, model risk, et

---

[259] OCC Ex. 261 at 4.

[260] *Id.* at 1.

[261] *Id.*.

[262] *Id.*

[263] See R. Ex. 5214, R. Ex. 7256.

[264] R. Ex. 5214 at 4.

al.)."[265] Ms. Russ Anderson testified that during the relevant period she viewed as critically important for her to execute her responsibilities in compliant with Bank policies.[266]

The reviews establish a series of deliverables on core enterprise risk commitments, including making sure that risk management systems "are aligned with the model risk management framework and policy", providing "credible challenge to the Community Banking lines of business" consistent with Wells Fargo's Vision and Values and risk appetite, collaborating with key stakeholders to "ensure that the appropriate parties are informed in a timely manner" on material issues, providing "timely and accurate opinions on the state of the risk", ensuring Community Banking lines of business "understand, appropriately manage, and meaningfully report on risk and issues", providing "insightful, actionable, timely analytics", and managing "risk/compliance initiatives to timely results that solve real business problems."[267] WF&S defined "credible challenge" as the "communication of an alternate view, opinion, or strategy developed through expertise and professional judgment to challenge business or enterprise strategies, policies, products, practices and controls."[268]

Ms. Russ Anderson testified that under the deliverables in her 2014 performance review, it was "a responsibility of mine and of all the people at Wells Fargo" to ensure the security of all customer information.[269] She agreed that when employees changed the customer email addresses and phone numbers in the Bank's records, that if done without customer consent it constituted a misuse of customer information, but "I don't know that I would have said that it seriously compromised it, but it compromised it, yes."[270]

Ms. Russ Anderson testified that each of these deliverables were important aspects of her job responsibilities as GRO, including ensuring transparency with the Enterprise Risk Management Committee (ERMC).[271] She qualified that testimony, however, by opining that her responsibilities arose only "[w]hen I was invited to present to them".[272] **Acting in furtherance of this opinion under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

The 2014 MBO included a requirement that Ms. Russ Anderson "[p]rioritize, attend and actively participate in key risk management meetings – including but not limited to Model Risk Executive Steering Committee, Monthly meetings with Mike Loughlin, CORC, and the weekly

---

[265] R. Ex. 7256 at 1.

[266] Tr. (Russ Anderson) at 9522.

[267] R. Ex. 7256 at 1.

[268] R. Ex. 11373 at 9.

[269] Tr. (Russ Anderson) at 9529.

[270] *Id.* at 9530; R. Ex. 7256 at 2.

[271] Tr. (Russ Anderson) at 9523.

[272] *Id.* at 9524.

operational risk management leadership meetings."[273] She testified that it was important for her to be transparent with ERMC and its members, but only those "who I had interaction with, but I didn't have interaction with the Committee unless invited."[274] The 2015 performance review included Ms. Russ Anderson's further representation that, without limitation, she "[e]nsured results" of corrective actions for MRAs and audit examines "were communicated to Chief Risk Officer, CBRM Management, Risk Management Committee Members, and executive team, via the monthly CB Risk Letter."[275]

Similarly, although she acknowledged that she had a responsibility to ensure transparency with the OCC, Ms. Russ Anderson qualified the responsibilities she had with the Bank's Board of Directors, opining that her responsibility for transparency with the Board was "[t]hrough my managers, yes. But not for me. I didn't meet with the Board."[276] Asked directly whether she believed that she – not her managers – was responsible for ensuring transparency with the Board, Ms. Russ Anderson replied: "Yes, if I were invited to the Board meeting."[277] **Acting in furtherance of these opinions under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Further, when asked if she believed that during the relevant period as GRO she was responsible for building a culture of accountability with strong controls to prevent sales practices misconduct – as set forth in the 2014 MBOs – Ms. Russ Anderson denied having that responsibility, answering "I don't believe you could prevent sales practices misconduct, so I would have to say no."[278] **Acting in furtherance of these opinions under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Ms. Russ Anderson then added to that answer, responding, "I believe it was my responsibility to build controls to prevent sales practices misconduct from occurring, but it's impossible to prevent all sales practices misconduct."[279]

Ms. Russ Anderson acknowledged that throughout the relevant period the Bank had to deliver products and services in compliance with laws and regulations.[280] She agreed that during the relevant period it was her responsibility to provide timely and accurate information to the

---

[273] R. Ex. 7256 at 10.

[274] Tr. (Russ Anderson) at 9524-25.

[275] OCC Ex. 626 at 6-7.

[276] Tr. (Russ Anderson) at 9525.

[277] *Id.*

[278] *Id.* at 9531.

[279] *Id.*

[280] *Id.* at 9515.

OCC about whether sales practices risk was adequately managed.[281] She agreed that it would have been a violation of laws and regulations for Bank employees to transfer customer funds or issue products and services to customers without their consent.[282]

Ms. Russ Anderson agreed that during the relevant period sales practices misconduct was a material issue for the Bank.[283] She testified, however, that during the relevant period she did not believe simulated funding was a type of fraud: "I didn't think of it in those terms."[284] Further, even during her testimony, when asked whether it was fraud for an employee to move customer funds without their consent, Ms. Russ Anderson responded, "I do not at this point in time."[285] She testified, however, that during the relevant period she believed an employee obtaining a customer's consent by making false and misleading representations violated laws and regulations.[286]

Although she agreed that ensuring effective and efficient risk management in the Community Bank with respect to sales practices misconduct was a critical aspect of her job during the relevant period, Ms. Russ Anderson testified that in relation to the amount of time she spent on each of these responsibilities, sales quality or sales practices misconduct "was not the top priority in 2013."[287] She testified that it "certainly was within the top five priorities, but depending on what other people's priorities were[, s]ometimes my priorities had to change to theirs."[288] She added that it "never went off my radar" and that throughout the relevant period they "were always up in the top five."[289]

Ms. Russ Anderson's 2015 performance review incorporated the material provisions of the two prior reviews, and required that she "[e]nsure issues management data is completed, accurate and timely. Root cause understood and solutions are sustainable. Repeat issues/finding will be scrutinized."[290] It included Ms. Russ Anderson's statement that "[e]fficient reporting routines create a foundation for evaluating performance, supporting business decisions, and satisfying external reporting requirements. Delivering quality unbiased information in a timely manner is an integral part of our successful Risk Management program."[291]

---

[281] *Id.* at 9529.

[282] *Id.* at 9516.

[283] *Id.* at 9526.

[284] *Id.* at 9516.

[285] *Id.* at 9518.

[286] *Id.*

[287] *Id.* at 9272, 9519.

[288] *Id.* at 9272.

[289] *Id.*

[290] *Id.* at 9537; OCC Ex. 626 at 5.

[291] OCC Ex. 626 at 6.

Ms. Russ Anderson testified that she agreed that throughout the relevant period it was important for her to timely inform the OCC, the ERMC (through its members), and Mr. Loughlin of existing problems in the Community Bank with respect to sales practices misconduct.[292] She denied, however, believing that sales practices misconduct continued to be a significant problems for the Bank from 2013 to 2016.[293]

Ms. Russ Anderson testified that she believed the failure on her part as GRO to timely disclose existing deficiencies in risk management in Community Banking with respect to sales practices misconduct could cause substantial harm to the Bank.[294] Further, she testified that if the "control was significant enough," the GRO's failure to timely disclose control breakdown with respect to sales practices misconduct could cause substantial harm to the Bank.[295]

Ms. Russ Anderson testified that she viewed it to be her responsibility to provide timely and accurate information to members of the ERMC about whether sales practices risk was adequately managed in the Community Bank, but opined that responsibility extended to the Committee only "if I was invited to the [ERMC] meeting.[296] She offered no authority to support this opinion. Similarly, Ms. Russ Anderson viewed her responsibility to provide timely and accurate information to the Board of Directors about whether sales practices risk was adequately managed "[o]nly if I were invited to the Board meeting."[297] **Acting in furtherance of these opinions under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Among the 2014 deliverables, Ms. Russ Anderson was responsible to "[k]eep Carrie Tolstedt, Mike Loughlin, Enterprise Risk Program Managers, and Business Heads aware of issues of concern."[298] Despite this, when asked, "From 2013 to 2016, did you consider it an important part of your job to accurately inform the Enterprise Risk Management Committee about whether incentive compensation plans in the Community Bank appropriately balanced risk and rewards, Ms. Russ Anderson answered, "I did not."[299] She testified that if she found those plans did not adequately balance risk and reward she "would have told Mike Loughlin, who was the head of the [ERMC]."[300] **Acting in furtherance of these opinions under the conditions**

---

[292] Tr. (Russ Anderson) at 9526-27.

[293] *Id.* at 9527.

[294] *Id.*

[295] *Id.* at 9527-28.

[296] *Id.* at 9528.

[297] *Id.*

[298] R. Ex. 7256 at 10.

[299] Tr. (Russ Anderson) at 9533-34.

[300] *Id.* at 9534.

Appellate Case: 25-1079     Page: 797     Date Filed: 05/16/2025 Entry ID: 5517644

**that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

In contrast to this testimony, Ms. Russ Anderson wrote in her 2016 review that she ensured results of corrective actions regarding MRAs "were communicated to Head of Community Banking, Wells Fargo Chief Risk Officer, CBRM Management, Risk Management Committee members, and executive team, via the monthly CB Risk Letter."[301]

Ms. Russ Anderson testified that she considered it an important part of her job to accurately inform the OCC about whether incentive compensation plans in the Community Bank appropriate balanced risk and reward, but only "if I felt that were true".[302] The 2014 review further reflected that it was her responsibility to "[u]nderstand the sales processes and incentive structures in Community Banking lines of business and the risk they present; provide credible challenge where appropriate to ensure we are not inadvertently incenting the wrong behavior."[303]

Among the 2016 self-identified deliverables, Ms. Russ Anderson included, "Establish sales practices to ensure principled sales behavior. Understand the risk and provide credible challenge as appropriate."[304] Further, she included, "[e]volve compliance to continuously improve the quality of the customer experience, while ensuring customer protection by establishing and enforcing effective front-end controls" and ensuring that "customer information security is a priority."[305] In describing collaborations, Ms. Russ Anderson reported, "Partner with [second line of defense], peer [group risk officer] organizations, business executives/partners, and WFAS to create a collaborative and effective Risk Management community. We will create and evaluate opportunities for program improvements and effectiveness across the enterprise, eliminating low value risk management processes without compromising prudent risk management."[306]

Through the 2016 review, Ms. Russ Anderson reported that she "[r]epresented Community Banking on various risk committees, including the Operational Risk Management Committee, the Information Risk Management Subcommittee, the Payments Risk Oversight Committee, the Information Security Risk Management Committee, the Identity & Access Management Oversight Group, the Cyber Defense Initiatives Update, the Data Loss Prevention Advisory Group, the Third Party Risk Council, the Business Process Risk Management Advisory Group, the Basel/CCAR Working Group, and the Technology Risk SLoD Update meetings."[307] She also reported meeting quarterly with OCC "to provide updates on trends and interested

---

[301] R. Ex. 13780 at 17.

[302] Tr. (Russ Anderson) at 9534.

[303] R. Ex. 7526 at 4.

[304] Tr. (Russ Anderson) at 9359; R. Ex. 13780 at 1.

[305] R. Ex. 13780 at 1.

[306] *Id.* at 7.

[307] *Id.* at 10.

projects", with WFAS "to discuss existing audits", and reported serving "as Community Banking liaison to the Corporate Risk Program Office to facilitate uniform and timely status updates regarding the activities required to comply with the Sales Practices MRA."[308]

### Complaint Management

Without specifying when the changes took place, Ms. Russ Anderson testified that her responsibilities differed from what they were before 2013 to what they became between 2013 and 2016.[309]

Ms. Russ Anderson testified that as GRO for Community Banking, about 100 team members reported to her in 2013, and that number increased to over 500 by the end of her tenure.[310] She described changes in her responsibilities between those years in these terms:

> Well, they changed in terms of what we've been talking about as the risks that became inherent in an organization the size of Wells Fargo, the risks that were needed to be managed went up with that. We were also working diligently on how to do complaint management better across the whole company. That just wasn't a Community Banking topic, but it was across the whole company. So getting complaints became a major work product. And so -- and like I said before, some of the other things, like the one that I would never have thought I would have had is model risk management. That became a very important topic.[311]

Ms. Russ Anderson testified that customer complaints "would have come in from the regulators or directly to Wells Fargo."[312] Asked whether the number of customer complaints had an influence on her determination that there was not a systemic sales practices problem, Ms. Russ Anderson testified:

> Absolutely, because customer complaints -- our customers are very good about complaining. Always have been. And should be. That's their right to tell you when you're not doing things correctly. And when we looked at the level of complaints we as an institution were getting and the corporate group for complaints compared those to what the CFPB was getting from other financial institutions, we were no better or worse. And I can hardly remember in my career when the OCC ombudsman's office was getting complaints that

---

[308] *Id.* at 11, 16.

[309] Tr. (Russ Anderson) at 9273.

[310] *Id.*

[311] *Id.* at 9273-74.

[312] *Id.* at 9388-89.

Add. 797

Appellate Case: 25-1079     Page: 799     Date Filed: 05/16/2025 Entry ID: 5517644

there were [near][313] to any. And then what was coming out of our executive office was minimal.[314]

***Risk Management***

Ms. Russ Anderson described "model risk management" in these terms:

> So, model risk management is you run models all over a financial institution. Just about anywhere. And you use models to determine what your overdraft activity might be and what the loss rates are in that. You run models on what kind of platform somebody's going to want on their phone. You run models -- financial models, those are the big models. And I had never been involved with model risk management, but one of our competitor banks had a fallout around models, and there was a real problem. So the regulators came to all the large banks and said, what's your model risk management process and policy. And people didn't really have a solid one, so we had to create one. And then I had to create testing around people's models to prove that the models were solid. So that was brand new. I had to hire a bunch of people to do that for me.[315]

The record reflects that risk management at Wells Fargo Bank, N.A., "is essential to achieving our vision and a key component of the culture" at the Bank.[316] The Bank's philosophy of risk management included the point that "no activity or person is beyond oversight and challenging our colleagues is something expected of us all."[317]

In early 2013, in preparation for a presentation she was to make before the Bank's Regional Banking leadership, Ms. Russ Anderson asked Jason MacDuff to provide feedback about an overview of the Bank's risk management philosophy.[318] Mr. MacDuff wrote that she might "review the consequences for inaction or 'turning a blind eye' – they're real as seen by actions taken against many competitors."[319]

Mr. MacDuff added:

> You might then close with your confidence in our team; we all want to do the right thing and sometimes our team members genuinely don't know or

---

[313] Corrected via 22-03-07 Respondents' Amended Revised Errata Days 9-38 at 76. Ordered via Second Supplemental Order Regarding Hearing Transcript Errata.

[314] Tr. (Russ Anderson) at 9389.

[315] *Id.* at 9274.

[316] OCC Ex. 50 at 4.

[317] *Id.*

[318] *Id.*.

[319] *Id.*

Add. 798

Appellate Case: 25-1079    Page: 800    Date Filed: 05/16/2025 Entry ID: 5517644

understand. If no one tells them otherwise, they may feel what they're doing is condoned. It's on all of us to ensure clarity, that the leaders we manage know their accountability for speaking up before punitive action may need to occur.[320]

**Ms. Russ Anderson's Roles and Responsibilities – Committee Membership**

The record is not clear whether all of Ms. Russ Anderson's committee memberships have been identified. When prompted to testify about the committees she sat on, she responded, "I'll give you a highlight because there were a lot of them. Wells Fargo liked committees."[321] Ms. Russ Anderson added that she "attended more than 90 percent" of all of the meetings of these committees.[322]

### *The Community Banking Risk Management Committee*

Ms. Russ Anderson testified that as Community Banking's Chief Risk Officer, she was Chair of the Community Banking Risk Management Committee (CBRMC).[323] Under the 2013 Charter, the purpose of the CBRMC was "to oversee the management of operational and compliance risks inherent in the Community Banking lines of business. This includes the development of appropriate risk identification, measurement and mitigation strategies and reporting, consistent with Wells Fargo's policies, processes and procedures."[324]

Effective January 2013, under its Charter the Committee's primary responsibility during the relevant period was to "understand Community Banking's operational risk profile and to work with management across Community Banking to ensure risks are managed effectively."[325]

Membership under the 2013 Charter included the head of Community Banking (Ms. Tolstedt), the Community Banking Group Risk Officer (Ms. Russ Anderson) as Chairperson, and eight other members – there was no mention of the presence of a representative from Wells Fargo Audit Services in this list of Committee members.[326]

Ms. Russ Anderson testified that in her role as Chair of the Community Banking RMC, it was her responsibility to inform members of the Committee about both systemic problems and control breakdowns in the Community Bank.[327] She testified that she considered the CBRMC an important committee at the Bank, but testified it was her responsibility to inform the Committee

---

[320] OCC Ex. 50 at 4.

[321] Tr. (Russ Anderson) at 9274-75.

[322] *Id.* at 9275.

[323] Tr. (Russ Anderson) at 9275, 9769; R. Ex. 5214 at 8; OCC Ex. 660 at 1.

[324] OCC Ex. 660 at 1.

[325] *Id.*

[326] *Id.* at 2.

[327] Tr. (Russ Anderson) at 9770.

Add. 799

Appellate Case: 25-1079     Page: 801     Date Filed: 05/16/2025  Entry ID: 5517644

about pervasive and widespread misconduct in the Community Bank only "[i]f I believed there was some".[328]

Under its 2013 Charter the Community Banking RMC was to meet quarterly "or as frequently as the Committee will deem necessary."[329] As GRO for Community Banking, Ms. Russ Anderson presided over meetings of the CBRMC, would establish the content of meeting agendas, would ensure that "responsibility is assigned for each initiative undertaken" by the RMC, and would ensure that the RMC "reviews and assesses the adequacy of the Community Banking RMC charter annually."[330]

Pursuant to its 2013 Charter, members of the Community Banking RMC were required to understand and evaluate "current emerging material risks", "examine trends", and "assess the strategic implications for business objectives and risk management practices."[331] Each member was required to "[w]eigh the relationship between risks; identify combinations of exposures that may change the operational risk portfolio and determine whether an appropriate balance exists between risks and rewards".[332] They also needed to review and evaluate "risk appetite metrics" and direct action "for metrics out of tolerance".[333]

Pursuant to its 2013 Charter, each member of the CBRMC was required to "[i]nitiate or direct the initiation of discussion, escalation or other measures with the appropriate person or forum about any current or emerging risk, trend, business practice or other business or environmental factors" and require that "corrective actions be taken to address any material breakdown of internal controls and assign monitoring responsibility through resolution."[334]

Pursuant to its 2013 Charter, each member of the RMC was required to oversee and approve "acceptance for high-risk activities, products and markets".[335] Member of the Committee "[s]erve as the ultimate approval authority for new high-risk products and material changes to existing products, as defined and required by Wells Fargo's policy."[336]

The Committee had the authority to establish, modify or eliminate Community Banking risk management programs as needed, "in collaboration with the corporate Operational Risk Group."[337] It was required to ensure that appropriate policies, procedures and processes "exist

---

[328] *Id.* at 9771.

[329] OCC Ex. 660 at 2.

[330] *Id.*

[331] *Id.* at 1.

[332] *Id.*

[333] *Id.*

[334] *Id.*

[335] *Id.*

[336] *Id.*

[337] *Id.*

Add. 800

Appellate Case: 25-1079     Page: 802     Date Filed: 05/16/2025 Entry ID: 5517644

for adequately identifying, measuring, managing and reporting risks across Community Banking", and review, validate, interpret and provide guidance to Community Banking business unit "regarding regulatory and operational risk requirements."[338]

Pursuant to the 2013 Charter:

> The scope of reviews and oversight would include, but not be limited to significant new strategies, vendors, business continuity planning, losses, major projects (including implementation and readiness assessment), risk self-assessments, key regulatory and legal issues, conflicts of interest, security, privacy and reputational risk."[339]

Nothing in the Charter limited these responsibilities to risks that were either systemic or widespread.

The 2013 Charter also required Committee members to review the status of previously identified risk management concerns and initiatives and "[i]nform, advise and educate the Community Banking leadership about risk management strategies, initiatives and related matters".[340]

Mr. McLinko identified the March 24, 2015 Community Banking Risk Management Committee Charter, and testified that he was a non-voting member of the Community Bank Risk Management Committee.[341] When asked during cross-examination whether as a member of the Committee he believed it was incumbent upon him to ensure that the Community Bank's risks were managed effectively, he responded that it was his responsibility to "understand the risk and ensure that Internal Audit . . . had the audit programs for that."[342]

Under the 2015 CBRMC Charter, the Committee is identified as a "risk governance committee the purpose of which is to oversee the management of Key Risk Types to which the Group is exposed, in particular: credit, compliance, operational, BSA/AML, model, strategic, emerging, reputational, and cross-functional risks."[343] The 2015 Charter provided that the Committee "shall serve as the primary management-level forum for the consideration of the highest priority risk issues resident in Community Banking."[344]

The 2015 Charter stated, "critically, the Committee shall support and assist Wells Fargo's Enterprise Risk Management Committee (ERMC) in carrying out its risk oversight

---

[338] *Id.*

[339] *Id.*

[340] *Id.*.

[341] Tr. (McLinko) at 8467, 8471; R. Ex. 11556.

[342] Tr. (McLinko) at 8471.

[343] R. Ex. 11556 at 1.

[344] *Id.*

Add. 801

responsibilities."[345] The CBRMC's primary responsibility "is to understand Community Banking's risk profile and to work with management across Community Banking to ensure risks are managed effectively."[346] The 2015 Charter provided that this included, "oversight of the development of appropriate risk identification, measurement and mitigation strategies and report, consistent with Wells Fargo's policies, processes, and procedures."[347]

The 2015 Charter expressly identified Mr. McLinko as Community Banking's Executive Audit Director, as a non-voting member of the Committee.[348] It identified Ms. Russ Anderson as Chair and a voting member, as Community Banking Group Risk Officer.[349] It identified Ms. Tolstedt as a voting member, as Head of Community Banking. It prohibited delegation of member participation "except for occasional instances when a member is unable to attend a meeting and an agenda item requires specific representation from the member's area."[350]

Under the 2015 Charter, issues that could be escalated to the Committee included but were not limited to:

- Triggers of Community Banking's risk appetite metric boundaries, as required
- Violations of Community Banking's risk management limits, as required
- Violations of Group-level policies, as required;
- Events likely to cause material adverse impact to customers, or to the Company's reputation or financial results, as required;
- Issues that are likely to be discussed with the Company's regulators as well as potentially new issues identified by the Company's supervisors (e.g., forthcoming/potential MRAs and MRIAs), as required; and
- Other matters that, based upon a reasonable manager's judgment, may adversely impact the Company.[351]

Nothing in this Charter limited issues to those that were known or thought to be widespread or systemic.

Under the 2015 Charter, the Committee "shall initiate or direct the initiation of discussion, escalation or other measures with the appropriate person or forum about any current or emerging risk, trend, business practice, or other business or environmental factors."[352]

---

[345] R. Ex. 11556 at 1.

[346] *Id.*

[347] *Id.*

[348] *Id.* at 4-5.

[349] *Id.* at 5.

[350] R. Ex. 11556 at 4.

[351] *Id.* at 2.

[352] *Id.*

Add. 802

Under the 2015 Charter, the Committee "shall require that corrective actions be taken to address any material breakdown of internal controls and assign monitoring responsibility through resolution."[353]

The Committee was required to "escalate matters that require decision-making from a more senior level of the Company to the Head of Community Banking, the Chief Risk Officer, and the relevant member of Corporate Risk, or to the ERMC as appropriate."[354] The Committee "may further escalate issues that require decision-making from a more senior level of the Company, at its discretion".[355]

For each escalated issue, the 2015 Charter provided that the Committee "shall have the authority to assess the degree to which the risk owner has identified, assessed, controlled, and mitigated the issue at hand" and "may require further actions to be taken by the risk owner and may require oversight of the issue by the Committee or a designated individual."[356] The 2015 Charter provided that the Committee may "[i]nform, advise, and educate the Community Banking leadership about risk management strategies, initiatives and related matters."[357]

The 2015 Charter provided that the Committee "shall aggregate and report regularly to the Head of Community Banking and the ERMC information that is sufficient to understand (a) the risk position of the Group, and (b) the performance of Community Banking's Group Risk Organization."[358] The 2015 Charter provided further that "periodic and/or ad hoc reports to the Committee on the risk types it oversees are provided by varying committees/forums and/or team members, each of which may escalate key issues and/or issue remediation plans to the Committee for its consideration and/or further escalation. Additional reporting or information on risk issues may be requested by voting members or the Chairperson as needed."[359]

### The Incentive Compensation Risk Committee

Ms. Russ Anderson testified that she was on the Incentive Compensation Risk Committee.[360] She testified that she was familiar with the incentive compensation risk management policy, and described the policy as one "that was written by the second line of defense for the Company on how the incentive compensation programs would run through the risk groups, through Legal, for credible challenge and for any alterations as needed."[361] She

---

[353] R. Ex. 11556 at 2.

[354] *Id.* at 3.

[355] *Id.* at 2.

[356] *Id.*

[357] *Id.*

[358] *Id.* at 3.

[359] *Id.*

[360] Tr. (Russ Anderson) at 9275.

[361] *Id.* at 9278.

testified that her responsibility was "to provide credible challenge to the process and to what the recommendations were."[362]

Without identifying which committee, if any, was involved (at this point in the record Ms. Russ Anderson referred to the Incentive Compensation Risk Committee, the Community Bank ICRM Steering Committee, and the ICRM Committee), Ms. Russ Anderson testified that as part of her responsibilities, she was involved with the approval of incentive compensation plans for the Bank during 2013 to 2016.[363]

Elaborating, Ms. Russ Anderson testified:

> Well, similar to what I was just speaking to, on the -- and it's not just the branch network. It was any of the -- any of the places that paid incentive, I would meet with the HR individuals. And in a couple of instances, the business manager, if they were a small enough group, and walk through all of their recommendations, push back where it was appropriate, have legal weigh in where it was appropriate. And then either get the answers I wanted or send them back for more information. And then ultimately, when satisfied, approve from a risk perspective that the balances were there.[364]

Ms. Russ Anderson was asked whether she ever provided Mr. Loughlin with independent assessments of the Bank's incentive compensation arrangements, and responded, "I did."[365]

It should be noted that this answer contradicts findings entered on July 20, 2021.[366] In the Statement of Material Fact (Russ Anderson) No. 95 presented in Enforcement Counsel's Summary Disposition Motion, Enforcement Counsel presented as a material and uncontroverted fact that Respondent Russ Anderson failed to provide to the Bank's Chief Risk Officer, Michael Loughlin, independent assessments of Community Bank's incentive compensation and whether it had the requisite balancing features as required by the Bank's own ICRM Policy.[367]

In her Opposition to the Motion, Ms. Russ Anderson responded that it was undisputed that she testified that she never directly addressed incentive compensation and balancing features, but disputed the claim generally because she "believed the balancing features were sufficient to disincent sales practices misconduct," citing prior her testimony, given on January 13, 2021, at 68:16-20.

That testimony was as follows:

---

[362] *Id.* at 9278.

[363] *Id.* at 9279.

[364] *Id.* at 9280.

[365] *Id.* at 9281.

[366] See Objection, Tr. (Russ Anderson) at 9280-81.

[367] MSD Ex. 290B (Loughlin Tr.) at 478:7-11; MSD Ex. 269 (NBE Candy Expert Report) at ¶ 61; MSD Ex. 266 (Russ Anderson Dep. Tr.) at 67:23-68:2.

Add. 804

Appellate Case: 25-1079     Page: 806     Date Filed: 05/16/2025 Entry ID: 5517644

Q: Do you believe it now, that incentive compensation plans in the community bank in retrospect did not adequately balance risk and reward?

A: The incentive compensation plans in the community bank were not designed for – and particularly I'll talk about it at the branch level -- were never designed for a banker or a teller to make a ton of money. So that was never -- I would -- I would never -- I never believed then, nor do I believe now that the incentive compensation plan would incent a person at the branch level to do -- to -- to commit incentive -- to commit sales practice misconduct.[368]

Based on this response, I found for the purposes of summary disposition, and continue to find, that Ms. Russ Anderson has presented an insufficient factual basis to establish a dispute on this factual question. Accordingly, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that preponderant substantial evidence establishes that she failed to provide to the Bank's Chief Risk Officer Michael Loughlin independent assessments of Community Bank's incentive compensation and whether it had the requisite balancing features as required by the Bank's own ICRM Policy. **Under the conditions that were present during the relevant period this constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Ms. Russ Anderson testified that throughout the relevant period she did not believe the incentive compensation plans needed to be adjusted.[369] She opined, "[t]here might have been tweaks during the course of the year that the line of business brought to us, but no material changes."[370]

During direct examination, Ms. Russ Anderson was asked whether there came a time when she believed sales goals should have been lowered.[371] Her answer was not responsive to the question asked. She testified:

In 2012, it became apparent in some of the data that we were seeing that the sales goals that had been set in 2011 for 2012 were not going to be attainable. At the time those goals were set, the implications of the Dodd-Frank and the overdraft fee changes, which totaled about $13.5 billion to Community Banking's revenue were unknown, and they had a very material effect on the financial plan and then [on][372] the goals also.[373]

---

[368] MSD Ex. 266 at 68:16-20.

[369] Tr. (Russ Anderson) at 9281.

[370] *Id.* at 9281-82.

[371] *Id.* at 9282.

[372] Via "22-03-07 Respondents' Amended Revised Errata Day 9-38" on page 75. Ordered by Second Supplemental Order.

[373] Tr. (Russ Anderson) at 9282.

The answer is wholly silent with respect to the 2013 to 2016 relevant period. Further, while through this the answer she opined that some of the data indicated goals that had been set "were not going to be attainable,"[374] the answer offered no evidence that Ms. Russ Anderson believed those goals should have been lowered.

Ms. Russ Anderson identified a brief email exchange dated September 11, 2015 between herself and Matthew Raphaelson, Head of Strategic Planning and Finance for the Community Banking Group.[375] In the first message, Mr. Raphaelson reported on being debriefed on the "Performance Management call this a.m."[376] Interpreting the perspective of an attendee on that call, Mr. Raphaelson said "it sounds like the RP's stance is: all the goals are bad [and] we just need to 'fix the goals' (whatever that means) and then all other issues including conduct risk largely go away and those that remain they know how to manage."[377]

In her response later that day, Ms. Russ Anderson wrote, "I was only able to attend part of the call due to a conflict but the part I was able to attend there certainly seemed to be controversy. I think the leadership team is looking for a new path forward but not sure they can articulate what that is."[378]

Ms. Russ Anderson testified that she understood the phone call under discussion was to talk about performance management, and that "within that call, we were talking about the [incentive compensation] plan and I think sales goals probably."[379] She testified that the controversy she referred to was that "the Regional Banking executives were frustrated and that . . . there seemed to be a mismatch between what Tyson was reporting to them and what they wanted to hear."[380] She added, "Regional Banking executives were very good about saying what was bad in their mind, but they were not ever very good about saying, here is how we should move forward."[381]

Ms. Russ Anderson denied that the document constituted an acknowledgement that the sales goals were bad, and disputed the testimony of Examiner Candy to the effect that the document showed Ms. Russ Anderson was reckless because, despite this knowledge, the goals remained unreasonable and Ms. Russ Anderson failed to take appropriate action.[382]

---

[374] *Id.* at 9282.

[375] *Id.* at 9400; OCC Ex. 1215U.

[376] OCC Ex. 1215U at 1.

[377] *Id.*

[378] *Id.*

[379] Tr. (Russ Anderson) at 9402-03.

[380] *Id.* at 9404.

[381] *Id.*

[382] *Id.* at 9405.

Appellate Case: 25-1079     Page: 808     Date Filed: 05/16/2025 Entry ID: 5517644

Elaborating, Ms. Russ Anderson testified that she did not think the sales goals were unreasonable,[383] and she disputed testimony from Examiner Candy to the effect that Ms. Russ Anderson never challenged sales goals.[384] Elaborating, Ms. Russ Anderson testified without offering any supporting documentation:

> I challenged the sales goals in all the appropriate settings, sometimes on [one-on-ones][385], sometimes in large group settings where we were with Carrie's leadership team talking about it. When it was appropriate and I was in a phone call or a one-on-one or in a large meeting, if it was controversial, if the sales goal -- because there's not just one sales goal, there's all the different products, if it appeared that there was controversy around it, I would voice my opinion.[386]

Ms. Russ Anderson recalled Examiner Candy testifying that she had reviewed thousands of documents in this case, and found that Ms. Russ Anderson never meaningfully challenged the sales goals.[387] In response to questioning by her Counsel during direct examination, Ms. Russ Anderson responded, "[f]rom emails, that's probably accurate."[388]

### The Fraud Risk Committee

Ms. Russ Anderson testified that she was on the Fraud Risk Committee.[389] She testified that it was her practice to review reporting she received on the Internal Fraud Committee, and opined that the Committee was a helpful and important committee.[390] She testified that, "broadly speaking," she understood that as a member of the Internal Fraud Committee she was charged with ensuring that internal fraud risks were appropriately managed in the Community Bank.[391]

As a Group Risk Officer, Ms. Russ Anderson had specific duties: "Group Risk Officers (GROs) and their delegates are responsible for opining on the adequacy of internal and external fraud risk management and providing credible challenge to the businesses they oversee."[392]

---

[383] *Id.* at 9406.

[384] *Id.*

[385] Via "22-03-07 Respondents' Amended Revised Errata Day 9-38" on page 76. Ordered by Second Supplemental Order.

[386] Tr. (Russ Anderson) at 9407.

[387] *Id.*

[388] *Id.*

[389] *Id.* at 9275.

[390] *Id.* at 9547-48.

[391] *Id.* at 9548.

[392] OCC Ex. 1272 (Fraud Risk Management Policy, August 1, 2013) at 7.

Mr. McLinko testified that he was a member of the Community Bank's Internal Fraud Committee.[393] With respect to his membership in the Committee, Mr. McLinko testified, "most of the senior leaders within Community Bank were there."[394] He testified that the Committee was established by the Corporate Investigations group in 2013 – so it was not a Committee of WFAS – and that it met twice a year and Mr. Bacon "led the meeting."[395]

Mr. McLinko identified the Corporate Fraud Risk Management Policy, dated August 1, 2013.[396] The Policy's stated purpose "is to promote accountability, measurability, partnership, and transparency of fraud risk management at Wells Fargo by setting the structure and expectations for business fraud risk management programs."[397] It identified those "particularly responsible for its implementation" to include "business, fraud, and operational risk managers at the business, group, and corporate levels."[398]

Under the Policy, "[e]ach Wells Fargo business is responsible for managing internal and externa fraud risk in a consistent and effective manner, in order to protect our customers, shareholders, and the company."[399] "Standards and requirements for the businesses" are set by Corporate Fraud Risk Management (CFRM), a part of Financial Crimes Risk Management (FRCM).[400] CFRM "monitors and oversees the management of these risks on a company-wide basis."[401]

The Policy reflected that Mr. McLinko had responsibilities both as a member of Community Banking's Internal Fraud Committee (IFC) and as an auditor in Wells Fargo Audit Services.[402] As a Business Internal Fraud Committee, the Policy directed members in Community Banking's IFC to "ensure that all stakeholders who share responsibility for internal fraud risk management receive appropriate reporting and have a forum to address broad team member misconduct matters. The IFC assists the GRO in addressing internal fraud matters specific to business practices and processes."[403] The Policy provides that IFCs "are accountable to the Team Member Misconduct Executive Committee (TMMEC)." CSI (Corporate Security

---

[393] Tr. (McLinko) at 8461.

[394] *Id.* at 7919.

[395] *Id.* at 7918-19.

[396] OCC Ex. 1272.

[397] *Id.* at 1.

[398] *Id.*

[399] *Id.*

[400] *Id.*

[401] *Id.*

[402] *Id.* at 5, 7.

[403] *Id.* at 5.

Add. 808

Appellate Case: 25-1079   Page: 810   Date Filed: 05/16/2025 Entry ID: 5517644

Investigations) "chairs each IFC, facilitates meetings held at least semi-annually, and provides the committee with Internal Fraud reporting."[404]

As a member of WFAS, Mr. McLinko had duties "in addition to general operational risk management roles and responsibilities".[405] The Policy provided that WFAS:

- Provides independent evaluation of the fraud controls that management has designed and implemented, including direct business controls
- Performs direct audits of business fraud programs and controls
- Communicates fraud-related audit findings to Corporate Fraud Risk Management
- Consults with Corporate Fraud Risk Management as necessary, during the annual audit planning cycle as well as during individual audits, regarding information that may address fraud risk or controls[406]

The Policy addressed "Escalation" in these terms:

Policy cannot account for every possible situation. To address situations not covered by policy, request a change to this policy or the related standards, or recommend and [sic] alternative practice, fraud managers contact the policy manager indicated on the last page of this document [Jim Richards, Chief Operational Risk Officer at Revision Date 8/1/2013]. The policy manager will work with the requesting business to address the business's needs and escalate the request as necessary.

The chief operational risk officer may approve policy changes or alternative implementation practices for certain businesses after consulting with senior executive business management, GROs and appropriate corporate and business subject matter experts. If needed, matters will be escalated to the Enterprise Risk Management Committee or Wells Fargo's Operating Committee for resolution.[407]

The Policy defined "Fraud" as "[a] deliberate misrepresentation which may cause another person or entity to suffer damages, usually monetary loss. Wells Fargo distinguishes between two major types of fraud: internal and external."[408] It defines "Misrepresentation" as "false or misleading representation or concealment of a fact"; it defines "True Name Fraud" as "fraud that occurs when an individual materially misrepresents his or her identity by using identifying

---

[404] Id.

[405] Id. at 7.

[406] Id.

[407] Id. at 8, 10.

[408] Id. at 8.

Add. 809

Appellate Case: 25-1079    Page: 811    Date Filed: 05/16/2025 Entry ID: 5517644

information that is the valid identity of another real individual"; and defines "Internal Fraud" thus:

> An event in which any suspected or known fraud operator is a team member or managed resources hired by Wells Fargo, who:
>
> - Commits misconduct meeting the definition of fraud, during the course of his or her employment
> - Is a customer who may have committed fraud
> - Colludes with a customer who may have committed fraud
> - Conducts, enables, or contributes to fraud[409]

### *Membership in other Risk-Management Committees*

Ms. Russ Anderson testified that she was on the Operational Risk Committee, the Regional Banking Risk Committee, the Risk Committee for each line of business in the Community Bank, the Regulatory Compliance Risk Management Committee, the Operational Risk Management Committee, the Bank Secrecy and Anti-Money Laundering Risk Committee, and the Sales Tracking Risk Steering Committee.[410]

### *The Evolving Model Steering Committee*

Ms. Russ Anderson testified that she was on the Evolving Model Steering Committee.[411] She said the evolving model "was a program process that was started up, Jason MacDuff ran it, but at Carrie's behest, where we were working on how do you evolve the Community Bank, and specifically the Regional Banking model."[412] She testified that this was one of "several things" she did to improve controls designed to detect and prevent sales integrity violations during the pause of proactive monitoring[413] (between November 2013 and July 2014). The evolving model "had started, so we were looking at, you know, what there were around controls that we could tighten up."[414]

Ms. Russ Anderson testified that while the initial concept for the evolving model came from Ms. Tolstedt, Matthew Raphaelson and Jason MacDuff, after she, Debra Patterson, and a Regional Banking executive, Laura Schulte were brought on board "the people who worked on it was vast" and included people from Corporate Risk, Legal, HR, and Community Banking – "all

---

[409] OCC Ex. 1272 at 9.

[410] Tr. (Russ Anderson) at 9275.

[411] *Id.*

[412] *Id.* at 9367.

[413] *Id.*

[414] *Id.*

of the Regional Banking executives would have been involved."[415] The Committee was to address potential loss of Bank revenue that was anticipated following the passage of the Dodd-Frank legislation.

Ms. Russ Anderson testified that the evolving model examined:

> [w]hat parts and pieces needed to change in the light of these - of the sales mispractice conducts we were seeing? What needed to change, because you, you know, were reducing sales goals? What needed to change because you lost $13.5 billion in revenue through Dodd-Frank and the overdraft changes. So it was really a compass about, you know, what in the Regional Banking world needed to be enhanced or changed or completely redone. And everything was open for conversations, whether it was banker positions, incentives, sales goals, the number of branches we were going to have to open. All of that was open for discussion.[416]

Ms. Russ Anderson testified that she and others had been on a mission to visit with three of the European Union banks located in London to "talk with them about the impacts of eliminating sales goals."[417] She stated that during this trip she learned, "elimination of sales goals . . . did not 100 percent do away with sales practices misconduct. That there were still sales practices misconduct going on."[418]

### The Community Bank ICRM Steering Committee

Although not mentioned during her initial testimony, through leading questioning by her Counsel during direct examination Ms. Russ Anderson testified that she was on the Community Bank ICRM steering committee.[419] She testified that the ICRM steering committee – consisting of "Debra Patterson, who was head of HR when it started, and then Tracy Kidd afterward, Matthew Raphaelson and myself" would meet once a year "when the business groups were developing their incentive programs."[420]

Ms. Russ Anderson testified that "during the course of the year" the Committee "would meet on an ad hoc basis if changes to any incentive program needed to be made."[421] She said the three of them "would meet with the incentive professionals and really walk through the programs

---

[415] *Id.* at 9368.

[416] *Id.* at 9367.

[417] *Id.* at 9399.

[418] *Id.*

[419] *Id.* at 9275-78.

[420] *Id.* at 9278-79.

[421] *Id.* at 9279.

Appellate Case: 25-1079     Page: 813     Date Filed: 05/16/2025 Entry ID: 5517644

that they were proposing and challenge their thought processes and, if necessary, send them back to do more analysis."[422]

Referring now to questions about the ICRM Committee meeting (possibly the ICRM Steering Committee or the Incentive Compensation Risk Committee[423]), Ms. Russ Anderson testified that the Committee was led by "the incentive comp HR personnel, which changed over time."[424]

Through leading questioning by her Counsel during direct examination, Ms. Russ Anderson testified that she provided credible challenge to ensure that risks related to the businesses' incentive compensation plan were balanced.[425] She offered no documentary evidence to support this assertion, and admitted that she never had a one-on-one conversation with Ms. Tolstedt indicating a need to modify sales goals in the Community Bank because the sale goals were causing employees to engage in sales practices misconduct.[426] She further admitted she never told Mr. Loughlin that the incentive compensation plans in the Community Bank did not adequately balance risk and reward.[427]

Testimony given by a witness during direct examination generally should not be based on leading questions. The test of a "leading question" is whether it suggests the answer desired by the examiner.[428] The examiner in this case was Attorney Douglas Kelley, Ms. Russ Anderson's Julian's trial counsel. The essential test of a leading question is whether it so suggests to the witness the specific tenor of the reply desired by counsel that such a reply is likely to be given irrespective of an actual memory; the evil to be avoided is that of supplying a false memory for the witness.[429]

There are three possible consequences of the leading question: (1) it can be very helpful in expediting the trial on matters that are indisputably preliminary or uncontested, or for refreshing memory or facilitating clear testimony from witnesses with language limitations; (2) it can amount to a minor and harmless violation of the prohibition against leading in that the answers elicited are not dispositive or otherwise critical; or (3) it can be unfair in that it supplies

---

[422] *Id.* at 9279.

[423] *Id.* at 9275.

[424] *Id.* at 9279.

[425] *Id.*

[426] *Id.* at 9628.

[427] *Id.*

[428] *U.S. v. Hansen,* 256 F. Supp. 2d 65 (D. Mass. 2003), aff'd, 434 F.3d 92, 69 Fed. R. Evid. Serv. 262 (1st Cir. 2006).

[429] *U. S. v. O'Brien*, 618 F.2d 1234, 5 Fed. R. Evid. Serv. 1236 (7th Cir. 1980).

Appellate Case: 25-1079    Page: 814    Date Filed: 05/16/2025 Entry ID: 5517644

the witness with dispositive or otherwise critical answers, and usurps the elements of credibility the jury should be entitled to assess.[430]

Given that the leading question here would have the witness assume she understood what "credible challenge" meant in this context and could recall instances where she engaged in such challenge under conditions relevant to the charges against Ms. Russ Anderson. Mr. Kelley's question supplied Ms. Russ Anderson with a dispositive and otherwise critical answer, and usurped the elements of credibility. There is little evidentiary substance to be gained by this form of questioning, yet it is a form repeatedly used, particularly with respect to the testimony of Ms. Russ Anderson by Mr. Kelley.

**Ms. Russ Anderson's failure to speak directly with Ms. Tolstedt indicating a need to modify sales goals in the Community Bank and her failure to tell Mr. Loughlin that the incentive compensation plans in the Community Bank did not adequately balance risk and reward constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Ms. Russ Anderson testified that as of 2013, she did not believe that sales goals in the Community Bank should be eliminated, and that the same was true in 2014; but that in 2015 "we were doing research as to whether or not it would make sense to start a pilot on . . . reducing or doing away sales goals".[431] Ms. Russ Anderson testified, however, that she did not have an opinion on doing away sales goals in either 2015 or 2016, and as a result never advocated for the elimination of sales goals.[432] **This conduct constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Ms. Russ Anderson testified that she considered that as the Group Risk Officer her responsibilities under the Bank's Incentive Compensation Risk Management policy to be important.[433] She denied, however, having the responsibility as GRO to advocate for wholesale or fundamental changes to the Community Bank's business model.[434] **Acting in furtherance of this opinion under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Ms. Russ Anderson testified that, based on conversations she had with regional executives, Tyson Pyles, and Michael Raphaelson, she believed that sales goals should be

---

[430] A Minnesota CLE Deskbook, Judge Gordon Shumaker (Ret.) Rulings on Evidence An Evidentiary Manual for Minnesota Trial Judges and Judicial Officers (and Attorneys!) 2013 last accessed on November 16, 2022 at https://blogpendleton.files.wordpress.com/2020/04/schmaker-on-evidence.pdf

[431] Tr. (Russ Anderson) at 9622.

[432] *Id.* at 9623-24.

[433] *Id.* at 9625.

[434] *Id.* at 9641-42.

Appellate Case: 25-1079    Page: 815    Date Filed: 05/16/2025 Entry ID: 5517644

lowered in 2013.[435] She testified that she did not know if the concerns raised by Mr. Pyles or Mr. Raphaelson were legitimate or not, but "that the leadership team was looking for a new path, but they didn't know how to get there."[436] She testified that she thought in 2013 that sales goals should be lowered – not because the goals were causing employees to engage in sales practices misconduct, but because employees "were not able to meet their sales goals."[437]

Ms. Russ Anderson testified that it was incumbent upon her to ensure that the modifications to the sales goals were sufficient to address the sales practices misconduct problem in the Community Bank.[438] Ms. Russ Anderson admitted, however, that she never told Mr. Loughlin that the incentive compensation plans in the Community Bank consisted of unreasonable goals, adding that this was because "I did not believe that to be true."[439] She testified that at no time from 2013 to 2016 did she believe that the sales goals in the Community Bank needed to be significantly reduced, and as a result, never advocated for significant reductions to the sales goals.[440] **Acting in furtherance of this opinion under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Ms. Russ Anderson acknowledged that as Group Risk Officer she would review for approval the Regional Bank's incentive compensation plans.[441] Ms. Russ Anderson identified a May 12, 2014 email chain among Ms. Tolstedt, Hope Hardison, Tim Sloan and John Shrewsberry describing "from a second line of defense and appropriate governance perspective" adjustments being made to the "sales plan and banker goals for the first six month[s]," adjusting "solutions plans down 3.7% on a full year but adjusted only for Q1 and Q2", leaving unchanged the incentive goals for tellers, service managers, or RBPBs "as performance in plan has remained very strong."[442] The email chain includes the statement that the plan changes had been reviewed and approved by Community Bank Compliance/Risk.[443]

---

[435] *Id.* at 9626.

[436] *Id.* at 9640; OCC Ex. 1215U. Similar concerns were presented in an undated memo regarding "2014 plan thoughts" by Robert W. Myers, who addressed debit cards, stating, "We need to sell 1.19 consumer debit cards for every CCDA in 2014. . . . We would need to open about 500,000 debit cards from our existing portfolio of DDAs yet we don't have that many HHs in West Coast without a debit card." OCC Ex. 1460. The memo has a hand-written notation that Lisa Stevens shared this memo with Ms. Russ Anderson on October 9, 2013, but Ms. Russ Anderson testified she had no recollection of either a discussion with Ms. Stevens or receipt of the memo. Tr. (Russ Anderson) at 9644-49.

[437] Tr. (Russ Anderson) at 9627.

[438] *Id.* at 9641-42.

[439] *Id.* at 9628

[440] *Id.* at 9629.

[441] *Id.* at 9633; OCC Ex. 1663.

[442] R. Ex. 17863 at 1.

[443] *Id.* at 2.

Appellate Case: 25-1079     Page: 816     Date Filed: 05/16/2025 Entry ID: 5517644

**Ms. Russ Anderson's Interaction with the OCC's Examiners**

Ms. Russ Anderson testified that in 2002 John Stumpf, who was then head of Wells Fargo's Community Bank, asked her to be his credit officer for the Community Bank.[444] She testified:

> One of the primary objectives he wanted me to work on was to rebuild the relationship with the OCC. There was a fissure between the OCC credit examiners and Community Banking. And so he asked me if I would work on that relationship, because obviously it was a very important one. And so I spent about a year and a half on that and was successful in rebuilding the trust between the OCC and Wells Fargo.[445]

Ms. Russ Anderson testified that as Group Risk Officer for Community Banking she "had the heightened expectations work with the OCC, which really consumed a lot of our activities as a SIFI [systemically important financial institution] now. There were just a lot more things that needed reporting."[446] She noted that when she referred to heightened expectations, she was referring to the Dodd-Frank legislation that "came out of the financial crisis, the big impact on Community Bank had to do with the transfer fees through the debit cards."[447]

Elaborating, she testified:

> At the time of the financial crisis, the Federal Reserve designated certain financial institutions as systemically important financial institutions, so that if they failed, it would significantly harm the economy of the United States of America. And so Wells Fargo, with the integration of Wachovia, became a systemically important financial institution. So there was a lot more reporting that went along with that around risk management, risk appetite, you know, what kind of appetite for these risks did you have. And those all started at the group risk officer level with our business groups and then rolled up through to Mike Loughlin and the Board for reporting, and to the regulators, obviously.[448]

Ms. Russ Anderson testified that during the relevant period she would meet with the Examiner-in-Charge and the senior OCC staff once a month, namely with OCC Examiners Chris

---

[444] *Id.* at 9263.

[445] *Id.* at 9263-64.

[446] *Id.* at 9270.

[447] *Id.* at 9271.

[448] *Id.* at 9272.

Appellate Case: 25-1079    Page: 817    Date Filed: 05/16/2025 Entry ID: 5517644

Moses, Jennifer Crosthwaite, Scott Wilson, [Dianne][449] Sirek, and "whoever the EIC was".[450] She testified that during these meetings she would reach out and ask "for a list of items that they wished to speak about, and then I would have two or three on my agenda of things that were going on in my group and . . . what new activities were we doing, what findings we might be having in . . . really any areas."[451]

 Ms. Russ Anderson testified that she met with OCC examiners monthly from January 2013 to 2015, and then "not quite as often" in 2016, adding that some meetings included "the CFPB and the Fed".[452] During cross-examination, Ms. Russ Anderson agreed that she was always in a position to answer questions and could provide information in advance of and during her meetings with the OCC (unless they had a question during a meeting "and I had to go back and get information for them").[453] When asked if she had ample opportunity to inform OCC examiners about information known to her related to sales practices misconduct in the Community Bank, Ms. Russ Anderson responded, "[i]f it was material, yes."[454] She agreed that she was obligated to be both truthful and transparent with the OCC, and that she could not provide misleading information to the OCC.[455]

 Ms. Russ Anderson testified that in addition, "Carrie Tolstedt and I met with the senior folks once a quarter where Carrie would talk about financials and other activities that were going on in the Community Bank plus whatever they would bring to our discussions."[456] She denied, however, receiving any feedback during the relevant period from the OCC regarding sales practices misconduct during these meetings.[457]

 Ms. Russ Anderson acknowledged that if throughout the relevant period she failed to provide transparent information to the OCC about sales practices misconduct in the Community Bank, or failed to provide complete information about the extent of sales pressure in the regional branches or the adequacy of controls to prevent or detect such misconduct, that would hinder the OCC's visibility into the sales practices misconduct problem and hinder its ability to accurately determine whether the Bank was complying with laws and regulations.[458]

---

[449] Via "22-03-07 Respondents' Amended Revised Errata Day 9-38" on page 75. Ordered by Second Supplemental Order.

[450] Tr. (Russ Anderson) at 9276.

[451] *Id.* at 9276-77.

[452] *Id.* at 9772-73.

[453] *Id.* at 9773.

[454] *Id.*

[455] *Id.* at 9773-74.

[456] *Id.* at 9277.

[457] *Id.*

[458] *Id.* at 9775-78.

Appellate Case: 25-1079 Page: 818 Date Filed: 05/16/2025 Entry ID: 5517644

When asked during cross-examination whether failing to provide complete information to the OCC about the volume of terminations for sales practice misconduct would hinder the OCC's visibility into the sales practices misconduct problem and hinder its ability to accurately determine whether the Bank was complying with laws and regulations, Ms. Russ Anderson responded, "I believe the OCC knew that information, so I don't know . . . that I could have hindered it since they knew the information."[459] **Acting in furtherance of this opinion under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Ms. Russ Anderson denied trying to keep information away from the OCC.[460] During cross-examination Ms. Russ Anderson was presented with an email chain between herself and Jannien Weiner from November 2013.[461] In the initial exchange, the OCC through Tai Nguyen presented to Ms. Weiner a "[l]ist of Community Bank UDAP items for follow up during 2014."[462] Ms. Weiner then forwarded the list to Ms. Russ Anderson and Jay Christoff, reporting that this "looks like the list they plan on monitoring/following in 2014", adding that "Tai asked for a quarterly call to address these UDAP [unfair or deceptive acts and practices] items."[463]

There were fourteen bulleted items in Mr. Nguyen's list.[464] Mr. Nguyen stated that during "our Community Bank UDAP examination this year, we obtained a high-level understanding of key components of Community Banking UDAP compliance program" and in the quarterly updates in 2014, sought "to know the level of coordination between Community Bank and the Office of Fair Lending and Responsible Banking of Regulatory Risk Management and any enhancements to the program to allow us to assess the effectiveness of the program."[465]

Two of the bulleted items were "Community Bank cross sell program" and "Retail Banking sales program".[466] An email exchange followed determining when a meeting could be scheduled and who should participate, with Ms. Weiner writing, "I'd like to run through the list with the 'owners' before the meeting so you feel 'prepped'".[467] In response later on November 20, 2013, Ms. Russ Anderson wrote to Ms. Weiner and Mr. Christoff, "Ok – but I would like to

---

[459] *Id.* at 9778.

[460] *Id.* at 9779.

[461] *Id.* at 9780; OCC Ex. 93.

[462] OCC Ex. 93 at 5.

[463] *Id.* at 4.

[464] *Id.*

[465] *Id.*

[466] *Id.*

[467] *Id.* at 1.

Add. 817

Appellate Case: 25-1079     Page: 819     Date Filed: 05/16/2025 Entry ID: 5517644

talk with you two first, as I am not on board with some of his requests/terminology – like the cross sell one . . . and the 'sales program' one."[468]

Ms. Russ Anderson denied this exchange showed that she was concerned with the OCC's requests specific to the cross-sell program and the sales program.[469] She testified that what she said was "I was not on board with it, because cross-sell meant I needed to bring in other partners. My team could not talk about that. And the same with the sales program. I would have needed to bring in other partners outside of my risk group to talk about that."[470]

## Ms. Russ Anderson's Relationship with WF&C's Legal Department – Applying the Attorney-Client Privilege

Throughout the administrative hearing, questions arose regarding the need to restrict public access to communication between Community Banking leaders, including Ms. Russ Anderson, and the Wells Fargo & Company Legal Department.[471] One such question was presented during Ms. Russ Anderson's testimony.[472]

During her testimony, Ms. Russ Anderson identified an email chain that began on November 6, 2013 with a message sent by Christine Meuers, an attorney with WF&C's Legal Department, to Michael Bacon, head of Corporate Security, with a copy to Laura Hurley, Hope Hardison (for HR), and Deanna Lindquist and David Otsuka (both of Legal).[473]

In her testimony, Ms. Russ Anderson identified the email chain in connection with a question presented to her by her Counsel during direct examination.[474] The question was whether anyone outside of SSCOT reviewed the thresholds that were put in place during 2013 to 2016, and Ms. Russ Anderson responded that the thresholds were reviewed by the Legal Department as "a stakeholder in terms of setting the thresholds", along with HR, the Deposit Product Groups, and Corporate Investigations, and supported that testimony by presenting the email as evidence.[475]

During the hearing on January 3, 2022, a representative from WF&C, Patrick Kelley, asserted two things regarding the email chain: first, that the Bank "does consider this privileged,"

---

[468] OCC Ex. 93 at 1.

[469] Tr. (Russ Anderson) at 9781.

[470] *Id.* at 9781-82.

[471] See, *e.g.*, application by Patrick Kelley on behalf of Wells Fargo & Company to close to the public the evidentiary hearing conducted on January 3, 2022 upon Respondent Russ Anderson's discussion of OCC Exhibit 1362.

[472] Tr. (Russ Anderson) at 9306-07.

[473] OCC Ex. 1362 at 1-2.

[474] Tr. (Russ Anderson) at 9306-07.

[475] *Id.* at 9308.

Appellate Case: 25-1079     Page: 820     Date Filed: 05/16/2025 Entry ID: 5517644

and sought to confirm that the document would not be shown publicly during the hearing.[476] After this was confirmed to be the case, Mr. Kelley requested, "that the session be closed for testimony about the privileged document."[477] That request was denied.[478]

The reason for denying Mr. Kelley's request to close the hearing based on the Bank's claim of attorney/client privilege is that the email exchange between Ms. Meuers and Mr. Bacon did not contain information protected by the attorney/client privilege (ACP).

Not all communication between a corporate attorney like Ms. Meuers and a corporate employee like Mr. Bacon qualifies for protection under the ACP. Broadly, the attorney-client privilege protects "confidential communication[s] between attorney and client . . . made for the purpose of obtaining or providing legal advice."[479]

In so doing, it "covers both (i) those communications in which an attorney gives legal advice; and (ii) those communications in which the client informs the attorney of facts that the attorney needs to understand the problem and provide legal advice."[480]

An example illustrates the point: In an exchange of email messages between Ms. Russ Anderson's subordinates working at the Community Bank's Sales and Service Conduct Oversight Team [SSCOT], a banker wrote directly to CEO John Stumpf in 2016, raising concerns about "unreasonable performance expectations."[481] The "Agency Referred Complaint," or ARC, was routed first to Wells Fargo Virtual Channels to Corporate Employee Relations, was sent from there to Corporate HR – Enterprise Employee Relations, and went from there to Community Banking Sales and Service Conduct Oversight.[482]

Throughout the chain, there is no suggestion that the contents were subject to the attorney-client privilege, and nothing in the text suggested the ACP applied.[483] At the final stage in the chain, Rebecca Rawson for SSCOT forwarded the conclusions to Ms. Russ Anderson, and to David Otsuka, "copying you as to place under ACP."[484] Nothing in the exchange suggested Ms. Rawson was responding to or seeking legal advice.

---

[476] Tr. (Russ Anderson) at 9307.

[477] *Id.*

[478] *Id.*

[479] *FTC v. Boehringer Ingelheim Pharm., Inc.*, 892 F.3d 1264, 1267 (D.C. Cir. 2018) ("*Boehringer II*").

[480] *Id.*

[481] OCC Ex. 111 at 6.

[482] *Id.* at 2-7.

[483] *Id.* at 1-7.

[484] *Id.* at 1.

Appellate Case: 25-1079    Page: 821    Date Filed: 05/16/2025 Entry ID: 5517644

The purpose of the privilege is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice."[485]

In the corporate context such as with the Bank, "[t]he attorney-client privilege covers . . . communications between an attorney and . . . any corporate employee acting at the direction of corporate superiors in order to secure legal advice for the corporation."[486]

The "attorney" for this purpose may be either in-house counsel or outside counsel.[487] Similarly, with respect to the federal government, "the 'client' may be the agency and the attorney may be an agency lawyer."[488] In either case, "the privilege protects only those disclosures necessary to obtain [or provide] informed legal advice which might not have been made absent the privilege."[489]

Not all substantive communications with attorneys are protected by the attorney-client privilege.[490] "[C]onsultation with one admitted to the bar but not in that other person's role as a lawyer is not protected."[491] An attorney's "advice on political, strategic, or policy issues," for example, "would not be shielded from disclosure."[492] "[O]rdinary business communications between non-attorneys with an attorney or attorneys as additional recipients" are likewise not privileged.[493]

"Parties, including corporations, may not shield otherwise discoverable documents from disclosure by including an attorney on a distribution list."[494] Furthermore, if a communication with an attorney has both a business purpose and a legal purpose, the court must "determine

---

[485] *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998) (internal quotation marks and citation omitted).

[486] *EEOC v. George Wash. Univ.*, 502 F. Supp. 3d 62, 020 WL 6504573, at *79 (D.D.C. Nov. 5, 2020) (internal quotation marks and citation omitted).

[487] *Boehringer II*, 892 F.3d at 1267.

[488] *Tax Analysts v. IRS*, 117 F.3d 607, 618 (D.C. Cir. 1997).

[489] *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 862 (D.C. Cir. 1980) (quoting *Fisher v. United States*, 425 U.S. 391, 403 (1976)).

[490] *See EEOC v. BDO USA, LLP*, 876 F.3d 690, 696 (5th Cir. 2017) ("There is no presumption that a company's communications with counsel are privileged.").

[491] *Center for Public Integrity v. Dep't of Defense*, 486 F. Supp. 3d 317, 341 (D.D.C. 2020) (quoting *In re Lindsey*, 148 F.3d 1100, 1106 (D.C. Cir. 1998) (per curiam).

[492] *Id.* (quoting *In re Lindsey*, 148 F.3d at 1106). See, *e.g.*, Tr. (Russ Anderson) at 9312-14 and R. Ex. 4840 (regarding discussion of termination thresholds).

[493] *United States ex. rel. Barko v. Halliburton Co.*, 74 F. Supp. 3d 183, 189 (D.D.C. 2014) (no protection where "attorneys were merely incidental recipients of communications made for ordinary business purposes").

[494] *Id.* at 188.

Appellate Case: 25-1079     Page: 822     Date Filed: 05/16/2025 Entry ID: 5517644

whether obtaining or providing legal advice was *one of* the significant purposes of the attorney-client communication."[495] If not, the communication is not privileged.[496]

As noted above, Ms. Russ Anderson presented the email chain in support of her testimony that she was not alone in considering the thresholds that would be appropriate in identifying "egregious potential simulated funding activity."[497] The initial email in this chain was sent by Ms. Meuers to Mr. Bacon (of Corporate Investigations) with copies to Laura Hurley and Hope Hardison.[498]

Ms. Meuers begins by reporting to Mr. Bacon that she met with "Pat, Hope, and Laura . . . to discuss the LA/OC situation and how these issues can be managed more centrally going forward given the regulatory and reputation risks."[499] Nothing in this suggests providing legal advice was a purpose of the communication. Any ambiguity about the purpose of the communication was eliminated when it became clear that Ms. Meuers was offering advice on political, strategic, or policy issues rather than offering or responding to a request for legal advice.

She wrote:

> You currently have the sales integrity investigation pending throughout the LA/OC (Phase 2), now expanded to the rest of the footprint for egregious potential simulated funding activity. These are all part of the business process that is driven by Claudia's Sales Quality team and referred to your CI team for investigation. The criteria Claudia's team has been using (*e.g.,* egregious filter for simulated funding) should continue to be used and the criteria or thresholds should not change – I understand that you all agreed to this yesterday morning in your call.
>
> A "core team" of you, Chris G., David O., Crystal, Lupe, Debra, Glen, Tanya and Claudia will be meeting weekly to monitor investigative process, discuss findings and communicate to appropriate stakeholders. We would like this core team to also cover and review any sales integrity issues that may arise outside of Claudia's team's process and are being handled by CI. For example, we are aware that unrelated investigations have surfaced in IA, NE and NJ.

---

[495] *Boehringer II*, 892 F.3d at 1268 (internal quotation marks and citation omitted) (emphasis in original).

[496] See Order Regarding Respondents' Motions for Orders to Seal Submissions Filed In Opposition To Enforcement Counsel's Motions for Summary Disposition, issued May 10, 2021, at 14-16 and citations to authorities therein.

[497] OCC Ex. 1362 at 1.

[498] *Id.*

[499] *Id.*

As you work through these cases, in order to ensure appropriate escalation and transparency, Pat and Hope have asked that Laura Hurley and I be looped in for final approval as major milestones are met (e.g., <u>any recommendations to terminate **more than one TM in a store**</u>, to expand investigation scope, to change criteria or the like). This way we will be able to address press impact and other enterprise implications.

Give me or Hope a call if you'd like to discuss further. Thanks, Christine.[500]

The second email link in this chain redoubled the showing that the exchange was not seeking or providing legal advice, where Ms. Meuers wrote to Mr. Bacon, "Michael, due to some confusion as to the minimum thresholds here, please see correction in e-mail below. We will want the matter escalated if there is a recommendation to terminate more than one TM in a store."[501]

After examining the email exchange between Ms. Meuers and Mr. Bacon, I determined that through this exchange Ms. Meuers provided advice on political, strategic, or policy issues, and that obtaining or providing legal advice was not one of the significant purposes of the exchange. That determination was the basis for denying the Bank's request to close the session to the public.

**Publication of the LA Times Articles in 2013**

In an email chain that began on October 3 and ended on October 4, 2013, Mr. Bacon alerted Ms. Russ Anderson and others that the L.A. Times had published an article (providing a copy of the same, dated October 3, 2013 by E. Scott Reckard) about Wells Fargo's termination of the employment of about 30 branch employees in the L.A. area "who tried to meet sales goals by opening accounts that were never used."[502]

The October 3, 2013 article quoted a Bank representative, Gary Kishner, as stating "We found a breakdown in a small number of our team members" who were "trying to take shortcuts to make sales goals".[503] "One of the fired employees said that in some cases signatures were forged and customers had accounts opened in their names without their knowledge."[504] "The employee, who spoke to The Times on condition of anonymity pending a meeting with an attorney, said the pressure to meet sales goals was intense at Wells Fargo. At times, managers required workers to stay late calling their friends and family members if they failed to open enough accounts during the day."[505]

---

[500] OCC Ex. 1362 at 1-2, emphasis *sic*.

[501] *Id.* at 1.

[502] R. Ex. 330 at 2.

[503] *Id.* at 3.

[504] *Id.*

[505] *Id.*

Appellate Case: 25-1079    Page: 824    Date Filed: 05/16/2025 Entry ID: 5517644

In her response to Mr. Bacon's initial email, Respondent Russ Anderson asked Mr. Bacon to "give me some context. I wasn't aware of this situation."[506] In responding to Ms. Russ Anderson, Mr. Bacon wrote:

> I am shocked that this is already out. I thought terms would occur today or next week. This is an interesting one – it started with RP running some reports with SQ and identifying they had a regional issue with simulated funding then it expanded into more. I believe they detected that TMs were falsifying the customers [sic] preferences, primarily putting in false phone numbers do [sic] they couldn't be contacted by [G]allop. I will get you more details shortly.[507]

In his forwarding of the email chain on October 4, 2013, Mr. Bacon wrote, "FYI only – big deal and very interesting article at bottom of chain."[508]

Within the email chain, Mr. Bacon wrote to Justin Richards, with copies to Patrick Russ and Bart Deese, writing that a Team Member "went to media during the investigation."[509] Mr. Bacon advised Mr. Richards to "keep this on the radar, since what we found in LA may be found elsewhere, so at some point we will be asking SQ to review other regions."[510] As Mr. Bacon noted, nothing about the article established that the issues presented by the reporting were limited to the Los Angeles or Orange County, California branches.

Ms. Russ Anderson testified that she learned about the October 3, 2013 article when it came out.[511] She described the L.A. Times articles as "terrible for the Bank".[512] She testified that the articles "outlined practices that were contrary to the Values and the Vision of the Bank, that the core of Wells Fargo was the customer. Everything that Wells Fargo did was for the customer, and those articles were completely contrary to that vision and that value that I had been part of for more than 30 years."[513]

Asked about her reaction to first article, she responded:

> Well, first I was surprised because I didn't know that the terminations had happened. Corporate Investigations and HR hadn't circled back with my team or anyone. But, secondly, I was very surprised at the allegations in the article

---

[506] R. Ex. 330 at 2.

[507] *Id.* at 1.

[508] *Id.*

[509] *Id.*

[510] *Id.*

[511] Tr. (Russ Anderson) at 9253.

[512] *Id.* at 9257.

[513] *Id.* at 9257-58.

about undue pressure from management in the local branches on some of the team members.[514]

Asked what influence the articles had on her plans to prevent and detect sales practices misconduct, Ms. Russ Anderson stated she "wanted to double down on it", wanted to "move faster and expand across the footprint with the pilot so that we could see if this was something that was only in the L.A. area", and if "it was that predominant across the footprint, what did we need to do to figure out why people were doing it . . . what was causing bankers to have that behavior."[515] Not included in her response was any indication that she would be providing credible challenge to whatever risk management controls were in place in the Community Bank regarding sales practices misconduct.

**The October 9, 2013 Significant Investigations Notification**

The record includes a copy of a Significant Investigation Notification (SIN) dated October 9, 2013, from Corporate Investigations to Ms. Russ Anderson and others.[516] Mr. Julian described these as a formal notification that WF&C's Corporate Investigations unit would use "to notify internally certain specific management of potential issues that they were investigating or had investigated."[517] He identified the SIN dated October 9, 2013 regarding a September 13, 2013 receipt by CI of an email referral from Sales Quality regarding allegations of "25 Team Members from various AU's located in Southern CA for possible Simulated Funding" and noting that further research "was conducted by Sales Quality that was requested by Regional President John Sotoodeh which identified 177 bankers for possible Simulated Funding at various AUs mostly in the San Fernando Valley."[518]

The report included the allegations that "Simulated Funding falsified entries were made to meet individual and store sales goals" and "[p]hone number changes were made to avoid a negative rating from Gallup poll surveys."[519] Upon conducting 35 interviews the report found that "most confessed" to Simulated Funding and knew "their actions were against WFB policy" and occurred "to meet quarterly sales goals."[520]

The report noted:

> A high number on phone number and preference changes were also
> identified by Sales Quality and additional research was requested by the
> LOB. Initial research discovered 9 stores that had over 100 telephone

---

[514] *Id.* at 9253-54.

[515] *Id.* at 9254.

[516] R. Ex. 866.

[517] Tr. (Julian) at 6259.

[518] R. Ex. 866 at 1.

[519] *Id.* at 2.

[520] *Id.* at 2.

Add. 824

Appellate Case: 25-1079    Page: 826    Date Filed: 05/16/2025 Entry ID: 5517644

number changes for May-July. One store was identified to have over 1,000 phone number changes.[521]

Further, the report stated the team member were "[f]ollowing manager and/or prior manager's guidance", that they "learned from observing/talking to other team members", that they "had customer's [*sic*] fund accounts with a $50 deposit and then withdraw from atm", and that they attempted to "contact customer with unfunded accounts but would resort to auto transfers w/o customer consent to meet goals timely".[522]

Investigators found that most of the interviewees confessed to changing phone numbers and preference changes to avoid negative surveys, and that they had "[d]eveloped a signal to alert management on a possible negative customer experience", and "[p]osted stickies on monitors with customer's name/account number [and at the] [e]nd of [the] day management would collect stickies and change digits on phone number," with an average of 15-40 per day, and with new tellers being "coached to explain, if asked" (noting there was a "large population of agricultural workers that change phone numbers often").[523]

Findings reported in the SIN included that "Management instructed them that it was acceptable", "[t]here was a big emphasis on obtaining perfect scores", "one bad score out of the five categories equaled a bad survey and he felt he would lose his job", "[n]ot obtaining perfect scores would mess with everyone's bonuses and recognition", "co-workers would know if someone received a bad score and would say things like you're messing with my money", members would "chang[e] the numbers trying to protect the branch", and "[b]ad surveys equal a manager talking to you and sending you to training".[524] One team member reported that he knew the conduct was wrong "but did not report it because he knew it would not be confidential."[525] Elaborating, the team member "explained that he reported policy issues to MSC who informed the branch that he reported issues [and] he felt betrayed and his trust was taken for granted."[526] The investigators emphasized, "we are now seeing a **pattern of denials despite the significant facts**".[527]

The investigation identified two store managers and one district manager as being implicated by the team members who were interviewed.[528]

---

[521] *Id.* at 2.

[522] *Id.* at 3.

[523] *Id.*

[524] *Id.* at 4.

[525] *Id.* at 5.

[526] *Id.*

[527] *Id.* (emphasis *sic*).

[528] *Id.* at 4.

The record includes a copy of an October 9, 2013 email chain among Ken Zimmerman, Carrie Tolstedt, and Claudia Russ Anderson, stating that during "our normal brainstorming about top/emerging risks" Chief Auditor "Julian raised the LA/OC issue and concerns about sales practices."[529] Ms. Tolstedt's email response was brief: "Why in the world does someone not come to me directly. Really upsets me that they talk around me but do not come directly to me. It has to stop. Thanks, Ken."[530] But when Mr. Zimmerman responded by saying there was "nothing accusatory in the discussion" and explained that the "nature of the [ERMC] process is that folks are supposed to bring up things that we should keep an eye on . . . even if we don't have all the facts," Ms. Tolstedt was emphatic that "It should not go into a document as an emerging risk without the facts."[531] The record here, however, established by preponderant evidence that by October 2013 sales practices misconduct by the Community Bank's team members was emerging as a material risk to the Bank, and in some instances had established itself as a fully realized threat to the safety and soundness of the Bank.

The L.A. Times published a second article on December 21, 2013.[532] Through this article the reporter, E. Scott Reckard, presented the results of interviews he conducted with 28 former and seven current Wells Fargo employees "who worked at bank branches in nine states, including California."[533] Nothing about this reporting suggested the issues being reported were limited in geographic location to California.

The lede for the article was "Wells Fargo branch manager Rita Murillo came to dread the phone calls."[534] Mr. Reckard reported, "Regional bosses required hourly conferences on her Florida branch's progress toward daily quotas for opening accounts and selling customers extras such as overdraft protection. Employees who lagged behind had to stay late and work weekends to meet goals, Murillo said."[535] "Then came the threats: Anyone falling short after two months would be fired."[536] Murillo reported that she resigned from her Wells Fargo branch in the Ft. Myers area in 2010, even though she had no other job and her husband wasn't working at the time. The couple ended up losing their home. She told the Times: "It all seemed worth the chance and the risk, rather than to deal with the mental abuse. . . . Just thinking about it gives me palpitations and a stomachache."[537]

---

[529] R. Ex. 17865 at 2.

[530] *Id.* at 1.

[531] *Id.*

[532] Tr. (Julian) at 6312, R. Ex. 5250.

[533] R. Ex. 5250 at 1.

[534] *Id.*

[535] *Id.*

[536] *Id.*

[537] *Id.* at 3.

Add. 826

Appellate Case: 25-1079    Page: 828    Date Filed: 05/16/2025 Entry ID: 5517644

The reporter wrote:

> Wells Fargo & Co. is the nation's leader in selling add-on services to its customers. The giant San Francisco bank brags in earnings reports of its prowess in 'cross-selling' financial products such as checking and savings accounts, credit cards, mortgages and wealth management. In addition to generating fees and profits, those services keep customers tied to the bank and less likely to jump to competitors.[538]

The Times investigation found that the "relentless pressure to sell has battered employee morale and led to ethical breaches, customer complaints and labor lawsuits".[539] It found that to meet quotas, "employees have opened unneeded accounts for customers, ordered credit cards without customers' permission and forged client signatures on paperwork."[540] A former business specialist said, "employees would open premium checking accounts for Latino immigrants, enabling them to send money across the border at no charge. Those accounts could be opened with just $50, but customers were supposed to have at least $25,000 on deposit within three months or pay a $30 monthly charge."[541]

One former business manager at a Canoga Park, California branch said, "managers there coached workers on how to inflate sales numbers."[542] He told the Times, "the manager would greet the staff each morning with a daily quota for products such as credit cards or direct-deposit accounts. To fail meant staying after hours, begging friends and family to sign up for services".[543] He told the Times his manager "would say: 'I don't care how you do it – but do it, or else you're not going home.'"[544] He said branch and district managers "told him to falsify the phone numbers of angry customers so they couldn't be reached for the bank's satisfaction surveys."[545]

In addition to opening duplicate accounts, workers "used a bank database to identify customers who had been pre-approved for credit cards – then ordered the plastic without asking them".[546] One former branch manager who worked in the Pacific Northwest discovered that employees "had talked a homeless woman into opening six checking and savings accounts with

---

[538] *Id.*.

[539] *Id.*

[540] *Id.*

[541] *Id.* at 4.

[542] *Id.* at 1.

[543] *Id.* at 4.

[544] *Id.*

[545] *Id.*

[546] *Id.* at 1.

Appellate Case: 25-1079    Page: 829    Date Filed: 05/16/2025 Entry ID: 5517644

fees totaling $39 a month."[547] The manager told the Times "It's all manipulation. We are taught exactly how to sell multiple accounts. . . . It sounds good, but in reality it doesn't benefit most customers."[548]

A branch manager with 14 years of service with Wells Fargo quit in February 2013, reporting, "she retired early because employees were expected to force 'unneeded and unwanted' products on customers to satisfy sales targets."[549] She is quoted as saying, "I could no longer do these unethical practices nor coach my team to do them either".[550]

The article reported that the Bank "expects staffers to sell at least four financial products to 80% of their customers," but "top Wells Fargo executives exhort employees to shoot for the 'Great 8' – an average of eight financial products per household."[551] The former branch manager from the Pacific Northwest told the Times that "branch managers are expected to commit to 120% of the daily quotas," and the results "were reviewed at day's end on a conference call with managers from across the region."[552] He told the Times, "If you do not make your goal, you are severely chastised and embarrassed in front of 60-plus managers in your area by the Community Banking president".[553]

The article said that by some measures, Wells Fargo is "the nation's biggest retail bank, with more than 6,300 offices and a market valuation of $237 billion.[554] The article reported that the Bank's branch employees "receive ethics training and are compensated mainly in salary, not bonuses," but that "[t]ellers earn about 3% in incentive pay linked to sales and customer service, . . . while personal bankers typically derive about 15% to 20% of total earning from these payments."[555]

The article quoted an independent bank consultant, Michael Moebs, stating that Wells Fargo "is a master at this, . . . No other bank can touch them."[556] The article reported the "pressure to meet sales goals starts with supervisors," and that that branch managers in California "have filed five related lawsuits alleging that the bank failed to pay them overtime. The extra hours were spent laboring to meet sales targets".[557] Two other recently filed lawsuits

---

[547] R. Ex. 5250 at 2.

[548] *Id.*

[549] *Id.* at 3.

[550] *Id.*

[551] *Id.*

[552] *Id.*

[553] *Id.*

[554] *Id.*

[555] *Id.* at 2.

[556] *Id.* at 3.

[557] *Id.* at 2.

Add. 828

Appellate Case: 25-1079    Page: 830    Date Filed: 05/16/2025 Entry ID: 5517644

alleged that Wells Fargo employees "opened accounts or credit lines for customers without their authorization".[558]

One former customer filed suit on September 11, 2013 in Los Angeles County Superior Court alleging that three Wells Fargo employees "used his birth date and Social Security number to open accounts in his name and those of fictitious businesses. At least one employee forged his signature several times".[559] The customer alleged that the employees "put their own addresses on the accounts so he wouldn't know about it. . . . It showed up on his credit report – that's how he found out."[560]

A former bank employee filed suit on October 3, 2013, alleging that she was wrongfully fired "after following her manager's directions to open accounts in the names of family members."[561]

The article reported that Wells Fargo carefully tracks account openings and "lucrative add-ons." The documents, dated from 2011 through October 2013, "include a 10-page report tracking sales of overdraft protection at more than 300 Southland branches from Ventura to Victorville; a spreadsheet of daily performance by personal bankers in 21 sales categories, and widely distributed emails urging laggard branches to boost sales and require employees to stay after hours for telemarketing sessions."[562]

Mr. Julian testified that he read the December 2013 article and found it to be "[c]oncerning to the extent that, if true, you don't want leadership – that type of pressure being placed on Team Members or that type of activity."[563] He added that it was concerning "to the extent that there were allegations being made that needed to be further investigated," but that he believed those allegations were being investigated.[564]

Mr. Julian also noted that the Bank's holding company issued a weekly "communications update" to members of the Board of Directors and its Operating Committee members – and that the update from December 23, 2013 included the following statement: "Los Angeles Times: The paper's expected feature about the sales culture at our Community Bank stores ran on Sunday (12/22). We are prepared for any follow up media inquiries that could result, but as of that evening we have received no calls from reporters."[565]

---

[558] *Id.* at 2.

[559] *Id.* at 4.

[560] *Id.*

[561] *Id.*

[562] R. Ex. 5250 at 3.

[563] Tr. (Julian) at 6312.

[564] *Id.* at 6313.

[565] *Id.* at 6314-15; R. Exs. 5242 and 5255.

Add. 829

Appellate Case: 25-1079    Page: 831    Date Filed: 05/16/2025 Entry ID: 5517644

**Community Banking First Line of Defense – Case 5721, November 5, 2013**

Ms. Russ Anderson identified an email exchange dated November 5, 2013 through which Quality Assurance Manager Monique Baxter-Larsen brought to the attention of Rebecca Rawson and Glen Najvar (both direct reports of Ms. Russ Anderson) Case 5721.[566] Through this transmission, Ms. Baxter-Larsen forwarded "call notes" from Quality Assurance Analyst Erica Martel, reporting on a telephone call with [MK] and [LK].[567]

The polling analyst, Ms. Martel, reported:

> I asked customer MK if she recalled speaking with banker [A] at the Coldwater Canyon location back in August in regards to possibly applying for a line of credit and she said "he offered it but I declined where are calling from again we have a huge file on this and I want your information." I gave her my information and then asked can you share more on what happened and she said "you know I think we got caught up in that whole thing that hit the LA Times about bankers opening accounts, we have been in contact with the reporter who wrote the article and shared with him what happened to us, the reporter told us we aren't the only customers of Wells Fargo who have reached out to him."
>
> She went on to explain that she never wanted a line of credit and declined it when it was offered[;] they had only gone into the bank to make a mortgage payment. [MK] also shared that the banker had put two applications in for her husband without his permission but both of them had declined. At this point she put her husband on the line and I asked for his full name and he stated that it was [LK]. He explained he had found out that they had applied two times for a line of credit for him and both times they declined. He said he had never given permission for either time. He said "this has been a mess[;] I had to put in 2 full days to get things straightened out with the credit bureaus and Wells Fargo has done nothing to help, when I called the branch manager he hung [up] on me." He also shared that he wrote a letter to John Stumpf who wrote back to him that the branch manager would be reaching out to him but this never did happen.[568]

Upon receipt of Ms. Martel's message, Ms. Baxter-Larson forwarded it to Ms. Rawson, who delivered it to Ms. Russ Anderson on November 5, 2013.[569] Providing additional context,

---

[566] Tr. (Russ Anderson) at 10074-75; OCC Ex. 282.

[567] OCC Ex. 282 at 2.

[568] *Id.*

[569] *Id.* at 1-2.

Add. 830

Appellate Case: 25-1079      Page: 832      Date Filed: 05/16/2025 Entry ID: 5517644

Ms. Rawson wrote, "Due to the sensitive nature of what has been happening in LA, I thought you would want to be aware of this conversation."[570]

Ms. Russ Anderson wrote in response, "Do we know if the customer has to sign documents?" to which Ms. Rawson responded, "The customer is not required to sign for personal lines of credit."[571] In her response later that day, Ms. Russ Anderson wrote, "Thanks. Seems like a bad practice."[572]

Presented with this exchange during cross-examination, Ms. Russ Anderson confirmed that she believed not requiring signatures was a "bad practice" – not only for personal lines of credit but also for debit cards, checking accounts, and savings accounts: "I was focusing on first lines and loans, credit cards, but debit cards came as a deposit product piece."[573] As such, Ms. Russ Anderson agreed that it was concerning when a customer's signature is not obtained for those products.[574]

Notwithstanding this testimony, Ms. Russ Anderson effectively maintained a policy of *not* requiring signatures on these products. Ms. Russ Anderson identified an email exchange from June 19 to 21, 2015, among Lisa Sheffield (Enterprise Risk Manager), herself, Jay Christoff, Rebecca Rawson, Paula Herzberg, Loretta Sperle, Camie Keilen, Justin Richards, Alana Sears, Keb Byers, and Kris Klos in which the subject was "Follow-up items from the OCC meeting on Complaints, Ethics Line Referrals and the SSCOT process on 6/19[2015]".[575]

The initial message included a list of times "from today's discussion" and reported that the OCC would like to whether there were signatures on file for certain named cases, and reported that the "OCC had a general policy and procedure question around requirements for signatures and in cases where they were not obtained, are there controls or checks and balances to confirm whether a signature was there or not".[576]

Mr. Christoff responded to Ms. Russ Anderson and others, reporting that OCC Examiner Moses "at the very end of the call wanted to ensure what our procedure was on Credit Card signatures and had admittedly not read the response you provided yesterday."[577] He wrote that he "did not want to step into that without the experts on the call. I think there [*sic*] question is, what

---

[570] OCC Ex. 282 at 1.

[571] *Id.*

[572] *Id.*

[573] Tr. (Russ Anderson) at 10076-77.

[574] *Id.* at 10078.

[575] *Id.* at 10080; OCC Ex. 883 at 3.

[576] OCC Ex. 883 at 3.

[577] *Id.* at 2.

Add. 831

Appellate Case: 25-1079    Page: 833    Date Filed: 05/16/2025 Entry ID: 5517644

do we do when signatures are required and not in file when a customer complains about unauthorized opening."[578]

Ms. Russ Anderson responded directly to Mr. Christoff (cc to the others):

> It is a bit difficult to respond because we will process an application without a signature (since it is not required by law) unless the applicant is under the age of 21. There are a lot of reasons the signature is not captured at the pin pad (like the pin pad is down). So if the customer complains and there is not a signature there isn't anything we 'do' about it.[579]

During cross-examination regarding this exchange, Ms. Russ Anderson was clearly defensive with respect to her instruction to her staff that there is nothing the Bank will do when a customer complains about an account opening without the customer's signature. When she was asked "And this response reflected your honest beliefs at the time, right?" to which Ms. Russ Anderson responded, "What do you mean by honest beliefs?"[580] To the next questions, "You were honest in this email to Mr. Christoff, correct?" Ms. Russ Anderson responded, "Which parts?"[581]

Responding to Mr. Christoff for SSCOT, Rebecca Rawson responded:

> Up until the recent Signature Capture Initiative, SSCOT did not look for signatures on credit card sales as part of our research process. In April 2015, SSCOT obtained access to signature data for credit card sales and incorporated looking for signatures captured on credit cards as part of our case research related to inquiries on credit card consent.[582]

Responding for Corporate Investigations, Loretta Sperle wrote:

> The response is yes, CI will look for signatures when we are assessing a sales incentive case, but up until guidance was sent out in 7/14 clarifying phone sales and service rules, accounts were being opened without signatures more frequently, and the lack of a signature on an application did not necessarily indicate an issue regarding customer consent. That would be considered along with the other facts/evidence in the case. Also, as previously noted signatures on credit card applications were not required until recently.[583]

**Corporate Security Report – November 18, 2013, Lumberton, North Carolina**

---

[578] OCC Ex. 883 at 2.

[579] *Id.*

[580] Tr. (Russ Anderson) at 10081.

[581] *Id.*

[582] OCC Ex. 883 at 1.

[583] *Id.*

Add. 832

Appellate Case: 25-1079      Page: 834      Date Filed: 05/16/2025 Entry ID: 5517644

In an email dated November 18, 2013, Corporate Security head Michael Bacon provided Ms. Russ Anderson, David Otsuka, Rebecca Rawson, Debra Paterson, Susan Nelson and others a report "related to the changing of customer phone numbers by two Lumberton, NC TMs."[584] Mr. Bacon stated, "[b]oth admitted to changing customer phone numbers in order to prevent customers from being contacted."[585]

In response to Mr. Bacon's request for comment or agreement related to an attachment to this email message, Ms. Russ Anderson wrote:

> I am not sure how to feel about this one. It seems to me that there must be some underlying issue for changing the numbers. Did we talk to the store manager or other team members to see if there was pressure to do this? I cannot imagine why the second team member would start this all on her own.[586]

In a response to the messages from Mr. Bacon and Ms. Russ Anderson, Community Banking's HR Manager, Ms. Nelson, wrote:

> Changing phone numbers, for me, falls into the teller referrals domain in terms of potential pressure on team members to avoid getting less than a "5 out of 5" score on WOW surveys and impacting them with aggressive performance coaching/disciplinary action. A similar issue already hit our e-mail boxes and I believe this is going to be an ongoing item. My preference is to take handle [*sic*] this like teller referrals and for the company to set a clear direction on how we will handle on a go-forward basis, rather than keep dealing with these on a case by case basis.[587]

In a response to Ms. Nelson's message, Community Banking's ER Manager, Glen Chambers wrote in support of Ms. Nelson's analysis:

> I agree with Susan, this is similar to the teller referral domain in terms of potential pressure on TMs. Also, it seems odd that no one introduced this to the second Teller and yet she knew exactly what to do. Second, we see this more often than not; TM perceived threats/pressure behind the motive which might come from the TM's fear of termination. TM store peer pressure or by something the manager said. I also agree with Claudia that it would be helpful to question the managers and other TMs, if for no other reason than to let them know this is not an acceptable action on their part.[588]

---

[584] OCC Ex. 1363 at 3.

[585] *Id.*

[586] *Id.* at 2.

[587] *Id.*

[588] *Id.* at 1.

Both Ms. Nelson and Mr. Chambers expressed a clear desire not to deal with these on a case-by-case basis, urging that Ms. Russ Anderson act to have the Bank issue clear instructions on how to handle these issues going forward.

Ms. Russ Anderson, responding to whether she had reason to question Mr. Chambers' analysis that team members' fear, and threats and pressures were motivating employee misconduct, responded that he was expressing "his opinion about it," and "[h]e's talking about perceived threats or pressure not actual".[589] She acknowledged, however, "I do not believe he was being dishonest."[590]

Responding to the messages, Community Banking Head of Human Resources Debra Paterson wrote:

> I'm with Glen and Susan. ██████████████████████████
> ██████ Also, just an FYI, the continual feedback we get is that ICP is not driving this behavior. It's sales and service goals and performance – fear of losing the job or being perceived as not "cutting it." Not the ICP.[591]

Ms. Russ Anderson testified that she trusted Ms. Paterson's opinion, agreeing that she was the most senior human resources leader in the Community Bank.[592] Ms. Russ Anderson testified that she had no reason to believe Ms. Paterson was being dishonest with her about what she was advising in this email message.[593] But when asked during cross-examination whether she had any reason to believe Ms. Paterson was being untruthful with respect to the statement that the "continual feedback" that HR had been receiving by November 2013 was that fear of losing the job due to sales and service goals, Ms. Russ Anderson responded, "I had no basis to not believe her or to believe her", notwithstanding that the email message was sent not long after the first LA Times article was published.[594] It should be noted that nothing in Ms. Paterson's response suggested she disagreed with the responses provided by Mr. Chambers or Ms. Nelson, or that indicated or suggested that Community Banking's HR had no termination code for failure to meet sales goals, and nothing that would suggest Ms. Paterson believed no one was terminated for failing to meet sales goals.[595]

The preponderant evidence in the record established that contrary to her stated opinion, Ms. Russ Anderson had reason to believe what Ms. Paterson, Mr. Chambers, and Ms. Nelson had reported to her regarding the significant, if not sole cause for the reported sales practices

---

[589] Tr. (Russ Anderson) at 9577.

[590] *Id.* at 9578.

[591] OCC Ex. 1363 at 1.

[592] Tr. (Russ Anderson) at 9578.

[593] *Id.* at 9580.

[594] *Id.*

[595] OCC Ex. 1363 at 1.

Add. 834

Appellate Case: 25-1079    Page: 836    Date Filed: 05/16/2025 Entry ID: 5517644

misconduct were the Community Bank's sales and service goals and performance standards. **Acting in furtherance of this opinion under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Ms. Russ Anderson was asked whether, subsequent to her receipt of the email exchange, she did any independent research about why employees engaged in sales practices misconduct; and she responded: "The research was being done through the core team, through conversations with Corporate Investigations, through conversations with others, but I did not myself go out and do an investigation".[596] There is no evidence in the record that Ms. Russ Anderson credibly challenged the risk-management controls that were then in place in the Community Bank regarding sales practices misconduct by team members. U**nder the conditions that were present during the relevant period, this failure to act constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Ms. Russ Anderson did not share this information with CRO Loughlin, testifying that she would have informed CRO Loughlin about the continual feedback described in this email exchange only if "through my conversations with Debra Paterson I had felt that was the case, then I would have".[597] She added that she "did not have the facts to take" information about this continual feedback to either CRO Loughlin or the ERMC.[598] She dismissed the import of the email chain as "opinions" and stated that she "then needed to take and talk to Debra Paterson as the head of HR for Community Banking and ask specific questions. Based on that conversation, I did not feel that it needed to be escalated to Mike Loughlin."[599] For the same reason she did not feel it was incumbent upon her as the Group Risk Officer to inform either the OCC or the WF&C Board of Directors about this continual feedback that sales and service goals and performance and fear of losing their jobs was driving employees to engage in misconduct.[600] **Acting in furtherance of these opinions under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**


**Investigation Debrief – November 19, 2013, Philadelphia, Pennsylvania**

On November 19, 2013, Bob Thomas of WF&C's Corporate Investigations issued an Investigation Debrief concerning a Bank branch located in Philadelphia, Pennsylvania.[601]

---

[596] Tr. (Russ Anderson) at 9583.

[597] *Id.* at 9584.

[598] *Id.*

[599] *Id.* at 9585.

[600] *Id.*

[601] R. Ex. 5037.

Appellate Case: 25-1079    Page: 837    Date Filed: 05/16/2025 Entry ID: 5517644

Recipients included Ms. Russ Anderson, Michael Bacon (of Corporate Investigations), Rebecca Rawson, Debra Patterson, Susan Nelson, and David Otsuka.[602]

Mr. Thomas reported that the investigation followed the Bank's receipt of a customer complaint, that "she had received a debit card and was enrolled in OLB without her consent."[603]

Mr. Thomas reported that the investigation that followed included an interview with Team Member [NR] (TMNR), who admitted to "issuing debit cards without customer consent", enrolling customers in OLB [on-line banking] without consent and subsequently activating the OLBs by issuing PIN Only service, creating a User ID and PW and answering the Security Questions."[604] TMNR also admitted to sending customer names and numbers "to Service Manager [AJ] so that her Tellers could submit Referrals."[605]

Mr. Thomas reported that TMNR completed CSSR training in December 2012, and was assigned to the Philadelphia branch.[606] He reported that when she started working at that branch, Store Manager NP "told her that he wanted accounts opened in packages which included a checking account, savings account, debit card and OLB."[607] TMNR reported that Store Manager NP "told her that even if a customer did not consent she was to issue a debit card and enroll the customer in OLB. In addition, [NP] told her to activate the OLBs and walked her through the activation process, which included answering the security questions."[608]

Mr. Thomas reported that TMNR stated, "other Bankers in the branch, CSSR [BJ] and PB [JV], were issuing debit cards without consent as well as enrolling and activating customer OLBs."[609] TMNR reported that Service Manager [AJ] had asked her and [BJ] to give her customer information for accounts that they had opened so that her tellers could be 'paid out' for the quarter for teller Referrals. TMNR stated that she agreed to help because they were her teammates."[610] She stated that she "remembered in her training that she was told that the customer needed to give consent before an account was opened" but that "wasn't how it worked in the branch where she had worked" and that she "was the new person in the branch" and "did not want to rock the boat" and "wanted to fit in."[611]

---

[602] Tr. (Russ Anderson) at 9560; R. Ex. 5037 at 1.

[603] R. Ex. 5037 at 1.

[604] *Id.*

[605] *Id.*

[606] R. Ex. 5037 at 2.

[607] *Id.*

[608] *Id.*

[609] *Id.*

[610] *Id.*

[611] *Id.*

Appellate Case: 25-1079     Page: 838     Date Filed: 05/16/2025 Entry ID: 5517644

Mr. Thomas reported that TMNR stated that she did not use the Ethics Line to report the bad behavior "because she had a bad experience with her last employer when she used their Ethics Line and it got back to the person she had reported that she had made the call."[612]

Mr. Thomas reported that research into the allegations incorporated a WFCI review of emails between Service Manager AJ, TMNR, BJ, and JV.[613] WFCI also requested a Sales Quality Review of Teller Referrals at the Philadelphia and OLB enrollments by Service Manager AJ, Store Manager NP, TMNR, and JV.[614] Further, "DCG Fraud Operations also provided information regarding suspected unauthorized OLB activations by WF TMs."[615]

Mr. Thomas reported the email review disclosed seven emails from TMNR to Service Manager AJ that listed customer names and account numbers, and that Service Manager AJ's response "indicated that the customer information had been distributed to her tellers."[616] Further, Sales Quality "confirmed that three of [Service Manager AJ's] tellers had submitted Referrals for the customers named in TMNR's emails.[617]

Mr. Thomas reported that CI interviewed Service Manager AJ who admitted asking her Tellers to submit invalid Referrals, giving this description:

> She had bent the rules regarding Referrals because her tellers were struggling to get their solution Referrals. TMNR was a team player who had wanted to help with the Referrals so TMNR sent her customer names and CNs of accounts that she had opened so that her tellers could submit Referrals for the customers. At the time that she had received the customers' information from TMNR she distributed the customer names between her tellers. TMNR helped them and they helped TMNR with other Referrals that the tellers generated. She did not remember the details concerning the customers named in the TMNR emails. It could have been a combination of walk-ins and accounts that TMNR had opened either in the branch or off-site. Her branch had very little traffic and most of their customers lived in the apartment building where the branch was located. Many of the customers were seniors. Solutions were very difficult to get.[618]

---

[612] R. Ex. 5037 at 2.

[613] Id.

[614] Id.

[615] Id.

[616] Id. at 3.

[617] Id.

[618] Id. at 4.

Add. 837

Appellate Case: 25-1079      Page: 839      Date Filed: 05/16/2025 Entry ID: 5517644

Mr. Thomas reported that following a discussion with Ann Cox, Employee Relations Manager, there was agreement that Service Manager AJ's employment should be terminated.[619]

Mr. Thomas reported that CI interviewed Store Manager NP, who admitted that when BJ and TMNR started at his branch, he told them that he wanted account packages opened, giving this description:

> Even if the customer did not want a Debit Card or Online Banking he told them to include it in the package by enrolling the customer. He showed each of them how to activate Online Banking. He showed them how to obtain a PIN Only. He told them to use the email address provided by the customer on SVP. If the customer did not have an email address on their profile, his Bankers used an email address that included the zip code of the branch. He showed them how to set up the User Name and Pass Word to activate the account. He did not tell them to answer the Security Questions.[620]

Mr. Thomas reported that during the interview, Store Manager NP continued the above practices until he received an email from MSC Barbara Romanoff, who was responding to a complaint that Service Manager AJ had enrolled and activated an online banking account without consent. NP stated upon receipt of Ms. Romanoff's email (the date of which he could not state for sure) he told his Bankers "that they needed the customer's consent to enroll in Online Banking and they could not activate a customer's Online Banking."[621]

NP also reported that he "did not follow up to ensure that his Bankers were no longer enrolling customers without consent," but "he assumed that because the branch was not meeting its sales goals they were no longer doing the enrollments and activations without consent."[622] NP "did not give a reason why, as Store Manager, he did not address his suspicions concerning the invalid Referrals."[623]

Mr. Thomas reported that following a discussion with Ann Cox, Employee Relations Manager, there was agreement that Store Manager NP's employment should be terminated.[624]

Mr. Thomas reported key findings included the following issues had been identified in the Investigation Debrief:

- Tellers admitted to submitting Referrals without speaking to customers.

---

[619] *Id.* at 8.

[620] *Id.* at 6.

[621] *Id.*

[622] *Id.*

[623] *Id.*

[624] *Id.* at 7.

Appellate Case: 25-1079    Page: 840    Date Filed: 05/16/2025 Entry ID: 5517644

- Service Manager admitted to bending the rules and forwarding to her Tellers Customer names and CNs for accounts opened by CSSR so that Referrals could be submitted.
  - Two CSSRs admitted to forwarding customer names and CNs to the Service Manager and/or to the Tellers so that they could submit invalid Referrals.
- Two CSSRs and the former Store Manager admitted to enrolling customers in OLB without consent and activating OLBs.
- Two CSSRs admitted to issuing Debit Cards without customer consent.
- Former Store Manager admitted to telling two CSSRs to issue Debit Cards without customer consent.
- Former Store Manager admitted to telling his CSSR's [*sic*] to enroll customers in OLB without consent and to activate OLBs without customer knowledge.
- An email review by WFCI disclosed seven emails had been sent from a CSSR to the Service Manager that listed Customer Names and CNs. The Service Manager's email responses indicated that the customer information had been distributed to her tellers. SQ confirmed that three of the Service Manager's Tellers had submitted Referrals for the customers named in CSSR's emails.
- SQ, independent of the customers listed in the CSSR's emails, reviewed Referrals for the tellers and subsequently conducted polling. Five additional customers substantiated invalid Referrals between the Tellers.
- The seven TMs who have been implicated acknowledged taking required Sales Integrity and Code of Ethics training courses.[625]

In addition to recommending that the employment of the Service Manager and Store Manager should be terminated, Mr. Thomas reported termination recommendations for a teller hired in 1995, who had admitted to submitting invalid referrals; a teller hired in 1983, who had admitted to submitting invalid referrals; and a teller hired in 2010 who had admitted to submitting invalid referrals.[626] The report reflected recommendations that TMNR and BJ be given final warnings – after noting both had been instructed to engage in misconduct by the Store Manager.[627]

Notwithstanding the scope of the investigations and the details presented through the Investigation Debrief, when asked whether she had reason to doubt that there was a great emphasis on "making the numbers" in branches outside of LA/OC, Ms. Russ Anderson responded, "I have no evidence to say one way or the other. This is one person's comment."[628]

---

[625] *Id.* at 6-7.

[626] *Id.* at 7-8.

[627] *Id.* at 8.

[628] Tr. (Russ Anderson) at 9562.

Add. 839

Appellate Case: 25-1079    Page: 841    Date Filed: 05/16/2025 Entry ID: 5517644

**Acting in furtherance of these opinions under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Ms. Russ Anderson testified "I don't remember this particular one. It's been a long time. And again, this is one person's comment, and it would not have led me to believe that that was a 6,000-storewide thought process. This is one person's – store manager's opinion."[629]

Similarly, after noting that the seven team members acknowledged taking the required Sales Integrity and Code of Ethics training courses, when asked whether this indicated to her that employees were engaging in sales practices misconduct notwithstanding whatever training they received, Ms. Russ Anderson responded, "[a]gain, not remembering this document, but all team members took training and Code of Ethics training, and team members in multiple places in the Company violated the Company's policies regardless of the training they took."[630] Ms. Russ Anderson confirmed that she understood this to be the case throughout the relevant period.[631]

### November 27, 2013 - The Role of the Sales and Services Conduct Oversight Team (SSCOT) and Proactive Monitoring

Ms. Russ Anderson testified that the Sales and Services Conduct Oversight Team conducted proactive monitoring in the Community Bank in 2013.[632] She testified that SSCOT was preceded by the Sales Quality Committee.[633]

Ms. Russ Anderson characterized the technology when she took over the team as "antiquated", that "they never had a real review of their processes", and so "it took a long time from the time an EthicsLine allegation came in for it to go through their processes to even determine if it had merit."[634] She said, "a lot of times these activities would start out as a cold, and the next thing you know, you have pneumonia."[635]

Ms. Russ Anderson testified that SSCOT did not itself conduct investigations, but that the groups within the Bank that did so were Human Resources and Corporate Investigations.[636] She testified that as GRO for Community Banking, she considered Corporate Investigations to be an important department, and that viewpoints from CI regarding what was causing employees to engage in sales practices misconduct were important.[637] She explained that CI interviewed

---

[629] *Id.* at 9563.

[630] *Id.* at 9564.

[631] *Id.*

[632] *Id.* at 9251.

[633] *Id.* at 9548.

[634] *Id.* at 9283.

[635] *Id.*

[636] *Id.* at 9549.

[637] *Id.*

Add. 840

Appellate Case: 25-1079      Page: 842      Date Filed: 05/16/2025 Entry ID: 5517644

employees accused of wrongdoing to understand why they engaged in sales practices misconduct, and that because of this activity the CI viewpoints were important.[638]

Ms. Russ Anderson testified that when she assumed responsibility for the Sales Quality team she received regular information about sales practices misconduct and sales integrity violations.[639] She testified that apart from proactive monitoring, the Bank was relying solely on EthicsLine allegations, customer complaints, and other reactive analyses; and acknowledged that throughout 2013 and 2014 the Community Bank did not have an effective customer complaint tracking system with respect to sales practices misconduct; and that there was improved tracking "in the latter part of 2015 and into 2016", describing the effectiveness by then at "at least 60 to 75 percent."[640]

Ms. Russ Anderson testified that proactive monitoring in this context "was a concept that I formed when the SSCOT team moved [to] me in January of 2012, as I wanted to look beyond just the reactive data that they were getting to try and find misconduct at its very earliest stages."[641] She testified that when she took over the Sales Quality team, "there were about 20 individuals. And they were only reactive to the data they got in mostly from the EthicsLine, but a little bit from other places."[642] Ms. Russ Anderson testified that the effectiveness of reactive controls "lagged" – but that she knew in the fall of 2013 how to proactively identify employees who engaged in simulated funding and phone number changes.[643]

Ms. Russ Anderson identified an email exchange between herself and Michael Bacon, head of Corporate Investigations, dated November 27, 2013 (from Mr. Bacon to Rebecca Rawson), and from Ms. Rawson to Mr. Bacon (cc: Ms. Russ Anderson).[644]

In the first message, Mr. Bacon asked Ms. Rawson to prepare, "a one page debrief on where all the Sim funding and Phone number changes are occurring".[645] After the summary was prepared he sought to "discuss adding some of the key findings from the cases already worked."[646] He referred to a request presented during a committee call the day before in which Debra Paterson asked for such a summary.[647] He stated that "a key point made during the call is

---

[638] *Id.* at 9549-50.

[639] *Id.* at 9656.

[640] *Id.* at 9657.

[641] *Id.* at 9251; see "22-03-07 Respondents' Amended Revised Errata Day 9-38" on page 75. Ordered by Second Supplemental Order.

[642] Tr. (Russ Anderson) at 9282.

[643] *Id.* at 9658.

[644] OCC Ex. 1031.

[645] *Id.* at 2.

[646] *Id.*

[647] *Id.*

Add. 841

Appellate Case: 25-1079    Page: 843    Date Filed: 05/16/2025 Entry ID: 5517644

we have enough of a sample that we (whomever) should have enough information to formulate a remediation plan."[648] He explained that this "was driven by the news of the new data and that the behavior is clearly continuing," and rhetorically asked, "do we really need a monthly report to tell us we have a systemic issue?"[649]

Ms. Russ Anderson acknowledged that this exchange occurred a month and a half after the publication of the first LA Times article.[650] She testified that the discussion about simulated funding and phone number changes "was the proactive monitoring".[651]

Despite having testified as to the importance of the work and views of those in Corporate Investigations, when asked whether she regarded Mr. Bacon's email as an important communication from the head of CI, Ms. Russ Anderson responded, "Not to me."[652] **Acting in furtherance of these opinions under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Despite understanding that the discussion related to the proactive monitoring that she was responsible for, Ms. Russ Anderson testified "I don't know what call he's talking about or what Debra was working on, so I . . . didn't think – I don't remember the email. And sitting here today, I don't know what phone calls they're talking about or any of that."[653]

In response to a question whether she found concerning Mr. Bacon's point that simulated funding and phone number changes were clearly continuing, Ms. Russ Anderson responded,

> Since this was only the second batch of proactive monitoring information that we had pulled, I was not surprised. We were expanding what we were looking at. It was not all just in the same place, so of course you're going to see more. We were looking for more. So, no, it didn't bother me.[654]

When asked whether she had any reason to doubt Mr. Bacon's finding that there was a systemic issue, Ms. Russ Anderson answered,

> I did not believe it was a systemic issue, and I did not believe that Michael was right. Again, going to my previous answer, this was activity we were specifically looking for. We had just started to expand the proactive monitoring outside of L.A./OC, and we didn't know how big it was. So for

---

[648] OCC Ex. 1031 at 2.

[649] *Id.*

[650] Tr. (Russ Anderson) at 9551.

[651] *Id.* at 9552-53.

[652] *Id.* at 9553-54.

[653] *Id.* at 9554.

[654] *Id.* at 9555.

Add. 842

Appellate Case: 25-1079    Page: 844    Date Filed: 05/16/2025 Entry ID: 5517644

something to be systemic, it has to be very broad-based. There was no data point here to come to that conclusion.[655]

**Acting in furtherance of these opinions under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Acknowledging that Corporate Investigations was the department that was investigating sales practices misconduct and was performing interviews with Bank employees, Ms. Russ Anderson nevertheless dismissed the point Mr. Bacon was making – that as of November 2013 the sales practices misconduct problem in Community Banking was systemic – testifying only that this "was Michael Bacon's opinion."[656] **Acting in furtherance of these opinions under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Two further points should be noted regarding this email chain. The first is that in her response to Mr. Bacon, Ms. Rawson described the employees who had been identified for potential simulated funding and phone number changes as "outliers".[657] She reported to Mr. Bacon that "Legal is still reviewing the 2nd round" and once she hears back from Legal "we will determine next steps."[658]

The second point is that in her response to Mr. Bacon and Ms. Rawson, Ms. Russ Anderson did not claim that there was, in fact, a need for a monthly report "to tell us we have a systemic issue" – but instead wrote that "whatever we prepare should be at the direction of legal" – apparently concluding that Mr. Bacon's request for a summary would not be respected unless such a summary was generated "at the direction" of the WF&C Legal Department.[659] **Acting in furtherance of these opinions under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Ms. Russ Anderson testified that proactive monitoring "began in 2013" and said several times she visited the teams located in Sacramento and in San Antonio.[660] "I would go to Sacramento and spend almost a week there at a time. The first year, I would go probably every six weeks" and the team would "advise me of the changes they were making."[661] She testified,

---

[655] *Id.* at 9556.

[656] *Id.* at 9556.

[657] OCC Ex. 1031 at 1.

[658] *Id.*

[659] *Id.*

[660] Tr. (Russ Anderson) at 9251, 9283.

[661] *Id.* at 9284.

"when we started into '13, I felt that the day-to-day work that they were doing was going to be done very efficiently, and then we could start this pilot on the proactive monitoring."[662]

Elaborating on the proactive monitoring process, Ms. Russ Anderson testified:

> So when I inherited the team in January of 2012, I spent time getting to know the team. They were small, about 20 employees. And it was very evident that the work they did was based on information they received in primarily from the EthicsLine, but from other sources, and that it was just a reaction to that data. Their technology was old. Their processes needed help, and so we spent the first year really upgrading technology, upgrading our processes. I brought in a process improvement team to help them, building out some more of their resources to help with that. So -- and all the while talking with the current manager at that time about moving to proactive monitoring.[663]

Ms. Russ Anderson testified that changes she made to the Sales Quality team when she took it over from Cindy Walker (when Ms. Walker "decided to retire in early 2013") included "upgrading some of the positions" and "just improved everything", giving the staff "all the tools that they would need to be successful." [664] She said she "had a real desire once I understood what work that the Sales Quality team was doing, to advance their work so that we could really look for activity in its infancy rather than waiting until it was full blown and being able to get out and train the bankers and the management on why that behavior was not appropriate."[665]

Ms. Russ Anderson said it was her idea to do proactive monitoring at Community Bank, and described a pilot project initiated in May 2013 upon the hiring of Rebecca Rawson to serve as the head of SSCOT.[666] Under management by objective (MBO), Ms. Rawson was to "start the first pilot on proactive monitoring."[667]

Elaborating, Ms. Russ Anderson testified:

> We started it in the late summer of 2013. One of the areas that was evolving and we were getting information through our deposit product group partners of activity that was evolving in a negative way was simulated funding. So we decided that that was a topic that we would like to first look at. The analytics around that showed that the first place we should do our pilot was in the LA/OC market, because that's where an abundance of the activity was

---

[662] *Id.* at 9284.

[663] *Id.* at 9251-52.

[664] *Id.* at 9284-86.

[665] *Id.* at 9302.

[666] *Id.* at 9252, 9303.

[667] *Id.* at 9252.

Add. 844

happening. And so we kicked it off. The data went to corporate investigations, and their results were evident in September of 2013.[668]

Ms. Russ Anderson described Ms. Rawson as having "been through the branch system who knew what it was like to be a banker, a store manager or a branch manager."[669] She described another hire, Paula Bernardo, as bringing "an immense amount of expertise at SSCOT around statistics and modeling".[670] She testified that she heard Ms. Bernardo's testimony in this administrative proceeding, disagreed with nothing Ms. Bernardo said, and stated "[t]here's very little that I could add to what Paula testified to."[671]

Ms. Russ Anderson testified, "particularly in Regional Banking . . . we always tried to do things in a pilot or test phase, test and learn. Doing something wide-scale could disrupt your customer base, and it could really disrupt your team members."[672]

Elaborating on this point, Ms. Russ Anderson testified:

> And so since we have never done anything like this, we didn't think there was another financial institution in America who had done anything like it, we really wanted to take baby steps and figure out what worked, what didn't work. Because if you go small and it's not working, you can pull back really fast. If you just blow it out there, it's hard to pull it back over those many branches and team members.[673]

Ms. Russ Anderson testified that she limited the goal of the 2013 pilot project to looking at "activity, potential simulated funding activity in the LA/OC market."[674] She said she picked that market because it "was always a market that if there was behaviors going on that you wouldn't want to happen, LA/OC was generally a place that you could find it", adding "we could get the most learnings there."[675]

Ms. Russ Anderson testified that SSCOT needed "behavioral" data.[676] Elaborating, Ms. Russ Anderson said the data looked "for types of activities that may look – may be perfectly normal, like opening the account, or money goes in, money goes out, but that could lead to sales

---

[668] *Id.* at 9253.

[669] *Id.* at 9286.

[670] *Id.* at 9287.

[671] *Id.* at 9305.

[672] *Id.* at 9303.

[673] *Id.* at 9304.

[674] *Id.*

[675] *Id.*

[676] *Id.* at 9287.

Add. 845

Appellate Case: 25-1079    Page: 847    Date Filed: 05/16/2025 Entry ID: 5517644

practices misconduct behaviors because the banker is manipulating things."[677] She testified that they also looked "for information as it related to signature capture" because "there were outliers in some of the branches of people who didn't get the signatures captured" so the SSCOT team "got data from the deposit product group, from the EthicsLine, from the Complaints Group, from the regulators' complaints, store management – or branch management could have sent them information."[678] In this testimony, Ms. Russ Anderson presented no evidence that the practice of failing to capture signatures was limited to "outliers". Preponderant evidence in the record set forth above established that no such limitation existed during the relevant period.

Ms. Russ Anderson defined a "sales integrity violation" as follows:

> My definition of a sales integrity violation means that the banker or teller did not have a -- that there were issues with how the sale was done. It could be that I went in as a customer, I saw the banker, I opened an account, but then the banker said, oh, you the teller, you need another referral. I'm going to give you that -- I'm going to give you that referral even though I as the customer never spoke to the teller. That's a sales integrity violation. There was no integrity in that. So all of the other pieces of sales practices misconduct plus other things is how I add into that the -- that there's an integrity issue.[679]

Asked to describe what SSCOT would do if they found evidence of potential sales practices misconduct, Ms. Russ Anderson testified:

> They would -- after they had put it through their filtering system in their processes that they had negotiated with Corporate Investigations and HR, if it reached certain hurdles or certain attributes, it would go to Corporate Investigations and/or HR.

> If it hit other attributes, they would send information back to the line management saying this banker needs to have additional training, here's the training they need to do. And thanks by some good work done by audit, we built a return loop back to SSCOT that if the banker didn't do the training, it was escalated to the next level manager to the next level manager to the next level manager.

> If a banker got two trainings, okay, now this is twice in this period of time that we're saying that that banker needs training, it would have been sent to HR or other places to say, wait a minute, if the training is happening but it's not taking, we need to maybe have you guys investigate further.[680]

---

[677] *Id.* at 9287.

[678] *Id.* at 9287-88.

[679] *Id.* at 9288.

[680] *Id.* at 9289.

Ms. Russ Anderson testified that she disagreed with testimony to the effect that given the high rate of turnover, training was ineffective.[681] Elaborating, Ms. Russ Anderson stated:

> Well, the turnover rate in Regional Bank, you have to dissect what it really is. We had the highest level of turnover at the teller line, and turnover numbers can be very confusing between did the person actually leave Wells Fargo, or a term we use as churning, did they move to a new position in Wells Fargo. And so people would talk about turnover that would actually include people who got a different job at the bank and didn't leave the employment of Wells Fargo. So the training was an integral part of what we did at Wells Fargo and very important for bankers and tellers to understand, especially people who had not worked in the banking industry before. You know, that's why we had the quality sale, you know, manual and we had all sorts of training and the ethical speaking and just days and days of training new team members would have, plus ongoing training throughout the year.[682]

When questioned about how SSCOT processed an EthicsLine allegation that had a sales practices misconduct or sales integrity issue, Ms. Russ Anderson testified, "it goes directly to SSCOT."[683]

Ms. Russ Anderson testified that "the Sales Quality Team would have been the first place where all" of the original EthicsLine allegations were "read and filtered."[684] She testified that in those cases where the EthicsLine complaint had either a sales practices misconduct or sales integrity issue in it, the following process was followed:

> If there's enough information, even if it's anonymous, they will then go to their other databases and pull information to see, okay, does that banker have -- is there some items out around signature capture with this banker or other activities with this banker that don't look quite right compared to other people in his market. And then they can do one of two things. If it's -- if it's very clear, very, very, very clear, they can send it direct to corporate investigations. If it's not quite so clear, they could send it to the polling team, and then the polling team would do their work. And then if polling confirmed the issue, then it would go to Corporate Investigations. If they couldn't, then it would go back to say, you know, this banker needs some training on this topic.[685]

Ms. Russ Anderson testified that she disagreed with testimony to the effect that polling

---

[681] *Id.* at 9381.

[682] *Id.* at 9382.

[683] *Id.* at 9290.

[684] *Id.* at 9294.

[685] *Id.* at 9290-91.

was not robust or effective.[686] Elaborating on this point, she stated:

> Well, polling had its limitations. There's no question about that. But it did provide a lot of good information. And it was just one of the tools that was used by SSCOT to determine if behavior -- if the behavior occurred or not. And so for me, it was one of the tools in the toolbox that you used to determine if a banker needed to be referred to Corporate Investigations.[687]

Ms. Russ Anderson also disagreed with testimony to the effect that she allowed SSCOT to have an arbitrary threshold for polling.[688] In support, she stated:

> The number that was used in the polling team was based on long discussions with Corporate Investigations. And you may recall from [Paula Bernardo's] testimony, over time, they would do analytics and make a recommendation to Corporate Investigations that perhaps they could lower that number to two, but Corporate Investigations always felt that three was the appropriate number. It gave them enough information to start an investigation. But I would like to make something clear, Mr. Kelley. If a polling call was made and the team member in SSCOT felt that that one call was enough, they could refer that team member to corporate investigations. They did not have to get to three. Three was the agreed parameter. But if you made one phone call and it was very clear that that team member had done something wrong, it would go directly to Corporate Investigations.[689]

Asked by her Counsel during direct examination whether she read EthicsLine allegations during the relevant period, Ms. Russ Anderson responded, "I did", adding that "when my SSCOT manager would find an allegation that she felt needed to come to my attention", Ms. Russ Anderson would read the ones sent by the manager and would discuss these with the manager.[690] She testified that she would then "always ask [the manager] if she would please circle back with me after they had done more research and after Corporate Investigations had completed their work."[691]

This response is materially incomplete when taken in conjunction with related evidence already in the record.

In the Statement of Material Fact (Russ Anderson) No. 173 submitted in support of the Motion for Summary Disposition, Enforcement Counsel averred, "While thousands of

---

[686] *Id.* at 9379.

[687] *Id.* at 9379-80.

[688] *Id.* at 9380.

[689] *Id.* at 9380-81

[690] Tr. (Russ Anderson) at 9293.

[691] *Id.* at 9294.

Add. 848

Appellate Case: 25-1079    Page: 850    Date Filed: 05/16/2025 Entry ID: 5517644

employees flooded the EthicsLine warning senior leadership for years about the retail branch environment of significant pressure to meet unreasonable sales goals and resulting misconduct, Respondent Russ Anderson "did not make a habit of reading the EthicsLine allegations that came in. I had a pretty busy job. That would have been not a wise use of my time."[692]

In her response to this factual claim, Ms. Russ Anderson did not dispute that she testified as presented, but clarified that she would "read the ones that [her] SSCOT team felt were important for [her] to know about" because the EthicsLine complaints contain "a broad variety of information" and so she "depended on [her] team, who did get EthicsLine allegations, to point situations out to [her] that they felt were noteworthy."[693]

Upon findings presented in the Summary Disposition Order, the Recommended Decision will include a factual finding as to Respondent Russ Anderson that while thousands of employees flooded the EthicsLine warning senior leadership for years about the retail branch environment of significant pressure to meet unreasonable sales goals and resulting misconduct, Respondent Russ Anderson "did not make a habit of reading the EthicsLine allegations that came in. I had a pretty busy job. That would have been not a wise use of my time." **Acting in furtherance of these opinions under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

During direct examination by her Counsel, Ms. Russ Anderson was offered the opportunity to respond to testimony by Examiner Candy, whom Counsel stated had expressed the belief that Ms. Russ Anderson's role as Group Risk Officer required her to read EthicsLine allegations.[694] Ms. Russ Anderson responded:

> Given the volume of the EthicsLine violations that came in, and I had a team who was trained in reading them and knowing how to gather the data around them and that they knew to escalate to me which ones were worthy of escalation for me to read and understand, I didn't believe that it was prudent for me to spend the time it would take to read all of those allegations. And plus, I don't know what I would have done with the data, because I didn't – I couldn't pull the analysis like my team could.[695]

Citing no supporting evidence, Ms. Russ Anderson testified that "somewhere between 80 to 85 percent" of EthicsLine allegations "could never be confirmed as a sales integrity

---

[692] MSD Ex. 266 (Russ Anderson Dep. Tr.) at 58:13-16.

[693] Russ Anderson's SMF at No. 173, quoting from MSD Ex. 266 (Russ Anderson Dep. Tr.) at 58:5-59:8.

[694] Tr. (Russ Anderson) at 9294.

[695] *Id.* at 9295.

violation."[696] She differentiated EthicsLine allegations from confirmed sales integrity violations in these terms:

> There are lots and lots of allegations that come in, like I said, and they can look and read like just about anything. And so you have to take that raw data and analyze it and add more of what you know to it to determine if it's a potential allegation -- a potential sales violation. When you get to that point and you've met the criteria that Corporate Investigations has made for them saying they'd take it, because there's protocols in place, then you hand it to Corporate Investigations. And only corporate investigations can then do the research and determine if it was an actual violation. The SSCOT team doesn't make that determination.[697]

Ms. Russ Anderson testified customer complaints, as distinguished from EthicsLine complaints, were fewer in number and could be collected at the branch level, or could come from the Bank's call center, the executive call-center complaint team, and through the OCC or CFPB.[698] She testified that in those cases where the complaint was from a consumer and not from the EthicsLine, and had either a sales practices misconduct or sales integrity issue in it, the following process was followed:

> The ones that would go to the complaint group in the call centers, again, sometimes I would get a complaint directly to me, not often, and I would send those directly to Carrie Mulligan in the complaint group and her team. Their team always called the customer directly and tried to get more of the facts around what had occurred. And then if that -- if the complaints person -- first of all, the idea was always to try to resolve the issue. But if in that issue there was a banker misconduct, that would be referred to -- generally directly to corporate investigations, but sometimes to the SSCOT team. It was Wells Fargo practice in the call centers to attempt to resolve -- if you called in about a fee, the call center banker was trained to resolve that fee issue.[699]

Ms. Russ Anderson offered a "real-life experience" that happened to her, where "one of my accounts was inadvertently charged a monthly fee, and so I just called the call center and I talked to the banker about it. And the banker looks at the rest of my accounts and says, 'Oh, yes, that's an error. I will refund that fee.' Done. And it doesn't – I mean it doesn't elevate to the

---

[696] *Id.* at 9293.

[697] *Id.* at 9292.

[698] *Id.* at 9291.

[699] *Id.* at 9296.

point of a complaint."[700] She added that if the banker had not refunded the fee, "and I had escalated to their manager, that now becomes a complaint."[701]

Ms. Russ Anderson testified she received reports from the Customer Connection and Call Center Executive Complaint Department at least quarterly and reviewed all of them.[702] Notwithstanding the volume of reports or allegations of sales integrity violations filed during the relevant period, Ms. Russ Anderson denied the problem was systemic and concluded the reports about sales integrity violations during the relevant period "was a small problem. It was not in the top issues that they worked with."[703] **Acting in furtherance of these opinions under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Ms. Russ Anderson testified that with respect to the "worst outcome" that could follow from the cases SSCOT gathered data on and transferred to either HR or Corporate Investigations was that "they would terminate team members."[704] The second "is that they could refer it back to Human Resources or to the line because they couldn't find an absolute issue, but they thought there should be training."[705] She testified, "the third one sometimes was the team member would resign prior to the investigation being completed."[706] She testified that the decision to terminate a team member was made either by HR or Corporate Investigations, but that SSCOT "had no control over that."[707] She also testified that she was "not in the feedback loop" from either Corporate Investigations or Human Resources regarding terminations.[708]

Ms. Russ Anderson then qualified that answer, testifying that Corporate Investigations or HR "would make their decisions, and unless there was controversy, in which case I would be brought in if there was controversy, they would just – it would just be part . . . of the practice."[709]

Ms. Russ Anderson testified that if Corporate Investigations opens an investigation "they have a set period of time to complete the investigation."[710] If CI filed a Suspicious Activity

---

[700] *Id.* at 9295-96.

[701] *Id.* at 9296.

[702] *Id.* at 9297.

[703] *Id.* at 9297-98

[704] *Id.* at 9298.

[705] *Id.*

[706] *Id.*

[707] *Id.* at 9298-99.

[708] *Id.* at 9299.

[709] *Id.*

[710] *Id.* at 9300.

Report (SAR) with FinCEN and "if they don't get it filed in that 30-day window, now they are . . . out of FinCEN's requirements. So they will go ahead and file the SAR even though the investigation's not completed."[711] Responding to the allegation – described through leading questioning during direct examination by her Counsel – that she downplayed information, when asked whether SARs were part of her disagreement with Michael Bacon and Corporate Investigations, Ms. Russ Anderson testified:

> It had to do with the reporting. One of the pieces of data that Michael would report was that SARs had gone up, or whatever it might be. And what I requested from Michael is let's talk about the why it has gone up. Is it really that many more team members who have done bad and nefarious things, or is it because you couldn't complete your investigation in time, you had to file the SAR, and so that -- because you don't have enough staff, and that's why you had to file the SAR. And so the fact that they went up or not was not as important to me as the why. And so Michael and I had disagreements about changing from just elevator analysis to really telling me why something's happening so the data would mean something to me.[712]

Ms. Russ Anderson testified that SARs "could go to the FBI" and as a result, an employee "could be investigated by the FBI."[713] She agreed, however, that if "simulated funding means that they were taking money from a customer's account to another customer's account, yes, that's illegal."[714]

As noted above, Ms. Russ Anderson provided testimony to the effect that she did not act alone when establishing thresholds to be used for referring cases to Corporate Investigations.[715] The record reflects that by November 2013 the sales integrity investigation pending throughout the LA/OC are had "now expanded to the rest of the footprint for egregious potential simulated funding activity."[716] The investigations were "all part of the business process that is driven by Claudia's Sales Quality team and referred to your CI team for investigation."[717] Ms. Russ

---

[711] *Id.* at 9300.

[712] *Id.* at 9301-02.

[713] *Id.* at 9302.

[714] *Id.* at 9669.

[715] See section, Ms. Russ Anderson's Relationship with WF&C's Legal Department – Applying the Attorney Client Privilege, above.

[716] OCC Ex. 1362 at 1.

[717] *Id.*

Add. 852

Appellate Case: 25-1079    Page: 854    Date Filed: 05/16/2025 Entry ID: 5517644

Anderson's team had been using and would continue to use the "egregious filter for simulated funding".[718]

Without providing any documentation to support the claim, Ms. Russ Anderson testified that she had discussed with Corporate Investigations changing these thresholds – and was told that "if the thresholds were not set at an appropriate level, the volume of potential misconduct that would go to them for research could overwhelm their current staffing levels" and could have the same effect with the filing of SARs.[719] She said she had the same conversations with HR, again without providing any documentation in support of this claim.[720] Preponderant reliable evidence in the record does not support Ms. Russ Anderson's factual claim that anyone at Corporate Investigations told her that if the thresholds were not set at an appropriate level, the volume of potential misconduct that would go to them for research could overwhelm Corporate Investigations' current staffing levels. The record includes probative evidence tending to demonstrate that Ms. Russ Anderson's testimony on this point is misleading.

As a member of the Core Team Ms. Russ Anderson acknowledged receipt of a November 5, 2013 email exchange regarding Sales Quality Core Team.[721] The initial message was from Mr. Otsuka, who provided this summary of the discussion, in pertinent part:

> Claudia provided some history about Sales Quality processes. Before Sales Quality moved under Claudia, that function was more reactionary to Ethics Line complaints and other externally raised issues. Beginning around January 2012, this function became more proactive. If Sales Quality saw hot spots or emerging trends, they will look across the footprint. Based on the findings in LA/OC, an outlier report was run, which resulted in 49 team members across the footprint showing up on that report.
>
> * * *
>
> Michael [Bacon, Head of Corporate Investigations] noted that the thresholds for simulated funding and phone number changes are fairly high (*e.g.*, 50 phone number changes). Claudia indicated that Sales Quality will not be expanding research into this activity, i.e., won't be looking to change these thresholds regarding simulated funding or phone number changes. Regarding other types of behavior, Sales Quality will follow its normal processes.[722]

Ms. Russ Anderson testified that "at this point in the pilot, it was not appropriate" to identify and refer for investigation those employees who engaged in simulated funding or phone

---

[718] OCC Ex. 1362 at 2.

[719] Tr. (Russ Anderson) at 9309.

[720] *Id.*

[721] *Id.* at 9663; OCC Ex. 1546.

[722] OCC Ex. 1546 at 2.

Add. 853

Appellate Case: 25-1079     Page: 855     Date Filed: 05/16/2025 Entry ID: 5517644

number changing fewer than 50 times.[723] **Acting in furtherance of these opinions under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Nothing in these notes indicated Mr. Bacon expressed any concern about his staff being overwhelmed should the thresholds be lowered to produce more referrals to CI for sales practices misconduct by Community Banking team members; and nothing suggested CI or Mr. Bacon resisted changing the thresholds in that direction.

To the contrary, the notes reflect that Ms. Russ Anderson actively and definitively resisted Mr. Bacon's suggestion that the current threshold – which would trigger a referral to CI only for team members who were suspected of engaging in 50 or more instances of misconduct – was too high. **Acting in furtherance of these opinions under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Given the opportunity during her testimony to respond to the notes and confirm that the notes are silent about CI being overwhelmed should the thresholds be changed, Ms. Russ Anderson responded, "I don't know that he didn't say that in the meeting. These are merely notes."[724]

Given that Ms. Russ Anderson thanked Mr. Otsuka for his reporting regarding what was discussed during this initial meeting of the Core Team and made no contemporaneous effort to challenge or contradict Mr. Otsuka's notes from the meeting, I find preponderant probative evidence established that as early as November 2013, Ms. Russ Anderson actively prevented adjusting the thresholds in a way that would have permitted a more in-depth analysis of the scope of sales practices misconduct (specifically: simulated funding and phone number changing) by Community Bank team members. **Such conduct constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Ms. Russ Anderson testified that Paula Bernardo reported directly to Rebecca Rawson, and that Ms. Bernardo headed the Data Analytics team – the team that would be responsible for "gathering the data analyzing the data and determining what team members should be forwarded over to Corporate Investigations and HR."[725]

Ms. Russ Anderson testified that as of November 5, 2013, it was her belief that "legal had made it clear through the Core Team to me that they were going to manage the threshold numbers."[726] Although not a distributee in the email chain, Ms. Russ Anderson identified an email exchange sent from Legal (by David Otsuka):

---

[723] Tr. (Russ Anderson) at 9667-68.

[724] *Id.* at 9665.

[725] *Id.* at 9309, 9684.

[726] *Id.* at 9314; R. Ex. 4840.

Add. 854

Appellate Case: 25-1079    Page: 856    Date Filed: 05/16/2025 Entry ID: 5517644



Mr. Otsuka identified Ms. Russ Anderson as a member of the "Core Team" "that is meeting weekly to discuss and coordinate."[728] He described the decision "to terminate employment based on phone number changes" and reported terminations based on "a very high number of phone number changes of 1-3 digits during a three month period: 162, 138, 165, and 46. The one who had 46 changes had a pattern of swapping the 4th and 6th digits. Investigations then followed up by calling a sample of numbers and in most instances they were wrong numbers or dial tones."[729]



Through this email message, Mr. Otsuka does refer to thresholds, but not in a way that suggested *Legal* was controlling or setting the threshold.

The import was the thresholds set by Ms. Russ Anderson for use in LA/OC were used across the enterprise and that Legal would "discuss and coordinate" with members of the Core Team, which included Ms. Russ Anderson. The message did not, however, suggest Legal was determining threshold policies for the investigation. Preponderant reliable evidence adduced during the hearing established that Ms. Russ Anderson, and not Legal, set the thresholds being discussed here.

"Staging," in this context, did not refer to setting thresholds that would drive when a case would be referred to either Corporate Investigations or HR. Ms. Russ Anderson testified that by "staging" the terminations of the remaining cases, she understood that "Legal did not want mass – didn't want the same termination – I call it mass, but the number of terminations occurring in

---

[727] R. Ex. 4840 at 2.

[728] *Id.*

[729] *Id.*

[730] *Id.*

[731] *Id.*

Page **102** of **443**

the same way in which it had been done which led to the first LA [Times] article. That they wanted them done in a very defined way, and so they were driving that behavior."[732] She added that Legal did not seek her input on the timing of terminations.[733]

One month before the publication of the first L.A. Times article, Regional Services Manager for LA/OC, Janice Dollar, presented to Paula Bernardo (Ms. Russ Anderson's direct report for Data Analysis in SSCOT) an analysis of data reflecting possible simulation of funding and changing of customer privacy preferences occurring in May through July 2013.[734] This data was then provided by Leslie Hicks-Veal to the head of Corporate Security, Mr. Bacon, in an email message sent on September 5, 2013.

In relaying the data analysis, Ms. Hicks-Veal provided the following narrative:

> I just wanted to give you a heads up of a pending case that is coming our way in SoCal. The Lead Region President John Sotoodeh requested a Sales Quality report of possible simulation of funding by bankers in his region. Attached is the spreadsheet that we have been reviewing the last few days with his Regional Presidents, H.R. Business Partner Manager and HMs. Russ Anderson. At this time the Line is debating what criteria they will use as a go forward standard for the team members they are asking us to speak with. At this time they identified 177 bankers showing signs of simulated funding. If we look at the absolute egregious team members we are looking at approx. 19 team members that we will need to speak with. The 19 if I'm not mistaken are based on the fact that 10% of the accounts opened as well as 10 accounts show evidence of funds in and out transfers in one day consecutively during a 4 month period.
>
> To make matters worse, one of John's RP's requested a report of all team members that have changed the privacy preference on accounts for the last few months. The numbers don't look great for this matter either. S.Q. is currently working on putting a spreadsheet together that would list all team members that changed the privacy preferences as well as changed either 1-3 digits of a customer's telephone number. Right now we are looking at 9 stores that have made over 100 telephone number changes for May – July. We believe the reasons for the changes are to prevent the customer from being contacted by Gallop Poll.
>
> I just wanted to bring this to your attention in case your phone starts ringing.[735]

---

[732] Tr. (Russ Anderson) at 9315.

[733] *Id.*

[734] R. Ex. 4588 at 1-2.

[735] *Id.* at 1.

Appellate Case: 25-1079     Page: 858     Date Filed: 05/16/2025 Entry ID: 5517644

When presented with this exhibit and asked during cross-examination whether it concerned her at the time that only the absolutely egregious team members were referred to Corporate Investigations as part of the simulated funding Proactive Monitoring pilot, Ms. Russ Anderson responded, "No, because within that 177, there could have been a large majority of those that were false positives."[736] **Acting in furtherance of these opinions under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

When asked not to speculate and asked to confirm that the only way she would know if there were <u>any</u> false positives was to do an investigation, Ms. Russ Anderson acknowledged, "[i]f you wanted to do all 177, yes."[737]

Ms. Russ Anderson acknowledged that expanding the thresholds would mean there would be more team members identified for potential misconduct and referred to Corporate Investigations for investigation.[738] When asked whether it concerned her that there was more potential sales practices misconduct in the Bank's largest line of business than the Investigations department would have the capacity to investigate, Ms. Russ Anderson responded:

> What I was concerned about was that if we went down the percentage too quickly, we had two issues: One, Corporate Investigations would be overwhelmed and couldn't do the investigations quickly enough; and, two, that swept up in that larger pool of team members were going to be a significant amount of false positives. And so moving the percentage down at a chunk basis until you figured out where the cross was, where the axis would cross, was my other consideration.[739]

Further, while positing that CI would be "overwhelmed" by the large number of cases referred for investigation, Ms. Russ Anderson testified this did not indicate that there was something deeply wrong with the Community Bank's business model – stating, again without documentary evidence to support the claim – that "there would be a raft of false positives in there, and that that would overwhelm Corporate Investigations."[740] Nothing in the record supports the proposition that there would be a "raft" of false positives that would "overwhelm" Corporate Investigations if the thresholds for CI referrals were changed. **Acting in furtherance of these opinions by refusing to adjust the "proactive" monitoring thresholds under the conditions that were present during the relevant period constituted unsafe or unsound**

---

[736] Tr. (Russ Anderson) at 9660.

[737] *Id.* at 9661.

[738] *Id.* at 9673.

[739] *Id.* at 9673-74.

[740] *Id.* at 9674.

**banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Ms. Russ Anderson acknowledged that as GRO for Community Banking she had a responsibility to understand the effectiveness of the thresholds, and to determine whether the thresholds monitored sales practices risk.[741] She further acknowledged that she was responsible for ensuring that SSCOT's methodology was effective to detect sales practices misconduct from 2013 to 2016.[742] **Ms. Russ Anderson's failure to ensure that SSCOT's methodology was effective to detect sales practices misconduct during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

**Core Team Analyses – December 5, 2013**

Ms. Russ Anderson testified that she was a member of the Core Team and believed the work of that team was necessary to the Bank.[743] She said it was necessary because "I believed that the people in the Legal Department and the Corporate HR and places like that were trying to have some understanding around the termination decisions that were being made."[744] She testified that because the materials the Core Team received about sales practices misconduct in the Community Bank were "based on investigations that were conducted," the materials were important sources of information.[745]

Pursuant to its responsibilities regarding the evaluation of allegations of sales practices misconduct by Community Bank team members, the Core Team reviewed a December 5, 2013 email from Mr. Otsuka that presented a series of cases – from Florida, Maryland, Pennsylvania, North Carolina, New York, and Connecticut.[746] Ms. Russ Anderson testified that she had routine discussions with members of the Bank's HR department regarding sales practice misconduct, including those who were part of the Core Team.[747] She testified the Core Team members shared with her their views about why employees engaged in such misconduct – "there was an exchange of ideas and concepts, yes" and that she valued their insights.[748]

The December 5, 2013 email chain reflected input from Core Team members regarding the cases presented, ███████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

---

[741] Tr. (Russ Anderson) at 9675.

[742] *Id.*

[743] *Id.* at 9739.

[744] *Id.*

[745] *Id.* at 9739-40.

[746] *Id.* at 9587-88; OCC Ex. 1366.

[747] Tr. (Russ Anderson) at 9586.

[748] *Id.*

Add. 858

Appellate Case: 25-1079    Page: 860    Date Filed: 05/16/2025 Entry ID: 5517644

██████████████████████ Mr. Otsuka concluded his message by asking recipients (including Ms. Russ Anderson, Mr. Bacon, Ms. Nelson, and Ms. Rawson) to "let me know by the end of the day, if possible, if you have anything to add or clarify."[750]

The record does not reflect any written response from Ms. Russ Anderson seeking to clarify or add to what Mr. Otsuka sent.[751] However, Ms. Nelson (head of Community Banking's HR department) did respond, as follows in pertinent part:

> While none of us would disagree that we train tellers on appropriate referral activity and our being "in the right" to terminate when tellers fail to act as expected, I have considerable angst on how these issues and our decision-making could be viewed in the public eye.
>
> For the average man and woman on the street they're not going to be swayed by the logic of fidelity bonding and sales quality process. They are going to see lower-paid [team members], many of whom are short-tenured, taking actions that are in many, many cases either encouraged or studiously ignored by their store management, in order to meet goals and keep their jobs.
>
> Teller referral issues continue to occur. And while we all hope – over time – that we can mitigate with communication, coaching, teaching, etc., we have many months of pain ahead of us.
>
> I believe this is a significant reputational and financial risk for our business. And as I complete the next risk rating reporting for my business from an HR perspective, I will be sure to call it out.[752]

Provided the opportunity to state whether she had any reason to believe Mr. Nelson was being untruthful in this email, Ms. Russ Anderson avoided answering the question, responding instead, "I think she was stating an opinion."[753] Provided the opportunity to state whether she believed when employees engage in sales practices misconduct this posed a significant financial risk to the Bank, Ms. Russ Anderson again avoided answering the question, responding instead, "[w]ell, she's talking specifically here about teller referral issues."[754] When presented with a second opportunity to answer the same question, Ms. Russ Anderson responded, "It could."[755] When pressed to answer whether it *did* pose a significant financial risk to the Bank, Ms. Russ

---

[749] OCC Ex. 1366 at 2-4.

[750] *Id.* at 2.

[751] OCC Ex. 1366.

[752] *Id.* at 1.

[753] Tr. (Russ Anderson) at 9589.

[754] *Id.* at 9590.

[755] *Id.*

Appellate Case: 25-1079     Page: 861     Date Filed: 05/16/2025 Entry ID: 5517644

Anderson responded, "I don't know that."[756] **Acting in furtherance of these opinions under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

**Pausing Proactive Monitoring – November 2013**

Ms. Russ Anderson testified that "[a]round the time of the L.A. article, individuals in Corporate HR and Legal put a pause on the proactive monitoring."[757] She testified that she learned about the pause during a phone call in late November or early December 2013 with Pat Callahan, then Chief Administrative Officer of Wells Fargo.[758] She said she "was not at all happy about" the pause, that it was "very disappointing to me" because she felt the proactive monitoring was "a good process and one that we should move forward on with all due haste."[759]

On further questioning, Ms. Russ Anderson testified that the pause actually began around November 2013, at the direction of Pat Callahan.[760] Ms. Russ Anderson testified that it "wasn't really clear what the pause was and who was supposed to be doing what" – disputing the premise that pausing proactive monitoring would be appropriate only if she used the time to really understand the root cause of sales practice issues.[761]

This, however, was the message explicitly presented by Hope Hardison in a December 23, 2013 email to Ms. Russ Anderson – who wrote:

> My understanding was that we had agreed to work through the Sales Quality reports already run and refer them to CI, but that with respect to future reporting we were hitting the pause button while the CB team and partners work to uncover the root causes and implement recommendations. With respect to pausing the Sales Quality proactive reporting, ▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ that provided we are using the time to really understand and address the root causes of the issue and taking appropriate action in response to our findings, we can pause. Once new programs are in place we would certainly resume testing to evaluate their effectiveness.[762]

---

[756] *Id.* at 9590.

[757] *Id.* at 9254.

[758] *Id.* at 9329, 9328-29.

[759] *Id.* at 9255.

[760] *Id.*

[761] *Id.*

[762] OCC Ex. 1142 at 1.

Add. 860

Appellate Case: 25-1079    Page: 862    Date Filed: 05/16/2025 Entry ID: 5517644

Ms. Russ Anderson acknowledged that she read this email, but that "there were a lot of emails"; but nevertheless she took it seriously.[763] She disagreed, however, that the message indicated it was incumbent upon her as the Group Risk Officer to understand what needed to be done during the pause – testifying instead that "the 'we' in here is Pat and Hope and me. . . . not just me as the Group Risk Officer".[764] When asked during cross-examination "Okay. But the 'we' includes you, the Group Risk Officer, right?" Ms. Russ Anderson responded, "It's not how I read it at the time. But I would agree to that now."[765]

Ms. Russ Anderson testified she did not know what either Ms. Callahan or Ms. Hardison was doing at this time to identify and address the root cause of sales practices misconduct.[766] Ms. Russ Anderson also testified that she did not recall ever telling either Mr. Julian or Mr. McLinko that she was working during this time to identify and address the root cause of sales practices misconduct.[767]

Ms. Russ Anderson testified, "[w]e had invested a lot of time and energy. And it was sort of my baby. And I thought that pausing it, we would lose momentum on what we had started."[768] She said she then called Carrie Tolstedt, expressed her discomfort with the pause, and Ms. Tolstedt "reiterated that this is what Pat and Hope Hardison . . . and Legal needed us to do, and so I followed their orders."[769] She testified that "if the Law Department had – their analysis talked extensively about what the pause would mean, and that putting the pause in place was legally okay to do, because we were going to be doing this work on determining root cause and understanding activities that had led up to the terminations."[770]

Ms. Russ Anderson testified that pausing proactive monitoring meant that SSCOT would stop looking proactively for the most egregious offenders of simulated funding and phone number changes and referring those employees to Corporate Investigations.[771] She testified that she was uncomfortable with the pause because she believed it hindered detection of additional employees who engaged in sales practices misconduct.[772] Without contradicting the premise that the pause was instituted so that she as GRO could determine the root cause of sales practices

---

[763] *Id.* at 9696.

[764] *Id.*

[765] *Id.*

[766] *Id.* at 9696-97.

[767] *Id.* at 9697.

[768] *Id.* at 9330.

[769] *Id.* at 9331.

[770] *Id.* 9333-34.

[771] *Id.* at 9687.

[772] *Id.*

Add. 861

misconduct, Ms. Russ Anderson testified the pause further hindered her ability to apprise senior leadership of the sales practices misconduct problem.[773]

Notwithstanding these concerns, Ms. Russ Anderson acknowledged that she failed to tell members of the Enterprise Risk Management Committee at the April 9, 2014 meeting that she was uncomfortable with pausing proactive monitoring; or that the pause hindered SSCOT's ability to detect additional sales misconduct; or that it hindered her from being able to apprise senior leadership of the depth and breadth of the potential misconduct.[774] She testified this was because "Pat Callahan and Hope Hardison and Mike Loughlin were on the Committee."[775] Offering no documentary evidence to support the factual claim, Ms. Russ Anderson testified that she did not raise the pause with the ERMC because its members "knew about the pause and they knew how I felt about the pause."[776] She acknowledged that there were others on the Committee, but that she did not "think it was necessary to tell them" and it "was not part of the conversation".[777] **Acting in furtherance of these opinions under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Ms. Russ Anderson also acknowledged that there was no lookback conducted of sales practices misconduct that occurred prior to April 2014.[778] She testified that she did not inform the ERMC about this – but that there were others on the Committee, including members from Legal, who she said knew about this.[779] She offered no documentary evidence to support this factual claim.

During her testimony regarding the disagreement she had – with Legal, HR, and Ms. Tolstedt – concerning the propriety of pausing the proactive monitoring of sales practices misconduct, Ms. Russ Anderson identified a series of email message chains.[780] In a November 25, 2013 exchange among senior staff for HR, Corporate Security, and Legal, HR Manager Susan Nelson raised concerns about "multiple tm terms" (presumably referring to multiple team member terminations).[781] She wrote, "As I'm chatting with the line HRBPs, I think we really need to put together something documenting roles and responsibilities around handling these

---

[773] Tr. (Russ Anderson) at 9687.

[774] *Id.* at 9688.

[775] *Id.*

[776] *Id.*

[777] *Id.* at 9689.

[778] *Id.*

[779] *Id.* at 9690.

[780] *Id.* at 9434-37; OCC Ex. 1365; R. Ex. 17697; OCC Ex. 1367.

[781] OCC Ex. 1365 at 7.

Add. 862

Appellate Case: 25-1079    Page: 864    Date Filed: 05/16/2025 Entry ID: 5517644

multiple tm terms. It's not feeling really coordinated and I'm worried that things are going to fall through the cracks. Just an unintended consequence of this new process, I think."[782]



Later on November 25, 2013, ███████████████████████████████ Ms. Russ Anderson "agreed to put a pause on what they do proactively (*i.e.*, the sales quality reports they run) through the end of the year."[783] ██████████████ Ms. Russ Anderson "would still respond reactively to all the stuff that comes through the Ethics Line, customer complaints, from regulators and the like."[784]

███████████████████ "with respect to the 109 that came up on the simulated funding/phone number report they just ran, they would need to move forward. She's agreed they wouldn't have to be referred to Investigations this week. ████████████████████████ ███████████████████████

The "109" refers to "the next grouping of team members that the SSCOT team had sent to Corporate Investigations," as reflected in a report contained in a November 26, 2013 email message from Mr. Otsuka to Ms. Meuers and Ms. Hurley.[786] The report reflects Simulated Funding cases throughout the country (Simulated Funding reported in Eastern: 6, West Coast: 19; Western Mountain: 13 – including LA/OC, Arizona/Idaho, San Francisco Bay Regional Banking; Northeast; Nevada Community Banking; and Utah Community Banking; and Phone Number Changes reported in West Coast: 28, Eastern: 18; Western Mountain: 14; Mountain Midwest: 13; Southwest: 4, including LA/OC, Arizona/Idaho; Northeast; San Francisco Regional Bay; Mid Atlantic; Colorado Regional; Greater Bay Area Regional; Minnesota/Great Lakes; Nevada Community Banking; Houston Community Banking; Southeast; Iowa/Illinois Regional Banking; Alaska Community Banking; Carolinas; Dakota Regional Banking; Florida; New Mexico/Western Border; Northern and Central California; Southern California; Utah Community Banking; and Washington Retail Banking.[787]

Ms. Russ Anderson testified that she told Mr. Otsuka that she wanted these cases processed because "the work had been done, and we needed in our protocols to move those to Corporate Investigations, who were anticipating that work."[788] She said she discussed the pause in proactive monitoring "extensively" with the other Core Team members – including Mr. Otsuka, Christine Meuers, [Crystal] Silva, Rebecca Rawson, Susan Nelson, Laura Hurley, and

---

[782] OCC Ex. 1365 at 7.

[783] *Id.* at 4.

[784] *Id.*

[785] *Id.* at 7.

[786] Tr. (Russ Anderson) at 9337; OCC Ex. 1365 at 1,3.

[787] OCC Ex. 1365 at 1-2.

[788] Tr. (Russ Anderson) at 9337.

Add. 863

Appellate Case: 25-1079      Page: 865      Date Filed: 05/16/2025 Entry ID: 5517644

Debra Patterson.[789] She testified that she understood the purpose of the Core Team was "that we were going to be reviewing the recommendations that Corporate Investigations would have around terminations of individuals in the branches through the data that they got from SSCOT."[790]

Ms. Russ Anderson testified that two issues were discussed in particular: the length of the pause, and whether there would be a "lookback" period.[791] She stated lookback was an issue "because the pause was in effect, there was this whole period of time where the activity was going on but we were not gathering that data. So the idea of the lookback was that we would actually go back and start at the period of time that the last data was gathered and pull it forward, and that we would work that data and try to catch up."[792] She said while she was in favor of the lookback period, "the Law Department was not at all in favor of us doing that."[793]

Ms. Russ Anderson identified an email message dated December 3, 2013 from Mr. Otsuka to Ms. Meuers and Ms. Hurley in which Mr. Otsuka briefed the recipients on a Core Team call made earlier that day.[794] The message reported Ms. Russ Anderson was not on the call but that "we're going to be moving forward with the most recent Sales Quality Report that was run by Claudia's team" (the 109).[795] Mr. Otsuka also reported agreement "on the following revised thresholds, which will better manage volume, and hopefully focus us all better on higher impact situations."[796]

The revised thresholds were set as follows:

- We'll continue to review any simulated funding/phone number change issues in LA/OC.
- Outside of LA/OC, we'll review simulated funding/phone number change issues if the recommendation from Investigations is termination of 3 or more team members in a Store.
- If the issue doesn't pertain to simulated funding/phone number change issues, we'll review if the recommendation from Investigations is termination of 5 or more team members.

███████████████████████████████

---

[789] Tr. (Russ Anderson) at 9337-41; see also, "In re Tolstedt-EC's 2d Revised Hrg Transcript Errata Sheet" on page 29. Ordered by Second Supplemental Order (correcting Ms. Silva's fist name).

[790] Tr. (Russ Anderson) at 9341.

[791] Id.

[792] Id. at 9342.

[793] Id.

[794] R. Ex. 17697 at 1.

[795] Id.

[796] Id.

Appellate Case: 25-1079     Page: 866     Date Filed: 05/16/2025 Entry ID: 5517644



Ms. Russ Anderson testified that she discussed the longer pause ███████████ in a phone call with Hope Hardison and Pat Callahan, that she was "unhappy with not being able to start the proactive monitoring again on January the 1st and that I disagreed quite vehemently with their desire for the proactive monitoring to be stopped for an unknown period of time."[798] Regarding the look back period, Ms. Russ Anderson testified – without offering documentary evidence to support the factual claim – that the "Core Team was not in favor of it. Neither Legal nor HR thought that it would be a good idea to do a look back, that . . . it could overwhelm Corporate Investigations, and that they would just as soon move forward instead of looking back."[799]

Ms. Russ Anderson testified she expressed her disagreement because "if we did a look back, that we could have learnings from and also who, if the behavior turned out to be true, needed to be disciplined."[800] She added that while she advocated the 109 be processed, HR felt that "if we went through with the 109, that the terminations would be very disruptive and wanted it to stay – those 109 to stay on pause and not finish the investigations on them."[801]

Ms. Russ Anderson identified an email chain dated December 19, 2013 among Core Team members regarding "Moving from reactive to proactive".[802] In the first message, Susan Nelson expressed the view that "[t]his is feeling very, very time sensitive to me. I'm so worried that the flood gates are opening up again and I'm feeling a little like Nero playing my violin while Rome is burning."[803] She wrote "I'm not sure how many more hours we can all continue to

---

[797] R. Ex. 17697 at 1.

[798] Tr. (Russ Anderson) at 9344.

[799] *Id.*

[800] *Id.* at 9345.

[801] *Id.*

[802] *Id.*; OCC Ex. 1367.

[803] OCC Ex. 1367 at 5.

invest in Core Group meetings to hammer through same issues – different names again and again."[804] Expressing a desire "to move the dialogue forward a little", Ms. Nelson identified initiatives she wanted to discuss, anticipating that "Corporate Investigations' hiatus on running sales integrity reporting" will end the end of December.[805]

Ms. Russ Anderson testified that with all of these emails and conversations, she "was feeling pressure to not move forward with the proactive monitoring and not doing a lookback. There was preponderance of opinion by Legal and senior HR people not to do it."[806] Ms. Russ Anderson acknowledged, however, that she did not inform the ERMC about the decision not to have a lookback period.[807]

Notwithstanding the "preponderance of opinion" cited by Ms. Russ Anderson in her testimony, the record reflects that on December 19, 2013, Ms. Russ Anderson "basically announced on today's Core Team call that she's resuming proactive reporting (using a look back period) starting 1/1/14."[808]

The point was addressed in greater detail in Ms. Meuers' email to Hope Hardison on December 20, 2013:

> Hope -- Just wanted you to be aware of this development, as it is different than what we had discussed previously. My understanding was that we had agreed to work through the Sales Quality reports already run and refer them to CI, but that with respect to future reporting we were hitting the pause button while the CB team and partners work to uncover the root causes and implement recommendations. With respect to pausing the Sales Quality proactive reporting, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ that provided we are using the time to really understand and address the root causes of the issue and taking appropriate action in response to our findings, we can pause. Once new programs are in place we would certainly resume testing to evaluate their effectiveness. Can you please check in with Claudia to level set on this?[810]

---

[804] OCC Ex. 1367 at 5.

[805] *Id.* at 3.

[806] Tr. (Russ Anderson) at 9349.

[807] *Id.* at 9690.

[808] OCC Ex. 2468 at 1.

[809] *Id.*

[810] *Id.*

Appellate Case: 25-1079     Page: 868     Date Filed: 05/16/2025 Entry ID: 5517644

Ms. Russ Anderson testified that a "level set" refers to being "all of like mind," and through the Core Team call on December 19, 2013, she "was making it clear that we were going to resume our proactive work on January 1, and that we were going to use a look back period to go back to where we had stopped and move forward."[811] When asked whether there was a discussion about finding the root cause, Ms. Russ Anderson answered, "it was mentioned. There was not a robust conversation."[812] When asked who was supposed to find out the root cause, Ms. Russ Anderson responded, "[m]y understanding was that it was going to be addressed through Corporate HR and Legal with help from the Core Team."[813] **Acting in furtherance of these opinions under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Ms. Russ Anderson identified an email exchange between herself and Ms. Hardison dated December 23, 2013, where Ms. Hardison "wanted to check in with" Ms. Russ Anderson on the "Sales Quality detective reporting."[814] Ms. Hardison wrote that her understanding was that "we had agreed to work through the Sales Quality reports already run and refer them to CI, but that with respect to future reporting we were hitting the pause button while the CB team and partners work to uncover the root causes and implement recommendations."[815]

Ms. Russ Anderson testified that finding root causes was being addressed in this message, but she was still advocating for a resumption of proactive monitoring effective January 1, 2014.[816]

Elaborating on her reasoning regarding her rejection of Ms. Hardison's approach, Ms. Russ Anderson testified:

> To me, the proactive monitoring work we were doing is what you needed in order to feed any new programs whatever she might have been thinking about and to help you work on root causes, because there's never just one root cause. But without that continued work, I felt we would be working in a vacuum, that we would be having stale data. You wouldn't know what the behavior was continuing to do and what the data would tell you.[817]

---

[811] Tr. (Russ Anderson) at 9351.

[812] *Id.* at 9352.

[813] *Id.* at 9354-55.

[814] *Id.* at 9355-56; OCC Ex. 1142 at 1.

[815] OCC Ex. 1142 at 1.

[816] Tr. (Russ Anderson) at 9358-59.

[817] *Id.* at 9359.

Ms. Russ Anderson testified that she spoke later that day with Ms. Hardison, Pat Callahan[] and Debra Paterson, who were "adamant" that resuming the proactive reporting "was not going to happen."[818]

The initiatives Ms. Nelson wanted to discuss included possible changes to new hire training.[819] She wrote, "it may be a good idea to look at **how** we're doing [NHO and new hire training] and what resources we can/should provide to [Shelley] to throw a spotlight on ethics and integrity".[820] (Emphasis *sic*.) She suggested "we do some hard copy materials delivery directly to new team members to reinforce what is done in the classroom or that the team member 'receives' via a direction to go read something on TeamWorks."[821] (Emphasis *sic*.)

On this point, Ms. Nelson advocated creating "some common core and common training for Investigations (and maybe also for us) around sales integrity training/materials."[822] She wrote:

> I recall that we had one Investigations report where the investigator asked 2 tellers if they were familiar with the Sales Integrity Manual and they said "no." I just learned yesterday (mea culpa) that the Sales Integrity Manual isn't shared with individual contributors, only store managers. A small but important point if we're using this question to determine whether we have grounds to terminate someone based upon knowledge of policy.[823]

Ms. Russ Anderson responded almost immediately, stating

> Susan – that is not correct. First, it is called the Sales Quality Manual and Sales Integrity EKOD and they are required by ALL store team members at hire and again annually. During the EKOD they certify that they have read the manual. Not sure who was misinformed but you can let them know that that is not correct.[824]

The record reflects, however, that Ms. Nelson was not "misinformed" about team member access to the Manual. Ms. Nelson advocated hard copy materials delivered directly to team members; and Ms. Russ Anderson wrote that the only access to the Manual during training is "virtual" so "in the training they click on a link and read the manual."[825] Ms. Russ Anderson

---

[818] Tr. (Russ Anderson) at 9360, see also "22-03-07 Respondents' Amended Revised Errata Day 9-38" on page 76. Ordered by Second Supplemental Order.

[819] OCC Ex. 1367 at 4.

[820] *Id.*

[821] *Id.*

[822] *Id.* at 3.

[823] *Id.*

[824] *Id.* at 2.

[825] *Id.* at 1.

opined that she "cannot imagine we would go back to paper", which is precisely what Ms. Nelson had been advocating.[826]

The exchange ended with Debra Paterson suggesting, "[p]erhaps we need to have them review it in classroom, have some Ethically Speaking discussion or scenarios around it and then make sure they know where the link is to refer to it once back in their stores if necessary."[827]

Ms. Nelson also advocated planning a session "with key leaders to dig deeper into the root causes of sales integrity problems across the footprint."[828] Further, she suggested that "[i]f we can influence CI at all, I'd like to see some core and common data in the investigation reports that are coming to the Core team".[829] She identified the need to see hiring dates, dates in position, and confirmation that all relevant training had been completed – for every team member investigated, and she wanted the same data for their service or store manager.[830]

Ms. Nelson also wanted to see "actual volume numbers of issues under investigation."[831]

Elaborating on this point, Ms. Nelson wrote:

> There is an in-built assumption that someone was flagged based on broad-based front-end guidance being used on sales integrity reporting. However, since that front-end guidance is pretty broad, I'd like to see actual numbers/percentages to get a feel for bigger picture. How many/percent of inappropriate referrals or simulated funding of accounts.[832]

Ms. Nelson noted, "we rolled out Ethically Speaking materials late in 2013. Not sure what the core and common strategy is around delivering these on an ongoing basis in 2014? Would love to see the strategy/plan. And if we don't have one, let's build one."[833]

Ms. Russ Anderson testified that the problem Ms. Tolstedt and others were focused on "were the number of team members that had been terminated in the initial LA/OC terminations that ended up in the newspaper. And they wanted, at their levels, to take a step back and see if they could determine a root cause of the activity."[834] "They thought that the number of terminations, as reported in the L.A. Times article, was . . . not good for the Bank's reputation, and so they wanted to take a look at the processes we were using and if there was a root cause to

---

[826] OCC Ex. 1367 at 1.

[827] *Id.*

[828] *Id.* at 4.

[829] *Id.* at 5.

[830] *Id.* at 4.

[831] *Id.*

[832] *Id.*

[833] *Id.*

[834] Tr. (Russ Anderson) at 9331.

Add. 869

the issue."[835] She testified that in her December 19, 2013 email, Ms. Nelson was expressing that "HR was very concerned that if we did this look back to go back and look at the behaviors that the bankers had, that there would be involuntary terminations through that data, and she . . . didn't want to advocate for that."[836]

Ms. Russ Anderson testified that she "wanted to start up right away in January 2014," but the pause ended and the pilot went forward in April 2014.[837] Asked whether she agreed with testimony attributed by her Counsel during direct examination to Examiner Candy that the immediate action Ms. Russ Anderson took after the second L.A. Times article in December 2013 was to pause proactive monitoring for seven months, Ms. Russ Anderson said she did not agree with it – testifying that "Ms. Candy is mistaken that I'm the one who took the pause. . . . the pause was taken at the direction of the senior leadership of Wells Fargo."[838] She also disagreed with any testimony suggesting that the pause in proactive monitoring was ultimately her responsibility, because she "had been directed by the Chief Administrative Officer of the Company, the head of HR for the Company, [her] own boss, and Legal to do this pause. I could not summarily go against their direction."[839]

It should be noted that there is substantial evidence establishing the pause on the Community Bank's proactive monitoring of simulated funding and phone number changes did not end until July 2014, in that SSCOT did not begin to refer cases generated from the proactive monitoring reports to Corporate Investigations until then.[840]

Further, there is substantial evidence establishing that here was no lookback conducted of potential simulated funding and phone number changes that occurred prior to April 2014.[841] Ms. Russ Anderson later clarified her answer, testifying that the "data started being collected in April of 2014 because they used 90 days' worth of data before they started – before they moved the data to Corporate Investigations."[842] Corporate Investigations thus did not receive Community Bank's data until July of 2014, at which time, Ms. Russ Anderson testified, they "started their interviews in the branches."[843]

---

[835] Tr. (Russ Anderson) at 9331-32.

[836] Id. at 9347-48.

[837] Id. at 9255, 9332.

[838] Id. at 9363-64.

[839] Id. at 9364.

[840] See Enforcement Counsel's Motion for Summary Disposition, Statement of Material Facts (MSD, SMF) (Russ Anderson) No. 202 and (Julian and McLinko) No. 161, responses thereto.

[841] Tr. (Russ Anderson) at 9360; see also MSD, SMF (Russ Anderson) No. 202 and (Julian and McLinko) No. 161.

[842] Tr. (Russ Anderson) at 9255.

[843] Id. at 9255-56; 9360.

Appellate Case: 25-1079     Page: 872     Date Filed: 05/16/2025 Entry ID: 5517644

Ms. Russ Anderson testified that her team would turn over to Corporate Investigations data being collected during the pause period.[844] She identified a January 30, 2014 email she sent to Ms. Callahan, Ms. Hardison, and Ms. Paterson that advised the recipients that soon her team "will be receiving from the Deposit Products Group some data that we need to analyze and, potentially, turn over to Corporate Investigations."[845] She testified that there were "several data points that we would get in from the Deposit Product Group", adding that Ken Zimmerman "had a very robust analytics group, and they analyzed all sorts of things and activities in the deposit space."[846] She said that Paula Bernardo's group within SSCOT "would use and manipulate" the data "to look for trends of behaviors, rolling funding rates, short cycle validations."[847] She testified that there "would also have been simulated funding, potential simulated funding activity in there."[848]

Ms. Russ Anderson testified that she wrote the email to make the recipients aware that the data showing simulated funding activity was coming not from proactive monitoring but through reactive work, and she wanted the recipients to "be aware of the fact that I wasn't going behind their back" but that there "could be some simulated funding activity in there that could lead to terminations."[849]

### *Project Clarity*

Ms. Russ Anderson testified that during the seven-month pause of SSCOT's proactive monitoring, apart from participating in the Evolving Model project,[850] she also worked on Project Clarity, which related to signature capture and customer consent.[851] She testified that the lack of a customer signature did not necessarily indicate the lack of consent by the customer.[852] She said "you had a level of where – where you were okay with not getting the signature."[853] "So let's say you had 98 percent signature capture, the other 2 percent you're okay with not getting, because you have things like ADA [Americans with Disabilities Act] restrictions."[854]

Elaborating on this point, Ms. Russ Anderson testified:

---

[844] Tr. (Russ Anderson) at 9363; OCC Ex. 1143.

[845] OCC Ex. 1143 at 1.

[846] Tr. (Russ Anderson) at 9362

[847] *Id.*

[848] *Id.*

[849] *Id.* at 9363.

[850] *Id.* at 9275.

[851] *Id.* at 9369.

[852] *Id.* at 9373.

[853] *Id.*

[854] *Id.* at 9373-74.

Add. 871

Appellate Case: 25-1079     Page: 873     Date Filed: 05/16/2025 Entry ID: 5517644

> You have customers who know you really, really well and would call on the phone and say, hey, Claudia, can you open this account for me? So you open the account. You didn't get a signature capture. It could be I went in, but I wanted the account in my husband's name and my name, so they have my signature but they don't have my husband's signature. There's a myriad of reasons. And now with phone bank and the Internet, we don't capture signatures on accounts that are opened in those two channels.[855]

Responding to leading questioning by her Counsel during direct examination, Ms. Russ Anderson testified that it is "extraordinarily difficult" to change something as much as just saying you have to have a signature on a piece of paper in the Community Bank, "because you have to start off with the technology pieces and build those, and you have to change all of your processes."[856] Stating, "it can be a customer experience issue, which is why, up until, you know, the '13, '14 timeline, our product partners preferred that we really not press for customer signatures."[857] **Acting in deference to product partner preference under the conditions that required credible challenge regarding customer consent and signature capture constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Ms. Russ Anderson testified that she disagreed with testimony to the effect that requiring a signature to show authorization of a credit card is a simple control to implement.[858] Elaborating on this point, Ms. Russ Anderson testified:

> As I stated earlier, signature capture is one of those items that you can build a process as good as you can, but you're never going to be perfect at it, because you have some limitations. So you set -- you set a percentage that you're comfortable with. To me, it's like at the teller line. You're always going [to] have some cash loss at the teller line. You just have to know what the limits are that you're comfortable with that risk. And that's what happens with signature capture."[859]

Ms. Russ Anderson testified that when she found out, "we were not capturing signatures on credit – well, we were capturing as many as we could. But the reason I got for why we weren't doing it for every credit card was because the credit card law did not require it."[860] She testified, "no one wanted" to require customer signatures on credit card applications: "They

---

[855] *Id.* at 9374.

[856] *Id.* at 9375.

[857] *Id.*

[858] *Id.* at 9376-77.

[859] *Id.* at 9377. See also "22-03-07 Respondents' Amended Revised Errata Day 9-38" on page 76. Ordered by Second Supplemental Order.

[860] Tr. (Russ Anderson) at 9377,

Add. 872

Appellate Case: 25-1079    Page: 874    Date Filed: 05/16/2025 Entry ID: 5517644

didn't think it was necessary. They felt that the fact that it wasn't required by law made it unnecessary. Nobody wanted to spend the technology dollars. And people feared that it would compromise the account opening process at the banker desk, that it would slow things down."[861]

Although she testified that signatures were not required until 2015, Ms. Russ Anderson testified without providing supporting documentation that she "took a lot of hits, but I persevered" and used "a lot of my political capital to get it done," because "capturing credit card signatures is really important so that you know if there's a dispute, that they signed up for that credit card."[862]

Ms. Russ Anderson testified that the concept behind Project Clarity had to do with signature capture and customer understanding: "the concept was, are we clear with the customer – are we clear and is the customer clear about the product and service that they're wanting and getting?"[863] Without providing details about signature capture, Ms. Russ Anderson testified that during the pause Project Clarity "was continuing to roll out" and after starting as "paper-based" it now is "actually built into the bankers' systems."[864] She said now when an account is opened over the phone, "you've captured the person saying 'yes, I want that account. And on the Internet, you're the one who is putting in your data. But in the branches, physically, you still sign."[865]

This description of Project Clarity is inconsistent with the minutes of the OCC's February 10, 2015 meeting with Ms. Russ Anderson. The minutes of that meeting, which the OCC called to provide Community Banking staff the opportunity to present information on the Conduct Risk Framework for the Operational Risk and Cross Sell Examination, reflects the following: "Project Clarity is work they are doing that clarifies what channels the customer will come through. They prefer they go through their local branches and use the 800 number secondary to in person/local branches."[866]

Regarding credit card customer signatures – a project she worked on – "we started requiring them in 2015, and it was fully rolled out before I left in 2016."[867] Notwithstanding the lack of customer signatures during the relevant period, through leading questioning by her Counsel during direct examination, Ms. Russ Anderson testified without offering supporting documentation that as a result of her work around signature requirements and consent, she saw

---

[861] *Id.* at 9378-79.

[862] *Id.*

[863] *Id.* at 9369.

[864] *Id.*

[865] *Id.* at 9374-75.

[866] OCC Ex. 1771 at 3.

[867] Tr. (Russ Anderson) at 9375.

Appellate Case: 25-1079   Page: 875   Date Filed: 05/16/2025 Entry ID: 5517644

"significant" improvements between 2013 and 2016, averring, "I don't remember the percentages, but consent issues went down quite materially."[868]

### Mystery Shopping

Ms. Russ Anderson testified that through the mystery shopping program, "you hire a third-party firm and they bring in individuals who act just like a customer. You would not know. So they go into the branch, they sit with a banker, and they experience – they go in with all different kinds of product that they desire. They go through the whole account opening process with the banker."[869]

Ms. Russ Anderson testified that the shopper would then provide feedback "as to did they feel pressured? Did they get all the right information?"[870] Through leading questioning by her Counsel during direct examination Ms. Russ Anderson testified that it was "sort of" like an undercover sting, and she "was very excited about" it.[871]

### The Quality Sales Report Card

Ms. Russ Anderson testified, "during the pause, we were continuing to evolve the Quality Sales Report Card [QSRC] and use it [to] help us understand quality of sales as well as behaviors."[872]

> So it was -- it was kind of growing up, and I was using it now -- because the data was good, I could use it now as a tool when we were talking about promotions, people speaking at conferences, people going to the annual conference. We would look at their quality sale report card and determine if they met the criteria for being promoted or being a speaker or what it might be.[873]

Elaborating, Ms. Russ Anderson testified:

> And it really was another mechanism of providing information to the Regional Banking branches, and really importantly, to the senior leadership of Regional Banking about the quality of the sales that were occurring. So it captured things like signature capture. It did things like rolling funding rates. It really gave information to the executives to show -- I think they started out with four and we would add things. But items that could indicate that the -- they had quality of sale issues. And if you have quality of sale issues, then

---

[868] Tr. (Russ Anderson) at 9375.

[869] *Id.* at 9370.

[870] *Id.*

[871] *Id.*

[872] *Id.* at 9371.

[873] *Id.*

Appellate Case: 25-1079     Page: 876     Date Filed: 05/16/2025 Entry ID: 5517644

perhaps do you have other -- you know, is there something else wrong with that -- with that sale.[874]

Ms. Russ Anderson identified an email exchange from February 2013 between herself and Jason MacDuff regarding her preparation for a presentation she was to make before the Bank's Regional Banking Leadership.[875] In the exchange, Mr. MacDuff inquired whether Ms. Russ Anderson's presentation on risk management might include a presentation by "a mid-senior leader to come share some of their practices and processes with their teams".[876] He qualified this by suggesting that such a presenter would need to have "good QSRC or recent significant improvement".[877]

In her response to this suggestion, Ms. Russ Anderson wrote that while she appreciated Mr. MacDuff's feedback, "I don't expect a mid to senior person to talk because quite frankly we couldn't find one whose stats were credible (hate to say that)".[878]

Presented with the opportunity to explain why she wrote this, Ms. Russ Anderson testified during direct examination:

> Because the Quality Sales Report Card, which Jason in the previous email was saying, you know, do you have anybody in the quality sales report card who shows really good numbers. My issue was that the Quality Sales Report Card was not even 10 months old yet, and there was a lot of movement in the numbers within the Quality Sales Report Card, which was why we weren't using it other than as an informational document at this point in time. And my biggest fear was that if I used the data in that report and I asked someone to come and speak and that person actually had really poor scores, you know, two months later as we continued to work the data, I was going to lose a lot of credibility with the leadership team for putting someone up on the stage who really was not doing the positive activity that we were saying they did.[879]

When asked to respond to Examiner Candy's testimony about this email exchange, Ms. Russ Anderson responded, "I think she's misinterpreted my message" and "didn't understand what my concerns were."[880] Ms. Russ Anderson testified that she and Ms. Tolstedt would talk about sales qualitative and quantitative measurements in discussing the promotion of executives

---

[874] *Id.* at 9382-83.

[875] *Id.* at 9385; OCC Ex. 50.

[876] OCC Ex. 50 at 4.

[877] *Id.*

[878] *Id.* at 3.

[879] Tr. (Russ Anderson) at 9386-87.

[880] *Id.* at 9387.

Add. 875

to higher-level jobs, and would use the QSRC "to help in advancement decisions for members of the Regional Bank".[881]

During cross-examination, Ms. Russ Anderson agreed that that from 2013 to 2016 the QSRC was not a control that prevented employees from engaging in sales practices misconduct.[882] She testified that she understood, however, that it could have been used as a control to detect such misconduct, while acknowledging that having a poor QSRC score would not result in an employee being terminated.[883]

Ms. Russ Anderson testified that the "quality of [the] sales report card wasn't even a year old, and the data was still being – I don't want to  - massaged so that we could really use it to mean something. So that's what this means."[884]

When asked during cross-examination whether this concerned her at the time, Ms. Russ Anderson responded, "No. Because we were getting close."[885] Asked whether it concerned her that she could not find a single mid to senior leader by this point in February 2013, Ms. Russ Anderson responded, "It did not, because I did not have the data to do that."[886] Asked to assume the premise that the sales goals were reasonable, Ms. Russ Anderson was asked during cross-examination whether she would expect to find at least one mid to senior leader who was able to meet sales goals and had even an improvement in the QSRC, Ms. Russ Anderson responded, "I don't know. I didn't think about it."[887]

The record reflects, however, that in February 2013 Ms. Russ Anderson did think about the issue, at some length, and that her testimony to the contrary was false.[888] In an Instant Message exchange – a copy of which Ms. Russ Anderson sent to herself on February 11, 2013 – Ms. Russ Anderson and Ken Zimmerman were discussing the content of the deck Ms. Russ Anderson would be presenting to the Regional Bank leadership conference.[889] Regarding the deck she had prepared, Ms. Russ Anderson wrote to Mr. Zimmerman, "this is painful. I am afraid Jason [MacDuff] and team are going to rip my deck apart. It is different from others."[890]

---

[881] *Id.* at 9480.

[882] *Id.* at 9753.

[883] *Id.* at 9753.

[884] *Id.* at 9764

[885] *Id.*

[886] *Id.* at 9765.

[887] *Id.*

[888] *Id.*; OCC Ex. 1192.

[889] Tr. (Russ Anderson) at 9766.

[890] OCC Ex. 1192 at 1.

Elaborating on this concern, Ms. Russ Anderson wrote, "Jason is trying to tell me how to do my presentation. If they had a vision I sure as heck wish they had told me before I put 30 hours into the darn deck", to which Mr. Zimmerman responded, "oops, sorry".[891]

Responding to Mr. Zimmerman, Ms. Russ Anderson wrote, "oh – it will be okay but you can't make my topic all warm and fuzzy and guide these SENIOR leaders by the nose that they have to lead around sales quality. They want me to give examples of how to do it. UGH!"[892] Mr. Zimmerman responded, "maybe enlist Chip. He can explain that all you have to do is tank your sales."[893] Ms. Russ Anderson wrote in response, "LOL! That is just it – they want me to find someone who is growing sales while having spotless sales quality. Yup – not gonna happen."[894]

During cross-examination, Ms. Russ Anderson denied that this reflected her frustration about having to perform her job of ensuring the Community Bank adequately managed sales practices risk – responding, "I was being very tongue-in-cheek with Mr. Zimmerman."[895] Ms. Russ Anderson also denied that the only way in February 2013 to have clean quality sales would be for a senior leader to "tank" their sales.[896]

Whether or not she was being "tongue-in-cheek" in her exchanges with Mr. Zimmerman, preponderant reliable evidence demonstrated Ms. Russ Anderson's claim that she did not think about the difficulty in finding at least one mid to senior leader who was able to meet sales goals and had an improvement in the QSRC was a false claim, one that eroded her reliability as a witness with respect to the interrelationship between meeting sales goals and having a QSRC score that could serve as a positive example.

Ms. Russ Anderson identified an October 13, 2014 email exchange between herself and Ms. Rawson regarding the results of the third quarter 2014 QSRC.[897] The report reflected that for the third quarter, "all District Managers were Acceptable on the QSRC measure for incentives."[898] Asked how she feels about this report, Ms. Rawson responded, "Well, the optimist in me would like to think that every district in the Regional Bank has dramatically improved their quality of sales; however the realist in me believes that this validates the need for

---

[891] OCC Ex. 1192 at 2.

[892] *Id.*

[893] *Id.*

[894] *Id.*

[895] Tr. (Russ Anderson) at 9767.

[896] *Id.* at 9767-68.

[897] *Id.* at 9756; R. Ex. 6993.

[898] R. Ex. 6993 at 2.

Add. 877

Appellate Case: 25-1079     Page: 879     Date Filed: 05/16/2025 Entry ID: 5517644

the work that is underway to further evolve the QSRC."[899] Ms. Russ Anderson's only response to this suggestion for further study was, "mind meld with me . . .".[900]

**February 4, 2014 Ethics Line Allegation – Phone Number Changes from October to December 2013**

In an email exchange dated February 4, 2014, Rebecca Rawson provided to Ms. Russ Anderson an email transmission from SSOCT Project Management Manager Glen Najvar[901] in which Mr. Najvar reported on an Ethics Line allegation.[902] The record reflects that Ms. Rawson forwarded the message to Ms. Russ Anderson on February 3, 2014.[903]

Mr. Najvar stated the complaint stated:

> At a one-on-one with store manager and DM, store visits and small talk conversations with Lana or [Sunset Vermont Store Manager AT] they always adviced [sic] bankers to change phone numbers for clients and manipulate the system for sales incentives too. . . . I'm tired of hearing co workers and friends that are good [assets] to the company being force[d] to do things that by politics have to get done in order to keep your job. . . but most of all Lana knowing about what's going on and its [sic] not only us . . . its [sic] the whole district and store managers and [Area President LM] that know what's going on . . . since they care so much about CE . . . [unfortunately] nothing ever happens to them and its [sic] the first ones in line the only ones that always get let go![904]

Attributing "High" importance to the message, Mr. Najvar wrote that this Ethics Line report specifically identified the DM (SB), but since the complaint mentioned AT and LM by name, they were added to the complaint.

Mr. Najvar then gave this accounting:

> Data revealed that 5,542 phone number changes occurred within the District from October-December 2013. Of these, 891 (16%) were where phone numbers were changed by 1 to 3 digits (this was the methodology used in the recent Behavior Trend Analysis).[905]

---

[899] R. Ex. 6993 at 1.

[900] *Id.*. See also OCC Ex. 135, 1/6/16 email exchange between Ms. Russ Anderson and Ms. Rawson reflecting tolerance for unfunded accounts when awarding and "Acceptable Score" based on 75% 30 day RFR and 10% Funded/Depleted." *Id.* at 1.

[901] Tr. (Russ Anderson) at 9618.

[902] *Id.* at 9591; OCC Ex. 289.

[903] Tr. (Russ Anderson) at 9591; OCC Ex. 289 at 2.

[904] OCC Ex. 289 at 2.

[905] *Id.*

Add. 878

Appellate Case: 25-1079    Page: 880    Date Filed: 05/16/2025 Entry ID: 5517644

Mr. Najvar presented these findings to Ms. Rawson (who forwarded them on February 3, 2014 to Ms. Russ Anderson):

> Sunset Vermont (AU 740) had more than half of the 1 to 3 digit phone number changes (currently 5 team members have pending SQ allegations for phone number changes as a result of the recent Behavioral Trend Analysis conducted by SQ)

> All other stores reflect data that speaks to phone number changes occurring throughout the District.[906]

Mr. Najvar concluded by reporting that he "spoke with Leslie Hicks-Veal in CI and shared all of these findings. It was agreed that Sales Quality refer the allegations directly to CI for their review; SQ referred the case file today."[907]

Upon receiving the message from Ms. Rawson, Ms. Russ Anderson responded that it was "[b]eyond interesting" and asked Ms. Rawson "[s]hould we send this to David also?"[908]

During cross-examination, Ms. Russ Anderson denied remembering the allegation.[909] Given the opportunity to respond whether she did or did not believe the allegation by the employee that "I'm tired of hearing coworkers and friends that are good assets to the company being forced to do things that by politics have to get done in order to keep your job," Ms. Russ Anderson responded, "I didn't have evidence to believe it was true or not. This was an allegation that would [have] need[ed] to be investigated."[910] When asked whether she knew what results came from such investigation, Ms. Russ Anderson responded, "Not off the top of my head, no."[911]

**Ms. Russ Anderson's Presentation to the March 19, 2014 ERMC Meeting**

Mr. Julian identified the minutes for the March 19, 2014 ERMC meeting and the agenda for the April 9, 2014 committee meeting.[912] He said Claudia Russ Anderson and Jason MacDuff were in San Francisco and made presentations on behalf of the Community Bank, and he participated by telephone.[913] He said members of the Committee "wanted an update specifically

---

[906] OCC Ex. 289 at 3.

[907] *Id.*

[908] *Id.* at 1.

[909] Tr. (Russ Anderson) at 9616.

[910] *Id.* at 9617. See "22-03-07 Respondents' Amended Revised Errata Day 9-38" on page 77. Ordered by Second Supplemental Order.

[911] Tr. (Russ Anderson) at 9617.

[912] Tr. (Julian) at 6458; R. Ex. 20347 (and duplicate at OCC Ex. 1438).

[913] Tr. (Julian) at 6460.

Add. 879

Appellate Case: 25-1079     Page: 881     Date Filed: 05/16/2025 Entry ID: 5517644

related to the work that the Community Bank was doing" with respect to the issues that had been raised in the L.A. Times article.[914]

According to Mr. Julian, Ms. Russ Anderson and Mr. MacDuff provided the ERMC members "with a high-level overview of the activity that the Community Bank was engaged in with respect to the L.A. Times['] article, the fact that 35 Team Members had been terminated and the sales pressure allegations that were raised in the articles."[915] He said he found the overview "was consistent with information that I had received previously", and that because the "controls are what identified the initial 35 Team Members," he had "no reason not to believe that the controls were working."[916]

In the record of their presentation to the ERMC on March 19, 2014, Mr. MacDuff "discussed ways team members may manipulate the sales or service programs for their benefit and the processes and controls in place to identify that behavior."[917] When asked how inappropriate behavior is identified early and whether managers are rewarded for proper coaching of their teams, Ms. Russ Anderson "noted there is a Sales Quality team that reviews ethic line referrals and outliers in performance metrics."[918] She also pointed to monitoring activity performed by "Deposit Products Group and Corporate Security".[919]

When asked whether the current model incents inappropriate behavior, the minutes reflect, "the Community Banking team doesn't believe that is the case."[920] The minutes reflect that "[t]he committee discussion also focused on holding managers accountable in cases of team member wrongdoing and possible recommendations to improve the model, such as reducing turnover and increasing the tenure of store managers before moving them to their next role."[921]

These minutes are wholly silent with respect to Ms. Russ Anderson providing Committee members with information about the widespread nature of sales practices misconduct, and with respect to the root cause of such misconduct. Specifically, Ms. Russ Anderson said nothing about the true nature of sales goals – other than to report that she denied the possibility that sales goals were driving sales practices misconduct.[922] The minutes further reflect that although both were

---

[914] Tr. (Julian) at 6460.

[915] Tr. (Julian) at 6462. See also "22-03-07 Respondents' Amended Revised Errata Day 9-38" on page 48. Ordered by Second Supplemental Order.

[916] Tr. (Julian) at 6463

[917] R. Ex. 20347 at 1.

[918] *Id.*

[919] *Id.*

[920] *Id.*

[921] *Id.*

[922] *Id.*

Appellate Case: 25-1079    Page: 882    Date Filed: 05/16/2025 Entry ID: 5517644

present at the meeting, neither Ms. Russ Anderson nor Mr. Julian sought to discuss sales practices misconduct as a significant or emerging risk.[923]

Ms. Russ Anderson acknowledged that people got promoted at Wells Fargo because they were successful at sales. "It's a sales organization."[924] She denied, however, knowing in 2014 that people in the Regional Bank got promoted because they were successful at sales; and did not recall whether SSCOT reviewed the track record of a branch manager before the manager got promoted.[925]

## Ms. Russ Anderson's Presentation to the April 9, 2014 ERMC Meeting

### *Analysis of Sales Quality Allegations Concerning Lack of Customer Consent*

Approximately three months before the Enterprise Risk Management Committee was due to meet in April 2014, Ms. Russ Anderson and Rebecca Rawson sought analyses regarding trends in Sales Quality allegations involving sales practices in the Community Bank.[926] In particular, Ms. Russ Anderson sought information regarding whether customer consent was an issue presented in Ethics Line complaints in 2013.[927]

At Ms. Rawson's direction, Glen Najvar (both are members of SSCOT) provided a report examining trends in Sales Quality allegations data through December 17, 2013.[928] Mr. Najvar reported that overall Sales Quality "has seen an increase in Q4 2013 allegation volumes vs. Q4 2012."[929] He reported a "17% increase in volumes in Q4 2013 vs. Q1-Q3 2013 cumulatively."

Mr. Najvar wrote, "[a]ll RBE regions and most Lead RP regions are up in the number of allegations reported" when comparing total Q4 2013 vs. total Q4 2012 allegations.[930] He provided a breakdown showing the Pacific Midwest was up 42% Year over Year (YOY); Eastern was up 30%; Western Mountain was up 24%; and Southwest was up 20%.

Mr. Najvar also looked for geographic concentrations, and reported that when "looking at the Lead RP areas for total Q4 2013 vs. total Q4 2012 allegations, no real concentration here either as most regions are up", reporting that LA-OC was up Q4 YOY 49%, placing them "in the 'middle of the pack' for those regions that increased."[931] He summarized, finding "allegations as

---

[923] R. Ex. 20347 at 2.

[924] Tr. (Russ Anderson) at 9724, quoting OCC Ex. 2509 (Russ Anderson deposition of January 13, 2021) at 22.

[925] Tr. (Russ Anderson) at 9722-24; but see OCC Ex. 154, email exchange between Ms. Russ Anderson and Tracy Kidd dated May 18, 2016 indicating "we only get sales quality reviews for [District Managers] and above."

[926] Tr. (Russ Anderson) at 9730; OCC Ex. 288.

[927] Tr. (Russ Anderson) at 9730; OCC Ex. 288 at 1.

[928] OCC Ex. 288 at 5.

[929] *Id.*

[930] *Id.*

[931] *Id.*

Add. 881

a whole are up; not just concentrated in LA-OC. Out of the 24 Lead RP areas, all experienced increases with the exception of 6 Lead RP regions in Q4 2.013 vs. Q4 2.012."[932]

Upon receipt of Mr. Najvar's analysis, Ms. Rawson on January 16, 2014 forwarded the same to Ms. Russ Anderson, who wrote that it "looks like most regions are up in Q4 allegations. There does not seem to be any significant outliers."[933]

Upon receipt of Ms. Rawson's transmission, Ms. Russ Anderson asked first, "what are the allegations looking like in for 2013 vs. 2012"; and second, "if we categorized the allegations how would they look YOY?"[934]

Mr. Najvar responded as follows:

> Year over Year SQ allegation volumes comparing 2012 to 2013 reflect a 3% increase in total SQ allegations (7,983 total allegations in 2013 vs. 7,714 in 2012). To offer additional context, this is attributed to the volumes increase that SQ experienced in Q4 of 2013. In Q4 2013 SQ allegations volumes increased 34% over Q4 2.012 (Q4 2013=2,119 vs. Q4 2012=1,581). All RBE regions reflected spikes in Q4 2013 vs. Q4 2012 (Pacific Midwest had the highest Q4 YOY increase of 45% and Southwest had the lowest at 22%)

> The overall YOY 2012 vs. 2013 allegation volumes are as follows:

> Eastern: 13% increase
> Pacific Midwest: 2% decrease
> Southwest: 5% decrease
> Western Mountain: 8% decrease

> When categorizing allegations by product the following key trends have been identified YOY 2012 vs. 2013:

> Credit Card up 53% (528 in 2012 vs. 806 in 2013)
> Teller Referrals up 33% (568 in 2012 vs. 755 in 2013)
> Line of Credit up 205% (87 in 2012 vs. 265 in 2013)
> Online/Bill Pay up 14% (392 in 2012 vs. 448 in 2013)
> Checking and Savings down 11% (5,881 in 2012 vs. 5,217 in 2013)[935]

---

[932] OCC Ex. 288 at 6.

[933] *Id.* at 5.

[934] *Id.* at 4.

[935] *Id.* at 3.

Appellate Case: 25-1079    Page: 884    Date Filed: 05/16/2025 Entry ID: 5517644

Upon her receipt of this categorization of trends in Sales Quality allegations regarding specific sales practices misconduct, Ms. Russ Anderson directed one further analysis, asking Mr. Najvar to report on whether, "[o]f the products listed were the allegations re: consent?"[936]

In an email dated January 24, 2014, Mr. Najvar responded that "for the most part, yes" and added that "the percentages are relatively the same for both 2012 and 2013".[937] He provided the following information, showing that customer consent was identified as an issue in the majority of all Sales Quality Ethics Line allegations received in 2013, versus the same data from 2012:

> When categorizing allegations by product the following key trends have been identified YOY 2012 vs. 2013:
>
> - **Credit Card up 53%** (528 in 2012 vs. 806 in 2013)
>   - ~90% of Credit Card allegations reference consent (others are procedural, i.e.: allegation advising team members sharing the best practice of selling CC's as Overdraft Protection)
> - **Teller Referrals up 33%** (568 in 2012 vs. 755 in 2013)
>   - Unrelated to product consent by the banker, but most all of Teller Referral allegations speak to Teller's entering unwarranted Teller Referrals without having spoken to a customer
> - **Line of Credit (LOC) up 205%** (87 in 2012 vs. 265 in 2013)
>   - ~90% of LOC allegations reference consent (others are procedural, i.e.: customer agreed to product, but didn't realize there was a fee)
> - **Online/Bill Pay up 14%** (392 in 2012 vs. 448 in 2013)
>   - ~80% of Online/Bill Pay allegations reference consent (others are procedural, i.e.: reports of token bill payments where customer consented to do so)
> - **Checking and Savings down 11%** (5,881 in 2012 vs. 5,217 in 2013)
>   - ~70% of Checking/Savings reference consent (others are procedural, i.e.: team members selling duplicate checking and savings accounts and customers agreeing to do so even though it's alleged they didn't really need them)[938]

After thanking Mr. Najvar, Ms. Russ Anderson sought to confirm that the referrals were "straight up Ethics Line complaints vs. the proactive work we were doing" – and Mr. Najvar confirmed this, writing on January 24, 2014 that "the vast majority of 'referral' complaints do

---

[936] *Id.* at 3.

[937] *Id.* at 2.

[938] *Id.*

come from the Ethics Line, but we do see some reported to SQ by HR Advisors as well (team members opting to call and report the concern via HRA rather than calling the Ethics Line".[939]

Ms. Russ Anderson testified that she did not recall getting the email chain reflected here.[940] She said she had no reason to doubt the honesty of either Ms. Rawson or Mr. Najvar, but when asked whether she believed the emails she responded, "I don't know how I felt about it."[941] Calling into question her reliability as a historian with respect to facts material to this issue, when asked during cross-examination why she requested Mr. Najvar analyze the extent to which customer consent was identified as an issue in these Ethics Line allegations, Ms. Russ Anderson responded, "I don't recall."[942]

Notwithstanding that the analyses presented by Mr. Najvar through Ms. Rawson as reflected in these email messages established that customer consent was consistently and persistently the dominant issue raised through the Ethics Line allegations, when asked during cross-examination whether she believed it was incumbent upon her to inform the ERMC at the April 9, 2014 meeting that most Sales Quality allegations related to lack of customer consent – and that in the Bank's largest line of business Sales Quality allegations relating to a lack of customer consent were not limited to the LA/OC area – Ms. Russ Anderson responded without elaboration or explanation, "I did not".[943] **Acting in furtherance of these opinions under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

### Ms. Russ Anderson's Report to the ERMC on April 9, 2014

Through leading questioning by her Counsel during direct examination, Ms. Russ Anderson acknowledged she had a responsibility as Group Risk Officer for Community Banking to escalate risk management issues to Mr. Loughlin.[944] She testified that Keb Byers instructed her to present at the April 9, 2014 ERMC meeting.[945] She testified that she believed her ERMC presentation was very important and that she took seriously the presentation she gave.[946] She testified that at no time during her service as Group Risk Officer did she ever believe that it was

---

[939] OCC Ex. 288 at 1.

[940] Tr. (Russ Anderson) at 9731.

[941] *Id.* at 9731-33.

[942] *Id.* at 9732.

[943] *Id.* at 9734-35.

[944] *Id.* at 9477.

[945] *Id.* at 9698.

[946] *Id.*

acceptable to provide false or misleading information to the ERMC, notwithstanding that she participated while at the airport in Phoenix.[947]

Ms. Russ Anderson recalled testimony from Ms. Callahan to the effect that "we, as individuals, would escalate [information] to our supervisors, our managers, those in our reporting chain in anticipation that they would then escalate them"; and that in her own case she would be reporting to Mr. Loughlin and Ms. Tolstedt.[948]

In response to leading questioning by her Counsel during direct examination Ms. Russ Anderson added, however, that it was not her practice to provide information to either Mr. Loughlin or Ms. Tolstedt that they were already aware of, because it "would have been redundant."[949] **Acting in furtherance of these opinions under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

During cross-examination, Ms. Russ Anderson acknowledged that "if it was germane to the conversation," she had an obligation to inform members of the Committee of existing problems in the Community Bank with respect to sales practices misconduct, and be fully transparent and candid with the ERMC members, notwithstanding whatever information she thought the members already had.[950]

Without pointing to any specific evidence in support, Ms. Russ Anderson testified she met those responsibilities by sending a monthly business letter to Mr. Loughlin and Ms. Tolstedt, and that she had monthly one-on-one meetings with Mr. Loughlin during which she would "talk to him about risk issues."[951] She testified there would be monthly Group Risk Officer meetings with him; and that she and Mr. Loughlin "talked and emailed if not daily, certainly multiple times a week when we would talk about risk issues within the Bank, in general, not just the Community Bank. So lots – lots of opportunities and mechanisms."[952]

Without identifying any specific evidence in support, Ms. Russ Anderson testified that she also escalated risk issues regarding sales pressure misconduct or sales practices misconduct with Ms. Tolstedt.[953] She testified that as one of Ms. Tolstedt's direct reports "she and I talked often about risks."[954] She testified that she would talk to Ms. Tolstedt about "items that my SSCOT team had sent to me from the EthicsLine or if something came through a complaint

---

[947] *Id.* at 9698-99.

[948] *Id.* at 9482.

[949] *Id.* at 9483.

[950] *Id.* at 9700-01.

[951] *Id.* at 9478

[952] *Id.*

[953] *Id.* at 9479.

[954] *Id.*

channel or if I was out in a region and talking to people, if I heard thoughts, I would talk to her about those."[955]

Ms. Russ Anderson testified that in advance of the April 9, 2014 ERMC meeting she did not talk directly with Mr. Loughlin about what he wanted her to cover but that instead she learned from Mr. MacDuff what the ERMC wanted to hear.[956] She testified that through this, it was her understanding that the Committee "wanted to hear about the activities in the Regional Bank on what we were doing around sales practices."[957]

I find this answer to be misleading and materially incomplete. The record reflects that Mr. MacDuff was not the only source providing Ms. Russ Anderson with information about what the Committee wanted to discuss on April 9, 2014. In an email exchange with Mr. MacDuff and Ms. Russ Anderson, Chris Mathews[958] on April 4, 2014 provided a summary of feedback of Ms. Russ Anderson's "Evolving Model" deck from Stephanie Painter[959] and Keb [presumably Byers[960]] that "they want more in the ERMC deck".[961]

Ms. Mathews provided copies of an email exchange between herself and Ms. Painter where Ms. Painter wrote "Keb's feedback was along the lines of sharing what's different? He said [the existing deck of materials] is heavy on the things we are going to be doing going forward, but doesn't really address what doesn't work well today in our existing sales practices."[962]

Ms. Painter wrote,

> The discussion with Mike [presumably Loughlin] originated out of the "team member misconduct committee" and I think he and Keb were looking for the committee to have insight into understanding the current state vs. future state. That will help call out what is actually a change from past practices in order to achieve the vision of earning all our customers' business and help them succeed financially.[963]

The record thus reflects that while Mr. MacDuff provided some information about what the ERMC wanted for its April 9, 2014 meeting, the focus of the meeting had been described in much greater detail by Ms. Painter and Ms. Mathews, both of whom represented to Ms. Russ

---

[955] *Id.* at 9479.

[956] *Id.* at 9408.

[957] *Id.* at 9409.

[958] *Id.* at 9411; Ms. Mathews is identified as a project manager who worked for Mr. MacDuff.

[959] Tr. (Russ Anderson) at 9411; Ms. Painter is identified as working for Keb Byers in Mike Loughlin's organization who "helped Keb with putting together the ERMC materials."

[960] See Tr. (Russ Anderson) at 9411.

[961] OCC ex. 60 at 2.

[962] *Id.* at 2-3.

[963] *Id.* at 3.

Add. 886

Appellate Case: 25-1079      Page: 888      Date Filed: 05/16/2025 Entry ID: 5517644

Anderson that the Committee was looking to see "what doesn't work well today in our existing sales practices".[964]

Ms. Russ Anderson acknowledged that while Mr. MacDuff was "the primary presenter" during the meeting "because he was physically present in the room", she had seniority over him, and he was not the Group Risk Officer in the Community Bank, was not a member of the SSCOT or the Core Team, did not report directly to Ms. Tolstedt, and did not lead the first line of defense.[965]

Ms. Russ Anderson testified that she was not a member of the Team Member Misconduct Committee and "didn't know what the discussion was".[966] From this email exchange it was clear, however, that both Ms. Mathews and Ms. Painter expected changes to the Evolving Model deck – that both Ms. Russ Anderson and Mr. MacDuff would need to review and approve the changes by April 6, 2014.[967] Ms. Mathews wrote to Ms. Painter that she is "open to what you have to share and will see what can be done", noting that she would be meeting with Mr. MacDuff at 7 a.m. the next day.[968]

When presented with the email chain, including Ms. Painter's report of what Mr. Loughlin and Mr. Byers wanted to be discussed in the April 9 meeting, Ms. Russ Anderson responded to Mr. MacDuff and Ms. Mathews "I am worried about putting something like that into a deck. I'd rather we did that verbally because this deck is subject to the regulator's review."[969]

Ms. Russ Anderson explained this statement with the following testimony:

> What I had in my mind when I wrote this, which wasn't very eloquent, was that there are a lot of things that were changing along the way. We were -- we were changing controls. We were changing procedures. We were changing a lot of things. And to put that information in this short period of time into this presentation I felt could backfire on us, because I've learned in my career that presentations don't just go to the group you think they're going to go to. They go all over the place. And you can't give context. So what I was hoping was we would do it verbally. It would be in the minutes. Then that way the OCC or the Fed or whoever, CFPB would get the presentation,

---

[964] *Id.* at 2.

[965] Tr. (Russ Anderson) at 9701-02.

[966] *Id.* at 9414

[967] OCC ex. 60 at 3.

[968] *Id.*

[969] *Id.* at 1.

Add. 887

they would get the minutes from the meeting and they would get the complete picture that way.[970]

During cross-examination, when presented with evidence showing that Mr. Byers' direction that she provide information about what was not going well in existing sales practices came to her on April 4, in advance of a meeting scheduled for April 9 – Ms. Russ Anderson was asked whether she expected sales practices to change much in the five days between the email and the meeting – and responded "It was not what would have happened in that period of time. What I was concerned about was after the April 9 forward and people would look at the deck a month from now, which was not untypical of regulators looking at decks months after they were written and coming back with boatloads of questions."[971] She testified that in such a case, regulators "had made assumptions that aren't correct, and then you have to spend a lot of time reeling it back and rebuilding it."[972]

During cross-examination, Ms. Russ Anderson acknowledged that the email reported what Mr. Byers thought the Committee wanted to have insight to – into what did not work well in existing sales practices.[973] She said she knew the ERMC was asking that she provide information as of April 2014 about what did not work well around sales practices.[974] She testified that she understood the instruction to her was to update the written presentation with information about what did not work well in existing sales practices, and that she assumed no one from the OCC would be attending the April 9, 2014 ERMC meeting.[975] She acknowledged, however, that in April 2014 she believed the OCC had a right to know what did not work well in existing sales practices in the Bank's largest line of business.[976]

Ms. Russ Anderson denied that the email reflected her concern that updating the written deck with information about what did not work well in existing sales practices was because it would go to the OCC, calling the message "a poorly written email, but that was not my concern was."[977] Ms. Russ Anderson acknowledged that the request for information about what was not working well was transmitted on April 4 in advance of the April 9 meeting.[978] She testified that "Jason and I were both running at 100 miles per hour" and "we had a very short period of time to put that information and turn this deck around."[979] She testified she was

---

[970] Id. at 9415.

[971] Id. at 9709.

[972] Id. at 9710.

[973] Id. at 9704.

[974] Id. at 9710.

[975] Id. at 9706.

[976] Id.

[977] Id. at 9707.

[978] Id. at 9709.

[979] Id. at 9708.

Add. 888

Appellate Case: 25-1079      Page: 890      Date Filed: 05/16/2025 Entry ID: 5517644

concerned that "we would slap some things on a piece of paper, that they would not be vetted well, and this presentation then would go to a lot of different places, and that the context of those conversations of that – that would not go with it. And sometime down the road, it would have a blowback at me."[980]

Ms. Russ Anderson testified that she was not trying to hide things from the OCC and testified that Mr. MacDuff apparently agreed with Ms. Russ Anderson's proposal to not include information about "what doesn't work well" – as he responded that this "was my instinct as well" and proposed to "speak to the what's working well and what are the areas of opportunity."[981] He sought Ms. Russ Anderson's approval to describe the "'Current state' in our business is always evolving and we must triangulate around several quantitative and qualitative indicators to assess and continually update responses accordingly. Really important they understand this. Make sense?"[982]

Apparently Ms. Russ Anderson's response was to respond by telephone, so the record lacks any written memoranda regarding whether Ms. Russ Anderson agreed with Mr. MacDuff's proposed strategy.[983] The record does have Ms. Russ Anderson's testimony on the point:

> Well, Jason and I had an exchange -- well, we -- of like mind about it. It's very difficult to put that sort of a thing into a document like this, because the facts change of what's working and what's not working pretty rapidly. And so I was hesitant, given the limited time we had, to: A, present; and, B, get this information into the deck and vetted, to put a lot more information into the presentation.[984]

Through her testimony, Ms. Russ Anderson offered a series of reasons why she and Mr. MacDuff would not provide information about what wasn't working in Community Banking: that she was too busy, that too little time was allocated for a proper response, and that she didn't know what Mr. Loughlin wanted her to cover. **Failing to provide to the Committee material information requested by the Committee constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Ms. Russ Anderson averred that it would have been challenging to change the Evolving Model deck because "Jason and I, first, we were in different time zones. But also, you know, it was very busy."[985] She testified that she "wasn't quite sure what [Keb Byers] was talking about" when using the phrase "what doesn't really work well", and added "as I tried to figure it out, what I thought they might want to know is are there items in the sales process that could be

---

[980] *Id.* at 9708.

[981] *Id.* at 9416; OCC ex. 60 at 1.

[982] OCC ex. 60 at 1.

[983] *Id.*

[984] Tr. (Russ Anderson) at 9413.

[985] *Id.* at 9412.

Add. 889

Appellate Case: 25-1079    Page: 891    Date Filed: 05/16/2025 Entry ID: 5517644

changed or that were looking to change that are just not – aren't a good fit."[986] She acknowledged that both Ms. Painter and Ms. Mathews wrote that Mr. Byers was looking at "what doesn't work well today" but said this did not particularly clarify the matter.[987]

Ms. Russ Anderson testified she understood 25 minutes had been allotted for her presentation, and that she expected it "to be a high-level meeting where we were going to provide the Committee with information, certainly answer questions, if they had them for us."[988] She testified that Mr. MacDuff prepared the materials and she "did some editing."[989] She testified that she was not physically present, that she was in the airport in Phoenix participating by cell phone, but that Mr. MacDuff was present with the Committee.[990]

Ms. Russ Anderson testified that while the information was not in the deck, she planned to share with Committee members what did not work well orally – rather than putting it in writing in the deck: She testified, "I felt it was better, since things were moving fast at this point in time, to have that as a verbal conversation with the ERMC where it would be in the minutes of the ERMC, which would go with the presentation to the regulators . . . and they would see the complete story."[991]

During cross-examination, however, Ms. Russ Anderson acknowledged that what she told the Committee was that the business model did not incent inappropriate behavior, and that the controls were adequate, and did not tell the Committee members anything about unreasonable or unattainable sales goals, or about the pressure placed on employees to meet sales goals – because she believed that information was not pertinent.[992] **Ms. Russ Anderson's presentation omitted material information and contained false and misleading information, and constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.** She testified that throughout the meeting, she did not tell the ERMC members about what did not work well with existing sales practices as she had been directed to do, because "the conversation never got to that place. The Committee – some Committee members took the discussion other places."[993]

Ms. Russ Anderson acknowledged that prior to the April 2014 ERMC meeting she knew about "hotspots" where employees faced significant pressure to meet unreasonable sales goals – but that this "was not part of the conversation. It wasn't pertinent at the time, and it was known

---

[986] *Id.* at 9413.

[987] *Id.* at 9414.

[988] *Id.* at 9409.

[989] *Id.*

[990] *Id.* at 9409-10.

[991] *Id.* at 9708.

[992] *Id.* at 9713-14.

[993] *Id.* at 9714.

Appellate Case: 25-1079      Page: 892      Date Filed: 05/16/2025 Entry ID: 5517644

to many people on the Committee already."[994] **Ms. Russ Anderson's failure to report on what she knew about hotspots, where employees faced significant pressure to meet unreasonable sales goals constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Ms. Russ Anderson disagreed with testimony that her desire not to put information about "what doesn't work" into the deck to be used to present to the ERMC constituted unsafe or unsound conduct, or that it was completely inappropriate to withhold the requested information, or that it was very alarming because at the time the ERMC was trying to understand what didn't work well in the model.[995]

Ms. Russ Anderson admitted that she was aware the OCC would get the written deck – the deck lacking information requested by Mr. Byers and Mr. Loughlin about what was not working in the Community Banking sales practices as of April 2014.[996] When asked why – given that she averred she was uncomfortable with the pause in proactive monitoring – she did not put those concerns in the written deck so that the Bank's primary regulator would see it, Ms. Russ Anderson responded, "Because I'd already told the OCC about the pause."[997] There was, however, no documentary evidence supporting this testimony – no evidence in the litigation of Ms. Russ Anderson having ever told the OCC about her discomfort on the pause in proactive monitoring.[998]

Mr. Julian acknowledged that the scope of the April 9, 2014 ERMC meeting was not limited to termination for sales practices misconduct – that such misconduct was "one type of wrongdoing" but the presentation "was about the controls overall, not just sales practices" – it "also touched on sales integrity and other kinds of violations."[999]

In response to a question presented to Mr. Julian by Mr. Loughlin, Mr. Julian reported, "1,000 to 2,000 per year Team Members in Community Bank were being terminated for wrongdoing."[1000] He noted the figure was for all forms of wrongdoing, not just sales practices misconduct, and could reflect terminations based on "not showing up for work", "short teller drawers", or "other violations of Wells Fargo code of ethics."[1001] Because the figure represented

---

[994] *Id.* at 9715.

[995] *Id.* at 9412-14, 9416-17.

[996] *Id.* at 9716.

[997] *Id.*

[998] *Id.* at 9718.

[999] Tr. (Julian) at 6464.

[1000] *Id.* at 6465.

[1001] *Id.* at 6466.

Add. 891

Appellate Case: 25-1079    Page: 893    Date Filed: 05/16/2025 Entry ID: 5517644

"1 to 2 percent of the Community Bank Team Members . . . it didn't occur to me to be a significant number".[1002]

Mr. Julian testified that during the ERMC meeting the question whether the current business model of the Community Bank incentivized misconduct did not come up.[1003] Evidence in the record suggests this is a misleading and inaccurate answer.

Through leading questioning by her Counsel during direct examination, Ms. Russ Anderson testified that she told the ERMC in April 2014 that the Bank's controls to address sales practices misconduct were adequate, adding that she continues to believe this to be true today.[1004] **Acting in furtherance of these opinions under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Ms. Russ Anderson testified, "Jason started his presentation and didn't get very far before a couple of the Committee members started peppering him with questions."[1005] She recalled Hope Hardison asking several questions, and Mr. Loughlin asked a question about terminations.[1006] Ms. Russ Anderson testified that in response to Mr. Loughlin's question about how many people were terminated for wrongdoing, Mr. MacDuff responded "it was between 1- to 2,000 team members per year."[1007]

The record reflects that in their Motion for Summary Disposition, Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 334 alleged that at the April 9, 2014 Enterprise Risk Management Committee meeting, Respondent Russ Anderson told the Committee that:

a.  the Community Bank's business model did not incent inappropriate behavior;

b.  "management tries to stress a balanced message of sales, service, and quality"; and

c.  "the Sales Quality team looks at a manager's track record prior to an individual being promoted."[1008]

Ms. Russ Anderson in her response to this factual allegation in Enforcement Counsel's summary disposition motion did not dispute that the quoted statements reflect what she told the

---

[1002] *Id.* at 6466.

[1003] *Id.*

[1004] Tr. (Russ Anderson) at 9388.

[1005] *Id.* at 9418

[1006] *Id.*

[1007] *Id.* at 9421.

[1008] See Notice of Charges at ¶ 271 and Russ Anderson Amended Answer ¶ 271; MSD Ex. 28; MSD Ex. 290A (Loughlin Tr.) at 156:23- 157:10.

Committee, but averred the Statement did not include everything that was discussed at the meeting.

From this exchange, I found that at the April 9, 2014 Enterprise Risk Management Committee meeting, Ms. Russ Anderson told the Committee that the Community Bank's business model did not incent inappropriate behavior; that "management tries to stress a balanced message of sales, service, and quality"; and "the Sales Quality team looks at a manager's track record prior to an individual being promoted."

Ms. Russ Anderson testified that by April 2014, she was already a member of the Core Team, that the Team met weekly, that she was reviewing sales practices misconduct cases from Corporate Investigations, that occasionally she was getting investigation debriefs explaining why employees engaged in the various types of sales practices misconduct.[1009] She acknowledged reporting to the Committee that 1 to 2 percent of Community Bank employees - 1,000 to 2,000, were terminated each year for sales practices-related wrongdoing.[1010] She further acknowledged that she knew as of April 2014 that the head of Corporate Investigations believed there was a systemic issue regarding sales practices misconduct.[1011]

During the hearing, Ms. Russ Anderson testified that she understood that the *Wells Fargo* "business model" was "to provide the best products and services available in the financial services industry to our customers and potential customers".[1012] Through this testimony, Ms. Russ Anderson did not differentiate between the business model of Community Banking (which is what her prior testimony referred to) and that of Wells Fargo Bank, N.A., or WF&C. Ms. Russ Anderson's amended answer expressly admitted that she told the ERMC members on April 9, 2014 that the *Community Bank's* business model did not incent inappropriate behavior.[1013]

Ms. Russ Anderson stated, "having sales goals and having incentives are tactics that you use in a model, but they're not – to me, it's not the model. Wells Fargo's stated model always was to be the best in the financial services industry with the best products and the best service."[1014]

Ms. Russ Anderson disagreed with testimony that the business model used unreasonable sales goals and unbearable pressure to meet those sales goals.[1015] She testified that she did not believe "that there was undue pressure in the – across the organization."[1016] She also testified

---

[1009] Tr. (Russ Anderson) at 9720.

[1010] *Id.* at 9721.

[1011] *Id.* at 9719-20.

[1012] *Id.*

[1013] Notice of Charges at ¶ 271 and Russ Anderson Amended Answer ¶ 271.

[1014] Tr. (Russ Anderson) at 9420.

[1015] *Id.* at 9420-21.

[1016] *Id.* at 9421.

Add. 893

Appellate Case: 25-1079     Page: 895     Date Filed: 05/16/2025 Entry ID: 5517644

that she could not imagine that there was one control she could have implemented to change the business model.[1017] **Acting in furtherance of these opinions under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Ms. Russ Anderson testified that she still does not believe sales practices misconduct to have been systemic. In support she stated: "I have no evidence then or during my whole tenure that it was a systemic issue. I did not see complaints from our consumers, which if it had been would have been – they would have been quite rampant."[1018] She testified, "the data that I was looking at, it did not show that we had systemic sales practices issues from the behaviors of – that Corporate Investigations and SSCOT we were looking at. There was not data there that would lead me to believe that it was systemic."[1019] **Acting in furtherance of these opinions under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

### The April 29, 2014 ERMC Meeting

Immediately after Mr. MacDuff and Ms. Russ Anderson made their presentation to the ERMC on April 9, 2014, Mr. MacDuff forwarded to Ms. Russ Anderson an email chain reflecting an exchange between him and Mary Mack (President and Head of Wells Fargo Advisors).[1020] Responding to her message "Nice job on a tough subject", Mr. MacDuff thanked her and wrote, "I was pretty shaky towards the end and then I heard your friendly voice and it calmed me right down."[1021] He stated he "knew it was going to be tough; knew we were set up stay [sic] in the generalities and be lectured given they allotted us 25 minutes on something very complex."[1022]

Ms. Russ Anderson testified that this exchange meant, "when you only have 25 minutes in a committee meeting like this where there's a number of people, you need to stay in generalities, because it wasn't a roll-up-your-sleeves session and get into details."[1023]

Mr. MacDuff continued in his response to Ms. Mack:

> My job was to define how we think about it, acknowledge we're not perfect and perfection is impossible, and illustrate why that is and then jump into what we're doing about it specifically (which we never got to). Hopefully we

---

[1017] *Id.* at 9421.

[1018] *Id.* at 9388.

[1019] *Id.* at 9388-89.

[1020] *Id.* at 9422-23; OCC Ex. 1470.

[1021] OCC Ex. 1470 at 1-2.

[1022] *Id.* at 1.

[1023] Tr. (Russ Anderson) at 9423-24.

Appellate Case: 25-1079     Page: 896     Date Filed: 05/16/2025 Entry ID: 5517644

put them in a frame of – if you really want to help its [*sic*] time to roll-up the sleeves and dig-into the specifics. Hopefully we can have that discussion next time. But let me say, that was not fun and I really appreciate the note.[1024]

Ms. Mack wrote back shortly thereafter, describing his presentation as "authentic" and stating, "Mike [Loughlin] wants to get you back and the next time is the time for specifics."[1025] Mr. MacDuff then forwarded to Ms. Russ Anderson Ms. Mack's message, saying, "Mary is a good friend to us," and telling Ms. Russ Anderson, "Mike wants us back to do specifics" and asking whether Ms. Russ Anderson has "met with her team that does their fiduciary testing, etc.?"[1026]

Instead of directly responding to Mr. MacDuff's question about whether she had met with Ms. Mack's fiduciary testing team, Ms. Russ Anderson wrote, "But, yes a good idea and Mary is a good, good friend to CB. I admire and respect her a lot."[1027] Ms. Russ Anderson testified that his response was that "it would be a really great idea" to follow Mr. Loughlin's request to return to provide specific information.[1028]

Ms. Russ Anderson testified that shortly after the April 9, 2014 ERMC meeting she sent an email to Mr. Byers, Mr. Loughlin, and Ms. Klos.[1029] She wrote, "Jason and I look forward to being able to come back and go into greater detail with the committee than time permitted today."[1030]

Although not raised in this message, Ms. Russ Anderson testified that she wrote the email in reaction to what happened during the ERMC meeting on April 9: "I felt that there were a lot of questions that weren't answered and misinformation, and so – or misunderstanding, I should say. So I wanted to have an opportunity to go back to the Risk Committee and really do a deeper dive with them this time."[1031]

Mr. Byers responded shortly thereafter, confirming that the Risk Committee Chair, Rick Hernandez, "has specifically request [*sic*] this topic be presented at the Tuesday, April 29th meeting in San Antonio, Texas (7 a.m. CT). It will probably need to be a combination of you and Carrie presenting."[1032] Mr. Byers identified specific topics that had been mentioned during the April 9th meeting, stating the "deck will need to be updated to capture issues and concerns we

---

[1024] OCC Ex. 1470 at 2.

[1025] *Id.* at 1.

[1026] *Id.*

[1027] *Id.*

[1028] Tr. (Russ Anderson) at 9424.

[1029] *Id.* at 9425; OCC Ex. 1228.

[1030] OCC Ex. 1228 at 1.

[1031] Tr. (Russ Anderson) at 9425-26.

[1032] OCC Ex. 1228 at 1.

Appellate Case: 25-1079     Page: 897     Date Filed: 05/16/2025 Entry ID: 5517644

have around sales practices today that are being addressed."[1033] These included "Team Member turnover, Store Manager tenor, customer interactions, scorecard enhancements, Ethics Line data analysis, etc."[1034]

Through questioning by her Counsel during direct examination, Ms. Russ Anderson was asked why she failed to disclose the unreasonable or unattainable sales goals at the April 9th meeting, and she responded, "It was not pertinent."[1035] **Acting in furtherance of these opinions under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

She was asked why she failed to inform the Committee about pressure placed on employees to meet sales goals at that meeting, and she responded, "It was not pertinent."[1036] **Acting in furtherance of these opinions under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

She was asked why she failed to inform the Committee of the pause on proactive monitoring at that meeting, and she responded, "It was not pertinent."[1037] **Acting in furtherance of these opinions under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

She was asked why she failed to inform the ERMC that she was uncomfortable with that pause, and she responded, "It was not pertinent."[1038] **Acting in furtherance of these opinions under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Ms. Russ Anderson denied attempting to conceal any information from the OCC during the April 9th meeting. Elaborating, she testified:

> There would have been no reason for me to conceal any information from any of the regulators, particularly the OCC. The deck was complete, and then there were minutes of the meeting of the things that we were going to discuss verbally. So that would have been a complete package that the OCC would

---

[1033] OCC Ex. 1228 at 1.

[1034] *Id.*

[1035] Tr. (Russ Anderson) at 9429.

[1036] *Id.*

[1037] *Id.* at 9430.

[1038] *Id.*

have gotten together and one package to look at the minutes and look at the data in the deck.[1039]

Although the record reflects the issues were to be presented to both the ERMC and the Board of Governors on April 29, 2014, Ms. Russ Anderson testified that she was never invited back to the ERMC and had "no idea" why.[1040]

**The Evolution of Controls**

In general, the Bank relied on three mechanisms to identify employees who engaged in sales practices misconduct: (1) employee reported allegations through the EthicsLine, to Human Resources, or to management, when the report was deemed sufficiently credible to warrant further review; (2) customer complaints, only if subsequent "polling" of other customers of the same employee revealed other similar incidents of misconduct; and (3) "proactive monitoring," which involved the use of data analytics to identify patterns of "red flag" sales activity.[1041] The first two detection methods were reactive and relied on another employee or a customer becoming aware of improper activity and reporting it.[1042] The third detection method was, in Examiner Candy's opinion, inadequate as it only identified patterns of activity for certain types of misconduct.[1043]

In an email dated August 3, 2012, the former Head of Sales Quality, Cindy Walker, acknowledged that the controls relied on employees and customers reporting misconduct rather than active monitoring to detect misconduct:

> The Sales Quality (SQ) business model has always been predicated upon being "reactive" by design. That is, researching and vetting incoming EthicsLine allegations, Phone Bank allegations and the like. Monitoring and/or additional reporting activities would not necessarily be effective or in scope considering the business intent.[1044]

During her supervisory review, Examiner Candy found that SSCOT's research process was not robust nor effective, and ultimately many allegations were not properly investigated as a result.[1045] Bank documents show that between 2012 and 2013, the Sales and Service Conduct Oversight Team (SSCOT– SSCOT was formerly known as Sales Quality), a group within the Community Bank that reported to Respondent Russ Anderson, began "proactively monitoring" some types of sales practices misconduct, including changes to customer phone numbers in the

---

[1039] Tr. (Russ Anderson) at 9430-31.

[1040] *Id.* at 9428.

[1041] EC MSD Ex. 269 (Report of NBE Candy) at ₱72.

[1042] *Id.*

[1043] *Id.*

[1044] *Id.* at ₱73, citing email from Marty Weber to Michael Bacon et. al. (Aug. 8, 2012) (OCC-WF-SP-06076695).

[1045] EC MSD Ex. 269 (Report of NBE Candy) at ₱74.

Add. 897

Appellate Case: 25-1079    Page: 899    Date Filed: 05/16/2025 Entry ID: 5517644

Bank's system and a practice the Bank referred to as "simulated funding."[1046] The activity that the Bank described as "simulated funding" involves a banker making fraudulent or unauthorized transfers of money from one account to another without the customer's consent to make it appear as if the customer had funded the account.[1047]

Bank documents show that in the summer and fall of 2013, SSCOT conducted an analysis to detect simulated funding and phone number changes in the Los Angeles/Orange County and then across the Regional Bank footprint, using criteria to identify "extreme outlier" activity.[1048] For conduct likely exhibiting simulated funding, SSCOT used criteria of 50 or more accounts in five months or more than 10 percent of total accounts opened in four months, where the account was funded with a single transfer of funds from an existing accounts to a new account, and then transferred back to the originating accounts within 1 day, with no further activity in the new account.[1049] The practical effect of using this methodology was that if activity exhibiting simulated funded was done to 49 accounts in five months, it was not detected through proactive monitoring.[1050]

This proactive monitoring was used to identify only egregious patterns of red flag activity for simulated funding and led to an initial round of investigation and termination of approximately 30 employees in fall 2013, some of whom complained to the Los Angeles Times.[1051] In October 2013, the Los Angeles Times reported, "the pressure to meet sales goals was intense at Wells Fargo. At times, managers required workers to stay in the branch after the close of business, calling their friends and family members, if they failed to open enough accounts during the day."[1052] In December 2013, the Los Angeles Times published a second article identifying that the sales practices misconduct was not limited to Los Angeles:

> To meet quotas, employees have opened unneeded accounts for customers, ordered credit cards without customers' permission and forged client signatures on paperwork. . . . These conclusions emerge from a review of internal bank documents and court records, and from interviews with 28 former and seven current Wells Fargo employees who worked at bank branches in nine states, including California.[1053]

---

[1046] EC MSD Ex. 269 (Report of NBE Candy) at ¶75.

[1047] *Id.*

[1048] *Id.* at ¶76.

[1049] *Id.*

[1050] EC MSD Ex. 269 (Report of NBE Candy) at ¶76, citing email from David Otsuka to Debra Patterson et. al. (Nov. 18, 2013) (OCC-WF-SP-06925140); Email from Glen Najvar to Michael Moore et. al. (Sept. 13, 2013) (OCC-WF-SP-08387599).

[1051] EC MSD Ex. 269 (Report of NBE Candy) at ¶77.

[1052] *Id.*

[1053] *Id.*

Add. 898

Appellate Case: 25-1079     Page: 900     Date Filed: 05/16/2025 Entry ID: 5517644

## Pause on Proactive Monitoring

Following the Los Angeles Times articles, SSCOT "paused" proactive monitoring until July 2014, purportedly to allow the Community Bank to identify and address the root cause of the misconduct.[1054] It was evident that the misconduct was widespread and continued monitoring could inundate the Community Bank with investigations and terminations.[1055] However, by 2013 the root cause of sales practices misconduct was well known by the Community Bank, the Law Department, and Audit.[1056]

The Community Bank paused proactive monitoring for approximately seven months, from December 2013 through July 2014.[1057] Based on her review of the evidence, Examiner Candy opined that at the time the Community Bank instituted the pause on proactive monitoring, the root cause had been well known within the Bank.[1058] Many Bank witnesses testified that no one ever suggested any cause for employees to engage in sales practices misconduct other than the pressure on employees to meet sales goals in order to keep their jobs, and to a lesser extent to earn incentive compensation.[1059]

From her review of Bank documents during the investigation and litigation, Examiner Candy opined that the pause on proactive monitoring was intended to limit the number of terminations for sales practices misconduct to avoid reputational harm to the Bank from negative publicity.[1060] In her opinion as a National Bank Examiner, this was not a prudent nor acceptable reason to pause proactive monitoring.[1061]

## Controls Following the Pause

In July 2014, SSCOT resumed proactive monitoring for simulated funding, applying a new criteria of identifying employees in the 99.99th percent (top 0.01 percent) of Bank team members who met "red flag" activity for simulated funding in one month.[1062] Based on Bank documents, approximately 30,000 employees exhibited characteristics of "red flag" activity for

---

[1054] *Id.* at ¶78.

[1055] EC MSD Ex. 269 (Report of NBE Candy) at ¶78, citing Email from Christine Meuers to Hope Hardison et. al. (Dec. 2, 2013) (OCC-WF-SP-07373388).

[1056] EC MSD Ex. 269 (Report of NBE Candy) at ¶78.

[1057] *Id.* at ¶80, citing Email from Paula Herzberg to Rebecca Rawson et. al. (Sept. 13, 2016) (OCC-WF-SP-07687489).

[1058] EC MSD Ex. 269 (Report of NBE Candy) at ¶81.

[1059] *Id.*

[1060] *Id.* at ¶82.

[1061] *Id.*

[1062] *Id.* at ¶83, citing Email from Deanna Lindquist to Crystal Silva et. al. (Oct. 22, 2015) (OCC-WF-SP-07916406); Email from Glen Najvar to David Otsuka (July 7, 2014) (OCC-WF-SP-08205606).

Add. 899

Appellate Case: 25-1079     Page: 901     Date Filed: 05/16/2025 Entry ID: 5517644

simulated funding in one month.[1063] However, due to the 99.99th percent threshold SSCOT used to identify potential simulated funding, SSCOT identified only 3 employees per month (i.e., 0.01 percent of 30,000 Community Bank team members) for investigation.[1064] The Community Bank referred to these employees as "outliers."[1065] Examiner Candy opined that this was grossly insufficient – opining that only reviewing 0.01 percent of the "red flag" activity in any given month is nowhere near a sufficient control for identifying potential simulated funding.[1066]

Beyond simulated funding, SSCOT used 99.99th percent as its threshold for proactive monitoring for the vast majority of sales activity monitored.[1067] In April 2015, the Community Bank's threshold was lowered slightly to detect employees in the 99.95th percentile of activity that was a red flag for simulated funding.[1068] The 99.95th percent threshold involved an employee engaging in approximately10.3 monthly occurrences of red flag activity for simulated funding.[1069] Lowering the threshold monitoring criteria slightly to the 99.95th percentile resulted in the identification of approximately 15 to 18 employees engaging in simulated funding per month.[1070] However, the Bank's data shows that 45 percent of employees had at least one instance of red flag activity for simulated funding per month.[1071]

OCC National Bank Examiner Gregory Coleman reported that during the May 2015 Risk Committee meeting, Board members expressed concerns about the adequacy of the high threshold that had been used in the 2013 investigation, namely the requirement that employees had made 50 or more telephone number changes to trigger review.[1072] Examiner Coleman

---

[1063] *Id.* at ¶84.

[1064] *Id.*

[1065] *Id.*

[1066] *Id.*

[1067] *Id.* at ¶85.

[1068] *Id.* at ¶86, citing Email from Deanna Lindquist to Crystal Silva et. al. (Oct. 22, 2015) (OCC-WF-SP-07916406); Email from Paula Herzberg to Rebecca Rawson et. al. (Sept. 13, 2016) (OCC-WF-SP-07687489).

[1069] EC MSD Ex. 269 (Report of NBE Candy) at ¶86, citing Email from David Otsuka to Rebecca Rawson et. al. (Sept. 21, 2015) (OCC-SP0613052).

[1070] EC MSD Ex. 269 (Report of NBE Candy) at ¶86, citing Email from Deanna Lindquist to Crystal Silva et. al. (Oct. 22, 2015) (OCC-WF-SP-07916406).

[1071] EC MSD Ex. 269 (Report of NBE Candy) at ¶86, citing Email from David Otsuka to Rebecca Rawson et. al. (Sept. 21, 2015) (OCC-SP0613052).

[1072] EC MSD Ex. 257 (Report of NBE Coleman) at ¶90 citing Strother Tr. 28:7-24 (December 18, 2018), OCC-SP00047742. Gregory J. Coleman is a Deputy Comptroller of Large Bank Supervision for the OCC. He became a commissioned National Bank Examiner in 1994 and Federal Thrift Regulator in 2013. As Deputy Comptroller of Large Bank Supervision, he is responsible for effectively supervising a portfolio of 8 financial institutions totaling $2.8 trillion in assets, as well as leading, mentoring, and managing a staff of 170 examiners and support personnel. Among other things, his responsibilities include setting examination strategy and overseeing the OCC's supervision and personnel management for the institutions in his portfolio. He also reviews and confirms the OCC's findings and conclusions on safety and soundness, legal and regulatory violations, and fiduciary duty expectations, and deliver such findings to the directors and senior management of the institutions he oversees. From

reported that despite these concerns about Community Bank thresholds, Respondent Russ Anderson, who presented at the meeting, failed to advise the Risk Committee of the 99.99 and 99.95 percent thresholds then being used to identify other types of misconduct.[1073]

In April 2015, an SSCOT manager who reported directly to Respondent Russ Anderson shared with Respondent Russ Anderson Facebook posts from a former Bank branch manager.[1074] The posts stated, "[Wells Fargo management] have created a toxic atmosphere of sales goals that forces employees to sell products [customers] don't want. They literally say 'every customer needs a credit card.' . . . If there is ever a company as disgusting and unethical as this one, I dare you to find it."[1075]

Examiner Smith reported that she is aware of several meetings where Respondent Russ Anderson was not transparent with the OCC's examination team.[1076] For example, Examiner Smith reported that notwithstanding her obvious knowledge about sales pressure, including terminations for not meeting sales goals, Respondent Russ Anderson told the OCC at a February 10, 2015 meeting, "no one loses their job because they did not meet sales goals."[1077] And she told examiners during a May 14, 2015 meeting with the OCC that interviews with employees "did not lead to a conclusion about sales pressure," that she does not "hear" about pressure from personal bankers "at all," and that "people are positive and pleased."[1078]

Examiner Smith reported that as early as November 2008, Respondent Russ Anderson was informed the "vast majority of customer consent sales integrity cases are directly related" to the fact that no customer signature is required for opening accounts.[1079] Yet, according to

---

approximately September 2015 to September 2019, he was the Deputy Comptroller of Large Bank Supervision responsible for overseeing the supervision of Wells Fargo Bank, N.A. Sioux Falls, South Dakota ("Wells Fargo" or "Bank"). Even after the management of the Bank moved out of his portfolio, he continued to participate in the OCC's investigation of the Bank's sales practices and receive periodic updates on the investigation status, consistent with the role of a senior manager. He has thirty-one years of professional experience at the OCC and Promontory Financial Group, including extensive experience in the government and private sector in the supervision and risk management of large, complex financial institutions. EC MSD Ex. 257 (Report of NBE Coleman) at ¶¶1-4, 6.

[1073] EC MSD Ex. 257 (Report of NBE Coleman) at ¶90, citing Minutes of the Meeting of the Risk Committee of the Board of Directors of Wells Fargo & Company held on May 19, 2015, OCC-WF-SP-08676318.

[1074] EC MSD Ex. 267 (Report of NBE Smith) at ¶111.

[1075] EC MSD Ex. 267 (Report of NBE Smith) at ¶111, quoting E-mail from Rawson to Russ Anderson, FYI ONLY | FW: SNJ FACEBOOK POSTS (RP & AP NAMED) (OCCWF-SP-04792164).

[1076] EC MSD Ex. 267 (Report of NBE Smith) at ¶112.

[1077] EC MSD Ex. 267 (Report of NBE Smith) at ¶112, citing Conclusion Memorandum, Community Bank Operational Risk Exam: Cross Sell/Sales Practices (Feb. 19, 2015) (OCC-SP0125161).

[1078] EC MSD Ex. 267 (Report of NBE Smith) at ¶112, quoting Meeting Notes, Discussion with CB GRO Claudia Russ Anderson surrounding Sales Practices (May 14, 2015) (OCC-SP0067064).

[1079] EC MSD Ex. 267 (Report of NBE Smith) at ¶113, quoting E-mail from Pyles to Russ Anderson, RE: SS&D Parking Lot File Pickup Notification (OCC-WF-SP-05012541).

Add. 901

Examiner Smith, the Community Bank continued to permit employees to issue products without a signature requirement.[1080]

Examiner Smith reported that although Respondent Russ Anderson was aware of the risks posed to the Bank by sales practices misconduct, the SSCOT, under her supervision, employed a proactive monitoring threshold for simulated funding designed to capture only "extreme outliers" or the worst of the worst offenders.[1081] She reported that Respondent Russ Anderson had previously assented to a months-long pause in 2013 and 2014 of the only proactive monitoring the Bank was doing to identify simulated funding.[1082] She reported that the Bank lacked the means to proactively identify many other types of sales practices misconduct, including the issuance of unauthorized debit cards.[1083]

Examiner Smith reported that notwithstanding her knowledge about the inadequacy of the Bank's sales practices controls, for which she was directly responsible, Respondent Russ Anderson was involved in the preparation and presentation of the May 2015 memorandum to the Risk Committee of the Board of Directors that stated the Bank's sales practices controls were "robust."[1084] The memo stated that the root cause of sales practices misconduct was "intentional team member misconduct," and that the there was "a dramatic reduction in inappropriate practices in the past year," without disclosing the high thresholds SSCOT used to identify wrongdoers.[1085] The memorandum was also provided to the OCC.[1086]

Examiner Smith opined that Respondent Russ Anderson engaged in violations of law, unsafe or unsound practices, and breaches of her fiduciary duty by failing to ensure that the Bank adequately managed sales practices risk, which allowed the Bank's sales practices misconduct problem to continue unabated for many years, and failed in performing the most basic elements of her job.[1087]

Examiner Smith further opined that Respondent Russ Anderson engaged in violations of law, unsafe or unsound practices, and breaches of her fiduciary duty by misleading and providing

---

[1080] EC MSD Ex. 267 (Report of NBE Smith) at ⁋114.

[1081] *Id.* at ⁋115, quoting E-mail from Rawson to Russ Anderson, FOR REVIEW | FW: SIM FUNDING & Phone Change outliers for OTHER AREAS—PROPOSED E-MAIL PART 3 (Oct. 25, 2013) (OCC-WF-SP-07037285).

[1082] EC MSD Ex. 267 (Report of NBE Smith) at ⁋115, citing E-mail from Russ Anderson to Callahan et al. Sales Quality work (Jan. 30, 2014) (OCC-SP00009142).

[1083] EC MSD Ex. 267 (Report of NBE Smith) at ⁋115.

[1084] *Id.* at ⁋116, quoting Memorandum from Strother to Risk Committee WFC Board of Directors, Board Risk Committee Agenda Item (May 19, 2015) (OCC-WF-SP-07083821).

[1085] EC MSD Ex. 267 (Report of NBE Smith) at ⁋117, quoting Memorandum from Strother to Risk Committee WFC Board of Directors, Board Risk Committee Agenda Item (May 19, 2015) (OCC-WF-SP-07083821) at 3, 5.

[1086] EC MSD Ex. 267 (Report of NBE Smith) at ⁋118.

[1087] *Id.*

Add. 902

Appellate Case: 25-1079    Page: 904    Date Filed: 05/16/2025 Entry ID: 5517644

false information to the Board of Directors and the OCC and obstructing the OCC's examination process; that Respondent Russ Anderson recklessly engaged in the aforementioned unsafe or unsound practices, and that Respondent Russ Anderson's violations, practices, and breaches constituted a pattern of misconduct, involved personal dishonesty, and demonstrated a willful and continuing disregard for the Bank's safety and soundness.[1088]

In late 2016, in response to an OCC MRA and the work of consultant PricewaterhouseCoopers regarding the volume of accounts that had likely been affected by simulated funding, the Bank's Financial Crimes Risk Management department conducted its own analysis of potential simulated funding.[1089] This analysis concluded that from May 2011 through July 2015, "387,000 accounts were opened by 41,000 Team Members that were more likely than not simulated funding."[1090]

Examiner Candy reported that the Bank's SSCOT continued to use the 99.95th percentile threshold until sales goals were eliminated in October 2016.[1091] She opined that using the 99.95th percentile, although slightly better than the 99.99th percentile, is also grossly insufficient given the amount of "red flag" activity.[1092]

**The Bank's Controls to Prevent and Detect Sales Practices Misconduct were Inadequate**

Examiner Candy reported that effective internal controls provide bankers and examiners reasonable assurance that bank operations are efficient and effective, risk management systems are effective, and the bank complies with banking laws and regulations, internal policies, and internal procedures.[1093] She added that senior management is supposed to oversee and provide leadership and direction for the communication and monitoring of control policies, practices, and processes.[1094]

Examiner Candy opined that the Bank's controls to prevent and detect sales practices misconduct were inadequate and the Bank's risk management of its sales practices and the sales practices themselves were recklessly unsafe or unsound.[1095] She reported that designing and implementing controls reasonably designed to prevent and detect misconduct or illegal activity is

---

[1088] EC MSD Ex. 267 (Report of NBE Smith) at ¶¶119-20.

[1089] EC MSD Ex. 257 (Report of NBE Coleman) at ¶66

[1090] Id., quoting FCRM Report at 1, OCC-WF-SP-08515940.

[1091] EC MSD Ex. 269 (Report of NBE Candy) at ¶87.

[1092] Id.

[1093] Id. at ¶88, citing Office of the Comptroller of the Currency, Comptroller's Handbook, Internal Control at 2 (Jan. 2001).

[1094] Id., citing Office of the Comptroller of the Currency, Comptroller's Handbook, Internal Control at 2, 16 (Jan. 2001).

[1095] EC MSD Ex. 269 (Report of NBE Candy) at ¶89.

Add. 903

Appellate Case: 25-1079     Page: 905     Date Filed: 05/16/2025 Entry ID: 5517644

a critical part of effective risk management and internal controls,[1096] adding that generally accepted standards of prudent operation require banks to manage risks and implement and maintain controls reasonably designed to prevent and detect misconduct.[1097] She reported that ineffective sales practices risk management increases the potential of financial loss, litigation, regulatory risk, reputational damage, conduct risk, and operational and compliance risks.[1098]

As explained in the OCC's Corporate and Risk Governance, Comptroller's Handbook:

> A responsible corporate culture and a sound risk culture are the foundation of an effective corporate and risk governance framework and help form a positive perception of the bank. A bank that fails to implement effective corporate and risk governance principles and practices may hinder the bank's competitiveness and adversely affect the bank's ability to establish new relationships and services or to continue servicing existing relationships. Departures from effective corporate and risk governance principles and practices cast doubt on the integrity of the bank's board and management. History shows that such departures can affect the entire financial services sector and the broader economy.[1099]

Examiner Candy opined that in addition to its inadequate detective controls, the Bank's controls to prevent sales practices misconduct were insufficient.[1100] For example, the Bank did not require a customer signature—i.e., evidence of customer consent—to open a debit card.[1101] The Bank began requiring a customer signature to open a credit card only in 2015.[1102] On November 3, 2008, the former Head of Sales Quality wrote the following email to Respondent Russ Anderson:

> Many of our product groups in the early 90's lobbied to remove the signature requirements because they slowed down the account opening process and carried a back room cost of filing and storing the paper application. The vast majority of customer consent sales integrity cases are directly related to this issue. This is why we have been pressing so hard for PIN or E-Signature Consent on ALL product sales. If we had a requirement that all product or

---

[1096] EC MSD Ex. 269 (Report of NBE Candy) at ¶89.

[1097] *Id.*

[1098] *Id.*

[1099] *Id.* at ¶88, quoting Office of the Comptroller of the Currency, Comptroller's Handbook, Safety and Soundness, Corporative and Risk Governance at 3 (July 2016).

[1100] EC MSD Ex. 269 (Report of NBE Candy) at ¶90.

[1101] *Id.*

[1102] *Id.*

Add. 904

Appellate Case: 25-1079     Page: 906     Date Filed: 05/16/2025 Entry ID: 5517644

services had one or the other, then most of our consent issues would become moot.[1103]

The Head of SSCOT, who reported to Respondent Russ Anderson, testified that the Bank's systems enabled employees to engage in sales practices misconduct.[1104] Rebecca Rawson explained in sworn testimony that the Bank's systems allowed employees to issue debit and credit cards to customers without their signatures or consent, which she determined was a control failure:

> Q Okay. So I take it the bank had a policy that you should not issue credit cards or debit cards without the customer's consent?
>
> A Correct.
>
> Q All right. But the system allowed team members to actually issue credit cards and debit cards without the customer's consent or the customer's signature?
>
> A I think that is right.
>
> Q Okay. And you view that as a failure in controls?
>
> A I think that is fair.[1105]

Based on the evidence that she reviewed, Examiner Candy opined that the Bank's controls to detect sales practices misconduct were also insufficient.[1106] She reported that a bank should investigate transactions that it considers a "red flag" for misconduct,[1107] adding that is particularly true where, as here, the suspected misconduct constitutes illegal and even criminal activity.[1108]

Examiner Candy reported that the Bank's use of the term "simulated funding" to refer to the activity described in this report does not change the fact that the activity constitutes fraud and falsification of bank records as well as a violation of 15 U.S.C. § 45(a) (Unfair and Deceptive Acts and Practices or UDAP).[1109] She reported that other types of sales practices misconduct

---

[1103] EC MSD Ex. 269 (Report of NBE Candy) at ₱90, quoting Email from Tyson Pyles to Claudia Russ Anderson (Nov. 3, 2008) (OCC-WF-SP-05012541).

[1104] EC MSD Ex. 269 (Report of NBE Candy) at ₱90.

[1105] *Id.* at ₱91, quoting Rawson Tr. 50:11-19 (July 26, 2018).

[1106] EC MSD Ex. 269 (Report of NBE Candy) at ₱92.

[1107] *Id.*

[1108] *Id.*

[1109] *Id.*

similarly constitute illegal and criminal activity, for example opening a savings account without customer authorization involves falsifying bank records and UDAP.[1110]

Examiner Candy reported that the evidence shows that SSCOT determined that every month approximately 30,000 employees, or 45 percent of its employees, engaged in an activity that the Bank itself considered to be a "red flag" for illegal behavior.[1111] Examiner Candy reported, however, that the Bank investigated only 3 employees per month during the period it was using the 99.99 percent threshold, and only approximately 15-18 employees per month when the Bank used the 99.95 percent threshold.[1112] Examiner Candy opined that this is far too few.[1113]

Examiner Candy was the lead OCC examiner who reviewed the Bank's earnings for three years and was responsible for understanding the drivers of the enterprise and the major business line income and expense streams.[1114] She understood that at least one of the justifications for the chosen thresholds was that the Bank believed it lacked resources to investigate additional misconduct and expanding the thresholds would yield many false positives.[1115] Examiner Candy opined that neither rationale is appropriate, and both demonstrate that the Bank did not have adequate risk management over sales practices.[1116]

Examiner Candy opined that the lack of resources to conduct necessary investigations is simply not an excuse for any bank, let alone a bank with the size and resources of Wells Fargo.[1117] She noted that Wells Fargo was posting record earnings quarter after quarter during that period.[1118] Moreover, she reported, a simple phone call to the customer asking whether he or she opened an account, moved a certain amount of money into it, and then moved back the same amount within one day and conducted no further activity on the new account, could suffice to investigate the issue.[1119]

Examiner Candy determined that the chosen thresholds were intentionally restrictive so as to allow the Bank to manage the *outcome* (that is, manage the number of employees identified), not the *risk*.[1120] She reported that the restrictive thresholds limited the number of

---

[1110] *Id.* at ¶92.

[1111] *Id.* at ¶93.

[1112] *Id.*

[1113] *Id.*

[1114] *Id.* at ¶94.

[1115] *Id.*

[1116] *Id.*

[1117] *Id.*

[1118] *Id.*

[1119] *Id.*

[1120] *Id.*

investigations and terminations for sales practices misconduct, rather than managing the risk.[1121] And she opined that that is not consistent with prudent and effective risk management.[1122]

Examiner Candy opined that the fact that the Bank was identifying more "red flag" activity than it had the capacity to investigative is a strong indicator that there was a serious and systemic sales practices misconduct problem in the Community Bank.[1123] She reported that this is particularly so given the narrow criteria used to identify "red flag" activity (involving back-and-forth movement of funds between accounts within 24 hours, which in Examiner Candy's view is not indicative of customer-authorized activity).[1124]

Moreover, she opined that the evidence indicates that the Community Bank lacked the ability to identify the following types of sales practices misconduct using data analytics (and thus relied on reactive channels only to detect such misconduct): bundling; pinning; sandbagging; and the opening of unauthorized debit cards and credit cards.[1125]

Examiner Candy reported that the detected "red flag" activity, the majority of which the Bank chose not to investigate, did not even come to close to reflecting the full universe of sales practices misconduct at the Bank.[1126] She noted that the Bank determined each month 30,000 of its employees engaged in an activity that was a red flag for just one of the various types of sales practice misconduct, and she opined that this should have alerted Bank leadership, including the Group Risk Officer and Audit, that there was a serious and systemic problem with sales practices misconduct in the Community Bank's model.[1127]

Examiner Candy opined that this should have alerted them that the problem was not attributable to rogue employees but to the Community Bank's business model and operations.[1128] She reported that rather than changing the profitable model, the Bank investigated three employees per month, and later fifteen to eighteen employees, out of the 30,000 employees identified per month who engaged in the "red flag" activity.[1129]

---

[1121] *Id.*

[1122] *Id.* at ¶95.

[1123] *Id.*

[1124] *Id.*

[1125] *Id.*

[1126] *Id.*

[1127] *Id.*

[1128] *Id.*

[1129] *Id.*

Examiner Candy reported that authoritative sources within the Bank knowledgeable on the red flag activity and the detection methodologies gave testimony that shows the Bank's detection approach was inappropriate.[1130]

For example, the head of SSCOT, testified as follows:

> Q I take it you would agree that the Bank's analysis shows that about 45 percent of the employees engaged in red flag activity, is that correct?
>
> A Correct.
>
> Q All right. And you also agree that the Bank was only investigating 18 of those? A Correct.
>
> Q All right. And you thought that was problematic?
>
> A Correct.
>
> Q And Ms. Sperle, the head of corporate investigation, also thought it was problematic?
>
> A I believe she did.[1131]

The Head of SSCOT admitted that the proactive monitoring demonstrated that the Bank's other two reactive methods for detecting sales practices misconduct (methods that relied on employees and customers reporting misconduct) were ineffective.[1132] That is because the reactive methods generally failed to identify even the "worst of the worst" actors, who then triggered the 99.99% and 99.95% thresholds.[1133] Accordingly, it follows that the reactive controls were also ineffective in detecting employees who engaged in the red flag activity with less frequency given that they did not detect even the most egregious offenders.[1134]

Specifically, the Head of SSCOT testified as follows:

> Q And for the most part, the number of people that met that threshold had not been caught by the Bank's other methods for identifying misconduct?
>
> A Correct.
>
> Q All right. So, if these other methods were not effective in identifying people who are at the top fraction of the top one percent of people engaged in the misconduct, it would fall into a mathematical certainty that

---

[1130] *Id.* at ¶96.

[1131] *Id.*, quoting Rawson Tr. 188:3-16 (July 26, 2018).

[1132] EC MSD Ex. 269 (Report of NBE Candy) at ¶97.

[1133] *Id.*

[1134] *Id.*

they really would not be effective if people engaged in this misconduct who
are in the 50th percentile or 60th percentile, correct?

A Correct.[1135]

Examiner Candy reported that the Bank had better systems and tools to detect employees who did not meet sales goals than it did employees who engaged in sales practices misconduct.[1136] She reported that the risk of termination for employees who did not meet sales goals far exceeded that of being investigated and terminated for sales practices misconduct.[1137] She found that the Community Bank management had the ability to track sales at a very granular level and would call the branches multiple times a day with an update on sales activity.[1138]

Examiner Candy reported that this contrasted sharply with the insufficient and infrequent sales quality and proactive monitoring reporting.[1139] She opined that the high pressure and aggressive sales goal business model contributed to an environment with high inherent risk for compliance.[1140] She reported that despite this, Respondent Russ Anderson failed to implement sufficient preventative and detective controls, which ultimately pushed the residual risk to unacceptable levels.[1141]

As an example, Examiner Candy noted that Loretta Kay Sperle, the former Head of Corporate Investigations, testified before the OCC that there was a significant likelihood that an employee's manager would know if the employee failed to meet her sales goals because the Community Bank tracked that; by contrast, the chances that an employee would be caught for issuing an unauthorized product or service were very small.[1142]

She testified:

Q Okay. So if [employees] were doing it when nobody is watching, and they don't do it enough to trigger the outlier thresholds that you've had, the chances of them getting caught is very small?

A Yes. I would agree.[1143]

**The Bank's Controls Were Intentionally Inadequate**

---

[1135] *Id.*, quoting Rawson Tr. 211:7-20 (July 26, 2018).

[1136] *Id.* at ¶98.

[1137] *Id.*

[1138] *Id.*

[1139] *Id.*

[1140] *Id.*

[1141] *Id.*

[1142] *Id.*

[1143] *Id.*, quoting Loretta Kay Sperle Tr. 158:15-20 (February 13, 2018) (EC MSD Ex. 299).

Add. 909

Appellate Case: 25-1079    Page: 911    Date Filed: 05/16/2025 Entry ID: 5517644

Based on Bank documents and sworn testimony that Examiner Candy reviewed, she concluded that the Bank's senior leaders did not want to identify and terminate additional employees for sales practices misconduct, beyond those identified through the reactive methods and the restrictive proactive monitoring methodology described above, in part because of the negative publicity that terminations were expected to generate.[1144]

Examiner Candy reported that ongoing mass terminations would have undermined the Bank's arguments that were presented to the Board and OCC examiners: (1) the misconduct was caused by "bad apple" employees engaging in intentional misconduct, as opposed to a defect in the business model, and (2) corrective measures implemented by the Community Bank were effectively resolving the problem.[1145] She opined that Respondent Russ Anderson's failure to implement effective controls, and the failure to identify employees engaged in sales practice misconduct to reduce terminations or to manage reputation risk, was unsafe or unsound and was inconsistent with the role of a Group Risk Officer.[1146]

Examiner Candy reported that the Bank's former Director of Investigations and Chief Security Officer Michael Bacon saw common schemes indicative of misconduct that could have easily been detected if the Bank had looked for them.[1147] She reported that in 2012 or 2013, he advocated for proactive monitoring of other types of sales practices activities, such as: employees or customers with excessive accounts (*e.g.*, hundreds of accounts) registered to the same address; college credit cards issued to non-college students; and Bank employees with inappropriate business accounts.[1148] She reported that the former Chief Security Officer testified that he offered suggestions for proactive monitoring primarily to Respondent Russ Anderson, but also to Operating Committee members.

Examiner Candy reported that in his testimony, Mr. Bacon stated that there was resistance to more investigations due to fear of finding more misconduct that would lead to additional terminations.[1149] She reported that the former Chief Security Officer testified that the "lack of being proactive" was a "reoccurring theme" and he informed Respondent Russ Anderson that the employees identified and terminated for sales practices misconduct were the

---

[1144] *Id.* at ¶99.

[1145] *Id.*

[1146] *Id.*

[1147] *Id.* at ¶100, citing Michael Bacon Tr. 120:7-127:19 (May 4, 2018) (EC MSD Ex. 295).

[1148] EC MSD Ex. 269 (Report of NBE Candy) at ¶100.

[1149] *Id.*, citing Bacon Tr. 120:7-127:19 (May 4, 2018).

Appellate Case: 25-1079      Page: 912      Date Filed: 05/16/2025 Entry ID: 5517644

"tip of the iceberg."[1150]  She reported that he emphasized to her and others that a decline in terminations did not necessarily indicate less misconduct because the Bank was not proactive.[1151]

The former Chief Security Officer testified before the OCC that Community Bank senior leadership, including Respondent Russ Anderson, "absolutely" wanted to minimize terminations even if there was strong evidence that the employee engaged in sales practices misconduct.[1152]

James Richards, the Head of the Bank's Financial Crimes Risk Management ("FCRM") department, testified before the OCC, "using a percentage threshold does not necessarily address the actual risk. So if you're pulling down a two percent or .01 percent or .05 percent that's managing the output more than it is managing the risk."[1153]  He testified that he explained this to Respondent Russ Anderson and offered members of his analytics team to assist SSCOT's monitoring, but she refused. He testified that Respondent Russ Anderson responded that if "SSCOT changed or dramatically changed their monitoring thresholds that they would have, and I can't recall her phrase, but many, many more identified team members than they could reasonably handle."[1154]


**Resumption of SSOCR's Proactive Monitoring of Simulated Funding Activity in July 2014**

After the Community Bank's Sales and Services Conduct Oversight Team (SSCOT) resumed sending data to WF&C's Corporate Investigations group in July 2014, Corporate Investigations identified 35 team members in Los Angeles "and approximately another 250 across the footprint with about 70 percent of those terminations being for phone number changes and 30 percent for simulated funding." [1155] Ms. Russ Anderson testified that she believed "without proactive monitoring, we never would have understood . . . what was going on with the simulated funding."

Elaborating on this point, she testified:

> And over time, I believe that it helped reduce the number of instances of simulated funding, because we were finding it -- we were training bankers better around it and senior leadership was looking for the behavior, more readily looking for the behavior than they had. So I think proactive

---

[1150] EC MSD Ex. 269 (Report of NBE Candy) at ₱100 quoting Bacon Tr. 105:25-106:19; 121:23-122:15 (May 4, 2018).

[1151] EC MSD Ex. 269 (Report of NBE Candy) at ₱100, citing Bacon Tr. 105:25-106:19; 121:23-122:15 (May 4, 2018).

[1152] EC MSD Ex. 269 (Report of NBE Candy) at ₱100, quoting Bacon Tr. 61:16-63:13 (May 4, 2018).

[1153] EC MSD Ex. 269 (Report of NBE Candy) at ₱100, quoting James Richards Tr. 139:3-140:17 (May 4, 2018) (EC MSD Ex. 298).

[1154] EC MSD Ex. 269 (Report of NBE Candy) at ₱100, quoting Richards Tr. 146:5-149:24 (May 1, 2018).

[1155] Tr. (Russ Anderson) at 9256.

monitoring had a significant impact on the reduction of proactive monitoring [as spoken] [simulated funding].[1156]

Ms. Russ Anderson did not dispute that initially proactive monitoring set a threshold of 99.99 percent.[1157] She identified a July 3, 2014 email message from Glen Najvar to Mr. Bacon and others asking the recipients to note that "beginning in May 2014 (as this behavior is now a part of SSCOT internal monitoring) the 'threshold' has been changed to included outlying team members considered in the 99.9% percentile as approved by Claudia Russ Anderson."[1158]

When asked through leading questioning by her Counsel during direct examination whether she intentionally set the threshold there to capture only the most egregious cases of sales integrity violations to minimize the scope of the sales practices problem at the Bank, Ms. Russ Anderson responded:

We did not do – that was not the reason that we set them at the levels that we did. It was a statistically valid sample, and it was meant to be used in the pilot as such, always with the understanding that we could continue to expand as we learned more.[1159]

Ms. Russ Anderson disputed the assertion that with this threshold SSCOT was referring for investigation only one out of every 10,000 employees who exhibited red flag activity for simulated funding.[1160] She disputed that under the threshold in July 2014, 30,000 employees were identified per month who exhibits activity that was a red flag for simulated funding.[1161] She testified that the 30,000 team members "was the number of team members that had . . . had a sale in that month."[1162]

Elaborating, Ms. Russ Anderson testified:

Those 30,000 team members did not exhibit potential simulated funding. The SSCOT team took that 30,000 team members that had a sale, overlaid what potential simulated funding activity would look like, took out the ones that had none of that activity, which I think was some 55 percent, and then took the rest and put more filters on it to see how many times that activity could

---

[1156] *Id.* at 9256-57. See Via "22-03-07 Respondents' Amended Revised Errata Day 9-38" on page 75. Ordered by Second Supplemental Order.

[1157] Tr. (Russ Anderson) at 9322.

[1158] *Id.*; OCC Ex. 1370.

[1159] Tr. (Russ Anderson) at 9322.

[1160] T*Id.*at 9322-23.

[1161] Tr. (Russ Anderson) at 9322-23.

[1162] *Id.* at 9323.

Add. 912

Appellate Case: 25-1079      Page: 914      Date Filed: 05/16/2025 Entry ID: 5517644

have occurred. And so the base is not 30,000. The base is something way smaller than 30,000.[1163]

Ms. Russ Anderson testified that she believes the thresholds were appropriate throughout the relevant period.[1164] In support, she stated, "[w]e were continuing to find behaviors. The behaviors were reducing, and so as the behaviors reduced, we lowered the percentage. And so because the number of instances were going down, it showed that, you know, it was working. The proactive monitoring was working."[1165] Explaining the change in April 2015, Ms. Russ Anderson testified that "if you get to a place, which I think we got to, a level where, like, you know what, now we need to go down another notch, which is why we did the research and said let's go to 99.95."[1166]

Through leading questioning by her Counsel during direct examination, Ms. Russ Anderson testified that she "completely believed" there was a deterrent effect about having Corporate Investigations going into the field and investigating these sales practices misconduct that resulted from SSCOT's research.[1167]

Asked by her Counsel during direct examination to describe what she did during 2013 and 2014 with respect to controls around sales practices misconduct, Ms. Russ Anderson testified:

> We did create more training around for the store bankers, for the branch bankers. We created an Ethically Speaking course as well as the quality sales manual. We -- I worked extensively -- I had to use a lot of political capital around signature capture, because it was not something that people were in favor of. I went out and spoke across the footprint two straight years several times a year to groups of people at the branch level and middle market. I talked extensively with the senior regional leadership about the data we had and how were they using the data and teaching them, you know, how to look for things that would help them manage the risks within their regions.[1168]

Ms. Russ Anderson identified a June 19, 2015 email chain among Kris Klos, Rebecca Rawson, herself and others regarding the need to follow up on discussion items raised during the OCC's meeting on Complaints, Ethics Line Referrals, and the SSCOT Process held that day.[1169] One of the items requiring action reflected, "the OCC had a general policy and procedure

---

[1163] *Id.* at 9323-24.

[1164] *Id.* at 9324.

[1165] *Id.*

[1166] *Id.*

[1167] *Id.* at 9324-25.

[1168] *Id.* at 9372-73.

[1169] *Id.* at 10018; OCC Ex. 223.

Add. 913

Appellate Case: 25-1079     Page: 915     Date Filed: 05/16/2025 Entry ID: 5517644

question around requirements for signatures, and in cases where they were not obtained, are there controls or checks and balances to confirm whether a signature was there or not."[1170]

When asked whether she believed this was an important question from the OCC, Ms. Russ Anderson responded, "I would have thought so, yes."[1171] She testified she believed she had an obligation to provide a complete response, and that it would not be appropriate for her to err on the side of under-inclusion when providing information to the OCC.[1172] In her responsive email, Ms. Russ Anderson wrote to the distributees "We also need to be clear with OCC IF a signature is required by law or not."[1173]

Ms. Russ Anderson apparently determined that the June 19, 2015 meeting sought information only about credit products and not deposit accounts: In the email exchange, Camie Keilen wrote to one of Ms. Russ Anderson's direct reports – Paula Herzberg – on June 23, 2015 that she was "attempting to get the narrative pulled together for the OCC's four outstanding questions that did not get answered in last Friday's call."[1174] Ms. Keilen provided a copy of the four questions and drafts of the answers, stating for Question #4, "we think we just need to explain to the OCC generally what if any signature requirements were in place during the period of time these complaints in question came in versus what has changed since then."[1175]

In her draft, Ms. Keilen provided a response that described signature requirements for consumer credit products, stating she "lifted language directly from the Messenger article that went out on April 3, 2015 as it relates to consumer credit products."[1176]

For deposit products, Ms. Keilen's draft was as follows:

> For deposits, we reached out to Donna See in DSSG and she explained that the signature requirements that were in place back then (during the period coinciding with the complaints) have not changed as of today. Though there is some sort of technical exception process in place when signatures are not on file, which should require team members to obtain those signatures, those controls unfortunately did not stop a few of the deposit accounts in question from being opened and activated. **We have asked Donna to put the explanation into a narrative and will get the entire document back to you**

---

[1170] OCC Ex. 223 at 1.

[1171] Tr. (Russ Anderson) at 10018.

[1172] *Id.* at 10018-19.

[1173] OCC Ex. 223 at 1.

[1174] R. Ex. 1720 at 3.

[1175] *Id.* at 3-4.

[1176] *Id.* at 4.

Appellate Case: 25-1079     Page: 916     Date Filed: 05/16/2025 Entry ID: 5517644

**in case you have any edits or suggestions**. We will be sending a draft of whatever we have to Claudia first thing in the morning so she can review.[1177]

This response thus interpreted the OCC's request for information to apply to credit and deposit accounts – not just credit accounts. Later the same day, however, Ms. Herzberg wrote to Ms. Keilen, stating, "I was not aware that the OCC asked about deposit accounts as well [as credit applications], but that is a bit different in terms of signatures."[1178] She asked Ms. Keilen, "Did this request also expect us to cover back end processes designed to follow up on missing signatures (such as credit card applications for those under 21)?"[1179]

The response to Ms. Herzberg's question came from Justin Richards, Complaints Program Manager for Community Banking Risk Management: "Yes, I think the scope of their questions are related to both deposit and credit products as well as the back-end processes to review exceptions."[1180] In forwarding to Ms. Herzberg the draft response – addressing both credit and deposit products – Mr. Richards expressed his concern about the completeness of the draft regarding deposit accounts, writing, "this clearly lacks details on the process for obtaining signatures for deposits but provides details on the exception process."[1181]

That draft read as follows:

> When opening or maintaining a deposit account without the required legal documents, information, or customer signature, a Technical Exception (TE) is generated. TEs are issued 15 days after the account opening or maintenance transaction was completed. This allows sufficient time for documents scanned to Operations to be added to the image library then reviewed for accuracy and supporting documentation. If a TE is generated for missing signatures for account opened the banker is informed and an account application is mailed to the customer asking for them to return a signed copy. Reports listing all TEs are sent to store management monthly via Minding the Store portal.[1182]

Shortly after receiving Mr. Richards' draft, Ms. Herzberg wrote back to him, Ms. Keilen, and Jay Christoff:

> To be clear there really isn't much of a follow up process for missing signatures on deposit accounts that I am aware of . . . this topic has come up numerous times and it is pretty much the same at most banks. It happens more

---

[1177] R. Ex. 1720 at 4 (emphasis *sic*).

[1178] *Id.* at 3.

[1179] *Id.*

[1180] *Id.* at 2.

[1181] *Id.*

[1182] *Id.*

often in the phone channel, of course, ███████████████████████████████████████████████████████████████ If they haven't specifically asked about deposit accounts, I really wonder if we should go there.[1183]

After describing the PIN PAD process used in credit card applications, Ms. Herzberg identified two instances where a PIN PAD signature might not have been captured: "(1) the PIN PAD is not functioning; or (2) it is bypassed assumedly because the customer cannot sign it (disability, etc.)." She wrote that if this occurs the banker is to "print a form and have the customer sign it, then fax it to Card Operations."[1184] She added, "[w]e did not provide this level of detail to the OCC, as we agreed to keep our initial response high level."[1185]

Ms. Herzberg concluded the message with the following admonition: "We would not want to include anything about phone sales, as these really weren't allowed by policy, but we found they were occurring and took steps to clarify policy, etc."[1186]

Ms. Russ Anderson responded directly – but only to Ms. Herzberg – stating "[The OCC] did not ask about deposits and we shouldn't add it. I'll edit it out when they send it."[1187] **Acting in furtherance of this opinion under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

During cross-examination, when asked whether she saw that Mr. Richards had confirmed that the scope of the OCC's questions included both deposit and credit products, Ms. Russ Anderson responded, "What I see is something that was his opinion that that's what the question was about. We had a debate as to whether or not that was what they were asking for."[1188] The record includes no suggestion, however, that Ms. Russ Anderson sought to clarify from the OCC whether Mr. Richards' "opinion" about the scope of the OCC's question was as narrowly drawn as she believed it to be.

Asked during cross-examination why she elected to edit out the draft regarding deposit accounts, Ms. Russ Anderson responded:

> For a couple of reasons. One, we had been getting criticized by the OCC for sending too much information and not being responsive to their requests in this period of time. And so Paula and I -- as you can see in the one above it,

---

[1183] R. Ex. 1720 at 1.

[1184] *Id.*

[1185] *Id.* at 1-2.

[1186] *Id.* at 2.

[1187] *Id.* at 1.

[1188] Tr. (Russ Anderson) at 10023-24

she agrees with me. We were trying to be responsive to the OCC, not overwhelm them with information they did not ask for. And also we had -- these were two kind of junior people who had not had a lot of experience with the OCC before, and so we were trying to ensure that what was being sent to the OCC was responsive and not just loading up stuff in the SharePoint site, which they had a criti- -- they were asking us and criticizing us about doing.[1189]

She added that while she thought Mr. Richards and Ms. Keilen wanted to be transparent, that "they thought that was what the OCC wanted" Ms. Russ Anderson and Ms. Herzberg "had a different interpretation of the request."[1190] Ms. Russ Anderson denied, however, seeking to edit out the deposit accounts information in order to prevent the OCC from seeing Ms. Herzberg's statement that there was no follow-up process for missing signatures on deposit accounts.[1191]

**Investigation Debrief Escalation Assessment (IDEA) – November 10, 2014  Corpus Christi, Texas**

On November 10, 2014 Corporate Investigations through Ron Castillo provided an Investigation Debrief Escalation Assessment to Ms. Russ Anderson and others,[1192] with a copy to Mr. McLinko and others. When asked during cross-examination whether she paid attention to the location of IDEA reports, Ms. Russ Anderson responded that she "would have read where they were," but could not remember whether she paid attention to the location of the misconduct.[1193] Nothing in this IDEA supported the factual premise that by late 2014 sales practices misconduct was limited to the L.A./Orange County branch offices of the Community Bank.

Each of the eleven cases reported in this IDEA arose from banker activity in the Calallen branch located in Corpus Christi, Texas.[1194] The investigation "was initiated upon receiving information of Sales Integrity Violations through multiple sources, to wit: anonymous complaint, a Human Resources Climate Survey, and Sales Quality polling."[1195]

The allegation of misconduct by Personal Banker [JB] is as follows:

An investigation into the activity of Personal Banker JB, located at the Calallen branch, was predicated upon receiving polling results from Sales Quality (SQ) for the third time this year. SQ polled (4/1/14 – 6/30/14) due to

---

[1189] *Id.* at 10024-25.

[1190] *Id.* at 10025.

[1191] *Id.* at 10026.

[1192] *Id.* at 9741; OCC Ex. 881.

[1193] Tr. (Russ Anderson) at 9742-43.

[1194] OCC Ex. 881 at 1.

[1195] *Id.*

Add. 917

Appellate Case: 25-1079      Page: 919      Date Filed: 05/16/2025 Entry ID: 5517644

an anonymous complaint which alleged the following: debit/credit cards were issued/ordered without consent, debit cards and PIN numbers mailed to the branch, and simulated funding. Polling results returned one substantiation from a customer who was polled and confirmed that an account was opened without consent. Data pulled resulted in the following stats: 21 out of 26 credit cards issued to customers are used; 73 out of 275 checking/savings accounts are missing signatures within 30 days; 59 out of 99 online banking activated by JB are not used, 25 accounts opened have in and out funding / 9 of the accounts have in & out funding within 1 day.

Previous SQ polling on JB returned the following:

- 3/13/2014 – SQ polled (11/2013 – 1/2014) as a result of an Ethics Line (EL) complaint on opening accounts without consent. One customer substantiated that JB opened a minor checking account without the minor being present.
- 3/3/2014 – SQ polled (11/2013 – 1/2014) as a result of an EL complaint on opening accounts without consent. One customer substantiated the allegation.
- 9/6/2013 – SQ polled (10/2013 – 12/2013) due to D.M. info that JB ordered debit cards without consent. 5 customers substantiated that JB ordered debit cards on a business account that they are signers on. (HR decided to keep JB as per direction of management.)
- 8/15/2013 – SQ polled (8/2013) as a result of a customer complaint that JB opened accounts without consent. One customer substantiated that JB ordered three debit cards without consent.[1196]

The Investigations Summary reports that JB "originally confessed to opening accounts via telephonic consent, however when questioned he changed his response and stated he had not done that since the rule changed and was unable to provide the date when the rule changed. JB is current with his Code of Ethics and Sales Integrity training.[1197]

The IDEA identified six tellers who confessed to sales practices misconduct – *i.e.*, "activity that is in direct violation of the Sales Quality Manual".[1198] In each case the investigators found that "Management directed tellers to engage in" such activity.[1199] In addition, in each case, after taking this into account, the recommended resolution was to retain the team member "due to undue influence."[1200] The recommendation for JB, however, was termination of his

---

[1196] OCC Ex. 881 at 2.

[1197] *Id.* at 4.

[1198] *Id.* at 5-6.

[1199] *Id.* at 5.

[1200] *Id.*

employment based on a finding of "opening checking/savings accounts, credit/debit cards without consent. Simulated funding."[1201] The Case Conclusion included the following: "The pattern of submitting inappropriate off-site teller referrals by Calallen team members is attributable to the culture that was intentionally cemented by management; through their misdirection and significant deviation of explicit company policy."

The IDEA investigation found that allegations of management directing inappropriate telling referrals "were substantiated" and recommended the termination of employment of Store Manager [EL] for directing team members to obtain and submit inappropriate teller referrals, and District Manager [RH] for directing the Store Manager to act in this way.[1202] No termination was recommended for the branch Service Manager [JP] upon a report that he "confessed to directing tellers with obtaining and submitting referrals from off-site businesses, at the direction of EL."[1203] The report found that "since [JP] was a Service Manager in training under EL from April 2014 to October 2014, he had no reason to question her direction. Although he has taken the sales integrity training since he began work at Wells Fargo, Perez did not recall going over this specific rule."[1204]

When asked during cross-examination whether the location of the IDEA report indicated the pervasive nature of sales practices misconduct in the Community Bank, Ms. Russ Anderson responded, "not necessarily," because "we had 6,000 branches, so a singular location didn't indicate to me a systemic nature of issues."[1205] With respect to JB in particular, Ms. Russ Anderson agreed the allegations presented were serious, but that she had no reason to disagree with the protocols under which referral to Corporate Investigations only took place if three customers substantiated the original allegation of misconduct.[1206] **Acting in furtherance of this opinion under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

During cross-examination Ms. Russ Anderson recalled testifying that meetings of the Core Team were difficult, explaining that during the meetings Core Team members were making decisions about team members' lives and their careers.[1207] Asked if she cared so much about team members and their lives why she did not advocate for the elimination of sales goals from 2013 to 2016, Ms. Russ Anderson responded, "I didn't think about that. And if I had, it would

---

[1201] *Id.* at 8.

[1202] *Id.* at 6-7.

[1203] *Id.* at 7.

[1204] *Id.*

[1205] Tr. (Russ Anderson) at 9743.

[1206] *Id.* at 9745-46.

[1207] *Id.* at 9748.

Add. 919

not have – I didn't believe it would have solved the problem."[1208] She acknowledged, however, that testifying now she "couldn't tell you" what the root cause for sales practices misconduct was in 2013 – but that she "worked on getting customer consent. We worked on customer clarity. We worked on additional training. We worked on . . . the quality of sale report card."[1209]

Ms. Russ Anderson testified that by 2014 "one of the root causes was lack of customer consent" in that "bankers weren't getting consent."[1210] Asked what the root cause was for that behavior, Ms. Russ Anderson responded, "I don't know."[1211] **Acting in furtherance of this opinion under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Asked what the root cause was for sales practices in 2015 or 2016, Ms. Russ Anderson responded, "I can't tell you while I'm sitting here."[1212] **Acting in furtherance of this opinion under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

**OCC's February 2015 Examination – Community Banking Operational Risk Management**

Mr. Julian identified the January 7, 2015 Request Letter addressed to Carrie Tolstedt as Senior Executive Vice President of Community Banking, sent from National Bank Examiner Christine Moses of the OCC.[1213] The Letter announced the OCC's intention to conduct an examination of Community Banking operational risk management to begin on February 2, 2015.[1214]

The scope of the examination was to include an assessment of the level of oversight and reporting within the first line of defense, an evaluation of the appropriateness of governance policies and procedures, business processes, quality and sufficiency of staff to monitor, challenge, and conduct controls testing, and a review of the Community Bank's cross sell oversight activities.[1215]

Asked what the term "cross-sell" means, Mr. Julian responded that "[c]ross-sell within Wells Fargo was the practice of providing customers with different products . . . that the company offered, offering customers different products that was [sic] believed that would be

---

[1208] *Id.*

[1209] *Id.* at 9750-51.

[1210] *Id.* at 9751-52.

[1211] *Id.* at 9752.

[1212] *Id.*

[1213] Tr. (Julian) at 6623; R. Ex. 7383.

[1214] R. Ex. 7383 at 1.

[1215] *Id.*

Add. 920

Appellate Case: 25-1079    Page: 922    Date Filed: 05/16/2025 Entry ID: 5517644

valuable to them."[1216] He described the "cross-sell metric" as a metric "by which the number of products that a customer had or had . . . obtained were provided across various lines or within a line of business."[1217]

Asked how, during the relevant time, cross-sell related to the Community Bank's revenue, Mr. Julian responded:

> Well, it was really inherent in the entire business. So when you think of the Community Bank and the Community Bank's customers, the business of the Community Bank was providing customers with various products that would be useful and valuable to the customer. So it was really a -- somewhat at core of the Community Bank's business.[1218]

Mr. Julian added that during the relevant period, WFAS lacked the ability to distinguish cross-sell from the Community Bank's overall sales activities – because cross-sell "was inherent in the business practices."[1219] He testified that as a result, WFAS could not conduct a cross-sell specific review of the Community Bank analogous to audits conducted for other businesses.[1220]

The inability of WFAS to conduct an analogous cross-sell specific review of the Community Bank was discussed between the OCC and Claudia Russ Andersons, as Operations Risk and Compliance Manager.[1221] The Supporting Comments for the February 23, 2015 Conclusion Memo reflects the initial meeting on cross sell took place on February 4, 2014.[1222] During that meeting, Ms. Russ Anderson explained to the OCC that in the Community Bank, "the focus is on selling customers additional products to enhance the 'mutual exchange of value' between customers and the bank. Customers benefit through additional utility, service, and convenience; the bank benefits through increased revenue and customer retention."[1223]

### Ms. Russ Anderson's Participation in the February 9, 2015 OCC Meeting Regarding WFAS Community Bank Sales Coverage

During cross-examination Ms. Russ Anderson identified an email chain running from February 6 to 9, 2015.[1224] In the chain, Jannien Weiner was corresponding with OCC Examiner

---

[1216] Tr. (Julian) at 6624.

[1217] *Id.* at 6624.

[1218] *Id.* at 6625.

[1219] *Id.*

[1220] *Id.* at 6625-26.

[1221] R. Ex. 18918 at 2.

[1222] *Id.*

[1223] *Id.*

[1224] Tr. (Russ Anderson) at 9783; R. Ex. 7694.

Appellate Case: 25-1079   Page: 923   Date Filed: 05/16/2025 Entry ID: 5517644

Hudson, who was seeking a meeting to discuss "new products and strategic planning" in addition to meetings regarding Sales Practices and Enterprise Global Services.[1225]

Seeking clarification of the scope of the strategic planning meeting, Ms. Weiner wrote to Examiner Hudson: "do you mean how PSRM fit into an overall strategic plan?" to which Examiner Hudson responded, "No."[1226] Responding to Ms. Weiner's request for more information about the scope of the Strategic Planning part of the February 2015 exam, Examiner Grover provided the following:

- Please provide Community Bank's Three-Year Strategic Plan, or the supporting Strategic Planning Template – even if it is in Draft status – showing specific strategic initiatives, trends and risks.
- Given the high level of operational risk inherent in the Community Banking landscape (large number of stores, products, team members, geographic span, retail distribution network, etc.), please outline major risk management efforts that are designed to mitigate operational risks associated with meeting strategic goals.
- What are the communication mechanisms (i.e., meetings, oversight) that Claudia and her Risk Group utilize to 1) keep abreast of strategic business plans, and 2) provide input or challenge into strategic decisions?
  - Provide examples, if any, where the GRO team has challenged strategic business proposals/decisions.[1227]

Ms. Russ Anderson acknowledged during cross-examination that sales practices misconduct posed operational risks for the Bank, and that she understood this to be the case from 2013 to 2016.[1228] She also acknowledged receiving from Ms. Weiner Examiner Grover's response at the start of the February 2015 examination, and agreed that it was pretty specific.[1229]

Ms. Russ Anderson testified that in her view, this request by the OCC was "completely out of scope" of the examination, while acknowledging that the OCC was entitled to make whatever requests it wanted from Ms. Russ Anderson and her staff.[1230] Nevertheless, the final entry in the email chain was a message from Ms. Russ Anderson that "Jannien and I are going to talk to OCC this week and try to kill this."[1231] **Acting in furtherance of this opinion under the conditions that were present during the relevant period constituted unsafe or unsound**

---

[1225] R. Ex. 7694 at 7.

[1226] R. Ex. 7694 at 6.

[1227] *Id.* at 5.

[1228] Tr. (Russ Anderson) at 9785.

[1229] *Id.* at 9785-86.

[1230] *Id.* at 9786-87.

[1231] R. Ex. 7694 at 1.

Appellate Case: 25-1079    Page: 924    Date Filed: 05/16/2025 Entry ID: 5517644

**banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Provided with the opportunity to explain this statement, Ms. Russ Anderson testified that "you've missed a very important email on page 2 where we were also talking with the people in Corporate about the strategic plan that the Corporation was working on and that they wanted us to work with – through them to the OCC."[1232]

Those messages, however, do not establish that anyone in Corporate wanted Ms. Russ Anderson to work through them with the OCC regarding the Community Bank's strategic plan. Little weight can be given to Ms. Russ Anderson's factual claim, and the testimony indicates a tendency to deflect when answering questions during cross-examination. The message from Carole Anderson (February 9, 2015) to Ms. Russ Anderson and Ms. Weiner was – in response to Ms. Russ Anderson's question "Is there a template the company gave us to use, Ms. Russ Anderson responded:

> Yes, the document that Osanna just sent out (you're copied, not Jannien) is a partial completed view of what the working team as [sic] completed to date. Again, neither Matthew or Jason have seen it before this. I would not feel comfortable sending it in without them, let alone Carrie, not having seen this. And again, it's a partial doc in that various financials, opening strategic sections, and industry analysis piece [sic] are not in this version she sent.[1233]

Nothing in the exchange supports Ms. Russ Anderson's testimony that "the conversation that Osanna and her boss had with [Examiner] Chris Moses, and this was removed from our exam" or that "we were also talking with the people in Corporate about the strategic plan that the Corporation was working on" and that Corporate "wanted us to work . . . through them to the OCC."[1234] Moreover, there is no evidence that Ms. Russ Anderson sought to exercise credible challenge to risk-management controls that Community Banking's first line of defense relied upon. **Acting in furtherance of this opinion under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

From the record it is clear the OCC sought the strategic plan as it existed at the start of the February 2015 exam, even if in draft form and even if presented as a template. It is clear that Ms. Russ Anderson knew the February 2015 examination would focus on operational risk, an area of her responsibility throughout the relevant period.[1235] Ms. Russ Anderson's claim that she did not want to kill the request is not supported by reliable or substantial evidence. Nothing in the record supports Ms. Russ Anderson's testimony that what she wanted to do "was remove the

---

[1232] Tr. (Russ Anderson) at 9787.

[1233] R. Ex. 7694 at 2.

[1234] Tr. (Russ Anderson) at 9787.

[1235] Id. at 9788.

entire request from the exam because it was not activities that the Corporation had formed policies and processes around."[1236] **Acting in furtherance of this opinion under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

### OCC's February 2015 Examination of Community Bank

Julian testified he received and read Supervisory Letter WFC 2015-07, the OCC through Examiner in Charge Bradley K. Linskens reported to Carrie Tolstedt, Community Bank's Senior Executive Vice President, findings from the OCC's February 2015 examination of Community Bank.[1237] Through this report, although rating Community Bank's operational risk management "effective" and thus awarding its highest rating, the OCC found that the "[l]ack of a comprehensive governance framework exposes CB to heightened reputation risk and possible negative publicity. Without a formalized structure, it is difficult to demonstrate compliance with the firm's values and goals while meeting strategic and financial objectives."[1238]

The February 2015 Exam prompted the OCC to require the Community Bank to "establish an overarching framework and formalize current practices in policy."[1239] To address existing deficits the OCC issued an MRA requiring the Community Bank's policies and framework to, inter alia, define "escalation protocols and address the timing and reporting of information of CB's sales activities to the CB Risk Management Committee" and define "appropriate sales practices and alignment with corporate values, goals, and mission statements."[1240] The Community Bank was expressly required to "[d]ocument compensation and incentive plans along with processes used to identify and prevent inappropriate sales conduct [and] [o]utline sales expectations for CB employees consistent with monitoring incentives for sales misconduct and employee turnover."[1241]

The Examination report states that "GRO Russ Anderson agreed to address the corrective actions", apparently without disagreeing with the findings.[1242]

Mr. Julian identified a January 7, 2015 Request Letter addressed to Carrie Tolstedt as Senior Executive Vice President of Community Banking, sent from National Bank Examiner Christine Moses of the OCC.[1243] The Letter announced the OCC's intention to conduct an

---

[1236] *Id.*

[1237] Tr. (Julian) at 6643; R. Ex. 654.

[1238] R. Ex. 654 at 3.

[1239] *Id.*

[1240] *Id.*

[1241] *Id.*

[1242] *Id.*

[1243] Tr. (Julian) at 6623; R. Ex. 7383.

Appellate Case: 25-1079    Page: 926    Date Filed: 05/16/2025 Entry ID: 5517644

examination of Community Banking operational risk management to begin on February 2, 2015.[1244]

The scope of the examination was to include an assessment of the level of oversight and reporting within the first line of defense, an evaluation of the appropriateness of governance policies and procedures, business processes, quality and sufficiency of staff to monitor, challenge, and conduct controls testing, and a review of the Community Bank's cross sell oversight activities.[1245]

The inability of WFAS to conduct an analogous cross-sell specific review of the Community Bank was discussed between the OCC and Claudia Russ Anderson, as Operations Risk and Compliance Manager.[1246] The Supporting Comments for the February 23, 2015 Conclusion Memo reflects the initial meeting on cross sell took place on February 4, 2014.[1247]

During that meeting, Ms. Russ Anderson explained to the OCC that in the Community Bank, "the focus is on selling customers additional products to enhance the 'mutual exchange of value' between customers and the bank. Customers benefit through additional utility, service, and convenience; the bank benefits through increased revenue and customer retention."[1248]

The notes from that meeting reflect that Ms. Russ Anderson told the OCC, "team members do have referral and sales goals but meeting these is only part of the review and evaluation process.[1249] Referral fees paid to team members are capped to keep incentive to sell products in check and keep the focus on customer service."[1250] She identified the "number of WFB products per household" as "the key metric" and reported the "most common products are checking accounts and debit cards."[1251] Other products included credit cards, on-line bill pay, and investment products.[1252]

The Conclusion Memorandum reported that as of "4Q14, the retail bank cross-sell metric was 6.17 (number of WFB products held/number of WFB retail bank households)."[1253] The "Retail Bank Cross Sell Steering Committee oversees metric data and customer calculation," and the Conclusion Memorandum described the work of the Committee – notably its data governance – as "critical" because "the metric is disclosed in SEC filings and is closely watched

---

[1244] R. Ex. 7383 at 1.

[1245] R. Ex. 7383 at 1.

[1246] R. Ex. 18918 at 2.

[1247] *Id.*

[1248] *Id.*

[1249] *Id.* at 3.

[1250] *Id.*

[1251] *Id.*

[1252] *Id.*

[1253] *Id.*

Add. 925

Appellate Case: 25-1079    Page: 927    Date Filed: 05/16/2025 Entry ID: 5517644

by investors, analysts, etc."[1254] Notwithstanding the importance of the work of the Committee, the Committee "is not a governance committee and does not have a charter or keep minutes."[1255]

The Conclusion Memorandum lacked audit reports of the Community Bank's cross sell; it had, however, audit reports of cross sell done in the Wholesale group and the Wealth, Brokerage, and Retirement (WBR) group.[1256] Although it lacked an audit report from the Community Bank, the Memorandum reflected that the OCC held a conference call on February 9, 2015 with WFAS personnel, including the Executive Audit Director Paul McLinko and Senior Audit Manager Bart Dees, to review WFAS Community Bank Sales Coverage.[1257]

The Memorandum noted that WFAS's audit reports regarding cross sell in both the Wholesale and WBR groups "focused on cross sell as a separate activity, assessing governance, internal controls, oversight, revenue derived from cross sell."[1258] The Memo reported that "WFAS has not conducted a similarly structured review" of cross sell in the Community Bank.[1259]

According to Mr. Swanson and Mr. Declue, at this point in the February 9, 2015 conference call, Ms. Russ Anderson and Mr. MacDuff "interjected and reiterated that in CB, cross sell is not a separate activity that can broken out and governed as a stand-alone activity. CB is the bank's main distribution channel and governance over cross sell is part of overall governance over products. Messrs. McLinko and Deese did not disagree or offer additional comments on this subject."[1260]

The Conclusions identified four main areas of WFAS's sales coverage for the Community Bank: sales and account opening, incentive compensation, sales quality (monitoring conduct and handling complaints), and the accuracy of reporting the cross sell metric.[1261]

In their Conclusions, Mr. Swanson and Mr. Declue reported that while the Community Bank's oversight processes "provide generally effective oversight of the [Community Bank's] cross sell activities," the current process "lacks transparency and needs to be formalized in a governing framework that describes roles and responsibilities, lines of reporting, escalation protocols, incentive compensation oversight, and quality assurance processes."[1262] Further, the Memo concludes that the "[l]ack of a comprehensive governance framework can expose the CB

---

[1254] *Id.*

[1255] *Id.*

[1256] *Id.*

[1257] *Id.*

[1258] *Id.*

[1259] *Id.*

[1260] *Id.*

[1261] *Id.* at 3-4.

[1262] R. Ex. 18918 at 1.

to heightened reputation risk through negative publicity. Without a more formal structure it is more difficult to ensure compliance with the firm's values and goals for achieving customer satisfaction and strategic and financial objectives."[1263]

Ms. Russ Anderson acknowledged being invited to and attending the February 9, 2015 meeting with the OCC.[1264] Meeting Notes reflect Ms. Russ Anderson stating that in Community Banking, "cross sell is 100 percent of revenue."[1265] For this meeting, the stated purpose was to permit Paul McLinko and Bart Deese "to present information on WFAS Community Bank Sales Coverage".[1266] Notwithstanding that the Examiners asked Mr. McLinko and Mr. Deese "why cross sell was not reviewed the same way by WFAS in CMBK" as with Wholesale and WRB, the Meeting Notes report that Ms. Russ Anderson answered the question rather than either Mr. McLinko or Mr. Deese (both of whom represented WFAS in the discussion).[1267]

Responding to leading questioning by her Counsel during direct examination, Ms. Russ Anderson denied that she intended to "hijack" the meeting.[1268] Without acknowledging the active role Ms. Russ Anderson is reported to have played during the meeting, after admitting this "was a meeting for Audit", she testified, "it was an exam of the Community Bank so I was there – I typically sat in on all of the meetings, so this was just another meeting."[1269]

During cross-examination Ms. Russ Anderson testified that Jannien Weiner "was in charge of the invites," but that she understood this was supposed to be a meeting between OCC examiners and members from WFAS.[1270] Responding to leading questioning by her Counsel during direct examination, Ms. Russ Anderson testified that she did not think she was compromising the independence of Audit by attending this meeting.[1271]

Without explanation but directly contradicting the contents of the OCC's Meeting Notes for the February 9th meeting, Ms. Russ Anderson testified that Audit is "a standalone oversight group from the Community Bank, and I would never have stepped in to answer for them. I mean, it was their meeting and . . . the discussion about Audit was for Audit to discuss, not me."[1272] I find preponderant reliable evidence establishes, however, that Ms. Russ Anderson did in fact step in and answer for Audit in responding to the OCC's questions about why Community Banking

---

[1263] Id.

[1264] Tr. (Russ Anderson) at 9431, 9433-34; R. Exs. 7389, 7409.

[1265] OCC Ex. 1740 at 1.

[1266] Id.

[1267] Id.

[1268] Tr. (Russ Anderson) at 9435-36.

[1269] Id. at 9436.

[1270] Id. at 9789-90.

[1271] Id. at 9436.

[1272] Id.

Appellate Case: 25-1079     Page: 929     Date Filed: 05/16/2025 Entry ID: 5517644

cross sell was not reviewed by WFAS in the same way that WFAS audited cross sell by Wholesale and WRB.[1273] This testimony eroded the reliability of Ms. Russ Anderson's testimony relating to her role in promoting the otherwise unfounded notion that cross sell by Community Banking could not be audited.

During cross-examination Ms. Russ Anderson acknowledged that regardless of whether or not she was supposed to come to this meeting, she had an obligation to provide accurate information to the OCC and had to be transparent with that information.[1274] She acknowledged that she understood the Community Bank's incentive compensation program was a topic at this meeting and acknowledged that during the meeting she stated that the impact of sales goals expectations on employee turnover is monitored through exit interviews and is not significant.[1275] She acknowledged further, however, that when she said this, she was aware there were hotspots where employees faced significant pressure to meet unreasonable sales goals.[1276]

The Notes from the February 9th meeting state that Ms. Russ Anderson and Mr. MacDuff told the OCC that because Community Banking "is the bank's main distribution channel, cross sell cannot be separated or distinguished from overall sales activities."[1277] The Notes reported that in Community Banking, WFAS's audit coverage "is of 'sales practices' rather than cross sell."[1278] They distinguished this from Wholesale and WBR audits, which were in fact "specifically focused on cross sell as a separate, distinct activity."[1279]

The February 9th Meeting Notes reflect that Ms. Russ Anderson told the OCC, "incentive compensation plans are capped to balance the incentives for sales vis-à-vis customer service. She added that the impact of sales goals expectations on employee turnover is monitored through exit interviews and that it is not significant."[1280]

The February 9th Meeting Notes report that WFAS through Paul McLinko and Bart Deese "participates in weekly status meetings that monitor CMBK compliance with corporate policy changes. Monitors WFCC complaint production monthly; complaint processing audit done in 2012. Audit of complaints planned for 2015."[1281]

The February 9th Meeting Notes reflect that WFAS (again through Mr. McLinko and Mr. Deese) "[p]articipates in RB Cross Sell Steering Committee Quarterly Meetings. The committee

---

[1273] OCC Ex. 1740 at 1.

[1274] Tr. (Russ Anderson) at 9790.

[1275] *Id.* at 9791.

[1276] *Id.*

[1277] OCC Ex. 1740 at 1-2.

[1278] *Id.* at 2.

[1279] *Id.*

[1280] *Id.* at 1.

[1281] *Id.* at 2.

Add. 928

Appellate Case: 25-1079      Page: 930      Date Filed: 05/16/2025 Entry ID: 5517644

oversees the data integrity of the cross sell metric, including what data should be included in the calculation."[1282] The Meeting Notes reflect, however, that Ms. Russ Anderson "clarified" this statement in the following terms:

> In response to an OCC question, Ms. Russ Anderson clarified that this steering committee oversees the cross sell metric but is not an overall CMBK cross sell governance committee. There is no such committee and she does not believe a separate cross sell governance committee would add any value. CB embeds risk professionals in the decision making process. Do have long-term goals, but target cross-sell is eight products per relationship (because it rhymes with great); internally stated that CB wants to grow the metric over time, do not give forward guidance on metrics to investors. Governance committee within CB is more tactical than strategic.[1283]

Ten days after the February 9th meeting in which Ms. Russ Anderson, Mr. McLinko, and Mr. Deese met with the OCC as part of the examination into WFAS's Community Bank Sales Coverage, Mr. McLinko provided Ms. Russ Anderson with a written summary of a second meeting between Mr. McLinko, Mr. Deese, and OCC Examiners Grover and Declue (and a third examiner, Kevin [presumably Swanson]).[1284]

Mr. McLinko wrote:

> As stated in their email to us asking for the meeting, they wanted to spend a few minutes to understand our coverage of "Community Bank". That in itself tells me that they don't have an understanding of the depth and breadth of the Community Bank and/or audit coverage. They started by asking some specific questions about Community Bank (e.g., sales committee structures, sales governance, sales metrics, etc.). I took that opportunity to tell them (after we had emailed them asking them to go to you) to make all such inquiries specifically relating to Community Bank process with you and your team. They agreed.

> We met for probably an hour and the short story from what I heard them say was (and I'll put it in the words of the Risk Framework): they have pulled the "Priority Sub-Risk" of Sales Practices from the Key Risk Type of "Cross Functional Risk"; and since they are in looking at Community Banking, they are asking framework questions related to **Risk Appetite** for both sales and cross sell, **Governance** for both, **Policies and Procedures** for both, **Reporting** for both, and **Organization/People** (including compensation) for

---

[1282] OCC Ex. 1740 at 2.

[1283] *Id.*

[1284] Tr. (Russ Anderson) at 9839; OCC Ex. 1070 at 1.

Add. 929

Appellate Case: 25-1079     Page: 931     Date Filed: 05/16/2025 Entry ID: 5517644

both. As you know, they've also spread some of the questions Enterprise wide and not just Community Bank.

We provided them with links to four or five of our audit workpaper databases relating to Account Opening, Sales, Sales Quality, etc. Interesting point is they said they were hoping to wrap up over the next two days. We can't even get through all our workpapers in 2 days so not really sure how they are going to do it.

Anyway, just wanted to provide you with some additional perspective.[1285]

Six weeks after Mr. McLinko sent this message to Ms. Russ Anderson, Ms. Russ Anderson responded as follows:

This is why I ended up the sales practices MRA. They waited until the end of the exam to think about 'sales practices', didn't have time to ask questions or allow us to provide details. Heck of a way to run a railroad.[1286]

Through cross-examination, Ms. Russ Anderson acknowledged that WFAS was supposed to be independent of Community Banking – that Audit (through Mr. McLinko) should be independent of the first line of defense, and she averred – notwithstanding testimony establishing the contrary – that she would never step in and answer for them.[1287] Ms. Russ Anderson testified that she did not remember whether she asked Mr. McLinko to provide this report or whether it was something he did on his own volition, adding, "We crossed information back and forth all the time."[1288]

There is no substantial evidence justifying Mr. McLinko's disclosures shown here – including identifying the workpaper databases WFAS was providing the OCC and detailing the areas of inquiry the OCC was pursuing through Audit relating to Community Banking. As such these disclosures constituted a breach of the independence Audit must maintain as the third line of defense.

**Ms. Russ Anderson's Participation in the OCC's February 10, 2015 Conduct Risk Framework for the Operational Risk and Cross Sell Examination**

Ms. Russ Anderson identified a February 10, 2015 email chain through which the OCC (by Kevin Swanson) provided Ms. Russ Anderson, Jason MacDuff, Rebecca Rawson and others a list of specific topics the OCC wanted to cover during their meeting later that day.[1289] The list included:

---

[1285] OCC Ex. 1070 at 1, emphasis *sic*.

[1286] *Id.*

[1287] Tr. (Russ Anderson) at 9838; OCC Ex. 1740 at 1.

[1288] Tr. (Russ Anderson) at 9839.

[1289] *Id.* at 9798; OCC Ex. 2955.

Add. 930

Appellate Case: 25-1079    Page: 932    Date Filed: 05/16/2025 Entry ID: 5517644

- Overview of the governance process for sales practices in Community Banking.
- April 9, 2014 Claudia Russ Anderson/Jason MacDuff presentation (with deck) to ERMC: Discuss presentation and proposed changes.
- Controls and monitoring processes for identifying inappropriate behavior.
- Incentive Compensation Policy; process for ensuring that inappropriate behavior is captured and reviewed in performance reviews, scorecards, etc.
- Testing to ensure that the incentive program encourages appropriate behavior.
- Monitoring MIS; Minding-the-Store metrics and role of the Risk Council.
- Copy of Risk Council charter.
- Roles of the various monitoring groups (SSCOT, Deposit Products, Corporate Investigations, etc.).
- Testing process for customer suitability of products sold by team members.
- OCC meeting with Mike Loughlin 2/5/15; Changes to compensation in CB; Book on Sales Practices, Project Clarity.[1290]

During cross-examination, upon being presented with this email exchange, Ms. Russ Anderson was asked whether from this she understood that information about controls and monitoring processes for identifying inappropriate behavior was material to the OCC's February 2015 examination; and responded, "I don't know if it was material."[1291] She also could not say whether the OCC's inquiry into whether the incentive compensation program encourages appropriate behavior was "material" and could not answer even whether the information was important.[1292] **Acting in furtherance of this opinion under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

In her prehearing Declaration, Ms. Russ Anderson admitted that at no time during the February 2015 examination did she disclose the thresholds used in SSCOT's proactive monitoring, averring that the OCC did not ask any questions about thresholds and stating that she "had no reason to believe that thresholds were relevant to our discussions because thresholds were a standard practice when managing data."[1293] **Acting in furtherance of this opinion under the conditions that were present during the relevant period constituted unsafe or unsound**

---

[1290] OCC Ex. 2955 at 1-2.

[1291] Tr. (Russ Anderson) at 9799-800.

[1292] *Id.* at 9801.

[1293] OCC Ex. 2279 at ¶29.

**banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

The averment that the OCC did not ask any questions about thresholds is contradicted by the OCC's February 10, 2015 Meeting Notes, which reflects, "Examiners inquired about testing for first line of defense (QA) for sales quality – and "Management responded that there are the scorecards, and the SOCR process, they review behaviors, etc. However, there is not a formal test for this area."[1294]

Ms. Russ Anderson acknowledged that she was present during Ms. Rawson's presentation to the Examiners.[1295] In the Meeting Notes, Ms. Rawson is reported as describing the Quality of Sale Report Card (QSRC) as outlining areas in need of additional employee training: "These reports are at the store level and above. The report cards influence incentives for district level managers and above. This gives them a heads up on any emerging trends."[1296]

Ms. Russ Anderson testified that this is a truncated representation of Ms. Rawson's presentation, and admitted that by the time of this meeting Ms. Russ Anderson knew that the QSRC could be manipulated, but stated (without supporting evidence) that "we were putting – we had controls to help mitigate that."[1297] When asked whether she should have shared this information with the OCC Ms. Russ Anderson responded, "I don't know that we didn't", adding that the meeting notes "are not my notes."[1298] She testified, "I do not remember if Rebecca spoke to it – I don't remember she did, I don't remember she didn't."[1299]

The Meeting Notes from the OCC's February 10, 2015 report that Community Banking staff "began the meeting to present information on the Conduct Risk Framework for the Operational Risk and Cross Sell Exam."[1300] The Meeting Notes report that Ms. Russ Anderson "opened the meeting" and stated "there is no one mecca around sales practices. Instead, the bank has established a certain culture that dictates practices."[1301]

On the question of incentive compensation, Mr. MacDuff is reported as stating, "they think of it broadly as to how to manage performance. They think about two things – the controls around practices (and how they recognize performance), and the implementation of the plan."[1302]

---

[1294] OCC Ex. 1771 at 3.

[1295] Tr. (Russ Anderson) at 9813.

[1296] OCC Ex. 1771 at 3.

[1297] Tr. (Russ Anderson) at 9814.

[1298] *Id.*

[1299] *Id.* at 9815.

[1300] OCC Ex. 1771 at 1.

[1301] *Id.*

[1302] *Id.*

Add. 932

Appellate Case: 25-1079     Page: 934     Date Filed: 05/16/2025 Entry ID: 5517644

The Meeting Notes report that the Store Operations Control Reviews (SOCR) process "is also factored into the incentive program."[1303]

In response to OCC questions about "how the Bank makes sure the customer is clear on what they purchased," Mr. MacDuff responded the Bank uses "disclosures and surveys. Then they use indicators that tell them how well they delivered the product and to what extent the customer is using the product."[1304]

Ms. Russ Anderson acknowledged saying at one of the February 2015 meetings that the customers are not cross-sold any products without first going through a formal needs assessment.[1305] The record reflects that this was not a complete or accurate answer.

Elaborating and expanding on that answer, Ms. Russ Anderson testified:

> [I]if a customer comes into the branch network and they want to speak to a banker about a product, the banker -- and this is a little more sophisticated now. But back then in 2015, the banker had a paper format, paper forms that they would do a needs assessment to make sure that since the customer wasn't clear what they wanted, that they could help them through that needs assessment to make sure that that was the right checking account or the right credit card or the home equity loan versus referring them to the mortgage company.
>
> Partway through that process, they would do what they called a mid-session review, where the manager -- the banker would talk to the manager, and the manager would make sure that the banker was doing what they said they were doing. Again, this was all paper. It wasn't in the computer yet. So that's what I was referring to. But if a customer walked in and said, hey, I absolutely need a checking account, I only need one. I already know what I want, I've got 15 minutes, let's get the account open, you're not going to stop the customer and do a complete needs assessment in that case. You'd lose the customer.[1306]

Ms. Russ Anderson denied that she intended to mislead the OCC when she made the statement during the February 2015 meeting: "I thought I was answering the question that they had asked me, so that's the detail that I gave them."[1307] **Ms. Russ Anderson's false representation to the OCC examiners that customers are not cross-sold any products without first going through a formal needs assessment a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

---

[1303] OCC Ex. 1771 at 3.

[1304] *Id.* at 1-2.

[1305] Tr. (Russ Anderson) at 9439-40.

[1306] *Id.* at 9440.

[1307] *Id.* at 9441.

Add. 933

Appellate Case: 25-1079     Page: 935     Date Filed: 05/16/2025 Entry ID: 5517644

Ms. Russ Anderson acknowledged that she had the obligation to correct any inaccurate, non-transparent, or incomplete statement made by a subordinate during this meeting.[1308] During cross-examination, Ms. Russ Anderson was presented with an excerpt of the Meeting Notes that reported, "Examiners asked how the Bank makes sure the customer is clear on what they purchased – Bank answered that they use disclosures and surveys."[1309] When asked whether she believed she had an obligation to tell examiners at this meeting that employees issued products and services to customers without their consent, Ms. Russ Anderson replied, "No."[1310] **Acting in furtherance of this opinion under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.** She admitted, however, that by this point, she knew that regardless of whatever needs assessment was supposed to be done, employees engaged in simulated funding – which she testified she knew was illegal.[1311]

During cross-examination, Ms. Russ Anderson reviewed the Meeting Notes that reported that if a banker opens up a product (like a credit card) and the customer did not request it, then the banker is terminated immediately.[1312] Responding to questioning during cross-examination to the effect that by this point Ms. Russ Anderson knew that unless an employee or a customer reported the misconduct the Bank would not know that a product was opened for a customer without consent – Ms. Russ Anderson responded that she "didn't know if there were other controls behind the scenes that would have caught it. I can't answer that definitively. I don't know that those were the only two ways."[1313] **Ms. Russ Anderson's failure to remain fully informed about the Community Bank's customer-consent risk management controls constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Through further cross-examination Ms. Russ Anderson acknowledged knowing about reactive channels like Ethics Line and customer complaints, and knew about proactive monitoring, but testified that she did not know "all of the controls that credit card had behind the scenes that could have detected it and sent it forward. So in the world in which I operated in, you are correct. What I can't tell you is what might have happened in the control systems that the credit card people owned, because they had a lot."[1314] Ms. Russ Anderson acknowledged her

---

[1308] Tr. (Russ Anderson) at 9801-02.

[1309] *Id.* at 9802-03.

[1310] *Id.* at 9803.

[1311] *Id.* at 9804.

[1312] *Id.* at 9806.

[1313] *Id.*

[1314] *Id.* at 9807.

Appellate Case: 25-1079     Page: 936     Date Filed: 05/16/2025 Entry ID: 5517644

own prior statement, however, that while not a problem exclusively for the Community Bank, "[c]omplaint tracking was a companywide issue" during the relevant period.[1315]

The February 10th Meeting Notes include a report that "[t]he incentive plan is not meant for everyone and it is not a requirement for keeping your job."[1316] Although the question does not appear in the Meeting Notes, through leading questioning by her Counsel during direct examination Ms. Russ Anderson testified that she was asked a question about sales goals and said in response that no one loses their job because they did not meet sales goals.[1317] When invited to elaborate on this response, Ms. Russ Anderson testified: "I had had conversations with Debra Paterson, who was the senior HR professional at Community Banking sometime before this, and asked that specific question, and she emphatically said it did not occur and that, in fact, there was not a code in the HR system for such a termination."[1318]

During cross-examination, however, Ms. Russ Anderson acknowledged that in prior testimony she knew that a team member's failure to meet sales goals could have been one of the reasons for termination – but that the termination would not have been based solely on not meeting sales goals. "There could have been other reasons, including not meeting sales goals, but not meeting sales goals would not be the only reason."[1319] Reminded of her testimony to the effect that Ms. Paterson "emphatically said" such terminations did not occur, during cross-examination she was asked, "[b]ut you always understood that employees could be terminated for failing to meet sales goals, it just could not be the sole reason, correct?" Ms. Russ Anderson responded, "I didn't nuance it that clearly."[1320]

Ms. Russ Anderson was asked: "Do you remember Examiner Candy testifying that you should have advocated for a formal policy that a team member could not be fired for failing to meet sales goals?" and responded that she recalled that testimony.[1321] Acknowledging that she did not during the February 10th meeting talk about terminations related to the intense focus on meeting sales goals, Ms. Russ Anderson was asked what she thought about Examiner Candy' testimony.[1322]

Ms. Russ Anderson responded, "since I didn't believe that team members were being terminated for not meeting sales goals, I wouldn't have considered having a policy to say

---

[1315] Tr. (Russ Anderson) at 9809; OCC Ex. 2279 at ¶40.

[1316] OCC Ex. 1771 at 2.

[1317] Tr. (Russ Anderson) at 9437.

[1318] *Id.* at 9438.

[1319] *Id.* at 9569, quoting OCC Ex. 2509 (1/12/21 deposition of Ms. Russ Anderson) at 52, lines 1-5.

[1320] Tr. (Russ Anderson) at 9571.

[1321] *Id.* at 9438.

[1322] *Id.* at 9439.

Add. 935

Appellate Case: 25-1079    Page: 937    Date Filed: 05/16/2025 Entry ID: 5517644

that."[1323] She added an anecdote involving a family member, leading to the conclusion that she "could not, in good conscience, work for a company that would terminate people for not meeting sales goals. . . . It's an abomination to me."[1324]

Ms. Russ Anderson later amended her answer – during cross-examination she changed her answer: "Let me correct my testimony. I meant solely for not meeting sales goals."[1325] In further cross-examination, the following exchange took place:

> Q: So it's your testimony now under oath that you always knew as the group risk officer of the Community Bank that employees could be terminated for not meeting sales goals, it just could not be the sole reason, correct?
>
> A. It would have been under performance standards. So were you coming late to work, were you showing up drunk, were you -- excuse me -- stealing money, were you, you know... But solely for not meeting sales goals, which was the question that was given to me, that is the answer, yes.
>
> Q. Okay. And I'm really not talking to you about anybody coming in to work drunk. My question is very simple. You always understood from 2013 to 2016 that employees could be terminated in the Regional Bank for not meeting sales goals, it just could not be the only reason for the termination, correct?
>
> A. Or the preponderate reason.[1326]

One of the purposes of an evidentiary hearing is to "enable the finder of fact to evaluate the credibility of witnesses by seeing 'the witness's physical reactions to questions, to assess the witness's demeanor, and to hear the tone of the witness's voice'".[1327] Further, "factors other than demeanor and inflection go into the decision whether or not to believe a witness. Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it."[1328]

Factors for assessing the credibility of a witness include (1) the opportunity and ability of the witness to see or hear or know the things testified to; (2) the witness's memory; (3) the

---

[1323] Tr. (Russ Anderson) at 9438.

[1324] *Id.* at 9439.

[1325] *Id.* at 9567.

[1326] *Id.* at 9568. See also, OCC Ex. 2509 (1/13/21 deposition of Ms. Russ Anderson) at p. 51, line 14 through p. 53, line 13.

[1327] *Vickers v. Smith,* No. 115CV00129SABPC, 2019 WL 1367784, at *5 (E.D. Cal. Mar. 26, 2019) (quoting *United States v. Mejia,* 69 F.3d 309, 315 (9th Cir. 1995); *Conservation Cong. v. United States Forest Serv.,* No. CV 2:15-00249 WBS AC, 2016 WL 3126116, at *5 (E.D. Cal. June 2, 2016) (evidentiary hearings "enable the court to listen to the witnesses' testimony, observe their demeanor, assess their credibility, and resolve the disputed issues of fact regarding defendant's motivations based on the totality of the evidence").

[1328] *Anderson v. City of Bessemer City,* 470 U.S. 564, 575 (1985).

witness's manner while testifying; (4) the witness's interest in the outcome of the case, if any; (5) the witness's bias or prejudice, if any; (6) whether other evidence contradicted the witness's testimony; (7) the reasonableness of the witness's testimony in light of all the evidence; and (8) any other factors that bear on believability.[1329]

Preponderant evidence adduced during the hearing compels the conclusion that Ms. Russ Anderson's testimony – that she told the examiners no employee was terminated solely for failing to meet sales goals – was false; that instead when she met with the examiners she represented to them that no employees were terminated for failing to meet sales goals – without qualifying the claim as she did during her testimony.

Preponderant evidence presented through this administrative enforcement action supports the finding that Respondent Russ Anderson falsely told OCC examiners during the February 2015 examination that no one's employment was terminated because they did not meet sales goals. Preponderant evidence also supports the finding that Ms. Russ Anderson gave false testimony during the evidentiary hearing. This testimony related to responses Ms. Russ Anderson gave to OCC examiners during the February 2015 exam and in particular during discussions with examiners on February 10 and 19, 2015. **Ms. Russ Anderson's failure to provide complete and honest answers during this testimony constituted a breach of the fiduciary duties she owed the Bank.**

Contemporaneous notes by examiners reflect that during the February 2015 examination Ms. Russ Anderson made the unconditioned statement that no one loses their job because they do not meet sales goals. During the hearing and now through proposed findings of fact advanced by her Counsel, however, Ms. Russ Anderson and her Counsel of record claim that she told the OCC that no one loses their job *solely* for not meeting sales goals.

Preponderant evidence establishing that this testimony misrepresented what Ms. Russ Anderson told the OCC in February 2015 includes: (1) undisputed evidence that on February 10, 2015, when an examiner asked whether pressure to meet baseline sales goals was sufficient and contributed to employee turnover, Ms. Russ Anderson responded that no one loses their jobs because they do not meet sales goals; (2) that she provided the same response during her pre-hearing deposition taken in advance of the evidentiary hearing; (3) that OCC examiner notes written contemporaneously to a February 19, 2015 meeting reflect Ms. Russ Anderson gave the same response; (4) that through a March 31, 2015 email to Ms. Russ Anderson, Examiner Hudson presented to Ms. Russ Anderson a recap of what Ms. Russ Anderson had averred – that no one is terminated for failing to meet sales goals – and Ms. Russ Anderson did not dispute making the statement and did not seek to correct the presentation; (5) that through responses she provided to the OCC in her response to the 15-Day Letter preceding the issuance of the Notice of Charges Ms. Russ Anderson through Counsel gave the same response; and (6) that in the course of the hearing itself, Ms. Russ Anderson first testified that she told the examiners that no

---

[1329] *Cuevas Espinoza v. Hatton,* No. 10CV397-WQH-BGS, 2020 WL 434269, at *32 (S.D. Cal. Jan. 28, 2020), citing Ninth Circuit Manuel of Model Civil Jury Instructions 1.14 (2017 ed.).

Add. 937

Appellate Case: 25-1079     Page: 939     Date Filed: 05/16/2025 Entry ID: 5517644

employees were terminated for not meeting their sales goals.

Upon this evidentiary base, I find Ms. Russ Anderson's present claim, advanced first in her hearing testimony and later through the findings of fact and conclusions of law her Counsel proposed, averring that Ms. Russ Anderson told the OCC in February 2015 that the Company did not terminate employees solely for not meeting sales goals, falsely represents what Ms. Russ Anderson told the OCC in February 2015, and that the falsehood is material to the claims and issues presented in this administrative enforcement action.

I find that through that part of her testimony averring that her prior statements were conditioned by the word "solely", Ms. Russ Anderson falsely reported what she told the OCC; and I find that by advancing as a proposed factual finding that Ms. Russ Anderson conditioned her prior statements by the word "solely" Counsel for Ms. Russ Anderson offered a submission that was self-evidently not well grounded in fact.

**I find further that by repeatedly informing the OCC that no one loses their job due to not meeting sales goals, Ms. Russ Anderson knowingly misrepresented the truth on a matter material to this enforcement action.**

In a written exchange between Examiners Moses and Crosthwaite later on February 10th, Examiner Crosthwaite wrote that the Sales Practice call "went fine . . . but we all agreed again after call . . . Claudia and Co not Transparent . . . very difficult . . . it's like pulling teeth . . . her theme was that they were not making improvements to the sales process that the process is constantly evolving . . . and never really acknowledged why they were at the ERMC (Mike made them come)."[1330] Examiner Crosthwaite wrote that Ms. Russ Anderson "acknowledged the sales book but kind of downplayed all of Mike's comments . . . and only briefly talked about Project Clarity . . . Biggest issue is testing . . . do they really do anything in the 1LOD proactively related to sales practices outside the whistleblower line. . . she kind of said no. . ."[1331]

During cross-examination Ms. Russ Anderson testified that she "believed the sales process evolved" but did not remember this conversation.[1332] It is not clear that Ms. Russ Anderson was able to provide reliable testimony regarding how far the sales process had evolved by May 2015. During cross-examination Ms. Russ Anderson identified a June 5, 2015 email exchange among Jim Richards, Keb Byers, Michael Loughlin, and others regarding the Sales Practices Update being presented to the OCC.[1333] Through this email, Mr. Byers provided a summary of his meeting with the OCC, during which time the OCC discussed "their review of 260 Ethics Line allegations."[1334]

---

[1330] R. Ex. 7713 at 1.

[1331] *Id.*

[1332] Tr. (Russ Anderson) at 9817.

[1333] Tr. (Russ Anderson) at 10103; OCC Ex. 71.

[1334] OCC Ex. 71 at 3.

Add. 938

Appellate Case: 25-1079     Page: 940     Date Filed: 05/16/2025 Entry ID: 5517644

In his summary, Mr. Byers wrote to Mr. Loughlin the following description of the OCC's reaction to these allegations:

> They [the OCC Examiners] know these are allegations, however they found many (45) of these to be "truthful", "egregious", and "frightening". They categorized into four themes: 1) general sales pressure (excessive manager pressure to sell, calling family and friends to hit sales goals, 2) taking advantage of a protected class (target disabled/Down Syndrome/elderly), 3) inappropriate practices ('2 for 2 promo' – bundling, adding additional products to meet sales goals), and 4) credit card. The OCC repeated that you, John, Carrie and I should read all these allegations – specifically the 'raw data' and not a summary from first line Community Bank Group Risk.[1335]

The summary included a preview of the five MRAs that would be issued shortly thereafter, reporting that the OCC thinks "it takes too much time for the first line to process and analyze complaints/allegations today" and thinks "the first line should also implement 'mystery shopping'."[1336]

Presented with this exchange during cross-examination, Ms. Russ Anderson was asked "So by this point in June 2015, the Community Bank, in fact, had not implemented a mystery shopping program, correct?" to which she responded, "I don't recall when – if we had or not. It seemed to me we had. We were in the process of starting it, but I don't remember when we actually started it."[1337] When, in a follow-up question she was asked, "You agree that mystery shopping had not been implemented at this point in June 2015, since the OCC was requiring the first line to implement the program, Ms. Russ Anderson responded, "I would agree that we had not implemented it yet, but I believe we were in the process of forming a concept around it and starting to look at companies who would do it."[1338]

The February 10th Meeting Notes report, "[a]n employee's compliance with the basic rules and standards is determined by the unit manager. Managers work with HR on this if someone appears to not meet the standards."[1339] Further, "[i]f a banker opens up a product (like a credit card) and the customer did not request it, then the banker is terminated immediately."[1340] Further, "Sales Tracking Steering Committee (STS system) is an application mainframe that houses data related to sales. All new products are vetted through this Committee. Management stated they will provide the last 6 months of meeting minutes for our review."[1341]

---

[1335] *Id.*

[1336] *Id.*

[1337] Tr. (Russ Anderson) at 10105.

[1338] *Id.* at 10106.

[1339] OCC Ex. 1771 at 2.

[1340] *Id.*

[1341] OCC Ex. 1771 at 2-3.

Add. 939

Appellate Case: 25-1079     Page: 941     Date Filed: 05/16/2025 Entry ID: 5517644

The February 10th Meeting Notes include a report from Rebecca Rawson regarding Regional Banking Sales & Service Conduct Oversight (SSCOT).[1342] The minutes reflect Ms. Rawson reported that SSCOT "researches allegations related to internal integrity/ethics issues (reported internally, not coming from customers).[1343]

The report continues:

> The majority of allegations come from the internal ethics line (80%). A smaller portion comes from HR, the phone bank, corporate investigations, etc. About 6% of issues are coming from proactive efforts. They consider the research process a "training opportunity" (it is not a determination of guilt). The unit has a "polling team" that is a group of non-exempt employees that call customers asking about their service experience (it is a discrete way to gather information from customers). If the research supports the allegation, then it is sent to corporate investigations.[1344]

According to the Meeting Notes for the February 10th meeting, the Quality of Sale Report Card (QSRC) "outlines areas in need of additional employee training. These reports are at the store level and above. The report cards influence incentives for district level managers and above. This gives them a heads up on any emerging trends."[1345]

Ms. Russ Anderson identified an email exchange between herself and Jannien Weiner from February 12 to 13, 2015 – during the OCC's February Operational Risk and Sales Practices Examination.[1346] The exchange begins with a request by Ms. Weiner to Dan Messamore, for Community Bank's Customer and Store Experience – Ms. Weiner wrote, "the OCC requested a recap of the scope and status for project Clarity in conjunction with the ongoing exam."[1347]

Mr. Messamore responded two days later, with an email addressed to Ms. Weiner and copied to Ms. Russ Anderson, Jason MacDuff, and Wendy Tazelaar.[1348]

Mr. Messamore wrote:

> Following is a response to OCC's request for a recap of the scope and status of our Clarity Initiative. Jannien we would like to exclude the status section below as it may generate more questions but felt it was probably necessary

---

[1342] *Id.* at 3.

[1343] *Id.*

[1344] *Id.*

[1345] *Id.*

[1346] Tr. (Russ Anderson) at 9820; OCC Ex. 934.

[1347] OCC Ex. 934 at 3.

[1348] *Id.* at 2.

Add. 940

Appellate Case: 25-1079    Page: 942    Date Filed: 05/16/2025 Entry ID: 5517644

given the request. Please delete this section if you think you can based on the conversations.[1349]

Ms. Russ Anderson acknowledged that Mr. Messamore was referring to "the clarity initiative that was being run by Dan and Wendy Tazelaar. So what this outlines is what their initiative was about".[1350]

Responding to the OCC's request, Mr. Messamore's draft provided background:

> Early in 2014, CB implemented a strategy that would allow for addressing original "consent" risks in a nimble fashion, this evolved to a process that would support addressing emerging risks related to the Customer Experience in the stores. Clarity topics can be sourced from various support and LOB groups, but are vetted & approved for inclusion through the Community Banking Clarity Oversight Committee.[1351]

Mr. Messamore's draft provided six bulleted points describing the approach taken with this initiative, and a "Status" section indicating that the "[t]eam is in place and the process has been evolving over the last 4 quarters."[1352] Specific examples of topics covered included "outbound sales clarity, appropriate survey management clarity, and highlighting emerging metrics added to the Sales Quality Report Card", and a list of "[f]uture topics" that included "clarity around customer authentication processes, proper handling of complaints and inquiries and other types of customer contact processes."[1353]

In forwarding the draft to Ms. Russ Anderson, Ms. Weiner recommended striking the whole "Status" section, and recommended <u>not</u> providing the OCC with "notes, minutes, materials, or anything else at this point."[1354] She wrote: "I'm sure they have plenty to work with now. I do fear they will ask to see monitoring reports, #6. Let me know your thoughts."[1355] During cross-examination, Ms. Russ Anderson testified that she supported this approach in responding to the OCC's request for information about the Clarity Initiative.[1356]

Ms. Russ Anderson also acknowledged making the following change to the draft:

> CB implemented a strategy that would allow for addressing ~~original 'consent' risks in a nimble fashion, this evolved to a process that would support~~

---

[1349] OCC Ex. 934 at 2.

[1350] Tr. (Russ Anderson) at 9823.

[1351] OCC Ex. 934 at 2.

[1352] *Id.*

[1353] *Id.*

[1354] Tr. (Russ Anderson) at 9826-27; OCC Ex. 934 at 1.

[1355] OCC Ex. 934 at 1. The reference to "#6" is to the sixth bulleted "Approach" item: "Create monitoring and follow up as appropriate." *Id.*

[1356] Tr. (Russ Anderson) at 9825.

Add. 941

Appellate Case: 25-1079    Page: 943    Date Filed: 05/16/2025 Entry ID: 5517644

~~addressing~~ emerging risks related to the Customer Experience in the stores.[1357]

Ms. Russ Anderson testified that "I don't know why I deleted that one piece, but I deleted it."[1358] She denied, however, deleting it because she did not want the OCC examiners to know about customer consent issues in the Community Bank.[1359] After testifying that the OCC already knew about customer consent issues, Ms. Russ Anderson was asked during cross-examination "So why did you delete it?" and Ms. Russ Anderson responded, "I don't remember."[1360] **Acting as reflected in the record constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

**WFAS Audit Engagement Report: Community Banking – Regional Banking (RB-SOCR) March 30, 2015**

Through its Audit Engagement Report of March 30, 2015, WFAS notified the Community Bank that the quality assurance functions of the Regional Banking Store Operations Control Review (SOCR) and its Business Banking Operations Control Review (BOCR) needed improvement.[1361] Prior to this time, WFAS "use[d] the results of SOCR/BOCR as part of our Leverage Program in determining annual audit coverage."[1362] Its March 30, 2015 report included reviews of Governance and Structure; Review Execution; Independence/Objectivity; Competency; and Management Reporting.[1363]

In addition, the audit program included "five processes specifically reviewed by the SOCR/BOCR team." These processes "correlate to the WFAS processes of move money, account setup, service customers and accounts, receiving/posting payments, and manage physical security."[1364] The audit report noted, however, that the review "did not test the effectiveness of the store controls but rather assessed if the QA function is performed as intended."[1365]

While finding controls related to SOCR/BOCR's governance, structure, independence and objectivity "are adequate to ensure appropriate coverage of business operational and regulatory risks," WFAS found "accuracy and completeness of program execution and supervisory review 'Needs Improvement' to ensure testing is sufficient, relevant, and

---

[1357] OCC Ex. 934 at 1.

[1358] Tr. (Russ Anderson) at 9827.

[1359] *Id.*

[1360] *Id.*

[1361] R. Ex. 523 at 2.

[1362] *Id.*

[1363] *Id.*

[1364] *Id.*

[1365] *Id.*

Appellate Case: 25-1079     Page: 944     Date Filed: 05/16/2025 Entry ID: 5517644

reliable."[1366] The fact that impact and severity of the issue was rated by WFAS as "High" indicated the auditor's judgment that the issue "needs a higher level of senior management attention with an increased urgency to address it."[1367]

The auditors noted in particular "issues regarding sampling, missed errors (*i.e.*, errors identified by WFAS, but not by SOCR/BOCR), inadequate workpaper documentation, inadequate supervision and review of work papers, and ineffective methods used to evidence and provide feedback to QAAs."[1368] Based on these findings, going forward from March 2015, at Mr. McLinko's recommendation WFAS "began performing its own testing and eventually designed processes to do in-branch work itself."[1369]

Mr. Julian testified that up to this point, WFAS "leveraged the work that SOCR and BOCR was [*sic*] doing with respect to SOCR and BOCR actually going into the stores and into the banking centers to perform control testing"; while WFAS would only "audit the governance that those groups were employing to perform those activities."[1370] He testified that up to this point, WFAS "wasn't personally or specifically going into the branches or the banking centers to perform the work, where Audit was leveraging the work of those two units."[1371]

When asked why WFAS used the work of the SOCR and BOCR units rather than directly and independently going into Community Bank's branches and stores, Mr. Julian responded only that "that's the practice that had been employed" when he came on board as Chief Auditor."[1372] Without offering any supporting documentation establishing what he actually knew about this mode of audit coverage, he said "based on what I knew, [I] didn't have any concerns about leveraging their activities, because I knew that [WFAS] was assessing their work and concluding that [WFAS] could rely on their work."[1373]

Mr. Julian described this approach as "an opportunity to leverage work that was going on already" by the first line of defense, adding, "it wouldn't have made a lot of sense for Audit to duplicate that work".[1374] Asked on direct examination whether Wells Fargo was unique in leveraging in-store first line of defense functions like SOCR and BOCR, Mr. Julian responded, again without supporting documentation, that "probably 50/50. Some of the peer banks chose to do that work themselves, meaning within their audit group. . . . [but] the majority of the larger

---

[1366] R. Ex. 523 at 2.

[1367] Tr. (Julian) at 6668-69.

[1368] R. Ex. 523 at 2.

[1369] Tr. (Julian) at 6670.

[1370] *Id.* at 6663.

[1371] *Id.*

[1372] *Id.*

[1373] *Id.*

[1374] *Id.* at 6664.

banks, the three or four sort of mega banks at the time were generally more aligned with [WFAS] in that practice."[1375]

Asked on direct examination whether WFAS Audit relied on other first line of defense testing functions, Mr. Julian responded, again without any supporting documentation and without reference to IIA standards for audit independence:

> Absolutely. Throughout the -- I'm sorry. Excuse me. Throughout the company, there were a number of different testing activities that went on, not just in the first line, but also in the second line -- excuse me -- where audit would rely on those activities. Corporate investigations, as we discussed, is another activity that rather than audit performing the investigations themselves, they would rely on corporate investigations to perform that work and would be able to leverage it. So there were a number of different activities that Wells Fargo Audit Services would leverage with respect to control testing and control-type activities.[1376]

### March 2015 MRAs - Community Banking FLOD Risk Management of Sales Practices

Ms. Russ Anderson testified that the OCC issued two Matters Requiring Attention (MRAs) following the February 2015 exam.[1377] She identified a March 26, 2015 email from Examiner Hudson to herself containing draft versions of the two MRAs.[1378]

Examiner Hudson prefaced the message as follows:

> We are presenting these MRAs in **draft** to you as they are still subject to final review internally. At this stage, providing this information is no longer an opportunity to discuss MRA vs no MRA. Our intent in sharing with you is to ensure factual accuracy and to obtain a commitment that you will address the corrective actions.[1379]

One of the MRAs concerned the lack of formal oversight and governance of "offshoring activities specific to its business" and is not related to this administrative enforcement action.[1380]

The second MRA concerned Community Banking's first line of defense (FLOD) risk management of sales practices, where the stated concern was that Community Banking, "lacks a formalized governance framework to oversee sales practices."[1381]

---

[1375] Tr. (Julian) at 6665-66.

[1376] *Id.* at 6666.

[1377] Tr. (Russ Anderson) at 9441.

[1378] *Id.* at 9441-42; OCC Ex. 2962.

[1379] OCC Ex. 2962 at 4, emphasis *sic*.

[1380] *Id.*

[1381] OCC Ex. 2962 at 4.

Add. 944

Appellate Case: 25-1079    Page: 946    Date Filed: 05/16/2025 Entry ID: 5517644

The draft MRA identified the **cause for this concern** in these terms:

> The GRO [Group Risk Officer] function oversees sales activities through CB's Risk Committee and Regional Banking Risk Council, a customer survey and polling process, a Sales and Service Conduct Oversight Program, and a sales quality manual. Each process operates separately and has a unique role associated with CB's sales practices. However, the current oversight program lacks transparency because CB has not brought them together under a formal governance framework.[1382]

The draft MRA identified the following **consequences of inaction**:

> Lack of a comprehensive governance framework exposes CB to heightened reputation risk and possible negative publicity. Without a formalized structure, it is difficult to demonstrate compliance with the firm's values and goals while meeting strategic and financial objectives.[1383]

The draft MRA described the **need for corrective action** in these terms:

> Given the importance of sales activities to the firm, the expectations placed on CB employees to meet sales goals, and the overall risk associated with sales activities, CB risk management must establish an overarching framework and formalize current practices in policy.[1384]

The draft MRA **identified the corrective action needed** – specifically that the Policy and Framework should:

- Describe the scope of CB's sales activities, overall goals for the program, and the roles and responsibilities of each line of business involved in the oversight process.
- Define escalation protocols and address the timing and reporting of information of CB's sales activities to the Enterprise Risk Committee and the Board of Directors' Risk Committee.
- Define appropriate sales practices and alignment with corporate values, goals, and mission statements.
- Document compensation and incentive plans along with processes used to identify and prevent inappropriate sales conduct. Outline sales expectations for CB employees consistent with minimizing incentives for sales misconduct and employee turnover.
- Describe the roles of Human Resources, the Law Department, and CB Risk Management in ensuring that compensation plans address HR regulations,

---

[1382] *Id.*

[1383] *Id.* at 5.

[1384] *Id.*

Add. 945

Appellate Case: 25-1079    Page: 947    Date Filed: 05/16/2025 Entry ID: 5517644

identify issues and concerns related to reputational risk, and provide authority and line of sight to CB Risk Management into sales practices and compensation across the CB.
- Describe the referral process and assign responsibility for compliance with CB's sales policy through to the end of the customer's experience with the firm regardless of where the final sales transaction occurs.
- Provide for an effective quality assurance function, including key metrics used in the monitoring process.[1385]

In her March 26, 2015 draft, Examiner Hudson stated that her "intent in sharing with you is to ensure factual accuracy and to obtain a commitment that [Ms. Russ Anderson] will address the corrective actions."[1386] Ms. Russ Anderson testified that she understood these were the reasons Examiner Hudson provided the draft.[1387] As such, it is noteworthy to identify those factual premises that were not controverted, as well as those about which Ms. Russ Anderson had comments, questions, or concerns.

Ms. Russ Anderson testified that when she received an MRA she considered it a serious issue and therefore, "I gave it all my attention."[1388] She added that it was not unusual for the OCC to provide a draft MRA before it was officially promulgated – that it "was always my experience that the OCC would send a draft so that we could make sure that between the OCC and my case, the receiving party, that it accurately reflected their views and what we could do."[1389]

In her response (provided after the OCC extended briefly the response time due to Ms. Russ Anderson's being "bedridden all weekend with high fever and flu like symptoms"), Ms. Russ Anderson did not dispute that as of March 2015 the GRO function oversaw sales activities through four activities:

1. CB's Risk Committee and Regional Banking Risk Council,
2. A customer survey and polling process
3. A Sales and Service Conduct Oversight Program, and
4. A sales quality manual.[1390]

Ms. Russ Anderson did not dispute that as of March 2015 each process operated separately and had a unique role associated with CB's sales practices.[1391]

---

[1385] *Id.*

[1386] *Id.*

[1387] Tr. (Russ Anderson) at 9835.

[1388] *Id.* at 9442.

[1389] *Id.*

[1390] OCC Ex. 2962 at 3-4.

[1391] OCC Ex. 2962 at 2.

Add. 946

Ms. Russ Anderson did not dispute that as of March 2015 the current oversight program lacked transparency because Community Banking had not brought them together under a formal governance framework.[1392] **Failing to take effective steps to assure such transparency constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Ms. Russ Anderson did not dispute that as of March 2015 the lack of a comprehensive governance framework exposed Community Banking to heightened reputation risk and possible negative publicity; and that without a formalized structure, it was difficult to demonstrate compliance with the firm's values and goals while meeting strategic and financial objectives.[1393] **Failing to take effective steps to assure the establishment of such a comprehensive governance framework constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Ms. Russ Anderson did not dispute that given the importance of sales activities to the firm, the expectations placed on CB employees to meet sales goals, and the overall risk associated with sales activities, CB risk management needed to but had not yet establish an overarching framework and formalize current practices in policy.[1394] **Failing to take effective steps to assure the establishment of such an overarching framework constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Ms. Russ Anderson did not dispute that the Community Bank's Risk Management Policy and Framework needed to describe the scope of Community Banking sales activities, the overall goals for the program, and the roles and responsibilities of each line of business involved in the oversight process, but that as of March 2015 it did not do so.[1395] **Failing to take effective steps to assure the Policy and Framework described the scope of Community Banking sales activities, the goals for the program, and the roles and responsibilities of each line of business involved in the Community Bank's oversight process constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Ms. Russ Anderson did not dispute that the Community Bank's Risk Management Policy and Framework needed to define escalation protocols and address the timing and reporting of information of CB's sales activities to the Enterprise Risk Committee and the Board of Directors' Risk Committee, but that as of March 2015 it did not do so.[1396] **Failing to take**

---

[1392] *Id.*

[1393] *Id.*

[1394] *Id.* See OCC Ex. 2962 at 2, where Ms. Russ Anderson reports that Corporate Risk (which is not part of Community Banking) "has recently kicked off an initiative to develop the Cross-Functional Risk functional framework, which includes the priority sub-risk of Sales Practices."

[1395] OCC Ex. 2962 at 2.

[1396] OCC Ex. 2962 at 2.

Add. 947

Appellate Case: 25-1079      Page: 949      Date Filed: 05/16/2025 Entry ID: 5517644

**effective steps to assure that the Policy and Framework defined escalation protocols and addressed the timing and reporting of information of Community Banking's sales activities to the Enterprise Risk Committee and the Board of Directors' Risk Committee constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Ms. Russ Anderson did not dispute that the Community Bank's Risk Management Policy and Framework needed to define appropriate sales practices and alignment with corporate values, goals, and mission statements, but that as of March 2015 it did not do so.[1397] **Failing to take effective steps to assure that the Community Bank's Risk Management Policy and Framework defined appropriate sales practices and alignment with corporate values constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Ms. Russ Anderson did not dispute that the Community Bank's Risk Management Policy and Framework needed to document compensation and incentive plans along with processes used to identify and prevent inappropriate sales conduct, but that as of March 2015 it did not do so.[1398] **Failing to take effective steps to assure that the Community Bank's Risk Management Policy and Framework documented compensation and incentive plans along with processes used to identify and prevent inappropriate sales conduct constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Ms. Russ Anderson reported that she was not certain she understood what the sentence "Outline sales expectations for CB employees consistent with minimizing incentives for sales misconduct and employee turnover" meant and asked for clarification.[1399]

Examiner Hudson responded, with the following explanation:

> In May 2014 ERMC, the committee asked whether the current sales model incents improper behavior and the response from CB was you did not believe so. What our bullet point is getting at is that you should define sales expectations/sales goals for each type of employee. We believe this is already happening, so you should incorporate these by reference into the framework. However, more importantly, we want you to evaluate these sales goals and the pressure (the great eight) put on employees, which has in the past (as indicated in a December 2013 LA Times Article) lead them to either (1) engage in improper behavior, or (2) resign. In other words, have you struck the right balance between (1) increasing sales and (2) controlling the incentives for improper behavior and turnover? We think this is the same question asked by the committee. We would expect analysis, something more

---

[1397] *Id.*

[1398] *Id.*

[1399] *Id.*

Add. 948

Appellate Case: 25-1079      Page: 950      Date Filed: 05/16/2025 Entry ID: 5517644

substantive than just assertions, that the sales model does not incent improper behavior or that no one is terminated for failing to meet sales goals, as indicated during the exam. If that analysis shows the opposite then have plans in place to control sales misconduct and employee turnover from failure to meet sales goals.[1400]

Ms. Russ Anderson did not dispute that the Community Bank's Risk Management Policy and Framework needed to describe the roles of Human Resources, the Law Department, and Community Banking's Risk Management in ensuring that compensation plans address HR regulations, identify significant issues and concerns related to reputational risk, and provide authority and line of sight to Community Banking Risk Management into sales practices and compensation across the Community Bank, but that as of March 2015 it did not do so.[1401]

Ms. Russ Anderson did not dispute that the Community Bank's Risk Management Policy and Framework needed to describe the referral process and assign responsibility for compliance with Community Banking's sales policy through to the end of the customer's experience with the firm, regardless of where the final sales transaction occurs – but that as of March 2015 it did not do so.[1402] She clarified, however, that the Framework needed to describe the referral process and assign responsibility for compliance with Community Banking's sales *integrity* policy – explaining that the sales integrity policy "was created and implemented in 2014", and then explaining that "[w]hen a referral is made to partners such as WBR, CLG and Wholesale for products and services not delivered end-to-end by CB compliance control and accountability is transferred to the appropriate GRO."[1403] In commenting on this sentence, Examiner Moses wrote to Examiner Hudson that the edits suggested by Ms. Russ Anderson would result in a sentence that "is not an action but a statement of fact" and added, "I still think we need something."[1404]

Ms. Russ Anderson did not dispute that the Community Bank's Risk Management Policy and Framework needed to provide for an effective quality assurance function, including key metrics used in the monitoring process, but that as of March 2015 it did not do so.[1405] **Failing to take effective steps to assure that the Community Bank's Risk Management Policy and Framework provided for an effective quality assurance function constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

_____

[1400] OCC Ex. 3000 at 1; also at OCC Ex. 2973 at 2.

[1401] OCC Ex. 2962 at 2.

[1402] *Id.*

[1403] *Id.*

[1404] Tr. (Russ Anderson) at 9837; OCC Ex. 2973 at 4.

[1405] OCC Ex. 2962 at 5.

Examiner Hudson's draft MRA concerning CB FLOD Risk Management – Sales Practices was sent to Ms. Russ Anderson in an email dated March 26, 2015 at 8:34 a.m. ET.[1406] In an email to Carrie Tolstedt dated March 31, 2015 at 6:20 p.m., Ms. Russ Anderson wrote, in full, "Wow is all I can say."[1407] Three hours later Ms. Tolstedt wrote, "Let's talk" and followed that five minutes later asking "Did they bring up the LA article during the meetings?" and Ms. Russ Anderson responded, "Not even once. None of the items in her response to me. We were never given an opportunity to know about or respond to their concerns. I feel like they ran out of exam time so they made it into an MRA."[1408]

During cross-examination, after noting that Ms. Russ Anderson wrote to Ms. Tolstedt that the examiners did not raise the LA Times article, Ms. Russ Anderson was asked "Shouldn't you have raised the LA Times article to the OCC examiners, and responded, "Should I have? No."[1409] **Acting in furtherance of this opinion under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of fiduciary duties Ms. Russ Anderson owed to the Bank.**

When asked whether she believed the sales practices MRA from the OCC was warranted, Ms. Russ Anderson responded, "No" without elaboration.[1410] When asked whether she ever conducted the analysis as directed by Examiner Hudson, Ms. Russ Anderson responded, "I did not direct for it to happen," adding, "we did not do this analysis because the MRA was rescinded."[1411] It should be noted the MRA remained in effect between April 3, 2015 and June 26, 2015.[1412] Ms. Russ Anderson provided no rationale for failing to act – failing even to begin work on the initial MRA – between those dates. **Failing to take such action constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

**Changing the Thresholds for Referral to Corporate Investigations**

Ms. Russ Anderson testified the thresholds used for referrals to Corporate Investigations changed in the summer of 2014 and again in April 2015.[1413] She said Legal, "ran the Core Team" and led to these changes.[1414] Without offering documentary evidence in support of the

---

[1406] OCC Ex. 624 at 5.

[1407] Id. at 2.

[1408] Id. at 1-2.

[1409] Tr. (Russ Anderson) at 9834.

[1410] Id. at 9833.

[1411] Id.

[1412] OCC Ex. 1239 at 8.

[1413] Tr. (Russ Anderson) at 9316.

[1414] Id. at 9317.

Add. 950

assertion, through leading questioning by her Counsel during direct examination Ms. Russ Anderson testified that she considered the directives she received from Legal to be things she must follow.[1415] "In April 2014, [the thresholds] were changed to the 99.99, and then there was a longer analysis done by Legal for the 2015 change, which brought it down to 99.95."[1416]

Ms. Russ Anderson provided inconsistent testimony, however, regarding the role members of WF&C's Legal Department had in controlling the thresholds used when making referrals to Corporate Investigations, rendering that testimony less than fully reliable.

During cross-examination when asked whether as Group Risk Officer she was responsible for effective risk management in the Community Bank with respect to sales practices misconduct, Ms. Russ Anderson responded, "I shared that responsibility with others, but, yes."[1417] When asked whether she was responsible for ensuring that the controls adequately managed sales practices risk, Ms. Russ Anderson responded, "Yes. Along with others."[1418] When asked about her, personally, and not others, Ms. Russ Anderson responded, "I understand. But that's a complete answer, 'with others'." When asked whether she understood that she was the Group Risk Officer of the Community Bank from 2013 to 2016 and not the lawyers, Ms. Russ Anderson responded, "That is correct."[1419]

Ms. Russ Anderson acknowledged that she was the one who led the first line of defense at the Community Bank, not the lawyers, and acknowledged that the lawyers were not in the first line of defense, adding, "the lawyers were important partners, but I was the first line of defense for Community Banking, yes."[1420] Ms. Russ Anderson also acknowledged that during the relevant period, SSCOT reported to her and not to the lawyers, and that there was only one Group Risk Officer on the Core Team – herself, and knew she could not delegate her risk responsibilities to the Law Department.[1421]

When asked during the hearing if she disagreed with Legal's views about what the thresholds should be whether she had the authority to veto them, Ms. Russ Anderson responded simply, "No."[1422] That testimony is directly inconsistent with testimony Ms. Russ Anderson provided under oath during a prehearing deposition taken on January 21, 2021.[1423]

During that deposition, the following exchange took place:

---

[1415] *Id.* at 9318.

[1416] *Id.* at 9317.

[1417] *Id.* at 9650.

[1418] *Id.*

[1419] *Id.* at 9651.

[1420] *Id.*

[1421] *Id.* at 9651-52.

[1422] *Id.* at 9653.

[1423] OCC Ex. 2509.

Q [by Enforcement Counsel]: Okay, Did you think that the thresholds for simulated funding and phone number changes were fairly high? Did you agree with Mr. Bacon?

A [by Ms. Russ Anderson]: I think in a normal operation, where we had finished the pilot and were in normal operating procedure, yes, the threshold would have been lower. But at this point in time, since we were in a test-and-learn mode, I felt that they were appropriate and I think that we were – that that thought process was further confirmed in 2015, ███████████████████ █████████████████

Q: Okay. You kept – you keep mentioning Legal, but you were the head of SSCOT, correct?

A: Yes. But at this point in time, legal was running quite a bit of the activity.

Q: Okay. But had you disagreed with Legal's views on what the threshold should be, you had the authority to veto them; right? You could have said, we need to look beyond the 99.95 threshold if you wanted to, correct?

A: If I felt that their analysis was flawed, yes.[1424]

Ms. Russ Anderson testified that in April 2015 "there were actually two changes made."[1425]

One, the -- how the money in and out was managed -- was looked at was expanded, so it was debits in and out, it was auto transfers in and out. It was a whole bunch of stuff in and out other than just cash in and out, which is what it had been. Then it was also lowered to the 99.95.[1426]

Ms. Russ Anderson testified that between April and July 2014, "the Core Team would have continued to have been meeting and working on issues that Corporate Investigations brought forward."[1427] She averred – again without referring to any supporting documentation – that "there were analysis [sic] done by the Legal Department on the threshold, and so the thresholds were changed to the 99.99 percent level for SSCOT to use to look at the – to send the data to CI."[1428] She stated that "across the footprint" "[t]here were approximately an additional 250 terminations from that work" based on phone number changes (70%) and simulated funding (30%).[1429]

---

[1424] OCC Ex. 2509 (RA Deposition, January 13, 2021 at 233-34).

[1425] Tr. (Russ Anderson) at 9318.

[1426] Id.

[1427] Id. at 9365.

[1428] Id. at 9365.

[1429] Id. at 9365-66.

Add. 952

Appellate Case: 25-1079    Page: 954    Date Filed: 05/16/2025 Entry ID: 5517644

Ms. Russ Anderson testified that she considered these findings "an important data point" because "when you look at the harm, customer harm in particular, in the simulated funding, the activity wasn't – the activity was not as high as some of the data might have indicated."[1430] She testified that it was her view that "in the area of simulated funding, the number of terminations out of the data that was given to Corporate Investigations . . . was small . . . in my mind. It was low."[1431]

Through leading questioning by her Counsel in direct examination, Ms. Russ Anderson testified that the issue of false positives in terms of setting the thresholds was an important consideration to her.[1432]

Elaborating on this response, Ms. Russ Anderson testified:

> Primarily, and there are multiple reasons, but primarily the reason you want to minimize the number of false positives is because if you have an overabundance of false positives in your data, you're going to impact innocent team members who are going to have to be identified and interviewed by corporate investigations, which would be a terrible experience. Two, you have now overwhelmed your system with information, and when you don't have enough resources to manage that, you get bogged down. And, third, it -- you're not getting to the real behavior if you have a lot of false positives. So if you can limit the amount of false positives, and, in particular, when we were at this pilot stage if you could limit the number of false positives, then you can really get to an understanding of why this behavior is occurring by this level of team members.[1433]

Through leading questioning by her Counsel during direct examination, Ms. Russ Anderson testified that she did not want too many false positives relating to SARs reports.[1434] Without referring to any supporting documentary evidence, Ms. Russ Anderson testified, "Because if now you've overwhelmed the system with too many false positives and corporate investigations can't get to those, but they're now in their case file, in their database, then they would be filing SARs on team members who were -- wouldn't -- didn't do that behavior, although the data looked like it had."[1435]

Ms. Russ Anderson recalled Examiner Candy's testimony to the effect that it would be "extremely easy" to address the false positives issue, that "All Ms. Russ Anderson and her group

---

[1430] *Id.* at 9366.

[1431] *Id.* at 9366-67.

[1432] *Id.* at 9318.

[1433] *Id.* at 9318-19.

[1434] *Id.* at 9319.

[1435] *Id.* at 9320.

had to do was literally pick up the phone and call the customer."[1436] Responding to this testimony, Ms. Russ Anderson stated "It's not nearly as simple as that sounds."[1437] She said to "set up a call center to do something like that would take quite a bit of time."[1438] She testified that "we have trained our customers that we won't call them. That if they get a call from someone saying they're from Wells Fargo that, you know, it could be a spam."[1439] She testified that "Wells Fargo does not do outbound sales calling."[1440]

This testimony is materially misleading. Ms. Russ Anderson's statement that Wells Fargo "does not do outbound sales calling" is a deflection – drawing attention from the Examiner's point that confirming an allegation by contacting the affected customer would have facilitated a determination of whether the allegation had merit. Such a call would not be a "sales call". Further, Ms. Russ Anderson's testimony that the Bank trains customers "that we won't call them" likewise is misleading, as it sidesteps the practice used by SSCOT's own polling team members, who called customers as part of their proactive monitoring.[1441]

Ms. Russ Anderson identified a May 29, 2015 email chain between Ms. Rawson and Reed Ramsay and herself through which Ms. Rawson provided the following "criteria and definition used for Simulated Funding monitoring":

> Outlier criteria: Total number of accounts that met the account's funding criteria that also meet the following:
>
> • Funds are transferred for a specific dollar amount from an existing account and deposited into the new account
> • Subsequently a withdrawal transfer of the same dollar amount was transferred back into originating (existing) account
> • Both transaction need to occur within 2 business days (For example, the deposit today and the withdrawal tomorrow)[1442]

She wrote that for the "Outlier threshold," "Review is completed on outliers at or above the 99.99 percentile of team members with at least one sale for the period reviewed.[1443]

---

[1436] Id.

[1437] Id.

[1438] Id.

[1439] Id. at 9321.

[1440] Id.

[1441] See id.. at 9677: "Q [by Enforcement Counsel] But you definitely knew that your own polling team in SSCOT called customers, right?" A: [by RA]: "Yes."

[1442] OCC Ex. 316 at 2.

[1443] Id. at 2.

Add. 954

Appellate Case: 25-1079      Page: 956      Date Filed: 05/16/2025 Entry ID: 5517644

Ms. Rawson wrote that this monthly testing had been in place since September 2014.[1444] She also added the note that "Bankers that make up the top 0.01% of all bankers within regional bank with accounts that qualify for potential simulated funding are considered outliers."[1445] When asked whether she believed it would be important to tell the OCC about this definition of what constituted an outlier, Ms. Russ Anderson responded "I don't know that I didn't tell them. I don't have a recollection of having a conversation one way or the other with them about it."[1446]

**Adding Phone Number Changing to SSCOT's Proactive Monitoring**

Without specifying when the process was modified, Ms. Russ Anderson testified that proactive monitoring changed after she talked with the LA/OC Regional President, Dave DiCristofaro.[1447] She testified "he was all on board with doing the proactive monitoring, but he mentioned to the team that he was seeing phone number changes, and he thought that was because people wanted to avoid the Gallup survey polls."[1448]

Elaborating on this point, Ms. Russ Anderson testified:

> So the Gallup survey is that they would choose a random number of people to call and then have you rate the service of your visit in the branch that day. I'm sure that all of us get some of those from different things. So if a team member felt that the customer had had a bad experience and they didn't want to get a bad score, they would flip a number in the telephone -- in the telephone numbers. And that was particularly difficult, because at that point, you couldn't call cell phones, so all you could call were land lines. So it was even lessening the number of customers that could be called. So the team said to David, yes, we could add phone number changes, and so they did.[1449]

Ms. Russ Anderson testified that when the pilot project was modified to test for phone number changes, it resulted in 70 percent terminations for that misconduct, versus 30 percent for simulated funding.[1450] She stated that during the pause, "we worked very actively with Gallup to move to emails, which was a much better response. And they also changed it from being an individual score to team scores. So two big changes that we made with the Gallup surveys."[1451]

---

[1444] *Id.* at 1.

[1445] *Id.*

[1446] Tr. (Russ Anderson) at 9685-86.

[1447] *Id.* at 9325.

[1448] *Id.*

[1449] *Id.* at 9325-26.

[1450] *Id.* at 9326.

[1451] Tr. (Russ Anderson) at 9371-72. See also, "22-03-07 Respondents' Amended Revised Errata Day 9-38" on page 76. Ordered by Second Supplemental Order.

Appellate Case: 25-1079     Page: 957     Date Filed: 05/16/2025 Entry ID: 5517644

Asked on direct examination by her Counsel whether she thought the changes had an effect on the number of instances of phone number changes, Ms. Russ Anderson responded: "It materially changed it, because bankers and tellers no longer had to worry about if I had a bad interaction with a customer at the teller line or anything like that. They no longer had to worry about someone's phone number – you know, people calling on the phone."[1452]

Notwithstanding the significance of phone number changing, Ms. Russ Anderson acknowledged that for those customers whose phone numbers had been changed, she never ensured that the customer's phone number was changed back to the right number in the Bank's system; nor did she know if customers were ever informed about the simulated funding – the transferring of funds between the customers' accounts.[1453] ██████████████████████ ██████████████████████ May 11, 2015 email, Ms. Russ Anderson wrote: "I have to say I do not recall that we went back and tried to change phone numbers."[1454] Similarly, Ms. Russ Anderson's direct report, Rebecca Rawson wrote:

> SSCOT did not take any action relating to correcting the customer phone numbers or determining what accounts that were funded through simulated funding were not wanted and closing them. Regarding the accounts that were funded through simulated funding, the fact that funding was simulated may not mean that the customer does not want or intend to use the account. It would be a case by case review and may require a conversation with the customer to understand if the account was consented to.[1455]

Although the record reflects that SSCOT maintained a polling team who would routinely contact customers by phone, there is no evidence in the record that by mid-2015 anyone from SSCOT actually engaged in the type of conversation Ms. Rawson alluded to here.[1456] The record also reflects that Ms. Russ Anderson did not find the lack of these corrective actions by SSCOT to be problematic.[1457] **Failing to take such action constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

**Corporate Security Activities – 2014 compared to 2013**

Ms. Russ Anderson testified that sales integrity cases decreased from 2013 to 2016.[1458] In support, she identified the Corporate Security Activities report that compared 2014 activities to

---

[1452] Tr. (Russ Anderson) at 9372.

[1453] *Id.* at 9678-79; R. Ex. 8736.

[1454] R. Ex. 8736 at 1.

[1455] *Id.*

[1456] Tr. (Russ Anderson) at 9677.

[1457] *Id.* at 9682.

[1458] Tr. (Russ Anderson) at 9390.

Appellate Case: 25-1079     Page: 958     Date Filed: 05/16/2025 Entry ID: 5517644

those in 2013.[1459] Ms. Russ Anderson testified that the report, compiled by Corporate Investigations, reported a reduction in Sales Integrity Violations by 16 percent and a 29 percent reduction in Customer Consent cases, from 2013 to 2014.[1460] From this report, Ms. Russ Anderson concluded that "the work we were doing around lots of activities, not just one thing, and controls that we were putting in place, that Sales Integrity Violations were down, and even more importantly, customer consent issues were down."[1461]

Elaborating on this response, Ms. Russ Anderson testified that the information was important because "it shows that our customers were actively saying they wanted the product, which then would tell me that the simulated funding that we were seeing was also going to be reducing, because we were getting more consent for the customer's account."[1462] She also noted an 18 percent reduction in Sales Integrity violations in all West Coast regions, along with an eight percent reduction in fraud cases in Southern California, LA Metro, and Orange County.[1463]

On cross-examination, however, Ms. Russ Anderson acknowledged that while she was comforted that there was a decrease in sales practices misconduct in 2014, she knew that she had paused proactive monitoring of sales practices misconduct for seven months and knew there was no lookback of sales practices misconduct prior to April 2014.[1464] She also acknowledged that during the pause SSCOT reverted entirely to the reactive methods for identifying sales practices misconduct during the pause – but averred, "they were also getting more sophisticated reporting through Ken Zimmerman that they were using to do their analysis."[1465]

Ms. Russ Anderson also identified data regarding terminations, going from 824 in 2013 to 999 in 2014.[1466] This, Ms. Russ Anderson asserted, "would reflect those terminations that we had done over the rest of the footprint. So there was a spike through the proactive monitoring."[1467]

The report further reflected an enterprise-wide 19 percent increase in Funding Manipulation;[1468] in the Southern California/LA Metro/Orange County regions, a 46 percent

---

[1459] Id.; R. Ex. 7273.

[1460] Tr. (Russ Anderson) at 9391.

[1461] Id. at 9391-92.

[1462] Id. at 9392. See, "22-03-07 Respondents' Amended Revised Errata Day 9-38" on page 76. Ordered by Second Supplemental Order.

[1463] Tr. (Russ Anderson) at 9393; R. Ex. 7273 at 3.

[1464] Id. at 9691.

[1465] Id.

[1466] Id. at 9392; R. Ex. 7273 at 2.

[1467] Tr. (Russ Anderson) at 9392.

[1468] R. Ex. 7273 at 1.

Appellate Case: 25-1079    Page: 959    Date Filed: 05/16/2025 Entry ID: 5517644

increase in Falsification,[1469] a 28 percent increase in Customer Account Fraud,[1470] and a 100 percent increase in Retaliation against Whistleblowers;[1471] and in the Montana-Wyoming regions a 42% increase in Sales Integrity Violations, a 200% increase in Customer Consent cases, and a 57% increase in Falsification.[1472] Increases in Sales Integrity violations were reported in the Greater Bay Area (False Entries/CIP violations – up 55%);[1473] and reported increases in Sales Integrity Violations overall, up 25% in San Francisco Bay;[1474] up overall in Oregon (9%),[1475] in All Great Plains Regions (10%),[1476] in Iowa and Illinois (24%),[1477] in Dakota Territory (6%),[1478] and Nebraska (33%).[1479]

Ms. Russ Anderson identified a similar report by Corporate Investigations covering changes from the first quarter of 2014 to the first quarter of 2015.[1480] She noted reductions in overall Sales Integrity Violations (down 17%) and Customer Consent (down 42%)[1481] Ms. Russ Anderson attributed the reductions to several things: "We were putting in additional controls. We had better reporting. Senior leadership was certainly paying more attention. There had been some reduction in sales goals and the proactive monitoring."[1482]

The report also identified areas where cases were increasing. There was an enterprise-wide 31% increase in False Entries/CIP Violations,[1483] a 91% increase in Funding Manipulation,[1484] and a 100% increase in Retaliation against Whistleblowers.[1485]

---

[1469] *Id.* at 5.

[1470] *Id.*

[1471] *Id.*

[1472] *Id.* at 14.

[1473] *Id.* at 5.

[1474] *Id.* at 7.

[1475] *Id.* at 9.

[1476] *Id.* at 20.

[1477] *Id.* at 22.

[1478] *Id.* at 23.

[1479] *Id.* at 24.

[1480] Tr. (Russ Anderson) at 9395; R. Ex. 9894.

[1481] R. Ex. 9894 at 2.

[1482] Tr. (Russ Anderson) at 9397.

[1483] R. Ex. 9894 at 2.

[1484] *Id.*

[1485] *Id.* at 5.

Add. 958

Appellate Case: 25-1079    Page: 960    Date Filed: 05/16/2025 Entry ID: 5517644

Ms. Russ Anderson did not discuss the case types where increases were reported, but expressed the view that it is not possible to eliminate all sales practices misconduct.[1486] Elaborating, she testified:

> I believe that it is impossible to get rid of all sales practices misconduct, because you are dealing with humans. And humans do things that you're not always going to understand. So in business, you just have to have some acceptance that people are going to sometimes do the wrong thing, whether it's a banker or a teller or a loan officer or whoever it may be.[1487]

She denied this meant that she was tolerating misconduct:

> I wouldn't say tolerating it. You have to just understand that it's going [to] happen and make business decisions around what does zero tolerance mean, right? So zero tolerance -- to get to a zero tolerance sales practices misconduct, there's going to be a lot of evidence in there that's not -- that's the -- I'm sorry. I just lost my word -- that is not the activity. It just looks like the activity, but once you get into it, you find out that it's a false positive. So if you -- there's a place where your number of real activity and the ones that look like it but aren't cross, and if you try to go to zero, you're going to impact a lot of innocent team members and your investigative work.[1488]

### April 2015 WF&C Risk Committee Meeting

Ms. Russ Anderson acknowledged during cross-examination that she was on an April 8-10, 2015 email chain the participants of which were reviewing a draft submission for the April 2015 Risk Management Committee.[1489] She testified that she assisted Ms. Tolstedt by editing the documents that would go to the Risk Committee of the Board for the April 2015 Risk Committee meeting.[1490]

In the first message of this chain, Mr. MacDuff wrote to Ms. Russ Anderson and others that he was providing "the latest for your review", and posed two questions:

> 1. After reading the Supervisory Letter from the OCC, I made some updates to the last page covering the MRA but elected not to add the detailed content of what's required in the response. I just wonder if it's too soon to be that specific with the Board (can certainly provide more specifics later). Let me know what you think.

---

[1486] Tr. (Russ Anderson) at 9397.

[1487] *Id.* at 9397-98.

[1488] *Id.* at 9398. See "22-03-07 Respondents' Amended Revised Errata Day 9-38" on page 76. Ordered by Second Supplemental Order.

[1489] Tr. (Russ Anderson) at 9736; OCC Ex. 952.

[1490] Tr. (Russ Anderson) at 9841.

2. Wondering if we're missing some content that outlines our response, specifically, for when a pattern or practice is discovered. In the LA Times talking points, we said when we see something to discover a trend not in keeping with our high standards of ethics or integrity we act and that can include terminations (paraphrasing). Just wonder if we need to be more specific about the actions we take.[1491]

Ms. Russ Anderson responded to Mr. MacDuff's first question as follows: "I would not add anything more than what we have in the document. We're still forming and storming and since this document will also go to the OCC I would prefer we keep it to a minimum."[1492] With respect to Mr. MacDuff's second question, Ms. Russ Anderson wrote: "Good question. If we added something I'd make it no more than two sentences. I think more than that and we look defensive. Is there something from the 12/13 talking points we could repurpose here?"[1493]

Presented with this exchange during cross-examination, Ms. Russ Anderson repeated her prior testimony that she understood the Bank's relationship with the OCC was very important, and recalled her testimony that she was worried in April 2014 that the deck being presented to the ERMC at the April 9, 2014 meeting would be subject to regulator review.[1494] When asked whether, now in 2015, she believed the substantive content going to the OCC should be kept to a minimum, Ms. Russ Anderson did not dispute this characterization but justified her comments, "[b]ecause we were still putting our response together to that MRA to the OCC. They had not seen my full response yet."[1495]

Ms. Russ Anderson also identified an April 24, 2015 email chain through which the draft Board Presentation – April 2015 – Community Banking Prep, Conduct Risk Segment – was circulated to Ms. Tolstedt, Mr. MacDuff, herself and others.[1496] Although Ms. Russ Anderson testified that she had no recollection of the email chain or the attachments, she was shown as a distributee of the chain and the circulated draft provided talking points for Ms. Tolstedt's presentation for the April 28, 2015 Risk Committee meeting.[1497]

In the final message, dated April 24, 2015, Carole Anderson provided Ms. Tolstedt, Ms. Russ Anderson, and others "the prep doc we worked on for you for the Board meeting next week."[1498]

---

[1491] OCC Ex. 952 at 3.

[1492] *Id.* at 2.

[1493] *Id.*

[1494] Tr. (Russ Anderson) at 9735.

[1495] *Id.* at 9737-38.

[1496] *Id.* at 9843-44; OCC Exs. 1701 & 1702

[1497] Tr. (Russ Anderson) at 9844.

[1498] OCC Ex. 1701 at 1.

Add. 960

Appellate Case: 25-1079    Page: 962    Date Filed: 05/16/2025 Entry ID: 5517644

Notwithstanding that by this time the OCC had directed Ms. Russ Anderson to evaluate the sales goals and the pressure in the Community Bank, Ms. Russ Anderson could not recall if she was satisfied with Ms. Tolstedt's talking points to the Risk Committee for the April 28, 2015 meeting, noting only that the instructions referred to "were rescinded."[1499]

Included in the talking points for Mr. Tolstedt's presentation were the following:

> At Wells Fargo we have a culture that invites dialogue. This is a place where our team members feel comfortable telling us how they feel and that is extremely valuable.

> Our retail bank household cross-sell was 6.13 products per household in February 2015, compared to 6.17 in February 2014 and November 2014.

> Managing sales practices conduct risk is a continual improvement process, and we will be making changes to programs every year; examples of potential next phase efforts include developing common sense promotion eligibility standards (e.g., time in position and AU, minimum performance "gates") which platform FTE and manager positions must achieve before eligibility to post for their next position.[1500]

In the section of the talking points about "other possible topics that may come up," Ms. Tolstedt's staff included the following:

> Risk structure – are additional resources needed in this space?

> • Potentially; we have already reallocated resources either directly in the GRO team or other areas to further document and augment risk management practices.
> • Additional resources may be needed depending on regulatory action.[1501]

By the time this draft circulated among Ms. Tolstedt's direct reports, including Ms. Russ Anderson, the OCC had identified concerns regarding sales practices misconduct – concerns that were not disclosed in the draft report that had been shared with Ms. Russ Anderson. Although Ms. Russ Anderson testified she did not recall reading the draft talking points, Mr. MacDuff wrote in an April 13, 2015 email that she had "read like 15 times now" so she probably could wait "until we hear back from Corporate and Legal" before reading it again.[1502] **Failing to assure that the concerns the OCC had identified regarding sales practices misconduct were part of this draft and part of the final report constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

---

[1499] Tr. (Russ Anderson) at 9844.

[1500] OCC ex. 1702 at 5-6.

[1501] *Id.* at 6.

[1502] Tr. (Russ Anderson) at 9847; OCC 717 at 1.

Appellate Case: 25-1079    Page: 963    Date Filed: 05/16/2025 Entry ID: 5517644

In circulating the draft to Ms. Russ Anderson, Mr. Loughlin, Mr. Byers, and others, Mr. MacDuff wrote:

> Please find the latest DRAFT memo on sales practices conduct risk attached. We welcome your feedback and insight into how this meets your objectives for this topic with the Risk Committee of the Board. This would go out in advance to the Committee members and Carrie can then answer questions (after a quick verbal overview if you'd like).

> In the document, we tried to lay out the approach to managing risk including by how to think about the ongoing nature of the risk itself and the evolving nature of how we manage it, and the key actions we've taken over the last year to 18 months – with results in many areas indicating improvement. We've also tried to develop the content consistent with what's been shared in either documents or conversations with the OCC and the Fed.[1503]

Included in the concerns the OCC brought to Ms. Russ Anderson's attention in writing one month before the April 2015 meeting of the Board's Risk Committee but <u>not included</u> in the draft of Ms. Tolstedt's talking points were the facts – not disputed by Ms. Russ Anderson – that as of March 2015 the current oversight program lacked transparency because Community Banking had not brought them together under a formal governance framework;[1504] the lack of a comprehensive governance framework exposed Community Banking to heightened reputation risk and possible negative publicity; and that without a formalized structure, it was difficult to demonstrate compliance with the firm's values and goals while meeting strategic and financial objectives;[1505] that given the importance of sales activities to the firm, the expectations placed on CB employees to meet sales goals, and the overall risk associated with sales activities, CB risk management needed to but had not yet establish an overarching framework and formalize current practices in policy;[1506] that the Community Bank's Risk Management Policy and Framework needed to describe the scope of Community Banking sales activities, the overall goals for the program, and the roles and responsibilities of each line of business involved in the oversight process, but that as of March 2015 it did not do so;[1507] that the Community Bank's Risk Management Policy and Framework needed to define escalation protocols and address the timing and reporting of information of CB's sales activities to the Enterprise Risk Committee and the Board of Directors' Risk Committee, but that as of March 2015 it did not do so;[1508] that the Community Bank's Risk Management Policy and Framework needed to define appropriate sales practices and alignment with corporate values, goals, and mission statements, but that as of

---

[1503] OCC Ex. 717 at 1-2.

[1504] OCC Ex. 2962 at 2.

[1505] *Id.* at 5.

[1506] OCC Ex. 2962 at 5. See OCC Ex. 2962 at 2.

[1507] OCC Ex. 2962 at 2.

[1508] *Id.*

Add. 962

Appellate Case: 25-1079    Page: 964    Date Filed: 05/16/2025 Entry ID: 5517644

March 2015 it did not do so;[1509] and that the Community Bank's Risk Management Policy and Framework needed to document compensation and incentive plans along with processes used to identify and prevent inappropriate sales conduct, but that as of March 2015 it did not do so.[1510]

Mr. Julian testified that he attended all but the end of the Board's Risk Committee meeting held on April 28, 2015.[1511] He was present for the presentation by Carrie Tolstedt, who provided "an overview of the Community Bank's Group Risk Management practices."[1512] Asked how he felt during the presentation, Mr. Julian responded that while it "appeared to be at a very high level," he was "[n]ot sure that it was fully responsive to what at least I understood the Committee's intents were for getting information."[1513] He added that after the meeting he heard, he thinks from Mr. Loughlin, that "the Committee members weren't pleased."[1514] After being led to provide this testimony by his Counsel during direct examination, Mr. Julian testified that it was not his impression that the Risk Committee members believed that the sales practices issues needed no further attention on their part."[1515]

According to the minutes, during that part of the her presentation which Mr. Julian attended, Ms. Tolstedt represented that the "high inherent risk level within the business" should be attributed to "a number of factors, including the size, turnover, experience level and distributed nature of the group's team members, the high volume of transactions, and the mass market segment supported by the business."[1516]

Ms. Tolstedt explained that the Community Bank "manages risk by using a multi-layered approach that is supplemented by ongoing monitoring and continuous efforts to enhance risk management practices."[1517] She discussed areas of focus, including "products and services training efforts for team members, the adoption of a simpler product set that is easily understood by customers, the monitoring of metrics, and the impact of performance management systems and compensation plans on business conduct."[1518]

Nothing in her presentation suggested that either Ms. Russ Anderson or WFAS provided credible challenge to the risk management measures Ms. Tolstedt described during this meeting. She reported, "investigations are undertaken to conduct a root cause analysis of conduct risk

---

[1509] Id.

[1510] Id.

[1511] Tr. (Julian) at 6694; OCC Ex. 1101-R.

[1512] Tr. (Julian) at 6695.

[1513] Id.

[1514] Id.

[1515] Id.

[1516] OCC Ex. 1101-R at 1-2.

[1517] OCC Ex. 1101-R at 2.

[1518] Id.

Add. 963

matters and in some cases the investigations may result in the termination of team members."[1519] Further, she noted that the business-conduct risk team "conducts a final root cause analysis to evaluate whether new controls or team member communications are needed and products and services are reviewed to evaluate potential areas where risk may arise."[1520] There is nothing in the minutes, however, suggesting Ms. Russ Anderson or WFAS had undertaken or had plans to undertake an analysis to determine if the Community Bank's testing controls effectively addressed the identification of root causes for sales practices misconduct within the Community Bank.

Ms. Tolstedt reported that the Community Banking risk management team "regularly reviews sales reports and that if an unusual increase in sales activity for a particular product is identified, then the team conducts an investigation with the support of product specialist partners."[1521] There is no suggestion, however, that either Ms. Russ Anderson or WFAS provided any support with respect to testing controls employed by the Community Bank's Risk Management Team.

Ms. Tolstedt reported that "over the years" "changes and other enhancements to business practices and organizational structure" included "the decision to move the reporting of the business conduct risk team to the Group Risk Officer," which Ms. Tolstedt reported "enhanced oversight practices".[1522] There is no indication that either Ms. Russ Anderson or WFAS ever determined whether this change to the Community Bank's business structure was an effective enhancement with regard to the Community Bank's risk management processes.

**WFAS's Noteworthy Risk Issues - May 2015**

The May 2015 WFAS Noteworthy Risk Issues report included the statement that:

> Sales Practices continues to be a significant risk to the Company. In April 2015, Community Banking received an MRA from the OCC noting the lack of a formal governance framework over sales practices. In addition, the city of Los Angeles has filed a lawsuit alleging that improper sales practices and sales goals harmed customers.[1523]

Then, copying and pasting from the February 2015 Noteworthy Risk Issues report, the report stated:

> Ensuring we are providing products that provide real benefit to the customer, are sold in the appropriate manner with the proper sales incentives, and are

---

[1519] Id.

[1520] Id.

[1521] Id.

[1522] Id. at 3.

[1523] R. Ex. 538 at 1.

Add. 964

Appellate Case: 25-1079    Page: 966    Date Filed: 05/16/2025 Entry ID: 5517644

delivered with high operational excellence is key in this environment to reducing our risk.[1524]

The report concludes with the following: "We are working to build out additional second line of defense oversight of Sales Practices. Community Banking has launched a project to specifically address the OCC's feedback, and Corporate Risk is currently outlining an enhanced governance approach over sales practices."[1525]

## City of Los Angeles Complaint – May 4, 2015

On May 4, 2015, acting on behalf of the State of California the Los Angeles City Attorney filed suit in the Superior Court for the County of Los Angeles, naming as Defendants both WF&C and Wells Fargo Bank, N.A.[1526] The suit sought equitable relief and civil penalties against the Defendants for violations of the California Unfair Competition Law for Gaming and for Failure to Provide Notice of Data Breach.[1527]

In its lead allegation, the City presented the following narrative:

> For years, Wells Fargo & Company and Wells Fargo Bank, National Association (collectively "Wells Fargo") have victimized their customers by using pernicious and often illegal sales tactics to maintain high levels of sales of their banking and financial products. The banking business model employed by Wells Fargo is based on selling customers multiple banking products, which Wells Fargo calls "solutions." In order to achieve its goal of selling a high number of "solutions to each customer, Wells Fargo imposes unrealistic sales quotas on its employees, and has adopted policies that have, predictably and naturally, driven its bankers to engage in fraudulent behavior to meet those unreachable goals. As a result, Wells Fargo's employees have engaged in unfair, unlawful, and fraudulent conduct, including opening customer accounts, and issuing credit cards, without authorization. Wells Fargo has known about and encouraged these practices for years. It has done little, if anything, to discourage its employees behavior and protect its customers. Worse, on the rare occasions when Wells Fargo did take action against its employees for unethical sales conduct, Wells Fargo further victimized its customers by failing to inform them of the breaches, refund fees they were owed, or otherwise remedy the injuries that Wells Fargo and its bankers have caused. The result is that Wells Fargo has engineered a

---

[1524] *Id.*; see also OCC Ex. 1098 at 2; and R. Ex. 19357 (ERMC Memo to WF&C Board of Directors and Operating Committee, January 22, 2014, at 1.

[1525] R. Ex. 538 at 1.

[1526] R. Ex. 168.

[1527] *Id.* at 1.

Add. 965

Appellate Case: 25-1079     Page: 967     Date Filed: 05/16/2025 Entry ID: 5517644

virtual fee-generating machine, through which its customers are harmed, its employees take the blame, and Wells Fargo reaps the profits.[1528]

Noteworthy for the purposes of this Recommendation are the following allegations:

From Complaint, ¶ 4:

> Wells Fargo boasts about the average number of products held by its customers, currently approximately six bank accounts or financial products per account. Wells Fargo seeks to increase this to an average of eight bank accounts or financial products per account holder, a company goal Wells Fargo calls the "Gr-eight" initiative.[1529]

From Complaint, ¶5:

> Wells Fargo quotas are difficult for many bankers to meet without resorting to the abusive and fraudulent tactics described further below. . . . Those failing to meet daily sales quotas are approached by management, and often reprimanded and/or told to "do whatever it takes" to meet their individual sales quotas. Consequently, Wells Fargo managers and bankers have for years engaged in practices called "gaming." Gaming consists of, among other things, opening and manipulating fee-generating customer accounts through often unfair, fraudulent, and unlawful means, such as omitting signatures and adding unwanted secondary accounts to primary accounts without permission.[1530]

From Complaint, ¶6.

> Wells Fargo's gaming practices have caused significant stress to, and hardship and financial losses for, its customers. Specifically, Wells Fargo has (a) withdrawn money from customers' authorized accounts to pay for the fees assessed by Wells Fargo on unauthorized accounts opened in the customers' names; (b) placed customers into collections when the unauthorized withdrawals from customer accounts went unpaid; (c) placed derogatory information in credit reports when unauthorized fees went unpaid; (d) denied customers access to their funds while Wells Fargo stockpiled account applications; and (e) caused customers to purchase identity theft protections.[1531]

From Complaint, ¶8.

---

[1528] *Id.* at 3.

[1529] *Id.* at 4.

[1530] *Id.* at 4.

[1531] *Id.* at 5.

While Wells Fargo has ostensibly terminated a small number of employees who have engaged in gaming, other employees have been rewarded for these practices, and even promoted, perpetuating the problem. Moreover, Wells Fargo has continued to impose the same companywide goals of attaining as many accounts as possible at any expense, thereby fostering the practice of gaming. Wells Fargo thus puts its employees between a rock and a hard place, forcing them to choose between keeping their jobs and opening unauthorized accounts.[1532]

The Complaint alleged violations of specific state laws. These included willfully obtaining personal identifying information for unlawful purposes – including obtaining or attempting to obtain credit, goods, or services without the consent of that person;[1533] being a party to a fraudulent conveyance;[1534] knowingly accessing and without permission using data to execute a scheme to defraud or wrongfully obtain money,[1535] and knowingly accessing and without permission making use of customer information.[1536]

The Complaint alleged specific *unfair* business acts, including violations of:

established public policy of the State of California which, among other things, seeks to ensure that: all monetary contracts are duly authorized by each party; all bank accounts are authorized and agreed to by the customer in whose name the bank account is opened; residents of the state are not harmed in their credit reports by acts not actually performed, or debts not actually incurred by that resident; personal information of an individual is not improperly obtained and used for an unlawful purpose; and that when personal information is obtained without authority, that the person whose information was obtained is informed immediately.[1537]

The Complaint alleged specific *fraudulent* business practices, including using misrepresentations, deception, and concealment of material information to view customers' personal information, open unauthorized accounts in its customers' names, and then fail to reveal to the customers that their personal information was compromised.[1538]

---

[1532] *Id.* at 5.

[1533] *Id.* at 16, ⁋55, citing California Business and Professions Code § 17200, et seq., and Penal Code section 530.5, subdivision (a).

[1534] R. Ex. 168 at 16, ⁋55, citing Penal Code section 531.

[1535] R. Ex. 168 at 16, ⁋55, citing Penal Code section 502, subdivision (c)(1).

[1536] R. Ex. 168 at 16, ⁋55, citing 15 United States Code 680, et seq. and rules and regulations promulgated thereunder.

[1537] R. Ex. 168 at 17, ⁋56.

[1538] *Id.* at 17-18, ⁋56.

Add. 967

Appellate Case: 25-1079    Page: 969    Date Filed: 05/16/2025 Entry ID: 5517644

**GRO Transparency with the OCC: May 14, 2015 Meeting**

Ms. Russ Anderson recalled testifying that she never intentionally obstructed OCC examinations.[1539] During cross-examination, Ms. Russ Anderson was shown Meeting Notes prepared by Examiner Hudson dated May 14, 2015, reflecting a discussion with "CB GRO Claudia Russ Anderson surrounding Sales Practices."[1540] After acknowledging that she recalled meeting with the OCC examiners once over the phone in May 2015 – right around the time the LA City Attorney sued the Bank – Ms. Russ Anderson was presented with a copy of the Meeting Notes prepared by Examiner Hudson.[1541] Ms. Russ Anderson did not recall reviewing these notes.[1542]

The Meeting Notes reflect Ms. Russ Anderson responded to a series of questions regarding sales practices misconduct at Community Banking.[1543] The notes begin:

> In late 3Q or early 4Q 2013, the Sales and Services Conduct Oversight team under Rebecca Rawson found sales funding integrity activities in the Los Angeles-Orange County (LA/OC) region. There were conversations with the regional vice president at the time. He expressed concern that team members were changing phone numbers by a digit or two. This information was handed over to Corporate Investigations, which found a number of team members in the 30+ range admitted to simulated-funding. Those employees were terminated for cause and marked "not eligible' for rehire. Some employees voluntarily resigned but their record was still marked for cause and rehire ineligible. The individuals terminated were primarily Personal Banker I and IIs in Personal Banking. There was a smattering of complicit store managers.[1544]

The Notes include a description of simulated funding ("when a banker opens an account a customer did not ask for and uses his/her own funds by putting, in example, $25 in an account" or when a customer "wants an account with funds coming from one account to another but the funds are expected to be put back into the original account after a certain period. The account appears funded for active use but the account is not used.")

Ms. Russ Anderson answered the question "How is it detected" with the following explanation, according to the Meeting Notes: "They work with the Deposit Products Group (DPG) who uses analytics with exact filters. DPG looks at the activity and Quality Sales Report

---

[1539] Tr. (Russ Anderson) at 9978.

[1540] *Id.* at 9978-79; OCC Ex. 1734.

[1541] Tr. (Russ Anderson) at 9979.

[1542] *Id.* at 9980.

[1543] OCC Ex. 1734 at 1-4.

[1544] *Id.* at 1.

**Page 215 of 443**

Card metric. They can see increases or decreases in that type of simulated funding. Scans occur regularly."[1545]

This answer is silent regarding the thresholds SSCOT was using to detect simulated funding. During cross-examination, Ms. Russ Anderson agreed that "How is [simulated funding] detected?" was a pretty specific question", but when asked "you did not believe you should have disclosed the 99.99 percent threshold to the OCC, Ms. Russ Anderson responded, "It didn't occur to me to do that, so, no, I didn't."[1546] **Failing to disclose to the OCC the 99.99 percent threshold constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Ms. Russ Anderson testified that she was proud of the thresholds, but asserted – without offering any supporting documentation, "This is one meeting in 2015. In 2013 when we were going to start the proactive monitoring, I told the OCC about it, and I told them how we were going to work it."[1547]

Through questioning during cross examination, Ms. Russ Anderson acknowledged being directly asked by the OCC about how simulated funding was detected – and remained silent about these thresholds. In her prior written Declaration, however, Ms. Russ Anderson averred, "I advised the OCC Wells Fargo supervisory team of our proactive monitoring efforts. I was never asked by the OCC Wells Fargo supervisory team about specific methodology for gathering data, including whether thresholds were being used. I would have gladly shared this information if they had thought it was important enough to ask about."[1548]

Nothing in the prior written Declaration, however, supports this averment: Ms. Russ Anderson testified, "this is referring more closely to the February exam. My recollection is when – in 2013 when we were talking about proactive monitoring, we talked about that we would use thresholds."[1549] She acknowledged, however, that this is not what she put in her Declaration.[1550] **Failing to provide such information to the OCC constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Presented with the question: "Did you look into why the preponderance of cases were isolated to the LA area?" the notes report Ms. Russ Anderson responded without answering the question, "General Practices in place that see an issue in store or district then interview the store

---

[1545] OCC Ex. 1734 at 1-2.

[1546] Tr. (Russ Anderson) at 9980-81.

[1547] *Id.* at 9981.

[1548] OCC Ex. 2279 at P28.

[1549] Tr. (Russ Anderson) at 9982.

[1550] *Id.* at 9883.

Add. 969

Appellate Case: 25-1079    Page: 971    Date Filed: 05/16/2025 Entry ID: 5517644

manager to see if there's a district manager issue. Problem has to be pretty systemic and intentional to fire a district manager."[1551]

Presented with the question: "Who did interviews?" the notes report that Ms. Russ Anderson responded Corporate Investigations (CI). "CB GRO looked to substantiate Ethics Line complaint by trying to reach customers as a service call to generically get a sense of yes there was a need and they asked for the referral. That call looks for inappropriate behavior to support the Ethics Line calls. CB GRO does not get involved after forwarding information to CI but gets feedback from CI on outcome of investigations."[1552]

Presented with the question: "Is HR involved in terminations?" the notes report that Ms. Russ Anderson responded, "Claudia is not familiar. HMs. Russ Anderson can tell you."[1553]

Presented with the question: "Was there customer harm?" the notes report that Ms. Russ Anderson responded, "Depends upon reason for termination. The phone number changes and referrals have no customer harm since related to falsifying bank records."[1554] **Failing to recognize customer harm related to team member falsification of bank records constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Presented with the question: "How much harm related to the 190 team member terminations?" the notes report that Ms. Russ Anderson responded, "Don't know. Keb stated that this information will be in the data being consolidated. A high number of these terminations were related to the changing of telephone numbers."[1555]

Presented with the question: "How many team members given a formal warning?" the notes report that Ms. Russ Anderson responded, "Don't know. Those previously given warnings is data Claudia doesn't recall."[1556]

Presented with the question: "Did you document for root cause analysis?" the notes report that Ms. Russ Anderson responded:

> Not in the formal sense, not a paper per se. The group was in process of changing from phone number Gallup poll surveys to email surveys at the time of terminations. They were getting an adverse selection of surveys that would get kicked back due to people using cell phones and no longer having a land

---

[1551] OCC Ex. 1734 at 2.

[1552] *Id.*

[1553] *Id.*

[1554] OCC Ex. 1734 at 2. *But see* 10014-15; R. Ex. 10074, email exchange including Ms. Russ Anderson describing potential direct financial harm associated with selling or opening multiple accounts to or for the same customer, risking incurring unnecessary account fees.

[1555] OCC Ex. 1734 at 2.

[1556] *Id.*

Add. 970

Appellate Case: 25-1079     Page: 972     Date Filed: 05/16/2025 Entry ID: 5517644

line. They changed in July 2014 to email Gallup surveys but it was in the works in 2013.

Directly influence by the bad behavior of those terminated was the change in reporting. They used to report results at the individual banker level but now changed to the store level.

Interviews did not lead to a conclusion about sales pressure. This was not an underlying issue but looking at 2012 and 2013 incentive plans. They continue to iterate incentive plan. Try to tell people you can't pull 15 levers at once, go for what has the biggest bank. The number of allegations in Ethics declined and no preponderance of issues discovered in interviews.[1557]

**Failing to document for root cause analysis constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

When asked whether she ever told anyone in Audit, including either Mr. Julian or Mr. McLinko, that she was conducting a root cause analysis, Ms. Russ Anderson responded only that "I don't recall."[1558] Further, nothing in Ms. Russ Anderson's response as reported in these Meeting Notes had anything to do with why employees issues products and services to customers without their consent.[1559]

Presented with the question: "Terminations since?" the notes report that Ms. Russ Anderson deflected without answering the question, stating "The body of work was into 2014. All didn't happen in 2013 since more team members were interviewed than were terminated. Met once a week in forum and had conversations. The body of work went through most of 2014."[1560]

Presented with the question "Can we see terminations for sales practices?" the notes report that Ms. Russ Anderson responded, "Don't know. There were team members terminated outside of that work. Look at those in the body of work and then those in business as usual terminations. Claudia would have to bucket those and there are lots of reasons for terminations. Keb stated that Jason MacDuff is working on a document."[1561] **Failing to assure transparency regarding terminations for sales practices constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Presented with the question: "Customer calls?" the notes report that Ms. Russ Anderson responded:

---

[1557] OCC Ex. 1734 at 2.

[1558] Tr. (Russ Anderson) at 9983-84.

[1559] OCC Ex. 1734 at 2.

[1560] *Id.* at 3.

[1561] OCC Ex. 1734 at 3.

Customer calls into service center. Service banker would ask if he/she wants account to be closed and may refund fees. If customer says yes that that's what occurs. If service banker cannot satisfy customer then the complaint is escalated to the executive office. If customer's happy then it won't show up as an escalation in the database today. Data will be captured and analyzed. CB under Jay Christoff or Camie Keillen is building out the analytics group.[1562]

Presented with the question: "Do certain complaints come in escalated?" the notes report that Ms. Russ Anderson responded: "Only direct letters to Carrie or John unless an agency complaint. Just into WF will not automatically be escalated but have plans in place with new policy. Agency complaints are regulatory, federal or state that consumer complained to for resolution.[1563]

Presented with the question: "When is rollout of CB Complaints Program?" the notes report that Ms. Russ Anderson responded, "Not until YE 2016. New policy is effective June 1, 2015 and will stage rollout until compliant at end of 2016. During this process, they will figure escalation and make sure adequate staff is in place. They don't want to be understaffed."[1564]

When presented with the question: "Talk about 40% of complaints from UDAAP related to sales practices. We looked at trends and noticed a big spike in 4Q14. May have to look at the details behind that information and sample some of those complaints" the notes report Ms. Russ Anderson responded, "4th quarter was the rollout of the pilot."[1565]

When presented with the question: "How do you hold team members accountable?" the notes report that Ms. Russ Anderson deflected and did not answer the question asked but responded, "CB recognized they were promoting store managers to bigger stores too quickly vs back in the day where you had years under you before being promoted. Promoted from asst manager to store manager to[o] fast. CB looking at how much time in the role before promoting them. Tracy & others looked to revisit before."[1566]

When presented with the question: "What is 8.25 Solutions Initiative Compensation for Personal Banker I & II?" the notes report Ms. Russ Anderson responded, "Average sales per day. Talk with Tracy about quarterly packages."[1567]

When presented with the question: "Service calls?" the notes report that Ms. Russ Anderson responded, "Tracked or logged into complaints database on a limited basis. They

---

[1562] *Id.*

[1563] *Id.*

[1564] *Id.*

[1565] *Id.*

[1566] *Id.*

[1567] OCC Ex. 1734 at 3.

Add. 972

capture how many fees are reversed. LA Times article customer quoted had fees waived almost consistently. They can tell that on a customer-by-customer basis. They have people look at that data."[1568]

When presented with the question: "Any Ethics Line call increases since article?" the notes report that Ms. Russ Anderson responded, "She (Rebecca Rawson) did not indicate an uptick but Ethics Line calls go to a third party vendor."[1569]

When presented with the question: "Any dialogue with Personal Bankers who indicate they are under pressure?" the notes report that Ms. Russ Anderson responded: "Claudia doesn't hear that at all. She's been at leadership summits and people are positive and please with what they hear and feel. Everybody isn't pristine. They don't have volume of negative activity. They have people that come to work where they deal with unsavory characters but this is the reason for detective and preventative controls.[1570]

The record reflects, however, that this response is not consistent with preponderant and reliable evidence in the record. Ms. Russ Anderson identified an April 10-13, 2015 email chain that included Ms. Russ Anderson as a distributee, between Ms. Russ Anderson and Mr. Otsuka.[1571] Through this exchange, Mr. Otsuka provided to Ms. Russ Anderson, Rebecca Rawson, Loretta Sperle (CI), Susan Nelson (HR) and others a description of agenda items to be discussed during the April 14, 2015 Core Team meeting.[1572] In a follow-up email on April 13, 2015, Mr. Otsuka added an item to the agenda regarding "today's protest activity in St. Paul, which focused in large part on sales pressure-related issues".[1573]

In this transmission, Mr. Otsuka provided the distributees with the "summary that Richele Messick, in Communications, circulated. She works out of the building where the rally/press conference took place:

> Just a quick update that the St. Paul rally/protest occurred. I was able to attend and they brought two buses, totaling around 50 individuals. They set up outside on a plaza where there is a prominent WF sign on the building. They were very organized with a podium, speakers, microphone – cardboard signs read "We heart tellers," "Bank workers organizing for change," "Bank workers say better banks today," etc. They had about six different speakers including Michael Lewis the WF team member quoted in *The Guardian* article and Thiago Marques an employee from a different bank in NJ who

---

[1568] *Id.* at 3-4.

[1569] *Id.* at 4. The record reflects the third party vendor is or was The Network, Inc. See OCC Ex. 2192 at 5, "Client Instructions".

[1570] OCC Ex. 1734 at 4.

[1571] Tr. (Russ Anderson) at 9987; OCC Ex. 3004.

[1572] OCC Ex. 3004 at 2.

[1573] *Id.* at 1.

Add. 973

Appellate Case: 25-1079     Page: 975     Date Filed: 05/16/2025 Entry ID: 5517644

was also quoted in the article. They focused on pay, sales goals, workers forced into unethical behavior and that US Bank and WF refuse to work with Somali MSBs/remit money to Somalia.[1574]

Confirming her receipt and review of the transmission, later on April 13, 2015 Ms. Russ Anderson circulated a message to all distributees, "just for everyone's FYI the article is not factually correct."[1575]

Ms. Russ Anderson acknowledged that she was based in St. Paul at the time, but said that it did not concern her that there was a protest in Minnesota involving 50 individuals which focused in large part on sales pressure. When asked about her averment that she did not hear that about sales practices pressure, Ms. Russ Anderson responded that while "sales pressure was a topic in the Core Team" "if you read the entirety of my response to the OCC's question, it had to do with my being out in the regions talking to regional personnel and that what the feedback I had been getting was that they had not been feeling the pressure" and that "the changes that we had been making were very positive".[1576]

Further, the record reflects that several months before the Minnesota protest Ms. Russ Anderson participated in a May 2014 meeting with the Core Team where the agenda expressly related to "sales pressure petitions floating around."[1577] Ms. Russ Anderson testified that she was concerned about the sales pressure petitions being circulated in 2014 and she "wanted to be part of the conversation" with Core Team members about these petitions.[1578]

The record also includes an Investigation Debrief dated March 24, 2015, which contradicts the response Ms. Russ Anderson provided to the OCC during the May 14, 2015 meeting. Having read the question presented and Ms. Russ Anderson's answer, and having reviewed the relevant record here, I find the answer Ms. Russ Anderson provided during the May 14, 2015 meeting lacked candor and transparency, as it was clear from the May 2014 and April 2015 email exchanges and from Ms. Russ Anderson's own testimony regarding her discussions with Core Team members that she was indeed aware of bankers who were experiencing sales pressure.

Ms. Russ Anderson testified that when she learned about the Minnesota protest, this indicated to her, "there was still some pressure, but not excessive pressure."[1579] She testified she reached this conclusion based on talking to "people when I was in the regions, giving – at conferences and talking about risk management, talking about sales quality, talking about all

_____

[1574] OCC Ex. 3004 at 1.

[1575] Id.

[1576] Tr. (Russ Anderson) at 9988-89.

[1577] Id. at 9996; OCC Ex. 1549.

[1578] Tr. (Russ Anderson) at 9996; OCC Ex. 1549 at 1.

[1579] Tr. (Russ Anderson) at 9991.

Add. 974

Appellate Case: 25-1079     Page: 976     Date Filed: 05/16/2025 Entry ID: 5517644

those things."[1580] Ms. Russ Anderson acknowledged, however, that when asked to name a single individual whom she met who told her that there was no sales pressure Ms. Russ Anderson could not do so – not during her deposition in January 2021 nor during the hearing in January 2022.[1581]

When asked during cross-examination whether it was appropriate to tell the OCC that she had not heard about sales pressure when she had been specifically informed about a sales pressure protest in Minnesota, Ms. Russ Anderson deflected, stating: "This was a protest of people that I don't know if they were team members. I don't know who they were."[1582] She added that 50 people "did not offset what I had been out talking to people about", adding, "I don't know if they're just people who like to protest. I have no idea what made up that group of people" while acknowledging that she took no steps to find out.[1583] **Failing to take effective action to find out what these bankers were protesting constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

When presented with the question: "Is there escalation beyond ERMC meeting in April 2014 and Carrie presentation to ERMC in April 2015, any presentations to the Board?" the notes report that Ms. Russ Anderson responded,

> Conversations may be happening at A&E. She was asked to come to ERMC at that time in April 2014 with Jason MacDuff. They continue to think about and led to final meeting. Keb stated the meetings with ERMC were going to take place in January but wanted to get through the cyber review. They did have a good discussion with Mike and ongoing meeting with him. They had standard reporting to the A&E and meetings with Yvette. HR Committee is where turnover or investigations would be addressed.[1584]

When presented with the question, "Anything else pertinent?" the notes report that Ms. Russ Anderson responded, "Most important thing is we found something, we were proactive, we did something, and the preponderance were non-customer impact. Claudia's available to have a conversation on anything else. [Examiner] Chris [Moses] stated that we need to have the facts to back up that there was no customer impact."[1585] **Failing to establish whether in fact a preponderance of sales practices misconduct were "non-customer impact" constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

---

[1580] *Id.* at 9992.

[1581] *Id.* at 9989, 9992.

[1582] *Id.* at 9990.

[1583] *Id.*

[1584] OCC Ex. 1734 at 4.

[1585] OCC Ex. 1734 at 4.

Appellate Case: 25-1079    Page: 977    Date Filed: 05/16/2025 Entry ID: 5517644

**Customer harm**

During cross-examination Ms. Russ Anderson acknowledged that at no time between 2013 and 2016 did she do any analysis to determine whether customers were harmed as a result of sales practices misconduct.[1586] When asked whether a bank employee's misuse of customer information has an impact on the customer, Ms. Russ Anderson responded, "It can. I was not focused on that part."[1587] Similarly, when asked whether there is customer impact when a bank employee issues products and services without their consent, Ms. Russ Anderson responded, "It can. . . . I don't know if this is what I actually said, but in my head was customer harm and the terms of were they financially harmed. And this was May of 2015."[1588] **Failing to include within the scope of customer harm those harms that did not directly result in financial harm constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

It should be noted that the record includes three documents establishing that Ms. Russ Anderson's response to this question lacked transparency and candor, as there were matters pertinent to the examination that Ms. Russ Anderson knew about but did not share with the OCC.

The first was information contained in a March 24, 2015 Investigation Debrief that was addressed to Ms. Russ Anderson and others from Isabelle Mercado of Corporate Investigations.[1589] Through this Debrief Ms. Russ Anderson was informed about a series of *confirmed* incidents involving sales practices misconduct, under conditions that warranted making a report to the OCC's Examiners.[1590]

One substantiated allegation associated 99 examples where team member [ME] moved funds in and out of the accounts within one day, indicating "possible simulation of funding", "195 checking/savings/debit cards that were disqualified and banker did not receive sales credit due to short term usage or the existing client's accounts were closed and duplicate new accounts were opened", and credit card sales that "raised red flags due to lack of usage and/or mother's maiden name listed same as client's last name that would suggest team member opened credit products without customer consent."[1591]

During the investigation, Corporate Investigation conducted customer polling related to debit cards issued without consent, substantiating the allegations in three such interviews.[1592] In

---

[1586] Tr. (Russ Anderson) at 10007.

[1587] *Id.* at 10006.

[1588] *Id.*

[1589] *Id.* at 9999; R. Ex. 9028.

[1590] R. Ex. 9028 at 1-10.

[1591] R. Ex. 9028 at 2.

[1592] *Id.*

Add. 976

Appellate Case: 25-1079     Page: 978     Date Filed: 05/16/2025 Entry ID: 5517644

addition to customer polling, CI conducted polling for six team members, "which resulted in 16 customer contacts with 5 substantiated consent issues."[1593]

In the interview summary of one team member ([SM]), Sales Quality "conducted polling related to debit cards issued without consent" and reported three clients substantiated the allegation and established that one customer's account history "shows a pattern of simulated funding."[1594] The team member "denied any wrong doing and would not supply a voluntary written statement," but "admitted to sales pressure." The Debrief recommended termination after noting that additional research was completed after the interview and showed [SM] processing an ATM withdrawal in the amount of $200 using [customer SK's] ATM/Debit card."[1595]

When asked whether she had any reason to doubt Corporate Investigation's findings in this Debrief, Ms. Russ Anderson responded, "What they're stating is what the banker told them. I don't know that that was their findings. They're just reporting what the banker said."[1596] This last statement is patently false, given the evidence presented through the Debrief – which included in specific detail accounts opened and not used by the customer and a narrative from the customer stating she opened one account, not the three shown in the Debrief.

Second, apart from the Investigation Debrief, Ms. Russ Anderson also was aware of postings on social media implicating the culture of sales practices pressure at Community Banking threatened the Bank's reputation. In an email Rebecca Rawson sent on April 27, 2015, Ms. Rawson provided Ms. Russ Anderson with a copy of an email chain initiated by Jessica Kaczor, Wells Fargo Area President, VP – SNJ-Jersey Shore Market dated April 26, 2015.[1597]

Ms. Kaczor initiated the chain by providing Estelle Matthews with an attachment showing a Facebook screenshot; and Ms. Matthews in turn forwarded the attachment to Denise Dennis, Wells Fargo Employee Relations Senior Consultant.[1598] Ms. Dennis forwarded the attachment to Glen Najvar, Quality Assurance Manager for Sales and Service Conduct Oversight, among others.[1599] Mr. Najvar asked Adam Curry of Sales and Service Conduct Oversight to "kindly post this image into the pending SSCOT case [2. . .]" and provided a copy of the attachment to Ms. Rawson, who forwarded the attachment to Ms. Russ Anderson.[1600]

---

[1593] Id.

[1594] Id.

[1595] Id. at 4.

[1596] Tr. (Russ Anderson) at 10000.

[1597] Id. at 10002; OCC Ex. 865.

[1598] OCC Ex. 865 at 2.

[1599] OCC Ex. 865 at 1.

[1600] Id.

Add. 977

Appellate Case: 25-1079     Page: 979     Date Filed: 05/16/2025 Entry ID: 5517644

The screenshot of the Facebook page presented a post from Eric Humphrey, a "former store manager (Neptune Store – NJ)".[1601] In her email message to Ms. Dennis, Ms. Matthews wrote, "Please read the attachment. Eric is busy again."[1602]

Mr. Humphrey's post from April 27, 2015 read, in pertinent part:

FUN TIP! . . .

Entering a Wells Fargo building on the first few days of the month is an invitation to possibly be harassed and tricked into sales. See what the leadership (Jessica Kaczor) has her area do is set sales appointments that are equal to 150-200% of a daily goal or she will encourage shortening the business days in the month (so for example a month with 20 business days would be treated as one with just 16) which is how they get around 150 and 200% anymore because HR already told them that was a violation.

This is most prominent in the first 3 days of every month and especially the first week in a quarter. If employees fail to report out enough appointments to hit 150-200% of their sales quotas five days in advance, the team then has their work/life balance held hostage until they meet that quota with the expectation being that if you book over your quota, you should hit your quota.

This tactic is reasonable with reasonable sales goals. But when every team member has to come in with 4 checking accounts every day (3 team members equal 12 accounts and I promise you 12 people are not walking in the door wanting to open accounts nor are 12 willing to set an appointment to do so every day).

So what happens? "Sir/Madame, you are getting a fee in your account or you are missing this service. We need to switch your account number to make sure you have everything you need." – this is the game folks. Hate me for calling it out all you want but that's reality, harsh and in your face.[1603]

[PJS] posted a response shortly after the original post, writing, "or ash will just open accounts for you and say he'll close them after 30 days", to which Mr. Humphrey responded, "That's another! They will tell you we just need to keep the account open for 30 days to make sure nothing else is going in[,] which isn't true. It's because they only receive sales credit for the account on its 30th day of being open".[1604]

---

[1601] *Id.*

[1602] *Id.* at 2.

[1603] OCC Ex. 866 at 1.

[1604] OCC Ex. 866 at 1.

Presented with this screenshot during cross-examination, when asked if she remembered this April 27, 2015 post from a team member about unreasonable sales goals, Ms. Russ Anderson responded, "I don't know if this person was a team member. It was sent by a team member up through . . . the chain."[1605] This answer is patently false – as the attachment was sent through a chain that expressly identified the person posting the message was a former Store Manager from the Neptune Store in New Jersey.[1606]

Given the strident tone used by Mr. Humphrey, and given the public nature of the forum he chose to write in (and apparently not for the first time), the message represented a clear and present threat to Wells Fargo's reputation in the community, and was indicative of a culture that presented reputational risk to the Bank. Ms. Russ Anderson's failure to bring the Facebook posting to the OCC's attention during the May 14, 2015 meeting with the OCC after being asked whether there was any other pertinent information regarding sales practices pressure – constituted a material lack of transparency and candor, and is probative evidence establishing that Ms. Russ Anderson obstructed the OCC's examination into sales practices pressure at the Community Bank. **Failing to effectively address the issues raised in this exchange constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Third, apart from concerns that she should have brought to the OCC's attention the results presented in the Investigation Debrief and the Facebook posting, Ms. Russ Anderson also withheld information indicating a material issue regarding how team members were abusing customer email addresses when opening accounts without customer consent.

In March 2015, Ms. Russ Anderson and the Core Team had examined "a significant issue . . . relating to bankers changing email addresses of customers, seemingly for the purpose of acknowledging online banking in order to get sales credit."[1607]

Rebecca Rawson explained the nature of this kind of team member misconduct as it related to sales practices misconduct:

> What we think is occurring is that the team member is changing the email address in the customer's profile to an email address that belongs to the team member. The team member is then having the customer enroll into online banking (or the team member is enrolling on behalf of the customer) than the team member is obtaining the email validation code that is sent to the email address that is listed in the customer profile and either providing the code to the customer to activate the online enrollment or going in on behalf of the customer and entering the validation code.[1608]

---

[1605] Tr. (Russ Anderson) at 10002.

[1606] OCC Ex. 865 at 1.

[1607] R. Ex. 8343 at 6.

[1608] R. Ex. 8343 at 3.

Ms. Russ Anderson responded to Ms. Rawson's explanation, stating, "I just spoke with Carrie and she is aware of our next steps and is supportive."[1609] The Core Team's response was to "begin review of this behavior with all team members with 15 or more occurrences . . . within the last 90 days".[1610]

Ms. Russ Anderson testified that this type of misconduct was a significant concern for her in March 2015, agreeing during cross-examination that when bankers change customer email addresses in the Bank's systems this constituted misuse of customer personal information.[1611] She denied, however, that the fact that team members who had engaged in this misconduct were not limited to any specific region meant that the sales practice misconduct was systemic.[1612] The record reflects that notwithstanding that she knew the practice raised serious consent issues, Ms. Russ Anderson did not disclose the practice during the May 14, 2015 meeting with the OCC.[1613] **The failure to promptly report to the OCC a known sales practices misconduct issue, whether or not the practices were systemic, constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

**Materials Provided to the WF&C Risk Committee - May 19, 2015**

Ms. Russ Anderson testified that there was a meeting of the Board's Risk Committee held on May 19, 2015, and identified an email dated May 16, 2015 she sent to Jason MacDuff and members of WF&C's Legal Department.[1614] Through an attachment to the email message, Mr. MacDuff provided Ms. Russ Anderson with what Mr. MacDuff wrote was the latest draft of a memo that was to be presented to the Board Risk Committee for the May 19th meeting.[1615]

Ms. Russ Anderson testified that "the L.A. lawsuit had just been filed," and she understood that "the Risk Committee of the Board was interested in understanding about the issues in L.A. and the reasons for the lawsuit."[1616] She said "Legal primarily was in charge of the memo, [and] Carrie Tolstedt, Jason MacDuff, others" including herself and "HR people probably".[1617]

Ms. Russ Anderson testified that she had been asked to read the draft memo and "to provide any edits as need be or comments on the content. Pretty standard."[1618] She added, "I'm a

---

[1609] Id. at 1.

[1610] Id. at 7.

[1611] Tr. (Russ Anderson) at 10010.

[1612] Id. at 10011.

[1613] See, OCC Ex. 1734.

[1614] Tr. (Russ Anderson) at 9450; OCC Ex. 171.

[1615] OCC Ex. 171 at 1.

[1616] Tr. (Russ Anderson) at 9448.

[1617] Tr. (Russ Anderson) at 9449-50.

[1618] Id. at 9453.

Add. 980

Appellate Case: 25-1079    Page: 982    Date Filed: 05/16/2025 Entry ID: 5517644

pretty good editor, so people look to me to help with edits."[1619] She recalled that her edits were "innocuous, at best. There was nothing substantial."[1620] Preponderant evidence in the record establishes this answer lacked candor, was incomplete, and was misleading.

Ms. Russ Anderson identified two email chains that preceded the Risk Committee meeting by three days, between herself and Jason MacDuff and others, through which Mr. MacDuff provided the latest draft of their memo to the Board Risk Committee along with Ms. Russ Anderson's "edits/comments".[1621] She identified a draft of the memo providing "Team Member Metrics" indicating that for Sales Integrity Violations – Team Member Terminations/Resignations, the "Involuntary team member turnover related to 'sales integrity' violations divided by total headcount in Retail Banking in any given year" showed a "trend" of "~1% of total Retail Banking workforce in 2013 and 2014", with a "target" of "1 to 2% of total workforce in any given year."[1622]

From this draft, Ms. Russ Anderson testified through cross-examination that even though some of the conduct that fell under the umbrella of sales integrity violations – and thus constituted illegal activity – Ms. Russ Anderson agreed with the trend; but that she did not know how the 1 percent figure was removed from the final draft of the May 19, 2015 memo.[1623]

Through a series of documents identified by Ms. Russ Anderson, the record reflects that during the drafting process, Ms. Russ Anderson raised questions about "the areas that are deemed 'sales integrity' violations."[1624] At this point, however, Ms. Sperle, head of Corporate Investigations, had provided Ms. Russ Anderson with a spreadsheet explicitly identifying the categories of misconduct identified within the umbrella of sales integrity violations.[1625]

Mr. MacDuff had written that Ms. Sperle "is probably the best person to comment on the underlying data as it comes from her team."[1626] Ms. Sperle wrote the "metrics represents all allegations of sales integrity violations investigated by Corporate Investigations in those time periods, and the term[inations]/resignations that resulted either due to confirmed fraud or a confirmed policy violation."[1627]

Notwithstanding her receipt of this data from a source shown to be reliable, when asked whether Ms. Russ Anderson had reason to question the accuracy of the terminations data for

---

[1619] *Id.*

[1620] *Id.*

[1621] OCC Exs. 171, 172.

[1622] OCC Ex. 172 at 6.

[1623] Tr. (Russ Anderson) at 9922-23.

[1624] OCC Ex. 825 at 1.

[1625] OCC Ex. 1232.

[1626] OCC Ex. 825 at 1.

[1627] OCC Ex. 825 at 1.

Appellate Case: 25-1079      Page: 983      Date Filed: 05/16/2025 Entry ID: 5517644

what Corporate Investigations identified as sales integrity violations, after acknowledging that CI had the right to categorize whatever conduct they believed was appropriate to be under the umbrella of sales integrity violations, Ms. Russ Anderson responded, "I always had a disagreement on one of those categories."[1628]

After testifying that she believed the Risk Committee had the right to know how many employees had been terminated due to confirmed fraud or a confirmed policy violation stemming from confirmed fraud, confirmed policy violations, or sales integrity violations, Ms. Russ Anderson was the only distributee on the email chain who voiced concerns about categorizing certain conduct as sales integrity violations.[1629]

Ms. Russ Anderson acknowledged that three days before the Risk Committee meeting, Ms. Russ Anderson was specifically informed by Corporate Investigations and by Jason MacDuff that 1,064 team members "were terminated for lack of customer consent across the footprint", along with another 128 people were terminated for simulated funding (or "funding manipulation").[1630] Ms. Russ Anderson testified that she had no reason to doubt the figures in the Excel spreadsheet prepared by Ms. Sperle, showing that the largest category for team member terminations was for lack of customer consent.[1631]

When presented with the native Excel spreadsheet showing the categorizations of CI cases, broken down to reflect defined categories (such as Funding Manipulations" and "Reassignment of Sales Credit"), Ms. Russ Anderson testified that while she received the spreadsheet in real time, "I can't tell you that I went to that tab. I generally stayed on the first tab."[1632] **Failing to familiarize herself with the results of the CI cases breakdown constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

When asked to acknowledge that the spreadsheet identified by year specific types of misconduct involving the lack of customer consent, and showing that sales integrity violations were not limited to any one region, Ms. Russ Anderson responded, "Again, I didn't go this deep into the data" despite having earlier testified that she reviewed the spreadsheet very carefully.[1633]

Similarly, having previously testified that she was concerned with the limits of Ethics Line allegations because they were unconfirmed, Ms. Russ Anderson acknowledged that the spreadsheet showed confirmed cases – that most of confirmed cases of sales integrity violations

---

[1628] Tr. (Russ Anderson) at 9926; 9943; See OCC Ex. 1300 regarding the category through which CIP violations were categorized as sales integrity violations.

[1629] OCC Exs. 825, 1231, 1232.

[1630] Tr. (Russ Anderson) at 9945-46.

[1631] *Id.* at 9945; OCC Ex. 1231.

[1632] Tr. (Russ Anderson) at 9932.

[1633] Tr. (Russ Anderson) at 9931, 9934.

Add. 982

Appellate Case: 25-1079      Page: 984      Date Filed: 05/16/2025 Entry ID: 5517644

related to the lack of consent – but testified, "I can't recall if I – if that was – if I knew that or didn't know it. If it was on this sheet and I read it, then I knew it."[1634]

Ms. Russ Anderson specifically could not recall if, when she reviewed the spreadsheet, she paid attention to the fact that from 2013 until the first quarter of 2015, there were a total of 1,064 employee terminations just for lack of customer consent – where these did not even include terminations for simulated funding.[1635]

Notwithstanding the data presented in this spreadsheet, when asked whether she believed the Risk Committee had the right to learn from her, as the Community Bank's Group Risk Officer, that 1,064 team members were terminated for lack of customer consent, Ms. Russ Anderson opined, "I did not" on the basis that the May 19, 2015 memo to the Risk Committee, "was talking about what occurred in the proactive monitoring work, and that was the data that was being used, I think, in the other memo, not this memo, but whatever the other memo was that we have with the charts and that in it." [sic][1636] **Acting in furtherance of this opinion constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Given the ambiguity and opacity of this response, Enforcement Counsel sought a more clear and direct answer, with the question: "Ms. Russ Anderson, let's call a spade a spade. As a senior risk professional in the Bank's largest line of business, you didn't believe that it was prudent to inform the Risk Committee of the Board that there were over a thousand terminations from 2013 to the first quarter of 2015 just for lack of customer consent?" to which Ms. Russ Anderson responded: "This [May 19, 2015] memo – that was not the intent of this memo. So, no, I did not think it would be prudent to put it in there."[1637] **Failing to inform the Risk Committee of the number of terminations based on lack of customer consent constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

She added that OCC examiners had a right to that information but conditioned her answer thus: "if it was part of our conversations."[1638] **Failing to inform the OCC of the number of terminations based on lack of customer consent – regardless of whether it was "part of our conversations" – constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

---

[1634] *Id.* at 9935.

[1635] *Id.* at 9936.

[1636] *Id.* at 9937, 9946.

[1637] *Id.* at 9947.

[1638] Tr. (Russ Anderson) at 9938; see "22-03-07 Respondents' Amended Revised Errata Day 9-38" on page 78. Ordered by Second Supplemental Order.

Add. 983

Appellate Case: 25-1079     Page: 985     Date Filed: 05/16/2025 Entry ID: 5517644

The record as noted above reflects that Ms. Russ Anderson was actively involved in preparing and editing the report that the Legal Department (through Mr. Strother) provided to members of the Board Risk Committee.[1639] She testified she "saw the entire package once before it went to the Board" and also reviewed the May 19, 2015 memo that went to the OCC.[1640]

Ms. Russ Anderson testified that she viewed her role in providing her opinion in her review of these memos as being important, that she had a duty as Group Risk Officer to act in the best interest of the Bank, and had a duty to ensure that the substantive content of the memo was accurate.[1641] She said she understood the reason for the May 19, 2015 meeting of the Risk Committee of the Board was the lawsuit filed by the Los Angeles City Attorney in connection with sales practices.[1642]

Ms. Russ Anderson testified that even though she knew the QSRC metrics could be manipulated, she did not think it would be prudent to inform the Risk Committee of this fact – including that the branches could fail two out of the four QSRC metrics and would still end up with an overall acceptable rating.[1643] **Failing to inform the Bank's Risk Committee of known weaknesses in the QSRC metrics constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Ms. Russ Anderson testified that even though she knew in 2013 that there were around 4,261 EthicsLine allegations of sales integrity and 3,809 allegations in 2014, these figures did not alarm her because she "looked at the EthicsLine as a place where employees could feel the most comfortable of making comments, complaints, recommendations. They could do it in an anonymous way or they could do it in a way that we could check back with them when the activity was going on."[1644] She said the complaint numbers did not alarm her because although

---

[1639] Tr. (Russ Anderson) at 9853-54; OCC Ex. 973 (5/15/15 email chain among Jason MacDuff and Carrie Tolstedt, et al): "Deanna had Pat, John, Lisa and Claudia review the LA/OC investigation write up." *Id.* at 1; 9857; OCC Ex. 170 (Sales Conduct Oversight & Corporate Security Investigation draft reflecting Ms. Russ Anderson's comment that she thought it was an "overstatement" where the draft stated: "The SSCOT is comprised of dedicated risk management professionals who understand Regional Banking programs and systems and who work to ensure understand our commitment to our customers is reflected in our products and services, how we deliver our products and services, and Regional Banking programs and systems." *Id.* at 1; 9857; OCC Ex. 169 (5/16/15 10:11 a.m. email chain among Ms. Russ Anderson and Deanna Lindquist (Legal), Jason MacDuff and others (Ms. Russ Anderson provided "Edits to the first document.") *Id.* at 1; 9859; OCC Ex. 171 (5/16/15 10:39 a.m. email chain among Ms. Russ Anderson, Deanna Lindquist *et al.* from Ms. Russ Anderson, "My edits/comments." *Id.* at 1; 9859; OCC Ex. 172 (Draft Memo to the Risk Committee WFC Board of Directors re: Retail Banking product and service delivery conduct risk management dated May 19, 2015); 9862; OCC Ex. 173 (5/16/15 6:39 p.m. email chain among Ms. Russ Anderson, Deanna Lindquist, et al. (Ms. Russ Anderson provided "Thoughts/edits. Not much new from me.") *Id.* at 1; 9863-64; OCC Ex. 174 (Memo DRAFT); 9879; OCC Ex. 745.

[1640] Tr. (Russ Anderson) at 9851.

[1641] *Id.* at 9852-53.

[1642] *Id.* at 9853.

[1643] *Id.* at 9864.

[1644] *Id.* at 9865-66.

Add. 984

Appellate Case: 25-1079    Page: 986    Date Filed: 05/16/2025 Entry ID: 5517644

sales practices misconduct in one such behavior, "sales integrity violations encompasses a lot of different behaviors."[1645] **Failing to effectively respond to EthicsLine allegations pertaining to sales integrity violations constituted, under the conditions present during the relevant period, unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Ms. Russ Anderson testified that she understood she had a duty as Group Risk Officer to correct anything in the May 19, 2015 memo that was "false or incorrect", or misleading, or not transparent about the scope of sales practices misconduct or the adequacy of controls to prevent or detect sales practices misconduct in the Community Bank.[1646]

Ms. Russ Anderson admitted that she was the only Community Bank GRO who worked on the May 19, 2015 memo, but denied having a duty as the GRO to ensure that the May 19, 2015 memo was transparent about where in the Bank's retail branch network sales practices misconduct occurred, because, "it wasn't part of the memo."[1647] She also denied having a duty to ensure the memo was transparent about the volume of terminations for sales integrity violations, or about whether the sales goals in the Community Bank were unreasonable, or about whether the culture in the branches was consistent with the Bank's Vision and Values.[1648] **Failing to provide transparent reporting regarding network sales practices or sales integrity misconduct or the imposition of unreasonable sales goals in the Community Bank constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Ms. Russ Anderson admitted that while working on the May 19, 2015 memo, she was knowledgeable in SSCOT operations, what methodology and thresholds SSCOT used in its proactive monitoring, and knew what the controls were to prevent and detect sales practices misconduct.[1649] She also admitted knowing what criteria was used (including SSCOT's Behavioral Trend Analysis) to detect simulated funding and phone number changes in the LA/OC area that resulted in the LA Times articles.[1650] She admitted knowing which misconduct SSCOT proactively monitored and which misconduct it did not monitor.[1651]

Ms. Russ Anderson testified that she knew that by May 2015, the Board's Risk Committee members were interested in the controls to prevent and detect sales practices

---

[1645] *Id.* at 9866.

[1646] *Id.* at 9867-69.

[1647] *Id.* at 9869, 9872.

[1648] *Id.* at 9870-71.

[1649] *Id.* at 9872-73.

[1650] *Id.* at 9874.

[1651] *Id.* at 9875.

Appellate Case: 25-1079     Page: 987     Date Filed: 05/16/2025 Entry ID: 5517644

misconduct, the scope of sales practices misconduct (as it related to the LA/OC area) and in understanding why employees engaged in sales practices misconduct.[1652]

Directly addressing this point, there was in the final version of the memo, the version provided to the Committee members, a headlined section titled: "Was a root cause analysis performed and, if so, what were the lessons learned?"[1653]

The text for this section reported as follows:

> The root cause was determined to be intentional team member misconduct based on the fact that only a small percentage of Retail Banking team members engaged in the outlier behavior at issue in the investigation, and when interviewed, many of them acknowledged that they received proper training and understood the conduct violated bank policies. We also determined that our controls were effective in detecting this behavior. The simulated funding activity was detected by footprint-wide data analysis and reporting that information to the line of business, followed by investigation into team member misconduct. The phone number change issue was surfaced by line management, which resulted in footprint-wide data analysis, followed by investigation into team member misconduct.[1654]

Ms. Russ Anderson acknowledged that this was the "one-liner" she referred to earlier in her testimony.[1655] She denied originating the language here, averring it was her belief that Legal did so.[1656] She testified that she believed intentional team member misconduct was "one of the root causes".[1657] **Under the conditions that existed when she reviewed the final version of this memo, approving language that reported the root cause of sales practices misconduct was intentional team member misconduct while withholding information about the role of unreasonable sales goals constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Asked by her counsel during direct examination whether she understood her role to include ensuring the root cause of sales practices misconduct was understood and resolved, Ms. Russ Anderson answered, "No." She added that she was "one of a group of people who would have needed to have worked on that."[1658] She said she would "have to work with Finance and with the HR people and actually even with Corporate, who would be setting goals for the

---

[1652] *Id.* at 9877-79.

[1653] *Id.* at 9882; OCC Ex. 1299 at 3.

[1654] OCC 1299R at 3.

[1655] Tr. (Russ Anderson) at 9456.

[1656] *Id.* at 9456-57.

[1657] *Id.* at 9457.

[1658] *Id.* at 9468-69.

Add. 986

Appellate Case: 25-1079    Page: 988    Date Filed: 05/16/2025 Entry ID: 5517644

Community Bank."[1659] **Failing to take effective steps to ensure the root cause of sales practices misconduct was understood and resolved constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Asked during cross-examination how long it took her to determine the root cause was intentional team member misconduct, Ms. Russ Anderson responded, "I don't recall."[1660] Asked whether it took her a year and a half to make this determination, Ms. Russ Anderson responded, "I don't recall."[1661] Asked in view of all of the enhancements and the evolving model work that was being done, and all of the training and evaluations she and her team were doing, whether the only conclusion about the root cause she reached after a year and a half was intentional team member misconduct, Ms. Russ Anderson responded, "I don't recall."[1662] When asked whether she believed that it was appropriate for her not to inform the Committee about the role of sales pressure in the sales practices misconduct problem or team members' fear of termination if they did not meet sales goals, Ms. Russ Anderson responded, "I don't recall."[1663] Given the scope of her testimony on direct examination, Ms. Russ Anderson's inability to answer these questions calls into question her ability to serve as a reliable historian of facts material to how and when she arrived at her conclusions regarding the root cause of team member sales practices misconduct.

Notwithstanding the MRA, the uncontroverted facts established following Examiner Hudson's written inquiries presented in March 2015, when asked whether she believed it was appropriate not to inform the Risk Committee in May 2015 of the Board about deficiencies in the Community Bank's business model, Ms. Russ Anderson responded, "I did not believe there were any deficiencies, so no."[1664] **Failing to recognize deficiencies in the Community Bank's business model related to risk management controls over sales practices misconduct constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Ms. Russ Anderson testified that she understood the memo's report declaring that the root cause was "determined to be intentional team member misconduct" was based on that only a small percentage of retail banking members engaged in the outlier behavior at issue in the investigation, and that in this context the finding of "outlier behavior" referred to employees who fell within SSCOT's thresholds.[1665] Ms. Russ Anderson acknowledged, however, that the memo

---

[1659] *Id.* at 9469.

[1660] *Id.* at 9887.

[1661] *Id.*

[1662] *Id.*

[1663] *Id.* at 9888-89.

[1664] *Id.* at 9887.

[1665] *Id.* at 9889.

Appellate Case: 25-1079     Page: 989     Date Filed: 05/16/2025 Entry ID: 5517644

to the Risk Committee did not define the methodology SSCOT used to identify outlier behavior.[1666]

Ms. Russ Anderson acknowledged that between 2013 and 2016 she was responsible for controls with respect to sales practices misconduct, and testified that she agreed with the statement in the memo that "We also determined that our controls were effective in detecting this behavior."[1667] Ms. Russ Anderson testified that she felt she had no obligation to tell members of the Committee what the controls were for detecting sales practices misconduct, stating, "I didn't think that it was responsive to what the Risk Committee was looking for."[1668] **Failing to fully inform the Risk Committee of the controls used by the Community Bank to detect sales practices misconduct – including the limitations of those controls – constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Ms. Russ Anderson identified an October 28-29, 2013 email chain among Leif Nygaard, Rebecca Rawson, herself and others pertaining to "potential simulated funding and potential falsification of customer phone numbers.[1669] In a message sent on Ms. Russ Anderson's behalf, Angie Meacham wrote:

> Recently Sales Quality conducted "Behavioral Trend Analyses" regarding the potential simulated funding of checking and savings accounts as well as potential falsification of customer phone numbers (possibly to circumvent 11 Ways to Wow Customer Surveys) across the Regional Bank. Sales Quality collaborated with various partners in regards to data findings (HR/ER, Corporate Investigations, and Legal). All parties agreed that Sales Quality cases should be opened on those team members that were considered "outliers" and referred to Corporate Investigations for further review. Sales Quality will continue to monitor these trends.[1670]

An "outlier" for potential simulated funding were identified where the team member had "50 or more instances" of where "Account X was opened; Account X was funded by virtue of an auto transfer from Account Y; and within one day funds were auto transferred from Account X back to Account Y leaving Account X with a $0 or possibly a negative balance; and Account X had no further funding activity within the 60 day RFR measurement period."[1671]

---

[1666] *Id.* at 9890.

[1667] *Id.*

[1668] *Id.* at 9891.

[1669] *Id.* at 9893; OCC Ex. 280.

[1670] OCC Ex. 280 at 1.

[1671] OCC Ex. 280 at 2.

Add. 988

Appellate Case: 25-1079     Page: 990     Date Filed: 05/16/2025 Entry ID: 5517644

In response the following day, Mr. Nygaard wrote, "Just curious regarding the 50+ for phone numbers changed 1-3 digits. 50 certainly is a lot, do we envision lowering that number in the future (whether that may be over a 3-month period, or a smaller X per month)?[1672]

On October 29, 2013, copying Ms. Russ Anderson, Ms. Rawson wrote in response that this "is the first slice of data. Sales Quality will be running this report monthly and will most likely be reviewing thresholds to go below the 50+.[1673]

During cross-examination Ms. Russ Anderson agreed with Mr. Nygaard's observation regarding the "50+" threshold, describing this as, "a sizable number, yes."[1674] Nevertheless, when Ms. Russ Anderson was asked whether she believed the Risk Committee had a right to know that to be considered an outlier for simulated funding, an employee had to have 50 or more instances of activity indicative of simulated funding over a five-month period, and responded, "from back in 2013, no I did not."[1675] **Under the conditions that existed in the Community Bank in 2013, failing to inform the Risk Committee of her reliance on a 50-or-more-instances threshold constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

The May 19, 2015 memo to the Board's Risk Committee reported further that in order to "foster teamwork in our bank branches" Community Banking stopped reporting individual team member performance as measured by the Gallup customer satisfaction surveys – measuring results "at a branch level, but no longer report[ing] individual team member performance."[1676]

The memo reported further, "we confirmed that issues raised by the three customers identified by LA Times had been resolved in the normal course."[1677] This is a materially misleading statement – the issues raised by the customers included Community Banking team members opening accounts without customer consent.[1678] The memo reported the only resolution was to determine that the fees complained about by the three customers had been reversed.[1679] The issues raised by these customer complaints directly concerned sales practices misconduct, and those issues were not addressed "in the normal course".[1680]

In the section titled "What are the protocols in Retail Banking for ongoing monitoring of sales practices, including measurements?" the memo states "[t]he SSCOT continues to monitor

---

[1672] *Id.* at 1.

[1673] *Id.*

[1674] Tr. (Russ Anderson) at 9895.

[1675] *Id.* at 9893-94.

[1676] OCC Ex.1299R at 4..

[1677] *Id.* at 5.

[1678] *Id.*

[1679] *Id.*

[1680] OCC Ex.1299R at 5.

Add. 989

simulated funding and phone number change activity and escalates outlier team member activity through the Sales & Service Conduct Oversight Allegation Process for further research, investigation, and corrective action when appropriate."[1681]

In addition, the memo states,

> More broadly, the SSCOT continues to examine data and trends and ensure actions are taken as appropriate. This includes responding to sales and service conduct issues referred to the SSCOT by, for example, the Ethics Line or product teams. This includes distribution of Quality of Sale Report Cards (QSRC), which measures various quality metrics for Retail Banking and is intended to provide management with trends surrounding key quality of sales indicators. SSCOT also conducts robust Proactive Monitoring to reduce inappropriate sales behaviors through early detection. The SSCOT remains committed to continuing to refine its processes to better detect team member activity indicative of improper conduct.[1682]

What this response does not do is fully disclose the material measurement protocols. When asked during cross-examination whether she understood in real time that the Risk Committee of the Board specifically asked about measurements, Ms. Russ Anderson responded, "I don't know that I knew that."[1683] Ms. Russ Anderson acknowledged that at this time, she knew that SSCOT had identified three team members, described them as outliers for simulated funding, and did so by applying the 99.99 percent threshold.[1684] Ms. Russ Anderson acknowledged that only using these measurement protocols did there appear to be a dramatic reduction in inappropriate practices.[1685] **Failing to fully inform the Risk Committee of the material measurement protocols SSCOT used constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Notwithstanding the application of these thresholds and in the face of her knowledge of the broader scope and volume of sales practices misconduct, Ms. Russ Anderson testified that she believed then and believes today the report was transparent – that "for simulated funding through the proactive monitoring work, I believe we gave the Committee what was truthful," and when asked whether she believed it was honest to tell the Risk Committee of the Board in the May 19, 2015 memo that there was a dramatic reduction in inappropriate practices because only three people were identified as outliers for simulated funding, Ms. Russ Anderson responded, "Yes, I do."[1686]

---

[1681] *Id.* at 5-6.

[1682] *Id.* at 6.

[1683] Tr. (Russ Anderson) at 9897.

[1684] *Id.* at 9898.

[1685] *Id.* at 9898-99.

[1686] *Id.* at 9899.

Add. 990

Appellate Case: 25-1079     Page: 992     Date Filed: 05/16/2025 Entry ID: 5517644

Ms. Russ Anderson acknowledged that the memo does not disclose that the immediate action that was taken after the L.A. Times articles were published was the pause in proactive monitoring.[1687] When asked whether she put the word "robust" in this text, Ms. Russ Anderson responded that she did not, but neither did she ask to take it out, averring that she thought the word was accurate and stating she believed the 99.99 percent threshold, and later the 99.95 percent threshold, both constituted robust proactive monitoring.[1688] **Failing to provide credible challenge to the memo's failure to report the pause in proactive monitoring and its characterization of the reporting threshold as "robust" constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

During cross-examination, Ms. Russ Anderson admitted she did not inform the Risk Committee through this memo that she was uncomfortable with the pause, averring, "the information was no longer timely."[1689] During cross-examination, Ms. Russ Anderson denied that proactive monitoring and polling were ever used together, rejecting the premise and testifying, "if it was happening, I was completely unaware and I would not have agreed to it" because "it would have been contrary to the whole point of doing the proactive monitoring."[1690]

When asked whether what SSCOT was doing stopped employees from issuing products and services to customers without consent, Ms. Russ Anderson responded: "I actually think the work we did, did stop team members from doing it by knowing that if they did, other team members -- they are watching other team members or heard of other team members being terminated. So, yes, I do think it prevented it from happening."[1691] In a follow-up question, Ms. Russ Anderson was asked, "By watching the three people that were referred to corporate investigations, it would have stopped other people from engaging in simulated funding?" Ms. Russ Anderson responded, "my answer is yes" even though she knew proactive monitoring would not physically stop an employee from engaging in sales practices misconduct like opening an unauthorized checking account for a customer.[1692] Given the record as a whole, no weight can be given to Ms. Russ Anderson's assertion that what SSCOT was doing actually stopped employees from engaging in sales practices misconduct. Further, her answer eroded her reliability as a witness with respect to the role SSCOT played in preventing sales practices misconduct by the Community Bank's team members.

When asked during cross-examination whether she believed this report significantly understated the scope of sales practice misconduct in the Community Bank, Ms. Russ Anderson responded, "I didn't think about it that way, so I – it wasn't . . . the intent of the paragraph. So if

---

[1687] *Id.* at 9885.

[1688] *Id.* at 9462-63, 9917-18.

[1689] *Id.* at 9886.

[1690] *Id.* at 9919-20.

[1691] *Id.* at 9915.

[1692] *Id.* at 9915-16.

it did, it was unintentional."[1693] When asked, however, whether she believed the report provided the Risk Committee with complete information about the scope of simulated funding, Ms. Russ Anderson responded, "No." and added that "that wasn't the intent. We were talking about proactive monitoring of simulated funding."[1694] She then denied that the paragraph significantly understated the scope of sales practices misconduct in the Community Bank, and testified she believed there was in fact a dramatic reduction in inappropriate sales practices between 2013 and the time this memo was presented to the Risk Committee.[1695] **Failing to provide the Risk Committee with complete and material information about the scope of simulated funding constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Elaborating, Ms. Russ Anderson testified: "You've misstated the document. The document was referring to the proactive monitoring. If the document had been talking about all potential simulated funding, then it would have understated it, yes. But that was not the point of the document."[1696] Given the record as a whole, no weight can be given to this averment, and the averment erodes Ms. Russ Anderson's reliability as a witness regarding the import of the document as it related to potential simulated funding.

During cross-examination, Ms. Russ Anderson identified an email exchange on which she was a distributee, between Jim Richards – then head of Corporate Financial Crimes Risk Management – and Carrie Tolstedt, as head of Community Banking.[1697] Mr. Richards stated in the initial message that the focus of an upcoming A&E Committee meeting was on "BSA/AML and Community Banking," but Mr. Richards wrote, "Community Banking should not come up during my A&E presentation."[1698] In his email, Mr. Richards was defending a position regarding Audit's opinion that the BSA/AML program be downgraded from Satisfactory to Needs Improvement.[1699]

In explaining what he believed Community Banking should not come up, Mr. Richards wrote:

> The only place I could see Community Banking coming up is the third paragraph on page 6 of my materials were I write that "we are terminating more than fourteen Team Members each working day." I don't believe the Board has ever seen that statistic. I write that I just took over Corporate

---

[1693] *Id.* at 9901-02.

[1694] *Id.* at 9900-01.

[1695] *Id.* at 9903-06.

[1696] *Id.* at 9902.

[1697] *Id.* at 9906; OCC Ex. 1264.

[1698] OCC Ex. 1264 at 3.

[1699] *Id.*

Add. 992

Appellate Case: 25-1079      Page: 994      Date Filed: 05/16/2025 Entry ID: 5517644

Security/Corporate investigations and need to dig into this more and understand root causes.[1700]

Although Ms. Russ Anderson was part of this exchange only through a CC, she responded to Mr. Richards, asking "do we know what makes up that statistic in terms of 'reason' for termination?" and Mr. Richards responded later that day: "No we don't know what makes up that statistic, other than 'almost all' are Community Banking (when told that, I knew there wasn't a lot of precision in the data)."[1701]

Ms. Tolstedt then responded to both Mr. Richards and Ms. Russ Anderson, still later that day, providing this background in response to Mr. Richards' query:

> The last time I looked into this the term[inations]/resignations fell into three broad categories. It's been over a year since I studied this so it is not current info and from my best memory and could have some inaccuracy. I can get specifics and facts that we can share but not on a Saturday. Many of the term[inations] are around operations issues (teller cash differences, forced balances). Recall, we have around 75,000 team members in our store, either teller or line platform. The number of transactions we do in the teller line are around 635 million per year. I am not sure how much cash that is transaction per year but it is knowable.
>
> 1. Sales (I think this was around 1,000 to 1,200 in 2013) with the changes we made in teller referrals this should go down – also, the number of allegations coming from the ethics line has gone down year over year.
> 2. Falsifications – mostly forced balancing.
> 3. Teller cash differences – I think this is the largest category of the three.[1702]

The following day Ms. Russ Anderson responded to Ms. Tolstedt and Mr. Richards, writing: "Carrie, your recollection is correct and nothing really has changed. This is the same data Corporate Investigations has been reporting for quite some time. Now that CI reports into Jim and his team we'll work with them to better frame the data."[1703]

During cross-examination, Ms. Russ Anderson acknowledged that she understood Ms. Tolstedt's data to reflect that the statement "I think this was around 1,000 to 1200 in 2013" referred to sales integrity violations.[1704] Ms. Russ Anderson acknowledged that she knew by 2013 that approximately 1,000 employees were terminated every year for sales integrity

---

[1700] OCC Ex. 1264 at 3.

[1701] *Id.* at 2.

[1702] *Id.* at 1.

[1703] *Id.*

[1704] *Id.* at 9909.

Add. 993

violations.[1705] Ms. Russ Anderson also acknowledged that her statement that "your recollection is correct and nothing has really changed" was an honest response to Mr. Tolstedt's statement – that "in terms of terminations, that's correct."[1706]

Ms. Russ Anderson acknowledged that nothing in this exchange indicated Ms. Russ Anderson told Ms. Tolstedt that there was a dramatic reduction in inappropriate practices; or that she did not correct Ms. Tolstedt by saying there were only three people identified as outliers for simulated funding.[1707]

When asked whether it alarmed her that from 2013 to 2015 nothing really had changed with respect to terminations for sales practices violations, Ms. Russ Anderson responded, "I didn't think about it. I'm sorry."[1708] She added: "sales integrity violations included a lot of different things, so no, it didn't bother me."[1709] She said, "It didn't go up. If it had gone up it would have bothered me. But no, the fact that it was relatively the same number didn't bother me."[1710]

During cross-examination, presented with her statement that "nothing has really changed", Ms. Russ Anderson was asked whether this indicated to her that firing employees who engaged in sales integrity violations and replacing them with new ones was not an effective solution to the sales integrity problem in the Community Bank, Ms. Russ Anderson avoided answering the question, responding only, "that  topic was not part of this email chain."[1711] Further, when asked whether this indicated that revamping training to team members did not address the root cause of sales practices misconduct, Ms. Russ Anderson again avoided answering the questions, responding that "that is not what I meant by that statement."[1712]

When asked by her Counsel during direct examination whether the memo made any mention of customer consent issues dominating the Ethics Line, Ms. Russ Anderson responded, "No sir, it did not" and when asked why she did not insist that it be put in there Ms. Russ Anderson responded, without elaboration, "It was not pertinent."[1713] **Failing to take customer consent into account in this memo constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

---

[1705] *Id.* at 9913.

[1706] *Id.* at 9909-10.

[1707] *Id.* at 9910.

[1708] *Id.*

[1709] *Id.*

[1710] *Id.* at 9910-11.

[1711] *Id.* at 9911.

[1712] *Id.* at 9912.

[1713] *Id.* at 9457.

Through leading questioning by her Counsel during direct examination, Ms. Russ Anderson testified she believed she fulfilled her responsibilities as GRO in helping to prepare the memo, and that she "absolutely" did not believe the memo intended to downplay the gravity of sales practices misconduct.[1714] Elaborating, she testified:

> It was -- the opportunity – the lawsuit had been filed. There was a need to present data to the Risk Committee of the Board, and that's what the intent of this was; to tell the Risk Committee of the Board what was occurring and -- at least in our part of it, and how many team members had been impacted in the work that had been done on simulated funding and phone number changes. And it accurately reflected, I believe, what the Risk Committee of the Board asked for.[1715]

**May 19, 2015 WF&C Board Risk Committee Meeting**

Ms. Russ Anderson identified the memorandum she had edited that had been presented to the Risk Committee in advance of the May 19, 2015 meeting.[1716] An agenda accompanied the materials, prepared by WF&C's General Counsel, Jim Strother.[1717]

The agenda identified three documents that were part of the presentation:

> (1) 'Sales Conduct Oversight & Corporate Security Investigation,' which summarizes the 2013/2014 sales and service integrity investigation, Retail Banking oversight of sales and service activity generally, and actions taken to respond to the issues identified;
> (2) A memorandum (subject line, "Retail Banking product and service delivery conduct risk management") that provides more detail around the multi-layered approach to product and service delivery conduct risk management; and
> (3) A memorandum (subject line, "Sales Practices Lawsuits") that summarizes the Los Angeles City Attorney's lawsuit, the putative nationwide consumer protection class action filed last week, and a putative California wage and hour class action also filed last week that refers extensively to sales pressure.[1718]

The Sales Conduct Oversight & Corporate Security Investigation report referred to a 2013-2014 investigation, stating that the Community Bank's Compliance and Operational Risk

---

[1714] *Id.* at 9463.

[1715] *Id.* at 9463.

[1716] *Id.* at 9454-55; OCC Ex. 1299R.

[1717] OCC Ex. 1299R at 1.

[1718] OCC Ex. 1299R at 1.

Add. 995

Appellate Case: 25-1079    Page: 997    Date Filed: 05/16/2025 Entry ID: 5517644

Management Group included a function "that is focused on oversight of sales and service activity in our bank branches."[1719] The report continued:

> This function is the Sales and Service Conduct Oversight Team (SSCOT), which reports to the Community Bank Group Risk Officer. As part of its proactive monitoring work, the SSCOT generates reports to identify team member conduct that is inconsistent with Wells Fargo's Visions and Values. In the summer of 2013, to monitor compliance with the requirement that deposit accounts are funded by the client, the SSCOT generated a report to identify any activity indicative of simulated funding across Retail Banking. Simulated funding is prohibited conduct that may involve a banker transferring money between a customer's accounts to make it appear as if a certain account is funded. This report indicated that a small percentage of our team members may have engaged in this prohibited conduct.[1720]

The report provided data regarding terminations by Corporate Investigations following the publication of the first of two L.A. Times articles, where the terminations resulted from customer phone number changes or simulated funding.[1721]

Under the heading, "What immediate actions did Wells Fargo take in response [to] the LA/OC findings," the report led with "Extension of the investigation to the remainder of the footprint."[1722] Without disclosing that proactive monitoring had been put on hold, the report stated:

> Extension of the investigation to the remainder of the footprint: In November 2013, the SSCOT performed a footprint-wide Behavioral Trends Analysis to identify instances of outlier activity with respect to potential simulated funding and customer phone number changes across Retail Banking. This expanded investigation continued into 2014 and resulted in one-hundred and fifty eight (158) team member separations (primarily terminations) for engaging in customer phone number changes, simulated funding or both.[1723]

Without elaboration, when asked by her Counsel during direct examination why the memo did not inform members of the Risk Committee that SSCOT had paused proactive monitoring during the period described in this part of the memo, Ms. Russ Anderson responded simply, "It wasn't pertinent."[1724] Again without elaboration, when asked by her Counsel why she did not mention in the memo that she was opposed to the pause, Ms. Russ Anderson responded,

---

[1719] *Id.* at 2.

[1720] *Id.*

[1721] *Id.*

[1722] *Id.* at 3.

[1723] *Id.*

[1724] *Id.* at 9454.

Add. 996

Appellate Case: 25-1079     Page: 998     Date Filed: 05/16/2025 Entry ID: 5517644

"It was not pertinent."[1725] When asked whether the memo discussed the root cause of sales practices misconduct, Ms. Russ Anderson responded, "No, sir. Well, actually, there was a one-liner in there, I think. I can't – I don't -- it was somewhere in one of those packages".[1726] **Failing to disclose to the Risk Committee the limitations of SSCOT's proactive monitoring and the failure to identify the root cause of sales practices misconduct by the Community Bank's team members constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Ms. Russ Anderson testified that she was in San Francisco with Carrie Tolstedt, Jim Strother and others, and participated in the May 19, 2015 meeting of the Wells Fargo & Company Risk Committee.[1727] She said, "very soon into the conversation, the Board started asking a lot of questions, and . . . the tone was difficult."[1728] She testified the Board members were "unhappy, strident" and when "someone asked a question about thresholds, to which I started to answer, David Otsuka fully answered."[1729] She added, "in my career, it was a very disturbing meeting."[1730]

Elaborating on this statement, Ms. Russ Anderson testified that she had never been in a situation where senior executives "were in a meeting where the Board was so obviously angry."[1731]

Ms. Russ Anderson identified the minutes of the May 19, 2015 Risk Committee meeting.[1732] Those minutes reflect the members of the Committee received reports from Ms. Russ Anderson and Ms. Tolstedt on "the nature and scope of internal investigations and monitoring of sales practices and resulting team member terminations or resignations."[1733] The minutes reflect that management "also discussed with the Committee the nature of potential customer impacts, its evaluation of the appropriateness of the Company's compensation practices and performance evaluation tools, internal audit activity relating to sales practices, and matter escalation channels within management and to the Board."[1734]

Before Ms. Tolstedt and Ms. Russ Anderson left the meeting, the Committee "requested that management provide the directors with additional information on prior reporting to the

---

[1725] *Id.*

[1726] *Id.*

[1727] *Id.* at 9463-64.

[1728] *Id.* at 9465.

[1729] *Id.*

[1730] *Id.*

[1731] *Id.* at 9465-66.

[1732] *Id.* at 9954; R. Ex. 156.

[1733] R. Ex. 156 at 1.

[1734] R. Ex. 156 at 1-2.

Add. 997

Appellate Case: 25-1079    Page: 999    Date Filed: 05/16/2025 Entry ID: 5517644

Board and its committees relating to sales practices, and Mr. Dean requested that management attend a future Human Resources Committee meeting to discuss Community Banking's incentive programs."[1735]

Ms. Russ Anderson testified that she recalled the Committee members were critical of the threshold concept – but that she "did not think they were correct. I thought they didn't understand the concept" regarding SSCOT's use of thresholds to detect sales practices misconduct.[1736] Ms. Russ Anderson acknowledged that during the relevant period, SSCOT reported to her and was the group that used the thresholds; and the fact that she was the one responsible for controls to detect sales practices misconduct.[1737] **Acting in furtherance of these opinions under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Despite the knowledge that the Board was dissatisfied with the threshold concept, when asked whether SSCOT continued using the 99.95 percent threshold until her exit from the Bank, Ms. Russ Anderson deflected, answering that she was comfortable applying the 99.95 threshold to detect simulated funding, and that the "threshold at 99.95 was the one that was approved and instituted by the Law Department. I followed their legal opinion in that matter."[1738] Given the record in this proceeding, I find no weight can be given to the suggestion by Ms. Russ Anderson that she did not set the threshold in question.

Ms. Russ Anderson testified that from her own observations during the meeting, the Board members were unhappy about the lawsuit from the City of Los Angeles, and asked a lot of very pointed and strident questions.[1739] She denied, however, the averment that the Board wanted to get to the bottom of the sales practices misconduct issues in the Community Bank, stating "I don't know that I knew that", averring that it was her understanding that "the Board wanted to understand about the lawsuit."[1740] She testified that since she "wasn't in Legal . . . [she didn't] know how long they may or may not have known about that lawsuit."[1741] She denied knowing that the Board wanted to know about the scope of sales practices misconduct in the Community Bank, about the adequacy of controls, or about the volume of sales practices misconduct in the Community Bank.[1742] Given the record as a whole, particularly her description of the meeting and given the paucity of information provided by the memo she helped create, no weight can be

---

[1735] *Id.* at 2.

[1736] Tr. (Russ Anderson) at 9964-65.

[1737] *Id.* at 9965-66.

[1738] *Id.* at 9965, 9968.

[1739] *Id.* at 9955.

[1740] *Id.*

[1741] *Id.* at 9956.

[1742] *Id.* at 9956-57.

Add. 998

given to Ms. Russ Anderson's denial that she knew the Board wanted to know about the scope of sales practices misconduct in the Community Bank, the inadequacy of controls, or the scope of the sales practices misconduct in the Community Bank.

Ms. Russ Anderson acknowledged that she had an obligation to provide complete information to the Risk Committee during the meeting, concerning (1) the adequacy of the Bank's controls around sales practices, (2) the methodology SSCOT was using to detect simulated funding, and (3) how widespread sales practices misconduct was in the Community Bank.[1743] She denied, however, having any responsibility to inform the Committee at the May 19, 2015 meeting about the polling methodology SSCOT used – because "it wasn't relevant to the discussion with the Board."[1744] **Acting in furtherance of this opinion under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

She also denied having any duty to supply accurate information to the Committee about the reasonableness of the sales pressure, because "[i]t was not part of the discussion."[1745] For the same reason, Ms. Russ Anderson also denied having any responsibility to supply members of the Committee with accurate information about the culture in the retail branch network of the Community Bank.[1746] **Acting in furtherance of these opinions under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Ms. Russ Anderson described her role in the process that led up to the meeting as "a supporting role in helping to prepare Carrie for the meeting and anyone else who needed my help, but I was not . . . the primary person and . . . I had no idea that I would be answering any questions when I went in there."[1747] Through leading questioning presented by her Counsel during direct examination, Ms. Russ Anderson testified that she did not believe the presentation was either misleading or incomplete.[1748] Given the record as a whole, no weight can be given to this testimony, as the preponderant evidence established that the presentation was both incomplete and misleading.

Elaborating, Ms. Russ Anderson testified, "I believe that the conversation was to be about the L.A. lawsuit and what had happened and what we had been doing up to that point in time. And I think that the presentation answered all those questions."[1749] Ms. Russ Anderson denied any claim that she was ultimately responsible for either the memo or the presentation, testifying

---

[1743] *Id.* at 9950-52.

[1744] *Id.* at 9951.

[1745] *Id.*

[1746] *Id.* at 9952.

[1747] *Id.* at 9467.

[1748] *Id.*

[1749] *Id.* at 9467.

Add. 999

Appellate Case: 25-1079     Page: 1001     Date Filed: 05/16/2025 Entry ID: 5517644

she did not have the power to make final edits and that the presentation "was requested by the chairperson of the Risk Committee of the Board of Mr. Strother and Ms. Carrie Tolstedt [*sic*]."[1750]

Ms. Russ Anderson testified that while she played a "minor" role during the May 19, 2015 Risk Committee meeting and "responded to one" question from the Committee members, she did not consider the volume of sales practices misconduct in the Community Bank to be significant relative to the number of team members employed in the retail branch network.[1751]

Ms. Russ Anderson identified Mr. Augliera's handwritten notes of the meeting, and acknowledged that during the meeting she "answered a question on thresholds."[1752] Those notes reflect that regarding Risk, "2013 – investigation team to Claudia that does proactive looking for behaviors. Funding not for client. Started investigating simulated funding and phone number changes. Two rounds of work in 2013, 35 TM terminated, 10 resigned, 21 terminated, six resigned."[1753] Ms. Russ Anderson testified that these notes were "roughly" consistent with her memory of what she told the Risk Committee during the May 19th meeting.[1754] Where the notes report that she said, "75,000 looking at every TM," Ms. Russ Anderson testified that she did not recall "that I said 75,000, but if this is what he wrote. I don't know."[1755]

Also roughly consistent with her memory were Mr. Augliera's notes, "November 2013 expanded to the rest of footprint. 2014 researched terminations and resignations, 158 TM over period of time, 230 TM fired or 70% phone number changes".[1756] She also did not recall saying, as reflected in these notes, that SSCOT picked a threshold and "looked at every TM 100%" – testifying only that she remembered "telling them that we picked a threshold and we looked at team members within that threshold. I don't remember the 75,000 piece."[1757] At an earlier point in her testimony, Ms. Russ Anderson stated that it was Mr. Otsuka who disclosed the 99.99 percent threshold during the meeting, and that the threshold she disclosed was the "50[+] filter."[1758]

Ms. Russ Anderson acknowledged that she knew at that time that SSCOT was not looking at every team member 100 percent – that by this point she was sending to Corporate

---

[1750] *Id.* at 9468.

[1751] *Id.* at 9958.

[1752] Tr. (Russ Anderson) at 9958; OCC Ex. 2158 at 5.

[1753] Tr. (Russ Anderson) at 9960; OCC Ex. 2158 at 5.

[1754] Tr. (Russ Anderson) at 9961; OCC Ex. 2158 at 5.

[1755] Tr. (Russ Anderson) at 9961; OCC Ex. 2158 at 5.

[1756] Tr. (Russ Anderson) at 9961; OCC Ex. 2158 at 5.

[1757] Tr. (Russ Anderson) at 9962; OCC Ex. 2158 at 5.

[1758] Tr. (Russ Anderson) at 9964. See OCC Ex. 791 at 3, "For the initial investigation that began in the Fall 2013 (LA/OC then across the footprint, there was a 50 or more threshold applied to a 5 month period of time. That investigation took us well into 2014." *Id.*

Add. 1000

Appellate Case: 25-1079     Page: 1002     Date Filed: 05/16/2025 Entry ID: 5517644

Investigations only at the top .05 percent of employees – the "top outlier[s]" – who engaged in potential simulated funding.[1759] **Ms. Russ Anderson's misrepresentation to the Committee of looking at every team member 100 percent a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

She also acknowledged knowing at the time that she was not doing proactive monitoring on other behaviors like bundling, pinning, sandbagging, and unauthorized debit or credit cards – on the basis that from 2013 to 2015 SSCOT's proactive monitoring was "in a pilot phase" because of the pause and "other things that were taken out of my control".[1760] **Ms. Russ Anderson's failure to disclose the material limits of SSCOT's proactive monitoring constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Through the summary disposition process, Ms. Russ Anderson did not dispute that the Memo she edited and Mr. Strother presented to the Board made no mention of unreasonable or unattainable sales goals; significant (or any) pressure to meet sales goals; employees' fear of termination if sales goals are not met; and employees being placed on corrective action and/or terminated for not meeting sales goals; the pause on proactive monitoring of simulated funding and phone number changes; or the proactive monitoring methodology or the 99.99 or 99.95 percent thresholds. **Ms. Russ Anderson's failure to disclose these limitations constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

She disputed the claim that sales goals were omitted because the May 19, 2015 Memo contains references to modifications of sales policies and sales goals, and gave an example, the discussion of efforts to tie sales practices and goals to Vision and Values and business conduct expectations at all levels with improved consistency in communications;[1761] averring that references adjustments to goals in connection with an initiative relating to incentive compensation plans;[1762] and disputed the claim that alleged pressure to meet sales goals is not mentioned at all because allegations of pressure to meet sales goals are discussed in relation to the Los Angeles lawsuit.[1763]

Through the summary disposition process I found uncontroverted that the Memo made no mention of employees' fear of termination if sales goals are not met; or employees being placed on corrective action and/or terminated for not meeting sales goals; or the pause on proactive monitoring of simulated funding and phone number changes; or the proactive monitoring methodology or the 99.99 or 99.95 percent thresholds. **Ms. Russ Anderson's failure to disclose**

---

[1759] Tr. (Russ Anderson) at 9962.

[1760] *Id.* at 9963.

[1761] Russ Anderson's SMF at No. 375 citing MSD Ex. 155 at 12.

[1762] Russ Anderson's SMF at No. 375 citing MSD Ex. 155 at 13.

[1763] Russ Anderson's SMF at No. 375 citing MSD Ex. 155 at 19-23.

Appellate Case: 25-1079    Page: 1003    Date Filed: 05/16/2025 Entry ID: 5517644

Add. 1001

these limitations constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.

I also found that in her Response to Statement No. 374, Ms. Russ Anderson sufficiently demonstrated a factual controversy exists regarding whether the Memo addressed all of the issues relating to Respondent Russ Anderson's fiduciary duties owed to the Bank, including alleged pressure to meet sales goals. As noted above, that factual controversy has now been addressed through the presentation of testimony and documentary evidence during the hearing. **Ms. Russ Anderson's failure to disclose to the Risk Committee the pressure to meet sales goals constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

Through the summary disposition process Enforcement Counsel alleged that the May 19, 2015 Memo did not discuss the issuance of debit cards or credit cards without customer consent, bundling, pinning, sandbagging, and other forms of sales practices misconduct.[1764] Ms. Russ Anderson disputed the claim, averring that the May 19, 2015 memo discusses issuance of debit cards or credit cards without consumer consent, bundling, pinning, sandbagging, and other forms of sales practices misconduct in the context of the Los Angeles lawsuit's allegations.[1765] As noted above, that factual controversy has now been addressed through the presentation of testimony and documentary evidence during the hearing. **Ms. Russ Anderson's failure to disclose to the Risk Committee these limitations constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

**Supervisory Letter WFC 2015-36 - Incentive Compensation Program in the Community Bank Failed to Balance Risk and Reward**

Through a June 26, 2015 Supervisory Letter, the OCC's Examiner in Charge for Wells Fargo Bank, N.A., Bradley Linskens, reported to the Bank's CEO, that "Wells Fargo's management and oversight of Enterprise Sales Practices is weak and needs to improve."[1766]

Examiner Candy participated in the OCC's May 2015 ongoing supervisory activity of the Bank's sales practices that resulted in Supervisory Letter (SL) 2015-36.[1767] The review was prompted by the City of Los Angeles lawsuit filed against Wells Fargo on May 4, 2015. SL 2015-36 specified that the OCC's review focused on the events in 2013 that led to the initial employee terminations for sales practices, the investigation of employee misconduct that followed, and overall changes in governance intended to improve the Bank's practices.[1768] The Operating Committee consisted of the Chief Executive Officer and his direct reports.[1769] SL

---

[1764] Enforcement Counsel's Statement of Material Fact (ECSMF) (Russ Anderson) No. 378, MSD Ex.155.

[1765] MSD Ex. 155 (materials for the Risk Committee meeting to be held on May 19, 2015) at 19.

[1766] OCC Ex. 1239 at 2.

[1767] EC MSD Ex. 269 (Report of NBE Candy) at ¶37.

[1768] EC MSD Ex. 269 (Report of NBE Candy) at ¶37.

[1769] *Id.*

Appellate Case: 25-1079     Page: 1004     Date Filed: 05/16/2025 Entry ID: 5517644

Add. 1002

2015-36 concluded that the Bank's management and oversight of Enterprise Sales Practices risk was weak and needed to improve.[1770]

During that review, Examiner Candy performed work to better understand the Bank's controls related to sales practices.[1771] She reviewed customer and employee complaints and identified themes from those complaints.[1772] Based on her work on the May 2015 review, she concluded that the Community Bank had a problem with sales practices misconduct and identified weakness in the Bank's controls.[1773] However, she did not have clear visibility into the extent, severity, and duration of the sales practices misconduct problem until further supervisory work and Examiner Candy's participation in the investigation.[1774]

SL 2015-36 notes that "[o]f the 2,856 sales integrity cases [in 2014], 43% involved lack of customer consent for a product."[1775] She noted that in her work sampling customer complaints, "in many cases there was no method to prove customer consent in the form of a signature for either the deposit or credit card product."[1776]

Based on her review of employee complaints made through the Bank's EthicsLine, Examiner Candy identified the following themes: sales pressure; taking advantage of a protected classes (e.g., age/elderly); and the selling of unwanted deposit or credit products.[1777] Review of customer complaints revealed similar themes.[1778] She found the complaints to be credible, and found that the Community Bank did not have adequate controls to proactively identify these types of misconduct, nor did they complete adequate follow-up or investigation of the allegations.[1779]

The May 2015 review resulted in the issuance of five MRAs, discussed in more detail below.[1780] One of the MRAs identified deficiencies in the Bank's controls over complaints.[1781] The review determined that the Bank did not have an effective customer complaint process and

---

[1770] Id.

[1771] Id. at ¶67.

[1772] Id.

[1773] Id.

[1774] Id.

[1775] Id., citing OCC Supervisory Letter WFC 2015-36 (June 25, 2015) (OCC-WF-SP-07084578).

[1776] EC MSD Ex. 269 (Report of NBE Candy) at ¶67, citing OCC Supervisory Letter WFC 2015-36 (June 25, 2015) (OCC-WF-SP-07084578) at 3.

[1777] EC MSD Ex. 269 (Report of NBE Candy) at ¶68, citing OCC Supervisory Letter WFC 2015-36 (June 25, 2015) (OCC-WF-SP-07084578), at 3.

[1778] EC MSD Ex. 269 (Report of NBE Candy) at ¶68.

[1779] Id.

[1780] Id. at ¶69.

[1781] Id.

Add. 1003

Appellate Case: 25-1079      Page: 1005      Date Filed: 05/16/2025 Entry ID: 5517644

required management to reassess the customer complaint process "since it is critical to promoting compliance with laws and regulations and reducing reputation risk."[1782] One of the MRAs also identified deficiencies in Audit's coverage of sales practices, finding that "no significant issues were identified or escalated as a result of [Audit's] work, and the group has not completed a comprehensive review of sales practices across the enterprise."[1783]

After the OCC issued the five MRAs in June 2015, the OCC continued its review of sales practices risk, ultimately issuing SL 2016-36 on July 18, 2016.[1784] Examiner Candy participated in the ongoing review that culminated in the issuance of SL 2016-36.[1785] SL 2016-36 documents the following conclusions, with which she agrees:

> The practice of opening deposit accounts without authorization, the practice of moving funds without customer consent (simulated funding) and the failure to timely refund or remediate fees charged are considered unsafe or unsound banking practices.[1786]

> The widespread and unauthorized opening of credit card accounts without consent . . . is considered an unsafe or unsound banking practices. The root causes include excessive sales pressure and the absence of a control process that required documentation of explicit customer consent.[1787]

> Aggressive sales pressure, coupled with lack of adequate risk management oversight, fostered inappropriate and possibly fraudulent behavior by employees. This behavior included the opening of unwanted deposit and credit card accounts and the practice of moving funds without customer consent (simulated funding), which resulted in customer harm, hundreds of terminated employees. . . . [1788] In addition, the risks from these sales practices were not adequately managed."[1789]

> Our own review of incentive compensation programs and sales goals confirmed the aggressive sales pressure. For example, Gold, Silver, and

---

[1782] *Id.*, citing OCC Supervisory Letter WFC 2015-36 (June 25, 2015) (OCC-WF-SP-07084578) at 4.

[1783] EC MSD Ex. 269 (Report of NBE Candy) at ¶69, citing OCC Supervisory Letter WFC 2015-36 (June 25, 2015) (OCC-WF-SP-07084578) at 2.

[1784] EC MSD Ex. 269 (Report of NBE Candy) at ¶70, citing OCC Supervisory Letter WFC 2016-36 (July 18, 2016) (OCC-WF-SP-07169362).

[1785] EC MSD Ex. 269 (Report of NBE Candy) at ¶70.

[1786] *Id.*

[1787] *Id.*

[1788] *Id.*

[1789] *Id.*

Add. 1004

Appellate Case: 25-1079    Page: 1006    Date Filed: 05/16/2025 Entry ID: 5517644

Bronze programs were in place to encourage employees to meet sales goals, with Gold requiring 13 daily 'solutions' or products sold per day.[1790]

Weaknesses in internal controls and management information systems including a lack of robust first, second and third lines of defense risk management programs.[1791]

SL 2015-36 also concluded that "[t]here also exists only limited monitoring and oversight by the second (Corporate Risk, Human Resources, Compliance, and Legal) and third lines of defense [Audit]."[1792] SL 2015-36 specifically noted, "Cross-selling, if not properly governed, can lead to excessive sales pressure on employees to meet sales goals and achieve financial incentives. Incentive compensation is a key factor in motivating employee behavior and should be reevaluated across all sales activities enterprise- wide given these events."[1793] SL 2015-36 required the Bank to review compensation programs to protect against incenting inappropriate behavior.[1794]

The OCC uses Matters Requiring Attention (MRAs) to communicate concern about a bank's deficient practices to a bank's board of directors and management.[1795] An MRA is a significant supervisory action and must be taken seriously and addressed by bank management.[1796]

All incentive compensation plans at the Bank, including the Community Bank, were required to comply with the Bank's Incentive Compensation Risk Management Policy ("ICRM Policy") dated July 13, 2011,[1797] and amended on November 27, 2012.[1798] The ICRM Policy was the primary policy that governs the Bank's incentive compensation arrangements.[1799]

---

[1790] *Id.*

[1791] *Id.*

[1792] *Id.*

[1793] *Id.*

[1794] *Id.*

[1795] *Id.* at ¶38.

[1796] *Id.* at ¶41.

[1797] EC MSD Ex. 269 (Report of NBE Candy) at ¶41, citing Wells Fargo & Co., Incentive Compensation Risk Management Policy (July 13, 2011) (OCC-WF-SP-05434513).

[1798] EC MSD Ex. 269 (Report of NBE Candy) at ¶41, citing Fargo & Co., Incentive Compensation Risk Management Policy (July 13, 2011) (OCC-WF-SP-05434513).

[1799] EC MSD Ex. 269 (Report of NBE Candy) at ¶42.

Add. 1005

Appellate Case: 25-1079    Page: 1007    Date Filed: 05/16/2025 Entry ID: 5517644

The Bank's ICRM Policy "applies to any Wells Fargo business that pays teams members under an incentive compensation arrangement. It covers both domestic and international team members in all jurisdictions where Wells Fargo does business."[1800]

The ICRM Policy states:

> The purpose of the Incentive Compensation Risk Management Policy is to help ensure that Wells Fargo's incentive compensation arrangements are aligned with appropriate risk taking – which is to balance short-term performance goals with the long-term strength and stability of the company.[1801]

The amended ICRM Policy issued on November 28, 2012 states:

> Incentive-based compensation arrangements should balance risk and financial rewards in a manner that does not provide our team members with an incentive to take inappropriate risks that could lead to material financial, operational, or reputational risk for the company.[1802]

Generally accepted standards of prudent operation and the Bank's own ICRM Policy required incentive compensation arrangements to balance risk and reward in a manner that does not encourage team members to expose Wells Fargo to imprudent risks.[1803]

The Wells Fargo Risk Management Framework also emphasized the importance of a sound incentive compensation program.[1804] It states:

> Wells Fargo's incentive-based compensation practices balance risk and financial reward in a manner that incents team members to take appropriate risks they understand and avoid taking risks they do not understand or that exceed risk appetite. To this end, the Incentive Compensation Risk Management (ICRM) program was developed to manage risk in incentive-based compensation arrangements throughout Wells Fargo. The ICRM principles and requirements are fundamental and strictly adhered to, guiding both general and tailored compensation practices. The balance of risk and reward is, and always will be, a top priority.[1805]

The Human Resources Committee of the Board received a presentation on the ICRM Policy in February 2012. The presentation stated, "[t]he ICRM Program has been broadened to

---

[1800] *Id.* at ¶43.

[1801] *Id.*

[1802] *Id.*

[1803] *Id.* at ¶44.

[1804] *Id.* at ¶45.

[1805] EC MSD Ex. 269 (Report of NBE Candy) at ¶45, citing Wells Fargo Bank, N.A., Wells Fargo Risk Management Framework, at 10-11 (July 2014) (OCC-WF-SP-04791987).

Add. 1006

Appellate Case: 25-1079     Page: 1008     Date Filed: 05/16/2025 Entry ID: 5517644

be the single risk management program for all incentive compensation related matters across the enterprise."[1806]

After determining Community Bank's incentive compensation practice did not conform to the Bank's own ICRM Policy and Fraud Risk Management Framework, Examiner Candy conducted additional review of sales goals.[1807] During this review, she discovered that from 2002 through 2016, the sales goals in the Community Bank were unreasonable.[1808] They were unreasonable in part because they could not be met by reasonable and diligent efforts and incentivized employees to engage in sales practices misconduct—improper, unethical, and illegal activity—to meet them.[1809]

The Community Bank's sales model was predicated on double-digit annual sales growth over the prior year's sales performance, a concept known as "run rate."[1810] The current year's sales plan served as the baseline for each successive year's sales goals, and sales goals were increased each year.[1811] So, for example: the Community Bank's 2012 sales plan derived from the 2011 sales performance, and required team members to sell a greater number of products and services than they had sold in 2011; by extension, the Bank's 2013 sales plan was derived from the Bank's 2012 sales performance, which required team members to sell a greater number of products and services than they had sold in 2012.[1812]

However, sales practices misconduct artificially inflated the run rate, making sales goals increasingly unattainable every year.[1813] The Community Bank's sales run rate was tainted by sales practices misconduct; each year's sales performance numbers reflected products and services that were opened for and issued to customers without their knowledge and consent or obtained through false statements and misrepresentations. This made it even harder to achieve the sales goals through legal and ethical means in every subsequent year.[1814]

The Independent Directors of the Board of Wells Fargo & Company, the Bank's holding company, conducted an investigation to understand the root cause of improper sales practices in

---

[1806] EC MSD Ex. 269 (Report of NBE Candy) at ¶46, citing Wells Fargo Bank, N.A., *Incentive Compensation Risk Management Program 2011 Program Update*, Human Resources Committee, at 2 (Feb. 28, 2012) (OCC-WF-SP-07644598).

[1807] EC MSD Ex. 269 (Report of NBE Candy) at ¶48.

[1808] *Id.*

[1809] *Id.*

[1810] *Id.*

[1811] *Id.*

[1812] *Id.*

[1813] *Id.*

[1814] *Id.*

Add. 1007

Appellate Case: 25-1079      Page: 1009      Date Filed: 05/16/2025 Entry ID: 5517644

the Community Bank ("Board Report").[1815] The Board Report explained the run rate as such: "[t]he problem built on itself: attaining growth when the prior year's sales included a large number of low quality accounts meant that even more low quality accounts had to be opened to hit the increased target."[1816]

The Board Report found that the Community Bank's sales goals were "untenable," "unrealistic," and "unattainable."[1817] The Board Report found that, even after the Community Bank made mid-year downward adjustments to sales goals in 2013 and 2014, "they were still set at an unachievable level."[1818] These findings are consistent with Examiner Candy's own conclusions based on her supervisory work and evidence she reviewed during the investigation and litigation.[1819]

In October 2015, Accenture, a firm hired by the Bank in response to MRAs issued by the OCC in June 2015, issued a report.[1820] The report stated, "despite recent reductions in store sales goals," employees "continue to feel pressure to meet sales targets that many team members perceive to be unreasonable, and this may occur at the potential expense of sales quality."

Accenture also observed based on its review that even in 2015, "sales goals have not been met since 2013 (even after accounting for adjustment made throughout the year to improve achievement rates)."[1821] However, even though sales goals were lowered in 2013, sales practices misconduct in the Community Bank continued to be significant (as discussed in this report), employees still could not meet sales goals, further highlighting that they were unreasonable.[1822]

Ms. Russ Anderson testified that she read the Supervisory Letter, and acknowledged that she served as the primary point of contact with the OCC for its examinations of Community Banking's first line of defense.[1823] She testified that she understood throughout the relevant period that transparency with the OCC was of utmost importance, that the lack of transparency would increase compliance risk, reputational risk, and operational risk to the Bank.[1824]

---

[1815] *Id.*, citing Independent Directors of the Board of Wells Fargo & Company, Sales Practices Investigation Report (Apr. 10, 2017), available at https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/presentations/2017/board-report.pdf [hereinafter Board Report].

[1816] EC MSD Ex. 269 (Report of NBE Candy) at ¶48, citing *Board Report* at 41.

[1817] *Id.* at ¶49, citing *Board Report* at 5, 19, 39.

[1818] *Id.*, citing *Board Report* at 45.

[1819] EC MSD Ex. 269 (Report of NBE Candy) at ¶49.

[1820] *Id.* at ¶50.

[1821] *Id.*, citing Accenture, *Wells Fargo Sales Practices Assessment – Community Banking Sales Practices Report: Observations and Recommendations* (Oct. 2015) (OCC-SP1140359).

[1822] EC MSD Ex. 269 (Report of NBE Candy) at ¶50.

[1823] Tr. (Russ Anderson) at 10028-30; OCC Ex. 1239.

[1824] Tr. (Russ Anderson) at 10030-31.

Appellate Case: 25-1079     Page: 1010     Date Filed: 05/16/2025 Entry ID: 5517644

Add. 1008

Among the conclusions relating to the first line of defense, the Letter stated:

> There has been and continues to remain an overall lack of transparency at the first line of defense regarding past investigations and ongoing controls and monitoring processes. There also exists only limited monitoring and oversight by the second (Corporate Risk, Human Resources, Compliance, and Legal) and the third line of defense.[1825]

Broadly stated, the conclusions included the following:

> The bank's Vision and Values' strategy emphasizes "cross-selling" – the process of offering customers the products and services they need to help them succeed financially. Cross-selling, if not properly governed can lead to excessive sales pressures on employees to meet sales goals and achieve financial incentives. Incentive compensation is a key factor in motivating employee behavior, and should be reevaluated across all sales activities enterprise-wide given these events. In addition, the communication of cross-sell is very apparent in annual reports, quarterly earnings calls, and investor presentations. Communication of this strategy needs to have the proper balance.[1826]

Specific to the second line of defense, the Letter stated:

> Management needs to accelerate the build-out of an enterprise-wide SLOD for Enterprise Sales Practices. The risk governance framework outlining this cross-functional risk area needs to address governance, staffing, roles and responsibilities, reporting, and testing and validation. The framework should also define escalation protocols and address the timing and reporting of sales practices information to the Board, Board level committees (i.e., the A&E Committee, Risk Committee), and executive management. Risk appetite metrics need to be established at the enterprise and group levels and, at a minimum, include indicators to highlight inappropriate sales practices, customer surveys, employee and customer complaints, Corporate Investigations metrics, SAR filing, and employee turnover at more granular levels.

> As part of this process, management needs to reassess the Ethics Line and customer complaint investigative processes by establishing full independence from the first line and ensuring referrals and complaints are reviewed timely.[1827]

---

[1825] OCC Ex. 1239 at 2.

[1826] *Id.*

[1827] OCC Ex. 1239 at 3.

Add. 1009

Appellate Case: 25-1079     Page: 1011     Date Filed: 05/16/2025 Entry ID: 5517644

Specific to the first line of defense, the Letter built on what was presented regarding the second line of defense:

> Consistent with the SLOD, the FLOD needs to establish a governance framework that clearly defines roles and responsibilities, committee governance, escalation protocols, risk appetite metrics and testing and validation functions. This framework needs to include the establishment of an effective oversight, testing/quality assurance function of branch (store) sales practices.[1828]

It bears noting that despite the admonition from the OCC through this Letter that Ms. Russ Anderson and the first line of defense needed to establish a governance framework consistent with the Bank's second line of defense, the record reflects significant antipathy by Ms. Russ Anderson in the first line of defense against the principal actors in the Bank's second line of defense, continuing into the following year.

Ms. Russ Anderson identified a March 10, 2016 email exchange between herself and Ron DiGiacomo – Executive Vice President and Deputy Chief Compliance Risk Management (RCRM) for WF&C – a functional part of the second line of defense.[1829] Through the first message in the chain, Mr. DiGiacomo provided Ms. Russ Anderson a PowerPoint presentation regarding "Potential Sales Practices Complaints Analysis".[1830]

Shortly after receiving the presentation, Ms. Russ Anderson wrote to Mr. DiGiacomo, stating, "I have to be honest that had we known this was going to the OCC without my and Carrie's final approval we would not have agreed to some of the content. Somewhere this process broke down and I would like for you and I to debrief when I get back from [paid time off]."[1831]

Mr. DiGiacomo wrote back shortly thereafter, "This was well understood by all working on the deck. It is a RCRM deliverable under the response to MRA #3 to the SL on Sales Practices."[1832]

Indeed, the third MRA included the following predicate in support of the RCRM deliverable:

> Extended timelines to implement Regulatory Compliance Risk Management's (RCRM) revised Enterprise Complaints Management Policy (Policy), published in May 2014, is not scheduled to take until year-end 2016.

---

[1828] *Id.* at 4.

[1829] Tr. (Russ Anderson) at 10031; OCC Ex. 146.

[1830] OCC Ex. 146 at 4.

[1831] *Id.*

[1832] *Id.* at 3.

Add. 1010

Appellate Case: 25-1079      Page: 1012      Date Filed: 05/16/2025 Entry ID: 5517644

This implementation plan appears excessive given the importance to the bank of an enterprise program.[1833]

Notwithstanding this, Ms. Russ Anderson wrote to Mr. DiGiacomo, "neither Paula nor I had that understanding."[1834] Having been copied on this message from Ms. Russ Anderson to Mr. DiGiacomo, Ms. Herzberg confirmed what Mr. DiGiacomo had written,

> It is true I was told it was an OCC deliverable . . . the work that is, not the deck. In retrospect, I should have asked more explicitly about what would be shared. I feel like they already had every bit of this information in the deck from various meetings and updates they have been invited to. So, the reality is that would have done it with or without our help . . . and were willing to.[1835]

Ms. Russ Anderson promptly responded to Ms. Herzberg: "I am just worried that it isn't going to be represented by ANYONE who knows anything. What a bs situation . . . I feel like it is all about them and not about the firm."[1836]

To this, Ms. Herzberg responded,

> Well, Joe's plan today is to defer any conversation about the actions to the meeting next week that he has scheduled with them . . . and he is adding me to that meeting. This kind of thing makes me really worried about what we share with the SLOD . . . it's not Joe I'm worried about.[1837]

Ms. Russ Anderson agreed, writing:

> Same here. If they gave us full disclosure as to their intent I would not care about what I gave them. It is because they take stuff and don't fully disclose what they are going to do with it that makes me crazy. If the OCC goes crazy it is us that the crap will hit. You did the right thing – they did not give you full disclosure. If they had you would have said 'wait – this is old or let me check with Jason.' Something![1838]

Although nothing in this email exchange supports the premise, Ms. Russ Anderson testified that she was concerned "the information that went to the OCC was incorrect."[1839] Offering no evidence in support of the premise that incorrect information went to the OCC, Ms.

---

[1833] OCC Ex. 1239 at 7.

[1834] OCC Ex. 146 at 3.

[1835] *Id.*

[1836] *Id.* at 2.

[1837] *Id.*

[1838] *Id.* at 2.

[1839] Tr. (Russ Anderson) at 10033.

Russ Anderson testified that the document that Mr. DiGiacomo had taken to the OCC "did not have correct information about items within the Community Bank. They did not give us an opportunity to correct those items before they went to the OCC."[1840]

Ms. Russ Anderson denied that she was concerned she might face criticism from the OCC, averring, "what I worried about was that if someone represented on my behalf and it was incorrect, then it was my reputation and my word that was going to be a subject to criticism."[1841]

Preponderant evidence establishes this representation is unreliable and therefore is rejected. When presented with the Regulatory Compliance Risk Management (RCRM) report on Potential Sales Practices Complaints Analysis of Products Sold in Branches – the report referred to in Ms. Russ Anderson's email exchange with Ms. Herzberg, Ms. Russ Anderson was unable to identify any inaccuracies, testifying, "I don't remember the content anymore."[1842] In the absence of substantial evidence in support of Ms. Russ Anderson's assertion that avoiding regulatory criticism was not a motivation, the assertion is given no weight.

It also bears noting that the RCRM report in question included a graphic presentation based on data from January 1, 2014 to September 30, 2015 indicating widespread, nationwide volume of sales practices complaints – an image that in and of itself indicates system-wide complaints of sales practices misconduct.[1843] Of particular note were observations that "[i]n more than 75% of the reviewed potential sales practices complaints for savings accounts, customers stated that accounts were opened without customer authorization" and "[m]ore than 50% of the reviewed Banker notes indicate that in-question savings accounts were opened simultaneously with Checking accounts."[1844] Any claim from this point forward denying that sales practices misconduct was systemic and widespread is unfounded and is rejected as not supported by preponderant reliable evidence.

Other relevant observations from the RCRM report that indicate systemic problems related to sales practices misconduct include the operational issue that the "[s]ystem of record notes were not sufficient to affirm consistent escalation of potential sales practice issues" and "potential gaps in cross-organizational alignment and sharing of sales practice related data."[1845] From this record, I find unreliable Ms. Russ Anderson's testimony that the contents of the RCRM report did not indicate the widespread or systemic nature of sales practices misconduct between January 2014 and September 2015.[1846]

---

[1840] *Id.* at 10037.

[1841] *Id.*

[1842] *Id.* at 10040.

[1843] OCC Ex. 1896 at 39.

[1844] *Id.* at 27.

[1845] OCC Ex. 1896 at 17.

[1846] Tr. (Russ Anderson) at 10042.

Add. 1012

Appellate Case: 25-1079     Page: 1014     Date Filed: 05/16/2025 Entry ID: 5517644

**June 26, 2015: Five MRAs**

The Supervisory Letter contained five Matters Requiring Attention (MRAs), requiring the attention of all three lines of defense.[1847]

In the MRA titled "**Enterprise Sales Practices – Corporate**" the OCC stated the following concern:

> Wells Fargo's strong emphasis on "cross-sell", combined with inadequate controls and oversight, promoted inappropriate employee behavior that is still being quantified and may yet be occurring. Internal assessments lacked reasonable independence and did not consider customer harm.[1848]

The OCC identified the following cause related to this concern: "Corporate emphasis on product sales and 'cross-selling' without an appropriate control or oversight structure."[1849]

Through his August 10, 2015 response to Mr. Linskens, Mr. Loughlin did not dispute the cause statement and committed to the OCC that the scope of WFAS's work would include:

> monitoring and validation, reviewing governance processes and enhanced policy, monitoring of projects/initiatives to enhance Enterprise Sales Practices compliance, and obtaining an understanding of key activities and functions performed to ensure compliance with enterprise sales practices along with their sustainability. WFAS anticipates quarterly status reports will be prepared, beginning the fourth quarter of 2015 and continue to our first ERMA.[1850]

In the MRA titled "**Enterprise Sales Practices – Second Line of Defense**" the OCC stated the following concern:

> Wells Fargo does not have an Enterprise Sales Practices oversight program. The bank's approach is heavily reliant on decentralized first line of defense identification and escalation of potential issues.[1851]

The OCC identified the following cause related to this concern: "Although identified as an area needing attention, management focused on higher priorities based on available resources (i.e., the build-out of operational and liquidity risk frameworks)."[1852]

Through Wells Fargo's August 10, 2015 response to MRA#2, Mr. Loughlin committed to implementing a "process for enhancing evaluation of sales practices risk as related to incentive

---

[1847] Tr. (Julian) at 6744; OCC Ex. 1239 at 3-9.

[1848] OCC Ex. 1239 at 6.

[1849] *Id.*

[1850] OCC Ex. 705 at 11.

[1851] OCC Ex. 1239 at 6.

[1852] *Id.*

Add. 1013

Appellate Case: 25-1079      Page: 1015      Date Filed: 05/16/2025 Entry ID: 5517644

compensation design and administration and related performance management practices."[1853] He told the OCC that the "ICC will provide oversight around the design and administration of the sales incentive plans and will report to the HRC regarding risk management practices in this area."[1854]

Under MRA#2, the OCC required WF&C to "[r]eassess both the EthicsLine and customer complaints investigative process, establish full independence from the first line, and ensure referrals and complaints are reviewed in a timely manner."[1855]

In a June 5, 2015 email exchange circulated among Mr. Loughlin, Mr. Byers, Ms. Hollingsworth (RCRM), Mr. Richards (BSA) and Ms. Klos two weeks before the Bank formally received the five MRAs, Mr. Byers summarized what the OCC examiners had discussed with him relevant to the upcoming MRAs.[1856] Mr. Byers reported that before going through each MRA, he and the OCC examiners "spent time discussing their review of 260 Ethics Line allegations."[1857] He reported the examiners understood these were allegations, but from their reading of the 260 reports the examiners "found many (45) of these to be 'truthful', 'egregious', and 'frightening'.[1858] The OCC then recommended Mr. Byers, Ms. Tolstedt, and Mr. Loughlin "read all these allegations – specifically the 'raw data' and not a summary from the first line Community Bank Group Risk."[1859]

Ms. Russ Anderson acknowledged that reading these allegations was a function of her team – but opined without elaboration that it was not important to read raw data from the Ethics Line.[1860] **Acting in furtherance of this opinion under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

It should be noted that – perhaps because of Ms. Russ Anderson's opinion that neither she nor her team needed to read raw data from the Ethics Line – Mr. Richards reported through the June 5, 2015 email exchange that the OCC examiners "want risk appetite metrics at both the enterprise and group level."[1861] Mr. Richards wrote there was "[n]othing surprising" about this corrective item, but continued: "however *they want the analysis of ethics line allegations and complaints moved to the 2nd line. Similar to above, they want Corporate Risk to review all 260*

---

[1853] OCC Ex. 705 at 7.

[1854] *Id.*

[1855] Tr. (Julian) at 6822; OCC Ex. 705 at 6.

[1856] Tr. (Russ Anderson) at 10106; OCC Ex. 71.

[1857] OCC Ex. 71 at 3.

[1858] *Id.*

[1859] *Id.*

[1860] Tr. (Russ Anderson) at 10106.

[1861] OCC Ex. 71 at 2.

Add. 1014

Appellate Case: 25-1079      Page: 1016      Date Filed: 05/16/2025 Entry ID: 5517644

allegations and complete an assessment and report back to the OCC and the Risk Committee."[1862]

No one participating in this email exchange raised concerns (or expressed surprise) about the OCC's directive to relieve Ms. Russ Anderson of her responsibility for Ethics Line analyses – although Mr. Richards noted that "Community Banking often challenges our characterization of Sales Integrity."[1863]

Along the same lines, the record reflects intransigence on Ms. Russ Anderson's part when leaders of the second line of defense sought information relating to case dispositions relating to the Community Bank. In the two weeks leading up to the OCC's issuance of the five MRAs, OCC Examiner Crosthwaite sought information about "repeat offenders" and a "timeline, from beginning to end if possible including Corporate Investigations work, on how long it takes to research, investigate, and fully disposition a complaint or ethics line allegation."[1864]

When Mr. Byers (for the second line of defense) sought information about these items, Ms. Russ Anderson responded without answering his questions, and when Mr. Byers asked "Do we not just have the numbers readily available?" Ms. Russ Anderson responded, "I don't know Keb. We have a really small team so I can't commit until I connect with Rebecca. Sorry."[1865]

There is no substantial evidence in the record supporting any claim by Ms. Russ Anderson that she could not produce the requested information due to having a "really small team". Upon the record as a whole, I find Ms. Russ Anderson's response to Mr. Byers disingenuous and entitled to no evidentiary weight.

When Mr. Richards followed up with an email to Ms. Rawson asking for a breakdown of cases closed as "non-issue" by Research without polling, and other data, rather than providing the requested data Ms. Russ Anderson responded to his request by writing: "We do. Why?"[1866] Mr. Richards responded, "So I understand the process, and know what comes to us, and how long it takes to get to us."[1867]

Shortly thereafter Ms. Rawson wrote directly and only to Ms. Russ Anderson asking, "would you like me to convey the requested information to Jim or should I hold off? I can have Paula pull and have it ready tomorrow morning in the event it is needed."[1868]

---

[1862] *Id.* (emphasis *sic*).

[1863] *Id.* 1.

[1864] Tr. (Russ Anderson) at 10113; R. Ex. 9489 at 8.

[1865] R. Ex. 9489 at 7.

[1866] R. Ex. 9489 at 4.

[1867] *Id.* at 3.

[1868] *Id.*

Add. 1015

Appellate Case: 25-1079     Page: 1017     Date Filed: 05/16/2025 Entry ID: 5517644

Ms. Russ Anderson responded – not to have Ms. Rawson provide the requested information, but directed her to "reach out and ask him if he would like a tutorial on how the team works and the protocols between the two groups. Otherwise it's just data."[1869] Ms. Russ Anderson apparently withheld the requested data, as she wrote directly and only to Ms. Rawson, "He's slightly irritated at me but I really don't want to just throw out data without context."[1870]

In his August 10, 2015 response to MRA#2, Mr. Loughlin reported to the OCC that while "Corporate HR is the owner of incentive compensation policies and is responsible for the oversight of incentive compensation risk management efforts," Corporate HR "partners with Enterprise Risk" to ensure "incentive compensation risks (including reputational issues and potential customer harm related to sales practices and employee conduct" are adequately understood and appropriately addressed."[1871]

Mr. Julian testified that in response to MRA #2, WF&C's Corporate Risk Group published a Sales Practices Risk Governance Document dated November 2015.[1872] Through this Governance Document, WF&S defined "credible challenge" as the "communication of an alternate view, opinion, or strategy developed through expertise and professional judgment to challenge business or enterprise strategies, policies, products, practices and controls."[1873]

According to the Governance Document, "Group Risk Officers (GROs), who lead the Group Risk organizations embedded in the Company's sales practices risk-generating Groups, exercise credible challenge through various means, including by raising concerns to Group management and escalating issues to CERG [Corporate Enterprise Risk Group] in a timely manner, and in particular its SPO [Sales Practices Oversight] unit in addition to certain components of the Chief Administrative Office, the Law Department, and certain Corporate Risk functions."[1874]

Further, the Governance Document required "all team members to escalate sales practices risk issues that necessitate specific reporting or decision making (particularly as it relates to remedial actions) to a higher level of the management or committee structure for consideration."[1875]

The Governance Document identified specific sales practices risk escalation events and the escalation model – so, for example, sales practices that are compensation-related are to be escalated through the escalation path outlined in the ICRM policy; and from there to the Sales

---

[1869] Id. at 2.

[1870] Id. at 1.

[1871] OCC Ex. 705 at 7.

[1872] Tr. (Julian) at 6816; R. Ex. 11373.

[1873] R. Ex. 11373 at 9.

[1874] R. Ex. 11373 at 9.

[1875] Id. at 21.

Appellate Case: 25-1079     Page: 1018     Date Filed: 05/16/2025 Entry ID: 5517644

Practices Oversight unit established through the Governance Document; and from there to the Head of Enterprise Risk; and from there to the ERMC, and then to the Risk Committee.[1876]

Without elaboration, Mr. Julian testified that while the Governance Document was designed "as a forward-looking document talking about what actions and activities and responsibilities, many of the practices that were – had been in place prior to this document were embedded or embodied into this, so it wasn't all new."[1877] Through leading questioning by his Counsel during direct examination, Mr. Julian testified that the Governance Document references the fact that Corporate Risk was establishing a new approach with regard to sales practices risk at this time.[1878]

According to the Governance Document, customer complaints and Unfair, Deceptive, or Abusive Acts or Practices (UDAAP) issues were to be escalated through the path outlined in the RCRM Policy, internal fraud through the path outlined in the Financial Crimes Risk Functional Framework, ethical issues through the Reputation Risk Framework – and all proceed from there to the Sales Practices Oversight Unit, using the same path as that used for incentive compensation issues.[1879]

Also in the MRA titled "**Enterprise Sales Practices – Second Line of Defense**" the OCC stated the following concern regarding "**Complaints**":

> Extended timelines to implement Regulatory Compliance Risk Management's (RCRM) revised Enterprise Complaints Management Policy (Policy), published in May 2014, is not scheduled to take until year-end 2016. This implementation plan appears excessive given the importance to the bank of an enterprise program.[1880]

The OCC identified the following cause related to this concern: "A decentralized complaints process, multiple complaints systems, and a need to capture verbal complaints systematically will require an extended period of time."[1881]

Mr. Julian testified that the second line of defense "developed a program to – again – to more centralize the intake process for customer complaints as well as enhance the reporting of

---

[1876] *Id.* at 22, Figures 3 and 4.

[1877] Tr. (Julian) at 6820-21.

[1878] Tr. (Julian) at 6912.

[1879] R. Ex. 11373 at 22, Figure 4.

[1880] OCC Ex. 1239 at 7.

[1881] *Id.*

Add. 1017

customer complaints."[1882] He said they "also evaluated the adequacy of the controls and built in controls that were necessary in the building out of that process and program."[1883]

In the MRA titled "**Community Bank Group – Sales Practices**" the OCC rescinded (effective June 26, 2015) the *Community Bank Risk Management – Sales Practices MRA* issued in Supervisory Letter 2015-07 on April 3, 2015, replacing that Letter with this MRA. The present MRA stated the following concern:

> The Community Bank (CB) Group lacks a formalized governance process to oversee Sales Practices and does not have an effective oversight and testing of branch (store) sales practices.[1884]

The OCC identified the following cause related to this concern: "Current governance processes are managed separately within the CB group and none address actual 'in branch' (store) monitoring of employee sales practices."[1885]

When asked on direct examination whom he understood this MRA to be directed at, Mr. Julian responded:

> To the Community Bank risk management group. It was very common for MRAs to be directed to specific businesses or specific lines of defense and not imply that Wells Fargo Audit Services was responsible for addressing the MRA or necessarily criticism of Wells Fargo services with respect to that MRA.[1886]

According to Mr. Julian, "the risk management function within the Community Bank was tasked with enhancing its oversight and quality assurance and testing programs with respect to sales practices within the branch stores."[1887] Mr. Julian acknowledged that this MRA required the Community Bank to establish "effective oversight and a testing/quality assurance function of branch (store) activities."[1888] Asked through leading questions on direct examination if he knew whether the first line of defense took meaningful steps to perform its commitment under this

---

[1882] Tr. (Julian) at 6824.

[1883] *Id.* at 6825.

[1884] OCC Ex. 1239 at 8.

[1885] *Id.*

[1886] Tr. (Julian) at 6747; 6825; see also, "22-03-07 Respondents' Amended Revised Errata Day 9-38" on page 53. Ordered by Second Supplemental Order.

[1887] Tr. (Julian) at 6825-26.

[1888] *Id.* at 6826; OCC Ex. 705 at 10.

Add. 1018

Appellate Case: 25-1079     Page: 1020     Date Filed: 05/16/2025 Entry ID: 5517644

MRA provision, Mr. Julian responded, without providing any details, "they enhanced their program and their governance policies and quality assurance functions."[1889]

Similarly, Mr. Julian acknowledged the MRA required the Community Bank to describe "the referral process and assign responsibility for compliance with CB's sales integrity policy," and testified – again without providing details – that they "applied a significant amount of resources to address this issue and built out the program."[1890]

In MRA #5, titled "**Audit,**" the OCC stated the following concern:

> Wells Fargo Audit Services (WFAS) did not identify the issues noted in this Supervisory Letter and past coverage did not provide an enterprise view of sales practices.[1891]

The OCC identified the following cause related to this concern: "WFAS coverage included various aspects of sales practices in individual audits, but did not aggregate these aspects into an enterprise view."[1892] It required WFAS to "[r]eassess their coverage of sales practices and provide an enterprise view (i.e., Enterprise Risk Management Assessment (ERMA) of Enterprise Sales Practices."[1893]

In the Supervisory Letter, EIC Linskens stated:

> There has been and continues to remain an overall lack of transparency at the first line of defense regarding past investigations and ongoing control and monitoring processes. There also exists only limited monitoring and oversight by the second (Corporate Risk, Human Resources, Compliance, and Legal) and third lines of defense. . . . [WFAS] related coverage included 12 audits addressing elements of sales practices between 2013 and 2015. However, no significant issues were identified or escalated as a result of that work, and the group has not completed a comprehensive review of sales practices across the enterprise.[1894]

Through MRA #5, WFAS was charged with reassessing their coverage of sales practices "and provide an enterprise view (i.e., Enterprise Risk Management Assessment (ERMA) of Enterprise Sales Practices."[1895] According to Mr. Loughlin's response to the MRA #5, "WFAS

---

[1889] Tr. (Julian) at 6826.

[1890] *Id.* at 6826-27.

[1891] OCC Ex. 1239 at 8.

[1892] *Id.* at 9.

[1893] *Id.*

[1894] OCC Ex. 1239 at 2.

[1895] Tr. (Julian) at 6830; OCC Ex. 705 at 11.

Add. 1019

Appellate Case: 25-1079    Page: 1021    Date Filed: 05/16/2025 Entry ID: 5517644

will be engaged with the various LOBs as they develop and implement corrective actions to the Enterprise Sales Practices MRAs."[1896]

Mr. Julian testified that WFAS responded to this task in the following way:

> So WFAS was engaged in dialogue with the various first and second line of defense folks who were tasked with implementing the responses to the MRA No. 1 through 4 to fully understand what those groups were doing and to building out the risk management framework, to building out the governance, to changing controls and processes, to understand all of that so that then Wells Fargo Audit Services could then reassess Wells Fargo Audit Service's coverage in light of all of those changes that were going on. At the same time, there were two third parties that were engaged, Accenture and PwC. So Wells Fargo Audit Services was engaged to understand the work that those two groups were doing, to the extent that that work should influence that Wells Fargo Audit Services was doing. And assessing through all of that its enterprise risk management view of sales practices.[1897]

Mr. Julian noted that the Supervisory Letter included a report that Corporate Risk "identified in early 2014 the need to establish a second line of defense framework for Sales Practices."[1898] Asked what that was referring to, Mr. Julian testified:

> So prior to the L.A. Times article back in 2013 and the escalation of sales practices risk -- corporate risk didn't have a risk framework, if you will, for evaluating and providing governance over sales practices. And as the sales practices matter became communicated and was being worked on, corporate investigations determined that they should develop a framework specific to sales practices risk.[1899]

According to Mr. Julian in response to leading questioning by his Counsel during direct examination, this meant the second line of defense – Corporate Risk – "owned" the responsibility for building out the risk framework.[1900]

Asked during direct examination to describe what he observed in terms of the Bank management's efforts to implement the corrective actions described in the June 2015 Supervisory Letter, Mr. Julian responded in generalities: "Corrective actions were identified.

---

[1896] OCC Ex. 705 at 11.

[1897] Tr. (Julian) at 6831; see also, "22-03-07 Respondents' Amended Revised Errata Day 9-38" on page 53. Ordered by Second Supplemental Order.

[1898] Tr. (Julian) at 6741; OCC Ex. 1239 at 2.

[1899] Tr. (Julian) at 6741. See also, "22-03-07 Respondents' Amended Revised Errata Day 9-38" on page 52. Ordered by Second Supplemental Order.

[1900] Tr. (Julian) at 6741.

Add. 1020

Appellate Case: 25-1079     Page: 1022     Date Filed: 05/16/2025 Entry ID: 5517644

Various plans were developed to address the issues. Again, a significant amount of resources. Really no money spared, no resources spared to address the issues."[1901]

Mr. Loughlin, Chief Risk Officer for WF&C, provided a more detailed description of the Bank's responses to the Supervisory Letter in a letter to EIC Linskens dated August 10, 2015.[1902] Nowhere in his response did Mr. Loughlin dispute the factual claims presented through the Supervisory Letter, nor did he disagree with the cause statements or that the actions required by the OCC were warranted.[1903]

Mr. Loughlin identified specific actions relating to the functions of WF&A's Incentive Compensation Risk Management (ICRM) Program, which was managed by Corporate Human Resources and was "overseen by the Company's Incentive Compensation Committee", which committee included Mr. Julian.[1904] Mr. Loughlin reported that key ICRM Program enhancements would include developing and implementing "methodology to incorporate sales practices risk metrics/outcomes as input into incentive compensation decisions for the Sales Practices Group", and expanding the ICRM governance framework "to include broader review of sales roles and evaluations of sales practices, including leveraging the oversight roles of the ICC [the Company's Incentive Compensation Committee] and HRC [the Human Resources Committee]."[1905]

In addition, WF&C engaged Accenture to complete an independent review of Enterprise Sales Practices, "with particular focus on Community Bank, Home Lending, and certain activities of Wells Fargo Advisors."[1906] Among the scope of Accenture's work in this engagement was a review of "Controls and Monitoring, including Ethics Line".[1907]

WF&C entered into a separate independent review with PricewaterhouseCoopers (PwC) "to complete an independent review that will assess quantification of potential customer harm related to the specific allegations in the Los Angeles litigation as well as a review to assess any broader enterprise concerns."[1908]

Mr. Loughlin reported that Corporate HR "in partnership with key stakeholders" would develop protocols to identify "whether any inappropriate behavior involving the sale of bank products by a bank employee and resulting in the termination of employment has the potential

---

[1901] *Id.* at 6786-87.

[1902] *Id.* at 6805-06; OCC Ex. 705.

[1903] OCC Ex. 705 at 1-12.

[1904] *Id.* at 2.

[1905] *Id.* at 3.

[1906] *Id.* at 3.

[1907] *Id.* at 4. See also OCC Ex. 195 (email summarizing Carol Dubie's call with Ms. Russ Anderson and Jason MacDuff, expressing her "big worry" that "the CFPB is very interested, along with the OCC and the Fed, who she says are ready to send the report off to DC and 'tear it apart'"). Id. at 3.

[1908] OCC Ex. 705 at 4.

for customer harm."[1909] He reported that the lines of business, along with "its Law Department and Regulatory Compliance Risk Management (RCRM) partners, will determine the existence of, and appropriate remediation for any customer harm."[1910] He specifically indicated that responsive action will include "partnering with Corporate Risk, [WFAS], and other key stakeholders to develop appropriate reporting" of handling the review of team member misconduct resulting in termination".[1911]

Asked through leading questioning by his Counsel during direct examination whether Corporate HR was taking meaningful action in response to the June 2015 Supervisory Letter and its five MRAs, Mr. Julian responded "Yes. I felt their response was appropriate and that they were taking action to implement the response."[1912]

Asked to describe how Corporate HR and WFAS were "partnering" in response to the MRAs, Mr. Julian responded, "Mostly working with WFAS as WFAS would monitor and assess the reporting that was being developed. They were getting advice, consultation, if you will, from WFAS to the extent that WFAS had a view whether it was responsive and appropriate reporting."[1913] Mr. Julian offered no documentation supporting this statement, and testified that he himself was not personally providing the services he attributed to WFAS.[1914]

Mr. Loughlin reported that WF&C would establish "an anonymous survey, testing, and analysis program (in store) to ensure our store team members are exhibiting appropriate sales and service conduct."[1915] After identifying Ms. Russ Anderson as the accountable executive, Mr. Loughlin reported that "[k]ey risk metrics to support analysis of effective sales practices activities will be developed by December 31, 2015" and that the Community Bank would "leverage the Community Bank Risk Management Committee to report, monitor and escalate sales practices activities and issues to the second line of defense and WFAS as appropriate."[1916]

Mr. Julian also acknowledged that WFAS "did not audit branches directly" but instead "leveraged" work performed by "several first-line control functions" which WFAS audited every two years.[1917] He identified SOCR, the Community Bank's "internal quality assurance team," as providing a "control function" by rating each retail branch location.[1918] Subsequent to a WFAS

---

[1909] Id.

[1910] Id.

[1911] Id.

[1912] Tr. (Julian) at 6812.

[1913] Id. at 6813.

[1914] Id.

[1915] OCC Ex. 705 at 10.

[1916] OCC Ex. 705 at 10.

[1917] OCC Ex. 1938 at 10 (page 8 of the Response).

[1918] Id.

Add. 1022

Appellate Case: 25-1079    Page: 1024    Date Filed: 05/16/2025 Entry ID: 5517644

audit of SOCR in 2014, WFAS "discontinued its reliance on SOCR and began conducting its own branch reviews."[1919]

Notwithstanding that WFAS did not audit Community Bank's branches directly, Mr. Julian denied the claim – attributed to OCC's Senior Deputy Comptroller Gregory Coleman – that WFAS audit scopes were specifically not designed to audit the sales practices issue.[1920] The assertion by the OCC is also related to the Conclusion Memorandum of February 23, 2015, which reported that WFAS has not conducted a structured review of cross sell in the Community Bank (like the ones performed for Wholesale and WRB)[1921] and noted Ms. Russ Anderson's insistence during the February 9, 2015 conference call that Community Bank's "cross sell is not a separate activity that can broken out and governed as a stand-alone activity" and noted no disagreement from WFAS's Mr. McLinko.[1922]

The record reflects that at least as of April 2015, the OCC recognized that Community Bank "is the Bank's main distribution channel, thus sales of products are an integral part of the group's activities." [1923] This was the stated reason the OCC "evaluated CB sales practices oversight instead of cross sell."[1924]

**July 13, 2015 Report of Examination on Risks Present at Wells Fargo Bank, N.A.**

In the July 13, 2015 ROE, the OCC, through Bradley Linskens as Examiner in Charge and Ron Pasch as Deputy Comptroller, identified the need to proactively control the Bank's reputational risks through "more effective compliance and operational risk programs."[1925]

Elaborating on this point, the ROE included the following:

> Two recent example [including the Los Angeles sales practices lawsuit] involved employee misconduct, actual or alleged, on a scale that is difficult to reconcile with management's perceptions of the risk culture within the firm. While we continue to assess the LA lawsuit, which alleges branch misconduct resulting in customer harm, our early findings suggest management should have responded more proactively to independently investigate the initial allegations. Management needs to ensure that matters such as these are fully and transparently investigated, harmed customers are remediated, bank employees are properly trained, incentive programs do not

---

[1919] *Id.*

[1920] Tr. (Julian) at 6632.

[1921] R. Ex. 18918 at 3.

[1922] *Id.*

[1923] Tr. (Julian) at 6636; R. Ex. 8347 at 3.

[1924] R. Ex. 8347 at 3.

[1925] R. Ex. 10015 at 5.

Add. 1023

Appellate Case: 25-1079      Page: 1025      Date Filed: 05/16/2025 Entry ID: 5517644

encourage the alleged behavior, and controls are in place to identify and resolve potential or emerging issues.[1926]

Asked during direct examination what steps were taken after the Bank received Supervisory Letter WFC 2015-26, Mr. Julian responded:

> Senior-level resources across all three lines of defense were tasked with developing responses to the MRAs. A senior-level person within corporate risk was tasked with coordinating the response. And, again, a significant amount of resources were applied to developing an appropriate response to the MRAs.[1927]

He identified an email chain that began with the OCC's email transmitting the June 26, 2015 Supervisory Letter to CEO John Stumpf, with copies to Mr. Julian and Ms. Russ Anderson among others.[1928]

**WFAS's Presentation to the A&E Committee: July 28, 2015**

Mr. Julian identified the minutes of the WF&C A&E Committee meeting of July 28, 2015, which meeting he said he attended.[1929] He also identified the WFAS Second Quarter 2015 Summary that was submitted to members of the Committee in advance of the meeting.[1930]

The minutes of the July 28, 2015 meeting include an oral record of Mr. Julian's report to the Committee.[1931] The minutes are silent with respect to *any* issues regarding sales practices misconduct attributed to team members of the Community Bank.[1932] The Report identified two engagements as unsatisfactory – Specialized Lending Services & Trust, and Unix Security – neither of which identified either the Community Bank or sales practices misconduct.[1933] It identified 40 rated projects or initiatives for 2Q15 – none of which concerned controls related to sales practices misconduct by team members at the Community Bank.[1934]

In his testimony about the contents of the July 2015 Summary, Mr. Julian asserted that the written Summary "communicated that the risk in the Community Bank remained heightened and increasing related to reputational and regulatory environment, specifically calling out the

---

[1926] R. Ex. 10015 at 5.

[1927] Tr. (Julian) at 6787.

[1928] *Id.*; R. Ex. 1039 at 4.

[1929] Tr. (Julian) at 6800; R. Ex. 20486.

[1930] Tr. (Julian) at 6801-02; R. Ex. 10038 (Summary), which appears to be a color version of the black and white version of the Summary found at OCC Ex. 2157; R. Ex. 10067 (transmittal email).

[1931] R. Ex. 20486 at 1-2.

[1932] *Id.* at 2.

[1933] R. Ex. 10038 at 3.

[1934] *Id.* at 12.

Add. 1024

Appellate Case: 25-1079    Page: 1026    Date Filed: 05/16/2025 Entry ID: 5517644

issuance to the City of Los Angeles lawsuit related to alleged improper sales practices, the issuance of the OCC report related to enterprise sales practices."[1935]

The written July 2015 Summary included the following:

**Community Banking**

Risk in Community Banking remains heightened and increasing related to reputation and regulatory environment. Ongoing media and regulatory scrutiny place additional pressure on management to ensure customers have a positive experience in all channels. This was especially evident in the second quarter with the recent issuance of the city of Los Angeles lawsuit alleging improper sales practices, along with the issuance of the OCC report related to enterprise sales practices. WFAS will be working with management as they develop their formal responses to the issues. In addition, we will monitor corrective actions related to enterprise sales practices, including those impacting Community Banking, and adjust our audit plan as warranted. The efforts of Community Banking, along with the large number of corporate initiatives impacting the business, continue to be a challenge and strain existing resources.[1936]

This Summary closely aligns with the Summary presented in August 2014, which described the risk trend as "stable."[1937] With no reference to the failure of either WFAS or the Community Bank to identify the root cause of sales practices misconduct by Community Bank team member reported by the Times article, the August 2014 Quarterly Report included the following:

Community Banking risk remains heightened related to reputation and regulatory change. Ongoing media and regulatory scrutiny place additional pressure to ensure customers have a positive experience in all channels including stores, call centers, digital channels, and ATMs. This includes meeting the technology needs of the millennial generation as well as competing with non-bank entities.

The risk trend is stable, and Community Banking has taken appropriate measures to continuously evaluate and enhance channel usability to meet the needs of the customer. Additionally, Community Banking continues to evaluate product offerings, pricing, and sales strategies to ensure customers are obtaining the products and services that help them achieve their financial goals.[1938]

---

[1935] Tr. (Julian) at 6911.

[1936] OCC Ex. 2157 at 25.

[1937] R. Ex. 6584 at 20.

[1938] R. Ex. 6584 at 20.

Add. 1025

Appellate Case: 25-1079    Page: 1027    Date Filed: 05/16/2025 Entry ID: 5517644

In the "mid-year review," the Second Quarter 2015 Summary recognized that the "audit plan is dynamic throughout the year," and avers "WFAS performs a mid-year review as part of our audit methodology to ensure our audit plan remains focused on key and/or emerging risk areas and adequate resources are available to complete the audit plan."[1939]

Notwithstanding that neither Internal Audit nor the first or second lines of defense had identified one or more root causes for the sales practices misconduct issues raised by the 2013 L.A. Times articles or the 2015 city of Los Angeles lawsuit, the Second Quarter 2015 Summary stated "WFAS management is comfortable with progress to date towards the original plan presented at the February 24, 2015, A&E Committee meeting."[1940]

Notwithstanding that the 2015 Summary expressly found that "WFAS needs to reassess their coverage of sales practices at an enterprise level and develop an Enterprise Risk Management Assessment (ERMA) process for sales practices,"[1941] the mid-year review reported only the need to "expand focus on activities such as consent order remediation, BSA/AML, Volker, regulatory reporting, and cybersecurity," but made no mention of the need to test the efficacy of first and second line of defense controls in place at the Community Bank relating to sales practices misconduct issues.[1942]

**September 2015 – Sales Practice Oversight Report Out**

By September 2015, data analyzed by the Sales Practice Oversight Working Group established that customer consent, unnecessary or inappropriate accounts, deceiving or misleading customers, and referrals were the top four allegation types in the May 2015 Corporate Investigations sample.[1943]

The Working Group reported that the intake of EthicsLine allegations for the month of May 2015 "was 21% higher than in the subsequent 3 months" and "a higher percentage of the overall allegations (+12.7%) were directly routed from the vendor to SSCOT for research."[1944] The Working Group Report stated its "completed work efforts to date" included "Completion of Corporate Investigation's (CI) review of 282 sales practices allegations from the month of May [2015]".[1945] When asked whether at the time of this report she was concerned by the findings, Ms. Russ Anderson responded, "I don't recall" but agreed that as the Group Risk Officer for

---

[1939] OCC Ex. 2157 at 36.

[1940] *Id.*

[1941] *Id.* at 43.

[1942] *Id.* at 36.

[1943] R. Ex. 10730 at 2.

[1944] R. Ex. 10730 at 2.

[1945] *Id.*

Add. 1026

Community Banking she had an obligation to pay attention to the themes coming out of the Ethics Line.[1946]

Acknowledging that the June 26, 2015 MRAs included matters concerning how EthicsLine complaints were being analyzed, Ms. Russ Anderson confirmed her receipt and review of the Working Group's report and testified that she was "paying the same amount of attention" to what employees were reporting through the Ethics Line as she had before receiving the OCC's June 26, 2015 Supervisory Letter – that she was being "[a]s careful as I always had."[1947]

The Working Group Report included a report by the Compliance Oversight Group – whose objective was "to complete review of 150 'sales practice/integrity allegations reported in June 2015 from the EthicsLine and identify high level themes across the sample set."[1948]

Ms. Russ Anderson acknowledged that SSCOT referred only a small percentage of sales practices allegations to Corporate Investigations for investigation.[1949]

Among the high-level themes were allegations that included:

1. Open[ing] accounts for customers who do not know accounts have been opened for them.
2. Convinc[ing] customers to open accounts they do not need[.]
3. Explain[ing] to customers that a new account is necessary when an account conversion is appropriate and can be done so without cost or fee to the customer.
4. Opening savings accounts for minors by convincing them the account [*sic*] were necessary.
5. Accounts opened by [team members] for themselves or family members that have zero balances.
6. Tak[ing] advantage of mentally handicapped customers and open[ing] credit card accounts and transfer[ring] funds to pay off other financial institution credit cards with lower debt.
7. [O]pen[ing] joint accounts for customers where one or more of the joint account holders is not present.
8. Maintaining old accounts when fraud has been detected; convincing customers to keep accounts open after fraud when not justified.

---

[1946] Tr. (Russ Anderson) at 10064.

[1947] *Id.* at 10061; R Exs. 10279, 10730.

[1948] R. Ex. 10730 at 5.

[1949] Tr. (Russ Anderson) at 10065; R. Ex. 10730 at 6: May 2015: 8%; June 2015: 8%; July: 5%; August: <1%.

Add. 1027

Appellate Case: 25-1079      Page: 1029      Date Filed: 05/16/2025 Entry ID: 5517644

9.      Referring calls to call center to open accounts that are not requested by the customer or for which the customer does not need or understand or for which they do not qualify.[1950]

**October 26-27, 2015 Meeting of the WF&C Board of Directors**

Ms. Russ Anderson stated that as late as September 2015, she was aware that Regional Bank executives continued to have concerns with sales goals associated with secondary deposit products – specifically about secondary debit cards not being activated.[1951]

The record reflects that Ms. Russ Anderson appeared before the WF&C Board of Directors during a regular meeting of the Board on October 26, 2015.[1952] Ms. Russ Anderson testified that she had no recollection of speaking during the meeting, suggesting that she currently is a poor historian with respect to recalling her past communication with the Board.

The minutes of the meeting reflect that she – along with Ms. Tolstedt and Mr. MacDuff –

> responded to directors' questions regarding Community Banking's efforts, including questions about team member turnover and comparisons with peers, the response of lower levels of management to recent sales practices enhancements, team member engagement, the timing of the implementation of the performance management and reward systems changes, other activities that could relate to sales practices risk, and Community Banking's research on the practices of other financial services firms.[1953]

Throughout the time Ms. Russ Anderson was present during this Board meeting, Ms. Tolstedt presented information to the Board regarding the Community Bank's "continuing efforts since 2013, and prior to the publication of the Los Angeles Times article, to evolve its model for product and service delivery with the goals to continue to improve the team member and customer experience, enhance organic growth, and reduce conduct risk".[1954]

Ms. Tolstedt's presentation "focused on Community Banking's process for setting solutions goals and the performance management and rewards systems . . . including actions to ensure solutions goals are set and administered fairly and do not contribute to undue pressure such as by establishing a solutions planning committee that includes the second line of

---

[1950] R. Ex. 10730 at 5.

[1951] Tr. (Russ Anderson) at 9638; OCC Ex. 193.

[1952] Tr. (Russ Anderson) at 9977; OCC Ex. 1102 at 6.

[1953] OCC Ex. 1102 at 7.

[1954] *Id.* at 6.

Add. 1028

Appellate Case: 25-1079    Page: 1030    Date Filed: 05/16/2025 Entry ID: 5517644

defense."[1955] (The record reflects that "solutions" in this context referred to products team members sold to bank customers.[1956])

The minutes reflect Ms. Tolstedt also "reviewed various ways in which Community Banking is adjusting, or is considering potential changes to, its performance management and rewards plans."[1957]

Included in her presentation to the Board were Ms. Tolstedt's comments on:

> areas of focus, including providing greater support and resources to the field in managing sales practices risk, enhancing monitoring capabilities and implementing risk appetite metrics, improving the adequacy of preventative and detective controls, and implementing a new retail sore conduct risk review team which will, among other things, conduct unannounced store visits to evaluate effectiveness of the program.[1958]

**February 2, 2016 Review of Internal Investigations of Confirmed Fraud – January 2013 through January 2016**

Ms. Russ Anderson identified a February 2, 2016 mail message from Jim Richards, head of Financial Crimes Risk Management.[1959] Through this transmission, Mr. Richards shared with Ms. Russ Anderson and others the results of an analysis by his analytics team – which looked at three years of terminations "relating to cases involving confirmed fraud determinations".[1960] While not limited to sales practices fraud by Community Banking team members, the analysis identified 9,168 such terminations between January 2013 and January 2016.[1961] One of the findings was that over 95% of the terminations "involved amounts below $5,000."[1962] This was the case with all of the 3,477 Sales Integrity cases during the referenced period.[1963]

When asked whether it concerned her that between January 2013 and January 2016 there were 3,477 terminations of team members for Sales Integrity violations involving confirmed fraud, Ms. Russ Anderson responded, "It did not. This was Jim Richards' report. I don't know what he pulled to come up with this data. But those numbers didn't concern me, no. There was

---

[1955] OCC Ex. 1102 at 6.

[1956] R. Ex. 168 at 3.

[1957] OCC Ex. 1102 at 6.

[1958] *Id.* at 6-7.

[1959] Tr. (Russ Anderson) at 10068; R. Ex. 11871.

[1960] Tr. (Russ Anderson) at 10070; R. Ex. 11871 at 1.

[1961] R. Ex. 11871 at 1.

[1962] *Id.*

[1963] *Id.*; R. Ex. 11872 at 1.

Add. 1029

Appellate Case: 25-1079    Page: 1031    Date Filed: 05/16/2025 Entry ID: 5517644

no fraud loss. There's no dollar loss."[1964] **Acting in furtherance of this opinion under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

**Magnitude of Sales Practices Misconduct**

Examiner Candy reported that the OCC's investigation revealed that the scope of misconduct dramatically exceeded what has been publicly reported even during the September 2016 Congressional inquiries, what was reported to the Board in real time, and what was disclosed to the OCC during its examinations.[1965] Examiner Candy opined that given the business model in the Community Bank, the duration of the sales practices misconduct problem, and the quality of the preventative and detective controls for sales practices misconduct, a significant number of Community Bank customer-interfacing employees engaged in sales practices misconduct.[1966]

Examiner Candy reported that in August 2017, Bank consultant PricewaterhouseCoopers determined that Bank employees opened approximately 3.5 million potentially unauthorized accounts between January 2009 and September 2016.[1967] She reported that Bank documents show that as of January 2016, the Community Bank allowed employees to have approximately 30 percent of the new accounts they opened to remain unfunded; they would still be eligible to receive sales credit for the unfunded accounts.[1968] She reported that it is likely that some employees would only engage in simulated funding if they had exhausted other types of misconduct (which the Bank did not have the capabilities to proactively detect) but were still unable to meet their goals.[1969] Thus, only employees who had exhausted other opportunities to invent sales but were still short on sales goals were most likely to resort to "simulated funding."[1970]

Examiner Candy noted that in the DOJ Statement of Facts, the Bank itself admitted to the volume of sales practices misconduct:

> The Community Bank's onerous sales goals and accompanying management pressure led thousands of its employees to engage in: (1) unlawful conduct to attain sales through fraud, identity theft, falsification of bank records, and (2) unethical practices to sell products of no or low value to the customer, while

---

[1964] Tr. (Russ Anderson) at 10072.

[1965] EC MSD Ex. 269 (Report of NBE Candy) at ¶101.

[1966] *Id.*

[1967] *Id.* at ¶102.

[1968] *Id.*) at ¶107.

[1969] *Id.*

[1970] *Id.*

Add. 1030

Appellate Case: 25-1079      Page: 1032      Date Filed: 05/16/2025 Entry ID: 5517644

believing that the customer did not actually need the account and was not going to use the account.[1971]

Millions of secondary accounts and products were opened from 2002 to 2016, and many of these were never used by customers.[1972]

Between 2011 and 2016, tens of thousands of employees were the subject of allegations of unethical sales practices. During this period, the Company referred more than 23,000 employees for sales practices investigation and terminated over 5,300 employees for customer-facing sales ethics violations, including, in many cases, for falsifying bank records. Thousands of additional employees received disciplinary action short of termination or resigned prior to the conclusion of the Company's investigations into their sales practices.[1973]

From 2002 to 2016, Wells Fargo opened millions of accounts or financial products that were unauthorized or fraudulent.[1974]

Millions of non-Wells Fargo-employee customer accounts reflected a Wells Fargo email address as the customer's email address, contained a generic and incorrect customer phone number, or were linked to a Wells Fargo branch or Wells Fargo employee's home address.[1975]

---

[1971] EC MSD Ex. 269 (Report of NBE Candy) at P110, quoting Press Release, U.S. Attorney's Office for the Central District of California, Wells Fargo Agrees to Pay $3 Billion to Resolve Criminal and Civil Investigations into Sales Practices (Feb. 21, 2020); Wells Fargo Deferred Prosecution Agreement and Exhibit A, Statement of Facts (Feb. 20, 2020), at A-1 through A-16, ¶ 15 (Feb. 21, 2020) (Bank admitting to criminal violations resulting from sales practices misconduct, the root cause, scope, and duration of the problem, and the knowledge of Community Bank senior leadership).

[1972] EC MSD Ex. 269 (Report of NBE Candy) at P110, quoting Press Release, U.S. Attorney's Office for the Central District of California, Wells Fargo Agrees to Pay $3 Billion to Resolve Criminal and Civil Investigations into Sales Practices (Feb. 21, 2020); Wells Fargo Deferred Prosecution Agreement and Exhibit A, Statement of Facts (Feb. 20, 2020) ¶ 17.

[1973] EC MSD Ex. 269 (Report of NBE Candy) at P110, quoting Press Release, U.S. Attorney's Office for the Central District of California, Wells Fargo Agrees to Pay $3 Billion to Resolve Criminal and Civil Investigations into Sales Practices (Feb. 21, 2020); Wells Fargo Deferred Prosecution Agreement and Exhibit A, Statement of Facts (Feb. 20, 2020) ¶ 30.

[1974] EC MSD Ex. 269 (Report of NBE Candy) at P110, quoting Press Release, U.S. Attorney's Office for the Central District of California, Wells Fargo Agrees to Pay $3 Billion to Resolve Criminal and Civil Investigations into Sales Practices (Feb. 21, 2020); Wells Fargo Deferred Prosecution Agreement and Exhibit A, Statement of Facts (Feb. 20, 2020) ¶ 32.

[1975] EC MSD Ex. 269 (Report of NBE Candy) at P110, quoting Press Release, U.S. Attorney's Office for the Central District of California, Wells Fargo Agrees to Pay $3 Billion to Resolve Criminal and Civil Investigations into Sales Practices (Feb. 21, 2020); Wells Fargo Deferred Prosecution Agreement and Exhibit A, Statement of Facts (Feb. 20, 2020) ¶ 16.

Add. 1031

Appellate Case: 25-1079     Page: 1033     Date Filed: 05/16/2025 Entry ID: 5517644

Examiner Candy reported that "millions" of non-Wells Fargo-employee customer account documents were not delivered to the customer but were sent to the team member or Bank premises indicates both the immense magnitude of the misconduct and the inadequate controls.[1976] She opined that this demonstrates the systematic nature of the misconduct and the detrimental impact of the high sales goals and high-pressure business model.[1977] She added that in an October 2013 email, a senior Community Bank executive stated, "Basically we are closing about 90% of the accounts we open within 12 months. Not something to broadcast but 'something' is going on."[1978]

Examiner Candy reported that anecdotal evidence also illustrated the pervasiveness of sales practices misconduct.[1979] She found that every customer-interfacing employee had a powerful motive and opportunity to engage in sales practices misconduct.[1980] She found the motive arose from fear of disciplinary action up to and including termination if they did not meet the unreasonable sales goals, or the desire to earn incentive compensation.[1981] She also found that the opportunity arose from the inadequate controls as detailed in this report.[1982] Given this motive and opportunity, the Bank's own data and analysis, the duration of sales practices misconduct, and her experience, training, and commission as a National Bank Examiner, it is Examiner Candy's opinion and conclusion that sales practices misconduct was pervasive in the Community Bank and involved tens of thousands, if not hundreds of thousands, of Bank employees issuing millions of products to customers without their consent.[1983]

**February 5, 2016 Agency-Referred Complaint to CEO John Stumpf**

Through an anonymous email message sent on February 5, 2016, an Agency-Referred Complaint (ARC) referenced the Greater Texas North District, complaining about unreasonable performance expectations.[1984] The banker's complaints and allegations in the ARC had been sent directly to CEO John Stumpf.[1985] Later that day, Employee Relations Leader Glen Chambers

---

[1976] EC MSD Ex. 269 (Report of NBE Candy) at ¶111.

[1977] *Id.*

[1978] *Id.* at ¶112, quoting Email from Laura Schulte to Shelly Freemen (Oct. 18, 2013) (OCC-WF-SP-05365262).

[1979] EC MSD Ex. 269 (Report of NBE Candy) at ¶113.

[1980] *Id.* at ¶114.

[1981] *Id.*

[1982] *Id.*

[1983] *Id.*

[1984] Tr. (Russ Anderson) at 9618; OCC Ex. 111 at 6-7.

[1985] OCC Ex. 111 at 5.

Appellate Case: 25-1079     Page: 1034     Date Filed: 05/16/2025 Entry ID: 5517644

forwarded the ARC to Rebecca Rawson, asking that Ms. Rawson "see if SSCOT wants to look into this matter first."[1986]

Three days later Ms. Rawson responded, letting Mr. Chambers know that "SSCOT will open a case and commence research on the district named in the letter."[1987] On February 23, 2016, Ms. Rawson received an email indicating Thomas Fox had "initial findings relating to this allegation" and asked Ms. Rawson when she would like to review those findings.[1988] Responding that it would be "difficult to find time to connect by phone this week," Ms. Rawson asked that Mr. Fox "convey findings via email".[1989]

Complying with this request, Mr. Fox wrote in response, in pertinent part: "Overall the Lubbock Area Retail Banking District does not appear to be an outlier compared to the other Districts within the Greater Texas North Retail Banking Division with regards to quality of sale indicators (activation and closures) related to credit products."[1990] Ms. Rawson then forwarded Mr. Fox's response to Glen Najvar, Senior Investigative Agent for SSCOT[1991]

At the end of March 2016, Mr. Najvar provided an update regarding the ARC. In pertinent part, after identifying five districts and five district manager, he wrote:

> The allegation stated DM's [*sic*] "sent down an order" for every banker to submit a minimum of two credit applications per day on average. It went on to state that if bankers did not meet this "quota" there was a possibility of being placed on Performance Improvement Plans or potentially even the possibility of termination.[1992]

Mr. Najvar's March 30, 2016 email to Ms. Rawson included copies of emails that had been included in the ARC, and Mr. Najvar's "Additional Information":

> • II has supplied the six email examples above as they reference credit applications which were mentioned in the letter to John Stumpf. Based on some of the email content; [*sic*] it appears there could be credence to the allegation.
> • II spoke with a seasoned team member, considered credible, within the market. This team member was adamant that they remain anonymous as they feared retaliation. This team member advised II that there was an expectation in the market for bankers to average 2 credit applications per day or that credit

---

[1986] OCC Ex. 111 at 6.

[1987] *Id.*

[1988] *Id.* at 5.

[1989] *Id.*

[1990] *Id.* at 4.

[1991] *Id.*

[1992] *Id.* at 1.

Add. 1033

Appellate Case: 25-1079      Page: 1035      Date Filed: 05/16/2025 Entry ID: 5517644

applications were expected on 30% of their total interactions (corroborates some of the content contained within supplied emails). This team member expressed that this was creating an immense amount of stress for bankers.

• The case within II will be closed as referred to ER due to ER concerns. II recommends SSCOT consider closing their case as referred to ER as well with this email being considered the referral notice to ER.[1993]

On April 27, 2016, through an email reflecting "High Importance", Ms. Rawson forwarded to Ms. Russ Anderson the email chain, "per our conversation today."[1994] During her testimony, however, Ms. Russ Anderson stated she did not recall the conversation with Ms. Rawson, and did not know "that we had a debrief on it."[1995] From the record as a whole this response indicates Ms. Russ Anderson was a poor historian regarding conversations she had with her direct report, Ms. Rawson, with respect to matters of high importance brought to her attention in April 2016.

Asked whether she had any reason to doubt that even as late as April 2016 employees faced unreasonable performance expectations with respect to sales goals, Ms. Russ Anderson responded, "I believe I've testified in the past that we had hotspots where people had unreasonable performance expectations", identifying LA/OC, New Jersey, Arizona, and Texas as "the primary ones" as "regions that would have hotspots" – something she acknowledged knowing about from 2013 to 2016.[1996]

Ms. Russ Anderson identified an email exchange from April 2016 through which she and others responded to a request by Steven Herfindahl of SSCOT for "the quarter by quarter breakdown of the allegations that were put into the buckets of consent and account openings for 2015".[1997] Within the exchange, Ms. Russ Anderson asked Ms. Rawson whether "we saw a decrease in those two categories or a steady state?" and Ms. Rawson responded, "Consent seems to be decreasing slightly."[1998]

When asked whether it concerned her at the time that the behaviors identified in Mr. Herfindahl's chart involving customer consent-based sales practices misconduct continued to occur in 2016 with only a slight decrease, Ms. Russ Anderson did not answer the question, deflecting by responding, "these are cases to the EthicsLine. They have not been proven allegations yet. The fact that there are decreasing allegations I thought was a good thing, but it

---

[1993] OCC Ex. 111 at 3.

[1994] *Id.* at 1.

[1995] Tr. (Russ Anderson) at 9620.

[1996] *Id.* at 9620-21.

[1997] *Id.* at 10084; R. Ex. 388 at 9.

[1998] R. Ex. 388 at 5.

Appellate Case: 25-1079     Page: 1036     Date Filed: 05/16/2025 Entry ID: 5517644

Add. 1034

doesn't necessarily mean that the cases that Corporate Investigations works – that's where the real information comes from."[1999]

Through the exchange, however, Ms. Russ Anderson requested and received data showing just the allegations, and through this when asked "by this point, regardless of whatever was done with respect to signature capture, SSCOT continued to find instances indicative of lack of customer consent, correct?" Ms. Russ Anderson responded, "that it could be indicated, yes" and found a "significant increase (+175% year over year)" of internal monitoring volumes.[2000]

Ms. Russ Anderson acknowledged that if the reduction to sales goals were sufficient and the evolving model work was effective, she would expect to see a significant decrease in improper sales behavior.[2001] She pointed to data analyses showing "consent inquiries have decreased 11 percent" and stated "[t]he reason the internal monitoring volume increased by 175 percent is because they added new metrics to what they were monitoring."[2002]

When asked whether it concerned her at the time that the more metrics that were added to SSCOT's monitoring, the more bad behavior was identified, Ms. Russ Anderson did not answer the question, deflecting by responding, "We were doing more proactive monitoring. You would always find more behaviors."[2003] When asked whether she would expect to continue to find more bad behaviors if the root cause had been addressed, Ms. Russ Anderson responded without answering the question, stating, "These were allegations or potential behaviors. We had no idea if they were yet proven."[2004]

Similarly, in a Core Team member email exchange from October 2015, the team reviewed a series of confirmed allegations of sales practices misconduct by Community Banking team members, and upon her review of the slate of cases, Ms. Russ Anderson wrote – two years after the publication of the first L.A. Times article, "In the case where there is no customer harm – such are referrals – I am also ok not putting them on admin leave. What is amazing to me is that we still have the behavior after all this time."[2005] Elaborating, Ms. Russ Anderson testified that this said that "email changes, you know, continued to occur even with all of the controls we were putting in place."[2006] She denied that this meant the controls were wholly inadequate, but "could continue to be strengthened."[2007]

---

[1999] Tr. (Russ Anderson) at 10088.

[2000] *Id.* at 10090.

[2001] *Id.* at 10092.

[2002] *Id.* at 10093.

[2003] *Id.*

[2004] *Id.*.

[2005] *Id.* at 10095; R. Ex. 10942 at 1.

[2006] Tr. (Russ Anderson) at 10097.

[2007] *Id.*

Add. 1035

Appellate Case: 25-1079   Page: 1037   Date Filed: 05/16/2025 Entry ID: 5517644

**February 12, 2016 Risk Assessment Summary by Hope Hardison (HR) and Michael Loughlin (CRO)**

Mr. Julian identified a Risk Assessment Summary provided to CEO Stumpf on February 12, 2016 by Hope Hardison (Director of Human Resources) and Michael Loughlin (Chief Risk Officer).[2008]

The Risk Assessment Summary included a list of "key risk issues" as of 2016, one of which related to Sales Practices (without limiting the risks to the Community Bank).[2009] Mr. Julian testified that while he recognized the Summary he did not see it other than as part of this enforcement litigation, and had no role in either reviewing or approving the Summary.[2010]

The Summary identified Claudia Russ Anderson among those with accountability for the sales practices issue.[2011] The Summary rated the sales practices issue at Community Bank as "improvement needed", describing the issue as "Top OCC issue with 5 MRAs related to Tone at the Top, FLOD, SLOD, and Customer Complaint. Current litigation related to Community Banking, ongoing customer remediation."[2012]

It described the impact as "reputational and regulatory risks for Wells Fargo resulting from this issue."[2013] It identified the resolution as follows: "Significant work has been accomplished to address the MRAs, but a lot still needs to be completed in a short timeframe for completion. Acceptable and steady progress is evidenced with all open corrective actions."[2014]

**Community Banking Enterprise Risk Management Assessment (ERMA) - 2015 (issued March 8, 2016)**

On March 8, 2016, WFAS, through Paul McLinko, Executive Audit Director, issued its 2015 Community Banking Enterprise Risk Management Assessment.[2015] Mr. Julian testified the process of developing the Community Bank ERMA was led by Paul McLinko and was "bottoms up" where "each line of business prepared their line of business ERMAs" – so "this was a result of that work that they prepared and were presenting it to their respective line of business management."[2016]

---

[2008] Tr. (Julian) at 6942; OCC Ex. 689.

[2009] OCC Ex. 689.

[2010] Tr. (Julian) at 6942-43.

[2011] OCC Ex. 689 at 7.

[2012] *Id.*

[2013] *Id.*

[2014] *Id.*

[2015] OCC Ex. 750.

[2016] Tr. (Julian) at 6959.

Add. 1036

Appellate Case: 25-1079      Page: 1038      Date Filed: 05/16/2025 Entry ID: 5517644

The Assessment reports that it is "designed to evaluate the adequacy of risk management within CB for those risks that could impact their ability to effectively meet their business objective."[2017] The overall assessment was that "risk management practices are effective in anticipating and escalating issues and emerging risks, as necessary."[2018] The Assessment found that "[m]odel risk processes and controls are effectively designed, implemented, and have demonstrated sustainability during 2015."[2019]

The Assessment included commentary regarding the five MRAs then pending:

> In 2015, the OCC issued five MRAs related to enterprise sales practices covering all lines of defense; one of which was issued specifically to Community Banking. In addition, two of the MRAs have corrective action components that specifically relate to incentive compensation. Management recognizes the significance of these issues and their impact on reputation. Since mid-2013, CB has been on a multi-year journey to evolve their model for product and service delivery. Progress continues to be made in these areas. Management has also begun multiple initiatives to address the Sales Practices MRAs. These include, but are not limited to enhanced Store Operations and Control Review (SOCR) questions, implementation of mystery shopping, customer complaint policy implementation and enhanced performance management plans. In addition, management is expanding sales practices oversight in areas such as enhanced reporting, trending, ethics line procedures, training and risk management (e.g., Regional Services, RB Compliance and Operational Risk, and Sales & Service Conduct and Oversight teams, Conduct Risk Committee, etc.). Combined these activities have a positive impact on the risk management environment.[2020]

The Assessment included notice that Wells Fargo "deferred its 2015 annual risk self-assessment completed by the first line of defense."[2021] Elaborating, the Assessment reported that "2015 was a year of significant change and transition for the Company with the implementation of various functional frameworks, significant initiatives across Corporate Risk including Compliance, BSA/AML, and Operational Risk as well as technology changes used to support the self-assessment process."[2022] The stated rationale included the following:

> An objective of the 2015 risk-assessment effort was to align it with the Corporate Risk Management Framework. Functional frameworks, a critical

---

[2017] OCC Ex. 750 at 1.

[2018] *Id.*

[2019] *Id.* at 2.

[2020] *Id.* at 3.

[2021] *Id.* at 23.

[2022] *Id.*

Add. 1037

Appellate Case: 25-1079    Page: 1039    Date Filed: 05/16/2025 Entry ID: 5517644

element in defining the first line responsibilities for the key risk types, continued to be developed and implemented throughout 2015. There were also other significant initiatives across Corporate Risk that created a high level of change across the organization. It was determined that there would be more value in doing the first line risk-self-assessment when the functional frameworks were further matured, and the initiatives were further implemented.[2023]

**WFAS's Presentation to the A&E Committee: April 25, 2016**

Mr. Julian testified that he made a presentation during the A&E Committee's April 25, 2016 meeting, and identified the minutes from that meeting.[2024] The minutes reflect that Mr. Julian "commented on the positive trends for the month, including a decline in the number of open MRAs and no MRAs that were reopened."[2025]

The minutes reflect that Mark Links "presented a report on the [WFAS] 2015 Enterprise Risk Management (ERM) Assessment" but nothing in the minutes indicated that Board members were presented with the recently issued 2015 Community Banking Enterprise Risk Management Assessment.[2026] Mr. Julian testified that Mr. Links was an Executive Audit Director with primary audit oversight of Corporate Risk, who "headed up the overall process for developing the enterprise-wide ERMA assessment."[2027]

The 2015 ERMA that Mr. Links presented to the A&E Board on April 25, 2016 concluded that as of December 31, 2015, Enterprise Risk Management at WF&C "needs improvement" under a rating system using three ratings – satisfactory, needs improvement, or weak.[2028] In its report on Organizational Risk, the Assessment found "the second line of defense needs to continue implementing new governance requirements. Challenges remain for the first line of defense in oversight, risk identification, risk assessment, operational risk, testing, and program maturity/sustainability, as shown by High related issues and regulatory concerns (i.e., MRAs and [Matters Requiring Immediate Attention]). First line of defense operational risk management practices are evolving and work remains to align practices with the enhanced framework."[2029]

Mr. Julian identified a Sales Practices MRA Status Update dated April 29, 2016 from Paul McLinko and others to Claudia Russ Anderson and others providing a summary of

---

[2023] *Id.*

[2024] Tr. (Julian) at 6961; R. Ex. 20631.

[2025] R. Ex. 20631 at 4.

[2026] Tr. (Julian) at 6965; R. Ex. 20631 at 4-5.

[2027] Tr. (Julian) at 6965.

[2028] R. Ex. 1144 at 2.

[2029] *Id.* at 2-3.

Add. 1038

Appellate Case: 25-1079      Page: 1040      Date Filed: 05/16/2025 Entry ID: 5517644

corrective actions relating to the five MRAs issued in 2015.[2030] The Update included in its "highlights" section that "management developed a dashboard to track the corrective action plan and progress."[2031]

The Update also noted that "Management has extended due dates on four corrective actions related to the independent evaluation of allegations of inappropriate behavior, risk appetite metrics, root cause analysis of sales integrity violations, and identifying complaints involving UDAP. These corrective actions are associated with MRAs 1, 2, and 3."[2032]

## May 3, 2016 Core Committee Meeting Regarding Root Cause of Sales Practices Misconduct

Ms. Russ Anderson testified that she was on the Core Committee.[2033] As previously noted, Ms. Russ Anderson testified that through the May 19, 2015 materials presented to the Risk Committee of the WF&C Board of Directors, the Core Committee's Sales Conduct Oversight & Corporate Security Investigation report stated "[t]he root cause [of sales practices misconduct] was determined to be intentional team member misconduct based on the fact that only a small percentage of Retail Banking team members engaged in the outlier behavior".[2034] Preponderant reliable evidence in the record established that this was a false and materially misleading statement.

While denying she wrote the language appearing in the report, she acknowledged editing the material in advance of its distribution to the Committee members.[2035] She testified that she believed intentional team member misconduct was "one of the root causes".[2036]

Twelve months later, a member of the Core Committee, David Otsuka, presented a proposed agenda for the Committee's May 3, 2016 meeting.[2037]

███████████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████████████████

---

[2030] Tr. (Julian) at 6973; R. Ex. 1062 (Memo); R. Ex. 12478 (transmittal email from Paul McLinko to David Julian).

[2031] R. Ex. 1062 at 1.

[2032] Id. at 2.

[2033] Tr. (Russ Anderson) at 9275. The Core Committee also is referred to as the Core Team. See, e.g., OCC Ex. 251 at 4: "Middletown, Delaware follow up: Background: Simulation of funding that was previously considered by the Core Team. . . . Initial review by the Core Committee expressed concern . . . ."

[2034] Tr. (Russ Anderson) at 9456; OCC Ex. 1299 at 3.

[2035] Tr. (Russ Anderson) at 9409.

[2036] Id. at 9457.

[2037] OCC Ex. 251.

Add. 1039

Appellate Case: 25-1079      Page: 1041      Date Filed: 05/16/2025 Entry ID: 5517644



---

[2038] OCC Ex. 251 at 6.

[2039] *Id.*

[2040] *Id.*

[2041] *Id.*

[2042] *Id.*



---

2043 OCC Ex. 251 at 4.

Add. 1041

Appellate Case: 25-1079     Page: 1043     Date Filed: 05/16/2025 Entry ID: 5517644

Ms. Russ Anderson identified the agenda advanced by Mr. Otsuka[2044] She said the Core Team meetings "occurred every Tuesday," and described them as being "very difficult" because "we were making decisions about team members' careers, people's lives and it was very, very hard. For me, it was hard."[2045]

Reflecting on the cases presented in the agenda, Ms. Russ Anderson testified that for "some of the recommendations that were being provided by Corporate Investigations, I had a different thought on what the outcome should be."[2046] Elaborating, Ms. Russ Anderson testified that she "felt that the team members who were particularly ones who were young may have been trained incorrectly and that we should try to find a way to give them another chance. And that's what I recollect from these; that I didn't agree with every one of these termination recommendations."[2047] This is reflected in the email chain, where Ms. Russ Anderson wrote to Mr. Otsuka, Ms. Herzberg, and Ms. Rawson "Can we talk about the emails at the bottom of the chain? I have some opposing thought on sending these."[2048]

In her response to Mr. Otsuka's proposed agenda, Ms. Russ Anderson wrote, "I am not convinced we are getting to the root of the issue in terms of 'why' this keeps happening."[2049] She added, "I might be totally over reacting here but I really feel like we are missing something after all this time and I think it is that we aren't going high enough in the food chain, as it were, to understand the messaging that is coming down to the stores."[2050]

Expounding on her email to Mr. Otsuka, Ms. Russ Anderson testified that she found "in talking with some of the Senior Regional Banking executives and Regional Presidents that they didn't feel like they needed to carry their message down to the store level."[2051] She testified she had been "rebuffed" by some of those executives, who told her when she brought these concerns to their attention that "they were overstepping their managers and that they did not want to do that."[2052] She testified that she wondered "if we've stagnated ourselves here at the district manager level in looking, and now we need to start looking at what messaging is coming from area presidents or regional presidents or lead regional presidents. . . is there a message breakage

---

[2044] Tr. (Russ Anderson) at 9469-70.

[2045] *Id.* at 9471.

[2046] *Id.* at 9472.

[2047] *Id.*

[2048] OCC Ex. 251 at 2.

[2049] *Id.* at 1.

[2050] *Id.*

[2051] Tr. (Russ Anderson) at 9474.

[2052] *Id.* at 9475.

Add. 1042

Appellate Case: 25-1079    Page: 1044    Date Filed: 05/16/2025 Entry ID: 5517644

somewhere in the continuum?"[2053] There is no substantial evidence that Ms. Russ Anderson engaged in credible challenge in her response to being rebuffed by these executives.

Asked by her Counsel during direct examination why was she still asking questions about root cause for sales practices in May of 2016, Ms. Russ Anderson responded:

> We had been solving root causes along the way. There were things that we had solved for, important things we had solved for, including changing sales goals and things like that. But there was still, in my mind, something that we were missing. I could have been completely wrong, which is why I said to David, I might be totally overreacting. But I just had a sense that -- that there was still something we needed to figure out.[2054]

Ms. Russ Anderson dismissed the premise, advanced by Examiner Candy, that it would have been possible to determine that pressure to meet sales goals was the root cause of the sales practices misconduct by looking to a sample of EthicsLine allegations.[2055] Ms. Russ Anderson testified that she did not think it would be possible to make such a determination.[2056]

Explaining this response, Ms. Russ Anderson testified:

> Because they are just that; they're allegations. Many of them are anonymous, and until you can really bring forth data and look at the data, it's hard to know if that's just a team member being -- complaining for complaining's sake, which happens, or if it's really "We've got a problem." So you can't -- I just think it's – I just don't think that you can sit and read EthicsLine allegations in and of themselves and do nothing else and determine what the root cause is. It's too simplistic.[2057]

**Acting in furtherance of this opinion under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

It should be noted that related to the May 2015 examination by the OCC, on June 1, 2015 Ms. Russ Anderson provided a sample of EthicsLine call reports.[2058] Initially Ms. Russ Anderson testified "I honestly don't remember" whether she actually read the samples; she then changed her answer to, "I did, yes."[2059]

---

[2053] Tr. (Russ Anderson) at 9475.

[2054] *Id.*

[2055] *Id.* at 9476.

[2056] *Id.*

[2057] *Id.*

[2058] *Id.* at 10116; OCC Ex. 2192.

[2059] Tr. (Russ Anderson) at 10117.

Each of the samples alleged Sales Incentive Program Violations.[2060]

From **Placentia, California**, on May 9, 2015 the anonymous EthicsLine caller identified a Banker, RP, and claimed to have witnessed "on numerous occasions" from March 2015 to the present, where RP "would forge customers initials on the customized summaries. Management does not say anything because she 'produces' numbers for the branch to make management and herself look good."[2061]

From **Wayzata, Minnesota** on May 9, 2015 the EthicsLine caller, [PY], reported, "It appears that a new account was opened with an existing account could have been converted. Customer did not know why the old account had not been closed. Management has not been notified as past instances similar reports have led to no perceived action."[2062]

From **Idaho Falls, Idaho** on May 9, 2015, an anonymous EthicsLine caller reported that on January 2, 2014:

> three accounts were opened up for customer [RH] by Store Manager [AW] without RH's authorization. This was brought to caller's attention on 5/9/15 when RH visited his/her branch. After speaking with RH, caller found out that RH had been in the branch and had discussed opening accounts, but had had to leave before actually going through with it. Copies of his identification were made on that day. However, he never signed for the accounts nor funded them. He was not aware of the accounts until he was notified that they were overdrawn.
>
> AW opened up checking account *196 and savings accounts *505 and *086. RH is currently interested in opening up an account. Caller would like for the company to investigate and reverse the fees and charge off so that RH is not penalized for what AW did.[2063]

From **Bremerton, Washington** on May 9, 2015, an anonymous caller reported that the customer:

> came into the Bremerton banking location very upset because he had been talking about opening a secured credit card with [Business Specialist CP]. He had not agreed to open up the card and came into the branch very confused because he did not have any money in his account. It appears that the card was opened up without his consent. This caused him to be in a very tight spot

---

[2060] OCC Ex. 2192 at 2-17.

[2061] *Id.* at 2.

[2062] *Id.* at 3.

[2063] *Id.* at 4.

Add. 1044

Appellate Case: 25-1079    Page: 1046    Date Filed: 05/16/2025 Entry ID: 5517644

because he did not have access to the funds he needed for the day because the card was in processing.[2064]

From **Lansdale, Pennsylvania** on May 9, 2015 an anonymous customer:

called in today 5/9/15 to check balances on accounts, in talking to the customer she told me she had two accounts and a 3rd that was closed due to fraud. I reviewed accounts and old account had not been closed, and did not have lost/stolen fraud holds placed on it at this time. When asked she told me that there were unauthorized transactions coming thru her original account and that banker told her she needed to close account and open a new one. No hold was placed on accounts allowing fraud to continue to come in, account was not submitted to close, and customer was convinced to open two new accounts thinking that fraud was [happening] and we were taking care of the problem.

In doing so the banker also took money from account to make opening deposits in new accounts. Causing overdraft fees and a negative balance that is not coverable by balances now because customer was misinformed. I submitted to relink debit cards because branch employee opened a debit card as well for new accounts and did not link things the way the customer was told. Causing money to come out of unexpected linkage. Customer was in good spirits about this issue but was very confused with situation and is concerned because money is still owed against original account that should have been closed now. [Note: the EthicsLine caller was not identified, nor was the customer, nor was any banker identified as a Reported Individual.][2065]

From **Denver, Colorado** on May 9, 2015, an anonymous EthicsLine caller reported:

On 4/22/2015 Customer [WN], who is 17 years old, went into this location. WN had a joint account with his parents. Since he was turning 18, Personal Banker [CW] advised him to open a regular account. CW opened a checking account and savings account for him.

On 5/19/2015 WN's father, [EN], came into the caller's branch (1601 Blake Street, Denver Colorado 80202) because his son had complained that he was sat down for more than an hour and CW had opened an account for him. EN also asked what happened with $600 that were removed from the account. The caller checked the accounts. He/She was able to see that the $600 were put into WN's new account. The caller told EN that a banking representative will call him on 5/11/2015 to further speak to him.

---

[2064] *Id.* at 6.

[2065] *Id.* at 7.

Add. 1045

Appellate Case: 25-1079     Page: 1047     Date Filed: 05/16/2025 Entry ID: 5517644

The same day, he/she spoke to District Manager [JV] about the incident. JV advised the caller to call the hotline. The caller wants to document the issue.[2066]

From **Croydon, Pennsylvania** on May 9, 2015, an anonymous EthicsLine caller reported, "Customer called and stated she opened a joint account in the branch without the other signer present, and was given an instant card for herself as well as the joint holder. The joint holder lives in another state.[2067]

From **Salem, Oregon/Dallas, Texas** on May 9, 2015 EthicsLine caller [TM, Phone Banker] reported that customer [CH] from Dallas, Texas:

> called in today to order some checks. During the authentication process I asked for her online banking username. She stated that she had no idea, that she has never had a computer and had never signed up for the service. I needed to further authenticate her as I proceeded with the order for checks. I asked her for her savings account number. She told me that she does not have one, and never had one. I continued to service the call and order her checks.[2068]

From **Salem, Oregon/Americus, Georgia** on May 9, 2015 anonymous EthicsLine caller reported:

> Customer [MW] called in highly upset because she was talked into opening a new checking account. She stated that this hurt her and she though WF was helping her. She stated she wanted to go back to her ONE checking account and her ONE savings account' however, she has 2 savings accounts and claims the only account that was newly opened was checking account #*913. Claims that she was not advised that by using her new account's debit card would pull funds from her old checking and old savings.[2069]

From **Fairfield, California** on May 9, 2015, EthicsLine caller [RW] reported:

> Customer called phone bank due to getting 2 debit cards and was unsure as to why, when we found out they were to her children[s']checking accounts[.] She then told me she only went into the bank to make a $200 deposit into her son's savings account[.] No other information was discussed[.] When I researched what had happened, the banker made a change to her checking accounts and sent out the debit cards[.] The customer stated that she has had

---

[2066] *Id.* at 9.

[2067] *Id.* at 11

[2068] *Id.* at 12.

[2069] *Id.* at 14.

**Page 293 of 443**

Add. 1046

Appellate Case: 25-1079     Page: 1048     Date Filed: 05/16/2025 Entry ID: 5517644

many problems with this specific branch previously and wanted to file complaints about how they do business[.][2070]

When asked wither she concluded that pressure to meet sales goals was not a predominant theme in the EthicsLine samples that she read, Ms. Russ Anderson responded, "I can't remember what I thought."[2071]

Ms. Russ Anderson denied any assertion that by the time proactive monitoring had been paused the root cause was well known to her.[2072] She added that even as she presently testified she did not have a view of what the root cause was for sales practices misconduct.[2073] She added she believes "that there are multiple root causes and that you have to work each one as you find them."[2074] **Acting in furtherance of these opinions under the conditions that were present during the relevant period constituted unsafe or unsound banking practice and a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

**Supervisory Letter WFC 2016-36: OCC Review of Enterprise Sales Practices**

On July 18, 2016, the OCC through Bradley Linskens as Examiner in Charge, Large Bank Supervision, issued Supervisory Letter WFC 2016-36, providing WF&C with the OCC's review of enterprise sales practices.[2075] Through this Supervisory Letter, the OCC noted that in June 2015 the OCC identified "a number of deficiencies in internal controls and monitoring processes at the first, second, and third lines of defense that resulted in improper and imprudent sales practices."[2076]

Following the issuance of the June 2015 Supervisory Letter, the OCC reported reviewing the Regulatory Compliance Risk Management's (RCRM) analysis of sales practices complaints related to products sold in branches; a sample of sales integrity cases from Corporate investigations that resulted in employee terminations; a sample of employee sales integrity allegations made to the Bank's employee ethics line and investigation by the Community Bank's Sales and Service Conduct Oversight Team (SSCOT); Accenture's review of sales practices in Community Banking, among other lines, and PwC's independent reviews of customer harm associated with inappropriate sales behavior.[2077]

Upon such review, the OCC concluded the Bank "engaged in unsafe and unsound banking practices based on findings in SL 2015 and further supported by our reviews" of the

---

[2070] *Id.* at 16.

[2071] Tr. (Russ Anderson) at 10117.

[2072] *Id.* at 9476-77.

[2073] *Id.* at 9477.

[2074] *Id.* at 9477.

[2075] Tr. (Julian) at 6987; OCC Ex. 805.

[2076] OCC Ex. 805 at 1, citing OCC Supervisory Letter 2015-36 (SL 2015).

[2077] OCC Ex. 805 at 1-2.

Add. 1047

Appellate Case: 25-1079     Page: 1049     Date Filed: 05/16/2025 Entry ID: 5517644

additional information noted above.[2078] It found "[a]ggressive sales pressure," along with the "lack of adequate risk management oversight, fostered inappropriate and possibly fraudulent behavior by employees."[2079] It found "evidence of sales pressure and inappropriate behavior resulting from the Bank's lack of sound risk management policies, procedures, and controls related to its sales practices."[2080]

> Enterprise culture was reported in these terms:

>> For decades, the Bank's Vision and Values statement emphasized "cross-selling" – the process of offering customers the products and services they need to help them succeed financially. While cross-selling itself may not be a supervisory concern, the practice at the Bank was not properly governed, which led to excessive pressure on employees to sell more products to meet sales goals and achieve financial incentives.

>> In addition, the risks from these sales practices were not adequately managed. Evidence reveals that many times cross-selling was done without considering whether the products were appropriate for or even wanted by the customer. The Accenture assessment also confirmed aggressive sales goals and inappropriate supervisory practices in the CB. These concerns included sales goals that put undue pressure on front-line employees, as well as incentive compensation programs that often were misaligned with local branch traffic, staff turnover and customer demand.[2081]

> The 2016 report found SL 2015 "highlighted a number of weaknesses in internal controls and management information systems including a lack of robust first, second and third lines of defense risk management programs."[2082]

> The 2016 Letter reported, "[t]he practice of opening deposit accounts without authorization, the practice of moving funds without customer consent (simulated funding) and the failure to timely refund or remediate fees charged are considered unsafe or unsound banking practices."[2083] It noted the issues presented in the 2015 Letter still had not been resolved:

>> Our review of a sample of Ethics Line referrals reflects allegations of inappropriate and unethical employee behavior and suggests there still may be too much pressure on store employees to meet sales goals. Noted themes from the allegations we reviewed were sales pressure, taking advantage of

---

[2078] OCC Ex. 805 at 2.

[2079] *Id.*

[2080] *Id.*

[2081] *Id.*

[2082] *Id.* at 3.

[2083] *Id.*

Add. 1048

Appellate Case: 25-1079    Page: 1050    Date Filed: 05/16/2025 Entry ID: 5517644

protected classes (e.g., age/elderly), and the selling of unwanted deposit or credit products, particularly credit cards. Our limited samples of customer complaints as well as the OCC's Customer Assistance Group (CAG) and CFPB complaints, identified similar themes and further evidence that the Bank engaged in the unsafe and unsound practice of failing to adequately monitor and control sales practices to prevent such inappropriate employee behavior.[2084]

The OCC identified the root causes of the "widespread and unauthorized opening of credit card accounts without consent" included "excessive sales pressure and the absence of a control process that required documentation of explicit customer consent."[2085]

Mr. Julian identified the response by Mr. Loughlin, presented in a letter dated July 29, 2016.[2086] Through this letter, Mr. Loughlin asserted Wells Fargo Bank, N.A., "risk management of sales practices and the specifically identified issues in the Supervisory Letter were not, and are not, unsafe or unsound."[2087] Mr. Loughlin used the definition of "unsafe or unsound practice" as "any action or omission, which is contrary to generally accepted standards of prudent operation, the possible consequences of which, if continued, would be abnormal risk or loss or damage to an institution, its shareholders, or the agencies administering the insurance funds."[2088]

Mr. Loughlin did not dispute that sales practices misconduct occurred: "We are deeply committed to our customers, and we acknowledge and regret that some customers were negatively impacted by the sales practices identified in the Supervisory Letters."[2089] According to Mr. Loughlin, however, "the identified sales practice issues do not present an abnormal risk of loss to the Bank or its shareholders, were self-identified, and the Bank has taken significant corrective action both independently and in response to the 2015 Supervisory Letter."[2090]

Through leading questioning by his Counsel during direct examination, Mr. Julian testified that at the time Mr. Loughlin sent the July 29, 2016 letter, he agreed that based on the information available to him at the time, that Wells Fargo Bank, N.A., had made significant progress on MRA action items and fundamentally improved the Bank's sales practices risk oversight.[2091]

---

[2084] *Id.* at 4.

[2085] *Id.*

[2086] Tr. (Julian) at 7003; R. Ex. 1192.

[2087] R. Ex. 1192 at 1.

[2088] R. Ex. 1192 at 1 n.1, quoting *In the Matter of Patrick Adams*, OCC AA-EC-11-50 and OCC Policies and Procedures Manual ("PPM") 5000-7 (February 26, 2016).

[2089] R. Ex. 1192 at 1.

[2090] *Id.* at 2.

[2091] Tr. (Julian) at 7003.

Add. 1049

Appellate Case: 25-1079      Page: 1051      Date Filed: 05/16/2025 Entry ID: 5517644

The letter reports, "[a] key principle of the Incentive Compensation Risk Management (ICRM) Program is that incentive compensation should balance risk and financial reward in a manner that does not provide team members with an incentive to exhibit inappropriate sales conduct."[2092] The letter continues: "Corporate HR, through the ICRM Program and in partnership with the appropriate Enterprise Risk and Compliance functions including Sales Practices Oversight (SPO), the Law Department, and others, continues to evaluate sales practice risk in connection with the design and administration of incentive compensation as well as related performance management practices within the LOBs, including team member sales goals."[2093]

Mr. Julian did not dispute Mr. Loughlin's representation that as of the issuance of this letter, neither WFAS nor any other entity at Wells Fargo Bank, N.A. had determined the root cause of the issues presented by the 2013 L.A. Times articles or the 2014 city of Los Angeles lawsuit. Mr. Loughlin reported, "SPO is currently conducting the root cause [of sales integrity violations] analysis and will provide an update to executive management and the Risk Committee. This analysis is being developed by reviewing the results and recommendations of the independent reviews as well as through discussions with senior leaders in both the first and second lines of defense."[2094]

**Sales Practices MRA Status Update – July 29, 2016**

Mr. Julian identified a Sales Practices MRA Status Update dated July 29, 2016 from Paul McLinko and others to Claudia Russ Anderson and others, which provided a summary of corrective actions relating to the five MRAs issued in 2015.[2095] He testified that WFAS team members provided updates as the report was being prepared, and the "had communications with them as to the conclusions drawn here."[2096] He added, however, that the update "was specifically with respect to the work that the first and second line were responsible for doing with respect to MRA No. 1 through 4," and that he did none of the work that led to the generation of this Status Update.[2097]

The Status Update reflected, "key corrective actions are not scheduled to be completed until the fourth quarter 2016", resulting in an Overall Rating of "Yellow".[2098] In this context, Yellow indicated "potential risk of schedule delay or missed milestones", "incomplete action plans to address issues", "implementation plan requires improvement to fully mitigate risks",

---

[2092] R. Ex. 1192 at 6.

[2093] *Id.*

[2094] *Id.* at 12.

[2095] Tr. (Julian) at 6973; R. Ex. 13164 (Memo).

[2096] Tr. (Julian) at 7005.

[2097] *Id.* at 7005-06.

[2098] R. Ex. 13164 at 1.

Add. 1050

"identified environmental factors (internal or external) have the potential to impact the timely implementation of this effort."[2099]

One of the "key milestones," relating to the sales practice oversight by the second line of defense, was to "[e]stablish initial risk appetite metrics for Community Banking".[2100] Through the Status Update, WFAS reported that it now "believes that a complaint metric should be included in order to effectively assess Sales Practices risk within Community Banking" but described other initial metrics presented through the Update "are a good starting point."[2101]

Another bulleted point relating to MRA #2 and the second line of defense was to "[r]eassess EthicsLine and customer complaints investigative processes."[2102] The Update reported, "[p]lanning for the Ethics Line audit is scheduled to start in July 206 [*sic*]."[2103] The Update reported that as "part of the overall planning for this audit, we will determine our testing approach as specifically related to the validation of EthicsLine portion of this corrective action. WFAS is also developing our validation testing approach for the customer complaints investigative processes."[2104]

### Podium Day – September 8, 2016

Through leading questioning by his Counsel during direct examination, Mr. Julian identified September 8, 2016, as the day the OCC Consent Order and L.A. City Attorney lawsuit regarding sales practices were publicly settled, with significant media reaction.[2105] He recalled, "there was a significant amount of activity, discussions, dialogues going on around that day."[2106]

### September 13, 2016: WF&C Eliminated All Sales Goals and Sales Incentives for Retail Banking Team Members

Mr. Julian recalled that on September 13, 2016, Wells Fargo & Company announced that it would eliminate all sales goals and sales incentives for retail banking team members.[2107]

### PwC Analysis of Deposit Accounts for Potential Simulated Funding Behavior – September 14, 2017

Mr. Julian identified the analysis by PricewaterhouseCoopers that examined deposit account data to identify "potential customers and accounts that possess attributes, account

---

[2099] R. Ex. 13164 at 5.

[2100] *Id.* at 3.

[2101] *Id.*

[2102] *Id.*

[2103] *Id.*

[2104] *Id.*

[2105] Tr. (Julian) at 7008-09.

[2106] *Id.* at 7008.

[2107] Tr. (Julian) at 7020.

Appellate Case: 25-1079    Page: 1053    Date Filed: 05/16/2025 Entry ID: 5517644

activity, and/or characteristics consistent with certain allegedly improper sales practices" and perform "mutually agreed-upon analyses that generate potential financial impact scenarios for such identified customers."[2108]

The Analysis identified potential primary harm as including account fees paid by the customer directly on unauthorized accounts and indirectly through the Bank's set-off process or through overdraft protection transfers – including monthly account service fees, overdraft fees and overdraft protection fees, non-Wells ATM fees, and "all other fees including check order fees, direct deposit advance fees, and analysis fees."[2109]

The Analysis reported the data included false positive accounts – where the accounts have "characteristics consistent with the simulated funding allegations – yet nevertheless represent authorized customer accounts."[2110] The Analysis reported that through discussions with the business, "such accounts may be legitimately opened by customers in order to minimize overall monthly service fees."[2111] As part of PwC's validation testing of the data analytics, "we manually reviewed the transaction details on hundreds of sampled accounts to: (1) confirm the implementation accuracy of the quantification methodology, and (2) to confirm the absence of any unexpected outcomes of the methodology as applied to these accounts. The results of this testing met these two objectives."[2112] Mr. Julian testified that WFAS did not attempt to validate whether the assumptions that PwC used would, in fact, identify potentially unauthorized accounts.[2113]

The Analysis found that from a starting account population in 2013 of 20,634,301 consumer and business deposit accounts, there were 469,243 accounts that possessed characteristics of simulated funding.[2114] The Analysis found that of this population, 21,033 "had fees consistent with the potential primary customer financial harm definition."[2115]

**The Board of Directors' Sales Practices Investigation Report**

On April 10, 2017, the Independent Directors of the Board of Wells Fargo issued its Sales Practices Investigation Report ("Board Report").[2116] Examiner Tanya Smith was the

---

[2108] Tr. (Julian) at 7059; OCC Ex. 1636E at 4.

[2109] OCC Ex. 1636E at 13.

[2110] *Id.* at 7.

[2111] *Id.*

[2112] *Id.* at 12.

[2113] Tr. (Julian) at 7062.

[2114] OCC Ex. 1636E at 14.

[2115] *Id.*

[2116] EC MSD Ex. 280 (Independent Directors of the Board of Wells Fargo & Company, Sales Practices Investigation Report, dated April 17, 2017.

Add. 1052

Appellate Case: 25-1079      Page: 1054      Date Filed: 05/16/2025 Entry ID: 5517644

Bank's Acting Examiner-in-Charge at the time.[2117] The Board Report found that the "root cause of sales practice failures was the distortion of the Community Bank's sales culture and performance management system, which, when combined with aggressive sales management, created pressure on employees to sell unwanted or unneeded products to customers and, in some cases, to open unauthorized accounts."[2118] It continued: "the only way definitively to address the broken sales model and the root cause of sales practice abuses was to emphasize other metrics for performance and to abandon exerting pressure through sales goals and sales-driven incentive programs."[2119]

The Board Report identified deficiencies in the Law Department, Audit, and Community Bank Risk. The Board Report found:

> Russ Anderson's performance fell far short of what was expected and required of the senior risk officer in the Community Bank. Russ Anderson failed to adequately assess and advocate for changes in the business practices that resulted in sales integrity violations. She also did not adequately address customer harm arising from improper sales practices.[2120]

> Between 2011 and 2016, Wells Fargo Audit Services ("Audit") conducted periodic audits that touched on sales practice issues within the Community Bank. These audits generally found that processes and controls designed to

---

[2117] Examiner Smith is the current Examiner-in-Charge of Wells Fargo Bank, N.A., Sioux Falls, South Dakota in Large Bank Supervision at the Office of the Comptroller of the Currency. She became Wells Fargo's Acting Examiner-in-Charge in March 2017 and has served as its permanent Examiner-in-Charge since July 2017. As Wells Fargo's Examiner-in-Charge, she manages a team of approximately 80 OCC examiners and other employees covering all aspects of the Bank's daily supervision. Her supervisory responsibilities include establishing regulatory and supervisory expectations on major programs through discussions with the Chief Executive Officer and other senior executives, providing clear feedback on progress against Enforcement Actions and Matters Requiring Attention, evaluating the Bank's systems and controls to determine the Risk Assessment and CAMELS ratings, preparing the Report of Examination and the annual comprehensive risk assessment ("CORE"), and regularly communicating with the Board about supervisory findings and priorities. Among other things, she is responsible for developing and supporting the supervisory strategy for this large, complex, multinational institution with multiple risk, regulatory, and control deficiencies, including those related to legal, audit, compliance, risk, governance, and sales practices. From March 2017 onwards, she participated in the OCC's examinations and investigation of the Bank's sales practices. She has over 27-years of professional experience at the OCC, the Federal Deposit Insurance Corporation ("FDIC"), and the International Monetary Fund ("IMF"), including extensive experience in the supervision of large, complex, multinational banks. EC MSD Ex. 267 (Report of Examiner Smith) at ¶¶1-3.

[2118] EC MSD Ex. 267 (Report of NBE Smith) at ¶51, quoting Independent Directors of the Board of Wells Fargo & Company, Sales Practices Investigation Report, at 8 (Apr. 10, 2017) ("Board Report"), available at https://www08.wellsfargomedia.com/assets/pdf/about/investorrelations/ presentations/2017/board-report.pdf.

[2119] EC MSD Ex. 267 (Report of NBE Smith) at ¶51, quoting Independent Directors of the Board of Wells Fargo & Company, Sales Practices Investigation Report, at 8 (Apr. 10, 2017) ("Board Report"), available at https://www08.wellsfargomedia.com/assets/pdf/about/investorrelations/ presentations/2017/board-report.pdf.

[2120] Independent Directors of the Board of Wells Fargo & Company, Sales Practices Investigation Report, at 8 (Apr. 10, 2017) ("Board Report"), available at https://www08.wellsfargomedia.com/assets/pdf/about/investorrelations/ presentations/2017/board-report.pdf at 49.

detect, investigate and remediate sales practice violations were effective at mitigating sales practice-related risks. In addition to auditing these detective functions, Audit also reviewed the Community Bank's compensation plans and found that their design did not promote unethical behavior.[2121]

Notwithstanding the growing awareness of the reputational risk associated with mass terminations, and the fact that many of these incidents involved unauthorized products or accounts, the perception persisted in the Law Department that sales integrity issues involved 'gaming' the Community Bank's incentive programs and not conduct affecting customers. That led them to underestimate the need to escalate and more directly manage sales integrity issues.[2122]

Respondent Julian was a member of the Operating Committee at the time the Board Report was issued and had the opportunity to review and correct any factual errors in the report prior to its issuance.[2123] Examiner Smith interacted with Respondent Julian at the time of the Board Report's issuance, asked him for his feedback on the Board Report, and does not recall him expressing *any* concerns about the accuracy of the report or any disagreement with any of its findings or conclusions.[2124]

Examiner Smith opined that Respondents' current assertion that the Bank fabricated or exaggerated its sales practices problem in the Board Report is implausible on its face.[2125] In her 27 years of professional experience as a bank examiner, Examiner Smith has never observed or even heard of any board exaggerating a significant problem to the extreme detriment to the institution.[2126]

In addition, in this instance the Board engaged outside counsel to independently look at the facts and circumstances that form the basis of the final report.[2127] Examiner Smith's team reviewed a number of documents and interview notes that the outside counsel gathered as part of the Board investigation and found the work and the conclusions to be credible, comprehensive,

---

[2121] Independent Directors of the Board of Wells Fargo & Company, Sales Practices Investigation Report, at 8 (Apr. 10, 2017) ("Board Report"), available at https://www08.wellsfargomedia.com/assets/pdf/about/investorrelations/ presentations/2017/board-report.pdf at 91.

[2122] EC MSD Ex. 267 (Report of NBE Smith) at ¶52, quoting Independent Directors of the Board of Wells Fargo & Company, Sales Practices Investigation Report, at 8 (Apr. 10, 2017) ("Board Report"), available at https://www08.wellsfargomedia.com/assets/pdf/about/investorrelations/ presentations/2017/board-report.pdf at 75.

[2123] EC MSD Ex. 267 (Report of NBE Smith) at ¶53.

[2124] *Id.*

[2125] *Id.* at ¶54.

[2126] *Id.*

[2127] *Id.*

Add. 1054

Appellate Case: 25-1079     Page: 1056     Date Filed: 05/16/2025 Entry ID: 5517644

and not exaggerated.[2128] Examiner Smith reported that the OCC's examination work and the subsequent investigation revealed that the sales practices misconduct problem was even worse than what was detailed in the Board Report.[2129]

On February 21, 2020, the Bank agreed to pay $3 billion to resolve criminal and civil investigations with the Department of Justice and the Securities and Exchange Commission into sales practices "involving the opening of millions of accounts without customer authorization."[2130] Wells Fargo agreed that the factual statements contained within the Statement of Facts to the Deferred Prosecution Agreement ("DOJ Statement of Facts") are true and accurate. The DOJ Statement of Facts described the sales goals as "onerous" and "aggressive."[2131]

In her report, Examiner Candy noted the following:

> Corporate culture refers to the norms and values that drive behaviors within an organization. An appropriate corporate culture for a bank is one that does not condone or encourage imprudent risk taking, unethical behavior, or the circumvention of laws, regulations, or safe and sound policies and procedures in pursuit of profits or business objectives. Office of the Comptroller of the Currency, Comptroller's Handbook, Safety and Soundness, Corporative and Risk Governance at 13 (July 2016).[2132]

Based on her work in the supervision of the Bank and evidence she reviewed during the investigation and litigation, Examiner Candy concluded that employees engaged in sales practices misconduct because they feared disciplinary action up to and including termination if they did not meet the unreasonable sales goals and that this environment and aggressive sales culture existed in the Community Bank from 2002 through 2016.[2133] Employees also engaged in sales practices misconduct to earn incentive compensation.

Based on her training, experience, and commission as a National Bank Examiner, Examiner Candy reported that incentive compensation arrangements require effective oversight,

---

[2128] *Id.* at ¶54.

[2129] *Id.*

[2130] EC MSD Ex. 269 (Report of NBE Candy) at ¶51, quoting Press Release 20-035, U.S. Dep't of Justice, Central District of California, Wells Fargo Agrees to Pay $3 Billion to Resolve Criminal and Civil Investigations into Sales Practices Involving the Opening of Millions of Accounts Without Customer Authorization (Feb. 21, 2020), https://www.justice.gov/usao- cdca/pr/wells-fargo-agrees-pay-3-billion-resolvecriminal-and-civil-investigations-sales.

[2131] EC MSD Ex. 269 (Report of NBE Candy) at ¶50, citing Press Release, U.S. Attorney's Office for the Central District of California, Wells Fargo Agrees to Pay $3 Billion to Resolve Criminal and Civil Investigations into Sales Practices (Feb. 21, 2020); Wells Fargo Deferred Prosecution Agreement and Exhibit A, Statement of Facts (Feb. 20, 2020).

[2132] EC MSD Ex. 269 (Report of NBE Candy) at ¶52.

[2133] *Id.* at ¶53

Add. 1055

Appellate Case: 25-1079      Page: 1057      Date Filed: 05/16/2025 Entry ID: 5517644

governance, controls, and risk management and she concluded that the incentive compensation plans in the Community Bank overemphasized unreasonable sales goals and did not appropriately balance financial risk and reward.[2134] The incentive compensation arrangements in the Community Bank incentivized employees to engage in sales practices misconduct.[2135] The incentive compensation arrangements also incentivized store or branch managers to encourage, or turn a blind eye to, sales practices misconduct.[2136]

At the Bank, incentive compensation and performance management went hand in hand. The sales and incentive plans were commonly referred to as 50/50 plans because there was an expectation that only half the regions would be able to meet them. Although in theory incentive compensation arrangements should reward superior performance and employees should not suffer employment consequences for failing to achieve incentive compensation goals, in practice this is not what happened in the Community Bank.[2137]

For employees, failure to meet sales goals under the incentive compensation plans carried with it both the risk of not obtaining incentive compensation and poor performance reviews, including the risk of disciplinary action and termination.[2138] As the Board Report concluded, "performance management and incentive plans added significant additional risk to the sales model."[2139] Moreover, promotions and advancement within the Community Bank were based primarily on employees' ability to generate sales and meet the unreasonable sales goals.[2140] This contributed to the high-pressure culture within the Community Bank and gave the impression that the Bank and senior management valued sales at all cost – including above ethics and the customer's best interest.[2141]

The incentive compensation plans rewarded employees for sales of secondary products (*e.g.*, a second checking or savings account or additional debit cards).[2142] An outsized portion of conduct risk was associated with sales of secondary products. As the Bank acknowledged in the DOJ Statement of Facts, "[m]illions of secondary accounts and products were opened from 2002

---

[2134] *Id.* at ¶54.

[2135] *Id.*

[2136] *Id.*

[2137] *Id.*

[2138] *Id.* at ¶55.

[2139] *Id.* at ¶54, citing Board Report at 27.

[2140] EC MSD Ex. 269 (Report of NBE Candy) at ¶55.

[2141] *Id.*

[2142] *Id.* at ¶56.

Add. 1056

Appellate Case: 25-1079      Page: 1058      Date Filed: 05/16/2025 Entry ID: 5517644

to 2016, and many of these were never used by customers."[2143] The Board Report explained that Community Bank

> [r]egional leadership was unsuccessful in having their concerns about secondary checking accounts addressed even as late as 2015. In that year, one regional leader wrote an email continuing to advocate the removal of secondary accounts from incentive compensation plans, saying he and other leaders should "fight the good fight every year – especially since I think one day we will be asked why it was part of the goal process to begin with."[2144]

The Board Report found that incentive compensation "contributed to problematic behavior by over-weighting sales as against customer service or other factors."[2145] Based on an extensive investigation, the Board Report determined that "the only way definitively to address the broken sales model and the root cause of sales practice abuses was to emphasize other metrics for performance and to abandon exerting pressure through sales goals and sales-driven incentive programs."[2146] The Board Report described the incentive compensation program as "misaligned" and in January 2017, the Bank put in place a new incentive program that focused on customer service rather than selling products.[2147] Examiner Candy's conclusions match those found in the Board Report.[2148]

It is Examiner Candy's opinion as a National Bank Examiner that the incentive compensation program and plans in the Community Bank were deficient in both design and implementation and resulted in employees engaging in sales practices misconduct.[2149] This was recklessly unsafe or unsound and exposed the Bank to increased operational, compliance, regulatory, legal, reputational and financial risks.[2150]

### OCC Supervisory Letter WFC 2016-49: Sales Practices Governance and Reporting Review

Through a Supervisory Letter dated September 21, 2017, the OCC summarized the results of its Sales Practice Governance and Reporting review that began in November 2016.[2151] Describing SL 2015-36 (issued June 2015) as the baseline for the 2017 Letter, the OCC reflected

---

[2143] *Id.*, citing Press Release, U.S. Attorney's Office for the Central District of California, Wells Fargo Agrees to Pay $3 Billion to Resolve Criminal and Civil Investigations into Sales Practices (Feb. 21, 2020); Wells Fargo Deferred Prosecution Agreement and Exhibit A, Statement of Facts (Feb. 20, 2020).

[2144] EC MSD Ex. 269 (Report of NBE Candy) at ¶57, citing *Board Report* at 41 n.17.

[2145] EC MSD Ex. 269 (Report of NBE Candy) at ¶58, citing *Board Report* at 7

[2146] EC MSD Ex. 269 (Report of NBE Candy) at ¶58, citing *Board Report* at 8.

[2147] EC MSD Ex. 269 (Report of NBE Candy) at ¶58, citing *Board Report* at 8.

[2148] EC MSD Ex. 269 (Report of NBE Candy) at ¶58.

[2149] *Id.* at ¶59.

[2150] *Id.*

[2151] Tr. (Julian) at 7062; OCC Ex. 1689 at 1.

Add. 1057

Appellate Case: 25-1079     Page: 1059     Date Filed: 05/16/2025 Entry ID: 5517644

that in June 2015 the OCC had concluded "that sales practices oversight was weak and in need of improvement."[2152] The 2015 Letter included five MRAs across each of the three lines of defense, and "highlighted a number of breakdowns in governance, risk management, incentive compensation, reporting, and controls."[2153]

The 2017 Letter noted that in July 2016, the OCC issued SL 2016-36, "citing the sales practices activities as unsafe or unsound."[2154] Drawing from data gathered through independent consultant reports and the ongoing work of its examiners, the OCC "identified that aggressive sales pressure combined with a lack of adequate risk management oversight resulted in unsafe or unsound practices."[2155] This work led in September 2016 to the Sales Practices Consent Order, which was announced in conjunction with the CFPB Consent Order and the Bank's settlement with the Los Angeles City Attorney.[2156]

Subsequent to the issuance of the 2016 Consent Order, the OCC sought to assess "who at the executive management level knew about sales practices issues, when they became aware of the problems, and what if any actions these individuals took to address or escalate the issues to the Board and the [OCC]."[2157] The 2017 Letter considered Board committee meeting packages, Community Bank committee meeting packages, EthicsLine and customer complaints, termination notes, Suspicious Activity Reports, and over 400,000 emails.[2158]

Through this assessment, the OCC evaluated "who was held accountable for the unsafe or unsound and/or lack of adequate supervision or escalation."[2159] The assessment leading to the 2017 Letter focused on Community Banking, which the OCC found was "responsible for retail sales and branch operations".[2160] It also evaluated the role of the Board of Directors and the former CEO; along with the Law Department, Human Resources, Audit, and Corporate Risk, "given their oversight and/or control function responsibilities."[2161] The assessment also evaluated employee terminations, EthicsLine allegations, and claims of retaliation.[2162]

---

[2152] OCC Ex. 1689 at 1.

[2153] Id.

[2154] Id. at 2.

[2155] Id.

[2156] Id.

[2157] Id.

[2158] Id. at 1.

[2159] Id. at 2.

[2160] Id.

[2161] Id.

[2162] Id.

Add. 1058

Appellate Case: 25-1079     Page: 1060     Date Filed: 05/16/2025 Entry ID: 5517644

In its supporting comments, the Letter identified the failure of former CEO John Stumpf to provide effective oversight of Community Banking.[2163] It reported, "the CB management team implemented aggressive sales goals and a poorly designed incentive compensation program which resulted in widespread unethical activity, significant customer harm and reputational damage to the bank."[2164]

The Letter noted the following in the history of the material issues:

In June of 2013, as a result of an increasing number of whistleblower emails regarding sales practices to the CEO, the Sales and Service Conduct Oversight Team (SSCOT) in the first line of defense launched an investigation into allegations of simulated funding in LA and Orange County (LA/OC). The bank initially terminated 30 employees in the LA/OC area and then launched a larger investigation across the company into simulated funding. As a result of the investigation, the bank terminated approximately 230 team members in total throughout 2014. None of this information was escalated to the OCC or the Board in 2013 or 2014. In February 2015, the OCC conducted a CB examination with a focus on sales practices governance to follow up on the claims of sales pressure. Multiple interviews were conducted with [Carrie] Tolstedt, [Claudia] Russ Anderson (Group Risk Officer), [Jason] MacDuff (Head of Strategic Planning) and a number of her direct reports. There was no mention of the 230 terminations related to simulated funding, or the larger issue of sales practices related terminations across the company.

In April 2015, Tolstedt presented to the Risk Committee of the Board on sales practices for the first time. There was no mention of the LA/OC investigation or the numbers of team members terminated on an annual basis. The focus was on the "Evolving Model" – the end to end improvement process developed to address some sales practices concerns. Just one month later, Tolstedt was again asked to present in response to the LA lawsuit that was filed on May 4, 2015. Her presentation focused only on the 230 terminated as a result of the LA/OC investigation with no mention of the larger body of terminations related to sales integrity issues. The root cause of the problem was summarized as a few rogue employees violating bank policy and the risk management team being aggressive in detecting and terminating team members engaging in conduct that violated CB policies. There was no mention of the history behind sales pressure, unattainable product goals, whistleblower complaints, SOX matters, or related class action lawsuits.

---

[2163] OCC Ex. 1689 at 6.

[2164] *Id.* at 7.

Add. 1059

Appellate Case: 25-1079      Page: 1061      Date Filed: 05/16/2025 Entry ID: 5517644

Tolstedt and Russ Anderson pushed back on the second and third lines of defense and were resistant to challenge and oversight by these groups. Tolstedt never voluntarily escalated sales practices issues, and when she did present at the Board level, the presentations were high level and viewed by many Board members as misleading. There was also a culture, pattern, and practice in the CB of redacting, minimizing and deleting material information that went to the Board or regulators. In an email exchange between Russ Anderson, Tolstedt, and various members of the Law Department on May 16, 2015, there were conversations about what to include in the Board presentation. A phone meeting was held later that evening and a decisions was made to delete termination data from the presentation, which showed the CB was terminating one percent of team members annually. That same package was presented to the OCC as a part of our request for information for the May 2015 review, and CB leadership never provided this termination data despite OCC requests. In interviews with Russ Anderson, she stated to the OCC that sales pressure was not an underlying issue for increased turnover and terminations.[2165]

In its conclusions, the OCC reported the following:

Since at least 2011, Wells Fargo's (WF) executive and senior management teams failed to adequately address widespread sales practices issues originating in CB [Community Banking], and the Board of Directors failed in their oversight duties by inadequately challenging senior leadership. CB management enforced an aggressive sales culture that resulted in team members selling unwanted products to customers and opening unauthorized accounts. The former CEO was slow to react, depending instead on Wells Fargo's strong market perception, exceptional financial performance, and overall balance sheet strength. He failed to properly supervise the head of the CB and did not address known problems with leadership in that Group over an extended period of time. Additionally, the decentralized corporate structure, most notably within Corporate Risk and HR, exacerbated the problem and provided the CB with undue independence and limited accountability.

The control functions also failed in their responsibilities. Executives in the Law Department, HR, Corporate Risk and Audit were aware of sales practices issues at least as early as 2011 through whistleblower complaints and adverse sales integrity metrics, but did not escalate the situation to the Board or regulators in a timely manner. Management and the Board need to move much more quickly to identify and address critical issues. The Law Department and Corporate Risk must work more closely together to

---

[2165] OCC Ex. 1689 at 7-8.

Add. 1060

Appellate Case: 25-1079     Page: 1062     Date Filed: 05/16/2025 Entry ID: 5517644

understand the broader risks contained in systemic legal issues and to ensure that the root cause of the issues are appropriately analyzed.

Escalation to and transparency with the Board of Directors and OCC is poor and must improve. CB management repeatedly failed to properly escalate the growing concerns around sales practices to the Board of Directors and the OCC. We found that CB management, primarily the head of CB and the Group Risk Officer, along with the Law Department and HR, engaged in a pattern and practice of minimizing and downplaying termination information and redacting information from OCC requests, ERMC presentations, and employee exit interviews and surveys.

Unsafe or unsound sales practices have been identified in a number of areas within the bank, indicating that while the most significant problems were in the CB, the culture of poor behavior went beyond just the CB. Issues have been identified in Insurance, Merchant Services, and Private Banking. We also identified several instances of potential retaliation when team members escalated issues. Management needs to ensure that the new Sales Practices Governance and Oversight function captures sales practices activity across the company and addresses supervision, escalation and governance committees to ensure new products and incentive compensation plans are properly structured. Investigations are ongoing in a number of these areas and management should continue to keep the OCC apprised of findings and ensure remediation plans are consistent where appropriate and approved by a designated Board Committee.[2166]

Mr. Julian testified that after the LA Times articles came out, "there was a significant amount of work going on around sales practices. But none of that work indicated to me that the controls managing sales practices activity was weak."[2167] He added, "In fact, as I've stated before, controls related to sales practices activity are what identified the issues and resulted in investigations and ultimately terminations of team members for that practice."[2168]

Asked what his biggest concern with regard to risk in the enterprise, Mr. Julian responded:

To the extent certainly a risk is deemed significant or material in some manner, my first concern is to make sure and assure that appropriate levels of management and, to the extent appropriate, the board is aware of the risk

---

[2166] *Id.* at 2-3.

[2167] Tr. (Julian) at 7065-66.

[2168] *Id.* at 7066.

so that management and the board can take steps to address the risk. Probably my biggest concern is – you know, that it doesn't get escalated.[2169]

Mr. Julian testified that when comparing when Audit engages in business monitoring versus having Audit test controls, "in order to provide assurance that controls are working effectively and as intended, then audit will scope in – they will develop a scope of certain tests to go in and test those controls to be able to determine if those controls are working as intended. So they would perform specific tests that will provide them overview as to whether the controls are appropriately working.[2170]

In addition to issuing new MRAs regarding Legal Governance and Oversight, Attorney Client Privilege Use and Oversight, and Suspicious Activity Reports, the 2017 Letter required the Bank to "formally adopt and implement enterprise-wide policies, procedures, and reporting for the exit interview process."[2171] It described the current exit interview process as "informal and not implemented consistently through the enterprise."[2172] The Letter reported that "[i]t was clear from this review that had management had a robust process in place to analyze and escalate this information, the issues would have surfaced much sooner."[2173] After noting that Community Banking now has a process in place to reach out to team members for exit interviews, the Letter reported the process "is not formalized in written policy and does not extend beyond the CB."[2174] The OCC required that Management "ensure that exit interview information is used to identify and report on trends, problem spots and issues across the geographies."[2175]

**OCC Requirements for a Heightened Standards Safety and Soundness Plan**

In a letter dated July 28, 2015, the OCC through its Examiner in Charge for Large Bank Supervision, Bradley Linskens, reported that it had determined that Wells Fargo Bank, N.A. "has failed to satisfy the safety and soundness standards contained in the OCC Guidelines Establishing Heightened Standards for Certain Large Insured National Banks".[2176] The letter noted that enforcement actions and MRAs existed to address some of the weaknesses in the Bank's compliance program, "recent compliance-related issued noted by various regulatory agencies, including the OCC, indicate significant actions remain to establish a fully effective compliance program."[2177]

---

[2169] *Id.* at 7066.

[2170] *Id.* at 7067.

[2171] OCC Ex. 1689 at 5.

[2172] *Id.*

[2173] *Id.*

[2174] *Id.*

[2175] *Id.*

[2176] OCC Ex. 2060 at 1.

[2177] *Id.*

Add. 1062

Appellate Case: 25-1079     Page: 1064     Date Filed: 05/16/2025 Entry ID: 5517644

The OCC noted here that while the "primary basis for finding that the Bank is not in compliance with Appendix D relates to deficiencies in the Bank's RCRM [Regulatory Compliance Risk Management], the Part 30 Plan must take into consideration the interdependencies of all three lines of defense to ensure that weaknesses in front line risk management or Internal Audit practices don't undermine the effectiveness of actions taken to improve RCRM.[2178]

**Ms. Russ Anderson's Response to the OCC's 15-day Letter**

Ms. Russ Anderson testified that she accepts responsibility for her role in handling sales practices misconduct, but testified that even now, she has no regrets about how sales practices misconduct was handled at the Community Bank.[2179] Prompted by her Counsel during direct examination, Ms. Russ Anderson clarified her answer to say "The only regret I have is that we didn't go faster."[2180] Through leading questioning by her Counsel during direct examination, Ms. Russ Anderson denied intentionally making false statements to bank examiners, denied intentionally obstructing bank examinations, denied intentionally downplaying information relating to the problem.[2181]

Ms. Russ Anderson rejected testimony to the effect that it was not a concern to her that elderly people and racial ethnicities had been mistreated, testifying:

> I believe in my deepest part of me that everyone needs to be treated equally and that no one should [be] preyed upon. I have many family members who that could apply to, including our youngest son Ryan, who is transgender male. And I could never work for a corporation that preyed on anyone who was disadvantaged or less sophisticated. And so those -- those concepts that Ms. Candy testified to are completely inaccurate.[2182]

Ms. Russ Anderson opined that knowing what she knows now, she did not act in an unsafe or unsound manner and did not act recklessly.[2183] She said she had never before been cited for any unsafe or unsound practices or breaches of fiduciary duty, nor had she been criticized by any regulator for actions similar to those at issue in this enforcement action.[2184]

Asked if she had any regrets about what happened at Wells Fargo, Ms. Russ Anderson testified:

---

[2178] OCC Ex. 2060 at 2, n. 1.

[2179] Tr. (Russ Anderson) at 9257-58.

[2180] *Id.* at 9257.

[2181] *Id.* at 9258.

[2182] Tr. (Russ Anderson) at 9510. See also, "22-03-07 Respondents' Amended Revised Errata Day 9-38" on page 77. Ordered by Second Supplemental Order.

[2183] Tr. (Russ Anderson) at 9510-11.

[2184] *Id.* at 9511.

Add. 1063

Appellate Case: 25-1079     Page: 1065     Date Filed: 05/16/2025 Entry ID: 5517644

My primary regret would be, one, we didn't maybe move faster. And, two, I wish that maybe we -- I could have kept better records of everything to show everything we were doing. But we were working fast and furious, and sometimes emails don't say what you need them to say, and sometimes documentation is not always kept. But I think overall we did the very best we knew how.[2185]

Ms. Russ Anderson testified that the damage to the Bank was "devastating" to her, that the Bank "was like a family", that "it hurts. I still consider it my company."[2186]

### The Importance of the Community Bank to WFC

WFC is a financial holding company and a bank holding company registered under the Bank Holding Company Act of 1956.[2187] WFC's principal business is to act as a holding company for its subsidiaries.[2188] As of December 31, 2019, Wells Fargo Bank, N.A. was WFC's principal subsidiary with assets of $1.7 trillion, or 89 percent of WFC's assets.[2189] WFC admitted that the Community Bank "contributed more than half (and in some years more than two-thirds) of the Company's revenue from 2007 through 2016."[2190]

Not only did the Bank generate more than half of WFC's revenue, it also provided important synergies to all parts of the corporation.[2191] "The Community Bank also made referrals to other units in WFC regarding mortgages, lines of credit, credit cards, investment products (including brokerage products), insurance products, safe deposit boxes and a variety of other banking products."[2192]

The Bank and the OCC's Wells Fargo examination team concluded that while the cross-sell business model was the root cause of unacceptable levels of misconduct, it was also financially beneficial and increased WFC's stock price.[2193]

---

[2185] Tr. (Russ Anderson) at 9511.

[2186] *Id.* at 9511-12.

[2187] EC MSD Ex. 658 (Report of Dr. Pocock) at ⁋44, citing Wells Fargo & Co., Annual Report (Form 10-K) at 1 (Feb. 27, 2020).

[2188] EC MSD Ex. 658 (Report of Dr. Pocock) at ⁋44, citing Wells Fargo & Co., Annual Report (Form 10-K) at 1 (Feb. 27, 2020).

[2189] EC MSD Ex. 658 (Report of Dr. Pocock) at ⁋44, citing Wells Fargo & Co., Annual Report (Form 10-K) at 1 (Feb. 27, 2020).

[2190] EC MSD Ex. 658 (Report of Dr. Pocock) at ⁋45, citing Deferred Prosecution Agreement at A-1.

[2191] EC MSD Ex. 658 (Report of Dr. Pocock) at ⁋46.

[2192] *Id.*, citing Deferred Prosecution Agreement at A-2/

[2193] EC MSD Ex. 658 (Report of Dr. Pocock) at ⁋47.

The scope of the scandal was publicized with the September 8, 2016 Announcement of the OCC's and CFPB's enforcement actions against the Bank.[2194] However, the Bank and OCC examiners concluded that the Bank suffered, and continues to suffer, reputational and financial harm that adversely affected WFC's stock price.[2195]

In testimony before the OCC, the Bank's former CEO, Timothy Sloan, testified about the financial impact of the sales practices misconduct scandal on the Bank as follows:

> Q Overall, what's the best estimate that you have on the total financial impact of the sales practices scandal on the company or the bank?

> A Oh it would be in the tens of billions of dollars, when you add -- the most significant impact was one that we were referring to earlier, and that was the impact of the stock price. We really missed out on recovery.[2196]

The stock price analysis Dr. Pocock performed provides significant evidence that the Bank and OCC examiners are correct with respect to both propositions.[2197] Dr. Pocock found that the Bank and its senior managers benefitted greatly from the impermissible but profitable cross-sell business model during the many years that the model was in effect.[2198] He also found, however, that the Bank suffered, and continues to suffer, staggering reputational and financial harm following the public disclosure of the Bank's sales practices misconduct on September 8, 2016 and the scandal that ensued.[2199]

From his analysis, Dr. Pocock opined that there is significant evidence that the Bank and its senior managers benefitted greatly from preserving and implementing the profitable but impermissible cross-sell business model for over fourteen years, and that the Bank suffered, and is still suffering, great reputational and financial harm from the scandal, that the impermissible cross-sell business model caused.[2200]

Examiner Smith reported that the sales practices misconduct problem has also led to volatility in the membership of the Board of Directors and of individuals in senior executive management positions.[2201]

---

[2194] EC MSD Ex. 658 (Report of Dr. Pocock) at ¶48.

[2195] *Id.*

[2196] *Id.* at ¶49, quoting Sworn Statement of Timothy Sloan at 260:8-16 (July 11, 2019) (OCC-SP00048394).

[2197] EC MSD Ex. 658 (Report of Dr. Pocock) at ¶50.

[2198] *Id.*

[2199] *Id.*

[2200] *Id.* at ¶66.

[2201] EC MSD Ex. 267 (Report of NBE Smith) at ¶150.

Examiner Smith reported that in 2017, the Bank fell to last place in a bank reputation survey conducted by American Banker/Reputation Institute.[2202] According to the American Banker, the Bank's reputation score "went into free fall . . . [and was] by far the lowest of any bank."[2203] The Bank's own research showed that its favorability ratings significantly trailed its peers and that it remained "near the bottom" in terms of trust.[2204]

Examiner Smith reported that the sales practices misconduct problem also had negative business impacts on the Bank. As Ms. Mack testified, the scandal hampered the ability of the Community Bank to attract customers.[2205]

Examiner Smith reported that the sale practices misconduct problems are ongoing[2206] and have led to significant customer harm and breaches of customer trust.[2207] She also reported that the sales model also had a significant impact on Bank employees.[2208] She opined that the intentionally unreasonable sales goals and extreme pressure to meet those goals led employees to engage in violations of laws (including criminal laws pertaining to fraud, identity theft, and the falsification of bank records), regulations, and Bank policy, and the Bank fired more than 5,300 employees for engaging in sales practices misconduct between 2011 and 2015.[2209] She reported that during that same period, over 8,100 employees were terminated from not meeting sales goals.[2210] Examiner Smith opined that all of the Community Bank's employees over a 14-year period were victimized by intentionally unreasonable goals and extreme pressure to meet those goals.[2211]

From these findings, Examiner Smith opined that Respondents' misconduct caused the Bank to suffer material financial loss and reputational damage.[2212] It is also her opinion that the

---

[2202] *Id.* at ¶151.

[2203] *Id.*

[2204] *Id.*, quoting 2017 reputation survey: Banks avoid the Wells Fargo drag, American Banker, Sean Sposito, (Jun. 27, 2017) available at https://www.americanbanker.com/news/2017-bank-reputation-survey, last accessed November 16, 2022.

[2205] EC MSD Ex. 267 (Report of NBE Smith) at ¶152, quoting Mack Tr. at 241:16-242:1.

[2206] EC MSD Ex. 267 (Report of NBE Smith) at ¶153.

[2207] *Id.* at ¶154.

[2208] *Id.* at ¶155.

[2209] *Id.*, citing Consent Order, In re Wells Fargo Bank, N.A., No. 2016-CFPB-0015 (Sept. 8, 2016) (CFPB), available at https://files.consumerfinance.gov/f/documents/092016_cfpb_ WFBconsentorder.pdf; Statement of John G. Stumpf, Chairman and Chief Executive Officer, Wells Fargo & Co., Hearing before the Committee on Banking, Housing, and Urban Affairs, U.S. Senate, 114th Congress (Sept. 20, 2016) (OCC-SP0111168).

[2210] EC MSD Ex. 267 (Report of NBE Smith) at ¶155, citing E-mail from Matthews to Huss, USE THIS VERSION: Updated with totals: Data Request: terms due to sales performance (Sept. 27, 2016) (OCC-SP00034166).

[2211] EC MSD Ex. 267 (Report of NBE Smith) at ¶155.

[2212] *Id.* at ¶156.

Bank has yet to recover from the reputational damage caused by sales practices, and that the reputational harm as well as the improper sales practices resulted in actual or prospective prejudice to the Bank's depositors.[2213]

**Each Respondent Received Personal Gain or Other Benefit from Their Misconduct**

Examiner Candy opined that each Respondent's misconduct conferred personal gain or other benefit to them.[2214] As explained above, she reported that the sales practices misconduct problem persisted because its root cause, the unreasonable goals and extreme pressure, also was the very basis for the financial success of the business model.[2215] She reported that the Community Bank was the largest line of business at the Bank and was the driver of growth for the Bank and the key to its publicly touted cross-sell success.[2216]

Examiner Candy opined that as senior executives at the Bank, Respondents reaped the benefits of that success in the form of compensation, substantial bonuses, and long-term equity awards.[2217] She reported that as WFC's share price increased during their tenures, so did their effective compensation.[2218] Further, she reported that cash bonuses were also substantial and linked to both the Respondents' individual performance as well as the performance of the bank.[2219]

Examiner Smith reported that Respondents' improper actions and inactions allowed the Bank's impermissible, but profitable, sales model to continue for many years.[2220] As senior executives of the Bank, they benefitted financially from the unsafe and unsound business model that their misconduct preserved and perpetuated because their compensation was based in part on the Bank's financial performance.[2221] Upon these findings, Examiner Smith opined that the Respondents received financial gain or other benefits by reason of their misconduct.[2222]

**Respondents' Misconduct Caused Financial Losses and Reputational Damage to the Bank as Well as Harm to its Customers and Employees**

---

[2213] *Id.* at ¶157.

[2214] EC MSD Ex. 269 (Report of NBE Candy) at ¶211.

[2215] *Id.* at ¶212.

[2216] *Id.*

[2217] *Id.* at ¶213.

[2218] *Id.*

[2219] *Id.*

[2220] EC MSD Ex. 267 (Report of NBE Smith) at ¶146.

[2221] *Id.*

[2222] *Id.* at ¶147.

Add. 1067

Appellate Case: 25-1079    Page: 1069    Date Filed: 05/16/2025 Entry ID: 5517644

Examiner Candy reported that when the sales practices scandal was publicized, the Bank suffered and continues to suffer massive financial loss and reputational damage.[2223] Examiner Smith reported that the sales practices misconduct problem caused enormous and ongoing financial losses and other damage to Wells Fargo.[2224] She reported that a former CEO of Wells Fargo estimated the total financial impact of sales practices misconduct on the Bank to be in the "tens of billions of dollars."[2225]

Examiner Smith reported that the Bank has to date paid roughly $3.83 billion in fines and penalties to the OCC, CFPB, City Attorney of Los Angeles, the U.S. Department of Justice, the Securities and Exchange Commission, and state Attorneys General to settle sales practices-related matters.[2226] She reported that the Bank has paid roughly $622 million in civil settlements related to sales practices and expended at least $160 million in payments to law firms and consultants in connection with sales practices.[2227]

Examiner Smith reported that the Bank also incurred significant expenses to rehabilitate its image and rebuild trust with its customers.[2228] She reported that in 2018, the Bank launched a marketing and outreach campaign, "Re-Established," that cost the Bank hundreds of millions of dollars.[2229] She reported that on February 2, 2018 the Board of Governors of the Federal Reserve imposed an "asset cap" on Wells Fargo, which she opined has had a significant financial impact on the Bank by limiting the Bank's ability to increase in asset size.[2230]

In its public announcement of the action, the Federal Reserve noted that the asset cap was being imposed in response "to recent and widespread consumer abuses and other compliance breakdowns by Wells Fargo"[2231] and that it would remain in effect until WFC sufficiently

---

[2223] EC MSD Ex. 269 (Report of NBE Candy) at ¶214.

[2224] EC MSD Ex. 267 (Report of NBE Smith) at ¶148.

[2225] *Id.*, quoting Sworn Statement of Timothy Sloan at 260:8-261:3 (July 11, 2019) (OCC-SP00048394).

[2226] EC MSD Ex. 267 (Report of NBE Smith) at ¶148, citing Wells Fargo & Company, Form 10-Q, at 124-25 (Aug. 4, 2020), available at https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/sec-ilings/2020/second-quarter-10q.pdf; Wells Fargo & Company, Form 10-Q, at 124-25 (Nov. 3, 2016), available at https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/sec-filings/2016/third-quarter-10q.pdf.

[2227] EC MSD Ex. 267 (Report of NBE Smith) at ¶148, citing Wells Fargo & Company, Form 10-Q, at 124-25 (Aug. 4, 2020), available at https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/sec-ilings/2020/second-quarter-10q.pdf; and Declaration of Scott W. Champion (Apr. 24, 2018) (OCC-WF-SP-06584570).

[2228] EC MSD Ex. 267 (Report of NBE Smith) at ¶148.

[2229] *Id.*, citing Sworn Statement of Hope Hardison at 36:14-38:18 (Aug. 16, 2018).

[2230] EC MSD Ex. 267 (Report of NBE Smith) at ¶148, citing Order to Cease and Desist Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended, In re Wells Fargo & Co., Docket No. 18-007-B-HC (Feb. 2, 2018) (FRB); EC MSD Ex. 658 (Report of Dr. Pocock) at ¶58.

[2231] EC MSD Ex. 658 (Report of Dr. Pocock) at ¶58 citing Federal Reserve Board of Governors, Press Release (Feb. 2, 2020), *available at* https://www.federalreserve.gov/newsevents/pressreleases/enforcement20180202a.htm.

improves its governance and risk management.[2232] She reported that as of the date of November 20, 2020, the asset cap remained in place.[2233]

Examiner Smith reported that the asset cap imposed on WFC is one of, if not the, costliest penalties ever.[2234] She reported that from February 2, 2018 through December 31, 2019:

        a. WFC's stock price declined by 16.0 percent;

        b. JPMorgan's stock price increased by 22.0 percent;

        c. Bank of America's stock price increased by 10.2 percent;

        d. Citigroup's stock price increased by 3.7 percent; and

        e. The S&P 500 Financials sector index increased by 5.0 percent.[2235]

Dr. Pocock reported that his stock analysis demonstrates that WFC far outperformed its peers for many years prior to September 8, 2016, and significantly underperformed its peers ever since that day.[2236] He opined that it would not be reasonable nor plausible to attribute this to a coincidence.[2237]

Examiner Smith reported that the Company's stock price has significantly lagged its peers since September 8, 2016, the date of the sales practices settlements with the OCC, CFPB, and City Attorney of Los Angeles.[2238] Examiner Smith also opined that the Bank subsequently suffered immense reputational damage as a result of the sales practices misconduct problem.[2239]

**Evidence Regarding the $10 Million Civil Money Penalty**

The record reflects that when the OCC presented Ms. Russ Anderson with the 15-day letter, it included a request that she provide a personal financial statement to accompany any response to the letter, and included a form designed for that purpose.[2240] Through Counsel, Ms. Russ Anderson represented that after she determined that the statement was not required, she did not provide the statement, on the ground that she and her counsel did not think there was a

---

[2232] EC MSD Ex. 658 (Report of Dr. Pocock) at ¶58.

[2233] *Id.*

[2234] *Id.*, citing American Banker, "Wells Fargo asset cap is now one of the costliest bank penalties," (Aug. 24, 2020), *available at* https://www.americanbanker.com/articles/wells-fargo-asset-cap-is-now-one-of-the-costliest-bank-penalties.

[2235] EC MSD Ex. 267 (Report of NBE Smith) at ¶58.

[2236] *Id.* at ¶65.

[2237] *Id.*

[2238] *Id.* at ¶148.

[2239] *Id.* at ¶149.

[2240] Tr. (Russ Anderson) at 9500-01.

Appellate Case: 25-1079    Page: 1071    Date Filed: 05/16/2025 Entry ID: 5517644

possibility of settlement at that level.[2241] Responding to two separate discovery requests, Ms. Russ Anderson supplied the OCC with all tax returns and supporting schedules for the years 2014 through 2019, and all documents relating to any equity compensation awarded to her.[2242]

Ms. Russ Anderson testified that she could not write a check as of the day of her testimony to pay the civil money penalty.[2243] She testified that prior to testifying she reviewed her bank and mortgage statements, statements from the investment firm, her 401(k), and "those types of things."[2244] She testified except as noted, that the values were as of September 30, 2021 – the last date that she had actual month-end statements; and that for the value of real estate she "went on Zillow.com."[2245]

Ms. Russ Anderson testified that she "was extraordinarily careful" in calculating these amounts, "and did the calculations multiple times to make sure that I had it correct."[2246] She produced a financial statement through which she reported approximately $7.1 million in total assets before taxes, which would be reduced to "approximately $4 million and change" if the assets were liquidated and taxes paid on the sales.[2247]

Upon objection by Enforcement Counsel on the ground that the statement was not shown to be reliable, the statement – produced for the first time during the hearing – was not admitted and the objection was sustained.[2248] In further testimony, Ms. Russ Anderson responded to her Counsel's question "so if you do your tax liquidation cost, what was that again?" by testifying "I believe $4.7 million. $5.3 million. Just the number. I apologize. The tax number would be $1,862,394."[2249] Asked by her Counsel "so after adjusting for taxes, so tax affecting this, what does that leave you with the final net worth?" Ms. Russ Anderson responded, "$5,324,910."[2250]

Notwithstanding the care described in this response, Ms. Russ Anderson acknowledged during cross-examination that in February 2017 she sold property she owned at 9620 Whistling Valley Trail in Lake Elmo, Minnesota for approximately $950,000 but did not disclose that in the financial statement she presented during the hearing nor during direct examination.[2251] Upon

---

[2241] Tr. (Russ Anderson) at 9501.

[2242] Id.

[2243] Id. at 9484.

[2244] Id.

[2245] Id. at 9485.

[2246] Id. at 9502.

[2247] Id. at 9504.

[2248] Id. at 9505-06.

[2249] Id. at 9506.

[2250] Id.

[2251] Id. at 10136; R. Ex. 20974.

Add. 1070

Appellate Case: 25-1079     Page: 1072     Date Filed: 05/16/2025 Entry ID: 5517644

considering the record as a whole, I find the testimony regarding Ms. Russ Anderson's financial statement is unreliable and entitled to little weight.

Ms. Russ Anderson testified that her salary, not including other forms of compensation, was $350,000 per year in 2016 when she left Wells Fargo.[2252] Without providing any documentation in support, she said she receives $19,000 per year as interest or dividends "through my retirement assets", that she is the sole owner of a supplemental 401(d) from which she receives approximately "$10,000 a year in Wells Fargo stock", that this amount fluctuates "based on the price of Wells Fargo stock at the time it's issued," that she expects five more payments from that account that she cannot accelerate, and that it "ceases" after that.[2253]

Without providing any documentation in support, Ms. Russ Anderson testified she receives approximately $330,000 as income from a deferred compensation plan and expects five more payments from that plan that she cannot accelerate, and then "there is no more funds".[2254] She testified she receives "about $5,000 per year" relating to a legacy pension from Norwest Bank; and that she estimates she can expect $393,000 in income in 2021.[2255]

Ms. Russ Anderson testified that she expects to rely on her 401(k), the IRAs, and Social Security retirement benefits when the five-year payments end.[2256] Without providing any documentation in support, she testified the approximate current value of the 401(k) account as of November 30, 2021 was $3.4 million, but if she were to withdraw funds from that account she would be subject to a combined state and federal tax rate of "about 40 percent."[2257]

Without providing any documentation in support, Ms. Russ Anderson testified that she is the sole owner of an IRA, which as of November 20, 2021 held "approximately $707,000" and which would likewise be subject to combined state and federal income taxes at the rate of approximately 40 percent.[2258]

Ms. Russ Anderson testified that her husband, William Anderson, has an individual retirement account on which she is the beneficiary, valued as of a date not specified at about $112,000 and subject to taxes at a rate not specified, payable only upon Mr. Anderson's death.[2259]

Without providing any documentation in support, Ms. Russ Anderson testified that she has a life insurance policy with "approximately $52,000 of cash value", and that her husband as a

---

[2252] *Id.* at 9485.

[2253] *Id.* at 9485-86.

[2254] *Id.* at 9487.

[2255] *Id.*

[2256] *Id.* at 9488.

[2257] *Id.*

[2258] *Id.* at 9489.

[2259] *Id.*

Add. 1071

Appellate Case: 25-1079    Page: 1073    Date Filed: 05/16/2025 Entry ID: 5517644

life insurance policy with approximately $12,000 cash value, where the premiums are being paid through that cash value.[2260]

Without providing any documentation in support, Ms. Russ Anderson testified that she owns her home jointly with her husband, that the property is located in Lake Elmo, Minnesota with a current approximate property value of $532,000, that there is a mortgage loan of approximately $325,000 remaining.[2261]

Without providing any documentation in support, Ms. Russ Anderson testified that she owns a home in Longwood, Florida, which she bought at $220,000 and which she said is worth $355,000 today, where her sister and her sister's husband reside, after caring for Ms. Russ Anderson's parents.[2262] Ms. Russ Anderson testified that she made "around $20,000 worth" of capital improvements on the property and receives rent from her sister and brother-in-law, who "pay what they can afford, which does not cover our expenses."[2263]

Without providing any documentation in support, Ms. Russ Anderson testified that a trust in her husband's name owns a townhome in Lake Elmo, Minnesota that she bought for $348,000 and is worth $400,000 now.[2264] Ms. Russ Anderson testified that her oldest son "is on the autism spectrum and holds down a fairly minimum wage job at Walmart," and resides in that townhome, that a roommate rents one of the rooms, but that this son "can't afford much" she provides this housing for him.[2265] She testified that since there is no mortgage on the property, the rent paid by the roommate "covers about dollar for dollar what our expenses are."[2266] She added that if required to liquidate the real estate, she would have to pay a six percent commission to the real estate agent.[2267]

Ms. Russ Anderson testified that her husband "started staying home with our kids in 1989 and does not really have a retirement program."[2268] She testified that 20 years ago they started working with their family attorney "to build up some assets in Bill's name for his retirement and to just give him some assets."[2269] Without providing any documentation in support, Ms. Russ Anderson testified that as of November 30, 2021 the value of the trust's investment account was $1.2 million, with a cost basis of about $970,000 – which would be subject to tax liabilities at a

---

[2260] *Id.* at 9490.

[2261] *Id.* at 9491, 9506.

[2262] *Id.*) at 9491-92.

[2263] *Id.* at 9492-93.

[2264] *Id.* at 9493-94, 9498.

[2265] *Id.* at 9493-94.

[2266] *Id.* at 9494.

[2267] *Id.* at 9496.

[2268] *Id.* at 9494.

[2269] *Id.* at 9494-95.

Add. 1072

Appellate Case: 25-1079     Page: 1074     Date Filed: 05/16/2025 Entry ID: 5517644

29 percent rate if withdrawn.[2270] The trust has a savings account of approximately $79,000 and $5,000 in a checking account.[2271] She testified that the balance of her Wells Fargo bank savings account as of November 30, 2021 was approximately $232,000, and that "the household account – the trust account, but we pay the household bills, was approximately $5,000 and another account was approximately $6,000."[2272]

Ms. Russ Anderson testified she had about $14,000 in credit card debt.[2273] Ms. Russ Anderson subsequently testified that "revolving accounts" debt was approximately $8,000.[2274]

Ms. Russ Anderson testified she had "nonfinancial assets" worth "around $150,000."[2275] She then testified that total liabilities were $333,759 and net worth before tax adjustments was $6,853,545, and – after subtracting tax impacts – a net worth of $4,991,151.[2276] In the absence of documentation to support this testimony, little weight is given to Ms. Russ Anderson's testimony regarding her income and assets.

Ms. Russ Anderson responded to testimony from Mr. Reep regarding equity compensation she has or will receive from Wells Fargo.[2277] Ms. Russ Anderson testified that after she "pulled the statements and did the calculations," she determined that the equity compensation analysis presented through the spreadsheet prepared by Mr. Reep was off by $3.1 million.[2278] She testified that it was her understanding the aggregate value of the equity compensation that was canceled by the Bank was "$1.8 million as of that date" and that the Bank canceled that compensation because "[the Bank] terminated me for cause."[2279]

After noting that United States Code Section 1818(i) allows a judge to consider matters as justice may require, Ms. Russ Anderson testified:

> Your Honor, to pay a $10 million or even a $5 million civil money penalty
> would wipe my husband and I out in its entirety. And I have -- I have spent
> my life being someone who you could count on and was truthful and honest.

---

[2270] *Id.* at 9495-96.

[2271] *Id.* at 9496.

[2272] *Id.*

[2273] *Id.* at 9497.

[2274] *Id.* at 9506.

[2275] *Id.* at 9497.

[2276] *Id.* at 9507.

[2277] *Id.* at 9498-99; OCC Ex. 2941.

[2278] Tr. (Russ Anderson) at 9499.

[2279] *Id.* at 9500, 10140; OCC Ex. 2126: "Upon completion of an internal investigation, in a unanimous decision, the Wells Fargo Board of Directors concluded that there is cause to terminate your employment, effective February 21, 2017, because you engaged in prohibited conduct in violation of Company policy, including the Company's Code of Ethics and Business Conduct."

Appellate Case: 25-1079    Page: 1075    Date Filed: 05/16/2025 Entry ID: 5517644

I apologize. This has been a very difficult time for my family and -- because it goes to the core of who I am. I do not believe that these civil money penalties are fair, and I absolutely could not pay them. I would have to -- I don't know how I would do it. There's nothing there.[2280]

Ms. Russ Anderson added her husband "is not able to work in a material way," and that if she had to liquidate her property she would have to find a way to keep her oldest son where he is because "to upset that would put him in a spin" due to health issues; and the harm to her sister "would be immeasurable to me."[2281]

Ms. Russ Anderson averred that what she described as a "massive civil penalty Enforcement Counsel seeks is not justified by law."[2282] In support, she noted that second tier Civil Monetary Penalties require proof of "misconduct" which requires a "violation of law, breach of fiduciary duty, or recklessly engaging in an unsafe or unsound practice,"[2283] and "effects," as evidenced by either a pattern of misconduct or conduct which caused or was likely to cause more than minimal loss to the institution, or which resulted in a gain or benefit to the respondent.[2284]

The record reflects that Enforcement Counsel has by preponderant evidence established that Respondent Russ Anderson violated the law, breached fiduciary duties she owed to the Bank, and recklessly engaged in unsafe and unsound banking practices.

Preponderant evidence also established that Ms. Russ Anderson engaged in a pattern of misconduct; engaged in conduct that was likely to cause and did in fact cause more than minimal loss to the Bank; and established that her conduct resulted in gain and benefit to her.

Respondent asserted that the "massive civil penalty Enforcement Counsel seeks is also "contrary to law."[2285] She noted that when assessing the amount of second tier civil money penalties, Enforcement Counsel must consider the following factors: 1) the size of financial resources and good faith of the bank officer; 2) the gravity of the violation; 3) the history of previous violations and 4) such other factors as justice may require.[2286]

---

[2280] Tr. (Russ Anderson) at 9508.

[2281] *Id.* at 9508-09.

[2282] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 134.

[2283] *Id.*, quoting 12 U.S.C. § 1818(i)(2)(B)(i).

[2284] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 134, quoting 12 U.S.C. § 1818(i)(2)(B)(ii).

[2285] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 135.

[2286] *Id.*, citing 12 U.S.C. § 1818(i)(2)(G).

Add. 1074

Appellate Case: 25-1079    Page: 1076    Date Filed: 05/16/2025 Entry ID: 5517644

The record in this enforcement proceeding includes evidence describing Respondent Russ Anderson's financial resources, and evidence demonstrating the absence of Respondent's good faith – both in her dealings with the Bank and its Board, and in her dealings with the OCC. The record establishes the gravity of the violations that can properly be attributed to Respondent. The record establishes Respondent has had no prior disciplinary charges brought against her, but had been provided repeated prior notices by OCC examiners of unsafe practices that needed her attention. And the record establishes that the OCC's examiners have considered other factors – including those mandated under Interagency Policy described below – as justice requires.[2287]

As noted by Respondent Russ Anderson, when evaluating the matter for the purpose of assessing a civil money penalty, the OCC's examiners were required to consider whether the violations were intentional, the duration and frequency of the violations, whether there is evidence of Respondent's failure to cooperate with the agency and evidence of concealment by Respondent, any previous admonishments not to engage in such conduct, the threat of or actual loss to bank, and evidence of financial gain or benefit to the participant."[2288]

The record in this enforcement proceeding establishes that Respondent's violations were intentional; the record describes and documents the duration and frequency of the violations; preponderant evidence established Respondent's repeated and material failure to cooperate with the OCC; there were repeated instances where Respondent concealed from the Bank's Board and from the OCC's examiners information that was material to the Bank's safety and soundness; there was substantial evidence of previous admonishments by OCC examiners directed at Respondent that brought safety and soundness concerns to her attention; there is substantial evidence of both the threat of loss and the fact of actual loss sustained by the Bank occasioned by Respondent's failure to address the safety and soundness concerns raised by the examiners; and there was substantial evidence establishing that Respondent realized financial gain and other benefits while engaging in unsafe and unsound banking practices. (As used in this context, evidence is substantial if it is relevant and a reasonable person would deem it adequate to support the ultimate conclusion.[2289])

Respondent asserted that consideration of the multiple civil penalty factors includes both objective factors and factors more dependent on subjective impressions.[2290] The hearing

---

[2287] Interagency Policy Regarding the Assessment of Civil Monetary Penalties by the Federal Financial Institutions Regulatory Agencies, 63 Fed. Reg. 30,226-227.

[2288] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 135, quoting Michael v. F.D.I.C., 687 F.3d 337, 355 (7th Cir. 2012).

[2289] *Michael v. F.D.I.C.*, 687 F.3d 337, 348 (7th Cir. 2012), citing Grubb v. FDIC, 34 F.3d 956, 961 (10th Cir.1994).

[2290] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 136, citing In the Matter of Jiampietro (Order dated June 5, 2017 at 84). Note that Respondent Russ Anderson supported the footnoted legal premise by citing to an Order without providing sufficient information to permit a determination of whether the cited authority actually supports the premise. The citation does not identify

Add. 1075

Appellate Case: 25-1079    Page: 1077    Date Filed: 05/16/2025 Entry ID: 5517644

conducted from September 2021 to January 2022 provided a forum permitting Ms. Russ Anderson to present evidence that would permit the evaluation of both objective and subjective impressions.

Respondent Russ Anderson posits that Enforcement Counsel may not impose civil monetary penalties that are arbitrary, capricious, an abuse of discretion, or contrary to law.[2291] She cites in support *Michael v. F.D.I.C.*[2292]

In *Michael*, the Court of Appeals affirmed the FDIC's prohibition order, providing the following context:

> Congress has provided the FDIC Board with the authority to ban bank officers and directors from participation in the operation of a federally insured depository institution when the bankers' actions threaten the integrity of the industry. The Board imposed that harsh sanction here after concluding that the Michaels engaged in repeated acts of self-dealing and unsafe and unsound banking practices. The Board found, upon adopting the ALJ's a findings, that common theme emerges when examining all three interrelated, complicated, and overlapping transactions: "Respondents exploited their positions as Bank directors, deliberately overstated the value of assets, and concealed their true financial interest to entice lenders and investors to fund their business ventures." The Michaels' complicity in any one of these transactions, the Board found, was sufficient to support removal.[2293]

As was the case in *Michael*, preponderant evidence adduced during this enforcement proceeding established Ms. Russ Anderson was involved in repeated acts of concealment that prevented the Bank's Board of Directors from taking appropriate curative action against the

---

the forum that issued the Order and bears no indicia establishing that the Order was issued by a decision-maker authorized to render final decisions for the forum. Pursuant to the February 13, 2020 Order to Attend Scheduling Conference and Supplemental Prehearing Orders, only the applicable regulatory agency may enter final decisions and establish precedential determinations in cases presented to adjudicators at the Office of Financial Institution Adjudication. As such, citations to authority using as precedent orders and recommended decisions from OFIA should be limited to those in which the agency has considered and approved the ALJ's order or recommended decision. Respondent Russ Anderson has made no showing that any agency has approved the cited Order. Further, the February 13, 2020 Order required that any citation to authority where the repository of the authority is other than Westlaw (Thomson Reuters) shall be accompanied by a copy of the authority. No such copy was supplied. Accordingly, no weight is given to the legal premise supported by the unidentified Order.

[2291] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 136, citing *Michael v. F.D.I.C.*, 687 F.3d 337, at 348.

[2292] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 136.

[2293] *Michael v. F.D.I.C.*, 687 F.3d 337, 348 (7th Cir. 2012).

Add. 1076

Appellate Case: 25-1079    Page: 1078    Date Filed: 05/16/2025 Entry ID: 5517644

damage being caused by business practices misconduct known to Respondent. She exploited her position as Risk Manager by minimizing the extent and scope of that misconduct, and by concealing the true scope, nature, and extent of the misconduct from OCC examiners and the Bank's Board. As was the case in *Michael*, Respondent Russ Anderson's complicity in the concealment of this misconduct is sufficient to support an order of prohibition.

Respondent Russ Anderson asserts that in determining civil penalties, "the amount of ill-gotten gain and the financial loss to customers are 'especially pertinent factors.'"[2294] In support of this assertion, Respondent relies upon the Court of Appeals' holding in *R&W Technical Services Ltd.*[2295] In that case, which applied civil money penalties under the Commodity and Exchange Act, the Court of Appeals followed a line of cases that have "rejected the notion that uniform sanctions must be imposed by an administrative agency for similar violations."[2296]

The Court of Appeals set aside the CFTS's penalty upon determining that the Commodity Futures Trading Commission "had no evidence of customer losses" but nevertheless assessed a $2.735 million sanction "based on estimated gross revenues".[2297] "When a penalty is designed for deterrence and not restitution," the Court of Appeals held, "the proper measure of gain to the defendant is net profits, not gross revenues."[2298]

It is true that the OCC's penalty in this enforcement action was designed for deterrence and not restitution. That, however, is the only material similarity between the CFTS case and the present case. The CFTS case applied regulations and statutes applicable to the Commodities and Exchange Act[2299] and not those applicable under the FDI Act. Nothing in the record of the present administrative enforcement action suggests or establishes that the OCC's civil money penalty assessment was based on gross revenues that were attributed as gains realized by Ms. Russ Anderson. Accordingly, the holding in the CFTS case does not support Respondent's assertion that either the amount of ill-gotten gains or financial loss to customers are pertinent factors here.

---

[2294] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 136, quoting *R& W Technical Services Ltd. V. Commodity Futures Trading Comm'n,* 205 F.3d 165, 178 (5th Cir. 2000), *cert. denied*, 531 U.S. 817 (Oct. 2, 2000).

[2295] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 136.

[2296] *R&W Tech. Servs. Ltd. v. Commodity Futures Trading Comm'n*, 205 F.3d 165, 178 (5th Cir. 2000), citing *Butz v. Glover Livestock Comm.* Co., 411 U.S. 182, 187, 93 S.Ct. 1455, 36 L.Ed.2d 142 (1973); *Monieson v. CFTC*, 996 F.2d 852, 864 (7th Cir. 1993).

[2297] *R&W Tech. Servs. Ltd.,* 205 F.3d at 178.

[2298] *Id.*

[2299] *Id.*

Add. 1077

Appellate Case: 25-1079      Page: 1079      Date Filed: 05/16/2025 Entry ID: 5517644

Ms. Russ Anderson posits that Enforcement Counsel must "specify and prove what days the violations occurred in order to impose civil penalties on a per day basis."[2300] In support, she cited *Southern Union Co.*, in which the Supreme Court considered the jury's role in setting a fine.

In *Southern Union Co.*, the Court held:

> Under 42 U.S.C. § 6928(d), the fact that will ultimately determine the maximum fine Southern Union faces is the number of days the company violated the statute. Such a finding is not fairly characterized as merely "quantifying the harm" Southern Union caused. Rather, it is a determination that for each given day, the Government has proved that Southern Union committed all of the acts constituting the offense.[2301]

The record in the present case reflects that OCC Examiner Smith conformed with the Court's analysis in *Southern Union Co.*: she identified a starting date of January 1, 2005 and an ending date of September 30, 2016, gave sufficient reasons for using those starting and ending dates, and noted the applicable maximum penalties that could be imposed between January 1, 2005 and November 1, 2015, and the revised maximum applicable for November 2, 2015 through September 30, 2016; and applied those maximums using the relevant dates.[2302]

Ms. Russ Anderson avers that the $10 million penalty Enforcement Counsel seeks is not justified under the applicable factors,[2303] and in support averred that she is 63 years old and retired, and the civil penalty Enforcement Counsel seeks "exceeds her financial resources."[2304] She supported this factual premise, and the averment that she is "unable to pay a $10 million civil penalty, which would render her destitute,"[2305] with a citation to the Declaration she filed in opposition to Enforcement Counsel's summary disposition motion.[2306]

In the paragraph of her Declaration cited in support of this factual claim, Ms. Russ Anderson said simply "I am 63 years old and fully retired. The civil penalty OCC seeks far

---

[2300] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 136, citing Southern Union Co. v. U.S., 567 U.S. 343, 359 (2012),

[2301] S. Union Co. v. United States, 567 U.S. 343, 359, 132 S. Ct. 2344, 2356, 183 L. Ed. 2d 318 (2012).

[2302] MSD-231 (Decl. of Examiner Smith) at ¶¶10-11.

[2303] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 136.

[2304] *Id.*, citing RAMF0001 (Russ Anderson Decl.) ¶ 48.

[2305] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 136.

[2306] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 136, citing RAMF0001 (Russ Anderson Decl.) ¶ 48.

Add. 1078

Appellate Case: 25-1079      Page: 1080      Date Filed: 05/16/2025 Entry ID: 5517644

exceeds my financial resources."[2307] Ms. Russ Anderson averred that because they had copies of her income tax returns, Enforcement Counsel were aware of – but failed to consider – that a substantial portion of Ms. Russ Anderson's compensation went to taxes and expenses[2308]

There is in the record, however, an insufficient factual basis to permit a determination of Ms. Russ Anderson's financial resources, most notably those resources that are not based on current income. There is thus insufficient evidence to support her averment that the $10 million civil penalty constitutes "an extremely harsh penalty, the financial equivalent of the death penalty," that "rises to the level of arbitrary, capricious and abusive."[2309]

Ms. Russ Anderson had sufficient opportunity through the administrative hearing process to demonstrate the true state of her financial resources. She did not rebut Examiner Smith's determination that her compensation at Wells Fargo was in "the millions," nor did she dispute that Examiner Smith took into consideration compensation she forfeited or the Bank withheld when determining the $10 million assessment.[2310]

Ms. Russ Anderson argues that Enforcement Counsel "has failed to establish civil penalties for each day of Ms. Russ Anderson's tenure as risk officer."[2311] She asserts that "[t]he only specific allegedly wrongful acts relied on by Enforcement Counsel . . . are the following relatively minimal number of acts: (1) April 2014 Enterprise Risk Management Committee meeting,[2312] and (2) statements to the OCC in 2015." [2313]

Upon these premises, she asserts that "the only affirmative misconduct alleged against Ms. Russ Anderson specifying the day the violation occurred did not occur until April 2014, roughly two years before she left Wells Fargo"[2314] and that any civil penalty imposed "needs to take into account the limited time frame of the alleged misconduct."[2315] Ignoring the continuing

---

[2307] RAMF0001 (Russ Anderson Decl.) ¶ 48.

[2308] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 143.

[2309] *Id.* at 136, citing *Dazzio v. F.D.I.C.*, 970 F.2d 71, 78 (5th Cir. 1992) (reversing $175,000 civil penalty against bank officer where regulator failed to introduce or consider sufficient evidence of what civil penalty he could afford to pay); *Merritt v. U.S.*, 960 F.2d 15, 18 (2nd Cir. 1992) (reversing civil penalty where agency failed to introduce or consider evidence of respondent's ability to pay).

[2310] MSD-231 (Decl. of Examiner Smith) at ¶60.

[2311] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 142.

[2312] *Id.*, citing Smith Decl. at 12, ¶ 27.

[2313] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 142, citing Smith Decl. at 14, ¶ 29

[2314] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 142.

[2315] *Id.*

Add. 1079

Appellate Case: 25-1079    Page: 1081    Date Filed: 05/16/2025 Entry ID: 5517644

nature of her failure to disclose what she knew of the sales practices misconduct, she asserted, "there is no basis for imposing penalties for each and every day of her tenure as risk officer."[2316]

It bears noting that the record reflects a significant pattern of misleading and deceptive practices by Ms. Russ Anderson that goes beyond the two incidents identified above. Even limiting the analysis to the two incidents identified here, the record reflects that the "relatively minimal number of acts" had a long-lasting negative effect and constituted unattenuated breaches of fiduciary duties Ms. Russ Anderson owed to the Bank.

Evidence regarding the misconduct occurring before, during, and after the April 2014 Enterprise Risk Management Committee meeting included Examiner Candy's observation that despite having knowledge to the contrary, Ms. Russ Anderson in the April 2014 presentation to the Bank's ERMC told the Committee that the Community Bank's business model did not incent inappropriate behavior.[2317] The record reflects that this was a patently false statement regarding a material issue, and that it had a continuing adverse effect on the Bank lasting until at least September 30, 2016.

Examiner Candy reported that Bank management needed to understand the risks generated by this activity so that it could design and implement controls that effectively manage the risk. As the Group Risk Officer, Ms. Russ Anderson's primary responsibility was to ensure that the Community Bank properly managed all risks inherent in its operations. She was also responsible for ensuring that the Community Bank implemented adequate controls commensurate with the risk inherent in those operations.

Examiner Candy reported that Ms. Russ Anderson served as Chairperson of the Community Banking Risk Management Committee from at least 2011 until August 2016, and was responsible for understanding the Community Bank's "operational risk profile and [] work[ing] with management across Community Banking to ensure risks are managed effectively." Examiner Candy reported that throughout the relevant four years (from 2013 to 2016), sales practices risk was not managed effectively. She opined that Ms. Russ Anderson failed to fulfill her responsibilities with respect to the sales practices misconduct problem and that this was recklessly unsafe or unsound and a breach of her fiduciary duty that continued unabated between 2005 and 2016.

Examiner Candy reported that the Community Bank's sales practices misconduct problem existed during the entire time that Ms. Russ Anderson served as the Group Risk Officer. She opined that the Community Bank did not adequately address the sales practices misconduct problem during her tenure and she did not advocate for fundamental changes to the business model. She found that the Bank Board's Report accurately concluded that: "Russ Anderson's performance fell far short of what was expected and required of the senior risk officer in the

---

[2316] Id.

[2317] EC MSD Ex. 269 (Report of NBE Candy) at ¶126, citing Minutes, Enterprise Risk Management Committee (April 9, 2014) (OCC-WF-SP-06400169).

Add. 1080

Appellate Case: 25-1079      Page: 1082      Date Filed: 05/16/2025 Entry ID: 5517644

Community Bank. Russ Anderson failed to adequately assess and advocate for changes in the business practices that resulted in sales integrity violations."

Examiner Candy opined that Ms. Russ Anderson also is responsible for significant deficiencies in the Bank's risk management and controls, which enabled ongoing legal violations by Bank employees. She reported that Ms. Russ Anderson did not ensure that incentive compensation plans adequately balanced risk and reward as required by the Incentive Compensation Risk Management Policy. She reported that the threat of employee termination and disciplinary action and actual terminations for failing to meet sales goals continued until October 2016.

Examiner Candy reported that it is her understanding that to this day, Ms. Russ Anderson maintains that employees were not terminated for failing to meet sales goals and that the controls were adequate. Examiner Candy opined that Ms. Russ Anderson failed to escalate the sales practices misconduct problem and that this was recklessly unsafe or unsound and constituted a breach of her fiduciary duty.

Examiner Candy reported that generally accepted standards of prudent operation require risk officers to identify risk in the line of business and ensure appropriate action is taken to mitigate and address the risk. She opined that Ms. Russ Anderson acted contrary to generally accepted standards of prudent operation by protecting the Community Bank's business model instead of challenging or correcting it. She reported that Ms. Russ Anderson never escalated or accurately reported on sales practices misconduct and its root cause, duration, and scope, and the adequacy of controls to the Chief Risk Officer, Enterprise Risk Management Committee, the Board, or the OCC.

Examiner Candy reported that instead, Ms. Russ Anderson attempted to protect the Community Bank from external scrutiny, rather than properly identifying, controlling, reporting, and escalating risks. She opined that Ms. Russ Anderson's false, misleading, and incomplete reporting to the Enterprise Risk Management Committee, the Board, and the OCC was recklessly unsafe or unsound and constituted a breach of fiduciary duties Respondent owed to the Bank. She reported that "[i]nformation should give directors a complete and accurate overview of the bank's condition, activities, and issues. Management is responsible for being transparent and providing information in a meaningful format."

Examiner Candy opined that Ms. Russ Anderson's reporting lacked this requisite transparency, candor, and completeness of information. She reported that despite having knowledge to the contrary, Ms. Russ Anderson in the April 2014 presentation to the Bank's Enterprise Risk Management Committee told the Committee that the Community Bank's

Appellate Case: 25-1079     Page: 1083     Date Filed: 05/16/2025 Entry ID: 5517644

business model did not incent inappropriate behavior.  Examiner Candy opined that this is a false statement and demonstrates Ms. Russ Anderson's personal dishonesty.[2318]

Examiner Candy reported that Ms. Russ Anderson also reviewed and edited the May 19, 2015 Memo that Mr. Strother submitted to the Risk Committee of the Board and the OCC.[2319] Examiner Crosthwaite reported that the May 19, 2015 Memo was false, misleading, and incomplete.[2320] Based on her 24 years of experience as a national bank examiner, Examiner Crosthwaite opined that as the Community Bank's Group Risk Officer Ms. Russ Anderson failed to fulfill her fiduciary duty and responsibilities as the first line of defense responsible for risk management and controls.[2321]

Examiner Crosthwaite reported that banks are required to have sound risk management policies, procedures, and controls related to all aspects of the bank, including those areas of the bank that may pose, or have posed, heightened risks such as in the case of Wells Fargo Community Bank's sales practices.[2322]  She noted that the Bank had various policies and procedures in place that touched on various aspects of sales practices misconduct.[2323]

Examiner Crosthwaite reported that Ms. Russ Anderson had responsibility for ensuring the adequacy and appropriateness of the Community Bank's risk management and controls.[2324] Under the Bank's Incentive Compensation Risk Management Policy, Ms. Russ Anderson was required to ensure that incentive compensation plans appropriately balanced risk and reward, as well as provide independent reviews of incentive compensation arrangements.[2325]  Ms. Russ Anderson admitted that "she had some, but not the sole, authority to address or investigate sales practices misconduct . . ."[2326] Notwithstanding that both the problem and its root cause were identified and well known by at least 2004, the Community Bank and Ms. Russ Anderson took no meaningful action.[2327]

---

[2318] EC MSD Ex. 269 (Report of NBE Candy) at ▯126.

[2319] *Id.*

[2320] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ▯108.

[2321] *Id.*

[2322] *Id.*

[2323] *Id.*

[2324] *Id.* at ▯109.

[2325] v at ▯110.

[2326] *Id.*

[2327] *Id.* at ▯111.

Add. 1082

Appellate Case: 25-1079      Page: 1084      Date Filed: 05/16/2025 Entry ID: 5517644

The Bank Board's Report stated: "Despite the recognition by 2004 of both the increasing scope of sales practice issues and their association with sales incentives, the problem continued to grow."[2328]

Examiner Crosthwaite reported that national bank examiners rely on information provided to them and communications with bank personnel and bank management during the course of supervisory activities and examinations.[2329] Examiner Crosthwaite reported that any bank employee is expected to be forthcoming, transparent, and candid in all communications with management, management committees, the board of directors, and its regulators, including the OCC, both orally and in writing.[2330]

Examiner Crosthwaite reported that management is required to be transparent and provide comprehensive and accurate information to senior management, the board, and the OCC. She reported that transparency and truthful communication between the banker and regulator is of utmost importance for banks of all sizes.[2331] She reported that it is imperative to the examination process that exams are conducted honestly and impartially, free from deceit, craft, dishonesty, trickery, unlawful impairment, impediment, and obstruction.[2332] She reported that the level of transparency by bank management with senior management, the board, and the regulator influence and can hinder the bank's reputation with shareholders, regulators, customers, other stakeholders, and the community at large.[2333]

Ms. Russ Anderson was the OCC's primary point of contact during the February 2015 Exam, given that the examination focused on her risk organization in the Community Bank.[2334] She was responsible for ensuring that accurate, complete, and transparent information related to sales practices was being provided to the OCC.[2335]

Examiner Crosthwaite opined, and stated the documents she reviewed demonstrate, that Respondent Russ Anderson intentionally and consistently misled the OCC and the Board on the scope, root cause, the adequacy of the controls and the longstanding nature of the sales practices misconduct problem,[2336] averring that Ms. Russ Anderson made several false and misleading statements during the February 2015 and May 2015 examinations and regularly sought to limit

---

[2328] *Id.* at ¶111.

[2329] *Id.* at ¶112.

[2330] *Id.*

[2331] *Id.* at ¶113.

[2332] *Id.* at ¶114.

[2333] *Id.*

[2334] *Id.* at ¶115.

[2335] *Id.* at ¶116.

[2336] *Id.* at ¶117.

Add. 1083

Appellate Case: 25-1079     Page: 1085     Date Filed: 05/16/2025 Entry ID: 5517644

the extent of information the Bank provided to Examiner Crosthwaite and others at the OCC.[2337] In support of these opinions, Examiner Crosthwaite noted the following:

a. In June of 2013, as a result of an increasing number of whistleblower emails regarding sales practices to the CEO, the Bank launched an investigation into allegations of simulated funding in Los Angeles and Orange County.[2338] In October and December 2013, the Los Angeles Times published two articles outlining the Bank's "pressure cooker" sales environment.[2339] As a result of that investigation, the Bank terminated approximately 230 team members. None of this information was escalated to the OCC or the Board during 2013 or 2014 by Respondent Russ Anderson.[2340] The OCC learned about the 230 team members from Legal in their response to the OCC's request letter for the May 2015 investigation.[2341] In February 2015, the OCC conducted a Community Bank examination with a focus on Sales Practices governance.[2342] OCC examiners conducted multiple interviews with Respondent Tolstedt, Respondent Russ Anderson, and a number of Tolstedt's direct reports.[2343] Respondent Russ Anderson did not mention the 2013 Los Angeles and Orange County investigation into simulated funding or the larger body of terminations.[2344]

b. On April 4, 2014, Corporate Risk provided feedback on Respondent Russ Anderson's written presentation to the Enterprise Risk Management Committee, requesting more content on the "current state" of sales practices. Respondent Russ Anderson responded that she was "worried about putting something like that into a deck. I'd rather we did that verbally because this deck is subject to the regulators [*sic*] review."[2345]

c. Respondent Russ Anderson participated in a February 10, 2015 conference call with the OCC.[2346] On the February 2015 OCC Call, an OCC examiner asked whether pressure to meet baseline sales goals was significant and contributed to employee turnover.[2347] Respondent Russ Anderson told the OCC that "no one

---

[2337] *Id.* at ¶117.

[2338] *Id.* at ¶118.

[2339] *Id.*

[2340] *Id.*

[2341] *Id.*

[2342] *Id.*

[2343] *Id.*

[2344] *Id.*

[2345] *Id.* at ¶117.

[2346] *Id.* at ¶118.

[2347] *Id.*

loses their job because they did not meet sales goals."[2348] This was demonstrably false.[2349] Through Examiner Crosthwaite's work on the February 2017 email review, her team found evidence that the Bank had terminated over 8,520 people between 2011 and 2016 for not meeting sales goals.[2350]

d.    Respondent Russ Anderson told examiners during the May 2015 OCC Meeting that interviews with employees "did not lead to conclusions about sales pressure," that she does not "hear" about pressure from personal bankers "at all," and that "people are positive and pleased."[2351] However, during the OCC's 2017 email review, examiners learned that the problem existed as early as 2002, and that for over 14 years, there was significant pressure, and double-digit increase in sales goals.[2352]

Examiner Hudson participated in a February 10, 2015 teleconference between OCC examination staff and Respondent Russ Anderson.[2353] Before the meeting, the OCC provided a list of topics and questions to be covered at the meeting, including: On the February 10, 2015 OCC call, incentive compensation was discussed.[2354] Examiner Hudson reported that Respondent Russ Anderson did not identify any concerns with incentive compensation at this meeting, did not discuss the risk created by the incentive compensation plans, and did not discuss whether such risks were adequately managed.[2355] Examiner Hudson reported that she expected that Respondent Russ Anderson, a senior Risk Officer, would understand whether a bank's incentive compensation program appropriately balances risk and reward because to do so is part of understanding, identifying, escalating, and addressing risks tied to incentive compensation.[2356]

•    "April 9, 2014 Claudia Russ-Anderson/Jason MacDuff presentation (with deck) to ERMC [Enterprise Risk Management Committee]: Discuss presentation and proposed changes."

•    "Controls and monitoring processes for identifying inappropriate behavior."

•    "Testing to ensure that the incentive program encourages appropriate behavior."[2357]

---

[2348] *Id.*

[2349] *Id.*

[2350] *Id.*

[2351] *Id.*

[2352] *Id.*

[2353] EC MSD Ex. 270 (Report of NBE Hudson) at ¶33.

[2354] *Id.*

[2355] *Id.* at ¶34.

[2356] *Id.*

[2357] *Id.* at ¶33, citing Email from Jill Charron to Kevin Swanson and attached notes (February 13, 2015) (OCC-SP0711664).

Add. 1085

Appellate Case: 25-1079    Page: 1087    Date Filed: 05/16/2025    Entry ID: 5517644

On the February 10, 2015 Call, OCC examiners asked whether pressure to meet baseline sales goals was significant and contributed to employee turnover. Respondent Russ Anderson interjected and stated, "no one loses their job because they did not meet sales goals."[2358] Examiner Hudson reported that she later learned this statement was demonstrably false.[2359]

On the February 10, 2015 Call, OCC examiners asked how the Bank ensures that the customer understands what they purchased.[2360] The answer Respondent Russ Anderson provided was that the Bank uses disclosures and surveys, and then they use indicators that tell them how well they delivered the product and to what extent the customer is using the product.[2361] Examiners were told that Rebecca Rawson's team manages that process.[2362]

No one on the February 10, 2015 Call, including Respondent Russ Anderson, or in any other meeting during the OCC's February 2015 Exam, told the OCC about Bank products the team members opened for customers that customers did not consent to or that customers did not need or want.[2363] During the February 2015 Exam, the OCC asked how the Bank determines that customers only received products that they want.[2364] Respondent Russ Anderson and her staff responded that the Bank does a customer needs assessment to make sure customers receive products they want and also use Gallup surveys to gauge customer satisfactions.[2365]

On the February 10, 2015 Call, Bank employees told OCC examiners that if a banker opens up a product (like a credit card) and the customer did not request it, then the banker is terminated immediately, and that if a teller puts in a referral that they did not earn, and the store manager knew (or should have known), then the store manager is fired.[2366] The messaging from Respondent Russ Anderson and her team on the February 10, 2015 Call was that the Bank was effective in detecting inappropriate sales conduct and took swift disciplinary action.[2367]

On the February 10, 2015 Call, OCC examiners also asked whether there was a first line of defense process, including monitoring and MIS (management information system), to assess

---

[2358] Citing Conclusion Memorandum from Kevin Swanson to Karin Hudson (Feb. 19, 2015) (OCC-SP0125161).

[2359] EC MSD Ex. 270 (Report of NBE Hudson) at ¶35.

[2360] *Id.* at ¶36.

[2361] *Id.*

[2362] EC MSD Ex. 270 (Report of NBE Hudson) at ¶36. Rebecca Rawson reported to Respondent Russ Anderson and managed the Sales and Service Conduct Oversight Team ("SSCOT") in the Community Bank. *Id.*

[2363] EC MSD Ex. 270 (Report of NBE Hudson) at ¶36

[2364] *Id.*

[2365] EC MSD Ex. 270 (Report of NBE Hudson) at ¶36, citing Email from Jill Charron to Kevin Swanson and attached notes (February 13, 2015) (OCC-SP0711664).

[2366] EC MSD Ex. 270 (Report of NBE Hudson) at ¶37.

[2367] *Id.*, citing Email from Jill Charron to Kevin Swanson and attached notes (February 13, 2015) (OCC-SP0711664).

Add. 1086

Appellate Case: 25-1079     Page: 1088     Date Filed: 05/16/2025 Entry ID: 5517644

overall sales quality and sales behavior.[2368] Respondent Russ Anderson responded that there was no overall process.[2369] Respondent Russ Anderson also stated on the February 10, 2015 Call that customers are not cross-sold any products without first going through a formal needs assessment discussion with a banker, a process that takes about one hour.[2370] This remark from Respondent Russ Anderson suggested that customers were only provided products that they needed and consented to.[2371]

At no point during the February 10, 2015 Call or at any point during the February 2015 Exam did Respondent Russ Anderson inform the OCC about any proactive monitoring threshold used by Sales and Service Conduct Oversight Team ("SSCOT"), a group within the Community Bank that reported to Respondent Russ Anderson.[2372] Specifically, at no point did Respondent Russ Anderson inform the OCC of the 99.99% threshold used by SSCOT in its proactive monitoring to detect sales practices misconduct and address the most egregious offenders.[2373]

The threshold was not communicated to the OCC even though OCC examiners asked about controls and monitoring during the February 2015 Exam. SSCOT reported to Respondent Russ Anderson.

If the Community Bank was using thresholds to detect sales practices misconduct, it was Examiner Candy's expectation as a National Bank Examiner is that Respondent Russ Anderson should have informed the OCC and answered the OCC's questions honestly, transparently, and fully.[2374] At this meeting, SSCOT's work was a topic of discussion, yet the proactive monitoring criteria used by SSCOT was not disclosed to the OCC. Examiner Candy reported that Russ Anderson's failure to disclose the manner in which the Bank monitored for sales practice misconduct at a meeting where the OCC had probed this area impeded the OCC's examination into the adequacy of the Bank's existing controls to identify sales practices misconduct.[2375]

Respondent Russ Anderson never escalated the sales practices misconduct problem to the Board or the OCC.[2376] When asked to present information on the scope and scale of sales

---

[2368] EC MSD Ex. 270 (Report of NBE Hudson) at ¶38.

[2369] *Id.*, citing Email from Jill Charron to Kevin Swanson and attached notes (February 13, 2015) (OCC-SP0711664).

[2370] EC MSD Ex. 270 (Report of NBE Hudson) at ¶38.

[2371] *Id.*

[2372] *Id.* at ¶39.

[2373] *Id.*

[2374] *Id.*

[2375] EC MSD Ex. 270 (Report of NBE Hudson) at ¶39, citing Email from Jill Charron to Kevin Swanson and attached notes (February 13, 2015) (OCC-SP0711664).

[2376] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶119.

Appellate Case: 25-1079    Page: 1089    Date Filed: 05/16/2025 Entry ID: 5517644

practices misconduct to the Board, Respondent Russ Anderson provided high level and misleading reports that failed to address the size and scope of the problem.[2377]

On February 21, 2017, while the examiners' review was underway, Respondent Russ Anderson was terminated for cause based on findings from the Board's independent investigation.[2378] Contributing factors included: (i) failure to manage risk, failure to escalate, behavior in opposition to culture; (ii) failure to take action to remediate customer harm from sales practices issues; (iii) failure to adequately change business practices once becoming aware of aggressive sales pressure; (iv) failure to take appropriate action to ensure complaints were handled in an appropriate manner; (v) obstructing the examination process; and (vi) continued failure to perform duties appropriate for a Senior Risk Officer of the company.[2379] Examiner Crosthwaite opined that Respondent Russ Anderson's false statements to examiners and other acts of obstruction of our examination, constituted a recklessly unsafe or unsound practice and a breach of her fiduciary duty.[2380]

Examiner Candy interacted with Respondent Russ Anderson during the OCC's May 2015 review.[2381] It is her opinion that Respondent Russ Anderson intentionally and consistently misled the OCC and the Board on the scope, duration, and root cause of the sales practices misconduct, and the adequacy of controls to prevent and detect such misconduct.[2382] During conversations, she attempted to mislead examiners that the extent of the problem was primarily limited to the Los Angeles and Orange County, California markets, and the Bank had implemented sufficient controls.[2383] Respondent Russ Anderson also attempted to prevent her employees from giving Examiner Candy information she explicitly asked for regarding controls.[2384]

Examiner Candy reported that in her role as the Group Risk Officer, Respondent Russ Anderson received extensive information about all aspects of the sales practices misconduct problem: the sales goals, the pressure, and the controls.[2385] Examiner Candy opined that Respondent Russ Anderson's failure to perform her responsibilities as the Group Risk Officer and her false, misleading, and incomplete reporting on the sales practices misconduct problem

---

[2377] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶119.

[2378] *Id.* at ¶120.

[2379] *Id.*

[2380] *Id.* at ¶121.

[2381] EC MSD Ex. 269 (Report of NBE Candy) at ¶127.

[2382] *Id.*

[2383] *Id.*

[2384] *Id.*

[2385] *Id.* at ¶128.

Add. 1088

Appellate Case: 25-1079    Page: 1090    Date Filed: 05/16/2025 Entry ID: 5517644

was in disregard of, and evidenced a conscious indifference to, a known or obvious risk of substantial harm to the Bank.[2386]

Examiner Candy reported that in a February 2013 email, months before the Los Angeles Times articles, Respondent Russ Anderson acknowledged that she could not identify any mid-level to senior leader in the Community Bank who had both "good sales production" and either good or significantly improved sales quality.[2387] Examiner Candy opined that under these conditions, Respondent Russ Anderson clearly understood that having good sales production was synonymous with having bad sales quality,[2388] but that Respondent Russ Anderson never reported this information to the Enterprise Risk Management Committee, the Bank's Board of Directors, or the OCC.[2389]

Examiner Candy reported that the false, misleading, and incomplete reporting on the sales practices misconduct problem that Respondent Russ Anderson actively participated in hindered the Bank Board's understanding of the root cause and scope of the problem and the adequacy of controls,[2390] and hindered the Bank's ability to fundamentally address sales practices misconduct and remediate customers.[2391]

Respondent Russ Anderson averred that "[n]one of the Interagency Policy factors . . . support such a drastic civil penalty.[2392] She averred that she was "motivated by a desire to be clear and concise in her communications with her superiors and the OCC"[2393] an averment not supported in the record. She also asserted that "there is no evidence in the record that the OCC admonished Ms. Russ Anderson personally" and that "the OCC reviewed her positively as late as 2015."[2394] Given the substantial evidence establishing the steps Respondent Russ Anderson took to conceal the scope and effect of the sales practices misconduct and her failure to address that misconduct, no weight is given to this averment.

Respondent Russ Anderson asserted that the penalty assessment is "disproportionately greater than the penalties it has imposed in other cases involving similar alleged misconduct."[2395]

---

[2386] Id.

[2387] Id.

[2388] Id.

[2389] Id.

[2390] Id.

[2391] Id.

[2392] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 144.

[2393] Id.

[2394] Id.

[2395] Id., citing In re Akahoshi, #N18-002, OCC AA-EC-2018-20 (April 16, 2018) (charging $50,000 penalty against chief compliance officer who falsely informed the OCC in multiple instances that a written report finding her bank not to be in compliance with BSA/AML requirements did not exist, in furtherance of a scheme in which the

Add. 1089

Although indicating there were other cases where other penalties, presumably more modest assessments, were levied, she identified no other cases relating to the Bank, thus making comparisons unavailable.[2396] She argued, unpersuasively, that "[t]hese other cases directly relate to and demonstrate that the massive civil penalty the OCC seeks is arbitrary, capricious, and abusive."[2397]

### Respondent's Argument that the $10 million assessment violates the Due Process and Excessive Fines Clauses

Quoting *TXO Productions Corp.*, Ms. Russ Anderson asserted that the "Due Process Clause of the Fourteenth Amendment imposes substantive limits 'beyond which penalties may not go,'"[2398] and "[a] civil penalty violates substantive due process when it is grossly excessive."[2399] Id. at .

In *TXO*, the Court considered a common-law action for slander of title, where respondents obtained a judgment against petitioner for $19,000 in actual damages and $10 million in punitive damages.[2400] The question before the Court was whether that punitive damages award violated the Due Process Clause of the Fourteenth Amendment, either because its amount is excessive or because it is the product of an unfair procedure.[2401]

In affirming the award, the Court provided this guidance:

---

bank laundered over $368 Million in illegal drug- sale proceeds); *In re Ellsworth and Stevenson,* NR 2012-19, OCC-EC-11-41 & 42 at 2-7 (February 6, 2012) (ordering $100,00 penalty against bank officers for misappropriation of bank funds and false statements to the OCC regarding the misappropriation); *In re Matthew Moore*, #2011-027, AA-EC-10-73 at 2-4 (ordering $20,000 civil penalty where branch manager falsified loan applications and made false statements to the OCC about his activities); *In re Craig Bjorklund*, #2016-096, AA-EC-2016-56 at 2-5 (October 3, 2016) (imposing $45,000 civil penalty where director made false statements to the OCC regarding the use of bank funds to pay director debts).

[2396] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 144. The citation to the URL bears no date indicating when the resource was accessed. Access attempted on August 3 and 6, 2021 resulted in the following message: "We can't find the page you're looking for."

[2397] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 144. As previously noted, citations to authority using as precedent orders and recommended decisions from OFIA should be limited to those in which the agency has considered and approved the ALJ's order or recommended decision. Respondent Russ Anderson has made no showing that any agency has approved the cited Orders, and provided no copies of the cited Orders. Accordingly, no weight is given to the legal and factual premise supported by the unidentified Orders.

[2398] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 145, quoting *TXO Productions Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 453-54 (1993).

[2399] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 145, citing *TXO Productions Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 458.

[2400] *TXO Prod. Corp. v. All. Res. Corp.*, 509 U.S. 443 (1993).

[2401] *Id. at* 446.

Add. 1090

Appellate Case: 25-1079     Page: 1092     Date Filed: 05/16/2025 Entry ID: 5517644

[I]in determining whether a particular award is so "grossly excessive" as to violate the Due Process Clause of the Fourteenth Amendment, *Waters–Pierce Oil Co.*, 212 U.S., at 111, 29 S.Ct., at 227, we return to what we said two Terms ago in *Haslip*: "We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case. We can say, however, that [a] general concer[n] of reasonableness ... properly enter[s] into the constitutional calculus." 499 U.S., at 18, 111 S.Ct., at 1043. And, to echo *Haslip* once again, it is with this concern for reasonableness in mind that we turn to petitioner's argument that the punitive award in this case was so "grossly excessive" as to violate the substantive component of the Due Process Clause.[2402]

*Haslip* provides further guidance:

We conclude that the punitive damages assessed by the jury against Pacific Mutual were not violative of the Due Process Clause of the Fourteenth Amendment. It is true, of course, that under Alabama law, as under the law of most States, punitive damages are imposed for purposes of retribution and deterrence. *Aetna Life Ins. Co. v. Lavoie*, 470 So.2d 1060, 1076 (Ala.1984). They have been described as quasi-criminal. See *Smith v. Wade*, 461 U.S. 30, 59, 103 S.Ct. 1625, 1641, 75 L.Ed.2d 632 (1983) (REHNQUIST, J., dissenting). But this in itself does not provide the answer. We move, then, to the points of specific attack.

We have carefully reviewed the instructions to the jury. By these instructions, see n. 1, supra, the trial court expressly described for the jury the purpose of punitive damages, namely, "not to compensate the plaintiff for any injury" but "to punish the defendant" and "for the added purpose of protecting the public by [deterring] the defendant and others from doing such wrong in the future." App. 105–106. Any evidence of Pacific Mutual's wealth was excluded from the trial in accord with Alabama law. See *Southern Life & Health Ins. Co. v. Whitman*, 358 So.2d 1025, 1026–1027 (Ala.1978).

To be sure, the instructions gave the jury significant discretion in its determination of punitive damages. But that discretion was not unlimited. It was confined to deterrence and retribution, the state policy concerns sought to be advanced. And if punitive damages were to be awarded, the jury "must take into consideration the character and the degree of the wrong as shown by the evidence and necessity of preventing similar wrong." App. 106. The instructions thus enlightened the jury as to the punitive damages' nature and

---

[2402] TXO Prod. Corp. v. All. Res. Corp., 509 U.S. 443, 458 (1993).

Add. 1091

Appellate Case: 25-1079    Page: 1093    Date Filed: 05/16/2025 Entry ID: 5517644

purpose, identified the damages as punishment for civil wrongdoing of the kind involved, and explained that their imposition was not compulsory.[2403]

The jurisprudential point addressed by the Court in both *Haslip* and *TXO* is not a neat fit with the issue presented by Ms. Russ Anderson's claim, because the Court in both cases was applying a Due Process analysis to a jury's application of common law principles in assessing punitive damages. In the present administrative enforcement action, the OCC's examiners were not applying common law principles, but instead were following a statutorily-prescribed protocol that included a matrix of very specifically parsed factors.[2404]

The cases relied upon by Ms. Russ Anderson nevertheless may provide guidance in supplying a lens through which an assessment intended to deter her and others from engaging in similar unsafe or unsound banking practices. As was true in *Haslip*, the purpose of the OCC's assessment is not to compensate a plaintiff for any injury, but to punish Ms. Russ Anderson "for the added purpose of protecting the public by [deterring] the defendant and others from doing such wrong in the future."[2405] The Court in *TXO* affirmed a jury's award of $19,000 in actual damages and $10 million in punitive damages; and in *Haslip* affirmed a jury's punitive damages award that was more than four times the amount of compensatory damages Haslip claimed.[2406] There is no basis to conclude from *TXO* or *Haslip* that the $10 million assessment against Ms. Russ Anderson violates the Fourteenth Amendment or the Due Process Clause.

Invoking the excessive penalty clause of the Eighth Amendment, Ms. Russ Anderson asserted the $10 million penalty is "grossly excessive and grossly disproportionate when considered in light of the alleged misconduct, the relatively minimal and unspecified amount of customer financial harm, the amount of alleged ill-gotten gain, and Ms. Russ Anderson's limited financial resources."[2407] In support, she cited *U.S. v. Bajakajian*, 524 U.S. 321 (1998).[2408]

In *Bajakajian*, customs inspectors found respondent and his family preparing to board an international flight carrying $357,144. *Bajakajian* was charged with attempting to leave the United States without reporting, as required by 31 U.S.C. § 5316(a)(1)(A), because he was

---

[2403] Pac. Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 19 (1991)

[2404] MSD-231 (Decl. of Examiner Smith) at ¶¶5 and 6, indicating that when making an assessment of a civil money penalty the OCC must take into account the statutory mitigating factors set forth in 12 U.S.C. § 1818(i)(2)(G) and the thirteen factors set forth in the Federal Financial Institutions Examination Council's Interagency Policy Regarding the Assessment of Civil Money Penalties by the Federal Financial Institutions Regulatory Agencies, 63 Fed. Reg. 30,226, 30,227 (June 3, 1998) ("Interagency CMP Policy"); and the guidance contained in the Interagency CMP Policy and in the OCC's Policies and Procedures Manual on Civil Money Penalties, PPM 5000-7 (Nov. 13, 2018).

[2405] Pac. Mut. Life Ins. Co. v. Haslip, 499 U.S. at 19.

[2406] Pac. Mut. Life Ins. Co. v. Haslip, 499 U.S. 1 (1991).

[2407] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 145.

[2408] *Id.* at 14.

Add. 1092

Appellate Case: 25-1079     Page: 1094     Date Filed: 05/16/2025 Entry ID: 5517644

transporting more than $10,000 in currency.[2409] The Government also sought forfeiture of the $357,144 under 18 U.S.C. § 982(a)(1), which provides that a person convicted of willfully violating § 5316 shall forfeit "any property ... involved in such an offense." Respondent pleaded guilty to the failure to report and elected to have a bench trial on the forfeiture.

The District Court found, among other things, that the entire $357,144 was subject to forfeiture because it was "involved in" the offense, that the funds were not connected to any other crime, and that respondent was transporting the money to repay a lawful debt. Concluding that full forfeiture would be grossly disproportional to the offense in question and would therefore violate the Excessive Fines Clause of the Eighth Amendment, the court ordered forfeiture of $15,000, in addition to three years' probation and the maximum fine of $5,000 under the Sentencing Guidelines. The Ninth Circuit affirmed, holding that a forfeiture must fulfill two conditions to satisfy the Clause: The property forfeited must be an "instrumentality" of the crime committed, and the property's value must be proportional to its owner's culpability. The United States appealed, and the Supreme Court affirmed the decision of the Court of Appeals.

The Court noted its prior determination that the Excessive Fines Clause "limits the government's power to extract payments, whether in cash or in kind, 'as punishment for some offense.'"[2410] The forfeiture in this case "serves no remedial purpose, is designed to punish the offender, and cannot be imposed upon innocent owners."[2411]

The Court held:

> The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish. See Austin v. United States, 509 U.S., at 622–623, 113 S.Ct., at 2812 (noting Court of Appeals' statement that " 'the government is exacting too high a penalty in relation to the offense committed' "); Alexander v. United States, 509 U.S. 544, 559, 113 S.Ct. 2766, 2776, 125 L.Ed.2d 441 (1993) ("It is in the light of the extensive criminal activities which petitioner apparently conducted ... that the question whether the forfeiture was 'excessive' must be considered"). Until today, however, we have not articulated a standard for determining whether a punitive forfeiture is constitutionally excessive. We now hold that a punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense.[2412]

Applying this test, I find Ms. Russ Anderson has presented no basis that would demonstrate the $10 million penalty is grossly disproportional to the gravity of her offenses. I

---

[2409] *United States v. Bajakajian*, 524 U.S. 321 (1998).

[2410] *Id.* at 328 (1998), quoting *Austin v. United States*, 509 U.S. 602, 609–610 (1993).

[2411] *Bajakajian*, 524 U.S. at 332.

[2412] *Id.* at 334.

Add. 1093

Appellate Case: 25-1079    Page: 1095    Date Filed: 05/16/2025 Entry ID: 5517644

reject as not supported in the record Ms. Russ Anderson's averment that the misconduct that can properly be attributed to Respondent resulted in "relatively minimal" harm – whether that harm was sustained by the Bank's customers or the Bank itself.

I find nothing in the Court's holding in *Bajakajian* that would indicate an Eighth Amendment analysis should take into account "the amount of alleged ill-gotten gain" – rather, the analysis requires a determination only of the "gravity of a defendant's offense" in relation to the amount of the penalty. Further, even if these factors were properly included in the proportionality analysis required under *Bajakajian*, the record does not support the factual averments that Respondent has been "singled out," that she serves as a "scapegoat," that she was "relatively low in the corporate structure," or that she was "powerless to change the policies in issue."[2413] She offers no support for the factual claim that the $10 million penalty "goes far beyond what is needed to deter other bank officers from committing unsafe, unsound or unlawful acts."[2414]

In sum, I find the $10 million penalty is proportionate, given the gravity of Respondent Russ Anderson's pattern of unsafe and unsound practices, her repeated and continual breach of fiduciary duties she owed the Bank, and her repeated violation of banking laws.

### Respondent's Claim that the Civil Penalty Enforcement Counsel Seeks Is Intended to Punish Respondent for Asserting Her Due Process Hearing Rights

Respondent made the factual claim that "the massive civil penalty sought is intended to punish Ms. Russ Anderson for asserting her right to a hearing", and that the penalty thus "violates due process."[2415] She presented no authority for the proposition.

Nothing in the record supports this factual averment. To the contrary, there is within the record substantial evidence establishing the basis for the $10 million assessment, and substantial evidence that in determining the assessment the OCC's Examiners fully considered the relevant statutory and regulatory factors. And while Respondent avers that "Enforcement Counsel does not articulate any reason for doubling the civil penalty in the Notice of Charges other than the fact that Ms. Russ Anderson is going through the administrative hearing process,"[2416] the record reflects that the OCC's examiners *have* articulated reasons for establishing the $10 million assessment following the introduction of Respondent's Amended Answer and the testimony she and other witnesses gave in the prehearing process.

Respondent Russ Anderson made the factual claim that "one of Enforcement Counsel's experts admitted in her declaration that Enforcement Counsel is seeking to punish Ms. Russ

---

[2413] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 145.

[2414] *Id.*

[2415] *Id.* at 146.

[2416] *Id.*

Add. 1094

Appellate Case: 25-1079     Page: 1096     Date Filed: 05/16/2025 Entry ID: 5517644

Anderson for contesting Enforcement Counsel's allegations.[2417] In support of the factual claim that one of Enforcement Counsel's experts "admitted in her Declaration that Enforcement Counsel is seeking to punish Ms. Russ Anderson for contesting Enforcement Counsel's allegations," Respondent Russ Anderson proffered the following excerpt from Examiner Tanya Smith's Declaration.[2418]

Under the Interagency CMP Policy, the OCC is not precluded "from considering any other matter relevant to the civil money penalty assessment." Interagency CMP Policy. Because the purpose of a CMP is to "serve as a deterrent to future violations, unsafe or unsound practices, and breaches of fiduciary duty, by the IAP or institution against which the CMP is assessed and by other IAPs and institutions," PPM 5000-7 (emphasis added); see Interagency CMP Policy, I also considered the extent of the Respondents' wealth in addition to evidence of "financial gain or other benefit."

After considering all the factors listed above and the evidence I have reviewed, including the Respondents' Amended Answer and deposition testimony and other information that has come to light after the Notice was filed in January 2020, I believe that the evidence, including evidence previously unavailable to the OCC, supports higher CMPs than was initially assessed against each Respondent. I believe that CMPs of $10 million for Respondent Russ Anderson, $7 million for Respondent Julian, and $1.5 million for Respondent McLinko are supported by the evidence and are appropriate.

The starting point for my analysis of appropriate amounts for CMPs against the Respondents for their roles in the Bank's longstanding and systemic sales practices misconduct problem is the maximum amounts permitted to be assessed by statute. Because I intended to conservatively calculate the statutory CMP amounts, I chose to use the per diem amounts for Tier 2 CMPs. I did this even though, based on my review of the evidence, Respondents' misconduct was knowing and caused substantial loss to the Bank and substantial pecuniary gain to each Respondent, and could support Tier 3 CMPs of over $1 million per day.

Twelve C.F.R. § 19.240 provided that a Tier 2 CMP based on conduct occurring from November 10, 2008 until November 1, 2015, shall not exceed $37,500 per violation, practice, or breach per day for each day that the misconduct continues. See Rules of Practice and Procedure; Civil Money Penalty Inflation Adjustments, 73 Fed. Reg. 66,493-501, 2008 WL 4829809 (Nov. 10, 2008). The maximum authorized CMP that could be assessed by the OCC in 2020 for conduct occurring on or after November 2, 2015, until September 30, 2016 (when the Bank

---

[2417] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 146, citing *Dazzio*, 970 F.2d at 79 (reversing civil penalty against bank officer where regulator increased the civil penalty with no change in the record supporting the penalty or articulation of the reason). "This looks to us uncomfortably like judicial vindictiveness, or 'charging for the use of the courthouse." Id. (citing *North Carolina v. Pearce*, 395 U.S. 711, 712 (1969)). See also *Oberstar v. F.D.I.C.*, 987 F.2d 494, 503-04 (8th Cir. 1993) (FDIC abused discretion by imposing civil penalty where the inference was that it was in retaliation for respondent seeking judicial review of a prohibition order, which the court found "deeply disturbing").

[2418] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 146, citing Tanya Smith Decl, 8-10.

eliminated the Community Bank's unreasonable sales goals) is $51,222 per day that the misconduct continues. See OCC Adjusts Civil Money Penalties for Inflation, 84 Fed. Reg. 71,735, 2019 WL 8270932 (Dec. 30, 2019).[2419]

Having considered the text of this part of Examiner Smith's Declaration, I find no basis that would support Respondent's factual claim that Examiner Smith "admitted" to the factual claim that "Enforcement Counsel is seeking to punish Ms. Russ Anderson". Nothing in this excerpt suggests Enforcement Counsel had any role in directing Examiner Smith's efforts to articulate a basis for the increased assessment.

In her Declaration, Examiner Smith laid out in plain language the factors she considered when arriving at the assessments presented through Enforcement Counsel's Motions for Summary Disposition. She noted in Paragraphs 5 and 6 that she must take into account the statutory mitigating factors set forth in 12 U.S.C. § 1818(i)(2)(G) and the thirteen factors set forth in the Federal Financial Institutions Examination Council's Interagency Policy Regarding the Assessment of Civil Money Penalties by the Federal Financial Institutions Regulatory Agencies, 63 Fed. Reg. 30,226, 30,227 (June 3, 1998) ("Interagency CMP Policy"); and the guidance contained in the Interagency CMP Policy and in the OCC's Policies and Procedures Manual on Civil Money Penalties, PPM 5000-7 (Nov. 13, 2018).

In Paragraph 7 of her Declaration she spelled out the thirteen factors that she included in determining a civil money penalty. In Paragraph 8 she quoted language in the Policy that permitted the OCC to consider "any other matter relevant to the civil money penalty assessment." She identified one such relevant matter: that one of the established purposes of the imposition of civil money penalties is to deter "future violations, unsafe or unsound practices, and breaches of fiduciary duty". She also expressly noted that in determining the appropriate assessment she considered the extent of Respondents' wealth in addition to evidence of financial gain or other benefit.

After identifying these factors, Examiner Smith in Paragraph 9 reflected on evidence she reviewed <u>after</u> the Notice of Charges was issued. These included the Respondents' Amended Answers, deposition testimony obtained after the filing of the Notice, and "other information that has come to light" during the course of this administrative enforcement action.

I find Examiner Smith's reliance on evidence she reviewed after the Notice of Charges supports her assessment with respect to Respondent Russ Anderson. I further find Ms. Russ

---

[2419] Note that on page 146 of her Memorandum of Law in Opposition, Respondent Russ Anderson supported her factual claim with the following citation: "Tanya Smith Decl, 8-10." Applying standard legal citation protocol, the citation refers the reader to pages 8 through 10 of Examiner Smith's Declaration. I read the text in those pages and found no support for the factual claim - the pages consist of part of Paragraph 17, and all of Paragraphs 18 through 23. Examiner Smith's Declaration in these paragraphs had nothing to do with the assessment factors she considered when evaluating a potential civil money penalty regarding Ms. Russ Anderson. The text quoted above appears in Paragraphs 8, 9, and 10 of Examiner Smith's Declaration, and are complete, verbatim presentations of those paragraphs.

Add. 1096

Appellate Case: 25-1079      Page: 1098      Date Filed: 05/16/2025 Entry ID: 5517644

Anderson's deposition testimony (taken on January 13, 2021)[2420] and her Amended Answer (dated August 7, 2020) contain relevant and material information relating to the factors bearing on the appropriateness of the civil money penalty, where such information was not available to Examiner Smith or to the OCC at the time the Notice of Charges was issued.

More to the point, I find the factual claim proffered by Respondent Russ Anderson that Examiner Smith "admitted in her declaration that Enforcement Counsel is seeking to punish Ms. Russ Anderson for contesting Enforcement Counsel's allegations" – is patently false. Nothing in Paragraphs 8, 9, or 10 support this factual claim.

If one were to rely on the factual averment presented on behalf of Ms. Russ Anderson, one would conclude that there is a factual basis to conclude Examiner Smith had determined that Enforcement Counsel "is seeking to punish" Respondent Russ Anderson "for contesting Enforcement Counsel's allegations." This would be a gross and obvious mischaracterization of Examiner Smith's Declaration, one that threatens the integrity of Respondent Russ Anderson's Memorandum in Opposition. For the same reason, the presentation of this claim calls into question both the diligence and the integrity of the attorney whose signature supported the claim.

In similar fashion, Respondent Russ Anderson through counsel made the factual claim that "[t]he evidence in the record that Enforcement Counsel is reacting to congressional criticism for its failure to appreciate the nature and scope of the sales practices misconduct issue bolsters this conclusion."[2421] This averment is presented, however, without any citation to the record, and again appears to be a patently false statement. There is no evidence that the $10 million assessment was in response to any criticism from any quarter.

Ms. Russ Anderson argues that the OCC's statutory authority to modify the civil penalty – changing what had been presented in the Notice of Charges to what is now before me through Enforcement Counsel's summary disposition motion – is limited such that a penalty can only be modified to a lower assessment.[2422] I find no legal basis for such a conclusion. As Ms. Russ Anderson noted, the OCC is authorized to "compromise, modify, or remit" any penalty which the agency has already assessed.[2423] In this context, and as Ms. Russ Anderson has herself acknowledged, the authority to "modify" a penalty already assessed includes the authority to change the amount by increasing or by decreasing the assessment.[2424]

---

[2420] MSD-266 (Deposition of Russ Anderson).

[2421] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 147.

[2422] Id.

[2423] Id., quoting 12 U.S.C. § 1818(i)(2)(F).

[2424] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 147, quoting the Random House Thesaurus (1984), which sets forth the following synonyms for the term "modify:" "alter," "vary," "change," "reduce," "moderate," and "temper."

Add. 1097

Appellate Case: 25-1079    Page: 1099    Date Filed: 05/16/2025 Entry ID: 5517644

Ms. Russ Anderson asserted the authority to modify an assessment limited the OCC's authority – that the term "modify" "must be interpreted in light of the terms surrounding it in the statute, which clearly don't allow for an increase, much less a doubling."[2425]

In support of this legal premise, Respondent relies on *Yates v. United States,* 574 U.S. 528, 543 (2015). My reading of *Yates* does not compel the conclusion urged by Ms. Russ Anderson that the authority to modify an assessment "only allows for a reduction of the initially-noticed penalty."[2426] In *Yates,* the Court construed language in the Sarbanes-Oxley Act (which had been prompted by exposure of Enron's massive accounting fraud and the systematic destruction of potentially incriminating documents) – where the Court rejected the government's claim that a "tangible object" within the Act's compass is "simply something other than a document or record."[2427]

In rejecting this construction, the Court provided guidance for construing the meaning of words within context. As the Court observed in *Atlantic Cleaners & Dyers,* 286 U.S., at 433, 52 S.Ct. 607:

> Most words have different shades of meaning and consequently may be variously construed. . . .Where the subject matter to which the words refer is not the same in the several places where [the words] are used, or the conditions are different, or the scope of the legislative power exercised in one case is broader than that exercised in another, the meaning well may vary to meet the purposes of the law, to be arrived at by a consideration of the language in which those purposes are expressed, and of the circumstances under which the language was employed [footnote omitted].

> In short, although dictionary definitions of the words "tangible" and "object" bear consideration, they are not dispositive of the meaning of "tangible object" in § 1519.[2428]

Applying *Yates,* I find Ms. Russ Anderson has not made a sufficient showing that the language that authorizes the OCC to modify an assessment precludes the modification to a greater amount. Nothing in the other cases cited by Ms. Russ Anderson (*Abercrombie*[2429] and

---

[2425] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 147.

[2426] *Id.* at 147-48.

[2427] *Yates v. United States*, 574 U.S. 528, 534 (2015).

[2428] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 148, quoting *Yates*, 574 U.S. at 538.

[2429] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 148, citing *Abercrombie v. Off. Of Comptroller of Currency*, 641 F. Supp. 598, 602 (S.D. Ind. 1986), aff'd, 833 F.2d 672 (7th Cir. 1987) (offered for the proposition that the OCC has the statutory authority to reduce the initially-noticed civil penalty).

Appellate Case: 25-1079     Page: 1100     Date Filed: 05/16/2025 Entry ID: 5517644

*Clifton Power*[2430]) compels a different outcome, as neither construe the language under review in the present enforcement action as limiting the agency's authority.

Ms. Russ Anderson argues, "[a]llowing Enforcement Counsel to double the civil penalty at the 11th hour of a proceeding without formal notice would also violate Ms. Russ Anderson's procedural due process rights." In support, she relied upon the Court's holding in *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Building and Constr. Trades Council*[2431] for the proposition that "[t]he statute should not be construed in a way that it would violate the Constitution."[2432]

As a parenthetical point, it would be difficult for the record to be construed in a way that holds the modification of Ms. Russ Anderson's assessment as arriving at "the 11th hour."[2433] The $10 million assessment came not long after Ms. Russ Anderson filed her Amended Answer. Through her Amended Answer which she filed on August 7, 2020 Respondent for the first time acknowledged having knowledge and information sufficient to answer a significant number of the material factual claims presented in the Notice of Charges – six months after initially claiming through her original Answer that she lacked information sufficient to admit or deny the claim.[2434]

Enforcement Counsel provided Examiner Smith's Declaration, and all of the other documents supporting the $10 million assessment, on March 26, 2021. At this point, the enforcement action had been pending since January 23, 2020 (with the issuance of the Notice of Charges), and the matter was scheduled for hearing to begin on September 13, 2021. This timeline does not suggest an 11th hour effort on Enforcement Counsel's part, particularly not given Russ Anderson's unwarranted six month delay in providing forthright and complete answers to the Notice of Charges.

The record also does not support Ms. Russ Anderson's assertion that she has not been given "formal notice" of the $10 million assessment.[2435] That notice was included in Enforcement Counsel's March 26, 2021 submission.

---

[2430] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 148, citing *Clinton Power Corp. v. F.E.R.C.*, 88 F.3d 1258, 1266 (D.C. Cir. 1996) (offered for the proposition that the penalty in notice of charges sets the maximum).

[2431] *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Building and Constr. Trades Council* 485 U.S. 568, 569 (1988).

[2432] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 148.

[2433] Id..

[2434] Compare Answer of Respondent Russ Anderson, filed February 11, 2020, with Amended Answer of Respondent Russ Anderson, filed August 7, 2020, at, e.g., ¶¶3, 6, 8, 14, 15, 16, 17, 18, and 19.

[2435] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 148.

Appellate Case: 25-1079     Page: 1101     Date Filed: 05/16/2025 Entry ID: 5517644

Enforcement Counsel proffered the Declaration of Examiner Smith, which is dated March 23, 2021, and which identified the information made available to the OCC only after the filing of the Notice of Charges – including Respondent's Amended Answer.[2436]

Respondent's reliance on the Court's holding in *Edward J. DeBartolo Corp.* is misplaced. In that case, the Supreme Court applied a long-standing rule of statutory construction, the general thrust of which is fairly straightforward.

The Court held:

> Where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress. *Catholic Bishop, supra,* 440 U.S., at 499–501, 504, 99 S.Ct., at 1318–1319, 1320–1321. This cardinal principle has its roots in Chief Justice Marshall's opinion for the Court in *Murray v. The Charming Betsy,* 2 Cranch 64, 118, 2 L.Ed. 208 (1804), and has for so long been applied by this Court that it is beyond debate. *E.g., Catholic Bishop, supra,* 440 U.S., at 500–501, 99 S.Ct., at 1318–1319; *Machinists v. Street,* 367 U.S. 740, 749–750, 81 S.Ct. 1784, 1790, 6 L.Ed.2d 1141 (1961); *Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 296–297, 76 L.Ed. 598 (1932); *Lucas v. Alexander,* 279 U.S. 573, 577, 49 S.Ct. 426, 428, 73 L.Ed. 851 (1929); *Panama R. Co. v. Johnson,* 264 U.S. 375, 390, 44 S.Ct. 391, 395, 68 L.Ed. 748 (1924); *United States ex rel. Attorney General v. Delaware & Hudson Co.,* 213 U.S. 366, 407–408, 29 S.Ct. 527, 535–536, 53 L.Ed. 836 (1909); *Parsons v. Bedford,* 3 Pet. 433, 448–449, 7 L.Ed. 732 (1830) (Story, J.). As was stated in *Hooper v. California,* 155 U.S. 648, 657, 15 S.Ct. 207, 211, 39 L.Ed. 297 (1895), "[t]he elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." This approach not only reflects the prudential concern that constitutional issues not be needlessly confronted, but also recognizes that Congress, like this Court, is bound by and swears an oath to uphold the Constitution. The courts will therefore not lightly assume that Congress intended to infringe constitutionally protected liberties or usurp power constitutionally forbidden it. See *Grenada County Supervisors v. Brogden,* 112 U.S. 261, 269, 5 S.Ct. 125, 129, 28 L.Ed. 704 (1884).[2437]

Respondent Russ Anderson advanced no statutory construction that operated contrary to the Court's holding in *DeBartolo.* As noted above, the OCC is authorized to "compromise,

---

[2436] MSD-231 (Decl. of Examiner Smith) at ¶9.

[2437] *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council,* 485 U.S. 568, 575 (1988).

modify, or remit" any penalty which the agency has already assessed.[2438] Applied in this context, there has been no showing that an upward modification of a penalty assessed by the OCC contravenes any provision of the statute that authorized modifications of assessed penalties.

**Respondent's Claim that the Tanya Smith Declaration is an Untimely, Inadmissible Expert[2439]**

Respondent Russ Anderson avers that in increasing the OCC's assessment against her, Enforcement Counsel relies on the declaration of Tanya Smith.[2440] She avers that Examiner Smith's declaration "does not rely on any new facts not previously available to Enforcement Counsel."[2441] As noted above, this factual premise is not supported by the record. Examiner Smith identified information that had not been available to the OCC at the time the Notice of Charges was filed – including significant factual admissions that were introduced to the record only in August 2020 with the filing of a more forthcoming set of answers to the Notice. The Declaration contained sufficient indicia of reliance on newly available information to warrant its introduction in this enforcement action.

Whether or not Examiner Smith waited to advocate for a $10 million civil penalty until after the close of discovery,[2442] nothing in the OCC's Uniform Rules or orders of this tribunal barred the use of newly discovered admissions or testimony in the development of Examiner Smith's Declaration. Ms. Russ Anderson had at her disposal the ability to introduce contradictory evidence through her response to Enforcement Counsel's summary disposition motion and their Statement of Material Facts. Having fully exercised the right to offer such contradictory evidence, there is no legal basis to conclude she has been deprived of "the opportunity to effectively defend herself in this case by deposing Ms. Smith regarding her dramatically different expert conclusion."[2443]

**Findings of Fact**

1. At all relevant times Wells Fargo Bank, N.A., Sioux Falls, South Dakota ("Bank") is a national banking association within the meaning of 12 U.S.C. §

---

[2438] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 147, quoting 12 U.S.C. § 1818(i)(2)(F).

[2439] Respondent Claudia Russ Anderson's Memorandum of Law in Opposition to Motion for Summary Disposition at 148.

[2440] *Id.*

[2441] *Id.*

[2442] *Id.* at 148-49.

[2443] *Id.* at 149.

Add. 1101

Appellate Case: 25-1079    Page: 1103    Date Filed: 05/16/2025 Entry ID: 5517644

1813(q)(1)(A) and an "insured depository institution" as defined in 12 U.S.C. § 1813(c)(2).[2444]

2. Respondent Claudia Russ Anderson was employed by the Bank within six years of the filing of the Notice of Charges. Pursuant to 12 U.S.C. § 1813(u), Respondent Russ Anderson is an "institution-affiliated party" of the Bank.

3. The OCC is the "appropriate Federal banking agency" as that term is defined in 12 U.S.C. § 1813(q) and is authorized to issue a prohibition order and initiate and maintain a civil money penalty action against Respondent Russ Anderson pursuant to 12 U.S.C. § 1818(e) and (i).[2445]

4. For purposes of the Notice of Charges, the term "sales practices misconduct" was defined as the practices of Bank employees issuing a product or service to a customer without the customer's consent, transferring customer funds without the customer's consent, or obtaining a customer's consent by making false or misleading representations.[2446]

5. The Bank utilized different terminology over the years to describe employee misconduct that encompassed sales practices misconduct and other ethical violations, such as "sales integrity violations," "sales incentive program violations," and "gaming."

6. The Bank's Sales Quality Manual from August 2008 defined "Sales Quality" as follows: "'Sales Quality' is a broader term that captures all sales and referral related issues that impact customer satisfaction as well as profitability of the sale/referral for Wells Fargo. Examples could range from general product design considerations and trends to Bankers failing to disclose fees while selling a solution[2447] to the most serious ethical violations."[2448]

7. The Bank's Sales Quality Manual from August 2008 defined "Sales Integrity" as follows: "'Sales Integrity' is a narrower term used to specifically describe the subset of Sales Quality concerns that are related to unethical and/or illegal behavior on the part of individuals while selling to our customers. Sales integrity issues involve the manipulation and/or misrepresentation of sales or referrals and reporting of sales and referrals in an attempt to receive compensation or to meet sales goals. Unethical sales behavior has far-reaching impacts. It impacts

---

[2444] Respondent Claudia Russ Anderson's Amended Answer ("Russ Anderson Amended Answer") at ¶ 1) and Response to Enforcement Counsel's Statement of Material Facts (ECSMF) at No. 1; ( MSD-1 and MSD-343 at 19 (the Bank's Board stipulating the Bank is a "national banking association" and an "insured depository institution"))

[2445] MSD-343 at 19 (the Bank's Board stipulating the Bank is the "appropriate federal banking agency").

[2446] Russ Anderson Amended Answer ¶ 4.

[2447] Within the Community Bank, the term "solution" referred to Bank products and services that could be opened, issued, or provided by Bank employees, including, but not limited to deposit accounts, debit and credit cards, online bill pay and other Bank services.

[2448] MSD-10 at 5.

customer relationships, damages relationships between Team Members, and leads to loss of revenue and reputation for the company."[2449]

8. The June 2010 Corporate Security Policy Manual categorized its "sales integrity violations" case type into the following subtypes: Customer Consent, False Entries/CIP Violations, Fictitious Customer, Online Banking, Product Manipulation, Funding Manipulation, Reassignment of Sales Credit, Referrals, and Other. All sales integrity violations subtypes were listed as "656 - Defalcation/Embezzlement, and/or 18 USC 1001 & 1005, False entries/records, USA Patriot Act (CIP issues)."[2450]

9. The Bank's Sales Quality Manual from July 2014 defined sales integrity violations as "manipulations and/or misrepresentations of sales, service or referrals and reporting of sales, service or referrals in an attempt to receive compensation or to meet sales and service goals."[2451]

10. In a November 2012 email, Bart Deese explained the distinction between sales quality and sales integrity to Respondent McLinko as follows: "I have heard Sales Quality and Sales Integrity used interchangeably across [Community Bank]. When I think SQ/SI, I think of them together in regards to a banker trying to manipulate incentive compensation plans by recording inappropriate sales (e.g. adding debit cards to customers without consent, creating bogus accounts, etc.)."[2452]

11. The term "gaming" within the Bank mirrored the definition of sales integrity violations. "Sales gaming may be classified as the manipulation and/or misrepresentation of sales or sales reporting to receive or attempt to receive compensation, or to meet or attempt to meet sales goals."[2453] Specified types of gaming, included the following:

   (a) "Selling products to existing customers without their knowledge (i.e. debit cards) or booking more expensive DDA products above what an actual customer requested and without their knowledge.

   (b) Listing bogus sales referrals by use of current customer SSN's when they were never present.

   (c) Misrepresenting products by not disclosing additional fee income items like overdraft protection.

   (d) Signing customers up for on-line banking and bill pay without

---

[2449] MSD-10 at 5.

[2450] MSD-423 at 7-9.

[2451] Russ Anderson Amended Answer ¶ 33; McLinko Amended Answer ¶ 33; MSD-9 at 5.

[2452] MSD-479.

[2453] MSD-2 at 1, 3.

their knowledge.

    (e) Management supplying tellers and bankers with SSN's from the Hogan system to be used as bogus referrals.

    (f) Opening unfunded DDA's without customer knowledge and waiving fees (zero balance account auto-closes within 90 days but the sales goal is registered).

12. Altering or falsifying documents translating to increased sales (i.e.; phony referrals).[2454]

13. A "sales incentive program violation" is defined as the "manipulation and/or misrepresentation of sales or sales reporting in an attempt to receive compensation or meet sales goals. Includes inappropriate sales."[2455]

14. A "case" or an "investigation" as used by the Bank's Corporate Investigations group "is defined as an allegation of team member misconduct involving a possible violation of law or a code of ethics policy violation or information security policy violation, which has resulted in a financial loss and/or exposure or represents a significant compliance or reputational risk."[2456]

15. A "systemic" problem, as used herein, refers to a problem that is inherent in the business model, operations, or culture of a bank as opposed to a problem that can be solved by terminating employees engaged in wrongdoing.

16. The Community Bank was and is the Bank's largest line of business and houses the Bank's retail branch network.[2457]

17. The Community Bank referred to its products and services as "solutions."[2458]

18. The Community Bank referred to its employees as "team members."[2459]

19. The Community Bank referred to its branches as "stores."[2460]

20. Sales practices misconduct violated laws and regulations and harmed the Bank's

---

[2454] MSD-557.

[2455] MSD-381 at 6.

2456 MSD-526 at 47; MSD-523 at 51.

[2457] Russ Anderson Amended Answer ¶ 2; MSD-1 at 20-21 ¶ 4; Julian Amended Answer ¶ 2; McLinko Amended Answer ¶ 2; MSD-1 at 20 ¶ 4.

[2458] MSD- 653 (Pyles Tr.) at 96:5-96:9; MSD-350 (Ramage Tr.) at 37:24-38:2; MSD-579 (Schulte Tr.) at 71:14-72:13.

[2459] MSD-266 (Russ Anderson Dep. Tr.) at 165:1-3.

[2460] MSD-1 at 21 ¶ 5.

customers.[2461]

21. Sales practices misconduct was pervasive and widespread within the Community Bank.[2462]

22. During the time period relevant to the issues presented in the Notice of Charges the root cause of sales practices misconduct was the Community Bank's business model, which imposed undue pressure on employees to meet unreasonable sales goals.[2463]

23. The Bank's controls to both prevent and detect sales practices misconduct were inadequate throughout the relevant period.[2464]

24. None of Respondents' expert witnesses concluded or opined on whether the Community Bank had a systemic sales practices misconduct problem, the root cause thereof, how long that lasted, the magnitude of the problem, or how widespread it was.[2465]

25. None of Respondents' expert witnesses concluded or opined that the sales goals in the Community Bank were reasonable.[2466]

26. None of Respondents' expert witnesses concluded or opined that the pressure was reasonable.[2467]

27. None of Respondents' expert witnesses concluded or opined that controls to prevent sales practices misconduct were adequate.[2468]

---

[2461] See Russ Anderson SOF ¶¶ 257-275; 459-489; Julian and McLinko SOF ¶¶ 214-231.

[2462] See Russ Anderson SOF ¶¶ 214-256; Julian and McLinko SOF ¶¶ 169-213.

[2463] See Russ Anderson SOF ¶¶ 48-68, 124-146; Julian and McLinko SOF ¶¶ 31-116.

[2464] See Russ Anderson SOF ¶¶ 150-213; Julian and McLinko SOF ¶¶ 117-168.

[2465] See MSD-264 (Farrell Expert Report) at 5; MSD-262 (Abshier Expert Report) at 5; MSD-281 (Wilcox Expert Report) at 11; MSD-265A (Farrell Dep. Tr.) at 52:18-22; MSD-263A (Abshier Dep. Tr.) at 44:18-25, 50:15-51:12; MSD-282A (Wilcox Dep. Tr.) at 40:11-41:11); MSD-271 (Ploetz Expert Report) at 4; MSD- 283A (Julian Deal Expert Report) at 8; MSD-283B (McLinko Deal Expert Report) at 8; MSD- 285 (Jarrett Expert Report) at 6; see also MSD-282A (Wilcox Dep. Tr.) at 40:11-41:16; MSD- 272A (Ploetz Dep. Tr.) at 16:16-22:4; MSD-286B (Jarrett Dep. Tr.) at 580:3-584:3; MSD-284A (Deal Dep. Tr.) at 116:3-119:9.

[2466] See MSD-271 (Ploetz Expert Report) at 4; MSD-283A (Julian Deal Expert Report) at 8; MSD-285 (Jarrett Expert Report) at 6; see also MSD-282A (Wilcox Dep. Tr.) at 40:20-23; MSD-286B (Jarrett Dep. Tr.) at 581:10-25; MSD-284A (Deal Dep. Tr.) at 118:10-17; MSD-272A (Ploetz Dep. Tr.) at 19:13-10.

[2467] See MSD-271 (Ploetz Expert Report) at 4; MSD-283A (Julian Deal Expert Report) at 8; MSD-283B (McLinko Deal Expert Report) at 8; MSD-285 (Jarrett Expert Report) at 6; see also MSD-282A (Wilcox Dep. Tr.) at 40:24-41:3; MSD-286B (Jarrett Dep. Tr.) at 582:3-18; MSD-284A (Deal Dep. Tr.) at 118:18-119:9; MSD-272A (Ploetz Dep. Tr.) at 21:9-21.

[2468] See MSD-271 (Ploetz Expert Report) at 4; MSD-283A (Julian Deal Expert Report) at 8; MSD-283B (McLinko Deal Expert Report) at 8; MSD-285 (Jarrett Expert Report) at 6; see also MSD-282A (Wilcox Dep. Tr.) at

Add. 1105

28. None of Respondents' expert witnesses concluded or opined that controls to detect sales practices misconduct were adequate.[2469]

29. In sworn testimony before the OCC during its investigation, Respondent Julian agreed there was a systemic problem with sales practices misconduct at the Bank, and the root cause of the problem was unattainable sales goals and severe pressure on employees to meet them.[2470]

30. Respondent Julian testified as follows:

Q: And as you know and as I've said earlier, our investigation is focused on the sales practice issues. And so, let me ask you: Hindsight is 20/20. Let me ask you based on what you know now today. Here we are on May 31st, 2018. Do you now believe that there was a systemic problem with sales practice misconduct at Wells Fargo? And let me define what I mean by 'systemic.' By 'systemic' I mean a problem that is inherent in the system, the business model, the culture of the bank as opposed to a problem that could be solved by terminating some individuals who are doing things they shouldn't do. With that definition, do you now believe that there was a significant systemic problem at Wells Fargo with sales practice misconduct?

A: I do.

…

Q. Is it fair to say that sitting here today based on the work that Wells Fargo's Audit Group has done, you can confidently say that Wells Fargo had systemic problem with sales practice misconduct that existed at least since 2011 where the data from Pricewaterhouse was looked at?

A. Yes. I'm just trying to differentiate the question between that – the – just the prior one. So the answer I think would be very –

Q. Yes.

A. – the same as – expanding on the same as I just said.

Q: Okay. And based on the work that Wells Fargo Audit Group did, the root cause of the sales practice misconduct was -- at least in large part

41:4-7; MSD-286B (Jarrett Dep. Tr.) at 583:15-584:6; MSD-284A (Deal Dep. Tr.) at 122:9-19; MSD-272A (Ploetz Dep. Tr.) at 21:22-22:4

[2469] See MSD-271 (Ploetz Expert Report) at 4; MSD-283A (Julian Deal Expert Report) at 8; MSD-283B (McLinko Deal Expert Report) at 8; MSD-285 (Jarrett Expert Report) at 6; see also MSD-282A (Wilcox Dep. Tr.) at 41:4-7; MSD-286B (Jarrett Dep. Tr.) at 582:20-583:13; MSD-284A (Deal Dep. Tr.) at 122:9-19; MSD-272A (Ploetz Dep. Tr.) at 21:22-22:4.

[2470] Julian Amended Answer ¶ 12; MSD-278 (Julian Tr.) at 25:1-27:3; 35:5-36:2, 40:23-41:9.

Add. 1106

Appellate Case: 25-1079     Page: 1108     Date Filed: 05/16/2025 Entry ID: 5517644

--- that the goals were unattainable or unreasonable, and the pressure to meet those unattainable goals was severe. Is that fair to say?

A: Yes, I -- I -- I think that's how I would characterize it.[2471]

31. Respondent Julian agreed under oath that the Community Bank's sales practices problem was longstanding, and the problem that existed in the Bank up until 2016 when the Bank eliminated the sales goals.[2472]

32. In sworn testimony before the OCC during its investigation, Respondent McLinko testified the Community Bank had a systemic problem with sales practices misconduct, the root cause of which was pressure on employees to meet unreasonable sales goals.[2473]

33. In sworn testimony before the OCC during its investigation, Respondent McLinko testified as follows:

Q Let's leave it within the community bank. Do you believe that the community bank had a systemic problem with sales practice misconduct?

A From everything that I've read, in the regional bank part of the community bank, yes.

Q All right. And when you say the regional bank, what does that include?

A That's the branch environment.

Q All right. So it's all the branches in all the regions of the country?

A That's right. Yes, correct.

Q Okay. And do you have a belief on what is the cause of this problem at the bank?

MR. CRUDO: Foundation.

THE WITNESS: Based upon everything that I've read, as of now, the different reports that were issued, I would say that the sales goals and incentive processes were certainly two areas that contributed significantly to the issue, the pressure for the sales goals.[2474]

34. In sworn testimony before the OCC during its investigation, Respondent

---

[2471] Julian Amended ¶ 12, 18; MSD-278 (Julian Tr.) at 24:23-25:16; 35:5-36:2.

[2472] MSD-278 at 200:15-19 (May 31, 2018).

[2473] McLinko Amended Answer ¶ 3; MSD-276 (McLinko Tr.) at 54:7-55:2, 95:19-24.

[2474] MSD-276 (McLinko Tr.) at 54:7-55:2.

McLinko testified that his conclusions about the systemic nature of the sales practice misconduct problem were based on the voluminous data and comprehensive analyses reflected in the reports of the Bank's third party consultants engaged to review the sales practices problem, as well as information detailed in the April 2017 Sales Practices Investigation Report published by the Independent Directors of the Board of Wells Fargo & Company, the Bank's holding company.[2475]

35. In sworn testimony before the OCC during its investigation, Respondent McLinko testified before the OCC that sales goals and incentives contributed significantly to the Community Bank's systemic problem with sales practices misconduct.[2476]

36. In sworn testimony before the OCC during its investigation, Respondent McLinko agreed in sworn testimony that the Community Bank's sales practices misconduct problem existed from at least 2004 until October 2016.[2477]

37. Community Bank team members engaged in numerous types of sales practices misconduct throughout the relevant period, including:

    (a) opening and issuing unauthorized checking and savings accounts, debit cards, and credit cards;

    (b) transferring customer funds between accounts without customer consent, a practice the Bank refers to as "simulated funding";

    (c) misrepresenting to customers that certain products were available only in packages with other products, known as "bundling";

    (d) enrolling customers in online banking and online bill-pay without consent, known as "pinning";

    (e) delaying the opening of requested accounts and other products to the next sales reporting period, known as "sandbagging"; and

    (f) accessing and falsifying personal customer account information without authorization such as customer phone numbers, home addresses, and email addresses.[2478]

---

[2475] MSD-276 (McLinko Tr.) at 56:8- 57:2; 57:16-21.

[2476] McLinko Amended Answer ¶ 19; 70; MSD-276 (McLinko Tr.) at 54:7-55:2.

[2477] MSD- 276 at 58:24-59:7, 93:17-22 (Mar. 2, 2018).

[2478] McLinko Amended Answer ¶ 8; Russ Anderson Amended Answer ¶ 8; MSD-22; MSD-23; MSD-108; MSD-225; MSD-1; MSD-2; MSD-297 (Richards Tr.) at 87:7-90:3; MSD-295 (Bacon Tr.) at 188:19-189:10; MSD-544 (Weber Tr.) at 82:24-84:12; MSD-585 (Herzberg Tr.) at 119:13-15) (McLinko Amended Answer ¶ 8; see also Russ Anderson Amended Answer ¶ 8; MSD-22; MSD-23; MSD-108; MSD-225; MSD-1; MSD-2; MSD-297

Add. 1108

Appellate Case: 25-1079     Page: 1110     Date Filed: 05/16/2025 Entry ID: 5517644

38. In sworn testimony before the OCC, the Bank's former CEO John Stumpf testified, "learning the things I've learned here the last few days, I would agree, it was a systemic problem. . . ."

39. In sworn testimony before the OCC, the Bank's former Chief Risk Officer Michael Loughlin testified that he was "trying to translate [Enforcement Counsel's definition of systemic] into a simple phrase like widespread" and did not believe the bank had a widespread issue until at least 2015, after reviewing a report "generated by corporate investigations."[2479]

40. In sworn testimony before the OCC, the Bank's former Chief Administrative Officer, Hope Hardison testified that "sometime in 2013" she became "worried that there was a root cause that . . . they weren't acknowledging," and that as late as 2014, the Enterprise Risk Management Committee "didn't believe there was a root cause issue to be solved" and that the Bank's response "to this problem was slow and incremental, and ultimately not effective until 2016."[2480]

41. In sworn testimony before the OCC, Patricia Callahan, the Bank's former Chief Administrative Officer in charge of the Corporate Human Resources function, testified that the incentive plans were "too aggressive," "basic performance plans were also probably too aggressive in terms of how many of whatever people needed to click off to get satisfactory performance and keep their jobs" and "there was a perception that there was just too much pressure in the branches", but averred that at the time "when the L.A. Times articles came out" that she "thought that the root cause was probably a few different things."[2481]

42. In sworn testimony before the OCC, the Bank's former Head of Corporate Enterprise Risk Karl ("Keb") Byers testified that sales goals in the Community Bank "were too high and there was pressure in the system. And there was an overemphasis on solutions versus quality of sale" and, when asked whether he believed the Community Bank had a systemic problem with "sales practices misconduct," without his memory being refreshed, and without access to the evidence, he responded "Sure" and "I think that sounds very reasonable."[2482] Mr. Byers also testified that, by the time he appreciated the scope of sales practices misconduct, "it was pretty late. . . to be perfectly honest it just wasn't prior to the September 8th, 2016 [Consent Order] announcement" and that both he and "the second line" thought "the first line [] was making progress and

---

(Richards Tr.) at 87:7-90:3; MSD-295 (Bacon Tr.) at 188:19-189:10; MSD-544 (Weber Tr.) at 82:24-84:12); MSD-585 (Herzberg Tr.) at 119:13-15.

[2479] Julian's ECSFM at No. 47, quoting MSD- 290A (Loughlin Inv. Tr.) at 49:6-52:23.

[2480] Julian's ECSFM at No.48.

[2481] *Id.* at No. 49, quoting MSD-291 at 87:18-88:17 (Callahan Inv. Tr.).

[2482] Julian's ECSFM at No. 50, quoting MSD- 382 at 132:2-132:16.

Add. 1109

Appellate Case: 25-1079      Page: 1111      Date Filed: 05/16/2025 Entry ID: 5517644

making improvement."[2483]

43. Michael Bacon, Chief Security Officer and Head of Corporate Investigations until September 2014 testified before the OCC that he realized in 2004 that the Bank had a systemic problem with sales practices misconduct, and the problem persisted until he left the Bank in 2014. He testified that "it was my view and continues to be my view that senior leaders in the roles that should have addressed it simply didn't do their job[,]" including Respondent Russ Anderson.[2484]

44. The Bank's former Head of Financial Crimes Risk Management James Richards, who succeeded Mr. Bacon in taking over the Corporate Investigations function, testified before the OCC that the Community Bank had a systemic problem with sales practices misconduct and what he "observed was that there were team members that felt pressure from senior management, sales goals related pressure and that those team members committed sales practices related misconduct as a result." Mr. Richards further testified that the Community Bank tracked whether employees were meeting sales goals on a daily basis and if employees failed to meet sales goals they would suffer adverse employment consequences up to and including termination.[2485]

45. In sworn testimony before the OCC during its investigation, former General Counsel James Strother testified the Community Bank's sales goals were a major contributing factor to the Bank's sales practices misconduct problem:

> [I]n hindsight knowing what I know today, it's clear that those goals were either the major contributing factor to the problems that we had, and certainly a major contributing factor to it, and that the bank, as a whole, and the Community Bank, in particular, should have recognized earlier that the amount of bad behavior that was resulting, either because of, or partly because of those goals, or mainly because of those goals, was unacceptable and it should have been changed.[2486]

46. In her declaration, the Bank's former Regional President for Los Angeles and Lead Regional President for Florida, Shelley Freeman, stated, "sales practices misconduct was a systemic problem in that it resulted from the Community Bank's incentive plans and high sales goals, coupled with a lack of oversight and controls. [S]ales practices misconduct had occurred throughout the Bank's geographic footprint, with higher concentrations in certain parts of the

---

[2483] Julian's ECSFM at No. 50, quoting MSD-382 at 132:17- 133:4.

[2484] MSD-295 (Bacon Tr.) at 25:12-26:23; see also id. at 17:21-20:19; MSD-296A (Bacon Dep. Tr.) at 222:6-24; 224:2-225:9; 226:1-15; MSD-296B (Bacon Dep. Tr.) at 433:13-434:14.

[2485] (MSD-297 (Richards Tr.) at 234:5-19).

[2486] MSD-288A (Strother Tr.) at 110:6-16.

country."[2487]

47. Lisa Stevens and Laura Schulte, Regional Bank Executives reporting to Carrie Tolstedt, held the belief that the Community Bank had a "systemic" sales practices misconduct problem.[2488]

48. In April 2017, the Independent Directors of the Board of Wells Fargo & Company, the Bank's holding company ("Company"), issued a Sales Practices Investigation Report ("Board Report").[2489] The Bank accepted the findings of the Board Report "as a critical part of [its] journey to rebuild trust."[2490]

49. Based on 100 interviews of Bank employees and review across 35 million documents, the Board Report concluded that "[t]he root cause of sales practice failures was the distortion of the Community Bank's sales culture and performance management system, which, when combined with aggressive sales management, created pressure on employees to sell unwanted or unneeded products to customers and, in some cases, to open unauthorized accounts."[2491]

50. Further, the Board Report pointed out Community Bank senior management's failure to recognize the sales model as the root of the problem: "[t]hey … failed to adequately consider that low quality accounts could be indicative of unauthorized accounts. It was convenient instead to blame the problem of low quality and unauthorized accounts and other employee misconduct on individual wrongdoers and poor management in the field rather than on the Community Bank's sales model."[2492]

51. As part of a Deferred Prosecution Agreement the Bank entered into after the Department of Justice concluded its investigation regarding the Bank's sales practices, the Bank admitted, accepted, and acknowledged as true the following facts:

(a) The Community Bank's onerous sales goals and accompanying management pressure led thousands of its employees to engage in: (1) unlawful conduct to attain sales through fraud, identity theft, and the falsification of bank records, and (2) unethical practices to sell products of no or low value to the customer, while believing that the customer did

---

[2487] MSD- 199 (Freeman Decl.) at ¶¶ 6-7.

[2488] MSD-546 (Stevens Tr.) at 201:1-10; 207:5-17; MSD-579 (Schulte Tr.) at 95:3-14; 99:1-7.

[2489] Russ Anderson Amended Answer ¶ 21; MSD-280). (Julian Amended Answer ¶ 21; McLinko Amended Answer ¶ 21; MSD-280.

[2490] MSD-326 at 5.

[2491] MSD-280 at 2.

[2492] *Id.* at 5.

not actually need the account and was not going to use the account;

(b) Despite knowledge of the widespread sales practices problems, including the pervasive illegal and unethical conduct tied to the sales goals, Community Bank senior leadership failed to take sufficient action to prevent and reduce the incidence of unlawful and unethical sales practices; and

(c) From 2002 to 2016, Wells Fargo opened millions of accounts or financial products that were unauthorized or fraudulent. During that same time period, Wells Fargo employees also opened significant numbers of additional unneeded, unwanted, or otherwise low value products that were not consistent with Wells Fargo's purported needs-based selling model. Wells Fargo collected millions of dollars in fees and interest to which the Company was not entitled, harmed the credit ratings of certain customers, and unlawfully misused customers' sensitive personal information (including customers' means of identification). In general, the unauthorized, fraudulent, unneeded, and unwanted accounts were created as a result of the Community Bank's systemic sales pressure and excessive sales goals.[2493]

52. The Community Bank imposed unreasonable sales goals on its employees until October 2016, including when Respondent Russ Anderson served as the Group Risk Officer of the Community Bank.[2494]

53. Among the claims unresolved prior to the start of the evidentiary hearing was Enforcement Counsel's claim stating the following:

The Bank internally and publicly identified a metric known as "cross-sell" which related to the number of products sold per household.[2495] The cross-sell ratio was a measure of products sold per customer household, as a perceived driver of future revenue. The more products sold to existing households, the more money the Bank expected to earn from each

---

[2493] MSD-1 at 25, 30, 31 ¶¶ 15, 25, 32.

[2494] MSD-50 ("In retrospect, we missed some clear indications that our goals were unrealistic, making the problem worse than it should've been."); MSD-131; MSD-269 (NBE Candy Expert Report) at ¶¶ 48-51; MSD-268 (NBE Crosthwaite Expert Report) at ¶¶ 43a-g; MSD-257 (NBE Coleman Expert Report) at ¶¶ 56, 69, 106; MSD-267(NBE Smith Expert Report) at ¶¶ 67-85; MSD-349 (Schumacher Tr.) at 30:12-33:3, 35:4-20, MSD-82; MSD-581 (Clegg Tr.) at 44:1-46:6, 84:8-11; MSD-300 (Rawson Tr.) at 237:2-7; MSD-582 (Sotoodeh Tr.) at 61:20-62:7, 73:21-74:12; MSD- 577 (Foley Tr.) at 134:19-135:9, 163:17-19; MSD-546 (Stevens Tr.) at 72:23-73:5; MSD-579 (Schulte Tr.) at 50:12-16; MSD-290B (Loughlin Tr.) at 304:3-14; MSD-297 (Richards Tr.) at 191:5-20; MSD-289A (Sloan Tr.) at 79:3-80:25.

[2495] Russ Anderson Amended Answer ¶¶ 6, 59; Julian Amended Answer ¶ 6; McLinko Amended Answer ¶ 6.

Appellate Case: 25-1079     Page: 1114     Date Filed: 05/16/2025 Entry ID: 5517644

relationship and the less likely those customers would exit their relationship with the Bank confuses the cross-sell metric with sales practices.[2496]

54. During the hearing, any ambiguity regarding (1) whether the Bank publicly identified the cross-sell metric as a perceived driver of future income; (2) whether the metric related to the number of products sold per household; and (3) whether the metric related to sales practices and thus to sales practices misconduct was resolved through preponderant evidence establishing as true each of these three factual premises.

55. The first claim – that the Bank internally and publicly identified a metric known as "cross-sell" which related to the number of products sold per household – was not disputed, as each Respondent confirmed the claim in their amended answers.[2497]

56. The next claim was that the cross-sell ratio was a measure of products sold per customer household, as a perceived driver of future revenue. Mr. Julian asserted that the factual premise as stated by Enforcement Counsel confused the cross-sell metric with sale practices.[2498] He asserted the cross-sell metric "was a key metric tracking the number of products per household and was reviewed by the Retail Bank Cross-Sell Steering Committee for data integrity."[2499]

57. Testimony during the hearing resolved any confusion or ambiguity: As Deputy Comptroller Coleman explained, the cornerstone of the Community Bank's business strategy was "selling more bank products to customers".[2500] The Community Bank developed their own "cross-sell metric so they could track the number of products that they sold."[2501] Through this testimony, Deputy Comptroller Gregory established the relationship between the Bank's business model and the metric used to determine the success of that model.

58. Susan Nelson, a Human Resources manager and later one of its Business Partner Leaders in the Community Bank, testified in a pre-hearing

---

[2496] Enforcement Counsel's MSD at Enforcement Counsel's Statement of Material Fact (Russ Anderson) No. 71 and (Julian and McLinko) No. 68.

[2497] Russ Anderson Amended Answer ¶¶ 6, 59; Julian Amended Answer ¶ 6; McLinko Amended Answer ¶ 6.

[2498] Julian's ECSFM at ¶68, citing DJ0576 at 1-2 OCC-SP0913943. See also Russ Anderson's ECSFM at ¶ 71 and McLinko ECSFM at ¶68, incorporating Mr. Julian's response.

[2499] MSD-548 (Nelson Tr., Jan. 31, 2018) at 116.

[2500] Tr. (Coleman) at 246.

[2501] *Id.*

Appellate Case: 25-1079    Page: 1115    Date Filed: 05/16/2025 Entry ID: 5517644

deposition.[2502] Responding to questioning by Mr. McLinko's attorney, she agreed that she understood that when discussing either sales practice misconduct or sales integrity, that would, using the description provided to her by the attorney, be referring to the practice of an employee providing a service or product to a customer without the customer's consent or knowledge, or transferring funds from one account to another without the customer's consent.[2503]

59.   Ms. Nelson testified that it was "the Wells Fargo way" to increase sales goals every year:

> A: . . . I can confirm that goals did go up every year.
> Q: Okay. Okay. And how are you able to confirm that goals went up every year?
> A: It was the Wells Fargo way. (Laughter.) Double digit, year over year, increasing goals.
> * * *
>  I would say in more recent years, it wasn't double digits. Listening to my businesses talk, I think it was less than ten percent, probably anywhere from one to nine percent, depending on the business, my guess is. … I'm going to say possibly in late … 2008, 2009" the "double digit pace kicked down."[2504]

60.   The Board Report found that, even after the Community Bank lowered sales goals mid-year in 2013 and 2014, "they were still set at an unachievable level," and described the Community Bank's sales goals as "untenable," "unrealistic," and "unattainable."[2505]

61.  Multiple senior regional leaders in the Community Bank testified that the Community Bank's sales goals were unreasonable.[2506]

62.  The Bank's former Chief Risk Officer Michael Loughlin testified that he had no doubt that the sales goals in the Community Bank were unreasonable:

> Q: And did you at some point conclude that the goals in Community Bank

---

[2502] MSD-548 (Nelson Tr. January 31, 2018).

[2503] *Id.* at 9.

[2504] Julian's ECSFM at No. 71.

[2505] MSD-280 at 5, 19, 44-45; see also MSD-199 (Freeman Decl.) at 2 ("I believed the sales goals were too high . . . despite the fact that the Community Bank at that time had been retroactively reducing sales goals . . . .").

[2506] See, e.g., MSD-546 (Stevens Tr.) at 72:23- 73:5; MSD-579 (Schulte Tr.) at 50:12-51:9; MSD-349 (Schumacher Tr.) at 36:3-25; MSD-575 (Lee Tr.) at 87:13-16; MSD-576 (Perry Tr.) at 35:2-9; MSD-577 (Foley) Tr. 62:23-63:5; see also MSD-199 (Freeman Decl.) at 2, 5-6.

– well, let me put it this way; sitting here today, do you have any doubt in your mind that Community Bank's sales goals were unreasonable?

A: I don't have any doubt.[2507]

A former regional leader Jeffrey Schumacher provided the following sworn testimony to the OCC about the impact of the sales goals:

Q: Okay. You also eluded [sic] to some emails that you sent, and some statements you made to others that high goals, that the goals were so unreasonable or aggressive that they are likely to cause that behavior. At least that's what I understood you to say. Is that what happened?

A: Yes.

Q: Okay. And why did you think that these unreasonable goals that you were assigned would lead to bad behavior?

A: Well, because people need jobs. I mean, they have families to feed, they have people that depend on them. And you know, the goals were part, the sales goals were part of their incentive plan which was how much extra money they made. And it was part of their performance review, which was obviously could determine whether they stay with the company. And so for a long period of time, sales were a pretty big part of what Wells Fargo did. And I actually, the common term was solutions are king. And I think senior management projected that. And so when sales goals are aggressive, I think that creates a lot of pressure on someone that's trying to keep their job and keep their family and it's a lot of pressure to make those goals. . . .[2508]

63. Respondent McLinko testified that sales goals within the Community Bank were unreasonable. Specifically, he testified:

Q: All right. From reading this and from what you now know from everything, do you have a belief as to whether these sales goals that Wells Fargo set for members of the community bank were unreasonable?

MR. CRUDO: Foundation.

A: Again, yes, based upon what I know now and reading this, they were certainly very difficult to attain.[2509]

64. Respondent Julian testified that the Community Bank's sales goals were unreasonable. Specifically, he testified:

---

[2507] MSD-290B (Loughlin Tr.) at 303:13-18.

[2508] MSD-349 (Schumacher Tr.) at 36:3-25 (emphasis added).

[2509] McLinko Amended Answer ¶ 5.

> Q: Okay. So, it's fair to say that you now know that the bank gave its employees unreasonable sales goals. Is that correct?
>
> A: Yes.[2510]

65. The Community Bank maintained "an incentive compensation system that was poorly designed, poorly monitored and managed and allowed to remain in place too long."[2511]

66. The incentive compensation plans in the Community Bank were based upon and consisted of unreasonable sales goals.[2512]

67. The Bank's Incentive Compensation Risk Management Policy, adopted in 2011, governed all incentive compensation plans, including those in the Community Bank, but did not impose oversight responsibilities on the Head of the Community Bank, the Community Bank Group Risk Officer, and the Law Department.[2513]

68. From the early 2000s and throughout Respondent Russ Anderson's tenure as the Group Risk Officer and until sales goals were eliminated in the Community Bank effective October 1, 2016, employees in the retail branch network of the Community Bank faced significant pressure to meet sales goals.[2514]

---

[2510] MSD-278 (Julian Tr.) at 121:4-7.

[2511] MSD-6; see also MSD-5; MSD-289A (Sloan Tr.) at 79:3-80:25.

[2512] MSD-5; MSD-6; MSD-213 (SL 2015-36) at 2 ("Cross-selling, if not properly governed, can lead to excessive sales pressure on employees to meet sales goals and achieve financial incentives. Incentive compensation is a key factor in motivating employee behavior and should be reevaluated across all sales activities enterprise-wide given these events."); MSD-280 (Board Report) at 23, 29, 31-33, 57, 78, 84 ("The Community Bank did not drop teller referral goals, and, while it lowered overall sales goals slightly for 2013, it did not revise the sales goals embedded in the eligibility thresholds for incentive compensation until 2014 (and then only slightly)."); MSD-570 (SL 2016-36); MSD-600 (SL-2016-49) at 1, 3, 7 ("the CB management team implemented aggressive sales goals and a poorly designed incentive compensation program which resulted in the widespread unethical activity, significant customer harm and reputational damage to the bank."); MSD-651 (SL 2016-35); MSD-343 (Sales Practices Consent Order); MSD-269 (NBE Candy Expert Report) at ¶¶ 37-59; MSD-382 (Byers Tr.) at 231:20-232:6; MSD-199 (Freeman Decl.) at ¶ 8, 17; MSD-411 (Raphaelson Decl.) at ¶¶ 5, 14, 15, 16, 19, 20, 23.

[2513] Russ Anderson Amended Answer ¶ 150; MSD-211; MSD-212; MSD-224 at 10, 24; McLinko Amended Answer ¶ 150; Julian Amended Answer ¶ 150; MSD-211; MSD-212; MSD-224 at 10, 24.

[2514] MSD-266 (Russ Anderson Dep. Tr.) at 32:17-33:9, 61:16-63:23, 78:18-79:17; MSD-268 (NBE Crosthwaite Expert Report) at ¶¶ 44, 46; MSD-580 (Henderson Tr.) at 131:18- 132:19 (describing call nights whereby employees who did not meet sales goals had to stay overtime to make calls in order to get sales); MSD-382 (Byers Tr.) at 231:20-232:6; MSD-128; MSD-129; MSD-81 ("We have a lot of markets and regions that are significantly below minimum standards, and you have to believe there is unbearable pressure. In light of that, you have to predict there will be more gaming."); MSD-141; MSD-142; MSD-158 at 4 ("Make your goals at any cost to the team member or customer – this is our environment."); MSD-159; MSD- 160; MSD-296A (Bacon Dep. Tr.) at 222:1-24, 225:20-226:3, MSD-296B (Bacon Dep. Tr.) at 180:17-181:9, 190:12-192:15, 200:4-202:24); MSD-544 (Weber Tr.) at 20:16-23:10, 27:20-32:8, 50:18-52:7, 146:23-148:4, 151:1-152:3 (Dec. 21, 2017); MSD-294 (Wipprecht Tr.) 35:1-38:3, 79:7-14, 94:1-21, 112:6-19; MSD-549 (Holliday Tr.) at 51:19-52:9, 69:14-71:22); MSD-73; MSD-74; MSD-75 ("…I do know gaming has everyone's attention at the moment. We've been preaching it for

Add. 1116

Appellate Case: 25-1079     Page: 1118     Date Filed: 05/16/2025 Entry ID: 5517644

69. The Community Bank tracked employees' sales performance on a daily and at times hourly basis.[2515]

70. Incentive compensation and promotional opportunities in the Community Bank depended on an employee's ability to meet sales goals.[2516]

71. From 2011 through third quarter 2016, the Bank terminated approximately 8,520 employees for sales performance issues, including failure to meet sales goals.[2517]

72. The Board Report found that Community Bank's sales-performance stack rankings and its determination of employees' incentive compensation and promotional opportunities relative to sales goals, created an "intense pressure to perform. . . ."[2518]

73. Employees remained under significant pressure to meet unreasonable sales goals even in September 2016, a month before the sales goals in the Community Bank were officially eliminated.[2519]

74. In an email dated October 5, 2016, Hope Hardison, the former Chief Administrative Officer and Head of Corporate Human Resources wrote the following: "Don't say there was nothing wrong with our culture. At least in the case of parts of the Community Bank, to suggest so just ignores a reality that everyone knows there was insane pressure on people to produce 'widgets' new account sales. That is a reality people know, and we will hear more about in the media as former team member exposes' will show."[2520]

75. During his May 2018 sworn statement, Respondent Julian testified that, "having seen the information, read the various reports, read the – what's out there in the

---

ten years largely ignored . . ."); MSD-76 (October 21, 2005 email from an Investigations Manager stating: "We have seen a recent surge in complaints regarding on-line banking enrolling, bill-pay enrollment and ordering debit cards without customer consent or knowledge. I don't know what's going on but I think we need to address the issue, as it is spiraling out of control."); MSD-581 (Clegg Tr.) at 50:3-12; 51:14-21, 81:4-82:7; MSD-287B (Otsuka Tr.) at 9:15-19; MSD-546 (Stevens Tr.) at 88:2-9, 111:5-18; MSD-582(Sotoodeh Tr.) at 81:16-82:2, 106:14-24, 107:3-10; MSD-579 (Schulte Tr.) at 71:9-11, 93:21-94:1.

[2515] MSD-549 (Holliday Tr.) at 25:7-27:25, 59:11-18; MSD-541 (J. Freeman Tr.) 76:20-77:12; MSD-350 (Ramage Tr.) at 33:13-36:18; MSD-199 (Freeman Decl.) at ¶ 10; MSD- 411 (Raphaelson Decl.) at ¶ 21.

[2516] MSD-266 (Russ Anderson Dep. Tr. ) at 22:13-23:3; MSD-349 (Schumacher Tr.) at 40:25-44:11; MSD-549 (Holliday Tr.) at 28:3-23; MSD-579 (Schulte Tr.) at 97:8-15; MSD-591 (Najvar Tr.) at 305:1– 308:2; MSD-350 (Ramage Tr.) at 112:1-113:4; MSD-595 (Vasquez Tr.) at 37:5-10, 98:12-18; MSD-508).

[2517] MSD-44.

[2518] MSD-280 (Board Report) at 20.

[2519] MSD-103; MSD-83 ("For the day, volume was up 177% over YTD daily volume and Sales Practice allegations almost doubled. I just read the 19 sales practice allegations and at least 50% are exactly 'pressure and gaming' related. It made my hair curl"); MSD-293A (Hardison Tr.) at 148:7-160:18 (testifying that employees were complaining about pressure and gaming for many years and reflected what was actually going on in the Community Bank for many years)); CRA-148; MSD-472 (Mack Tr.) at 179:19-181:9.

[2520] MSD-77; MSD-293A (Hardison Tr.) at 134:4- 137:11; McLinko Amended Answer ¶ 134.

public, read team members' allegations, read customer complaints, it – it's clear to me that we had a culture within the general bank, within the retail bank at Wells Fargo that was putting goal-oriented, undue -- my words -- undue pressure on team members to reach goals that either were unattainable or were very challenging to be able to reach, and it put pressure on the culture of not only setting goals that appeared to have been in a number of appearances unattainable."[2521]

76. Similarly, during his March 2018 sworn statement, Respondent McLinko testified: "There was certainly the pressure of the goals and that sort of stuff, sales goals."[2522]

77. Corporate Investigations was a department within the Bank responsible for investigating employee misconduct.[2523]

78. Employees investigated for engaging in sales practices misconduct expressed to investigators in Corporate Investigations that they committed the misconduct because of sales pressure and fear that they could and would be fired for failing to meet sales goals. Multiple senior leaders in Corporate Investigations testified before the OCC that employees who engaged in sales practices misconduct did so because of significant pressure to meet unreasonable sales goals.[2524]

79. Through the summary disposition process, the parties identified a factual dispute regarding whether controls to prevent and detect sales practices misconduct were inadequate. Testimony taken during the evidentiary hearing constituted preponderant evidence establishing that controls from both the first and third lines of defense were inadequate and neither prevented nor detected sales practices misconduct.

80. With respect to the first line of defense, as GRO Ms. Russ Anderson was responsible for implementing proactive and sound risk-management practices and reinforcing the risk culture throughout the Community Bank.[2525] As Chair of the Community Bank's Risk Management Committee and pursuant to the Bank's Risk Management Framework, Ms. Russ Anderson was responsible for understanding the Community Bank's risk profile and working with management across the Community Bank to ensure risks were effectively managed.[2526]

81. As a member of the Community Bank's Internal Fraud Committee, Ms. Russ Anderson

---

[2521] MSD-278 (Julian Tr.) at 25:4-26:11.

[2522] MSD-276 (McLinko Tr.) at 125:11-13.

[2523] Russ Anderson Amended Answer, ¶ 50; Julian Amended Answer ¶ 50; McLinko Amended Answer ¶ 50.

[2524] MSD-544 (Weber Tr.) 21:24-23:20; MSD-299 (Sperle Tr.) at 67:4-25, 139:10-140:1, 146:1-13, 162:8-25; MSD-294 (Wipprecht Tr.) 38:23-39:25; MSD-297 (Richards Tr.) at 79:11-80:22; MSD-581 (Clegg Tr.) at 44:1-46:6.OCC Exh. 2340 at ¶ 118; OCC Exh. 2335 at ¶ 109; OCC Exh. 0102 at 0025; OCC Exh. 2407 at ¶ 106.

[2525] OCC Exh. 2340 at ¶ 118; OCC Exh. 2335 at ¶ 109; OCC Exh. 0102 at 0025; OCC Exh. 2407 at ¶ 106.

[2526] OCC Exh. 0660 at 0001; R Exh. 11556 at 0001; Tr. at 9769-9770 (CRA).

Add. 1118

Appellate Case: 25-1079     Page: 1120     Date Filed: 05/16/2025 Entry ID: 5517644

was responsible for managing internal fraud risks related to business practices and processes, and for developing appropriate controls to mitigate such risks.[2527] Taking these responsibilities into account, NBE Candy identified the inadequacies of these controls and Ms. Russ Anderson's role:

> Q (by Enforcement Counsel): What, if any, conclusions did you reach about the adequacy of the Bank's controls to prevent sales practices misconduct from 2013 to 2016?

> A (by NBE Candy): From reviewing documents and testimony, I have concluded that from 2013 to 2016, this relevant time period, that the controls to prevent sales practices misconduct were inadequate.

> Q: Why?

> A: There's a number of reasons for that. The most basic way to explain it is if a customer -- I mean, if an employee wanted to open up an unauthorized account, he or she could. If they wanted to open up an unauthorized credit card, he or she could. If he wanted to open up an unauthorized checking account, move money in and out of that account to make it appear funded and then take the money out, he could or she could. During this entire time, the preventative controls were not effective to prevent these, this sort of misconduct to happen, and we know that, both from confirmed cases of sales practice misconduct and fraud, as well as from other analyses that show the, the potential magnitude of the problem at the Community Bank.

> * * *

> Q: How, if at all, is Ms. Russ Anderson responsible for the inadequate controls to prevent sales practices misconduct as the Group Risk Officer?

> A: As the group risk officer for the Community Bank during this period, it was absolutely her responsibility to implement adequate preventative controls. [T]he bank was pursuing a risky business model, as well as the fact that there's just risk inherent in, in offering products and services to customers. As the Group Risk Officer charged with ensuring that risk management was effective, which includes preventative controls, it was her responsibility to implement adequate preventative controls.

> Q: What controls to prevent sales practices misconduct should Ms. Russ Anderson have instituted during her tenure as the Group Risk Officer?

> A: There's a number of things. I can't give an exhaustive list, but probably the most important thing that she could have done to prevent sales practice misconduct was to advocate for fundamental changes to the business model.

---

[2527] OCC Exh. 2340 at ¶ 120; OCC Exh. 1272 at 0003, 0005; R Exh. 06313 at 0003, 0005; Tr. at 9548 (CRA).

Appellate Case: 25-1079    Page: 1121    Date Filed: 05/16/2025 Entry ID: 5517644

Wells Fargo's Community Bank chose to have unreasonable sales goals and unbearable pressure to meet those sales goals.

Changing that model was by far, advocating and incredibly challenging that model, was one of the most effective things she could have done to prevent sales practice misconduct from occurring. Also, she could have advocated for a formal policy that team members could not be terminated for failing to meet sales goals. The fact that people could risk termination if they did not meet the unreasonable goals did drive some of the misconduct. So that would have been another effective thing to do.

And in terms of her responsibilities with incentive compensation risk management, there's also a number of things she could do. She could have advocated for not giving credit for unfunded accounts or not giving credit for duplicate accounts. You know, I've seen people who have had 50-plus checking accounts unnecessarily. She could have advocated for not giving credit to accounts that appeared to be simulated funding. Or she could have advocated for just taking the sales goals out of the incentive compensation plan.

But other than those three, there's a number of things she could have done for preventing the misconduct from ever happening, including things such as requiring signatures prior to opening up accounts, including things such as having text message or e-mail confirmations, you know, when you're opening an account that you are authorizing it. Again, this is not exhaustive, but there's, there's a number of things that she should have implemented as Group Risk Officer to prevent sales practice misconduct.[2528]

82. From no later than 2004 until 2016, the controls to prevent and detect sales practices misconduct were inadequate.[2529]

83. The Bank's systems did not prevent employees from engaging in sales practices misconduct. The Bank's Head of SSCOT (Sales and Service Conduct Oversight Team), Rebecca Rawson, who reported directly to Respondent Russ Anderson, provided the following sworn testimony about the deficiencies in controls to prevent sales practices misconduct:

   A: . . . And also looking at controls within our operations, so the systems that

---

[2528] Tr. (Candy) at 1065-69.

[2529] MSD-269 (Expert Report of NBE Elizabeth Candy); MSD-267 (Expert Report of Tanya K. Smith, NBE, CFA); MSD-92; MSD-297 (Richards Tr.) at 175:21-178:13; MSD-300 (Rawson Tr.) at 49:5-50:22; 211:21-212:2; MSD-92 ("With the recent sales practices matter, we have recognized the consumer and customer impact, reputational impact, legal and regulatory impact of conduct risk. Fragmented, complex controls spread across the company have not proven to be effective."); MSD-643A (DiCristofaro Tr.) at 109:18-21; MSD-472 (Mack Tr.) at 111:3-112:8; MSD-59.

are used by the bankers, so store vision platform. And if we say a signature is required, or whatever by policy, why does the system not prevent the banker from going against policy? So in other words, making it harder for someone to get something -- for a banker to get it wrong.

Because I think in that point in time, we have policies and procedures that stated X, but the system really could just allow you to proceed.

Q: Okay.

A: So I think that is what I think about with the root cause a little bit.

Q: I see. Again, I will tell you what I got from your testimony, and please correct me if I misunderstood you.

A: Okay.

Q: At the Community Bank, I take it there was a significant problem with controls that are supposed to detect and prevent sales practice misconduct? Is that fair to say?

A: I do not know if it would be -- it depends in how you define the system.

Q: Okay.

A: If the system is a control. I think we should have -- this is my opinion. We should have built into our systems places where it stops the team member from advancing if they are not acting in accordance with policy. Q: Okay. So I take it the bank had a policy that you should not issue credit cards or debit cards without the customer's consent?

A: Correct.

Q: All right. But the system allowed team members to actually issue credit cards and debit cards without the customer's consent or the customer's signature?

A: I think that is right.

Q: Okay. And you view that as a failure in controls? A: I think that is fair.[2530]

84. Community Bank employees across its nationwide branch network used a Bank system known as the Store Vision Platform ("SVP") to open and issue products and services for bank customers.[2531]

85. SVP required bank employees to enter or confirm customers' personal data and select options within the platform to open or issue any product or service.[2532]

86. Bank policies required Bank employees to obtain express consent from customers prior to opening accounts or services, where such consent could be through a variety of

---

[2530] MSD-300 (Rawson Tr.) at 49:5-50:22; 211:21-212:2; see also MSD-150 ("Lines of Credit, Cards, and ancillary services such as online, bill pay, rewards, etc. do not require signatures and thus are hard to track internally.".

[2531] MSD-200 (Hughes Decl.) at 1; MSD-596 at 3.

[2532] MSD-200 (Hughes Decl.); MSD-596.

Add. 1121

Appellate Case: 25-1079    Page: 1123    Date Filed: 05/16/2025 Entry ID: 5517644

means, including pins, signatures, and verbal consent.[2533]

87. SVP did not require Community Bank employees to obtain evidence of customer consent, such as a customer signature, before they could open or issue credit cards, debit cards, lines of credit, or certain other products and services, or transfer customer funds; and Respondent Russ Anderson explained in 2015 that the Bank "will process [a credit card] application without a signature (since it is not required by law) unless the applicant is under the age of 21 . . . . So, if the customer complains [that a card was unauthorized] and there is not a signature there isn't anything we 'do' about it."[2534]

88. Until approximately 2014, it was an acceptable practice for Community Bank employees to open accounts over the phone and not obtain customer signature.[2535]

89. Not until approximately 2016 were Bank systems modified to require evidence of customer consent before Community Bank employees could issue credit cards or transfer funds in customer accounts.[2536] Consent capture for non-credit card products had not yet been implemented as of May 2016.[2537] Up until March 2018, customer signatures still were not required to obtain a debit card.[2538]

90. Community Bank leaders, including Respondent Russ Anderson, knew that the vast majority of customer-consent sales integrity cases were related to the Community Bank's failure to capture evidence of customer consent.[2539]

91. In spring and summer 2012, the Community Bank piloted a program that would require explicit customer consent before allowing bankers to issue debit cards to customers.[2540] On June 28, 2012, Respondent Russ Anderson received a PowerPoint presentation explaining the "[p]ositive impacts of store pilot for consumer and business debit cards" included: "Strong customer preference per market research"; (2)"Banker feedback that debit consent screen flow and process easy to adopt, and represents a sales quality improvement"; and (3) "Lifts in debit card fraud activation and POS [point of sale] activation – especially where customer provides consent electronically (on the signature pad)."[2541] She was also informed, "Debit card 'lack of consent' contributes

---

[2533] Julian's ECSFM at No., citing MSD-010 at 5; MSD-009 at 7.

[2534] MSD-66; MSD-150; MSD-229; MSD-356.

[2535] MSD-65.

[2536] MSD-356.

[2537] *Id.*; MSD-598.

[2538] MSD-655 at 6-7 ("signatures are still not required to obtain a debit card.").

[2539] MSD-58); MSD-59; MSD-60; MSD-150.

[2540] MSD-229.

[2541] *Id.* at 3.

Add. 1122

Appellate Case: 25-1079    Page: 1124    Date Filed: 05/16/2025 Entry ID: 5517644

more than fair share of enterprise quality issues and corrective actions."[2542]

92. In a Supervisory Letter issued on June 26, 2015 to the Bank, the OCC stated: "[o]ur sampling of customer complaints noted in many cases there was no method to prove customer consent in the form of a signature for either the deposit or credit card product."[2543]

93. Another preventative control that the Community Bank failed to institute was awarding sales credit to employees only for accounts that customers use. This was Accenture's first recommendation to the Community Bank in October 2015.[2544]

94. There were four primary mechanisms the Bank employed to detect sales practices misconduct. Three were reactive tools that relied on employees or customers to surface problems: 1) a whistleblower hotline known as the EthicsLine established for employees to raise concerns about behavior that may violate the Bank's Code of Ethics, or any laws, rules or regulations, 2) employee complaints sent directly to senior management or others within the Bank, and 3) customer complaints. The fourth tool involved using data analytics to detect activity indicative of certain sales practices misconduct, referred to as "proactive monitoring." The Bank did not begin employing proactive monitoring until around 2012; before then, the primary way the Bank detected sales practices misconduct was if a customer or a Bank employee reported it.[2545]

95. The Bank's former Head of Corporate Investigations Loretta Sperle testified before the OCC that there was nearly a 100% chance an employee's boss would know if she failed to meet her sales goals. By contrast, the chances were very small that an employee would be caught for issuing an unauthorized product or service. Ms. Sperle testified:

> Q: Okay. So if [employees] were doing it when nobody is watching, and they don't do it enough to trigger the outlier thresholds that you've had, the chances of them getting caught is very small?
>
> A: Yes. I would agree.

[2542] MSD-229 at 4; see also id. at 7 (noting that "Debit explicit consent has strong customer appeal.").

[2543] MSD- 213 (SL 2015-36) at 3; see also MSD-570 (SL 2016-36) at 4 ("The root causes include excessive sales pressure and the absence of a control process that required documentation of explicit customer consent").

[2544] MSD-51 at 12 ("Reward team members based more on positive customer outcomes (e.g., account utilization) with less emphasis on solutions sold."). "As of January 2016, the Community Bank allowed employees to have approximately 30 percent of the new accounts they opened to remain unfunded; they would still be eligible to receive sales credit for the unfunded accounts." (MSD-269 (NBE Candy Expert Report) at ¶ 107c; MSD-647); see also MSD-295 (Bacon Tr.) at 121:15-125:1 (suggestions of preventative controls).

[2545] Russ Anderson Amended Answer ¶ 92; MSD-290A (Loughlin Tr.) 236:1-13; MSD- 300 (Rawson Tr.) at 86:2-88:15, 213:2-8; MSD-299 (Sperle Tr.) at 41:6-42:2, 53:13-19.

Add. 1123

Appellate Case: 25-1079    Page: 1125    Date Filed: 05/16/2025 Entry ID: 5517644

96. Although the EthicsLine was one of the Community Bank's mechanisms for detecting sales practices misconduct, Community Bank employees did not consistently use the EthicsLine to report issues. In its 2015 independent review of sales practices, Accenture reported, based on its interviews of over 300 Community Bank employees, that "[m]any bankers stated that ethics issues are usually escalated through management and rarely escalated through the Ethics Line," and "some Service Managers and Bankers stated that they do not utilize the Ethics Line as they fear retribution or that it may not be anonymous."[2546] Sales integrity-related EthicsLine complaints were referred to Community Bank's Sales Quality team, later known as SSCOT.[2547]

97. Sales Quality/SSCOT referred only a small percentage of the EthicsLine complaints to the Bank's Corporate Investigations group for investigation. Sales Quality imposed various preliminary thresholds including, among other things, polling of other customers of the accused employee, to determine which allegations to send to Corporate Investigations for investigation. An employee accused of sales practices misconduct might only be referred to Corporate Investigations if telephone "polling" of other customers of the same employee revealed other incidents, or "substantiations," of similar misconduct.[2548]

98. The Bank's former CEO John Stumpf testified before the OCC, "As I sit here today looking back, there were a number of outreaches by team members that were informing the company and senior leadership about these issues. And I wish we would have moved faster on those". He took responsibility that he personally should have moved faster, and testified that employees did all they could to complain about the unreasonable sales goals to Bank senior leadership in numerous ways over many years, by calling the EthicsLine, sending emails, holding protests, and approaching newspapers. He further stated that the senior leadership team and not the employees, is to blame for the Bank not moving fast enough to address the sales practices misconduct problem.[2549]

99. According to the Community Bank's former Chief Compliance Officer, who reported to Respondent Russ Anderson, the "Community Bank did not have an adequate system

---

[2546] MSD-51 at 41; see also *id*. at 11.

[2547] MSD-381 at 15.

[2548] MSD-245 at 9; MSD-381; MSD-122 ("Generally speaking, if there are fewer than 3 polling substantiations, there's no referral to Investigations."); MSD-93 ("No single LOB [Line of Business] or Second Line of Defense 'owns' EthicsLine/Sales Integrity/Sales Practices, and Corporate Investigations only sees a sliver of these.") (emphasis added); MSD-297 (Richards Tr.) at 226:18-229:20; MSD-591 (Najvar Tr.) at 142:24-144:25; MSD-75; MSD-150; MSD-151 at 1 ("There are lots of situations where we do polling. Generally speaking, if the team member denied the conduct and there was just one polling confirmation, we're not likely to terminate (and it might not even get sent to Investigations."); MSD-245.

[2549] MSD-8B (Stumpf Tr.) at 401:9-402:6.

Add. 1124

Appellate Case: 25-1079     Page: 1126     Date Filed: 05/16/2025 Entry ID: 5517644

to track customer complaints from 2011 until [his] departure in 2015. Specifically:

> a. Retail branches lacked the technology to track customer complaints in a consistent manner;

> b. Complaints that were tracked were captured via disparate systems and inputted into various spreadsheets; and

> c. The Community Bank did not have a centralized repository for customer complaints."[2550]

100.    The Community Bank did not consistently capture customer complaints from customers affected by sales practices misconduct. When Accenture conducted its 2015 independent review of sales practices within the Community Bank, it found in its interviews of over 300 Community Bank employees that "team members . . . do not have a clear understanding of what constitutes a customer complaint and frequently do not capture or document complaints for further analysis." Accenture's review "did not identify a clear and consistent process or governance model to ensure all customer complaints are captured, monitored, addressed, and reported across all stores within the Community Bank."[2551]

101.    Of the customer complaints Community Bank Sales Quality/SSCOT captured, lack of consent was the most common customer complaint type. Accenture "review[ed] all SSCOT cases with 'an element of a customer complaint' provided by SSCOT." Its review "revealed that 'Consent' is the greatest case type (68%). The remaining case types are related to 'Account Openings' (14%) and case types that are a combination of the consent and account opening case types."[2552]

102.    Lack of consent had been the greatest customer complaint type since long before Accenture conducted its review in 2015. A September 5, 2007 presentation by the Sales Quality Team, the predecessor to SSCOT, showed that by 2007, the Bank as a whole was receiving 25,000-48,000 "Customer Calls Annually Stating 'Did Not Request'" (i.e. lack of consent) for certain Bank products.[2553] The presentation explained: "The content of these calls is very similar to content in [approximately] 50% of the formal EthicsLine/HR allegations that Sales Quality allegations currently processes."[2554] The presentation depicted an iceberg, representing the Bank was only detecting the

---

[2550] MSD-56 (Christoff Decl.).

[2551] MSD-51 at 10.

[2552] Julian's ECSFM at No. 138 citing MSD-51 at 43.

[2553] MSD-51 at 7.

[2554] Id.

Add. 1125

Appellate Case: 25-1079    Page: 1127    Date Filed: 05/16/2025 Entry ID: 5517644

tip of the iceberg of sales practices misconduct.[2555]



103. The presentation separately stated that the primary allegations handled by the Sales Quality Team "continue to be customer consent issues and account opening procedural issues" and that sales quality allegations were occurring across the Bank geography wide.[2556]

104. In a Supervisory Letter issued on June 26, 2015 to the Bank, the OCC cited a Matter Requiring Attention ("MRA") related to the Bank's complaint management systems.[2557]

105. The group within the Community Bank that performed proactive monitoring was SSCOT, which reported to Respondent Russ Anderson beginning from 2012 through 2016.[2558]

106. SSCOT proactively monitored for simulated funding and phone number

---

[2555] MSD-51 at 7; MSD-539 (Dement Tr.) at 159:20-163:20.

[2556] MSD- 72 at 3-4 (emphasis added).

[2557] MSD-213 at 4, 7-8.

[2558] Russ Anderson Amended Answer ¶ 260; Julian Amended Answer ¶ 260; McLinko Amended Answer ¶ 260.

Appellate Case: 25-1079     Page: 1128     Date Filed: 05/16/2025 Entry ID: 5517644

changes.[2559]

107. The practice that the Bank referred to as simulated funding involved the unauthorized transfer of customer funds between one customer account and another, unauthorized customer account.[2560]

108. The Community Bank did not proactively monitor other types of sales practices misconduct, including pinning, bundling, sandbagging, and the issuance of unauthorized debit and credit cards.[2561]

109. In the summer and fall of 2013, SSCOT conducted an analysis to detect instances of simulated funding and of employees changing customer phone numbers without customer authorization in Los Angeles/Orange County, and then across the regional footprint.[2562]

110. For the Los Angeles/Orange County and then regional footprint analysis, Respondent Russ Anderson approved SSCOT applying the following methodology to identify employees who, based on data analytics, exhibited activity that was a red flag for simulated funding: "account X was opened, account X was funded by virtue of an auto transfer from account Y, within one day funds were auto transferred from Account X back to account Y leaving account X with a $0 or possibly a negative balance," and "account X had no further funding activity within [] 60 day[s]."[2563]

111. After applying this methodology for identifying red flag simulated funding activity, SSCOT then referred for investigation only those employees who were "extreme outliers" for simulated funding (e.g., those who met the following restrictive criteria): "50 or more instances of the above activity occurring over the five month period review OR Four of the five months reflected 10+ accounts involved in this activity and 10% or more of checking/savings sales was involved in this activity."[2564]

112. For the Los Angeles/Orange County and then regional footprint analysis, SSCOT identified employees who engaged in "potential falsification of customer phone numbers (possibly to circumvent 11Ways to Wow Customer Surveys)" by identifying instances in which a "Customer's existing phone

---

[2559] Russ Anderson Amended Answer ¶ 97; Julian Amended Answer ¶ 260; McLinko Amended Answer ¶ 260.

[2560] MSD-297 (Richards Tr.) at 82:4-84:4.

[2561] MSD-300 (Rawson Tr.) at 79:16-83:17; MSD-297 (Richards Tr.) at 96:6- 97:19; MSD-299 (Sperle Tr.) at 56:10-62:3.

[2562] MSD-105; MSD-106; MSD-107; MSD-155 at 4.

[2563] MSD-105 (emphasis in original); MSD-106; MSD-107; ("…the fact that the accounts only had one deposit and one withdrawal with no additional transactions ultimately resulting in a zero balance seems unusual"); MSD-265 (Farrell Dep. Tr.) at 369:16-370:24.

[2564] MSD-105 (emphasis added); MSD-106; MSD-107.

Add. 1127

Appellate Case: 25-1079    Page: 1129    Date Filed: 05/16/2025 Entry ID: 5517644

number was changed by 1-3 digits."[2565] After applying this methodology, SSCOT then referred for investigation only those employees "having greater than 50 examples of unique phone number changes" in a three-month period.[2566]

113. On October 18, 2013, Corporate Investigations sent Respondent Russ Anderson a Significant Investigation Notification.[2567] Respondent McLinko's direct report Bart Deese received the Significant Investigation Notification from Corporate Investigations.[2568] Mr. Deese provided Respondent McLinko with an updated Significant Investigation Notification on November 1, 2013.[2569] The Significant Incident Notification stated, "Corporate Investigations has deemed this case significant based on the number of team members impacted and the specific misconduct identified."[2570]

114. The Significant Investigation Notification noted that 177 bankers were identified for possible simulated funding.[2571] The allegation was that "Simulated funding falsified entries were made to meet individual and store sales goals."[2572] Individuals with "the most egregious simulated funding numbers were to be interviewed first."[2573] The criteria for identifying employees with the most egregious simulated funding numbers was the criteria of "50 or more accounts opened in 1 month or 10% of total accounts opened in a 4 month period."[2574] Those individuals with the most egregious phone number changes were also interviewed.[2575]

115. The Significant Investigation Notification Respondent Russ Anderson received contained the following key findings based on the investigation of employees with the most egregious simulated funding numbers: "[k]nowing their actions were against wfb [Wells Fargo Bank] policy[;] [t]o meet quarterly sales goals; following manager and/or prior manager's guidance[;] [l]earned from observing/talking to other team members[;] [h]ad customer's [sic] fund accounts with a $50 deposit and then withdraw from atm[;] [a]ttempt to contact customer

---

[2565] MSD-105; MSD-106; MSD-107.

[2566] MSD-105; MSD-106; MSD-107.

[2567] MSD-108.

[2568] Id.

[2569] MSD-333.

[2570] MSD-108 at 2.

[2571] Id.

[2572] Id. at 3 (emphasis added).

[2573] Id.

[2574] Id.

[2575] Id.

Add. 1128

Appellate Case: 25-1079    Page: 1130    Date Filed: 05/16/2025 Entry ID: 5517644

with unfunded accounts but would resort to auto transfers w/o customer consent to meet goals timely[.]"[2576]

116. As Corporate Investigations explained, "The SIN and IDEA notifications are designed to ensure that the investigative findings are appropriately shared with all appropriate key stakeholders. The goal of the SIN and IDEA is to ensure all key stakeholders are aware of the issue and that they review for possible follow-up specific to their role and responsibility within the organization. A primary role for each LOB [line of business] Group Risk Officer is to mitigate risks and acts of TM [team member] misconduct and fraud are a key part of these risks."[2577]

117. The analysis from SSCOT in the summer and fall of 2013 to identify employees engaged in egregious patterns of simulated funding and phone number changes led to an initial round of investigations that resulted in terminations of approximately 35 employees in the fall of 2013, followed by a footprint-wide investigation of similar conduct across the Regional Bank.[2578]

118. On October 3, 2013, the *Los Angeles Times* published an article under the headline, "Wells Fargo Fires Workers Accused of Cheating on Sales Goals." The article reported that the Bank had fired 30 employees in the Los Angeles region for "open[ing] accounts that were never used and attempt[ing] to manipulate customer-satisfaction surveys." The article further reported "the pressure to meet sales goals was intense" and that there were cases of forged customer signatures and accounts opened without customer knowledge.[2579]

119. On December 21, 2013, the *Los Angeles Times* published a second article, with the headline: "Wells Fargo's Pressure-Cooker Sales Culture Comes at a Cost." The article stated it was based on interviews with 28 former and seven current employees across nine states. This article reported that employees were threatened with termination if they failed to meet their sales goals.[2580]

120. Respondents Julian and McLinko were both aware of the October 2013 and December 2013 Los Angeles Times articles about the Community Bank's sales practices.[2581]

121. The pause on the Community Bank's proactive monitoring of simulated funding and phone number changes did not end until July 2014, in that SSCOT did not begin to refer cases generated from the proactive monitoring reports to

---

[2576] MSD-108 at 3.

[2577] MSD-221 at 2.

[2578] Russ Anderson Amended Answer ¶ 99; MSD-114 at 2-3.

[2579] Russ Anderson Amended Answer ¶ 100; MSD-331 (email forwarding Oct. 2013 L.A. Times Article) (Russ Anderson asking Mr. Bacon for "some context" because she "wasn't aware of this situation"); MSD-56 (Christoff Decl.) at ¶ 16.

[2580] Russ Anderson Amended Answer ¶ 101; MSD-111.

[2581] Julian Amended Answer ¶ 55, 102; McLinko Amended Answer ¶ 55, 102; MSD-531 (a colleague warning Respondent McLinko, "it poses reputation risk to the firm").

Add. 1129

Appellate Case: 25-1079     Page: 1131     Date Filed: 05/16/2025 Entry ID: 5517644

Corporate Investigations until then.[2582] There was no lookback conducted of potential simulated funding and phone number changes that occurred prior to April 2014.[2583]

122. When SSCOT resumed proactive monitoring of simulated funding in July 2014, the Community Bank used a threshold that identified for further investigation only the top 0.01% of employees who engaged in "red flag" simulated funding activity. The other 99.99% of employees engaging in "red flag" activity were not referred for investigation as a result of the proactive monitoring.[2584]

123. SSCOT's application of the 99.99% threshold beginning in July 2014 identified approximately 30,000 employees per month who exhibited activity that was a red flag for simulated funding. SSCOT referred for investigation only the top 0.01% of those employees who had the most activity indicative of simulated funding, or 3 employees per month. In other words, SSCOT referring for investigation only 1 out of every 10,000 employees who exhibited red flag activity for simulated funding.[2585]

124. The "extreme outlier" employees identified for further investigation through SSCOT's proactive monitoring of simulated funding had not been previously identified and terminated through the Bank's other reactive detective means, such as the EthicsLine or customer complaints.[2586]

125. From April 2015 through October 2016, SSCOT lowered the threshold slightly to refer for investigation those employees at or above the 99.95th percentile of activity that was a red flag for simulated funding. SSCOT's proactive monitoring of simulated funding never looked beyond the most egregious offenders.[2587]

126. Lowering the threshold to the 99.95[th] percentile resulted in the identification and referral of approximately 15 to 23 employees per

---

[2582] MSD-115 at 2, 3.

[2583] MSD-115.

[2584] Russ Anderson Amended Answer ¶ 104; MSD-116 at 3; MSD-300 (Rawson Tr.) at 91:21-94:22, 177:2-22; MSD-602 (Bernardo Tr.) at 109:12-112:25, 115:3-116:2.

[2585] MSD-116 at 3; see also MSD-300 (Rawson Tr.) at 176:17-179:11.

[2586] MSD- 300 (Rawson Tr.) at 90:18-91:20.

[2587] Russ Anderson Amended Answer ¶ 106; MSD- 116 at 3; MSD-115 at 3 (describing the evolution of thresholds); MSD-300 (Rawson Tr.) at 158:24-163:3 225:11-22 (testifying that plan to expand thresholds was not approved); Russ Anderson Dep. Tr. 229:6-17, 225:4-22; MSD-299 (Sperle Tr.) at 110:20-111:1 (testifying that SSCOT continued using the 99.95 threshold for identifying simulated funding, even in 2016); MSD-118; MSD-119; MSD-121.

Appellate Case: 25-1079    Page: 1132    Date Filed: 05/16/2025 Entry ID: 5517644

month.[2588]

127. The 99.95% percent threshold captured employees who had on average 10.3 occurrences of red flag activity for simulated funding each month.[2589]

128. The Bank's former Head of Financial Crimes Risk Management James Richards explained to Respondent Russ Anderson that "applying percentage based, purely percentage based thresholds allows you to manage to the output from those thresholds rather than to manage to the underlying risk or underlying activity that you're monitoring. It allows you to manage the output."[2590]

129. As part of the Bank's February 2020 Deferred Prosecution Agreement with the U.S. Department of Justice related to its sales practices, the Bank admitted, accepted, and acknowledged as true the following:

• Gaming conduct and the practice of pushing unnecessary accounts on customers began in at least 2002 and became widespread over time, lasting through 2016, when the community Bank eliminated product sales goals for its employees.

• From 2002 to 2016, Wells Fargo opened millions of accounts or financial products that were unauthorized or fraudulent. During that same time period, Wells Fargo employees also opened significant numbers of additional unneeded, unwanted, or otherwise low-value products that were not consistent with Wells Fargo's purported needs-based selling model. Wells Fargo collected millions of dollars in fees and interest to which the Company was not entitled, harmed the credit ratings of certain customers, and unlawfully misused customers' sensitive personal information (including customers' means of identification).

• Millions of non-Wells Fargo-employee customer accounts reflected a Wells Fargo email address as the customer's email address, contained a generic and incorrect customer phone number, or were linked to a Wells Fargo branch or Wells Fargo employee's home address.

• Millions of secondary accounts and products were opened from 2002 to 2016, and many of these were never used by customers.[2591]

130. Respondent McLinko testified in March 2018 that thousands of Wells

---

[2588] MSD-603; MSD-116 at 3; MSD-119 at 1-2 (noting that application of the 99.95% captures the "more egregious behavior"); MSD- 122; MSD-300 (Rawson Tr.) at 169:7-172:10, 213:16-23; MSD-299 (Sperle Tr.) at 170:9- 171:13.

[2589] MSD-119; MSD-300 (Rawson Tr.) at 165:11-19.

[2590] MSD-297 (Richards Tr.) at 146:11-148:20.

[2591] MSD-1 at 27, 31 ¶¶ 17-18, 32.

Add. 1131

Appellate Case: 25-1079     Page: 1133     Date Filed: 05/16/2025 Entry ID: 5517644

Fargo employees issued millions of products and services without customers' consent:

Q [by Enforcement Counsel] All right. You -- I think that based on everything you've read, that central report, the PricewaterhouseCooper report, and your audit work, do you believe now that, over the years, let's say from 2009 to 2016, thousands of Wells Fargo employees issued products and services to customers without the customers' consent?

A [by Mr. McLinko]: Based upon everything that I've read, that's correct.

Q: Okay. And based on what you have seen and all the information you gathered, those thousands of Wells Fargo employees have issued millions of products and services without customers' consent?

MR. CRUDO: Foundation.

THE WITNESS: Based upon the data that was produced, on the filing of the data analysis that's done, and the modeling, yes.[2592]

131. The Bank's former Chief Risk Officer, Mr. Loughlin, testified that "the sales practice problem as described in this 2004 [Investigation Report] is essentially the same problem that existed at the bank up until the elimination of sales goals in the fall of 2016."[2593]

132. After publication of the 2016 Consent Orders with the OCC and CFPB and settlement with the City of LA, a regional leader in California forwarded negative media coverage of the Bank's sales practices "crisis", commenting that the "[o]nly thing this article is missing is that [the sales practices crisis] wasn't created over the span of 5 years – this was created since 2002!"[2594]

133. The Bank's former Head of Corporate Investigations, Loretta Sperle, agreed in sworn testimony that given the Community Bank's business model and the controls that existed at the Bank, every customer-facing employee had a daily temptation and opportunity to cheat. She testified before the OCC that given the amount of pressure that existed at the Bank, it would not be surprising "that there is going to be a high percentage of people that will cheat."[2595]

---

[2592] McLinko Amended Answer ¶ 8; SS at 124:1-18.

[2593] MSD-290B (Loughlin Tr.) at 332:22-333:7.

[2594] MSD-550.

[2595] MSD- 299 (Sperle Tr.) at 160:16-163:4; see also MSD-269 (NBE Candy Expert Report) at ¶ 108, 114; MSD-581 (Clegg Tr.) at 46:11-48:13; MSD-223 at OCC-WF-SP-06963006 ("Focus on 'business practices & business processes' (are they creating need or opportunity)".

134. Bankers received sales credit for unfunded accounts.[2596]

135. As of December 2015, the Bank had approximately 12.4 million accounts that had been inactive for the last 12 months, including nearly 7 million debit cards (approximately 18% of all debit cards accounts had been inactive for the last 12 months).[2597]

136. Debit card accounts were a "major contributor" to customer consent cases and represented an "outsize portion of conduct risk."[2598]

137. Debit cards generally represented about 25% of all solutions sold by the Community Bank each year.[2599] For example, in 2013, approximately 10.3 million consumer and business debits cards were sold, which comprised about 24.1% of total solutions sold that year.[2600]

138. Respondents' only expert to opine on the PwC work admitted he has done no analysis to confirm or quantify false negatives related to the PwC data (i.e. unauthorized accounts in fact affected by simulated funding that were excluded from PwC's estimate of potentially unauthorized accounts), though he testified "it seems very likely that there would be, you know, false – some false negatives."[2601]

139. Audit relied on PwC's sales practices work and did not conduct its own analysis of the scope of the sales practices. Audit noted that its work on the identification of customers and associated financial harm for the customer account analysis and the historical complaints analysis was complete: "For the customer account analysis, based on our assessment of the implementation of the analytical approach by PwC to identify potentially impacted customers, and the identification of the associated reimbursement amounts, we are reasonably confident that the work is accurate and complete."[2602]

140. Respondent McLinko testified that the model used by PwC was "probably

---

[2596] MSD-243; MSD-269 (NBE Candy Expert Report) at ¶ 107(c) ("the Community Bank allowed employees to have approximately 30 percent of the new accounts they opened to remain unfunded; they would still be eligible to receive sales credit for the unfunded accounts."

[2597] MSD-604.

[2598] MSD-239; MSD-60 ("This furthers my view that debit cards should be one of our primary areas of focus . . . It's a major contributor in cases involving both Tellers and PBs [Personal Bankers], and it's the primary factor in customer consent allegations. Also, as we noted in previous conversations, the debit card can be a 'doorway' to additional unethical sales (online, billpay, rewards).")"; see also MSD-18; MSD-23; MSD-46; MSD-61; MSD-62; MSD-63 (discussing that "an outsize portion of conduct risk is related to" issuance of secondary checking and secondary debit cards); MSD-64; MSD-150.

[2599] MSD-605; MSD-606; MSD-607; MSD-608.

[2600] MSD-608.

[2601] MSD-282A (Wilcox Dep. Tr.) at 125:12-126:10.

[2602] MSD-347; MSD-413 at 14.

Add. 1133

Appellate Case: 25-1079     Page: 1135     Date Filed: 05/16/2025 Entry ID: 5517644

substantially correct."[2603]

141. A report distributed to regional leaders on July 2, 2013 showed that "11.26% of accounts that are funded in West Coast are done so using simulated funding (vs 6.82% for regional banking [nationwide]) and approx[imately] 60% of those accounts are closed within 90 days."[2604]

142. The former Head of Corporate Investigations, Michael Bacon, testified that the senior leadership in the Community Bank wanted to minimize terminations even with strong evidence that an employee engaged in sales integrity violations.[2605]

143. From January 2011 through March 2016, the Bank terminated over 5,300 employees for engaging in improper sales practices.[2606] Improper sales practices included:

    (a)    Opening any account without the consumer's consent;

    (b)    Transferring funds between a consumer's accounts without the consumer's consent;

    (c)    Applying for any credit card without the consumer's consent;

    (d)    Issuing any debit card without the consumer's consent;

    (e)    Enrolling any consumer in online-banking services without the consumer's consent.

144. SSCOT outlined the criteria for simulated funding monitoring under Ms. Russ Anderson's direction. In a May 11, 2015 analysis, Paula Bernardo presented a chart showing the Simulated Funding outlier criteria as it existed in 2014.2607 From the Sales Quality Proactive Monitoring Plan report, Ms. Russ Anderson's subordinate reported that Sales Quality was continuing previously established monitoring that defined outliers as the top "99.99 percentile of team members participating in each activity except Low Debit Card Activations" – and specifically included identified those activities as including instances of "missing signatures" and low debit card activations.[2608]

145. According to Kathlyn Farrell, Ms. Russ Anderson's expert witness, use of the 99.99 (and later 99.95) percentile for this monitoring model only caught the worst offenders of simulated funding, so only a small percentage of

---

[2603] MSD-276 (McLinko Tr.) at 124:20-125:4.

[2604] MSD-227.

[2605] MSD-295 (Bacon Tr.) at 62:8- 25.

[2606] MSD-52; MSD-661 at 96.

[2607] MSD-116 at 3.

[2608] R. Ex. 17391 at 1.

employees, *i.e.*, only the top .01 percent of employees with potential simulated funding activity would be identified for investigation.[2609]

146. According to Examiner Candy, these two thresholds were not disclosed to the OCC during the May 2015 examination.[2610] Through her subsequent investigation, after familiarizing herself with how the thresholds had been used, NBE Candy concluded that the reports provided by Ms. Russ Anderson's subordinate supported the conclusion that using the 99.99 percent threshold, "over 30,000 team members per month engaged in at least one instance of activity that was indicative of simulated funding."[2611] She found that only three to six team members were actually referred to Corporate Investigations for simulated funding.[2612]

147. When asked how she knew that approximately 30,000 employees exhibited red flag activity for simulated funding per month, NBE Candy responded:

A few different ways. One is understanding what the threshold means. So when they used a 99.99 percent threshold, that means they're not going to look at 99.99 percent; they are looking at, or Ms. Russ Anderson's group was looking at the .01 percent of that, of team members that engaged in that behavior. So one, it is simple math.

When you take to six number of people that they were referring to corporate investigations and apply the facts that they're looking at, that .01, that will get you between 30,000 and 60,000 team members per month that engaged in activity indicative of simulated funding. And it's not a surprise that that number varies because this is measured on a monthly basis, so it's not going to be the same month to month.

But also I have reviewed documentation from the bank that has confirmed that during this time period about 45 percent of Community Bank employees had, were engaging in the red flag activity for simulated funding. At this time there was roughly 70,000 customer-facing people in the Community Bank, which also translates to that 30,000 figure.

Lastly, in Ms. Rebecca [Rawson's] testimony, who was the head of SSCOT during this period, she testified to, you know, knowledge of that 45 percent of team members were engaging in activity that was a red flag for simulated funding, and she confirmed the methodology that I have

---

[2609] Tr. (Farrell) at 10515-16.

[2610] Tr. (Candy) at 1079.

[2611] *Id.* at 1080.

[2612] *Id.* at 1080; (Report of NBE Candy) at 9, 84, 93, and 95(a).

Add. 1135
Appellate Case: 25-1079    Page: 1137    Date Filed: 05/16/2025 Entry ID: 5517644

described today.[2613]

148. Preponderant evidence established that SSCOT's application the 99.99% threshold beginning in July 2014 identified approximately 30,000 employees per month who exhibited activity that was a red flag for simulated funding. Only 1 out of every 10,000 employees were referred for further investigation.[2614]

149. Of all the issues Bank employees could report to the EthicsLine (the whistleblower hotline), the most common issue during the relevant period was sales integrity, ultimately comprising more than half of all EthicsLine complaints.[2615]

150. An investigator testified that there were a "multitude of ways" employees engaged in sales practices misconduct: "Oh, simulated funding, opening accounts for nonexistent people, opening accounts for deceased people, opening multiple checking accounts where a person should only have one, if that. It would depend on the emphasis during that time period."[2616]

151. Corporate Investigations (also called Corporate Security) prepared quarterly updates that were included in WFAS's quarterly reports to the Audit and Examination Committee of the Board.[2617]  In Audit's February 2012 report to the Audit and Examination Committee, Corporate Security noted a 44% increase in Suspicious Activity Report ("SAR") filings in 2011 related to team member misconduct and attributed the increases in part to "sales integrity issues involving a possible violation of law." Corporate Investigation's report also noted 42% of all EthicsLine reports were referred to the Community Bank's Sales Quality Team (i.e. they were related to possible sales integrity violations).[2618]

152. During the April 2012 Ethics Committee meeting, Head of Corporate Investigations, Michael Bacon, provided a written presentation to the Ethics Committee that showed that over 90% of EthicsLine reports in 2011 related to Community Banking and the vast majority of EthicsLine cases referred to Corporate Investigations related to sales integrity violations. Specifically, it showed that Corporate Investigations opened 1,339 sales integrity violations cases from EthicsLine complaints in 2010 and opened 1,220 sales integrity

---

[2613] Tr. (Candy) at 1081-82.

[2614] MSD-116 at 3.

[2615] MSD-3 at 52; MSD-161-168; MSD-430 at 15 ("Over 50% of [EthicsLine] calls were related to sales integrity."); MSD-324 at 5 (showing that sales integrity cases made up 48% of EthicsLine cases).

[2616] MSD-581 (Clegg Tr.) at 47:9-48:1.

[2617] MSD-279 (Julian Dep. Tr.) at 204:15-207:1.

[2618] MSD-425 at 3-4.

Add. 1136

Appellate Case: 25-1079     Page: 1138     Date Filed: 05/16/2025 Entry ID: 5517644

violationscases from EthicsLine complaints in 2011.[2619]

153. The TMMEC (Team Member Misconduct Executive Committee) presentation listed misconduct-governance supporting policies and processes, including:

    (a)   "Comprehensive Team Member Misconduct/Fraud Investigations Program (includes routine reporting of results, escalation or risks/controlbreakdowns/systemic issues, partnering with audit, and components specific to strategic internal fraud testing and ongoing internal fraud assessments);"

    (b)   Senior Leader / Operating Committee / A&E / GRO & Audit escalationprocesses;" and

    (c)   "Investigative Key Activity reporting to all key stakeholders, LOBInternal Fraud Committees, GEVPS, and Audit & Examination Committee.[2620]

154. The TMMEC presentation provided an update on the establishment of Internal Fraud Committees within each line of business, including the Community Bank. The update provided: "[a]s stated within the Corporate Fraud Policy, the primary responsibility for adequateresponse to investigation results lies with LOB senior leaders, GROs, and LOB specific internal fraud committee members" and "LOB [Internal Fraud Committee] membership includes, but [is]not limited to . . . *Audit*."[2621]

155. The presentation further showed the TMMEC that sales integrity violations was the second-most common Corporate Investigations case type and that sales integrity violations were at 3,108 for 2012, up from 2,992 in 2011. It also showed that the vast majority of Corporate Investigation cases in both 2011 and 2012 originated in the Community Bank.[2622]

156. In the February 26, 2013 WFAS Fourth Quarter 2012 Summary to the Audit and Examination Committee, Corporate Security reported that sales integrity violations and related falsifications were one of the top four case types and had increased 4% over the prior year's volume. The report explained that the increase could be partly attributed to enhanced monitoring and detection, and a slight increase in misconduct in some regions.[2623]

157. On March 3, 2013, Respondent Julian received an EthicsLine complaint that an employee was being retaliated against by a Florida manager after the manager learned someonehad reported him for "influencing team members to

---

[2619] MSD-506 at 8, 10.

[2620] MSD-436 at 7.

[2621] *Id.* at 10.

[2622] *Id.* at 11.

[2623] MSD-523 at 51.

Add. 1137

violate sales incentive policies." Specifically, the employee said the manager "instructed team members to open accounts despite the customers' need for the products."[2624]

158. On March 4, 2013, Respondent Julian received an EthicsLine report that a banker had opened a business credit card for a customer without his consent and he had called the National Business Banking Center "because he was upset about fees charged to a business credit card that he did not authorize."[2625]

159. The October 4, 2013 *Los Angeles Times* article stated that the Bank "fired about 30 branch employees in the Los Angeles region who the bank said had opened accounts that were never used and attempted to manipulate customer-satisfaction surveys." According to the article, a Bank spokesperson explained that "[t]he employees were trying to take shortcuts to meet sales goals." The article also stated that one of the fired employees said, "in some cases signatures were forged and customers had accounts opened in their names without their knowledge" and "the pressure to meet sales goals was intense at Wells Fargo."[2626]

160. On December 21, 2013, the Los Angeles Times published an article titled "Wells Fargo's Pressure-Cooker Sales Culture Comes at a Cost." The article stated it was based on interviews with 28 former and seven current employees across nine states and reported that "To meet quotas, employees have opened unneeded accounts for customers, ordered credit cards without customers' permission and forged client signatures on paperwork" and employees were threatened with termination if they failed to meet their sales goals.[2627]

161. Respondent Julian testified to the OCC during its investigation that after he read the 2013 Los Angeles Times articles, he started "thinking that, gosh, is there a problem" with Community Bank sales practices misconduct.[2628]

162. Corporate Security's update in the February 25, 2014 WFAS Fourth Quarter 2013 Summary to the Audit and Examination Committee explained that a "case is defined as an allegation of team member misconduct involving a possible violation of law or a code of ethics policy violation or information security policy violation, which has resulted in a financial loss and/or exposure or represents a significant compliance or reputational risk." It further stated that "The major case types that increased year-over-year include Sales Integrity up 5%" and that "43% [of EthicsLine complaints] were referred to

---

[2624] MSD-491.

[2625] MSD-492.

[2626] MSD-331.

[2627] Julian Amended Answer ¶ 101; MSD-111 at 1-2). Respondent Julian was aware of the article. (Julian Amended Answer ¶ 55, 102; 404.

[2628] Julian Amended Answer ¶ 405.

Add. 1138

Appellate Case: 25-1079      Page: 1140      Date Filed: 05/16/2025 Entry ID: 5517644

Community Bank Sales Quality" (*i.e.* related to sales practices).[2629]

163. On February 28, 2014, Respondent Julian received a "Corporate Investigations 2013 Year End Update/2014 Priorities" slide deck for the Head of Corporate Investigations' presentation to the Audit Management Committee on March 3, 2014. The presentation showed sales integrity violations as the number two case type for both 2012 and 2013, with 3,167 and 3,330 respectively.[2630]

164. On March 4, 2014, Respondent Julian received a 2013 year-end update from Head of Corporate Investigations Michael Bacon as part of his TMMEC membership. The report showed that sales integrity violations were the second highest case type at the Bank in 2012 and 2013, with 3,330 sales integrity violations cases YTD in 2013 compared with 3,167 sales integrity violations cases YTD in 2012.[2631] The report also reflected that the vast majority of EthicsLine complaints related to the Community Bank[2632] and that 3,653 of 8,535 (42.8%) EthicsLine reports in 2013 were referred to Sales Quality (*i.e.* related to sales practices) compared with 3,739 of 8,354 (44.7%) in 2012.[2633]

165. At the April 9, 2014 Enterprise Risk Management Committee meeting, Community Bank leadership, including Respondent Russ Anderson, informed the committee that one to two percent of the Community Bank employees (1,000-2,000) were terminated each year for sales practices-related wrongdoing.[2634]

166. The Corporate Security update in WFAS's May 5, 2014 First Quarter 2014 Summary to the Audit and Examination Committee stated that, of the 2,168 total EthicsLine complaints received in YTD 1Q14, 46% were referred to Community Bank Sales Quality (i.e. were related to sales practices).[2635]

167. Corporate Security's update in WFAS's August 4, 2014 Second Quarter 2014 Summary to the Audit and Examination Committee stated that sales integrity was one of Corporate Investigations' major case types[2636] and 42% of the 4,536 total EthicsLine received YTD in 2Q14 "were referred to Community Bank Sales Quality" (i.e. were related to sales practices).[2637]

---

[2629] MSD-526 at 47-48, 51.

[2630] MSD-335 at 4.

[2631] MSD-447 at 4.

[2632] *Id.*

[2633] *Id.* at 7.

[2634] MSD-28 at 1; Julian Amended Answer ¶¶ 164, 271, 398; McLinko Amended Answer ¶ 164, 271, 398.

[2635] MSD-451 at 52.

[2636] MSD-397 at 64.

[2637] *Id.* at 68.

Appellate Case: 25-1079    Page: 1141    Date Filed: 05/16/2025 Entry ID: 5517644

168. The Corporate Security update in WFAS's November 18, 2014 Third Quarter 2014 Summary to the Audit and Examination Committee stated that 40% of the 6,700 EthicsLine complaints received 3Q14 YTD were "referred to Community Bank Sales Quality" (i.e. were related to sales practices).[2638]

169. The Corporate Security update in WFAS's February 24, 2015 WFAS Fourth Quarter 2014 Summary to the Audit and Examination Committee stated that 39% of the 8,707 EthicsLine complaints received 4Q14 YTD were referred to Community Bank Sales Quality (i.e. were related to sales practices).[2639]

170. On May 4, 2015, the City Attorney of Los Angeles sued the Bank in connection with the Community Bank's sales practices. The Complaint, which was consistent with the information Respondents Julian had received over the years related to the Bank's salepractices, alleged the following:

> For years, Wells Fargo & Company and Wells Fargo Bank, National Association (collectively "Wells Fargo") have victimized their customers by using pernicious and often illegal sales tactics to maintain high levels of sales of their banking and financial products. The banking business model employed by Wells Fargo is based on selling customers multiple banking products, which Wells Fargo calls "solutions." In order to achieveits goal of selling a high number of "solutions" to each customer, Wells Fargo imposes unrealistic sales quotas on its employees, and has adopted policies that have, predictably and naturally, driven its bankers to engage in fraudulent behavior to meet those unreachable goals.

> As a result. Wells Fargo's employees have engaged in unfair, unlawful, and fraudulent conduct, including opening customer accounts, and issuing credit cards, without authorization. Wells Fargo has known about and encouraged thesepractices for years. It has done little, if anything, to discourage its employees' behavior and protect its customers.

> Worse, on the rare occasions when Wells Fargo did take action against its employees for unethical sales conduct, Wells Fargo further victimized its customers by failing to inform them of the breaches, refund fees they were owed, or otherwise remedy the injuries that Wells Fargo and its bankers have caused.

> The result is that Wells Fargo has engineered a virtual fee-generating machine, through which its customers are harmed, its

---

[2638] MSD-398 at 69.

[2639] MSD-400 at 79.

Add. 1140

employees take the blame, and Wells Fargo reaps the profits. [2640]

171. On May 4, 2015, Respondent Julian received the *Los Angeles Times* article titled,"L.A. Sues Wells Fargo, alleging 'unlawful and fraudulent conduct," which described the allegations in the City Attorney of Los Angeles lawsuit. [2641]

172. On October 4, 2013, the Head of Corporate Investigations forwarded to Respondent McLinko the October 3, 2013 *Los Angeles Times* Article, "Wells Fargo Fires Workers Accused of Cheating on Sales Goals". The Head of Corporate Investigations wrote that the article was a "big deal and very interesting."[2642]

173. The October 3, 2013 *Los Angeles Times* article stated that the Bank "fired about 30 branch employees in the Los Angeles region who the bank said had opened accounts that were never used and attempted to manipulate customer-satisfaction surveys." According to the article, a Bank spokesperson explained that "[t]he employees were trying to take shortcuts to meet salesgoals." The article also stated that one of the fired employees said, "in some cases signatures were forged and customers had accounts opened in their names without their knowledge" and "the pressure to meet sales goals was intense at Wells Fargo."[2643]

174. On November 1, 2013, Bart Deese (a direct report of Respondent McLinko) forwarded to Respondent McLinko a Significant Investigation Notification (SIN) that he received from Corporate Investigations about the investigation that gave rise to the October 2013 *Los Angeles Times* article. The notification stated the allegation was that "[s]imulated funding falsified entries were made to meet individual and store sales goals;" twenty employees "with the most egregious simulated funding numbers were to be interviewed first" and that the "Criteria for egregious [was] 50 or more accounts opened in 1 month or 10% of total accounts opened in a 4 month period" that met the simulated funding criteria; and the investigation found that employees engaged in simulated funding "[t]o meet quarterly sales goals" despite "[k]nowing their actions were against [Bank] policy."[2644]

175. After the *Los Angeles Times* published its second article about the Bank's sales practices, *Wells Fargo's Pressure-Cooker Sales Culture Comes at a Cost*, a fellow WFAS corporate risk auditor sent a link to article to Respondent McLinko the and wrote: "I am not sure how much merit there is to this story (L.A. Times), but it poses reputation risk to the firm."[2645]

---

[2640] MSD-169 at 3.

[2641] MSD-463.

[2642] McLinko Amended Answer ¶¶ 55, 102, 404, 457; MSD-331.

[2643] MSD-331.

[2644] MSD-333 at 3.

[2645] MSD-531.

Add. 1141

Appellate Case: 25-1079    Page: 1143    Date Filed: 05/16/2025 Entry ID: 5517644

176. The article stated it was based on interviews with 28 former and seven current employees across nine states and reported that "To meet quotas, employees have opened unneeded accounts for customers, ordered credit cards without customers' permission and forged client signatures on paperwork" and employees were threatened with termination if they failed to meet their sales goals.[2646]

177. On February 28, 2014, Respondent McLinko received a "Corporate Investigations 2013 Year End Update/2014 Priorities" slide deck for the Head of Corporate Investigations' presentation to the Audit Management Committee on March 3, 2014. The presentation showed sales integrity violations as the number two case type for both 2012 and 2013, with 3,167 and 3,330 respectively. Although sales-integrity violation cases are not specifically tied to the Community Bank, the Community Bank comprises of the vast majority of cases: 11,591 cases inCommunity Bank versus 1,583 in the other lines of business in 2012 and 11,915 cases in Community Bank versus 1,821 in the other lines of business in 2013.[2647]

178. Respondent McLinko received a presentation and agenda for an Internal Fraud Committee meeting. The agenda stated: "Sales Integrity key activity is mixed, but expected to increase due to proactive initiatives" (*i.e.* the Community Bank will identify more sales integrity violations when it increases proactive monitoring). The presentation showed: 740 sales integrity violations cases in 4Q12, 798 in 1Q13, 823 in 2Q13, 822 in 3Q13, and 824 in 4Q13 (i.e. 3,267 total sales integrity cases in 2013); and 361 terminations/resignations for sales integrity violations in 4Q12, 335 in 1Q13, 383 in 2Q13, 389 in 3Q13, and 348 in 4Q13 (i.e. 1,455 terminations/resignations for sales integrity violations in 2013).[2648]

179. On August 18, 2014, Respondent McLinko received a presentation for an October 2, 2014 Internal Fraud Committee meeting showing: 824 sales integrity violations cases in 2Q13, 822 in 3Q13, 822 in 4Q13, 746 in 1Q14, and 744 in 2Q14; and 386 terminations/resignations for sales integrity violations in 2Q13, 389 in 3Q13, 368 in 4Q13, 381 in 1Q14, and 393 in 2Q14.[2649]

180. According to a February 2015 presentation made to the OCC by Respondent McLinko (and his direct report Bart Deese) on WFAS Community Bank Sales Coverage, WFAS had a "[p]artnership with Corporate Investigations" and interacted with Corporate Investigations in several ways.[2650] For example,

---

[2646] McLinko Amended Answer ¶ 101; MSD-111 at 1-2. Respondent McLinko was aware of the article; McLinko Amended Answer ¶ 55, 102.

[2647] MSD-335 at 4.

[2648] MSD-336 at 7, 28.

[2649] MSD-614 at 6, 30.

[2650] MSD-476 at 6.

WFAS was "[c]opied on all significant cases above established dollar thresholds for review and assessment," it had "[o]ngoing dialogue throughout the year on open cases (where needed)," and it "[p]articipat[ed] in semi-annual CMBK Internal Fraud Committee Meeting."[2651] The presentation also noted that WFAS attended "Semi-annual Regional President meetings," in which "RB – Sales Quality and Corporate Investigations attend and share information."[2652]

181. Similarly, in a May 27, 2015 email to the OCC, Respondent Julian wrote that WFAS's "audit methodology includes contacting Corporate Investigations at the beginning of each audit to determine if there are any cases/trends related to the area under review. In addition, the Community Banking (CB) audit team interact with Corporate Investigations in a number of ways throughout the year (e.g., Semi-annual Regional President meetings, Semi-annual CMBK Internal Fraud Committee, Copied on SINs and IDEAs, Ad hoc discussions) to understand cases/trends, etc."[2653]

182. Like Respondent Julian, Respondent McLinko's direct reports also received extensive information from both Corporate Investigations and the Community Bank's Sales Quality team indicating that sales practices misconduct existed throughout the Community Bank, that consent was the number one sales integrity issue, and that the root cause of the misconduct was pressure to meet sales goals.[2654]

183. At a July 6, 2010 Regional President meeting (Southwest region) attended by Bart Deese, Corporate Investigations reported, "sales integrity cases continue to increase."[2655]

184. At a July 7, 2010 Regional President meeting (Carolinas region) attended by Bart Deese, Corporate Investigations reported, "due to a more aggressive sales culture, sales integrity is going to be a challenge."[2656]

185. Preponderant evidence established that Ms. Russ Anderson failed to identify incentive compensation practices as relating to sales practices and sales practices misconduct throughout the relevant period.

186. When asked what she found during the 2016 risk management examination, NBE Candy responded that adverse risk events were not adequately incorporated into incentive decisions during the relevant period:

---

[2651] MSD-476 at 6.

[2652] *Id.*

[2653] MSD-416; Julian Amended Answer ¶ 400, 451; McLinko Amended Answer ¶¶ 400, 451; MSD-369 (providing Respondent Julian with a draft email to send to the OCC).

[2654] SOF ¶¶ 265-418.

[2655] MSD- 615.

[2656] MSD-616.

Add. 1143

Appellate Case: 25-1079      Page: 1145      Date Filed: 05/16/2025 Entry ID: 5517644

A [Ms. Candy]: You know, for this exam, we were doing it in 2016, and we were basing it off of 2015 compensation decisions. So when we look specifically to sales practices, at this point, you know, it's after the L.A. Times article. It's also after the OCC issued the five letter -- I mean the five MRAs to the bank from the sales practices exam in June of 2015.

There was a lot of knowledge within the bank about the deficiencies in risk management that led to sales practice misconduct occurring. Despite this, there was not adequate incorporation of that as a huge adverse risk event in compensation decisions.

When you specifically looked at people that were identified as accountable for sales, you know, the sales practices issue, they, the lowest they received compensation was 98 percent of their target bonus, up until 120 percent of their target bonus. So they even got above target bonus payments despite this event.

When people are not held accountable, especially through compensation for adverse risk events, it does not; it's not consistent with incentive compensation risk management practices to deter that behavior. You know, furthermore, when we were looking at compensation plans in the Community Bank, we also identified that there was not an adequate process at an individual level and especially manager level to incorporate sales practice misconduct and conduct risk into their compensation as well.

* * *

Q: Okay. To your knowledge, were the deficiencies with the incentive compensation plans that you identified in this supervisory letter in November 2016 previously identified by any of the respondents in this case?

A: They were not. And frankly that's a problem.

Q Why? A So as we've talked about the last few days about heightened standards and risk governance framework and the purpose of the three lines of defense, as the first line of defense they are responsible for managing and identifying the risks.

So in this case, you know, risks got posed by the incentive compensation plan. The second line of defense should be credibly challenging that and overseeing it. And then the third line of defense is also critical, because they're the last, you know, the last stop within the bank and should be adequately providing oversight and testing to ensure compliance.

So when the OCC has to go in and identify an issue, that really demonstrates failures in all three lines of defense.

* * *

Q: Ms. Candy, respondents may argue that the incentive compensation plans in the Community Bank were being modified beginning in 2013. What, if anything, did you conclude about any modifications to incentive compensation plans in the Community Bank from 2013 to 2016?

A: I concluded that any modifications made were not sufficient. When we reviewed the 2015 plans, you know, when we reviewed it in 2016 during this exam, we found them still to be unreasonable and driving inappropriate behavior, so it shows any subsequent, you know, tweaks to the plans were not adequate to manage the risk and sales practices misconduct.[2657]

187. On November 26, 2012, after Respondent Russ Anderson learned that WFAS had contacted the OCC regarding an upcoming examination, Respondent Russ Anderson wrote: "[n]ot sure why audit would make this type of inquiry and not cc me as GRO. Help!" Respondent McLinko replied: "You have my assurance that we would never bring anything to the regulators attention without you are [sic] your team being aware (thus preventing a disconnect). No surprises as we agreed."[2658]

188. On December 18, 2012, Respondent McLinko described a meeting with Respondent Russ Anderson to his direct reports, where he wrote "It's either my charming personality (not or mimosa's [sic] in the morning (not on my part) or something else, but had a very good meeting with [Respondent Russ Anderson]… regarding [Respondent Russ Anderson's] expectations for me at her offsite the first week of January. As the audit lead, she's looking to partner, for me to get to know her folks better (and vice versa), and hear what the senior risk leaders … have to say. She also expects me to stay for heavy appetizers and beverages (she needs to twist my arm for that :))." [also – I specifically brought up audits of Sales Quality, Suitability and a slip on my part Integrity. Her only comment was they don't use Integrity as those issues are referred to [the Head of Corporate Investigations]".[2659]

189. On March 4, 2013, Respondent McLinko asked his audit team to put together

---

[2657] Tr. (Candy) at 1123-28. See also OCC Ex. 2407 (Report of NBE Candy) at ¶128 (regarding Respondents Julian and McLinko), ¶115-16 (regarding Respondent Russ Anderson); OCC Ex. 2335 (Report of NBE Crosthwaite) at ¶31 (regarding Respondents Julian and McLinko), and ¶110-11 (regarding Respondent Russ Anderson).

[2658] MSD-388 (emphasis added).

[2659] MSD-389.

Add. 1145

Appellate Case: 25-1079     Page: 1147     Date Filed: 05/16/2025 Entry ID: 5517644

a presentation in advance of a March 19, 2013 meeting with Carrie Tolstedt and Respondent Russ Anderson. Respondent McLinko directed his team prepare a slide that suggests the Community Bank should consider WFAS as "more of a partner verses an auditor."[2660] The draft PowerPoint presentation that Respondent McLinko's team prepared contained a slide titled "Working Together." The slide stated: "Consider us more a partner than an auditor."

190. On March 7, 2013, WFAS issued its Community Banking Enterprise Risk Management Assessment ("ERMA") for 2012 ("2012 CB ERMA"), concluding that "risk management within Community Banking is Satisfactory trending toward Strong. . .WFAS's evaluation of risk related to Community Banking focused on Operational Risk with an emphasis on . . . sales quality, regulatory compliance, and reputation impacts." Governance, Culture, and Risk Response and Control were rated Strong. Strategy/Objective Setting and Risk Identification, Assessment and Analysis were rated Satisfactory.[2661] At the time, ERMA ratings were Strong, Satisfactory, or Weak.[2662]

191. On October 29, 2013, WFAS had provided members of the Community Bank with a draft Issue and Recommendation Memo ("Draft I&R") in connection with its Regional Banking – Sales Quality / Sales Integrity audit. The Draft I&R and cover email described an issue identified during audit regarding enhancing training notifications and "escalation and increased visibility of repeat sales offenders."[2663] WFAS requested a written response from Community Bank about the audit issue, setting corrective actions and reasonable target dates to complete them, and designating responsible individuals. Neither the Draft I&R nor cover email requested line edits to the Draft I&R itself.[2664]

192. On November 15, 2013, the Community Bank provided line edits to the 2013 Draft I&R, including edits from Respondent Russ Anderson.[2665] The Draft I&R included language such as "Enhance the training notification process and increased visibility of repeat sales offenders," which was changed to "Enhance the training notification process and increased visibility of second time training notifications."[2666]

193. Respondent Russ Anderson changed "The monthly regional sales reports including metrics on cases resulting in training e-mail does not differentiate between first time and repeat offenders" in the original Draft I&R to "The

---

[2660] MSD-390.

[2661] MSD-373.

[2662] MSD-373 at 1.

[2663] MSD-503 at 1, 2.

[2664] MSD-503 at 1, 2.

[2665] MSD-198.

[2666] *Id.*

Add. 1146

Appellate Case: 25-1079    Page: 1148    Date Filed: 05/16/2025 Entry ID: 5517644

monthly regional sales reports including metrics on cases resulting in training e-mail notifications does not differentiate between first time and second time training notifications."[2667]

194. The Risk section of the Draft I&R originally read "Failure to properly monitor training e-mail notifications and escalate/report repeat allegationscould lead to inappropriate training practices and increased numbers of repeat offenders of inappropriate sales practices," but Respondent Russ Anderson changed it to "Failure to properly monitor training e-mail notifications and differentiate between first and second time training notifications could lead to inappropriate training practices and increased numbers of additional allegations."[2668]

195. WFAS incorporated Respondent Russ Anderson's edits on the Draft I&R into its final audit engagement report on RB – Sales Quality/Sales Integrityissued on December 16, 2013 and its final Issue and Recommendation Memo.[2669]

196. On February 9, 2015, Respondent McLinko and his reports met with OCC examiners of WFAS's Community Bank Sales Coverage. Respondent Russ Anderson attended the meeting as well.[2670] According to OCC examiner Karin Hudson, "Respondent McLinko was unable to respond to many questions around sales practices" at the February 9, 2015 meeting. Additionally, Respondent Russ Anderson interjected during the meeting and stated at the meeting "that the Community Bank group risk function had a 'good partnership with Audit.'"[2671]

197. On February 19, 2015, Respondent McLinko updated Respondent Russ Anderson on another WFAS meeting with the OCC regarding sales and cross-sell, to provide her with additional perspective. In the update, Respondent McLinko described part of the conversation: "Itook that opportunity to tell them (after we had emailed them asking them to go to you) to make all such inquiries specifically relating to Community Bank process with you and your team."[2672]

198. On March 30, 2015, WFAS issued its audit report on RB – SOCR (Regional Banking Store Operations Control Review ("SOCR")). In determining annual audit coverage, WFAS leveraged the results of SOCR on-site reviews. WFAS rated the SOCR program **Needs Improvement** because of the accuracy and completeness of program execution and supervisoryreview.[2673] On February 10, 2015, Respondent McLinko had assured Carrie Tolstedt that the SOCR audit

---

[2667] MSD-198.

[2668] Id.

[2669] MSD-376 (not using the term "repeat offenders" or "inappropriate sales practices"); MSD-601.

[2670] MSD-185.

[2671] MSD-270 (NBE Hudson Expert Report) at ¶ 25, 30.

[2672] MSD-399.

[2673] MSD-520.

Appellate Case: 25-1079     Page: 1149     Date Filed: 05/16/2025 Entry ID: 5517644

would not be reported to the Board.[2674]

199. On May 4, 2015, the Los Angeles City Attorney filed a complaint against the Bank alleging it violated the California Unfair Competition Law, Business and Professional Code § 17200 et seq. by engaging in unlawful sales practices.[2675]

200. On May 4, 2015, WFAS presented its First Quarter 2015 Summary to the Audit and Examination Committee of the Board. Audit's quarterly report to the Board contained the following update on the "Sales Conduct, Practices and the Consumer Business Model" Noteworthy Risk: "Sales audits are planned for Regional Banking and Business Banking in 2015. The focus of these reviews is on the sales practices and conduct to ensure customers are sold products meeting their financial needs."[2676]

201. In May 2015, the OCC commenced an examination of Enterprise Sales Practices at the Bank, which was prompted by the City of Attorney of Los Angeles lawsuit against the Bank relating to its sales practices. The review "focused on the events in 2013 that led to the initial employee termination, the investigation of employee misconduct that followed, and overall changes in governance intended to improve the bank's practices."[2677] The former Examiner-in-Charge of the Bank explained that the purpose of the May 2015 examination was "to find the truth. We were told being one thing by the bank and management, and we were seeing something else" in the City Attorney of Los Angeles lawsuit.[2678]

202. On June 26, 2015, the OCC communicated the results of its May 2015 examination of Enterprise Sales Practices in Supervisory Letter WFC 2015-36 ("SL 2015-36"). SL 2015-36 concluded, "Wells Fargo's management and oversight of Enterprise Sales Practices risk is weak and needs to improve."[2679]

203. SL 2015-36 contained five MRAs, covering all three lines of defense: Enterprise Sales Practices - Corporate; Enterprise Sales Practices - Second Line of Defense; Complaints; Community Bank Group - Sales Practices; and Audit Coverage. The Enterprise Sales Practices - Corporate MRA required the Bank to hire an independent third party consultants "to conduct a thorough review of Wells Fargo's approach to Enterprise Sales Practices" and "to ensure all allegations of inappropriate behavior (e.g., gaming, pinning, bundling, etc.) are evaluated and properly remediated."[2680]

---

[2674] MSD-368.

[2675] Julian Amended Answer ¶¶ 123, 223; McLinko Amended Answer ¶¶ 123, 223.

[2676] MSD-634 at 59-60.

[2677] MSD-213.

[2678] MSD-302 (Linskens Dep. Tr.) at 147:12-16.

[2679] MSD-213 at 2.

[2680] *Id.* at 3-4, 6-9.

Add. 1148

Appellate Case: 25-1079      Page: 1150      Date Filed: 05/16/2025 Entry ID: 5517644

204. The concern identified by the OCC in the Community Bank Group - Sales Practices MRA, was that the Community Bank "lacks a formalized governance framework to oversee sales practices and does not have effective oversight and testing of branch (store) sales practices." The MRA explained that inaction "could impact reputation risk and cause customer harm."[2681] The concern identified by the OCC in the Audit Coverage MRA was that "Wells Fargo Audit Services (WFAS) did not identify the issues noted in this Supervisory Letter and past coverage did not provide an enterprise view of sales practices." The MRA explained that inaction "increases compliance, legal, and reputation risks."[2682]

205. On July 28, 2015, the OCC issued a Notice of Deficiency under 12 C.F.R. Part 30 to the Bank because based on deficiencies and weaknesses in all three lines of defense related to the Bank's compliance risk management program, which Respondents Julian and McLinko received.[2683] The Part 30 Notice of Deficiency required the Bank to submit a Safety and Soundness Plan to "adequately address all of the deficiencies and weaknesses noted in compliance-related supervisory letters" and must specifically include "[d]evelop[ing] audit programs that test the first lines of defense compliance with high-risk laws and regulations" and "[r]eport[ing] Internal Audit identified deficiencies to the Bank's Audit and Examination Committee, along with the severity of the deficiencies and the corrective actions."[2684]

206. On August 10, 2015, the Bank provided a response to SL 2015-36, stating that the Bank "recognize[s] the importance of the concerns discussed in the Supervisory Letter to Wells Fargo and its customers."[2685] The response named Respondent McLinko as an accountable executive for the Audit Coverage MRA and stated that WFAS was "committed to maintaining independence and implementing the changes needed to address the concerns noted in the MRA" and "evalu[ating] the current sales practices audit coverage and commit to develop a comprehensive audit approach." WFAS also committed to "engag[ing] with Accenture and PwC to understand the scope of their coverage as it relates to Wells Fargo's approach to Enterprise Sales Practices and assessing potential customer harm for allegations of inappropriate behavior, respectively. Their review and evaluation will be compared to our current sales practices audit coverage, and enhance coverage where appropriate. WFAS anticipate incorporating the preliminary findings from PwC and Accenture as part of our 2016 audit plan process and will enhance our coverage when additional

---

[2681] MSD-213 at 8.

[2682] *Id.* at 8-9.

[2683] MSD-414 at 1-2.

[2684] *Id.* at 2-3.

[2685] MSD-313 at 1.

Add. 1149

Appellate Case: 25-1079     Page: 1151     Date Filed: 05/16/2025 Entry ID: 5517644

information is available."

207. The Bank's August 10, 2015 response further stated, "WFAS will be engaged with the various LOBs as they develop and implement corrective actions to the Enterprise Sales Practices MRAs. The scope of WFAS's work will include: issue monitoring and validation, reviewing governance processes and enhanced policy, monitoring of projects/initiatives to enhance Enterprise Sales Practices compliance, and obtaining an understanding of key activities and functions performed to ensure compliance with enterprise sales practices along with their sustainability."[2686]

208. Accenture's top recommendation was to "Review the solution sales goals setting at district/store level, and reward team members based more on positive customer outcomes (e.g., account utilization) with less emphasis on solutions sold."[2687] The report noted, "solution sales goals have not been met since 2013 (even after accounting for adjustments made throughout the year to improve achievement rates)."[2688] The Accenture Report warned of the risk that "[n]egative sales practices may occur due to pressure to meet unreasonable sales targets set by senior management, which could lead to adverse customer impact."[2689]

209. Respondent McLinko testified "in the Accenture report, the volume of interviews that were done, the data that they had gathered on a very large sample of the community bank, they had a very strong basis to come up with their conclusions. So that led me, at least initially to like, there's a systemic issue here, from that perspective."[2690]

210. On April 21, 2016, Respondent McLinko sent the following email message to Respondent Russ Anderson:

Hi Claudia,

Not sure if you traveled home yet or not, but if you did, hope it was a good flight. If not, safe travels.

My regulator meeting to discuss the 2016 audit plan was a non-event. We discussed my sales practices audit validation coverage in some detail, along with ERMA (the area where the topic of Risk Culture has been raised). Chris Mosses asked the most questions, but nothing on the culture front. They continue to be very interested in complaints and ethics line, the rollout, the data, and what is done with that data. Chris

---

[2686] MSD-313 at 11; Julian Amended Answer ¶ 419, 468; McLinko Amended Answer ¶¶ 419, 468.

[2687] MSD-51 at 4.

[2688] Id. at 27.

[2689] Id.

[2690] MSD-276 (McLinko Tr.) at 56:8-19.

Add. 1150

Appellate Case: 25-1079    Page: 1152    Date Filed: 05/16/2025 Entry ID: 5517644

indicated that she thought she was meeting with you next week. If so, I'm sure the topics will come up. Jenny asked a few questions, but more on my FTE count and some specifics on my plan.

It just hit me that you and Carrie meet with regulators monthly and culture doesn't come up and I meet with them bimonthly and sometimes in between and the topic is not specifically raised with me (I hear it from my peers). Wonder what that is about?

That's the low lights. I'd appreciate it if you don't mention audit and the risk culture topic together when and if you approach the subject with the regulators.[2691]

211. On July 18, 2016, the OCC communicated the findings from its ongoing review of sales practices at the Bank in Supervisory Letter WFC 2016-36 ("SL 2016-36"), which Respondents Julian and McLinko received.[2692] SL 2016-36 noted that since the issuance of SL 2015-36, the OCC "reviewed additional reports and material prepared by the Bank and third-party consultants as part of our ongoing supervision. . . One of our objectives in reviewing these materials was to determine whether the findings identified instances of unsafe or unsound banking practices. Based on our ongoing review, we have concluded that the Bank's risk management of its sales practices and its sales practices themselves are unsafe or unsound."[2693]

212. Regarding the unsafe or unsound practices, SL 2016-36 elaborated:

a. "The practice of opening deposit accounts without authorization, the practice of moving funds without customer consent (simulated funding) and the failure to timely refund or remediate fees charged are considered unsafe or unsound banking practices."[2694]

b. "The widespread and unauthorized opening of credit card accounts without consent . . . is considered an unsafe or unsound banking practice."[2695]

c. "[T]he Bank engaged in the unsafe or unsound practice of failing to adequately monitor and control sales practices to prevent such inappropriate employee behavior."[2696]

d. "[T]he Bank engaged in the unsafe or unsound practices of operating

---

[2691] McLinko's ECSFM at No. 490, quoting MSD-407.

[2692] MSD-342 at 1.

[2693] *Id.* at 2.

[2694] MSD-570 at 5.

[2695] *Id.* at 6.

[2696] *Id.*

Add. 1151

without adequate controls and monitoring over its sales practices."[2697]

213. The OCC informed the Bank in SL 2016-36 that the "inappropriate sales practices and the lack of adequate risk management over the sales practices referenced in this letter are considered unsafe or unsound banking practices, and the OCC is considering formal enforcement action against the Bank."[2698]

214. On September 8, 2016, the OCC issued a consent order and assessed a $35,000,000 civil money penalty to the Bank for deficiencies and unsafe or unsound practices in the Bank's risk management and oversight of the Bank's sales practices, and unsafe or unsound sales practices by the Bank.[2699]

215. In the Sales Practices Consent Order, the Comptroller found "that the OCC has identified the following unsafe or unsound sales practices in the Bank's Community Bank Group," which the Sales Practices Consent Order referred to as the "unsafe or unsound sales practices":

    a. "The selling of unwanted deposit or credit card accounts";

    b. "The unauthorized opening of deposit or credit card accounts";

    c. "The transfer of funds from authorized, existing accounts to unauthorized accounts ('simulated funding')"; and

    d. "Unauthorized credit inquiries".[2700]

216. In the Sales Practices Consent Order, the Comptroller also found "that the OCC has identified the following deficiencies and unsafe or unsound practices in the Bank's risk management and oversight of the Bank's sales practices:"

    a. "The incentive compensation program and plans within the Community Bank Group were not aligned properly with local branch traffic, staff turnover, or customer demand, and they fostered the unsafe or unsound sales practices";

    b. "The Bank lacked an Enterprise-Wide Sales Practices Oversight Program and thus failed to provide sufficient oversight to prevent and detect the unsafe or unsound sales practices";

    c. "The Bank lacked a comprehensive customer complaint monitoring process that impeded the Bank's ability to: (1) assess customer complaint activity across the Bank; (2) adequately monitor, manage, and report on customer complaints; and (3) analyze and understand the

---

[2697] MSD-570 at 6; Julian Amended Answer ¶ 131; McLinko Amended Answer ¶ 131.

[2698] MSD-342 at 7; Julian Amended Answer ¶ 131; McLinko Amended Answer ¶ 131.

[2699] MSD-343.

[2700] Id.

Add. 1152

Appellate Case: 25-1079    Page: 1154    Date Filed: 05/16/2025 Entry ID: 5517644

potential sales practices risk";

    d. "The Bank's Community Bank Group failed to adequately oversee sales practices and failed to adequately test and monitor branch employee sales practices"; and

    e. "The Bank's audit coverage was inadequate because it failed to include in its scope an enterprise-wide view of the Bank's sales practices."[2701]

217. In the Sales Practices Consent Order, the Comptroller further found that by reason of the unsafe or unsound sales practices and unsafe or unsound practices in the Bank's risk management and oversight of the Bank's sales practices, "the Bank engaged in reckless unsafe or unsound banking practices that were part of a pattern of misconduct."[2702]

218. The Sales Practices Consent Order contained actionable articles covering an Enterprise-Wide Risk Review of Sales Practices Risk, an Enterprise-Wide Sales Practices Risk Management and Oversight Program, an Enterprise Complaints Management Policy, Internal Audit, and Customer Reimbursement.[2703]

219. On April 27, 2017, WFAS issued its 2016 Sales Practices Enterprise Risk Management Assessment for 2016 ("2016 SP ERMA"). The 2016 SP ERMA concluded that Enterprise Risk Management for sales practices risk was Weak, the lowest WFAS audit rating. WFAS defined sales practices risk as sales practices, complaints, team member allegations including EthicsLine, and Internal Investigations. The weak rating was driven by several factors, including the lack of an overall view of sales practices risk across the Bank and the effectiveness and sustainability of the recently implemented enhancements needed to be demonstrated.[2704]

220. The 2016 SP ERMA issued on April 27, 2017 rated the First Line of Defense (i.e., the Community Bank) as Weak due to the need to better understand where sales practices risk reside, the need to implement the Sales Practices Risk Governance Document, and additional time to demonstrate the recently implemented enhancements to demonstrate effectiveness and sustainability.[2705] The 2016 SP ERMA rated the Second Line of Defense Weak due to the magnitude and complexity of the corrective actions that remained to build and sustain an effective sales practices risk management program.[2706] Finally, the

---

[2701] MSD-343.

[2702] *Id.* at 3.

[2703] MSMSD-469.D-343.

[2704] MSD- 386 at 1.

[2705] *Id.* at 3.

[2706] *Id.* at 2.

Add. 1153

Appellate Case: 25-1079    Page: 1155    Date Filed: 05/16/2025 Entry ID: 5517644

2016 SP ERMA rated Team Member Allegations processes as Weak and Complaints and Internal Investigations processes as Needs Improvement.[2707]

221. One of the auditors responsible for the 2016 SP ERMA testified that despite the improvements made by the Bank in 2015 and 2016 in response to OCC Matters Requiring Attention, controls and risk management related to sales practices was still weak.

> Q: So notwithstanding the risk management and control improvements to address the MRAs from 2015 through 2016, audit still gave sales practices risk a weak rating overall; is that correct?
>
> A: We - - we concluded the overall sales practices risk is weak, as of December 31, 2016.[2708]

222. Respondent Julian testified before the OCC during his May 31, 2018 sworn statement that he would now consider the Community Bank's controls over sales practices misconduct from 2012 to 2016 to be "unsatisfactory," the lowest possible rating that Audit could issue at that time:

> Q. Okay. But how about if we limit it to not just work that Audit – and the Audit Group did by itself, but work that the Audit Group did by itself, but work that the Audit Group did in conjunction with other parts of the bank or other consultants? Would you then conclude, based on that – the work that the Audit Group did by itself and in conjunction with other groups – that the controls for sales practice misconduct were unsatisfactory?
>
> A. That the controls – I'm sorry.
>
> Q. Yes, the controls to manage the risk of sales practice misconduct were unsatisfactory.
>
> A. Based on what I know now, yes.
>
> . . .
>
> Q. Okay. And if the systems did not prevent employees from issuing credit cards and debit cards without customer signatures, how would you rate the controls?
>
> A. Based on the impact and what we know the controls were unsatisfactory in that way.
>
> Q. Thank you. And unsatisfactory is the lowest grade you can get?
>
> A. Yes, sir.[2709]

---

[2707] MSD-386 at 4.

[2708] MSD-505 (Sheng Dep. Tr.) at 220:23-221:3.

[2709] Julian Amended Answer ¶ 414; MSD-278 (Julian Tr.) at 37:2-14, 155:22-156:5.

Add. 1154

Appellate Case: 25-1079     Page: 1156     Date Filed: 05/16/2025 Entry ID: 5517644

223. In a January 23, 2020 Wells Fargo press release about the OCC's Notice of Charges, the Bank's current CEO stated, "The OCC's actions are consistent with my belief that we should hold ourselves and individuals accountable. They also are consistent with our belief that significant parts of the operating model of our Community Bank were flawed. At the time of the sales practices issues, the Company did not have in place the appropriate people, structure, processes, controls, or culture to prevent the inappropriate conduct. This was inexcusable. Our customers and you all deserved more from the leadership of this Company."[2710]

224. The Community Bank was "Wells Fargo's largest operating segment in terms of revenue," contributing roughly half of the Company's average annual revenue and profits each year.[2711]

225. NBE Crosthwaite opined:

The Community Bank model with the unreasonable goals and the extreme pressure was also a wildly profitable model for the company. So with all that pressure, team members were putting on lots of real accounts and real customers, which ultimately drove up revenue, net income, and quarter after quarter, the bank's performance was going up, and their stock was going up.[2712]

226. The Community Bank's business model was financially profitable for Wells Fargo and was key to its growth and cross-sell success.[2713]

227. From January 1, 2002 through September 8, 2016 (the date of the Sales Practices Consent Order), Wells Fargo's stock price performed "significantly better than the stock price of its peers and the financial services sector."[2714]

228. There is no requirement that a banker receive additional equity compensation beyond that which he was entitled under the bank's existing compensation

---

[2710] MSD-662.

[2711] Julian Amended Answer ¶ 2; MSD-1 at 20 ¶ 4 ("Wells Fargo's largest business unit was the Community Bank, which contributed more than half (and in some years more than two-thirds) of the Company's revenue from 2007 through 2016."); MSD-692 at 50; MSD-693 at 42; MSD-694 at 46; MSD-695 at 44; MSD-696 at 46; MSD-697 at 45; MSD-698 at 53; MSD-658 (Pocock Expert Report) at 9-10 ¶ 44-45).

[2712] Tr. at 2420 (Crosthwaite); OCC Exh. 2335 at ¶¶ 63-64; OCC Exh. 2407 at 28; OCC Exh. 2330 at ¶¶ 105-107.

[2713] MSD-266 (Russ Anderson Dep. Tr.) at 87:16-88:24; see also MSD-294 (Wipprecht Tr.) at 133:4-11; See MSD-658 (Pocock Expert Report) at ¶ 13, 18, 19; MSD-267 (Expert Report of Tanya Smith) at ¶ 72 ("The Bank described the 'cross-sell' as 'its primary strategy' and 'the foundation of our business model.'"); MSD- 304A (Candy Dep. Tr.) at 234:4-13; MSD-649 ("The Community Bank is 'Rome' in our company—all roads lead to and from it."); MSD-692 at 100 ("'cross-selling' – is very important to our business model and key to our ability to grow revenue and earnings.").

[2714] MSD-658 (Pocock Expert Report) at 5, 11-14.

Add. 1155

Appellate Case: 25-1079     Page: 1157     Date Filed: 05/16/2025 Entry ID: 5517644

program. Retaining employment is, in and of itself, a benefit sufficient to meet the benefit element, where such retention was occasioned by the failure of the head of the bank's third line of defense to effectively challenge inadequate controls put in place by the first line of defense.

229. Preponderant evidence established that Ms. Russ Anderson benefitted by her failure to credibly challenge the risk management practices relating to controls that should have detected and prevented sales practices misconduct at the Community Bank.

230. Next, there is merit in Enforcement Counsel's proposition that the increase in the proposed civil money penalty does not constitute retaliation for Respondents' exercising their right to a hearing.[2715] The increase in the proposed penalty can be wholly attributed to the Respondents "plac[ing] themselves in their self-contradictory position after this litigation began."[2716]

231. Next, only through the process leading up to the filing of Enforcement Counsel's summary disposition motions was it possible to take the full measure of Respondents' good faith – one of the factors that must be considered when recommending a civil penalty. The record reflects, as described above, substantial evidence of sustained gross neglect by each Respondent, coupled with evidence that each Respondent was motivated by greed and a desire to keep their jobs, which required them to withhold from the Bank's Board of Directors and its regulators the true scope and nature of the Bank's highly profitable and seriously unsafe compensation practices.

232. Last, the hearing produced the remarkable and indefensible position by Ms. Russ Anderson asserting that having witnessed the testimony presented, she could not articulate whether incentive compensation through sales goals was the root cause of Community Bank team member sales practices misconduct. This position utterly beggars belief, given the abundance of uncontroverted evidence establishing the relationship between the sales goals and the misconduct.

233. On or about September 8, 2016, the Bank paid a total of $185 million as part of a stipulated judgment to settle the Los Angeles City Attorney lawsuit, and to pay civil money penalties assessed by the CFPB and OCC related to the Bank's systemic sales practices misconduct.[2717]

234. The September 2016 announcement of the settlement and subsequent public awareness of the sales practices misconduct problem, which resulted in part from Ms. Russ Anderson's misconduct, significantly damaged the Bank's reputation. The May 2017 results of a corporate reputation tracking study indicated the Bank's favorability rating plummeted 50% between September and October 2016, and by May 2017 had recovered only to 65% of its previous level.

---

[2715] See, Enforcement Counsel's Post-Hearing Reply Brief as to Paul McLinko at 88.

[2716] Id.

[2717] Julian Amended Answer ¶ 132; McLinko Amended Answer ¶ 132; MSD-562.

Add. 1156

Appellate Case: 25-1079      Page: 1158      Date Filed: 05/16/2025 Entry ID: 5517644

235. The announcement of the September 2016 settlement and subsequent public backlash caused the Community Bank to change the Community Bank's business model and eliminate product sales goals, effective October 1, 2016.[2718]

236. After the September 8, 2016 settlement announcement, and continuing over the next several years, the Bank suffered a series of other losses related to sales practices misconduct, including civil judgments to settle class action lawsuits, investigations commissioned to root out malfeasance, the costs of advertising campaigns aimed at rehabilitating its reputation, and in February 2020, a $3 billion settlement with the DOJ and the SEC.[2719]

237. Respondent Russ Anderson testified, based on her experience as a senior risk professional with years of experience in the risk business, that when employees engage in various types of sales practices misconduct, they are violating applicable laws and regulations:

> Q: Understand. So just so we're clear, you agree that when employees issue a product or service to a customer without the customer's consent, they're violating applicable laws and regulations; correct?
>
> A: I would agree, yes.
>
> Q: Okay. And you also agree that when employees transfer customer funds without customer consent, they're violating applicable laws and regulations; correct?
>
> A: I would agree, yes.[2720]

238. Respondent Russ Anderson's expert witness, Kathlyn Farrell, testified that sales practices misconduct violated UDAP, Regulation Z, Regulation DD, and Truth in Savings Act.[2721] The testimony by Ms. Farrell that was relied upon by Enforcement Counsel is as follows:

> Q. Okay. I'm going to read part of this e-mail to you. In -- in the body of the e-mail starting with the third sentence, Ms. Bresee wrote: "To be honest, if the allegations are proven to be correct, they violate a series of laws which are in the talking points we drafted. So, to the extent a team member gives a customer a credit card they didn't want/didn't consent to, it likely violates: UDAAP (OCC), UDAAP," with two As, "(CFPB), TILA, Reg Z, and the Fair" -- "and FCRA. On the deposit

---

[2718] MSD-289A (Sloan Tr.) at 251:2-253:6; MSD- 288-B (Strother Tr.) at 49:22-50:10; MSD-8B (Stumpf Tr.) at 228:11-229:16; MSD-563.

[2719] MSD- 293A (Hardison Tr.) at 34:4-36:18; MSD-289A (Sloan Tr.) at 251:2-253:6; MSD-564; MSD-1.

[2720] MSD-266 (Russ Anderson Dep. Tr.) at 122:22-124:19.

[2721] MSD-265 (Farrell Dep. Tr.) at 63:5-66:1.

Appellate Case: 25-1079    Page: 1159    Date Filed: 05/16/2025 Entry ID: 5517644

side, providing a savings/checking account that a customer didn't want/didn't consent to likely violates: UDAP, UDAAP" with two As, "the Truth in Savings Act, and Reg DD. (As well as similar state laws.)" Do you see that?

A. I do.

Q. Okay. You mentioned previously that whether there were any violations of law as a result of the sales practices misconduct issues crossed your mind; is that right?

A. Yes.

Q. Okay. Does sales practice misconduct, as we defined it earlier, violate UDAP with one A [verbatim]?

A. I think so.

Q. Does sales practice misconduct, as we described it before, violate UDAAP with two As?

A. I think it probably does.

Q. Okay. Does opening an unauthorized account violate TILA?

A. Probably. I'm saying that without looking it up, but I suspect that it does.

Q. Why?

A. Because I don't think you're supposed -- well, now that I think about it, I don't think you're supposed to issue any activated credit card to anybody without their consent. So, yes, if the card was activated before -- you used to could send them out unactivated, but I -- I don't -- so if these were activated, then, yes, it's clearly a violation of Truth in Lending.

Q. Does opening an unauthorized credit card account also violate Reg Z?

A. Yes. It would be the same.

Q. Does opening an unauthorized credit card account violate FCRA?

A. That completely would depend upon whether it is reported to the credit bureaus. I have no idea if they did in this case.

Q. Okay. And if they were reported to the credit card bureaus, would there be a violation of the FCRA if there was an unauthorized credit card account opened?

A. I think so.

Q. Does opening an unauthorized deposit account violate the Truth in Savings Act?

A. I would have to look at it.

Q. Does opening an unauthorized deposit account violate Reg DD?

A. Again, I would have to -- to look at that for sure. Those are disclosure laws that are hard to remember. I'm sorry.

Add. 1158

Q. Okay. It's all right. If -- if an unauthorized deposit account was opened and the required disclosures weren't made, would that violate Reg DD?

A. Yes, it would.

Q. Would that also violate the Truth in Savings Act?

A. Yes, it would.[2722]

239. As part of its Deferred Prosecution Agreement with the U.S. Department of Justice "to resolve the federal criminal investigation of violations of, among other statutes, Title 18, United States Code, Sections 1005 and 1028A, arising out of Wells Fargo's improper sales practices," the Bank admitted, accepted, and acknowledged as true that the "Community Bank's onerous sales goals and accompanying management pressure led thousands of its employees to engage in: (1) unlawful conduct to attain sales through fraud, identity theft, and the falsification of bank records." Wells Fargo agreed, "the acts and omissions described in the Statement of Facts" attached to the Deferred Prosecution Agreement "are sufficient to establish violations by Wells Fargo of Title 18, United States Code, Sections 1005 and 1028A."[2723]

240. Under the Bank's June 2010 Corporate Security Policy Manual, sales integrity violations, including but not limited to customer consent and funding manipulation cases, were considered to result in violations of 18 U.S.C. §§ 656 (misapplication), 1001 (false statements), and 1005 (false bank entries).[2724]

241. Authoritative sources within the Bank testified about the illegal nature of sales practices misconduct.[2725] For example, James Strother, the Bank's former General Counsel, testified before the OCC that sales practices misconduct violated applicable laws and regulations and that "for sure it is [an] unfair and deceptive practice. There are laws in every state that prohibit that" in addition to federal laws. He agreed under oath that such practices constitute "fraud" and "falsification of bank records" and might constitute identity theft in some states.[2726]

242. Ms. Herzberg, who formerly worked as an examiner for the Office of Thrift Supervision ("OTS") and was a "safety and soundness regulator" and did work

---

[2722] MSD-265 (Farrell Dep. Tr.) at 63:5-66:1.

[2723] MSD-1 (DOJ SOF) at 7, 10, 25.

[2724] MSD-423 at 7-9.

[2725] MSD-544 (Weber Tr.) at 82:13-22, 91:22-93:21; MSD-297 (Richards Tr.) at 84:5-11.

[2726] MSD-288A (Strother Tr.) at 26:19-28:13, 142:25-143:10, 192:23-193:24 (testifying that issuing products and services to customers without their consent "is serious and violates law."); James Strother Amended Answer ¶¶ 141 ("Admitted that sales practices misconduct involved serious misconduct that likely included violations of criminal laws"); MSD-382 (Byers Tr.) at 135:6- 136:5; MSD-297 (Richards Tr.) at 82:4-84:11, 105:4-9 (explaining why simulated funding is improper and that it is a form of fraud), 200:4-201:2, 251:8-15; MSD-599 (Meuers Tr.) at 11:3- 11; MSD-549 (Holliday Tr.) at 69:14-70:9; MSD-149.

Add. 1159

Appellate Case: 25-1079     Page: 1161     Date Filed: 05/16/2025 Entry ID: 5517644

in compliance before working at the Bank, gave the following testimony under oath before the OCC:

> Q: …As I understand your testimony, now you believe that sales practice misconduct at the bank was systemic. Is that correct?
> A: Yes.  Now I believe that.
> Q: All right. And you believe the sales practice misconduct at the bank that was systemic also constituted unsafe and unsound banking practices. Is that --
> A: Yes.
> Q: Okay. And you also believe that the sales practices misconduct at the bank that was systemic also constituted violations of applicable laws and regulations.
> A: That's right.
> Q: All right. And that includes violations of – and that includes unsafe and unsound practices, as well as unfair and deceptive practices.
> A: Yes.[2727]

Ms. Herzberg also testified as follows:

> Q.    Regardless of the motivation, the behavior of inputting fake email addresses essentially constitutes falsification of bank records.
> A.    Yes. Regardless of why they did it. Yes.
> Q.    Are you familiar with Reg DD?
> A.    Yes.
> Q.    Would the behavior also violate Reg DD?
> A.    Yes.  They didn't receive their deposit account disclosures. Yes.[2728]

243. In the Bank's September 2016, CFPB Sales Practices Consent Order, the CFPB concluded that the Bank, by engaging in sales practices misconduct, "engaged in 'unfair' and 'abusive' acts or practices that violate §§ 1031(c)(1), (d)(1), (d)(2)(B), and 1036(a)(1)(B) of the [Consumer Financial Protection Act]. 12 U.S.C. §§ 5531(c)(1), (d)(1), (d)(2)(B), 5536(a)(1)(B)" (UDAAP).[2729]

244. OCC examiners have concluded that sales practices misconduct violates multiple consumer and criminal laws and regulations, including: 18 U.S.C. §§ 656 (theft/misapplication by bank employee), 1005 (false entries), 1028(a)(7) (identity theft), and 1344(2) (bank fraud); 15 U.S.C. § 45(a) (unfair or deceptive acts and practices); 12 C.F.R. § 1030.4(a) (Regulation DD/Truth in

---

[2727] MSD-585 (Herzberg Tr.) at 17:18-19:5, 220:21-222:4, 26:9-27:20, 30:15-32:8.

[2728] MSD-257 (Herzberg Tr.) at 166:18-167:4; 221:14-23.

[2729] MSD-52 (CFPB Consent Order) (citing violations of UDAAP against the Bank for sales practices misconduct).

Savings); and 12 C.F.R. § 1026.12(a) (Regulation Z/Truth in Lending).[2730]

245. In its Deferred Prosecution Agreement with the U.S. Department of Justice, the Bank further admitted, accepted, and acknowledged as true the following:

    (a)    "Employees created false records and forged customers' signatures on account opening documents to open accounts that were not authorized by customers."[2731]

    (b)    "After opening debit cards using customers' personal information without consent, employees falsely created a personal identification number ('PIN') to activate the unauthorized debit card. Employees often did so because the Community Bank rewarded them for opening online banking profiles, which required a debit card PIN to be activated."[2732]

    (c)    "Employees created false records by opening unauthorized checking and savings accounts to hit sales goals."[2733]

    (d)    "Unlawfully misused customers' sensitive personal information (including customers' means of identification)."[2734]

246. Bank policies did not permit employees to open accounts or issue products not authorized by a customer or to engage in simulated funding.[2735] Bank employees who confessed to opening unauthorized accounts or engaging in simulated funding admitted they knew it was against Bank policy and ethics guidelines.[2736]

247. To open or issue an unauthorized account, product, or service for a customer, Bank employees generally would have had to enter false information into the Bank's systems.[2737] Bank employees used the Bank's Store Vision Platform ("SVP") "to open accounts for new and existing Bank customers, and the provision to customers of new accounts kits, including electronic new account kits ('eNAK')."[2738]

---

[2730] MSD-257 (NBE Coleman Expert Report) at 6; MSD-267 (NBE Smith Expert Report) at 7; MSD-268 (NBE Crosthwaite Expert Report) at 7; MSD-269 (NBE Candy Expert Report) at 8.

[2731] MSD-1 at 25.

[2732] *Id.*

[2733] *Id.* at 26.

[2734] *Id.* at 31.

[2735] MSD-9 at 7; MSD-10.

[2736] See, e.g., MSD-108 (concluding that employees engaged in simulated funding to meet sales goals despite knowing it was against Bank policy).

[2737] See MSD-200 (Hughes Decl.).

[2738] *Id.* at 1.

Add. 1161

Appellate Case: 25-1079    Page: 1163    Date Filed: 05/16/2025    Entry ID: 5517644

248. "When opening or issuing an account, product or service for a customer, SVP required Bank employees to indicate in the system whether the customer was present in the branch. If an employee issued a product or service to a customer without customer consent, the employee would have had to indicate that the customer was present when in fact the customer was not present to avoid" appearing on a "report reflecting products and services issued to a customer when the customer was not present."[2739]

249. "When opening a savings or checking account or issuing a debit card to a customer, SVP required Bank employees to enter into the system, as applicable, information related to the nature of the Bank employee's interaction with the customer, the customer request method, the source of funds for the opening deposit, the purpose of the account, the estimated monthly account activity, and whether the customer was present. In situations where employees opened a checking or savings account or issued a debit card for a customer without customer consent, Bank employees would have had to fabricate (or use without consent) some or all of this information in order to open the account or issue the card."[2740]

250. "When opening a savings, checking, or credit card account for a customer, the Bank requires its employees to provide the customer with certain account opening disclosures, either in paper form or electronically via eNAK. SVP required Bank employees to indicate in the system that the required disclosures were provided to the customer; otherwise, SVP would not allow the employee to continue with the account opening process. In situations where Bank employees opened a savings, checking, or credit card account for a customer without customer consent, Bank employees would have had to indicate in SVP that the required disclosures were provided to the customer when, in fact, they were not."[2741]

251. "When opening a credit card account for a customer, SVP required Bank employees to enter into the system the customer's current income information. In situations where employees opened a credit card account for a customer without customer consent, Bank employees would have had to fabricate (or use without consent) this information."[2742]

252. "When opening or issuing an account, product or service for a customer, SVP required Bank employees to enter into the system the customer's identification information, such as a driver's license number. In situations where employees issued a product or service to an existing customer without customer consent, Bank employees could have populated customer identification information with

---

[2739] *Id.* at 1-2.

[2740] *Id.* at 2.

[2741] *Id.* at 4.

[2742] *Id.* at 5.

Page **409** of **443**

Add. 1162

information previously supplied by the customer."[2743]

253. In October 2016, the Bank finally eliminated sales goals for Community Bank employees.[2744]

254. Sales practices misconduct at the Bank breached its customers' trust, including but not limited to by opening accounts for customers without customer consent, transferring customer funds without customer consent, and misusing its customers' personal information to do so.[2745]

255. Sales practices misconduct at the Bank resulted in financial harm to the Bank's customers, including but not limited to account fees paid by the customer and increased borrowing costs borne by the customer due to a credit score impact.[2746]

256. The Bank has acknowledged that its sales practices misconduct problem resulted in a breach of its customers' trust and financially harmed its customers. In an August 31, 2017 Wells Fargo press release related to the remediation process, former Bank CEO Tim Sloan said:

> We apologize to everyone who was harmed by unacceptable sales practices that occurred in our retail bank. To rebuild trust and to build a better Wells Fargo, our first priority is to make things right for our customers, and the completion of this expanded third-party analysis is an important milestone. Through this expanded review, as well as the class action settlement, free mediation services, and ongoing outreach and complaint resolution, we've cast a wide net to reach customers and address their remaining concerns. Our commitment has never been stronger to build a better bank for our customers, team members, shareholders and communities.[2747]

257. As part of its February 20, 2020 Deferred Prosecution Agreement with the DOJ, the Bank also admitted as true that, as a result of its sales practices misconduct problem from 2002 through 2016, the Bank "collected millions of dollars in fees and interest to which the Company

---

[2743] *Id.* at 6.

[2744] Russ Anderson Amended Answer ¶ 135; MSD-295 (Bacon Tr.) at 194:10-197:8 (testifying that "it took an act of Congress for the company to change."; MSD-289A (Sloan Tr.) at 251:2-253:6; MSD-288-B (Strother Tr.) at 49:22-50:10; MSD-8B (Stumpf Tr.) at 228:11- 229:16; MSD-563; (Julian Amended Answer ¶ 135; McLinko Amended Answer ¶ 135. The Head of the Community Bank's Sales and Service Conduct Oversight Team ("SSCOT") testified that the Bank's "elimination of sales goals [in early October 2016] help[ed] dramatically reduce the sales practices problem," a conclusion she testified was supported by SSCOT's own data. (MSD-300 (Rawson Tr.) at 66:3- 66:8).

[2745] MSD-8A (Stumpf Tr.) at 127:9-14; MSD-567; MSD-568; MSD-569.

[2746] MSD-543; MSD-663.

[2747] MSD-664.

Add. 1163

Appellate Case: 25-1079      Page: 1165      Date Filed: 05/16/2025 Entry ID: 5517644

was not entitled, harmed the credit ratings of certain customers, and unlawfully misused customers' sensitive personal information (including customers' means of identification)."[2748]

258. The Bank has paid millions of dollars of remediation to its customers to compensate them for harm resulting from its sales practices.[2749]

259. On June 14, 2018, the U.S. District Court for the Northern District of California approved a $142 million class action settlement in *Jabbari v. Wells Fargo & Co,* No. 15-cv- 02159-VC.[2750]

260. The *Jabbari* settlement class included "All Persons for whom Wells Fargo or Wells Fargo's current or former subsidiaries, affiliates, principals, officers, directors, or employees opened an Unauthorized Account or submitted an Unauthorized Application, or who obtained Identity Theft Protection Services from Wells Fargo during the period from May 1, 2002 to April 20, 2017."[2751]

261. In a June 15, 2018 Wells Fargo press release about the *Jabbari* settlement, former Bank CEO Tim Sloan stated: "The court's approval of the broad and far-reaching $142 million settlement agreement is a significant step forward in making things right for our customers and further restoring trust with all of Wells Fargo's stakeholders. . . . We are pleased with this decision as it supports our efforts to help customers impacted by improper retail sales practices and ensures they have every opportunity for remediation."[2752]

262. Under the *Jabbari* settlement, "Claimants will be reimbursed from the Net Settlement Amount for out-of-pocket losses stemming from Unauthorized Accounts and Unauthorized Applications. Such out-of-pocket losses shall consist of two components: (1) increased borrowing cost due to credit score impact as a result of a Credit Analysis Account ('Credit Impact Damages'); and (2) fees assessed by Wells Fargo in connection with certain Unauthorized Accounts."[2753]

263. On September 8, 2016, the Bank was fined $185 million by the OCC, the Consumer Financial Protection Bureau, and the Office of the Los Angeles City Attorney in connection with its sales practices.[2754]

264. On February 2, 2018, the Board of Governors of the Federal Reserve imposed on Wells Fargo an "asset cap" limiting the Bank's ability to increase in asset size

---

[2748] MSD-1 at 31 ¶ 32.

[2749] MSD-542; Julian Amended Answer ¶ 26; MSD-665.

[2750] MSD-665; see also Julian Amended Answer ¶ 173.

[2751] MSD-665.

[2752] MSD-666.

[2753] MSD-664.

[2754] MSD-667; MSD-52; MSD-343; MSD-344.

Add. 1164

Appellate Case: 25-1079    Page: 1166    Date Filed: 05/16/2025 Entry ID: 5517644

because it "pursued a business strategy that emphasized sales and growth without ensuring that senior management had established and maintained an adequate risk management framework commensurate with the size and complexity of the Firm, which resulted in weak compliance practices."[2755]

265. The "asset cap" has had a significant adverse financial impact on the Bank.[2756]

266. On October 22, 2018, Wells Fargo was fined $65 million by the Office of the Attorney General of the State of New York in connection with its sales practices.[2757]

267. On December 28, 2018, the Bank was fined $575 million by all 50 state Attorneys General and the District of Columbia in connection with its sales practices and related matters.[2758]

268. By July 11, 2019, when former Bank CEO Tim Sloan testified before the OCC, he estimated the total financial impact of the sales practices scandal on the Bank to be already "in the tens of billions of dollars, when you add -- the most significant impact was one that we were referring to earlier, and that was the impact of the stock price. We really missed out on recovery."[2759]

269. The Company's stock price has significantly lagged its peers since September 8, 2016, the date of the sales practices settlements with the OCC, CFPB, and City Attorney of Los Angeles.[2760]

270. The Bank has also expended significant sums of money on lawyers and consultants in connection with its sales practices. From the fourth quarter of 2016 through the first quarter of 2018, the Bank paid legal fees and consulting costs of at least $169 million related to its sales practices.[2761]

271. The Bank's 10-Q SEC filing dated August 2, 2019 includes the following statement: "[T]he Company establishes accruals for legal actions when potential losses associated with the actions become probable and the costs can be reasonably estimated. The high end of the range of reasonably possible potential losses in excess of the Company's accrual for probable and estimable losses was approximately $3.9 billion as of June 30, 2019."[2762]

---

[2755] MSD-668; MSD-679.

[2756] MSD-267 (NBE Smith Expert Report) at ¶ 148(e); MSD-669 (noting the Bank "has missed out on roughly $4 billion in profits -- and counting -- since the cap was imposed").

[2757] MSD-670; MSD-673; MSD-678.

[2758] MSD-671; MSD-672.

[2759] MSD-289A (Sloan Tr.) at 260:8-16.

[2760] MSD-658 (Pocock Expert Report) at 5, 13-14; MSD-267 (NBE Smith Expert Report) at 148(f); MSD-289A (Sloan Tr.) at 256:25-257:8; see also MSD-257 (NBE Coleman Expert Report) at ¶ 115.

[2761] MSD-564 (Champion Decl.); MSD-267 (NBE Smith Expert Report) at ¶ 148; MSD-289A (Sloan Tr.) at 255:10-18.

[2762] Julian Amended Answer ¶ 184; McLinko Amended Answer ¶ 184.

272. On February 20, 2020, the Bank was fined $3 billion by the U.S. Department of Justice and U.S. Securities and Exchange Commission in connection with its sales practices.[2763]

273. In a February 21, 2020 Wells Fargo press release related to their $3 billion Deferred Prosecution Agreement with the DOJ and SEC, the Bank's CEO said: "The conduct at the core of today's settlements — and the past culture that gave rise to it — are reprehensible and wholly inconsistent with the values on which Wells Fargo was built. Our customers, shareholders and employees deserved more from the leadership of this Company."[2764]

274. Wells Fargo's reputation was significantly impacted as a result of the sales practices misconduct problem.[2765]

275. According to the Bank's own research, the Bank's favorability and trustworthiness scores declined significantly between September and October 2016. As of May 2017, Wells Fargo's favorability and trustworthiness scores remained "near the bottom."[2766]

276. In 2017, the Bank fell to last place in a bank reputation survey conducted by the *American Banker*/Reputation Institute. According to the *American Banker*, the Bank's reputation score "went into free fall . . . [and was] by far the lowest of any bank." It added, "Wells Fargo's image is in tatters — and will likely remain so for some time." Wells Fargo's declining reputation score was attributed to the sales practices scandal.[2767]

277. In an August 4, 2017 news release, former Wells Fargo CEO Tim Sloan acknowledged the reputational damage resulting from the Bank's sales practices: "Rebuilding trust became our top priority when I became CEO last October. That's when we began our recovery from the reputation damage we sustained from unacceptable retail sales practices in the Community Bank."[2768]

278. In explaining how the Bank's sales practices misconduct problem "so clearly harmed [the Bank's] reputation," former Wells Fargo CEO Tim Sloan testified before the OCC: "Well, prior to [the sales practices scandal], Wells Fargo had a very stellar reputation in terms of serving our customers, serving all of our stakeholders. And because of the mistakes that we made related to sales practices, we saw significant criticism on the part of a number of those stakeholders."[2769]

---

[2763] MSD-1 at 1-4; MSD-674.

[2764] MSD-674.

[2765] MSD-267 (NBE Smith Expert Report) at ¶ 149; MSD-257 (NBE Coleman Expert Report) at ¶¶ 114, 117; MSD-289A (Sloan Tr.) at 43:15-23; MSD-565; MSD-675.

[2766] MSD- 565.

[2767] MSD-675; Julian Amended Answer ¶ 175.

[2768] MSD-676.

[2769] MSD-289A (Sloan Tr.) at 43:15-23.

279. On May 7, 2018, the Bank launched its "Re-Established" marketing campaign "to emphasize the company's commitment to re-establish trust with stakeholders and to demonstrate how Wells Fargo is transforming as it emerges from a challenging period in its history."[2770]

280. The "Re-Established" marketing campaign cost the Bank hundreds of millions of dollars.[2771]

281. The sales practices misconduct problem also negatively affected the Bank's ability to attract new customers. The current Head of the Community Bank Mary Mack testified on October 26, 2018 that the scandal hampered the ability of the Community Bank to attract customers.[2772] Similarly, former Wells Fargo CEO Tim Sloan testified before the OCC on July 11, 2019 that, as a result of the sales practices scandal, "on the retail side of the bank we clearly haven't grown as many new customers."[2773]

### 3. Conclusions of Law

**Requirements to Support a Section 8(e) Prohibition Order**

Preponderant credible evidence has established that Ms. Russ Anderson and is an institution-affiliated party and the Office of the Comptroller of the Currency is the appropriate Federal banking agency as provided for under the Federal Deposit Insurance Act.

To issue a prohibition order pursuant to section 1818(e)(1), the Comptroller must make each of the following three findings: "(1) There must be a specified type of misconduct—violation of law, unsafe or unsound practice, or breach of fiduciary duty; (2) The misconduct must have a prescribed effect—financial gain to the respondent or financial harm or other damage to the institution; and (3) The misconduct must involve culpability of a certain degree—personal dishonesty or willful or continuing disregard for the safety or soundness of the institution."[2774] "Stated more succinctly, the Board must prove (1) an improper act, (2) that had an impermissible effect, and (3) was accompanied by a culpable state of mind."[2775]

The "misconduct" prong may be satisfied by a finding of violation of law or regulation, unsafe or unsound practices, or breach of fiduciary duty.

An *unsafe or unsound practice* is "one that is contrary to generally accepted standards of prudent operations, the possible consequence of which, if continued, would be abnormal risk or

---

[2770] MSD- 677; Julian Amended Answer ¶ 178; McLinko Amended Answer ¶ 178.

[2771] MSD-293A (Hardison Tr.) at 36:14-38:18; MSD-289A (Sloan Tr.) at 254:3-15.

[2772] MSD-472 (Mack Tr.) at 241:16-242:1.

[2773] MSD-289A (Sloan Tr.) at 257:18-23.

[2774] *In re Vas*a, 81 Fed. Res. Bull. 1171, 1995 WL 736814, at *1-2 (Dec. 1995).

[2775] *Michael v. FDIC*, 687 F.3d 337, 349 (7th Cir. 2012).

Add. 1167

Appellate Case: 25-1079     Page: 1169     Date Filed: 05/16/2025 Entry ID: 5517644

loss or damage to the institution its shareholders, or the insurance fund."[2776]

There are two overarching *fiduciary duties* applicable in this context: the duty of care and the duty of loyalty.[2777] The duty of loyalty requires fiduciaries to "put the interests of the bank before their own, and not use their positions at the bank for their own personal gain."[2778] "Self-dealing, conflicts of interest, or even divided loyalties are inconsistent with fiduciary responsibilities."[2779] "A crucial component of the duty of loyalty is the duty of candor, which requires that corporate fiduciaries disclose all material information relevant to corporate decisions from which they may derive a personal benefit."[2780] Omissions are sufficient to trigger a violation of this duty.[2781]

A breach of the fiduciary duty of care is shown when a banker fails to act in good faith and in a manner reasonably believed to be in the bank's best interest.[2782] It includes the obligation to act diligently, prudently, honestly and carefully in carrying out their responsibilities. It also requires the proper supervision of subordinates, a knowledge of state and federal banking laws, and the constant concern for the safety and soundness of the bank.[2783]

The record reflects Ms. Russ Anderson engaged in unsafe or unsound practices and breached fiduciary duties she owed to the Bank.

The "effects" prong may be satisfied by a finding that by reason of the misconduct, the Bank has suffered or will probably suffer financial loss or other damage; the interests of the Bank's depositors have been or could be prejudiced; or such party has received financial gain or other benefit. It is satisfied by evidence of either potential or actual loss to the financial institution, and the exact amount of harm need not be proven.

The record reflects the Bank has suffered and will probably continue to suffer financial

---

[2776] *See, e.g., In re Fletcher*, FRB Nos. 17-007-E-I, 17-007-CMP-I, 2018 WL 395574, at *5 (Jan. 4, 2018) (quoting *In re Salmon*, 84 Fed. Res. Bull. 807, 1998 WL 609758, at *3 n.3 (Sept. 1998)) (emphasis in original); *see also In re ***, FRB No. AA-EC-87-88, 1988 WL 427510, at *8 (Jan. 1, 1988) (same).

[2777] *In re Ellsworth*, OCC Nos. AA-EC-11-41 and AA-EC-11-42, 2013 WL 3963708, at *34 (June 25, 2013).

[2778] *In re Ellsworth*, at *35 (citing *Seidman v. OTS*, 37 F.3d 911, 933-34 (3d Cir. 1994)).

[2779] *Michael v. FDIC*, 687 F.3d 337, 351 (7th Cir. 2012) (quotation omitted) (upholding prohibition order assessment of civil monetary penalties under 12 U.S.C. § 1818).

[2780] *In re Ellsworth*, 2013 WL 3963708, at *35 (citations omitted).

[2781] *De La Fuente II v. FDIC*, 332 F.3d 1208, 1222 (9th Cir. 2003) ("It is well established that a person can breach a fiduciary duty by failing to disclose material information, even if not asked . . . .")

[2782] *In re Ellsworth*, 2016 WL 11597958, at *15 (citing *Michael v. FDIC*, 687 F.3d 337, 350-51 (7th Cir. 2012)); *In re Bush*, No. OTS AP 91-16, 1991 WL 540753, at *4 n.3 (Apr. 18, 1991) (citing cases) (final order) ("[O]fficers and directors of depository institutions are held to a strict fiduciary duty to act in the best interests of the institution, its shareholders and its depositors.")

[2783] *In re Grubb*, Nos. FDIC-88-282K, FDIC-89-111e, 1992 WL 813163, at *28 (Aug. 25, 1992) (final decision) aff'd sub nom. *Grubb v. FDIC*, 34 F.3d 956 (10th Cir. 1994).

Add. 1168

Appellate Case: 25-1079    Page: 1170    Date Filed: 05/16/2025 Entry ID: 5517644

loss and reputational damage; that the interests of its depositors have been prejudiced; and that by her breaches of fiduciary duties Ms. Russ Anderson received financial gain in the form of compensation paid while she was breaching those duties.

The "culpability" prong may be satisfied by a finding of personal dishonesty or willful or continuing disregard for the safety or soundness of" the bank. The personal dishonesty element is satisfied when a person disguises wrongdoing from the institution's board and regulators, or fails to disclose material information. Both the personal dishonesty and willful or continuous disregard elements require some showing of scienter. Willful disregard is shown by deliberate conduct that exposed the bank to abnormal risk of loss or harm contrary to prudent banking practices, and continuing disregard requires conduct over a period of time with heedless indifference to the prospective consequences.

The record reflects Ms. Russ Anderson deliberately withheld from the Bank's Board and OCC examiners material information that would have identified the root cause of sales practices misconduct by the Community Bank's team members. Preponderant evidence demonstrated that between 2013 and 2016 while serving as the Community Bank's Group Risk Officer and holding multiple committee positions that required the disclosure of information known to her indicating inadequate controls over risks associated with such misconduct, Ms. Russ Anderson withheld that information and failed to take steps that would have identified the root cause of such misconduct and mitigated the adverse effects of that misconduct.

Upon a sufficient showing that Ms. Russ Anderson engaged in unsafe or unsound practices and breached fiduciary duties she owed to the Bank, the "misconduct" prong has been met.

Preponderant credible evidence established that Ms. Russ Anderson's unsafe or unsound practices and breaches of fiduciary duties both probably would cause and actually caused the Bank to suffer loss, including financial and reputational loss, and prejudiced depositors' interests, and gave financial gain and other benefits to Ms. Russ Anderson, meeting the "effects" prong.

Preponderant credible evidence established that the unsafe or unsound practices and breaches of fiduciary duties occurred under conditions that involved Ms. Russ Anderson's personal dishonesty and demonstrated her willful or continuing disregard for the safety or soundness of the Bank.

Upon such evidence, cause has been shown to recommend the issuance of a prohibition order against Ms. Russ Anderson as shown in Enforcement Counsel's Proposed Prohibition Order that accompanied their Post-Hearing Brief and Proposed Findings of Fact and Conclusions of Law at Appendix A.

5.    **Civil Money Penalty**

Through the Notice of Charges, the Comptroller proposed to assess Tier 2 civil money penalties against Respondents Ms. Russ Anderson, Mr. Julian, and Mr. McLinko. Tier 1 penalties are available upon sufficient evidence establishing that a Respondent violated any law or regulation. Tier 2 penalties are available upon sufficient evidence establishing that the

Respondent violated laws or recklessly engaged in unsafe or unsound practices in conducting the Bank's business, or breached any fiduciary duty owed to the Bank, if the violation of law, unsafe practice, or breach of duty was part of a pattern of misconduct, or caused or was likely to cause more than a minimal loss to the Bank, or resulted in pecuniary gain or other benefit to the Respondent.

In this context, conduct is reckless if it is done in disregard of, and evidences a conscious indifference to, a known or obvious risk of a substantial harm. If a Respondent was aware of a risk of substantial harm but did not act to appropriately address or mitigate that risk, or took only perfunctory steps, that conduct is reckless.

### 6. Assessment of Civil Money Penalties

Examiner Smith reported that Respondents Russ Anderson, Julian, and McLinko were among the most senior officers of Wells Fargo, one of the largest financial institutions in the world.[2784] She opined that Ms. Russ Anderson had a unique and important responsibility with respect to the Bank's longstanding, widespread, and systemic sales practices misconduct problem.[2785] She reported that Ms. Russ Anderson knew about the problem and its root cause.[2786] She opined that notwithstanding this knowledge, Ms. Russ Anderson failed her respective responsibilities.[2787]

Examiner Smith opined that each Respondent individually failed to identify, escalate, and address the sales practices misconduct problem continuously and repeatedly for years.[2788] In Examiner Smith's opinion, these failures resulted in the opening of millions of unauthorized accounts, and billions of dollars of financial losses and massive reputational damage to the Bank.[2789] She opined that Ms. Russ Anderson received financial benefit as a result of the Bank's improper sales model.[2790]

Examiner Candy opined that Ms. Russ Anderson had insight into the sales practices misconduct problem, giving rise to responsibilities that required her to take action to minimize and address the associated risks, and required that she use her authority and stature as GRO and committee member to effectuate change.[2791] She opined that Ms. Russ Anderson failed to fulfill

---

[2784] EC MSD Ex. 267 (Report of NBE Smith) at ¶159.

[2785] *Id.*

[2786] *Id.*

[2787] *Id.*

[2788] *Id.*

[2789] *Id.*

[2790] *Id.*

[2791] EC MSD Ex. 269 (Report of NBE Candy) at ¶217

Add. 1170

Appellate Case: 25-1079     Page: 1172     Date Filed: 05/16/2025 Entry ID: 5517644

her important responsibilities and that her conduct and failures perpetuated the sales practices misconduct problem and enabled ongoing illegal activity at the Bank.[2792]

Examiner Candy reported that the OCC considers a number of statutory and interagency factors in determining the amount of a civil money penalty ("CMP") to assess to an individual.[2793] These include: (1) the size of the financial resources and good faith of the person; (2) the gravity of the violation; (3) the history of previous violations; (4) such other matters as justice may require; (5) evidence that the violations were intentional or committed with disregard of the law or consequences to the institution; (6) the duration and frequency of the misconduct; (7) the continuation of the misconduct after the respondent was notified or, alternatively, its immediate cessation and correction; (8) the failure to cooperate with the agency in effecting early resolution of the problem; (9) concealment of the misconduct; (10) any threat of loss, actual loss, or other harm to the institution, including harm to the public confidence in the institution, and the degree of such harm; (11) the respondent's financial gain or other benefit from the misconduct; (12) any restitution paid by the respondent for the losses; (13) any history of previous misconduct, particularly where similar to the actions under consideration; (14) previous criticism of the institution or individual for similar actions; (15) presence or absence of a compliance program and its effectiveness; (16) tendency to engage in violations of law, unsafe or unsound practices or breaches; and (17) the existence of agreements, commitments, orders or conditions imposed in writing intended to prevent violations.[2794]

In his review of these factors, Deputy Comptroller Coleman noted that Title 12 U.S.C 1818(i) permits the assessment of a CMP on a per-violation and per-day basis.[2795] Title 12 U.S.C. 1818(i)(2)(B) authorizes the OCC to assess a CMP of "of not more than $25,000 for each day during which such violation, practice, or breach continues."[2796] Examiner Coleman opined that each Respondent engaged in a repeated pattern of reckless unsafe and unsound practices and breaches of their fiduciary duties over a period of many years, and calculated that even if the OCC were to assess Respondents based on a single violation over a single year, the maximum CMP would exceed $18 million.[2797]

---

[2792] *Id.* at ¶217.

[2793] *Id.* at ¶215, citing 1818(i)(2)(G); and Federal Financial Institutions Examination Council's (FFIEC) "Interagency Policy Regarding the Assessment of Civil Money Penalties by the Federal Financial Institutions Regulatory Agencies" transmitted in OCC Bulletin 1998-32, "Civil Money Penalties: Interagency Statement" (July 24, 1998).

[2794] EC MSD Ex. 257 (Report of NBE Coleman) at ¶119, citing 12 U.S.C. § 1818(i)(2)(G) and Interagency Policy Regarding the Assessment of Civil Money Penalties by the Federal Financial Institutions Regulatory Agencies, 63 Fed. Reg. 30227, (June 3, 1998).

[2795] EC MSD Ex. 257 (Report of NBE Coleman) at ¶127.

[2796] *Id.,* noting that 12 C.F.R. § 19.240 provides for annual adjustments to this amount for inflation. "The current Tier 2 CMP maximum is $51,222 per violation per day. The per-day maximum for violations that occurred between December 6, 2012 and November 2, 2015 is $37,500." *Id.*

[2797] EC MSD Ex. 257 (Report of NBE Coleman) at ¶127.

Examiner Crosthwaite reported that the OCC considers a number of statutory and interagency factors in determining the amount of a civil money penalty ("CMP") to assess to an individual.[2798] She reported that one such factor is the Respondent's ability to pay the CMP. She reported that there is no evidence that any of these Respondents lack the financial resources to pay the assessed CMP or a greater amount.[2799]

Examiner Crosthwaite reported that each Respondent had many opportunities to submit a personal financial statement or other evidence showing that their financial resources should mitigate the CMP but each chose not to.[2800] She reported that as a result, the OCC assumes the Respondents have the ability to pay CMPs in the assessed amounts.[2801] Even without relying on that assumption, from her review of the Respondents' compensation information received from the Bank, Examiner Crosthwaite opined that each of the Respondents has the ability to pay the CMPs in the assessed amounts.[2802]

Examiner Coleman noted the assessed CMPs or even higher CMPs are appropriate to serve the purpose of deterrence.[2803] He reported that an important purpose of a CMP is to function as a deterrent.[2804] Examiner Coleman reported that each Respondent was a senior executive within the Bank, accepted significant responsibility, and was well compensated.[2805] Given the duration and scope of sales practices misconduct problem, Examiner Coleman opined that significant penalties are necessary to deter these Respondents or others in the industry from similar misconduct.[2806] Examiner Coleman asserted that if CMPs are insufficient, bank officers might reasonably conclude that ignoring the harm caused by a profitable business model is the prudent and profitable course of action.[2807] He asserted that CMPs must be high enough to change that calculation; to encourage other bank executives to identify significant problems and escalate and address them, even if doing so may be unwelcome to their colleagues or senior management.[2808]

---

[2798] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶131, citing 12 U.S.C. § 1818(i)(2)(G) and interagency policy.

[2799] EC MSD Ex. 268 (Report of NBE Crosthwaite) at ¶131.

[2800] Id.

[2801] Id.

[2802] Id.

[2803] EC MSD Ex. 257 (Report of NBE Coleman) at ¶130.

[2804] Id., citing OCC PPM 5000-7, Civil Money Penalties (November 13, 2018) at 3 ("A CMP may serve as a deterrent to future violations, unsafe or unsound practices, and breaches of fiduciary duty, by the IAP or institution against which the CMP is assessed and by other IAPs and institutions.")

[2805] EC MSD Ex. 257 (Report of NBE Coleman) at ¶130.

[2806] Id.

[2807] Id.

[2808] Id.

Add. 1172

Appellate Case: 25-1079     Page: 1174     Date Filed: 05/16/2025 Entry ID: 5517644

Upon consideration of all of the statutory and interagency factors, Examiner Candy opined that the CMPs in the assessed amounts are appropriate.[2809] Specifically, Examiner Candy opined that a CMP of at least $5,000,000 against Respondent Russ Anderson is warranted. Further, she opined that *higher* CMPs against Ms. Russ Anderson would be consistent with and supported by the evidence.[2810]

Evidence adduced during the hearing established the following:

(1) *the size of the financial resources and good faith of the person*: The record reflects the absence of good faith on Ms. Russ Anderson's part, where in her conduct prior to the issuance of the Notice of Charges she persistently failed to provide timely material information to the Bank's Chief Risk Officer, its Board of Directors, and the OCC examiners, factors warranting a high penalty. Further, by presenting false and unreliable testimony throughout the proceeding, Ms. Russ Anderson provided evidence of a lack of good faith that was not available at the time the Notice of Charges was issued. Further, by offering uncorroborated and incomplete information regarding her financial resources, Ms. Russ Anderson has deprived the Tribunal and the Comptroller of material information regarding her financial resources.

(2) *the gravity of the violation*: the record reflects the risks of financial loss and harm to the Bank's reputation were aggravating conditions warranting a high penalty – and that those conditions worsened following the issuance of the Notice of Charges.

(3) *the history of previous violations*: there is nothing in the record establishing a history of violations by Ms. Russ Anderson preceding the misconduct alleged in the Notice of Charges.

(4) *such other matters as justice may require*: The record reflects that through her testimony during the hearing, Ms. Russ Anderson repeatedly sought to evade answering questions presented during cross-examination and provided answers that directly contradicted her prior written statements, including averments she included in the responses she provided to the 15-day letter. Through her testimony during the hearing, Ms. Russ Anderson sought to deflect responsibility for her failure to provide credible challenge. This evidence was not available at the time the Notice of Charges was issued. Having been present and attentive to Ms. Russ Anderson's testimony, I find ample cause has been shown for the $10 million penalty sought by Enforcement Counsel.

(5) *evidence that the violations were intentional or committed with disregard of the law or consequences to the institution*: The record establishes Ms. Russ Anderson's refusal to act in the Bank's interest and her failure to escalate known issues regarding the ineffective risk management controls that were in place in the Community Bank were intentional acts taken in utter disregard to the myriad adverse consequences to the Bank.

(6) *the duration and frequency of the misconduct*: The record establishes a chronic lack of effective risk-management services and credible challenge by Ms. Russ Anderson throughout a

---

[2809] EC MSD Ex. 269 (Report of NBE Candy) at ¶216.

[2810] *Id.*

Add. 1173

Appellate Case: 25-1079     Page: 1175     Date Filed: 05/16/2025 Entry ID: 5517644

period that began no later than January 2013 and ended only during late 2016.

(7) *the continuation of the misconduct after the respondent was notified or, alternatively, its immediate cessation and correction*: The record reflects Ms. Russ Anderson's failure to provide effective services as the Community Bank's Group Risk Officer and member of risk-management committees persisted after she received repeated notifications of risk-management control failures and elected to take no action to mitigate those control failures.

(8) *the failure to cooperate with the agency in effecting early resolution of the problem*: The record reflects that Ms. Russ Anderson's interactions with the OCC examiners exacerbated the adverse implications of the Community Bank's risk management control failure, through her failure to exercise credible challenge to the Community Bank's first line of defense and failure to properly supervise the teams in the first line of defense responsible for identifying such failure.

(9) *concealment of the misconduct*: The record reflects Ms. Russ Anderson persistently provided to the Board and to the OCC little or no notice of the ineffectiveness of Community Bank's risk management controls, notwithstanding her position as the Community Bank's GRO and her placement on risk-management committees where the mission of those committees mandated disclosure and not concealment of known issues.

(10) *any threat of loss, actual loss, or other harm to the institution, including harm to the public confidence in the institution, and the degree of such harm:* The record reflects significant material losses sustained by the Bank related to team member sales practices misconduct, both financial and reputational losses, that threatened public confidence in the Bank to a significant degree, losses that were mitigated only when external auditors were employed to quantify the true scope of that harm.

(11) *the respondent's financial gain or other benefit from the misconduct*: The record reflects that Ms. Russ Anderson was able to profit from the Bank's increased income and value, where that value was increased only due to the pervasive sales practices culture that exposed the Bank to financial loss in the long run. Until those risks were exposed, Ms. Russ Anderson was highly compensated as the Community Bank's GRO, allowing her to benefit from her misconduct.

(12) *any restitution paid by the respondent for the losses*. Nothing in the record suggests Ms. Russ Anderson or anyone else has paid restitution for the Bank's losses.

(13) *any history of previous misconduct, particularly where similar to the actions under consideration*: Apart from the significant course of time over which ineffective risk management controls permitted pervasive sales practices misconduct by team members in the Community Bank, the record is silent regarding similar misconduct by Ms. Russ Anderson in her previous postings.

(14) *previous criticism of the institution or individual for similar actions*: There is no record of previous criticism of either the Bank or Ms. Russ Anderson apart from the misconduct alleged in the Notice of Charges.

(15) *presence or absence of a compliance program and its effectiveness*: Although there

is evidence in the record of the Bank's development of compliance programs after the issuance of five MRAs, two of which directly addressed the Community Bank's first line of defense, the record does not establish effective compliance programs regarding risk management control failures at the Community Bank during the relevant period, until sales goals were eliminated in 2016.

(16) *tendency to engage in violations of law, unsafe or unsound practices or breaches*: The record reflects Ms. Russ Anderson had a tendency to deny responsibility for risk-management control functions that were clearly hers to fulfill, including responsibilities arising out of her membership on critical risk-management committees.

(17) *the existence of agreements, commitments, orders or conditions imposed in writing intended to prevent violations*: The record includes written directives issued by the OCC that were intended to prevent violations, where responses from Ms. Russ Anderson and the risk-management committees on which she served could have but did not effectively address those matters requiring attention.

Upon a sufficient showing that each of these factors were considered by the OCC when arriving at such assessments,[2811] and upon my separate review of the evidence presented during the hearing relating to each of these factors, sufficient cause has been shown to recommend the issuance of an order assessing a $10 million civil money penalty against Ms. Russ Anderson.

7. **Key Factual Findings**

1. Beginning in not later than January 2013, Ms. Russ Anderson had actual notice that controls put in place by Community Bank's first line of defense were not effective against risks related to sales practices misconduct by Community Bank's team members.
2. Between January 2013 and mid-2016, the number of Bank products per household was the key metric through which the Bank benefitted through increased revenue and customer retention. The metric was critical to the Bank's reputation because it was disclosed in SEC filings and was closely watched by investors and analysts.
3. In February 2015 the OCC notified Ms. Russ Anderson that between January 2013 and February 2015 oversight of the Community Bank's cross-sell activities lacked transparency and needed to be formalized in a governing framework that describes roles and responsibilities, lines of reporting, escalation protocols, incentive compensation oversight, and quality assurance processes. Further, the OCC noted that the lack of a comprehensive governance framework could expose the Community Bank to heightened reputation risk through negative publicity, and that without a more formal structure it would be difficult to ensure compliance with the Bank's values and goals for achieving customer satisfaction and strategic and financial objectives.

---

[2811] See OCC Ex. 2377 (Declaration of OCC Acting Examiner-in-Charge Tanya K. Smith, March 23, 2021).

Appellate Case: 25-1079     Page: 1177     Date Filed: 05/16/2025 Entry ID: 5517644

Add. 1175

4. Between January 2013 and mid-2016, sales practices violations were widespread and driven by a systemic disconnect between incentives available to team members and team members' ethical and legal obligations.

5. Between January 2013 and mid-2016, Ms. Russ Anderson failed to identify control deficiencies in Community Bank's incentive compensation programs and the relationship between those programs and sales practices misconduct by Community Bank's team members.

6. Between January 2013 and mid-2016, Ms. Russ Anderson failed to provide credible challenge to the Community Bank's leadership (including Carrie Tolstedt) regarding the Community Bank's risk culture. Between January 2013 and mid-2016, Ms. Russ Anderson failed to take effective measures to determine the root cause of sales practices misconduct by Community Bank's team members.

7. Between January 2013 and mid-2016, Ms. Russ Anderson failed to effectively escalate risk issues related to sales practices misconduct by Community Bank team members and controls over such misconduct.

8. Between late 2013 (with the publication of two L.A. Times articles regarding sales practices pressure and related misconduct by team members of the Community Bank) and mid-2016, Ms. Russ Anderson failed to take meaningful action to escalate known issues regarding controls over sales risk management and sales risk culture in the Community Bank.

9. By late 2013, sales practices misconduct by Community Bank team members was widespread in scope and nature, and persisted as a material risk to the safety and soundness of the Bank throughout 2014 to 2016. Between 2013 and mid-2016, Ms. Russ Anderson persistently and knowingly failed to address known risk-management control failures in the Community Bank, exposing the Bank to financial, reputational, and regulatory risk that exceeded the Bank's risk appetite.

10. Through the independent analysis by PwC commissioned by the Bank in 2015 and completed in 2017, the Bank learned that at least 1.8 million potentially unauthorized accounts were opened between 2013 and 2016; and that simulated funding occurred across the Bank's nationwide branch network and was not limited to Los Angeles or Orange County, California.

11. In 2016, the Bank's Corporate Risk unit determined that as of November 2016, 40,600 team members had potentially engaged in simulated funding and that at the time of this determination there were 19,900 currently employed team members who had potentially engaged in such misconduct.

12. Between 2013 and mid-2016, the risks associated with sales practices misconduct by Community Bank team members exceeded and contravened the Bank's established risk appetite.

13. Throughout 2014 to 2016, Ms. Russ Anderson was aware of the scope and nature of the risk, including regulatory and reputational risk, associated with sales practices misconduct by Community Bank team members, and knew of control failures within Community Bank's first line of defense related to that risk.

Add. 1176

14. Throughout 2013 to mid-2016, Ms. Russ Anderson failed to exercise credible challenge to known deficiencies in controls that had been put in place under the direction of Ms. Tolstedt that were supposed to detect and prevent sales practices misconduct by Community Bank team members.

15. Between late 2013 and 2016, Ms. Russ Anderson concealed from members of the Bank's Audit & Examination Committee, its Enterprise Risk Management Committee, its Board of Directors, and the OCC examiners the extent of sales practices misconduct being committed by Community Bank team members and the inadequacy of controls related to such misconduct.

16. Throughout 2013 to 2016, Ms. Russ Anderson failed to take effective measures to identify the root cause of the risks associated with sales practices misconduct by Community Bank's team members.

17. Throughout 2013 to 2016, Ms. Russ Anderson failed to take sufficient measures to assure that effective preventative and detective controls tied to team member sales practices misconduct were in place at the Community Bank.

18. Throughout 2013 to 2016, Ms. Russ Anderson failed to effectively supervise WFAS staff members and failed to provide credible challenge regarding the management of risks associated with team member sales practices misconduct in the Community Bank. **This conduct constituted unsafe or unsound practice and violated fiduciary duties Ms. Russ Anderson owed to the Bank.**

19. Whether or not a customer realized a financial harm, at a minimum the Bank suffered a reputational injury when a customer learns that an account had been opened that the customer did not want or request.

20. Although she was aware of reports of sales practices misconduct from across the bank branch system, Ms. Russ Anderson took no steps in early 2013 to determine the true scope and reach of such misconduct, nor did she determine whether Community Bank's first line of defense had effective controls in place that would determine the root cause of such misconduct, nor did she take steps to determine whether the first line of defense had controls to assure the culture in the Community Bank adhered to the Bank's Vision and Values. **Failing to take such steps constituted unsafe or unsound banking practices and violated the fiduciary duties Ms. Russ Anderson owed to the Bank.**

21. October 3, 2013, the L.A. Times published an article written by E. Scott Reckard under the headline, "WELLS FARGO FIRES WORKERS ACCUSED OF CHEATING ON SALES GOALS". The article reported that the Bank had fired 30 employees in the Los Angeles region for opening accounts that were never used and attempting to manipulate customer-satisfaction surveys. The article further reported the pressure to meet sales goals was intense and that there were known cases of forged customer signatures and accounts opened without customer knowledge.

22. On December 21, 2013, the L.A. Times published a second article, also by Mr. Reckard, with the headline: "WELLS FARGO'S PRESSURE-COOKER SALES CULTURE COMES AT A COST". The article stated it was based on interviews

with 28 former and seven current employees across nine states. This article reported that employees were threatened with termination if they failed to meet their sales goals.

23. On May 4, 2015, the City Attorney of Los Angeles sued the Bank in connection with the Community Bank's sales practices. The Complaint alleged the Wells Fargo & Company and Wells Fargo Bank, N.A. had for years victimized their customers by using pernicious and often illegal sales tactics to maintain high levels of sales of their banking and financial products. It alleged the banking business model employed by Wells Fargo was based on selling customers multiple banking products. It alleged that in order to achieve its goal of selling products and services to each customer, Wells Fargo imposed unrealistic sales quotas on its employees, and adopted policies that drove its bankers to engage in fraudulent behavior to meet those unreachable goals.

24. The lawsuit alleged that as a result, Wells Fargo's employees engaged in unfair, unlawful, and fraudulent conduct, including opening customer accounts, and issuing credit cards, without authorization. It alleged that on the rare occasions when Wells Fargo did take action against its employees for unethical sales conduct, Wells Fargo further victimized its customers by failing to inform them of the breaches, refund fees they were owed, or otherwise remedy the injuries that Wells Fargo and its bankers have caused. It alleged that Wells Fargo had engineered a virtual fee-generating machine, through which its customers were harmed, its employees took the blame, and Wells Fargo reaped the profits.

25. An independent sales practices assessment commissioned by the Board in mid-2015 and shared with Ms. Russ Anderson resulted in an October 2015 report finding the Community Bank's first line of defense did not have a uniform way of evidencing sufficient control over sales practices issues; that many bankers felt pressure to meet sales targets that they perceive to be unreasonable and that this may occur at the potential expense of sales quality; that the Company's Vision and Values were not fully understood or incorporated by team members; that there was no consistent process or governance model to ensure all customer complaints were captured, monitored, addressed and reported across the Community Bank; that eligibility thresholds under the Community Bank's incentive compensation plan may have been misaligned with store traffic and customer demand; and that cases that should be reported through the Company's Ethics Line were not being documented or captured.

26. In September 2015, the Board commissioned an independent analysis of one form of sales practices misconduct – simulated funding – to determine the number of accounts that may have been subject to such activity and to report on the harm – primarily financial harm – related to such activity. The analysis, issued on December 18, 2015, identified two types of harm: primary financial harm, where customers paid account fees directly on the unauthorized account as well as indirectly through the Bank's set-off process; and secondary financial harm, which was defined as net overdraft fees paid by the customer on his or her

authorized account from which the simulated funding occurred, or due to the Bank's set-off process.

27. In November 2016, the OCC completed an examination of the Bank's Talent Management and Incentive Compensation programs. Through this examination, the examiners found the Bank's incentive compensation program was weak and in need of improvement. Examiners found weaknesses in the design and execution of compensation and performance management practices, found that management lacked a holistic and cohesive testing, monitoring, and validation strategy that would ensure risks were identified and well controlled. It found that performance management and incentive compensation decisions did not adequately and consistently incorporate adverse risk outcomes or conduct issues. It found that other control functions, including risk, compliance, and audit, should have a more prominent role in incentive compensation design and risk management. It found that these weaknesses exposed the Bank to increased operational, compliance, regulatory, and reputational risks, and were considered unsafe or unsound banking practices.

28. **Ms. Russ Anderson's fiduciary duties arose not only because of her position as** the Group Risk Officer for the Community Bank, but also through the mandates of the committees on which she served. As a member of these committees, Ms. Russ Anderson had fiduciary responsibilities based on the mission of each committee. Her presence on these committees gave her the opportunity and the duty to gather information concerning risk activities. With that information, she had the duty to engage in credible challenge related to those activities. **The failure to gather such information and engage in credible challenge related to those activities constituted unsafe or unsound banking practices and constituted a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

29. As a member of these committees, Ms. Russ Anderson had fiduciary duties that included addressing risk issues that were, or should have been, made known to committee members, escalating the issues where appropriate, and ensuring that the issues were promptly resolved. Notwithstanding the fiduciary duties associated with her membership in these committees, throughout 2013 to 2016 Ms. Russ Anderson persistently failed to present to members of these committees material information regarding the mismanagement of sales practice risk controls by Community Bank's first line of defense. **The failure to present such information constituted unsafe or unsound banking practices and constituted a breach of the fiduciary duties Ms. Russ Anderson owed to the Bank.**

30. **Ms. Russ Anderson's failure to take effective steps to identify and address sales practices misconduct in the Community Bank persisted over at least four years, a**nd expressed itself as a pattern of misconduct, one that included willful neglect of the duty to familiarize herself with the scope and nature of sales practices misconduct by Community Bank's team members and extant controls related to such misconduct, willful failure to disclose through escalation

information establishing the root cause of such misconduct, and willful failure to provide credible challenge to assure team member compliance with regulatory and professional audit standards.

31. Ms. Russ Anderson's failure to take effective steps to identify and address sales practices misconduct in the Community Bank was likely to cause and did cause more than a minimal loss to the Bank. Those losses included the Bank's payment of civil penalties and criminal fines, and costs the Bank bore to rebuild trust with the holding company's shareholders, customers, the public, and regulators. Those losses and costs continue, as the Bank continues to remediate its present and past customers.

32. Through her failure to disclose the inadequacy of the Community Bank's risk management control processes, sales practice misconduct by Community Bank team members continued throughout 2013 to 2016. During this time, because the problem was unaddressed and hidden from the public and myriad stakeholders, Ms. Russ Anderson was able to retain her employment and receive the benefits of being a highly regarded and compensated member of the Bank's senior officer staff.

33. Although the Community Bank's business model incented misconduct, it was profitable throughout the relevant period, which benefited Ms. Russ Anderson during that same period. In addition to being able to retain his position as the Group Risk Officer for the Community Bank, by allowing the misconduct to proliferate Ms. Russ Anderson benefited from bonus payments and stock increases that were directly tied to the Bank's financial performance. As long as the true risks associated with such misconduct were withheld from the Bank's A&E Committee, its Enterprise Risk Management Committee, the Bank's Board of Directors, and the OCC (and other regulators), Ms. Russ Anderson, month by month from 2013 through 2016, received the material financial and other benefits that came from such non-disclosure.


## Conclusions of Law

1. Preponderant evidence presented during the hearing established that Ms. Russ Anderson is an institution-affiliated party, that the Bank is a financial institution as that term is used in the Federal Deposit Insurance Act, and that the OCC is the appropriate Federal regulator authorized to issue cease and desist orders under the FDI Act.

2. Preponderant evidence presented during the hearing established that Ms. Russ Anderson has engaged in unsafe and unsound practices in conducting the business of the Bank, sufficient to warrant the issuance of a prohibition order as proposed by Enforcement Counsel in their post-hearing brief.

3. Preponderant evidence presented during the hearing established that Ms. Russ Anderson engaged in misconduct by engaging in unsafe or unsound practice, breached fiduciary duties she owed to the Bank; (2) the Bank has suffered and

Add. 1180

Appellate Case: 25-1079    Page: 1182    Date Filed: 05/16/2025 Entry ID: 5517644

will probably continue to suffer financial loss or other damage by reason of Ms. Russ Anderson's misconduct; that Ms. Russ Anderson's misconduct could have prejudiced and did prejudice the Bank's depositors, and her misconduct resulted in financial gain or other benefit to her; and (3) her misconduct involved both her personal dishonesty and her willful or continuing disregard for the safety or soundness of the Bank.

4. After taking into account each of the statutory and regulatory factors relevant to the assessment of civil money penalties in this context, preponderant evidence presented during the hearing established cause to assess a $10 million civil money penalty against Ms. Russ Anderson.

5. Statute of Limitations[2812]

The parties assert the five-year statute of limitations in 28 U.S.C. § 2462 applies to the civil money penalty action and the cease and desist order.[2813]

Enforcement Counsel have persuasively established that the cited statute does not apply to enforcement actions seeking cease and desist orders.[2814] As such and for the reasons cited in Enforcement Counsel's Post-Hearing Reply Brief as to Paul McLinko, the assertion is found to be without merit and the affirmative defense is denied as to limitations applicable to cease and desist actions under the Federal Deposit Insurance Act.

There is no dispute among the parties that because prohibition orders are punitive in nature the five-year limitation in 28 U.S.C. § 2462 is applicable.

Respondents argue the limitations period under Section 2462 is triggered once the elements of a claim are present.[2815] Enforcement Counsel respond that even if cease and desist actions are properly subject to the five-year limitation the

---

[2812] Respondent Claudia Russ Anderson's Proposed Findings of Fact and Conclusions of Law at 149; Respondent Claudia Russ Anderson's Post-Hearing Reply Brief at 87; Respondent David Julian's Proposed Findings of Fact and Conclusions of Law at 107; Respondent David Julian's Post-Hearing Reply Brief at 92; Respondent Paul McLinko's Proposed Findings of Fact and Conclusions of Law at 119; Respondent Paul McLinko's Post-Hearing Reply Brief at 92.

[2813] Respondent David Julian's Proposed Findings of Fact and Conclusions of Law at 107.

[2814] See Enforcement Counsel's Post-Hearing Reply Brief as to Paul McLinko at 92-93, citing SEC v. Graham, 823 F.3d 1357, 1362 (11th Cir. 2016) ("Because injunctions are equitable, forward-looking remedies and not penalties within the meaning of § 2462, we conclude that the five-year statute of limitations is inapplicable to injunctions such as the one the SEC sought in this case."); See First Nat'l Bank of Bellaire, 697 F.2d 674 at 680-81 (5th Cir. 1983) ("Congress designed the Cease and Desist power to give the Comptroller 'a statutory means of moving quickly and effectively to require adherence to the law and cessation and correction of unsafe or improper practices.' ... In other words, the Cease & Desist power was envisioned as a means of correcting improprieties and not as a form of punitive relief."); In re ***, Nos. FDIC-83-252b&c, FDIC-84-49b, -50e, 1985 WL 303871, at *104 (Aug. 19, 1985) (final decision); In re The Stephens Security Bank, 1991 WL 789326, at *4 (FDIC Aug. 9, 1991).

[2815] Respondent David Julian's Proposed Findings of Fact and Conclusions of Law at 108.

Add. 1181

Appellate Case: 25-1079     Page: 1183     Date Filed: 05/16/2025 Entry ID: 5517644

continuing nature of Respondents' action permits this enforcement action, as the misconduct attributed to each Respondent continued from before the five-year period well into the five-year period.

In support of their argument, Respondents cite to *Blanton v. OCC*.[2816] In *Blanton*, the Court of Appeals held:

> A claim generally accrues "when the factual and legal prerequisites for filing suit are in place." *Proffitt v. Fed. Deposit Ins. Corp.*, 200 F.3d 855, 862 (D.C. Cir. 2000) (quoting *3M Co. (Minnesota Min. & Mfg.) v. Browner*, 17 F.3d 1453, 1460 (D.C. Cir. 1994)). Here, an actionable infraction consists of two elements: first, the bank official must "recklessly engage[ ] in an unsafe or unsound [banking] practice"; and second, the reckless practice must be "part of a pattern of misconduct." 12 U.S.C. § 1818(i)(2)(B)(i)(II), (ii)(I). *For our purposes, then, a claim accrues each time a bank official recklessly engages in an unsafe or unsound banking practice as part of a pattern of misconduct.*
>
> Blanton contends that the OCC's overdraft claim accrued long before June 30, 2010, because the Bank's practice of honoring Campos's overdrafts began before Blanton assumed the CEO role. But the initial onset of the Bank's ongoing (and preexisting) pattern of honoring the overdrafts did not alone trigger the limitations clock. *Rather, each instance of an unsafe or unsound practice triggers a new claim if part of a pattern of misconduct.* See *Proffitt*, 200 F.3d at 863-64.
>
> As a result, each time the Bank, under Blanton's direction, honored a Campos overdraft without having imposed adequate risk controls, an unsafe or unsound banking practice occurred, continuing the pattern of misconduct and causing a new claim to accrue. It follows that each honored overdraft after June 30, 2010 (there were at least ten) constituted an actionable banking practice as part of a pattern of misconduct. And even though the OCC "might well have brought an action earlier," its "failure to do so" does not make the claims it elected to bring "untimely." Id. at 864.

Respondents' conduct as reported above constituted a continuous pattern of inactions, affirmative misconduct, and false and misleading reporting that was inconsistent with their respective risk management and control function responsibilities. Under the continuing violations doctrine, where one of the cognizable effects of Respondents' respective misconduct has occurred within the

---

[2816] Respondent David Julian's Proposed Findings of Fact and Conclusions of Law at 108, citing *Blanton v. OCC*, 909 F.3d 1162, 1171 (D.C. Cir 2018).

Add. 1182

Appellate Case: 25-1079    Page: 1184    Date Filed: 05/16/2025 Entry ID: 5517644

limitations period, an action to enforce Section 1818 is timely.[2817]

Under this doctrine, a continuing violation occurs when a defendant creates a situation from which new claims continue to arise, notwithstanding that some of the defendants' specific acts fell outside the limitations period.[2818] Under the continuing violations doctrine, the statute of limitations under 28 U.S.C. § 2462 is tolled for a claim that otherwise would be time-barred where the violation giving rise to the claim continues to occur within the limitations period.[2819] I find that from the record now assembled, this is the case for all claims presented against Mr. Julian and Mr. McLinko. As such, given the facts reported above, the limitations of actions defense raised by Mr. Julian and Mr. McLinko is without merit and is denied.

Where conduct was not shown to be continuing, and where such conduct predated January 23, 2015 (the limitations period based on the January 23, 2020 filing of the Notice of Charges), 28 U.S.C. § 2462 bars enforcement action where the action seeks a prohibition order. Thus, to the extent claims based on Ms. Russ Anderson's violation of federal laws that were committed prior to January 23, 2015, those claims are barred. The record reflects, however, that allegations that supported the claims of federal law violations by Ms. Russ Anderson were based on her conduct during the February 2015 OCC examination and were not based on conduct predating January 23, 2015.

Finding insufficient factual and legal bases to support the affirmative defense based on 28 U.S.C. § 2462, the defense is without merit and is denied.

Respondents' Affirmative Defenses

Estoppel

The parties assert the Tribunal erred in striking Mr. Julian's affirmative defenses, including the defense of estoppel.[2820] For the reasons articulated in the Tribunal's April 1, 2020 Order Regarding Enforcement Counsel's Motion to Strike Respondents' Affirmative Defenses, the assertion is found to be without merit and

---

[2817] *Proffitt v. Fed. Deposit Ins. Corp.*, 200 F.3d 855, 861 (D.C. Cir. 2000).

[2818] *In re Conover*, Nos. FDIC-13-214e, FDIC-13-217k, 2016 WL 10822038, at * 21 (Nov. 29, 2016) (final decision) (citing *In re Leuthe,* Nos. FDIC-95-15e, FDIC-95-16k, 1998 WL 438323, at *5 (June 26, 1998) (final decision)); *Courtney v. La Salle Univ.*, 124 F.3d 499, 505 (3d Cir. 1997) ("[I]n the case of a continuing unlawful practice, every day that the practice continues is a fresh wrong for purposes of the statute of limitations.").

[2819] *Nat'l Park & Conversation Ass'n, Inc. v. Tenn Valley Auth.*, 502 F.3d 1316, 1322 (11th Cir. 2007).

[2820] Respondent David Julian's Proposed Findings of Fact and Conclusions of Law at 109; Respondent Paul McLinko's Proposed Findings of Fact and Conclusions of Law at 143; Respondent Claudia Russ Anderson's Proposed Findings of Fact and Conclusions of Law at 150.

Appellate Case: 25-1079    Page: 1185    Date Filed: 05/16/2025 Entry ID: 5517644

the contents of that Order are incorporated by this reference. The parties argue further that, with respect to the evidence presented during the hearing, the OCC provided positive assessments and feedback; that they relied upon that feedback; that the reliance was detrimental; that that the OCC now seeks to deflect blame from the OCC to the Respondents.[2821]

While Respondents are not precluded from the affirmative defense of equitable estoppel, they bear an increased burden in order to prevail on their estoppel claim. "To succeed on a claim of equitable estoppel against the government, a plaintiff must not only prove all the elements of equitable estoppel, but also that the government committed affirmative misconduct." *Charleston Hous. Auth. v. U.S. Dep't of Agric.*, 419 F.3d 729, 739 (8th Cir.2005). Through this affirmative misconduct requirement, "[t]he Supreme Court has imposed a more stringent standard for estopping the government because there is a strong public interest in upholding the rule of law, even where hardship may result to individuals in particular cases." *Wang*, 823 F.2d at 1276. The claimant bears the "heavy burden" of establishing that the government engaged in affirmative misconduct. *Morgan v. Comm'r*, 345 F.3d 563, 566 (8th Cir.2003).

If a claimant satisfies the affirmative misconduct requirement, he then must prove the four traditional elements of estoppel: (1) a "false representation by the government;" (2) government intent to induce the claimant to act on the misrepresentation; (3) a lack of knowledge or inability to obtain true facts on the part of the claimant; and (4) the claimant's "reliance on the misrepresentation to his detriment."[2822]

Respondents assert the government engaged in affirmative misconduct by providing "positive assessments and feedback concerning Mr. Julian and WFAS."[2823] This assertion will not support the affirmative defense relied upon by Respondents.[2824] While the record reflects positive feedback had been provided by the OCC's examiners, the record also reflects that the basis for that feedback was reporting by Respondents that falsely assured the OCC, the Bank's A&E committee, and its Board of Directors that Community Bank's risk management controls over sales practices misconduct was proactive and effective. No reliance on this body of misinformation (supplied by Mr. Julian, Ms. Russ Anderson, and Mr. McLinko directly and through their roles as members of risk management committees) can support an estoppel claim.

---

[2821] Respondent David Julian's Proposed Findings of Fact and Conclusions of Law at 109.

[2822] *Rutten v. United States*, 299 F.3d 993, 995 (8th Cir.2002).

[2823] Respondent David Julian's Proposed Findings of Fact and Conclusions of Law at 109.

[2824] See, *Bartlett v. U.S. Dep't of Agric.*, 716 F.3d 464, 475–76 (8th Cir. 2013),

Add. 1184

Appellate Case: 25-1079     Page: 1186     Date Filed: 05/16/2025 Entry ID: 5517644

Upon these findings, the affirmative defense of estoppel as pleaded and as presented through the evidence adduced during the hearing is without merit and is denied.

Constitutional Violations

   a. Article II[2825]
      The Respondents asserted deference given to examiners under *Sunshine*[2826] violated the Appointments Clause,[2827] and that the presiding ALJ was not validly appointed by the appropriate head of a department and that any subsequent ratification of such appointment does not cure the deficiency. Finding an insufficient factual and legal basis has been advanced in support of this claim, I find the claims raised by Respondents to be without merit and are denied.

   b. Article III[2828]
      The Respondents assert this administrative enforcement action is unconstitutional. In support, they cited Respondents' Joint Motion for Summary Disposition on the Basis of Their Appointments, Removal, and Improper Signatory Defenses (May 12, 2020); Respondents' Joint Motion for Summary Disposition on the Basis of Their Article III, Seventh Amendment, and Due Process Defenses (May 12, 2020). The merits of these claims have been addressed by subsequent orders of this Tribunal, the contents of which are incorporated by reference. Upon this record, the claims raised by Respondents in these motions are denied for the reasons appearing in the record.

   c. Discovery
      The Respondents asserted the Tribunal erred by striking their discovery requests seeking information covered by *Brady v. Maryland*.[2829] The merits of these claims were addressed in the Order Regarding

---

[2825] Respondent David Julian's Post-Hearing Reply Brief at 93-94; Respondent Claudia Russ Anderson's Proposed Findings of Fact and Conclusions of Law at 150; Respondent Claudia Russ Anderson's Post-Hearing Reply Brief at 87; Respondent David Julian's Proposed Findings of Fact and Conclusions of Law at 123-31; Respondent David Julian's Post-Hearing Reply Brief at 98-99; Respondent Paul McLinko's Proposed Findings of Fact and Conclusions of Law at 144-47; Respondent Claudia Russ Anderson's Proposed Findings of Fact and Conclusions of Law at 150; Respondent Claudia Russ Anderson's Post-Hearing Reply Brief at 87.

[2826] *Sunshine State Bank v. FDIC*, 783 F.2d 1580 (11th Cir. 1986).

[2827] Julian COL ¶¶425-60.

[2828] Respondent David Julian's Proposed Findings of Fact and Conclusions of Law at ¶¶461-66.

[2829] Julian COL at ¶ 467.

Appellate Case: 25-1079     Page: 1187     Date Filed: 05/16/2025 Entry ID: 5517644

Enforcement Counsel's Motion to Strike Portions of Respondent Julian's et al. Fourth Request for Production of OCC Documents (Oct. 28, 2020). Upon this record, the claims raised by Respondents in these motions are denied for the reasons appearing in the record.

d.  Summary Disposition

The Respondents asserted the Tribunal erred in entertaining summary disposition and in ruling that Enforcement Counsel had established 356 statements of material fact concerning Mr. Julian and that only twelve of the asserted statements were controverted.[2830] The record includes the analysis of claims presented by the parties, which analysis is incorporated by reference.[2831] Upon this record, the claims raised by Respondents in these motions are denied for the reasons appearing in the record.

e.  Pretrial

The Respondents asserted the Tribunal erred in striking certain witnesses and quashing certain subpoenas addressed to those witnesses.[2832] The record includes an analysis of the claims presented by the parties, which analysis is incorporated by reference.[2833] Upon this record, the claims raised by Respondents in these motions are denied for the reasons appearing in the record.

f.  The Hearing

The Respondents asserted the Tribunal erred by making an opening statement at the start of the evidentiary hearing, on the ground that the statement constituted evidence of prejudgment.[2834] Upon review of the record and finding the statement consisted of findings already entered into the record through the summary disposition process, I find the claim is without merit and is denied.

The Respondents asserted error in the order of hearing, including orders regarding when witnesses would be permitted to testify, the import of answers provided, whether the questions sought information beyond the scope of direct examination, examiner competence and credibility, limits on the scope of testimony permitted, the provisional admission of documentary evidence, the

---

[2830] Julian COL at ¶¶ 467-74; Respondent David Julian's Post-Hearing Reply Brief at 94-98 Respondent Claudia Russ Anderson's Proposed Findings of Fact and Conclusions of Law at 150 (Due Process Clause, consultation with counsel, Summary Disposition); Respondent Claudia Russ Anderson's Post-Hearing Reply Brief at 87.

[2831] See Order Regarding Enforcement Counsel's Motions for Summary Disposition, issued July 20, 2021.

[2832] Julian COL at ¶¶ 475-76.

[2833] Order Regarding EC's Motions to Quash Hearing Subpoenas Directed to Certain OCC Personnel and Strike Them from Respondents' Witness Lists and for Order to Show Cause, issued Aug. 18, 2021.

[2834] Julian COL at ¶ 478.

Add. 1186

Appellate Case: 25-1079    Page: 1188    Date Filed: 05/16/2025 Entry ID: 5517644

admission of evidence for the truth of the matter asserted, the admission of evidence asserted to be not relevant, the admission of expert witness opinions, the admission of summary exhibits, the admission of prior statements, the admission of documents provided by the Bank, the admission of agreements between the Bank and other parties, the admission of certain spreadsheets, the admission of testimony regarding certain audits, the admission of or the exclusion of peer bank reports.[2835] Upon review of the premises and finding an insufficient factual and legal basis has been presented, I find the claims are without merit and are denied.

    g.   ALJ Recusal

The Respondents asserted the ALJ's conduct warranted recusal.[2836] The record includes an analysis of the claims presented by the parties, which analysis is incorporated by reference.[2837] Upon this record, the claims raised by Respondents in these motions are denied for the reasons appearing in the record.

    h.   Seventh Amendment [2838]

The Respondents asserted the administrative enforcement action violated his Seventh Amendment right to a jury trial, citing in support *Tull v. United States*, 481 U.S. 412, 417, 421-422, 425 (1987); *SEC v. Lipson*, 278 F.3d 656, 662 (7th Cir. 2002); and *Jarkesy v. SEC*, 2022 WL 1563613, at *4-5 (5th Cir. May 18, 2022).

Finding an insufficient factual and legal basis has been advanced to explain and support these claims, I find the claims raised by Respondents to be without merit and are denied.

    i.   Proposed Recommendation for a New Hearing

The Respondents[2839] proposed that if the Tribunal does not recommend the dismissal of the case against them, the Tribunal should recommend that the Comptroller grant a new hearing.[2840] In support, they incorporated by reference Respondents' Motion for Disqualification Based on Personal

---

[2835] Julian COL at ⁋ 479-504; Respondent David Julian's Proposed Findings of Fact and Conclusions of Law at 123-31; Respondent David Julian's Post-Hearing Reply Brief at 98-99; Respondent Paul McLinko's Proposed Findings of Fact and Conclusions of Law at 144-47; Respondent Claudia Russ Anderson's Proposed Findings of Fact and Conclusions of Law at 150; Respondent Claudia Russ Anderson's Post-Hearing Reply Brief at 87.

[2836] Julian COL at ⁋⁋ 505-08.

[2837] See, Order Regarding Respondents' Motion for Disqualification Based on Personal Bias and Other Disqualification under 5 U.S.C. § 556(b), issued November 3, 2021, and Order Regarding Respondents' Motion for Disqualification Based on Personal Bias and Other Disqualification, issued Nov. 5, 2021.

[2838] Respondent David Julian's Proposed Findings of Fact and Conclusions of Law at 131.

[2839] Ms. Russ Anderson incorporated this claim by reference, see Respondent Russ Anderson's Post-Hearing Reply Brief at 87; as did Mr. McLinko, see Respondent McLinko's Post-Hearing Reply Brief at 1.

[2840] Respondent Julian's Post-Hearing Reply Brief at 100.

Appellate Case: 25-1079   Page: 1189   Date Filed: 05/16/2025   Entry ID: 5517644

Bias and Other Disqualification Under 5 U.S.C. § 556(b) (Oct. 15, 2021) and Respondents' Motion for Reconsideration (May 27, 2022).

I find the premises supporting this assertion to be without merit, for the reasons set forth in the Order Regarding Respondents' Objection Pursuant to 12 U.S.C. 1818(h)(1) and Motion for Reconsideration, issued on September 6, 2021, the Order Regarding Respondents' Motion for Disqualification Based on Personal Bias and Other Disqualifications under 5 U.S.C. § 556(b), issued on November 3, 2021 and the Order Regarding Respondents' Motion for Reconsideration and for Leave to File, issued on July 5, 2022. Incorporating by reference the determinations issued through these orders and finding Respondents have presented an insufficient factual and legal basis in support of the request for a new hearing, the request is denied.

    6.   Proposed Orders

A proposed Prohibition Order is attached, accompanied by a proposed Civil Money Penalty assessment against Ms. Russ Anderson.

Date: December 5, 2022

Christopher B. McNeil, JD, PhD
U.S. Administrative Law Judge
Office of Financial Institution Adjudication

## CERTIFICATE OF SERVICE

On October 20, 2022 and December 5, 2022, the Office of Financial Institution Adjudication provided hard drives containing the hearing exhibits and the certified record upon the Hearing Clerk, Office of the Comptroller of the Currency by encrypted hard drive, along with a copy of the index of the certified record, a copy of the index of exhibits, the Executive Summary, and Recommended Decision in OCC AA-EC-2019-81 regarding Respondent Claudia Russ Anderson.

Also on December 5, 2022, I served upon the parties by email transmission a copy of the index of the certified record, a copy of the index of exhibits, along with copies of the Executive Summary and Recommended Decision in OCC AA-EC-2019-81, Respondent Claudia Russ Anderson, upon:

Hearing Clerk:

Office of the Comptroller of the Currency
400 7th Street, S.W.
Washington, D.C. 20219
By email to: hearingclerk@occ.treas.gov

Enforcement Counsel:
William Jauquet, Assistant Director
Jason E. Friedman
Zina Lapidus
Tarek Sawi
Lauren R. Snook
Melinda Barnes
Sean Young
Lee Perla
Quinn Nguyen
Gary Spencer
Office of the Comptroller of the Currency
400 7th St SW
Washington, DC 20219
william.jauquet@occ.treas.gov
jason.friedman@occ.treas.gov
zina.lapidus@occ.treas.gov
tarek.sawi@occ.treas.gov
lauren.snook@occ.treas.gov
melinda.barnes@occ.treas.gov
sean.young@occ.treas.gov
lee.perla@occ.treas.gov
quinn.nguyen@occ.treas.gov
gary.spencer@occ.treas.gov

Treana D. Bennett
Western District Office
Office of the Comptroller of the Currency
1225 17th Street, Suite 300
Denver, CO 80202
treana.bennett@occ.treas.gov

Anna K. Mills
Northeastern District Office
Office of the Comptroller of the Currency
340 Madison Avenue, 5th Floor
New York, NY 10173
Anna.mills@occ.treas.gov

Add. 1189

**Respondents' Counsel:**

**Respondent Claudia Russ Anderson**
c/o Douglas A. Kelley
Daniel M. Scott
Stacy L. Bettison
Brett D. Kelley
Michael J. Tostengard
Perry F. Sekus
Jeffrey D. Smith
KELLEY, WOLTER & SCOTT, P.A.
Centre Village Offices
431 S. Seventh Street, Suite 2530
Minneapolis, MN 55415
dkelley@kelleywolter.com
dscott@kelleywolter.com
sbettison@kelleywolter.com
bkelley@kelleywolter.com
mtostengard@kelleywolter.com
psekus@kelleywolter.com
jsmith@kelleywolter.com

**Respondent David Julian**
c/o Franca Harris Gutierrez
Matthew T. Martens
Michael Carpenter
Rafael J. Gallardo Hevia
Charlie Johnson
Emily Gomez
Karin Dryhurst
Mikayla Foster
Sharon Kelleher

WILMER CUTLER PICKERING HALE AND DORR, LLP
1875 Pennsylvania Avenue NW Washington, DC 20006
franca.gutierrez@wilmerhale.com
matthew.martens@wilmerhale.com
Michael.Carpenter@wilmerhale.com
Rafael.GallardoHevia@wilmerhale.com

Charlie.Johnson@wilmerhale.com
Emily.Gomez@wilmerhale.com
Karin.Dryhurst@wilmerhale.com
Mikayla.Foster@wilmerhale.com
Sharon.Kelleher@wilmerhale.com
Jessica Lewis
Margaux Joselow
Dan Willey
Sierra Shear
Kimberly Crowley
WILMER CUTLER PICKERING HALE AND DORR, LLP
60 State Street
Boston, MA 02109
jessica.lewis@wilmerhale.com
Margaux.Joselow@wilmerhale.com
Dan.Willey@wilmerhale.com
Sierra.Shear@wilmerhale.com
kim.crowley@wilmerhale.com


Laura Goodall
WILMER CUTLER PICKERING HALE AND DORR, LLP
One Front Street, Suite 3500
San Francisco, CA 94111
Laura.Goodall@wilmerhale.com


Jose R. Valenzuela
WILMER CUTLER PICKERING HALE AND DORR, LLP
2600 El Camino Real Suite 400
Palo Alto, CA 94306
Jose.Valenzuela@wilmerhale.com


**Respondent Paul McLinko**
c/o Timothy P. Crudo
Rees F. Morgan
Benjamin C. Pulliam
Daniel M. Bruggebrew
Katharine Van Dusen
Mark Hejinian
Thomas Harvey
David Beach

Emily Margolis
Tom Lin
COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000
San Francisco, CA 94104
ef-tpc@cpdb.com
ef-rfm@cpdb.com
ef-bcp@cpdb.com
ef-dmb@cpdb.com
ef-ktv@cpdb.com
ef-mlh@cpdb.com
ef-tah@cpdb.com
ef-dcb@cpdb.com
ef-exm@cpdb.com
ef-txl@cpdb.com


Christopher B. McNeil JD, PhD
U.S. Administrative Law Judge
Office of Financial Institution Adjudication
ofia@fdic.gov (e-mail)
(703) 562-2740 (telephone)

# UNITED STATES OF AMERICA
# DEPARTMENT OF THE TREASURY
# OFFICE OF THE COMPTROLLER OF THE CURRENCY

In the Matter of
Claudia Russ Anderson
Former Community Bank Group Risk
Officer

Wells Fargo Bank, N.A.
Sioux Falls, South Dakota

OCC AA-EC-2019-81

## PROPOSED ORDER OF PROHIBITION AND
## ORDER FOR THE ASSESSMENT OF A CIVIL MONEY PENALTY

**WHEREAS**, the Office of the Comptroller of the Currency ("OCC") initiated prohibition and civil money penalty proceedings against Claudia Russ Anderson ("Respondent"), the former Community Bank Group Risk Officer of Wells Fargo Bank, N.A. ("Bank"), pursuant to 12 U.S.C. § 1818(e) and (i), through the issuance of a Notice of Charges for Orders of Prohibition and Orders to Cease and Desist and Notice of Assessments of a Civil Money Penalty dated January 23, 2020 in *In the Matter of Carrie Tolstedt, et al.* ("Notice") based on Respondent's conduct related to the Bank's sales practices misconduct problem;

**WHEREAS**, Respondent timely filed an Answer to the Notice and requested a hearing on February 11, 2020. Respondent filed an Amended Answer on August 7, 2020;

Page **440** of **443**

Add. 1193

**WHEREAS**, pursuant to 12 U.S.C. §§ 1818(e) and (i) and 12 C.F.R. Part 19, a hearing was conducted before an Administrative Law Judge in Sioux Falls, South Dakota and remotely via videoconference between September 13, 2021 and January 6, 2022. Respondent was given a full opportunity to appear, present evidence, examine and cross-examine witnesses, file proposed findings of fact and conclusions of law, and file post-hearing and reply briefs;

**NOW, THEREFORE**, having considered the evidence presented at said hearing and the record as a whole, the arguments of both parties, and the Recommended Decision issued by the presiding Administrative Law Judge, and pursuant to the authority vested in him by the Federal Deposit Insurance Act, as amended, 12 U.S.C. § 1818, the Comptroller of the Currency ("Comptroller") hereby issues the following prohibition and civil money penalty orders ("Order"):

## ARTICLE I
## JURISDICTION

(1) The Bank is an "insured depository institution" as that term is defined in 12 U.S.C. § 1813(c)(2).

(2) Respondent was an officer and employee of the Bank and was an "institution-affiliated party" of the Bank as that term is defined in 12 U.S.C. § 1813(u), having served in such capacity within six (6) years from the date of the Notice. *See* 12 U.S.C. § 1818(i)(3).

(3) The Bank is a national banking association within the meaning of 12 U.S.C. § 1813(q)(1)(A), and is chartered and examined by the OCC. *See* 12 U.S.C. § 1 *et seq.*

(4) The OCC is the "appropriate Federal banking agency" as that term is defined in 12 U.S.C. § 1813(q) and is therefore authorized to initiate and maintain these prohibition and civil money penalty actions against Respondent pursuant to 12 U.S.C. § 1818(e) and (i).

## ARTICLE II
## ORDER OF PROHIBITION

Pursuant to the authority vested in him by the Federal Deposit Insurance Act, as amended, 12 U.S.C. § 1818, the Comptroller hereby orders that:

(1) With respect to the institutions and agencies set forth in paragraph (2) of this Article, Respondent hereby shall not:

Appellate Case: 25-1079     Page: 1196     Date Filed: 05/16/2025 Entry ID: 5517644

(a)      participate in any manner in the conduct of their affairs;

(b)      solicit, procure, transfer, attempt to transfer, vote, or attempt to vote any proxy, consent, or authorization with respect to any voting rights;

(c)      violate any voting agreement previously approved by the "appropriate Federal banking agency," as defined in 12 U.S.C. § 1813(q); or

(d)      vote for a director, or serve or act as an "institution-affiliated party," as defined in 12 U.S.C. § 1813(u).

(2)      The prohibitions in paragraph (1) of this Article apply to the following institutions and agencies:

(a)      any insured depository institution, as defined in 12 U.S.C. § 1813(c);

(b)      any institution treated as an insured bank under 12 U.S.C. § 1818(b)(3), (b)(4) or (b)(5);

(c)      any insured credit union under the Federal Credit Union Act;

(d)      any institution chartered under the Farm Credit Act of 1971;

(e)      any appropriate Federal depository institution regulatory agency; and

(f)      the Federal Housing Finance Agency and any Federal Home Loan Bank.

(3)      The prohibitions of paragraphs (1) and (2) of this Article shall cease to apply with respect to a particular institution if Respondent obtains the prior written consent of both the OCC and the institution's "appropriate Federal financial institutions regulatory agency," as defined in 12 U.S.C. § 1818(e)(7)(D).

## ARTICLE III

## <u>ORDER FOR CIVIL MONEY PENALTY</u>

(1)      Respondent shall pay a civil money penalty in the amount of Ten Million Dollars ($10,000,000.00), which shall be paid in full upon the effective date of this Order.

(2)      Respondent shall make payment in full via wire transfer, in accordance with instructions provided by the OCC. The docket number of this case (AA-EC- 2019-81) shall be referenced in connection with the submitted payment.

(3)

**ARTICE IV**

**CLOSING**

(1)      Respondent is prohibited from seeking or accepting indemnification from any insured depository institution for the civil money penalty assessed and paid in this matter.

(2)      If, at any time, the Comptroller deems it appropriate in fulfilling the responsibilities placed upon him by the several laws of the United States of America to undertake any action affecting the Respondent, nothing in this Order shall in any way inhibit, estop, bar or otherwise prevent the Comptroller from so doing.

(3)      The provisions of this Order are effective at the expiration of thirty (30) days after the service of this Order by the Comptroller, through his authorized representative whose hand appears below, and shall remain effective and enforceable, except to the extent that, and until such time as, any provisions of this Order shall have been amended, suspended, waived, or terminated in writing by the Comptroller.

IT IS SO ORDERED, this _____ day of _____, 202_

_____
Comptroller of the Currency
Office of the Comptroller of the Currency

Add. 1196

Appellate Case: 25-1079      Page: 1198      Date Filed: 05/16/2025 Entry ID: 5517644

UNITED STATES OF AMERICA
DEPARTMENT OF THE TREASURY
OFFICE OF THE COMPTROLLER OF THE CURRENCY

| | | |
|---|---|---|
| **In the Matter of:** | ) | |
| | ) | |
| Claudia Russ Anderson | ) | |
| Former Community Bank Group Risk Officer | ) | AA-EC-2019-81 |
| | ) | |
| Wells Fargo Bank, N.A. | ) | |
| Sioux Falls, South Dakota | ) | |

## FINAL DECISION OF THE COMPTROLLER OF THE CURRENCY

I.     INTRODUCTION ............................................................................... 6

II.    STATEMENT OF JURISDICTION ..................................................... 8

III.   PROCEDURAL HISTORY .................................................................. 8

    A.   Notice of Charges and Affirmative Defenses ................................. 8

    B.   Summary Disposition Proceedings ................................................. 9

    C.   Hearing and Post-Hearing Proceedings ........................................ 11

    D.   Proceedings Before the Comptroller ............................................ 11

IV.   SCOPE OF COMPTROLLER REVIEW ........................................... 12

V.    APPLICABLE LEGAL STANDARDS .............................................. 14

    A.   Section 1818(e) Prohibitions .......................................................... 14

    B.   Section 1818(i) CMPs ..................................................................... 15

VI.   COMPTROLLER'S FINDINGS OF FACT AND CONCLUSIONS OF LAW
REGARDING THE PROHIBITION ORDER ........................................................... 17

    A.   Background ....................................................................................... 17

      1.   SPM was widespread and systemic in the Bank throughout the relevant period ........ 17

        a.    Reports show that SPM was widespread ............................... 19

        b.    Testimony from Bank employees shows SPM was widespread and systemic ....... 22

      2.   Anderson knew or should have known that SPM was widespread and systemic ........ 23

      3.   Anderson was responsible for effectively managing the risks in the Community Bank ..
.................................................................................................................................... 27

      4.   SPM posed significant risks to the Bank ................................................... 29

1

Appellate Case: 25-1079     Page: 1199     Date Filed: 05/16/2025    Entry ID: 5517644

B.  Misconduct ......................................................................................................... 29

1.  Anderson engaged in unsafe or unsound practices by failing to provide information or providing false, incomplete, and/or misleading information to the OCC during the 2015 OCC examinations. ................................................................................................... 29

    a.  Anderson did not provide the OCC accurate information about the volume of terminations relating to SPM during the 2015 examinations .............................................. 31

    b.  Anderson made false statements to the OCC regarding team members being under sales pressure ......................................................................................................... 33

    c.  Anderson falsely told the OCC during the 2015 examinations that no one loses their job because sales goals were not met .............................................................. 35

    d.  Anderson failed to disclose the thresholds used in proactive monitoring during the 2015 examinations ................................................................................................. 40

2.  Anderson's failure to credibly challenge the incentive compensation program's unreasonable sales goals constituted an unsafe or unsound practice ................................... 42

    a.  Anderson was required to credibly challenge the incentive compensation program .. ................................................................................................................. 43

    b.  Anderson knew that the Community Bank imposed unreasonable sales goals on employees ......................................................................................................... 45

    c.  Anderson failed to credibly challenge the incentive compensation program to Bank executives .......................................................................................................... 49

3.  Anderson's failure to institute effective controls to manage the risk of SPM was an unsafe or unsound practice ............................................................................................ 52

    a.  Overview of SSCOT and SPM Controls ................................................... 53

    b.  The amount of SPM demonstrates the controls were ineffective ..................... 57

    c.  The record does not show that SPM decreased from 2013 to 2016 ...................... 59

    d.  Anderson's additional controls were also ineffective ............................... 62

        i.  Training ............................................................................................ 63

        ii.  Customer complaint system improvements ..................................... 63

        iii.  Increased staffing ......................................................................... 64

        iv.  Elimination of Jump into January ................................................. 64

        v.  Signature capture ......................................................................... 65

        vi.  QSRC ............................................................................................. 65

        vii.  Lowering sales goals ..................................................................... 66

4.  Anderson's failure to escalate known or obvious risks related to SPM was an unsafe or unsound practice ......................................................................................................... 67

    a.  Anderson was required to escalate known or obvious risks related to SPM to Loughlin and Tolstedt ......................................................................................... 67

    b.  Anderson failed to escalate to Loughlin and Corporate Risk ...................... 69

Add. 1198

Appellate Case: 25-1079      Page: 1200      Date Filed: 05/16/2025 Entry ID: 5517644

       c.      Anderson continually downplayed the severity of SPM ........................ 73

    5.    Anderson's failure to provide information or provision of false, incomplete, and/or misleading information during the 2015 examinations violated 18 U.S.C. §§ 1517 and 1001(a) ................................................................................................................ 79

  C.  Effect ...................................................................................................................... 81

    1.    The Bank suffered financial loss or other damage ...................................... 82

    2.    The interests of the Bank's depositors were prejudiced ............................. 86

    3.    The financial gain or other benefit prong was not met ............................... 90

  D.  Culpability ............................................................................................................. 91

    1.    Anderson demonstrated *personal dishonesty* ........................................... 92

    2.    Anderson exhibited *willful disregard* ...................................................... 93

    3.    Anderson exhibited *continuing disregard* ............................................... 93

VII.    COMPTROLLER'S FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING THE CIVIL MONEY PENALTY ............................................................ 94

  A.  Misconduct ............................................................................................................ 94

    1.    Anderson *recklessly* failed to provide or provided false, incomplete and/or misleading information to the OCC during the 2015 OCC examinations ............................. 95

    2.    Anderson *recklessly* failed to credibly challenge the incentive compensation program .. ................................................................................................................ 96

    3.    Anderson *recklessly* failed to institute effective controls to manage the risk of SPM . 97

    4.    Anderson *recklessly* failed to escalate known or obvious risks related to SPM .......... 98

    5.    Anderson committed violations of law ...................................................... 99

  B.  Effect ...................................................................................................................... 99

    1.    Anderson's misconduct constituted a pattern of misconduct ................... 100

    2.    The Bank suffered more than a minimal loss ........................................... 102

    3.    The pecuniary gain or other benefit prong was not met ........................... 103

  C.  Appropriateness of CMP Amount ....................................................................... 103

    1.    The CMP increase was warranted ............................................................ 103

    2.    The statutory factors support a $10 million CMP ..................................... 104

    3.    The thirteen interagency factors further support a $10 million CMP ....... 105

    4.    Anderson's remaining CMP exceptions are rejected ................................ 106

VIII.   ANDERSON'S STRUCTURAL EXCEPTIONS .................................................. 107

  A.  This Proceeding Does Not Violate Article III or the Seventh Amendment ................... 107

Add. 1199

Appellate Case: 25-1079    Page: 1201    Date Filed: 05/16/2025 Entry ID: 5517644

B.   ALJ McNeil and Deputy Comptroller for Large Bank Supervision Gregory Coleman Were Properly Appointed ........................................................................................................ 108

    1.   ALJ McNeil was properly appointed and was not unconstitutionally protected from removal ............................................................................................................................ 108

    2.   Deputy Comptroller for Large Bank Supervision Gregory Coleman, who signed the Notice of Charges, was properly appointed ................................................................. 110

C.   The OCC's Funding Structure is Constitutionally Sound ............................................. 112

D.   The Administrative Proceeding Afforded Anderson All Her Due Process Rights ......... 113

IX.   EXCEPTIONS REGARDING PREHEARING ERRORS ............................................. 113

A.   The Statute of Limitations Does Not Bar Any Claims Against Anderson ................... 113

B.   Partial Summary Disposition Was Proper ................................................................... 118

    1.   Summary disposition is allowed in OCC administrative actions ............................. 119

    2.   12 C.F.R. Part 19 allows for partial summary disposition ...................................... 120

    3.   The Comptroller's *de novo* review has cured any remaining errors related to summary disposition ......................................................................................................................... 122

C.   The ALJ Properly Rejected Anderson's Affirmative Defense of Estoppel ................. 123

D.   The ALJ Did Not Unconstitutionally Restrict Communications with a Critical Witness .... ........................................................................................................................................ 124

E.   The ALJ's Discovery Orders Restricting Certain Testimony and Documents Pertaining to NBEs Were Not Arbitrary and Capricious ................................................................... 126

F.   Anderson Was Not Prejudiced by the ALJ's Prehearing Rulings ............................... 128

X.   EXCEPTIONS REGARDING HEARING ERRORS ................................................... 129

A.   The ALJ Did Not Infringe on Anderson's Due Process Rights in Conducting the Hearing ........................................................................................................................................ 129

B.   Anderson's Exceptions Regarding Evidence ............................................................... 131

C.   Enforcement Counsel's Exceptions Regarding Evidence ............................................ 134

D.   The ALJ Was Not Required to Recuse Himself ........................................................... 135

XI.   EXCEPTIONS REGARDING THE RECOMMENDED DECISION ........................... 140

A.   The RD Generally Complies with the APA and Any Alleged Deficiencies Are Cured by This Final Decision ......................................................................................................... 140

B.   The Executive Summary Is Not Unlawful ................................................................... 143

C.   The RD's Reliance on Unadmitted or Excluded Evidence Does Not Prejudice Anderson .. ........................................................................................................................................ 144

D.   The RD's Reliance on Summary Disposition Findings Does Not Amount to Uncurable Error ................................................................................................................................ 145

E.   The ALJ's Reliance on NBE Testimony and Expert Reports Did Not Prejudice Anderson ........................................................................................................................................ 147

Add. 1200

Appellate Case: 25-1079   Page: 1202   Date Filed: 05/16/2025 Entry ID: 5517644

F.  The Comptroller Does Not Give Any Witnesses Special Deference in this Case .......... 149

G.  The Comptroller Does Not Decide Whether Anderson Breached Her Fiduciary Duty . 149

XII.  CONCLUSION ................................................................................................ 150

## I.    INTRODUCTION

This is a Final Decision in an enforcement action brought by Enforcement Counsel ("EC") of the Office of the Comptroller of the Currency ("OCC") against Claudia Russ Anderson ("Respondent" or "CRA"), former Group Risk Officer for the Community Bank at Wells Fargo Bank, N.A. ("Bank"). This case stems from one of the largest scandals in banking history. *See infra* Part VI.A; *see generally* Emily Flitter, *The Price of Wells Fargo's Fake Account Scandal Grows by $3 Billion*, N.Y. TIMES (Feb. 21, 2020), https://www.nytimes.com/ 2020/02/21/business/wells-fargo-settlement.html; Emily Glazer, *Wells Fargo's Sales-Scandal Tally Grows to Around 3.5 Million Accounts*, WALL ST. J. (Aug. 31, 2017, 6:59 PM), https://www.wsj.com/articles/wells-fargos-sales-scandal-tally-grows-to-around-3-5-million-accounts-1504184598. Under pressure to meet unreasonable sales goals, thousands of employees at Wells Fargo engaged in a collection of practices subsequently referred to as "sales practices misconduct" ("SPM"). These practices included opening millions of unauthorized customer accounts, transferring funds without customer consent, lying to customers that certain products were available only as a package with other products, enrolling customers in online banking and bill-pay without their consent, delaying the opening of requested accounts and products until the next sales reporting period, and falsifying customers' personal information. *See infra* Part VI.A.1. SPM harmed customers' credit scores and damaged customers' trust in the banking system, while the Bank pocketed millions in customer fees to which it was not entitled. *Id.* In short, it was exactly the kind of wrongdoing that threatens the OCC's mission of maintaining a safe, sound, and fair banking system.

Enforcement Counsel filed a Notice of Charges ("Notice") on January 23, 2020, against Anderson and other senior bankers at Wells Fargo, including David Julian, Chief Auditor, and Paul McLinko, Executive Audit Director for the Community Banking Group (collectively,

"Respondents").[1] The Notice alleged that Anderson violated laws and regulations, recklessly engaged in unsafe or unsound practices, and breached her fiduciary duties to the Bank. Notice at 52, 60. Pursuant to 12 U.S.C. § 1818(i) and (e), the Notice sought a $5 million civil money penalty ("CMP") against Anderson and an order prohibiting her from work in the banking sector. *Id.* at 1-2.

Following discovery practice and motions for summary disposition, the case went to a 38-day hearing. On December 5, 2022, Administrative Law Judge ("ALJ") Christopher McNeil issued a Recommended Decision ("RD") against Anderson (as well as separate decisions against Respondents Julian and McLinko), which recommended that the Comptroller of the Currency ("Comptroller") issue a prohibition order and a $10 million CMP. RD at 7. Following submission of exceptions briefing from Respondents and Enforcement Counsel, the case was submitted to the Comptroller for a final decision.

Upon careful review of the entire administrative record and the arguments raised by Anderson and Enforcement Counsel in their exceptions, and for the reasons set forth in this decision, the Comptroller adopts in part and rejects in part the ALJ's recommendations. As detailed below, the Comptroller finds that, from 2013 to 2016 (the "relevant period"), Anderson failed to provide or provided false, incomplete, and/or misleading information to the OCC; failed to credibly challenge the Bank's incentive compensation program; failed to institute effective controls to manage the risks posed by SPM; and failed to escalate known or obvious risks related to SPM. *See infra* Part VI. The Comptroller finds that each of those instances of misconduct constituted unsafe or unsound practices pursuant to § 1818(e)(1)(A) and that those unsafe or unsound practices were "reckless" under § 1818(i)(2)(B). *See infra* Parts VI and VII. The

_____

[1] The remaining Respondents—Carrie Tolstedt and James Strother—settled.

7

Comptroller further finds that Anderson committed violations of 18 U.S.C. §§ 1517 and 1001. *See infra* Part VI.B.5. The Comptroller also finds that Anderson acted with the requisite culpability under § 1818(e)(1)(C) and that her misconduct had the requisite effect under both § 1818(e)(1)(B) and § 1818(i)(2)(B)(ii). *See infra* Parts VI.C-D, VII.B. Accordingly, the Comptroller hereby enters an order of prohibition and assesses a $10 million CMP against Anderson.

## II.   STATEMENT OF JURISDICTION

At all times relevant to the facts alleged in the Notice of Charges, the Bank was a national banking association within the meaning of 12 U.S.C. § 1813(q)(1)(A) and an "insured depository institution" as defined in § 1813(c)(2), and Anderson was an "institution-affiliated party" ("IAP") as defined in § 1813(u). CRA Amended Answer ("Am. Ans.") at ¶¶ 1, 245. Pursuant to § 1813(q), the OCC is the "appropriate Federal banking agency" with jurisdiction over the Bank and its IAPs, and the OCC is authorized to initiate and maintain this enforcement action against Respondent.

## III.   PROCEDURAL HISTORY

### A. Notice of Charges and Affirmative Defenses

As noted above, Enforcement Counsel filed a Notice of Charges against Anderson and other senior bankers on January 23, 2020, alleging that Anderson violated laws and regulations, recklessly engaged in unsafe or unsound practices, and breached her fiduciary duty to the Bank. Specifically, the Notice identified four categories of alleged misconduct: (1) Anderson failed in her responsibilities as Group Risk Officer; (2) Anderson failed to ensure that the Community Bank's controls were reasonably designed to prevent and detect sales practices misconduct; (3) Anderson failed to escalate and accurately report the sales practices misconduct problem and its root cause to the Enterprise Risk Management Committee ("ERMC") and the Board;

Add. 1204
Appellate Case: 25-1079      Page: 1206      Date Filed: 05/16/2025 Entry ID: 5517644

(4) Anderson made false and misleading statements to the OCC. Notice at 53-58. The Notice sought a $5 million CMP and a prohibition order. *Id.* at 100.

Anderson filed her Answer ("Ans.") on February 11, 2020, along with a request for a hearing pursuant to 12 C.F.R. § 19.19(a).[2] Her Answer included several affirmative defenses that argued, *inter alia*, that the OCC's action was barred by the statute of limitations, estoppel, waiver, Article III, and the due process clause of the U.S. Constitution. Ans. at 18. Enforcement Counsel moved to strike Respondents' affirmative defenses, and the ALJ issued an order striking Anderson's estoppel and waiver defenses. Order Regarding EC's Motion to Strike Respondents' Affirmative Defenses at 8, Apr. 1, 2020.[3] On July 16, 2020, the ALJ ordered Respondents to file amended answers "so as to comply with OCC Uniform Rules 12 C.F.R. 19.19(b)." Order Regarding EC's Motion Concerning the Answers of Respondents Strother, Julian and McLinko at 17, July 16, 2020. Anderson filed her Amended Answer on August 7, 2020.

## B. Summary Disposition Proceedings

On May 12, 2020, Respondents filed three joint motions for summary disposition based on their remaining affirmative defenses. After receiving Enforcement Counsel's opposition to the

---

[2] The Comptroller notes that 12 C.F.R. Part 19 was revised after the RD. *See* 88 Fed. Reg. 89843 (Dec. 28, 2023). The current version of 12 C.F.R. Part 19, Appendix A, contains Part 19 as it applies to this action. All citations to Part 19 in this decision are to 12 C.F.R. Part 19, Appendix A.

[3] Anderson withdrew three of the affirmative defenses included in her initial answer—that the Notice of Charges "fails to state any claim," that the Notice of Charges is barred because "it relies on unpromulgated rule-making," and that the Notice of Charges is barred by laches—but she preserved the rest. Respondents' Joint Response to EC's Motion to Strike Certain Affirmative Defenses at 4 n.2, Mar. 30, 2020 (withdrawing laches defense); Respondents' Joint Notice of Withdrawal of Certain Affirmative Defenses, Apr. 3, 2020 (withdrawing failure to state a claim defense); CRA's Notice of Withdrawal of Affirmative Defense No. 3, May 12, 2020 (withdrawing unpromulgated rulemaking).

9

Appellate Case: 25-1079     Page: 1207     Date Filed: 05/16/2025 Entry ID: 5517644

motions on June 2, 2020, ALJ McNeil denied all three motions. Order Regarding Respondents' Initial Joint Motions for Summary Disposition at 31, June 24, 2020.

Following further motions practice and discovery, on March 26, 2021, Enforcement Counsel moved for summary disposition against Anderson, arguing that there was "no genuine issue as to any material fact regarding the charges alleged and relief sought." Brief in Support of EC's Motion for Summary Disposition as to CRA ("EC MSD Br.") at 1. Enforcement Counsel submitted 500 statements of material fact in support of the motion against Anderson. *See generally* EC's Statement of Material Facts as to CRA ("EC SOMF"). Enforcement Counsel also requested an increased CMP amount of $10 million for Anderson. EC MSD Br. at 204. Anderson opposed the motion and responded to each of Enforcement Counsel's statements of material fact. *See* CRA's Memorandum of Law in Opposition to Motion for Summary Disposition, May 21, 2021 (refiled); CRA's Response to EC's Statement of Material Facts as to CRA, Apr. 30, 2021.

On July 20, 2021, ALJ McNeil issued a 753-page order granting in part and denying in part Enforcement Counsel's motion for summary disposition against the three remaining Respondents. The ALJ found that most of Enforcement Counsel's statements of material fact against Anderson were undisputed and could be resolved against her at the summary disposition stage. The remaining factual issues were set to be resolved at the hearing, along with the other unresolved claims from the Notice of Charges. *See* Order Regarding EC's Motion for Summary Disposition, July 20, 2021 ("SD Order"); Excerpts Identifying Controverted Facts to be Presented and Supplemental Prehearing Order, July 28, 2021; EC's Supplemental Statement of Disputed Issues at 2-3, Aug. 6, 2021; CRA's Supplemental Prehearing Statement at 8-19, Aug. 6, 2021.

### C. Hearing and Post-Hearing Proceedings

ALJ McNeil presided over a 38-day hearing that began on September 13, 2021, and concluded on January 6, 2022. The parties' presentation of evidence and sworn testimony covered more than 3,000 exhibits and generated more than 10,000 pages of hearing transcript. The parties filed post-hearing briefs on May 23, 2022, and they filed their respective reply briefs a month later. Acknowledging the size and complexity of this case, ALJ McNeil issued an order pursuant to 12 C.F.R. § 19.38(a) extending the typical 45-day deadline to issue a recommended decision. Status Report, Aug. 4, 2022. On December 5, 2022, the ALJ issued three RDs—one for each Respondent—plus an Executive Summary that applied to all three Respondents. Executive Summary, Dec. 5, 2022. As to Anderson, the ALJ recommended that the Comptroller issue a prohibition order and a $10 million CMP. RD at 442. In recommending the prohibition order, the ALJ found that Anderson engaged in multiple unsafe or unsound practices, breaches of her fiduciary duties, and violations of law. *Id.* at 416.

### D. Proceedings Before the Comptroller

After the Comptroller granted two extensions, the parties filed their exceptions to the RDs on April 14, 2023. *See* 12 C.F.R. § 19.39. On April 18, 2023, Respondents filed a joint motion requesting that the Comptroller direct the Office of Financial Institution Adjudication ("OFIA") to file a corrected record and index with 61 additional documents. The Comptroller issued an order on May 15, 2023, taking official notice of those 61 documents and providing the parties ten additional days to review the record and to request any further additions. *See* Order Regarding Respondents' Motion for an Order Directing OFIA to File a Corrected Certified Record and Index, May 15, 2023. Both parties filed responses on May 31, 2023. Enforcement Counsel filed a response containing a chart listing 135 documents or categories of documents to be added to the record; Respondents did not request that any additional documents be added. On

July 5, 2023, the Comptroller issued a final order certifying that the record was complete and giving notice that the matter was deemed submitted for a final decision. *See* Order Regarding EC's Report and Request that Additional Documents be Added to the Certified Record, July 5, 2023.

On July 21, 2023, Respondents filed a motion to stay the proceedings pending the outcome of the Supreme Court's decisions in *SEC v. Jarkesy*, 144 S. Ct. 2117 (2024) and *CFPB v. Cmty. Fin. Serv. Ass'n of Am., Ltd.*, 601 U.S. 416 (2024). The Comptroller denied the motion on August 8, 2023, reasoning that neither case would be binding on this tribunal. *See* Order Denying Respondents' Motion to Stay Proceeding, Aug. 8, 2023.

Due to the unprecedented size of this case—including over 6,000 pages of exceptions briefing from Respondents alone—the Comptroller issued two additional orders extending the deadline to issue a final decision. Order Extending Time to Issue Final Decision, Dec. 6, 2023; Order Extending Time to Issue Final Decision, June 7, 2024.

## IV.     SCOPE OF COMPTROLLER REVIEW

The Comptroller is the final agency decisionmaker in this enforcement action. 12 C.F.R. § 19.40(c)(1). The final decision is based on review of the entire record, *see id.*, and "[t]he Comptroller is free to accept or reject the ALJ's recommendations." *In the Matter of Adams*, No. OCC AA-EC-11-50, 2014 WL 8735096, at *7 (OCC Sept. 30, 2014). In this case, review of the entire record includes all prehearing filings—including summary disposition filings, exhibits, and findings[4]—as well as hearing transcripts, exhibits, post-hearing filings, and briefing before

---

[4] The Comptroller's review of the record included a review of the statements of material fact and responses thereto, supporting evidence, and arguments from all parties at the summary disposition stage. The foregoing decision cites evidence and findings from both the hearing and the ALJ's summary disposition order. The undersigned notes that Anderson has challenged the validity of the summary disposition process and its attendant findings; while these exceptions are

the Comptroller. When reviewing an ALJ's procedural determinations, the Comptroller should overturn such a ruling only where it amounts to "an abuse of discretion" or constitutes "manifest unfairness." *In the Matter of Brooks*, No. AA-EC-91-153, 1993 WL 13966512, at *14 (OCC June 17, 1993).

A party's failure to file written exceptions to the ALJ's recommended decision, findings, conclusions, admission or exclusion of evidence, or the ALJ's failure to make a ruling proposed by a party is deemed a waiver of objection thereto. *See* 12 C.F.R. § 19.39(a), (b)(1). Furthermore, "[n]o exception need be considered by the Comptroller if the party taking exception had an opportunity to raise the same objection, issue, or argument before the [ALJ] and failed to do so." *Id.* § 19.39(b)(2). All exceptions must, *inter alia*, set forth "page or paragraph references to the specific parts of the [ALJ's] recommendations to which exception is taken" and "the legal authority relied upon to support each exception." *Id.* § 19.39(c)(2).

In reaching a final decision, "the Comptroller may limit the issues to be reviewed to those findings and conclusions to which opposing arguments or exceptions have been filed by the parties." *Id.* § 19.40(c)(1). That does not mean, however, that the Comptroller's final decision must explicitly address and rule upon every single exception raised by the parties in their over 6,000 pages of briefing. Anderson's exceptions briefing alone totals more than 1,400 pages.[5] The Comptroller has carefully reviewed all of the parties' exceptions during the review of the entire

addressed more fully below in Part IX.B, it is worth noting that any summary disposition finding cited in this decision has been fully reviewed by the Comptroller and has been determined to have been properly determined at the summary disposition stage.

[5] Anderson submitted two exceptions briefs: one that raises line-by-line exceptions to the RD and another that raises broader legal arguments in support of those exceptions. *See* Anderson's Legal Brief in Support of Exceptions to Recommended Decision, Apr. 14, 2023 ("CRA Br."); Anderson's Exceptions to the Administrative Law Judge's Recommended Decision, Apr. 14, 2023 ("CRA Exceptions"). The Comptroller considers these exceptions holistically and cites to both as needed.

Add. 1209

Appellate Case: 25-1079      Page: 1211      Date Filed: 05/16/2025 Entry ID: 5517644

record of this proceeding. This decision addresses the most significant exceptions individually, and it otherwise addresses categories of exceptions rather than exhaustively addressing each one. *See Pharaon v. Bd. of Govs. of Fed. Rsrv. Sys.*, 135 F.3d 148, 155 (D.C. Cir. 1998) (explaining that "agencies need only indicate that they have considered and rejected a party's exceptions" rather than "respond with specificity to each of [the party's] many exceptions"). If an exception is not specifically mentioned in this decision, it will be covered categorically, and unless otherwise noted, the party who raised it can consider it rejected.

The following decision applies only to Respondent Anderson. The Comptroller has set forth his findings against Respondents Julian and McLinko in a separate decision.

## V. APPLICABLE LEGAL STANDARDS

When reviewing the record, the Comptroller "determine[s] whether, in his judgment, Enforcement Counsel has met its burden of supporting its allegations by a preponderance of the evidence in the record." *Adams*, 2014 WL 8735096, at *7 (citing 5 U.S.C. § 556(d)); *see also Steadman v. SEC*, 450 U.S. 91, 104 (1981); *In the Matter of Ellsworth*, Nos. OCC AA-EC-11-41, OCC AA-EC-11-42, 2016 WL 11597958, at *8 n.10 (OCC Mar. 23, 2016). Under this standard, Enforcement Counsel must adduce evidence that the existence of a fact is more probable than its nonexistence. *See Concrete Pipe & Prods. of Cal. v. Constr. Laborers Pension Tr.*, 508 U.S. 602, 622 (1993).

### A. Section 1818(e) Prohibitions

For the Comptroller to enter an order of prohibition against an IAP pursuant to 12 U.S.C. § 1818(e), Enforcement Counsel must establish three separate elements: misconduct, effect, and culpability. *See* 12 U.S.C. § 1818(e)(1)(A)-(C); *Kim v. OTS*, 40 F.3d 1050, 1054 (9th Cir. 1994) (labeling the three elements).

Appellate Case: 25-1079      Page: 1212      Date Filed: 05/16/2025   Entry ID: 5517644

The *misconduct* element may be satisfied by showing that the IAP has "directly or indirectly" violated any law or regulation; "engaged or participated in any unsafe or unsound practice in connection with any insured depository institution . . ."; or "committed or engaged in any act, omission, or practice which constitutes a breach of such party's fiduciary duty." *See* 12 U.S.C. § 1818(e)(1)(A). Only one form of misconduct is required to uphold the charge. *See Dodge v. Comptroller of Currency*, 744 F.3d 148, 156 (D.C. Cir. 2014).[6] An unsafe or unsound practice includes "any action or lack of action [that] is contrary to generally accepted standards of prudent operation, the possible consequences of which, if continued, would be abnormal risk or loss or damage to an institution, its shareholders, or the agencies administering the insurance funds." *Adams*, 2014 WL 8735096, at *11.[7]

The *effect* element may be satisfied by showing that, "by reason of" the misconduct, the institution at issue "has suffered or will probably suffer financial loss or other damage," that the institution's depositors' interests "have been or could be prejudiced," or that the charged party "has received financial gain or other benefit." 12 U.S.C. § 1818(e)(1)(B). Finally, the *culpability* element may be satisfied by showing that the alleged misconduct "involves personal dishonesty" or "demonstrates willful or continuing disregard by [an IAP] for the safety or soundness of such insured depository institution." 12 U.S.C. § 1818(e)(1)(C).

## B. Section 1818(i) CMPs

Pursuant to § 1818(i)(2), the Comptroller may assess CMPs, categorized by escalating "tiers," including first-tier penalties of up to $5,000 per day of continued misconduct and second-

---

[6] Here, the ALJ found that Anderson had engaged in all three types of misconduct. RD at 321, 414-16; Executive Summary at 56-61; *see also infra* Parts VI-VII.

[7] Anderson's exceptions assert that the ALJ applied an incorrect and incomplete legal standard for unsafe or unsound practices. *See e.g.,* CRA Br. at 426-39, 590; CRA Exceptions at 626. The Comptroller re-affirms that the standard set forth in *Adams* is the proper standard. *See Adams*, 2014 WL 8735096, at *2-5.

tier penalties of up to $25,000 per day of continued misconduct.[8] Here, Enforcement Counsel sought and the ALJ recommended a second-tier CMP of $10 million against Anderson. *See* RD at 422.[9]

For the Comptroller to assess a second-tier CMP against an IAP, Enforcement Counsel must establish two elements: *misconduct* and *effect*. As relevant here, *misconduct* can take the form of a violation of law, breach of fiduciary duty, or the "reckless" engagement in an unsafe or unsound practice in conducting the affairs of the institution. *See* 12 U.S.C. § 1818(i)(2)(B)(i). Conduct is "reckless" if it is "done in disregard of, and evidencing a conscious indifference to, a known or obvious risk of a substantial harm." *Cavallari v. OCC*, 57 F.3d 137, 142 (2d Cir. 1995). "[R]ecklessness does not require that the Bank suffer an actual loss; it requires only a 'risk of a substantial harm.'" *In the Matter of Blanton,* No. OCC AA-EC-2015-24, 2017 WL 4510840, at *14 (OCC July 10, 2017) (quoting *Cavallari*, 57 F.3d at 142), *aff'd in relevant part sub nom., Blanton v. OCC*, 909 F.3d 1162 (D.C. Cir. 2018). If an IAP was aware of a risk of substantial harm but did not act to appropriately address or mitigate that risk, that conduct is reckless. *Id.*[10]

To satisfy the *effect* prong, Enforcement Counsel must also establish that the misconduct "is part of a pattern of misconduct"; that it "causes or is likely to cause more than a minimal loss

---

[8] The daily maximum CMP set at $25,000 in 12 U.S.C. § 1818(i)(2) must be adjusted periodically by agencies in rulemaking to account for inflation. 28 U.S.C. § 2461 note. For the relevant period through November 1, 2015, the daily maximum was $37,500. 73 Fed. Reg. 66493, 66496 (Nov. 10, 2008). From November 2, 2015, onward, the daily maximum was $61,238. 89 Fed. Reg. 872, 874 (Jan. 8, 2024).

[9] Enforcement Counsel also asserted that the elements to impose a Tier 1 CMP against Anderson were met because she violated multiple laws. *See* EC Exceptions Br. at 42-44.

[10] The Comptroller partially upholds Enforcement Counsel's exceptions arguing that Anderson recklessly engaged in unsafe or unsound practices to the extent noted in Part VII below. *See* Brief in Support of Enforcement Counsel's Exceptions to the ALJ's Recommended Decision as to Anderson, Apr. 14, 2023 ("EC Exceptions Br.") at 51-53.

to such depository institution"; or that it "results in pecuniary gain or other benefit to such party." 12 U.S.C. § 1818(i)(2)(B)(ii); *see also In the Matter of Blanton*, 2017 WL 4510840, at *15 (referring to § 1818(i)(2)(B)(ii) as the statute's "effect" prong).

## VI. COMPTROLLER'S FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING THE PROHIBITION ORDER

### A. Background

#### 1. SPM was widespread and systemic in the Bank throughout the relevant period

The Comptroller finds that the evidence in the record supports the ALJ's findings that SPM at the Bank was widespread and systemic. *See generally* RD at 8-10, 18-19, 22-23, 89-90, 140-41, 259, 306-07, 352, 356-59, 397, 406-07, and 422-23. In making this determination, the Comptroller incorporates the following relevant facts that the ALJ properly found undisputed at the summary disposition stage: SD Order SOMFs 48-53, 55-56, 58-60, and 264.

These SD Order SOMFs demonstrate that SPM included: (1) opening and issuing unauthorized checking and savings accounts, debit cards, and credit cards; (2) simulated funding, which involved transferring customer funds between accounts without customer consent; (3) bundling, which involved misrepresenting to customers that certain products were available only as a package with other products; (4) pinning, which involved enrolling customers in online banking and online bill-pay without consent; (5) sandbagging, which involved delaying the opening of requested accounts and products until the next sales reporting period; and (6) accessing and falsifying customers' personal information, such as phone numbers, home addresses, and email addresses, without authorization. SD Order SOMF 48. They also demonstrate that several Bank executives stated that the Bank had a systemic SPM problem. *See, e.g.*, SD Order SOMFs 49 (Chief Executive Officer), 50 (Chief Risk Officer), 51 (Chief Administrative Officer), 52 (same), 53 (Head of Corporate Enterprise Risk), 55 (Chief Security

17

Officer), 56 (Head of Financial Crimes Risk Management), 58 (General Counsel), 59 (Regional President), 60 (Regional Bank Executives), 264 (Sales and Service Conduct Risk Leader).

In addition, the evidence and testimony adduced at the hearing supports the findings that SPM was widespread and systemic. Reports by third parties and the Bank strongly support the conclusion that SPM was widespread and systemic.

Anderson excepts to the RD's determination that SPM was widespread and systemic. Anderson's exceptions fall into two categories. First, she faults the RD and Enforcement Counsel for not quantifying the amount of SPM. *See, e.g.*, CRA Br. at 405-08; CRA Exceptions at 33-35. Second, she argues that the reports upon which the RD relies to conclude that SPM was widespread and systemic are unreliable, should not have been admitted, and do not support the conclusion that SPM was widespread and systemic. *See, e.g.*, CRA Br. at 409-20; CRA Exceptions at 33-40.

The Comptroller disagrees with Respondent's contention that the amount of SPM needs to be specifically quantified. The record contains testimony and evidence that establishes that SPM was systemic and widespread. Precise numbers of the amount of SPM are not necessary to come to that conclusion.[11]

Anderson's exceptions to the various reports are without merit. As discussed in Part X.B, the OCC's Uniform Rules afford the ALJ wide discretion to admit evidence. *See* 12 C.F.R. § 19.36(a). Additionally, Anderson argues extensively that the reports, individually, do not show that SPM was systemic or widespread. If Enforcement Counsel had offered up only one report,

---

[11] Nor is it necessary for aggrieved customers to testify that the Bank opened unauthorized accounts in their name, as Anderson suggests. *See* CRA Br. at 408. The fact that SPM occurred is well-established in the record evidence, and Anderson even agreed that SPM occurred in her own testimony. *See, e.g.*, Hr'g Tr. at 9561:20-22 ("[A]s I previously testified, sales practices misconduct occurred. I'm not saying it didn't.").

18

Anderson might have a point. The record, however, contains multiple reports, each supporting the conclusion that SPM was systemic and widespread. The weight of the evidence points to this conclusion, even if an individual report might not prove it alone.

Based on a review of the record evidence, as detailed in the following subsections, the Comptroller finds that SPM was both widespread and systemic and accordingly rejects Anderson's exceptions. SPM was systemic, as it resulted from the Bank's business model that incentivized bankers to engage in SPM to meet sales goals.[12] The record contains several reports that demonstrate that SPM was widespread and systemic. A cavalcade of Bank employees testified that SPM was widespread and systemic. Based on this record evidence, the Comptroller finds that Enforcement Counsel proved by a preponderance of the evidence that SPM was widespread and systemic.

     *a.   Reports show that SPM was widespread*

The record evidence contains multiple reports indicating that the Bank had a widespread SPM problem during Anderson's tenure at the Bank. Taken together, these reports provide a preponderance of evidence showing that SPM was widespread in the Bank.[13] These reports are addressed below in turn.

---

[12] Anderson faults the RD for not defining widespread, for using a variety of different words to describe the extent of SPM, and for using a definition of "systemic" that is unintelligible. *See, e.g.*, CRA Br. at 405-07; CRA Exceptions at 31-32. These exceptions are misplaced. These words are not terms of art, and the RD uses their common-sense meanings. Regardless, whatever words were used to describe SPM, the underlying question for Anderson was whether SPM presented a risk to the Bank that Anderson, as Group Risk Officer for the Community Bank, was required to manage. As detailed in this section, the Comptroller finds that SPM presented a serious risk to the Bank that Anderson was required to manage. Her failure to manage the risks that led to and resulted from SPM is what is at issue in this action.

[13] In addition to the discussion in this section, Part VI.B.3 also reviews and discusses some of these reports and other data showing the extent of SPM at the Bank.

Add. 1215

Appellate Case: 25-1079    Page: 1217    Date Filed: 05/16/2025 Entry ID: 5517644

The first report was an October 2015 report from Accenture ("Accenture Report"). OCC Exh. 1312. The goal of this report was, in part, to "identify examples of sales practices risk." *Id.* at 2. The Accenture Report was based on approximately 470 interviews with randomly selected Bank employees, including Community Bank employees and Bank executives. *Id.* The Accenture Report concluded that communication, execution of sales quality monitoring controls, setting sales goals, and customer complaint tracking were weaknesses that needed to be addressed. *Id.* at 4. The Accenture Report stated, "[m]any team members interviewed made statements regarding activities that, if true, would indicate sales practices issues." *Id.* at 6. Additionally, it stated that customer complaints and employee ethics escalation data had "limited use." *Id.* While the Accenture Report did not specifically opine on whether SPM was systemic or widespread, it shows that SPM posed multiple medium and high risks to the Bank. *Id.* at 46 (showing three "medium" risks and ten "high" risks). Anderson herself testified that she read the Accenture Report and believed it was "very important work." Hr'g Tr. at 10109:23-10111:3.

Another report was the Bank's Regulatory Compliance Risk Management report dated March 8, 2016 ("RCRM Report"). OCC Exh. 1896U. This report was meant to identify customer complaints and inquiries from January 1, 2014, to September 30, 2015, that may have involved SPM. *Id.* at 3. The RCRM Report found approximately 45,000 complaints with potential SPM. *Id.* at 38. It also included a slide with a graphic showing that SPM occurred across the country. *Id.* at 39. On that same page, the RCRM Report noted, "The largest volume of sales practices complaints [was] reported in California, Texas, Florida, and Arizona. The higher volume of potential sales practice complaints can be partially attributed to the number of Stores per state." *Id.* The RCRM Report is an early quantification of the amount of potential SPM in the Bank, showing that it was widespread throughout the Bank's geographic footprint.

Appellate Case: 25-1079     Page: 1218     Date Filed: 05/16/2025 Entry ID: 5517644

The best estimate of the amount of SPM admitted as evidence comes from a series of reports produced by outside consultant PwC in September 2017. *See* OCC Exhs. 1811RU, 1812RU, 1813RU, 1636R. These PwC reports attempted to quantify the amount of SPM. PwC looked at potential SPM in online bill pay, credit cards, line of credit accounts, and accounts with potential simulated funding. *See id.* From January 1, 2013, through September 30, 2016, PwC identified 182,829 unauthorized bill pay accounts, 643,948 unauthorized credit card accounts, 72,980 unauthorized line of credit accounts, and 1,018,866 million unauthorized accounts with simulated funding. *See id.* Combining the numbers from the PwC reports, PwC identified approximately 1.9 million unauthorized accounts that Bank employees opened between 2013 and 2016. Notably, these reports did not include all types of SPM. *See* Hr'g Tr. at 1197:5-14 (Candy). These figures did not include other types of SPM like bundling, pinning, or sandbagging. *See id.* 1199:1-19 (Candy). They also did not include all the types of accounts that could have been used to engage in SPM, such as debit cards. *See id.* at 1199:16-19 (Candy), 10298:21-10300:6 (Abshier).

The final report was the report issued by the independent directors of the Bank's holding company on April 10, 2017 ("Board Report"). R. Exh. 16147. The Board Report was the result of an investigation of SPM at the Bank by a Board committee with four independent directors, assisted by a law firm. *Id.* at *2. The Board Report found that systemic sales practice failures were rooted in "the distortion of the Community bank's sales culture and performance management system, which, when combined with aggressive sales management, created pressure on employees to sell unwanted or unneeded products to customers and, in some cases, to open unauthorized accounts." *Id.* The Board Report concluded that "the Community Bank's senior leaders distorted the sales model and performance management system, fostering an atmosphere

21

that prompted low quality sales and improper and unethical behavior." *Id.* at 4. The Board Report reviewed data that showed SPM allegations and termination increasing as sales goals increased. *Id.* at 6. While the Board Report does not specifically conclude that SPM was widespread or systemic, the findings paint a picture of a systemic and widespread problem. *See generally id.*

In sum, the findings from these reports demonstrate that SPM was indeed widespread.

### b. *Testimony from Bank employees shows SPM was widespread and systemic*

In addition to the documented evidence in the above-described reports, numerous Bank executives, including high-level executives, testified that that SPM was widespread and systemic. Michael Loughlin, the Bank's former Chief Risk Officer, testified at hearing and in a sworn statement that he realized that SPM was systemic in the first half of 2015. *See* Hr'g Tr. at 3038:5-13; OCC Exh. 2890 at 49:20-52:5. Similarly, the Bank's former Chief Executive Officer, John Stumpf, testified in a sworn statement that he agreed the Bank had a systemic SPM problem. *See* MSD-8C at 551:1-11.

Karl ("Keb") Byers, the former Head of Corporate Enterprise Risk, testified that based on the number of terminations related to SPM, he concluded in September 2016 that the Bank had a systemic SPM problem. *See* MSD-382 at 132:17-134:24. He further testified that "there was just way too much pressure . . . in the system . . . starting with the incentive comp[ensation] plan. There was pressure from management, and not everybody did this, but a large number, you know, did this . . . the root cause, to me, is just the pressure." OCC Exh. 2736 at 231:24-232:6.

Hope Hardison, the Bank's former Chief Administrative Officer, testified that she believed, as early as 2013, that the Bank had a systemic SPM problem. *See* MSD-293A at 33:9-25; *see also* Hr'g Tr. at 5431:1-10 (testifying that she came to the conclusion that the Bank had a systemic problem with SPM sometime between 2013 and 2016). Patricia Callahan, another former Chief Administrative Officer, believed SPM was systemic in 2013. *See* MSD-291 at

22

110:14-111:13; *see also* Hr'g Tr. at 4956:5-13 (testifying that she suspected in late 2013 that the root cause of SPM may be incentive plans that were too aggressive). Paul McLinko, the Community Bank's former Executive Audit Director, testified in his sworn statement that the Bank had a systemic SPM problem in all regions of the country. *See* OCC Exh. 2785 at 54:8-18, 95:19-24. David Julian, the Bank's former Chief Auditor, testified that that the Bank had a systemic SPM problem. *See* OCC Exh. 2772 at 25:2-26:11.

In addition to this testimony, other Bank executives, Community Bank employees, and Community Bank executives concluded that SPM was systemic and widespread. *See, e.g.*, MSD-298 at 40:14-20 (head of Bank's Financial Crimes Risk Management division); MSD-295 at 25:12-20 (Chief Security Officer and Head of Corporate Investigations); MSD-199 ¶ 6 (Regional President of Retail Banking in Los Angeles); MSD-546 at 207:5-9 (regional bank executive); MSD-579 at 99:1-7 (regional bank executive); MSD-585 at 25:20-26:14 (leader of Community Bank's sales quality group). In sum, authoritative sources within the Bank testified that SPM was widespread and systemic from 2013 to 2016.

2. <u>Anderson knew or should have known that SPM was widespread and systemic.</u>

The Comptroller finds that the evidence in the record supports the ALJ's findings that Anderson knew SPM was widespread and systemic. *See generally* RD at 7-11, 19-21, 352, 423. In making this determination, the Comptroller incorporates the following relevant facts that the ALJ properly found undisputed at the summary disposition stage: SD Order SOMFs 85, 99-101, 142-43, 196, 199-200, 280, 292-95, 299, 306, 310, 312-13, 317-18, 320, 410. Based on review of

Add. 1219

Appellate Case: 25-1079    Page: 1221    Date Filed: 05/16/2025 Entry ID: 5517644

the entire record, the Comptroller finds that Anderson knew that SPM was widespread and systemic.[14]

The SD Order SOMFs demonstrate that Anderson knew there was pressure in the Community Bank to perform and that this pressure was the reason for SPM. *See* SD Order SOMFs 99-100. Corporate Investigations regularly informed Anderson about continuing SPM. S*ee* SD Order SOMFs 280, 299. Anderson also received employee complaints, including employee surveys, about unethical sales practices and read the *LA Times* articles on SPM at the Bank. S*ee* SD Order SOMFs 196, 199-200, 292-95, 306, 312-13, 317. In 2016, Anderson received a report that SPM represented the largest category of EthicsLine cases. S*ee* SD Order SOMF 318. Anderson was also aware of SPM through meetings and conferences where concerns about sales pressure, sales quality, and team member misconduct and terminations were discussed. *See e.g.*, SD Order SOMFs 85, 101, 142-43, 280, 313, 317, 320, 410.

Despite all of the above evidence of SPM, Anderson testified at hearing that she did "not agree [SPM] was a significant problem" for the Bank. Hr'g Tr. at 9527:5-13. She testified that "sales practices misconduct occurred," *id.* at 9561:20-23, but asserted that it was only a problem in "hotspots where people had unreasonable performance expectations." *Id.* at 9620:13-9621:7. Upon reviewing Anderson's testimony and the contrary record evidence, the Comptroller rejects this assertion for the reasons explained below.

Anderson testified that she did not believe SPM was systemic because she had "no evidence then or during [her] whole tenure that it was a systemic issue." *Id.* at 9388:14-19; s*ee also id.* at 9527:8-9 ("I would not agree [SPM] was a significant problem, no."). Her other

---

[14] To the extent Anderson argues she did not actually know that SPM was widespread and systemic, the hearing testimony and record evidence also shows that Anderson *should have known* that SPM widespread and systemic.

Add. 1220

Appellate Case: 25-1079    Page: 1222    Date Filed: 05/16/2025 Entry ID: 5517644

testimony, however, undercuts this assertion. Anderson was part of the core team that met weekly and reviewed SPM cases from Corporate Investigations. *Id.* at 9719:10-18. She testified that throughout 2015, "[s]ales pressure was a topic in the core team." *Id.* at 9988:23-24. She testified that, in 2016, the Bank had SPM "hotspots where people had unreasonable performance expectations," including in Los Angeles, New Jersey, Arizona, and Texas. *Id.* at 9620:20-9621:4. Anderson knew that SPM was the result of, among other things, "pressure to meet sales goals," *id.* at 9573:8-9574:3, and that this pressure persisted in 2016. *Id.* at 9620:20-9621:7. This knowledge, combined with the many concerns, complaints, and reports of SPM that she received in her role as GRO all contradict her assertion that there was "no evidence" that SPM was systemic.

Similarly, Anderson continued to assert that SPM was not systemic even when presented with evidence that refuted her assertion. When presented with a March 2016 report showing SPM complaints throughout the country, *see* OCC Exh. 1896U at 39, Anderson still maintained that SPM was not "significant" or "widespread." Hr'g Tr. at 10041:13-42:7. Additionally, Anderson testified that 3,477 terminations for SPM from January 2013 to January 2016 "didn't concern" her. *Id.* at 10072:7-23. Anderson's assertions in the face of this contradictory evidence strain credulity, especially given that in another part of her testimony Anderson admitted that SPM was a "material issue" for the Bank from 2013 to 2016. *Id.* at 9526:8-10. Anderson's testimony shows, despite her protestations, that she knew or should have known that SPM was widespread and systemic.

In addition to this testimony, the record evidence shows that Anderson knew or should have known that SPM was widespread and systemic based on reporting she received. Anderson received many reports of employees committing SPM between 2013 and 2016. These reports

included reports of individual employees committing SPM. *See, e.g.*, OCC Exhs. 191,251 881, 1363, 1485; R. Exhs. 5037, 8343, 10942. She also received reports containing aggregated data showing widespread and systemic SPM. *See, e.g.*, OCC Exhs. 273,274, 288, 602, 777, 1231; R. Exhs. 388, 3819, 10730. She confirmed at the hearing that she received regular information about SPM. Hr'g Tr. at 9656:5-10.[15]

Additionally, there is evidence that Anderson understood that SPM was a bigger problem than she admitted in her hearing testimony. For example, in 2016, she sent an email to David Otsuka:

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████

OCC Exh. 251 at *1. This email indicates that Anderson understood that SPM was more than an issue in a few "hotspots." Anderson also received emails where others opined that SPM was widespread and systemic. In November 2013, she received an email from Michael Bacon, the former head of Corporate Investigations, asking "do we really need a monthly report to tell us we have a systemic issue" with SPM? OCC Exh. 1031 at *2. In December 2013, she received an email from Susan Nelson, a Human Resources ("HR") Manager, stating, "I'm not sure how many more hours we can all continue to invest in Core Group meetings to hammer through [the] same issues- different names again and again." OCC Exh. 1367 at *5. Finally, she read the October 2015 Accenture Report, *see* Hr'g Tr. at 10109:23-25 (Anderson), which found that

---

[15] The Comptroller also notes that Anderson states in her exceptions brief that she "was aware of the scope and nature of SPM and knew of control failures in the [first line of defense]." CRA Exceptions at 415-16.

Community Bank employees were challenged to meet sales goals and noted heightened turnover. *See* OCC Exh. 1312 at 4-6.

Based on this evidence, the Comptroller finds that Anderson knew or should have known that SPM was widespread and systemic and that her assertions to the contrary are not credible.

3. <u>Anderson was responsible for effectively managing the risks in the Community Bank</u>

Anderson was the Community Bank's[16] Group Risk Officer ("GRO") between 2004 and August 2016. Am. Ans. ¶ 242. Between 2006 and 2015, she reported to the Head of the Community Bank, Carrie Tolstedt. *Id*; SD Order SOMF 19; OCC Exh. 2279 ¶ 6 (Anderson Decl.). She also reported to the Bank's Chief Risk Officer, Loughlin, starting in the fall of 2013. SD Order SOMF 20; OCC Exh. 2279 ¶ 7. As GRO, Anderson led the first line of defense with responsibility for risk management and controls, including with respect to sales practices. Am. Ans. ¶ 247; Hr'g Tr. at 9251:1-7 (Anderson). Anderson was responsible for understanding the sales processes and incentive structures in the Community Bank and the risks they presented. SD Order SOMF 27. In January 2012, Anderson gained direct management oversight of the Sales and Service Conduct Oversight Team ("SSCOT") within the Community Bank, which was responsible for detecting sales practices misconduct and conducting proactive monitoring. Am. Ans. ¶ 260. Anderson also served on important management committees with responsibilities for identifying, managing, and escalating sales practices misconduct. SD Order SOMF 28; Am. Ans. ¶ 151.

---

[16] The Community Bank was the Bank's largest line of business. *See* OCC Exh. 2327 at *20. The Community Bank provided financial products and services to individuals and small businesses, including checking and savings accounts, debit cards, credit cards, bill pay, and remittance products. *See id.* It included the Bank's retail branch network, with over 6,000 physical branches. *See* R. Exh. 5940 at *1.

Per her annual performance objectives, Anderson was required to "ensure effective and efficient operational risk management in the Community Bank lines of business and to support effective and efficient risk management in aggregate at the enterprise level." R. Exh. 5214 at 1 (2013 performance objectives); R. Exh. 7256 at 1 (2014 performance objectives);[17] *see also* Hr'g Tr. at 9518:13-9519:2 (Anderson) (discussing performance objectives). Anderson understood that a critical aspect of her responsibilities was risk management relating to sales practices misconduct. Hr'g Tr. at 9519:3-10 (Anderson). She also understood that operational risk was defined as "all risks excluding credit and market, inclusive of risks we have traditionally viewed as basic business risks such as new product and technology development, staffing, incentives, execution risk, loss prevention, and team member behavior (sales quality/sales integrity, internal fraud, ethics violations, etc.)." *Id.* at 9519:21-9520:4 (agreeing with definition in R. Exh. 7256 at 1). Anderson understood that she was accountable for effective management of operational and compliance risks and that SPM posed these operational, compliance, and operational risks. Hr'g Tr. at 9520:5-9521:13 (Anderson). Anderson further acknowledged that it was her responsibility to build controls to prevent SPM from occurring (even if impossible to completely prevent it), *id.* at 9531:8-17, and that she was responsible for building a culture of accountability with strong controls to detect SPM. *Id.* at 9532:3-7; R. Exh. 7256 at 2.

Additionally, her performance objectives required her to "[p]rovide credible challenge to the Community Banking lines of businesses, as well as cross-enterprise and corporate Enterprise Risk Programs," and to "[c]ollaborate with, be timely and ensure transparency to key stakeholders including corporate risk and other impacted GROs." R. Exh. 7256 at 1; Hr'g Tr. at

---

[17] The record also contains her performance objectives for 2015 and 2016, which contain similar requirements. *See* OCC Exh. 626 at 1; R. Exh. 13780 at 1.

9523:9-21 (Anderson) (acknowledging that she had these duties). She also a responsibility to escalate risk issues to risk management, *see, e.g.*, R. Exhs. 5214 at 5, 7256 at 1; *see also,* Hr'g Tr. at 9477:18-25 (Anderson), and to build a culture of accountability with strong controls to ensure no material operational losses. *See, e.g.*, R. Exhs. 5214 at 3, 7256 at 2; *see also,* Hr'g Tr. at 9532:3-9533:2 (Anderson) (discussing responsibility for controls).

### 4. SPM posed significant risks to the Bank

Given the severe consequences of SPM at the Bank, including massive losses to the Bank as detailed in Part VI.C, the Comptroller finds that SPM posed significant risks to the Bank.

## B. Misconduct

The *misconduct* element of § 1818(e) may be satisfied by showing that the IAP has "directly or indirectly" violated any law or regulation, "engaged or participated in any unsafe or unsound practice in connection with any insured depository institution," or "committed or engaged in any act, omission, or practice which constitutes a breach of such party's fiduciary duty." 12 U.S.C. § 1818(e)(1)(A). As detailed below, the Comptroller hereby finds that Anderson committed several unsafe or unsound practices and violated federal laws, each of which is sufficient to meet the misconduct element of § 1818(e).

### 1. Anderson engaged in unsafe or unsound practices by failing to provide information or providing false, incomplete, and/or misleading information to the OCC during the 2015 OCC examinations.

Following a review of the record evidence and hearing testimony, the Comptroller finds that the evidence in the record supports the ALJ's findings that Anderson engaged in unsafe or unsound practices during the February and May 2015 OCC examinations by failing to provide information or providing false, incomplete, and/or misleading information to OCC examiners. *See generally* RD at 64, 177-85, 215-16, 220-22, and 230. Specifically, the Comptroller finds that, during the 2015 OCC examinations, Anderson (1) did not provide accurate information

Appellate Case: 25-1079     Page: 1227     Date Filed: 05/16/2025 Entry ID: 5517644

about the volume of terminations relating to SPM, (2) made false statements regarding her knowledge of sales pressure, (3) falsely stated that no one loses their job because sales goals are not met, and (4) failed to disclose the thresholds used in proactive monitoring.[18] In making this determination, the Comptroller incorporates the following relevant facts that the ALJ properly found undisputed at the summary disposition stage: SD Order SOMFs 18-19, 22, 25-27, 85, 101, 142-43, 196, 199-200, 280, 313, 317, 320, 335, 345, 390-92, 394-95, 397-99, 401-04, 406-07, 410-13, 415-17, 419-23, and 425.

Candor and transparency are crucial to the OCC's supervisory process. Examiners rely on information that bank personnel provide them during examinations to fully understand a bank's activities to evaluate risk, assess controls, and ensure that the bank is operating in a safe and sound manner. *See* Hr'g Tr. at 144:17-145:16 (Coleman) (testifying that communication between the Bank and the OCC is a significant component of our supervision model), 688:9-19 (Hudson) (testifying that "[c]ommunications with bank personnel play a vital role in the examination process"), 689:20-22 (Hudson) ("the hallmark of examining is to be able to rely upon the information that's communicated throughout the process."). Moreover, Anderson affirmed that she understood her obligations to be transparent and honest with the OCC, *id.* at 9773:23-9774:9, and that her failure to do so would not only hinder the OCC's exam, *id.* at 9774:23-9777:25, but could result in increased reputational, compliance, and operational risk. *Id.* at 10030:6-10031:8; *see also* SD Order SOMF 394 (establishing that Anderson was aware of her obligations to the

---

[18] In addition to these four findings, the ALJ made additional findings that Anderson had not been candid or forthcoming during the 2015 OCC examinations. *See, e.g.,* RD at 160-64; 180-81; and 197. The Comptroller finds that it is unnecessary to address the remaining findings, because there is more than enough evidence to affirm the ALJ's overall conclusion that Anderson engaged in misconduct when she failed to provide or provided false, incomplete, and/or misleading information to the OCC during the 2015 OCC examinations.

Appellate Case: 25-1079    Page: 1228    Date Filed: 05/16/2025 Entry ID: 5517644

OCC). Anderson also agreed that she had an obligation to correct information or fill in gaps if her colleagues or subordinates provided incorrect information to the OCC. *Id.* at 9802:8-21.

Despite her obligation to be transparent with examiners, the record evidence firmly establishes that Anderson's candor to examiners was lacking and that she failed to provide complete and accurate information during the 2015 examinations. As discussed below, these instances of misconduct constituted unsafe or unsound practices. *See e.g.*, *De la Fuente v. FDIC*, 332 F.3d. 1208, 1224 (9th Cir. 2003) (finding that failing to disclose relevant information to bank regulators, particularly related to potential problems, was an unsafe or unsound practice); *In re Seidman*, 37 F.3d 911, 936-37 (3d Cir. 1994) (finding that withholding information from the regulator to hinder an investigation constitutes an unsafe or unsound practice); *In re Cirino*, No. 99-011e, 2000 WL 33983843 (FDIC Jan. 14, 2000) (finding that an officer concealing information or providing false information to the regulator constitutes an unsafe or unsound practice), *aff'd*, FDIC-99-011e, 2000 WL 1131919 (May 10, 2000).

> ### a. *Anderson did not provide the OCC accurate information about the volume of terminations relating to SPM during the 2015 examinations*

Following a review of the record evidence and hearing testimony, the Comptroller affirms the ALJ's finding that Anderson was not transparent or candid in providing the OCC accurate information regarding the number of terminations relating to SPM. *See* RD at 64, 230. The record evidence shows that, by 2013, Anderson was aware that 1,000 or more employees were terminated every year for SPM. *See* Hr'g Tr. at 9913:9-19 (Anderson); *see also* OCC Exh. 1264 (Anderson response to April 2015 email agreeing that the number of terminations in 2013 was around 1,000 to 1,200 and that nothing had really changed); Hr'g Tr. at 9909:3-9910:1 (Anderson) (discussing OCC Exh. 1264 and testifying that her response in the April 2015 email was correct). The record evidence also shows that, in April 2014, Anderson informed the ERMC

that between approximately 1,000 and 2,000 team members were terminated in the Community Bank. *See* OCC Exh. 1438 at 1 (ERMC Meeting Minutes); Anderson Am. Ans. ¶ 164(e) (admitting that in an April 9, 2014, ERMC meeting, "Community Bank leadership informed the committee that one to two percent of Community Bank employees (1,000 to 2,000) were terminated each year for sales practices-related wrongdoing."); *see also* Hr'g Tr. at 9721:5-21 (discussing response in Amended Answer).[19] During the 2015 OCC examinations, when asked for information on termination volumes, Anderson initially referenced that 30 employees were terminated and later that an additional 160 terminations were reported, for a total of 190 terminations for SPM. *See* OCC Exh. 1734 at 1-2 (May 14, 2015, meeting notes). However, as evidenced above, Anderson clearly knew that the volume of terminations significantly exceeded 190 employees prior to and during the 2015 OCC examinations. National Bank Examiner ("NBE") Hudson testified that, during the examination, she asked several times for data regarding terminations and expressed concern that Anderson was "piecemealing" information. Hr'g Tr. at 736:5-25.

At the hearing, Anderson testified that she had a duty to be honest and transparent with the OCC on a number of topics, *see id.* at 9867-71, yet when specifically asked about this duty regarding termination volumes, she inexplicably denied that she had a duty to be transparent on this topic. *Id.* at 9870:14-19.[20] She further testified that she did not believe that her failure to provide complete information about the volume of terminations would hinder the OCC's

---

[19] At her deposition, Anderson admitted that she did not think the termination numbers represented true risk. OCC Exh. 2509A at 180-81. While this view may explain why she did not feel a need to fully inform the OCC of the larger termination numbers, it does not change the fact that she knowingly provided incorrect information to the OCC during the examinations.
[20] "Q: Did you believe at the time that you had a duty as the group risk officer to ensure that the May 19, 2015, memo was transparent about the volume of terminations for sales integrity violations? A. No."

32

examinations. Hr'g Tr. at 9778:14-20. ("I believe the OCC knew that information, so I don't know – I don't know that I could have hindered it since they knew the information.").[21] NBE Hudson testified that because Anderson was specifically asked to provide termination information, her failure to do so was not justified simply because the OCC could have reviewed information that had been previously provided to the OCC. *Id.* at 737:18-738:6. In later testimony, Anderson was again asked if the OCC examiners had a right to information regarding the number of terminations based on lack of customer consent and she responded "yes, if it was part of our conversations." Hr'g Tr. at 9938:18-19.[22] Failing to provide accurate information about this material issue during the OCC examinations constituted an unsafe or unsound practice.

     *b.  Anderson made false statements to the OCC regarding team members being under sales pressure*

     Following a review of the record evidence and hearing testimony, the Comptroller affirms the ALJ's finding that Anderson's responses to the OCC's questions regarding sales pressure during at the May 14, 2015, examination lacked candor and transparency. RD at 220-22. During the May 2015 examination, the OCC asked Anderson questions concerning sales pressure. In response to a question about whether she had any dialogue with Personal Bankers indicating that they were under pressure, she responded that she did not hear that at all, explaining that "[s]he's been at leadership summits and that people are positive with what they hear and feel." OCC Exh. 1734 at 4; *see also id.* at 3 (noting that interviews did not lead to a

---

[21] Anderson asserts that the ALJ erred in his findings related to the OCC examinations because he excluded evidence relating to OCC's supervision and knowledge of SPM and other associated issues. *See e.g.*, CRA Exceptions at 424-25; CRA Br. at 159-61. Even if the OCC had some prior knowledge of SPM, that does not refute the evidence that Anderson provided the OCC false, incomplete, and/or misleading information during the 2015 examinations, nor does it alter her obligations to be candid and provide accurate and complete information during a bank examination. The Comptroller therefore rejects this exception.

[22] *See* Respondents' Amended Revised Errata Transcripts of Hearing Days Day 9-38 at 78, Mar. 7, 2022 (changing "conversation" to "conversations").

conclusion about sales pressure); *see also* Hr'g Tr. at 9985:23-9986:9 (Anderson) (confirming that she told OCC examiners that she did not hear that bankers were under pressure at all).

However, both the record evidence and her hearing testimony confirm that Anderson had knowledge that sales pressure relating to SPM was a problem before the 2015 examinations. *See, e.g.,* SD Order SOMFs 196, 199-200, 280, 313, 410 (supporting that Anderson had knowledge since at least 2013 that sales pressure was an issue related to SPM). The record evidence also establishes that the information Anderson provided during the May 2015 OCC examination that sales pressure was not an issue was false. *See, e.g.*, OCC Exh. 1549 at 2 (email dated May 22, 2014) (noting agenda item for core team meeting involved "online sales pressure petitions floating around"); R. Exh. 9028 at 4,6 (March 2015 investigation debrief) (noting the reasons team members gave for engaging in behavior involved sales pressure); OCC Exh. 3004 (email dated April 13, 2015) (adding item to core team agenda regarding "protest activity in St. Paul, which focused in large part of sales pressure related issues.").

Anderson testified that she knew that between 2013 and 2016, "we had hotspots where people had unreasonable performance expectations." Hr'g Tr. at 9620:13-9621:7, 9791:17-21 (affirming that she understood that between 2013 and 2016 that there were hotspots where employees faced significant pressure to meet unreasonable goals), 9831:1-8 (same). Anderson also testified that she understood that pressure to meet sales goals was a reason why employees engaged in SPM between 2013 and 2016. *Id.* at 9573:8-9574:3,9996:10-23 (admitting she had concerns about sales pressure petitions in 2014).[23] And during questioning about an employee

---

[23] NBE Crosthwaite testified that there were only two reasons why a lower-level employee would open up a fake account, Hr'g Tr. at 2297:9-2298:11, and that one of them was "extreme pressure and fear of losing your job because you're not going to make your goals." *Id.* at 2298:9-11.

protest that took place in St. Paul, Anderson admitted that the protest—which occurred just one month before the May 2015 examination—led her to "believe that there was still some pressure, but not excessive pressure." Hr'g Tr. at 9991:17-22. Yet, she testified that it did not occur to her to provide this information to the OCC because she didn't know who the protesters were and if the protesters were team members. *See id.* at 9989:23-9990:20.[24]

NBE Hudson explained that it was important to the OCC to understand whether employees faced sales pressure in order to assess risk, not only to the institution but to the customers that the bank serves. Hr'g Tr. at 734:23-735:5. The hearing and record evidence discussed above confirms that Anderson knowingly misled the OCC about a material issue when she told examiners that she was not hearing about sales pressure at all. This failure to provide the OCC complete and truthful information constituted an unsafe or unsound practice.

   c. *Anderson falsely told the OCC during the 2015 examinations that no one loses their job because sales goals were not met*

Following a review of the record evidence and hearing testimony, the Comptroller affirms the ALJ's finding that Anderson falsely told OCC examiners that "no one loses their job because they did not meet sales goals." RD at 184-85. The record evidence shows that Anderson made this unqualified statement to OCC examiners in 2015. *See* OCC Exhs. 1735 at 3 (February 19, 2015, conclusion memo) (noting that the statement was made and expressing concern with Anderson's candor), 1943 at 2 (Anderson's response to OCC's 15-day letter) (stating that "[a]n employee could not be fired for failing to meet sales goals. There simply is no Human Resources

---

[24] Anderson had received an email providing information about the protest that specifically referenced team members by name. OCC Exh. 3004 (email dated April 13, 2015). Furthermore, Anderson admitted that she never took any steps to find out who was protesting. Hr'g Tr. at 9989:23-9990:20.

code for such a discharge."),[25] Anderson's Response to EC's SOMF 405 ("Undisputed Ms. Russ Anderson testified [at her deposition] that she stated to the OCC during the 2015 examinations that employees could not be terminated for failing to meet sales goals, because that is what she believed and knew at the time, having been told this information by others at the Bank upon making inquiries about this issue."), OCC Exh. 1771 at 2 (February 10, 2015, meeting notes) (Anderson failed to correct a statement made during the meeting with the OCC that "[t]he incentive plan. . . . is not a requirement for keeping your job.").

At the hearing, Anderson was directly asked if her statement that "no one loses their job because they did not meet sales goals" in the OCC's memo was accurate. Her response was "yes," and she explained that her statement was based on conversations with Debra Paterson, a senior HR professional, who told her that such terminations did not occur and there was no code in the system for such a termination.[26] Hr'g Tr. at 9437:6-9438:7. The OCC examiners also confirmed this is what Anderson told them during the 2015 examinations. *See* Hr'g Tr. at 706:2-8 (Hudson) (testifying that Anderson told her during the exam that "no one loses their job for failure to meet sales goals."), 2270:14-16 (Crosthwaite) ("I asked her specifically if they were terminating team members for not meeting sales goals, and the answer was no.").

However, during her cross-examination, Anderson changed her testimony and qualified her statement, testifying that employees were not terminated "*solely* for not meeting sales goals." Hr'g Tr. at 9567:15-25 (emphasis added). And importantly, she confirmed that between 2013

---

[25] Anderson admits that she was heavily involved in preparing the 15-day letter response and testified that the contents were accurate. *See* OCC Exh. 2509A (Anderson Dep.) at 37:24-39:21.
[26] Anderson also testified that this was an important topic for her based on her personal experience with her son who has Aspergers, as she "could not in good conscience work for a company that would terminate people for not meeting sales goals. It is – it's an abomination to me." Hr'g Tr. at 9439:11-14.

Add. 1232

Appellate Case: 25-1079     Page: 1234     Date Filed: 05/16/2025 Entry ID: 5517644

and 2016 she knew and understood that employees *could* be terminated for not meeting sales goals, but it could not be the only "or the preponderate [*sic*] reason." *Id.* at 9568:1-20. She also admitted that, during her earlier direct testimony, she "didn't nuance it that clearly." *Id.* at 9570:20-9571:9. In her post-hearing briefing, Anderson affirmatively asserted that she told the OCC examiners back in February 2015 that the bank did not terminate employees "*solely*" for not meeting sales goals. *See* Anderson's Proposed Findings of Fact and Conclusions of Law, Finding of Fact ¶ 172 (emphasis added). Yet the record evidence and hearing testimony does not support this assertion, nor is there any evidence that she ever informed the OCC examiners of this qualification.

The record contains contemporaneous evidence showing that examiners had concerns with Anderson's candor and transparency during the 2015 examinations. For example, in an email chain discussing the February 10, 2015, sales practices call, NBE Crosthwaite wrote "we all agreed after call…Claudia [Anderson] and Co not Transparent…very difficult…it's like pulling teeth…." NBE Moses agreed, stating, "As you said Claudia [Anderson] was downplaying or dodging." R. Exh. 7713 (email chain dated February 10-11, 2015); OCC Exh. 1754 at 2 (June 26, 2015, Supervisory Letter) (concluding "[t]here has been and continues to remain an overall lack of transparency at the first line of defense regarding past investigations, and ongoing control and monitoring processes."); *see also infra* Part VI.B.4 (discussing Anderson's tendency to downplay SPM risks).

Anderson's own hearing testimony confirms that she was selective in the information she provided to the OCC. For example, in response to a question about whether, during the relevant period, she had "ample opportunity to inform OCC examiners about information known to [her] related to sales practices misconduct," she stated, "*[i]f it was material*, yes." Hr'g Tr. at 9773:14-

19 (emphasis added). Likewise, in her deposition, she qualified her answer regarding her obligation to provide complete information to the OCC during her tenure as the GRO, testifying, "I was responsible for providing the OCC with complete and accurate information *for which they asked for*, yes." OCC Exh. 2509A at 93:11-18 (emphasis added). Anderson's admissions that she limited the information she provided to the examiners is inconsistent with the examination process. *See, e.g.,* Hr'g Tr. at 144:17-145:16 (Coleman) (explaining that examiners rely on information provided to assess banks), 688:3-690:2 (Hudson) (same).

The ALJ similarly found that Anderson's hearing testimony regarding representations she made to the OCC were not credible. *See, e.g.,* RD at 183-85. Specifically, the ALJ found that "[p]reponderant evidence adduced during the hearing compels the conclusion that Ms. Russ Anderson's testimony – that she told the examiners no employee was terminated *solely* for failing to meet sales goals – was false; that instead when she met with the examiners, she represented to them that no employees were terminated for failing to meet sales goals – without qualifying the claim as she did during her testimony." *Id.* at 184 (emphasis added). The Comptroller has reviewed the evidence relating to this credibility determination and finds that Anderson's hearing testimony was inconsistent and contradictory with the record evidence.[27] Accordingly, the Comptroller affirms the ALJ's credibility determination.

In her exceptions, Anderson asserts that the ALJ erred because he incorrectly found that the first time Anderson qualified her statement with the word "solely" was at the hearing rather

---

[27] The ALJ expressed similar concerns about other parts of her hearing testimony, finding that it was false and/or unreliable. *See e.g.,* RD at 123-24 (finding Anderson's testimony about the quality of sales report card during her cross examination was contradicted by the evidence), 226 (finding Anderson gave false testimony at hearing), 420 (finding Anderson presented false and unreliable testimony throughout the proceeding). The Comptroller agrees with the ALJ's assessment that her testimony was inconsistent.

than a year earlier at her pre-hearing deposition.[28] CRA Br. at 248-52; CRA Exceptions at 546-54. The Comptroller rejects this exception. Whether she first qualified her statement at her deposition or at the hearing does not alter the record evidence demonstrating that Anderson knew at the time of the 2015 examinations that employees could be terminated for failing to meet sales goals as long as it was not the only reason, and she never informed the OCC of this qualification.[29] The hearing testimony and record evidence establish that (1) during the 2015 examinations, Anderson told the OCC that no one loses their job for not meeting sales goals; (2) she repeated this unqualified assertion numerous times, including in her responses to the OCC's 15-day letter and to EC's SOMFs; (3) at the time she made the unqualified statement to the OCC, Anderson knew that, in fact, an employee *could* be terminated for not meeting sales goals, as long as it was not the sole or preponderant reason; and (4) she never informed the OCC of the qualified answer. Based on this evidence, the Comptroller finds that Anderson informing the OCC during the examination that employees were not terminated for not meeting sales goals was a knowing and material misrepresentation, which constituted an unsafe or unsound practice.

---

[28] Anderson also claims that the ALJ mischaracterized her response to the OCC's 15-day letter. *See* CRA Exceptions at 549-550; CRA Br. at 250. The Comptroller rejects this exception. The letter clearly states that "[e]mployees could not be terminated for failure to meet sales goals." OCC Exh. 1943 at 6.

[29] Anderson excepts to the RD's findings about her transparency during the February 10, 2015, examination, claiming that the ALJ ignored contrary evidence. CRA Br. at 479-80. The Comptroller rejects this exception. The hearing testimony suggests that the ALJ did, in fact, review Anderson's evidence regarding her transparency. *See, e.g.*, Hr'g Tr. at 3236:7-10. In any case, the Comptroller has reviewed all such evidence in his *de novo* review of the record. *See supra* Part IV. The record contains both testimony and documentary evidence that demonstrates that Anderson was not transparent and did provide false, incomplete, and/or misleading information to the OCC.

Add. 1235

Appellate Case: 25-1079      Page: 1237      Date Filed: 05/16/2025 Entry ID: 5517644

Following a review of the record evidence and hearing testimony, the Comptroller affirms the ALJ's finding that Anderson failed to disclose the thresholds used in proactive monitoring during the 2015 OCC examinations.[30] *See generally* RD at 178-79, 215-16. Anderson does not dispute that she failed to disclose the thresholds during the 2015 examinations, but she justifies her omission by claiming that the OCC did not specifically ask for the information. *See* OCC Exh. 2279 ¶ 28 (Anderson Decl.) ("I was never asked by the OCC Wells Fargo supervisory team about specific methodology for gathering data, including whether thresholds were being used. I would have gladly shared this information if they had thought it was important enough to ask about."), ¶ 29 (during the February 2015 examination, the OCC examination staff did not ask "any questions about the thresholds used in SSCOT's proactive monitoring" and she "had no reason to believe that thresholds were relevant" to the discussions); *see also* OCC Exh. 2509A at 96:18-97:9 (testifying she had no recollection of telling OCC about thresholds), 96:18-22 ("if they had asked me the question, and we [would have] given them the whole, complete answer . . . I can't sit here today and tell you if I would have told them about the 99.9."); SD Order SOMF 420 ("At the May 14, 2015, Meeting, Respondent Russ Anderson did not disclose the 99.99% and 99.95% thresholds used by SSCOT to detect simulated funding.").

However, the record evidence contradicts Anderson's assertion that she was not asked for this information. Prior to the February 10, 2015, meeting, Anderson was provided with a list of topics to be covered, which included "controls and monitoring processes for identifying

---

[30] Anderson excepts to this finding. *See* CRA Exceptions at 569-70; CRA Br. at 513-14. For the reasons detailed below, the finding is support by the record and the Comptroller adopts the ALJ's finding.

40

inappropriate behavior." OCC Exh. 2955 at *2. The OCC's meeting notes from the February 2015 examination indicate that there was a discussion of SSCOT, but the notes do not show that either proactive monitoring or thresholds were discussed. OCC. Exh. 1771 at 3. Additionally, the notes indicate that the examiners inquired about testing for the first line of defense for sales quality and were told about scorecards, but there is no mention of monitoring or thresholds. *Id.*

The OCC's meeting notes for the May 2015 examination indicate that, during a discussion regarding SPM, Anderson was specifically asked "how is it detected?" OCC Exh. 1734 at 1-2. Again, the notes contain no indication that she mentioned proactive monitoring or thresholds in her response. *Id.* NBE Hudson testified that Anderson was asked the question "how simulated funding [was] detected" in order "to understand the controls that were in place in order to detect inappropriate behavior." Hr'g Tr. at 731:24-732:5. NBE Hudson further explained that she would have expected Anderson to disclose controls such as the thresholds if they were being used to isolate the type of activity because it was important for examiners to understand the controls in assessing operational risks. *Id.* at 732:6-733:1. Hudson rejected the idea that the OCC had to use the specific word "thresholds" in order to get this information, explaining that the OCC had been asking the same questions since February 2015. *Id.* at 733:2-25. Hudson further testified that if there was a threshold (regardless of terminology being used), it was important for Anderson to communicate that information, as it was not the examiner's job to interrogate bank management, and examiners rely on officers to answer questions "accurately and transparently and candidly." *Id.* at 733:11-25. NBE Candy also confirmed that thresholds were not disclosed during the May 2015 examination. *Id.* at 1079:17-19.

Anderson testified that she had previously advised the OCC about thresholds in 2013 during discussions on proactive monitoring. *Id.* at 9982:20-25. But the mere fact that she had

41

discussed thresholds back in 2013 does not excuse her failure to provide information on thresholds during the 2015 examinations. The evidence discussed above demonstrates that the OCC asked specific questions regarding how simulated funding was detected and that Anderson did not discuss thresholds then or any time during the 2015 examinations. Moreover, Anderson admitted there were changes made to the thresholds in the summer of 2014 and again in April 2015. *Id.* at 9316:17-21. At a minimum, Anderson should have disclosed these changes during the 2015 examinations. *See id.* at 9317:1-6 (Anderson) (testifying that in April 2014 the threshold was 99.99 and in 2015 it was lowered to 99.95). The Comptroller finds that because the 2015 OCC examinations were focused on SPM and controls, information such as changes to the controls were clearly material to the examination and her failure to disclose this information constituted an unsafe or unsound practice.

2. Anderson's failure to credibly challenge the incentive compensation program's unreasonable sales goals constituted an unsafe or unsound practice

The Comptroller finds that the record evidence supports the RD's findings that Anderson committed unsafe or unsound banking practices by failing to *credibly challenge* the Bank's incentive compensation program. *See generally* RD at 17, 39, 54, 60, 170, 210-11. In making this determination, the Comptroller incorporates the following relevant facts the ALJ properly found undisputed at the summary disposition stage. *See* SD OrderSOMFs 18-20, 22-24, 69, 86, 88-95, 97-98, 104, 110, and 117.

The Comptroller finds that the record evidence, including hearing testimony and exhibits, further establishes by preponderant evidence that: (1) Anderson had a responsibility to credibly challenge the incentive compensation program; (2) Anderson knew that unreasonable sales goals in the incentive compensation program were incentivizing employees to commit SPM; and

42

(3) Anderson failed to discharge her obligation to credibly challenge the incentive compensation program.

      *a.  Anderson was required to credibly challenge the incentive compensation program*

The record evidence demonstrates that Anderson had an obligation under Bank policies to ensure effective risk management of the incentive compensation program, including by exercising credible challenge to the incentive compensation program.

Under the Bank's Fraud Risk Management Policy, the GRO was responsible for "providing credible challenge to the businesses they oversee." OCC Exh. 1272 at 7; *see also* OCC Exh. 1733 at 5 (Wells Fargo Product and Service Risk Management Policy). The Bank's Sales Practices Risk Governance Document defined *credible challenge* as "the communication of an alternative view, opinion, or strategy developed through expertise and professional judgment to challenge business or enterprise strategies, policies, products, practices, and controls." R. Exh. 11373 at 9. The policy further stated that "Group Risk Officers . . . exercise credible challenge through various means, including by raising concerns to Group management . . . ." *Id.*

The Bank's Incentive Compensation Risk Management Policy specifically required incentive compensation programs to appropriately balance risk and reward. OCC Exh. 1855 at 3-4 (Incentive Compensation Risk Management Policy). As described above, Anderson, as GRO, was responsible for providing an independent assessment of and credibly challenging the Bank's incentive compensation program, including use of sales goals, to her superiors. *See* OCC Exhs. 1272 at 7 (Wells Fargo Fraud Risk Management Policy), 1733 at 5 (Wells Fargo Product and Service Risk Management Policy); *see also* SD Order SOMF 94.

As GRO, Anderson was also responsible for understanding the risks posed by incentive compensation, ensuring that proper controls were in place for that risk and continuously

43

monitoring those controls. Hr'g Tr. at 1132:13-22, 1138:1-5 (Candy). Indeed, Anderson admitted in her post-hearing briefing that "it was an important part of her job to credibly challenge the incentive compensation plans in the Community Bank to ensure they appropriately balanced risk and reward." CRA Post-Hearing Reply Br. at 3-4. Additionally, Anderson testified during the hearing that "[her] responsibilities . . . were to provide credible challenge to the [incentive compensation] process . . . ." Hr'g Tr. at 9278:14-16. She also recognizes this responsibility in her exceptions. *See* CRA Exceptions at 104. Therefore, the Comptroller finds that Anderson was obligated (and knew she was obligated) to credibly challenge her superiors on the incentive compensation program wherever it failed to properly balance risk and reward.

Anderson raises in her exceptions that the legal standard for "credible challenge" is left undefined by the ALJ and Enforcement Counsel. CRA Br. at 333-34, 501-02. However, as established above, the Bank's policies clearly defined credible challenge and charged the GRO with the responsibility to credibly challenge the businesses they oversaw. *See* OCC Exhs. 1272 at 7, 1733 at 5; R. Exh. 11373 at 9. Moreover, Anderson has already admitted in her hearing testimony, post-hearing briefing, and in her own exceptions that she had a responsibility to provide credible challenge on the incentive compensation program. *See* Hr'g Tr. at 9278:14-16;CRA Post-Hearing Reply Br. at 3-4; CRA Exceptions at 104. Additionally, Anderson's own expert witnesses testified that she had to provide credible challenge as GRO. Hr'g Tr. at 10368:14-18 (Farrell) (testifying that Anderson as GRO had to credibly challenge incentives and sales goals). Chief Risk Officer Michael Loughlin also testified that one of Anderson's "primary responsibilities would have been to provide credible challenge to the Community Bank and its leadership" and that a credible challenge meant "a challenge to either the performance or the strategy of . . . the Community Bank . . . with thoughtfulness, collegiality, [and] information . . .

Add. 1240

." Hr'g Tr. at 2949:1-13. The Comptroller rejects this exception because the NBE's testimony, the Bank's corporate policies governing the incentive compensation program and risk management, and the hearing testimony demonstrate that Anderson had a clear obligation to exercise credible challenge and that she was aware of this requirement.

Failing to discharge this obligation of credible challenge constitutes an unsafe or unsound banking practice, as it represents a "lack of action which is contrary to generally accepted standards of prudent operation" that could result in "abnormal risk or loss or damage" to the Bank. *Adams*, 2014 WL 8735096, at *11. Failing to comply with the responsibilities under the Bank's policies represents a departure from generally accepted standards of prudent operation, and the substantial risks to the Bank posed by SPM have already been established above. Therefore, Anderson's failure to provide credible challenge represented an unsafe or unsound practice.

b. *Anderson knew that the Community Bank imposed unreasonable sales goals on employees*

Upon review of the record evidence, the Comptroller finds that Anderson knew that the Community Bank imposed unreasonable sales goals on employees. From 2013 to 2016, the Community Bank's incentive compensation program included unreasonable sales goals. SD Order SOMFs 69and 88; *see also, e.g.*, Hr'g Tr. at 1131:7-20 (Candy),4282:20-4283:3 (Smith). Through the incentive compensation program, managers and employees were pressured to meet unreasonable sales goals. SD Order SOMF 302; *see also* Hr'g Tr. at 1119:18-24 (Candy),2295:18-2296:3 (Crosthwaite); OCC Exh. 1754 at 3. Managers and employees in the Community Bank sought to meet unreasonable sales goals to achieve financial compensation and to avoid adverse employment actions, up to and including termination. Hr'g Tr. at 1130:2-21

45

(Candy). And throughout 2013-2016, Anderson had knowledge that the sales goals were unreasonable and incentivizing employees to commit SPM. *See supra* Part VI.A.2.

There is extensive evidence that sales goals were unattainable during 2013-2016. *See, e.g.*, OCC Exhs. 835, 1163, 1215U, 1312 at 27-28, 1985; R. Exh. 17720 at 2-3; *see also*, OCC Exhs. 38, 1020, 1549, 1742; R. Exh. 16147 at 47; Hr'g Tr. at 10241:2-10242:7 (Abshier). For example, in a January 2013 email, Bart Deese relayed concerns that Michael Bacon had relating to sales integrity and compliance, including unfunded accounts, duplicate addresses, suspicious IDs, and ineligible customers. OCC Exh. 1985 at *1. As part of the discussion about the root cause of some of those issues, Bacon "said he felt a lot of it was related to the sales goals and pressure." *Id.* Bacon further recounted a story in which Chief Risk Officer Michael Loughlin's wife entered a Wells Fargo branch to conduct a transaction and "came out with 5 products," implying an environment where employees pushed products onto customers. *Id.* at *2. Further,Loughlin testified at hearing that he believed "sales goals were increasing turnover, which is not a good thing from a risk management perspective." Hr'g Tr. at 3286:18-3287:2. Indeed, even Anderson herself wrote in an October 2013 email: "I don't get the savings to [demand deposit account] goal," expressing confusion as to why sales goals encouraged employees to sell customers more than one savings account per checking account. OCC Exh. 1163 at *2. She went on to write that her own family only had one savings account, two checking accounts, and one brokerage account because that was "[a]ll we need," implying that the goals set for employees did not make sense for many customers' needs. *Id.* at *1.

Anderson admitted that she believed that sales goals were unreasonable in 2012, but attributes that fact to regulatory changes relating to the 2010 Dodd-Frank Act. Hr'g Tr. at 9282:3-15 (Anderson). She further asserted that the sales goals were no longer unreasonable after

Add. 1242

Appellate Case: 25-1079     Page: 1244     Date Filed: 05/16/2025 Entry ID: 5517644

the targets were lowered beginning around 2012-2013. *See id.* at 9405:25-9406:5, 9629:3-7; CRA Post-Hearing Reply Br. at 5. However, she fails to present any evidence that supports her assertion that sales goals became reasonable after being lowered other than her own testimony. Hr'g Tr. at 9628:19-23 (Anderson); R. Exh. 278 at 68 (Anderson Dep.). In contrast, Kenneth Zimmerman, head of the deposit products group at Wells Fargo during 2013-2016, testified that the Bank went through multiple quarters of lowering sales goals beginning around 2012 because "the sales force was missing those goals by a wide margin" and that he "would have been advocating for lower goals than we ultimately settled on," further supporting the conclusion that the sales goals were too high and remained so. Hr'g Tr. at 4516:13-4518:25, 4519:19-25.

The record contains extensive evidence that Anderson had knowledge that sales goals were unattainable and driving employees to commit SPM, as she received contemporaneous information through various channels about employees committing SPM due to pressure to meet the same sales goals she alleges were reasonable. *See, e.g.*, OCC Exhs. 111, 242, 261, 289, 295, 306, 815, 877, 1035, 1163, 1363, 1366, 1375, 1489; Hr'g Tr. at 2295:18-2296:3 (Crosthwaite). For example, Anderson responded to an email chain from November 2013 regarding an investigation into employees changing customer phone numbers during account openings, questioning whether "there was pressure to do this?" and stating that "there must be some underlying issues for changing the numbers." OCC Exh. 1363. Indeed, Anderson admitted in her hearing testimony that she was aware and concerned that sales pressure was a reason why employees engaged in SPM from 2013-2016. Hr'g Tr. at 9573:8-9574:3.

Anderson also contends that sales pressure was not the cause of SPM. *See, e.g.*, CRA Exceptions at 34, 36; CRA Br. at 464. Anderson again does not present any evidence other than her own testimony to support the assertion that sales goal pressure did not lead to substantial

47

risks, including SPM. In his SD Order, the ALJ properly found the evidence shows that employees faced significant pressure to meet unreasonable sales goals and feared losing their jobs if they did not meet sales goals, which incentivized them to commit SPM. SD Order SOMFs 98and 302.

Supporting this finding, ample record evidence demonstrates Bank employees committed SPM due to pressure to meet unreasonable sales goals. *See, e.g.*, OCC Exhs. 26, 111, 306, 644, 835, 877, 1363, 1366, 1861, 2915 at 21-25, 2988. For example, in a December 2013 email chain regarding investigations into employee misconduct from around the country, HR manager Susan Nelson expressed concern about team members "taking actions that are in many, many cases either encouraged or studiously ignored by their store management, in order to meet goals and keep their jobs." OCC Exh. 1366 at *1. ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

Moreover, NBE Candy testified that "[t]he fact that people could risk termination if they did not meet the unreasonable goals did drive some of the misconduct." Hr'g Tr. at 1068:12-18. She further testified that the incentive compensation program "enforced or encouraged people to meet the unreasonable sales goals" and "gave managers an incentive to either encourage inappropriate illegal behavior to meet the sales goals or . . . turn a blind eye." *Id.* at 1130:2-21. Jason MacDuff, a Wells Fargo employee in strategic planning during 2013-2016, also testified that subject-matter experts at the Bank conveyed to him that pressure to meet sales goals was driving misconduct. *Id.* at 5679:19-5680:20. In addition to the record evidence and testimony, Anderson essentially concedes that unreasonable sales goals were a primary driver of SPM in her

48

exceptions briefing. While arguing that "escalation occurred" in the Bank to address SPM risks, she asserts that "[c]hanges to sales goals and incentive compensation plans . . . resulted in significant decreases in the rates of sales practices misconduct." CRA Br. at 448. The premise of this statement is self-evident: Sales goals were a primary driver of SPM.

This evidence together demonstrates that sales pressure did indeed drive employees to commit SPM, and that Anderson did know about it. Given the extent and severity of the misconduct being reported directly to Anderson, there is little doubt that Anderson knew that the incentive compensation program was not appropriately balancing risk and reward. Hr'g Tr. at 1119:18-1120:1 (Candy); OCC Exh. 1742 at 8.

Anderson testified that while there were geographic "hotspots" where employees faced significant pressure to meet unreasonable sales goals, she did not believe that it ever rose to the level requiring escalation to her superiors. *See* Hr'g Tr. at 9715:5-18, 9791:17-24. However, her testimony is rebutted by the many reports of pressure on employees to meet unreasonable sales goals from throughout the country. Further, as NBE Crosthwaite testified: "if you were having hot spots in L.A. and Orange Country, New Jersey, and Arizona, more than likely you're going to have problems elsewhere." *Id.* at 2332:3-11 (Crosthwaite).

Based on the foregoing, the Comptroller finds that Anderson had knowledge that sales goals in the Community Bank were unreasonable and were incentivizing employees to commit SPM and rejects her exceptions relating to this finding.

c. *Anderson failed to credibly challenge the incentive compensation program to Bank executives*

For the reasons explained below, the Comptroller finds that Anderson failed to credibly challenge the Bank's incentive compensation program.

As established above, Anderson was aware that employees were committing SPM due to sales pressure, and she acknowledged her responsibility to credibly challenge Bank executives on the incentive compensation program. Despite Anderson's knowledge of SPM caused by the unreasonable sales goals, there is scant evidence in the record that she raised the issue with her superiors. She justifies her failure by claiming that other Bank executives already knew about the SPM issue and by offering some bare assertions that she orally challenged sales goals. *See, e.g.*, CRA Exceptions at 104; CRA Br. at 503-05; Hr'g Tr. at 9715:12-18 (Anderson); *see also infra* Part VI.B.4. Even if her superiors knew about the unreasonable sales goals and SPM, that knowledge would not have relieved her of her responsibility to credibly challenge the unreasonable sales goals. As GRO, Anderson should have been the first person to advocate for changes to sales goals during 2013-2016. Hr'g Tr. at 1138:6-9 (Candy). She should have challenged the Community Bank's business model, advocated for a formal policy that employees could not be fired for failing to meet sales goals, sought to withhold incentive compensation credit for accounts of dubious origins, and advocated for tighter controls on new accounts. *Id.* 1068:1-1069:15 (Candy).

Specifically, Anderson should have raised the alarm to Chief Risk Officer Michael Loughlin[31] and Community Bank head Carrie Tolstedt.[32] Anderson asserts that she attended many meetings with Loughlin and Tolstedt, inviting the inference that she credibly challenged the incentive compensation program merely because she regularly met with them. *See, e.g.*, CRA Exceptions at 93-94, 118. Her testimony that she orally challenged sales goals is unsupported by

---

[31] Anderson had a "dotted-line" reporting to Chief Risk Officer Michael Loughlin, beginning some time before 2016. SD Order SOMF 20; MSD-290A at 26:18-27:10.
[32] Anderson reported directly to Community Bank head Carrie Tolstedt from 2006 through 2016. SD Order SOMF 19.

any identified record evidence. *See, e.g.*, Hr'g Tr. at 9278:23-9279:19. As established in the SD Order, Anderson failed to provide Loughlin with independent assessments of the incentive compensation program, including whether it appropriately balanced risk and reward, as required under Bank policy. SD Order SOMF 95. Loughlin further testified that he believed Anderson should have done more to invite inspection of the SPM problem, escalated to him in a more aggressive way, and credibly challenged the Community Bank's business model more strongly. Hr'g Tr. at 2958:9-14. Having reviewed the relevant portions of the record, the Comptroller declines to give any weight to Anderson's bare assertions of credible challenge.

Anderson argues in her exceptions that the Comptroller should find that she did exercise credible challenge and therefore discharged her obligation. *See, e.g.*, CRA Exceptions at 118; CRA Br. at 501-505. None of these arguments are availing.

First, Anderson asserts that she never told Loughlin or Tolstedt that sales goals needed to be modified because she did not believe they were causing employees to commit SPM or that the incentive compensation program failed to appropriately balance risk and reward. Hr'g Tr. at 9628:7-9629:7 (Anderson). However, the Comptroller has already found that Anderson knew that sales goals were unreasonable and incentivized employees to commit SPM. Since Anderson was aware of that substantial risk, she was obligated to credibly challenge.

Second, Anderson asserts that she did not have unilateral authority to lower or eliminate sales goals, and that even Tolstedt would have been ignored or replaced if she proposed to eliminate sales goals. *See, e.g.*, CRA Exceptions at 104, 460. Even accepting these assertions as true, a gap remains between what Anderson did and what she was obligated to do. The fact that Tolstedt, Loughlin, and other Bank executives may have known about the SPM problem did not

51

absolve Anderson from her obligation to credibly challenge them to change the incentive compensation program. *See also infra* Part VI.B.4.

Last, Anderson asserts that she discharged her duties by taking various actions, such as site visits to Wells Fargo facilities across the country, updating new training material for employees on risk and ethics, consulting banks in the United Kingdom on sales goals, participating in a pilot initiative on eliminating sales goals, and adjusting existing sales goals. *See, e.g.*, CRA Exceptions at 93-95, 120-21; CRA Br. at 503-04. However, these actions do not address her failure to credibly challenge the incentive compensation program up her chain to Tolstedt and Loughlin. Moreover, while Anderson took some actions to lower the sales goals during the 2012-2013 period, she admitted that she did not advocate for lowering sales goals from 2013 to 2016. *See* CRA Post-Hearing Reply Br. at 5; Hr'g Tr. at 9405:25-9406:4, 9629:3-7 (Anderson).

The Comptroller finds that the record evidence establishes that Anderson was obligated to credibly challenge the incentive compensation program, that the incentive compensation program imposed unreasonable sales goals that failed to balance risk and reward and incentivized employees to commit SPM, and that Anderson failed to credibly challenge the incentive compensation program. Given Anderson's knowledge that unreasonable sales goals posed substantial risks to the Bank, Anderson's failure to provide such credible challenge constituted unsafe or unsound banking practices.

### 3. Anderson's failure to institute effective controls to manage the risk of SPM was an unsafe or unsound practice

The Comptroller finds that the record evidence and hearing testimony supports the ALJ's findings that Anderson engaged in unsafe or unsound practices by failing to institute effective controls to prevent and detect SPM from 2013 until October 1, 2016, when the Bank eliminated

52

sales goals. *See generally* RD at 93-105, 112-17, 121-25, 145-47, 150-60; 197-201, 231-32, 370-87, 424. Specifically, the record shows that the controls that existed were ineffective because (1) the significant amount of SPM that existed demonstrates that the controls failed to prevent SPM; and (2) the controls detected only a small proportion of SPM that existed in the Bank. In making this determination, the Comptroller incorporates the following relevant facts that the ALJ properly found undisputed at the summary disposition stage: SD Order SOMFs 157, 161-64, 168, 170-71, 174-93, 195-96, 199-200, 202-07, 209, and 211-13.

  *a.*   *Overview of SSCOT and SPM Controls*

  Anderson managed SSCOT, which was responsible for reviewing allegations of SPM as well as conducting proactive monitoring to detect SPM in the Bank. OCC Exh. 1771 at *3; SD Order SOMF 181. SSCOT received allegations of SPM from a variety of sources, including the Bank's EthicsLine (a 24-hour hotline and website), customer complaints, human resources, management, Corporate Investigations, and proactive monitoring tools. R. Exh. 1778 at 20.

  Upon receipt of an SPM allegation, SSCOT processed the allegation on one of two tracks. *See* R. Exh. 9704. The most serious allegations were referred directly to Corporate Investigations.[33] *See id.* at 8. Allegations not sent directly to Corporate Investigations were reviewed by SSCOT, which applied certain criteria to determine whether the allegation should be dismissed, whether the employee involved should be referred for additional training, or whether "polling" should be conducted.[34] *Id.* at 1-7; *see also* R. Exh. 1778 at 20. When conducting

---

[33] Corporate Investigations was a department within the Bank responsible for investigating employee misconduct. *See* Hr'g Tr. at 5961:4-11 (Julian).

[34] For example, an allegation that an employee opened an unauthorized checking or savings account had the following investigation and resolution criteria:
- If the accused employee had less than 15% of new accounts missing signatures
- and no customer complaints, the allegation was closed as a non-issue;

53

polling, SSCOT contacted a randomly selected list of the employee's customers who had opened the same type of banking product involved in the allegation. Hr'g Tr. at 5795:24-5796:11 (Rawson). SSCOT talked to a maximum of five customers during polling. OCC Exh. 302 at *3. SSCOT generally required three substantiations from polling before referring the allegation to Corporate Investigations. *See* R. Exh. 9704 at 9.[35]

The record shows that only a small percentage of SPM allegations that SSCOT received were referred to Corporate Investigations. *See, e.g.*, Hr'g Tr. at 10065:9-17 (Anderson); R. Exh. 10730 at 6; OCC Exh. 1865 at *1-2. For example, in 2014, SSCOT received 10,964 allegations of SPM that did not require direct referral to Corporate Investigations. OCC Exh. 1865 at *1. Of those, SSCOT substantiated and referred to Corporate Investigations for further review only 693 allegations. *See id.*; OCC Exh. 1998U at *88-89.[36] Similarly, in 2013, only 641 allegations of SPM out of 10,316 were substantiated and referred to Corporate Investigations for further review. *See* OCC Exh. 1998U at *88-89.

---

- If the accused employee had between 15% and 40% of new accounts missing signatures, SSCOT would close the allegation and send an e-mail to the employee's managers recommending training; or
- If the accused employee had over 40% of new accounts missing signatures or over 100 accounts missing signatures, SSCOT would then move the allegation to polling.

R. Exh. 9704 at 2, 11. This exhibit also shows the criteria that were applicable to teller referrals, *id.* at 3, debit card consent, *id.* at 4, account opening procedures, *id.* at 5, possible falsifications, *id.* at 6, and low volume sales, *id.* at 7.

[35] There were a few circumstances where SSCOT would refer cases directly to Corporate Investigations. For example, if polling revealed one substantiated instance of record falsification, then the allegation would be referred directly to Corporate Investigations. *See* R. Exh. 9704 at 9.

[36] These numbers come from examiner notes from a June 4, 2015, meeting with Bank personnel. *See* OCC Exh. 1865. Bank documents potentially show the number of SSCOT allegations processed to be slightly lower—showing 7,962 "inquires" in 2014. OCC Exh. 1998U at *88. However, the 2014 resolution data on the following page totals to 10,964. *See id.* at *89. The exact number of allegations sent to SSCOT is not material because the evidence is clear that only a small percentage of allegations were substantiated as SPM by SSCOT.

Add. 1250

Appellate Case: 25-1079    Page: 1252    Date Filed: 05/16/2025 Entry ID: 5517644

As of May 2015, approximately 80% of the allegations SSCOT received came from the EthicsLine. OCC Exh. 1771 at *3. Bank employees used the EthicsLine to report violations of the Bank's code of ethics, violations of law, and suspicious conduct involving other employees. R. Exh. 1373 at 44. The most commonly reported allegations to the EthicsLine were sales integrity violations, which includes types of SPM and comprised approximately half of all EthicsLine complaints. *See, e.g.*, R. Exh. 7214 at 5-6 (showing more than half of EthicsLine cases were for sales integrity violations); OCC Exh. 1265 (showing between 40% and 47% of EthicsLine cases were for sales incentive program violations). The EthicsLine sent 4,261 and 3,809 SPM allegations to SSCOT in 2013 and 2014, respectively. OCC Exh. 174 at *7.

Another control SSCOT used to detect SPM was proactive monitoring for simulated funding. Employees identified through proactive monitoring would then go through the SSCOT review process detailed above. *See* R. Exh. 1778 at 20. Proactive monitoring began in 2013 but was paused in December 2013. OCC Exhs. 280, 100; *see also* SD Order SOMFs 184-91. For this initial proactive monitoring period, SSCOT's protocols called for a review of sales activity involving phone number changes and signs of simulated funding.[37] OCC Exh. 280 at *2-3. As an example of the number of employees this initial proactive monitoring detected, in November 2013, proactive monitoring identified 77 employees who engaged in phone number changes and 38 employees who engaged in potential simulated funding. OCC Exh. 1365 at *1-2.

---

[37] Proactive monitoring initially included a review of customer phone number changes and a check for simulated funding. For phone number changes, employees were identified if, from May 2013 to July 2013, they changed more than 50 phone numbers by 1-3 digits. OCC Exh. 280 at *2. For simulated funding, employees were identified if, from March 2013 to July 2013, they: (1) opened 50 more accounts that showed potential simulated funding, or (2) in four of those five months, they had 10 or more accounts with potential simulated funding and 10% or more of checking and savings sales involved potential simulated funding. *Id.*

55

Proactive monitoring resumed in July 2014. From July 2014 to March 2015, SSCOT's proactive monitoring protocols used a new 99.99% threshold for potential simulated funding. OCC Exh. 196 at *3; *see also* SD Order SOMFs 203-04. This threshold identified employees in the top 99.99% for potential simulated funding activity and placed those employees in SSCOT's review process. OCC Exh. 196 at *1. Until October 2014, the monitoring looked at the previous 30 days' activity, but starting October 2014, the monitoring expanded and looked at the previous 90 days. *Id.* at *3. These thresholds identified approximately 4 employees per month while they were used. *Id.*

Starting in April 2015, SSCOT again changed the thresholds for proactive monitoring to a 99.95% threshold for potential simulated funding. *Id.*; *see also* SD Order SOMFs 204-07. This threshold identified employees in the top 99.95% for potential simulated funding activity and placed those employees in SSCOT's review process. OCC Exh. 196 at *3. The Bank used this threshold for proactive monitoring until the Bank eliminated sales goals on October 1, 2016. Hr'g Tr. at 1079: 8-13 (Candy). This threshold identified approximately 18 employees per month. OCC Exh. 602 at *3. These last two phases of proactive monitoring identified *only* approximately 354 employees for SSCOT review from July 2014 to September 2016. *See* OCC Exhs. 196, 602.[38]

---

[38] The parties extensively argued in post-hearing briefing about whether proactive monitoring was effective. *See, e.g.*, EC Post-Hearing Br. at 14-22; EC Post-Hearing Reply Br. at 9-14; CRA Post-Hearing Reply Br. at 48-52. The RD has extensive discussions on these points. *See, e.g.*, RD at 91-92; 100-17; 145-47; 152-60; 197-201. It also has extensive findings on these points. *See id.* at 370-83. Anderson's exceptions brief, however, appears to abandon the argument that proactive monitoring was effective. *See* CRA Br. at 505-14. The Comptroller has reviewed the record evidence and finds that none of the controls, including proactive monitoring, were effective. The Comptroller need not decide the other arguments related to proactive monitoring as they do not alter this conclusion.

### b. *The amount of SPM demonstrates the controls were ineffective*

Based on a review of the record, the Comptroller finds that SSCOT's controls were ineffective in detecting or preventing SPM. A comparison of the overall amount of potential SPM to the amount of SPM that the controls actually detected and referred for investigation demonstrates that the controls were ineffective in detecting SPM. Additionally, the substantial amount of SPM and SPM allegations that persisted even with the controls in place demonstrates that the controls were ineffective in preventing SPM.

A series of reports produced by PwC attempted to quantify the amount of SPM at the Bank. *See* OCC Exhs. 1811RU, 1812RU, 1813RU, 1636R.[39] Combining the numbers from the PwC reports, PwC identified approximately *1.9 million* unauthorized accounts that Bank employees opened from 2013 to 2016. *Id.*; *See also* Hr'g Tr. at 1197:1-4 (Candy) (stating that PwC identified approximately 1.8 million unauthorized accounts).[40] Anderson argues that PwC's analyses overstate the amount of SPM because they likely include false positives. *See, e.g.*, CRA Proposed Findings of Fact and Conclusions of Law ¶¶ 276-78. However, the PwC report makes clear that the numbers of unauthorized accounts it identifies is only an estimate, and the report includes a caveat that the accounts it identifies are those that PwC "could not otherwise exclude from being potentially unauthorized." *E.g.*, OCC Exh. 1813RU at *2.

Upon reviewing the evidence, the Comptroller finds that PwC's numbers likely undercount the amount of SPM. PwC only included accounts showing potential simulated funding, potentially unauthorized online bill pay, potentially unauthorized credit cards, and potentially unauthorized lines of credit. *See* Hr'g Tr. at 1197:5-14 (Candy). NBE Candy testified

---

[39] These reports are discussed in more detail in Part VI.A.1.a above.
[40] The difference between NBE Candy's testimony and the PwC numbers is immaterial to the conclusion that the amount of SPM demonstrates the controls were not effective.

Appellate Case: 25-1079     Page: 1255     Date Filed: 05/16/2025 Entry ID: 5517644

that the PwC methodology resulted in underestimates of those four types of SPM. *See* Hr'g Tr. at 1200:4-24. This figure does not include other types of SPM, such as bundling, pinning, and sandbagging. *See* Hr'g Tr. at 1199:1-19 (Candy). It also does not include all the types of accounts that could have been used to engage in SPM. *See* Hr'g Tr. at 1199:16-19 (Candy), 10298:21-10300:7 (Abshier).

Although the weight of the evidence supports a finding that the 1.9 million number is likely an undercount of SPM, the Comptroller need not decide whether this specific number is correct. No matter the exact number, the record demonstrates that SSCOT's controls only detected a small sliver of SPM. *See* OCC Exhs. 1998U, 1865 at *1-2. Another example is simulated funding, which was one type of SPM that PwC reviewed. The amount of simulated funding detected with SSCOT's controls was only a small percentage of simulated funding. While PwC found approximately 1 million unauthorized accounts with potential simulated funding, *see* OCC Exh. 1636R, SSCOT's proactive monitoring only detected approximately 700 employees in total responsible for the opening of approximately 24,500 unauthorized accounts with potential simulated funding.[41] This is well below the number of accounts opened with

---

[41] Because the Comptroller has not located record evidence totaling all of the employees identified for potential simulated funding by the various thresholds, this total is conservative and likely overstates the number of employees identified through proactive monitoring. Proactive monitoring for simulated funding identified 48 employees from July 2014 through April 2015. *See* OCC Exh. 196 at *3. Extrapolating from OCC Exhibit 1365, the Bank identified 342 employees through the initial thresholds from March to December 2013. *See* OCC Exh. 1365. The 99.95% threshold identified approximately 18 employees per month, meaning the Bank identified 306 employees for potential simulated funding from May 2015 to September 2016. *See* OCC Exh. 603. Adding this up, SSCOT's proactive monitoring identified roughly 342 employees from March 2013 to December 2013, 48 employees from July 2015 through April 2015, and then 306 employees from May 2015 to September 2016, for a total of 696 employees.

Similarly, there is no record evidence totaling the number of unauthorized accounts these employees opened. OCC Exhibit 602, however, shows the number of average monthly

58

Add. 1254

potential simulated funding, even if the PwC total is overinclusive. Whatever the exact number of SPM was, it dwarfs the amount of SPM SSCOT detected or substantiated, showing that the controls were ineffective in detecting SPM. Likewise, the total amount of SPM that likely occurred makes plain that the controls were ineffective in preventing SPM.

Therefore, the Comptroller finds that SSCOT's controls were ineffective in both preventing and detecting SPM. Anderson's responsibility as GRO was to institute effective controls to manage risks. Failing to effectively manage known risks as GRO is contrary to the accepted standards of a risk officer. Additionally, failing to manage the risk of SPM through effective controls resulted in abnormal risk to the Bank. Accordingly, given Anderson's knowledge that SPM was widespread and posed a risk to the Bank, her failure to institute effective controls constituted an unsafe or unsound practice.

### c. *The record does not show that SPM decreased from 2013 to 2016*

Anderson argues in her exceptions that SPM decreased from 2013 to 2016 because she strengthened the controls. *See* CRA Br. at 505-11; *see also, e.g.*, CRA Exceptions at 45-49. She points to various documents showing a decrease in simulated funding from 2013 to 2016, *see* CRA Br. at 505-08; *see also, e.g.*, CRA Exceptions at 129-31, as well as documents showing decreases in EthicsLine and SSCOT cases. *See* CRA Br. at 508-09; *see also, e.g.*, CRA Exceptions at 129-31. She also points to testimony from Bank employees who stated that the Community Bank was making progress on reducing SPM during that time period. *See* CRA Br. at 509; *see also, e.g.*, CRA Exceptions at 129-31.

_____

occurrences of simulated funding for various percentiles in September 2015. The highest monthly occurrences of simulated funding with the percentiles was 35. *See* OCC Exh. 602 at *3. Thus, if proactive monitoring identified 700 employees for simulated funding, and these employees averaged 35 instances of simulated funding, that means these employees opened 24,500 unauthorized accounts with simulated funding. The Comptroller recognizes that there are limitations with this number but believes it to be a conservative estimate.

The Comptroller rejects these exceptions and finds that Anderson's arguments fail for two reasons. First, even if SPM had decreased (which is not clearly established by the documentary evidence), the amount of SPM that still existed shows that the controls were ineffective. Second, even if SPM had decreased, Anderson has not established that her controls were the reason for any decrease. The Comptroller addresses each conclusion in turn.

As an initial matter, the Comptroller notes that the documentary evidence Anderson relies on to show that SPM decreased is incomplete because she does not include any evidence after October 2015. *See* CRA Br. at 508. Additionally, the record contains evidence indicating that SPM was trending upwards during the first nine months of 2015, which undercuts Anderson's assertion that SPM decreased in 2015. *See* OCC Exhs. 1896 at 20 (showing customer complaints of SPM increasing from 2014 through the third quarter of 2015), 213 (showing EthicsLine tracking upwards in 2015). Additionally, evidence from 2016 indicates that SPM was continuing to trend upward in 2016. *See* OCC Exh. 899 at 2 (a July 13, 2016, presentation stating that SSCOT cases were up 39% compared to the year-to-date in 2015); R. Exh. 14173 at 8 and 17 (a July 26, 2016, presentation noting the Bank had terminated more employees for SPM in 2016 than 2015 and that SSCOT cases originating from proactive monitoring increased 121% year over year).

There is also record evidence that supports the conclusion that these reports are *undercounting* the amount of SPM. *See* OCC Exh. 1312 at 39 (discussing that employees were not consistently logging customer complaints). Specifically, the October 2015 Accenture Report states: "[n]egative sales practices may be underrepresented or unidentified due to customer complaints in stores not being logged, escalated, and monitored." *Id.* This report further notes

Appellate Case: 25-1079     Page: 1258     Date Filed: 05/16/2025 Entry ID: 5517644

that employees were not consistently reporting ethics issues to the EthicsLine. *Id*. at 41.[42] While these cases are not all confirmed instances of SPM, the record evidence demonstrates that the EthicsLine allegations also underrepresented the amount of SPM. The Comptroller finds that at best the evidence shows that only certain types of SPM decreased in that timeframe, but the preponderance of the evidence does not show that SPM decreased overall from 2013 to 2016.

Even if Anderson were correct that SPM decreased from 2013 to 2016, the amount of SPM that still existed demonstrates that the controls were ineffective. Putting together the PwC analyses for simulated funding, online bill pay, credit cards, and lines of credit, there were 330,659 instances of potential SPM in 2015 and 170,969 potential instances of SPM in 2016 (through September 30). *See* OCC Exhs. 1811RU, 1812RU, 1813RU, 1636R. Over 6% of the lines of credit in the Community Bank were potentially unauthorized. OCC Exh. 1813RU at *2-3. Approximately 4% of the credit cards in the Community Bank were potentially unauthorized. *See* OCC Exh. 1812RU at *2-3. Even without including the full universe of SPM, these numbers are significant. This level of SPM was not acceptable and not consistent with safe and sound banking practices.

Finally, Anderson's assertion that SSCOT's controls *caused* a decrease in SPM is unsupported. Anderson's exceptions brief does not support any such causation. Instead, the brief offers nothing more than a rhetorical question: "Upon establishing that significant improvements were realized, the question then becomes what caused those improvements?" CRA Br. at 506,

---

[42] Anderson cites to the executive summary of this report, arguing that it shows she was taking effective steps to address SPM. *See* CRA Br. at 509 (quoting OCC Exh. 1311 at *4). Anderson coincidentally ignores the statement: "[a]lthough there are multiple programs in flight to strengthen controls within the 1LOD, the 1LOD does not have a uniform way of evidencing sufficient control over sales practices issues." OCC Exh. 1311 at *42.

Add. 1257

505-11. As detailed above, the record does not support that significant improvements in SPM were realized as the result of SSCOT's controls.

In short, Anderson as GRO had a responsibility to address the risks from SPM and to institute effective controls. The data demonstrates that she failed..

### d. *Anderson's additional controls were also ineffective*

In her exceptions, Anderson points to seven additional controls that she argues worked to decrease SPM: (1) training, (2) customer complaint system improvements, (3) increased staffing, (4) elimination of the Jump into January program, (5) signature capture, (6) the quality of sales report card ("QSRC"), and (7) lowering sales goals.[43] *See* CRA Br. at 509-11; *see also, e.g.*, CRA Exceptions at 45-49.

The Comptroller has reviewed the RD, hearing testimony, and the record evidence. Based on this review, the Comptroller finds that these additional controls were not effective at preventing or detecting SPM. As detailed above, the sheer amount of SPM alone demonstrates that no control, or combination of controls, was effective in managing or even materially improving SPM. For some of the controls—training, customer complaint system improvements, increased staffing, the elimination of Jump into January, and signature capture—there is no evidence in the record that shows they were effective or had any effect on the level of SPM at all. For one control—the QSRC—the evidence shows that it had other purposes and was not even

---

[43] The RD does not address training or the elimination of the Jump into January program. The RD touches on the rest of Anderson's posited controls, although some in more depth than others. For example, the RD discusses signature capture in detail, but does not specifically address whether it was an effective control. *See* RD at 150-58. Additionally, the RD states that sales goals were lowered but finds that SPM continued to be significant despite this. *See id.* at 11, 255. The RD states that the Bank's customer complaints system did not consistently capture complaints from customers affected by SPM. *See id.* at 371-73. The RD does, however, discuss the QSRC in some detail.

used as a control for SPM. For the final control—lowering sales goals—the evidence does not support that Anderson was responsible for this.

### i. Training

Anderson argues that she improved training and that had lowered SPM. *See* CRA Br. at 510. The record is weak on this point. The evidence does support that Anderson implemented training that was, in part, designed to address SPM. *See* OCC Exh. 1030; R. Exh. 6884 at 9. Nonetheless, the Bank continued to have a significant amount of SPM, which demonstrates that the training was not an effective control to manage the risk of SPM.

### ii. Customer complaint system improvements

Anderson also argues that she improved the Bank's customer complaint system and did so to such an extent that in 2015 it was an effective control for SPM. *See* CRA Br. at 511. The record evidence, however, demonstrates that the customer complaint system was inadequate through 2016. From 2015 to 2017, the OCC issued multiple supervisory letters concluding that the Bank's customer complaint system was inadequate. *See* OCC Exhs. 1239 at 4, 805 at 3, 1689R at 12. Bank employee testimony, *e.g.*, Hr'g Tr. at 5705:14-5706:5 (MacDuff), Bank documents, *e.g.*, OCC Exh. 1878 at 10, and third-party reports, *e.g.*, OCC Exh. 1312 at 10, further support this conclusion. For example, the Accenture Report states that the Bank did not have a process or model to ensure all customer complaints were captured, monitored, addressed, and reported across all branches. *See* OCC Exh. 1312 at 10. If anything, the evidence shows that the Bank was only incrementally improving the system through 2016. *See, e.g.*, R. Exh. 18970 at 4; Hr'g Tr. at 9657:9-9658:5 (Anderson). Even taking these improvements into consideration, this does not alter the conclusion that the Bank's customer complaint system remained

inadequate.[44] Therefore, the Comptroller finds that the Bank's customer complaint system was not an effective control.

### iii. Increased staffing

Anderson also argues that the Bank invested millions of dollars in risk resources, such as increased staffing, and that such investments served to improve SPM. *See* Anderson's Exceptions Brief at 510. The record evidence shows that the headcount in Anderson's department increased from 261 to 480 in 2015, *see* OCC Exh. 2376 at *17, and this headcount consisted of risk professionals. Hr'g Tr. at 5586:5-5588:1 (MacDuff). The record evidence, however, does not link this increased staffing to an improvement in SPM. As the Comptroller detailed above, SPM continued, despite the increased staffing. The Comptroller finds that increased staffing was not an effective control.

### iv. Elimination of Jump into January

Anderson further argues that she eliminated the Jump into January program to reduce SPM risk. *See* CRA Br. at 511. The Jump into January program was a program adopted to incentivize Bank employees to exceed January sales goals each year, but the program increased SPM in January as a result. *See, e.g.*, R. Exh. 18970; Hr'g Tr. at 9657:9-9658:5 (Anderson). The record evidence here supports Anderson's contention that she raised concerns about the program to Tolstedt, which resulted in the Bank changing and then eliminating the program. R. Exh. 278 at 132:22-134:13 (Anderson Dep.). Despite this, the Bank continued to have a significant amount of SPM. Therefore, while Anderson did contribute to the elimination of the Jump into January program, the Comptroller finds that this was not a sufficiently effective control to meet Anderson's obligations as GRO.

---

[44] A review of the record demonstrates that the Bank's customer complaint system was inadequate before 2015 as well. *See* SD Order SOMFs 174-76.

Add. 1260

### v. Signature capture

Anderson argues that in 2014 she began to implement controls to capture signatures or other evidence of consent that the customer wanted to open an account through various projects, such as Contact Clarity and Evolving Model. *See* CRA Br. at 509-11. Based on a review of the evidence presented at summary disposition, as discussed above, the Comptroller finds it undisputed that the Bank did not actually require signatures or other evidence of consent on all its products until 2016. *See* SD Order SOMF 157. While the record does show that signature capture improved because of Anderson's projects, *see* R. Exh. 1536 at 4, the record does not show that signature capture effectively prevented SPM. As noted above, SPM remained systemic and widespread despite improved signature capture. Even Anderson's own expert opined that signature capture would not and did not prevent SPM. *See* Hr'g Tr. at 10366:17-10367:14 (Farrell) ("The team member [when opening an account] is free to forge a signature or enter data that's fake into the system. And there's nothing that will prevent that."). Based on this evidence, the Comptroller finds that signature capture was not an effective control to manage the risk of SPM.

### vi. QSRC

Anderson argues that the QSRC was an effective control for detecting and assessing the risk from SPM. *See* CRA Br. at 510; *see also* CRA Post-Hearing Br. at 53-55. The QSRC was a tool launched in April 2012 that measured key qualities of sale metrics from branches up to regional parts of the Community Bank. *See* R. Exh. 879 at 8. It was made up of four different components—signatures, activations, procedures, and fundings. Hr'g Tr. at 9137:15-24 (Bernardo). Bankers were graded on the four components separately, which would then be combined to make up a summary score. *Id.* The data was provided quarterly to the regional bank

65

Appellate Case: 25-1079    Page: 1263    Date Filed: 05/16/2025 Entry ID: 5517644

risk council and gave insight into metrics such as customer signatures on accounts, debit card activation rates, and account funding. *See, e.g.*, R. Exh. 11879 at 33-34.

The RD discusses the QSRC in some depth. *See* RD at 121-25. The RD does not opine on whether the QSRC was an effective control, although the discussion implies that it was not in practice used as a control for SPM. *See id.* Specifically, the RD notes that Anderson admitted that the QSRC was not a control that prevented employees from engaging in SPM. *Id.* at 123. It also notes that the QSRC *could* have been, but was not, used as a control to detect SPM, as a poor QSRC would not result in an employee's termination. *Id.*

The Comptroller, upon review of the record evidence, agrees with the RD's discussion on this point. The evidence is strong that the QSRC was not actually used as a control for SPM. Bank employees, including SSCOT employees, testified that it was not a control to prevent or detect SPM. *See, e.g.*, Hr'g Tr. at 5851:9-18 (Rawson),9129:17-25 (Bernardo), 5690:10-18 (MacDuff). Additionally, even if the QRSC was meant to be used as a control, the QSRC metrics were not robust enough to be useful in that sense, as an employee with 25% of newly open unfunded accounts could still have an acceptable QSRC score. OCC Exh. 135. The only testimony that supports Anderson's argument that the QRSC was an effective control for detecting SPM and assessing the risk from SPM is from her own expert, *see* Hr'g Tr. at 10391:1-10392:14 (Farrell), whose testimony alone does not outweigh the other evidence on this point. Therefore, the Comptroller finds that the QSRC was not a control for SPM.

### vii. *Lowering sales goals*

Anderson finally argues that lowering sales goals and implementing changes to incentive compensation helped to reduce SPM. *See* CRA Br. at 510. While the record evidence is clear that the Bank did lower sales goals from 2012 onward, *see, e.g.*, R. Exh. 16147 at 44-45, the record evidence is also clear that even the lowered sales goals remained unachievable. *See, e.g., id.* at

66

44. Importantly, while it is true the sales goals were lowered, Anderson presents no evidence that the lowered goals were the result of her efforts. At most, she testified only that she challenged the sales goals in certain discrete settings. *See* Hr'g Tr. at 9406:19-9408:20 (Anderson).[45] While Anderson argues that she implemented lower sales goals as a control for SPM, she has provided no evidence to support her argument. Accordingly, the Comptroller rejects the argument that lowering sales goals was something *Anderson herself* did to manage the risk of SPM.

Accordingly, the Comptroller finds that Anderson failed to institute effective controls to manage SPM risks and that this failure constituted an unsafe or unsound practice.

4. <u>Anderson's failure to escalate known or obvious risks related to SPM was an unsafe or unsound practice</u>

The Comptroller finds that the record evidence supports the ALJ's finding that Anderson failed to escalate risk issues related to SPM. *See generally* RD at 423-26. Specifically, the record reflects that Anderson repeatedly failed to escalate known or obvious SPM risks to the individuals in her escalation path and that she continually downplayed the extent of SPM in the Community Bank. This misconduct constituted an unsafe or unsound practice. In making this determination, the Comptroller incorporates the following relevant facts that the ALJ properly found undisputed at the summary disposition stage: SD Order SOMFs 320-22, 327, 332, 343, 351-56.

a. *Anderson was required to escalate known or obvious risks related to SPM to Loughlin and Tolstedt*

It is undisputed that Anderson had an obligation to escalate SPM risks to Loughlin (and, by extension, Loughlin's Corporate Risk group) and Tolstedt. In her exceptions, Anderson describes that her "escalation path was to Ms. Tolstedt and Mr. Loughlin." CRA Br. at 447.

---

[45] In contrast, Kenneth Zimmerman, who managed the Bank's deposit products group, testified that he advocated for lower goals than were set in 2013 through 2015. *See* Hr'g Tr. at 4559:8-17.

Anderson also admitted this in her hearing testimony, noting that she believed it was important for her to "timely inform Mr. Loughlin of existing problems in the Community Bank with respect to sales practices misconduct" and that it was important for her to provide Loughlin and the ERMC with "timely and accurate information . . . about whether sales practices risk was adequately managed." Hr'g Tr. at 9526:11-9528:19. She also recognized that "failure to timely disclose existing deficiencies in risk management in the Community Bank with respect to sales practices misconduct could cause substantial harm to the [B]ank." *Id.* at 9527:15-18.

Anderson's responsibility to escalate risk issues is bolstered by internal Bank documents and OCC guidance. The Bank's Risk Management Framework explicitly states that the first line of defense is "responsible for identifying, measuring, assessing, controlling, mitigating, monitoring, and reporting current and emerging risk exposures . . . [as well as] escalating breaches to the appropriate level of the company." OCC Exh. 102 at 32. This accords with the escalation responsibility set forth in the 2012 Product and Service Risk Management Policy, which provides that the Group Risk Officer "[s]erv[es] as a coordination point across all risk management disciplines, escalating matters requiring attention to" the group's own management team (Tolstedt), Corporate Risk (Loughlin), the Law Department, and Wells Fargo Audit Services. OCC Exh. 1733 at 5. The requirement to escalate is also set forth in the Comptroller's Handbook on Corporate and Risk Governance, which explains that management should "recognize[], escalate[], and address[]" material risks and risk-taking activities exceeding the risk appetite in a timely manner. R. Exh. 18439 at 44, *rescinded* and *reimplemented* at OCC Exh. 1908U at 40.

Anderson argues in her exceptions that she did not need to escalate beyond Loughlin and Tolstedt. CRA Br. at 444, 447. But whether she should have escalated to others is immaterial.

68

The record evidence supports a finding that she was required to escalate risk issues to Loughlin and Corporate Risk, and—as demonstrated below—she failed to do so.

   b. *Anderson failed to escalate to Loughlin and Corporate Risk*

  Loughlin and Anderson had frequent interactions throughout the relevant period, including monthly one-on-one meetings about "risk issues," Hr'g Tr. at 9478:7-9 (Anderson), as well as quarterly meetings with both Loughlin and Tolstedt "to try to help them reduce sales pressure at the bank," *id.* at 3237:4-14 (Loughlin). *See also* CRA Br. at 445-46. A primary reason for these frequent meetings was Loughlin's reliance on Anderson, as the GRO, to "manage the risk properly in the businesses," since his own role in Corporate Risk was more of an "oversight function." Hr'g Tr. at 2958:21-25 (Loughlin).

  Despite these frequent meetings, Loughlin was dissatisfied with Anderson's "level of transparency." *Id.* at 2959:14-17. He testified that there were "activities inside the Community Bank that I would have liked to have known more about," including SSCOT's proactive monitoring, but Anderson did not tell him about those *Id.* at 2959:19-2960:9.

  More broadly, Loughlin testified that he believed that Anderson's conduct deviated from that expected of a group risk officer in two keys way. First, he found that her response to problems stemming from SPM was "generally slow." *Id.* at 2956:2-5. He urged her to move quickly to address SPM, but he "felt that some of her actions delayed an effective response to the problem." *Id.* at 2956:14-19, 2957:22-23; *see also id.* at 2956:8-13 (explaining the consequence of the delays). In particular, he said that the Community Bank was too slow to "size" the problem (*i.e.*, quantify the scope and impact on customers), in part because Anderson did not invite inspection. *Id.* at 2957:25-2958:10. In addition to her delays in addressing the problems, he testified that he "would have hoped that she escalated problems to me in a more aggressive way[.]" *Id.* at 2958:10-12. He also testified that the "other group risk officers escalated issues to

69

me on a more timely basis," demonstrating that this problem was unique to Anderson. *Id.* at 2961:10-12. He also testified that his "direct reports felt that . . . Claudia could be slow in producing the information they requested." *Id.* at 2960:16-18.

Loughlin's experience with Anderson is corroborated by two other members of the Corporate Risk team, Keb Byers and Yvette Hollingsworth. Byers testified in his sworn statement that Anderson's group "wasn't as transparent as they could have been" and that Anderson frequently attempted to control communication with regulators, even where that hindered efforts to "escalate more quickly." *See* OCC Exh. 2736 at 51:1-3, 110:8-112:7. Hollingsworth's testimony—in which she explained that Anderson made it *more* difficult for her team to address SPM risks—is discussed further in Part VI.B.4.c below.

Anderson argues in her exceptions that Loughlin was already aware of SPM issues, so she had no obligation to escalate anything further to him. *See* CRA Br. at 445; CRA Exceptions at 302. Before discussing how the record evidence contradicts this argument, it is worth noting that this argument fails on its own terms. Just because the target of escalation has some awareness of a problem does not mean that further escalation and ongoing communication about that risk is not required, and the failure to do so could result in a slower response to the problem. *See* Hr'g Tr. at 2956:2-2958:13 (Loughlin).

More importantly, the record reflects that Loughlin was *not* aware of many of the risks related to SPM as well as the controls to manage those risks, including proactive monitoring (and the pause on proactive monitoring) and thresholds. Loughlin testified that he first learned of the "threshold" concept at the April 2015 Risk Committee meeting, and he found the concept "troubling." *Id.* at 4858:19-4859:16. He further testified that, at the time of the hearing, he had "no recollection of proactive monitoring or what it is." *Id.* at 3281:19-20 (Loughlin). Because he

did not "recall what proactive monitoring is," he also did not recall any conversations about the pause on proactive monitoring. *Id.* at 2967:24-2968:23.

Anderson makes much of the fact that she and Loughlin "communicated regularly," including a "monthly risk letter, monthly one-on-one meetings, monthly group risk officer meetings, emails and other one-on-one conversations multiple times per week." CRA Br. at 445-46 (citing Hr'g Tr. at 9478:1-17 (Anderson)); CRA Exceptions Br. at 302. But if anything, this weakens her claim that she escalated to Loughlin. Given the frequency of her communication with Loughlin, the fact that he had not even heard of proactive monitoring only demonstrates how little relevant information she escalated to him throughout the relevant period.

Anderson dedicates most of the escalation section in her exceptions briefing to the argument that she did, in fact, escalate properly. However, while Anderson dedicates roughly 50 pages of briefing to this argument, she points to virtually no affirmative evidence that she "escalated properly through her established escalation path." CRA Br. at 455-501. Most of her arguments involve rebutting arguments that are irrelevant to the finding that she failed to escalate properly to Loughlin and Corporate Risk. *See, e.g.*, CRA Br. at 455 (Anderson's arguments concerning the April 2012 Ethics Committee Meeting), 456 (EthicsLine complaints), 467 (March 4, 2014, TMMEC Presentation). In addition, she points to a few controls she instituted or supported to address the problem, such as "Project Clarity" and "Contact Clarity." *See* CRA Br. at 459-60. But these controls are not escalation, so they are irrelevant. *See generally supra* Part VI.B.3.

Most of the remaining evidence of "escalation" that Anderson puts forth is escalation that was done by *others at the Bank*. *See generally* CRA Br. at 448-50 (using passive voice to argue that "there was escalation" and that "changes were made"); CRA Exceptions Br. at 305 (same).

One of the only affirmative pieces of evidence Anderson puts forth to suggest that she escalated issues related to SPM is an email she sent to David Otsuka in Legal on May 3, 2016. OCC Exh. 251 at 1; *see also* CRA Br. at 462-63. She wrote:



First, because this email is addressed to Mr. Otsuka in Legal, it is irrelevant to whether she failed to escalate to Loughlin and Tolstedt, which she already admitted was her established escalation path. Moreover, one email in 2016 is insufficient to prove that she properly escalated SPM issues. The ALJ found—and the Comptroller agrees—that Anderson failed to escalate risk issues from 2013 to 2016; a sole email in 2016 to someone admittedly is outside her escalation path (and in which she appears to deflect the blame onto those "high[er] . . . in the food chain") proves nothing and is certainly not enough to compensate for years of downplaying and failing to escalate SPM risks.

The rest of Anderson's exceptions regarding escalation are either irrelevant or unavailing.[46] CRA Br. at 449. Underneath her arguments is Anderson's lack of recognition that SPM was a serious problem for the Bank. Anderson testified that she believed that SPM was not a "significant problem" for the Bank from 2013 to 2016. Hr'g Tr. at 9527:5-13 (Anderson). This simple admission all but proves the claim: because she did not believe that SPM was a

---

[46] *See, e.g.*, Anderson's argument that she was not "an Executive Officer empowered to modify sales goals"—if anything, this proves that escalation to more senior officials who *did* have that power was her best tool to address the problem. CRA Br. at 449.

Appellate Case: 25-1079    Page: 1270    Date Filed: 05/16/2025 Entry ID: 5517644

significant problem for the Bank, she failed to escalate that fact to Loughlin and Corporate Risk. And because she still, six years later, refused to acknowledge that SPM posed a significant problem for the Bank, it is difficult to accept that she sufficiently escalated the risks related to that problem when it was at its zenith.

It is important to put the evidence regarding Anderson's lack of escalation in the larger context of the evidence regarding how she reacted to SPM risks more broadly. As the next section demonstrates, the evidence shows that Anderson repeatedly downplayed risks related to SPM and actively hindered attempts to address those risks.

### c. *Anderson continually downplayed the severity of SPM*

Despite her responsibility to escalate known or obvious risks regarding SPM to her superiors, the record reflects that Anderson took the opposite approach. More than half a dozen witnesses within the Bank testified about Anderson's tendency to downplay the severity of SPM and hinder efforts to escalate and address the issues posed by SPM.

Mary Mack, Tolstedt's successor as head of the Community Bank, testified that "the sales practices issues were described to me fairly consistently by Claudia and my predecessor and others as being . . . fairly limited in scope, limited to a small portion of the employees and something that the tweaks could address." Hr'g Tr. at 4589:14-19. Mack also testified that Anderson generally did not sufficiently address SPM issues. *See id.* at 4587:20-24 ("She had been a part of a series of steps that didn't appear to be solving the problem, didn't appear to be working, and I needed to bring in somebody who could help me build out a rigorous control framework.").

Anderson's tendency to downplay the scope and severity of SPM rather than provide accurate information about SPM risks to her colleagues and superiors is well-documented. For example, the Bank's Chief Compliance Officer, Yvette Hollingsworth, expressed frustrations

73

with getting accurate information about SPM risks from Anderson. *See generally id.* at 2898:8-2905:15 (Hollingsworth); OCC Exh. 2173 at 1. She explained that "oftentimes information I did request *perhaps I wouldn't receive it because Claudia didn't permission it*." Hr'g Tr. at 2898:25-2899:2 (emphasis added).

Byers expressed a similar general sentiment in his sworn statement. As discussed above, he testified that the Community Bank group was "not as transparent" as it could have been, and he described how Anderson frequently attempted to control communication with regulators, even where that hindered efforts to "escalate more quickly." *See* OCC Exh. 2736 at 111:25, 114:2. James Richards, the Bank's former Head of Financial Crimes Risk Management, corroborated this view. He testified in his sworn statement that Anderson was "extremely irritated and disappointed in me, both professional and personally," after he reported to the Board's Audit & Examination Committee that the Community Bank terminated 14 team members per business day. *See* SD Order SOMF 343 (citing MSD-297 at 44:5-46:22). He said that Anderson expressed to him that she was disappointed that he shared that statistic and that the statistic "lacked context." *Id.*

Michael Bacon also testified about Anderson's tendency to minimize or downplay risks. Throughout his "continuous, ongoing conversations" with Anderson, he described that "she'd follow the Carrie Tolstedt approach of trying to minimize it" and that "she certainly leaned towards downplaying it." MSD-295 at 39:17-18, 41:17-23. The former Chief Compliance Officer of the Community Bank Division, Jay Christoff, submitted a declaration that adds to this narrative of Anderson downplaying, minimizing, and seeking to put herself and her group in the best possible light. He stated that he observed Anderson "edit[ing] the Community Bank's responses to questions posed by the OCC, with an eye towards putting the Bank in the best

Appellate Case: 25-1079   Page: 1272   Date Filed: 05/16/2025 Entry ID: 5517644

possible light." OCC Exh. 2369 at 4. He also stated that he suggested that Anderson implement a "branch review or mystery shopping program," but that she pushed back on his suggestion, stating, "no one goes into the branches, not even Audit." *Id.* at 3. Loughlin also testified that Anderson did not want to implement a mystery shopping program, Hr'g Tr. at 2953:9-11, and he wrote in an email that although he had proposed a mystery shopping program that would target the Bank's branches "[a] number of times . . . I have never received much support." OCC Exh. 35.[47]

Loughlin's testimony also supports the broader idea that Anderson tended to downplay SPM. As noted above, Loughlin and Anderson communicated frequently between 2013 and 2016, including through monthly one-on-one meetings where "[she] would talk to him about risk issues." Hr'g Tr. at 9478:8-9 (Anderson); *see also* CRA Br. at 445-46. In addition, after the publication of the *L.A. Times* articles, Loughlin had quarterly meetings with Anderson and Tolstedt "to try to help them reduce sales pressure at the bank." Hr'g Tr. at 3237:4-14 (Loughlin). Despite these frequent interactions and communications—many of which were ostensibly about reducing risk issues related to SPM—Loughlin testified that "most of my interaction with Ms. Russ Anderson was Ms. Russ Anderson defending the Community Bank and its business model." *Id.* at 2955:15-17. He noted that Anderson "was protective of the Community Bank's business model" and that he "would have hoped that she had invited more

---

[47] Anderson claimed in her testimony that she was "very excited" about a mystery shopping program. Hr'g Tr. at 9370:1-4 (Anderson). And when asked whether it was "the OCC's recommendation to implement the mystery shopping program, not yours," she responded, "That's not true." *Id.* at 10105:10-11 (Anderson). But no other evidence suggests that she had any role in implementing the mystery shopping program. To the contrary, the multiple witnesses and contemporaneous evidence discussed above suggest that she actively *hindered* efforts to implement the program.

75

Appellate Case: 25-1079    Page: 1273    Date Filed: 05/16/2025 Entry ID: 5517644

inspection [and] escalated problems to me in a more aggressive way[.]" *Id.* at 2955:8-10, 2958:9-11.

In addition to the Bank witnesses, multiple OCC witnesses have testified about Anderson's tendency to downplay known or obvious risks. NBE Moses, who met with Anderson in November 2015 along with several other examiners, testified that, at that meeting, Anderson was "trying to deflect. . . from the issue of sales pressure and high goals and trying to blame it [on] an employee misperception issue." Hr'g Tr. at 1000:5-8. NBE Hudson, who was present for both the February 2015 OCC exam and May 2015 OCC exam, testified that Anderson's conduct "did not change" even by the May 2015 exam. *Id.* at 739:3. "She continued to downplay and minimize. She continued to say that there was no sales pressure, that everyone is happy, you know." *Id.* at 739:3-6. She testified that this was part of her overall assessment that Anderson "was downplaying … our concerns. She was minimizing the pressure on employees. She minimized the amount of terminations." *Id.* at 729:12-15.

In addition to all this testimonial evidence, there are documents that show Anderson's attempts to downplay SPM issues in real time. The most significant of these is an email exchange with two of her team members in advance of an April 9, 2014, ERMC meeting. The email chain involved suggested additions to the slide deck that Anderson and MacDuff were to present at the meeting. OCC Exh. 60. Specifically, Anderson was told that Keb Byers "is looking [for] what doesn't work well today in our existing sales practices" because the deck was too "heavy" on plans for the future and needed more information about the current state of the problem. *Id*; *see also* SD Order SOMF 332. Anderson then responded, "I am worried about putting something like that into a deck. *I'd rather we did that verbally because this deck is subject to the regulators review*." OCC Exh. 60 at 1 (emphasis added). Accordingly, the

Add. 1272

Appellate Case: 25-1079    Page: 1274    Date Filed: 05/16/2025 Entry ID: 5517644

presentation itself downplayed the risks posed by SPM, but Anderson didn't follow through with presenting the risks verbally—effectively concealing the entire issue. Rather, Anderson told the ERMC "that the controls were adequate." Hr'g Tr. at 9713:12-15 (Anderson). And she failed to tell the ERMC about "unattainable sales goals" or "pressure placed on employees to meet sales goals." *Id.* at 9713:16-9714:21. And she likewise failed to tell the committee about the pause in proactive monitoring, the fact that she was allegedly "uncomfortable" with the pause, or the fact that the pause "hindered SSCOT's ability to detect additional sales practice misconduct." *Id.* at 9687:15-9689:13. More broadly, she admitted that she "did not tell the [ERMC] what did not work well with existing sales practices like [she] was directed to do." *Id.* at 9714:12-17; *see also id.* at 5423:14-5424:24 (Hardison), 10594:2-7 (Farrell).

At the hearing, Anderson testified about this email exchange and presentation and tried to justify why she didn't want to put this information in the deck. But her testimony is not convincing, and her answers appear evasive. *See* Hr'g Tr. at 9707:2-24 (Anderson). Anderson further testified that her real concern was that "we had a very short period of time to put that information and turn this deck around," and that the presentation would "not be vetted well" and that "*sometime down the road, it would have a blowback at me.*" *Id.* at 9708:2-13 (emphasis added). This answer encapsulates how her priorities were misaligned with her GRO responsibilities. Instead of fully informing the ERMC about the scope of the problem and what hadn't worked so far, her primary concern was with the personal consequences she might face if others found out about the extent of the problem. As NBE Candy explained in her testimony, "For a group risk officer to not want to put material information into a deck because it's subject to regulator review is completely inappropriate . . . the information that goes to the committee needs to be sufficient, accurate, complete, and transparent." *Id.* at 1153:18-23.

Appellate Case: 25-1079     Page: 1275     Date Filed: 05/16/2025 Entry ID: 5517644

Anderson had a similar exchange a year later. MacDuff asked Anderson her thoughts on a memo they were working on to be sent to the Risk Committee, and Anderson replied, "I would not add anything more than what we have in the document. We're still forming and storming and since this document will also go to the OCC I would prefer we keep it to a minimum." OCC Exh. 952 at 2; SD Order SOMF 353. Yet again, the evidence shows Anderson deliberately minimizing issues, rather than providing complete and transparent information to her colleagues and the OCC.

One final example should suffice. Anderson made edits to a risk memo from Audit to Rebecca Rawson, and the edits evidence attempts by her to downplay risks associated with SPM. *See* SD Order SOMF 198; RD at 393. She deleted the existing text under the "root cause" section and repeatedly changed "repeat sales offenders" to the softer "second time training notifications." OCC Exh. 1030 at 1, 3, 5. This demonstrates, again, that Anderson's instinct was to make her own group look better, even in internal documents where another line of defense—internal audit—was trying to work through the same issues related to SPM. *See* Hr'g Tr. at 2360:19-2362:20 (Crosthwaite).[48]

Putting this all together, the picture that emerges of Anderson is remarkably consistent. And it is not a picture of an executive faithfully executing her duties to the Bank. Indeed, instead

---

[48] Anderson excepts to this finding in the Recommended Decision, but her only exception is an argument that the ALJ found this fact at Summary Disposition against Julian and McLinko, and *not* against Anderson, so she had no notice that the fact would be used against her and no opportunity to rebut it. CRA Exceptions at 253-54. While it is true that the ALJ found these facts against Julian and McLinko, he also found them against Anderson. *Compare* SD Order SOMF 441 (Julian and McLinko) *with* SD Order SOMF 198 (Anderson). Moreover, the exhibit he relied on in finding against Anderson on that issue—MSD-198—is essentially the same as two hearing exhibits combined—OCC Exhs. 1029 and 1030—so all of this information was in the record already, giving Anderson ample opportunity to respond.

Appellate Case: 25-1079    Page: 1276    Date Filed: 05/16/2025 Entry ID: 5517644

of escalating obvious risks related to SPM, Anderson did the exact opposite: she actively hindered the flow of information that would have allowed herself, her colleagues, and the OCC to address those risks and minimize the damage to the Bank and its depositors. Given the obvious risks posed by widespread SPM at the Bank, *see supra* Part VI.A, Anderson's repeated failure to escalate and her continual downplaying of SPM risks constituted an unsafe or unsound practice.

5. <u>Anderson's failure to provide information or provision of false, incomplete, and/or misleading information during the 2015 examinations violated 18 U.S.C. §§ 1517 and 1001(a)</u>

The Comptroller finds that the record evidence supports the ALJ's findings that Anderson violated federal laws by failing to provide or providing false, incomplete, and/or misleading information during the 2015 examinations. *See generally* Executive Summary at 39-40, 56, 58-61.

Title 18 U.S.C. § 1517 makes it unlawful to "corruptly obstruct[] or attempt[] to obstruct any examination of a financial institution by an agency of the United States with jurisdiction to conduct an examination of such financial institution." The term "corruptly" in § 1517 means that "the conduct must be engaged in voluntarily and intentionally, and with the bad purpose of accomplishing . . . an unlawful end or result," such as "obstructing [a] bank investigation." *United States v. Church*, 11 F. App'x 264, 268 (4th Cir. 2001) (quoting H.R. REP. NO. 681(I), 101st Cong., 2d Sess., 174 n. 5, *reprinted in* 1990 U.S.C.C.A.N. 6472, 6580). "The substance of the [IAP's] obstruction need not be material to the bank investigation." *Id.* at 267. Lying to bank examiners, falsifying bank documents, and withholding bank records sought in an examination "falls squarely within the common-sense meaning of section 1517." *Id.* at 268.

Knowingly and willfully making a false statement to the Government as well as falsifying, concealing, or covering up, including by use of half-truths when a person has a duty to

Appellate Case: 25-1079     Page: 1277     Date Filed: 05/16/2025 Entry ID: 5517644

speak the truth, also violates 18 U.S.C. § 1001(a). *See generally United States v. Matthews*, 48 F. App'x 168, 172 (6th Cir. 2002); *see also United States v. Wintermute*, 443 F.3d 993, 1000 (8th Cir. 2006) (affirming a conviction under § 1001 based on false statements made to the OCC); *United States v. Moore*, 446 F.3d 671, 677, 680 (7th Cir. 2006) (explaining that "half-truths" may constitute false statements when they render other disclosures inaccurate). For purposes of § 1001(a), any assertion that is false "under any reasonable interpretation" is a false statement. *United States v. Adler*, 623 F.2d 1287, 1289 (8th Cir. 1980); *see also United States v. Stoddard*, 150 F.3d 1140, 1144–45 (9th Cir. 1998) (holding that an ambiguous statement was "false" under § 1001 because "[a] jury could rationally infer that [the defendant's] statement was at best a half-truth.").

As detailed above, the Comptroller has already found that that Anderson failed to provide or provided false, incomplete and/or misleading information to the OCC during the 2015 examinations (1) by falsely stating that no one loses their job because sales goals are not met; (2) by making false statements regarding her knowledge of sales pressure; (3) by failing to provide accurate information about the volume of terminations relating to SPM; and (4) by failing to disclose the thresholds used in proactive monitoring. The Comptroller finds that this same misconduct also violated both 18 U.S.C. §§ 1517 and 1001(a), because it involved intentional and knowing obstruction of a bank examination and willful and knowing omissions and false statements to OCC officials. *See supra* Part VI.B.1.[49]

---

[49] Anderson's exceptions do not directly challenge these findings as violations of law; rather, she merely refers back to her arguments challenging the underlying misconduct findings, which the Comptroller has already rejected. *See* CRA Exceptions at 748-751, 753, 779-80, 782-85, 787; *see also supra* Part VI.B.

80

Add. 1276

Appellate Case: 25-1079    Page: 1278    Date Filed: 05/16/2025 Entry ID: 5517644

### C. Effect

The *effect* element of a prohibition order under 12 U.S.C. § 1818(e) can be satisfied by

showing that one of the following three events occurred "by reason of" Anderson's misconduct:

1. The Bank suffered or will probably suffer financial loss or other damage;
2. The interests of the bank's depositors have been or could be prejudiced; or
3. Respondent received financial gain or other benefit.

In the RD, the ALJ found that all three prongs of the effect element were satisfied. *See* RD at

415-16. For the foregoing reasons, the Comptroller finds that the record evidence supports the

ALJ's findings that Anderson's misconduct satisfied the bank-loss prong (prong 1) and

depositor-prejudice prong (prong 2) of the effect element. The Comptroller finds that the record

evidence does not support the ALJ's findings that Anderson's misconduct satisfied the third

prong, but since the effect element was still met under both the first and second prongs, this does

not change Anderson's ultimate liability under § 1818(e).

The parties disagree over the causation standard required by the phrase "by reason of" in

this statutory provision. Anderson argues that the effect element requires a showing of both

proximate cause and but-for cause.[50] CRA Br. at 591-92. Enforcement Counsel argues that "there

is no proximate cause requirement" for either provision. EC Post-Hearing Br. at 65. The phrase

is not defined in the statute, and there is a circuit split concerning whether proximate cause is the

proper standard for the effect element of § 1818(e) or whether some other standard—such as a

*reasonably foreseeable* test—is appropriate. *See, e.g., Calcutt v. FDIC*, 37 F.4th 293, 329-30 (6th

Cir. 2022) (holding that § 1818(e) requires proximate cause); *Landry v. FDIC*, 204 F.3d 1125,

1139 (D.C. Cir. 2000) (not specifying a standard); *De la Fuente v. FDIC*, 332 F.3d at 1223 (risk

---

[50] None of Anderson's cited authorities support the idea that but-for causation *and* proximate
causation are required. Since proximate cause is the stricter standard, the Comptroller uses that
standard (without deciding whether it is mandated by § 1818(e)) for his analysis.

of loss to the Bank must be "reasonably foreseeable"). *See also FDIC v. Bierman*, 2 F.3d 1424, 1434 (7th Cir. 1993) (adopting proximate cause in a pre-Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") FDIC enforcement action). However, the Comptroller does not need to determine whether proximate cause is required under § 1818(e) because, as the following analysis shows, the record supports a finding that Anderson's misconduct satisfied the effect element under the heightened proximate-cause standard.

1. The Bank suffered financial loss or other damage

The Comptroller finds that the record supports the ALJ's finding that Anderson's misconduct satisfied the "financial loss or other damage" prong of 12 U.S.C. § 1818(e)'s effect element. In making this determination, the Comptroller incorporates the following relevant facts that the ALJ properly found undisputed at the summary disposition stage: SD Order SOMFs 448, 449, 454, 458, 466-68, 472-76, 479-80, 488.

The SD Order SOMFs demonstrate that the Bank paid the following fines, penalties, fees, and related expenses as a result of its SPM problem:

- The OCC, the Consumer Financial Protection Board ("CFPB"), and the Los Angeles City Attorney issued a total of $185 million in fines and penalties against the Bank related to sales practices misconduct. CRA Am. Ans. ¶ 132; Julian Am. Ans. ¶ 132; MSD-343; MSD-344.

- The Bank was fined $65 million by the Office of the Attorney General of the State of New York in connection with its sales practices. MSD-670; MSD-673; MSD-678.

- The Bank was fined $575 million by all 50 state Attorneys General and the District of Columbia in connection with its sales practices and related matters. MSD-671; MSD-672.

- The Bank was fined $3 billion by the U.S. Department of Justice and U.S. Securities and Exchange Commission in connection with its sales practices. MSD-1 at 1-4; MSD-674.

- The Board of Governors of the Federal Reserve imposed an "asset cap" limiting the Bank's ability to increase in asset size, and this asset cap had a significant financial impact on the Bank. MSD-267 (NBE Smith Expert Report) ¶ 148(e); MSD-669 at 1

(noting the Bank "has missed out on roughly $4 billion in profits – and counting – since the cap was imposed").

- The Bank paid a $142 million class-action settlement in *Jabbari v. Wells Fargo & Co*, No. 15-cv-02159-VC, which the Bank admitted in a press release was a "significant step forward in making things right for our customers and further restoring trust with all of Wells Fargo's stakeholders . . . [and] supports our efforts to help customers impacted by improper retail sales practices[.]" MSD-665; MSD-666; *see also* Julian Am. Ans. ¶ 173.

In short, the Bank suffered a loss of more than $3 billion because of SPM. The crucial question that remains, for the purposes of liability under § 1818(e), is to what extent Anderson is responsible for a portion of those losses. In answer, the Comptroller finds that a preponderance of the evidence supports the ALJ's finding that Anderson's misconduct caused financial loss to the Bank—even under the proximate-cause standard advocated for by Anderson.[51]

To satisfy the effect prong of § 1818(e), Anderson's misconduct need not have caused— as Anderson appears to suggest in her exceptions—"the entirety" of the losses identified by Enforcement Counsel. *See* CRA Br. at 539. Enforcement Counsel merely has to demonstrate that some portion of the losses can be attributable to Anderson's misconduct, even though Enforcement Counsel need not identify "the exact amount of harm."[52] *Pharaon*, 135 F.3d at 157. Indeed, Congress amended § 1818 with the explicit goal of making it easier for the federal banking agencies to pursue enforcement actions, "without having to quantify losses to the institution or the degree of prejudice to depositors." *Proffitt v. FDIC*, 200 F.3d 855, 864 (D.C.

---

[51] The Comptroller agrees with Enforcement Counsel that the RD did not fully address the causation standard. *See* EC Exceptions Br. at 46-50. The Comptroller upholds these exceptions to the extent detailed in this section.

[52] Anderson also takes issue with the fact that some of the settlement agreements "expressly concern conduct that predates the relevant period." CRA Br. at 542. But because Enforcement Counsel need only demonstrate that a portion of the losses can be attributable to Anderson's misconduct, it is irrelevant whether some of those losses can be attributable to events that occurred outside the relevant period, so long as some event(s) occurred within the relevant time period.

Cir. 2000) (discussing H.R. Rep. No. 101–54, at 392, *reprinted in* 1989 U.S.C.C.A.N. 188).

These changes were intended to "expand, enhance, and clarify the enforcement powers" of the

banking regulators. *Id.*

Likewise, Anderson need not be solely responsible for the losses. Anderson attempts to

shift blame onto others at the Bank for failing to address the risks posed by SPM. *See, e.g.*, CRA

Br. at 444-447. But doing so does not absolve her of her own liability under § 1818(e). It does

not matter if others at the Bank also committed actionable misconduct; nor does it matter if

others at the Bank were "more guilty" than Anderson. *Landry*, 204 F.3d at 1139; Restatement

(Second) of Torts § 439, cmt. b (Am. L. Inst. 1965) ("If the harm is brought about by the

substantially simultaneous and active operation of the effects of . . . the actor's negligent conduct

and [the] [wrongful] act of a third person . . . the conduct of each is a cause of the harm, and both

. . . are liable."). All that matters is whether Anderson's misconduct was a "substantial factor" in

producing the loss and that the loss was "reasonably foreseeable." *Bierman*, 2 F.3d at 1434

(applying a proximate-cause standard).

The weight of the evidence supports the conclusion that Anderson's misconduct caused

the bank to suffer financial loss or other damage. As Group Risk Officer, Anderson was

responsible for ensuring that risks were managed and escalated appropriately. *See* Hr'g Tr. at

282:15-22 (Coleman). And her failure to manage the risks posed by SPM—including her failure

to credibly challenge the Bank's business model, institute proper controls, and escalate SPM

risks—delayed an effective response to the problem and resulted in a greater loss to the Bank

than if she had properly managed and escalated the risks in the first place. *See* Hr'g Tr. at

2957:16-2958:25 (Loughlin), 1238:11-1239:14 (Candy), 4064:15-4065:24 (Smith). It was

Appellate Case: 25-1079    Page: 1282    Date Filed: 05/16/2025 Entry ID: 5517644

certainly reasonably foreseeable that Anderson's misconduct, which exacerbated the SPM problem and delayed an effective response, would lead to greater losses for the Bank.

Anderson argues that she cannot be held liable for Bank losses stemming from SPM because the Board was already aware of SPM in February 2014 but did not eliminate sales goals until September 2016. CRA Br. at 538. Even if this is true, it does not follow that additional escalation—let alone instituting the proper controls—would have been ineffectual. Indeed, the evidence discussed above suggests that the Bank would have been able to resolve SPM issues more quickly if Anderson had fulfilled her duties and identified and escalated sales issues on a timely basis. *See supra* Part VI.B.4. It does not matter that the Board already may have been aware of the problem; the Board's awareness does not absolve Anderson of her own responsibilities to address the problem, nor does such awareness mean that her failure to execute her responsibilities did not make the problem far worse than it otherwise would have been. *See* Hr'g Tr. at 4066:8-24 (Smith) ("It doesn't matter if other people also failed. It doesn't make their failures less severe or less impactful.").

Anderson also argues that losses to Wells Fargo & Company ("WFC"), the Bank's holding company, do not qualify as losses to Wells Fargo Bank, N.A. CRA Br. at 543-44. This argument is moot, because most—if not all—of the above-mentioned penalties were paid by the Bank itself, rather than the holding company. The only settlements arguably paid for by the holding company were the New York Attorney General settlement and the settlement with 50 State Attorneys General. *Id.* at 543. And the latter settlement involved the holding company "*acting for* Wells Fargo Bank, N.A. and their current and former parents." MSD-671 at 1 (emphasis added). There is no reason to think that Congress intended for IAPs to escape liability simply because the Bank's holding company—rather than the Bank itself—is the entity writing

Appellate Case: 25-1079      Page: 1283      Date Filed: 05/16/2025 Entry ID: 5517644

the check. But again, more than $3 billion of loss was clearly incurred by the Bank itself, even without the two state settlements.

Enforcement Counsel also argued that reputational damage, the Bank's decline in market capitalization, legal and consulting fees, and the Federal Reserve Board's "asset cap" satisfy the bank-loss prong. EC Post-Hearing Br. at 65; OCC Exh. 2338 (Report of NBE Smith) ¶148. Anderson has raised exceptions to each of those arguments. *See* CRA Br. at 546-47 (reputational damage), 549-50 (market cap), 544, 547 (legal and consulting fees), 550-52 (asset cap). Because the evidence supports a finding that the fines and penalties are more than sufficient to satisfy the "financial loss or other damage" prong of the "effect" element of § 1818(e), the Comptroller declines to decide whether those additional losses also satisfy the element, and Anderson's exceptions regarding those losses are therefore moot.

### 2. The interests of the Bank's depositors were prejudiced

The Comptroller finds that the record supports the ALJ's finding that Anderson's misconduct satisfied the second prong of 12 U.S.C. § 1818(e)'s effect element—that the "interests of the [bank's] depositors have been or could be prejudiced." In making this determination, the Comptroller incorporates the following relevant facts that the ALJ properly found undisputed at the summary disposition stage: SD Order SOMFs 412, 447, 449, 462-65, 488.

First, it is worth addressing Anderson's argument that Enforcement Counsel is required to prove that Anderson caused "actual past harm" to the Bank because they are bound to the specific language they used in the Notice of Charges. *See* CRA Br. at 526-27, 594.[53] The Notice

---

[53] Anderson primarily levies this exception in relation to the first prong—financial loss or other damage—but because there is abundant evidence that Anderson's misconduct did cause actual loss (rather than just "likely" loss), the exception is moot with respect to that prong.

alleged that Anderson's misconduct "prejudiced the interests of depositors." Notice at 60. But it did not allege that her misconduct "could" prejudice the interests of depositors, which is also sufficient to satisfy the "effect" element under the statute. *Id.* According to Anderson, Enforcement is bound by this assertion and cannot now claim that the effect element is satisfied by potential prejudice to depositors—it must rely on *actual* prejudice.

This argument is unavailing for several reasons. First, Enforcement Counsel's failure to specifically allege potential prejudice had no effect on their burden of proof, as it is a lesser-included offense. *See, e.g.*, *United States v. Walkingeagle*, 974 F.2d 551, 554 (4th Cir. 1992). An assertion that Anderson's misconduct prejudiced the Bank's depositors *necessarily includes* the lesser assertion that her misconduct *could potentially* prejudice depositors. Proving the former necessarily proves the latter; no additional notice is required.[54] Moreover, Respondent cites only general legal authorities that support the principle that parties can be bound by factual allegations in pleadings, but none of their authorities supports the notion that Enforcement Counsel must specifically elucidate every lesser-included offense where they have already expressly provided notice of their claims with the same statutory elements.[55] Last, and most important, the record

---

[54] Indeed, all the APA requires is that a party "understood the issue" and "was afforded full opportunity" to be heard. *Golden Grain Macaroni Co. v. FTC*, 472 F.2d 882, 885 (9th Cir. 1972). Anderson's own prehearing filings indicate that she acknowledged that she would have to contest future losses at the hearing. *See* CRA Statement of Disputed Issues to be Resolved at the Hearing ¶ 54, June 25, 2021.

[55] Anderson cites one case—*Proffitt*—for the specific proposition that Enforcement cannot hold an IAP liable for "potential future harm" where "the 'notice [of charges] focused solely on [Respondent]'s prior conduct' causing actual past harm." CRA Br. at 527 (alterations in original). *Proffitt* provides no support for that assertion. The relevant discussion in *Proffitt* concerned whether a prohibition order constituted a "penalty" for statute-of-limitation purposes; the discussion of the lack of forward-looking assertions in the Notice of Charges concerned Proffitt's ongoing fitness to serve, which might have provided support for the prohibition order being less of a backwards-looking penalty. *Proffitt*, 200 F.3d at 862. There is no discussion of "potential future harm," let alone anything resembling a holding or even dicta that could justify Anderson's reliance on such case law.

reflects that Anderson's misconduct *did* prejudice depositors' interests, rendering this particular exception moot.

There is no substantive factual dispute that SPM caused significant harm to customers, including unwarranted account fees, credit score impacts, and misuse of customers' personal information. *See generally* MSD-543; MSD-663; SD Order SOMF 464; OCC Exh. 2175 at 31 (proffered). The Bank has repeatedly admitted that SPM harmed customers and eroded their trust in the Bank. *See* MSD-1 at 31 ¶ 32; MSD-664; MSD-677; Julian Am. Ans. ¶ 178; McLinko Am. Ans. ¶ 178. Anderson herself admitted that one of the responsibilities of her job involved "ensur[ing] security of all customer information." Hr'g Tr. at 9529:16-21. She further admitted that several of the practices associated with SPM—including changing customer contact information—constituted "misuse of customer information" and "compromised the security of customer information." *Id.* at 9529:22-9530:19. She also admitted in her deposition that SPM can erode customer trust. OCC Exh. 2509A at 179:10-14.

For the same reasons the Comptroller finds that a portion of the Bank's losses can be attributed to Anderson's misconduct, the Comptroller finds that some of SPM's harms to customers occurred by reason of Anderson's misconduct. *See supra* Part VI.C.1 (applying proximate-cause analysis to the first prong). Anderson's misconduct, individually and in the aggregate, exacerbated the risks posed by SPM and delayed an effective response to the problem, and this misconduct could have and did prejudice the interests of the Bank's depositors. *See* Hr'g Tr. at 2956:24-2957:1 (Loughlin) ("[T]he longer it took to get our hands around the problem, the more . . . customers were potentially being harmed."). NBE Smith's testimony provided a useful summary of the scope of the harm to customers and the extent to which SPM eroded trust in the Bank: "This was one of the worst events in banking. It created a level of mistrust around Wells

88

Fargo that is hard to match. I can't think of another instance in a consumer bank that has created this level of distrust within a bank." Hr'g Tr. at 4019:19-23. Or perhaps it is best to hear the perspective of a customer, in her own words: "[I]t is truly scary that an employee of a financial institution can manipulate my information and assert himself [*sic*] into my personal and financial life." MSD-110; *see also* SD Order SOMF 312.

In addition to the compounding effect that Anderson's failures as GRO played in exacerbating the harms posed by SPM (including her failure to escalate, failure to credibly challenge, and failure to institute proper controls), her provision of false and/or misleading information to the OCC caused a unique harm that has been recognized in other enforcement cases brought by the federal banking regulators. As noted in *Cousin*, an IAP's attempts to "disrupt a lawful government inquiry" can prejudice depositors' interests by eroding trust in their Bank's ability to communicate with its regulator to address relevant risks. The Office of Thrift Supervision explained:

> Effective communication is seriously jeopardized by the efforts of an association's chief executive officer to obstruct a lawful government inquiry. In this case, the evidence is compelling that Respondent intended to do exactly that. In the Acting Director's judgment, Respondent's interference with a lawful IRS investigation could destroy whatever confidence depositors might have that Respondent would communicate with regulators with the requisite candor. Their deposits would be subject to a substantially greater risk than at an institution where the management cooperated with government oversight.

*In re Cousin*, No. AP 94-98, 1994 WL 621240, at *16 (OTS Oct. 11, 1994). Here, Anderson's obstruction of the OCC exam by failing to provide or providing false, incomplete and/or misleading information is even more of a threat to depositors' interests than the obstruction in *Cousin* because it involved a lack of candor to the specific regulator whose mission it is to ensure the safety and soundness of the institution and the banking system as a whole. In her exceptions, Anderson argues that depositor prejudice requires "evidence of an actual threat to a bank's

89

ability to safeguard the depositors' funds." CRA Br. at 594. But the case law does not support the overly narrow interpretation of 12 U.S.C. § 1818(e)(1)(b)(ii) that she advances. Cases such as *Cousin* reveal that there are alternative means to satisfy this prong, including potential prejudice (rather than actual prejudice) as well as a loss of trust by depositors in the institution itself. Because Anderson's misconduct harmed customers and could have eroded their trust in the Bank, this prong of the effect element is satisfied.

### 3. The financial gain or other benefit prong was not met

The Comptroller finds that Enforcement Counsel did not meet its burden to prove that Anderson also satisfied the *financial gain or other benefit* prong of the effect element. Enforcement Counsel levied two distinct arguments relating to this prong: (1) the Community Bank's unsafe or unsound business model was financially profitable, thereby increasing Anderson's compensation, which was tied to the Bank's profits; and (2) Anderson's misconduct "allowed her to keep her job," which qualifies as an "other benefit" under this prong. EC Post-Hearing Br. at 69-71. As to the first argument, Enforcement Counsel did not adduce sufficient evidence to prove that the illegal or unsafe or unsound aspects of the Bank's business model— rather than the Bank's so-called *cross-sell* model generally—generated additional profits for the Bank. *See id.*; CRA MSD Opp. at 123-24. In addition, this argument contradicts Enforcement Counsel's argument that Anderson's misconduct caused a loss to the Bank in the form of share price underperformance. *Compare* EC Post-Hearing Br. at 70 (the business model was "financially profitable for the Bank" and Anderson benefitted from more-valuable "stock awards") *with* EC MSD Br. at 154-55 (arguing that the Bank's "reduced shareholder return" and "negatively impacted" share price provides evidence for the bank-loss prong). And while the ALJ accepted Enforcement Counsel's argument, he did so in part by relying on an expert report that was not admitted into evidence at the hearing from a witness who did not testify at the

90

Appellate Case: 25-1079    Page: 1288    Date Filed: 05/16/2025 Entry ID: 5517644

hearing. *See* RD at 311-12. Simply put, the record does not contain sufficient evidence to support the argument that Anderson's misconduct resulted in financial gain due to the increased value of her compensation.

Enforcement Counsel's second argument fares no better. They provide no evidence that it was Anderson's *misconduct* that allowed her to keep her job. If anything, the record evidence suggests the opposite. Anderson was ultimately fired for cause in February 2017. OCC Exh. 2126; Hr'g Tr. at 10136:9-11, 10139:11-10140:8 (Anderson). It seems highly unlikely that Anderson would have lost her job *earlier* had she refrained from committing any misconduct in the first place. *See In re Akahoshi*, No. AA-EC-2018-20, Order Modifying Sections A2, B2, and B3 of This ALJ's October 16, 2020 Order, 2021 WL 7906090 (Mar. 1, 2021) (Order) ("[I]f Respondent would have remained employed at the Bank simply by *not engaging in the alleged misconduct to begin with*, then it cannot be said that the alleged misconduct resulted in her continuing to receive salary and bonuses.") (emphasis in original). The Comptroller therefore rejects the ALJ's finding that Anderson's misconduct satisfied the financial gain or other benefit prong of 12 U.S.C. § 1818(e)'s effect element.

### D. Culpability

The culpability element may be satisfied where the alleged misconduct either "involves personal dishonesty," 12 U.S.C. § 1818(e)(1)(C)(i), or "demonstrates willful or continuing disregard by [an IAP] for the safety or soundness of such insured depository institution . . . ." § 1818(e)(1)(C)(ii). The RD found that both prongs of the culpability element were met. *See* RD at 414-16. The Comptroller finds that the record evidence supports both findings.

Both prongs of the culpability element require some showing of *scienter*. *See Kim*, 40 F.3d at 1054-55 (collecting cases). *Personal dishonesty* "may include: a disposition to lie, cheat, or defraud; untrustworthiness; lack of integrity; misrepresentation of facts and deliberate

91

Add. 1287

deception by pretense and stealth; or want of fairness and straightforwardness." *Van Dyke v. Bd. of Governors*, 876 F.2d 1377, 1379 (8th Cir. 1989) (internal citations omitted); *see also Michael v. FDIC*, 687 F.3d 337, 351 (7th Cir. 2012). *Willful disregard* and *continuing disregard* present distinct bases for a finding of scienter. *Brickner v. FDIC*, 747 F.2d 1198, 1202 (8th Cir. 1984). Willful disregard is shown by "deliberate conduct which exposed the bank to abnormal risk of loss or harm contrary to prudent banking practices," while continuing disregard requires conduct "over a period of time with heedless indifference to the prospective consequences." *Dodge v. Comptroller of the Currency*, 744 F.3d 148, 160 (D.C. Cir. 2014) (quoting *Grubb v. FDIC*, 34 F.3d 956, 961–62 (10th Cir. 1994)) (citations and internal quotation marks omitted).

1. Anderson demonstrated *personal dishonesty*

The record evidence clearly establishes that Anderson demonstrated personal dishonesty. *See generally supra* Part VI.B. The personal dishonesty element "is satisfied when a person disguises wrongdoing from the institution's board and regulators or fails to disclose material information." *Dodge*, 744 F.3d at 160 (internal citations omitted). There is ample evidence to show that Anderson failed to provide information or provided false, incomplete, and/or misleading information to the OCC during the 2015 examinations. *See supra* Part VI.B.1. Specifically, the evidence demonstrates that, during the 2015 OCC examinations, Anderson: (1) did not provide accurate information about the volume of terminations relating to SPM, *id.* at VI.B.1.a; (2) made false statements regarding her knowledge of sales pressure, *id.* at VI.B.1.b; (3) falsely stated that no one loses their job because sales goals are not met, *id.* at VI.B.1.c; and (4) failed to disclose the thresholds used in proactive monitoring, *id.* at VI.B.1.d.

Anderson understood that if she did not provide appropriate information to the OCC, that it "would obviously hinder them." Hr'g Tr. at 9777:16-9778:13. Despite this understanding, the record evidence establishes that she failed to provide information or provided false, incomplete,

92

Appellate Case: 25-1079    Page: 1290    Date Filed: 05/16/2025 Entry ID: 5517644

and/or misleading information, evidencing personal dishonesty in her communications with the OCC.

## 2. Anderson exhibited *willful disregard*

Willful disregard exists when an IAP "deliberately and consciously tak[es] part in an action that evidences utter lack of attention to an institution's safety and soundness" or demonstrates "a willingness to turn a blind eye to [the institution's] interests in the face of known risks." *Cavallari* 57 F.3d at 145. Here, the record evidence shows that Anderson deliberately exposed the Bank to abnormal risks and turned a blind eye to the risks of SPM: (1) by failing to credibly challenge the incentive compensation program, *see supra* Part VI.B.2; (2) by failing to institute effective controls to counter SPM, *id.* at VI.B.3; and (3) by failing to escalate concerns about SPM, *id.* at VI.B.4. Anderson admitted at the hearing that she knew that employees engaging in SPM posed operational, compliance, regulatory, and reputational risks to the bank. Hr'g Tr. at 9520:5-9522:1. Given the known or obvious risks posed by SPM, Anderson's misconduct evidenced willful disregard to the Bank's safety and soundness.

## 3. Anderson exhibited *continuing disregard*

Continuing disregard is conduct that has been "voluntarily engaged in over a period of time with heedless indifference to the prospective consequences." *See Grubb*, 34 F.3d at 962. It is a mental state "akin to recklessness." *See Kim*, 40 F.3d at 1054; *Brickner* 747 F.2d at 1203 n.6. "Recklessness is established by acts committed 'in disregard of [] and evidencing conscious indifference to a known or obvious risk of a substantial harm.'" *See Douglas v. Conover*, FDIC-13-214e, 2016 WL 10822038, at *27 (Dec. 14, 2016) (quoting *Cavallari*, 57 F.3d at 142). It may also be demonstrated through "voluntary and repeated inattention to" unsafe or unsound practices, or the "knowledge of and failure to correct clearly imprudent and abnormal practices that have been ongoing." *See In the Matter of Swanson,* No. AP 95-19, 1995 WL 329616, at *5

93

(OTS Apr. 4, 1995). Disregard is continuing where there is repetition of the misconduct, *see id.*, "over a period of time," *see Grubb*, 34 F.3d at 962.

The same record evidence identified above also supports a finding that Anderson exhibited continuing disregard for the safety and soundness of the Bank. The evidence shows that between at least January 2013 and August 2016, when she left the Bank, Anderson knew or should have known that SPM was widespread and systemic and, further, recognized or should have recognized that SPM created operational, compliance, regulatory and reputational risks to the Bank. *See supra* Part VI.A. Yet during that time period, she consistently failed to take appropriate steps to prevent or detect SPM through better controls, by failing to ensure the incentive compensation plans program adequately balance risk and reward, and by failing to escalate the issues up the chain so actions could be taken to reduce SPM. *See supra* Part VI.B.2-4. These actions demonstrated continuing disregard for the serious risks posed by SPM.

## VII. COMPTROLLER'S FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING THE CIVIL MONEY PENALTY

### A. Misconduct

The *misconduct* element of a second-tier CMP may be satisfied by any violation of law, breach of fiduciary duty, or the "reckless" engagement in an unsafe or unsound practice. *See* 12 U.S.C. § 1818(i)(2)(B)(i).

Conduct is reckless if it is "done in disregard of, and evidencing a conscious indifference to, a known or obvious risk of a substantial harm." *Cavallari*, 57 F.3d at 142. "[R]ecklessness does not require that the Bank suffer an actual loss; it requires only a 'risk of a substantial harm.'" *See In the Matter of Blanton*, 2017 WL 4510840, at *14. If Respondent was aware of a risk of substantial harm but did not act to appropriately address or mitigate that risk, that conduct is reckless. *Id.* Here, the record has established that Anderson knew or should have known that

94

SPM was widespread and systemic at the Bank throughout the relevant period and that SPM posed significant risks to the Bank. *See supra* Part VI.A. Therefore, misconduct that evidenced a conscious indifference to the significant risks posed by SPM was reckless.

For the reasons set forth below, the Comptroller hereby finds that the unsafe or unsound practices detailed in Part VI.B above were reckless for the purposes of § 1818(i)(2)(B)(i)(II). Each of these unsafe or unsound practices, in addition to the violations of law detailed in Part VI.B.5, is sufficient to satisfy the misconduct element of § 1818(i).

1. Anderson *recklessly* failed to provide or provided false, incomplete and/or misleading information to the OCC during the 2015 OCC examinations

The Comptroller has found that Anderson's failure to provide information and/or providing false, incomplete, and/or misleading information to the OCC during the 2015 OCC examinations constituted an unsafe or unsound practice. *See supra* Part VI.B.1. The record evidence also supports a finding that this unsafe or unsound practice was reckless, meeting the standard for misconduct for a second-tier CMP under § 1818(i)(2)(B).

The relationship between a bank and its prudential regulator depends upon cooperation by bank personnel; the OCC cannot achieve its mandate of ensuring a safe and sound banking system if bank personnel do not furnish complete and accurate information. *See In re Bankers Tr.*, 61 F.3d 465, 471 (6th Cir. 1995) ("The success of [bank] supervision . . . depends vitally upon the quality of communication between the regulated banking firm and the bank regulatory agency."); *see also* OCC PPM 5310-10, "Examiner Guidance for Securing Access to Bank Books and Records" (January 7, 2000). Anderson's testimony demonstrates that she understood that she was required to be transparent and honest with the OCC, Hr'g Tr. at 9773:23-9774:9, and that her failure to do so could result in increased reputational, compliance, and operational risk, *id.* at 10030:10-10031:8. By failing to provide information and/or providing false,

incomplete, and/or misleading information to the OCC, Anderson compromised the OCC's ability to fully identify and address the risks posed by SPM, and she did so in conscious disregard of the obvious risks of substantial harm to the Bank. *See In the Matter of Blanton*, 2017 WL 4510840, at *13.

2. Anderson *recklessly* failed to credibly challenge the incentive compensation program

The Comptroller has found that Anderson's failure to credibly challenge the Bank's incentive compensation program, which included unreasonable sales goals and which raised substantial risks of SPM by applying pressure to employees, was an unsafe or unsound practice. *See supra* Part VI.B.2. The record evidence also supports a finding that this unsafe or unsound practice was reckless, meeting the standard of misconduct for a second-tier CMP under 12 U.S.C. § 1818(i)(2)(B).

Based on the record evidence, the Comptroller finds that Anderson had actual knowledge of a risk of substantial harm: the risk of SPM caused by pressure on employees to meet unreasonable sales goals. Anderson acquired a wealth of knowledge about the extent of SPM and the fact that managers and employees were complaining about sales goals and sales pressure. Hr'g Tr. at 1156:10-20 (Candy); *see supra* Part VI.A-B. She also participated in numerous email chains detailing instances of employees committing SPM to meet sales goals, demonstrating that she read and considered those details. *See supra* Part VI.B.2. Despite this knowledge, she failed to credibly challenge the incentive compensation program to her superiors Michael Loughlin and Carrie Tolstedt.

Appellate Case: 25-1079    Page: 1294    Date Filed: 05/16/2025 Entry ID: 5517644

Given the amount of information Anderson possessed, the Comptroller finds that Anderson acted recklessly by disregarding a known and obvious risk and by failing to credibly challenge the incentive compensation program.[56]

### 3. Anderson *recklessly* failed to institute effective controls to manage the risk of SPM

The Comptroller has found that Anderson's failure to institute effective controls to manage the SPM risk constituted an unsafe or unsound practice. *See supra* Part VI.B.3. The record evidence also supports the finding that this unsafe or unsound practice was reckless, meeting the standard for misconduct for a second-tier CMP under 12 U.S.C. § 1818(i)(2)(B).

Specifically, the record demonstrates that Anderson disregarded a risk of substantial harm by relying on controls that both the OCC and Accenture warned Anderson were ineffective. *See* OCC Exhs. 195 at 3-5 (showing Anderson read both reports documenting that the controls in place were ineffective), 1239 at 6 (OCC's June 2015 supervisory letter), 1312 at 4, 6, 42 (Accenture's October 2015 report); Hr'g Tr. at 10028:20-22 (Anderson). Additionally, Bank employees warned Anderson that SSCOT's proactive monitoring was ineffective. *See, e.g.*, OCC Exh. 280 at *1 (e-mail from Bank employee stating that 50 phone numbers are "a lot"); Hr'g Tr. at 9964:19-22 (Anderson) (testimony that the head of the Bank's risk committee criticized the concept of thresholds). Anderson dismissed this criticism. *See, e.g.*, Hr'g Tr. at 9964:23-9965 (testifying that the risk committee "didn't understand the concept" of thresholds). In relying on ineffective controls despite knowledge of their nature, Anderson disregarded the substantial risk of harm from the ineffective controls.

---

[56] The Comptroller also finds that Anderson had constructive knowledge of an obvious risk of substantial harm, as she was informed through various channels of many instances of employees committing misconduct in order to meet unreasonable sales goals. *See supra* Part VI.B.2.

Even if Anderson were to assert that, despite this evidence, she didn't know about the risks, the Comptroller finds that she should have known. Given the warnings she received, any lack of knowledge of the risks of substantial harm on her part would have to mean that Anderson was consciously indifferent to such risk. *See In the Matter of Blanton*, 2017 WL 4510840, at *13 ("Conduct is reckless under the [Federal Deposit Insurance Act] for purposes of assessing a CMP when it is done in disregard of, and evidencing conscious indifference to, a known or obvious risk of substantial harm.") (internal quotation marks omitted).

4. Anderson *recklessly* failed to escalate known or obvious risks related to SPM

The Comptroller already has found that Anderson's repeated downplaying of the risks posed by SPM and her lack of escalation constituted an unsafe or unsound practice. *See supra* Part VI.B.4. The record also supports the finding that this unsafe or unsound practice was reckless, meeting the standard for misconduct for a second-tier CMP under 12 U.S.C. § 1818(i)(2)(B).

As demonstrated above, more than half a dozen witnesses within the Bank testified to Anderson's tendency to downplay the risks posed by SPM. Instead of faithfully discharging her duties as GRO, she actively hindered the flow of information within the Bank that would have allowed herself, her colleagues, and the OCC to address the risks posed by SPM and minimize the harm to the Bank's customers. Given that Anderson knew or should have known that SPM was widespread and systemic at the Bank throughout the relevant period and that SPM posed significant risks to the Bank, her repeated downplaying of those risks and her failure to escalate was done in conscious disregard of a "known or obvious risk of substantial harm." *Cavallari*, 57 F.3d at 142. The Comptroller finds that this unsafe or unsound practice was reckless under § 1818(i)(2)(B).

5. Anderson committed violations of law

The Comptroller previously found that that Anderson failed to provide information or provided false, incomplete, and/or misleading information to the OCC during the 2015 examinations (1) by falsely stating that no one loses their job because sales goals are not met; (2) by making false statements regarding her knowledge of sales pressure; (3) by not providing accurate information about the volume of terminations relating to SPM; and (4) by failing to disclose the thresholds used in proactive monitoring, and these actions violated both 18 U.S.C. §§ 1517 and 1001(a).[57] *See supra* Part VI.B.5. These violations are sufficient to meet the misconduct prong of § 1818(i)(2)(B). *See id.*

**B. Effect**

The *effect* element of a second-tier CMP under 12 U.S.C. § 1818(i)(2)(B) can be satisfied by showing that Respondent's misconduct:

1. Is part of a pattern of misconduct;
2. Causes or is likely to cause more than a minimal loss to the Bank; or
3. Results in pecuniary gain or other benefit.

In the RD, the ALJ found that all three prongs of the effect element were satisfied. *See* RD at 427-28. For the following reasons, the Comptroller finds that the record evidence supports the ALJ's findings that Anderson's misconduct satisfied two prongs of the effect element of § 1818(i)(2)(B):a pattern of misconduct (prong 1); and bank-loss (prong 2). As to the last prong (prong 3, pecuniary gain), the Comptroller finds that Enforcement Counsel did not meet its burden of proof and overrules the ALJ's finding as to that prong.

---

[57] The Comptroller partially upholds, to the extent detailed in this paragraph, Enforcement Counsel's exception that although the Executive Summary makes a finding, the RD did not explicitly find Anderson violated these laws. *See* EC Exceptions Br. at 58-67. The Comptroller rejects the remainder of Enforcement Counsel's exceptions related to violations of law. *See id.* at 67-71.

1. <u>Anderson's misconduct constituted a pattern of misconduct</u>

Under the Federal Deposit Insurance Act ("FDI Act"), a *pattern of misconduct* involves a "series of unlawful efforts." *In re Seidman*, No. OTS AP-91-78, 1994 WL 16012535 (OTS Feb. 2, 1994) (recommended decision), *aff'd*, 1995 WL 18252476 (OTS Nov. 8, 1995) (final decision). Repeated instances of statutory misconduct can constitute a pattern and, so too, repeated attempts to conceal such misconduct. *See Rapp v. OTS*, 52 F.3d 1510, 1518 (10th Cir. 1995). In addition, ongoing misconduct over a period of months or years can constitute a pattern, particularly when such misconduct demonstrates "utter disregard for the Bank's interests over a significant period of time." *Ellsworth*, 2016 WL 11597958, at *21; *see also In the Matter of Blanton*, 2017 WL 4510840, at *10.

The record evidence establishes that Anderson's misconduct constituted a pattern of misconduct for the purposes of § 1818(i)(2)(B). As discussed in Part VI.B.1, Anderson repeatedly made false, incomplete and/or misleading statements to the OCC. As discussed in Part VI.B.2, Anderson repeatedly failed to credibly challenge the Bank's incentive compensation program. As discussed in Part VI.B.3, Anderson repeatedly failed to institute the proper controls to manage the risks posed by SPM. And, as discussed in Part VI.B.4, Anderson repeatedly downplayed the severity of the risks posed by SPM and repeatedly failed to escalate SPM risks. Each of these repeated instances of misconduct constituted a pattern under the statute.

In her exceptions, Anderson argues that a pattern "must be based on repetitive, affirmative misconduct rather than an overall failure to act." CRA Br. at 532. But the case law does not support this reading of the statute. Anderson reframes the misconduct at issue in *In the Matter of Blanton* as "disregarding warnings from OCC and bank officers," but *In the Matter of Blanton* is a perfect illustration of why repeated failures or omissions can constitute a pattern of misconduct under the FDI Act. In *In the Matter of Blanton*, the OCC found that the Respondent

100

engaged in a pattern of misconduct by allowing one customer to repeatedly overdraft his account, despite repeated warnings from the OCC about the risks this posed to the Bank. *In the Matter of Blanton*, 2017 WL 4510840, at *8. Blanton's misconduct was more of a failure to act than an affirmative action—the respondent could have instituted the proper controls to prevent the overdrafts, but he did not, and this repeated failure to prevent the overdrafts constituted a pattern of actionable misconduct. *Id.* The misconduct in this case involves a similar pattern: at all times throughout the relevant period, Anderson was aware of SPM and could have instituted proper controls, credibly challenged the Bank's incentive compensation model, and escalated SPM risks. But she repeatedly failed to do so, which allowed SPM to proliferate, and this repeated failure constituted a pattern of misconduct.

More broadly, if a failure or omission can constitute actionable misconduct under the statute, it follows that *repeated* failures or omissions can constitute a pattern of misconduct. In any case, even assuming Anderson's interpretation is correct, two of the types of misconduct that Anderson committed—repeatedly making false, incomplete, and/or misleading statements to the OCC and repeatedly downplaying the severity of SPM—involved affirmative misconduct that constituted a pattern.

Anderson's exceptions propose additional requirements for "pattern of misconduct" that are not grounded in statutory language or case law. *See* CRA Br. at 533-35. She argues that instances of misconduct must by "tied together by a common illicit purpose," *id.* at 533, but this has never been a requirement for misconduct to form a pattern under § 1818(i)(2)(B). Anderson also argues that the term *pattern* in the FDI Act should be given the precise legal meaning the Supreme Court ascribed to the term *pattern* in the RICO Act of 1970, which she claims involves "identical language" to the FDI Act. *Id.* at 531, 533-34. In RICO, the relevant language is,

"pattern of racketeering activity." 18 U.S.C. § 1961(5). It is a stretch to call this "identical language" to § 1818's "pattern of misconduct" and an even bigger stretch to claim that the Supreme Court's interpretation of that language in RICO is binding here. The Comptroller rejects both of these arguments.

Finally, Anderson argues that a continuing violation cannot form a pattern of misconduct. CRA Br. at 529. This exception is irrelevant, as the Comptroller has not applied the continuing violations doctrine in this case. *See infra* Part IX.A.

2.  The Bank suffered more than a minimal loss

The parties have largely combined their arguments for the bank-loss prongs of the effect element of both 12 U.S.C. §§ 1818(e) and 1818(i)(2)(B). *See* EC Post-Hearing Br. at 65 (combining the two bank-loss prongs); CRA Br. at 591-93 (arguing that Anderson did not meet the § 1818(e) bank-loss prong by incorporating her arguments with respect to the § 1818(i) bank-loss prong). Accordingly, the Comptroller incorporates his findings from Part VI. In Part VI.C.1, the Comptroller discussed his findings that Anderson's misconduct caused financial loss to the Bank for the purposes of the effect element of § 1818(e). Her misconduct delayed an effective response to the SPM problem and resulted in a greater loss to the Bank than if she had executed her responsibilities as GRO. *See id.* For the reasons articulated in Part VI.C.1, the Comptroller finds that the "more than a minimal loss" prong of § 1818(i)(2)(B)(ii) is also satisfied.

Anderson argues, again, that but-for and proximate cause is required under this Section. CRA Br. at 538. Because the Comptroller has already determined that Anderson's misconduct caused financial loss to the Bank under a heightened causation standard, *see supra* Part VI.C.1, the Comptroller hereby incorporates those findings, which renders this exception moot. Even under the higher causation standard advocated for by Anderson, her misconduct caused

102

Appellate Case: 25-1079      Page: 1300      Date Filed: 05/16/2025 Entry ID: 5517644

"financial loss" to the Bank pursuant to § 1818(e)(1)(B)(i), which also entails "more than minimal loss" for the purposes of § 1818(i)(2)(B)(ii).

3. The pecuniary gain or other benefit prong was not met

For the same reasons articulated in Part VI.C.3, the Comptroller finds that Enforcement Counsel did not meet its burden of proof to demonstrate that Anderson satisfied the "pecuniary gain or other benefit" prong of the "effect" element of § 1818(i)(2)(B). The Comptroller therefore accepts the ALJ's recommendation that the first two prongs of § 1818(i)'s effect element are satisfied but rejects his recommendation regarding the third prong.

## C. Appropriateness of CMP Amount

### 1. The CMP increase was warranted

Anderson's next challenge is to the CMP increase. *See* CRA Exceptions at 285-86; CRA Br. at 559-66. The Notice originally sought a $5 million CMP from Anderson; in its summary disposition motion, however, Enforcement Counsel requested a $10 million CMP against Anderson. *Compare* Notice at 2 *with* EC MSD Br. at 199. Anderson argues that the increase in the CMP was "legally improper and factually unfounded." *See* CRA Br. at 560. For the reasons explained below, the Comptroller rejects this exception.

Title 12 U.S.C. § 1818(i)(2)(F) gives the OCC the authority to "compromise, modify, or remit" a CMP after a notice of charges is filed. The Tenth Circuit interpreted this provision to allow federal banking agencies to increase *or* decrease a penalty. *See Long v. Bd. of Governors of the Fed. Rsrv. Sys.*, 117 F.3d 1145, 1157-58 (10th Cir. 1997). To read "modify" as only meaning "lessen"—as Anderson does—would render the surrounding terms "compromise" and "remit" redundant. *See id.* at 1157 (noting that "a statute must be construed in such a manner that every word has some operative effect.").

103

In addition to the sound legal basis for increasing the penalty, the Comptroller also has sound factual basis for adopting the higher penalty. As the Tenth Circuit acknowledged in *Long*, there will often be situations where the factual basis for a given penalty will change—and support a higher penalty—after the notice of charges is filed. *Id.* at 1158. In this case, Enforcement Counsel adduced new evidence that justified the increase. In particular, new evidence reflected that the Bank opened over 18.2 million deposit and checking accounts that never had any customer-initiated transactions. *See* EC MSD Br. at 200; MSD-231 ¶ 17. Moreover, new evidence further revealed how Anderson misled the OCC and obstructed OCC exams. *See infra* Part VI.B.1. Given the substantial record evidence demonstrating the extent of Anderson's misconduct and the effect her misconduct had on the Bank's depositors, the Comptroller is justified in adopting the higher CMP amount.

Anderson also argues that Enforcement Counsel and the ALJ impermissibly increased the CMP "to punish [her] for asserting her right to a hearing," in violation of her due process rights. CRA Br. at 585. However, Enforcement Counsel clearly pointed to factual reasons for the increased penalty. *See* EC MSD Br. at 200. In any case, as Enforcement Counsel correctly note in their exceptions, what matters is the Comptroller's rationale for the increased CMP. EC Exceptions Br. at 40. The Comptroller's Final Decision is based on his review of the entire record in this proceeding, and it this review of the evidence in the record that supports the imposition of a $10 million CMP.

2.  The statutory factors support a $10 million CMP

The Comptroller must consider four statutory factors that weigh toward mitigation when assessing the appropriateness of a CMP amount: (1) the size of financial resources and good faith of the person charged; (2) the gravity of the violation; (3) the history of previous violations; and (4) such other matters as justice may require. 12 U.S.C. § 1818(i)(2)(G). The Comptroller finds

104

that the balance of the four statutory factors does not weigh in favor of mitigation. Although Anderson does not have a history of previous violations, the gravity of the violations was severe,[58] she did not demonstrate sufficient good faith,[59] she has not demonstrated that she does not have the necessary financial resources to pay the $10 million CMP, and no such other matters as justice may require apply in this instance.

Anderson argues in her exceptions that she does not have the necessary financial resources to pay the CMP amount. CRA Exceptions at 358-361; CRA Br. at 570-72. Anderson declined to provide a notarized financial statement in this proceeding, Hr'g. Tr. at 9500:6-9501:11 (Anderson), but only submitted a self-compiled statement without notarization or supporting documentation estimating her net worth at $6.8 million. R. Exh. 20974. Enforcement Counsel produced evidence to support, and Anderson does not dispute, that she received annual pre-tax compensation between $500,000 and $1.37 million every year between 2004 and 2016, indicating a very high income for an extended period of time. OCC Exh. 2055. The OCC need not affirmatively prove Anderson's financial condition before imposing a CMP. *Stanley v. Bd. of Governors of Fed. Rsrv. Sys.*, 940 F.2d 267, 274 (7th Cir. 1991).

Having considered the record evidence, the Comptroller finds that the balance of the statutory mitigating factors does not weigh in favor of reducing the CMP amount $10 million.

3.  The thirteen interagency factors further support a $10 million CMP

In addition to the statutory factors which the Agency is required to consider in assessing a CMP, Anderson also excepts to the analysis of the thirteen interagency factors that can guide the

---

[58] *See, e.g., supra* Part VI.B.4 (finding that Anderson failed to escalate substantial risks relating to SPM).

[59] *See, e.g., supra* Part VI.B.1 (finding that Anderson made false statements to OCC examiners).

Add. 1301

Appellate Case: 25-1079    Page: 1303    Date Filed: 05/16/2025 Entry ID: 5517644

Agency in assessing CMPs.[60] CRA Br. at 575-84; *see also* 63 Fed. Reg. 30227 (June 3, 1998) (stating that this "policy provides general guidance"); OCC PPM 5000-7 (explaining that CMP matrices are only guidance). The Comptroller finds that the ALJ reviewed and considered the interagency factors based on the evidence established during the hearing in recommending a CMP. RD at 420-22. Anderson's assertion that the ALJ's analysis should be rejected because he failed to specifically cite evidence supporting his conclusions is erroneous. There is no error simply because the ALJ summarized his prior findings in his review of the thirteen interagency factors. The RD had previously set forth numerous specific findings and citations to the evidence, and there was no requirement for the ALJ to repeat the process again.

4. Anderson's remaining CMP exceptions are rejected

Anderson asserts that the CMP amount exceeds the maximum statutory limit. CRA Br. at 566-67. This is unavailing. For misconduct in the period ending November 1, 2015, the daily maximum CMP was set at $37,500 for each day the misconduct continued. 12 U.S.C. § 1818(i)(2)(B); 28 U.S.C § 2461 note; 73 Fed. Reg. 66493-94, 66496 (Nov. 10, 2008). From November 2, 2015, onward, the daily maximum was set at $61,238. 89 Fed. Reg. 872-74 (January 8, 2024). As established above, multiple instances of misconduct continued from 2013 to 2016. Even one instance of misconduct persisting from January 1, 2013, through August 1,

---

[60] Anderson asserts she was prejudiced because the ALJ precluded her from reviewing the CMP matrices Enforcement Counsel had prepared prior to issuing the Notice of Charges. CRA Br. at 576; *see also id.* at 271-76. This exception is rejected. First, the excluded matrices pertain to another Respondent, not Anderson. *See* Hr'g Tr. at 2073:16-2074:12, 2078:7-2079:14 (Candy). Second, the ALJ properly sustained an evidentiary objection because the attorney did not lay the proper foundation. *See id.* at 2076:10-2077:9. Most importantly, because the matrices are only guidance, and were not directly considered by the ALJ in his RD, any error is harmless.

2016, would produce a maximum CMP amount of over $55 million,[61] an order of magnitude higher than the actual CMP amount of $10 million. The exception is rejected.

## VIII. ANDERSON'S STRUCTURAL EXCEPTIONS

In addition to the exceptions related to the ALJ's factual findings discussed above, Anderson also makes numerous exceptions related to the structure and nature of the proceedings, up to and including the RD. The Comptroller discusses these exceptions in the remaining Parts of the Final Decision.

### A. This Proceeding Does Not Violate Article III or the Seventh Amendment

Anderson asserts that the enforcement proceeding violated Article III of the U.S. Constitution and deprived her of her Seventh Amendment right to a jury trial. CRA Br. at 26-45. For the reasons explained below, the Comptroller rejects these exceptions.

Congress may validly assign adjudications outside of Article III in cases that implicate *public rights. Jarkesy*, 144 S. Ct. at 2132. In contrast, if a case involves *private rights*—that is, if the case "is made of 'the stuff of the traditional actions at common law tried by the courts at Westminster in 1789'"—adjudication by an Article III court is mandatory. *Id.* Because this case involves public rights, Anderson's Article III challenge fails. And so, too, does her Seventh Amendment challenge: public rights cases may be validly assigned to an agency for adjudication "without a jury, consistent with the Seventh Amendment." *Id.* at 2131.

Enforcement actions brought by the OCC under the federal banking statutes are quintessentially public rights actions. Unlike some agencies whose enforcement powers extend to "private individuals interacting in a pre-existing market," *id.* at 2136, the OCC's enforcement

---

[61] The 1,034 days between January 1, 2013, and November 1, 2015, at a daily maximum of $37,500 produce a penalty of $38,775,000. The 273 days between November 2, 2015, and August 1, 2016, at a daily maximum of $61,238 produce a penalty of $16,717,974.

authority extends only to national banks, federal savings associations, federal branches of foreign banks, and certain IAPs affiliated with those institutions, *see* 12 U.S.C. § 1813(q). National banks did not exist at common law; they are "are instrumentalities of the Federal government, created for a public purpose, and as such necessarily subject to the paramount authority of the United States." *Davis v. Elmira Sav. Bank*, 161 U.S. 275, 283 (1896). The OCC's adjudications pursuant to § 1818 vindicate the public's right to a safe and sound banking system. Moreover, courts have long understood that enforcement actions brought by the federal banking regulators pursuant to § 1818 implicate public rights. *See, e.g.*, *Cavallari*, 57 F.3d at 145 (explaining that the charges brought by the OCC "pursuant to its regulatory authority . . . clearly implicate public rights."); *Simpson v. OTS*, 29 F.3d 1418, 1423-24 (9th Cir. 1994) (holding the Seventh Amendment inapplicable to an Office of Thrift Supervision proceeding under § 1818 because it implicates public rights); *Akin v. OTS*, 950 F.2d 1180, 1186 (5th Cir. 1992) (same).

Because this action implicates public rights, Anderson's arguments regarding Article III and the Seventh Amendment are unavailing.

## B. ALJ McNeil and Deputy Comptroller for Large Bank Supervision Gregory Coleman Were Properly Appointed

### 1. ALJ McNeil was properly appointed and was not unconstitutionally protected from removal

Anderson asserts that ALJ McNeil was improperly appointed and that he enjoyed dual for-cause removal protection in violation of Article II of the U.S. Constitution. *See* CRA Exceptions at 629; CRA Br. at 48-56. For reasons explained below, the Comptroller rejects both of these exceptions.

First, following the Supreme Court's decision in *Lucia v. S.E.C.*, 585 U.S. 237 (2018), on November 15, 2018, then-Secretary of the Treasury Steven T. Mnuchin—the relevant head of department for Article II appointment purposes—issued an order appointing Christopher B.

108

Add. 1304

Appellate Case: 25-1079      Page: 1306      Date Filed: 05/16/2025 Entry ID: 5517644

McNeil as an ALJ. EC Exhibits in Opposition to Respondents' Motion for Summary Disposition

Regarding Appointments, Removal, Article III, etc. ("EC Exhibits"), Exh. 2 at *6; *see also*

5 U.S.C. §§ 556-57, 3105 (statutory authority for appointing ALJs); 5 C.F.R. § 930.204

(regulations on appointing ALJs); 12 U.S.C. § 1 (establishing the OCC as a bureau within the

Treasury Department). This 2018 Order cured any potential constitutional defect of ALJ

McNeil's appointment well before the Notice of Charges was issued on January 23, 2020.[62] The

Comptroller thus rejects this exception.

Second, Anderson's assertion that ALJ McNeil enjoyed unconstitutional dual for-cause

removal protection is also unavailing. By statute, ALJs can only be removed by an agency for

"good cause established and determined" by the Merit Systems Protection Board ("MSPB").

5 U.S.C. § 7521(a). In turn, members of the MSPB may only be removed by the President for

"inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1202(d). But there is no

constitutional bar to this dual layer of for-cause removal protection.

In *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, the Supreme Court

ruled that two layers of for-cause removal protection for inferior officers violated Article II of

the U.S. Constitution, but only where inferior officers perform *executive* functions, such as

enforcement or policymaking. 561 U.S. 477, 483-85 (2010)(explaining the executive functions

of the Public Company Accounting Oversight Board ("PCAOB")). Indeed, the Court explicitly

distinguished ALJs from members of the PCAOB because ALJs do not perform executive

functions, writing: "our holding also does not address that subset of independent agency

---

[62] Anderson's claim that this order was a mere ratification of a previously invalid appointment that did not cure the defect is belied by the express language of the order: Secretary Mnuchin's order certified that ". . . I today approve their appointment as my own action under the Constitution."

employees who serve as administrative law judges" because ". . . unlike members of the [PCAOB], many administrative law judges of course perform adjudicative rather than enforcement or policymaking functions or possess purely recommendary powers." *Id.* at 507 n.10 (cleaned up).

ALJ McNeil performed solely adjudicative rather than enforcement or policymaking functions. *See* 12 C.F.R. § 19.5 (laying out the powers of an ALJ). He also possessed purely recommendatory powers, because the Comptroller—who is removable at-will by the President, 12 U.S.C. § 2—has the sole authority to rule on dispositive motions, *see* 12 C.F.R. § 19.5(b)(7), issue the final decision of the agency, *see* 12 C.F.R. § 19.40(c), and may, "at any time during the pendency of a proceeding, perform . . . any act which could be done or ordered by the administrative law judge," 12 C.F.R. § 19.4. In issuing a final decision, the Comptroller may review the record *de novo* and make his own findings of fact and conclusions of law. *In the Matter of O'Connell*, No. OCC AA-EC-92-21, 1993 WL 13967907, at *1 (OCC June 4, 1993).

Because ALJ McNeil performed solely adjudicative functions and possessed purely recommendatory powers, he did not enjoy unconstitutional dual for-cause removal protection. Anderson has also not demonstrated any "compensable harm" flowing from these alleged constitutional defects. *Collins v. Yellen*, 594 U.S. 220, 259 (2021). Thus, the Comptroller rejects this exception.

2. <u>Deputy Comptroller for Large Bank Supervision Gregory Coleman, who signed the Notice of Charges, was properly appointed</u>

Anderson asserts that the Notice is invalid because it was signed by Deputy Comptroller for Large Bank Supervision Gregory Coleman, who was purportedly not validly appointed. *See* CRA Exceptions at 629-30; CRA Br. at 56-59. For the reasons explained below, the Comptroller rejects this exception.

110

Specifically, Anderson alleges that Coleman's appointment to that position violated 12 U.S.C. § 4, which provides that the "Secretary of the Treasury shall appoint no more than four Deputy Comptrollers of the Currency." She posits that since there were more than four OCC employees holding a title that included "Deputy Comptroller" at the time of the Notice, Coleman's appointment violated § 4.

However, Coleman was not appointed under § 4 as a "Deputy Comptroller of the Currency." Instead, he was appointed as "Deputy Comptroller for Large Bank Supervision" under the authority of 12 U.S.C. § 482, which provides that "the Comptroller of the Currency shall… appoint and direct, all employees of the Office of the Comptroller of the Currency." *Compare* EC Exhibits, Exh. 6 at *39 (showing Coleman was appointed as "Deputy Comptroller for Large Bank Supervision" under § 482) *with* Exh. 5 at *31, *33 (showing others appointed as "Deputy Comptrollers of the Currency" by the Secretary of the Treasury under § 4).

Whereas "Deputy Comptroller of the Currency" is a position established and limited in number by statute in § 4, "Deputy Comptroller for Large Bank Supervision" is the title of a separate position appointed by the Comptroller under his general employment authority found in § 482. Because Coleman's appointment to his position was proper, the Comptroller validly delegated authority to Coleman to sign the Notice of Charges under 12 U.S.C. § 4a, which provides that the Comptroller "may delegate to any duly authorized employee, representative, or agent any power vested in the office by law." *See* Respondents' Exhibits to Statement of Undisputed Facts in Support of Respondents' Appointments MSD, Exh. 7 at *35-41 (delegating authority to Coleman). The Comptroller therefore rejects this exception.

Add. 1307
Appellate Case: 25-1079    Page: 1309    Date Filed: 05/16/2025 Entry ID: 5517644

### C. The OCC's Funding Structure is Constitutionally Sound

Anderson asserts that the funding structure of the OCC violates the Appropriations Clause of the U.S. Constitution. CRA Br. at 59-61. For the reasons explained below, the Comptroller rejects this exception.

The OCC is statutorily funded by assessments on its own regulated entities, up to an amount determined by the Comptroller to be appropriate for the Agency's operation. 12 U.S.C. § 16. As a threshold matter, the Comptroller notes that it is unclear whether the Appropriations Clause even applies to the OCC's funding structure. The clause provides that "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *CFPB v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. 416, 425 (2024) (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)). Specifically, "[t]he Appropriations Clause applies to money 'drawn from the Treasury.'" *Id.* The OCC's funding neither originates from, nor flows to, the Treasury. Indeed, Congress specifically provided that the OCC's funds "shall not be construed to be Government funds or appropriated monies." 12 U.S.C. § 16. Anderson offers no justification for why the Appropriations Clause should be interpreted so broadly as to encompass the OCC's fee-assessment funding regime.

Even assuming the Appropriations Clause applies to the OCC, the Agency's standing appropriation—set forth in 12 U.S.C. § 16—is more than sufficient to satisfy the clause's requirements. The Supreme Court recently rejected a similar challenge to the CFPB's funding structure. *See CFPB. v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. 416 (2024). The Court wrote that "the Appropriations Clause requires [no] more than a law that authorizes the disbursement of specified funds for identified purposes." *Id.* at 438. The law in § 16 provides exactly such authorization of specified funds for identified purposes. As such, the Comptroller rejects this exception.

### D. The Administrative Proceeding Afforded Anderson All Her Due Process Rights

Anderson argues that her due process rights under the Fifth Amendment were violated by the structure of the administrative proceeding because the OCC "serves as witness, investigator, prosecutor, and judge." CRA Br. at 47, 61. For the reasons explained below, the Comptroller rejects this exception.

There is no dispute that a CMP and prohibition order implicate Anderson's property and liberty interests, respectively, affording her the protection of due process under the Fifth Amendment. *See FDIC v. Mallen*, 486 U.S. 230, 240 (1988); *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 572 (1972). However, Anderson's due process rights were not infringed by the administrative proceeding. The Supreme Court has held that vesting the aforementioned separate functions in a single agency does not violate due process. *Withrow v. Larkin*, 421 U.S. 35, 55-58 (1975). The OCC's Uniform Rules provide for a strict separation of adjudicative and prosecutorial functions. *See* 12 C.F.R. § 19.9(e). Anderson does not argue—and there is nothing in the record to suggest—that the OCC did not adhere to this strict separation of functions in prosecuting this case.[63] The Comptroller therefore rejects this exception.

## IX. EXCEPTIONS REGARDING PREHEARING ERRORS

### A. The Statute of Limitations Does Not Bar Any Claims Against Anderson

Both Anderson and Enforcement Counsel filed exceptions related to the statute of limitations. For the reasons detailed below, the Comptroller rejects Anderson's exceptions and partially rejects and partially accepts Enforcement Counsel's exceptions.

---

[63] Anderson argues that "[d]ue process is especially violated where, as here, [Enforcement Counsel] chose to prove its case almost entirely based on witnesses who are conflicted." CRA Br. at 62. But her cited authority does not support this claim. Because Enforcement Counsel's witnesses were not acting as "decisional employees," their role in the prosecution of the case raises no specter of a due-process violation. *See Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 878-79 (2009).

Anderson asserted the statute of limitations as an affirmative defense in her answer. *See* Ans. at 18; Am. Ans. at 24. All Respondents filed a joint motion for summary disposition based on the statute of limitations. *See* Respondents' Joint Motion for Summary Disposition on the Basis of their Statute of Limitations Defenses, May 12, 2020. On June 24, 2020, ALJ McNeil issued an order denying this motion. *See* Order Regarding Respondents' Initial Joint Motions for Summary Disposition, June 24, 2020.

In the RD, the ALJ found that the five-year statute of limitations in 28 U.S.C. § 2462 applies to the CMP and prohibition charges filed against Anderson. *See* RD at 428-30. The ALJ found that the effect of Anderson's misconduct occurred within the statute of limitations period and that the charges were timely brought. *See id.* The ALJ further found that the continuing violations doctrine applied. *See id.* The ALJ, however, found that claims against Anderson based on violations of federal law prior to January 23, 2015, did not constitute continuing violations and were therefore time-barred. *See id.* at 430. Despite this, the ALJ held that the claims against Anderson based on conduct after January 23, 2015, were sufficient to support a prohibition and the $10 million CMP. *See id.*

Both Anderson and Enforcement Counsel filed exceptions to the ALJ's statute of limitations analysis. Anderson argues that the ALJ incorrectly applied the statute of limitations, finding liability based on conduct prior to the statute of limitations. *See* CRA Br. at 62-67; CRA Exceptions at 628. She argues that the RD correctly stated that claims against her for conduct prior to January 23, 2015, were timed-barred, yet it imposed liability for that conduct. *See* CRA Br. at 62-67. Therefore, she argues that the case should either be dismissed entirely or narrowed to conduct that occurred after January 23, 2015, and remanded to the ALJ to determine the correct amount of the CMP based solely on that conduct. *See id.* at 67.

Enforcement Counsel argues that the ALJ misstated the law for when prohibition and CMP claims accrue under the statute of limitations. *See* EC Exceptions Br. at 77-79. Enforcement Counsel also argues that the ALJ misapplied the continuing violations doctrine. *See id.* at 73-77.

Both parties and the Comptroller agree that CMP and prohibition claims are subject to the generally applicable statute of limitations in 28 U.S.C. § 2462 which states:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

Accordingly, the Comptroller analyzes when the claims against Anderson first accrued. If the claim accrued more than five years prior to the case commencing, the statute bars the claim. Because the Notice was filed on January 23, 2020, the five-year date for purposes of 28 U.S.C. § 2462 is January 23, 2015, and claims that first accrued prior to January 23, 2015, are barred.

Both parties recognize, and the Comptroller agrees, that the D.C. Circuit case *Proffitt v. FDIC*, 200 F.3d 855 (D.C. Cir. 2000), applies to this action. *Proffitt* explains that a prohibition claim under 12 U.S.C. § 1818 accrues when the "factual and legal prerequisites for filing suit are in place." *Id.* at 862 (internal quotation omitted). In *Proffitt*, the court stated that all three elements of a prohibition claim—misconduct, effect, and culpability—must be present for a prohibition claim to accrue within the meaning of 28 U.S.C. § 2462. *Id.* at 862-63. The court explained, "Because misconduct and effect are separate [elements], the underlying conduct may not always immediately effect a [12 U.S.C. § 1818(e)] violation and thus the accrual of the claim. The same misconduct can produce different effects at different times, resulting in separate [12 U.S.C. § 1818(e)] claims and separate accruals." *Id.* at 863. The *Proffitt* court held that

115

regardless of when the first effect occurred, the statute of limitations period can be triggered separately under the alternative effects language in 12 U.S.C. § 1818(e)(1)(B). *Id.* at 862-83. Thus, the first occurrence of one element of a prohibition action does not necessarily start the statute of limitations. This is true even if all three elements are satisfied—the first occurrence of a different effect (or misconduct or culpability) under 12 U.S.C. § 1818(e) means a new prohibition claim has accrued. *See id.* at 864 (holding that, even though the conduct at issue in *Proffitt* occurred prior to the five-year statute of limitations *and* satisfied the effect element prior to the five-year statute of limitations, a different effect occurring within the five-year statute of limitations made the action timely).

The D.C. Circuit later applied *Proffitt*'s reasoning to CMP actions under 12 U.S.C. § 1818(i) in *Blanton v. OCC*, 909 F.3d 1162 (D.C. Cir. 2018). In *Blanton*, the OCC sought a second-tier CMP, which has two elements: misconduct and effect. The *Blanton* court held that a CMP claim accrues each time there is misconduct that also has an effect. *Id.* at 1171. Each instance of misconduct triggers a new claim if it also meets the effect element. *See id.* (citing *Proffitt*, 200 F.3d at 863-64).

Accordingly, the Comptroller finds that the ALJ erred in his discussion of the statute of limitations. Considering only dates, the ALJ found that claims based on Anderson's misconduct that occurred prior to January 23, 2015, were time-barred, but the claims based on Anderson's misconduct that occurred after January 23, 2015, were timely. *See* RD at 429-30. The ALJ's sole focus on the timing of Anderson's misconduct is misplaced because misconduct is only one element of a second-tier CMP or prohibition claim. Instead, if *any* occurrence of *any* element *first* occurred on or after January 23, 2015, the claims against Anderson are timely under 28 U.S.C. § 2462.

116

Appellate Case: 25-1079    Page: 1314    Date Filed: 05/16/2025 Entry ID: 5517644

Applying this legal standard to the facts of this case, the Comptroller finds that the statute of limitations does not bar any claims against Anderson. The record shows that the first occurrence of loss to the Bank was on September 8, 2016, when the Bank agreed to a $186 million fine by the OCC, CFPB, and the Office of the Los Angeles City Attorney. This loss satisfies the "effect" element of a CMP, as it was the first time Anderson's misconduct "cause[d] more than a minimal loss" to the Bank. 12 U.S.C. § 1818(i)(2)(B)(ii)(II).[64] This loss also satisfies the "effect" element of a prohibition because it was the first time the Bank "suffered . . . financial loss," 12 U.S.C. § 1818(e)(1)(B)(i).[65] Following the reasoning in *Proffitt*, the first occurrence of loss in 2016 means the entire action against Anderson is timely, as it occurred after January 23, 2015.

Additionally, the Comptroller notes that Anderson committed misconduct numerous times within the five-year statute of limitations period. As detailed in Parts VI and VII, Anderson violated federal law and recklessly engaged in unsafe or unsound practices after January 23, 2015. Anderson cannot evade liability because her misconduct continued for more than five years. *See In the Matter of Blanton*, 2017 WL 4510840, at *16. In fact, the record shows that Anderson's misconduct in providing false, incomplete, and/or misleading information to the OCC occurred *entirely* within the five-year statute of limitations period. *See supra* Part VI.B.1.

---

[64] For a detailed discussion of the effect element, *see supra* Parts VI.C and VII.B.

[65] Anderson argues that reputational damage that occurred after the publication of the Los Angeles Times articles in 2013 satisfies this element. *See* CRA Br. at 65. However, Enforcement Counsel did not allege that these articles caused reputational damage, nor did they allege that reputational damage occurred in 2013. *See, e.g.*, Notice ¶¶ 174-77 (alleging various forms of reputational damage that all occurred after September 2016); MSD-658 (Pocock Expert Report) ¶ 14 ("[T]he sales practice misconduct scandal caused severe reputational and financial damage to WFC and the Bank following the September 8, 2016 announcement[.]").

That misconduct provides an independent basis for the prohibition and CMP action. Under 28 U.S.C. § 2462, that misconduct falls within the statute of limitations.

Finally, the Comptroller overrules Enforcement Counsel's exceptions to the RD's analysis of continuing violations. The Comptroller need not determine whether the continuing violations doctrine applies, because the entire action is timely pursuant to 28 U.S.C. § 2462. Therefore, the Comptroller does not adopt or rely on the ALJ's continuing violation analysis, and Enforcement Counsel's exceptions to this analysis are moot.

## B. Partial Summary Disposition Was Proper

Anderson's exceptions advance both legal and factual arguments about the summary disposition process. *See* CRA Exceptions at 13-20; CRA Br. at 95-123. Anderson's legal arguments are: (1) the Administrative Procedure Act ("APA") does not allow for summary disposition; and (2) the ALJ did not adhere to the requirements of 12 C.F.R. Part 19 by issuing partial summary disposition for some of Enforcement Counsel's material facts.[66] *See id.* Beyond those purely legal arguments, she also advances factual arguments that the ALJ erred in finding partial summary disposition in favor of Enforcement Counsel. *See id.* Anderson urges the Comptroller to dismiss the entire case based on these alleged errors. *See generally id.*

For the reasons explained below, the Comptroller rejects both of Anderson's legal arguments as meritless. To address Anderson's factual arguments, the Comptroller reviewed the summary disposition record, including Enforcement Counsel's SOMFs and the evidence cited therein, as well as Anderson's responses to the SOMFs and any evidence cited therein. Based on

---

[66] Anderson also complains that the ALJ relied on OCC decisions not available to her. *See* CRA Br. at 119-21. Anderson points to one case cited by Enforcement Counsel that she claims the OCC did not publish. This decision, however, is available on Westlaw. *See In the Matter of Texas National Bank*, Nos. OCC-AA-EC-92-88, OCC-AA-EC-92-90, OCC-AA-EC-92-92, 1994 WL 17121289 (OCC Sept. 28, 1994). In any case, the Comptroller does not rely on unpublished precedent in this Final Decision. This exception is therefore rejected.

this review, the Comptroller finds that the ALJ erred in finding that some of Enforcement Counsel's material facts were undisputed. However, these errors do not require dismissal of the case or remand because, as detailed in Parts VI and VII, there is still sufficient evidence in the record to support both the prohibition and the CMP against Anderson.

1. Summary disposition is allowed in OCC administrative actions

Anderson's first legal argument is that the text of the APA does not allow for summary disposition. *See* CRA Exceptions at 13; CRA Br. at 101-05. Anderson points to the text of 5 U.S.C. § 556(d), arguing that she has a statutory right to present oral and documentary evidence, submit rebuttal evidence, and to conduct cross-examination at an on-the-record hearing. *See id.* Beyond this statutory argument, Anderson cites to an academic article that argues administrative summary judgment in SEC cases is unlawful under the APA. *See generally id.*

This argument is incorrect. Section 916 of FIRREA expressly allows for summary disposition for OCC administrative hearings under 12 U.S.C. § 1818. *See* FIRREA, Pub. L. No. 101-73, § 916, 103 Stat. 183, 486-87 (1989). Section 916 states:

> Before the close of the 24–month period beginning on the date of the enactment of this Act, the appropriate Federal banking agencies (as defined in section 3(q) of the Federal Deposit Insurance Act)[67] and the National Credit Union Administration Board shall jointly—
>
> (1) establish their own pool of administrative law judges, and
>
> (2) develop a set of uniform rules and procedures for administrative hearings, *including provisions for summary judgment rulings where there are no disputes as to material facts of the case*.

*Id.* (emphasis and footnote added). This provision of FIRREA, enacted after the APA, expressly allows for summary disposition. Anderson does not address this in her exceptions. *See* CRA

---

[67] 12 U.S.C. § 1813(q)(1) (defining appropriate Federal banking agency to include the OCC).

Exceptions at 13; CRA Br. at 101-05. The Comptroller rejects this exception, as Congress expressly authorized summary disposition in OCC administrative action.[68]

### 2. 12 C.F.R. Part 19 allows for partial summary disposition

Anderson's second legal argument is that the ALJ improperly entered partial summary disposition under 12 C.F.R. Part 19. *See* CRA Exceptions at 13; CRA Br. at 105-06, 108-10. She argues that the ALJ did not have the power to enter partial summary disposition *sua sponte* or without prior notice to the nonmovant. *See* CRA Br. at 105-06. She also argues that the ALJ can only resolve "claims" in summary disposition, which she argues are causes of action. *See id.* at 108-10. She argues the ALJ erred by resolving material facts instead of causes of action. *See id.*

The Comptroller rejects these arguments. The text of 12 C.F.R. §§ 19.29 and 19.30 allow the ALJ to grant partial summary disposition and resolve factual claims. Twelve C.F.R. § 19.29(b)(1) allows a party to move "for summary disposition in its favor of all or any part of the proceeding." Twelve C.F.R. § 19.30 states:

> If the administrative law judge determines that a party is entitled to summary disposition as to certain claims only, he or she shall defer submitting a recommended decision as to those claims. A hearing on the remaining issues must be ordered. Those claims for which the administrative law judge has determined that summary disposition is warranted will be addressed in the recommended decision filed at the conclusion of the hearing.

---

[68] Anderson's argument fails for other reasons as well. She argues that she was entitled to an oral hearing under the APA, but she did receive a hearing—a 38-day oral hearing where she was able to present oral and documentary evidence, submit rebuttal evidence, and conduct cross-examination. Moreover, case law fails to support her assertion that the APA's text does not allow for summary disposition. *See, e.g., Crestview Parke Care Center v. Thompson*, 373 F.3d 743, 750 (6th Cir. 2004) ("[I]t would seem strange if disputes could not be decided without an oral hearing when there are no genuine issues of material fact."). Even the academic article that Anderson relies upon cites only to cases that have *upheld* the use of summary disposition in SEC administrative actions. *See* Alexander I. Platt, *Is Administrative Summary Judgment Unlawful?*, 44 HARV. J.L. & PUB. POL'Y 239, 292-96 (2021).

Appellate Case: 25-1079     Page: 1318     Date Filed: 05/16/2025 Entry ID: 5517644

Reading these together, the Comptroller finds that the ALJ can enter partial summary disposition when a party moves for either partial or total summary disposition. *See also* 56 Fed. Reg. 27790, 27795 (June 17, 1991) ("If only a portion of the proceeding warrants summary disposition, the administrative law judge will accordingly limit the issues for hearing to the remaining claims[.]"). This accords with the intent of Part 19 to encourage judicial economy and limit the hearing to the genuine controversies.[69]

Similarly, the text of 12 C.F.R. § 19.30 allows the ALJ to resolve material facts. As a definitional matter, the word "claim" in § 19.30 is best interpreted as a factual claim—or, as Enforcement Counsel styled it, a material fact. Black's Law Dictionary's first definition for claim is: "1. A statement that something yet to be proved is true <claims of torture>." *Claim*, BLACK'S LAW DICTIONARY (11th ed. 2019). The preamble also uses the words "claim" and "issue" interchangeably, indicating that the word "claim" in 12 C.F.R. § 19.30 does not mean entire causes of action. *See* 56 Fed. Reg. 27790, 27795 (June 17, 1991). It is in the interest of judicial economy to limit hearings to factual claims where there is a genuine dispute. Furthermore, OFIA ALJs routinely issue partial summary disposition orders in response to motions for total summary disposition[70] and routinely issue partial summary disposition orders

---

[69] Anderson faults the ALJ for not giving notice that he was considering partial summary disposition. *See* CRA Br. at 105-06. While the Comptroller does not believe this was an error, any error was harmless. Anderson submitted extensive briefing and exhibits and responded to each of Enforcement Counsel's SOMF.

[70] *See, e.g.*, *In the Matter of Joseph Jiampietro*, Nos. 16-012-E-I, 16-012-CMP-I, 2021 WL 7906101 (FRB, Dec. 7, 2021) (ALJ granting partial summary disposition in response to a motion for total summary disposition); *In the Matter of Frank E. Smith*, No. 18-036-E-I, 2021 WL 7906091 (FRB, Mar. 24, 2021) (noting that the ALJ granted partial summary disposition in response to a motion for total summary disposition).

that resolve factual claims rather than entire causes of action.[71] The Comptroller sees no reason within the text of Part 19 to upend this practice.

### 3. The Comptroller's *de novo* review has cured any remaining errors related to summary disposition

Anderson advances a variety of factual arguments about summary disposition. She argues that the ALJ did not test the sufficiency or admissibility of the evidence Enforcement Counsel presented. *See* CRA Br. at 112-16. She also argues that the ALJ did not view evidence in the light most favorable to her as the non-moving party. *See id.* at 110-12. She further argues that the ALJ entered findings despite obvious disputes. *See id.* at 116-18; *see also* CRA Exceptions at 19.[72]

To address these arguments and cure any deficiencies, the Comptroller conducted a *de novo* factual review of the SD Order's factual findings, Enforcement Counsel's SOMFs, and the evidence cited by all parties. Where this Final Decision relies on a finding or SOMF from the SD Order, the Comptroller's review has determined that the finding or SOMF is properly supported by the evidence adduced at the summary disposition stage. For the reasons explained in this Final Decision, the SD Order SOMFs where there was not a genuine dispute of material fact— combined with the evidence and testimony from the hearing—support the issuance of a prohibition order and a CMP against Anderson.[73]

---

[71] *See, e.g.*, *Jiampietro*, 2021 WL 7906101 (Order for partial summary disposition); *In the Matter of Bank of Louisiana*, Nos. FDIC 12-489b, FDIC 12-479k, 2016 WL 10879437 (FDIC, May 17, 2016) (Recommended Decision).

[72] Anderson also objects to the first 139 pages of the SD Order, which she argues were procedurally and substantively flawed. *See* CRA Br. at 121-23; CRA Exceptions at 18-19. The Comptroller did not consider these introductory pages in this decision. As explained throughout this decision, the Comptroller considered and reviewed the rest of the SD Order and the RD.

[73] Enforcement Counsel argued in its exceptions that testimony and evidence presented at the hearing further supported the ALJ's summary disposition findings. *See* EC Exceptions Br. at 99-102. This argument has some merit, and the Comptroller agrees with it to the extent detailed in Parts VI and VII.

Appellate Case: 25-1079    Page: 1320    Date Filed: 05/16/2025 Entry ID: 5517644

### C. The ALJ Properly Rejected Anderson's Affirmative Defense of Estoppel

Anderson's exceptions assert that the ALJ erred by striking her affirmative defense of estoppel in two respects: (1) by finding that the defense was insufficiently pled and (2) by rejecting the defense on the merits. *See* CRA Br. at 602-06; CRA Exceptions at 634. For the reasons detailed below, the Comptroller finds that the ALJ properly rejected this affirmative defense.

Government estoppel is applied "only in the narrowest of circumstances," *Linkous v. United States*, 142 F.3d 271, 277 (5th Cir. 1998), and requires the party asserting the claim to bear a "heavy burden." *Morgan v. Comm'r*, 345 F.3d 563, 566 (8th Cir. 2003). In addition to proving the traditional estoppel elements, the party must show that the government engaged in affirmative misconduct. *Id.* This misconduct cannot rest on an omission, a failure to discharge an obligation, or an "erroneous representation." *Rider v. U.S. Postal Serv.*, 862 F.2d 239, 241 (9th Cir. 1988); *see also Mich. Exp., Inc., v. United States*, 374 F.3d 424, 427 (6th Cir. 2004). Instead, the alleged misconduct must involve the government "intentionally or recklessly" misleading the claimant, *Mich. Exp., Inc.*, 374 F.3d at 427, through "an affirmative misrepresentation" or "concealment of a material fact," *Watkins v. U.S. Army*, 875 F.2d 699, 707 (9th Cir. 1989).

Here, Anderson's assertion that her estoppel defense was properly pled can be easily rejected as her pleadings plainly did not assert any affirmative misconduct by the OCC. *See* Am. Ans. at 24. ("Because OCC knew about the issues raised in the Notice of Charges and *took no action* for many years, its claims are barred by the doctrines [of] estoppel and waiver") (emphasis added).[74]

---

[74] Anderson also incorporated the other two Respondents' affirmative defenses by reference. Those answers likewise fail to properly plead that the OCC engaged in affirmative misconduct. *See e.g*, McLinko Ans., Sixth Affirmative Defense (alleging the OCC "failed to exercise its

Appellate Case: 25-1079    Page: 1321    Date Filed: 05/16/2025 Entry ID: 5517644

Moreover, Anderson fails to demonstrate how the record supports active concealment or affirmative misconduct by the OCC. Anderson claims that "the ALJ refused to recognize that the OCC's contemporaneous positive feedback to [her], and its subsequent attempt to find Ms. Russ Anderson liable for that same conduct, amounted to affirmative misconduct." CRA Br. at 603. This theory cannot square with the limited application of government estoppel. Courts only recognize government estoppel in cases where "the government's wrongful act will cause a serious injustice, and the public's interest will not suffer undue damage by imposition of the liability." *Morgan v. Heckler*, 779 F.2d 544, 545 (9th Cir. 1985); *Morgan v. Comm'r*, 345 F.3d at 566-67 (holding that "negligence and possible bad faith" in an IRS officer's representations about tax liability were "insufficient grounds for estoppel"). Here, neither of these conditions is met. *See generally supra* Part VI.

### D. The ALJ Did Not Unconstitutionally Restrict Communications with a Critical Witness

Anderson asserts that the ALJ's Order restricting her (and the other Respondents') communications with former Respondent Carrie Tolstedt while Tolstedt's parallel criminal case was pending was unconstitutional because it interfered with Anderson's ability to prepare a defense.[75] *See* CRA Br. at 67-75. For the reasons explained below, the Comptroller rejects this exception.

---

regulatory authority"). "[A] failure to discharge an affirmative obligation, [] never amounts to affirmative misconduct." *Matamoros v. Grams*, 706 F.3d 783, 794 (7th Cir. 2013); *see also Lanvin v. Marsh*, 644 F.2d 1378, 1382-84 (9th Cir. 1981) (an alleged failure to inform or discharge an obligation does not establish the affirmative misconduct necessary to support a government estoppel claim).

[75] At the request of the Attorney General, Enforcement Counsel moved for a stay of the administrative proceeding against Respondent Tolstedt to limit her ability to utilize civil discovery mechanisms to obtain information and evidence that she would otherwise not be entitled to under the Federal Rules of Criminal Procedure. In granting the stay, the ALJ clearly highlighted this fact as the basis for imposing discovery controls on Respondent Tolstedt. The

Appellate Case: 25-1079     Page: 1322     Date Filed: 05/16/2025 Entry ID: 5517644

In determining the validity of such restrictions, courts balance the justification for the restrictions against any harms they may impose. *See e.g.*, *Kines v. Butterworth*, 669 F.2d 6, 10 (1st Cir. 1981) (finding no violation from restricting access to witness because there was no "specific prejudice resulting from the non-access"); *United States v. Gonzalez*, No. 17-CR-709 (WFK), 2018 WL 2186406, at *3 (E.D.N.Y. May 11, 2018) (finding no error in imposing restriction because "the defendant never identified any evidence or offered any argument to establish how the restriction actually prevented him from preparing for his trial"). Here, there was a compelling reason for the restriction—the parallel Department of Justice criminal proceedings—and the record shows that Anderson was not prejudiced by the restriction.

Anderson fails to point to any specific information that Tolstedt might have provided her that was unavailable from other sources prior to the issuance of the Stay Order. The OCC produced more than 90 sworn statement transcripts and approximately 1.6 million other documents requested by the Respondents prior to the Stay Order. *See* Opposition to the Request for Clarification of the Order Regarding Enforcement Counsel's Motion to Stay the OCC's Enforcement Action Against Respondent Carrie Tolstedt at 15, Oct. 5, 2020. Moreover, Anderson had over seven months to engage in conversations with Tolstedt prior to issuance of the Stay Order, and she clearly *did* engage in those conversations, as evidenced by their joint filings. *Id.* In addition, the record shows that it is highly unlikely that Tolstedt would have offered Anderson much help in defending the charges given her stipulation that she would invoke her Fifth Amendment privilege against self-incrimination if called to testify. Clarification

restriction on communication was entered as part of this stay order. *See* Order Regarding EC's Motion to Stay the OCC's Enforcement Action Against Respondent Carrie Tolstedt, Sept. 9, 2020 ("Stay Order"); *see also* Order Regarding Respondents' Request for Clarification of the Order Regarding Enforcement Counsel's Motion to Stay the OCC's Enforcement Action Against Respondent Carrie Tolstedt, Oct. 6, 2020 ("Clarification Order").

Add. 1321

Appellate Case: 25-1079    Page: 1323    Date Filed: 05/16/2025 Entry ID: 5517644

Order at 5. These facts undermine Anderson's claim that denial of communications with Tolstedt interfered with her ability to prepare a defense.

### E. The ALJ's Discovery Orders Restricting Certain Testimony and Documents Pertaining to NBEs Were Not Arbitrary and Capricious

In her exceptions, Anderson claims that the ALJ arbitrarily blocked certain discovery to shield the OCC by (1) quashing subpoenas to certain NBEs, (2) not requiring the disclosure of exculpatory materials, and (3) blocking discovery of OCC personnel information. CRA Br. at 76-91. The Comptroller has considered these exceptions and rejects them.

The Uniform Rules, 12 C.F.R. § 19.5(b), confer broad powers on the ALJ, including "all powers necessary to conduct the proceeding," which includes the power to consider and rule upon all procedural and other motions including discovery motions. *See also id.* § 19.25. The ALJ's rulings on these matters did not constitute an "abuse of discretion," and, accordingly, the Comptroller does not overturn them. *Brooks*, 1993 WL 13966512, at *14.

As to quashing the subpoenas of several NBEs, *see* CRA Br. at 76-80, the Comptroller reviewed the relevant motions and responses and finds that the ALJ fully considered and appropriately rejected respondent's legal and factual arguments in quashing the subpoenas. *See* Order Regarding EC's Motions to Quash Hearing Subpoenas Directed to Certain OCC Personnel and Strike Them from Respondents' Witness Lists and for Order to Show Cause, Aug. 18, 2021.[76]

---

[76] The ALJ provided multiple grounds for quashing the subpoenas, including but not limited to the fact that these witnesses were among 79 total witnesses listed in her prehearing papers who would testify to the same or similar facts, and because her witness list ignored the ALJs specific instructions to take into account the findings previously made in his SD Order in identifying witnesses and their relevant testimony. Moreover, the ALJ specifically considered and found that Anderson had failed to establish a factual predicate for her claim that these witnesses were relevant to the issue of bias and credibility.

Appellate Case: 25-1079    Page: 1324    Date Filed: 05/16/2025 Entry ID: 5517644

In addition, Anderson's assertion that the ALJ erred in striking discovery requests, including requests for "exculpatory information under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny" can be summarily disposed of because neither the APA nor the Uniform Rules extends the *Brady* standard to OCC administrative hearings.[77] *See* CRA Br. at 83-87.

Moreover, Anderson's assertion that the ALJ wrongly blocked discovery requests seeking the personnel records of the NBEs who supervised the bank also lacks merit. *See id.* at 87-91. The Comptroller has previously recognized that public policy considerations weigh against disclosure of bank examiner personnel files and that personnel files are not needed to establish or impeach witness credibility. *In the Matter of Texas National Bank*, Nos. OCC-AA-EC-88, 89, OCC-AA-EC-90, 91, OCC-AA-EC-92, 93, 1993 WL 13967919 at *3-4 (OCC Feb. 26, 1993). In this case, the ALJ properly evaluated the relevant factors supporting his finding that Respondents failed to advance a sufficient basis to justify inquiries into the personnel files of the NBEs. *See* Order Regarding Enforcement Counsel's Motion for Protective Order Regarding Sensitive OCC Personnel Information, Nov. 2, 2020.[78]

---

In addition, the Comptroller rejects Anderson's assertion that the ALJ's order striking pre-2010 discovery was in error, *see* CRA Br. at 80-83, finding the ALJ appropriately balanced the proportionality and the relevance and scope of documents the parties had agreed were discoverable. *See* Order Regarding EC's Motions to Limit and Strike Portions of the First Requests for Production of Documents by Respondents Anderson and Strother, Mar. 20, 2020.

[77] *Brady* requires the prosecution in a criminal case to turn over all evidence to the defense that might exonerate the defendant. *See United States v. Brady*, 373 U.S. 83 (1963). Although some administrative agencies have adopted rules requiring disclosure of *Brady* material, as Anderson recognizes, the OCC has not, and the cited Executive Order does not require it to do so.

[78] Anderson also alleges that the ALJ similarly erred in disallowing evidence concerning examiner competence, credibility, and bias during the hearing. CRA Br. at 91-92. The proffered testimony generally relates to when the examiners knew certain information and what they did with such information, based on the theory that the examiners had motives to blame Respondents for what they had failed to figure out. For the reasons stated above, this proffered testimony is not relevant or material to Anderson's alleged misconduct.

Appellate Case: 25-1079   Page: 1325   Date Filed: 05/16/2025 Entry ID: 5517644

### F. Anderson Was Not Prejudiced by the ALJ's Prehearing Rulings

In her exceptions, Anderson alleges that she was "burdened" by several prehearing rulings that she claims had no basis in the Uniform Rules. CRA Br. at 92-95. The Comptroller has considered these exceptions and rejects them for the reasons set forth below.

As noted above, *see supra* Part IV, the ALJ has broad powers to consider and rule upon all prehearing motions, and those rulings should only be overturned where they amount to "an abuse of discretion" or constitutes "manifest unfairness." *Brooks*, 1993 WL 13966512, at *14. The limits the ALJ set relating to depositions, the sufficiency of Anderson's prehearing statements, and the timing to file motions regarding her affirmative defenses all clearly fall within these broad powers and were not an abuse of discretion. Anderson's briefing cites no case law that suggests otherwise. Moreover, despite her claims she was prejudiced by these various rulings, Anderson fails to point to any particularized harms resulting from the rulings.

In addition, Anderson claims that the ALJ's denial of her motion to extend the deadline to file a supplemental expert report was arbitrary and capricious. CRA Br. at 124-29. After review of the relevant motions and orders, the Comptroller rejects this exception. The denial did not occur in a vacuum. Only months before, in September 2020, the ALJ had previously denied cross-motions by both parties seeking extensions of time. *See* Order Regarding EC's Motion Requesting Extension of the Current Schedule and Respondents Russ Anderson's et al. Cross-Motion for Adjustment of Interim Deadlines, at 5-6, Sept. 17, 2020. Moreover, Anderson's exceptions focus on the technological issues she faced in collecting the data in a timely manner but fails to explain why she waited months after discovery began before requesting the data. Therefore, the denial of the requested deadline extension was not an abuse of discretion.

**X.     EXCEPTIONS REGARDING HEARING ERRORS**

**A.  The ALJ Did Not Infringe on Anderson's Due Process Rights in Conducting the Hearing**

Anderson asserts that the ALJ infringed on her due process rights during the hearing in four ways: (1) making new findings of fact in his "opening statement" prior to the presentation of evidence; (2) denying her the right to counsel by prohibiting her from consulting with her attorney during breaks and recesses from her testimony; (3) setting the order of and timing for her presentation of witnesses; and (4) requiring her to conduct direct examination of witnesses before Enforcement Counsel rested its case. *See* CRA Br. at 129-38. The Comptroller rejects each of these exceptions for the reasons explained below.

First, the hearing was conducted pursuant to the Uniform Rules, 12 C.F.R. Part 19, and Anderson has not pointed to anything in those rules that prohibit an ALJ from introducing himself and providing some background of the case, including a summary of what previously occurred in the case prior to the presentation of the evidence. *See e.g.,* Hr'g Tr. at 6:8-11:5, 44:6-62:6. Moreover, Respondents specifically asked the ALJ if his opening statements constituted additional findings, and the ALJ rejected that characterization, stating, "No additional findings. It was just an opening statement." *Id.* at 63:21-22. Most importantly, even if the ALJ had made additional findings, Anderson was still provided a meaningful opportunity to be heard at the hearing as well as the opportunity to challenge the findings and to have them reviewed by the Comptroller. Thus, the "opening statement" did not violate Anderson's due process rights.

Second, Anderson was not denied her right to counsel. The administrative right to counsel under due process "is not synonymous with, and certainly not greater than the Sixth Amendment right to counsel." *See In re Ulrich*, No. AA-EC-00-40, 2003 WL 21307609 (OCC Jan. 31, 2003) (Recommended Decision). Even under the Sixth Amendment, Anderson would

only have a right to consult with counsel *before* she began to testify. *Perry v. Leeke*, 488 U.S. 272, 281-83 (1989).[79] She does not have an absolute right to consult with her attorney during breaks and recesses from her testimony in this administrative hearing. *See In re Ulrich*, No. AA-EC-00-40, 2003 WL 22379189, at *10 (OCC Oct. 15, 2003) (Final Decision) (finding that while the APA allows parties to be "accompanied, represented, and advised by counsel," it does not state or suggest that parties are entitled to discuss their ongoing testimony with counsel while on breaks at an administrative hearing). In addition, the ALJ correctly found that Anderson's counsel failed to timely object to this restriction by waiting until more than three months after the restriction was first imposed, *see* Hr'g Tr. at 13:16-14:8, 310:22-311:14, and because the restriction had already been followed by the other Respondents' counsel and Enforcement Counsel, *see id.* at 9187:16-9189:16 (raising objection for first time), 9192:19-9193:6 (Enforcement Counsel noting restriction previously abided by others).

The last two exceptions—setting the order and timing of witnesses and requiring Anderson to conduct direct examination of witnesses before the government rested its case—are squarely addressed by the OCC's Uniform Rules. The rules state that hearings must be conducted to provide a "fair and expeditious presentation" of the issues. 12 C.F.R. § 19.35(a)(1). To accomplish this, the rules provide ALJs with "all powers necessary" to fairly and impartially conduct proceedings and to avoid unnecessary delay. *Id.* § 19.5(a). The rules also provide ALJs with the general power "[t]o regulate the course of the hearing and the conduct of the parties and their counsel," *id.* § 19.5(b)(5), and the rules explicitly contemplate ALJs changing the order of presentation, *see id* § 19.35(a)(2). The ALJ's actions here were reasonable and did not change

---

[79] The protections provided by the Sixth Amendment do not apply to administrative hearings, because such protections "are explicitly confined to 'criminal prosecutions.'" *Austin v. United States*, 509 U.S. 603, 608 (1993); *see also United States v. Ward*, 448 U.S. 242, 248 (1980).

Appellate Case: 25-1079    Page: 1328    Date Filed: 05/16/2025 Entry ID: 5517644

Anderson's burden of proof or prevent her from meaningfully responding to the government's case. *See e.g.*, Hr'g Tr. at 60:11-20.

The fundamental requisite of due process is the opportunity to be heard at a meaningful time and in a meaningful manner. The administrative hearing provided Anderson such an opportunity.

### B. Anderson's Exceptions Regarding Evidence

Anderson posits numerous evidentiary errors in her exceptions. *See* CRA Br. at 144-284. The Comptroller has considered each of these objections and rejects them because they either lack merit, or are harmless, or because the Comptroller does not rely upon the challenged evidence in this decision. As discussed above, ALJs have significant discretion to determine the scope of the proceedings. *See* 12 C.F.R. § 19.5. This broad discretion also extends to evidentiary rulings. The Uniform Rules provide that evidence that would be admissible under the Federal Rules of Evidence ("FRE") is admissible in adjudicatory proceedings, *id.* § 19.36(a)(2), and that, except as otherwise provided, "relevant, material, and reliable evidence that is not unduly repetitive is admissible to the fullest extent authorized by the Administrative Procedure Act and other applicable law," *id.* § 19.36(a)(1). If evidence meets this latter standard but would be inadmissible under the FRE, the ALJ may not deem the evidence inadmissible. *Id.* § 19.36(a)(3).

Many of the alleged evidentiary errors were previously raised in an omnibus motion *in limine* and were rejected by the ALJ. *See* Respondents' Omnibus Motion in Limine, Sept. 3, 2021; Order Nunc Pro Tunc Regarding the Parties' Motions Seeking Orders in Limine, Oct. 1, 2021; Order Regarding the Parties' Motions Seeking Orders in Limine, Sept. 9, 2021. In that Omnibus Motion, Anderson (along with the other Respondents) moved to exclude much of the evidence on the grounds that the evidence would be inadmissible under the FRE. However, evidence that is inadmissible under the FRE is admissible in an administrative proceeding as

long as it is relevant, material, reliable and not unduly repetitive. *See* 12 C.F.R § 19.36(a)(3). Given the ALJ's substantial discretion to rule on evidentiary matters under the Uniform Rules, the Comptroller finds that the ALJ's rulings that the evidence was admissible under the Uniform Rules were not an abuse of discretion.

In her exceptions briefing, Anderson once again incorrectly relies on the FRE to support her assertions that the ALJ erred in admitting evidence. For example, Anderson objects to the admissibility of certain evidence on hearsay grounds, including expert reports, board reports, investigative documents, and newspaper articles. *See e,g*, CRA Br. at 201-06, 217-28, 230-45. However, even Anderson recognizes that hearsay evidence is admissible if it is relevant, material, reliable, and not unduly repetitive. *See id.* at 138 (citing 12 C.F.R. § 19.36). The Comptroller rejects Anderson's evidentiary exceptions to the extent she bases her arguments on the FRE. Similarly, Anderson generally asserts that some pieces of evidence and related testimony were wrongly admitted because they were unreliable, such as reports of supervisory activity, EthicsLine reports, and settlement documents. S*ee, e,g, id.* at 245-46, 252-67. To the extent the Comptroller has relied on such evidence in making findings in this decision, the Comptroller has reviewed the cited evidence and determined that the evidence is relevant, material, reliable, and not unduly repetitive. Therefore, Anderson's exceptions on these grounds are hereby rejected.

Anderson's exceptions also challenge the admissibility of evidence and testimony relating to communications with Tolstedt, *see id.* at 155-59, the OCC's supervision and knowledge of SPM, *id.* at 159-64, and the characterization of Anderson's testimony regarding terminations, *id.* at 248-52. The Comptroller discusses and rejects these arguments in other sections of this decision. *See supra* Part IX.B.C-F; *infra* Part XI.

The Comptroller likewise rejects Anderson's exception that the ALJ erred by admitting evidence from outside of the 2013 to 2016 time period—which the ALJ had stated was the "relevant" time period—because doing so violated her rights under the APA and the Due Process Clause. *See generally* CRA Br. at 144-55. The Comptroller finds that Anderson was on notice that evidence outside of this time period was not excluded from being presented during the hearing. *See e,g*, Hr'g Tr. at 35:8-36:5 (ALJ agreeing that the time period from 2010 to October 3, 2013 was "still in play" and he was not "going to rule [it] out"); Order Regarding the Parties' Motions Seeking Orders in Limine at 32, Sept. 9, 2021. Although the ALJ limited the focus of Anderson's misconduct to the period of 2013 to 2016, this did not operate to exclude evidence that pertained to or discussed events outside of this time period. *See id.* Accordingly, the Comptroller finds that the ALJ did not abuse his discretion by allowing such evidence and letting the parties present arguments about the extent to which that evidence demonstrated or failed to demonstrate that Anderson committed misconduct within the relevant time period.

Anderson also asserts that the ALJ erred by limiting her right to cross-examination. *See* CRA Br. at 173-76. In an administrative enforcement hearing, there is no absolute right to conduct cross-examination. *Cellular Mobile Sys. of Pa., Inc. v. FCC*, 782 F.2d 182, 198 (D.C. Cir. 1985) ("Cross-examination is therefore not an automatic right conferred by the APA; instead, its necessity must be established under specific circumstances by the party seeking it."); 12 C.F.R. § 19.35(a) (party only entitled "to conduct such cross examination as may be required for full disclosure of the facts."). Moreover, setting limits on cross-examination is clearly within the ALJ's broad discretion. *See* 12 C.F.R. § 19.5. As part of the *de novo* review prior to issuing this final decision, the Comptroller has reviewed and considered Anderson's proffers relating to

Appellate Case: 25-1079    Page: 1331    Date Filed: 05/16/2025 Entry ID: 5517644

excluded testimony. *See, e.g.*, CRA Br. at 175-76; *see also infra* Part XI.E.[80] While, in some cases, the Comptroller may not have made the same initial determinations as the ALJ, the Comptroller finds that the ALJ's limits on cross-examination were not an abuse of discretion and did not constitute manifest unfairness.

### C. Enforcement Counsel's Exceptions Regarding Evidence

Enforcement Counsel also excepts to the ALJ's decisions about evidence—namely, that the ALJ wrongfully excluded certain evidence. *See* EC Exceptions Br. at 104-33. Enforcement Counsel argues that the ALJ should have allowed the testimony of Michael Bacon and that the ALJ should not have excluded certain pre-2013 evidence. *See id.*[81] The Comptroller has reviewed these exceptions and, for the reasons set forth below, rejects them. The ALJ's decisions were not an abuse of discretion and did not constitute manifest unfairness toward Enforcement Counsel. *See Brooks*, 1993 WL 13966512, at *14.

First, the ALJ reasonably found that Michael Bacon's testimony was only marginally relevant. The ALJ found Bacon's testimony to be unreliable and repetitive. *See* Hr'g Tr. at 7723:15-7724:6. Nothing in Enforcement Counsel's proffer at hearing, *see id.* at 7714:20-7718:23, or in Enforcement Counsel's briefing shows that this determination was an abuse of discretion or constituted manifest unfairness.

---

[80] Many of the instances of alleged error are harmless because the Comptroller does not rely on the offending testimony or evidence in this final decision. *See, e.g.*, Anderson's exceptions concerning R. Exh. 17863 and OCC Exh. 1370, which she claims were admitted outside the scope of Anderson's cross examination. CRA Br. at 174. The Comptroller does not use or rely on those exhibits in this decision.

[81] Enforcement Counsel argues that it was significantly prejudiced by the ALJ excluding pre-2013 evidence. *See* EC Exceptions Br. at 115-18. Given that the ALJ recommended a prohibition order and the $10 million CMP sought by Enforcement, this argument is without merit, and the Comptroller rejects it.

Appellate Case: 25-1079    Page: 1332    Date Filed: 05/16/2025 Entry ID: 5517644

Similarly, the Comptroller declines to admit the additional pre-2013 evidence Enforcement Counsel offers at this stage of the proceeding. Any error here is harmless, given the Comptroller's ultimate decision. The ALJ's reasoning for excluding some evidence predating 2013 was that the *Los Angeles Times* articles published in 2013 established the point at which Anderson had uncontroverted knowledge of SPM. *See* Order Regarding the Parties' Motions Seeking Orders in Limine at 31-32, Sept. 9, 2021. The Comptroller understands that this evidence might buttress Enforcement Counsel's case against Anderson; as discussed above, however, the admitted evidence already supports the case.[82] Enforcement Counsel argued, for example, that this decision allowed Anderson to advance misleading arguments that she lacked knowledge of the widespread nature of SPM at the Bank. *See* EC Exceptions Br. at 116. As explained in Part VI.A, however, the admitted evidence shows that she knew or should have known that SPM was widespread and systemic. Even if the ALJ erred by generally excluding pre-2013 evidence, this error did not prejudice Enforcement Counsel. The Comptroller rejects this exception accordingly.

### D. The ALJ Was Not Required to Recuse Himself

Anderson's exceptions assert three broad arguments for disqualification of the ALJ: (1) the ALJ prejudged the case; (2) the ALJ engaged in *ex parte* communications with Enforcement Counsel; and (3) the ALJ was biased and incapable of managing the case. *See* CRA Br. at 290. The Comptroller rejects these exceptions for the reasons detailed below.

---

[82] The Comptroller notes that the ALJ did not *categorically* exclude all pre-2013 evidence, as he stated such evidence could be admitted with a "particular showing of materiality." Order Regarding the Parties' Motions Seeking Orders in Limine at 32, Sept. 9, 2021. He also stated at the hearing that he would not rule out evidence between 2010 and 2013 but generally did not think it relevant. Hr'g Tr. at 36:2-5. The ALJ did admit evidence pre-dating 2013 using this standard. *See, e.g.*, OCC Exhs. 34, 38.

Appellate Case: 25-1079     Page: 1333     Date Filed: 05/16/2025 Entry ID: 5517644

First, to prevail on a claim of disqualification based on prejudgment, Anderson must prove that the ALJ had "demonstrably made up [his] mind about important and specific factual questions and [was] impervious to contrary evidence," and that the ALJ had a "closed mind on the merits of the case." *Power v. FLRA*, 146 F.3d 995, 1001-02 (D.C. Cir. 1998); *see Liteky v. United States*, 510 U.S. 540, 541 (1991). "[O]pinions formed by the [ALJ] on the basis of facts introduced or events occurring in the course of the current proceedings, or prior proceedings, do not constitute a basis for a bias . . . unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky*, 510 U.S. at 541. Similarly, statements made by an ALJ at the beginning of a hearing noting that he is "ready to rule" on a violation are insufficient to show prejudgment. *See Throckmorton v. Nat'l Transp. Safety Bd.*, 963 F.2d 441, 445 (D.C. Cir. 1992).

Anderson claims that the ALJ had prejudged the case because he made factual and quasi-legal findings before the hearing began. *See* CRA Br. at 288-93. This claim is not supported by the record. By the time the hearing began in September 2021, the ALJ had already entered substantial findings into the record throughout the summary disposition proceedings, and it was not error to refer to those findings in later parts of the proceedings. Moreover, Anderson points to the ALJ's "opening statement" at the hearing as evidence of prejudgment. CRA Br. at 292. But his opening remarks at the hearing do not show that the ALJ had demonstrably made up his mind about important and specific factual questions, that he was impervious to contrary evidence, or that he had a closed mind about the merits of the case. *Power*, 146 F.3d at 1001-02. On the contrary, the ALJ stated:

> Enforcement Counsel must provide a preponderance of substantial evidence to establish each of the remaining material facts supporting the charges that have not yet been determined through summary disposition. . . . Each party has the right to

Add. 1332
Appellate Case: 25-1079   Page: 1334   Date Filed: 05/16/2025 Entry ID: 5517644

present its case or defenses by oral and documentary evidence and to conduct
such cross-examination that may be required for full disclosure of the facts.

Hr'g Tr. at 60:14-24. Because the ALJ's opinions were formed based on facts and events that had already occurred in the proceedings, and because the ALJ had an open mind about the merits of the case, the Comptroller finds that there is no basis for disqualification of the ALJ based on prejudgment.

Second, the OCC's Uniform Rules provide that "the administrative law judge may not consult a person or party on any matter *relevant to the merits* of the adjudication, unless on notice and opportunity for all parties to participate." 12 C.F.R. § 19.9(e) (emphasis added). Anderson asserts that the ALJ engaged in improper *ex parte* communications with Enforcement Counsel,[83] which reflected an appearance of partiality and provided grounds for disqualification. CRA Br. at 294-98. Specifically, Anderson points to an occasion in which the ALJ met with attorneys from Enforcement Counsel, one of whom was in charge of COVID protocols for the OCC, in his office following a tour of the hearing site with all counsel, as well as various electronic communications between Enforcement Counsel, the ALJ, and a liaison for the ALJ regarding hearing logistics, electronic submissions, technical difficulties, troubleshooting, and data security standards. CRA Br. at 294-96. While the ALJ and Enforcement Counsel did communicate as stated, a review of the record reveals that the communications at issue were not improper *ex parte* communications, as they were purely administrative or logistical in nature. As

---

[83] Under 12 C.F.R. § 19.9, an *ex parte* communication is defined as any "material oral or written communication *relevant to the merits* of an adjudicatory proceeding that was neither on the record nor on reasonable notice to all parties that takes place between: (i) An interested person outside the OCC (including such person's counsel); and (ii) The administrative law judge handling that proceeding, the Comptroller, or a decisional employee." 12 C.F.R. § 19.9(a)(1) (emphasis added).

Appellate Case: 25-1079    Page: 1335    Date Filed: 05/16/2025 Entry ID: 5517644

such, they were not material or relevant to the merits of the adjudication within the scope of 12 C.F.R. § 19.9(a)(1).

Third, ALJs are presumed to be unbiased, and a bias claim requires a "high burden of persuasion." *Hasie v. OCC*, 633 F.3d 361, 368 (5th Cir. 2011); *see also Schweiker v. McClure*, 456 U.S. 188, 195 (1982); *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *Partee v. Astrue*, 638 F.3d 860, 865 (8th Cir. 2011) ("There is a 'presumption of honesty and integrity in those serving as adjudicators.'" (quoting *Withrow*, 421 U.S. at 47)). For bias to rise to the level requiring disqualification, it must "stem from an extrajudicial source and result in an opinion on the merits on some other basis than what the judge learned from his participation in the case." *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966); *Liteky*, 510 U.S. at 555; *see also Jenkins v. Sterlacci*, 849 F.2d 627, 634 (D.C. Cir. 1988).[84] Bias based on an ALJ's factual findings must "point to something outside of the record indicating prejudgment or [demonstrating] that the . . . findings were undermined by his animus toward" the accusing party. *Migliorini v. Director, OWCP*, 898 F.2d 1292, 1294 n.9 (7th Cir.), *cert. denied*, 498 U.S. 958 (1990).

Judicial rulings alone almost never constitute a valid basis for bias because in and of themselves, they cannot possibly show reliance upon an extrajudicial source; only in the rarest of circumstances do they evidence the degree of favoritism or antagonism required when no extrajudicial source is involved. *Grinnell Corp.*, 384 U.S. at 583; *Liteky*, 510 U.S. at 555. Similarly, bias cannot simply be inferred from a pattern of rulings by a judicial officer; it

---

[84] Anderson argues that the ALJ erred in applying an "actual bias" standard rather than an "appearance of bias" standard. CRA Br. at 285-90. The Comptroller finds that Anderson did not meet the burden of persuasion required to succeed on a bias claim under either standard.

Add. 1334

Appellate Case: 25-1079    Page: 1336    Date Filed: 05/16/2025 Entry ID: 5517644

requires evidence that the officer "had it 'in' for the party for reasons unrelated to the officer's view of the law, erroneous as that view might be." *McLaughlin v. Union Oil Co. of Cal.*, 869 F.2d 1039, 1047 (7th Cir. 1989); *see also Jenkins*, 849 F.2d at 634-35. Bias cannot be established merely by questioning the correctness of an ALJ's rulings, as rulings in administrative proceedings are not by themselves sufficient to show bias. *NLRB v. Honaker Mills*, 789 F.2d 262, 266 (4th Cir. 1986); *Orange v. Island Creek Coal Co.*, 786 F.2d 724, 728 (6th Cir. 1986).

Similarly, making an error of law does not constitute bias on the part of an ALJ. Even if an ALJ's rulings are erroneous, "a judicial ruling made in the ordinary course is not to be translated into bias by disappointed counsel." *Hedison Mfg. Co. v. NLRB*, 643 F.2d 32, 35 (1st Cir. 1981). Something more than unfavorable or even unsupported findings must be shown to sustain a charge of bias by the body that pronounces judgment in a judicial or quasi-judicial proceeding. *Cont'l Box Co. v. NLRB*, 113 F.2d 93, 95-96 (5th Cir. 1940); *see also NLRB v. Stackpole Carbon Co.*, 105 F.2d 167, 177 (3d Cir. 1939) (stating that erroneous conclusions by the NLRB do not establish bias by the NLRB), *cert. denied*, 308 U.S. 605 (1939). Further, "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Liteky*, 510 U.S. at 555. Lastly, ineffective case management is not grounds for disqualification of an ALJ under the APA. *See* 5 U.S.C. § 554, 556(b).

Anderson argues that the ALJ was biased based on his misapplication of the law and pattern of improper and unfair rulings throughout the proceedings. CRA Br. at 288-89, 298-99, 301. She also argues that the ALJ's comments and conduct, coupled with inconsistent and erroneous rulings, reflect an appearance of bias, regardless of whether actual bias was present, that justified disqualification. *Id.* at 286-90. It must first be noted that, as discussed above, bias

Appellate Case: 25-1079     Page: 1337     Date Filed: 05/16/2025 Entry ID: 5517644

cannot be established merely by questioning the correctness of an ALJ's rulings, as rulings in an administrative proceeding are not by themselves sufficient to show bias and mismanagement. Even a pattern of rulings requires a showing from outside of the record that the ALJ's rulings were undermined by his animus for a party in order to establish bias. Anderson makes no such showing here. Additionally, the record does not reveal any conduct, comment, or statement made by the ALJ that was so plainly inconsistent with his responsibility as an impartial decisionmaker as to establish bias. Therefore, the Comptroller finds that Anderson fails to meet the high burden of persuasion required to make a showing of actual bias or the appearance of bias.

## XI. EXCEPTIONS REGARDING THE RECOMMENDED DECISION

### A. The RD Generally Complies with the APA and Any Alleged Deficiencies Are Cured by This Final Decision

Anderson asserts that the RD violates the APA for several reasons. *See generally* CRA Br. at 304-420. For the reasons set forth below, the Comptroller rejects these exceptions.

Anderson asserts that the RD generally fails to explain the ALJ's reasoning. CRA Br. at 329-38. She further asserts that the ALJ mischaracterizes her testimony in inexplicable ways, thus failing to offer a reasoned explanation for the RD's findings. *Id.* at 385-95. More specifically, Anderson asserts that large parts of the ALJ's testimony summary were unclear and provided no purpose, that the RD unjustifiably criticized Anderson for failing to supply contemporaneous documentary evidence during testimony, and that the RD unjustifiably discounted Anderson's testimony due to "leading questioning." *Id.*

Agency decisions under the APA must "include a statement of . . . findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record." 5 U.S.C. § 557(c)(3)(A). Such administrative decisions must be "based on substantial evidence and reasoned findings." *Balt. & O. R. Co. v. Aberdeen & Rockfish R.*

*Co.*, 393 U.S. 87, 92 (1968). An agency is required to adequately explain its reasoning and fails to do so where it merely "list[s] the facts and state[s] its conclusions, but d[oes] not connect them in any rational way." *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1407 (D.C. Cir. 1995). Still, even agency decisions of "less than ideal clarity" will be upheld "if the agency's path may reasonably be discerned." *Id.* at 1404 (citations omitted).

The Comptroller recognizes that the RD is not a model of clarity; some of Anderson's arguments concerning the RD's deficiencies are valid. However, the Comptroller, as the ultimate decider of issues of fact and law under the APA, has the power to review the record *de novo* and cure any relevant factual or legal deficiencies in the RD. The Comptroller has done so in this Final Decision.

As explained in detail throughout this decision, the Comptroller's review has found that preponderant evidence supports the findings that Anderson engaged in *misconduct*, that the misconduct had the requisite *effect*, and that she possessed the requisite *culpability* so as to uphold a prohibition order against her. 12 U.S.C. § 1818(e). Further, the Comptroller has determined that preponderant evidence in the record supports the findings that Anderson recklessly engaged in *misconduct*, and that her reckless misconduct had requisite *effect*, so as to uphold a second-tier CMP against her. 12 U.S.C. § 1818(i)(2)(B). In this Final Decision, the Comptroller has cured any relevant factual or legal deficiencies in the RD that would have affected the outcome of the case by not relying on findings in the RD that are unsupported by substantial evidence.

The Comptroller recognizes that the RD fails in places to make clear the ALJ's actual findings and conclusions or the connection between the findings and conclusions. However, the Comptroller does not adopt the RD in its entirety, nor does the Comptroller accept all of the

ALJ's findings without exception. In reaching this Final Decision, the Comptroller has reviewed the entire record, has identified the relevant evidence and law, has relied on the evidence and law in reaching findings of fact and conclusions of law, and has presented a reasoned explanation for the imposition of prohibition and CMP orders. Moreover, any mischaracterization of Anderson's testimony in the RD, if it occurred, is not fatal to the outcome of the case because the Comptroller has reviewed Respondent's testimony in reaching this decision. Further, the Comptroller has not relied upon findings from the RD that are unsupported by the evidence. Although Anderson's arguments concerning the RD's deficiencies have some merit, these deficiencies have been cured on review and do not warrant the relief Respondent requests.

Anderson also asserts that the RD fails to address arguments made in her briefing, CRA Br. at 339-47, and ignores hearing testimony and contradictory evidence, *id.* at 347-60. Agency decisions under the APA must consider all parties' non-frivolous arguments. *See Dickson*, 68 F.3d at 1405; *Frizelle v. Slater*, 111 F.3d 172, 177 (D.C. Cir. 1997). An agency decision cannot "*entirely ignore[]* relevant evidence," *Morall v. DEA*, 412 F.3d 165, 178 (D.C. Cir. 2005) (emphasis in original), nor can it depend "merely on the basis of evidence which in and of itself justified it, without taking into account contradictory evidence." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487-88 (1951) (holding that the "substantiality of evidence must take into account whatever in the record fairly detracts from its weight"). An agency decision also cannot "provide[] virtually no explanation for [its] acceptance of some opinions and [its] rejection of others." *Barren Creek Coal v. Witmer*, 111 F.3d 352, 355 (3d Cir. 1997). Mere conclusory statements that do not provide a reasoned explanation will not suffice. *See Dickson*, 68 F.3d at 1407; *Amerijet Intern., Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014).

Appellate Case: 25-1079     Page: 1340     Date Filed: 05/16/2025 Entry ID: 5517644

While the RD does fail to fully address some arguments Anderson made in her briefing, the Comptroller has identified, considered, and analyzed all such relevant arguments in reaching this Final Decision. The Comptroller also recognizes that the RD fails in places to cite or analyze relevant evidence procured at the hearing, including testimony and exhibits entered into evidence. However, the Comptroller has again identified, considered, and analyzed the relevant evidence in reaching this Final Decision, weighing its importance and ascribing it to the conclusions stated. For example, Anderson asserts that the RD fails to address her arguments challenging the credibility of NBE testimony and the ALJ's appointment under the Appointments Clause of the U.S. Constitution. CRA Br. at 340-41. The Comptroller addresses both of these issues in this Final Decision. *See supra* Parts VIII, X, *infra* Part XI.E. A comparable analysis has been conducted for all relevant factual and legal issues, fully addressing any deficiencies that may exist in the RD.

**B.  The Executive Summary Is Not Unlawful**

Anderson argues that the ALJ's "Executive Summary," which was issued contemporaneously with the RD, is unlawful because neither the APA nor the OCC's Uniform Rules authorize the ALJ to issue an executive summary, CRA Br. at 326, and because the summary contains findings and conclusions not found in the RD, *id.* at 326-27. As explained below, the Comptroller rejects this exception.

Aside from this conclusory assertion and a bare citation to relevant parts of the APA and the OCC's Uniform Rules, Anderson provides no legal support that it is *unlawful* for an ALJ to issue and transmit an executive summary to the Comptroller. The OCC's rules provide only that the transmitted record "must include" the ALJ's recommended decision—not that it *cannot include* a summary. The APA likewise contains no provision barring the transmission of a summary. The Comptroller rejects the unsupported notion that the APA and the Uniform Rules

143

exert such unnecessary control over the form of the ALJ's transmitted recommendation to the Comptroller. Most importantly, as detailed several times throughout this opinion, it is the Comptroller's final decision—not the ALJ's recommendation—that forms the final agency action in this case. To the extent the ALJ erred in his executive summary by insufficiently explaining or supporting his findings, the Comptroller cures such errors in this decision. *See supra* Part XI.A.

### C. The RD's Reliance on Unadmitted or Excluded Evidence Does Not Prejudice Anderson

Anderson asserts that the ALJ erred because he relied on unadmitted or previously excluded evidence in the RD or relied on admitted evidence that should have been excluded. CRA Br. at 360-63. For the reasons set forth below, the Comptroller rejects this exception.

The Comptroller has already addressed Anderson's arguments concerning evidence she believes should have been excluded from evidence in Part X.B. The same reasoning applies to the use of that evidence in the RD. As noted previously, the ALJ has broad discretion under the Uniform Rules to rule on evidentiary matters, and the Comptroller has determined that he did not abuse that discretion. *See supra* Parts IX-X. And to the extent that the ALJ relied on any evidence that should have been excluded in the RD, the Comptroller has not relied on such evidence in the final decision. *See id.*

Anderson's argument regarding reliance on unadmitted or previously excluded evidence is based on a misunderstanding of the OCC's procedures and on a misreading of the ALJ's August 2, 2021 Supplemental Order Regarding Order Determining the Merits of EC's Motions for Summary Disposition ("August 2 Order"). Anderson excepts to dozens of findings in the RD on the basis that the ALJ relied on evidence unadmitted or excluded at hearing. But the vast

144

majority of those instances involved citations to summary disposition exhibits.[85] As the ALJ explained in his August 2 Order, the documents presented in support of summary disposition are part of the record for the Comptroller on review. August 2 Order at 4. They did not need to be separately admitted at the hearing for them to be part of the record. Because the Comptroller's final decision encompasses a review of all aspects of the proceeding—including summary disposition and exhibits relied on therein—the Comptroller may rely on exhibits and findings from both summary disposition as well as the hearing. *See also supra* Part IX.B. To the extent the RD errs by relying on unadmitted evidence that otherwise should not be part of the record, the Comptroller's decision cures those errors for the reasons explained in Part XI.A.

### D. The RD's Reliance on Summary Disposition Findings Does Not Amount to Uncurable Error

In her exceptions, Anderson argues that the ALJ repeatedly committed two errors with respect to summary disposition findings in the RD. CRA Br. at 402-05. First, she argues that the RD relies only on summary disposition evidence in deciding claims that the ALJ previously found disputed at summary disposition. Second, she argues that the ALJ included several summary disposition findings made exclusively against McLinko and Julian that were never alleged against Anderson.

The Comptroller acknowledges that these exceptions have some merit, but they have been cured by the Comptroller's review. The Comptroller reviewed the entire record, including all findings at both the summary disposition stage and in the RD, and this final decision is based

---

[85] *See, e.g.*, Anderson's exceptions to the RD's Findings of Fact ("FOF") ¶¶ 6, 8, 9, 13, 17, 37, 39-41, 44-47, 52, 61-62, 68-71, 73-74, 78, 83, 86, 88, 91, 93-98, 102-03, 107-12, 116, 121-22, 125-28, 131-39, 142-43, 149, 183, 224, 226, 233, 235-36, 240-41, 246-54, 276-77. CRA Exceptions (throughout).

on those parts of the record that the Comptroller has determined can be properly upheld at each stage of the case. *See supra* Parts IX.B, XI.A.

For example, Anderson identifies SD Order SOMF 314 as an example of a fact that the ALJ found controverted at summary disposition but resolved against Anderson at the hearing without citing to new evidence. CRA Br. at 402 (citing SD Order SOMF 314); RD at 383. The proposed SD finding stated, "Each year, nearly half of all Ethics Line cases related to employee sales integrity violations." SD Order SOMF 314. In the RD, the ALJ found that sales integrity issues comprised "more than half" of EthicsLine cases. RD at 383. While it is true that the ALJ cited only to SD evidence to support this finding in the RD, it is also true that there was sufficient evidence adduced at the hearing to support a finding that roughly half of EthicsLine cases were related to sales integrity. For instance, MSD-135, which shows that 47% of EthicsLine cases in Q1 2016 involved sales incentive program violations, was ultimately admitted at the hearing (in substantially the same form) as OCC Exh. 1265. Moreover, additional hearing exhibits and hearing testimony support the RD's finding. *See, e.g.*, R. Exh. 7214 at *5 (showing that more than half of EthicsLine allegations were related to sales quality); Hr'g Tr. at 2040:12-14 (Candy) ("over half of the [EthicsLine] complaints were with regard to sales practice misconduct in the Community Bank"). Because the evidence adduced at the hearing supports the finding that roughly half of EthicsLine cases were related to sales integrity, the Comptroller has included this finding in his discussion of SPM controls. *See supra* Part VI.B.3.

In addition, characterization of a fact as "disputed" at summary disposition does not preclude the entry of a finding of that fact in the final disposition of the case, even if the evidence at the hearing is substantially the same as—or even identical to—the evidence at summary disposition. The burden of proof in the final disposition of the case is substantially lower than

146

that at summary disposition, so it certainly follows that some factual findings would meet the former burden but not the latter. *See Adams*, 2014 WL 8735096, at *7 (specifying "preponderance of the evidence" burden for final disposition); 12 C.F.R. § 19.29(a) (specifying "no genuine issue as to any material fact" burden for summary disposition).

The Comptroller's review of the record also cures any alleged defects relating to summary disposition findings alleged against McLinko and Julian, rather than Anderson. Most of these findings concern evidence and testimony relevant to the other two Respondents and are unnecessary to support the penalties against Anderson; the Comptroller has therefore not relied on these findings in his final decision. However, upon review the Comptroller has determined that some of the offending findings *were* found against Anderson, either in the first instance or in substantially identical form, undercutting any argument that Anderson had "neither notice nor an opportunity to be heard" with regard to those findings.[86] CRA Br. at 405.

### E. The ALJ's Reliance on NBE Testimony and Expert Reports Did Not Prejudice Anderson

Anderson argues that the RD improperly ignores evidence of NBE knowledge and bias. CRA Br. at 363-68. This section of Anderson's exceptions brief is primarily a reiteration of her exceptions regarding determinations the ALJ made in prehearing rulings and at the hearing concerning evidence and cross-examination related to NBE bias. *See* CRA Br. at 76-91, 159-64; *supra* Parts IX.E, X.A-B. As explained above, the ALJ did not abuse his discretion by limiting Respondents' access to certain impeachment evidence, including personnel files. *See supra* Part IX.E. Moreover, evidence from all three Respondents—including testimonial evidence—

---

[86] *See, e.g.*, RD at 369, FOF ¶ 87 (found specifically against all three Respondents in SD Order SOMF 122); SD Order SOMF 441 (Julian and McLinko) (found in substantially the same form against Anderson at SD Order SOMF 198 (Anderson)).

regarding NBE knowledge and bias has been preserved in the record as proffers, and the Comptroller has reviewed all of that evidence *de novo,* rendering any errors the ALJ may have made in excluding or ignoring that evidence harmless. *See, e.g.*, R. Exhs. 826 (proffered), 1215 at 2-3 (proffered), 1218 at 1 (proffered), 1220 (proffered), 13741 at 1 (proffered), 15477 (proffered); Hr'g Tr. at 616:20-619:2 (Coleman) (proffered), 2160:4-2161:25 (Candy) (proffered), 2863:17-2865:2 (Crosthwaite) (proffered), 4189:19-4190:1 (Smith) (proffered). This proffered evidence, which shows merely that the OCC and its employees were trying to learn as much as they could in the years following the SPM crisis, is insufficient to support Respondents' claims of a conspiracy among OCC officials and NBEs to "shift blame away from themselves toward Ms. Russ Anderson." CRA Br. at 187.

In her exceptions, Anderson also points out several deficiencies in the NBE expert reports. She argues that the NBE expert reports are unreliable because Enforcement Counsel drafted a substantial portion of them. CRA Br. at 365, 401. She argues that the NBE expert reports offer largely "conclusory" opinions that lack evidence and proper justification. *See, e.g.*, CRA Br. at 368-69, 371. And she argues that these expert reports offer "legal conclusions," which are impermissible from expert witnesses. CRA Br. at 383.

The Comptroller partially accepts these exceptions. Four of the NBE witnesses did, in fact, admit that Enforcement Counsel drafted a substantial portion of their expert reports. *See* MSD-303A at 14:14-21 (Crosthwaite) ("My attorneys drafted my report"); MSD-301A at 26:1-12 (Smith) ("I wrote the first couple pages."); MSD-304A at 16:6-19:1 (Candy) (admitting that Enforcement Counsel wrote the first draft of her report); MSD-646A (Hudson) at 17:20-18:13 (admitting that an Enforcement Counsel attorney wrote the first draft of her report). And it is true that the expert reports largely consist of conclusory statements and conclusions of law. Recognizing that this is an inappropriate practice, the Comptroller nevertheless finds that the

148

ALJ did not err in admitting the reports, because these factors go to the *weight* that a decisionmaker should give to the expert reports, rather than their admissibility. As a result, the Comptroller gives little weight to the NBE reports and only cites them when they are factual, highly relevant, and material.

### F. The Comptroller Does Not Give Any Witnesses Special Deference in this Case

Anderson makes two primary arguments concerning the ALJ's alleged deference to the NBE witnesses. First, she argues that the ALJ improperly deemed NBEs "experts as a matter of law" and accorded them "*Sunshine* deference" pursuant to the Eleventh Circuit case *Sunshine State Bank v. FDIC*, 783 F.2d 1580 (11th Cir. 1986). CRA Br. at 372-73.[87] Anderson further argues that, even assuming the applicability of *Sunshine*, the ALJ should not have deferred to the NBE expert reports because they were "unreliable, irrelevant, and immaterial" and because they are not otherwise covered by *Sunshine*. CRA Br. at 369, 380-85.

As explained above in Parts X.B and XI.E, the ALJ did not abuse his discretion in admitting the expert reports under the OCC's Uniform Rules. However, as explained above, there are deficiencies in the expert reports that affect how much weight they are due, and the Comptroller is attentive to those deficiencies and therefore places little weight on the expert reports. *See supra* Part XI.E. The Comptroller accordingly gives no special deference to the opinions of any witnesses, including the NBE witnesses.

### G. The Comptroller Does Not Decide Whether Anderson Breached Her Fiduciary Duty

In her exceptions, Anderson argues that the ALJ applied the wrong body of law in determining whether Anderson breached her fiduciary duties. CRA Br. at 515. She argues that

---

[87] The parties appear to disagree over whether the RD applied such deference. In their exceptions, Enforcement Counsel argue that the ALJ should have explicitly applied *Sunshine* deference. EC Exceptions Br. at 55.

149

Delaware state law governs, rather than Federal common law. *Id.* She further argues that the ALJ's findings regarding breach of fiduciary duty are flawed because he did not separate his findings and analysis for breach of fiduciary duty from his findings regarding unsafe or unsound practices. *Id.* at 516-17.

As explained in Parts VI and VII above, the Comptroller has determined that Anderson committed several unsafe or unsound practices and violations of law, each of which supports a prohibition order and second-tier civil money penalty. The Comptroller declines to decide whether Anderson's conduct also resulted in breaches of her fiduciary duties to the Bank, rendering these exceptions moot.

## XII. CONCLUSION

For the foregoing reasons, the Comptroller hereby assesses a prohibition order and a $10 million CMP against Anderson.

IT IS SO ORDERED.

**Michael J. Hsu**
Digitally signed by Michael J. Hsu
Date: 2025.01.14 07:22:32 -05'00'

MICHAEL J. HSU
ACTING COMPTROLLER OF THE CURRENCY

150

UNITED STATES OF AMERICA
DEPARTMENT OF THE TREASURY
OFFICE OF THE COMPTROLLER OF THE CURRENCY

| | |
|---|---|
| **In the Matter of:** | ) |
| | ) |
| Claudia Russ Anderson | ) |
| Former Community Bank Group Risk Officer | )   AA-EC-2019-81 |
| | ) |
| Wells Fargo Bank, N.A. | ) |
| Sioux Falls, South Dakota | ) |

## ORDER OF PROHBITION AND
## ORDER FOR THE ASSESSMENT OF A CIVIL MONEY PENALTY

**WHEREAS**, the Office of the Comptroller of the Currency ("OCC") initiated prohibition

and civil money penalty proceedings against Claudia Russ Anderson ("Respondent"), former

Group Risk Officer of Wells Fargo Bank, N.A. ("Bank"), pursuant to 12 U.S.C. §§ 1818(e) and

(i), through the issuance of a Notice of Charges for Orders of Prohibition and Orders to Cease

and Desist and Notice of Assessments of a Civil Money Penalty dated January 23, 2020, in *In the*

*Matter of Carrie Tolstedt, et al.* ("Notice") based on Respondent's conduct related to the Bank's

sales practices misconduct problem;

**WHEREAS**, Respondent timely filed an Answer to the Notice, requested a hearing on

February 11, 2020, and filed an Amended Answer on August 7, 2020;

**WHEREAS**, pursuant to 12 U.S.C. §§ 1818(e) and (i) and 12 C.F.R. Part 19, a hearing

was conducted before an Administrative Law Judge in Sioux Falls, South Dakota, and remotely

via videoconference between September 13, 2021, and January 6, 2022, and Respondent was

given full opportunity to appear, present evidence, examine and cross-examine witnesses, file

proposed findings of fact and conclusions of law, and file post-hearing and reply briefs;

1

**NOW, THEREFORE**, having considered the evidence presented at said hearing and the record as a whole, the arguments of both parties, and the Recommended Decision issued by the presiding Administrative Law Judge, and pursuant to the authority vested in him by the Federal Deposit Insurance Act, as amended, 12 U.S.C. § 1818, the Acting Comptroller of the Currency ("Comptroller") hereby issues the following prohibition and civil money penalty orders ("Order"):

## ARTICLE I

## JURISDICTION

(1) The Bank is an "insured depository institution" as that term is defined in 12 U.S.C. § 1813(c)(2).

(2) Respondent was an officer and employee of the Bank and was an "institution-affiliated party" of the Bank as that term is defined in 12 U.S.C. § 1813(u), having served in such capacity within six (6) years from the date of the Notice. *See* 12 U.S.C. § 1818(i)(3).

(3) The Bank is a national banking association within the meaning of 12 U.S.C. § 1813(q)(1)(A) and is chartered and examined by the OCC. *See* 12 U.S.C. § 1 *et seq.*

(4) The OCC is the "appropriate Federal banking agency" as that term is defined in 12 U.S.C. § 1813(q) and is therefore authorized to initiate and maintain these prohibition and civil money penalty actions against Respondent pursuant to 12 U.S.C. § 1818(e) and (i).

## ARTICLE II

## ORDER OF PROHIBITION

Pursuant to the authority vested in him by the Federal Deposit Insurance Act, as amended, 12 U.S.C. § 1818, the Comptroller hereby orders that:

(1)     With respect to the institutions and agencies set forth in paragraph (2) of this Article, Respondent hereby shall not:

   (a)     participate in any manner in the conduct of their affairs;

   (b)     solicit, procure, transfer, attempt to transfer, vote, or attempt to vote any proxy, consent, or authorization with respect to any voting rights;

   (c)     violate any voting agreement previously approved by the "appropriate Federal banking agency," as defined in 12 U.S.C. § 1813(q); or

   (d)     vote for a director or serve or act as an "institution-affiliated party," as defined in 12 U.S.C. § 1813(u).

(2)     The prohibitions in paragraph (1) of this Article apply to the following institutions and agencies:

   (a)     any insured depository institution, as defined in 12 U.S.C. § 1813(c);

   (b)     any institution treated as an insured bank under 12 U.S.C. §§ 1818(b)(3), (b)(4), or (b)(5);

   (c)     any insured credit union under the Federal Credit Union Act;

   (d)     any institution chartered under the Farm Credit Act of 1971;

   (e)     any appropriate Federal depository institution regulatory agency; and

   (f)     the Federal Housing Finance Agency and any Federal Home Loan Bank.

(3)     The prohibitions of paragraphs (1) and (2) of this Article shall cease to apply with respect to a particular institution if Respondent obtains the prior written consent of both the OCC and the institution's "appropriate Federal financial institutions regulatory agency," as defined in 12 U.S.C. § 1818(e)(7)(D).

Appellate Case: 25-1079     Page: 1351     Date Filed: 05/16/2025 Entry ID: 5517644

## ARTICLE III

## ORDER FOR CIVIL MONEY PENALTY

(1)     Respondent shall pay a civil money penalty in the amount of ten million

dollars ($10,000,000.00), which shall be paid in full upon the effective date of this Order.

(2)     Respondent shall make payment in full via wire transfer, in accordance with

instructions provided by the OCC. The docket number of this case (AA-EC-2019-81) shall be

referenced in connection with the submitted payment.

## ARTICLE IV

## CLOSING

(1)     Respondent is prohibited from seeking or accepting indemnification from any

insured depository institution for the civil money penalty assessed and paid in this matter.

(2)     If, at any time, the Comptroller deems it appropriate in fulfilling the

responsibilities placed upon him by the several laws of the United States of America to

undertake any action affecting the Respondent, nothing in this Order shall in any way inhibit,

estop, bar, or otherwise prevent the Comptroller from so doing.

(3)     The provisions of this Order are effective at the expiration of thirty (30) days after

the service of this Order by the Comptroller, and shall remain effective and enforceable, except

to the extent that, and until such time as, any provisions of this Order shall have been stayed,

modified, terminated, or set aside in writing by the Comptroller, his designated representative, or

a reviewing court.

4

IT IS SO ORDERED.

Michael J. Hsu

Digitally signed by Michael J.
Hsu
Date: 2025.01.14 07:23:04
-05'00'

_____

MICHAEL J. HSU
ACTING COMPTROLLER OF THE CURRENCY



"(4) implementing the 1-time assessment credit to certain insured depository institutions in accordance with section 7(e)(3) of the Federal Deposit Insurance Act [12 U.S.C. 1817(e)(3)], as amended by section 2107 of this subtitle, including the qualifications and procedures under which the Corporation would apply assessment credits; and

"(5) providing for assessments under section 7(b) of the Federal Deposit Insurance Act [12 U.S.C. 1817(b)], as amended by this subtitle.

"(b) TRANSITION PROVISIONS.—

"(1) CONTINUATION OF EXISTING ASSESSMENT REGULATIONS.—No provision of this subtitle [subtitle B (§§2101–2109) of title II of Pub. L. 109–171, see Short Title of 2006 Amendment note set out under section 1811 of this title] or any amendment made by this subtitle shall be construed as affecting the authority of the Corporation to set or collect deposit insurance assessments pursuant to any regulations in effect before the effective date of the final regulations prescribed under subsection (a).

"(2) TREATMENT OF DIF MEMBERS UNDER EXISTING REGULATIONS.—As of the date of the merger of the Bank Insurance Fund and the Savings Association Insurance Fund pursuant to section 2102 [section 2102 of Pub. L. 109–171, set out as a Merger of BIF and SAIF note under section 1821 of this title], the assessment regulations in effect immediately before the date of the enactment of this Act [Feb. 8, 2006] shall continue to apply to all members of the Deposit Insurance Fund, until such regulations are modified by the Corporation, notwithstanding that such regulations may refer to 'Bank Insurance Fund members' or 'Savings Association Insurance Fund members'."

Pub. L. 102–242, title III, §302(c), Dec. 19, 1991, 105 Stat. 2348, provided that: "To implement the risk-based assessment system required under section 7(b) of the Federal Deposit Insurance Act [12 U.S.C. 1817(b)] (as amended by subsection (a)), the Federal Deposit Insurance Corporation shall—

"(1) provide notice of proposed regulations in the Federal Register, not later than December 31, 1992, with an opportunity for comment on the proposal of not less than 120 days; and

"(2) promulgate final regulations not later than July 1, 1993."

Pub. L. 102–242, title III, §302(f), Dec. 19, 1991, 105 Stat. 2349, provided that: "To carry out the amendments made by this section [amending this section and sections 1815, 1818, and 1820 of this title], the Corporation may promulgate regulations governing the transition from the assessment system in effect on the date of enactment of this Act [Dec. 19, 1991] to the assessment system required under the amendments made by this section."

TRANSITION RESERVE RATIO REQUIREMENTS TO REFLECT NEW ASSESSMENT BASE

Pub. L. 111–203, title III, §334(c)–(e), July 21, 2010, 124 Stat. 1539, provided that:

"(c) For a period of not less than 5 years after the date of the enactment of this title [July 21, 2010], the Federal Deposit Insurance Corporation shall make available to the public the reserve ratio and the designated reserve ratio using both estimated insured deposits and the assessment base under [former] section 7(b)(2)(C) of the Federal Deposit Insurance Act [12 U.S.C. 1817(b)(2)] does not contain a subpar. (C)].

"(d) RESERVE RATIO.—Notwithstanding the timing requirements of section 7(b)(3)(E)(ii) of the Federal Deposit Insurance Act [12 U.S.C. 1817(b)(3)(E)(ii)], the Corporation shall take such steps as may be necessary for the reserve ratio of the Deposit Insurance Fund to reach 1.35 percent of estimated insured deposits by September 30, 2020.

"(e) OFFSET.—In setting the assessments necessary to meet the requirements of subsection (d), the Corporation shall offset the effect of subsection (d) on insured depository institutions with total consolidated assets of less than $10,000,000,000."

[For definitions of terms used in section 334(c)–(e) of Pub. L. 111–203, set out above, see section 5301 of this title.]

REPORT TO CONGRESS ON REFUNDS, DIVIDENDS, AND CREDITS FROM DEPOSIT INSURANCE FUND

Pub. L. 109–173, §5, Feb. 15, 2006, 119 Stat. 3606, required that any determination under former subsection (e)(2)(E) of this section be submitted to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives not later than 270 days after making such determination and provided that the report submitted include a detailed explanation for the determination and a discussion of the factors required to be considered under former subsection (e)(2)(F) of this section.

SPECIAL ASSESSMENT TO CAPITALIZE SAIF

Pub. L. 104–208, div. A, title II, §2702, Sept. 30, 1996, 110 Stat. 3009–479, provided that the Board of Directors of the Federal Deposit Insurance Corporation was to impose a special assessment on the SAIF-assessable deposits of each insured depository institution in accordance with assessment regulations of the Corporation at a rate applicable to all such institutions that the Board of Directors determined would cause the Savings Association Insurance Fund to achieve the designated reserve ratio on the first business day of the 1st month beginning after Sept. 30, 1996.

SMALL BUSINESS AND SMALL FARM LOAN INFORMATION

Pub. L. 102–242, title I, §122, Dec. 19, 1991, 105 Stat. 2251, as amended by Pub. L. 102–550, title XVI, §1603(c), Oct. 28, 1992, 106 Stat. 4079, provided that:

"(a) IN GENERAL.—Before the end of the 180-day period beginning on the date of the enactment of this Act [Dec. 19, 1991], the appropriate Federal banking agency shall prescribe regulations requiring insured depository institutions to annually submit information on small businesses and small farm lending in their reports of condition.

"(b) CREDIT AVAILABILITY.—The regulations prescribed under subsection (a) shall require insured depository institutions to submit such information as the agency may need to assess the availability of credit to small businesses and small farms.

"(c) CONTENTS.—The information required under subsection (a) may include information regarding the following:

"(1) The total number and aggregate dollar amount of commercial loans and commercial mortgage loans to small businesses.

"(2) Charge-offs, interest, and interest fee income on commercial loans and commercial mortgage loans to small businesses.

"(3) Agricultural loans to small farms."

CONDITIONS GOVERNING EMPLOYMENT OF PERSONNEL NOT REPEALED, MODIFIED, OR AFFECTED

Nothing contained in section 201 of Pub. L. 89–695, which amended this section, to be construed as repealing, modifying, or affecting section 1829 of this title, see section 206 of Pub. L. 89–695, set out as a note under section 1813 of this title.

Executive Documents

TERMINATION OF TRUST TERRITORY OF THE PACIFIC ISLANDS

For termination of Trust Territory of the Pacific Islands, see note set out preceding section 1681 of Title 48, Territories and Insular Possessions.

§1818. Termination of status as insured depository institution

(a) Termination of insurance

(1) Voluntary termination

Any insured depository institution which is not—

Appellate Case: 25-1079     Page: 1354     Date Filed: 05/16/2025     Entry ID: 5517644

(A) a national member bank;

(B) a State member bank;

(C) a Federal branch;

(D) a Federal savings association; or

(E) an insured branch which is required to be insured under subsection (a) or (b)[1] of section 3104 of this title,

may terminate such depository institution's status as an insured depository institution if such insured institution provides written notice to the Corporation of the institution's intent to terminate such status not less than 90 days before the effective date of such termination.

**(2) Involuntary termination**

**(A) Notice to primary regulator**

If the Board of Directors determines that—

(i) an insured depository institution or the directors or trustees of an insured depository institution have engaged or are engaging in unsafe or unsound practices in conducting the business of the depository institution;

(ii) an insured depository institution is in an unsafe or unsound condition to continue operations as an insured institution; or

(iii) an insured depository institution or the directors or trustees of the insured institution have violated any applicable law, regulation, order, condition imposed in writing by the Corporation in connection with the approval of any application or other request by the insured depository institution, or written agreement entered into between the insured depository institution and the Corporation,

the Board of Directors shall notify the appropriate Federal banking agency with respect to such institution (if other than the Corporation) or the State banking supervisor of such institution (if the Corporation is the appropriate Federal banking agency) of the Board's determination and the facts and circumstances on which such determination is based for the purpose of securing the correction of such practice, condition, or violation. Such notice shall be given to the appropriate Federal banking agency not less than 30 days before the notice required by subparagraph (B), except that this period for notice to the appropriate Federal banking agency may be reduced or eliminated with the agreement of such agency.

**(B) Notice of intention to terminate insurance**

If, after giving the notice required under subparagraph (A) with respect to an insured depository institution, the Board of Directors determines that any unsafe or unsound practice or condition or any violation specified in such notice requires the termination of the insured status of the insured depository institution, the Board shall—

(i) serve written notice to the insured depository institution of the Board's inten-

tion to terminate the insured status of the institution;

(ii) provide the insured depository institution with a statement of the charges on the basis of which the determination to terminate such institution's insured status was made (or a copy of the notice under subparagraph (A)); and

(iii) notify the insured depository institution of the date (not less than 30 days after notice under this subparagraph) and place for a hearing before the Board of Directors (or any person designated by the Board) with respect to the termination of the institution's insured status.

**(3) Hearing; termination**

If, on the basis of the evidence presented at a hearing before the Board of Directors (or any person designated by the Board for such purpose), in which all issues shall be determined on the record pursuant to section 554 of title 5 and the written findings of the Board of Directors (or such person) with respect to such evidence (which shall be conclusive), the Board of Directors finds that any unsafe or unsound practice or condition or any violation specified in the notice to an insured depository institution under paragraph (2)(B) or subsection (w) has been established, the Board of Directors may issue an order terminating the insured status of such depository institution effective as of a date subsequent to such finding.

**(4) Appearance; consent to termination**

Unless the depository institution shall appear at the hearing by a duly authorized representative, it shall be deemed to have consented to the termination of its status as an insured depository institution and termination of such status thereupon may be ordered.

**(5) Judicial review**

Any insured depository institution whose insured status has been terminated by order of the Board of Directors under this subsection shall have the right of judicial review of such order only to the same extent as provided for the review of orders under subsection (h) of this section.

**(6) Publication of notice of termination**

The Corporation may publish notice of such termination and the depository institution shall give notice of such termination to each of its depositors at his last address of record on the books of the depository institution, in such manner and at such time as the Board of Directors may find to be necessary and may order for the protection of depositors.

**(7) Temporary insurance of deposits insured as of termination**

After the termination of the insured status of any depository institution under the provisions of this subsection, the insured deposits of each depositor in the depository institution on the date of such termination, less all subsequent withdrawals from any deposits of such depositor, shall continue for a period of at least 6 months or up to 2 years, within the discretion of the Board of Directors, to be in-

[1] See References in Text note below.

sured, and the depository institution shall continue to pay to the Corporation assessments as in the case of an insured depository institution during such period. No additions to any such deposits and no new deposits in such depository institution made after the date of such termination shall be insured by the Corporation, and the depository institution shall not advertise or hold itself out as having insured deposits unless in the same connection it shall also state with equal prominence that such additions to deposits and new deposits made after such date are not so insured. Such depository institution shall, in all other respects, be subject to the duties and obligations of an insured depository institution for the period referred to in the 1st sentence from the date of such termination, and in the event that such depository institution shall be closed on account of inability to meet the demands of its depositors within such period, the Corporation shall have the same powers and rights with respect to such depository institution as in case of an insured depository institution.

**(8) Temporary suspension of insurance**

**(A) In general**

If the Board of Directors initiates a termination proceeding under paragraph (2), and the Board of Directors, after consultation with the appropriate Federal banking agency, finds that an insured depository institution (other than a savings association to which subparagraph (B) applies) has no tangible capital under the capital guidelines or regulations of the appropriate Federal banking agency, the Corporation may issue a temporary order suspending deposit insurance on all deposits received by the institution.

**(B) Special rule for certain savings institutions**

**(i) Certain goodwill included in tangible capital**

In determining the tangible capital of a savings association for purposes of this paragraph, the Board of Directors shall include goodwill to the extent it is considered a component of capital under section 1464(t) of this title. Any savings association which would be subject to a suspension order under subparagraph (A) but for the operation of this subparagraph, shall be considered by the Corporation to be a "special supervisory association".

**(ii) Suspension order**

The Corporation may issue a temporary order suspending deposit insurance on all deposits received by a special supervisory association whenever the Board of Directors determines that—

(I) the capital of such association, as computed utilizing applicable accounting standards, has suffered a material decline;

(II) that such association (or its directors or officers) is engaging in an unsafe or unsound practice in conducting the business of the association;

(III) that such association is in an unsafe or unsound condition to continue operating as an insured association; or

(IV) that such association (or its directors or officers) has violated any applicable law, rule, regulation, or order, or any condition imposed in writing by a Federal banking agency, or any written agreement including a capital improvement plan entered into with any Federal banking agency, or that the association has failed to enter into a capital improvement plan which is acceptable to the Corporation within the time period set forth in section 1464(t) of this title.

Nothing in this paragraph limits the right of the Corporation or the Comptroller of the Currency to enforce a contractual provision which authorizes the Corporation or the Comptroller of the Currency, as a successor to the Federal Savings and Loan Insurance Corporation or the Federal Home Loan Bank Board, to require a savings association to write down or amortize goodwill at a faster rate than otherwise required under this chapter or under applicable accounting standards.

**(C) Effective period of temporary order**

Any order issued under subparagraph (A) shall become effective not earlier than 10 days from the date of service upon the institution and, unless set aside, limited, or suspended by a court in proceedings authorized hereunder, such temporary order shall remain effective and enforceable until an order of the Board under paragraph (3) becomes final or until the Corporation dismisses the proceedings under paragraph (3).

**(D) Judicial review**

Before the close of the 10-day period beginning on the date any temporary order has been served upon an insured depository institution under subparagraph (A), such institution may apply to the United States District Court for the District of Columbia, or the United States district court for the judicial district in which the home office of the institution is located, for an injunction setting aside, limiting, or suspending the enforcement, operation, or effectiveness of such order, and such court shall have jurisdiction to issue such injunction.

**(E) Continuation of insurance for prior deposits**

The insured deposits of each depositor in such depository institution on the effective date of the order issued under this paragraph, minus all subsequent withdrawals from any deposits of such depositor, shall continue to be insured, subject to the administrative proceedings as provided in this chapter.

**(F) Publication of order**

The depository institution shall give notice of such order to each of its depositors in such manner and at such times as the Board of Directors may find to be necessary and may order for the protection of depositors.

Appellate Case: 25-1079     Page: 1356     Date Filed: 05/16/2025 Entry ID: 5517644

**(G) Notice by Corporation**

If the Corporation determines that the depository institution has not substantially complied with the notice to depositors required by the Board of Directors, the Corporation may provide such notice in such manner as the Board of Directors may find to be necessary and appropriate.

**(H) Lack of notice**

Notwithstanding subparagraph (A), any deposit made after the effective date of a suspension order issued under this paragraph shall remain insured to the extent that the depositor establishes that—

(i) such deposit consists of additions made by automatic deposit the depositor was unable to prevent; or

(ii) such depositor did not have actual knowledge of the suspension of insurance.

**(9) Final decisions to terminate insurance**

Any decision by the Board of Directors to—

(A) issue a temporary order terminating deposit insurance; or

(B) issue a final order terminating deposit insurance (other than under subsection (p) or (q));

shall be made by the Board of Directors and may not be delegated.

**(10) Low- to moderate-income housing lender**

In making any determination regarding the termination of insurance of a solvent savings association, the Corporation may consider the extent of the association's low- to moderate-income housing loans.

**(b) Cease-and-desist proceedings**

(1) If, in the opinion of the appropriate Federal banking agency, any insured depository institution, depository institution which has insured deposits, or any institution-affiliated party is engaging or has engaged, or the agency has reasonable cause to believe that the depository institution or any institution-affiliated party is about to engage, in an unsafe or unsound practice in conducting the business of such depository institution, or is violating or has violated, or the agency has reasonable cause to believe that the depository institution or any institution-affiliated party is about to violate, a law, rule, or regulation, or any condition imposed in writing by a Federal banking agency in connection with any action on any application, notice, or other request by the depository institution or institution-affiliated party, or any written agreement entered into with the agency, the appropriate Federal banking agency for the depository institution may issue and serve upon the depository institution or such party a notice of charges in respect thereof. The notice shall contain a statement of the facts constituting the alleged violation or violations or the unsafe or unsound practice or practices, and shall fix a time and place at which a hearing will be held to determine whether an order to cease and desist therefrom should issue against the depository institution or the institution-affiliated party. Such hearing shall be fixed for a date not earlier than thirty days nor later than sixty days after service of such notice unless an ear-

lier or a later date is set by the agency at the request of any party so served. Unless the party or parties so served shall appear at the hearing personally or by a duly authorized representative, they shall be deemed to have consented to the issuance of the cease-and-desist order. In the event of such consent, or if upon the record made at any such hearing, the agency shall find that any violation or unsafe or unsound practice specified in the notice of charges has been established, the agency may issue and serve upon the depository institution or the institution-affiliated party an order to cease and desist from any such violation or practice. Such order may, by provisions which may be mandatory or otherwise, require the depository institution or its institution-affiliated parties to cease and desist from the same, and, further, to take affirmative action to correct the conditions resulting from any such violation or practice.

(2) A cease-and-desist order shall become effective at the expiration of thirty days after the service of such order upon the depository institution or other person concerned (except in the case of a cease-and-desist order issued upon consent, which shall become effective at the time specified therein), and shall remain effective and enforceable as provided therein, except to such extent as it is stayed, modified, terminated, or set aside by action of the agency or a reviewing court.

(3) This subsection, subsections (c) through (s) and subsection (u) of this section, and section 1831aa of this title shall apply to any bank holding company, and to any subsidiary (other than a bank) of a bank holding company, as those terms are defined in the Bank Holding Company Act of 1956 [12 U.S.C. 1841 et seq.], any savings and loan holding company and any subsidiary (other than a depository institution) of a savings and loan holding company (as such terms are defined in section 1467a of this title)),[2] any noninsured State member bank and to any organization organized and operated under section 25(a)[1] of the Federal Reserve Act [12 U.S.C. 611 et seq.] or operating under section 25 of the Federal Reserve Act [12 U.S.C. 601 et seq.], in the same manner as they apply to a State member insured bank. Nothing in this subsection or in subsection (c) of this section shall authorize any Federal banking agency, other than the Board of Governors of the Federal Reserve System, to issue a notice of charges or cease-and-desist order against a bank holding company or any subsidiary thereof (other than a bank or subsidiary of that bank) or against a savings and loan holding company or any subsidiary thereof (other than a depository institution or a subsidiary of such depository institution).

(4) This subsection, subsections (c) through (s) and subsection (u) of this section, and section 1831aa of this title shall apply to any foreign bank or company to which subsection (a) of section 3106 of this title applies and to any subsidiary (other than a bank) of any such foreign bank or company in the same manner as they apply to a bank holding company and any subsidiary thereof (other than a bank) under para-

---

[2] So in original. The second closing parenthesis probably should not appear.

Appellate Case: 25-1079　　　Page: 1357　　　Date Filed: 05/16/2025　Entry ID: 5517644

graph (3) of this subsection. For the purposes of this paragraph, the term "subsidiary" shall have the meaning assigned to it in section 2 of the Bank Holding Company Act of 1956 [12 U.S.C. 1841].

(5) This section shall apply, in the same manner as it applies to any insured depository institution for which the appropriate Federal banking agency is the Comptroller of the Currency, to any national banking association chartered by the Comptroller of the Currency, including an uninsured association.

(6) AFFIRMATIVE ACTION TO CORRECT CONDITIONS RESULTING FROM VIOLATIONS OR PRACTICES.—The authority to issue an order under this subsection and subsection (c) which requires an insured depository institution or any institution-affiliated party to take affirmative action to correct or remedy any conditions resulting from any violation or practice with respect to which such order is issued includes the authority to require such depository institution or such party to—

(A) make restitution or provide reimbursement, indemnification, or guarantee against loss if—

(i) such depository institution or such party was unjustly enriched in connection with such violation or practice; or

(ii) the violation or practice involved a reckless disregard for the law or any applicable regulations or prior order of the appropriate Federal banking agency;

(B) restrict the growth of the institution;
(C) dispose of any loan or asset involved;
(D) rescind agreements or contracts; and
(E) employ qualified officers or employees (who may be subject to approval by the appropriate Federal banking agency at the direction of such agency); and

(F) take such other action as the banking agency determines to be appropriate.

(7) AUTHORITY TO LIMIT ACTIVITIES.—The authority to issue an order under this subsection or subsection (c) includes the authority to place limitations on the activities or functions of an insured depository institution or any institution-affiliated party.

(8) UNSATISFACTORY ASSET QUALITY, MANAGEMENT, EARNINGS, OR LIQUIDITY AS UNSAFE OR UNSOUND PRACTICE.—If an insured depository institution receives, in its most recent report of examination, a less-than-satisfactory rating for asset quality, management, earnings, or liquidity, the appropriate Federal banking agency may (if the deficiency is not corrected) deem the institution to be engaging in an unsafe or unsound practice for purposes of this subsection.

(9) [Repealed]

(10) STANDARD FOR CERTAIN ORDERS.—No authority under this subsection or subsection (c) to prohibit any institution-affiliated party from withdrawing, transferring, removing, dissipating, or disposing of any funds, assets, or other property may be exercised unless the appropriate Federal banking agency meets the standards of Rule 65 of the Federal Rules of Civil Procedure, without regard to the requirement of such rule that the applicant show that the injury, loss, or damage is irreparable and immediate.

### (c) Temporary cease-and-desist orders

(1) Whenever the appropriate Federal banking agency shall determine that the violation or threatened violation or the unsafe or unsound practice or practices, specified in the notice of charges served upon the depository institution or any institution-affiliated party pursuant to paragraph (1) of subsection (b) of this section, or the continuation thereof, is likely to cause insolvency or significant dissipation of assets or earnings of the depository institution, or is likely to weaken the condition of the depository institution or otherwise prejudice the interests of its depositors prior to the completion of the proceedings conducted pursuant to paragraph (1) of subsection (b) of this section, the agency may issue a temporary order requiring the depository institution or such party to cease and desist from any such violation or practice and to take affirmative action to prevent or remedy such insolvency, dissipation, condition, or prejudice pending completion of such proceedings. Such order may include any requirement authorized under subsection (b)(6). Such order shall become effective upon service upon the depository institution or such institution-affiliated party and, unless set aside, limited, or suspended by a court in proceedings authorized by paragraph (2) of this subsection, shall remain effective and enforceable pending the completion of the administrative proceedings pursuant to such notice and until such time as the agency shall dismiss the charges specified in such notice, or if a cease-and-desist order is issued against the depository institution or such party, until the effective date of such order.

(2) Within ten days after the depository institution concerned or any institution-affiliated party has been served with a temporary cease-and-desist order, the depository institution or such party may apply to the United States district court for the judicial district in which the home office of the depository institution is located, or the United States District Court for the District of Columbia, for an injunction setting aside, limiting, or suspending the enforcement, operation, or effectiveness of such order pending the completion of the administrative proceedings pursuant to the notice of charges served upon the depository institution or such party under paragraph (1) of subsection (b) of this section, and such court shall have jurisdiction to issue such injunction.

(3) INCOMPLETE OR INACCURATE RECORDS.—

(A) TEMPORARY ORDER.—If a notice of charges served under subsection (b)(1) specifies, on the basis of particular facts and circumstances, that an insured depository institution's books and records are so incomplete or inaccurate that the appropriate Federal banking agency is unable, through the normal supervisory process, to determine the financial condition of that depository institution or the details or purpose of any transaction or transactions that may have a material effect on the financial condition of that depository institution, the agency may issue a temporary order requiring—

(i) the cessation of any activity or practice which gave rise, whether in whole or in part, to the incomplete or inaccurate state of the books or records; or

Appellate Case: 25-1079    Page: 1358    Date Filed: 05/16/2025 Entry ID: 5517644

(ii) affirmative action to restore such books or records to a complete and accurate state, until the completion of the proceedings under subsection (b)(1).

(B) EFFECTIVE PERIOD.—Any temporary order issued under subparagraph (A)—

(i) shall become effective upon service; and

(ii) unless set aside, limited, or suspended by a court in proceedings under paragraph (2), shall remain in effect and enforceable until the earlier of—

(I) the completion of the proceeding initiated under subsection (b)(1) in connection with the notice of charges; or

(II) the date the appropriate Federal banking agency determines, by examination or otherwise, that the insured depository institution's books and records are accurate and reflect the financial condition of the depository institution.

(4) FALSE ADVERTISING OR MISUSE OF NAMES TO INDICATE INSURED STATUS.—

(A) TEMPORARY ORDER.—

(i) IN GENERAL.—If a notice of charges served under subsection (b)(1) specifies on the basis of particular facts that any person engaged or is engaging in conduct described in section 1828(a)(4) of this title, the Corporation or other appropriate Federal banking agency may issue a temporary order requiring—

(I) the immediate cessation of any activity or practice described, which gave rise to the notice of charges; and

(II) affirmative action to prevent any further, or to remedy any existing, violation.

(ii) EFFECT OF ORDER.—Any temporary order issued under this subparagraph shall take effect upon service.

(B) EFFECTIVE PERIOD OF TEMPORARY ORDER.—A temporary order issued under subparagraph (A) shall remain effective and enforceable, pending the completion of an administrative proceeding pursuant to subsection (b)(1) in connection with the notice of charges—

(i) until such time as the Corporation or other appropriate Federal banking agency dismisses the charges specified in such notice; or

(ii) if a cease-and-desist order is issued against such person, until the effective date of such order.

(C) CIVIL MONEY PENALTIES.—Any violation of section 1828(a)(4) of this title shall be subject to civil money penalties, as set forth in subsection (i), except that for any person other than an insured depository institution or an institution-affiliated party that is found to have violated this paragraph, the Corporation or other appropriate Federal banking agency shall not be required to demonstrate any loss to an insured depository institution.

**(d) Temporary cease-and-desist orders; enforcement**

In the case of violation or threatened violation of, or failure to obey, a temporary cease-and-desist order issued pursuant to paragraph (1) of subsection (c) of this section, the appropriate Federal banking agency may apply to the United States district court, or the United States court of any territory, within the jurisdiction of which the home office of the depository institution is located, for an injunction to enforce such order, and, if the court shall determine that there has been such violation or threatened violation or failure to obey, it shall be the duty of the court to issue such injunction.

**(e) Removal and prohibition authority**

(1) AUTHORITY TO ISSUE ORDER.—Whenever the appropriate Federal banking agency determines that—

(A) any institution-affiliated party has, directly or indirectly—

(i) violated—

(I) any law or regulation;

(II) any cease-and-desist order which has become final;

(III) any condition imposed in writing by a Federal banking agency in connection with any action on any application, notice, or request by such depository institution or institution-affiliated party; or

(IV) any written agreement between such depository institution and such agency;

(ii) engaged or participated in any unsafe or unsound practice in connection with any insured depository institution or business institution; or

(iii) committed or engaged in any act, omission, or practice which constitutes a breach of such party's fiduciary duty;

(B) by reason of the violation, practice, or breach described in any clause of subparagraph (A)—

(i) such insured depository institution or business institution has suffered or will probably suffer financial loss or other damage;

(ii) the interests of the insured depository institution's depositors have been or could be prejudiced; or

(iii) such party has received financial gain or other benefit by reason of such violation, practice, or breach; and

(C) such violation, practice, or breach—

(i) involves personal dishonesty on the part of such party; or

(ii) demonstrates willful or continuing disregard by such party for the safety or soundness of such insured depository institution or business institution,

the appropriate Federal banking agency for the depository institution may serve upon such party a written notice of the agency's intention to remove such party from office or to prohibit any further participation by such party, in any manner, in the conduct of the affairs of any insured depository institution.

(2) SPECIFIC VIOLATIONS.—

(A) IN GENERAL.—Whenever the appropriate Federal banking agency determines that—

(i) an institution-affiliated party has committed a violation of any provision of sub-

Appellate Case: 25-1079　　　Page: 1359　　　Date Filed: 05/16/2025 Entry ID: 5517644

chapter II of chapter 53 of title 31 and such violation was not inadvertent or unintentional;

(ii) an officer or director of an insured depository institution has knowledge that an institution-affiliated party of the insured depository institution has violated any such provision or any provision of law referred to in subsection (g)(1)(A)(ii);

(iii) an officer or director of an insured depository institution has committed any violation of the Depository Institution Management Interlocks Act [12 U.S.C. 3201 et seq.]; or

(iv) an institution-affiliated party of a subsidiary (other than a bank) of a bank holding company or of a subsidiary (other than a savings association) of a savings and loan holding company has been convicted of any criminal offense involving dishonesty or a breach of trust or a criminal offense under section 1956, 1957, or 1960 of title 18 or has agreed to enter into a pretrial diversion or similar program in connection with a prosecution for such an offense,

the agency may serve upon such party, officer, or director a written notice of the agency's intention to remove such party from office.

(B) FACTORS TO BE CONSIDERED.—In determining whether an officer or director should be removed as a result of the application of subparagraph (A)(ii), the agency shall consider whether the officer or director took appropriate action to stop, or to prevent the recurrence of, a violation described in such subparagraph.

(3) SUSPENSION ORDER.—

(A) SUSPENSION OR PROHIBITION AUTHORIZED.—If the appropriate Federal banking agency serves written notice under paragraph (1) or (2) to any institution-affiliated party of such agency's intention to issue an order under such paragraph, the appropriate Federal banking agency may suspend such party from office or prohibit such party from further participation in any manner in the conduct of the affairs of the depository institution, if the agency—

(i) determines that such action is necessary for the protection of the depository institution or the interests of the depository institution's depositors; and

(ii) serves such party with written notice of the suspension order.

(B) EFFECTIVE PERIOD.—Any suspension order issued under subparagraph (A)—

(i) shall become effective upon service; and

(ii) unless a court issues a stay of such order under subsection (f), shall remain in effect and enforceable until—

(I) the date the appropriate Federal banking agency dismisses the charges contained in the notice served under paragraph (1) or (2) with respect to such party; or

(II) the effective date of an order issued by the agency to such party under paragraph (1) or (2).

(C) COPY OF ORDER.—If an appropriate Federal banking agency issues a suspension order

under subparagraph (A) to any institution-affiliated party, the agency shall serve a copy of such order on any insured depository institution with which such party is associated at the time such order is issued.

(4) A notice of intention to remove an institution-affiliated party from office or to prohibit such party from participating in the conduct of the affairs of an insured depository institution, shall contain a statement of the facts constituting grounds therefor, and shall fix a time and place at which a hearing will be held thereon. Such hearing shall be fixed for a date not earlier than thirty days nor later than sixty days after the date of service of such notice, unless an earlier or a later date is set by the agency at the request of (A) such party, and for good cause shown, or (B) the Attorney General of the United States. Unless such party shall appear at the hearing in person or by a duly authorized representative, such party shall be deemed to have consented to the issuance of an order of such removal or prohibition. In the event of such consent, or if upon the record made at any such hearing the agency shall find that any of the grounds specified in such notice have been established, the agency may issue such orders of suspension or removal from office, or prohibition from participation in the conduct of the affairs of the depository institution, as it may deem appropriate. Any such order shall become effective at the expiration of thirty days after service upon such depository institution and such party concerned (except in the case of an order issued upon consent, which shall become effective at the time specified therein). Such order shall remain effective and enforceable except to such extent as it is stayed, modified, terminated, or set aside by action of the agency or a reviewing court.

(5) For the purpose of enforcing any law, rule, regulation, or cease-and-desist order in connection with an interlocking relationship, the term "officer" within the term "institution-affiliated party" as used in this subsection means an employee or officer with management functions, and the term "director" within the term "institution-affiliated party" as used in this subsection includes an advisory or honorary director, a trustee of a depository institution under the control of trustees, or any person who has a representative or nominee serving in any such capacity.

(6) PROHIBITION OF CERTAIN SPECIFIC ACTIVITIES.—Any person subject to an order issued under this subsection shall not—

(A) participate in any manner in the conduct of the affairs of any institution or agency specified in paragraph (7)(A);

(B) solicit, procure, transfer, attempt to transfer, vote, or attempt to vote any proxy, consent, or authorization with respect to any voting rights in any institution described in subparagraph (A);

(C) violate any voting agreement previously approved by the appropriate Federal banking agency; or

(D) vote for a director, or serve or act as an institution-affiliated party.

(7) INDUSTRYWIDE PROHIBITION.—

Add. 1358

(A) IN GENERAL.—Except as provided in subparagraph (B), any person who, pursuant to an order issued under this subsection or subsection (g), has been removed or suspended from office in an insured depository institution or prohibited from participating in the conduct of the affairs of an insured depository institution may not, while such order is in effect, continue or commence to hold any office in, or participate in any manner in the conduct of the affairs of—

(i) any insured depository institution;

(ii) any institution treated as an insured bank under subsection (b)(3) or (b)(4), or as a savings association under subsection (b)(9);[1]

(iii) any insured credit union under the Federal Credit Union Act [12 U.S.C. 1751 et seq.];

(iv) any institution chartered under the Farm Credit Act of 1971 [12 U.S.C. 2001 et seq.];

(v) any appropriate Federal depository institution regulatory agency; and

(vi) the Federal Housing Finance Agency and any Federal home loan bank.

(B) EXCEPTION IF AGENCY PROVIDES WRITTEN CONSENT.—If, on or after the date an order is issued under this subsection which removes or suspends from office any institution-affiliated party or prohibits such party from participating in the conduct of the affairs of an insured depository institution, such party receives the written consent of—

(i) the agency that issued such order; and

(ii) the appropriate Federal financial institutions regulatory agency of the institution described in any clause of subparagraph (A) with respect to which such party proposes to become an institution-affiliated party,

subparagraph (A) shall, to the extent of such consent, cease to apply to such party with respect to the institution described in each written consent. Any agency that grants such a written consent shall report such action to the Corporation and publicly disclose such consent.

(C) VIOLATION OF PARAGRAPH TREATED AS VIOLATION OF ORDER.—Any violation of subparagraph (A) by any person who is subject to an order described in such subparagraph shall be treated as a violation of the order.

(D) "APPROPRIATE FEDERAL FINANCIAL INSTITUTIONS REGULATORY AGENCY" DEFINED.—For purposes of this paragraph and subsection (j), the term "appropriate Federal financial institutions regulatory agency" means—

(i) the appropriate Federal banking agency, in the case of an insured depository institution;

(ii) the Farm Credit Administration, in the case of an institution chartered under the Farm Credit Act of 1971 [12 U.S.C. 2001 et seq.];

(iii) the National Credit Union Administration Board, in the case of an insured credit union (as defined in section 101(7) of the Federal Credit Union Act [12 U.S.C. 1752(7)]); and

(iv) the Secretary of the Treasury, in the case of the Federal Housing Finance Agency and any Federal home loan bank.

(E) CONSULTATION BETWEEN AGENCIES.—The agencies referred to in clauses (i) and (ii) of subparagraph (B) shall consult with each other before providing any written consent described in subparagraph (B).

(F) APPLICABILITY.—This paragraph shall only apply to a person who is an individual, unless the appropriate Federal banking agency specifically finds that it should apply to a corporation, firm, or other business enterprise.

**(f) Stay of suspension and/or prohibition of institution-affiliated party**

Within ten days after any institution-affiliated party has been suspended from office and/or prohibited from participation in the conduct of the affairs of an insured depository institution under subsection (e)(3) of this section, such party may apply to the United States district court for the judicial district in which the home office of the depository institution is located, or the United States District Court for the District of Columbia, for a stay of such suspension and/or prohibition pending the completion of the administrative proceedings pursuant to the notice served upon such party under subsection (e)(1) or (e)(2) of this section, and such court shall have jurisdiction to stay such suspension and/or prohibition.

**(g) Suspension, removal, and prohibition from participation orders in the case of certain criminal offenses**

(1) SUSPENSION OR PROHIBITION.—

(A) IN GENERAL.—Whenever any institution-affiliated party is the subject of any information, indictment, or complaint, involving the commission of or participation in—

(i) a crime involving dishonesty or breach of trust which is punishable by imprisonment for a term exceeding one year under State or Federal law, or

(ii) a criminal violation of section 1956, 1957, or 1960 of title 18 or section 5322 or 5324 of title 31,

the appropriate Federal banking agency may, if continued service or participation by such party posed, poses, or may pose a threat to the interests of the depositors of, or threatened, threatens, or may threaten to impair public confidence in, any relevant depository institution (as defined in subparagraph (E)), by written notice served upon such party, suspend such party from office or prohibit such party from further participation in any manner in the conduct of the affairs of any depository institution.

(B) PROVISIONS APPLICABLE TO NOTICE.—

(i) COPY.—A copy of any notice under subparagraph (A) shall also be served upon any depository institution that the subject of the notice is affiliated with at the time the notice is issued.

(ii) EFFECTIVE PERIOD.—A suspension or prohibition under subparagraph (A) shall remain in effect until the information, indictment, or complaint referred to in such subparagraph is finally disposed of or until terminated by the agency.

(C) REMOVAL OR PROHIBITION.—

(i) IN GENERAL.—If a judgment of conviction or an agreement to enter a pretrial di-

Appellate Case: 25-1079　　　Page: 1361　　　Date Filed: 05/16/2025 Entry ID: 5517644

version or other similar program is entered against an institution-affiliated party in connection with a crime described in subparagraph (A)(i), at such time as such judgment is not subject to further appellate review, the appropriate Federal banking agency may, if continued service or participation by such party posed, poses, or may pose a threat to the interests of the depositors of, or threatened, threatens, or may threaten to impair public confidence in, any relevant depository institution (as defined in subparagraph (E)), issue and serve upon such party an order removing such party from office or prohibiting such party from further participation in any manner in the conduct of the affairs of any depository institution without the prior written consent of the appropriate agency.

(ii) REQUIRED FOR CERTAIN OFFENSES.—In the case of a judgment of conviction or agreement against an institution-affiliated party in connection with a violation described in subparagraph (A)(ii), the appropriate Federal banking agency shall issue and serve upon such party an order removing such party from office or prohibiting such party from further participation in any manner in the conduct of the affairs of any depository institution without the prior written consent of the appropriate agency.

(D) PROVISIONS APPLICABLE TO ORDER.—

(i) COPY.—A copy of any order under subparagraph (C) shall also be served upon any depository institution that the subject of the order is affiliated with at the time the order is issued, whereupon the institution-affiliated party who is subject to the order (if a director or an officer) shall cease to be a director or officer of such depository institution.

(ii) EFFECT OF ACQUITTAL.—A finding of not guilty or other disposition of the charge shall not preclude the agency from instituting proceedings after such finding or disposition to remove such party from office or to prohibit further participation in depository institution affairs, pursuant to paragraph (1), (2), or (3) of subsection (e) of this section.

(iii) EFFECTIVE PERIOD.—Any notice of suspension or order of removal issued under this paragraph shall remain effective and outstanding until the completion of any hearing or appeal authorized under paragraph (3) unless terminated by the agency.

(E) RELEVANT DEPOSITORY INSTITUTION.—For purposes of this subsection, the term "relevant depository institution" means any depository institution of which the party is or was an institution-affiliated party at the time at which—

(i) the information, indictment, or complaint described in subparagraph (A) was issued; or

(ii) the notice is issued under subparagraph (A) or the order is issued under subparagraph (C)(i).

(2) If at any time, because of the suspension of one or more directors pursuant to this section,

there shall be on the board of directors of a national bank less than a quorum of directors not so suspended, all powers and functions vested in or exercisable by such board shall vest in and be exercisable by the director or directors on the board not so suspended, until such time as there shall be a quorum of the board of directors. In the event all of the directors of a national bank are suspended pursuant to this section, the Comptroller of the Currency shall appoint persons to serve temporarily as directors in their place and stead pending the termination of such suspensions, or until such time as those who have been suspended, cease to be directors of the bank and their respective successors take office.

(3) Within thirty days from service of any notice of suspension or order of removal issued pursuant to paragraph (1) of this subsection, the institution-affiliated party concerned may request in writing an opportunity to appear before the agency to show that the continued service to or participation in the conduct of the affairs of the depository institution by such party does not, or is not likely to, pose a threat to the interests of the bank's[3] depositors or threaten to impair public confidence in the depository institution. Upon receipt of any such request, the appropriate Federal banking agency shall fix a time (not more than thirty days after receipt of such request, unless extended at the request of such party) and place at which such party may appear, personally or through counsel, before one or more members of the agency or designated employees of the agency to submit written materials (or, at the discretion of the agency, oral testimony) and oral argument. Within sixty days of such hearing, the agency shall notify such party whether the suspension or prohibition from participation in any manner in the conduct of the affairs of the depository institution will be continued, terminated, or otherwise modified, or whether the order removing such party from office or prohibiting such party from further participation in any manner in the conduct of the affairs of the depository institution will be rescinded or otherwise modified. Such notification shall contain a statement of the basis for the agency's decision, if adverse to such party. The Federal banking agencies are authorized to prescribe such rules as may be necessary to effectuate the purposes of this subsection.

(h) Hearings and judicial review

(1) Any hearing provided for in this section (other than the hearing provided for in subsection (g)(3) of this section) shall be held in the Federal judicial district or in the territory in which the home office of the depository institution is located unless the party afforded the hearing consents to another place, and shall be conducted in accordance with the provisions of chapter 5 of title 5. After such hearing, and within ninety days after the appropriate Federal banking agency or Board of Governors of the Federal Reserve System has notified the parties that the case has been submitted to it for final decision, it shall render its decision (which shall include findings of fact upon which its decision

---

[3] So in original. Probably should be "depository institution's".

Appellate Case: 25-1079     Page: 1362     Date Filed: 05/16/2025 Entry ID: 5517644

is predicated) and shall issue and serve upon each party to the proceeding an order or orders consistent with the provisions of this section. Judicial review of any such order shall be exclusively as provided in this subsection (h). Unless a petition for review is timely filed in a court of appeals of the United States, as hereinafter provided in paragraph (2) of this subsection, and thereafter until the record in the proceeding has been filed as so provided, the issuing agency may at any time, upon such notice and in such manner as it shall deem proper, modify, terminate, or set aside any such order. Upon such filing of the record, the agency may modify, terminate, or set aside any such order with permission of the court.

(2) Any party to any proceeding under paragraph (1) may obtain a review of any order served pursuant to paragraph (1) of this subsection (other than an order issued with the consent of the depository institution or the institution-affiliated party concerned, or an order issued under paragraph (1) of subsection (g) of this section) by the filing in the court of appeals of the United States for the circuit in which the home office of the depository institution is located, or in the United States Court of Appeals for the District of Columbia Circuit, within thirty days after the date of service of such order, a written petition praying that the order of the agency be modified, terminated, or set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court to the agency, and thereupon the agency shall file in the court the record in the proceeding, as provided in section 2112 of title 28. Upon the filing of such petition, such court shall have jurisdiction, which upon the filing of the record shall except as provided in the last sentence of said paragraph (1) be exclusive, to affirm, modify, terminate, or set aside, in whole or in part, the order of the agency. Review of such proceedings shall be had as provided in chapter 7 of title 5. The judgment and decree of the court shall be final, except that the same shall be subject to review by the Supreme Court upon certiorari, as provided in section 1254 of title 28.

(3) The commencement of proceedings for judicial review under paragraph (2) of this subsection shall not, unless specifically ordered by the court, operate as a stay of any order issued by the agency.

**(i) Jurisdiction and enforcement; penalty**

(1) The appropriate Federal banking agency may in its discretion apply to the United States district court, or the United States court of any territory, within the jurisdiction of which the home office of the depository institution is located, for the enforcement of any effective and outstanding notice or order issued under this section or under section 1831o or 1831p–1 of this title, and such courts shall have jurisdiction and power to order and require compliance herewith; but except as otherwise provided in this section or under section 1831o or 1831p–1 of this title no court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any notice or order under any such section, or to review, modify, suspend, terminate, or set aside any such notice or order.

(2) CIVIL MONEY PENALTY.—

(A) FIRST TIER.—Any insured depository institution which, and any institution-affiliated party who—

(i) violates any law or regulation;

(ii) violates any final order or temporary order issued pursuant to subsection (b), (c), (e), (g), or (s) or any final order under section 1831o or 1831p–1 of this title;

(iii) violates any condition imposed in writing by a Federal banking agency in connection with any action on any application, notice, or other request by the depository institution or institution-affiliated party; or

(iv) violates any written agreement between such depository institution and such agency,

shall forfeit and pay a civil penalty of not more than $5,000 for each day during which such violation continues.

(B) SECOND TIER.—Notwithstanding subparagraph (A), any insured depository institution which, and any institution-affiliated party who—

(i)(I) commits any violation described in any clause of subparagraph (A);

(II) recklessly engages in an unsafe or unsound practice in conducting the affairs of such insured depository institution; or

(III) breaches any fiduciary duty;

(ii) which violation, practice, or breach—

(I) is part of a pattern of misconduct;

(II) causes or is likely to cause more than a minimal loss to such depository institution; or

(III) results in pecuniary gain or other benefit to such party,

shall forfeit and pay a civil penalty of not more than $25,000 for each day during which such violation, practice, or breach continues.

(C) THIRD TIER.—Notwithstanding subparagraphs (A) and (B), any insured depository institution which, and any institution-affiliated party who—

(i) knowingly—

(I) commits any violation described in any clause of subparagraph (A);

(II) engages in any unsafe or unsound practice in conducting the affairs of such depository institution; or

(III) breaches any fiduciary duty; and

(ii) knowingly or recklessly causes a substantial loss to such depository institution or a substantial pecuniary gain or other benefit to such party by reason of such violation, practice, or breach,

shall forfeit and pay a civil penalty in an amount not to exceed the applicable maximum amount determined under subparagraph (D) for each day during which such violation, practice, or breach continues.

(D) MAXIMUM AMOUNTS OF PENALTIES FOR ANY VIOLATION DESCRIBED IN SUBPARAGRAPH (C).—The maximum daily amount of any civil penalty which may be assessed pursuant to subparagraph (C) for any violation, practice, or breach described in such subparagraph is—

(i) in the case of any person other than an insured depository institution, an amount to not exceed $1,000,000; and

Appellate Case: 25-1079 Page: 1363 Date Filed: 05/16/2025 Entry ID: 5517644

(ii) in the case of any insured depository institution, an amount not to exceed the lesser of—

(I) $1,000,000; or

(II) 1 percent of the total assets of such institution.

(E) ASSESSMENT.—

(i) WRITTEN NOTICE.—Any penalty imposed under subparagraph (A), (B), or (C) may be assessed and collected by the appropriate Federal banking agency by written notice.

(ii) FINALITY OF ASSESSMENT.—If, with respect to any assessment under clause (i), a hearing is not requested pursuant to subparagraph (H) within the period of time allowed under such subparagraph, the assessment shall constitute a final and unappealable order.

(F) AUTHORITY TO MODIFY OR REMIT PENALTY.—Any appropriate Federal banking agency may compromise, modify, or remit any penalty which such agency may assess or had already assessed under subparagraph (A), (B), or (C).

(G) MITIGATING FACTORS.—In determining the amount of any penalty imposed under subparagraph (A), (B), or (C), the appropriate agency shall take into account the appropriateness of the penalty with respect to—

(i) the size of financial resources and good faith of the insured depository institution or other person charged;

(ii) the gravity of the violation;

(iii) the history of previous violations; and

(iv) such other matters as justice may require.

(H) HEARING.—The insured depository institution or other person against whom any penalty is assessed under this paragraph shall be afforded an agency hearing if such institution or person submits a request for such hearing within 20 days after the issuance of the notice of assessment.

(I) COLLECTION.—

(i) REFERRAL.—If any insured depository institution or other person fails to pay an assessment after any penalty assessed under this paragraph has become final, the agency that imposed the penalty shall recover the amount assessed by action in the appropriate United States district court.

(ii) APPROPRIATENESS OF PENALTY NOT REVIEWABLE.—In any civil action under clause (i), the validity and appropriateness of the penalty shall not be subject to review.

(J) DISBURSEMENT.—All penalties collected under authority of this paragraph shall be deposited into the Treasury.

(K) REGULATIONS.—Each appropriate Federal banking agency shall prescribe regulations establishing such procedures as may be necessary to carry out this paragraph.

(3) NOTICE UNDER THIS SECTION AFTER SEPARATION FROM SERVICE.—The resignation, termination of employment or participation, or separation of a institution-affiliated party (including a separation caused by the closing of an insured depository institution) shall not affect the jurisdiction and authority of the appropriate Federal banking agency to issue any notice or order and proceed under this section against any such party, if such notice or order is served before the end of the 6-year period beginning on the date such party ceased to be such a party with respect to such depository institution (whether such date occurs before, on, or after August 9, 1989).

(4) PREJUDGMENT ATTACHMENT.—

(A) IN GENERAL.—In any action brought by an appropriate Federal banking agency (excluding the Corporation when acting in a manner described in section 1821(d)(18) of this title) pursuant to this section, or in actions brought in aid of, or to enforce an order in, any administrative or other civil action for money damages, restitution, or civil money penalties brought by such agency, the court may, upon application of the agency, issue a restraining order that—

(i) prohibits any person subject to the proceeding from withdrawing, transferring, removing, dissipating, or disposing of any funds, assets or other property; and

(ii) appoints a temporary receiver to administer the restraining order.

(B) STANDARD.—

(i) SHOWING.—Rule 65 of the Federal Rules of Civil Procedure shall apply with respect to any proceeding under subparagraph (A) without regard to the requirement of such rule that the applicant show that the injury, loss, or damage is irreparable and immediate.

(ii) STATE PROCEEDING.—If, in the case of any proceeding in a State court, the court determines that rules of civil procedure available under the laws of such State provide substantially similar protections to a party's right to due process as Rule 65 (as modified with respect to such proceeding by clause (i)), the relief sought under subparagraph (A) may be requested under the laws of such State.

**(j) Criminal penalty**

Whoever, being subject to an order in effect under subsection (e) or (g), without the prior written approval of the appropriate Federal financial institutions regulatory agency, knowingly participates, directly or indirectly, in any manner (including by engaging in an activity specifically prohibited in such an order or in subsection (e)(6)) in the conduct of the affairs of—

(1) any insured depository institution;

(2) any institution treated as an insured bank under subsection (b)(3) or (b)(4);

(3) any insured credit union (as defined in section 101(7) of the Federal Credit Union Act [12 U.S.C. 1752(7)]); or

(4) any institution chartered under the Farm Credit Act of 1971 [12 U.S.C. 2001 et seq.],

shall be fined not more than $1,000,000, imprisoned for not more than 5 years, or both.

**(k) Repealed. Pub. L. 101–73, title IX, § 920(c), Aug. 9, 1989, 103 Stat. 488**

**(l) Notice of service**

Any service required or authorized to be made by the appropriate Federal banking agency

Appellate Case: 25-1079      Page: 1364      Date Filed: 05/16/2025   Entry ID: 5517644

under this section may be made by registered mail, or in such other manner reasonably calculated to give actual notice as the agency may by regulation or otherwise provide. Copies of any notice or order served by the agency upon any State depository institution or any institution-affiliated party, pursuant to the provisions of this section, shall also be sent to the appropriate State supervisory authority.

**(m) Notice to State authorities**

In connection with any proceeding under subsection (b), (c)(1), or (e) of this section involving an insured State bank or any institution-affiliated party, the appropriate Federal banking agency shall provide the appropriate State supervisory authority with notice of the agency's intent to institute such a proceeding and the grounds therefor. Unless within such time as the Federal banking agency deems appropriate in the light of the circumstances of the case (which time must be specified in the notice prescribed in the preceding sentence) satisfactory corrective action is effectuated by action of the State supervisory authority, the agency may proceed as provided in this section. No bank or other party who is the subject of any notice or order issued by the agency under this section shall have standing to raise the requirements of this subsection as ground for attacking the validity of any such notice or order.

**(n) Ancillary provisions; subpena power, etc.**

In the course of or in connection with any proceeding under this section, or in connection with any claim for insured deposits or any examination or investigation under section 1820(c) of this title, the agency conducting the proceeding, examination, or investigation or considering the claim for insured deposits, or any member or designated representative thereof, including any person designated to conduct any hearing under this section, shall have the power to administer oaths and affirmations, to take or cause to be taken depositions, and to issue, revoke, quash, or modify subpenas and subpenas duces tecum; and such agency is empowered to make rules and regulations with respect to any such proceedings, claims, examinations, or investigations. The attendance of witnesses and the production of documents provided for in this subsection may be required from any place in any State or in any territory or other place subject to the jurisdiction of the United States at any designated place where such proceeding is being conducted. Any such agency or any party to proceedings under this section may apply to the United States District Court for the District of Columbia, or the United States district court for the judicial district or the United States court in any territory in which such proceeding is being conducted, or where the witness resides or carries on business, for enforcement of any subpena or subpena duces tecum issued pursuant to this subsection, and such courts shall have jurisdiction and power to order and require compliance therewith. Witnesses subpenaed under this subsection shall be paid the same fees and mileage that are paid witnesses in the district courts of the United States. Any court having jurisdiction of any proceeding instituted under this section by an insured depository institution

or a director or officer thereof, may allow to any such party such reasonable expenses and attorneys' fees as it deems just and proper; and such expenses and fees shall be paid by the depository institution or from its assets. Any person who willfully shall fail or refuse to attend and testify or to answer any lawful inquiry or to produce books, papers, correspondence, memoranda, contracts, agreements, or other records, if in such person's power so to do, in obedience to the subpoena of the appropriate Federal banking agency, shall be guilty of a misdemeanor and, upon conviction, shall be subject to a fine of not more than $1,000 or to imprisonment for a term of not more than one year or both.

**(o) Termination of membership of State bank in Federal Reserve System**

Whenever the insured status of a State member bank shall be terminated by action of the Board of Directors, the Board of Governors of the Federal Reserve System shall terminate its membership in the Federal Reserve System in accordance with the provisions of subchapter VIII of chapter 3 of this title, and whenever the insured status of a national member bank shall be so terminated the Comptroller of the Currency shall appoint a receiver for the bank, which shall be the Corporation. Except as provided in subsection (c) or (d) of section 1814 of this title, whenever a member bank shall cease to be a member of the Federal Reserve System, its status as an insured depository institution shall, without notice or other action by the Board of Directors, terminate on the date the bank shall cease to be a member of the Federal Reserve System, with like effect as if its insured status had been terminated on said date by the Board of Directors after proceedings under subsection (a) of this section. Whenever the insured status of an insured Federal savings bank shall be terminated by action of the Board of Directors, the Comptroller of the Currency shall appoint a receiver for the bank, which shall be the Corporation.

**(p) Banks not receiving deposits**

Notwithstanding any other provision of law, whenever the Board of Directors shall determine that an insured depository institution is not engaged in the business of receiving deposits, other than trust funds as herein defined, the Corporation shall notify the depository institution that its insured status will terminate at the expiration of the first full assessment period following such notice. A finding by the Board of Directors that a depository institution is not engaged in the business of receiving deposits, other than such trust funds, shall be conclusive. The Board of Directors shall prescribe the notice to be given by the depository institution of such termination and the Corporation may publish notice thereof. Upon the termination of the insured status of any such depository institution, its deposits shall thereupon cease to be insured and the depository institution shall thereafter be relieved of all future obligations to the Corporation, including the obligation to pay future assessments.

**(q) Assumption of liabilities**

Whenever the liabilities of an insured depository institution for deposits shall have been as-

sumed by another insured depository institution or depository institutions, whether by way of merger, consolidation, or other statutory assumption, or pursuant to contract (1) the insured status of the depository institution whose liabilities are so assumed shall terminate on the date of receipt by the Corporation of satisfactory evidence of such assumption; (2) the separate insurance of all deposits so assumed shall terminate at the end of six months from the date such assumption takes effect or, in the case of any time deposit, the earliest maturity date after the six-month period. Where the deposits of an insured depository institution are assumed by a newly insured depository institution, the depository institution whose deposits are assumed shall not be required to pay any assessment with respect to the deposits which have been so assumed after the assessment period in which the assumption takes effect.

**(r) Action or proceeding against foreign bank; basis; removal of officer or other person; venue; service of process**

(1) Except as otherwise specifically provided in this section, the provisions of this section shall be applied to foreign banks in accordance with this subsection.

(2) An act or practice outside the United States on the part of a foreign bank or any officer, director, employee, or agent thereof may not constitute the basis for any action by any officer or agency of the United States under this section, unless—

(A) such officer or agency alleges a belief that such act or practice has been, is, or is likely to be a cause of or carried on in connection with or in furtherance of an act or practice within any one or more States which, in and of itself, would constitute an appropriate basis for action by a Federal officer or agency under this section; or

(B) the alleged act or practice is one which, if proven, would, in the judgment of the Board of Directors, adversely affect the insurance risk assumed by the Corporation.

(3) In any case in which any action or proceeding is brought pursuant to an allegation under paragraph (2) of this subsection for the suspension or removal of any officer, director, or other person associated with a foreign bank, and such person fails to appear promptly as a party to such action or proceeding and to comply with any effective order or judgment therein, any failure by the foreign bank to secure his removal from any office he holds in such bank and from any further participation in its affairs shall, in and of itself, constitute grounds for termination of the insurance of the deposits in any branch of the bank.

(4) Where the venue of any judicial or administrative proceeding under this section is to be determined by reference to the location of the home office of a bank, the venue of such a proceeding with respect to a foreign bank having one or more branches or agencies in not more than one judicial district or other relevant jurisdiction shall be within such jurisdiction. Where such a bank has branches or agencies in more than one such jurisdiction, the venue shall be in the jurisdiction within which the branch or branches or agency or agencies involved in the proceeding are located, and if there is more than one such jurisdiction, the venue shall be proper in any such jurisdiction in which the proceeding is brought or to which it may appropriately be transferred.

(5) Any service required or authorized to be made on a foreign bank may be made on any branch or agency located within any State, but if such service is in connection with an action or proceeding involving one or more branches or one or more agencies located in any State, service shall be made on at least one branch or agency so involved.

**(s) Compliance with monetary transaction recordkeeping and report requirements**

**(1) Compliance procedures required**

Each appropriate Federal banking agency shall prescribe regulations requiring insured depository institutions to establish and maintain procedures reasonably designed to assure and monitor the compliance of such depository institutions with the requirements of subchapter II of chapter 53 of title 31.

**(2) Examinations of depository institution to include review of compliance procedures**

**(A) In general**

Each examination of an insured depository institution by the appropriate Federal banking agency shall include a review of the procedures required to be established and maintained under paragraph (1).

**(B) Exam report requirement**

The report of examination shall describe any problem with the procedures maintained by the insured depository institution.

**(3) Order to comply with requirements**

If the appropriate Federal banking agency determines that an insured depository institution—

(A) has failed to establish and maintain the procedures described in paragraph (1); or

(B) has failed to correct any problem with the procedures maintained by such depository institution which was previously reported to the depository institution by such agency,

the agency shall issue an order in the manner prescribed in subsection (b) or (c) requiring such depository institution to cease and desist from its violation of this subsection or regulations prescribed under this subsection.

**(t) Authority of FDIC to take enforcement action against insured depository institutions and institution-affiliated parties**

**(1) Recommending action by appropriate Federal banking agency**

The Corporation, based on an examination of an insured depository institution by the Corporation or by the appropriate Federal banking agency or on other information, may recommend in writing to the appropriate Federal banking agency that the agency take any enforcement action authorized under section 1817(j) of this title, this section, or section 1828(j) of this title with respect to any insured

Appellate Case: 25-1079    Page: 1366    Date Filed: 05/16/2025 Entry ID: 5517644

depository institution, any depository institution holding company, or any institution-affiliated party. The recommendation shall be accompanied by a written explanation of the concerns giving rise to the recommendation.

**(2) FDIC's authority to act if appropriate Federal banking agency fails to follow recommendation**

If the appropriate Federal banking agency does not, before the end of the 60-day period beginning on the date on which the agency receives the recommendation under paragraph (1), take the enforcement action recommended by the Corporation or provide a plan acceptable to the Corporation for responding to the Corporation's concerns, the Corporation may take the recommended enforcement action if the Board of Directors determines, upon a vote of its members, that—

(A) the insured depository institution is in an unsafe or unsound condition;

(B) the institution or institution-affiliated party is engaging in unsafe or unsound practices, and the recommended enforcement action will prevent the institution or institution-affiliated party from continuing such practices;

(C) the conduct or threatened conduct (including any acts or omissions) poses a risk to the Deposit Insurance Fund, or may prejudice the interests of the institution's depositors or [4]

(D) the conduct or threatened conduct (including any acts or omissions) of the depository institution holding company poses a risk to the Deposit Insurance Fund, provided that such authority may not be used with respect to a depository institution holding company that is in generally sound condition and whose conduct does not pose a foreseeable and material risk of loss to the Deposit Insurance Fund;[5]

**(3) Effect of exigent circumstances**

**(A) Authority to act**

The Corporation may, upon a vote of the Board of Directors, and after notice to the appropriate Federal banking agency, exercise its authority under paragraph (2) in exigent circumstances without regard to the time period set forth in paragraph (2).

**(B) Agreement on exigent circumstances**

The Corporation shall, by agreement with the appropriate Federal banking agency, set forth those exigent circumstances in which the Corporation may act under subparagraph (A).

**(4) Corporation's powers; institution's duties**

For purposes of this subsection—

(A) the Corporation shall have the same powers with respect to any insured depository institution and its affiliates as the appropriate Federal banking agency has with respect to the institution and its affiliates; and

(B) the institution and its affiliates shall have the same duties and obligations with respect to the Corporation as the institution and its affiliates have with respect to the appropriate Federal banking agency.

**(5) Requests for formal actions and investigations**

**(A) Submission of requests**

A regional office of an appropriate Federal banking agency (including a Federal Reserve bank) that requests a formal investigation of or civil enforcement action against an insured depository institution or institution-affiliated party shall submit the request concurrently to the chief officer of the appropriate Federal banking agency and to the Corporation.

**(B) Agencies required to report on requests**

Each appropriate Federal banking agency shall report semiannually to the Corporation on the status or disposition of all requests under subparagraph (A), including the reasons for any decision by the agency to approve or deny such requests.

**(6) [6] Powers and duties with respect to depository institution holding companies**

For purposes of exercising the backup authority provided in this subsection—

(A) the Corporation shall have the same powers with respect to a depository institution holding company and its affiliates as the appropriate Federal banking agency has with respect to the holding company and its affiliates; and

(B) the holding company and its affiliates shall have the same duties and obligations with respect to the Corporation as the holding company and its affiliates have with respect to the appropriate Federal banking agency.

**(6) [6] Referral to Bureau of Consumer Financial Protection**

Subject to subtitle B of the Consumer Financial Protection Act of 2010 [12 U.S.C. 5511 et seq.], each appropriate Federal banking agency shall make a referral to the Bureau of Consumer Financial Protection when the Federal banking agency has a reasonable belief that a violation of an enumerated consumer law, as defined in the Consumer Financial Protection Act of 2010, has been committed by any insured depository institution or institution-affiliated party within the jurisdiction of that appropriate Federal banking agency.

**(u) Public disclosures of final orders and agreements**

**(1) In general**

The appropriate Federal banking agency shall publish and make available to the public on a monthly basis—

(A) any written agreement or other written statement for which a violation may be enforced by the appropriate Federal banking agency, unless the appropriate Federal banking agency, in its discretion, determines that publication would be contrary to the public interest;

---

[4] So in original. Probably should be "; or".

[5] So in original. The semicolon probably should be a period.

[6] So in original. Two pars. (6) have been enacted.

Appellate Case: 25-1079 Page: 1367 Date Filed: 05/16/2025 Entry ID: 5517644

(B) any final order issued with respect to any administrative enforcement proceeding initiated by such agency under this section or any other law; and

(C) any modification to or termination of any order or agreement made public pursuant to this paragraph.

**(2) Hearings**

All hearings on the record with respect to any notice of charges issued by a Federal banking agency shall be open to the public, unless the agency, in its discretion, determines that holding an open hearing would be contrary to the public interest.

**(3) Transcript of hearing**

A transcript that includes all testimony and other documentary evidence shall be prepared for all hearings commenced pursuant to subsection (i). A transcript of public hearings shall be made available to the public pursuant to section 552 of title 5.

**(4) Delay of publication under exceptional circumstances**

If the appropriate Federal banking agency makes a determination in writing that the publication of a final order pursuant to paragraph (1)(B) would seriously threaten the safety and soundness of an insured depository institution, the agency may delay the publication of the document for a reasonable time.

**(5) Documents filed under seal in public enforcement hearings**

The appropriate Federal banking agency may file any document or part of a document under seal in any administrative enforcement hearing commenced by the agency if disclosure of the document would be contrary to the public interest. A written report shall be made part of any determination to withhold any part of a document from the transcript of the hearing required by paragraph (2).

**(6) Retention of documents**

Each Federal banking agency shall keep and maintain a record, for a period of at least 6 years, of all documents described in paragraph (1) and all informal enforcement agreements and other supervisory actions and supporting documents issued with respect to or in connection with any administrative enforcement proceeding initiated by such agency under this section or any other laws.

**(7) Disclosures to Congress**

No provision of this subsection may be construed to authorize the withholding, or to prohibit the disclosure, of any information to the Congress or any committee or subcommittee of the Congress.

**(v) Foreign investigations**

**(1) Requesting assistance from foreign banking authorities**

In conducting any investigation, examination, or enforcement action under this chapter, the appropriate Federal banking agency may—

(A) request the assistance of any foreign banking authority; and

(B) maintain an office outside the United States.

**(2) Providing assistance to foreign banking authorities**

**(A) In general**

Any appropriate Federal banking agency may, at the request of any foreign banking authority, assist such authority if such authority states that the requesting authority is conducting an investigation to determine whether any person has violated, is violating, or is about to violate any law or regulation relating to banking matters or currency transactions administered or enforced by the requesting authority.

**(B) Investigation by Federal banking agency**

Any appropriate Federal banking agency may, in such agency's discretion, investigate and collect information and evidence pertinent to a request for assistance under subparagraph (A). Any such investigation shall comply with the laws of the United States and the policies and procedures of the appropriate Federal banking agency.

**(C) Factors to consider**

In deciding whether to provide assistance under this paragraph, the appropriate Federal banking agency shall consider—

(i) whether the requesting authority has agreed to provide reciprocal assistance with respect to banking matters within the jurisdiction of any appropriate Federal banking agency; and

(ii) whether compliance with the request would prejudice the public interest of the United States.

**(D) Treatment of foreign banking authority**

For purposes of any Federal law or appropriate Federal banking agency regulation relating to the collection or transfer of information by any appropriate Federal banking agency, the foreign banking authority shall be treated as another appropriate Federal banking agency.

**(3) Rule of construction**

Paragraphs (1) and (2) shall not be construed to limit the authority of an appropriate Federal banking agency or any other Federal agency to provide or receive assistance or information to or from any foreign authority with respect to any matter.

**(w) Termination of insurance for money laundering or cash transaction reporting offenses**

**(1) In general**

**(A) Conviction of title 18 offenses**

**(i) Duty to notify**

If an insured State depository institution has been convicted of any criminal offense under section 1956 or 1957 of title 18, the Attorney General shall provide to the Corporation a written notification of the conviction and shall include a certified copy of the order of conviction from the court rendering the decision.

**(ii) Notice of termination; pretermination hearing**

After receipt of written notification from the Attorney General by the Corpora-

tion of such a conviction, the Board of Directors shall issue to the insured depository institution a notice of its intention to terminate the insured status of the insured depository institution and schedule a hearing on the matter, which shall be conducted in all respects as a termination hearing pursuant to paragraphs (3) through (5) of subsection (a).

**(B) Conviction of title 31 offenses**

If an insured State depository institution is convicted of any criminal offense under section 5322 or 5324 of title 31 after receipt of written notification from the Attorney General by the Corporation, the Board of Directors may initiate proceedings to terminate the insured status of the insured depository institution in the manner described in subparagraph (A).

**(C) Notice to State supervisor**

The Corporation shall simultaneously transmit a copy of any notice issued under this paragraph to the appropriate State financial institutions supervisor.

**(2) Factors to be considered**

In determining whether to terminate insurance under paragraph (1), the Board of Directors shall take into account the following factors:

(A) The extent to which directors or senior executive officers of the depository institution knew of, or were involved in, the commission of the money laundering offense of which the institution was found guilty.

(B) The extent to which the offense occurred despite the existence of policies and procedures within the depository institution which were designed to prevent the occurrence of any such offense.

(C) The extent to which the depository institution has fully cooperated with law enforcement authorities with respect to the investigation of the money laundering offense of which the institution was found guilty.

(D) The extent to which the depository institution has implemented additional internal controls (since the commission of the offense of which the depository institution was found guilty) to prevent the occurrence of any other money laundering offense.

(E) The extent to which the interest of the local community in having adequate deposit and credit services available would be threatened by the termination of insurance.

**(3) Notice to State banking supervisor and public**

When the order to terminate insured status initiated pursuant to this subsection is final, the Board of Directors shall—

(A) notify the State banking supervisor of any State depository institution described in paragraph (1), where appropriate, at least 10 days prior to the effective date of the order of termination of the insured status of such depository institution, including a State branch of a foreign bank; and

(B) publish notice of the termination of the insured status of the depository institution in the Federal Register.

**(4) Temporary insurance of previously insured deposits**

Upon termination of the insured status of any State depository institution pursuant to paragraph (1), the deposits of such depository institution shall be treated in accordance with subsection (a)(7).

**(5) Successor liability**

This subsection shall not apply to a successor to the interests of, or a person who acquires, an insured depository institution that violated a provision of law described in paragraph (1), if the successor succeeds to the interests of the violator, or the acquisition is made, in good faith and not for purposes of evading this subsection or regulations prescribed under this subsection.

**(6) "Senior executive officer" defined**

The term "senior executive officer" has the same meaning as in regulations prescribed under section 1831i(f) of this title.

(Sept. 21, 1950, ch. 967, §2[8], 64 Stat. 879; Pub. L. 89–695, title II, §§202, 204, Oct. 16, 1966, 80 Stat. 1046, 1054; Pub. L. 93–495, title I, §110, Oct. 28, 1974, 88 Stat. 1506; Pub. L. 95–369, §§6(c)(14), (15), 11, Sept. 17, 1978, 92 Stat. 618, 624; Pub. L. 95–630, title I, §§107(a)(1), (b), (c)(1), (d)(1), (e)(1), 111(a), title II, §208(a), title III, §§303, 304, Nov. 10, 1978, 92 Stat. 3649, 3653, 3654, 3656, 3660, 3665, 3674, 3676; Pub. L. 97–320, title I, §113(g), (h), title IV, §§404(c), 424(c), (d)(6), (e), 425(b), (c), 427(d), 433(a), Oct. 15, 1982, 96 Stat. 1473, 1474, 1512, 1523–1527; Pub. L. 99–570, title I, §1359(a), Oct. 27, 1986, 100 Stat. 3207–27; Pub. L. 101–73, title II, §201, title IX, §§901(b)(1), (d), 902(a), 903(a), 904(a), 905(a), 906(a), 907(a), 908(a), 912, 913(a), 920(a), (c), 926, Aug. 9, 1989, 103 Stat. 187, 446, 450, 453, 457, 459, 462, 477, 482, 483, 488; Pub. L. 101–647, title XXV, §§2521(b)(1), 2532(a), 2547(a)(1), (2), 2596(a), (b), Nov. 29, 1990, 104 Stat. 4864, 4880, 4886, 4887, 4908; Pub. L. 102–233, title III, §302(a), Dec. 12, 1991, 105 Stat. 1767; Pub. L. 102–242, title I, §131(c)(1), (2), title III, §§302(e)(5), formerly (e)(4), 307, Dec. 19, 1991, 105 Stat. 2266, 2349, 2360; Pub. L. 102–550, title XV, §§1503(a), 1504(a), title XVI, §§1603(d)(2)–(4), 1605(a)(5)(A), (11), Oct. 28, 1992, 106 Stat. 4048, 4051, 4080, 4085, 4086; Pub. L. 102–558, title III, §§303(b)(6)(A), 305, Oct. 28, 1992, 106 Stat. 4225, 4226; Pub. L. 103–204, §25, Dec. 17, 1993, 107 Stat. 2408; Pub. L. 103–325, title IV, §411(c)(2)(A), title VI, §602(a)(11)–(18), Sept. 23, 1994, 108 Stat. 2253, 2289; Pub. L. 105–164, §3(a)(2), Mar. 20, 1998, 112 Stat. 35; Pub. L. 105–362, title X, §1001(d), Nov. 10, 1998, 112 Stat. 3291; Pub. L. 106–569, title XII, §1232, Dec. 27, 2000, 114 Stat. 3037; Pub. L. 109–173, §§3(a)(6), (7), 8(a)(10), Feb. 15, 2006, 119 Stat. 3605, 3611; Pub. L. 109–351, title III, §303, title VII, §§702(c), 708(a), 710(b), 715(a), 716(a), 717, Oct. 13, 2006, 120 Stat. 1970, 1985, 1988, 1991, 1995, 1996; Pub. L. 110–343, div. A, title I, §126(b), Oct. 3, 2008, 122 Stat. 3795; Pub. L. 111–203, title I, §172(b), title III, §363(3), title X, §1090(1), July 21, 2010, 124 Stat. 1439, 1551, 2093.)

### Editorial Notes

#### References in Text

Subsections (a) and (b) of section 3104 of this title, referred to in subsec. (a)(1)(E), were redesignated sub-

Appellate Case: 25-1079 Page: 1369 Date Filed: 05/16/2025 Entry ID: 5517644

sections (b) and (c), respectively, of section 3104 of this title by Pub. L. 103–328, title I, § 107(a)(1), Sept. 29, 1994, 108 Stat. 2358.

The Bank Holding Company Act of 1956, referred to in subsec. (b)(3), is act May 9, 1956, ch. 240, 70 Stat. 133, which is classified principally to chapter 17 (§ 1841 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 1841 of this title and Tables.

Section 25(a) of the Federal Reserve Act, referred to in subsec. (b)(3), which is classified to subchapter II (§ 611 et seq.) of chapter 6 of this title, was renumbered section 25A of that Act by Pub. L. 102–242, title I, § 142(e)(2), Dec. 19, 1991, 105 Stat. 2281. Section 25 of the Federal Reserve Act is classified to subchapter I (§ 601 et seq.) of chapter 6 of this title.

The Federal Rules of Civil Procedure, referred to in subsecs. (b)(10) and (i)(4)(B), are set out in the Appendix to Title 28, Judiciary and Judicial Procedure.

The Depository Institution Management Interlocks Act, referred to in subsec. (e)(2)(A)(iii), is title II of Pub. L. 95–630, Nov. 10, 1978, 92 Stat. 3672, which is classified principally to chapter 33 (§ 3201 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 3201 of this title and Tables.

Subsection (b)(9) of this section, referred to in subsec. (e)(7)(A)(ii), was repealed by Pub. L. 111–203, § 363(3)(C). See 2010 Amendment note below.

The Federal Credit Union Act, referred to in subsec. (e)(7)(A)(iii), is act June 26, 1934, ch. 750, 48 Stat. 1216, which is classified generally to chapter 14 (§ 1751 et seq.) of this title. For complete classification of this Act to the Code, see section 1751 of this title and Tables.

The Farm Credit Act of 1971, referred to in subsecs. (e)(7)(A)(iv), (D)(ii) and (j)(4), is Pub. L. 92–181, Dec. 10, 1971, 85 Stat. 583, which is classified generally to chapter 23 (§ 2001 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 2001 of this title and Tables.

Subchapter VIII of chapter 3 of this title, referred to in subsec. (o), was in the original "section 9 of the Federal Reserve Act", meaning section 9 of act Dec. 23, 1913, ch. 6, 38 Stat. 251, which is classified generally to subchapter VIII (§ 321 et seq.) of chapter 3 of this title.

The Consumer Financial Protection Act of 2010, referred to in subsec. (t)(6), is title X of Pub. L. 111–203, July 21, 2010, 124 Stat. 1955, which enacted subchapter V (§ 5481 et seq.) of chapter 53 of this title and enacted, amended, and repealed numerous other sections and notes in the Code. Subtitle B of the Act is classified generally to part B (§ 5511 et seq.) of subchapter V of chapter 53 of this title. For complete classification of this Act to the Code, see Short Title note set out under section 5301 of this title and Tables.

PRIOR PROVISIONS

Section is derived from subsec. (i) of former section 264 of this title. See Codification note set out under section 1811 of this title.

AMENDMENTS

2010—Subsec. (a)(8)(B)(ii). Pub. L. 111–203, § 363(3)(A), substituted "Comptroller of the Currency" for "Director of the Office of Thrift Supervision" in two places in concluding provisions.

Subsec. (b)(3). Pub. L. 111–203, § 363(3)(B), inserted "any savings and loan holding company and any subsidiary (other than a depository institution) of a savings and loan holding company (as such terms are defined in section 1467a of this title)), any noninsured State member bank" before "and to any organization" and "or against a savings and loan holding company or any subsidiary thereof (other than a depository institution or a subsidiary of such depository institution)" before the period at the end.

Subsec. (b)(9). Pub. L. 111–203, § 363(3)(C), substituted "[Repealed]" for heading and text. Text read as follows: "Subsections (a) through (s) of this section and sub-

section (u) of this section shall apply to any savings and loan holding company and to any subsidiary (other than a bank or subsidiary of that bank) of a savings and loan holding company,, [sic] whether wholly or partly owned, in the same manner as such subsections apply to a savings association."

Subsec. (e)(7)(A)(v) to (vii). Pub. L. 111–203, § 363(3)(D)(i), inserted "and" after the semicolon in cl. (v), substituted "Agency" for "Board" and a period at the end for "; and" in cl. (vi), and struck out cl. (vii) which read as follows: "the Resolution Trust Corporation."

Subsec. (e)(7)(D)(iii) to (v). Pub. L. 111–203, § 363(3)(D)(ii), inserted "and" after the semicolon in cl. (iii), substituted "Agency" for "Board" and a period at the end for "; and" in cl. (iv), and struck out cl. (v) which read as follows: "the Thrift Depositor Protection Oversight Board, in the case of the Resolution Trust Corporation."

Subsec. (j)(2). Pub. L. 111–203, § 363(3)(E)(i), which directed striking out ", or a savings association under subsection (b)(9) of this section", was executed by striking out ", or as a savings association under subsection (b)(9)" before the semicolon at the end, to reflect the probable intent of Congress, because original text did not include the phrase "of this section".

Subsec. (j)(3) to (5). Pub. L. 111–203, § 363(3)(E)(ii)–(iv), inserted "or" after the semicolon in par. (3), substituted a comma at the end for "; or" in par. (4), and struck out par. (5) which read as follows: "the Resolution Trust Corporation.".

Subsec. (o). Pub. L. 111–203, § 363(3)(F), substituted "Directors, the Comptroller of the Currency" for "Directors, the Director of the Office of Thrift Supervision".

Subsec. (t)(1). Pub. L. 111–203, § 172(b)(1), inserted ", any depository institution holding company," before "or any institution-affiliated party".

Subsec. (t)(2)(D). Pub. L. 111–203, § 172(b)(2), added subpar. (D).

Subsec. (t)(6). Pub. L. 111–203, § 1090(1), added par. (6) relating to referral to Bureau of Consumer Financial Protection.

Pub. L. 111–203, § 172(b)(3), added par. (6) relating to powers and duties with respect to depository institution holding companies.

Subsec. (w)(3)(A). Pub. L. 111–203, § 363(3)(G), struck out "and the Office of Thrift Supervision" after "paragraph (1)".

2008—Subsec. (c)(4). Pub. L. 110–343 added par. (4).

2006—Subsec. (b)(1). Pub. L. 109–351, §§ 716(a)(1), 717(1), in first sentence, substituted "in writing by a Federal banking agency" for "in writing by the agency", "any action on any application, notice, or other request by the depository institution or institution-affiliated party," for "the granting of any application or other request by the depository institution", and "the appropriate Federal banking agency for the depository institution may issue and serve" for "the agency may issue and serve".

Subsec. (b)(3). Pub. L. 109–351, § 702(c)(1), substituted "This subsection, subsections (c) through (s) and subsection (u) of this section, and section 1831aa of this title" for "This subsection and subsections (c) through (s) and subsection (u) of this section".

Subsec. (b)(4). Pub. L. 109–351, § 702(c)(2), substituted "This subsection, subsections (c) through (s) and subsection (u) of this section, and section 1831aa of this title" for "This subsection and subsections (c) through (s) and subsection (u) of this section".

Subsec. (e)(1). Pub. L. 109–351, § 717(2)(B), substituted "the appropriate Federal banking agency for the depository institution may serve upon such party" for "the agency may serve upon such party" in concluding provisions.

Subsec. (e)(1)(A)(i)(III). Pub. L. 109–351, §§ 716(a)(2), 717(2)(A), substituted "in writing by a Federal banking agency" for "in writing by the appropriate Federal banking agency" and "any action on any application, notice, or request by such depository institution or in-

Appellate Case: 25-1079    Page: 1370    Date Filed: 05/16/2025 Entry ID: 5517644

stitution-affiliated party" for "the grant of any application or other request by such depository institution".

Subsec. (e)(2)(A)(iv). Pub. L. 109–351, §710(b), added cl. (iv).

Subsec. (e)(4). Pub. L. 109–351, §303, struck out "In any action brought under this section by the Comptroller of the Currency in respect to any such party with respect to a national banking association or a District depository institution, the findings and conclusions of the Administrative Law Judge shall be certified to the Board of Governors of the Federal Reserve System for the determination of whether any order shall issue." before "Any such order shall become effective".

Subsec. (g). Pub. L. 109–351, §708(a)(2), inserted heading.

Subsec. (g)(1)(A). Pub. L. 109–351, §708(a)(1)(A), substituted, in introductory provisions, "is the subject of any information, indictment, or complaint, involving the commission of or participation in" for "is charged in any information, indictment, or complaint, with the commission of or participation in" and, in concluding provisions, "posed, poses, or may pose a threat to the interests of the depositors of, or threatened, threatens, or may threaten to impair public confidence in, any relevant depository institution (as defined in subparagraph (E))," for "may pose a threat to the interests of the depository institution's depositors or may threaten to impair public confidence in the depository institution," and "affairs of any depository institution" for "affairs of the depository institution".

Subsec. (g)(1)(B)(i). Pub. L. 109–351, §708(a)(1)(B), substituted "any depository institution that the subject of the notice is affiliated with at the time the notice is issued" for "the depository institution".

Subsec. (g)(1)(C)(i). Pub. L. 109–351, §708(a)(1)(C), substituted "posed, poses, or may pose a threat to the interests of the depositors of, or threatened, threatens, or may threaten to impair public confidence in, any relevant depository institution (as defined in subparagraph (E))," for "may pose a threat to the interests of the depository institution's depositors or may threaten to impair public confidence in the depository institution," and "affairs of any depository institution" for "affairs of the depository institution".

Subsec. (g)(1)(C)(ii). Pub. L. 109–351, §708(a)(1)(D), substituted "affairs of any depository institution" for "affairs of the depository institution".

Subsec. (g)(1)(D)(i). Pub. L. 109–351, §708(a)(1)(E), substituted "any depository institution that the subject of the order is affiliated with at the time the order is issued" for "the depository institution".

Subsec. (g)(1)(E). Pub. L. 109–351, §708(a)(1)(F), added subpar. (E).

Subsec. (i)(2)(A)(iii). Pub. L. 109–351, §§716(a)(3), 717(3), substituted "in writing by a Federal banking agency" for "in writing by the appropriate Federal banking agency" and "any action on any application, notice, or other request by the depository institution or institution-affiliated party" for "the grant of any application or other request by such depository institution".

Subsec. (i)(3). Pub. L. 109–351, §715(a), inserted "or order" after "notice" in two places.

Subsec. (p). Pub. L. 109–173, §3(a)(6), struck out "semiannual" before "assessment period".

Subsec. (q). Pub. L. 109–173, §3(a)(7), substituted "assessment period" for "semiannual period".

Subsec. (t)(2)(C). Pub. L. 109–173, §8(a)(10), substituted "Deposit Insurance Fund" for "deposit insurance fund".

2000—Subsec. (o). Pub. L. 106–569 substituted "subsection (c) or (d) of section 1814" for "subsection (d) of section 1814".

1998—Subsec. (b)(9). Pub. L. 105–164, §3(a)(2)(A), struck out "to any service corporation of a savings association and to any subsidiary of such service corporation" after "of a savings and loan holding company,".

Subsec. (e)(7)(A)(ii). Pub. L. 105–164, §3(a)(2)(B), substituted "(b)(9)" for "(b)(8)".

Subsec. (j)(2). Pub. L. 105–164, §3(a)(2)(C), substituted "(b)(9)" for "(b)(8)".

Subsec. (u)(3) to (8). Pub. L. 105–362 redesignated pars. (4) to (8) as (3) to (7), respectively, and struck out heading and text of former par. (3). Text read as follows: "A written report shall be made part of a determination not to hold a public hearing pursuant to paragraph (2) or not to publish a document pursuant to paragraph (1)(A). At the end of each calendar quarter, all such reports shall be transmitted to the Congress."

1994—Subsec. (a)(3). Pub. L. 103–325, §602(a)(11), substituted "paragraph (2)(B)" for "subparagraph (B) of this subsection".

Subsec. (a)(7). Pub. L. 103–325, §602(a)(12), inserted comma after "Board of Directors" in first sentence and substituted "the period" for "the period the period" in third sentence.

Subsec. (b)(4). Pub. L. 103–325, §602(a)(13), substituted "paragraph (3)" for "subparagraph (3)".

Subsec. (c)(2). Pub. L. 103–325, §602(a)(14), substituted "injunction" for "injuction".

Subsec. (g)(1)(A)(ii). Pub. L. 103–325, §411(c)(2)(A), substituted "section 5322 or 5324 of title 31" for "section 5322 of title 31".

Subsec. (g)(2). Pub. L. 103–325, §602(a)(15), substituted "bank" for "depository institution" wherever appearing.

Subsec. (o). Pub. L. 103–325, §602(a)(16), in second sentence, substituted "subsection (d)" for "subsection (b)" and "Board of Directors" for "board of directors" in two places.

Subsec. (p). Pub. L. 103–325, §602(a)(17), substituted "depository" for "banking" wherever appearing.

Subsec. (r)(2). Pub. L. 103–325, §602(a)(18), substituted "agent thereof" for "agent therof".

Subsec. (w)(1)(B). Pub. L. 103–325, §411(c)(2)(A), substituted "section 5322 or 5324 of title 31" for "section 5322 of title 31".

1993—Subsec. (b)(10). Pub. L. 103–204, §25(2), added par. (10).

Subsec. (i)(4)(B). Pub. L. 103–204, §25(1), added subpar. (B) and struck out former subpar. (B) which read as follows: "A permanent or temporary injunction or restraining order shall be granted without bond upon a prima facie showing that money damages, restitution, or civil money penalties, as sought by such agency, is appropriate."

1992—Subsec. (a)(3). Pub. L. 102–550, §1503(a)(2), inserted "of this subsection or subsection (w)" after "subparagraph (B)".

Subsec. (e)(2). Pub. L. 102–550, §1504(a)(1), amended par. (2) generally. Prior to amendment, par. (2) read as follows: "Whenever, in the opinion of the appropriate Federal banking agency, any director or officer of an insured depository institution has committed any violation of the Depository Institution Management Interlocks Act, the agency may serve upon such director or officer a written notice of its intention to remove him from office."

Subsec. (g)(1). Pub. L. 102–550, §1504(a)(2), amended par. (1) generally, subdividing existing provisions into subpars. (A) to (D) and, in subpar. (A), including violations under section 1956, 1957, or 1960 of title 18, or section 5322 of title 31, as cause for suspension of any institution-affiliated party.

Subsec. (i)(1). Pub. L. 102–550, §1603(d)(3), inserted reference to section 1831p–1 of this title in two places, and substituted "order under any such section, or to review" for "order under this section, or to review".

Pub. L. 102–550, §1603(d)(2), amended directory language of Pub. L. 102–242, §131(c)(2)(A). See 1991 Amendment note below.

Subsec. (i)(2)(A)(ii). Pub. L. 102–550, §1603(d)(4), substituted "subsection (b), (c), (e), (g), or (s) or any final order under section 1831o or 1831p–1 of this title" for "subsection (b), (c), (e), (g), or (s) of this section, or final order under section 1831o of this title".

Subsec. (q). Pub. L. 102–558, §303(b)(6)(A), amended directory language of Pub. L. 102–242, §302(e). See 1991 amendment note below. Pub. L. 102–550, §1605(a)(5)(A),

Appellate Case: 25-1079    Page: 1371    Date Filed: 05/16/2025 Entry ID: 5517644

which contained an identical amendment, was repealed, effective Oct. 28, 1992, by Pub. L. 102–558, §305, set out in a Repeal of Duplicative Provisions note under section 1815 of this title.

Subsec. (t)(2)(B). Pub. L. 102–550, §1605(a)(11)(A), inserted "or institution-affiliated party" after "institution" in two places.

Subsec. (t)(2)(C). Pub. L. 102–550, §1605(a)(11)(B), substituted "the conduct or threatened conduct" for "the institution's conduct or threatened conduct".

Subsec. (t)(5)(A). Pub. L. 102–550, §1605(a)(11)(C), inserted "or institution-affiliated party" after "depository institution".

Subsec. (w). Pub. L. 102–550, §1503(a)(1), added subsec. (w).

1991—Subsec. (b)(8), (9). Pub. L. 102–242, §131(c)(1), added par. (8) and redesignated former par. (8) as (9).

Subsec. (i)(1). Pub. L. 102–242, §131(c)(2)(A), as amended by Pub. L. 102–550, §1603(d)(2), inserted "or under section 1831o of this title" after first and second references to "section".

Subsec. (i)(2)(A)(ii). Pub. L. 102–242, §131(c)(2)(B), inserted ", or final order under section 1831o of this title" after "section".

Subsec. (q). Pub. L. 102–242, §302(e)(5), as renumbered by Pub. L. 102–558, §303(b)(6)(A), substituted "assessment with respect to the deposits" for "assessment upon the deposits".

Subsec. (t). Pub. L. 102–242, §307, amended subsec. (t) generally, substituting present provisions for provisions relating to authority of Board to take enforcement action against savings associations.

1990—Subsec. (b)(4). Pub. L. 101–647, §2596(a)(2), substituted "subsections (c) through (s) and subsection (u) of this section" for "subsections (c), (d), (h), (i), (k), (l), (m), and (n) of this section".

Subsec. (b)(6). Pub. L. 101–647, §2596(a)(1), inserted "or remedy" after "to correct".

Subsec. (c)(1). Pub. L. 101–647, §2596(b), inserted "or remedy" after "to prevent" and substituted "(b)(6)" for "(b)(6)(B)".

Subsec. (h)(1). Pub. L. 101–647, §2547(a)(2), struck out after first sentence "Such hearing shall be private, unless the appropriate Federal banking agency, in its discretion, after fully considering the views of the party afforded the hearing, determines that a public hearing is necessary to protect the public interest."

Subsec. (i)(4). Pub. L. 101–647, §2521(b)(1), added par. (4).

Subsec. (u). Pub. L. 101–647, §2547(a)(1), amended subsec. (u) generally. Prior to amendment, subsec. (u) read as follows:

"(1) IN GENERAL.—The appropriate Federal banking agency shall publish and make available to the public—

"(A) any final order issued with respect to any administrative enforcement proceeding initiated by such agency under this section or any other provision of law; and

"(B) any modification to or termination of any final order described in subparagraph (A) of this paragraph.

"(2) DELAY OF PUBLICATION UNDER EXCEPTIONAL CIRCUMSTANCES.—If the appropriate Federal banking agency makes a determination in writing that the publication of any final order pursuant to paragraph (1) would seriously threaten the safety or soundness of an insured depository institution, such agency may delay the publication of such order for a reasonable time."

Subsec. (v). Pub. L. 101–647, §2532(a), added subsec. (v).

1989—Pub. L. 101–73, §201(a), substituted references to insured depository institutions for references to insured banks wherever appearing in this section.

Subsec. (a). Pub. L. 101–73, §926(1), inserted heading.

Subsec. (a)(1) to (3). Pub. L. 101–73, §926(1), added pars. (1) to (3) and struck out first four sentences which read as follows: "Any insured bank (except a national member bank, a foreign bank having an insured branch which is a Federal branch, a foreign bank having an insured branch which is required to be insured under section 3104(a) or (b) of this title, or State member bank)

may, upon not less than ninety days' written notice to the Corporation, terminate its status as an insured bank. Whenever the Board of Directors shall find that an insured bank or its directors or trustees have engaged or are engaging in unsafe or unsound practices in conducting the business of such bank, or is in an unsafe or unsound condition to continue operations as an insured bank, or violated an applicable law, rule, regulation or order, or any condition imposed in writing by the Corporation in connection with the granting of any application or other request by the bank, or any written agreement entered into with the Corporation the Board of Directors shall first give to the Comptroller of the Currency in the case of a national bank or a district bank, to the Federal Home Loan Bank Board in the case of an insured Federal savings bank, to the authority having supervision of the bank in the case of a State bank, and to the Board of Governors of the Federal Reserve System in the case of a State member bank, a statement with respect to such practices or violations for the purpose of securing the correction thereof and shall give a copy thereof to the bank. Unless such correction shall be made within one hundred and twenty days, or such shorter period not less than twenty days fixed by the Corporation in any case where the Board of Directors in its discretion has determined that the insurance risk of the Corporation is unduly jeopardized, or fixed by the Comptroller of the Currency in the case of a national bank, or the Federal Home Loan Bank Board in the case of an insured Federal savings bank, or the State authority in the case of a State bank, or Board of Governors of the Federal Reserve System in the case of a State member bank as the case may be, the Board of Directors, if it shall determine to proceed further, shall give to the bank not less than thirty days' written notice of intention to terminate the status of the bank as an insured bank, and shall fix a time and place for a hearing before the Board of Directors or before a person designated by it to conduct such hearing, at which evidence may be produced, and upon such evidence the Board of Directors shall make written findings which shall be conclusive. If the Board of Directors shall find that any unsafe or unsound practice or condition or violation specified in such statement has been established and has not been corrected within the time above prescribed in which to make such corrections, the Board of Directors may order that the insured status of the bank be terminated on a date subsequent to such finding and to the expiration of the time specified in such notice of intention."

Subsec. (a)(4). Pub. L. 101–73, §926(2), designated fifth sentence as par. (4) and inserted heading.

Pub. L. 101–73, §901(d), substituted "depository institution" for "bank".

Subsec. (a)(5). Pub. L. 101–73, §926(3), designated sixth sentence as par. (5), inserted heading, and substituted "Any insured depository institution whose insured status" for "Any insured bank whose insured status".

Subsec. (a)(6). Pub. L. 101–73, §926(4), designated seventh sentence as par. (6) and inserted heading.

Pub. L. 101–73, §901(d), substituted "depository institution" for "bank" wherever appearing.

Subsec. (a)(7). Pub. L. 101–73, §926(5), (6), designated last three sentences as par. (7), inserted heading, substituted "of at least 6 months or up to 2 years, within the discretion of the Board of Directors" for first reference to "of two years", and "the period referred to in the 1st sentence" for second reference to "of two years", and struck out "of two years" after "within such period".

Pub. L. 101–73, §901(d), substituted "depository institution" for "bank" wherever appearing.

Subsec. (a)(8) to (10). Pub. L. 101–73, §926(7), added pars. (8) to (10).

Subsec. (b)(1). Pub. L. 101–73, §901(d), substituted "depository institution" for "bank" wherever appearing.

Pub. L. 101–73, §901(b)(1)(A)(1), (B), substituted references to institution-affiliated parties for references to directors, officers, employees, agents, or other persons participating in the conduct of banks.

Appellate Case: 25-1079     Page: 1372     Date Filed: 05/16/2025 Entry ID: 5517644

Pub. L. 101–73, § 901(b)(1)(A)(ii), which directed that "institution-affiliated parties" be substituted for "directors, officers, employees, agents, or other persons participating in the conduct of the affairs of such bank", was executed by making the substitution for "directors, officers, employees, and other persons participating in the conduct of the affairs of such bank", as the probable intent of Congress.

Subsec. (b)(2). Pub. L. 101–73, § 901(d), substituted "depository institution" for "bank".

Subsec. (b)(3). Pub. L. 101–73, § 902(a)(1)(A), substituted "subsections (c) through (s) and subsection (u)" for "subsections (c) through (f) and (h) through (n)".

Subsec. (b)(4). Pub. L. 101–73, § 902(a)(1)(B), which directed the substitution of "subsections (c) through (s) and subsection (u)" for "subsections (c) through (f) and (h) through (n)", could not be executed because the words "subsections (c) through (f) and (h) through (n)" did not appear. See 1990 Amendment note above.

Subsec. (b)(6) to (8). Pub. L. 101–73, § 902(a)(1)(C), added pars. (6) to (8).

Subsec. (c)(1). Pub. L. 101–73, § 902(a)(2)(A), substituted "insolvency or significant dissipation" for "insolvency or substantial dissipation", struck out "seriously" before "weaken the condition of" and before "prejudice the interests of", and inserted after first sentence "Such order may include any requirement authorized under subsection (b)(6)(B)".

Pub. L. 101–73, § 901(d), substituted "depository institution" for "bank" wherever appearing.

Pub. L. 101–73, § 901(b)(1)(B), substituted references to institution-affiliated parties for references to directors, officers, employees, agents or other persons participating in the conduct of the affairs of banks.

Subsec. (c)(2). Pub. L. 101–73, § 901(d), substituted "depository institution" for "bank" wherever appearing.

Pub. L. 101–73, § 901(b)(1)(B), substituted references to institution-affiliated parties for references to directors, officers, employees, agents or other persons participating in the conduct of the affairs of banks.

Subsec. (c)(3). Pub. L. 101–73, § 902(a)(2)(B), added par. (3).

Subsec. (d). Pub. L. 101–73, § 901(d), substituted "depository institution" for "bank".

Subsec. (e)(1). Pub. L. 101–73, § 903(a)(1), amended par. (1) generally, by, among other changes, giving existing provisions subpar. designations, and by adding as conditions for removal of a party a violation of any condition imposed by writing in connection with a grant of any application or request, and violation of any written agreement between such depository institution and agency.

Subsec. (e)(2). Pub. L. 101–73, § 903(a)(2), redesignated par. (3) as (2) and struck out former par. (2) which read as follows: "Whenever, in the opinion of the appropriate Federal banking agency, any director or officer of an insured bank, by conduct or practice with respect to another insured bank or other business institution which resulted in substantial financial loss or other damage, has evidenced either his personal dishonesty or a wilful or continuing disregard for its safety and soundness, and, in addition, has evidenced his unfitness to continue as a director or officer and, whenever, in the opinion of the appropriate Federal banking agency, any other person participating in the conduct of the affairs of an insured bank, by conduct or practice with respect to such bank or other insured bank or other business institution which resulted in substantial financial loss or other damage, has evidenced either his personal dishonesty or a wilful or continuing disregard for its safety and soundness, and, in addition, has evidenced his unfitness to participate in the conduct of the affairs of such insured bank, the agency may serve upon such director, officer, or other person a written notice of its intention to remove him from office or to prohibit his further participation in any manner in the conduct of the affairs of the bank."

Subsec. (e)(3). Pub. L. 101–73, § 903(a)(2), added par. (3). Former par. (3) redesignated (2).

Subsec. (e)(4). Pub. L. 101–73, § 903(a)(2), redesignated par. (5) as (4) and struck out former par. (4) which read as follows: "In respect to any director or officer of an insured bank or any other person referred to in paragraph (1), (2), or (3) of this subsection, the appropriate Federal banking agency may, if it deems it necessary for the protection of the bank or the interests of its depositors, by written notice to such effect served upon such director, officer, or other person, suspend him from office or prohibit him from further participation in any manner in the conduct of the affairs of the bank. Such suspension or prohibition shall become effective upon service of such notice and, unless stayed by a court in proceedings authorized by subsection (f) of this section, shall remain in effect pending the completion of the administrative proceedings pursuant to the notice served under paragraph (1), (2), or (3) of this subsection and until such time as the agency shall dismiss the charges specified in such notice, or, if an order of removal or prohibition is issued against the director or officer or other person, until the effective date of any such order. Copies of any such notice shall also be served upon the bank of which he is a director or officer or in the conduct of whose affairs he has participated."

Pub. L. 101–73, § 901(b)(1)(C), substituted references to institution-affiliated parties for references to directors, officers, or other persons.

Pub. L. 101–73, § 901(d), substituted reference to depository institutions for reference to banks.

Subsec. (e)(5). Pub. L. 101–73, § 903(a)(2), redesignated par. (6) as (5). Former par. (5) redesignated (4).

Pub. L. 101–73, § 901(b)(1)(D), inserted "within the term 'institution-affiliated party'" after "the term 'officer'", and inserted "within the term 'institution-affiliated party' as used in this subsection" after "the term 'director'".

Pub. L. 101–73, § 901(d), substituted reference to depository institution for reference to bank.

Subsec. (e)(6). Pub. L. 101–73, § 903(a)(2), (3), added par. (6) and redesignated former par. (6) as (5).

Subsec. (e)(7). Pub. L. 101–73, § 904(a), added par. (7).

Subsec. (f). Pub. L. 101–73, § 903(a)(4)(A), substituted "(e)(3)" for "(e)(4)" and "(e)(1) or (e)(2)" for "(e)(1), (e)(2), or (e)(3)".

Pub. L. 101–73, § 901(b)(1)(E), substituted "any institution-affiliated party" and "such party" for "any director, officer, or other person" and "such director, officer, or other person", respectively, wherever appearing.

Pub. L. 101–73, § 901(d), substituted "depository institution" for "bank".

Subsec. (g)(1). Pub. L. 101–73, § 906(a), struck out "authorized by a United States attorney" after "information, indictment, or complaint", and substituted "or an agreement to enter a pre-trial diversion or other similar program" for "with respect to such crime".

Pub. L. 101–73, § 903(a)(4)(B), substituted "(1), (2), or (3)" for "(1), (2), (3), or (4)".

Pub. L. 101–73, § 901(d), substituted references to depository institutions for references to banks wherever appearing.

Pub. L. 101–73, § 901(b)(1)(F)(i), substituted "institution-affiliated party" for "director or officer of an insured bank, or other person participating in the conduct of the affairs of such bank".

Pub. L. 101–73, § 901(b)(1)(F)(v), which directed the substitution of "party" for "director, officer or other person", could not be executed, because the phrase did not appear.

Pub. L. 101–73, § 901(b)(1)(F)(ii)–(iv), (vi), substituted "such party" for "the individual" wherever appearing, "such party" for "such director, officer, or other person" wherever appearing, "such party" for "him" wherever appearing, and "whereupon such party (if a director or an officer)" for "whereupon such director or officer".

Subsec. (g)(2). Pub. L. 101–73, § 901(d), substituted references to depository institutions for references to banks wherever appearing.

Subsec. (g)(3). Pub. L. 101–73, § 901(d), substituted references to depository institutions for references to banks wherever appearing.

Appellate Case: 25-1079　　　　Page: 1373　　　　Date Filed: 05/16/2025　Entry ID: 5517644

Pub. L. 101–73, § 901(b)(1)(G), substituted "the institution-affiliated party concerned" for "the director, officer, or other person concerned" and substituted "such party" for "such individual", for "the concerned director, officer, or other person", and for any other reference to the director, officer or other person.

Subsec. (h)(1). Pub. L. 101–73, § 901(d), substituted "depository institution" for "bank".

Subsec. (h)(2). Pub. L. 101–73, § 920(a), substituted "Any party to any proceeding under paragraph (1)" for "Any party to the proceeding, or any person required by an order issued under this section to cease and desist from any of the violations or practices stated therein,".

Pub. L. 101–73, § 901(d), substituted "depository institution" for "bank" wherever appearing.

Pub. L. 101–73, § 901(b)(1)(H), substituted "institution-affiliated party" for "director or officer or other person".

Subsec. (i)(1). Pub. L. 101–73, § 901(d), substituted "depository institution" for "bank".

Subsec. (i)(2). Pub. L. 101–73, § 907(a), amended par. (2) generally, revising and restating as subpars. (A) to (K) provisions of former cls. (i) to (vii).

Subsec. (i)(3). Pub. L. 101–73, § 905(a), added par. (3).

Subsec. (j). Pub. L. 101–73, § 908(a), amended subsec. (j) generally. Prior to amendment, subsec. (j) read as follows: "Any director or officer, or former director or officer of an insured bank, or any other person, against whom there is outstanding and effective any notice or order (which is an order which has become final) served upon such director, officer, or other person under subsections (e)(4), (e)(5), or (g) of this section, and who (i) participates in any manner in the conduct of the affairs of the bank involved, or directly or indirectly solicits or procures, or transfers or attempts to transfer, or votes or attempts to vote, any proxies, consents, or authorizations in respect of any voting rights in such bank, or (ii) without the prior written approval of the appropriate Federal banking agency, votes for a director, serves or acts as a director, officer, or employee of any bank, shall upon conviction be fined not more than $5,000 or imprisoned for not more than one year, or both."

Subsec. (k). Pub. L. 101–73, § 920(c), struck out subsec. (k) which defined the terms "cease-and-desist order which has become final", "order which has become final", and "violation", as those terms were used in this section.

Subsec. (l). Pub. L. 101–73, § 901(d), substituted "State depository institution" for "State bank".

Pub. L. 101–73, § 901(b)(1)(I), substituted "institution-affiliated party" for "director or officer thereof or other person participating in the conduct of its affairs".

Subsec. (m). Pub. L. 101–73, § 901(b)(1)(J), substituted "institution-affiliated party" for "director or officer or other person participating in the conduct of its affairs".

Subsec. (n). Pub. L. 101–73, § 901(d), substituted "depository institution" for "bank".

Subsec. (o). Pub. L. 101–73, § 201(b), substituted "Director of the Office of Thrift Supervision" for "Federal Home Loan Bank Board".

Subsec. (q). Pub. L. 101–73, § 901(d), substituted "depository institution" for "bank" wherever appearing and "depository institutions" for "banks".

Subsec. (s). Pub. L. 101–73, § 901(d), substituted references to depository institutions for references to banks wherever appearing.

Subsec. (t). Pub. L. 101–73, § 912, added subsec. (t).

Subsec. (u). Pub. L. 101–73, § 913(a), added subsec. (u).

1986—Subsec. (i)(2)(i). Pub. L. 99–570, § 1359(a)(2), inserted reference to subsec. (s) of this section.

Subsec. (s). Pub. L. 99–570, § 1359(a)(1), added subsec. (s).

1982—Subsec. (a). Pub. L. 97–320, § 113(g), inserted "to the Federal Home Loan Bank Board in the case of an insured Federal savings bank," after "national bank or a district bank," and "or the Federal Home Loan Bank

Board in the case of an insured Federal savings bank," after "Currency in the case of a national bank,".

Subsec. (b)(3). Pub. L. 97–320, § 425(b), substituted "25(a)" for "25A".

Subsec. (b)(4). Pub. L. 97–320, § 425(c), which directed the amendment of subsec. (b) by adding a new par. (4) at end, was executed (as the probable intent of Congress) as a general amendment of existing par. (4), as added by Pub. L. 95–369, the two pars. (4) being identical except that the new par. (4) refers to "purposes of this paragraph" rather than "purposes of this subparagraph".

Subsec. (b)(5). Pub. L. 97–320, § 404(c), added par. (5).

Subsec. (b)(3). Pub. L. 97–320, § 427(d)(1)(A), added par. (3). Former par. (3) redesignated (4).

Subsec. (e)(4). Pub. L. 97–320, § 427(d)(1)(A), (B), redesignated former par. (3) as (4) and inserted references to par. (3) of this subsection in two places. Former par. (4) redesignated (5).

Subsec. (e)(5), (6). Pub. L. 97–320, § 427(d)(1)(A), redesignated former pars. (4) and (5) as (5) and (6), respectively.

Subsec. (f). Pub. L. 97–320, § 427(d)(2), substituted references to "subsection (e)(4)" for "subsection (e)(5) or (e)(7)" and "subsection (e)(1), (e)(2), or (e)(3)" for "subsection (e)(1), (e)(3), or (e)(7)".

Subsec. (g)(1). Pub. L. 97–320, § 427(d)(3), in penultimate sentence, included reference to par. (4) of subsec. (e) of this section.

Subsec. (i)(2)(i). Pub. L. 97–320, § 424(c), (d)(6), inserted proviso giving agency discretionary authority to compromise, etc., any civil money penalty imposed under such authority, and substituted "may be assessed" for "shall be assessed".

Subsec. (i)(2)(iv). Pub. L. 97–424(e) substituted "twenty days from the service" for "ten days from the date".

Subsec. (j). Pub. L. 97–320, § 427(d)(4), struck out reference to subsec. (e)(3) and included reference to subsec. (e)(5) of this section.

Subsec. (o). Pub. L. 97–320, § 113(h), inserted provision that whenever the insured status of an insured Federal savings bank shall be terminated by action of the Board of Directors, the Federal Home Loan Bank Board shall appoint a receiver for the bank, which shall be the Corporation.

Subsec. (q). Pub. L. 97–320, § 433(a), struck out item (3) provisions requiring the assuming or resulting bank to give notice of an assumption to each of the depositors of the bank whose liabilities are assumed within thirty days after such assumption takes effect.

1978—Subsec. (a). Pub. L. 95–369, § 6(c)(14), inserted "a foreign bank having an insured branch which is a Federal branch, a foreign bank having an insured branch which is required to be insured under section 3104(a) or (b) of this title" after "(except a national member bank".

Subsec. (b)(1), (2). Pub. L. 95–630, § 107(a)(1), extended coverage of par. (1) to include directors, officers, employees, agents, or other persons participating in the conduct of the affairs of an insured bank or a bank which has insured deposits, and reenacted par. (2) without change.

Subsec. (b)(3). Pub. L. 95–630, § 107(b), substituted "subsections (c) through (f) and (h) through (n) of this section" for "subsections (c), (d), (h), (i), (k), (l), (m), and (n) of this section" and inserted provisions relating to any organization organized and operated under section 25A of the Federal Reserve Act or operating under section 25 of the Federal Reserve Act and provisions relating to the issuance of a notice of charges or cease-and-desist order against a bank holding company or subsidiary by any Federal banking agency other than the Board of Governors of the Federal Reserve System.

Subsec. (b)(4). Pub. L. 95–369, § 11, added par. (4).

Subsec. (c)(2). Pub. L. 95–630, § 107(c)(1), in pars. (1) and (2) inserted references to any director, officer, employee, agent, or other person participating in the conduct of the affairs of the bank and in par. (1) inserted "prior to the completion of the proceedings conducted pursuant to paragraph (1) of subsection (b) of this sec-

Appellate Case: 25-1079     Page: 1374     Date Filed: 05/16/2025     Entry ID: 5517644

tion" after "interests of its depositors" and "and to take affirmative action to prevent such insolvency, dissipation, condition, or prejudice pending completion of such proceedings" after "violation or practice".

Subsec. (e). Pub. L. 95–630, §§ 107(d)(1), 208(a), generally revised and condensed the provisions relating to the suspension and removal of bank directors and officers, consolidated procedures relating to the certification of facts to the Board of Governors of the Federal Reserve System by the Comptroller of the Currency, substituted references to insured banks for references to insured State banks (other than a District Bank), and inserted provisions defining "officer" and "director" for the purpose of enforcing any law, rule, etc., in connection with an interlocking relationship.

Subsec. (g). Pub. L. 95–630, § 111(a)(1), among other changes, inserted in par. (1) ", if continued service or participation by the individual may pose a threat to the interests of the bank's depositors or may threaten to impair public confidence in the bank" after "agency may" in two places, inserted provision that any notice of suspension or order of removal issued under this paragraph remain effective and outstanding until the completion of any hearing or appeal authorized under paragraph (3) hereof unless terminated by the agency, and added par. (3).

Subsec. (h)(1). Pub. L. 95–630, § 111(a)(2), inserted "(other than the hearing provided for in subsection (g)(3) of this section)" after "provided for in this section".

Subsec. (i). Pub. L. 95–630, § 107(e)(1), designated existing provisions as par. (1) and added par. (2).

Subsec. (j). Pub. L. 95–630, § 111(a)(3), substituted "subsections (e)(3), (e)(4)" for "subsections (e)(5), (e)(7), (e)(8)".

Subsec. (k). Pub. L. 95–630, § 111(a)(4), substituted "paragraph (1) or (3) of subsection (g)" for "paragraph (1) of subsection (g)".

Subsec. (n). Pub. L. 95–630, § 111(a)(5), inserted provision creating a criminal penalty for a willful failure or refusal to attend and testify or to answer any lawful inquiry or to produce books, papers, etc. in obedience to the subpoena of the appropriate Federal banking agency.

Pub. L. 95–630, § 303, inserted "or in connection with any claim for insured deposits or any examination or investigation under section 1820(c) of this title," after "proceeding under this section,", "examination, or investigation or considering the claim for insured deposits," after "conducting the proceeding,", and "such agency or any" before "party to proceedings" and substituted "any such proceedings, claims, examinations, or investigations" for "any such proceedings" and "subpenaed under this subsection" for "subpenaed under this section".

Subsec. (q). Pub. L. 95–630, § 304, among other changes, substituted provisions requiring the assuming or resulting bank to give notice of an assumption to each of the depositors of the bank whose liabilities are so assumed within thirty days after such assumption takes effect for provisions requiring the bank whose liabilities are being assumed to give notice of such assumption to its depositors within thirty days after such assumption takes effect, by publication or by any reasonable means, in accordance with regulations to be prescribed by the Board of Directors.

Subsec. (r). Pub. L. 95–369, § 6(c)(15), added subsec. (r). 1974—Subsec. (b)(3). Pub. L. 93–495 added par. (3).

1966—Subsec. (a). Pub. L. 89–695, § 204, enlarged the authority of the Corporation to institute involuntary termination proceedings against an insured bank which had engaged in or whose directors or trustees had engaged in, rather than merely continued unsafe or unsound practices, or was in an unsafe or unsound condition to continue operations as an insured bank, or had violated any law, rule, regulation or order, or any condition imposed in writing by the Corporation or any written agreement entered into with the Corporation; made it clear that the Corporation would be required to give the State authority a copy of the statement deal-

ing the practices or violations where the State bank involved was a State member bank; provided for an alternative and shortened correction period of not less than twenty days in those cases where the Board of Directors of the Corporation on its discretion determined that the insurance risk of the Corporation was unduly jeopardized; provided the State authority with power to shorten the correction period in those cases involving State banks whether member or nonmember banks; transposed the position of the fourth and fifth sentences; and provided a bank whose insured status had been terminated with right of judicial review to the extent provided in subsec. (h) of this section.

Subsecs. (b) to (q). Pub. L. 89–695, § 202, added subsecs. (b) to (n) and redesignated former subsecs. (b) to (d) as (o) to (q), respectively.

## Statutory Notes and Related Subsidiaries

### CHANGE OF NAME

Oversight Board redesignated Thrift Depositor Protection Oversight Board, effective Feb. 1, 1992, see section 302(a) of Pub. L. 102–233, formerly set out as a note under section 1441a of this title. Thrift Depositor Protection Oversight Board abolished, see section 14(a)–(d) of Pub. L. 105–216, formerly set out as a note under section 1441a of this title.

### EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by section 172(b) of Pub. L. 111–203 effective 1 day after July 21, 2010, except as otherwise provided, see section 4 of Pub. L. 111–203, set out as an Effective Date note under section 5301 of this title.

Amendment by section 363(3) of Pub. L. 111–203 effective on the transfer date, see section 351 of Pub. L. 111–203, set out as a note under section 906 of Title 2, The Congress.

Amendment by section 1090(1) of Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

### EFFECTIVE DATE OF 2006 AMENDMENT

Amendment by section 3(a)(6), (7) of Pub. L. 109–173 effective Jan. 1, 2007, see section 3(b) of Pub. L. 109–173, set out as a note under section 1817 of this title.

Amendment by section 8(a)(10) of Pub. L. 109–173 effective Mar. 31, 2006, see section 8(b) of Pub. L. 109–173, set out as a note under section 1813 of this title.

### EFFECTIVE DATE OF 1992 AMENDMENTS

Amendment by section 303(b)(6)(A) of Pub. L. 102–558 deemed to have become effective Mar. 1, 1992, see section 304 of Pub. L. 102–558, set out as a note under section 4502 of Title 50, War and National Defense.

Amendment by sections 1603(d)(2)–(4) and 1605(a)(5)(A), (11) of Pub. L. 102–550 effective as if included in the Federal Deposit Insurance Corporation Improvement Act of 1991, Pub. L. 102–242, as of Dec. 19, 1991, except that where amendment is to any provision of law added or amended by Pub. L. 102–242 effective after Dec. 19, 1992, then amendment by Pub. L. 102–550 effective on effective date of amendment by Pub. L. 102–242, see section 1609 of Pub. L. 102–550, set out as a note under section 191 of this title.

### EFFECTIVE DATE OF 1991 AMENDMENT

Amendment by section 131(c)(1), (2) of Pub. L. 102–242 effective 1 year after Dec. 19, 1991, see section 131(f) of Pub. L. 102–242, set out as a note under section 1464 of this title.

Amendment by section 302(e)(4) of Pub. L. 102–242 effective on earlier of 180 days after date on which final regulations promulgated in accordance with section 302(c) of Pub. L. 102–242, set out as a note under section 1817 of this title, become effective or Jan. 1, 1994, see section 302(g) of Pub. L. 102–242, set out as a note under section 1817 of this title.

Appellate Case: 25-1079　　　Page: 1375　　　Date Filed: 05/16/2025　　Entry ID: 5517644

EFFECTIVE DATE OF 1990 AMENDMENT

Pub. L. 101–647, title XXV, §2547(a)(3), Nov. 29, 1990, 104 Stat. 4887, provided that: "The amendment made by paragraph (1) [amending this section] shall apply with respect to all written agreements which are entered into and all written statements which become effective after the date of the enactment of this Act [Nov. 29, 1990]."

EFFECTIVE DATE OF 1989 AMENDMENT

Amendment by section 903(a) of Pub. L. 101–73 applicable with respect to violations committed and activities engaged in after Aug. 9, 1989, see section 903(e) of Pub. L. 101–73, set out as a note under section 1786 of this title.

Amendment by section 907(a) of Pub. L. 101–73 applicable to conduct engaged in after Aug. 9, 1989, except that increased maximum penalties of $5,000 and $25,000 may apply to conduct engaged in before such date if such conduct is not already subject to a notice issued by the appropriate agency and occurred after completion of the last report of the examination of the institution by the appropriate agency occurring before Aug. 9, 1989, see section 907(l) of Pub. L. 101–73, set out as a note under section 93 of this title.

EFFECTIVE DATE OF REGULATIONS PRESCRIBED UNDER 1986 AMENDMENT

The regulations required to be prescribed under amendment by Pub. L. 99–570 effective at end of 3-month period beginning on Oct. 27, 1986, see section 1364(e) of Pub. L. 99–570, set out as a note under section 1464 of this title.

EFFECTIVE DATE OF 1978 AMENDMENT

Amendment by Pub. L. 95–630, except for amendment by section 107(e)(1), effective upon expiration of 120 days after Nov. 10, 1978, see section 2101 of Pub. L. 95–630, set out as an Effective Date note under section 375b of this title.

Amendment by section 107(e)(1) of Pub. L. 95–630, relating to imposition of civil penalties, applicable to violations occurring or continuing after Nov. 10, 1978, see section 109 of Pub. L. 95–630, set out as a note under section 93 of this title.

EXPIRATION OF 1966 AMENDMENT

Pub. L. 91–609, title IX, §908, Dec. 31, 1970, 84 Stat. 1811, repealed section 401 of Pub. L. 89–695 which had provided that: "The provisions of titles I and II of this Act [amending sections 1464, 1730, 1813, 1817 to 1820 and repealing section 77 of this title and enacting provisions set out as notes under sections 1464, 1730, and 1813 of this title] and any provisions of law enacted by said titles shall be effective only during the period ending at the close of June 30, 1972. Effective upon the expiration of such period, each provision of law amended by either of such titles is further amended to read as it did immediately prior to the enactment of this Act [Oct. 16, 1966] and each provision of law repealed by either of such titles is reenacted."

IMPROVED ADMINISTRATIVE HEARINGS AND PROCEDURES FOR FEDERAL BANKING AGENCIES AND NATIONAL CREDIT UNION ADMINISTRATION BOARD

Pub. L. 101–73, title IX, §916, Aug. 9, 1989, 103 Stat. 486, provided that before close of 24-month period beginning on Aug. 9, 1989, appropriate Federal banking agencies (as defined in section 3(q) of the Federal Deposit Insurance Act [12 U.S.C. 1813(q)]) and National Credit Union Administration Board jointly establish their own pool of administrative law judges and develop a set of uniform rules and procedures for administrative hearings, including provisions for summary judgment rulings where there are no disputes as to material facts of the case.

TASK FORCE STUDY OF DELEGATION OF ENFORCEMENT ACTIONS

Pub. L. 101–73, title IX, §917, Aug. 9, 1989, 103 Stat. 487, directed appropriate Federal banking agencies (as defined in section 1813(q) of this title and National Credit Union Administration Board to create a joint task force to study desirability and feasibility of delegating investigation and enforcement authority to their regional or district offices or banks, provided for composition of task force, and required that not later than Sept. 30, 1990, task force report to Congress its findings and recommendations, together with responses of Comptroller of the Currency, Director of Office of Thrift Supervision, Chairperson of Federal Deposit Insurance Corporation, Chairman of Board of Governors of Federal Reserve System, and Chairman of National Credit Union Administration.

CREDIT STANDARDS ADVISORY COMMITTEE

Pub. L. 101–73, title XII, §1205, Aug. 9, 1989, 103 Stat. 521, as amended by Pub. L. 102–242, title IV, §422, Dec. 19, 1991, 105 Stat. 2377; Pub. L. 111–203, title III, §367(7), July 21, 2010, 124 Stat. 1557; Pub. L. 117–286, §4(a)(55), Dec. 27, 2022, 136 Stat. 4311, provided that:

"(a) ESTABLISHMENT.—There is hereby established the Credit Standards Advisory Committee (in this section referred to as the 'Committee').

"(b) MEMBERSHIP.—

"(1) APPOINTMENT.—The Committee shall consist of 11 members, as follows:

"(A) The Chairman of the Board of Governors of the Federal Reserve System, or the Chairman's designee.

"(B) The Chairperson of the Federal Deposit Insurance Corporation, or the Chairperson's designee.

"(C) The Comptroller of the Currency, or the Comptroller's designee.

"(D) The Chairman of the National Credit Union Administration, or the Chairman's designee.

"(E) 6 members of the public appointed by the President who are knowledgeable with the credit standards and lending practices of insured depository institutions, no more than 3 of whom shall be from the same political party.

"(2) TERMS.—Each member appointed under paragraph (1)(E) shall serve for the life of the Committee.

"(3) CHAIRPERSON.—The Chairperson of the Committee shall be designated by the President from among the members appointed under paragraph (1)(F) [now (1)(E)].

"(4) VACANCIES.—Any vacancy on the Committee shall be filled in the manner in which the original appointment was made.

"(5) PAY AND EXPENSES.—Members of the Committee shall serve without pay but each member of the Committee shall be reimbursed for expenses incurred in connection with attendance of such members at meetings of the Committee. All expenses of the Committee shall be shared on a pro rata basis, based upon each agency's total budget for the preceding year by the Federal financial regulators specified in subparagraphs (A) through (E) of paragraph (1).

"(6) MEETINGS.—The Committee shall meet, not less frequently than quarterly, at the call of the chairperson or a majority of the members.

"(c) DUTIES OF THE COMMITTEE.—The Committee shall do the following:

"(1) REVIEW CREDIT STANDARDS, LENDING PRACTICES, AND SUPERVISION BY FEDERAL REGULATORS.—Review the credit standards and lending practices of insured depository institutions and the supervision of such standards and practices by the Federal financial regulators.

"(2) PREPARE RECOMMENDATIONS.—Prepare written comments and recommendations for the Federal financial regulators to ensure that insured depository institutions adhere to prudential credit standards and lending practices that are consistent for all in-

sured depository institutions, to the maximum extent possible.

''(3) MONITOR CREDIT STANDARDS, LENDING PRACTICES, AND SUPERVISION BY FEDERAL REGULATORS.—Monitor the credit standards and lending practices of insured depository institutions, and the supervision of such standards and practices by the Federal financial regulators, to ensure that insured depository institutions can meet the demands of a modern and globally competitive financial world.

''(d) ANNUAL REPORT.—

''(1) REQUIRED.—Not later than January 30 of each year, the Committee shall submit a report to the Committee on Banking, Finance and Urban Affairs [now Committee on Financial Services] of the House of Representatives and the Committee on Banking, Housing, and Urban Affairs of the Senate.

''(2) CONTENTS.—The report required by paragraph (1) shall describe the activities of the Committee during the preceding year and the reports and recommendations made by the Committee to the Federal financial regulators.

''(e) CONFLICT OF INTEREST GUIDELINES.—The Committee shall prescribe such guidelines as the Committee determines to be appropriate to avoid conflicts of interest with respect to the disclosure to and use by members of the Committee of information relating to insured depository institutions and the Federal financial regulators.

''(f) CHAPTER 10 OF TITLE 5, UNITED STATES CODE, DOES NOT APPLY.—Chapter 10 of title 5, United States Code, shall not apply with respect to the Committee.''

[For termination, effective May 15, 2000, of reporting provisions under 1205(d) of Pub. L. 101–73, set out above, see section 3003 of Pub. L. 104–66, as amended, set out as a note under section 1113 of Title 31, Money and Finance, and page 159 of House Document No. 103–7.]

CONDITIONS GOVERNING EMPLOYMENT OF PERSONNEL
NOT REPEALED, MODIFIED, OR AFFECTED

Nothing contained in sections 202 and 204 of Pub. L. 89–695 amending this section to be construed as repealing, modifying, or affecting section 1829 of this title, see section 206 of Pub. L. 89–695, set out as a note under section 1813 of this title.

## § 1819. Corporate powers

### (a) In general

Upon June 16, 1933, the Corporation shall become a body corporate and as such shall have power—

First. To adopt and use a corporate seal.

Second. To have succession until dissolved by an Act of Congress.

Third. To make contracts.

Fourth. To sue and be sued, and complain and defend, by and through its own attorneys, in any court of law or equity, State or Federal.

Fifth. To appoint by its Board of Directors such officers and employees as are not otherwise provided for in this chapter, to define their duties, fix their compensation, require bonds of them and fix the penalty thereof, and to dismiss at pleasure such officers or employees. Nothing in this chapter or any other Act shall be construed to prevent the appointment and compensation as an officer or employee of the Corporation of any officer or employee of the United States in any board, commission, independent establishment, or executive department thereof.

Sixth. To prescribe, by its Board of Directors, bylaws not inconsistent with law, regulating the manner in which its general business may be conducted, and the privileges granted to it by law may be exercised and enjoyed.

Seventh. To exercise by its Board of Directors, or duly authorized officers or agents, all powers specifically granted by the provisions of this chapter, and such incidental powers as shall be necessary to carry out the powers so granted.

Eighth. To make examinations of and to require information and reports from depository institutions, as provided in this chapter.

Ninth. To act as receiver.

Tenth. To prescribe by its Board of Directors such rules and regulations as it may deem necessary to carry out the provisions of this chapter or of any other law which it has the responsibility of administering or enforcing (except to the extent that authority to issue such rules and regulations has been expressly and exclusively granted to any other regulatory agency).

### (b) Agency authority

#### (1) Status

The Corporation, in any capacity, shall be an agency of the United States for purposes of section 1345 of title 28 without regard to whether the Corporation commenced the action.

#### (2) Federal court jurisdiction

##### (A) In general

Except as provided in subparagraph (D), all suits of a civil nature at common law or in equity to which the Corporation, in any capacity, is a party shall be deemed to arise under the laws of the United States.

##### (B) Removal

Except as provided in subparagraph (D), the Corporation may, without bond or security, remove any action, suit, or proceeding from a State court to the appropriate United States district court before the end of the 90-day period beginning on the date the action, suit, or proceeding is filed against the Corporation or the Corporation is substituted as a party.

##### (C) Appeal of remand

The Corporation may appeal any order of remand entered by any United States district court.

##### (D) State actions

Except as provided in subparagraph (E), any action—

(i) to which the Corporation, in the Corporation's capacity as receiver of a State insured depository institution by the exclusive appointment by State authorities, is a party other than as a plaintiff;

(ii) which involves only the preclosing rights against the State insured depository institution, or obligations owing to, depositors, creditors, or stockholders by the State insured depository institution; and

(iii) in which only the interpretation of the law of such State is necessary,

shall not be deemed to arise under the laws of the United States.

##### (E) Rule of construction

Subparagraph (D) shall not be construed as limiting the right of the Corporation to invoke the jurisdiction of any United States

Appellate Case: 25-1079     Page: 1377     Date Filed: 05/16/2025 Entry ID: 5517644