IN THE

# United States Court of Appeals
# for the Eighth Circuit

CLAUDIA RUSS ANDERSON,

*Petitioner-Appellant,*

v.

OFFICE OF THE COMPTROLLER OF THE CURRENCY,

*Respondent-Appellee.*

ON PETITION FOR REVIEW OF THE FINAL ORDER
OF THE COMPTROLLER OF THE CURRENCY
NO. AA-EC-2019-81

## BRIEF OF PETITIONER CLAUDIA RUSS ANDERSON

KELLEY, WOLTER & SCOTT, P.A.
  Douglas A. Kelley
  Steven E. Wolter
  Brett D. Kelley
  Perry F. Sekus
  Garrett S. Stadler
11100 Wayzata Boulevard, Suite 510
Minnetonka, MN 55305
Tel: (612) 371-9090
Fax: (612) 371-0574

Ilan Wurman
UNIVERSITY OF MINNESOTA
LAW SCHOOL*

229 S. 19th Ave
Minneapolis, MN 55455
Tel: (612) 624-8816

*Affiliation included
for identification purposes only

*Attorneys for Petitioner*

## SUMMARY OF THE CASE

This administrative proceeding stems from allegations of "Sales Practices Misconduct" at Wells Fargo as far back as 2002 but focusing on the 2013-16 timeframe. The years-long process culminated in a final decision by the Comptroller of the Currency finding that Ms. Russ Anderson, as group risk officer, engaged in "unsafe or unsound" banking practices, misled bank examiners, and violated 18 U.S.C. §§1001 and 1517. The Comptroller imposed a $10 million civil money penalty against Ms. Russ Anderson and a prohibition on her future participation in the industry.

The Comptroller and his agency erred grievously. They applied no known rules when they accused Ms. Russ Anderson of, for example, failing to "credibly challenge" her superiors. They improperly assumed consumer protection powers by holding that an "unsafe" or "unsound" banking practice need not risk the financial integrity of the institution. And they impermissibly doubled the monetary penalty after Ms. Russ Anderson chose to defend herself. Worse, they never should have adjudicated this case. Ms. Russ Anderson was entitled to an Article III court and a jury of her peers because the government prosecuted her for alleged violations of law and sought to deprive her of her life's savings and life's work. The Court should vacate the unconstitutional proceedings in their entirety. Thirty minutes of oral argument are respectfully requested.

i

# TABLE OF CONTENTS

**Page(s)**

SUMMARY OF THE CASE..................................................................... i

TABLE OF AUTHORITIES ............................................................... iv

JURISDICTIONAL STATEMENT ......................................................1

STATEMENT OF ISSUES ...................................................................2

STATEMENT OF THE CASE ..............................................................5

SUMMARY OF ARGUMENT ...........................................................11

ARGUMENT .....................................................................................13

I.     Standard of Review ..................................................................13

II.    Ms. Russ Anderson did not violate 18 U.S.C. §§1001 and 1517. ...................14

    A.    Terminations...................................................................15

    B.    Sales pressure. ................................................................17

    C.    Sales goals. ....................................................................18

    D.    Thresholds. ....................................................................20

III.   Ms. Russ Anderson did not engage in unsafe or unsound banking practices. ..........................................................................21

    A.    No existing rule prohibited Ms. Russ Anderson's conduct....................22

    B.    None of the conduct threatened the financial soundness of the institution and so cannot constitute unsafe or unsound practices. ..........30

IV.   Ms. Russ Anderson was entitled to have an Article III court and jury adjudicate the civil money penalty. .....................................................35

    A.    The public rights framework. ..............................................35

    B.    The public rights exception is inapplicable...............................39

ii

Appellate Case: 25-1079    Page: 3    Date Filed: 05/21/2025 Entry ID: 5518650

C.    The Seventh Amendment applies..........................................................47

V.    The prohibition order is unconstitutional and unlawful. ..................................49

    A.    Ms. Russ Anderson was entitled to a jury and court.............................50

    B.    The Comptroller did not find a legally relevant effect...........................52

VI.    Excluding exculpatory evidence and other procedural errors require a new proceeding.........................................................................................................55

VII.    Doubling the monetary penalty was unlawful...................................................58

CONCLUSION ........................................................................................................62

Appellate Case: 25-1079    Page: 4    Date Filed: 05/21/2025 Entry ID: 5518650

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akin v. OTS*,
　950 F.2d 1180 (5th Cir. 1992) ..................................................... 46, 48

*AT&T, Inc. v. FCC*,
　No. 24-60223, 2025 WL 1135280 (5th Cir. Apr. 17, 2025) ......................... 39, 43

*Atlas Roofing v. Occup. Safety and Health Rev. Comm'n*,
　430 U.S. 442 (1977) ....................................................................38

*Bank of Augusta v. Earle*,
　38 U.S. 519 (1839) .....................................................................45

*Bordenkircher v. Hayes*,
　434 U.S. 357 (1978) ....................................................................61

*Briggs v. Spaulding*,
　141 U.S. 132 (1891) ....................................................................44

*Bronston v. United States*,
　409 U.S. 352 (1973) .......................................................... 2, 14, 21

*Brown v. Plaut*,
　131 F.3d 163 (D.C. Cir. 1997) ..........................................................60

*Buttfield v. Stranahan*,
　192 U.S. 470 (1904) ....................................................................37

*Cavallari v. OCC*,
　57 F.3d 137 (2d Cir. 1995)................................................... 43, 46, 48

*Crowell v. Benson*,
　285 U.S. 22 (1932) ............................................................... 36, 51

*Cuomo v. Clearing House Ass'n, L.L.C.*,
　557 U.S. 519 (2009) ....................................................................46

*Curtis v. Loether*,
　415 U.S. 189 (1974) ....................................................................47

*Dairy Queen, Inc. v. Wood*,
　369 U.S. 469 (1962) ....................................................................50

iv

*Davenport v. Prentice*,
126 A.D. 451 (N.Y. App. Div. 1908) ...................................................49

*Davis v. Elmira Sav. Bank,*
161 U.S. 275 (1896) ........................................................ 44, 45

*Dazzio v. FDIC*,
970 F.2d 71 (5th Cir. 1992)...........................................................61

*De Niz Robles v. Lynch*,
803 F.3d 1165 (2015)...................................................................23

*Dep't of Homeland Sec. v. Thuraissigiam*,
591 U.S. 103 (2020).....................................................................37

*Drukker Commc'ns, Inc. v. NLRB*,
700 F.2d 727 (D.C. Cir. 1983) .........................................................4

*Ex parte Bakelite Corp.*,
279 U.S. 438 (1929)......................................................................36

*First Nat'l Bank of Eden v. Department of the Treasury*,
568 F.2d 610 (8th Cir.1978)..........................................................33

*First Nat'l Bank v. Kentucky*,
76 U.S. 353 (1869) .......................................................................45

*Goldberg v. Kelly*,
397 U.S. 254 (1970)......................................................................46

*Greene County Bank v. FDIC*,
92 F.3d 633 (8th Cir. 1996)...........................................................33

*Gulf Fed. Sav. & Loan Ass'n of Jefferson Par. v. Fed. Home Loan Bank Bd.*,
651 F.2d 259 (5th Cir. 1981)................................................... passim

*In re Seidman*,
37 F.3d 911 (3d Cir. 1994)............................................ 2, 15, 21, 31

*In re Walt Disney Co. Deriv. Litig.*,
907 A.2d 693 (Del. Ch. 2005)........................................................42

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*,
448 U.S. 607 (1980)......................................................................60

*Iowa League of Cities v. EPA*,
711 F.3d 844 (8th Cir. 2013)................................................... 13, 14

v

*Iverson v. United States*,
    973 F.3d 843 (8th Cir. 2020)..................................................................59

*Kavanaugh v. Gould*,
    223 N.Y. 103 (1918) ............................................................... 44, 49

*Keech v. Sandford*
    [1726] Sel. Cas. Ch. 61, 25 E.R. 223 ................................................43

*Loper Bright Enterprises v. Raimondo*,
    603 U.S. 369 (2024)............................................................................14

*MCI Telecommunications Corp. v. Am. Tel. & Tel. Co.*,
    512 U.S. 218 (1994)........................................................................4, 59

*Meier v. City of St. Louis*,
    78 F.4th 1052 (8th Cir. 2023) ...........................................................60

*Morissette v. United States*,
    342 U.S. 246 (1952)...........................................................................41

*Murray's Lessee v. Hoboken Land & Imp. Co.*,
    59 U.S. 272 (1856) ................................................................. 35, 51

*N. Pipeline Const. Co. v. Marathon Pipe Line Co.*,
    458 U.S. 50 (1982) ............................................................. 35, 36, 51

*Oberstar v. FDIC*,
    987 F.2d 494 (8th Cir. 1993)..........................................................4, 60

*Oceanic Steam Navigation Co. v. Stranahan*,
    214 U.S. 320 (1909) .............................................................. 37, 40

*Passavant v. United States*,
    148 U.S. 214 (1893) .............................................................. 37, 40

*Preston v. Prather*,
    137 U.S. 604 (1891) ..........................................................................49

*Prestwick Capital Mgt., Ltd. v. Peregrine Fin. Group, Inc.*,
    727 F.3d 646 (7th Cir. 2013)..............................................................58

*Proffitt v. FDIC*,
    200 F.3d 855 (D.C. Cir. 2000) ..........................................................50

*Quick v. Donaldson Co., Inc.*,
    90 F.3d 1372 (8th Cir. 1996)...........................................................4, 58

Appellate Case: 25-1079    Page: 7    Date Filed: 05/21/2025 Entry ID: 5518650

*Red Lion Broad. Co. v. FCC*,
   395 U.S. 367 (1969) ...................................................................37

*Resolution Tr. Corp. v. Heiserman*,
   839 F. Supp. 1457 (D. Colo. 1993) ......................................44

*Retail, Wholesale and Dep't Store Union, AFL-CIO v. NLRB*,
   46 F.2d 380 (D.C. Cir. 1972) ................................................23

*SEC v. Chenery Corp.*,
   332 U.S. 194 (1947) (*Chenery II*) .......................... passim

*SEC v. Jarkesy*,
   603 U.S. 109 (2024) ....................................................... passim

*Simpson v. OTS*,
   29 F.3d 1418 (9th Cir. 1994) ............................... 31, 46, 48

*Stern v. Marshall*,
   564 U.S. 462 (2011) .............................................. 35, 51

*Tull v. United States*,
   481 U.S. 412 (1987) ............................................. 3, 47, 50

*U.S. ex rel. Attorney Gen. v. Del. & Hudson Co.*,
   213 U.S. 366 (1909) ...................................................................60

*U.S. ex rel. Turner v. Williams*,
   194 U.S. 279 (1904) ...................................................................37

*Union Pac. R. Co. v. U.S. Dep't of Homeland Sec.*,
   738 F.3d 885 (8th Cir. 2013) .........................................4, 60

*United States v. Dale*,
   782 F. Supp. 615 (D.D.C. 1991) .............................. 14, 21

*United States v. Duell*,
   172 U.S. 576 (1899) ...................................................................36

*Vail v. Derwinski*,
   946 F.2d 589 (8th Cir. 1991) ...............................................60

*Van Dyke v. Bd. of Governors of Fed. Rsrv. Sys.*,
   876 F.2d 1377 (8th Cir. 1989) .............................................33

*Wells Fargo & Co. v. United States*,
   91 Fed. Cl. 35 (2010) ...............................................................45

vii

*Yates v. United States*,
574 U.S. 528 (2015) ..........................................................................4, 59

**Administrative Adjudications**

*In re Cousin*,
1994 WL 621240 (OTS Oct. 11, 1994) ...........................................55

*In re Patrick Adams*,
OCC AA-EC-11-50, 2014 WL 8735096 (OCC Sept. 30, 2014) .................. 31, 42

**Constitutional Provisions**

U.S. Const. amend. V .........................................................................4, 22

U.S. Const. amend. VII .........................................................................3

U.S. Const. art. III, § 2 .........................................................................3, 36

U.S. Const. art. III, § 2, cl. 3 .........................................................................41

**Statutes**

112 Cong. Rec. 24984 .........................................................................33

112 Cong. Rec. 26474 (1966) .........................................................................32

12 U.S.C. § 1818 .........................................................................2, 7

12 U.S.C. § 1818(e) .........................................................................14

12 U.S.C. § 1818(e)(1)(A) .........................................................................10

12 U.S.C. § 1818(e)(1)(A)(ii) .........................................................................21

12 U.S.C. § 1818(e)(1)(B) .........................................................................11, 52

12 U.S.C. § 1818(e)(1)(C) .........................................................................10

12 U.S.C. § 1818(e)(1)(C)(i) .........................................................................15

12 U.S.C. § 1818(e)(4) .........................................................................57

12 U.S.C. § 1818(h)(1) .........................................................................1

12 U.S.C. § 1818(h)(2) .........................................................................1, 13

12 U.S.C. § 1818(i) .........................................................................14

12 U.S.C. § 1818(i)(2) .........................................................................48

12 U.S.C. § 1818(i)(2)(A)-(B) .........................................................................9

viii

12 U.S.C. § 1818(i)(2)(B)(i)(II) ............................................................ 15, 21

12 U.S.C. § 1818(i)(2)(E)(i) ....................................................................58

12 U.S.C. § 1818(i)(2)(F) ........................................................................58

12 U.S.C. § 1818(i)(2)(G) ........................................................................48

12 U.S.C. § 1818(i)(2)(G)(i) ...............................................................8, 61

15 U.S.C. § 78u–2(c) ..............................................................................48

15 U.S.C. § 80b–3(i)(3) ..........................................................................48

18 U.S.C. § 1001 .............................................................................. passim

18 U.S.C. § 1001(a) ......................................................................... passim

18 U.S.C. § 1517 .............................................................................. passim

5 U.S.C. § 554(a) ....................................................................................57

5 U.S.C. § 706 .......................................................................... 13, 14, 61

Banking Act of 1933, ch. 89, § 30, 48 Stat. 162, 193-94 ........................44

**Other Authorities**

1 William Blackstone,
   Commentaries on the Laws of England (1765) ....................................22

Caleb Nelson, *Adjudication in the Political Branches*,
   107 Colum. L. Rev. 559 (2007) ..........................................................36

Caleb Nelson, *Sovereign Immunity as a Doctrine of Personal Jurisdiction*,
   115 Harv. L. Rev. 1559 (2002) ...........................................................36

Code of Hammurabi
   §§ 48, 100 ...........................................................................................45

Deuteronomy
   23:19-20 ..............................................................................................45

Nathan S. Chapman and Michael W. McConnell, *Due Process as Separation of Powers*,
   121 Yale L.J. 1672 (2012) ...................................................................22

Restatement (Second) of Torts
   § 283 ....................................................................................................43

ix

Restatement (Second) of Torts
  § 525 ...................................................................................................42

Restatement (Second) of Torts
  § 550 ...................................................................................................42

Restatement (Second) of Torts
  § 551 ...................................................................................................42

Restatement (Second) of Torts
  § 552 ...................................................................................................42

W. Page Keeton et al., Prosser and Keeton on the Law of Torts
  § 34 (5th ed. 1984) .............................................................................43

William Baude, *Adjudication Outside Article III*,
  133 Harv. L. Rev. 1511 (2020) ..........................................................36

x

# JURISDICTIONAL STATEMENT

Claudia Russ Anderson was an "institutional-affiliated party" of Wells Fargo Bank N.A., over which the Office of the Comptroller of the Currency (OCC) is the "appropriate Federal banking agency." 12 U.S.C. §§1818, 1813. The Comptroller served his final decision and order under 12 U.S.C. §1818(h)(1) on December 17, 2024 (sealed) and January 14, 2025 (redacted). On January 15, 2025, Ms. Russ Anderson timely filed a Petition for Review pursuant to 12 U.S.C. §1818(h)(2) and Federal Rule of Appellate Procedure 15(a). Jurisdiction is proper because the Bank's "home office" is in Sioux Falls, South Dakota. 12 U.S.C. §1818(h)(2).

Appellate Case: 25-1079    Page: 12    Date Filed: 05/21/2025 Entry ID: 5518650

## STATEMENT OF ISSUES

*The full text of 12 U.S.C. §1818, the statute governing federal depository institutions, is included in the Addendum. Add.1352-1375.

1.     Does a failure to answer questions one was not asked violate 18 U.S.C. §§1001 and 1517?

**Apposite Authorities:**

*Bronston v. United States*, 409 U.S. 352 (1973).

*In re Seidman*, 37 F.3d 911 (3d Cir. 1994).

2.     Is the government prohibited from retroactively applying for purposes of punishment rules newly invented in an adjudication?

**Apposite Authorities:**

*SEC v. Chenery Corp.*, 332 U.S. 194 (1947) (*Chenery II*).

3.     Can banking practices be "unsafe or unsound" if they do not risk the financial soundness of the institution or the safety of its deposits?

**Apposite Authorities:**

*Gulf Fed. Sav. & Loan Ass'n of Jefferson Par. v. Fed. Home Loan Bank Bd.*, 651 F.2d 259 (5th Cir. 1981).

12 U.S.C. §1818.

2

4.    Is Ms. Russ Anderson entitled to an Article III court to adjudicate allegations she violated federal criminal laws, and others sounding in common law and equity?

**Apposite Authorities:**

*SEC v. Jarkesy*, 603 U.S. 109 (2024).

*Tull v. United States*, 481 U.S. 412 (1987).

U.S. Const. art. III, §2.

5.    Is Ms. Russ Anderson entitled to have a jury adjudicate the $10 million civil money penalty, the prohibition order, or both, because such remedies are legal in nature and involve her private rights?

**Apposite Authorities:**

*Jarkesy*, 603 U.S. 109.

U.S. Const. amend. VII.

6.    Are settlement payments to regulators "financial loss" under the statute, and does harm to customers "prejudice" the "interests of ... depositors" if the harm is unrelated to the safety of their deposits?

**Apposite Authorities:**

*Gulf Federal*, 651 F.2d 259.

3

7.     Is a new proceeding warranted because the agency excluded exculpatory evidence and committed procedural errors?

**Apposite Authorities:**

*Drukker Commc'ns, Inc. v. NLRB*, 700 F.2d 727 (D.C. Cir. 1983).

*Quick v. Donaldson Co., Inc.*, 90 F.3d 1372 (8th Cir. 1996).

U.S. Const. amend. V.

8.     Did the agency exceed its authority to "compromise, modify, or remit" a penalty proposed in the Notice of Charges when it doubled the civil money penalty a year into the proceeding?

**Apposite Authorities:**

*MCI Telecommunications Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218 (1994).

*Yates v. United States*, 574 U.S. 528 (2015).

*Union Pac. R. Co. v. U.S. Dep't of Homeland Sec.*, 738 F.3d 885 (8th Cir. 2013).

*Oberstar v. FDIC*, 987 F.2d 494 (8th Cir. 1993).

Appellate Case: 25-1079     Page: 15     Date Filed: 05/21/2025 Entry ID: 5518650

# STATEMENT OF THE CASE

## Factual and Procedural Background

Claudia Russ Anderson spent 36 years in the banking industry, all with Wells Fargo and its predecessor banks. Much of her early career involved credit; in 2002, she became the Chief Credit Officer for Community Banking. In 2004, Ms. Russ Anderson became the Group Risk Officer for the Community Bank ("Bank")—the largest unit under the umbrella of Wells Fargo. She reported to Executive Vice President Carrie Tolstedt, head of the Bank, and to Chief Risk Officer Michael Loughlin. App._[A.R.576_at_27]; Add.1223. She was never part of the Bank's "C suite"; she attended only two company board meetings her entire career. App._[A.R.495 (Tr.9450:8-15)].

In 2012, Ms. Russ Anderson began leading the Sales Quality Team. App._[R.Exh.879_at_4]. In that capacity, she increased efficiencies, staffing, and technology to proactively monitor, detect, and investigate sales practices. App._[A.R.495 (Tr.9251:11-9252:11), A.R.495 (Tr.9282:16-9285:22)]; App._[OCC.Exh.2376_at_17]. The new processes detected significant potential "sales practice misconduct" (SPM) in the Los Angeles-Orange County (LAOC) area. App._[A.R.495 (Tr.8584:14-19)]. This included "simulated funding" of accounts or opening accounts without customer consent, all to give the appearance of additional sales.

5

Thirty-four Bank employees were terminated after the resulting investigation. App._[OCC.Exh.1998U_at_4]; App._[R.Exh.1115] (email from examiner crediting Bank's team for uncovering the SPM); App._[OCC.Exh.1299] (report of events). A total of 240 team members were ultimately fired or voluntarily resigned after a broader investigation. App._[OCC.Exh.1998U_at_5]. The *Los Angeles Times* published a series of articles in late 2013 detailing the "fake accounts scandal" that Ms. Russ Anderson and her team uncovered. App._[OCC.Exh.644; R.Exh.5250; OCC.Exh.1299]. These articles captured the attention of the L.A. City Attorney, who sued Wells Fargo on May 4, 2015, under California's consumer protection statutes. App._[OCC.Exh.1684].

That lawsuit, in turn, caught the attention of regulators. Martin Pfinsgraff, Senior Deputy Comptroller of Large Bank Supervision at OCC, asked why bank examiners had not detected the sales practices issues. App._[R.Exh.14584_at_2]. The examiners sent the Bank a supervisory letter, explaining the "lawsuit" prompted new supervision. App._[OCC.Exh.1239_at_1]. In notes of their May 14, 2015, meeting with Bank employees, the lead examiner "explained that the recent news article resulted in calls from DC where the team had to put together information that was given to folks in DC. Following review of this data, DC wanted more." App._[OCC.Exh.1734_at_1].

6

Although nothing immediately came of these examinations, the Consumer

Financial Protection Bureau (CFPB) filed a regulatory action against Wells Fargo.

App._[R.Exh.12077_at_1]. Unable to sit by, OCC joined suit. On September 8,

2016, the Bank settled with all regulatory authorities. App._[A.R.576_at_117];

Add.1313. The politicians in D.C., however, couldn't get enough of the story.

During a September 20, 2016, Senate Banking Committee hearing, they chastised

the Comptroller about OCC's supposedly inadequate supervision. Two days later,

national media quoted House Financial Services Chair Jeb Hensarling opining that

"OCC was asleep at the switch" and "must be held accountable."

App._[R.Exh.1218]. Facing this pressure, OCC issued an Order of Investigation to

the Bank. App._[R.Exh.1141].

By November 2016, Ms. Russ Anderson was under investigation. On

September 6, 2019, OCC formally informed her it was "considering whether to

institute administrative enforcement action." App._[R.Exh.19335]. On January 23,

2020, OCC's Enforcement Counsel initiated this action, filing a 100-page, 474-

paragraph Notice of Charges ("NOC") against Ms. Russ Anderson and four other

Bank officers. App._[A.R.576_at_6-7]; Add.1202-03. OCC accused Ms. Russ

Anderson of making false and misleading statements, breaching fiduciary duties,

and engaging in other "unsafe or unsound practice[s]" in conducting the business

of the Bank, in violation of 12 U.S.C. §1818, the statute governing federal

7

depository institutions. It sought a $5 million civil money penalty and a prohibition order forbidding her future participation in the banking industry.

Two months before the scheduled administrative hearing, the Administrative Law Judge (ALJ) summarily found 363 facts that Ms. Russ Anderson disputed were "undisputed" and "resolved" them against her over counsel's objections. App._[A.R.576_at_10]; Add.1206. A four-month hearing followed, producing over ten thousand transcript pages, tens of thousands more pages of exhibits, thousands of pages of cumulative briefing, a 443-page recommended decision by the ALJ, and a 155-page Final Decision by the Comptroller of the Currency. The Final Decision imposed a $10 million civil penalty against Ms. Russ Anderson and entered an order of prohibition. The Comptroller assessed these penalties even though they would wipe out Ms. Russ Anderson's entire life's savings,[1] and notwithstanding her otherwise unblemished thirty-six-year career.

---

[1] Ms. Russ Anderson's net worth is approximately $4.9 million, about what one would expect after a thirty-six-year career earning at peak $350,000-$400,000 in salary. App._[A.R.495 (Tr.3353:17-3355:10)]; App._[A.R.495 (Tr.9485:16)]; App._[R.Exh.20974]. Many of her stock options were clawed back. App._[A.R.495 (Tr.4048:22-23)]. The statute requires consideration of her "financial resources," 12 U.S.C. §1818(i)(2)(G)(i), making the penalty improper. *See* Part VII.

8

**Statutory Framework and Findings**

A civil money penalty can only be imposed if the institution-affiliated party engaged in certain types of misconduct, which caused a relevant effect. A penalty can be imposed if the party (1) (I) "violates any law or regulation," (II) "recklessly engages in an unsafe or unsound practice in conducting the affairs of such insured depository institution," or (III) "breaches any fiduciary duty"; and (2) such a "violation, practice, or breach (I) is part of a pattern of misconduct; (II) causes or is likely to cause more than a minimal loss to such depository institution; or (III) results in pecuniary gain or other benefit to such party." 12 U.S.C. §1818(i)(2)(A)-(B). The first requirement is the "misconduct" prong of the analysis; the second is the "effects" prong.

Regarding misconduct, the Comptroller found that Ms. Russ Anderson had violated federal law by lying to examiners, specifically violating 18 U.S.C. §§1001 and 1517. App._[A.R.576_at_80, 99]; Add.1276, 1295. Section 1001(a) prohibits "knowingly and willfully" falsifying or concealing material facts or making materially false statements to any federal officer. Section 1517 criminally punishes anyone who "corruptly obstructs or attempts to obstruct any examination of a financial institution by" the relevant agency.

The Comptroller declined to find Ms. Russ Anderson breached fiduciary duties. App._[A.R.576_at_149-50]; Add.1345-46. The Comptroller found,

9

however, that Ms. Russ Anderson "recklessly" engaged in various "unsafe or unsound practice[s]." The Comptroller concluded that the same omissions or misrepresentations constituted unsafe or unsound banking practices. He further found that Ms. Russ Anderson failed to provide "credible challenge" to her superiors, to implement successful controls, and to escalate matters to her superiors. App._[A.R.576_at_29-80, 94-99]; Add.1225-76, 1290-95.

As for the "effects" prong, the Comptroller acknowledged that no pecuniary gain resulted. App._[A.R.576_at_103]; Add.1299. He found, however, a "pattern of misconduct" causing loss to the financial institution because of payments Wells Fargo made to settle with regulators and customers. App._[A.R.576_at_100-03]; Add.1296-99.

A prohibition order similarly requires misconduct and a relevant effect. The misconduct prong is identical, except omits the requirement of "recklessness" in engaging in unsafe practices. 12 U.S.C. §1818(e)(1)(A) (the misconduct prong). This recklessness requirement is replaced by a "culpability" provision that requires finding either "personal dishonesty" or "willful or continuing disregard" on Ms. Russ Anderson's part "for the safety or soundness" of the institution. 12 U.S.C. §1818(e)(1)(C). The Comptroller found that the same misconduct justified a prohibition order. App._[A.R.576_at_29-80, 94-99]; Add.1225-76, 1290-95.

Appellate Case: 25-1079    Page: 21    Date Filed: 05/21/2025 Entry ID: 5518650

The effects prong differs slightly: the institution must have "suffered or will probably suffer financial loss or other damage," "the interests of the insured depository institution's depositors have been or could be prejudiced," or the party received a pecuniary or other benefit "by reason of" the misconduct. 12 U.S.C. §1818(e)(1)(B) (the effects prong). The Comptroller additionally found that the interests of depositors were prejudiced. App._[A.R.576_at_86-90]; Add.1282-86.

The Comptroller erred across the board. These allegations and penalties should never have been adjudicated before a biased agency whose employees were seeking a scapegoat to cover their own failures under pressure from "D.C." Ms. Russ Anderson now appeals.

## SUMMARY OF ARGUMENT

Ms. Russ Anderson is innocent. OCC accused her, and found her guilty, of lying to bank examiners. Yet when each alleged instance is examined, OCC complains that she failed to volunteer answers to questions she was never asked. That is not a violation, and certainly not a "willful" or "corrupt" violation, of federal laws prohibiting false statements.

The government's enforcement action was also flawed because no known rule established that failing to "credibly challenge" or to "escalate" to one's superiors constitutes an unsafe or unsound banking practice. OCC's handbooks provide that the *Board* must credibly challenge *senior management*, including the

11

Chief Risk Officer to whom Ms. Russ Anderson reported, and that senior management must create processes for escalation. An agency cannot invent rules and apply them retroactively to deprive someone of vested liberty and property interests. *SEC v. Chenery Corp.* (*Chenery II*), 332 U.S. 194, 203 (1947) (if "the ill effect of the retroactive application of a new standard" is greater than the "mischief" to be prevented, the retroactivity "is condemned by law").

Nor could the agency create such rules if it wanted: the challenged conduct in no way threatened the "financial integrity" of the Bank or created a federal "insurance risk." *Gulf Fed. Sav. & Loan Ass'n of Jefferson Par. v. Fed. Home Loan Bank Bd.*, 651 F.2d 259, 264 (5th Cir. 1981). The agency impermissibly assumed consumer protection powers it does not possess.

Nor should the agency have heard this case, which involves Ms. Russ Anderson's private rights to liberty and property. For that reason alone, she was entitled to a real court and jury. It also involves alleged federal criminal law violations. The unsafe or unsound practices allegations sound in the law of negligence. The Supreme Court recently held similar claims required an Article III court and jury, and do not involve "public rights" that may be exclusively determined by the executive branch. *SEC v. Jarkesy*, 603 U.S. 109 (2024).

Other errors warrant vacatur. The Comptroller erroneously concluded that settlement payments constituted "financial loss" under the statute and that the

Appellate Case: 25-1079    Page: 23    Date Filed: 05/21/2025 Entry ID: 5518650

"interests of ... depositors" were prejudiced though their deposits were perfectly safe. The agency routinely excluded exculpatory evidence, including OCC reports suggesting examiners already knew information they claimed Ms. Russ Anderson omitted, and an email from a lead examiner agreeing with an article characterizing the agency's harassment of the Bank as an "amazing overreaction" and "regulatory abuse." And, contrary to law, the agency doubled the monetary penalty under its modest authority to "compromise, modify, or remit" a penalty proposed in the NOC, which permits modifying such a penalty downward, not upward—and certainly not doubling it.

The Court should vacate the order in its entirety and free Ms. Russ Anderson from her decade-long nightmare.

## ARGUMENT

This Court should vacate the Comptroller's order. Ms. Russ Anderson committed no cognizable misconduct; the monetary penalty must be adjudicated by a court and jury; the prohibition order is unconstitutional and unlawful; and the ALJ and Comptroller committed numerous other errors.

## I. Standard of Review

The APA governs review. 12 U.S.C. §1818(h)(2). The Court reviews all legal questions *de novo*. 5 U.S.C. §706; *Iowa League of Cities v. EPA*, 711 F.3d

844 (8th Cir. 2013); *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 413 (2024). It reviews factual questions for substantial evidence. §706(2).

## II.   Ms. Russ Anderson did not violate 18 U.S.C. §§1001 and 1517.

The misconduct allegations are meritless. OCC claims Ms. Russ Anderson lied to bank examiners or intentionally misrepresented material matters. The Comptroller concluded that making these alleged misrepresentations constituted unsafe or unsound practices as well as violated 18 U.S.C. §§1001(a) and 1517, satisfying two misconduct prongs of 12 U.S.C. §§1818(e) and (i).

The Comptroller made four findings in this regard. None persuades. With one exception, OCC accused Ms. Russ Anderson and found her guilty of not volunteering information for which she was not asked. "[M]ere silence in the face of an unasked question" is insufficient for liability under section 1001 (and necessarily under section 1517). *United States v. Dale*, 782 F. Supp. 615, 626 (D.D.C. 1991); *cf. also Bronston v. United States*, 409 U.S. 352, 362 (1973) ("Precise questioning is imperative as a predicate for the offense of perjury."). In *Bronston*, the Court held that "any special problems arising from the literally true but unresponsive answer are to be remedied through the 'questioner's acuity' and not by a federal perjury prosecution." *Id.* Here, Ms. Russ Anderson's statements were not only literally true, *but also responsive*.

Appellate Case: 25-1079     Page: 25     Date Filed: 05/21/2025 Entry ID: 5518650

Nor is failing to volunteer information for which one was not asked "recklessly" committing unsafe or unsound banking practices or doing so with "personal dishonesty" as required by 12 U.S.C. §§1818(e)(1)(C)(i) and (i)(2)(B)(i)(II). The Third Circuit specifically held there was no liability under the statute for a "failure to volunteer information" where the agency "never directly asked [one] the questions it now charges [one] with evading." *In re Seidman*, 37 F.3d 911, 937 n.38 (3d Cir. 1994).

Ms. Russ Anderson does not deny the accuracy of the bank examiner's notes. The Comptroller simply inexplicably omitted what she was *asked* in the interviews. The question becomes whether the undisputed facts amount to a violation of law—that is, whether failing to answer questions one is not asked is a "willful" or "corrupt" misrepresentation or an unsafe or unsound practice. The answer is no.

### A.  Terminations.

First, OCC alleged (and found) that Ms. Russ Anderson lied about the scope of terminations at the Bank for SPM. The Comptroller found Ms. Russ Anderson "was aware that 1,000 or more employees were terminated every year for SPM," but she "initially referenced" to the examiners "that 30 employees were terminated and later that an additional 160 terminations were reported, for a total of 190 terminations for SPM." App._[A.R.576_at_31-32]; Add.1227-28. "Failing to

provide accurate information about this material issue during the OCC examinations," the Comptroller concluded, "constituted an unsafe or unsound practice" and "violated both 18 U.S.C. §§1517 and 1001(a)." App._[A.R.576_at_33, 80, 99]; Add.1229, 1276, 1295.

The examiner's meeting notes, however, which provided the entire basis for this finding, puts the lie to the accusation. The entire discussion concerned the *L.A. Times* article about SPM in Los Angeles and the L.A. County Attorney lawsuit. In the very bullet where Ms. Russ Anderson gave the relevant number, she was talking about the "Los Angeles-Orange County (LAOC) region," where Corporate Investigations "found a number of team members in the 30+ range [who] admitted to simulated-funding." App._[OCC.Exh.1734_at_1]. *That statement was true*. App._[OCC.Exh.1299_at_2]. She later reported additional team members who were fired *in that region*. App._[OCC.Exh.1734_at_2] ("Additional 160 terminations were bankers and tellers."). She was not asked about total terminations everywhere across all time—information that OCC already possessed. App._[R.Exh.826_at_6]; App._[A.R.495 (Tr.2673:25-2675:25)]; App._[OCC.Exh.1438_at_1]; App._[R.Exh.952_at_1-2]. Nor would such information have been particularly remarkable; 1,000 terminations constituted a tiny fraction of the total workforce and would not have been unusual for a bank the size of Wells Fargo. App._[R.Exh.16387_at_1].

16

The Comptroller also inexplicably accuses Ms. Russ Anderson of denying "she had a duty to be transparent on this topic," citing to a portion of the trial transcript in which she was asked about a May 19, 2015, memorandum written by the Bank's general counsel. App._[A.R.576_at_32 & n.20]; Add.1228 & n.20. The Comptroller omitted her explanation: the memorandum was only about the LAOC investigation. App._[A.R.495 (Tr.9867:16-9870:19)]; App._[OCC.Exh.1299] (May 19, 2025, memorandum).

### B. Sales pressure.

Second, OCC alleged (and found) that Ms. Russ Anderson lied to bank examiners about her knowledge of sales pressures leading to SPM. App._[A.R.576_at_33-35]; Add.1229-31. The Comptroller focused on the portion of the examiner's notes in which Ms. Russ Anderson was asked, "Any dialogue with Personal Bankers who indicate they are under pressure?" App._[OCC.Exh.1734_at_4]. Ms. Russ Anderson answered, according to the notes, that she "doesn't hear that at all" and she has "been at leadership summits and people are positive and pleased with what they hear and feel," but not everybody is "pristine." *Id.* She added that "[t]hey don't have volume of negative activity," but there are "unsavory characters," which is "the reason for detective and preventative controls." *Id.* The Comptroller accuses Ms. Russ Anderson of lying because "both the record evidence and her hearing testimony confirm that

17

[she] had knowledge that sales pressure relating to SPM was a problem before the 2015 examinations." App._[A.R.576_at_34]; Add.1230. From this observation the Comptroller concludes that Ms. Russ Anderson "knowingly misled the OCC about a material issue." App._[A.R.576_at_35, 80, 99]; Add.1231, 1276, 1295.

But that changes the subject. Ms. Russ Anderson was not asked about sales pressure generally. She was asked about her dialogues with personal bankers. The Comptroller cites no contrary evidence of any such dialogues. Moreover, the examiners were asking Ms. Russ Anderson the question as of the 2015 examination date, and by then she and others *were* hearing good things given the steady reduction in sales goals. App._[R.Exh.16147_at_9]; App._[A.R.495 (Tr.3596:14-3598:20)]; App._[A.R.495 (Tr.4961:19-4962:2)]. The Comptroller cannot take a specific question about personal dialogues in 2015 (or that was at least vague as to time) and accuse Ms. Russ Anderson of failing to answer a different question about a different subject pertaining to a different time.

### C.    Sales goals.

Third, OCC alleged (and found) that Ms. Russ Anderson lied to investigators when she said that employees were not fired for failing to meet sales goals. At the hearing, Ms. Russ Anderson emphasized that she had said no one was ever fired *solely* for failing to meet such goals. App._[A.R.576_at_36]; Add.1232. The Comptroller determined that Ms. Russ Anderson had changed her story and never

18

made that qualification during the initial examinations. App._[A.R.576_at_37]; Add.1233 ("[N]or is there any evidence that she ever informed the OCC examiners of this qualification."); App._[A.R.576_at_38]; Add.1234 (relying on ALJ's determination that it was "false" to claim she had qualified her answer). The Comptroller concluded that "informing the OCC during the examination that employees were not terminated for not meeting sales goals was a knowing and material misrepresentation, which constituted an unsafe or unsound practice" and "violated both 18 U.S.C. §§1517 and 1001(a)." App._[A.R.576_at_39, 80, 99]; Add.1235, 1276, 1295.

Even a cursory look at the examiners' summary, however, reveals that Ms. Russ Anderson said the following: "Regarding sales goals, Ms. Russ Anderson stated that team members do have referral and sales goals but meeting these *is only part of the review and evaluation process*." App._[OCC.Exh.1735_at_2] (emphasis added). What, exactly, are we doing here?[2]

---

[2] The ALJ even accused *her lawyers* of dishonesty because they pursued this argument. *See* App._[OCC.Exh.1943_at_2]; App._[A.R.534_at_185]; Add.938. The Comptroller relatedly accuses Ms. Russ Anderson of failing "to correct a

19

### D. Thresholds.

Fourth, the Comptroller found that Ms. Russ Anderson "failed to disclose the thresholds used in proactive monitoring." App._[A.R.576_at_40-42]; Add.1236-38. Ms. Russ Anderson had informed the bank examiners about proactive monitoring processes, but did not specifically tell them what proportion of all potentially problematic accounts were sent for further investigation. App._[A.R.576_at_55]; Add.1251. Crediting a bank examiner's testimony, the Comptroller "rejected the idea that the OCC had to use the specific word 'thresholds' in order to get this information." App._[A.R.576_at_41]; Add.1237. He thus concluded Ms. Russ Anderson's "failure to disclose this information constituted an unsafe or unsound practice," and "violated both 18 U.S.C. §§1517 and 1001(a)." App._[A.R.576_at_42, 80, 99]; Add.1238, 1276, 1295.

In this regard, this alleged omission is similar to the others: the Comptroller found Ms. Russ Anderson failed to *volunteer* information, and to *guess* what information the examiners deemed relevant. Obviously, not every potentially

---

statement made during the meeting with the OCC" by two other Bank employees to the effect that the incentive plan "is not a requirement for keeping your job." App_[A.R.576_at_36]; Add.1232; App_[OCC.Exh.1771_at_2]. That statement was consistent with what Ms. Russ Anderson herself told the examiners. There was nothing to correct.

20

problematic account can be investigated without infinite resources. Ms. Russ Anderson did, nevertheless, respond to the question about how simulated funding is detected by stating her group "uses analytics with exact filters." App._[OCC.Exh.1734_at_2]. If the examiners had wanted to know about what analytics and what exact filters, why didn't they ask?

In sum, Ms. Russ Anderson did not willfully or corruptly conceal material information or provide materially false information. "[M]ere silence in the face of an unasked question" cannot establish liability. *Dale*, 782 F. Supp. at 626. "Precise questioning is imperative as a predicate for the offense of perjury." *Bronston*, 409 U.S. at 362. Nor is such silence an unsafe or unsound banking practice. *In re Seidman*, 37 F.3d at 937 n.38.

## III. Ms. Russ Anderson did not engage in unsafe or unsound banking practices.

The Comptroller further found that Ms. Russ Anderson "recklessly engage[d] in an unsafe or unsound practice in conducting the affairs" of her institution under 12 U.S.C. §1818(i)(2)(B)(i)(II) (money penalty), and "engaged" in such unsafe or unsound practices with personal dishonesty or reckless disregard under 12 U.S.C. §1818(e)(1)(A)(ii) (prohibition). App._[A.R.576_at_91-99]; Add.1287-95. To the extent such claims are based on alleged misrepresentations, they have absolutely no basis for the reasons stated above.

21

Nor is there any basis to conclude Ms. Russ Anderson engaged in other unsafe or unsound banking practices, for two reasons.

First, no law, regulation, or precedent established that what Ms. Russ Anderson did was unsafe or unsound. Second, there is a reason no such rules exist: because none of the conduct in question threatens the financial safety or soundness of the institution, as required by the statute.

## A.   No existing rule prohibited Ms. Russ Anderson's conduct.

The Due Process Clause provides, "No person shall ... be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. A central requirement of the clause is that there *be law* before the government can deprive someone of life, liberty, or property. Nathan S. Chapman and Michael W. McConnell, *Due Process as Separation of Powers*, 121 Yale L.J. 1672, 1679 (2012); 1 William Blackstone, Commentaries on the Laws of England 45 (1765).

In the administrative context, this principle is governed by *Chenery II*. The Supreme Court upheld an agency's decision to require the disgorgement of certain stock purchases by management, even though no law or regulation applied, because a reorganization plan was pending. "The absence of a general rule or regulation governing management trading during reorganization did not affect the Commission's duties in relation to the particular proposal before it." 332 U.S. at 201. The Commission still had "to grant or deny effectiveness" to the

22

reorganization plan. *Id.*; *but see id.* at 216 (Jackson, J., dissenting) (decrying the "Commission's assertion of power to govern the matter without law").

The majority made clear, however, that "retroactivity must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles." 332 U.S. at 203. Only "[i]f that mischief is greater than the ill effect of the retroactive application of a new standard, it is not the type of retroactivity which is condemned by law." *Id.*

The courts have, for example, prohibited retroactivity when the new rule contradicts a previously established rule. *See, e.g.*, *Retail, Wholesale and Dep't Store Union, AFL-CIO v. NLRB*, 46 F.2d 380 (D.C. Cir. 1972). In *De Niz Robles v. Lynch*, then-Judge Gorsuch explained that retroactive application was more suitable in backward-looking decisions settling the rights of parties. 803 F.3d 1165, 1170 (2015). ("[F]or civil society to function the people need courts to provide backward-looking resolutions for their disputes.").

Here, unlike in *Chenery II*, there is nothing left to "undo," and no dispute between Ms. Russ Anderson and the Bank requires adjudicating their respective rights. The ill effects of retroactively depriving Ms. Russ Anderson of liberty and property for the sole purpose of punishment far outweigh any possible benefits of applying new rules to her case.

23

Applying this framework, the unsafe or unsound practices claims against Ms. Russ Anderson must be vacated. They were not based on any existing rule. Retroactivity aside, the absence of established rules strongly suggests that Ms. Russ Anderson did not engage in unsafe or unsound practices.

### 1. "Credible challenge"

The Comptroller found that Ms. Russ Anderson recklessly engaged in an unsafe or unsound practice "by failing to credibly challenge the Bank's incentive compensation program." App._[A.R.576_at_42]; Add.1238. The Comptroller found that she was, and knew she was, obligated "to credibly challenge her superiors on the incentive compensation program wherever it failed to properly balance risk and reward." App._[A.R.576_at_44]; Add.1240. "Even if her superiors [already] knew about the unreasonable sales goals and SPM, that knowledge would not have relieved her of her responsibility to credibly challenge the unreasonable sales goals." App._[A.R.576_at_50]; Add.1246. According to the Comptroller, Ms. Russ Anderson "should have challenged the Community Bank's business model, advocated for a formal policy that employees could not be fired for failing to meet sales goals, sought to withhold incentive compensation credit for accounts of dubious origins, and advocated for tighter controls on new accounts." *Id.* Even if her superiors already knew about the issues, the Comptroller reiterated—and even if she had no control over sales goals, App._[A.R.495

24

(Tr.4538:19-4539:1), A.R.495 (Tr.4551:25-4552:9)]—that would not "absolve [Russ] Anderson from her obligation to credibly challenge them to change the incentive compensation program." App._[A.R.576_at_51-52]; Add.1247-48.

No law or rule, however, provides that a non-executive commits unsafe or unsound banking practices by failing to "credibly challenge" her superiors about policies over which she lacks control. The only OCC document that defines "credible challenge"—the OCC's Corporate Risk and Governance Handbook—emphasizes the *Board's* responsibility to challenge *management*. App._[R.Exh.18439_at_14] ("[The] board is responsible for … providing credible challenge to management."); App._[R.Exh.18439_at_121] (defining "credible challenge" as "[t]he method that directors use to hold management accountable by being engaged and asking questions and eliciting any facts necessary, when appropriate, to satisfy themselves that management's strategies are viable and in the bank's best interests.").

The Comptroller instead relied on an internal Bank policy for the proposition that the group risk officer "was responsible for 'providing credible challenge to the businesses they oversee.'" App._[A.R.576_at_43]; Add.1239; App._[OCC.Exh.1272_at_7]. And he relied on Ms. Russ Anderson's performance assessments for the proposition that her job required her to "[p]rovide credible

25

challenge to the Community Banking lines of businesses." App._[A.R.576_at_28]; Add.1224; App._[R.Exh.7256].

But her own annual performance review does not establish a *legal obligation* to provide credible challenge. Nor do a bank's internal policies. The Comptroller fashioned a new rule requiring non-executives with no escalation path to the Board to credibly challenge their superiors, or a new rule providing that unsatisfactorily performing one's job according to one's job description risks legal liability. Such retroactivity "is condemned by law." *Chenery II*, 332 U.S. at 203. Further, the absence of a relevant rule suggests that Ms. Russ Anderson engaged in no unsafe or unsound practice.

### 2. Strict liability.

The Comptroller also found that Ms. Russ Anderson "engaged in unsafe or unsound practices by failing to institute effective controls to prevent and detect SPM from 2013 until October 1, 2016, when the Bank eliminated sales goals." App._[A.R.576_at_52-53]; Add.1248-49. The Comptroller's finding was based on his conclusion that the controls she and the Bank instituted proved to be ineffective. As group risk officer, Ms. Russ Anderson "had a responsibility to address the risks from SPM and to institute effective controls. The data demonstrates that she failed." App._[A.R.576_at_62]; Add.1258. Although the Comptroller recognized that Ms. Russ Anderson imposed additional controls as the

26

problems with SPM became more apparent, he concluded they "were not effective at preventing or detecting SPM" because "the sheer amount of SPM alone demonstrates that no control, or combination of controls, was effective in managing or even materially improving SPM." *Id.*

Putting aside the Comptroller's dubious assertion of fact—potential simulated funding decreased dramatically between 2013 and 2016, from 2.3% to 0.7%, as Ms. Russ Anderson's team continued to focus on SPM, App._[OCC.Exh.1636R_at_2]—the Comptroller cited no law or rule for the proposition that a group risk officer is strictly liable if the controls she imposed turned out to be ineffective. The Comptroller's analysis was simply Monday-morning quarterbacking. It is true that an institution's risk department must institute controls, and those controls must meet generally accepted standards. But the responsibility lies with the *Board*. App._[R.Exh.18439_at_50] ("The board should oversee the bank's risk management system to ensure that the system identifies, measure, monitors, and controls risks."). And *senior* management—including the Chief Risk Officer, Mr. Loughlin, to whom Ms. Russ Anderson reported—"is responsible for the implementation, integrity, and maintenance of the risk management system." *Id.*; *see also* App._[R.Exh.18439_at_5] (defining senior management). And, as the Comptroller knows but ignores, no system of controls is

27

perfect. App._[A.R.495 (Tr.10195:23-10197:1)]; App._[OCC.Exh.2376_at_8 ¶¶ 19-20].

But whoever is responsible, the analysis must be *ex ante*. Otherwise any banking scandal would lead to automatic liability for the institution's risk officers. Yet the Comptroller made no findings whatsoever as to whether *ex ante* the controls in place were unreasonable. He simply presumed that because, according to him, those controls failed, they must have been inadequate. Inventing a strict liability rule to punish Ms. Russ Andreson retroactively is impermissible. *Chenery II*, 332 U.S. at 203. And the absence of any such rule further suggests Ms. Russ Anderson did not engage in unsafe or unsound practices.

### 3. "Failure to escalate."

The Comptroller additionally found that Ms. Russ Anderson recklessly engaged in unsafe or unsound practices because she "failed to escalate risk issues related to SPM." App._[A.R.576_at_67]; Add.1263. She "repeatedly failed to escalate known or obvious SPM risks to the individuals in her escalation path and that she continually downplayed the extent of SPM in the Community Bank." *Id.* Crediting the testimony of Chief Risk Officer Loughlin, the Comptroller concluded that Ms. Russ Anderson was "generally slow" in addressing SPM and should have escalated to Loughlin "in a more aggressive way." App._[A.R.576_at_69]; Add.1265.

28

The Comptroller cited no law or rule, however, specifying that an employee who is "slow" or not sufficiently "aggressive" commits an unsafe or unsound practice. OCC's policy document, specifically the "Corporate and Risk Governance" chapter of the Comptroller's Handbook on Safety and Soundness, provides that the Bank's *directors* and *senior management* are responsible for developing *processes* that allow for escalation. App._[R.Exh.18439_at_47] ("[S]enior management should ... ensure material risk and risk-taking activities exceeding the risk appetite are recognized, escalated, and addressed in a timely manner."); App._[R.Exh.18439_at_48] ("Consistent with the board-approved risk appetite, senior management should ... establish an escalation process to ensure that material weakness or problems are escalated to senior management."); App._[R.Exh.18439_at_60] ("The CEO and management also are responsible for ensuring that processes promptly escalate material issues to the board and senior management.").

To repeat, at all times Mr. Loughlin was the Bank's Chief Risk Officer. App._[A.R.576_at_22]; Add.1218. The Comptroller's Handbook specifies that position as Senior Management. App._[R.Exh.18439_at_5]; App._[OCC.Exh.1908U_at_5]. OCC has not directed Ms. Russ Anderson to any existing rule that establishes a non-executive under senior management can be

29

liable for having engaged in an "unsafe or unsound" practices for failing to escalate a particular problem.

It is obvious why no such rule exists. How much escalation is sufficient? How "slow" is too slow? How "aggressive" is aggressive enough? And how does one account for the fact that Ms. Russ Anderson had dozens of other issues on her plate at the time, including the integration of Wachovia Bank and ongoing regulatory actions stemming from the 2008 financial crisis? App._[A.R.495 (Tr.9269:10-9272:11)]; App._[OCC.Exh.2376_at_40 ¶¶ 94-95]. Such a rule would be unenforceable. On the other hand, OCC can more easily determine whether a bank has implemented policies and structures that encourage escalation.

**B.    None of the conduct threatened the financial soundness of the institution and so cannot constitute unsafe or unsound practices.**

Retroactivity aside, there is a reason none of the conduct Ms. Russ Anderson is alleged to have committed has ever been declared an unsafe or unsound practice: because it does not risk the *soundness* or *safety* of the institution, that is, its financial integrity and stability. The Comptroller erroneously applied a lax standard, according to which an unsafe or unsound practice includes "any action or lack of action [that] is contrary to generally accepted standards of prudent operation, the possible consequences of which, if continued, would be abnormal risk or loss or damage to an institution, its shareholders, or the agencies

30

administering the insurance funds." App._[A.R.576_at_15 & n.7]; Add.1211 & n.7 (quoting *In re Patrick Adams*, OCC AA-EC-11-50, 2014 WL 8735096 (OCC Sept. 30, 2014)).

Yet merely requiring any abnormal "risk" *or* "loss" *or* "damage" to the institution, its shareholders, or the agencies would stretch the statute beyond its ordinary meaning. Much risk, loss, or damage might have nothing to do with the financial *soundness* of the institution, or whether it is *safe* for depositors. As the Fifth Circuit long ago held, an unsafe or unsound practice relates to the institution's "financial integrity" and to the government's "insurance risk," nothing more. *Gulf Federal*, 651 F.2d at 264. The Fifth Circuit thus "limit[ed] the 'unsafe or unsound practice' provision to an association's financial condition." *Id.* at 265. Other courts followed suit. *See, e.g.*, *Seidman*, 37 F.3d at 928 ("The imprudent act must pose an abnormal risk to the financial stability of the banking institution."); *Simpson v. OTS*, 29 F.3d 1418, 1425 (9th Cir. 1994) (requiring "reasonably direct effect on an association's financial soundness").

These courts had it right: A banking institution is "unsafe" or "unsound" if it lends to risky borrowers, cannot pay its depositors, and has insufficient capital and liquidity. In what sense does a mere reputational harm for poor customer service— Wells Fargo will open unnecessary accounts!—risk the *safety* of existing deposits or the *soundness* of the institution? As the Fifth Circuit held, a "'loss of public

31

confidence' rationale would result in open-ended supervision" and allow the agency to "enforce the public's standard of fairness" and to monitor "every activity of the association in its role of proctor for public opinion." *Gulf Federal*, 651 F.2d at 264-65. That "departs entirely from the congressional concept of acting to preserve the financial integrity of its members." *Id.* at 265.

As the Fifth Circuit observed, the laxer standard comes verbatim from a statement the Chairman of the Federal Home Loan Bank Board made to Congress in 1966. 112 Cong. Rec. 26474 (1966). Yet as the Fifth Circuit noted, "Chairman Horne listed several practices that fell within his definition," including "paying excessive dividends, disregarding a borrower's ability to repay, careless control of expenses, excessive advertising, and inadequate liquidity." *Gulf Federal*, 651 F.2d at 264. Those examples involve the financial integrity of the institution, and whether it is safe for depositors. The Fifth Circuit detected no tension between its holding and Horne's dictum. The Fifth Circuit thought Horne's dictum supported its reading that the phrase requires a relationship to financial integrity or insurance risk—the whole point of the federal bank insurance program.

Other members also stated the obvious. "[I]t should be clear to all that the cease-and-desist powers and management removal powers are aimed specifically at actions impairing the safety or soundness of our insured financial institutions. These new flexible tools relate strictly to the insurance risk and to assure the public

32

sound banking facilities." 112 Cong. Rec. 24984 (Rep. Patman); *Gulf Federal*, 651 F.2d at 264. That is how proponents of the bill assuaged concerns that the "unsafe or unsound practice[s]" would be a vague and broad delegation of power to the agency. *Gulf Federal*, 651 F.2d at 264.

This Court has mentioned the Horne version of the standard. *See Van Dyke v. Bd. of Governors of Fed. Rsrv. Sys.*, 876 F.2d 1377, 1380 (8th Cir. 1989); *First Nat'l Bank of Eden v. Department of the Treasury*, 568 F.2d 610, 611 n.2 (8th Cir.1978). Both cases involved traditional unsafe practices that threatened the soundness of the institution. *Eden* involved "criticized assets" and violations of established regulations regarding "credit." 568 F.2d at 611.[3] *Van Dyke* involved a check-kiting scheme by the bank's president. 876 F.2d at 1378-80. In *Greene County Bank v. FDIC*, 92 F.3d 633, 636 (8th Cir. 1996), this Court purported to prefer the *Eden* formulation over the Fifth Circuit standard, but the conduct involved risky investments and qualified under either. This Court has never addressed the difference where the outcome would change.

---

[3] The case also involved deficiencies in internal controls and audit procedures, but presumably the practices insufficiently controlled and audited involved the criticized assets and credit problems. The agency also pursued a cease-and-desist order, suggesting the controls were inadequate ex ante.

33

Under the proper standard, in what sense did SPM risk the "financial integrity" of the Bank, or create an "insurance risk" for the federal government? This case is indistinguishable from *Gulf Federal*: There, the Bank Board sought to force the bank to refund interest payments erroneously collected from customers. The bank argued that the regulator was "attempt[ing] to enter the consumer protection field," for which there was no statutory authority. 651 F.2d at 261.

The Fifth Circuit agreed: in no way did collecting more interest than warranted risk the bank's "financial integrity" or create "insurance risk." *Id.* at 264. The regulator was impermissibly assuming a "consumer protection" role. To state the facts of that case is to decide this one. The entire scope of SPM, in which Ms. Russ Anderson never personally participated, involved at most charging customers for things they did not need, if they were charged at all. That is a matter of consumer protection, not financial soundness.

Even if, somehow, SPM had the potential to impact the financial integrity of the bank or create an insurance risk, Ms. Russ Anderson's own actions and inactions did not. Failing to create escalation paths and audit controls does threaten a bank's financial integrity and create insurance risk; but does a personal failure to escalate matters as aggressively as her supervisors would have, in hindsight, preferred? When the Board has no serious oversight of management, *that* risks the

34

institution's financial soundness; but does the failure of a non-executive to challenge her superiors?

The monetary and prohibition orders should be vacated.

## IV. Ms. Russ Anderson was entitled to have an Article III court and jury adjudicate the civil money penalty.

Both the civil money penalty and the order of prohibition must be vacated because no misconduct has been shown. The monetary penalty must be vacated for an additional reason: because an Article III court and jury were required to adjudicate it.

### A. The public rights framework.

Congress may not "withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty." *Murray's Lessee v. Hoboken Land & Imp. Co.*, 59 U.S. 272, 284 (1856). Matters "involving public rights," however, "are susceptible of judicial determination, but which congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper." *Id.* "Public rights" may be adjudicated "exclusively" by Congress or the executive branch. *Jarkesy*, 603 U.S. at 112; *Stern v. Marshall*, 564 U.S. 462, 493 (2011); *N. Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 68 (1982).

35

Public rights do not derive from the state of nature but instead from government grace, or, like natural resources, they belong to the public. Caleb Nelson, *Adjudication in the Political Branches*, 107 Colum. L. Rev. 559, 566-67 (2007). On the most widely accepted understanding, the reason such matters can be determined exclusively in Congress or the executive is sovereign immunity. If the government denies a public benefit, a wrongly denied individual has no remedy unless the government waives that immunity. The power to deny consent includes the lesser power of limiting any judicial review. *See N. Pipeline*, 458 U.S. at 67-68 (explaining the sovereign immunity rationale); William Baude, *Adjudication Outside Article III*, 133 Harv. L. Rev. 1511, 1544 (2020). Although disputes under public rights schemes "aris[e] under the ... laws of the United States," U.S. Const. art. III, §2, cl. 1, they elude the reach of the federal judicial power because without a waiver of sovereign immunity there is no defendant and therefore no "case" within the meaning of Article III. *See* Caleb Nelson, *Sovereign Immunity as a Doctrine of Personal Jurisdiction*, 115 Harv. L. Rev. 1559 (2002).

This framework explains why public benefits like land, patent, and welfare grants can be adjudicated in the executive branch. *Crowell v. Benson*, 285 U.S. 22, 51 (1932); *United States v. Duell*, 172 U.S. 576, 582-83 (1899); *Jarkesy*, 603 U.S. at 130. As can tariffs, foreign trade, and immigration matters, which involve public privileges, not private rights. *Ex parte Bakelite Corp.*, 279 U.S. 438, 446 (1929)

36

(tariffs); *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 131 (2020)

(immigration); *U.S. ex rel. Turner v. Williams*, 194 U.S. 279, 289-90 (1904)

(same); *Buttfield v. Stranahan*, 192 U.S. 470, 493 (1904) ("no individual has a

vested right to trade with foreign nations"). This framework explains why the

allocation of licenses to transmit over the airwaves—a limited public resource—is

a public right. *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 389 (1969).

Within the scope of some of these public rights categories, some degree of

monetary fines and penalties have traditionally been allowed—but only insofar as

necessary to secure efficient performance of ongoing regulatory obligations. In

*Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320 (1909), the Supreme

Court upheld the administrative imposition of a monetary fine for bringing into the

country aliens carrying contagious diseases that could have been detected prior to

embarking. The Court distinguished "infamous crime," which required a court, and

a fine imposed "to secure the efficient performance" of the regulatory "duty." *Id.* at

337. In *Passavant v. United States*, 148 U.S. 214, 221 (1893), the Court upheld

conclusive executive-branch determinations of customs duties, including additional

duties as penalties for undervaluing imports. Such additional duties were "designed

to discourage undervaluation upon imported merchandise." *Id.*

In the modern era, the Supreme Court expanded the scope of public rights to

include certain administrative proceedings where the government seeks monetary

37

penalties as punishment for violations of statutory obligations more generally. *Atlas Roofing v. Occup. Safety and Health Rev. Comm'n*, 430 U.S. 442 (1977). That case is irreconcilable with traditional notions of public and private rights, and the Supreme Court has recently limited its reach. Specifically, in *Jarkesy*, the Court explained that *Atlas Roofing* allowed for a non-Article III adjudication because the statute "did not borrow its cause of action from the common law." 603 U.S. at 136. The relevant standards brought "no common law soil with them," and rather "resembled a detailed building code." *Id.* The "OSH Act adjudications," the Court concluded, could be assigned "to an agency because the claims were 'unknown to the common law.'" *Id.* at 138 (quoting *Atlas Roofing*, 430 U.S. at 461).

The Court held that an enforcement action for a civil monetary penalty for violating the securities laws was a matter of private right because Congress had "created claims whose causes of action are modeled on common law fraud and that provide a type of remedy available only in law courts." *Jarkesy*, 603 U.S. at 135-36. The securities laws "target the same basic conduct as common law fraud, employ the same terms of art, and operate pursuant to similar legal principles." *Id.* at 134.

Applying the *Jarkesy* decision, the Fifth Circuit recently held that Article III applied to a civil monetary penalty against AT&T for violations of section 222 of the Telecommunications Act. *AT&T, Inc. v. FCC*, No. 24-60223, 2025 WL

38

1135280 (5th Cir. Apr. 17, 2025). Under that provision, telecommunications carriers had an obligation to protect the confidentiality of "customer proprietary network information," and could not "use, disclose, or permit access to" such information except as necessary to provide telecommunications services. *Id.* at *1. Commission regulations further provided that carriers "must take reasonable measures to discover and protect against attempts to gain unauthorized access to" such information. *Id.*

The Fifth Circuit concluded that the public rights exception did not apply because "[n]egligence claims against common carriers have been routinely adjudicated in state and federal courts." *Id.* at *7. It held that "the section 222 action is analogous to common law negligence" because it "punishes carriers for failing to take reasonable measures to protect customers' personal data." *Id.* at *5. The action "target[s] the same basic conduct" as the common law negligence claim. *Id.* at *6 (quoting *Jarkesy*, 603 U.S. at 125). "[T]he statutory action need not be 'identical' to a common law analogue," but must merely have a "close relationship" to it. *Id.* (quoting *Jarkesy*, 603 U.S. at 126).

### B. The public rights exception is inapplicable.

Applying this legal regime, it is evident that this entire case, and certainly the civil money penalty, involves private not public rights.

39

### 1. Ms. Russ Anderson's private rights are at stake.

Ms. Russ Anderson is being deprived of her *private property*. The $10 million the government seeks—which she does not have and never had—are not government funds that she has wrongfully withheld from the U.S. treasury. To the extent she can pay part of the penalty with her entire life's savings, those savings belong to *her*. She even earned that money through private employment that in no way depended on government. Even if working at a bank could somehow be described as a public right akin to public employment, that would not change the nature of any income she had already earned. There is simply no plausible way to describe her life's savings as a public privilege. It is her property and none other's.

Nor is the penalty here like the small penalties in *Oceanic Steam Navigation* and *Passavant*, imposed contemporaneously with the violations to secure the efficient performance of and compliance with ongoing regulatory duties. Ms. Russ Anderson has not been employed at Wells Fargo since February 2017. The alleged conduct ended in 2016. These enforcement proceedings did not initiate until four years later.

### 2. Article III courts must adjudicate violations of federal criminal laws outside the regulatory scheme.

Even if the nature of the right were not dispositive, the nature of the claims would be. The Comptroller justified the $10 million penalty in part because he

40

concluded that Ms. Russ Anderson violated 18 U.S.C. §§1001 and 1517. Counsel are not aware of any case in which an administrative agency has been permitted to base a civil monetary penalty on finding a violation of federal criminal laws.

No one disputes that if the U.S. Attorney had prosecuted Ms. Russ Anderson for alleged violations of these statutes, she would have been entitled to an Article III court. The federal judicial power would extend to such a case because it would "aris[e] under the ... laws of the United States." Traditional due process protections would apply, including the jury right. *See* U.S. Const. art. III, §2, cl. 3 ("The Trial of all Crimes ... shall be by Jury").

If, however, statutes must resemble common law crimes, these do. Section 1001 requires "knowingly and willfully" making material representations or omissions, while Section 1517 requires "corruptly" obstructing an examination of a financial institution. As the Supreme Court held in *Morissette v. United States*, regulatory and "public welfare" offenses were distinguished from crimes having their roots in common law ideas of an "evil-meaning mind." 342 U.S. 246, 251-58 (1952). Regulatory offenses could dispense with mental states; traditional offenses, like those which Ms. Russ Anderson has been accused of violating, could not. *Id.* at 256-58.

Appellate Case: 25-1079    Page: 52    Date Filed: 05/21/2025 Entry ID: 5518650

3.  The unsafe or unsound practice standard sounds in the law of negligence and fiduciary duties.

The claim that Ms. Russ Anderson recklessly engaged in unsafe or unsound practices also sounds in traditional causes of action, for three reasons.

First, the Comptroller found the same misconduct that constituted violations of 18 U.S.C. §§1001 and 1571 also constituted unsafe or unsound practices. To that extent, the unsafe or unsound practices claim sounds in traditional criminal law, as well as the law of negligent or fraudulent misrepresentation. *See* Restatement (Second) of Torts §525 (fraudulent misrepresentation), §550 (liability for fraudulent concealment), §551 (liability for nondisclosure), §552 (information negligently supplied).

Second, the general standard for assessing unsafe or unsound practices is whether it "is contrary to generally accepted standards of prudent operation." *In re Adams*, 2014 WL 8735096, at *3. This standard is like a breach of fiduciary duty, which turns on a duty of care measured by what "ordinarily careful and prudent men would use in similar circumstances," *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 749 (Del. Ch. 2005). Fiduciary duties have long been defined by common law and equity courts. *See, e.g.*, *Varity Corp. v. Howe*, 516 U.S. 489, 496 (1996) ("fiduciary duties draw much of their content from the common law of

42

trusts"); *Keech v. Sandford* [1726] Sel. Cas. Ch. 61, 25 E.R. 223 (English chancery decision establishing a trustee's fiduciary duty of loyalty).

Third, the standard even more closely parallels negligence. Restatement (Second) of Torts §283 ("[T]he standard of conduct to which [an actor] must conform to avoid being negligent is that of a reasonable man under like circumstances."). In *AT&T v. FCC*, the Fifth Circuit recently ruled that section 222 of the Telecommunications Act is analogous to common law negligence because it "punishes carriers for failing to take reasonable measures to protect customers' personal data." 2025 WL 1135280, at *5. So too, here, the standard punishes institutions and affiliated parties "for failing to take reasonable measures to protect" the financial integrity of the institution.

If that were somehow not enough, the Comptroller found—as required by statute—that Ms. Russ Anderson's conduct was reckless. App._[A.R.576_at_94]; Add.1290 (conduct "is reckless if it is 'done in disregard of, and evidencing a conscious indifference to, a known or obvious risk of a substantial harm.'" (citing *Cavallari v. OCC*, 57 F.3d 137, 142 (2d Cir. 1995)). That standard derives from tort law. *Cavallari*, 57 F.3d at 142 (citing, e.g., W. Page Keeton et al., Prosser and Keeton on the Law of Torts §34, at 213 (5th ed. 1984)).

43

4. Banking and its related common-law rules long predated federal banking laws.

What is more, negligence standards applied to banking institutions long before the "unsafe or unsound practice[s]" standard appeared in federal statute. Prior to 1933, *see* Banking Act of 1933, ch. 89, §30, 48 Stat. 162, 193-94 (establishing standard), "federal common law had long recognized that officers and directors of banks 'must exercise ordinary care and prudence in the administration of the affairs of a bank.'" *Resolution Tr. Corp. v. Heiserman*, 839 F. Supp. 1457, 1463 (D. Colo. 1993) (quoting *Briggs v. Spaulding*, 141 U.S. 132, 165 (1891)). Courts recognized that "[t]he law governing the duties of directors in financial institutions is well settled," and "[t]hey are summoned to the same degree of care and prudence that men prompted by self-interest generally exercise in their own affairs." *Kavanaugh v. Gould*, 223 N.Y. 103, 105 (1918).

Astoundingly, the Comptroller insists that "[n]ational banks did not exist at common law; they are 'are instrumentalities of the Federal government, created for a public purpose, and as such necessarily subject to the paramount authority of the United States.'" App._[A.R.576_at_108]; Add.1304 (quoting *Davis v. Elmira Sav. Bank,* 161 U.S. 275, 283 (1896)). The Comptroller confuses banks like the Bank of the United States and the Federal Reserve, which were and are indeed instrumentalities of the federal government, with banks that have charters under

44

the national banking laws, like Wells Fargo. The Court in *Davis* held nothing more than federal banking laws preempt contrary state banking laws. 161 U.S. at 290.

The right to lend money was not created by the U.S. government; it is as old as time. *See, e.g.*, Code of Hammurabi §§48, 100 (describing loans and interest rates); Deuteronomy 23:19-20 (forbidding lending upon interest to fellow Israelites, but permitting it upon foreigners). The very first bank—the Bank of England—was a *private* institution, and remained so until 1946. https://www.britannica.com/money/Bank-of-England. It "is very clear that at common law, the right of banking in all of its ramifications, belonged to individual citizens; and might be exercised by them at their pleasure." *Bank of Augusta v. Earle*, 38 U.S. 519, 595-96 (1839).

As for Wells Fargo, it "began in business in 1852 as a provider of stagecoach service, mail delivery, banking services, freight delivery, and passenger transportation," long before the first national banking laws. *Wells Fargo & Co. v. United States*, 91 Fed. Cl. 35, 45 (2010). And its being chartered today under the federal banking laws does not sever its historic connection to the common law. The Supreme Court long ago held that banks with national charters remain "subject to the laws of the State, and are governed in their daily course of business far more by the laws of the State than of the nation." *First Nat'l Bank v. Kentucky*, 76 U.S. 353, 362 (1869).

45

5. Determining "unsafe or unsound" practices may involve public rights, but only in the context of cease-and-desist orders and termination of insurance.

Finding that this case involves private rights would not diminish the important role OCC performs. A depository institution's receipt of federal insurance is a public benefit. Due process applies before the government rescinds any insurance, but an Article III court would not be required. *See, e.g.*, *Goldberg v. Kelly*, 397 U.S. 254 (1970) (requiring due process protections through internal agency processes for the withholding of welfare benefits).

Additionally, OCC still promulgates rules fleshing out the "unsafe or unsound practice[s]" standard, which it can also elaborate by adjudicating cease-and-desist orders. In the cases the Comptroller cited for the proposition that the banking statute involves public rights, all dealt with such orders. *See Simpson*, 29 F.3d at 1423-24 (cease-and-desist proceeding that ordered restitution); *Akin v. OTS*, 950 F.2d 1180, 1186 (5th Cir. 1992) (same); *Cavallari*, 57 F.3d at 145 (recklessly disregarding OCC cease-and-desist order).

These powers reflect the government's historic "visitorial" powers upon corporations. *Cuomo v. Clearing House Ass'n, L.L.C.*, 557 U.S. 519, 525-26 (2009). These powers allow OCC to examine and supervise a bank's "internal operations." *Id.* at 547. Such powers of examination are distinct from the kinds of cases that would have been heard in courts to "redress grievances" and "frauds."

46

*Id.* at 527. So too here: OCC retains its important visitorial powers, and public benefits are an important feature of the scheme. But when private rights are at stake, an Article III court is required.

### C. The Seventh Amendment applies.

Once it is determined that an Article III court is required, a jury trial does not always follow. Historically, juries did not apply in admiralty or equity. Courts must therefore "examine both the nature of the action and of the remedy sought." *Tull v. United States*, 481 U.S. 412, 417 (1987). This requires courts to "compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity," and to determine whether the remedy "is legal or equitable in nature." *Id.* at 417-18. The nature of the remedy is more consequential: "the relief sought is '[m]ore important' than finding a precisely analogous common-law cause of action." *Id.* at 421 (quoting *Curtis v. Loether*, 415 U.S. 189, 196 (1974)).

In *Tull*, the Court concluded: "A civil penalty was a type of remedy at common law that could only be enforced in courts of law. Remedies intended to punish culpable individuals, as opposed to those intended simply to extract compensation or restore the status quo, were issued by courts of law, not courts of equity." *Id.* at 422. The agency had sought a several-million-dollar penalty for violations of the Clean Water Act; the Court held a jury was required.

47

More recently in *SEC v. Jarkesy*, the Court held that a $300,000 monetary penalty for violation of the securities laws required a jury. The Court found the remedy "all but dispositive" because the SEC sought "civil penalties, a form of monetary relief," which is a "prototypical common law remedy." 603 U.S. at 123. Because the monetary penalty was "designed to punish or deter the wrongdoer" rather than to "restore the status quo," it was legal rather than equitable. *Id.* The Court observed that several of the statutory factors governing monetary penalties "concern[ed] culpability, deterrence, and recidivism." *Id.* at 123-24.

Once it is determined that an Article III court is required, *Tull* and *Jarkesy* resolve the Seventh Amendment question. The $10 million penalty was designed to punish Ms. Russ Anderson. That is "all but dispositive" of her claim. 603 U.S. at 123. As in *Jarkesy*, the statutory factors focus on blameworthiness, namely the defendant's "good faith," the "gravity of the violation," "the history of previous violations," and "other matters as justice may require." *Compare* 12 U.S.C. §1818(i)(2)(G) *with* 15 U.S.C. §§78u–2(c), 80b–3(i)(3). The cases cited by the Comptroller, in contrast, involved restitution and restoring the status quo. *Simpson*, 29 F.3d at 1423-24; *Akin*, 950 F.2d at 1186; *Cavallari*, 57 F.3d at 145.

As noted, the Court also looks to whether the cause of action arose in law or equity. The Article III analysis demonstrated that the causes of action are criminal or rooted in negligence; here, moreover, the Comptroller disclaimed any findings

48

regarding fiduciary duties (which may be equitable in nature). Additionally, the wrongdoing of bank directors was historically adjudicated by juries. *See, e.g.*, *Kavanaugh*, 223 N.Y. at 112 (noting a "jury" might have found a bank director's various failures were negligent); *Preston v. Prather*, 137 U.S. 604, 609 (1891) (jury could determine liability of bank for failure of safe-keeping of deposits); *Davenport v. Prentice*, 126 A.D. 451 (N.Y. App. Div. 1908) (bank directors sued at common law for damages for failure to supervise activities of subordinates).

In the Seventh Amendment context, the Supreme Court also looks to see if the matter involves public rights. *Jarkesy*, 603 U.S. at 127-40. That goes without saying: if the matter may be determined in the executive branch, an Article III court is not required, so neither is a jury. As discussed in the previous section, this case involves private not public rights.

## V.   The prohibition order is unconstitutional and unlawful.

For the reasons described in Parts II and III—there was no misconduct—both the civil money penalty and the prohibition order must be vacated.

Two additional reasons require vacating the prohibition order. First, that order, too, must be adjudicated by an Article III court and jury. Second, the Comptroller did not find a relevant effect. He erroneously concluded that regulatory penalties and settlements constituted "financial loss or other damage" under the statute, and that "the interests of ... depositors" were "prejudiced" even

49

though the safety of their deposits was never in question. App._[A.R.576_at_86]; Add.1282. Both require vacating the prohibition order.

### A. Ms. Russ Anderson was entitled to a jury and court.

Because the factual bases for both the monetary penalty and the prohibition overlap, a jury is required to decide all common questions of fact. It is black-letter law that when there is an "issue common to both the legal and equitable claims," to allow the equitable claims to be "finally determined by the court" first would "deprive[]" the "party seeking trial by jury on the legal claim" his right to a jury trial on "these common issues." *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 472 (1962). Where "issues are common," the "legal claims involved in the action must be determined prior to any final court determination" of the "equitable claims." *Id.* at 470.

Moreover, an order of prohibition may not be equitable at all. As the Supreme Court has explained numerous times, both the remedy and the cause of action must be considered. *Tull*, 481 U.S. at 417-18; *Jarkesy*, 603 U.S. at 122-23. Here, the causes of action sound in criminal and common law. Nor is the remedy necessarily equitable. It is designed to *punish*, not restore. *Cf., e.g.*, *Proffitt v. FDIC*, 200 F.3d 855, 861 (D.C. Cir. 2000) (holding that a prohibition order is "punitive" rather than compensatory and is therefore a "penalty" for statute of limitations purposes).

50

Even if a jury trial were not required for the prohibition order, an Article III court still would be. After all, courts decide matters of *equity*, too. *Murray's Lessee*, 59 U.S. at 284. For the reasons discussed previously, this case involves private and not public rights. That conclusion applies regardless of remedy. To be sure, if the jury right does not apply, it could be argued that prohibition orders can be adjudicated by an administrative tribunal. Some degree of fact-finding may be assigned to an administrative tribunal in narrow circumstances so long as the jury right is inapplicable. *Crowell v. Benson*, 285 U.S. 22 (1932).

*Crowell*, however, does not apply here. First, the Court in *Northern Pipeline* and *Stern* confirmed that if the cause of action arises in state law or common law, it must be adjudicated in an Article III court. *N. Pipeline*, 458 U.S. at 80-82; *Stern*, 564 U.S. at 493. Congress can only assign to administrative tribunals federal causes of action for resolution. *Stern*, 564 U.S. at 493. Here Congress enacted both 18 U.S.C. §§1001 and 1517 but did not provide for resolution of claims arising under those provisions to an administrative tribunal.

Second, this is not a situation in which Congress devised an "expert and inexpensive method for dealing with a class of questions of fact which are particularly suited to examination and determination by an administrative agency specially assigned to that task." *Stern*, 564 U.S. at 494 (quoting *Crowell*, 285 U.S. at 46). This is not a workers' compensation scheme like *Crowell*, where the

51

commission merely determined the fact and extent of injury and the compensation to which the worker was entitled. Nor is this a cease-and-desist case. The entire case involves mental states: personal dishonesty or "willful and continuing disregard," that is, *wrongdoing*. Those are matters for courts, not agencies.

### B.     The Comptroller did not find a legally relevant effect.

An order of prohibition requires finding that, "by reason of" the misconduct, the institution "suffered or will probably suffer financial loss or other damage," "the interests of the insured depository institution's depositors have been or could be prejudiced," or the party received a pecuniary or other benefit. 12 U.S.C. §1818(e)(1)(B). The Comptroller found that Ms. Russ Anderson did not obtain any pecuniary gain by virtue of her conduct. App._[A.R.576_at_90-91]; Add.1286-87. He found, however, that the institution suffered financial loss or other damage because it paid various regulators fines and penalties. App._[A.R.576_at_82-83]; Add.1278-79. And he found that the interests of the depositors were prejudiced because "SPM caused significant harm to customers, including unwarranted account fees, credit score impacts, and misuse of customers' personal information." App._[A.R.576_at_88]; Add.1284. The prohibition order must also be vacated because neither is a relevant effect under the statute.

Appellate Case: 25-1079     Page: 63     Date Filed: 05/21/2025 Entry ID: 5518650

1. Regulatory fines and penalties.

The Comptroller found that "the Bank paid the following fines, penalties, fees, and related expenses as a result of its SPM problem," all of which constituted "financial loss or other damage" under the statute. App._[A.R.576_at_82]; Add.1278. He then listed the "fines and penalties" paid to OCC, CFPB, and the Los Angeles City Attorney; to the Attorney General of New York; to the attorneys general of all fifty states; and to the U.S. Department of Justice, totaling nearly $4 billion. A relatively small $142 million was also paid to settle a class action on behalf of affected customers.

The $4 billion in financial "loss" or "damage," upon which the Comptroller based his prohibition order, is not a loss or damage within the meaning of the statute. To include such fines and penalties as loss or damage would render the statute circular. A regulatory fine or penalty can only be imposed *if* there is a relevant effect—that is how the statute assures that regulators will only punish for relevant conduct. To say that the fines and penalties paid to regulators are losses under the statute is to beg the very question—whether there were relevant financial losses or damages such that regulatory fines and penalties could be imposed.

Nor can OCC claim fines paid to other regulators are a relevant loss under the statute justifying the imposition of an OCC fine. Otherwise, OCC would be

53

able to piggyback off other regulators' jurisdiction without addressing whether the financial loss is of the kind that *its* statute gives it authority to regulate.

Moreover, the Bank never admitted any wrongdoing. App._[OCC.Exh.631; OCC.Exh.632]. Banks settle for many reasons. How, therefore, are such settlements caused "by reason of" the misconduct, if institutions usually settle with their regulators even if they believe they have done nothing wrong? The Comptroller cites no case for the proposition that settlements, fines, and penalties can constitute financial loss or damage under the statute. The relevant financial loss or damage must be independent of any regulatory penalties or lawsuits; the acts themselves must cause or risk loss to the institution, as when the Bank makes faulty loans or officers engage in self-dealing.

### 2. Customer harm.

Nor does "significant harm to customers, including unwarranted account fees, credit score impacts, and misuse of customers' personal information," App._[A.R.576_at_88]; Add.1284, count as "prejudice" to the "interests of the ... depositors." Those harms involve consumer protection matters beyond the statute's reach. *Gulf Federal*, 651 F.2d at 264-65. OCC's predecessor agency recognized as much. To prejudice the interests of depositors, the institution must engage in conduct that harms the reputation of the institution such that it causes "loss of confidence to depositors." *In re Cousin*, 1994 WL 621240, at *15 (OTS Oct. 11,

54

1994). The agency elaborated: the relevant conduct is that which "injures the reputation of the institution or that otherwise would persuade a depositor that his or her funds were subject to a substantial risk." *Id.* The statute no longer requires "serious" prejudice, but the *funds* must still be subject to a "risk."

How do "unwarranted account fees, credit score impacts, and misuse of customers' personal information" affect the safety or risk of depositors' *deposits*? They don't. That is why millions of customers continued to open accounts with Wells Fargo. App._[OCC.Exh.1636R_at_2]. They do cause consumer protection harms, which is why the Bank settled with its customers under those statutes. But that has nothing to do with OCC's jurisdiction. Nor does a general "ero[sion] of trust," App._[A.R.576_at_88]; Add.1284, which has nothing to do with deposits. *Gulf Federal*, 651 F.2d at 264-65.

Because the Comptroller has not found any legally relevant effect under the statute, the prohibition order must be vacated for that reason, too.

## VI.  Excluding exculpatory evidence and other procedural errors require a new proceeding.

If all else fails, the Court must order a retrial. The ALJ routinely excluded exculpatory material. "It is repugnant to notions of fairness for the government to seek sanctions for alleged wrongdoing while withholding from the proceeding

55

evidence that would demonstrate innocence." *Drukker Commc'ns, Inc. v. NLRB*, 700 F.2d 727, 733 (D.C. Cir. 1983) (Scalia, J.).

First, the ALJ excluded the "Lessons Learned" report, an internal OCC report highly critical of the bank examiners responsible for Wells Fargo. App._[R.Exh.826]; App._[A.R.490]. That report, for example, noted that in 2010 examiners had asked senior management "about the 700 cases of whistleblower complaints related to gaming of incentive plans." App._[R.Exh.826_at_6]. It shows the entire Board and examiners received regular reports "related to sales integrity violations" since 2005. *Id.* That suggests examiners already knew what they accused Ms. Russ Anderson of hiding or failing to escalate.

More generally, the document accused the bank examiners who testified against Ms. Russ Anderson of "untimely and ineffective supervision," "noncompliance with OCC guidance," and maintaining "unclear supervisory records." App._[R.Exh.826_at_5, 10-11]. Ms. Russ Anderson was entitled to ask the examiners who testified against her about their motivations and credibility.

Second, the ALJ precluded all testimony about an email from OCC Examiner-In-Charge Brad Linskens, in which he agreed with a 2016 article describing the agency as "blindsided" by the public outcry related to SPM, and OCC's subsequent treatment of the Bank as "regulatory abuse." App_[R.Exh.824]. "[T]he OCC and its head, Tom Curry, were embarrassed that they were blindsided

56

by the Wells phony-accounts scandal. Now they're getting even. It is an amazing overreaction," the article stated. *Id.* Why did examiner Linskens think this claim "has merit"? *Id.* Ms. Russ Anderson was entitled to ask him.

She was also entitled to OCC reports detailing the extent of SPM at peer institutions to establish her conduct comported with the standard of care. The ALJ denied her that opportunity, too. App._[A.R.46_at_4].

Worse, the proceedings were infected by error from the start. Over Ms. Russ Anderson's objection, the ALJ summarily disposed of hundreds of disputed facts without the "upon the record ... hearing" required by statute and the APA. 12 U.S.C. §1818(e)(4); 5 U.S.C. §554(a); App._[A.R.348]; Add.1-753; App._[A.R.384_at_2] ("The Summary Disposition Order determined factual claims presented in some of [EC's] Statements of Material Fact."). The ALJ left only 18 factual issues for trial, App._[A.R.350], and categorically prohibited Petitioner from addressing at the hearing the hundreds of facts he "resolved" on paper, App._[A.R.353_at_4]; App._[A.R.384_at_2].

The Comptroller effectively concedes this error: "The ALJ found that most of Enforcement Counsel's statements of material fact against Anderson were undisputed and could be resolved against her at the summary disposition stage." App._[A.R.576_at_10, 119]; Add.1206, 1315. How can a fact be "undisputed,"

and yet also "resolved against" a party? *See also* App._[A.R.576_at_121-22]; Add.1317-18 (ALJ "resolve[d] factual claims" on summary disposition).

Even if summary disposition were allowed under a statute requiring an on-the-record hearing—an open question—the ALJ's blatant bias in resolving disputed facts at the summary disposition stage denied Ms. Russ Anderson's right to a hearing. *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996) ("the court should not weigh the evidence, make credibility determinations, or attempt to determine the truth of the matter" on summary judgment); *Prestwick Capital Mgt., Ltd. v. Peregrine Fin. Group, Inc.*, 727 F.3d 646, 663 (7th Cir. 2013) ("summary judgment is not a paper trial").

## VII. Doubling the monetary penalty was unlawful.

At a minimum the civil money penalty must be reduced. One year after the proceeding had started and just months before the administrative hearing began, OCC sought to double the penalty that had been proposed in the NOC to $10 million. App._[A.R.249_at_199]. This was thinly veiled retaliation for Ms. Russ Anderson's decision to defend herself. And it was unlawful.

The OCC is authorized to "assess" a civil money penalty "by written notice," 12 U.S.C. §1818(i)(2)(E)(i), which the party may challenge within twenty days. After a penalty has been assessed, OCC retains the authority to "compromise, modify, or remit" the penalty. *Id.* §1818(i)(2)(F). The statutory text makes clear

that an agency is not authorized to increase, let alone double, a penalty sought in the notice midway through proceedings.

First, the word "modify" means making "modest" changes. "The word 'modify'—like a number of other English words employing the root 'mod-' (deriving from the Latin word for 'measure'), such as 'moderate,' 'modulate,' 'modest,' and 'modicum'—has a connotation of increment or limitation." *MCI Telecommunications Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 225 (1994); *id.* at 228 ("'Modify,' in our view, connotes moderate change.").

Second, the agency can only modify the penalty *downward*. The word "modify" is between two terms that give the agency power to *remove* penalties—by "compromis[ing]" or "remit[ting]" them. The word modify takes on the meaning of its associates. *Yates v. United States*, 574 U.S. 528, 543 (2015) ("[W]e rely on the principle of *noscitur a sociis*—a word is known by the company it keeps—to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress.") (cleaned up); *Iverson v. United States*, 973 F.3d 843, 852 (8th Cir. 2020) (similar). The agency thus can remit the penalty entirely, compromise it for settlement, or otherwise reduce it without compromising.

The canon of constitutional avoidance further supports this interpretation. If the statute allowed the agency to double (why not quadruple?) a penalty after the

59

NOC, it would "make such a sweeping delegation of legislative power that it might be unconstitutional." *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 646 (1980) (cleaned up). And it would violate due process, of which notice is "[a]n essential principle." *Meier v. City of St. Louis*, 78 F.4th 1052, 1058 (8th Cir. 2023). For notice to be effective, it must "provide[] an accurate picture of what was at stake." *Brown v. Plaut*, 131 F.3d 163, 172 (D.C. Cir. 1997); *Vail v. Derwinski*, 946 F.2d 589, 594 (8th Cir. 1991).

An interpretation that would risk violating the nondelegation doctrine and due process should be avoided. "It is a bedrock principle of statutory interpretation that 'where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter.'" *Union Pac. R. Co. v. U.S. Dep't of Homeland Sec.*, 738 F.3d 885, 892-93 (8th Cir. 2013) (quoting *U.S. ex rel. Attorney Gen. v. Del. & Hudson Co.*, 213 U.S. 366, 408 (1909)).

Separately, this Court recognized in *Oberstar v. FDIC* that increasing a civil penalty to punish someone for seeking judicial review "is deeply disturbing." 987 F.2d 494, 503 (8th Cir. 1993) (Loken, J.). It is also unconstitutional. "To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort, and for an agent of the State to pursue a course of action whose objective is to penalize a person's reliance on his legal rights is

60

'patently unconstitutional.'" *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978) (citations omitted). The increased penalty punished Ms. Russ Anderson for exercising her constitutional right to a hearing. *Bordenkircher*, 434 U.S. at 363; *Dazzio v. FDIC*, 970 F.2d 71, 79 (5th Cir. 1992) (increase in penalty looked "uncomfortably like judicial vindictiveness"). The Court should not countenance such unconstitutional retaliation.

Finally, the penalty must be vacated or reduced because the agency did not consider the statutory factors. As noted, OCC was required to consider Ms. Russ Anderson's "financial resources." 12 U.S.C. §1818(i)(2)(G)(i). She provided sworn testimony, supported by documentary evidence, that her net worth was just shy of $5 million. App._[A.R.495 (Tr.9507:17-9508:20)]; *supra* note 1. The Comptroller ignored this evidence and relied instead on his own speculation and extrapolation from what he conceived as a "very high income for an extended period of time." App._[A.R.576_at_105]; Add.1301. That was an abuse of discretion if ever there was one. 5 U.S.C. §706(2)(A).

Moreover, even if Enforcement Counsel's own assertions were correct—which Ms. Russ Anderson denies—they speculated she earned a total income of $22 million over twelve years in compensation and equity. App._[A.R.249_at_204]. But even if that were true (and it is not), half of that would go to state and federal taxes. She also had to *live* over that decade. How

61

could the Comptroller justify a $10 million penalty even on his agency's own (unsupported) assumptions?

The Court should vacate the penalty.

## CONCLUSION

It is time to end Ms. Russ Anderson's nearly decade-long nightmare. She neither lied nor committed any "unsafe" or "unsound" practice. And the agency never had constitutional authority to adjudicate her case. Its order should be vacated.

Dated:  May 20, 2025

**KELLEY, WOLTER & SCOTT, P.A.**

By:  _____

       Douglas A. Kelley (#54525)
       Steven E. Wolter (#170707)
       Brett D. Kelley (#397526)
       Perry F. Sekus (#309412)
       Garrett S. Stadler (#402831)
11100 Wayzata Boulevard, Suite 510
Minnetonka, MN  55305
Tel: (612) 371-9090
Fax: (612) 371-0574
Email:   dkelley@kelleywolter.com
        swolter@kelleywolter.com
        bkelley@kelleywolter.com
        psekus@kelleywolter.com
        gstadler@kelleywolter.com

By:  _____

       Ilan Wurman (#505733)
University of Minnesota Law School*
Minneapolis, MN  55455
229 S. 19th Ave
Tel: (612) 624-8816
Email:   iwurman@umn.edu

*Affiliation included for identification purposes
only

***Attorneys for Petitioner Claudia Russ Anderson***

63

## CERTIFICATE OF COMPLIANCE

The undersigned certify that this Brief complies with the length and type-size limitations under Federal Rule of Appellate Procedure 32(a). The Brief contains 12,995 words set in Times New Roman, a proportional font, type-size 14 point. The undersigned certify that the word count stated above was generated by the word-count function of Microsoft Word for Office 365 as specifically applied to include all text, inclusive of headings, footnotes and quotations, but exclusive of the caption, tables, signature block, and certificates of compliance and service. This Brief and the Addendum have been scanned for viruses and are virus-free.

Dated: May 20, 2025      **KELLEY, WOLTER & SCOTT, P.A.**

By:     *s/ Brett D. Kelley*
         Douglas A. Kelley (#54525)
         Steven E. Wolter (#170707)
         Brett D. Kelley (#397526)
         Perry F. Sekus (#309412)
         Garrett S. Stadler (#402831)
11100 Wayzata Boulevard, Suite 510
Minnetonka, MN 55305
Tel: (612) 371-9090
Fax: (612) 371-0574
Email:   dkelley@kelleywolter.com
        swolter@kelleywolter.com
        bkelley@kelleywolter.com
        psekus@kelleywolter.com
        gstadler@kelleywolter.com

64

## CERTIFICATE OF SERVICE

I hereby certify that on May 20, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

By: *s/     Brett D. Kelley*

65