No. 25-1079

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

CLAUDIA RUSS ANDERSON,
Former Community Bank Group Risk Officer
*Petitioner-Appellant*,

vs.

OFFICE OF THE COMPTROLLER OF THE CURRENCY,
Department of the Treasury
*Respondent-Appellee.*

On Petition for Review from the Office of the Comptroller of the Currency

## BRIEF OF *AMICUS CURIAE* THE CHAMBER OF COMMERCE
## OF THE UNITED STATES OF AMERICA IN SUPPORT OF
## PETITIONER-APPELLANT AND VACATUR

MICHAEL H. MCGINLEY
BRIAN A. KULP
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104

JENNIFER B. DICKEY
KEVIN R. PALMER
U.S. CHAMBER LITIGATION
CENTER
1615 H Street, NW
Washington, DC 20062

STEVEN A. ENGEL
 *Counsel of Record*
DECHERT LLP
1900 K Street, NW
Washington, DC 20006
(202) 261-3369
steven.engel@dechert.com

*Counsel for the Chamber of Commerce of the United States of America*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Fed. R. App. P. 26.1, the undersigned counsel certifies that the Chamber of Commerce of the United States of America ("Chamber") is a nonprofit, tax-exempt organization incorporated in the District of Columbia. The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in the Chamber.

Dated: May 21, 2025

*/s/ Steven A. Engel*
Steven A. Engel
DECHERT LLP
1900 K Street, NW
Washington, DC 20006
(202) 261-3369
steven.engel@dechert.com

# TABLE OF CONTENTS

**Page**

INTEREST OF *AMICUS CURIAE*................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................2

ARGUMENT ................................................................................................6

I.    Ms. Russ Anderson Has a Constitutional Right to a Jury Trial on the OCC's Civil Penalty Claim................................................................7

    A.    The Remedy Sought by the OCC Is All But Dispositive.....................8

    B.    The Nature of the Cause of Action Confirms that the Seventh Amendment Applies................................................................9

    C.    The Public Rights Exception Does Not Apply. ..................................12

II.    The OCC Further Violated Ms. Russ Anderson's Jury Right by Making Findings for the Prohibition Order Claim that Bear on the Civil Penalty Claim........................................................................16

CONCLUSION ..........................................................................................18

Appellate Case: 25-1079    Page: 3    Date Filed: 05/21/2025    Entry ID: 5519005

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akin v. Off. of Thrift Supervision*
    950 F.2d 1180 (5th Cir. 1992) ........................................................................15

*AT&T, Inc. v. FCC*,
    135 F.4th 230 (5th Cir. 2025) ......................................................................10

*Beacon Theatres, Inc. v. Westover*,
    359 U.S. 500 (1959) .....................................................................................17

*Bowsher v. Synar*,
    478 U.S. 714 (1986) ....................................................................................2, 3

*Cavallari v. OCC*,
    57 F.3d 137 (2d Cir. 1995) ..........................................................................15

*Curtis v. Loether*,
    415 U.S. 189 (1974) .....................................................................................10

*Dairy Queen, Inc. v. Wood*,
    369 U.S. 469 (1962) .....................................................................................17

*Dimick v. Schiedt*,
    293 U.S. 474 (1935) .......................................................................................7

*Erlinger v. United States*,
    602 U.S. 821 (2024) ................................................................................3, 4, 5

*Kungys v. United States*,
    485 U.S. 759 (1988) .....................................................................................11

*Lytle v. Household Mfg., Inc.*,
    494 U.S. 545 (1990) ................................................................................16, 17

*Murray's Lessee v. Hoboken Land & Improvement Co.*,
    59 U.S. (18 How.) 272 (1855) .......................................................................6

iii

*Parsons v. Bedford*,
    28 U.S. (3 Pet.) 433 (1830) ................................................................. 5

*Proffitt v. FDIC*,
    200 F.3d 855 (D.C. Cir. 2000) ........................................................... 16

*Ross v. Bernhard*,
    396 U.S. 531 (1970) .................................................................... 6, 10

*SEC v. Jarkesy*,
    603 U.S. 109 (2024) .............................................................. *passim*

*Seila Law LLC v. CFPB*,
    591 U.S. 197 (2020) ....................................................................... 2

*Simpson v. Off. of Thrift Supervision*
    29 F.3d 1418 (9th Cir. 1994) ............................................................ 15

*Smith Flooring, Inc. v. Pa. Lumbermens Mut. Ins. Co.*,
    713 F.3d 933 (8th Cir. 2013) ............................................................ 17

*Tull v. United States*,
    481 U.S. 412 (1987) .................................................................... 5, 8

**Constitutional Provisions**

U.S. Const. amend. VII ........................................................................ 5

**Statutes**

12 U.S.C. § 1818(i)(2)(A) ..................................................................... 9

12 U.S.C. § 1818(i)(2)(B) ..................................................................... 9

12 U.S.C. § 1818(i)(2)(B)(ii)(II) ............................................................ 9

12 U.S.C. § 1818(i)(2)(B)(ii)(III) ........................................................... 9

12 U.S.C. § 1818(i)(2)(C) ..................................................................... 9

12 U.S.C. § 1818(i)(2)(C)(ii) ................................................................ 9

12 U.S.C. § 1818(i)(2)(G)(iii) ............................................................... 9

Appellate Case: 25-1079     Page: 5     Date Filed: 05/21/2025 Entry ID: 5519005

12 U.S.C. § 1818(i)(2)(G)(iv) ............................................................9

12 U.S.C. § 1818(i)(2)(J) ..................................................................9

Act of Feb. 25, 1791, ch. 10, § 1, 1 Stat. 191 ...............................14

**Other Authorities**

3 William Blackstone, *Commentaries on the Laws of England* (1768) ...................3

4 William Blackstone, *Commentaries on the Laws of England* (1769) .................11

M. L. Bradbury, *Legal Privilege and the Bank of North America*, 96 Pa. Mag. of Hist. & Bio. 139 (1972) .......................................14

*The Declaration of Independence* para. 20 (U.S. 1776) .............................................4

Federal Reserve Bank of Philadelphia, *The First Bank of the United States: A Chapter in the History of Central Banking* (2021).............................................14

The Federalist No. 47 (James Madison) (Clinton Rossiter ed., 2003) .....................2

1 *Journals of the Continental Congress 1774–1789* (Oct. 14, 1774).......................4

2 *Journals of the Continental Congress 1774–1789* (July 6, 1775).........................4

Luther Martin, *Genuine Information* (1787), reprinted in 3 *The Records of the Federal Convention of 1787* (Max Farrand ed., 1911)........................................7

*Our History*, Bank of England, https://bit.ly/42NnIq4 ...........................................14

1 John Phillip Reid, *Constitutional History of the American Revolution: The Authority of Rights* (1986) .......................................4

*Resolutions of the Stamp Act Congress* (Oct. 19, 1765), bit.ly/3YdhAFo ...............4

Carl Ubbelohde, *The Vice-Admiralty Courts and the American Revolution* (1960)...................................................................4

v

# INTEREST OF *AMICUS CURIAE*[1]

The Chamber of Commerce of the United States of America ("Chamber") is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community.

Businesses, and corporate officers and directors, are frequent respondents in administrative enforcement actions brought by the Office of the Comptroller of the Currency ("OCC") and other federal agencies. The Chamber has a significant interest in ensuring that such proceedings give enforcement targets a fair shake by respecting the Constitution's structural limitations. It submits this brief to address one such limitation—the Seventh Amendment right to a jury trial—which applies regardless of the merits of the parties' underlying claims and defenses.

---

[1] No counsel for any party authored this brief in whole or in part and no entity or person, aside from *amicus curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief. Counsel for all parties have consented to the filing of this brief.

Appellate Case: 25-1079    Page: 7    Date Filed: 05/21/2025 Entry ID: 5519005

# INTRODUCTION AND SUMMARY OF ARGUMENT

This case presents yet another example of an administrative agency exceeding constitutional limits. The Framers recognized that "structural protections against abuse of power [are] critical to preserving liberty." *Bowsher v. Synar*, 478 U.S. 714, 730 (1986). Indeed, they regarded the "accumulation of all powers, legislative, executive, and judiciary, in the same hands" as "the very definition of tyranny." The Federalist No. 47, at 298 (James Madison) (Clinton Rossiter ed., 2003). Accordingly, the Framers separated the legislative and executive powers from the judicial; devised a system in which a unitary executive would remain accountable to the people; and granted the right to trial by jury as a further check against government overreach.

The growth of the administrative state has eroded these safeguards—as Petitioner's experience in this case exemplifies. For years, she has been trapped in the bureaucratic machinery of the OCC, subjected to the type of consolidated executive adjudication that the Framers feared. Like other federal agencies, the OCC "acts as a mini legislature, prosecutor, and court, responsible for creating substantive rules" that affect the financial sector, "prosecuting violations, and levying knee-buckling penalties against private citizens." *Seila Law LLC v. CFPB*, 591 U.S. 197, 222 n.8 (2020). Even worse, the agency imposes those punishments through in-house proceedings, without effective oversight from the people or an Article III

2

judge. That cannot be. The Constitution prohibits such concentrations of power, no matter whether the political branches believed, at one time or another, that the OCC's arrangement might prove more efficient than what the Constitution requires. *See Bowsher*, 478 U.S. at 736.

Here, the OCC exploited that unconstitutional scheme to impose substantial civil penalties on Ms. Russ Anderson without the protection of a jury trial. By the time of the Founding, that "most excellent method of decision" had long been hailed as "the glory of the English law." 3 William Blackstone, *Commentaries on the Laws of England* 391 (1768). And, as the Supreme Court emphasized this past Term, the jury trial right was "prized by the American colonists" in both criminal and civil cases alike. *SEC v. Jarkesy*, 603 U.S. 109, 121 (2024). After all, a jury ensures that a person's rights and property can be stripped only by "the unanimous consent of twelve of his neighbours and equals," rather than by the political will of government functionaries. 3 Blackstone, *Commentaries* at 379.

But "as tensions grew between the British Empire and its American Colonies, imperial authorities responded by stripping away that ancient right" on this side of the Atlantic. *Erlinger v. United States*, 602 U.S. 821, 829 (2024). Most notably, the Crown enforced unpopular acts of Parliament in the 1760s "by siphoning adjudications to juryless admiralty, vice admiralty, and chancery courts." *Jarkesy*,

3

603 U.S. at 121; *see also* Carl Ubbelohde, *The Vice-Admiralty Courts and the American Revolution* 12–13, 63, 145–46, 206–08 (1960).

These decisions to channel enforcement actions away from the people served as a major catalyst for the Revolutionary War. For "[j]ust as authorities hoped, the tactic proved 'most effective' at securing the verdicts they wished." *Erlinger*, 602 U.S. at 829 (citation omitted). The resulting abuse led the voters of Boston to decry the juryless "Jurisdiction of the Admiralty"—along with taxation without representation—as their "greatest Grievance." 1 John Phillip Reid, *Constitutional History of the American Revolution: The Authority of Rights* 177 (1986) (citation omitted). The Stamp Act Congress of 1765 similarly protested that, "by extending the jurisdiction of the courts of Admiralty beyond its ancient limits," the Stamp Act and others "ha[d] a manifest tendency to subvert the rights and liberties of the colonists." *Resolutions of the Stamp Act Congress* (Oct. 19, 1765), bit.ly/3YdhAFo. The First and Second Continental Congresses then amplified this colonial indignation—most famously in the Declaration of Independence—which identified "depriving [the colonists] in many cases, of the benefits of Trial by Jury," among its list of grievances against the King. *The Declaration of Independence* para. 20 (U.S. 1776); *see* 1 *Journals of the Continental Congress 1774–1789*, at 69 (Oct. 14, 1774); 2 *Journals of the Continental Congress 1774–1789*, at 145 (July 6, 1775).

Appellate Case: 25-1079     Page: 10     Date Filed: 05/21/2025 Entry ID: 5519005

"After securing their independence, the founding generation sought to ensure what happened before would not happen again." *Erlinger*, 602 U.S. at 829. The people thus quickly ratified the Seventh Amendment to "preserve[]" the civil jury trial right in "Suits at common law." U.S. Const. amend. VII. And they understood this language to "embrace[] all suits which are not of equity or admiralty jurisdiction, whatever may be the peculiar form which they may assume." *Jarkesy*, 603 U.S. at 122 (quoting *Parsons v. Bedford*, 28 U.S. (3 Pet.) 433, 447 (1830)).

That includes suits by the government for civil penalties, which historically "could only be enforced in courts of law." *Tull v. United States*, 481 U.S. 412, 422 (1987). It could hardly be otherwise, given the concerns that prompted the Seventh Amendment. This guarantee is no less important today, for rerouting penalty actions through in-house proceedings eradicates the jury's crucial check on bureaucratic overreach while "concentrat[ing] the roles of prosecutor, judge, and jury in the hands of the Executive Branch." *Jarkesy*, 603 U.S. at 140. "That is the very opposite of the separation of powers that the Constitution demands." *Id.*

Yet that is what the OCC has done. The OCC pursued a $5 million penalty against Ms. Russ Anderson through the inner workings of the agency—and then it doubled that civil penalty when she opted to defend herself. Where the government pursues a civil penalty, the Seventh Amendment provides the defendant with a right to demand such a legal claim be tried before a jury. And here, the jury's findings on

5

the OCC's claim for a monetary penalty would govern its other claim for a prohibition order—even assuming this other claim seeks equitable relief—insofar as "common issue[s] exist[] between the claims." *Ross v. Bernhard*, 396 U.S. 531, 538 (1970).

The OCC may not justify this constitutional deprivation by proclaiming the vindication of "public rights." As *Jarkesy* made clear, the "public rights" exception is narrow and inapplicable absent a specific showing that "'withdraw[al] from judicial cognizance'" has firm roots in "background legal principles." 603 U.S. at 131–32 (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 284 (1855)). The OCC cannot identify any historical understanding that would support removing this garden-variety legal case from the Article III courts—and the jury review that the Constitution requires.

Accordingly, this Court should vacate the OCC's decision and order.

## ARGUMENT

The OCC brushed aside Ms. Russ Anderson's Seventh Amendment claim in barely a page of cursory analysis. *See* A.R. 583 (OCC Final Decision) at 107–08, Add. 1303–04. But this Court should not do the same. "The right to trial by jury is 'of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right' has always been and 'should be scrutinized

6

with the utmost care.'" *Jarkesy*, 603 U.S. at 121 (quoting *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935)).

Applying that careful analysis leaves no doubt that the OCC violated the Seventh Amendment.  Indeed, the colonial experience showed that suits "between [the] government and its officers on the one part, and the subject or citizen on the other," are the "very cases, where, of all others, [the jury trial] is most essential for [the people's] liberty."  Luther Martin, *Genuine Information* (1787), reprinted in 3 *The Records of the Federal Convention of 1787*, at 172, 222 (Max Farrand ed., 1911) (italics omitted).  That is precisely why the Framers adopted the Seventh Amendment.  The OCC's process of pursuing penalties against individuals through juryless in-house proceedings is an affront to that guarantee.  And the Court can vacate the OCC's order in its entirety based on that violation alone.

## I.     Ms. Russ Anderson Has a Constitutional Right to a Jury Trial on the OCC's Civil Penalty Claim.

*Jarkesy* says everything necessary to find a Seventh Amendment violation for the OCC's civil penalty claim.  In that case, the Supreme Court held that "the Seventh Amendment entitles a defendant to a jury trial when the SEC seeks civil penalties against him for securities fraud." *Jarkesy*, 603 U.S. at 120.  Along the way, the Court stressed that "whether [a] claim is statutory is immaterial" to the Seventh Amendment analysis. *Id.* at 122.  Rather, "[t]he Seventh Amendment extends to a particular statutory claim if the claim is 'legal in nature.'" *Id.* (citation omitted).

7

And "[t]o determine whether a suit is legal in nature," the Court "consider[ed] the cause of action and the remedy it provides," while noting that "the remedy was the 'more important' consideration." *Id.* at 122–23 (citation omitted). The "civil penalties in [that] case [were] designed to punish and deter, not to compensate," and they were accordingly "'a type of remedy at common law that could only be enforced in courts of law.'" *Id.* at 125 (citation omitted). As a result, the SEC could not pursue them through an in-house adjudication. *See id.* at 122–27. So too here.

## A. The Remedy Sought by the OCC Is All But Dispositive.

As in *Jarkesy*, "the remedy is all but dispositive" of Ms. Russ Anderson's right to a jury trial. 603 U.S. at 123. The OCC "seeks civil penalties, a form of monetary relief." *Id.* And "a monetary remedy is legal if it is designed to punish or deter the wrongdoer." *Id.* That is because "[r]emedies intended to punish culpable individuals, as opposed to those intended simply to extract compensation or restore the status quo," were historically issued only "by courts of law, not courts of equity." *Tull*, 481 U.S. at 422; *see also Jarkesy*, 603 U.S. at 123. In fact, "[a]ctions by the Government to recover civil penalties under statutory provisions" were long "viewed as one type of action in debt requiring trial by jury." *Tull*, 481 U.S. at 418–19.

The OCC does not dispute that the $10 million penalty imposed pursuant to section 1818(i) here is designed to deter and punish Ms. Russ Anderson. Nor could it. Like the securities statutes in *Jarkesy*, section 1818(i) conditions the amount and

availability of civil penalties on several criteria, including the defendant's state of mind, *see* 12 U.S.C. § 1818(i)(2)(A)–(C), her "history of previous violations," *id.* § 1818(i)(2)(G)(iii), the amount of "loss" to a banking institution, *id.* § 1818(i)(2)(B)(ii)(II), (i)(2)(C)(ii), the defendant's "pecuniary gain," *id.* § 1818(i)(2)(B)(ii)(III), (i)(2)(C)(ii), and "such other matters as justice may require," *id.* § 1818(i)(2)(G)(iv). "Of these, several concern culpability, deterrence, and recidivism," which are the hallmarks of punishment statutes. *Jarkesy*, 603 U.S. at 123–24. In addition, section 1818(i) mirrors the statutes in *Jarkesy* by providing for three tiers of civil penalties, with "[e]ach successive tier authoriz[ing] a larger monetary sanction." *Id.* at 124; *see* 12 U.S.C. § 1818(i)(2)(A)–(C). And the OCC "is not obligated to return any money to victims." *Jarkesy*, 603 U.S. at 124. Instead, the penalties recovered "shall be deposited into the Treasury." 12 U.S.C. § 1818(i)(2)(J).

All this shows that the "civil penalties in this case are designed to punish and deter." *Jarkesy*, 603 U.S. at 125. That "effectively decides that this suit implicates the Seventh Amendment right" to a jury trial. *Id.*

### B. The Nature of the Cause of Action Confirms that the Seventh Amendment Applies.

If any doubt remained as to how the rule of *Jarkesy* applies, the OCC's cause of action here is "analogous to a number of tort actions recognized at common law."

9

*Curtis v. Loether*, 415 U.S. 189, 195 (1974). Once again, the OCC does not argue otherwise. *See* A.R. 583 at 107–08, Add. 1303–04. That is no surprise.

At its core, the OCC's claim against Ms. Russ Anderson is "analogous to common law negligence." *AT&T, Inc. v. FCC*, 135 F.4th 230, 237 (5th Cir. 2025). The Comptroller charged her with engaging in "unsafe or unsound practices" by failing to mitigate risks that she "knew or should have known" about. A.R. 583 at 94–95, Add. 1290–91. This included allegations of "fail[ing] to credibly challenge the incentive compensation program," "fail[ing] to institute effective controls to manage the risk of [sales practice misconduct]," and "fail[ing] to escalate known or obvious risks." A.R. 583 at 96–98, Add. 1292–94. The OCC found that these supposed shortcomings "depart[ed] from generally accepted standards of prudent operation." A.R. 583 at 45, Add. 1241; *see* A.R. 583 at 15, Add. 1211 (same); A.R. 583 at 59, Add. 1255 ("contrary to the accepted standards of a risk officer"). All of this is another way of alleging that Ms. Russ Anderson did not act as a reasonably prudent person would have under the circumstances. That sort of "reasonableness" analysis "is a staple of the common law." *AT&T*, 135 F.4th at 237; *see Ross*, 396 U.S. at 542. A jury should have made that determination—just as it would have at the Founding.

The OCC's action also "target[s] the same basic conduct" as a "common law fraud" claim, alleging that Ms. Russ Anderson "misrepresent[ed] or conceal[ed]"

10

material facts." *Jarkesy*, 603 U.S. at 125.  In particular, the agency charged her with "provid[ing] false, incomplete and/or misleading information" during the OCC's investigation.  A.R. 583 at 95, Add. 1291.  That alleged misconduct sounds in fraud, another type of common law claim tried to a jury.  *See Jarkesy*, 603 U.S. at 134.

The OCC's assertion that this alleged misconduct involved "intentional and knowing obstruction of a bank examination" also sounds in obstruction of justice.  A.R. 583 at 80, Add. 1276; *see also* A.R. 583 at 99, Add. 1295.  That is similarly analogous to a host of common law claims for which a jury is—and always has been—required.  *See, e.g.*, 4 Blackstone, *Commentaries* at 128–29, 136–38 (detailing various "offences against public justice" in eighteenth-century England (italics omitted)); *Kungys v. United States*, 485 U.S. 759, 769–70 (1988) (tracing a "number of federal statutes criminalizing false statements to public officials" to their "common-law antecedents").

Simply put, this litany of historical analogs "confirms that this action is 'legal in nature.'"  *Jarkesy*, 603 U.S. at 126 (citation omitted).  Ms. Russ Anderson was therefore entitled to have her case adjudicated by a jury, not by in-house adjudicators.

11

### C.    The Public Rights Exception Does Not Apply.

The OCC does not seriously contest that its pursuit of civil penalties implicates the Seventh Amendment. It thus retreats to arguing that the "public rights" exception applies. A.R. 583 at 107–08, Add. 1303–04. That is incorrect.

*Jarkesy* once again removed any doubt. There, the Supreme Court held that the government "cannot 'conjure away the Seventh Amendment by mandating that traditional legal claims be taken to an administrative tribunal.'" *Jarkesy*, 603 U.S. at 135 (alteration adopted; citation omitted). That is true "[e]ven when an action 'originates in a newly fashioned regulatory scheme.'" *Id.* at 134 (citation and brackets omitted). What matters instead "is the substance of the suit, not where it is brought, who brings it, or how it is labeled." *Id.* at 135. Indeed, "[i]f a suit is in the nature of an action at common law, then the matter presumptively concerns private rights." *Id.* at 128. The government can rebut that presumption only by pointing to firmly rooted "background legal principles" that justify a departure from the text of Article III and the Seventh Amendment. *Id.* at 131; *see also id.* at 153 (Gorsuch, J., concurring) ("[T]raditionally recognized public rights have at least one feature in common: a serious and unbroken historical pedigree.").

The OCC cannot point to any history that would allow it to dispense with Ms. Russ Anderson's jury trial right. This case does not involve any of the traditionally recognized public rights identified by the Supreme Court, such as the collection and

disbursement of tax revenues from a customs agent, the granting of patents, or immigration matters. *See id.* at 128–30 (majority op.). Nor is there any reason for this Court to expand the doctrine to this new context. "The public rights exception is, after all, an *exception*" that "has no textual basis in the Constitution." *Id.* at 131. It thus must be applied "with care" and "close attention" to Founding-era history; otherwise, "the exception would swallow the rule." *Id.*

The OCC responds that its enforcement actions "vindicate the public's right to a safe and sound banking system." A.R. 583 at 108, Add. 1304. But the purpose of this action is beside the point—it does not alter the substance-centered analysis this Court must conduct. There is nothing unusual about a federal banking program that would prevent an Article III court and jury from adjudicating this civil penalty claim based upon Ms. Russ Anderson's charged misconduct. And the OCC ignores that, "despite its misleading name, the [public rights] exception does not refer to all matters brought by the government against an individual to remedy public harms." *Jarkesy*, 603 U.S. at 152 (Gorsuch, J., concurring) (emphasis omitted). "Instead, public rights are a narrow class defined and limited by history." *Id.*; *see also id.* at 130–32 (majority op.). The OCC lacks any historical support for invoking that exception here.

Taking a different tack, the OCC contends that common law analogies break down because national banks "did not exist" at the Founding. A.R. 583 at 108, Add.

13

1304.  That is simply wrong.  Like national banks today, the Crown chartered the Bank of England "as a private bank" in 1694.  *Our History*, Bank of England, https://bit.ly/42NnIq4 (last visited May 21, 2025).  The Continental Congress relied "heavily on the charter of the Bank of England" when creating the Bank of North America in 1781.  M. L. Bradbury, *Legal Privilege and the Bank of North America*, 96 Pa. Mag. of Hist. & Bio. 139, 140 (1972).  And Alexander Hamilton likewise "used the charter of the Bank of England as the basis" for a federal "national bank," which Congress established in 1791.  Federal Reserve Bank of Philadelphia, *The First Bank of the United States: A Chapter in the History of Central Banking* 2 (2021); *see also* Act of Feb. 25, 1791, ch. 10, § 1, 1 Stat. 191, 191–92.

The OCC cites no evidence that imposing monetary punishment against employees of these private entities "historically could have been determined exclusively by [the executive and legislative] branches."  *Jarkesy*, 603 U.S. at 128 (alterations in original; citation omitted).  The same goes for employees and former employees of nationally chartered private banks today.  They have a right to a jury trial for such punitive claims.

Left with no historical support, the OCC turns to non-binding decisions from other circuits.  *See* A.R. 583 at 108, Add. 1304.  But those decisions were issued long before the Supreme Court clarified the law in *Jarkesy*, and, to the extent that they conflict, were abrogated by that decision.  They would not help the OCC

14

anyway.  In *Simpson v. Office of Thrift Supervision*, the government secured "an order of restitution, an *equitable* remedy."  29 F.3d 1418, 1423 (9th Cir. 1994) (emphasis added).  Yet the Seventh Amendment applies to actions at law, and the OCC cannot argue here that its claim for civil penalties is rooted in equity rather than law.  In *Akin v. Office of Thrift Supervision*, the government similarly obtained a "cease and desist order" providing "restitution" where the defendant was "unjustly enriched"—not a civil penalty under section 1818(i).  950 F.2d 1180, 1182–83 (5th Cir. 1992).  Again, that remedial distinction matters.  At the Founding "courts of equity could order a defendant to return unjustly obtained funds," but "only courts of law issued monetary penalties to 'punish culpable individuals.'"  *Jarkesy*, 603 U.S. at 123 (citation omitted).  This case falls squarely in the latter camp.

The Second Circuit's decision in *Cavallari v. OCC*, 57 F.3d 137 (2d Cir. 1995), is also distinguishable.  It too involved a "restitution order."  *Id.* at 145.  And the court declined to recognize a jury right for a penalty claim only because the penalty there was imposed for "disregard of [a cease-and-desist] order issued by the OCC," as "distinct from any legal claims."  *Id.*  This case, by contrast, involves the imposition of a civil penalty for a legal claim that is analogous to several common law causes of actions.  *See supra* Sections I.A, I.B.

Appellate Case: 25-1079     Page: 21     Date Filed: 05/21/2025 Entry ID: 5519005

For all these reasons, the public rights exception does not apply. The Seventh Amendment does, and the OCC cannot deprive Ms. Russ Anderson of a jury trial for the civil penalty claim that the agency has pursued against her.

## II. The OCC Further Violated Ms. Russ Anderson's Jury Right by Making Findings for the Prohibition Order Claim that Bear on the Civil Penalty Claim.

The OCC's prohibition order under section 1818(e) likewise serves a "punitive purpose." *Proffitt v. FDIC*, 200 F.3d 855, 861 (D.C. Cir. 2000). And its claim on this front also targets conduct that sounds in the traditional legal claims of negligence, fraud, and obstruction of justice. *See supra* Section I.B. That strongly suggests that the prohibition order claim is "legal in nature" as well. *Jarkesy*, 603 U.S. at 122.

This Court, however, need not address whether the Seventh Amendment would apply to the OCC's claims for prohibition orders in the ordinary course. The entire decision here would need to be vacated even if that claim were equitable. That is because "[w]hen legal and equitable claims are joined in the same action, 'the right to [a] jury trial on the legal claim, *including all issues common to both claims*, remains intact.'" *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 550 (1990) (emphasis added; citation omitted). The "jury's verdict" will then "conclusively settle th[e] common issues, and only issues peculiar to the equitable claim will be left" to the

16

presiding official. *Smith Flooring, Inc. v. Pa. Lumbermens Mut. Ins. Co.*, 713 F.3d 933, 937 (8th Cir. 2013) (citation omitted).

That is how this case should have played out, even if the claim for a prohibition order were considered equitable. The OCC admits that both of its claims required it to prove the elements of "misconduct" and "effect." A.R. 583 at 14, 16, Add. 1210, 1212. And it acknowledges that those elements overlap extensively between the claims. *See* A.R. 583 at 14–17, Add. 1210–13. Indeed, the OCC specifically incorporated its "misconduct" findings for the prohibition order claim to support that element of the penalty claim. *See* A.R. 583, at 94–99, Add. 1290–95. And it did the same for the "effect" element that applies to both claims. *See* A.R. 583 at 100–02, Add. 1296–98.

That factual overlap requires vacatur of the prohibition order. Because the factual "issues are common with those upon which" the claim to allegedly "equitable relief is based, the legal claim[]" for civil penalties "must be determined *prior* to any final . . . determination of [the] equitable claims." *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 479 (1962) (emphasis added); *see also Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 511 (1959). That sequencing is "essential to vindicating [Ms. Russ Anderson's] Seventh Amendment rights." *Lytle*, 494 U.S. at 553.

17

* * *

The Court should thus vacate the OCC's decision and order in its entirety. The Seventh Amendment gives Ms. Russ Anderson "the right to be tried by a jury of [her] peers before a neutral adjudicator" in an Article III court. *Jarkesy*, 603 U.S. at 140. And the OCC denied her that guarantee.

## CONCLUSION

For the foregoing reasons, the Chamber respectfully requests that this Court vacate the OCC's decision and order.

Respectfully Submitted,

*/s/ Steven A. Engel*

MICHAEL H. MCGINLEY
BRIAN A. KULP
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104

JENNIFER B. DICKEY
KEVIN R. PALMER
U.S. CHAMBER LITIGATION
CENTER
1615 H Street, NW
Washington, DC 20062

STEVEN A. ENGEL
  *Counsel of Record*
DECHERT LLP
1900 K Street, NW
Washington, DC 20006
(202) 261-3369
steven.engel@dechert.com

*Counsel for the Chamber of Commerce of the United States of America*

18

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 4,158 words, excluding those portions of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Times New Roman 14-pt font. This brief has been scanned for viruses using the latest version of VirusTotal and was determined to be virus-free.

Dated: May 21, 2025

*/s/ Steven A. Engel*
Steven A. Engel
DECHERT LLP
1900 K Street, NW
Washington, DC 20006
(202) 261-3369
steven.engel@dechert.com

*Counsel of Record for the*
*Chamber of Commerce of the*
*United States of America*

**CERTIFICATE OF SERVICE**

I hereby certify that I caused the foregoing *amicus curiae* brief to be filed with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit on May 21, 2025. The Court's CM/ECF system was used to file the brief, and so all counsel of record were served automatically by the Court's CM/ECF system.

Dated: May 21, 2025

*/s/ Steven A. Engel*
Steven A. Engel
DECHERT LLP
1900 K Street, NW
Washington, DC 20006
(202) 261-3369
steven.engel@dechert.com

*Counsel of Record for the*
*Chamber of Commerce of the*
*United States of America*