# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

CLAUDIA RUSS ANDERSON,

*Petitioner*,

v.

OFFICE OF THE COMPTROLLER OF THE CURRENCY,

*Respondent*.

On Petition for Review of the Final Decision of the Comptroller of the Currency
No. AA-EC-2019-81

**BRIEF OF RESPONDENT**
**OFFICE OF THE COMPTROLLER OF THE CURRENCY**

STUART FELDSTEIN, Acting Principal Deputy Chief Counsel
PATRICIA S. GRADY, Deputy Chief Counsel
PETER C. KOCH, Director for Litigation
DANIEL PRIEVE, Counsel
HANNAH HICKS, Counsel
DERICK FONG, Attorney
KRISTIN M. MCMANUS, Attorney
Attorneys for Respondent Office of the Comptroller of the Currency
400 7th Street S.W.
Washington, D.C. 20219
202-860-4306

## SUMMARY OF THE CASE

Acting pursuant to 12 U.S.C. § 1818(e) and (i), the Comptroller of the Currency ("Comptroller") issued an order prohibiting Petitioner Claudia Russ Anderson ("Petitioner") from further participation in the affairs of banking institutions and assessing a $10 million civil money penalty against her for her role in the systemic sales practices misconduct problem at Wells Fargo Bank, N.A., Sioux Falls, South Dakota ("Wells Fargo" or "Bank"). The Comptroller concluded that Petitioner engaged in unsafe or unsound banking practices and violated laws.

Petitioner does not—and cannot—meaningfully dispute the Comptroller's factual findings that she failed to perform her job responsibilities at the Bank, implemented grossly inadequate risk management controls, consistently downplayed the scope and severity of the Bank's widespread illicit sales practices, and failed to credibly challenge the incentive compensation program behind one of the largest banking scandals in modern history. Additionally, Petitioner ignores and misconstrues voluminous record evidence demonstrating that she repeatedly made false statements to and concealed material information from bank examiners.

Because Petitioner cannot meaningfully dispute the reasonableness of the Agency decision, she raises a series of meritless constitutional, statutory, and procedural challenges to the proceedings. The Court should deny the petition.

Respondent respectfully requests twenty minutes of oral argument.

1

# TABLE OF CONTENTS

**Summary of the Case**...................................................................................1

**Table of Authorities**..................................................................................4

**Counterstatement of the Issues**..............................................................9

**Counterstatement of the Case**................................................................12

I.     The OCC.............................................................................................12

II.    OCC Administrative Enforcement Actions....................................15

      A.     Section 1818(e) Prohibitions..................................................16

      B.     Section 1818(i) Civil Money Penalties ...............................17

III.    Factual Background and Prior Proceedings ...................................18

      A.     Sales Practices Misconduct ...................................................18

      B.     Petitioner's Role at the Bank.................................................20

      C.     Petitioner's Role in the Bank's Sales Practices Misconduct Problem 21

           1.     Petitioner failed to institute effective controls to manage sales practices misconduct.........................................................22

           2.     Petitioner failed to escalate known or obvious risks related to sales practices misconduct.........................................................23

           3.     Petitioner failed to credibly challenge the incentive compensation program's unreasonable sales goals. ...................25

           4.     Petitioner provided the OCC false, incomplete, or misleading information regarding sales practices misconduct. ...................27

      D.     Procedural History.................................................................30

**Summary of Argument**..............................................................................31

**Standard of Review**..................................................................................32

**Argument**...................................................................................................33

I.     Section 1818 Actions Involve Public Rights....................................33

II.    The Final Decision Is in Accordance with Law and Supported by Substantial Record Evidence.....................................................................................46

      A.     Petitioner engaged in actionable misconduct......................46

           1.     Petitioner engaged in unsafe or unsound practices. ...................46

i.   The Comptroller's reliance on longstanding precedent interpreting unsafe or unsound practices did not violate Petitioner's due process rights. ................................................47

ii.  Petitioner's failure to implement effective controls was an unsafe or unsound practice. ....................................................49

iii. Petitioner's failure to escalate known or obvious risks related to sales practices misconduct was an unsafe or unsound practice. ...............................................................51

iv. Petitioner's failure to credibly challenge the incentive compensation program's unreasonable sales goals was an unsafe or unsound practice. ....................................................52

v.  Petitioner's lack of candor with examiners was an unsafe or unsound practice. ...............................................................52

2.     Petitioner engaged in violations of law. ....................................57

B.    Petitioner's misconduct caused actionable effects. ............................59

III.  Procedural Rulings Determining the Scope of the Proceedings Were in Accordance with Law and Not an Abuse of Discretion. ...............................62

IV.  The Civil Money Penalty Is in Accordance with Law. .................................64

A.    The civil money penalty is supported by substantial evidence and does not violate due process. .......................................................65

B.    The Comptroller considered all statutory factors. ...............................67

**Conclusion** ...............................................................................68

**Certificate of Service** ...............................................................70

**Certificate of Compliance Pursuant to Rule 32(g)** ...............................71

3

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adame-Hernandez v. Barr*,
   929 F.3d 1020 (8th Cir. 2019) ..........................................................................32

*Adams*,
   No. OCC AA-EC-11-50, 2014 WL 8735096 (OCC Sept. 30, 2014) .......... 39, 48

*Akin v. OTS*,
   950 F.2d 1180 (5th Cir. 1992) .......................................................................43

*Ashton*, Nos. 16-015-E-I, 16-015-CMP I, 2017 WL 2334473 (FRB May 19, 2017)
   ............................................................................................................................60

*Atlas Roofing Co., Inc. v. OSHA*,
   430 U.S. 442 (1977) .........................................................................................41

*Axalta Coating Sys., LLC v. Fed. Aviation Admin.*,
   No. 23-2376, 2025 WL 1934352 (3d Cir. July 15, 2025) ...............................35

*Blanton v. OCC*,
   909 F.3d 1162 (D.C. Cir. 2018) ................................................................. 10, 48

*Bronston v. United States*,
   409 U.S. 352 (1973) .........................................................................................58

*Carter v. Dep't of Labor*,
   108 F.4th 1028 (8th Cir. 2024) .......................................................................54

*Cavallari v. OCC*,
   57 F.3d 137 (2nd Cir. 1995)....................................................................... 42-44

*CFTC v. Schor*,
   478 U.S. 833 (1986).........................................................................................40

*Commonwealth ex rel. Torrey v. Ketner*,
   92 Pa. 372 (1880) ................................................................................. 9, 37, 38

*Cousin*, No. AP 94-48, 1994 WL 621240 (OTS Oct. 11, 1994) ............................61

*Crowell v. Benson*,
   285 U.S. 22 (1932)...........................................................................................34

*Davis v. Elmira Sav. Bank*,
   161 U.S. 275 (1896).........................................................................................36

*De La Fuente v. FDIC*,
   332 F.3d 1208 (9th Cir. 2003) ................................................................ 9, 48, 52

*De Niz Robles v. Lynch*,
   803 F.3d 1165 (10th Cir. 2015) ......................................................................48

4

*Easton v. Iowa*,
    188 U.S. 220 (1903) ................................................................ 9, 37-38

*Fahey v. Mallonee*,
    332 U.S. 245 (1947) ......................................................................39

*Farmers' & Mechanics' Nat'l Bank v. Dearing*,
    91 U.S. 29 (1875) ..........................................................................36

*First Nat. Bank of Eden v. OCC*,
    568 F.2d 610 (8th Cir. 1978) .......................................................47

*Frontier State Bank Oklahoma City, Okla. v. FDIC*,
    702 F.3d 588 (10th Cir. 2012) .....................................................48

*General Elec. Co. v. EPA*,
    53 F.3d 1324 (D.C. Cir. 1995) .....................................................48

*Granfinanciera, S.A. v. Nordberg*,
    492 U.S. 33 (1989) .................................................................32-34, 41

*Greene Cnty. Bank v. FDIC*,
    92 F.3d 633 (8th Cir. 1996) .........................................................46

*In re Seidman*,
    37 F.3d 911 (3rd Cir. 1994) ............................................... 48, 52, 57

*In re Subpoena*,
    967 F.2d 630 (D.C. Cir. 1992) .....................................................45

*Kim v. OTS*,
    40 F.3d 1050 (9th Cir. 1994) .......................................................16

*Landry v. FDIC*,
    204 F.3d 1125 (D.C. Cir. 2000) ..................................................50

*Liteky v. United States*,
    510 U.S. 540 (1991) ......................................................................64

*Long v. Bd. of Governors of the Fed. Rsrv. Sys.*,
    117 F.3d 1145 (10th Cir. 1997) ....................................... 11, 64, 66, 67

*Melcher v. Fed. Open Market Comm.*,
    644 F. Supp. 510 (D.D.C. 1986) .................................................39

*Morissette v. United States*,
    342 U.S. 246 (1952) ......................................................................40

*Murray's Lessee v. Hoboken Land & Improvement Co.*,
    18 How. 272 (1856) ......................................................................40

*N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*,
    458 U.S. 50 (1982) ........................................................................34

*Oceanic Steam Navigation Co. v. Stranahan*,
    214 U.S. 320 (1909) ...................................................................9, 41

*Osborn v. Bank of United States*,
    22 U.S. 738 (1824) ........................................................................37

*Ouachita Nat'l Bank v. Tosco Corp.*,
   686 F.2d 1291 (8th Cir. 1982) ...................................................63

*Pagel, Inc. v. SEC*,
   803 F.2d 943 (8th Cir. 1986) ....................................................63

*Partee v. Astrue*,
   638 F.3d 860 (8th Cir. 2011) ................................................ 10, 63

*Paul v. OTS*,
   763 F. Supp. 568 (S.D. Fla. 1990) ...........................................43

*SEC v. Chenery Corp.*,
   332 U.S. 194 (1947)................................................................47

*SEC v. Jarkesy*,
   603 U.S. 109 (2024)..........................................9, 12, 31, 33-35, 39-42

*Simpson v. OTS*,
   29 F.3d 1418 (9th Cir. 1994) ............................................. 42-43

*Sinclair v. Hawke*,
   314 F.3d 934 (8th Cir. 2003) ............................................. 38, 44

*Stanley v. Bd. of Governors of Fed. Rsrv. Sys.*,
   940 F.2d 267 (7th Cir. 1991) ....................................................68

*Stern v. Marshall*,
   564 U.S. 462 (2011)................................................................42

*Tiffany v. Nat'l Bank of Mo.*,
   85 U.S. 409 (1873)..................................................................13

*Towe*, Nos. OCC-AA-EC-93-42, OCC-AA.EC-93-43, 1997 WL 689309 (OCC
   Oct. 1, 1997)...........................................................................60

*United States v. Church*,
   11 F. App'x 264 (4th Cir. 2001) ...............................................58

*United States v. Dale*,
   782 F. Supp. 615 (D.D.C. 1991) ...............................................58

*United States v. McKanry*,
   628 F.3d 1010 (8th Cir. 2011) .................................................57

*United States v. Moore*,
   446 F.3d 671 (7th Cir. 2006) ...................................................58

*United States v. Nordic Vill., Inc.*,
   503 U.S. 30 (1992)..................................................................65

*United States v. Phila. Nat'l Bank*,
   374 U.S. 321 (1963)................................................................44

*United States v. Salther*,
   955 F.3d 666 (8th Cir. 2020) ...................................................57

*United States v. Stewart*,
   433 F.3d 273 (2d Cir. 2006).....................................................58

6

*Van Allen v. The Assessors,*
   70 U.S. 573 (1865) ........................................................................37
*Wal-Mart Stores East, LP v. Acosta,*
   919 F.3d 1073 (8th Cir. 2019) ......................................................32
*Woodward v. Credit Service Int'l Corp.*, 132 F.4th 1047 (8th Cir. 2025)...............36

**Statutes**

5 U.S.C. § 554 ...................................................................................63
5 U.S.C. § 706 ................................................................ 9, 10, 32, 63, 68
12 U.S.C. § 1 .............................................................................. 14, 39
12 U.S.C. § 481 ....................................................................... 14, 44, 58
12 U.S.C. § 1464 ................................................................................14
12 U.S.C. § 1818 ........ 1, 2, 9-12, 15-17, 33, 36-37, 41-46, 48, 50, 57, 59-60, 63-67
12 U.S.C. § 1820 ........................................................................ 14, 44
12 U.S.C. § 3102 ................................................................................14
18 U.S.C. § 1001 ...................................................................... 31, 57-58
18 U.S.C. § 1517 ...................................................................... 31, 57-58
28 U.S.C. § 2461 ................................................................................17
National Bank Act, ch. 58, § 1, 12 Stat. 665, 665-66 (1863) .................................13
National Bank Act, ch. 106, § 1, 13 Stat. 99, 99-100 (1864) ................................13
The Banking Act of 1933, ch. 89, Pub. L. No. 73-66, § 30, 48 Stat. 162, 193-94
   (1933) ....................................................................................15
The Financial Institutions Regulatory and Interest Rate Control Act, Pub. L. No.
   95-630, § 103, 92 Stat. 3641, 3643-44 (1978) ......................................15
The Financial Institutions Reform, Recovery, and Enforcement Act of 1989 §§
   901-08, 103 Stat. 183, 446-77 ................................................. 15, 65

**Regulations**

12 C.F.R. Part 19 ........................................................................ 10, 15
12 C.F.R. § 4.2 .................................................................................14
12 C.F.R. § 19.5 ........................................................................ 10, 62
12 C.F.R. § 19.29 ..............................................................................63
12 C.F.R. § 19.39 ..............................................................................15
12 C.F.R. § 19.40 ..............................................................................16
88 Fed. Reg. 89843 (Dec. 28, 2023) ..........................................................10
73 Fed. Reg. 66493 (Nov. 10, 2008) ..........................................................17
89 Fed. Reg. 872 (January 8, 2024) ..........................................................17

Appellate Case: 25-1079     Page: 8     Date Filed: 07/21/2025 Entry ID: 5539505

## Other Authorities

ANNUAL REPORT OF THE SECRETARY OF THE TREASURY ON THE STATE OF FINANCES (1861) ................................................................................... 12-13

ANNUAL REPORT OF THE SECRETARY OF THE TREASURY ON THE STATE OF FINANCES (1862) ................................................................................... 12-13

*Financial Institutions Supervisory Act of 1966: Hearings on S. 3158 Before the House Comm. on Banking and Currency*, 89th Cong., 2d Sess. 49 (1966) ........39

BRAY HAMMOND, BANKS AND POLITICS IN AMERICA: FROM THE REVOLUTION TO THE CIVIL WAR 720-22 (1967)................................................................12

Rajkamal Iyer & Manju Puri, *Understanding Bank Runs: The Importance of Depositor-Bank Relationships and Networks*, 102 AM. ECON. REV. 4 (2012) ....61

ROGER LOWENSTEIN, WAYS AND MEANS: LINCOLN AND HIS CABINET AND THE FINANCING OF THE CIVIL WAR (2022) ........................................... 12-14

IT'S A WONDERFUL LIFE, RKO Radio Pictures (1946).............................................61

S. Rep. No. 89-1482, at 3532, 3540 (1966), *available in* 1966 U.S.C.C.A.N. 3532 ................................................................................................................37

2024 ANNUAL REPORT OF THE OFFICE OF COMPTROLLER OF THE CURRENCY at 24 (2024), *available at* https://www.occ.gov/publications-and-resources/publications/annual-report/files/2024-annual-report.pdf ...................14

## COUNTERSTATEMENT OF THE ISSUES

1. Whether Article III or the Seventh Amendment precludes Congress from authorizing the Office of the Comptroller of the Currency ("OCC" or "Agency") to carry out its mission of ensuring the safety and soundness of the national banking system through, among other measures, administrative assessment of civil money penalties and issuance of prohibition orders.

   **Apposite Authorities**:

   *SEC v. Jarkesy*, 603 U.S. 109 (2024).

   *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320 (1909).

   *Easton v. Iowa*, 188 U.S. 220 (1903).

   *Commonwealth ex rel. Torrey v. Ketner*, 92 Pa. 372 (1880).

2. Whether the OCC acted reasonably, within its discretion, and in accordance with law in issuing, based on substantial evidence, an order of prohibition against Petitioner.

   **Apposite Authorities**:

   12 U.S.C. § 1818(e).

   5 U.S.C. § 706.

   *De La Fuente v. FDIC*, 332 F.3d 1208 (9th Cir. 2003).

9

3. Whether the OCC acted reasonably, within its discretion, and in accordance with law in assessing, based on substantial evidence, a $10 million civil money penalty against Petitioner.

    **Apposite Authorities**:

    12 U.S.C. § 1818(i).

    5 U.S.C. § 706.

    *Blanton v. OCC*, 909 F.3d 1162 (D.C. Cir. 2018).

4. Whether the OCC correctly concluded that Petitioner's procedural and evidentiary objections were meritless.

    **Apposite Authorities:**

    12 U.S.C. § 1818 note.

    12 C.F.R. § 19.5.[1]

    *Partee v. Astrue,* 638 F.3d 860 (8th Cir. 2011).

5. Whether the OCC correctly concluded that 12 U.S.C. § 1818(i) allowed it to seek a higher civil money penalty than it originally had sought when it filed the case.

---

[1] The OCC revised 12 C.F.R. Part 19 after the underlying proceeding.  88 Fed. Reg. 89843 (Dec. 28, 2023).  The current version of 12 C.F.R. Part 19, Appendix A, contains Part 19 as it applies to this action.  All citations to Part 19 in this brief are to 12 C.F.R. Part 19, Appendix A, and the statutory addendum submitted with this brief contains the relevant sections.

**Apposite Authorities**:

12 U.S.C. § 1818(i)(2)(F).

*Long v. Bd. of Governors of the Fed. Rsrv. Sys.*, 117 F.3d 1145 (10th Cir. 1997).

11

## COUNTERSTATEMENT OF THE CASE

### I. The OCC

Of the many arguments that Petitioner has leveled against the Final Decision of the Comptroller of the Currency ("Final Decision"), none is more of the moment than her argument premised on *SEC v. Jarkesy*, 603 U.S. 109 (2024). The historic role of the OCC and the uniquely public purposes served by national banks are key in assessing whether the public rights doctrine applies to section 1818 actions.

In 1863, President Abraham Lincoln faced a mounting problem: how to finance the Civil War when all avenues of funding had been exhausted. Prior to 1863, the Department of the Treasury used a combination of loans from state-chartered banks—the only kind of bank in existence at the time—and direct issuance of "United States notes," colloquially known as greenbacks, to fund the enormous outlays required to keep the Union armies supplied.[2] After loans from state banks ran dry, the greenbacks temporarily served a dual purpose of funding the Union and providing a uniform, circulating currency for use by the populace.[3] However, as the Government continued to issue greenbacks at the breakneck speed

---

[2] ROGER LOWENSTEIN, WAYS AND MEANS: LINCOLN AND HIS CABINET AND THE FINANCING OF THE CIVIL WAR, 60-61, 100-01, 104 (2002); BRAY HAMMOND, BANKS AND POLITICS IN AMERICA: FROM THE REVOLUTION TO THE CIVIL WAR 720-22 (1967); ANNUAL REPORT OF THE SECRETARY OF THE TREASURY ON THE STATE OF FINANCES 7-12 (1862) ("1862 REPORT").

[3] LOWENSTEIN, *supra,* at 66-68, 76-77, 84-87, 104-05; HAMMOND, *supra,* at 721-22; 1862 REPORT at 7-12, 24.

12

required to fund the war effort, the greenbacks began to lose the value and stability needed to serve their dual purpose.[4]

Faced with the imminent exhaustion of funding after a series of losses on the battlefield, Treasury Secretary Salmon Chase revived a solution he initially proposed in his first Annual Report in 1861: the creation of a national banking system.[5] From the blueprint laid out in Secretary Chase's reports, the National Bank Act was born. Passed in 1863 and amended in 1864, the National Bank Act established a national banking system and created the OCC to oversee it. National Bank Act, ch. 58, § 1, 12 Stat. 665, 665-66 (1863); National Bank Act, ch. 106, § 1, 13 Stat. 99, 99-100 (1864). The new nationally chartered banks were required to issue a uniform currency backed by United States bonds, creating a stable currency for use by the populace and a reliable market for Treasury bonds. National Bank Act of 1864 §§ 16, 21-23, 37; *see also Tiffany v. Nat'l Bank of Mo.*, 85 U.S. 409, 413 (1873) ("[National banks] were established for the purpose, in part, of providing a currency for the whole country, and in part to create a market for the loans of the General government."). The creation of the OCC and a

---

[4] LOWENSTEIN, *supra,* at 129-30, 169; 1862 REPORT at 20.
[5] LOWENSTEIN, *supra*, at 145-46, 168-69; ANNUAL REPORT OF THE SECRETARY OF THE TREASURY ON THE STATE OF FINANCES 18-20 (1861); 1862 REPORT at 15-16.

13

national banking system, combined with taxation reform, gave the Union the financial edge it needed to supply its troops and outlast the Confederacy.[6]

The OCC's mission since its creation has been to ensure the safety, soundness, and fairness of the federal banking system. 12 U.S.C. § 1. The Comptroller[7] is the administrator of the national banking system and the principal officer of the OCC. *Id.* The OCC charters, regulates, and supervises national banks, federal savings associations, and federal branches and agencies of foreign banks. *See, e.g.*, 12 U.S.C. §§ 1, 1464, 3102; 12 C.F.R. § 4.2. The OCC's supervisory process involves bank examiners evaluating bank activities and ensuring that banks comply with applicable laws and regulations and operate in a safe and sound manner. *See* 12 U.S.C. §§ 481, 1820(d). Today, the OCC supervises approximately 1,000 banks with approximately $16 trillion in assets.[8] The OCC supervises the largest and most systemically important banks in the United States—including Wells Fargo.[9]

---

[6] LOWENSTEIN, *supra*, at 310-15.

[7] This Brief refers to the former Acting Comptroller of the Currency Michael J. Hsu and the statutory Office of the Comptroller of the Currency as "Comptroller."

[8] 2024 ANNUAL REPORT OF THE OFFICE OF COMPTROLLER OF THE CURRENCY at 24 (2024), *available at* https://www.occ.gov/publications-and-resources/publications/annual-report/files/2024-annual-report.pdf.

[9] *Id.*

14

## II.  OCC Administrative Enforcement Actions

In furtherance of the OCC's mission, Congress has granted the OCC authority to undertake a variety of administrative enforcement actions against bank institution-affiliated parties.  *See, e.g.,* 12 U.S.C. § 1818(e) (proceedings to suspend or remove institution-affiliated parties from participation in the banking industry), (i) (proceedings to assess civil money penalties).  Pursuant to this enforcement authority, which Congress has expanded over time in response to banking and financial crises,[10] OCC Enforcement Counsel may initiate an action by issuing a notice of charges detailing the alleged violations.  Unless the charges are uncontested, a hearing and related proceedings are conducted by an administrative law judge ("ALJ") pursuant to the Administrative Procedure Act and the OCC's rules of practice and procedure.  *Id.* § 1818(e), (h)-(i); *id.* § 1818 note; 12 C.F.R. Part 19.  Following a hearing or filing of dispositive motions, the ALJ prepares a recommended decision and full record of the proceedings for submission to the Comptroller.  At such time, the parties may also file with the Comptroller exceptions to the recommended decision.  12 C.F.R. § 19.39(a).  Upon

---

[10] *See generally*, The Banking Act of 1933 ("Glass-Steagall Act"), ch. 89, Pub. L. No. 73-66, § 30, 48 Stat. 162, 193-94 (1933); The Financial Institutions Regulatory and Interest Rate Control Act, Pub. L. No. 95-630, § 103, 92 Stat. 3641, 3643-44 (1978); The Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") §§ 901-08, 103 Stat. 183, 446-77.

Appellate Case: 25-1079     Page: 16     Date Filed: 07/21/2025 Entry ID: 5539505

review of the full record, the Comptroller issues the final decision of the Agency. 12 U.S.C. § 1818(h); 12 C.F.R. § 19.40.

## A.     Section 1818(e) Prohibitions

For the Comptroller to enter an order of prohibition against an institution-affiliated party, Enforcement Counsel must establish the separate elements of *misconduct*, *effect*, and *culpability*.  *See* 12 U.S.C. § 1818(e)(1)(A), (B), & (C); *Kim v. OTS*, 40 F.3d 1050, 1054 (9th Cir. 1994).  The misconduct element may be satisfied by showing the institution-affiliated party has "engaged or participated in any unsafe or unsound practice in connection with any insured depository institution. . ." or "violated—any law or regulation."  12 U.S.C. § 1818(e)(1)(A). The effect element may be satisfied by showing that, "by reason of" the misconduct, the institution at issue "has suffered or will probably suffer financial loss or other damage" or the institution's "depositors have been or could be prejudiced."  *Id*. § 1818(e)(1)(B).  Finally, the culpability element may be satisfied when the alleged misconduct "involves personal dishonesty" or "demonstrates willful or continuing disregard . . . for the safety or soundness of such insured depository institution. . . ."  *Id*. § 1818(e)(1)(C).[11]

---

[11] Substantial evidence supports the Comptroller's conclusion that Petitioner exhibited the requisite culpability for a prohibition action.  Add.1287-90; App._[A.R.576_at_91-94.]  Petitioner does not contest these findings in her briefing to this Court.

16

## B.    Section 1818(i) Civil Money Penalties

The Comptroller may also assess civil money penalties, categorized by escalating "tiers," including second-tier penalties of up to $25,000 per day[12] of continued misconduct.  For the Comptroller to assess a second-tier civil money penalty, Enforcement Counsel must establish two elements: *misconduct* and *effect*. Misconduct can take the form of a violation of law or a recklessly unsafe or unsound practice.  12 U.S.C. § 1818(i)(2)(B)(i).[13]  The effect prong may be satisfied by establishing that the misconduct "is part of a pattern of misconduct" or that the misconduct "causes or is likely to cause more than a minimal loss to such depository institution."  *Id.* § 1818(i)(2)(B)(ii).

---

[12] At the relevant time, the inflation-adjusted daily statutory cap was between $37,500 and $61,238.  28 U.S.C. § 2461 note ("the head of each agency shall . . . adjust each civil monetary penalty provided by law"); 73 Fed. Reg. 66493, 66496 (Nov. 10, 2008); 89 Fed. Reg. 872, 873 (January 8, 2024).

[13] Substantial evidence supports the Comptroller's conclusion that Petitioner recklessly engaged in unsafe or unsound practices.  Add.1290-94; App._[A.R.576_at_94-98.]  In her briefing to this Court, Petitioner does not challenge the Comptroller's finding that her conduct was reckless.  Pet. Br. at 21-35.

17

## III.   Factual Background and Prior Proceedings

### A.   Sales Practices Misconduct

Under pressure to meet unreasonable sales goals, thousands of employees at Wells Fargo retail branches[14] throughout the country engaged in widespread illicit sales practices for years.  These practices, hereinafter collectively referred to as "sales practices misconduct," included opening unauthorized customer checking, savings, debit and credit card accounts; "simulated funding," which involved transferring funds between customers' accounts without their consent; misrepresenting to customers that certain products were available only as a package with other products; enrolling customers in online banking and bill-pay without their consent; inappropriately delaying the opening of requested accounts and products until the next sales reporting period; and accessing and falsifying customers' personal information—such as phone numbers, home addresses, and email addresses—without authorization.  Add.1202,[15] 1213 (citing App._[A.R.348_at_207-09]); App._[A.R.576_at_6, 17] (same.)

A consultant engaged by the Bank to quantify a subset of sales practices misconduct identified approximately 1.9 million unauthorized accounts opened

_____

[14] At all relevant times, the Bank's retail branch network was part of Wells Fargo's Community Bank group, which consisted of more than 6,000 physical branches and was the Bank's largest line of business.  App._[OCC.Exh.2327_at_20]; App._[R.Exh.5940_at_1.]

[15] Citations to "Add." are to Petitioner's Addendum.

18

between 2013 and 2016.  Add.1217 (citing App._[OCC.Exh.1811RU];

App._[OCC.Exh.1812RU]; App._[OCC.Exh.1813RU]; App._[OCC.Exh.1636R]);

App._[A.R.576_at_21] (same.)  The independent directors of the Bank's holding

company found that sales practices misconduct was rooted in "the distortion of the

Community [B]ank's sales culture and performance management system, which,

when combined with aggressive sales management, created pressure on employees

to sell unwanted or unneeded products to customers and, in some cases, to open

unauthorized accounts."  Add.1217 (quoting App._[R.Exh.16147_at_*2]);

App._[A.R.576_at_21] (same.)  The directors concluded that "the Community

Bank's senior leaders distorted the sales model and performance management

system, fostering an atmosphere that prompted low quality sales and improper and

unethical behavior."  Add.1217-18 (quoting App._[R.Exh.16147_at_4]);

App._[A.R.576_at_21-22] (same.)

Wells Fargo's sales practices misconduct problem resulted in significant

harm to customers, damaged their trust in the banking system, and caused billions

of dollars in losses to the Bank.  The Bank paid more than $3 billion in penalties,

including to the City of Los Angeles, the State of New York, attorneys general of

all fifty states, the Consumer Financial Protection Bureau, and the U.S. Department

of Justice.  Add.1278-79 (citing App._[A.R.246_(MSD-343)];

App._[A.R.246_(MSD-670)]; App._[A.R.246_(MSD-671)];

19

App._[A.R.246_(MSD-1)_at_1-4]); App._[A.R.576_at_82-83] (same.)  The Bank

also paid a $142 million settlement in a class-action lawsuit brought by Bank

customers harmed by sales practices misconduct.  Add.1279 (citing

App._[A.R.246_(MSD-665)]); App._[A.R.576_at_83] (same.)  An OCC examiner

testified that sales practices misconduct "created a level of mistrust around Wells

Fargo that is hard to match.  I can't think of another instance in a consumer bank

that has created this level of distrust."  Add.1284-85 (citing

App._[A.R.495_(Tr.4019:19-23)]); App._[A.R.576_at_88-89] (same.)

## B.    Petitioner's Role at the Bank

Petitioner was Wells Fargo Community Bank's Group Risk Officer between

2004 and 2016.  Add.1223 (citing App._[A.R.113_at_20]); App._[A.R.576_at_27]

(same.)  As the Group Risk Officer, Petitioner was positioned to prevent the

Bank's sales practices abuses.  She was responsible for ensuring that the

Community Bank had effective risk management and internal controls, including

with respect to sales practices.  Add.1223-24 (citing App._[A.R.113_at_21];

App._[A.R.495_(Tr.9251:1-7)]; App._[A.R.495_(Tr.9519:3-10)];

App._[A.R.495_(Tr.9531:8-17)]); App._[A.R.576_at_27-28] (same.)  Petitioner

was required to understand and mitigate risks related to retail sales processes and

incentive structures within the Community Bank.  Add.1223 (citing

App._[A.R.348_at_182]); App._[A.R.576_at_27] (same.)  Petitioner managed the

20

Community Bank's Sales and Service Conduct Oversight Team, which was responsible for detecting sales practices misconduct through conducting "proactive monitoring"[16] and reviewing employee and customer complaints. Add.1223 (citing App._[A.R.113_at_21]); App._[A.R.576_at_27] (same.) Petitioner also served on various management committees responsible for identifying, managing, and escalating sales practices misconduct. Add.1223 (citing App._[A.R.348_at_182]; App._[A.R.113_at_17]); App._[A.R.576_at_27] (same.)

## C. Petitioner's Role in the Bank's Sales Practices Misconduct Problem

The Comptroller found that Petitioner knew or should have known that sales practices misconduct was widespread throughout 2013 to 2016 (the "relevant period"). Add.1219-23; App._[A.R.576_at_23-27.] Petitioner was part of a team that met weekly to review cases of sales practices misconduct; she received complaints made against individual employees and reports containing aggregated data regarding sales practices misconduct; and she attended meetings and conferences where concerns about sales pressure, sales quality, and employee misconduct and terminations were discussed. Add.1220-22 (citing, *e.g.*,

---

[16] Proactive monitoring used data analytics to identify behavior that indicated possible sales practices misconduct. App._[OCC.Exh.196_at_*1.] Proactive monitoring for simulated funding was set up, however, to identify for investigation only the most prolific offenders. *Id.* (noting that the Bank used a threshold of employees in the top 99.99% for potential simulated funding activity and later lowered that threshold to the top 99.95%).

App._[A.R.495_(Tr.9719:10-18)]; App._[OCC.Exh.1896U_at_39];

App._[OCC.Exh.191]; App_[OCC.Exh.273]); App._[A.R.576_at_24-26] (same.)

Petitioner knew that sales practices misconduct posed a significant risk to the

Bank. Add.1221 (citing App._[A.R.495_(Tr.9526:8-10)] (testifying that sales

practices misconduct was a "material issue" for the Bank)); App._[A.R.576_at_25]

(same.)

The Comptroller found that, throughout the relevant period, Petitioner failed

to institute effective controls to manage the risks posed by sales practices

misconduct; failed to escalate known or obvious risks related to sales practices

misconduct; failed to credibly challenge the Bank's incentive compensation

program; and provided false, incomplete, or misleading information to the OCC.

Add.1203; App._[A.R.576_at_7.] The Comptroller further found that Petitioner's

misconduct exacerbated and delayed an effective response to the Bank's sales

practices misconduct problem. Add.1284-85; App._[A.R.576_at_88-89.]

> 1. Petitioner failed to institute effective controls to manage sales practices misconduct.

Managing risks related to sales practices misconduct, including

implementing controls to prevent and detect such misconduct, was a key aspect of

Petitioner's responsibilities. Add.1224 (citing App._[A.R.495_(Tr.9519:3-10)];

App._[A.R.495_(Tr.9531:8-9532:7)] (testifying that it was her responsibility to

build controls to prevent and detect sales practices misconduct));

App._[A.R.576_at_28] (same.)

The Community Bank's controls to prevent and detect sales practices misconduct, which Petitioner oversaw, *see* Add.1249-52, 1258-63; App._[A.R.576_at_53-56, 62-67], were grossly ineffective because they caught only a sliver of the widespread sales practices misconduct. Add.1254 (citing, *e.g.*, App._[OCC.Exh.1865_at_*1-2]); App._[A.R.576_at_58] (same.)[17] The Sales and Service Conduct Oversight Team, which Petitioner managed, processed allegations of sales practices misconduct in such a manner that they were unlikely to be substantiated. App._[R.Exh.9704.] And the proactive monitoring instituted by Petitioner referred for further investigation only the most prolific offenders engaged in simulated funding. App._[OCC.Exh.196_at_*1]; *see also supra* note 15.

      2.   <u>Petitioner failed to escalate known or obvious risks related to sales practices misconduct.</u>

Between 2006 and 2015, Petitioner reported to the Head of the Community Bank. Starting in 2013, she also reported to the Bank's Chief Risk Officer,

---

[17] For example, in 2014, the Sales and Service Conduct Oversight Team substantiated only 693 allegations it received as sales practices misconduct. App._[OCC.Exh.1865_at_1.] In comparison, the Bank's consultant identified approximately 555,000 unauthorized accounts opened in 2014. *See* App._[OCC.Exh.1811RU]; App._[OCC.Exh.1812RU]; App._[OCC.Exh.1813RU]; App._[OCC.Exh.1636R.]

23

Michael Loughlin. Add.1223 (citing App._[A.R.348_at_177-78]; App._[OCC.Exh.2279_at_2]); App._[A.R.576_at_27] (same.) The Bank's policies during the relevant period explicitly stated that Petitioner was responsible for reporting "risk exposures . . . [and] escalating breaches to the appropriate level" of the Bank, Add.1264 (citing App._[OCC.Exh.102_at_32]); App._[A.R.576_at_68] (same).[18] Petitioner testified that it was important that she "timely inform Mr. Loughlin of existing problems in the Community [B]ank with respect to sales practices misconduct" and that it was important for her to provide Loughlin with "timely and accurate information . . . about whether sales practices risk was adequately managed." Add.1264 (citing App._[A.R.495_(Tr.9526:11-9528:19)]); App._[A.R.576_at_68] (same.)

Petitioner had frequent meetings with Loughlin throughout the relevant period, including monthly one-on-one meetings about "risk issues," Add.1265 (citing App._[A.R.495_(Tr.9478:7-9)]); App._[A.R.576_at_69] (same), and quarterly meetings with both Loughlin and the Head of the Community Bank aimed at "reduc[ing] sales pressure at the [B]ank." Add.1265 (citing App._[A.R.495_(Tr.3237:4-14)]); App._[A.R.576_at_69] (same). Loughlin

_____

[18] This responsibility is also supported by OCC guidance, which explains that "[m]anagement should ensure material risk and risk-taking activities exceeding the risk appetite are recognized, escalated, and addressed in a timely manner." App._[R.Exh.18439_at_44.]

testified that he was dissatisfied with Petitioner's "level of transparency" during these meetings. Add.1265 (citing App._[A.R.495_(Tr.2959:14-17)]); App._[A.R.576_at_69] (same.) In particular, Loughlin stated that the Community Bank was too slow to quantify the scope and impact of sales practices misconduct, as Petitioner did not invite inspection because she "was protective of the Community Bank's business model." Add.1271-72 (citing App._[A.R.495_(Tr.2955:8-17)]; App._[A.R.495_(Tr.2957:25-2958:10)]); App._[A.R.576_at_75-76] (same.) He also testified that he wished Petitioner had "escalated problems to me in a more aggressive way[.]" Add.1272 (citing App._[A.R.495_(Tr.2958:9-11)]); App._[A.R.576_at_76] (same.)

### 3. Petitioner failed to credibly challenge the incentive compensation program's unreasonable sales goals.

Petitioner was required to "[p]rovide credible challenge to the Community Banking lines of businesses." Add.1224-25 (citing App._[R.Exh.7256_at_1]; App._[A.R.495_(Tr.9523:9-13)]); App._[A.R.576_at_28-29] (same.) Bank policies defined credible challenge as: "the communication of an alternative view, opinion, or strategy developed through expertise and professional judgment to challenge business or enterprise strategies, policies, products, practices and controls." Add.1239 (citing App._[R.Exh.11373_at_9]); App._[A.R.576_at_43] (same.) Bank policies also specifically required any incentive compensation program to appropriately balance risk and reward. Add.1239 (citing

25

App._[OCC.Exh.1855_at_3-4]); App._[A.R.576_at_43] (same.)  As Group Risk

Officer, Petitioner was responsible for credibly challenging the Bank's incentive

compensation program, including its use of sales goals, to her superiors.  Add.1239

(citing App._[OCC.Exh.1272_at_7]; App._[OCC.Exh.1733_at_5]);

App._[A.R.576_at_43] (same.)

Under the incentive compensation framework, Community Bank employees

had baseline sales goals and received bonuses for exceeding those goals.

App._[OCC.Exh.1735_at_3.]  Although Petitioner knew that Bank employees

were under extensive pressure to meet unreasonable sales goals, Add.1243-49;

App._[A.R.576_at_47-53]; *see also* App._[OCC.Exh.1163_at_1-2];

App._[OCC.Exh.1363],[19] she did not credibly challenge this aspect of the

Community Bank's incentive compensation program.  Add.1247-49;

App._[A.R.576_at_51-53].  Loughlin testified that Petitioner should have done

more to invite inspection of sales practices misconduct and credibly challenge the

Community Bank's business model.  Add.1247 (citing App._[A.R.495_(Tr.2958:9-

14)]); App._[A.R.576_at_51] (same.)

---

[19] The Comptroller cited additional evidence of Petitioner's knowledge of pressure
to meet unreasonable sales goals.  Add.1243-47; App._[A.R.576_at_47-51.]

Appellate Case: 25-1079     Page: 27     Date Filed: 07/21/2025 Entry ID: 5539505

4. <u>Petitioner provided the OCC false, incomplete, or misleading information regarding sales practices misconduct.</u>

Candor and transparency are crucial to the OCC's supervisory process. Examiners rely on information provided by bank personnel to evaluate risk, assess controls, and ensure that banks operate in a safe and sound manner. Add.1226 (citing App._[A.R.495_(Tr.144:17-145:16)]; App._[A.R.495_(Tr.688:9-19)]; App._[A.R.495_(Tr.689:20-22)]); App._[A.R.576_at_30] (same.) Petitioner understood her obligation to be transparent and honest with OCC examiners and recognized that her failure to do so would not only hinder the OCC's examinations but could result in increased risks to the Bank. Add.1226 (citing App._[A.R.495_(Tr.9773:23-9777:25)]; App._[A.R.495_(Tr.10030:6-10031:8)]); App._[A.R.576_at_30] (same.) Despite her obligation to be transparent with examiners, Petitioner failed to provide complete and accurate information during the OCC's 2015 examinations on sales practices misconduct. Specifically, Petitioner failed to provide information or provided false, incomplete, or misleading information to examiners regarding (1) whether Bank employees were terminated if they did not meet sales goals; (2) the number of terminations arising from sales practices misconduct; (3) sales pressure; and (4) the existence of thresholds used in proactive monitoring.

During these 2015 examinations, examiners and Bank employees regularly met to discuss the Bank's incentive compensation framework. Add.1231 (citing

27

App._[OCC.Exh.1735_at_3]); App._[A.R.576_at_35] (same.) In response to an examiner question about whether pressure to meet sales goals contributes to employee turnover, Petitioner falsely stated, "no one loses their job because they did not meet sales goals." *Id.*; *see also* Add.1231-32 (citing App._[A.R.495_(Tr.706:2-8)]; App._[A.R.495_(Tr.2270:14-16)]; App._[OCC.Exh.1943_at_2]); App._[A.R.576_at_35-36] (same.) Petitioner knew this was false—she knew employees could be terminated for not meeting sales goals. Add.1232 (citing App._[A.R.495_(Tr.9567:1-20)]; App._[A.R.576_at_36] (same); App._[OCC.Exh.1943_at_6.]

Additionally, at a meeting discussing the Bank's sales practices during the 2015 examinations, examiners asked Petitioner how many Bank employees had been terminated due to sales practices misconduct. Add.1227-28 (citing, *e.g.* App._[OCC.Exh.1734_at_1-3]); App._[A.R.576_at_31-32] (same.) Petitioner responded that 190 employees had been terminated due to misconduct in the Los Angeles region in 2013. Add.1228 (citing [App._[OCC.Exh.1734_at_1-2]; App._[A.R.495_(Tr.736:1-25)]); App._[A.R.576_at_32] (same.) However, Petitioner was aware that approximately 1,000 employees were terminated in both 2013 and 2014 for sales practices misconduct. Add.1227-28 (citing App._[A.R.495_(Tr.9721:5-21)]; App._[A.R.495_(Tr.9909:3-9910:1)];

28

App._[A.R.495_(Tr.9913:9-19)]; App._[OCC.Exh.1264];

App._[OCC.Exh.1438_at_1]); App._[A.R.576_at_31-32] (same.)

In the same meeting, examiners asked if Petitioner had "[a]ny dialogue with Personal Bankers who indicate they are under pressure?" Add.1229 (citing App._[OCC.Exh.1734_at_4]); App._[A.R.576_at_33] (same.) Petitioner responded that she "doesn't hear that *at all*." *Id.* (emphasis added); *see also* App._[A.R._495_(Tr.9986:7-9).] However, when she made this statement, she knew it was false—she knew employees faced sales pressure because of employee petitions, sales pressure, and reports she received. Add.1230 (citing App._[OCC.Exh.1549_at_2]; App._[OCC.Exh.3004]; App._[R.Exh.9028]); App._[A.R.576_at_34] (same.) At the time, she also believed "that there was still some [sales] pressure" because of conversations she had with Bank employees. Add.1231 (citing App._[A.R._495_(Tr.9991:17-9992:2)]); App._[A.R.576_at_35] (same.)

Finally, at this same meeting, an OCC examiner explicitly asked Petitioner "how simulated funding [was] detected." Add.1237 (citing App._[A.R.495_(Tr.731:24-732:5)]; App._[A.R.495_(Tr.733:9-14)]; App._[OCC.Exh.1734_at_2]); App._[A.R.576_at_41] (same.) Petitioner responded, but did not tell examiners about the Sales and Service Conduct Oversight Team's proactive monitoring or the thresholds it used in proactive

29

monitoring—*i.e.*, tools the Bank used to detect sales practices misconduct. Add.1237 (citing App._[OCC.Exh.1734_at_2]); App._[A.R.576_at_41] (same); *see also* App._[OCC.Exh.1771.]

### D.    Procedural History

On January 23, 2020, Enforcement Counsel initiated this action against Petitioner.  The Notice of Charges for Orders of Prohibition and Orders to Cease and Desist and Notice of Assessment of a Civil Money Penalty ("Notice") sought an order of prohibition and assessment of a $5 million civil money penalty against Petitioner on grounds that, as relevant here, she engaged in unsafe or unsound practices and violated laws.  App._[A.R._1_at_52-61.]  Following extensive discovery, partial summary disposition,[20] and a 38-day hearing, the ALJ recommended that the Comptroller enter an order of prohibition against Petitioner and assess a $10 million civil money penalty against her.  Add.754-1196; App._[A.R.534.][21]

The Comptroller adopted in part and rejected in part the ALJ's recommendation in the Final Decision.  The Comptroller assessed a $10 million second-tier civil money penalty and entered an order of prohibition against

---

[20] As part of its summary disposition motion, Enforcement Counsel sought an increased civil money penalty of $10 million.  App._[A.R.246 (EC Br._at_199).]
[21] Prior to the hearing, the ALJ entered a 753-page order partially granting and partially denying Enforcement Counsel's motion for summary disposition.  Add.1-753; App._[A.R.348.]

30

Petitioner.  In connection with imposing a second-tier civil money penalty, the Comptroller concluded that Enforcement Counsel established by a preponderance of evidence that Petitioner recklessly engaged in unsafe or unsound practices and violated 18 U.S.C. §§ 1001(a) and 1517; that this misconduct was part of a pattern; and that this misconduct caused more than a minimal loss to the Bank.  Add.1290-1302; App._[A.R.576_at_94-106.]  In connection with imposing an order of prohibition, the Comptroller concluded that Petitioner engaged in unsafe or unsound practices and violated sections 1001(a) and 1517; that this misconduct caused a loss to the Bank and prejudiced the interests of the Bank's depositors; and that Petitioner's misconduct involved personal dishonesty and demonstrated willful and continuing disregard for the safety and soundness of the Bank.  Add.1225-90; App._[A.R.576_at_29-94.]

## SUMMARY OF ARGUMENT

Congress authorized the Comptroller to adjudicate violations of banking laws and to impose civil money penalties when appropriate.  Because actions arising from regulation of the national banking system are unknown to the common law and implicate public rights, such actions may be constitutionally assigned to and adjudicated by the Executive Branch.  *Jarkesy*, 603 U.S. at 128-30, 138.  "[T]he Seventh Amendment poses no independent bar" to the proceedings

31

underlying Petitioner's appeal.  *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 53-54 (1989).

The Comptroller's conclusions are reasonable, in accordance with law, and supported by substantial record evidence.  Petitioner recklessly engaged in unsafe or unsound practices and violated laws as part of a pattern of misconduct.  This misconduct resulted in financial loss to the Bank and prejudice to depositors and demonstrated personal dishonesty and willful and continuing disregard for the Bank's safety and soundness.

The Petition for Review should be denied.

## STANDARD OF REVIEW

The Court reviews agency action to determine if it is "arbitrary, capricious," or "otherwise not in accordance with law," and whether it is supported by substantial evidence.  *See* 5 U.S.C. § 706.  "Substantial evidence is relevant evidence that a reasonable person might accept as adequate to support a conclusion."  *See Wal-Mart Stores East, LP v. Acosta*, 919 F.3d 1073, 1077 (8th Cir. 2019) (citation modified).  The Court reviews questions of constitutional law *de novo*.  *Adame-Hernandez v. Barr*, 929 F.3d 1020, 1022 (8th Cir. 2019).

32

# ARGUMENT

## I. Section 1818 Actions Involve Public Rights.

Petitioner argues that the civil money penalty must be vacated "because an Article III court and jury were required to adjudicate it." Pet. Br. at 35. But her argument rests on a fundamental misconception of Article III and of the Seventh Amendment, both of which have always allowed for Executive adjudication in section 1818 actions.

The OCC does not contest that the civil money penalty "implicates the Seventh Amendment." *Jarkesy*, 603 U.S. at 120. The Seventh Amendment "preserve[s] the right to jury trial as it existed in 1791" and applies to "statutory rights that are analogous to common-law causes of action ordinarily decided in English law courts" at the Founding. *Granfinanciera*, 492 U.S. at 41-42. In determining whether a federal statute implicates the Seventh Amendment, the Court looks to whether "the claim is legal in nature." *Jarkesy*, 603 U.S. at 122 (citation modified). Because claims for punitive "money damages" are a "prototypical common law remedy," *id.* at 123, the OCC's civil money penalty against Petitioner implicates the Seventh Amendment.

That, however, is only the beginning of the analysis. The Court next asks "whether Congress may assign" adjudication of the claim "to a non-Article III adjudicative body that does not use a jury as factfinder." *Granfinanciera*, 492 U.S.

33

at 42; *accord Jarkesy*, 603 U.S. at 120 (employing "the approach set forth in *Granfinanciera*"). That option is available to Congress when an adjudication involves "'public rights,' *e.g.*, where the Government is involved in its sovereign capacity under an otherwise valid statute creating enforceable public rights." *Granfinanciera*, 492 U.S. at 51. Violations of public rights may be adjudicated by the Executive Branch "free from the strictures of the Seventh Amendment." *Id.*

The Supreme Court has never definitively identified the distinguishing features of public rights. *Jarkesy*, 603 U.S. at 131. But it is well established that the Executive Branch may adjudicate matters related to "the congressional power as to interstate and foreign commerce, taxation, immigration, the public lands, public health, the facilities of the post office, pensions, and payments to veterans." *Crowell v. Benson*, 285 U.S. 22, 51 (1932); *accord N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 69 n.22 (1982) (quoting *Crowell*'s "attempt[] to catalog some of the matters that fall within the public-rights doctrine"). The Supreme Court has not categorically limited public rights to these specifically identified areas, but it has clarified that the doctrine does not extend to "[w]holly private tort, contract, and property cases, as well as a vast range of other cases." *Granfinanciera*, 492 U.S. at 51.

In *Jarkesy*, the Supreme Court considered whether the Securities and Exchange Commission ("SEC") could use an administrative proceeding to impose

34

civil penalties when a person had violated the federal securities laws' "antifraud provisions [that] replicate common law fraud." *Jarkesy*, 603 U.S. at 120. The Supreme Court explained that, although the relevant federal securities law provisions were part of a "newly fashioned regulatory scheme," the alleged fraud violations were "a common law suit in all but name," and so did not involve public rights. *Id.* at 135-36. Instead, the SEC's enforcement action "target[ed] the same basic conduct as common law fraud," under a statute that "employ[ed] the same terms of art, and operate[d] pursuant to similar legal principles" to the common law. *Id.* at 134. In so holding, *Jarkesy* did not overrule any Supreme Court precedent, recognizing that the Seventh Amendment does not preclude Executive adjudication of public rights, including proceedings to impose civil money penalties. *See Axalta Coating Sys., LLC v. Fed. Aviation Admin*., No. 23-2376, 2025 WL 1934352, at *4 (3d Cir. July 15, 2025) ("[T]he Court in *Jarkesy* applied, but did not abrogate, the public rights doctrine.").

Unlike the SEC's action in *Jarkesy*, regulation of the national banking system and those acting within it is not modeled on the common law. Rather, the national banking system traces its origins to Civil-War-era legislation advancing distinctly public purposes: establishment of a uniform national currency maintained by a safe and sound national banking system. *See supra* Counterstatement of the Case, Part I. National banks did not exist at common law.

35

They are "instrumentalities of the federal government, created for a public purpose, and as such necessarily subject to the paramount authority of the United States." *Davis v. Elmira Sav. Bank*, 161 U.S. 275, 283 (1896).

Petitioner erects a straw man and offers a truism: "The right to lend money was not created by the U.S. government; it is as old as time." Pet. Br. at 45. The OCC does not dispute that banks have existed since common law. However, banks created under the National Bank Act are creatures of statute organized for distinctly public purposes. National banks and their employees, officers, and directors must submit themselves to the jurisdiction of the Comptroller, in whom Congress has entrusted exclusive authority over the safety and soundness of the national banking system. 12 U.S.C. §§ 1 (establishing the OCC), 1818(e) (proceedings to suspend or remove institution-affiliated parties from participation in the banking industry), 1818(i) (conferring enforcement jurisdiction over certain bank institution-affiliated parties).

The Supreme Court has long understood the uniquely public role that national banks play in the U.S. economy. Since the 19th century, the Court has repeatedly recognized that national banks organized under the laws of the United States are "instruments designed to be used to aid the government in the administration of an important branch of the public service." *Farmers' & Mechanics' Nat'l Bank v. Dearing*, 91 U.S. 29, 30 (1875). The Court has

36

"frequently expressed" that nationally chartered banks are "not considered as a private corporation whose principal object is individual trade and individual profit, but as a public corporation created for public and national purposes." *Easton v. Iowa*, 188 U.S. 220, 229-30 (1903) (quoting *Osborn v. Bank of United States*, 22 U.S. 738, 860 (1824)); *see also Van Allen v. The Assessors*, 70 U.S. 573, 590 (1865) (explaining that national banks are "intimately connected in their functions and operations with the national government"). Likewise, Congress has continued to note that national banks and national bankers operate "under special licenses granted by the Government in the public interest." S. Rep. No. 89-1482, at 3532, 3540 (1966), *available in* 1966 U.S.C.C.A.N. 3532.

Regulation of national banks was originally and exclusively within Congress's control, and enforcement actions under the National Bank Act and its amendments (including the § 1818 action here) were not drawn from existing common-law actions. For example, in 1880, the Supreme Court of Pennsylvania overturned a state conviction based on the offense of embezzlement at a national bank because "the affairs of such banks are exclusively under the control of Congress." *Commonwealth ex rel. Torrey v. Ketner*, 92 Pa. 372, 377 (1880) ("*Torrey*"). The court recognized that national banks were "creatures of another sovereignty"—*i.e.* the federal government—and that, prior to the National Bank Act of 1863, "*there were no national banks*, nor even a law to authorize their

37

creation." *Id.* at 376 (emphasis added). Thus, a claim alleging that the defendant misused funds at a national bank is "not a common-law offence." *Id.*

The U.S. Supreme Court approvingly quoted *Torrey* at length in its decision in *Easton v. Iowa*, 188 U.S. 220 (1903), which held that an Iowa law prescribing punishment for the offense of receiving deposits at a time of bank insolvency was preempted by federal law. The Supreme Court disagreed with the Iowa Supreme Court's conclusion that the state statute could apply to national banks and their officers, concluding that such reasoning was "not based on a correct conception of the Federal legislation creating and regulating national banks." *Id.* at 229. Unlike other commercial entities, national banks are unique creatures of statute that "cannot . . . be viewed as solely organized and operated for private gain." *Id.* The Court concluded "that Congress, having power to create a system of national banks, is the judge as to the extent of the powers which should be conferred upon such banks, and has the sole power to regulate and control the exercise of their operations." *Id.* at 238. As *Torrey* and *Easton* demonstrate, Congress has original and exclusive authority to create a scheme that provides for the regulation of national banks and the imposition of penalties against national bank officers. *See also Sinclair v. Hawke*, 314 F.3d 934, 940 (8th Cir. 2003) ("Congress has been establishing and extensively regulating national banks for over two hundred years.").

Appellate Case: 25-1079    Page: 39    Date Filed: 07/21/2025 Entry ID: 5539505

Thus, regulation of national banks and institution-affiliated parties falls within the "distinctive areas involving governmental prerogatives," which "may be resolved outside of an Article III court, without a jury." *Jarkesy*, 603 U.S. at 120. Banking is "one of the longest regulated and most closely supervised of public callings." *Fahey v. Mallonee*, 332 U.S. 245, 250 (1947). And Congress has "undoubted power to regulate the banking industry and the nation's money supply." *Melcher v. Fed. Open Market Comm.*, 644 F. Supp. 510, 523-24 (D.D.C. 1986).

Petitioner argues that the OCC's claims for unsafe or unsound practices resemble traditional common law claims for negligence and breach of fiduciary duty, and therefore the public rights doctrine cannot apply. Pet. Br. at 42-43. But this argument ignores that unsafe or unsound practice claims are inextricably intertwined with the OCC's enabling statutes, which charge the agency with "assuring the safety and soundness" of the national banking system. 12 U.S.C. § 1. Furthermore, the standard the OCC uses for unsafe or unsound practices derives from legislative materials. *See Financial Institutions Supervisory Act of 1966: Hearings on S. 3158 Before the House Comm. on Banking and Currency*, 89th Cong., 2d Sess. 49 (1966) (statement of John E. Horne, Chairman of the FHLBB), 112 CONG. REC. 26,474 (1966); *see also Adams*, No. OCC AA-EC-11-50, 2014 WL 8735096, at *2-3 (OCC Sept. 30, 2014) (adopting standard).

39

Even if unsafe or unsound practice claims arguably bear some resemblance to common law claims, that would not be enough to remove the action from the scope of the public rights doctrine. "Article III does not confer on litigants an absolute right to the plenary consideration of every nature of claim by an Article III court." *CFTC v. Schor*, 478 U.S. 833, 848 (1986). In determining whether an administrative adjudication runs afoul of Article III, the Supreme Court looks "beyond form to the substance of what Congress has done." *Id.* at 854 (citation modified). Here, the OCC is exercising its exclusive authority to adjudicate misconduct in the affairs of a national bank. The public rights doctrine allows the Executive Branch to adjudicate such claims entirely, even if some of the claims "were presented in such form that the judicial power [wa]s capable of acting on them." *Jarkesy*, 603 U.S. at 128 (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 18 How. 272, 284 (1856)).[22]

In evaluating whether an adjudication involves public rights, the Supreme Court also considers "whether the[] actions [a]re closely intertwined with" the statutory scheme and whether jury trials would be "generally incompatible" with

---

[22] Petitioner also cites *Morissette v. United States*, 342 U.S. 246 (1952) for the proposition that "Article III courts must adjudicate violations of federal criminal laws." Pet. Br. at 40-41. *Morissette*, which concerns a criminal conviction for conversion of government property, is irrelevant to whether the public rights exception applies. In any case, Enforcement Counsel did not—and cannot—bring criminal penalties against Petitioner.

40

the overall regime. *Jarkesy*, 603 U.S. at 133-34 (citation modified). The OCC cannot bring enforcement actions against anyone who commits an unsafe or unsound practice: The OCC's jurisdiction extends *only* to certain banks and institution-affiliated parties thereof. Nor can individuals proceed with a private right of action to remedy the misconduct in which Petitioner engaged. Only the Federal banking agencies are authorized to pursue such actions against banks and bankers who threaten the safety and soundness of the national banking system. Additionally, section 1818 provides the exclusive mechanism for those enforcement actions; there is simply no alternative forum to administrative adjudication in which to pursue claims such as those against Petitioner. *Granfinanciera*, 492 U.S. at 58-59 n.14 (noting that "creditors lack an alternative forum to the bankruptcy court in which to pursue their claims").

Petitioner argues that this case involves private rights because her "private property" is at stake in a civil money penalty. Pet. Br. at 40. If this were enough to move a case into the realm of private rights, no civil money penalty could ever come within the purview of the public rights doctrine. But the Supreme Court has routinely approved the imposition of civil money penalties when those penalties are issued pursuant to a larger statutory framework that implicates public rights. *See, e.g.*, *Atlas Roofing Co., Inc. v. OSHA*, 430 U.S. 442 (1977); *Oceanic Steam Nav. Co. v. Stranahan*, 214 U.S. 320 (1909). Here, the Comptroller assessed the

41

civil money penalty as part of Congress' exclusive regulation of the national banking system.

In contrast, the Supreme Court determined the securities fraud action in *Jarkesy* implicated private rights because it involved "transactions between private individuals interacting in a pre-existing market." *Jarkesy*, 603 U.S. at 135. The substance of that suit involved a private individual asserting a private right not to be defrauded, which is the kind of action "the courts of Westminster" could entertain. *Id.* at 128 (quoting *Stern v. Marshall*, 564 U.S. 462, 484 (2011)). Here, the OCC is not asserting a private right against Petitioner, nor is there any way for an individual to bring a private cause of action against Petitioner for her misconduct in conducting the affairs of a national bank. The "substance" of the suit is that of a federal banking regulator taking action to protect depositors and ensure the systemic integrity of the national banking system.

Given the distinctly public purposes underlying the federal banking regulators' enforcement powers, it is unsurprising that every appellate court to have considered the question has determined that section 1818 actions implicate public rights and can therefore be adjudicated outside of Article III. *See, e.g.*, *Cavallari v. OCC*, 57 F.3d 137 (2nd Cir. 1995); *Simpson v. OTS*, 29 F.3d 1418 (9th

42

Cir. 1994); *Akin v. OTS*, 950 F.2d 1180 (5th Cir. 1992); *Paul v. OTS*, 763 F. Supp.

568 (S.D. Fla. 1990), *aff'd*, 948 F.2d 1297 (11th Cir. 1991).

In the face of this overwhelming authority, Petitioner offers a tactical

concession:  Adjudications of unsafe or unsound practices "may involve public

rights, but only in the context of cease-and-desist orders and termination of

insurance."  Pet. Br. at 46.  This reflects an overly narrow reading of the case law.

In each of the above-described cases analyzing section 1818 actions, the court

considered the broad public purposes underlying the banking agencies'

enforcement powers and their important role in protecting the safety and soundness

of the national banking system.  Consider the Ninth Circuit's reasoning in

*Simpson*:  "The purpose of enforcement of the thrift regulation laws is to safeguard

the thrift industry, the depositors, and the federal insurance fund. . . . By instituting

the cease-and-desist proceedings, the OTS served a public purpose of the sort

Congress envisioned in providing for administrative adjudication."  *Simpson*, 29

F.3d at 1423.  The same rationale can be found in *Cavallari*, in which the Second

Circuit upheld both a civil money penalty imposed by the OCC *and* a prohibition

order imposed by the FDIC:  "Congress enacted FIRREA in order to safeguard the

thrift industry and the FDIC. . . . The [c]harges brought against Cavallari stemmed

from his disregard of an order issued by the OCC pursuant to its regulatory

authority under FIRREA.  The OCC charges clearly implicate public rights."

43

*Cavallari*, 57 F.3d at 145. In these cases, the courts did not parse the various enforcement tools available to the banking regulators and determine that only some of them involved public rights. Instead, they examined the history and context of the entire enforcement apparatus—most recently updated by Congress with the passage of FIRREA in the wake of the savings and loan crisis—and recognized that it advances distinctly public purposes. *See id.*

Petitioner's attempt to limit application of the public rights doctrine to cease-and-desist orders also reflects a misunderstanding of how the banking agencies' enforcement apparatus is inextricably intertwined with the supervisory process. Many OCC enforcement actions arise out of the bank supervision process, in which bank examiners evaluate bank activities and assess whether a bank is complying with applicable laws and regulations and is operating in a safe and sound manner. *See, e.g.,* 12 U.S.C. §§ 481, 1820(d); *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 329 (1963) ("[T]he agencies maintain virtually a day-to-day surveillance of the American banking system. And should they discover unsound banking practices, they are equipped with a formidable array of sanctions."). Congress authorized the OCC to utilize various enforcement mechanisms recognizing the Agency may need to tailor its response to the severity of the misconduct and the threat that misconduct poses to depositors or the national banking system. *See Sinclair v. Hawke*, 314 F.3d 934, 941 (8th Cir. 2003)

("Through periodic examinations and intense regulation of unsound practices, the OCC actively engages with bank management to protect the interest of depositors and the general public in the solvency and soundness of national banks.").

The specific claims against Petitioner illustrate the extent to which the OCC's enforcement and supervisory powers are intertwined. The Comptroller found that Petitioner had, among other forms of misconduct, obstructed the OCC's examination of the Bank, which obscured the OCC's view into the extent of the sales practices misconduct problem. While Petitioner attempts to frame these claims as involving "fraudulent misrepresentation," Pet. Br. at 42, they bear no resemblance to common law fraud. Instead, these claims arise out of the unique supervisory relationship between a national bank, which enjoys the public privileges discussed above, and its federal regulator, which can revoke those privileges if doing so would protect the public interest. This "iterative process" of close supervision "depends vitally upon the quality of communication between the regulated banking firm and the bank regulatory agency." *In re Subpoena*, 967 F.2d 630, 633 (D.C. Cir. 1992). No such relationship between banking regulator and nationally chartered bank existed at common law. It is Petitioner's interference with the supervisory relationship that, in part, gave rise to the claims in this case. Because these claims involve distinctly public rights, Congress may assign their adjudication outside of Article III, as it did in section 1818.

Appellate Case: 25-1079     Page: 46     Date Filed: 07/21/2025 Entry ID: 5539505

## II. The Final Decision Is in Accordance with Law and Supported by Substantial Record Evidence.

Substantial evidence supports the Comptroller's conclusions that Enforcement Counsel established all required elements of a prohibition order and second-tier civil money penalty. *See supra* Counterstatement of the Case, Part II.

### A. Petitioner engaged in actionable misconduct.

#### 1. Petitioner engaged in unsafe or unsound practices.

Substantial record evidence establishes that Petitioner engaged in unsafe or unsound practices, which include "any action or lack of action, which is contrary to generally accepted standards of prudent operation, the possible consequences of which, if continued, would be abnormal risk or loss or damage to an institution, its shareholders, or the agencies administering the insurance funds."[23]  Add.1211; App._[A.R.576_at_15.]  The definition of unsafe or unsound practices applied by the Comptroller in the Final Decision reflects the "well-settled" definition in this Court.  *See Greene Cnty. Bank v. FDIC*, 92 F.3d 633, 635 (8th Cir. 1996). Moreover, this Court has squarely rejected Petitioner's argument that conduct must

---

[23] As discussed at *supra* Counterstatement of the Case, Part II, the misconduct element of a section 1818(e) prohibition may be satisfied by establishing that the institution-affiliated party engaged in an unsafe or unsound practice; the misconduct element of a section 1818(i) second-tier civil money penalty may be satisfied by establishing that the institution-affiliated party recklessly engaged in an unsafe or unsound practice.

46

threaten a bank's financial soundness to be unsafe or unsound.  *See id.* at 635; *see also* Pet. Br. 30-35.

> **i.**  *The Comptroller's reliance on longstanding precedent interpreting unsafe or unsound practices did not violate Petitioner's due process rights.*

Petitioner contends that her due process rights were violated because "no existing rule" prohibited her precise misconduct.  Pet. Br. at 22-24.  In support of this argument, Petitioner relies on *SEC v. Chenery Corp.*, 332 U.S. 194 (1947) ("*Chenery II*").  Pet. Br. at 22-24.  This reliance is misplaced.  In *Chenery II*, the Supreme Court considered the scope of a court's review when an agency announces and applies a new standard of conduct through administrative adjudication.  *Chenery II*, 332 U.S. at 207.  But the Final Decision did not announce or apply a new standard of conduct.  Rather, the Comptroller applied a longstanding standard (which has been the law of this Circuit since 1978, *see First Nat. Bank of Eden v. OCC*, 568 F.2d 610, 611 n.2 (8th Cir. 1978)), to the facts presented.  After considering the full record—including testimony from Petitioner, her experts, examiners, and Bank employees, Petitioner's job descriptions, Comptroller's Handbooks, and Bank policies, *see, e.g.*, Add.1224, 1226, 1240, 1264; App._[A.R.576_at_28, 30, 44, 68]—the Comptroller concluded that Petitioner's failure to implement adequate controls, credibly challenge unreasonable sales goals, and escalate risks related to sales practices, as well as her

47

attempts to mislead examiners, were contrary to the generally accepted standards of prudent operation. Add. 1223-27, 1239-41, 1263-65; App._[A.R.576_at_27-31, 43-45, 67-69].

An agency does not violate due process if parties can ascertain the standards they must conform to. *General Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995); *see also De Niz Robles v. Lynch*, 803 F.3d 1165, 1175 (10th Cir. 2015) (Gorsuch, J.) (noting that administrative agencies may apply "preexisting rules to new factual circumstances"); *Adams*, 2014 WL 8735096, at *6 ("[t]he novelty of a given practice cannot be permitted to preclude" a showing that it is unsafe or unsound). Case law interpreting section 1818 provided sufficient notice that the misconduct Petitioner engaged in amounted to unsafe or unsound practices. *See, e.g.*, *De La Fuente v. FDIC*, 332 F.3d 1208, 1224 (9th Cir. 2003) (failing to disclose information to examiners is an unsafe or unsound practice); *In re Seidman*, 37 F.3d 911, 936-37 (3rd Cir. 1994) (accord); *see also Blanton v. OCC*, 909 F.3d 1162, 1172-73 (D.C. Cir. 2018) (failing to institute effective controls is an unsafe or unsound practice); *Frontier State Bank Oklahoma City, Okla. v. FDIC*, 702 F.3d 588, 604 (10th Cir. 2012) (failing to adequately manage risk is an unsafe or unsound practice).

Indeed, Petitioner's own testimony evinces an understanding of the standards set forth in relevant case law and belies her argument that no existing

48

rule applied to her conduct. Petitioner testified that she was obligated to implement adequate controls, Add.1224 (citing App._[A.R.495_(Tr.9531:8-17)]); App._[A.R.576_at_28] (same); to escalate known or obvious risks, Add.1264 (citing App._[A.R.495_(Tr.9526:11-9528:19)]); App._[A.R.576_at_68] (same)[24]; "to provide credible challenge," Add.1240 (citing App._[A.R.495_(Tr.9278:14-16)]); App._[A.R.576_at_44] (same)[25]; and to be transparent and honest with examiners, App._[A.R.495_(Tr.9773:23-9777:25)]. She further testified that failure to be transparent and honest with examiners would hinder OCC examinations. App._[A.R.495_(Tr.9777:16-9778:13).]

> ii. *Petitioner's failure to implement effective controls was an unsafe or unsound practice.*

Substantial evidence supports the Comptroller's conclusion that Petitioner's failure to institute effective controls to prevent and detect sales practices misconduct was an unsafe or unsound practice. *Supra* Counterstatement of the Case, Part.III.C.1. Petitioner does not contest that the Community Bank's controls to prevent and detect sales practices misconduct were inadequate or that her failure

---

[24] Petitioner also acknowledged that "failure to timely disclose existing deficiencies in risk management in the Community Bank with respect to sales practices misconduct could cause substantial harm to the [B]ank." Add.1264 (citing App. _[A.R.495_(Tr.9527:15-18)]); App. _[A.R.576_at_68] (same.)
[25] Petitioner agreed she had a responsibility to credibly challenge the incentive compensation program, including sales goals, in post-hearing briefing. App._[A.R.550 (Br._at_104).] The Court should reject her attempt to now wish away this obligation.

49

to implement adequate controls was unsafe or unsound. *See* Pet. Br. at 26-28.

Instead, she argues that the Comptroller imposed "strict liability" on her and that

she bears no responsibility for the Community Bank's significant risk management

and control failures because other Bank officials, including the Chief Risk Officer,

had more direct oversight of risk management systems. *Id.*

These arguments are meritless. First, the Comptroller did not engage in an

analysis remotely resembling strict liability. As required by 12 U.S.C.

§ 1818(i)(2)(B) and (e)(1)(C), the Comptroller concluded Petitioner was reckless

and exhibited willful and continuing disregard in implementing inadequate

controls. Add.1289-90, 1293-94; App._[A.R.576_at_93-94, 97-98.][26] Second,

Petitioner's misconduct is no less actionable because others separately fell short.

*See Landry v. FDIC*, 204 F.3d 1125, 1139 (D.C. Cir. 2000) (concluding that the

fact that others may have been "more guilty" does not absolve individual from

responsibility for actions). Petitioner conceded that she was responsible for

implementing adequate controls. Add.1224 (citing App._[A.R.495_(Tr.9531:8-

---

[26] Petitioner's assertion that the Comptroller erred by failing to perform an "*ex ante*" analysis of the inadequacy of the controls misses the mark. Pet. Br. at 27-28. The controls were inadequate at the time of their implementation because, among other defects, they "detected only a small proportion of [sales practices misconduct] that existed in the Bank" and were not commensurate with the significant risks posed by the Community Bank's sales-oriented business model. Add.1249; App._[A.R.576_at_53.]

50

17)]); App._[A.R.576_at_28] (same.)  She did not, and the Court should not excuse this failure because others were at fault too.

> iii.  *Petitioner's failure to escalate known or obvious risks related to sales practices misconduct was an unsafe or unsound practice.*

The Comptroller correctly found that Petitioner engaged in unsafe or unsound practices because she failed to escalate risks related to sales practices misconduct.  Add.1263-69; App._[A.R.576_at_67-73.]  Specifically, the Comptroller found that Petitioner never escalated known or obvious sales practices misconduct risks to her superiors and that she continually downplayed the extent of sales practices misconduct in the Community Bank.  *Id.*

Petitioner argues that being slow or insufficiently aggressive in escalating risks is not an unsafe or unsound practice.  Pet. Br. at 29.  However, this argument distorts the Comptroller's conclusion.  Substantial evidence shows that Petitioner *never* escalated the significant risk of sales practices misconduct to Loughlin and instead continually downplayed that risk.  *Supra* Counterstatement of the Case, Part III.C.2.  Petitioner's complete failure to escalate a significant risk was an unsafe or unsound practice.

51

    *iv. Petitioner's failure to credibly challenge the incentive compensation program's unreasonable sales goals was an unsafe or unsound practice.*

   The Comptroller's conclusion that Petitioner engaged in an unsafe or unsound practice when she failed to credibly challenge the unreasonable sales goals in the Bank's incentive compensation program is supported by substantial evidence. *See supra* Counterstatement of the Case, Part III.C.3. Petitioner cannot disclaim her responsibility by asserting that Bank executives already knew about sales practices misconduct and that she could not unilaterally alter sales goals. Pet. Br. at 35-36. As Group Risk Officer, Petitioner had a responsibility to raise concerns to her superiors, escalate issues, and communicate alternative views. Add.1239-41; App._[A.R.576_at_43-45]; App._[R.Exh.11373_at_9]; *see supra* Counterstatement of the Case, Part III.C.3. She failed to take any of these actions. *Supra* Counterstatement of the Case Part III.C.3.

    *v. Petitioner's lack of candor with examiners was an unsafe or unsound practice.*

   Misleading bank examiners is an unsafe or unsound practice. *See, e.g., De la Fuente*, 332 F.3d at 1224 (holding that "[f]ailure to disclose relevant information to a government investigator" is an unsafe or unsound practice); *Seidman*, 37 F.3d at 936 (holding that "hindering" an "investigation" is an unsafe or unsound practice). Petitioner does not dispute this.

In her briefing to this Court, Petitioner stretches the bounds of plain meaning in an attempt to rehabilitate her false assertions and omissions. Substantial evidence flatly contradicts her arguments. The evidence supports the Comptroller's conclusions that Petitioner misled or made false statements to examiners when she: (1) stated that "no one loses their job because they did not meet sales goals"; (2) failed to disclose the true number of terminations relating to sales practices misconduct; (3) failed to disclose her knowledge of sales pressure; and (4) failed to disclose thresholds used in monitoring for sales practices misconduct. Add.1225-38; App._[A.R.576_at_29-42]; *supra* Counterstatement of the Case, Part III.C.4.

First, substantial evidence supports the Comptroller's conclusion that Petitioner falsely told examiners during the OCC's 2015 examinations of the Bank that Bank employees did not lose their jobs for failing to meet sales goals. Add.1231-35; App._[A.R.576_at_35-39.] At the hearing, Petitioner attempted to hedge her prior unqualified statement, testifying that she told examiners that no one loses their job *solely* because they did not meet sales goals. Add.1232 (citing App._[A.R.495_(Tr.9567:15-25)]); App._[A.R.576_at_36] (same.) The Comptroller and the ALJ appropriately determined that this testimony was not credible, as it was contradicted by examiner testimony, examiner notes, and Petitioner's own prior testimony. *See* Add.1234-35; App._[A.R.576_at_38-39];

53

App._[A.R.495_(Tr.706:2-8)]; App._[A.R.495_(Tr.2270:14-16)];

App._[OCC.Exh.1943_at_2, 6.]  This Court should accept these well-supported

credibility determinations.  *See Carter v. Dep't of Labor*, 108 F.4th 1028, 1033

(8th Cir. 2024).

Additionally, Petitioner's reference to a different response she provided to

examiners misconstrues the record.  Pet. Br. at 18-19.  Petitioner points to

comments she made prior to the meeting in question.  Add.1231 (citing

App._[OCC.Exh.1735]); App._[A.R.576_at_35] (same.)  Notably, at no point did

she disclose that employees had been terminated for failing to meet sales goals.  *Id.*

Furthermore, Petitioner continued to assert to the OCC as late as 2019 that Bank

"[e]mployees could not be terminated for failure to meeting sales goals."

Add.1235 n.39 (quoting App._[OCC.Exh.1943_at_6]); App._[A.R.576_at_39

n.39] (same.)

Second, Petitioner unpersuasively argues that she did not mislead examiners

when she failed to disclose the total number of terminations arising from sales

practices misconduct.  By her account, the discussion with examiners was limited

to sales practices misconduct in the Los Angeles area.  Pet. Br. at 15-17.  This

excuse is too clever by half.  The record flatly contradicts Petitioner's assertion

about the limited focus of the discussion in question.  App._[OCC.Exh.1734 at 2-

3] (reflecting discussion of a focus group that looked at instances of sales practices

54

misconduct "holistically" and demonstrating that the OCC directly asked about terminations since 2013 and asked to "see terminations for sales practices.") Moreover, examiners specifically had asked if there had been any terminations since an earlier group of 190 employees had been fired. App._[OCC.Exh.1734_at_3.] Examiners also asked to see a breakdown of all terminations related to sales practices. *Id.* Additionally, in describing this meeting, an OCC examiner testified that examiners "continued to ask questions" about the total number of terminations, App._[A.R.495_(Tr.736:21-25)]; that Petitioner's response was "false and misleading," App._[A.R.495_(Tr.736:8-12)]; and that there was no justification for Petitioner "not providing the information when I asked for it." App._[A.R.495_(Tr.738:5-6)]. This Court should reject Petitioner's invitation to ignore such evidence and excuse her misrepresentation.

Third, Petitioner unpersuasively asserts that her statement to OCC examiners during the 2015 examinations that she did not hear about sales pressure "at all," Add.1229 (citing App._[OCC.Exh.1734_at_4]); App._[A.R.576_at_33] (same), was in response to OCC questions about "her dialogues with personal bankers." Pet. Br. at 17-18. Petitioner cites no evidence to support her self-serving version of the exchange. And in any event, despite her obligation to be fully transparent with examiners regarding sales practices misconduct, Petitioner did not tell examiners about employee protests or petitions, that sales pressure continued to persist, or

55

that sales pressure was causing employees to engage in sales practices misconduct earlier in 2015. *Supra* Counterstatement of the Case, Part III.C.4. Petitioner herself testified that, between 2013 and 2016, there were "hotspots" with sales pressure due to unreasonable performance expectations. Add.1230 (citing App._[A.R._495_(Tr.9620:13-9621:7)]); App._[A.R.576_at_34] (same.) She did not tell examiners this.

Fourth, Petitioner does not—and cannot—dispute that she failed to disclose thresholds used in monitoring for sales practices misconduct. Pet. Br. at 20-21. Instead, Petitioner argues that examiners never asked about exact thresholds and therefore she did not have to disclose them. *Id.* This, too, is contradicted by the record. During the 2015 examinations, examiners directly asked Petitioner how simulated funding was detected, and they repeatedly asked about testing and controls for sales practices misconduct. Add.1236-37 (citing App._[OCC.Exh.1734_at_2]; App._[OCC.Exh.1771_at_3]; App._[A.R.576_at_41] (same); *see also* App._[OCC.Exh.2955_at_2]; App._[A.R.495_(Tr.731:24-732:5)]; App._[A.R.495_(Tr.733:9-14)]. Even so, Petitioner did not disclose the Sales and Service Conduct Oversight Team's use of proactive monitoring or the thresholds the Bank used in proactive monitoring. Add.1236-37 (citing App._[OCC.Exh.1734_at_2]; App._[OCC.Exh.1771_at_3]; App._[A.R.576_at_41]

(same.)  This omission was a material misrepresentation and an unsafe or unsound practice.[27]

2.    Petitioner engaged in violations of law.

The Comptroller concluded that Petitioner violated 18 U.S.C. §§ 1001(a) and 1517.[28]  Add.1275-76; App._[A.R.576_at_79-80.]  Substantial evidence supports these conclusions.

To establish a violation of section 1001(a), Enforcement Counsel must show that: (1) the defendant made a statement; (2) the statement was false, fictitious or fraudulent as the defendant knew; (3) the defendant made the statement knowingly and willfully; (4) the statement was within the jurisdiction of a federal agency; and (5) the statement was material.  *United States v. McKanry*, 628 F.3d 1010, 1018 (8th Cir. 2011).  Petitioner solely challenges the second element on the ground that it was not met because the statements were actually true.  Pet. Br. at 14-21.  Under section 1001, a statement is false "if it contains factual misrepresentations." *United States v. Salther*, 955 F.3d 666, 667 (8th Cir. 2020).  For the reasons stated above, *supra* Counterstatement of the Case, Part III.C.4, substantial evidence

_____

[27] Petitioner's reliance on *Seidman* is misplaced because here, unlike in *Seidman*, examiners directly questioned Petitioner about the relevant matter.  *Seidman*, 37 F.3d at 937 n.38.

[28] As discussed at *supra* Counterstatement of the Case, Part II, the misconduct element of a section 1818(e) prohibition and a section 1818(i) second-tier civil money penalty may be satisfied by establishing that the institution-affiliated party engaged in a violation of law.

Appellate Case: 25-1079      Page: 58      Date Filed: 07/21/2025 Entry ID: 5539505

demonstrates that Petitioner knowingly made false statements. *United States v. Moore*, 446 F.3d 671, 680 (7th Cir. 2006) (holding that statements that are "half-truths" or "[exclude] information necessary to make [a] statement accurate" violate § 1001); *United States v. Stewart*, 433 F.3d 273, 318 (2d Cir. 2006) (explaining that § 1001 includes duty to disclose information when speaking with investigators).[29] The second element is therefore satisfied.[30]

Similarly, to establish a violation of section 1517, Enforcement Counsel must show that Petitioner "corruptly obstruct[ed] or attempt[ed] to obstruct any examination of a financial institution by an agency of the United States with jurisdiction to conduct an examination of such financial institution." 18 U.S.C. § 1517. The term "corruptly" means that "the conduct must be engaged in voluntarily and intentionally, and with the bad purpose of accomplishing . . . an unlawful end or result," such as "obstructing [a] bank investigation." *United States v. Church*, 11 F. App'x 264, 268-69 (4th Cir. 2001). Lying to government agents

---

[29] Indeed, case law cited by Petitioner supports this conclusion. *United States v. Dale*, 782 F. Supp. 615, 626 (D.D.C. 1991) (holding that "deliberate failure to disclose material facts in the face of a specific duty to disclose" violates § 1001); *see also* Pet. Br. at 14. A second case cited by Petitioner—*Bronston v. United States*, 409 U.S. 352, 357 (1973)—is irrelevant because it interprets only the federal criminal perjury statute, 18 U.S.C. § 1621.

[30] Substantial evidence also demonstrates that the other elements were met: Petitioner knew her conduct was unlawful, as she testified she had to be honest and transparent with the OCC, App._[A.R.495_(Tr.9773:23-9774:9)]; the statements were in the jurisdiction of the OCC, 12 U.S.C. § 481; and the statements were material, App_[A.R.495_(Tr.732:18-733:1)].

"falls squarely" within section 1517.  *Id.* at 268.  The evidence detailed above

demonstrates that Petitioner lied to examiners, *see supra* Counterstatement of the

Case, Part III.C.4, and therefore violated this law.

### B.  Petitioner's misconduct caused actionable effects.

The Comptroller found that Petitioner's misconduct exacerbated and

prolonged the sales practices misconduct problem at the Bank and caused the Bank

to lose more than $3 billion, satisfying the financial loss element.  12 U.S.C.

§ 1818(e)(1)(B)(i); Add.1278-82; App._[A.R.576_at_82-86].[31]  Petitioner does not

contest the financial impact to the Bank caused by her misconduct.  This impact

included, in her words, "[a] relatively small $142 million [that] was . . . paid to

settle a class action on behalf of affected consumers."  Pet. Br. at 53.

_____

[31] As discussed at *supra* Counterstatement of the Case, Part II, the effect element of
a section 1818(e) prohibition action may be satisfied by showing that, "by reason
of" the misconduct, the institution at issue "has suffered or will probably suffer
financial loss or other damage."  12 U.S.C. § 1818(e)(1)(B).  Similarly, the effect
element of a section 1818(i) second-tier civil money penalty action may be
satisfied by showing that the misconduct "is part of a pattern of misconduct" or
that the misconduct "causes or is likely to cause more than a minimal loss to such
depository institution."  *Id.* § 1818(i)(2)(B)(ii).  Substantial evidence supports the
Comptroller's conclusion that Enforcement Counsel established the effect element
required for a second-tier civil money penalty by showing that Petitioner's
misconduct (1) caused more than minimal loss to the Bank, and (2) was part of a
pattern.  *See* Add.1295-99; App._[A.R.576_at_99-103]; *see also* 12 U.S.C.
§ 1818(i)(2)(B)(ii).  Petitioner does not contest the Comptroller's conclusion with
respect to the effect element for a second-tier civil money penalty.

59

Petitioner instead argues that a subset of the losses she caused—the regulatory fines and penalties—do not qualify as "loss or damage" within the meaning of the statute because such fines or penalties "would render the statute circular." Pet. Br. at 53. Plainly, fines and penalties are a form of "financial loss." *See* 12 U.S.C. § 1818(e)(1)(B)(i); *see also Ashton*, Nos. 16-015-E-I, 16-015-CMP I, 2017 WL 2334473, at *5 (FRB May 19, 2017); *Towe*, Nos. OCC-AA-EC-93-42, OCC-AA.EC-93-43, 1997 WL 689309, at *11 (OCC Oct. 1, 1997). Even if this Court were to accept her arguments about government fines and penalties, the class-action settlement independently satisfies the bank-loss prong.

Petitioner's misconduct also brought about significant harm to customers and eroded depositors' trust in the Bank. This supports the Comptroller's conclusion that by means of Petitioner's misconduct, the Bank's "depositors have been . . . prejudiced," thus providing a separate and independent basis on which the effect element is satisfied for purposes of a prohibition action. *See supra* Counterstatement of the Case, Part II; 12 U.S.C. § 1818(e)(1)(B)(ii); Add.1282-86; App._[A.R.576_at_86-90]. Petitioner admits that sales practices misconduct can erode customer trust, Add.1284 (citing App._[OCC.Exh.2509A_at_179:10-14]); App._[A.R.576_at_88] (same), and "cause consumer protection harms," Pet. Br. at 55, which included misuse of customers' personal information, adverse credit score impacts, and payment of unwarranted fees, Add.1284 (citing

60

App._[A.R.246_(MSD-543)]; App._[A.R.246_(MSD-663)]);

App._[A.R.576_at_88] (same).[32]  Despite these admissions, Petitioner argues that

significant harm to customers cannot support a finding of depositor prejudice[33]

asserting that an "erosion of trust" among customers "has nothing to do with

deposits."  Pet. Br. at 55 (citation modified).

The history of banking says otherwise.  Banking depends on widespread

trust among a Bank's customers; as that trust erodes, the risks of a bank run and a

bank failure increase.  *See* Rajkamal Iyer & Manju Puri, *Understanding Bank

Runs: The Importance of Depositor-Bank Relationships and Networks*, 102 AM.

ECON. REV. 4 (2012); *see also* IT'S A WONDERFUL LIFE, RKO Radio Pictures

(1946).  Substantial evidence demonstrates that Petitioner's misconduct enabled

and prolonged ongoing sales practices misconduct and that sales practices

misconduct damaged customers' trust in the Bank and in the banking system,

which satisfies the effect element.  *See Cousin*, No. AP 94-48, 1994 WL 621240, at

*15 (OTS Oct. 11, 1994), *aff'd*, 73 F.3d 1242 (2d Cir. 1996).

---

[32] The Bank has repeatedly admitted that sales practices misconduct harmed
customers and eroded their trust in the Bank.  App._[OCC.Exh.2327_at_31_¶32];
App._[A.R.246_(MSD-664)]; App._[A.R.246_(MSD-677).]
[33] A bank's depositors are part and parcel of its customer base.  *Cf.*
App._[A.R.246_(MSD-543)_at_1-2]; App._[A.R.246_(MSD-663)_at_17];
Add.720.; App._[A.R.348_at_720.] Additionally, the evidence shows that sales
practices misconduct occurred *in deposit accounts*.  App_[OCC.Exh.1636R.]

## III. Procedural Rulings Determining the Scope of the Proceedings Were in Accordance with Law and Not an Abuse of Discretion.

Under the applicable rules of practice and procedure, ALJs may exercise discretion to determine the scope of the proceedings. *See* 12 C.F.R. § 19.5 (authorizing ALJs, *inter alia*, to "receive relevant evidence," "regulate the course of the hearing," "consider and rule upon all procedural and other motions appropriate in an adjudicatory proceeding," and "do all other things necessary and appropriate to discharge the duties of a presiding officer"). Petitioner argues that the ALJ improperly excluded purportedly exculpatory material, including the OCC's public "Lessons Learned" report reviewing its supervision of Wells Fargo, testimony regarding an OCC examiner's email, and confidential OCC reports relating to potential sales practices misconduct at other banks. Pet. Br. at 55-57.

This Court should reject Petitioner's contentions. First, these evidentiary rulings do not amount to an abuse of discretion. Second, Petitioner fails to point to any particularized harms or manifest unfairness arising out of these evidentiary rulings. Third, even if the ALJ did err in connection with these rulings, those errors were harmless because, as part of his *de novo* review, the Comptroller reviewed and considered Petitioner's proffers related to the excluded reports and testimony. Add.1329-30; App._[A.R.576_at_133-34.] Admitting this purportedly

62

exculpatory evidence would not have altered the outcome. *See Pagel, Inc. v. SEC*, 803 F.2d 943, 947 (8th Cir. 1986); 5 U.S.C. § 706.

Petitioner also argues that the ALJ improperly disposed of hundreds of disputed facts on summary disposition without an on-the-record hearing, which she erroneously asserts is required by section 1818(e) and 5 U.S.C. § 554(a). Pet. Br. at 57-58. Petitioner alternatively argues that even if summary disposition were authorized, the ALJ's purported bias in resolving disputed facts at the summary disposition stage effectively denied her right to a fair hearing. Pet. Br. at 58. Both arguments lack merit.

First, section 1818 expressly allows for "summary judgment rulings where there are no disputes as to material facts of the case" for OCC administrative hearings under section 1818. *See* 12 U.S.C. § 1818 note.[34] Second, Petitioner does not point to anything in the record to challenge the presumption of an honest adjudicator, nor does she cite any evidence that would demonstrate bias under applicable case law. *See Partee v. Astrue,* 638 F.3d 860, 865 (8th Cir. 2011) ("there is a presumption of honesty and integrity in those serving as adjudicators") (citation modified)); *Ouachita Nat'l Bank v. Tosco Corp*., 686 F.2d 1291, 1300-01

---

[34] As part of his *de novo* review, the Comptroller considered all material facts offered at summary disposition and only relied on those material facts he independently determined were not in genuine dispute. Add.1208-09 n.4; App._[A.R.576_at_13-14_n.4]; *see also* 12 C.F.R. § 19.29(a)(1).

63

(8th Cir. 1982) (stating that a judge is presumed to be impartial and that a party alleging bias bears the substantial burden of identifying specific behavior on the part of the judge showing such bias), *aff'd in pertinent part on rehearing en banc*, 716 F.2d 485, 488 (8th Cir. 1983); *see also Liteky v. United States*, 510 U.S. 540, 555 (1991) ("opinions formed by the [ALJ] . . . do not constitute a basis for a bias . . . unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.").

## IV.    The Civil Money Penalty Is in Accordance with Law.

The Comptroller is statutorily empowered to "compromise, modify, or remit" a civil money penalty.  12 U.S.C. § 1818(i)(2)(F).  The Comptroller's interpretation of section 1818(i)(2)(F) as permitting the increase of the amount of a civil money penalty after the filing of a notice of charges is in accordance with law.  *Long v. Bd. of Governors of the Fed. Rsrv. Sys.*, 117 F.3d 1145, 1157-58 (10th Cir. 1997).

Petitioner's assertion that section 1818(i)(2)(F) only allows for a decrease of a civil money penalty is contrary to the plain language of the statute and to canons of statutory interpretation.  Pet. Br. at 58-60.  Dictionary definitions contemporaneous with FIRREA's passage establish that to *modify* is "to make basic or fundamental changes in [order] to give a new orientation to or to serve a

64

new end." *Modify*, Webster's Ninth New Collegiate Dictionary (9th ed. 1985).[35]

Further, to interpret *modify* as only allowing a reduction of the civil money penalty would fail to give separate effect to section 1818(i)(2)(F)'s usage of *remit*, which means "to release from the guilt or penalty of" or "to refrain from exacting." *Remit*, Webster's Ninth New Collegiate Dictionary (9th ed. 1985). *See United States v. Nordic Vill., Inc.*, 503 U.S. 30, 36 (1992) (it is a "settled rule that a statute must, if possible, be construed in such fashion that every word has some operative effect").

### A. The civil money penalty is supported by substantial evidence and does not violate due process.

Petitioner's assertion that the Comptroller raised the civil money penalty to retaliate against her for litigating her case, Pet. Br. at 60-61, is unsupported by the record evidence. As the Comptroller noted, a higher civil money penalty was warranted due to evidence adduced after the filing of the Notice. Add.1300; App._[A.R.576_at_104.] Regarding the scope of the sales practices problem, evidence was adduced that the Bank opened more than 18 million deposit accounts that never had any customer-initiated transactions. App._[A.R.246_(MSD-231_at_¶_17).][36] Additional evidence was also adduced about Petitioner's false

_____

[35] The term *modify* was introduced to the relevant statutory text with the passage of FIRREA. FIRREA § 907, 103 Stat. 183, 464 (1989) (codified at § 1818(i)(2)(F)).
[36] This figure is higher than the consultant's findings detailed above in part because it covers more years.

65

statements to the OCC and obstruction of OCC examinations.  Add.1225-38; App.\_[A.R.576\_at\_29-42]; *see supra* Counterstatement of the Case, Part III.C.4; *see also Long*, 117 F.3d at 1152 ("A determination of the appropriate monetary penalty depends on the facts and circumstances of the particular case at issue. . . ."). The evidence adduced after the filing of the Notice demonstrated the severity of the customer harm and the gravity of Petitioner's misdeeds. This provided a reasonable basis for the Comptroller to increase the civil money penalty. *See Long*, 117 F.3d at 1158 (concluding that, pursuant to § 1818(i)(2)(F), an "increase [to] the amount of a civil penalty [wa]s reasonable and in accordance with law" when supported by changed circumstances "after the Notice of Assessment [wa]s filed").

The evidence adduced after the Notice was filed, coupled with the fact that the civil money penalty imposed against Petitioner was well below the statutory cap,[37] establishes that the penalty does not violate the Due Process Clause. *See id.* at 1156 ("a penalty must be grossly excessive to run afoul of the Due Process Clause") (citation modified); *cf. id.* (concluding that $717,941 penalty—which was more than double the amount sought in the notice—did not violate due process where petitioner "knowingly and intentionally" engaged in misconduct,

---

[37] Even a single instance of misconduct persisting every day from January 1, 2013, through August 1, 2016, would produce a maximum statutory civil money penalty of over $55 million.  *See* Add.1302-03; App.\_[A.R.576\_at\_106-07].

"deliberately concealed" misconduct and failed to remedy it "for almost five years," and Federal banking agency was authorized to assess a maximum penalty of $45,600,000).[38]  Additionally, Petitioner does not—and could not—point to any evidence of any retaliatory intent from the Comptroller.

## B.    The Comptroller considered all statutory factors.

Contrary to Petitioner's assertions, in assessing the civil money penalty, the Comptroller fully considered the statutory factors set forth in section 1818(i)(2)(G) and determined that those factors did not weigh in favor of mitigating the penalty amount.  *See* Pet. Br. at 61-62; *but see* Add.1300-03; App._[A.R.576_at_104-07]. The Comptroller need not affirmatively prove the financial resources of Petitioner, "who obviously oppose[s] higher penalties and whose self-interest is served by

_____

[38] Petitioner makes a series of convoluted assertions on due process and the non-delegation doctrine without presenting meaningful argument.  Pet. Br. at 59-60. This court should deem these issues waived.  *Woodward v. Credit Service Int'l Corp.*, 132 F.4th 1047, 1057-58 (8th Cir. 2025) (holding that an argument is waived if not included in the statement of issues and not meaningfully argued in the brief).  To the extent this Court construes Petitioner's briefing as effectively arguing a lack of notice or procedural fairness in the administrative process related to the civil money penalty, this is unsupported by the record, and Petitioner has not demonstrated that she was prejudiced in any way.  *Long,* 117 F.3d at 1159 (concluding that petitioner's due process rights were not violated where he "received adequate notice the penalty could be increased" and he failed to show that he was prejudiced by the allegedly insufficient notice).  Petitioner was put on notice of the penalty increase in Enforcement Counsel's Motion for Summary Disposition, dated March 26, 2021, App._[A.R.246 (Br._at_199)], and she asserted in her exceptions that the increase was "legally improper and factually unfounded." App._[A.R.550 (Exceptions_at_285-86)]; App._[A.R.550 (Br._at_559-66).]

painting as grim a picture as possible of [her] respective financial condition[]."
*Stanley v. Bd. of Governors of Fed. Rsrv. Sys.*, 940 F.2d 267, 274 (7th Cir. 1991).
While Petitioner contends that she does not have the financial resources to pay the
civil money penalty, she has declined to provide a financial statement supported by
documentary evidence and has merely submitted a self-compiled statement without
any supporting documentation. Add.1301 (citing App._[A.R.495_(Tr.9500:6-
9501:11)]); App._[A.R.576_at_105] (same); App._[R.Exh.20974]. Meanwhile,
Enforcement Counsel adduced documentary evidence that Petitioner earned a
salary between $500,000 and $1.37 million every year between 2004 and 2016.
Add.1301 (citing App_[OCC.Exh.2055]); App._[A.R.576_at_105] (same.) Having
already found that Petitioner made false statements to the OCC, the Comptroller
did not find her contentions to credibly weigh against the evidence of a very high
income for an extended period of time. Add.1301-03; App._[A.R.576_at_105-07.]
Accordingly, the imposition and amount of the civil money penalty is supported by
substantial evidence and is neither arbitrary or capricious nor an abuse of
discretion. 5 U.S.C. § 706(2)(A), (E).

## CONCLUSION

The Petition for Review should be denied.

Appellate Case: 25-1079    Page: 69    Date Filed: 07/21/2025 Entry ID: 5539505

Respectfully submitted,

Stuart Feldstein, Acting Principal
Deputy Chief Counsel
Patricia S. Grady, Deputy Chief
Counsel
Peter C. Koch, Director for Litigation
*/s/ Daniel Prieve*
Daniel Prieve, Counsel
Hannah Hicks, Counsel
Derick Fong, Attorney
Kristin M. McManus, Attorney
Attorneys for Respondent Office of
the Comptroller of the Currency

## CERTIFICATE OF SERVICE

I, Daniel Prieve, counsel for Respondent Office of the Comptroller of the Currency, hereby certify that on July 18, 2025, I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<div style="margin-left:50%">

*/s/ Daniel Prieve*
Daniel Prieve
Counsel for Respondent Office of the
Comptroller of the Currency
400 7th Street S.W.
Washington, D.C. 20219

</div>

## CERTIFICATE OF COMPLIANCE PURSUANT TO RULE 32(g)

The undersigned counsel hereby certifies that:

1.      This brief complies with the type-volume litigation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,805 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

3.      This brief and the statutory addendum have been scanned for viruses and are virus-free.


*/s/ Daniel Prieve*
Daniel Prieve
Counsel for Respondent Office of the
Comptroller of the Currency
400 7th Street S.W.
Washington, D.C. 20219